**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>            Defendants. | Case No.: 1:22-cv-06978-AS<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED COMPLAINT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................3

III.    LEGAL ARGUMENT........................................................................................8

        A.      Heightened Pleading Standards Govern Plaintiff's Claims. ...................8

        B.      Plaintiff Cannot Plead an Actionable Statement or Item 303 Violation. .................9

                1.      The Challenged Statements Were True and Not Misleading......................9

                2.      Co-Diagnostics Did Not Violate Item 303....................................14

        C.      Plaintiff Cannot Plead the Requisite Strong Inference of Scienter.......................17

        D.      Any "Scheme" Claim and the Section 20(a) Claim Fail for the Same Reasons....20

IV.     CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)................................................................................................12

*Abuhamdan v. Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014).....................................................................................16

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) .............................................................................................3, 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).................................................................................................20

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022).....................................................................................8

*City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*,
2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)..........................................................................16

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .....................................................................13

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...............................................................................................17

*In re Ferroglobe PLC Sec. Litig.*,
2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020).....................................................................13

*Finger v. Pearson PLC*,
2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019)...................................................................19

*In re Gen. Elec. Sec. Litig.*,
2020 WL 2306434 (S.D.N.Y. May 7, 2020), *aff'd*, 844 F. App'x 385 (2d Cir.
2021) ....................................................................................................................................15

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)...............................................................................................18

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015).................................................................................15

*Loc. #817 IBT Pension Fund v. XPO Logistics, Inc.*,
2022 WL 2358414 (2d Cir. June 30, 2022) ........................................................................19

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ...............................................................................12

*In re MELA Sciences, Inc. Sec. Lit.*,
    2012 WL 4466604 (S.D.N.Y. Sep. 19, 2012)...................................................17, 20

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)....................................................................20

*Nguyen v. MaxPoint Interactive, Inc.*,
    234 F. Supp. 3d 540 (S.D.N.Y. 2017).....................................................................17

*In re Nokia Corp. Sec. Litig.*,
    2021 WL 1199030 ...................................................................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................2, 8, 10, 14

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .................................................................................17

*Schiro v. Cemex*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)....................................................................18

*Siegel v. Bos. Beer Co., Inc.*,
    2022 WL 17417111 (S.D.N.Y. Dec. 5, 2022) .......................................................13

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)...................................................................................14

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019)...............................................................12, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................8, 17

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)...................................................................................10

*Villare v. Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021).......................................................19

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B).................................................................................................8

15 U.S.C. § 78u-5 ............................................................................................................14

Private Securities Litigation Reform Act of 1995 ............................................................8

Securities Exchange Act of 1934 Sections 10(b) and 20(a) ...........................................................2

## I.    INTRODUCTION

Based solely on a disappointing quarterly earnings release, Plaintiff accuses Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company"), its CEO, Dwight Egan, and its CFO, Brian Brown (the "Defendants") of failing to disclose business trends that did not take shape until well after the statements Plaintiff challenges. But Defendants had no ability, or obligation under the federal securities laws, to have perfect prescience, and these fraud-by-hindsight claims fail.

Co-Diagnostics is a small, Utah-based public company that develops, manufactures, and sells proprietary diagnostic testing technology, including a polymerase chain reaction ("PCR") diagnostic test for COVID-19 (the "Logix test") that for several years has accounted for the vast majority of its revenue. Prior to 2020, the Company had a few diagnostic tests approved for sale but had never turned a profit. But with the emergence of COVID-19, Co-Diagnostics was able to use its existing, proprietary PCR technology to rapidly develop a high-performing COVID test that was among the first to receive clearance in multiple jurisdictions around the world. Sales soared, and revenue grew continuously from the spring of 2020 through the first quarter of 2022—waves of COVID infection came and went, but demand remained strong. And the Company put many of its new resources to work developing its next blockbuster product, in preparation for COVID's inevitable transition from pandemic to endemic threat.

All this gave the Defendants confidence in the Company's products and long-term prospects in the spring of 2022, even as the Omicron wave receded and testing and masking policies began to shift. On May 12, 2022, Defendants announced record earnings for the first quarter driven by strong Logix test sales, and expressed continued belief in "the long-term potential of our business and the demand for our products," but they also noted that the Company was "experiencing sizable fluctuations in order patterns" and that "changes in our operating environment and markets have restricted our near term visibility" making it difficult to "accurately

1

forecast [Logix] test sales through the balance of the year." Ex. 1[1] (5/12/22 Tr.), at 7.

Defendants' hesitance to provide guidance in the face of these changing conditions proved well-founded—on August 11, 2022, the Company announced second quarter revenue that was down significantly year over year, and the market reacted accordingly. With the wisdom that comes from knowing the outcome, Plaintiff now brings claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, asserting that Defendants' optimistic statements in May and June of 2022 about Co-Diagnostics' long-term prospects and demand for its range of products must have been false and misleading given the subsequent second quarter earnings release, and that the Form 10-Q filed on May 12, 2022 violated Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303; "Item 303") by failing to disclose "the uncertainty caused by the exhaustion of federal funding for COVID-19 testing" in March 2022. Amended Complaint ("AC"; Dkt. #31), ¶¶ 6, 50.

No facts support either assertion. Under Section 10(b), Plaintiff must plead, among other things, particularized facts showing (i) a materially false or misleading statement (or omission of a material fact required to be disclosed under Item 303); and (ii) a strong inference that each defendant acted with scienter (i.e., intent to deceive investors). But the Amended Complaint offers no such pleadings: no confidential witnesses attesting to Defendants' knowledge or facts inconsistent with the statements, no red flags, no motive for any Defendant—nothing at all beyond the innocuous fact of the lower second quarter revenue itself. This is insufficient to show that any challenged statement—all of which were statements of opinion subject to *Omnicare*'s[2] rigorous standard—was false or misleading, much less that any Defendant made them with intent to

---

[1] Defendants' Request for Judicial Notice ("RJN") explains the bases for considering materials beyond the AC. "Ex. __" refers to exhibits to the Greene Declaration. Unless otherwise indicated, all internal quotation marks and citations are omitted, and emphasis is in original.

[2] *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).

defraud. Indeed, the record before the Court is replete with evidence of good faith. At each point in time, the Defendants shared their best understanding of the Company's performance and prospects, and for eight consecutive quarters—through multiple waves of infection and changing government policies—the Company achieved quarterly revenue above $20 million, and met the quarterly revenue guidance it started providing with 2Q21. And when the spread of COVID variants and testing patterns worldwide changed enough in spring 2022 that it became difficult to provide reliable forecasts, the Defendants expressed that opinion to investors, explained what they were seeing in the market and why they no longer felt comfortable providing guidance, and acted accordingly. No facts suggest they did not genuinely believe the challenged statements or stood to gain from misleading investors. And the fact that Defendants held their shares throughout the class period, and executed a buyback plan, evidence strong belief in the Company and its products.

Plaintiff wants someone to blame for its loss, but investing in an emerging diagnostic testing company that derives nearly all of its current revenue from COVID testing sales came with obvious and well-disclosed risks—namely, that demand for COVID testing would continue to fluctuate as the world adjusted to living with COVID. That is precisely what happened. A disappointing earnings report does not establish the falsity of earlier positive statements, and "Defendants' lack of clairvoyance simply does not constitute securities fraud." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). Because Plaintiff cannot plead that any challenged statement was false or misleading, that any omission violated Item 303, or that any Defendant acted with scienter, the AC should be dismissed in its entirety with prejudice.

## II.    BACKGROUND

Co-Diagnostics develops and sells proprietary diagnostic testing technology with the goal of making gold-standard molecular testing "accessible and affordable around the world." Ex. 2 (6/15/22 Tr.), at 14. Its patented Co-Primer technology represents a significant advancement in

PCR testing—the gold standard for diagnosing many diseases—simplifying historically complex procedures that have in the past kept PCR prices high and its availability limited. *See* Ex. 3 (2021 10-K), at 5. Prior to 2020, the Company was primarily focused on using its novel PCR technology to develop and sell affordable tests to combat diseases prevalent in the developing world—tuberculosis, hepatitis B and C, Malaria, dengue, Zika, etc. *Id.* But when COVID emerged in early 2020, this same technology enabled the Company to quickly develop a high-performing diagnostic PCR test for COVID. On February 24, 2020, the Logix test became the first U.S.-based COVID test to obtain regulatory clearance in the European Union and other markets that accept the CE-mark, and on April 6, 2020, the test received Emergency Use Authorization from the FDA, allowing it to be sold to certified laboratories in the U.S. as well. *Id.*

It was the right technology at the right time—sales soared as people around the world turned to testing to protect themselves and reduce the virus' spread. Through March 2022, the Company sold more than 30,000,000 COVID tests in more than 50 countries. *Id.* at 5. Annual revenue increased from just $215,000 in 2019, to $74.5 million in 2020, to $97.9 million in 2021, with roughly half of that 2021 revenue coming from abroad. *Id.* at 20, 35; Ex. 4 (2020 10-K), at 19. New variants and waves of infection came and went, making waves in the testing market, but overall demand for testing remained strong through the first two years of COVID.

Even amidst this success, Co-Diagnostics was realistic and clear with investors about the risks inherent in its COVID-driven rise. The 2021 10-K, filed March 24, 2022, warned that:

> ***We have a limited commercial history upon which to base our prospects and are not certain that we will sustain profitability in the future.*** . . . We were able to achieve net income during the prior two fiscal years because we were able to develop, market and profitably sell our . . . COVID-19 tests, but we do not have any way to predict how long our market for that test will continue. . . .
>
> ***Our near-term success has been dependent on the market for our COVID-19 tests and future success is dependent on continued demand for COVID-19 diagnostics***

> ***and upon our ability to develop and market other commercially accepted diagnostic tests.*** Our future success will depend, in part, on the continued market for COVID-19 tests, our ability to develop and sell sufficient quantities of other diagnostics tests, and our ability to successfully receive regulatory approval for and profitably market our [new at-home PCR platform and multi-plex tests]. . . .

Ex. 3 (2021 10-K), at 13. Indeed, Co-Diagnostics recognized early on the need to plan for "what happens after COVID traverses from a pandemic to an endemic phase," and from 2020 onward it has devoted significant resources to developing a new at-home and point of care diagnostic testing platform and kits that will enable PCR testing for COVID (currently in clinical trials) and other diseases without having to send samples to a lab. "Multi-plex" test kits currently in development will also allow the platform to test for multiple diseases at once. Ex. 5 (3/24/22 Tr.), at 13. Defendants have long believed this platform "will win in a post-COVID environment," making affordable, gold-standard PCR diagnostics available at home, at the point-of-care, and to underserved populations around the world. *Id.*

The winter of 2021-22 brought another significant and particularly contagious wave of COVID infection (Omicron) that drove test sales even higher, but it left many people fatigued from years of caution and restraint.[3] In retrospect, this proved to be a turning point—the U.S. began moving away from masking and testing mandates and towards something more like pre-COVID living. Amid much public debate, Congress chose not to extend federal funding for COVID vaccines, treatment, and testing, leading many to worry that the country would be insufficiently prepared for the next, inevitable COVID wave. *See id.*; AC ¶¶ 41-42. This change in policy, and its potential effects on test manufacturers, was widely discussed in the press at the time. *See, e.g.*, Matthew Perrone, "Experts worry about costs as free COVID testing comes to end in May,"

---

[3] *See* Paul LeBlanc, "Here's what the White House's grim coronavirus warning means for you," *CNN*, May 9, 2022, *https://www.cnn.com/2022/05/09/politics/white-house-100-million-covid-infections-projection-what-matters/index.html*.

*PBS.org*, Apr. 11, 2023, *https://www.pbs.org/newshour/health/experts-worry-about-costs-as-free-covid-testing-comes-to-end-in-may* ("The U.S. struggled to build up its test manufacturing capacity during the first two years of the pandemic, with demand waning after each surge. Experts worry that the country could again be caught flat-footed after the federal government stops purchasing tests in bulk.").

But these changes had not yet coalesced into a clear pattern in the spring and early summer of 2022. Logix test sales were up year-over-year in 1Q22, and the Company remained confident both in long-term demand for the Logix test, as new COVID variants inevitably emerged, as well as in its new at-home testing platform and multi-plex kits, which were moving closer to regulatory approval. Thus, when an analyst asked on the March 24, 2022 earnings call about the expected impact of the exhaustion of federal COVID funding, Mr. Egan explained his view that while it might have some effect, the Company felt confident about long-term demand. *See, e.g.*, Ex. 5 (3/24/22 Tr.), at 13 ("COVID is so pernicious in terms of its lethality that . . . [it] will have to be a part of the mix [along with flu and RSV] of what people are tested for" moving forward).

In March, the Company authorized an up to $30 million share repurchase program "reflect[ing] confidence in our balance sheet . . . [and] our positive outlook for the future of Co-Diagnostics," which it began to execute in 2Q22. *Id.* at 8; Ex. 6 (8/11/22 Tr.), at 7. And on May 12, 2022 (the beginning of the alleged Class Period), Defendants announced record earnings for the first quarter "primarily driven by increased global sales of our [Logix tests]." Ex. 1 (5/12/22 Tr.), at 6. However, they also identified recent developments that were making it difficult to predict near-term sales, and announced they would not be providing guidance until visibility improved:

> [O]ur ability to accurately forecast [Logix test] sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any

6

level of precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]

AC ¶ 44; *see also id.* ¶ 45 ("[W]e are experiencing sizable fluctuations in order patterns . . . that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve."). Nonetheless, Defendants "remain[ed] very confident about the long-term potential of our business and the demand for our products" (*id.* ¶ 44)—COVID was not going away, and it had opened up a new at-home testing market for which the Company's multi-plex platform was perfectly suited. Defendants explained that they viewed the changes in order patterns as a matter of timing rather than long-term demand, and while the short-term was hard to predict they still believed there would be "some level of demand for the remainder of the year." *Id.* ¶¶ 46-47. Mr. Egan and Mr. Brown expressed similar optimism at the Sidoti Summer Small Cap Virtual Investor Conference on June 15, 2022. AC ¶¶ 51-54; Ex. 2 (6/15/22 Tr.).

On August 11, 2022, Defendants announced second quarter revenue of just $5 million, down significantly year over year and from the previous quarter. AC ¶ 7; Ex. 11 (8/11/22 8-K). On the earnings call, Mr. Egan identified several factors the Company believed contributed to these disappointing results, "including a reduction in mandated testing for travel and public venues, a reduction in public funding assistance for testing programs and an increase in overall weariness for the disruption to daily life after a multiyear pandemic, specifically the Omicron variant earlier this year," and he noted that "[t]his dramatic shift in testing behavior was widely felt across the diagnostics industry." Ex. 6 (8/11/22 Tr.), at 4-5. But he also reaffirmed their confidence in long-term demand:

> Experts believe other waves of COVID variants are all but inevitable. However, the timing and severity are impossible to predict with every new variant . . . . All evidence to date points to a resilient, mutable virus with no indication it will go away and that we will be living with it for years to come. Trends observed since

the original outbreak of the virus suggest a buildup in the number of positive cases increasing as we move further into the fall and winter seasons. While there is significant public resistance against future lockdowns and other mitigation measures, we are confident that reliable, accurate testing will remain a critical line of defense to identify and counter future waves of the virus. (*Id.* at 5)

Co-Diagnostics' stock price dropped following the 2Q22 earnings announcement, and the first of these consolidated securities class actions was filed just five days later.

## III.    LEGAL ARGUMENT

### A.  Heightened Pleading Standards Govern Plaintiff's Claims.

Securities fraud claims—whether based on allegedly false and misleading statements or an alleged Item 303 violation—must meet the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (the "Reform Act") and Rule 9(b). *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 81, 95 (S.D.N.Y. 2022). To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must, among other things, (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed" (15 U.S.C. § 78u-4(b)(1)(B)) (or allege with particularity the elements of Item 303); and (2) "state with particularity facts giving rise to a strong inference" of scienter—that the particular defendant made each allegedly false or misleading statement, or Item 303 violation, intentionally or with deliberate recklessness (*id.* § 78u-4(b)(2)(A)). A "strong inference" is "more than merely plausible or reasonable"; it must be "powerful" and "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007). And in analyzing both falsity and scienter, courts must go beyond the pleadings to consider the full factual context of the challenged statements. *Id.* at 323-24; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

190-91 (2015); *see also* RJN. Here, Plaintiff cannot meet these heightened pleading standards.

### B. Plaintiff Cannot Plead an Actionable Statement or Item 303 Violation.

#### 1. The Challenged Statements Were True and Not Misleading.

Plaintiff challenges statements made on just two dates—May 12, 2022 (when Co-Diagnostics announced its 1Q22 earnings), and June 15, 2022 (when Mr. Egan and Mr. Brown participated in a Q&A session at an investor conference, which Plaintiff does not and cannot allege was reported on by any news outlet or securities analyst)—and of two types: (1) statements describing the Company's past performance and interpreting current market conditions; and (2) forward-looking statements expressing optimism about the Company's prospects and describing Defendants' expectations regarding future demand for its products. Plaintiff argues each statement was false or misleading for the same reason: "at the time Defendants made these representations, Co-Dx was experiencing a significant falloff in demand for its [Logix test]." AC ¶ 48.

This theory is fundamentally flawed. First, it is based entirely on speculation—no facts establish when or how much Logix test orders were down at any point during the second quarter (or how that compared to usual order patterns), much less what, if anything, any Defendant knew about it at any time. Second, even assuming a significant "falloff" was apparent earlier in the quarter, Plaintiff fails to show how this would have been inconsistent with Defendants' caution about its short-term prospects or Defendants' optimism about the Company's long-term prospects. As detailed below, no facts demonstrate that any statement was false or misleading.

***Statements Characterizing the Current COVID-19 Test Market and Past Performance.***
First, Plaintiff challenges statements describing current market conditions and the Company's past financial performance:

- that they had decided not to provide quarterly guidance moving forward because "our ability to accurately forecast sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of

new variants, and persistently low vaccination rates" (May 12; AC ¶¶ 44, 45);

- that "we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter" and that this "is more about the timing . . . not necessarily a demand issue that we're seeing" (May 12; ¶¶ 44-47); and

- reporting year-over-year quarterly revenue and Adjusted EBITDA growth, and characterizing this as "one of the most impressive things we've been able to do" and "show[ing] the strength of . . . what we've built here" (June 15; ¶¶ 53-54).

All of these statements expressed Defendants' subjective views and characterizations of matters open to interpretation (i.e., what they were seeing happening in the COVID-testing market); as such, they constitute statements of opinion under the securities laws. *See Omnicare*, 575 U.S. at 183; *Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016). For a statement of opinion to be false or misleading under *Omnicare*, Plaintiff must do more than allege that it turned out to be incorrect: Plaintiff must plead particularized facts showing that (1) the speaker did not actually hold the stated belief at the time; or (2) a material omitted fact rendered the opinion "misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 188-89, 194. This is "no small task." *Id.* Moreover, "A reasonable investor understands . . . that opinions sometimes rest on a weighing of competing facts, and that it is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Tongue*, 816 F.3d at 210.

Here, Plaintiff offers no factual allegations beyond the fact of the disappointing second quarter earnings announcement itself, relying entirely on the hindsight assumption that because Defendants announced disappointing second quarter revenue on August 11, 2022, they must not have believed the positive opinions they expressed on May 12 and June 15, and the information available to them then must have been inconsistent with those opinions.

This does not follow logically and is insufficient as a matter of law to plead falsity. The fact that Logix test sales for the full second quarter ultimately came in lower than previous quarters

10

is entirely consistent with what the Defendants told the market in May and June: that various factors—including decreased mask mandates, continued emergence and spread of new variants, and low vaccination rates worldwide—were causing "sizeable fluctuations in order patterns" across geographies that made it difficult to predict short-term financial performance, but that the Defendants believed this to be more an issue of timing than long-term demand. *See, e.g.*, AC ¶ 51 ("[T]he experts tell us that . . . the covid virus is gonna be with us until the end of time, and so . . . I think we're gonna have continued demand [for testing]"). No facts suggest that the factors Defendants identified were not actually impacting order patterns, that these factors had not in fact diminished the Company's ability to accurately forecast sales for the rest of the year, or that this was not truly the reason the Company stopped providing quarterly financial guidance at that time. Plaintiff speculates that Defendants must have known their statements were misleading because Mr. Egan later mentioned that the Company was "able to monitor the daily influx of demand for our tests" (*id.* ¶ 66), but lower sales orders in the short-term is not the same as a long-term reduction in demand, and COVID test sales had experienced sharp ups and down before. Indeed, even assuming Defendants did observe a significant fall off in Logix test sales early in the second quarter (and Plaintiff does not show this), such a fall off would have been consistent with their stated belief that recent "fluctuations in order patterns" were "more about timing and being able to forecast the timing of orders" and "not necessarily a demand issue." AC ¶ 51. Because the AC pleads no facts indicating Defendants did not actually believe these opinion statements, or that they were misleading in light of particular omitted facts, they cannot ground Plaintiff's claims.

The same is true for Mr. Brown's statements at the Sidoti conference, reporting Co-Diagnostics' strong 1Q22 results and characterizing them as "one of the most impressive things we've been able to do" and "show[ing] the strength of . . . what we've built." AC ¶¶ 53-54. The

11

reported quarterly revenue and Adjusted EBITDA were true statements of fact—Plaintiff does not contest this. They also were not misleading, particularly in the context of the Company's statements just weeks before explaining that changing order patterns were making it impossible to provide near-term guidance. As for characterizations of these results as "strong" and "impressive," these were both true and not misleading statements of opinion and non-actionable "puffery"— "optimistic statement[s] . . .  so vague, broad, and non-specific that a reasonable investor would not rely on [them]." *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at \*17; *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable."). Mr. Brown truly believed that Co-Diagnostics' ability to maintain Adjusted EBITDA even as it took on significant additional expenses following recent acquisitions was impressive and demonstrated the Company's long-term strength; this makes abundant sense, and no facts suggest otherwise. *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 365 (S.D.N.Y. 2019) ("the present has never looked as … successful thanks to our product and marketing, and resulting record sales" is puffery).

*Forward-looking statements expressing optimism and describing Defendants' expectations.* The same is true with respect to the second category—forward-looking statements expressing Defendants' optimistic views about the Company's future prospects: "we remain very confident about the long-term potential of our business and the demand for our products" (May 12; ¶¶ 44, 45); agreeing with the statement that "[Defendants] don't expect demand for COVID-19 testing to go away in 2022. You're just not sure the timing of when you'll get orders, but you still think there will be some level of demand for the remainder of the year" (May 12; ¶ 47); and "I think we're gonna have continued demand, where every kind of technology, the centralized lab type approach as well as the at home point of care, they're all gonna [be] used to their highest and

12

best use, and they're gonna be complementary to each other" (June 15; ¶ 51).

These too are opinions subject to *Omnicare*'s demanding standard; each also is a forward-looking statement protected under the Reform Act's safe harbor, and many are non-actionable puffery. *See Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("[E]xpressions of optimism [and] projections about the future are quintessential opinion statements."); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) ("continued strong demand" does not "convey any material information" because it "does not contain information of reasonable specificity or impart a definite indicia of performance"). No factual pleadings suggest the Defendants did not actually "remain confident" about the Company's long-term potential and demand for its products, or that any particular contemporaneous facts rendered these vague expressions of optimism misleading in context. *See, e.g.*, *Siegel v. Bos. Beer Co., Inc.*, 2022 WL 17417111, at *7 (S.D.N.Y. Dec. 5, 2022) (statements about anticipated continued demand for hard seltzer as COVID ebbed were true and not misleading opinions); *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *9 (S.D.N.Y. Nov. 10, 2020) (same re stated "expect[ation]" that demand would "continue delivering steady growth for silicon metal"). To the contrary, the Defendants clearly explained why they expected COVID to continue to be a significant global issue for years to come, with new variants driving continued demand for tests, and how the centralized-lab-based Logix test and at-home multi-plex testing platform would be complementary tools in that ongoing fight against COVID. *See supra* pp.6-8. Plaintiff claims that Mr. Egan later "admitted" on the August 11, 2022 earnings call that "Defendants were aware of the reduced demand for their [Logix test] throughout the quarter," but all Mr. Egan actually said was that the Company "keep[s] a close eye on" demand (as one would expect) and saw it fall off "as the second quarter progressed." AC ¶ 57. This is too vague to undercut any challenged statement: it says nothing about how sales orders

13

looked on May 12 or June 15 (or how, if at all, that varied from expectations or usual patterns), much less what any particular Defendant knew or believed the order data meant. And in any case, the challenged statements expressed Defendants' opinions regarding long-term—not short-term— demand for Co-Diagnostics' products, and the Defendants clearly explained on the August 11 call that they remained optimistic about those future prospects even after the disappointing second quarter results. *See, e.g.*, *supra* p.7-8; Ex. 6 (8/11/22 Tr.), at 8 ("[A]s we head into the fall and into the winter . . . . COVID is going to be with us for many, many years to come. . . . We think . . . we'll see testing continue to persist and be one of the primary parts of sort of a trimodal defense").

Moreover, each of these true and not misleading statements of opinion was also a protected forward-looking statement. The Reform Act's safe harbor protects forward-looking statements that are *either* (a) identified as such and accompanied by meaningful cautionary language; *or* (b) immaterial, *or* (c) not made with actual knowledge of falsity. *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); 15 U.S.C. § 78u-5; *see also, e.g.*, *Skechers*, 412 F. Supp. 3d at 365 ("[w]e believe that our accelerated growth trend will [continue]" is protected forward-looking statement). Here, each statement is separately protected under both the first and third prongs of this disjunctive standard. Each statement was identified as forward-looking and accompanied by meaningful cautionary language. *See supra* pp.4-5 (quoting cautionary language in 2021 10-K); Ex. 3 (2021 10-K), at 3-4, 13-14; Ex. 7 (5/12/22 Form 8-K), at 4-5 (identifying forward-looking statements and referring investors to cautionary language in Form 10-K); Ex. 1 (5/12/22 Tr.), at 4 (same); Ex. 2 (6/15/22 Tr.), at 2 (same). And no statement was made with actual knowledge of its falsity. *See supra* pp.9-14 (no allegations showing lack of genuine belief under *Omnicare*) and *infra* pp.17-20 (no strong inference of scienter). Accordingly, none of these forward-looking statements—each of which was also a true and not misleading opinion—can form the basis for Plaintiff's claims.

### 2. Co-Diagnostics Did Not Violate Item 303.

14

Plaintiff's Item 303 allegations fare no better. Item 303 requires that a Form 10-Q "describe any *known* trends or uncertainties that have had or that are reasonably likely to have a *material* . . . unfavorable impact on net sales or revenues . . . ." 17 C.F.R. § 229.303(b)(2)(ii) (emphasis added). This duty is limited: "where an outcome is merely speculative, the duty to disclose does not attach." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015). And while in this Circuit[4] "[a] violation of Item 303 can constitute a material omission under Rule 10b-5, [] plaintiffs must also sufficiently plead the other elements of such a claim, including scienter." *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *8 (S.D.N.Y. May 7, 2020), *aff'd*, 844 F. App'x 385 (2d Cir. 2021). Here, Plaintiff claims Defendants violated Item 303 by failing to discuss in the 1Q22 10-Q "the uncertainty caused by the exhaustion of federal funding for COVID-19 testing by the end of March 2022," which "was reasonably likely to have, and by May 12, 2022, already had a material unfavorable impact on Co-Dx's revenues." AC ¶¶ 49-50.

This dramatically overstates the importance of federal funding to Co-Diagnostics' revenue and finds no support in the factual pleadings. As detailed above, the Company thoughtfully disclosed in its public filings the most significant risks the Company faced, including that "we have a limited commercial history," "our near-term success has been dependent on the market for our COVID-19 tests," and "we do not have any way to predict how long our market for that test will continue." *Supra* pp.4-5 (quoting 2021 10-K); Ex. 8 (1Q22 10-Q), at 16 (incorporating 2021 10-K by reference). Co-Diagnostics appropriately identified and discussed these risks and uncertainties because they were well-known to management and had the potential to materially impact the Company's sales and earnings in the future. *See, e.g., Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *19 (S.D.N.Y. May 19, 2023) (dismissing Item 303 claim

---

[4] Defendants note the Supreme Court has taken up this issue this term in light of a circuit split.

where company made adequate "disclosures about the uncertainties and trends it was facing as a result of the COVID-19 pandemic").

By contrast, the widely publicized exhaustion of federal funding for COVID tests, by itself, was not an "uncertainty" that was reasonably likely to have—or that had already had—a material impact on Co-Diagnostics' revenue when the 1Q22 10-Q was filed on May 12, 2022. As discussed above, close to half of the Company's revenue was derived from foreign sales in 2021 and the first quarter of 2022, and its customer base was diverse. *Supra* p.4. No factual pleadings suggest that reduced federal funding for testing in the U.S. (i) was likely to materially impact Co-Diagnostics' revenue; (ii) in fact had such an effect (by May 12, 2022, or at any other time); or (iii) that the Defendants should have expected it to. Plaintiff appears to rely entirely on Mr. Egan's backwards-looking statement on August 11, 2022 that a reduction in "public funding assistance programs" (not simply U.S. federal funding) was one of *several* factors the Company believed contributed to the disappointing second quarter earnings—along with "a reduction in mandated testing . . . and an increase in overall weariness for the disruption of daily life after a multiyear pandemic." Ex. 6 (8/11/22 Tr.), at 4. But Mr. Egan did not identify any of these factors individually as material, and he also stated that government funding "has not been the big driver of what we've done for the last 2.5 years. . . . [w]e have serviced more private oriented market and an international market." *Id.* at 9-10. Plaintiff's failure to plead any facts showing the magnitude of the alleged revenue impact from reduced federal funding or how it was material relative to the Company's overall revenue is fatal. *See, e.g.*, *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, 2019 WL 452051, at *8 (S.D.N.Y. Feb. 5, 2019) (dismissing 303 claim that "failed to plead facts with sufficient particularity to explain how or why [contract cancellation] would necessarily have a material, detrimental effect on financial operations" or the "anticipated magnitude . . . in light of

16

the totality of [defendant's] activity"); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206 (D. Conn. 2014) (dismissing 303 claim where allegations of sales decline were "too vague" to infer materiality). Even if Co-Diagnostics had seen some revenue impact from reduced federal funding between the end of March and mid-May 2022 (and no facts suggest this), courts in this district consistently hold that this is too short a period to establish a trend or uncertainty. *See Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546–47 (S.D.N.Y. 2017) (collecting cases).

### C. Plaintiff Cannot Plead the Requisite Strong Inference of Scienter.

Plaintiff's claims also fail for another, independent reason—lack of scienter. To plead scienter, Plaintiff must state "with particularity" facts giving rise to a "strong inference" that each Defendant acted with "an intent to deceive, manipulate, or defraud" with respect to each challenged statement. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). In the Second Circuit, this is typically done by alleging facts showing either (i) motive and opportunity for fraud or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Either way, the strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Unlike other motions to dismiss, this "inherently comparative" inquiry requires the court to holistically weigh "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323-24.

Here, there is no motive, and non-fraudulent inferences abound. Neither Mr. Egan nor Mr. Brown is alleged to have sold stock at any point during the class period; indeed, each increased his stock holdings during that time. *See* Ex. 10 (5/23/22 Egan Form 4); Ex. 9 (5/23/22 Brown Form 4). This cuts strongly against scienter and confirms that they believed in Co-Diagnostics' prospects and the long-term value of its stock. *See Acito*, 47 F.3d at 54 (lack of stock sales undermines

17

scienter); *In re MELA Sciences, Inc. Sec. Lit.*, 2012 WL 4466604, at *5 (S.D.N.Y. Sep. 19, 2012) (increased holdings "inconsistent with" scienter); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no scienter where insiders "miss[ed] the boat"). Why would Defendants, who Plaintiff claims were intentionally artificially inflating the stock price and allegedly knew Logix test sales had sharply declined, set themselves up to be victims of their own fraud by increasing and holding their stock beyond the second quarter earnings announcement they allegedly knew would report low revenue? Plaintiff cannot say. Similarly, why would Defendants have poured limited corporate resources into repurchasing stock at a price they allegedly knew was artificially inflated and would soon fall? And why would they do so while maintaining their stock holdings and not personally benefiting from the alleged fraud in any way? They would not have. The far more compelling—and only reasonable—inference is that they genuinely believed in the long-term prospects of the Company and that the stock price would continue to climb.

Against these strong inferences of good faith, Plaintiff's allegations are exceptionally weak. Plaintiff offers no particularized scienter allegations with respect to Mr. Egan or Mr. Brown—much less any alleged motive—relying instead on vague, circumstantial allegations of recklessness. But "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *See Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001). Yet Plaintiff's theory boils down to the conclusory assertion that Mr. Egan and Mr. Brown must have known the challenged statements were false or misleading at the time (and intended the alleged Item 303 violation) because they "had full access to the Company's books and records" and Logix test sales were important to the Company's financial performance. AC ¶¶ 65-75.

This is insufficient as a matter of law. The fact of a defendant's high-level role at a company cannot by itself show scienter. *See, e.g.*, *Schiro v. Cemex*, 396 F. Supp. 3d 283, 307-08 (S.D.N.Y.

18

2019) (no inference of scienter based on senior position). Nor can the core operations doctrine—or the magnitude of the drop in revenue—support a strong inference of scienter where, as here, Plaintiff has not provided "specific factual allegations linking Defendants to the alleged fraud." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at \*23 (S.D.N.Y. Sept. 21, 2021) (dismissing in part because core operations alone cannot show scienter). The mere facts that (i) Logix test sales were important to the Company and (ii) revenue dropped significantly in 2Q22, do not suggest anything about what any Defendant knew or believed when they made the challenged statements on May 12 and June 15, 2022, and cannot provide the particularized allegations necessary to raise a strong inference of scienter. *See, e.g.*, *Finger v. Pearson PLC*, 2019 WL 10632904, at \*14 (S.D.N.Y. Sept. 16, 2019) (core operations and size of later impairment insufficient to show scienter).

Finally, no facts suggest Defendants acted with scienter by not including in the 1Q22 10-Q that certain federal funding for COVID services ended in March 2022. As previously discussed, this was just one of several factors Mr. Egan later identified as having likely contributed to the 2Q22 drop in revenue, and he clarified that government funding "has not been the big driver of what we've done for the last 2.5 years. . . . [w]e have serviced more private oriented market and an international market." *Supra* p.16. And the fact that it was widely publicized (and raised by an analyst on the 4Q21 earnings call) makes it particularly farfetched that any Defendant would have sought to somehow deceive investors by omitting it from their filings and discussions. For these reasons, Plaintiff cannot plead a strong inference of scienter with respect to its Item 303 claim. *See, e.g.*, *Loc. #817 IBT Pension Fund v. XPO Logistics, Inc.*, 2022 WL 2358414, at \*4 (2d Cir. June 30, 2022) (dismissing Item 303 claim for lack of scienter).

A motive-less alleged fraud rarely survives the Reform Act's strict scrutiny, and Plaintiff's allegations support this maxim. Here, the most compelling inference is that the Defendants truly

19

believed their positive statements about "the long-term potential of our business and the demand for our products" (AC ¶ 44) even when volatility in the diagnostic testing market made it hard to forecast short-term demand. In contrast, the posited fraud makes no sense, particularly when the Defendants maintained their stock holdings rather than selling, and did not personally profit from the alleged fraud in any way. *See In re MELA*, 2012 WL 4466604, at *6 ("[A]ny . . . strong circumstantial evidence of conscious misbehavior or recklessness is negated by defendants' . . . holding" of shares during the class period). Because Plaintiff fails to plead a strong inference of scienter as to any Defendant, all of its claims must be dismissed.

### D.  Any "Scheme" Claim and the Section 20(a) Claim Fail for the Same Reasons.

Any "scheme liability" claim Plaintiff purports to assert—and the AC's non-specific invocation of "Rule 10b-5" does not appear to do so—fails for the same reasons. A scheme claim under Rule 10b-5(a) or (c) carries the same elements as a 10b-5(b) claim, except that a "deceptive or manipulative act" in furtherance of a fraudulent scheme replaces a false or misleading statement. *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). The AC does not assert any facts separate from the challenged statements that could even theoretically constitute deceptive conduct. Thus, any scheme claim fails for the same reasons as the Rule 10b-5(b) claim—failure to plead deceptive conduct, or scienter, with respect to any Defendant.

Plaintiff's § 20(a) claim likewise fails both because it cannot state a § 10(b) primary violation and because it fails to allege any facts showing either individual defendant "controlled" Co-Diagnostics. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## IV.    CONCLUSION

Plaintiff has had ample opportunity to plead a claim but cannot, due to the fatal flaws detailed above. Accordingly, the Court should dismiss the AC in its entirety with prejudice.

Dated: October 20, 2023                    Respectfully submitted,


                                           **BAKER & HOSTETLER LLP**


                                           By:    */s/ Douglas W. Greene*
                                                  Douglas W. Greene (*pro hac vice*)
                                                  dgreene@bakerlaw.com
                                                  Genevieve G. York-Erwin
                                                  gyorkerwin@bakerlaw.com
                                                  Zachary R. Taylor
                                                  ztaylor@bakerlaw.com
                                                  45 Rockefeller Plaza
                                                  New York, NY 10111
                                                  Telephone: 212.589.4200

                                           *Attorneys for Defendants*

21