# **Exhibit 3**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549.**

# Form 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended **December 31 , 2021**

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from_____to_____

Commission File Number **001-38148**

# CO-DIAGNOSTICS, INC.
(Exact Name of Registrant as Specified in Its Charter)

| **Utah** | **3841** | **46-2609396** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**2401 S. Foothill Drive , Salt Lake City , Utah 84109**
(Address of principal executive offices and zip code)

**(801) 438-1036**
(Registrant's telephone number including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock | CODX | The Nasdaq Capital Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common stock was last sold as of the last business day of the registrant's most recently completed second fiscal quarter was approximately $ 229,000,000 .

As of March 23, 2022, there were 33,965,318 shares of common stock, par value $0.001 per share, outstanding.

**Table of Contents**

| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business. | 4 |
| Item 1A. | Risk Factors. | 13 |
| Item 1B. | Unresolved Staff Comments. | 16 |
| Item 2. | Properties. | 16 |
| Item 3. | Legal Proceedings. | 16 |
| Item 4. | Mine Safety Disclosures. | 17 |

## PART II

Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.    17

Item 6.    [Reserved.]    18

Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations.    18

Item 7A.    Quantitative and Qualitative Disclosures About Market Risk.    22

Item 8.    Financial Statements and Supplementary Data.    23

Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.    44

Item 9A.    Controls and Procedures.    44

Item 9B.    Other Information.    45

Item 9C.    Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.    45

## PART III

Item 10.    Directors, Executive Officers and Corporate Governance.    45

Item 11.    Executive Compensation.    50

Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.    54

Item 13.    Certain Relationships and Related Transactions, and Director Independence.    55

Item 14.    Principal Accountant Fees and Services.    56

## PART IV

Item 15.    Exhibits and Financial Statement Schedules.    56

2

## PART I

**Forward-Looking Statements**

This Annual Report on Form 10-K contains "forward-looking statements" that involve risks and uncertainties. All statements other than statements of historical fact contained in this Annual Report and the documents incorporated by reference herein, including statements regarding future events, our future financial performance, business strategy, and plans and objectives of management for future operations, are forward-looking statements. We have attempted to identify forward-looking statements by terminology including "anticipates," "believes," "can," "continue," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "should," or "will" or the negative of these terms or other comparable terminology. Although we do not make forward looking statements unless we believe we have a reasonable basis for doing so, we cannot guarantee their accuracy. These statements are only predictions and involve known and unknown risks, uncertainties and other factors and the documents incorporated by reference herein, which may affect our or our industry's actual results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Moreover, we operate in a

highly regulated, very competitive, and rapidly changing environment. New risks emerge from time to time and it is not possible for us to predict all risk factors, nor can we address the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause our actual results to differ materially from those contained in any forward-looking statements.

We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy, short term and long-term business operations, and financial needs. These forward-looking statements are subject to certain risks and uncertainties that could cause our actual results to differ materially from those reflected in the forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, those discussed in this Annual Report, and in particular, the risks discussed below and under the heading "Risk Factors" in other documents we file with the SEC. The following discussion should be read in conjunction with the consolidated financial statements for the fiscal years ended December 31, 2021 and 2020 and notes incorporated by reference therein. We undertake no obligation to revise or publicly release the results of any revision to these forward-looking statements, except as required by law. In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this Annual Report may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statement.

You should not place undue reliance on any forward-looking statement, each of which applies only as of the date of this Annual Report. Except as required by law, we undertake no obligation to update or revise publicly any of the forward-looking statements after the date of this Annual Report to conform our statements to actual results or changed expectations.

You are advised, however, to consult any further disclosures we make on related subjects in our reports on Forms 10-Q, 8-K and 10-K filed with the SEC. You should understand that it is not possible to predict or identify all risk factors. Consequently, you should not consider this list to be a complete set of all potential risks or uncertainties.

Important factors that could cause actual results to differ materially from those in the forward-looking statements include, without limitation:

● the results of clinical trials and the regulatory approval process;

● market acceptance of any products that may be approved for commercialization;

● our ability to protect our intellectual property rights;

● the impact of any infringement actions or other litigation brought against us;

● competition from other providers and products;

● our ability to develop and commercialize new and improved products and services;

● changes in government regulation;

● and other factors (including the risks contained in the section entitled "Risk Factors" in other documents we file with the SEC) relating to our industry, our operations and results of operations.

3

Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may differ significantly from those anticipated, believed, estimated, expected, intended or planned.

Factors or events that could cause our actual results to differ may emerge from time to time, and it is not possible for us to predict all of them. We cannot guarantee future results, levels of activity, performance or achievements. Except as required by applicable law, including the securities laws of the United States, we do not intend to update any of the forward-looking

statements to conform these statements to actual results.

As used in this Annual Report, the terms "we", "us", "our", "Company" and "Co-Diagnostics" means Co-Diagnostics, Inc., a Utah corporation and its consolidated subsidiaries (the "Company"), unless otherwise indicated.

## ITEM 1: BUSINESS

## Overview

Co-Diagnostics, Inc., a Utah corporation (the "Company" or "CODX"), develops, manufactures and sells reagents used for diagnostic tests that function via the detection and/or analysis of nucleic acid molecules (DNA or RNA), including robust and innovative molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications. In connection with the sale of our tests we may sell diagnostic equipment from other manufacturers as self-contained lab systems (which we refer to as the "MDx Device"). We have also developed a unique, groundbreaking portable PCR device (the "CODX YourTest PCR™ Device") that has been designed to bring affordable, reliable gold-standard polymerase chain reaction ("PCR") to patients in point-of-care and even at-home settings.

Our diagnostics systems enable dependable, low-cost, molecular testing for organisms and genetic diseases by automating historically complex procedures in both the development and administration of tests. CODX's technical advance involves a novel, patented approach to PCR test design of primer and probe structure ("CoPrimers™") that eliminates one of the key vexing issues of PCR amplification, the exponential growth of primer-dimer pairs (false positives and false negatives) which adversely interferes with identification of the target DNA/RNA.

We believe our proprietary molecular diagnostics technology is paving the way for innovation in disease detection and life sciences research through our enhanced detection of genetic material. For various reasons, including owning our own our platform, we believe we will be able to accomplish this faster and more economically, allowing for significant margins while still positioning the Company to be a low-cost provider of molecular diagnostics and screening services.

In addition, continued development has demonstrated the unique properties of our CoPrimer technology that we believe makes it ideally suited for a variety of applications where specificity is key to optimal results, including multiplexing several targets, enhanced Single Nucleotide Polymorphism ("SNP") detection and enrichment for next generation sequencing.

Our scientists use the complex mathematics of DNA/RNA test design to engineer and optimize DNA/RNA tests and to automate algorithms that rapidly screen millions of possible options to pinpoint the optimum design. Dr. Brent Satterfield, our founder, developed the Company's intellectual property consisting of the predictive mathematical algorithms and patented molecular structure used in the testing process, which together represent a major advance in PCR testing systems. CODX technologies are now protected by more than 20 granted or pending US and foreign patents, as well as certain trade secrets and copyrights. Ownership of our proprietary platform permits us the advantage of avoiding payment of patent royalties required by other PCR test systems, which may allow the sale of diagnostic PCR tests at a lower price than competitors, while enabling us to maintain profit margins.

We may either sell or lease the MDx Device to labs and diagnostic centers, through sale or lease agreements, and sell the reagents that comprise our proprietary tests to those laboratories and testing facilities.

Our proprietary test design process involves identifying the optimal locations on the target genes for amplification and pair the locations with the optimized primer and probe structure to achieve outputs that meet the design input requirements identified from market research. This is done by following planned and documented processes, procedures and testing. In other words, we use the data resulting from our tests to verify whether we succeeded in designing what we intended at the outset. Verification is a series of testing that concludes that the product is ready to proceed to validation in an evaluation either in our laboratory or in an independent laboratory setting using initial production tests to confirm that the product as designed meets the user needs.

4

Using our proprietary test design system and proprietary reagents, we have designed and obtained regulatory approval in the European Community and/or in India to sell PCR diagnostic tests for the detection of COVID-19, influenza, tuberculosis, hepatitis B and C, human papillomavirus, malaria, chikungunya, dengue, and the zika virus. In the United States, CODX has obtained Emergency Use Authorization ("EUA") for its Logix Smart ™ COVID-19 detection test from the Food and Drug Administration, or FDA, and sells that test to qualified labs. In addition, our COVID-19 detection test and certain of our other suite of COVID-19 products have been approved for sale in countries such as the United Kingdom, Australia and Mexico by the regulatory bodies in those countries and have been registered for sale in many more countries.

In addition to testing for infectious disease, the technology lends itself to identifying any section of a DNA or RNA strand that describe any type of genetic trait, which creates a number of significant applications. We, in conjunction with our customers, are active in designing and licensing tests that identify genetic traits in plant and animal genomes. We also have three multiplexed tests developed to test mosquitos for the identification of diseases carried by the mosquitos to enable municipalities to concentrate their efforts in managing mosquito populations on the specific areas known to be breeding the mosquitos that carry deadly viruses.

On January 23, 2020, we announced the completion of the principal design work for a PCR test for the new coronavirus, later named COVID-19, intended to address the potential need for detection of the virus. This test features the Company's patented CoPrimer technology, and was designed using our proprietary software system, following the guidelines published by the World Health Organization (WHO) and Centers for Disease Control (CDC).

On February 24, 2020, we announced that this test had obtained regulatory clearance to be sold as an IVD for the diagnosis of COVID-19 in markets that accept CE-marking as valid regulatory approval, and became available for purchase from the Company's Utah-based ISO-13485:2016 certified facility—the first US-based company to obtain such a marking for a COVID-19 test.

We commenced sales of the COVID-19 tests in February and March of 2020 to international customers and to date have since sold over 30,000,000 of this and other COVID tests in numerous countries around the world through an expanding distributor network.

On April 6, 2020, we announced that we had received an Emergency Use Authorization from the FDA allowing us to commence sales of our Logix Smart™ COVID-19 test to laboratories certified by the Center for Medicare and Medicaid Services under the Clinical Laboratories Improvements Act ("CLIA") to accept human samples for diagnostics testing throughout the United States and have sold our Logix Smart™ COVID-19 test to such CLIA labs since that time.

Because we believe that testing for COVID-19 is going to be a consideration for public health worldwide even after the current pandemic has subsided, we have initiated the Eikon platform to facilitate frequent testing in homes, schools, businesses, and the hospitality industry. We believe this may be accomplished through the development of a low-cost testing device, easy to use by non-professionals, that can provide PCR test results in around 30 minutes. The initial project built on this platform, an at-home and point-of-care COVID-19 PCR test, was ultimately facilitated by our development of a saliva or nasal swab-based PCR test that does not require the RNA/DNA extraction. While the final result is believed to be approximately equivalent to those processed by a high-complexity clinical laboratory, it has the advantages of increased speed and ease of handling thanks to lyophilization (or freeze-drying) of our testing reagents to allow for stability at room temperatures.

On February 15, 2021, we engaged the services of a group of professionals at Idaho Molecular, Inc and Advanced Conceptions, Inc (the "Entities,") with the expertise to develop the hardware for such a device using our CoPrimers™ as the reagent chemistry. On December 22, 2021, we announced that we would be acquiring the Entities along with all existing and future assets and intellectual property related to the platform and device. It is expected that the device and test will be available to homes, schools, offices, and the travel industry among other locations at a cost that will allow screening frequently to prevent spread of the COVID-19 virus in the future. The device would also be available to test for other pathogens detectable through saliva or other samples as we develop those tests and offer them to the marketplace. All such tests will be subject to regulatory approval.

**Infectious Disease Product Offering**

Using our proprietary test design system and proprietary reagents, we and CoSara Diagnostics Pvt Ltd ("CoSara"), our joint venture for manufacturing in India, design and sell PCR diagnostic tests for detection of diseases and pathogens such as COVID-19, tuberculosis, hepatitis B and C, malaria, dengue, human papillomavirus, chikungunya, and Zika virus, all of which tests have been designed and verified in our laboratories. Our tuberculosis test and Zika test received a CE Mark in 2018, and a triplex test for Zika, dengue and chikungunya received a CE Mark in 2019, qualifying the tests to be sold throughout the European community and in most countries in central and South America. In December, 2019, CoSara received a license to manufacture and sell tuberculosis, hepatitis B, hepatitis C, human papillomavirus 16/18 and malaria tests in India from the Central Drugs Standard Control Organization ("CDSCO"). In February 2020, we received a CE Mark for our Logix Smart™ COVID-19 test followed by an Emergency Use Authorization by the FDA a few weeks later, and in April 2020, our COVID-19 test was approved for manufacture and sale in India by the CDSCO and in Mexico by the INDRE, Mexico's equivalent to the United States Center for Disease Control. In August 2020, we received approval from the Australian Department of Health Therapeutic Goods Division to sell our COVID-19 test in Australia. Other regulatory approvals and registrations followed those listed here.

As explained above, our Logix Smart™ COVID-19 test was designed, developed, submitted for regulatory approval and ready to be used as an IVD in countries that accept a CE Mark as approval for use of the test in a period of just over 30 days. This is a real-world example of how the CODX technology can be used in an evolving epidemic to get diagnostic tools in the hands of medical professionals without delay. It can be similarly used to design a test for mutated strains of the virus should they not be detectable using currently available tests.

### *Caribbean and Central and South America*

Our initial sales were to entities located in South and Central America. In some of those countries, there are limited regulatory hurdles so we started offering our tests immediately. We have applied for and received registrations for our tests in many of those countries that require registration, and our distributors in those countries have provided us with in country assistance in completing such registrations.

We first offered our Zika test in this region because of the demand for such a test, followed by tests for tuberculosis, our triplex test for Zika, chikungunya, and dengue. Sales of those tests have not been material, but with the granting of a CE mark for our Logix Smart™ COVID-19, we began significant sales in this region. Products are manufactured for sale upon receipt of purchase orders from distributors, labs and hospitals.

### *India*

In January 2017, the Company entered into an agreement to manufacture diagnostics tests for seven infectious diseases with a pharmaceutical manufacturing company in India and formed an Indian joint venture organized as CoSara Diagnostics, Pvt Ltd ("CoSara"). The agreement provided for the construction of a manufacturing plant and the manufacture of the tests named above and the joint sales and marketing of those tests in India. We have received a license for the plant in Ranoli, India to manufacture approved tests and is being used for testing and manufacturing of our products for the Indian market.

As mentioned above, the CDSCO has given us the approval for manufacture and sale of the nine tests referred above and the Company has begun manufacture and sale of those tests. The Company has commenced a reagent rental program in India with thermocyclers purchased from third-party vendors and which we refer to as our MDx Device. Each of the reagent rental placements requires the purchase of a minimum number of tests per month. The placement of thermocyclers in India has facilitated the sale of the SaraGene COVID-19 tests in India. The World Health Organization ("WHO") 2019 Global Tuberculosis Report indicates that India is the country with the highest number of cases of tuberculosis in the world. WHO tuberculosis statistics for India for 2018 give an estimated incidence figure of 2.69 million cases of tuberculosis for India out of a global incidence of approximately 10.0 million.

On March 19, 2020, we announced that CoSara received authorization to begin manufacture and sale of COVID-19 tests in India. Those tests in India are branded as SaraGene COVID-19 tests and are sold exclusively by CoSara. The Indian government places restrictions on the price that could be charged for COVID-19 tests which has limited the revenue in India more than we have experienced in other parts of the world. At the time of this report, CoSara has received CDSCO clearance for RT-PCR tests for Mycobacterium tuberculosis, malaria, hepatitis B, hepatitis C, human papillomavirus (HPV), two COVID-19 assays, chikungunya, dengue, a dengue/chikungunya duplex test, and an influenza A/influenza B/COVID-19 ("ABC") multiplex test.

### *Europe*

Molecular diagnostics, such as our tests, are governed in Europe by the framework for in vitro diagnostics (IVDs), which encompasses diagnostic products such as reagents, instruments and systems intended for use in diagnosis of disease. The regulatory system for some IVDs allows for a self-certification procedure, placing heavy responsibility on manufacturers. Non self-certified products are subject to the same standards as self-certified products but are also subject to audit and review by a notified body prior to receiving approval to be CE-marked. A CE-marking is a manufacturer's declaration that a product meets the requirements of the applicable European Commission directive. Examples of current obligations include having in place a qualitative manufacturing process, user instructions that are clear and fit for purpose, and ensuring that the 'physical' features of devices and diagnostics do not pose any danger. If a product fulfils these and other related control requirements, it may be CE-marked as an indication that the product is compliant with EU legislation and sold in the European Union. We have received CE Marks for six of our tests including for COVID-19, COVID-19 (2 gene test), ABC (a triplex test for Flu A, Flu B and COVID-19), a DS (Direct Saliva, extraction-free) COVID-19 test, tuberculosis, Zika, and our Zika, dengue, chikungunya triplex tests.

We are ISO 13485:2016 certified, relating to the design and manufacture of our medical device products. The ISO certification indicates that we meet the standards required to self-certify certain of our products and affix a CE-marking for sales of our products in countries accepting the CE marking (not in the United States) with only minimal further governmental approvals and registrations in most countries.

### *United States*

The U.S. Food and Drug Administration (FDA) has granted permission for us to export all of our IVD products. The FDA's permission to export was granted under Section 801(e) of the Federal Food, Drug, and Cosmetic Act, as amended (the "FDC Act"). Section 801(e) of the FDA Act covers certain medical devices that have not yet received an approved Premarket Approval in the United States by the FDA, such as our products. We have not commenced any Premarket Approval steps with the FDA. Section 801(e) of the FDA Act applies to medical devices that are acceptable to the importing country and that are manufactured under the FDA's Good Manufacturing Practices. We have received EUA for our COVID-19 test, which allows sales to qualified labs in the United States.

Under our EUA, we are actively selling our Logix Smart™ COVID-19 test to CLIA certified laboratories in the United States and the CLIA labs are able to use our test as it is or further validate our COVID-19 or other tests as Laboratory Developed Tests (LDTs), which refers to a diagnostic test that has been validated for use in the CLIA lab. LDTs may be used by the lab only in that laboratory. CLIA laboratories develop the performance characteristics, perform the analytical validation for their LDTs and obtain licenses to offer them as diagnostic services. The FDA has publicly announced its intention to regulate certain LDTs in a phased-in approach, but draft guidance that was published a couple of years ago was withdrawn at the end of the Obama administration and replaced by an informal non-enforceable discussion paper reflecting some of the feedback that it received on LDT regulation. We are currently marketing our Logix Smart™ COVID-19 test to CLIA laboratories throughout the US.

### Market Opportunity

The market opportunity for our tests changed radically with the emergence of the COVID-19 pandemic. Because we were able to respond rapidly and produce a quality product, we have been able to build a distribution network that extends to more than 80 countries with over 50 active distributors, most of which have been the sales network that has allowed us to

export products throughout the world. We believe that after the pandemic is brought under control, the network of distributors that we have built in these extra-ordinary times will serve us well in sales of other diagnostic tests.

7

The molecular diagnostics market is a fast-growing portion of the in vitro (test tube-based, controlled environment) diagnostics market. There are several advantages of PCR tests, such as the ones we market and sell, over other forms of diagnostic testing. These advantages include higher specificity and sensitivity, the ability to perform multiplex tests and the ability to test for drug resistance or for individual genes.

**Mosquito Vector Control Services**

In response to market demand, we introduced our first diagnostics tests to be used exclusively to test for mosquito borne pathogens in June 2019. Municipalities in the US and many other countries in the world are concerned about the diseases carried by mosquitos and which infect the human population. To prevent outbreaks of potentially harmful viruses, such as Zika or West Nile, from infecting the public the municipalities conduct mitigation operations to eliminate the mosquito populations carrying the diseases. Because it is too expensive and potentially harmful to the environment to spray all mosquito breeding areas, the solution is to identify which particular area has mosquitos that are carrying the harmful viruses. To know where the host mosquitos with the harmful viruses are located, traps are set, mosquitos collected and then tested to find the areas that most needed spraying. There are over 3,000 mosquito abatement districts throughout the United States and almost all of them conduct testing to help make the spraying more effective.

Our first vector related test was a triplex test that tests for West Nile, western equine and St. Louis encephalitis. We began shipping the tests in June 2019. We added a second test that tests mosquitos for Zika, chikungunya and dengue in a triplex test. Finally, in November 2019, we completed a test for West Nile, eastern equine and St. Louis encephalitis, specifically for use in the eastern United States. As a result, mosquito abatement districts can test for three target viruses in one test as compared to performing three different tests using other market available tests, which saves our customers money. Additionally, the districts are more effective because they can get test results in a matter of hours using our product instead of weeks when they might otherwise have to wait for a central lab to process the mosquito tests.

We have sold our Vector Smart test products and/or related lab equipment to testing districts in different sections of the country and are marketing our products through trade shows, electronic and regular mail solicitations.

**Competitive Advantages of Co-Diagnostics**

**We believe that we have the following competitive advantages:**

- *Affordability:* Lower-cost test kits and low-cost MDx-device.

- *Flexibility:* CODX's tests have been designed to run on many vendors' DNA/RNA diagnostic testing machines. These tests are particularly well suited to the new generation of "lab-on-a-chip" and "point-of-care" ("LOC and POC"), highly portable analysis machinery for field, clinical and office applications.

- *Speed* : We believe our rapid assay design system software provides shorter time to product release. This has been demonstrated with the conception, design, product manufacture, clinical verification and submission for a CE Mark for our Logix Smart™ coronavirus disease (COVID-19) test being approximately 30 days.

- *Accuracy* : We believe our technology allows us to build tests that are highly sensitive and specific, the two benchmarks for accuracy in PCR testing.

- *Personalized Medicine* : We project that rising health care costs in developed and developing nations will increasingly require that health care systems be patient-specific to eliminate waste, misdiagnoses, and ineffectiveness. A critical component will be accurate, more affordable DNA-based diagnostics, especially in

at-home and POC settings, which we plan to offer.

- *Low-cost Provider* : Our platform technology obviates the need to pay patent royalties typically required of our competitors, which use patented test platforms to design their tests.

8

- *Worldwide Footprint* : With a dynamic technology that encompasses markets worldwide, we anticipate that we can identify the best target markets, not only in high burden developing countries but also in developed nations.

- *Growth Industry Category* : We believe that DNA/RNA testing is the fastest-growing segment of in-vitro diagnostic testing.

- *Combination Product Offering* : Our sensitive tests can be a well-designed match for a new generation of handheld and other small POC devices now entering the market, including our own MDx and YourTest PCR™ devices. Used together, these affordable tests and devices may revolutionize the molecular diagnostics industry in cost, speed of test results and simplification.

- *Multiplexing:* Our existing multiplexed tests demonstrate that our CoPrimer-designed tests are able to test for multiple targets in the same sample without the distortion caused by false negatives and false positives that often occur in multiplexed tests.

## Liquid Biopsy for Cancer Screening

The enhanced specificity of our technology opens up some unique applications for liquid biopsy, demonstrating its ability to detect small quantities of mutations associated with cancer within an environment of large amounts of normal DNA, as we position the Company to take part in this historic and challenging development in human health care.

## Agricultural Applications

SNP detection is also used in the agricultural industry to identify variations in crop genomes to achieve improved seed viability and other desired characteristics, including drought resistance, disease resistance, pest resistance and higher yield.

In mid-2017, the Company was first approached by a large agribusiness to evaluate our ability to multiplex certain target genomes. The results of the development project have successfully demonstrated our ability to not only multiplex the target genomes, but targeted SNP's as well. The project was undertaken in conjunction with the manufacturer of our CoPrimer tests. The results of the project encouraged the parent of our manufacturer to seek a world-wide licensing arrangement for our CoPrimers™ in the agricultural industry, which was completed in October 2018. Pursuant to the exclusive license for the agronomics industry, the licensee pays us a royalty for all CoPrimers™ sold to the licensee's customers. In January 2019, the licensee formally introduced the product at a large agricultural conference and has branded the product under the name "BHQ CoPrimers™".

9

## Additional Licensing and Assay Development

In addition, the unique properties of our CoPrimer technology make them ideally suited to a variety of applications where sensitivity is key to optimal results, including multiplexing several targets, enhanced SNP detection and enrichment for next generation sequencing. Our licensee for our agricultural testing requested an expansion of our license agreement to include test design services for their customers and potential customers, both in the infectious disease arena as well as for agricultural customers. The license was amended in July 2019 and we expect to derive a license fee from our licensee for its design

services. If any of its customers desire to commercialize the tests designed, they will need to seek a commercial license directly from us. Because of these unique characteristics of CoPrimers™, research companies and institutions have requested that we design diagnostics to locate and identify uncommon gene sequences and SNPs and create tests for the target sequences in a multiplexed reaction. This application of our technology is in its beginning stages, but we believe that the results from our initial research indicate a significant step forward in defining the capabilities of our technology, which we believe can be translated to revenue producing licensing arrangements.

**Intellectual Property**

Because much of our future success and value depends on our proprietary technology, our patent and intellectual property strategy is of critical importance. Five of our initial U.S. patents related to our technology have been granted by the U.S. Patent and Trademark Office (PTO), including the patent for our CoPrimer technology, which we consider our most important patent. One of our patents has been issued in Great Britain but still pending in the United States, and another has been granted in South Korea. As of March 2022, we have an issued patent in Great Britain and India on "Rapid Oligo Probes." We also have an issued patent in the U.S. on "Primers for Nucleic Acid Extension or Amplification Reactions." We have another issued patent in the U.S. on "Detection of Primers for Nucleic Acid Extension or Amplification Reactions." We have 3 patents issued in the US, as well as patents issued in Australia, Korea, and Mexico on "Cooperative Primers, Probes, and Applications Thereof." We have applications pending in Australia, Canada, Europe, and the U.S. for "Methods and Compositions for Next Generation Sequencing (NGS) Library Preparation." We have applications pending in the U.S. and internationally as a PCT application for "Allele-Specific Design of Cooperative Primers for Improved Nucleic Acid Variant Genotyping." Lastly, we have a provisional application on file in the U.S. for "Methods and Compositions Related to Cooperative Primers and Reverse Transcription.

We have identified additional applications of the technology, which represent potential patents that further define specific applications of the processes that are covered by the original patents. We intend to continue building our intellectual property portfolio as development continues and resources are available.

We have copyrighted our development software that is used by us to develop diagnostic tests based on our technology.

**Major Customers**

We had certain customers which were each responsible for generating 10% or more of our total revenue for the year ended December 31, 2021. Two customers together accounted for approximately 48% of total revenue for the year ended December 31, 2021. These customers may not account for the same percentage of sales in future periods. If we were to sell nothing to those customers in the future, it would have a material adverse effect on our financial condition unless we were able to replace those customers with others.

**Competition**

The molecular diagnostics industry is extremely competitive. There are many firms that provide some or all of the products we provide and provide many diagnostic tests that we have yet to develop. Many of these competitors are larger than us and have significantly greater financial resources. Because are more recently established, many of our competitors have a competitive advantage in the diagnostic testing industry because they also have other lines of business in the pharmaceutical industry from which they derive revenues and for which they are well known and respected in the medical profession. We will need to overcome the disadvantage of being perceived as a start up with no significant respect from the medical and testing professionals, although this is changing as we continue to market our Logix Smart™ COVID-19 tests and other tests in the United States to well-known and successful laboratories. In the diagnostic testing industry, we compete with such companies as BioMerieux, Siemens, Qiagen, Cue Health, Lumira Dx and Cepheid and with such pharmaceutical companies as Abbott Laboratories, Becton Dickinson and Johnson and Johnson.

Many of these competitors already have an established customer base with industry standard technology, which we

must overcome to be successful.

Competition is, and will likely continue to be, particularly intense in the market for COVID-19 diagnostic tests. Numerous companies in the United States and internationally have announced their intention to offer new products, services and technologies that could be used in substitution for our Logix Smart™ COVID-19 tests. Many of those competitors are significantly larger, and have substantially greater financial, engineering and other resources, than our company. Existing and potential competitors in the market for COVID-19 diagnostic tests include developers of serological, antigen and molecular tests. We also compete with companies from Asia in certain markets who are willing to sell their tests for much less than we sell our tests, which creates competitive price pressure on us.

We expect competition to continue to increase as other established and emerging companies enter the market, as customer requirements evolve, and as new products, services and technologies are introduced. The entrance of new competitors is being encouraged by governmental authorities, who are offering funding to support development of testing solutions for COVID-19. Some of our existing or new competitors may have strong relationships with current and potential customers, including governmental authorities, and, as a result, may be able to respond more quickly to new or changing regulatory requirements, new or emerging technologies, and changes in customer requirements.

**Government Regulation**

In the United States, we are regulated by the FDA and our products must be approved, cleared, or authorized by the FDA before we are allowed to sell our tests in the United States as *in vitro* diagnostics. The FDA granted us an EUA to manufacture and sell our Logix Smart™ COVID-19 test to CLIA labs in the United States. Being ISO certified greatly facilitates our applications for CE-Marking, which allows us to sell any CE Marked test in most countries in Europe, South America and Asia, depending on the country and following that country's registration process. We currently have CE Markings issued for our Logix Smart™ COVID-19 test, tuberculosis test, our Zika virus test, a triplex test that tests for Zika, dengue, and chikungunya simultaneously, a triplex "ABC" test that identifies and distinguishes between Flu A, Flu B and Covid-19, our SARS-CoV-2 2-gene multiplex test, and our DS (Direct Saliva, extraction-free) COVID-19 test. In addition, our Logix Smart™ COVID-19 has received the license to manufacture and sell in India from India's CDSCO and the National Epidemiology Institute in Mexico evaluated our Logix Smart™ COVID-19 and ABC tests and approved them for sale in Mexico. We have also received approval to sell in Australia. We are in the process of registering for sale our Logix Smart™ COVID-19 and other tests in a number of major countries around the world.

**Employees**

As of December 31, 2021, we had 101 full-time and part-time employees at our executive offices and lab facilities in Salt Lake City, Utah. We have engaged independent contractors in India to promote the use of our products and develop outlets for products and employ the services of independent sales representatives on an "as needed" basis.

**Organizational History and Corporate Information**

We were incorporated as Co-Diagnostics, Inc., in Utah on April 18, 2013. Our principal executive office is located 2401 S. Foothill Drive, Salt Lake City, Utah 84109. Our telephone number is (801) 438-1036. Our web address is www.codiagnostics.com . The contents of our website are not incorporated by reference in this Annual Report.

11

**Implications of Being an Emerging Growth Company**

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012. We will remain an emerging growth company until the earlier of (i) the last day of the fiscal year following the fifth anniversary of July 12, 2017, the date of the first sale of our common stock pursuant to an effective registration statement under the Securities Act of 1933, as amended (the "Securities Act"); (ii) the last day of the fiscal year in which we have total annual gross revenues of $1 billion or more; (iii) the date on which we have issued more than $1 billion in nonconvertible debt during the previous three

years; or (iv) the date on which we are deemed to be a large accelerated filer under applicable SEC rules. We expect that we will remain an emerging growth company for the foreseeable future, but cannot retain our emerging growth company status indefinitely. We refer to the Jumpstart Our Business Startups Act of 2012 herein as the "JOBS Act". For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from specified disclosure requirements that are applicable to other public companies that are not emerging growth companies. These exemptions include:

- being permitted to provide only two years of audited financial statements, in addition to any required unaudited interim financial statements, with correspondingly reduced "Management's Discussion and Analysis of Financial Condition and Results of Operations" disclosure;

- not being required to comply with the requirement of auditor attestation of our internal controls over financial reporting;

- not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements;

- reduced disclosure obligations regarding executive compensation; and

- not being required to hold a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

For as long as we continue to be an emerging growth company, we expect that we will take advantage of the reduced disclosure obligations available to us as a result of that classification. Accordingly, the information contained herein may be different than the information received from other public companies.

An emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. This allows an emerging growth company to delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably elected to avail ourselves of this extended transition period and, as a result, we will not be required to adopt new or revised accounting standards on the dates on which adoption of such standards is required for other public reporting companies.

We are also a "smaller reporting company" as defined in Rule 12b-2 of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and have elected to take advantage of certain of the scaled disclosure available for smaller reporting companies.

## ITEM 1A. RISK FACTORS

### Risks Related to Our Business and Industry

*We have a limited commercial history upon which to base our prospects and are not certain that we will sustain profitability in the future.*

We began operations in April 2013, and we have a limited operating history. We were profitable for the years ended December 31, 2021 and 2020, respectively. Our accumulated retained earnings were $54.2 million and $17.5 million as of December 31, 2021 and 2020, respectively. We realized net income for the first time for the three months ended June 30, 2020. We were able to achieve net income during the prior two fiscal years because we were able to develop, market and profitably sell our LogixSmart COVID-19 and other COVID-19 tests, but we do not have any way to predict how long our market for that test will continue. Potential investors should be aware of the difficulties normally encountered by a new enterprise, many of which are beyond our control, including substantial risks and expenses in the course of developing new diagnostic tests, establishing or entering new markets, organizing operations and marketing procedures. The likelihood of our success must be

considered in light of these risks, expenses, complications and delays, and the competitive environment in which we operate. There is, therefore, nothing at this time upon which to base an assumption that our business plan will continue to prove successful, and we may not be able to generate significant revenue, raise additional capital or operate profitably. We will continue to encounter risks and difficulties frequently experienced by early commercial stage companies, including scaling up our infrastructure and headcount, and may encounter unforeseen expenses, difficulties or delays in connection with our growth. In addition, as a result of the start-up nature of our business, we can be expected to continue to sustain substantial operating expenses and may not be able to continue generating sufficient revenues to cover expenditures. Any investment in our company is therefore highly speculative and could result in the loss of any investment.

***Our near-term success has been dependent on the market for our COVID-19 tests and future success is dependent on continued demand for COVID-19 diagnostics and upon our ability to develop and market other commercially accepted diagnostic tests.***

Our future success will depend, in part, on the continued market for COVID-19 tests, our ability to develop and sell sufficient quantities of other diagnostics tests, and our ability to successfully receive regulatory approval for and profitably market our "YourTest PCR™ Device." Attracting new customers and distribution networks requires substantial time and expense. Any failure to continue sales of our tests in sufficient quantities to maintain profitability would adversely affect our operating results. Many factors could affect the market acceptance and commercial success of any of our diagnostic tests and devices, including:

- Our ability to develop additional infectious disease diagnostic tests for which there is a commercial market.
- our ability to convince our potential customers of the advantages and economic value of our tests over competing technologies and diagnostic tests;
- the breadth of our test menu relative to competitors;
- changes to policies, procedures or currently accepted best practices in clinical diagnostic testing;
- the extent and success of our marketing and sales efforts; and
- our ability to manufacture in quantity our commercial diagnostic tests and meet demand in a timely fashion.

**General Risk Factors**

***The price of our common stock may fluctuate substantially.***

The market price of our common stock may be subject to wide fluctuation in response to various factors, some of which are beyond our control. Some factors that may cause the market price of our common stock to fluctuate, in addition to the other risks mentioned in this "Risk Factors" section and elsewhere in this report, are:

- sales of our common stock by our shareholders, executives, and directors;
- our ability to enter new markets;
- actual or un-anticipated fluctuations in our annual and quarterly financial results;
- our ability to obtain financings to continue and expand our commercial activities, expand our manufacturing operations, conduct research and development activities including, but not limited to, human clinical trials, and other business activities;

- our ability to secure resources and the necessary personnel to continue and expand our commercial activities, develop additional diagnostic tests, conduct clinical trials and gain approval for our diagnostic tests on our desired schedule;
- commencement, enrollment or results of our clinical trials of our diagnostic tests or any future clinical trials we may conduct;
- changes in the development status of our diagnostic tests;
- any delays or adverse developments or perceived adverse developments with respect to review by the FDA or other similar foreign regulatory authorities of our planned clinical trials;

- any delay in our submission for studies or test approvals or adverse regulatory decisions, including failure to receive regulatory approval for our diagnostic tests;
- our announcements or our competitors' announcements regarding new tests, enhancements, significant contracts, acquisitions or strategic investments;
- failures to meet external expectations or management guidance;
- changes in our capital structure or dividend policy, including as a result of future issuances of securities and sales of large blocks of common stock by our shareholders;
- announcements and events surrounding financing efforts, including debt and equity securities;
- competition from existing technologies and diagnostic tests or new technologies and diagnostic tests that may emerge;
- announcements of acquisitions, partnerships, collaborations, joint ventures, new diagnostic tests, capital commitments, or other events by us or our competitors;
- changes in general economic, political and market conditions in any of the regions in which we conduct our business;
- changes in industry conditions or perceptions;
- changes in valuations of similar companies or groups of companies;
- analyst research reports, recommendations and changes in recommendations, price targets and withdrawals of coverage;
- departures and additions of key personnel;
- disputes and litigations related to intellectual properties, proprietary rights, and contractual obligations;
- changes in applicable laws, rules, regulations, or accounting practices and other dynamics;
- actions taken by our principal shareholders and release or expiry of lockup or other transfer restrictions; and
- other events or factors, many of which may be out of our control.

In addition, if the market for stocks in our industry or industries related to our industry, or the stock market in general, experiences a loss of investor confidence, the trading price of our common stock could decline for reasons unrelated to our business, financial condition and results of operations. If any of the foregoing occurs, it could cause our stock price to fall and may expose us to lawsuits that, even if unsuccessful, could be costly to defend and a distraction to management.

***Future sales of our common stock in the public market may cause our stock price to decline and impair our ability to raise future capital through the sale of our equity securities.***

There are a substantial number of shares of our common stock held by shareholders who owned shares of our capital stock prior to our initial public offering that may be able to sell in the public market. Sales by such shareholders of a substantial number of shares could significantly reduce the market price of our common stock.

Shares issued by us upon exercise of options granted under our equity plan will be eligible for sale in the public market. If any of these holders cause a large number of securities to be sold in the public market, the sales could reduce the trading price of our common stock. These sales also could impede our ability to raise capital in the future.

***Anti-takeover provisions in our charter documents and Utah law could discourage delay or prevent a change of control of our Company and may affect the trading price of our common stock.***

We are a Utah corporation and the anti-takeover provisions of the Utah Control Shares Acquisition Act may discourage, delay or prevent a change of control by limiting the voting rights of control shares acquired in a control share acquisition. In addition, our Articles of Incorporation and Bylaws may discourage, delay or prevent a change in our management or control over us that shareholders may consider favorable. Among other things, our Amended and Restated Articles of Incorporation and Bylaws:

- authorize the issuance of "blank check" preferred stock that could be issued by our board of directors in response to a takeover attempt;

- provide that vacancies on our board of directors, including newly created directorships, may be filled only by a majority vote of directors then in office, except a vacancy occurring by reason of the removal of a director without cause shall be filled by vote of the shareholders; and

- limit who may call special meetings of shareholders.

These provisions could have the effect of delaying or preventing a change of control, whether or not it is desired by, or beneficial to, our shareholders.

***NASDAQ may delist our common stock from its exchange, which could limit investors' ability to make transactions in our common stock and subject us to additional trading restrictions.***

Should we fail to satisfy the continued listing requirements of the NASDAQ Capital Market, such as the corporate governance requirements or the minimum closing bid price requirement, NASDAQ may take steps to delist our common stock. Such a delisting would likely have a negative effect on the price of our common stock and would impair your ability to sell or purchase our common stock when you wish to do so. In the event of a delisting, we would take actions to restore our compliance with the NASDAQ Capital Market's listing requirements, but we can provide no assurance that any such action taken by us would allow our common stock to become listed again, stabilize the market price or improve the liquidity of our common stock, prevent our common stock from dropping below the NASDAQ Capital Market's minimum bid price requirement or prevent future non-compliance with the NASDAQ Capital Market's listing requirements.

If the NASDAQ Capital Market does not maintain the listing of our securities for trading on its exchange, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity with respect to our securities;

- a determination that our shares of common stock are "penny stock" which will require brokers trading in our shares of common stock to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for our shares of common stock;

- a limited amount of news and analyst coverage for our company; and

- decreased ability to issue additional securities or obtain additional financing in the future.

Therefore, it may be difficult for our shareholders to sell any shares if they desire or need to sell them.

***We do not currently intend to pay dividends on our common stock.***

We do not expect to pay cash dividends on our common stock. Any future dividend payments are within the absolute discretion of our board of directors and will depend on, among other things, our results of operations, working capital requirements, capital expenditure requirements, financial condition, contractual restrictions, business opportunities, anticipated cash needs, provisions of applicable law and other factors that our board of directors may deem relevant. We may not generate sufficient cash from operations in the future to pay dividends on our common stock.

***We are an "emerging growth company" and will be able to avail ourselves of reduced disclosure requirements applicable to emerging growth companies, which could make our common stock less attractive to investors.***

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, and we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. Investors may find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

We may take advantage of these reporting exemptions until we are no longer an "emerging growth company." We will remain an "emerging growth company" until the earliest of (i) the last day of the fiscal year in which we have total annual gross revenues of $1.0 billion or more; (ii) the last day of our fiscal year following the fifth anniversary of the date of the completion of our initial public offering; (iii) the date on which we have issued more than $1.0 billion in nonconvertible debt during the previous three years; or (iv) the date on which we are deemed to be a large accelerated filer under the rules of the Securities and Exchange Commission.

---

15

---

***We have elected to use the extended transition periods for complying with new or revised accounting standards.***

We have elected to use the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards that have different effective dates for public and private companies until the earlier of the date we (i) are no longer an emerging growth company or (ii) affirmatively and irrevocably opt out of the extended transaction period provided in Section 7(a)(2)(B). As a result, our financial statements may not be comparable to those of companies that comply with public company effective dates.

***Our management is required to devote substantial time to compliance initiatives.***

As a public company, we incur significant legal, accounting and other expenses that we did not incur as a newly formed entity. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the Securities and Exchange Commission, and NASDAQ, have imposed various new requirements on public companies, including requiring establishment and maintenance of effective disclosure and financial controls and changes in corporate governance practices. Our management and other personnel devote a substantial amount of time to these new compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time consuming and costly. We expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain the same or similar coverage.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

Our headquarters are located at 2401 S. Foothill Drive, Salt Lake City, Utah. Our current facility has approximately 14,000 square feet of laboratory and office space under a lease that expires in February 2024. Our recently acquired subsidiaries also lease additional laboratory and office space under month-to-month leases. We believe the facility we lease is sufficient to meet our needs for the immediate future.

## ITEM 3. LEGAL PROCEEDINGS

In July 2020, we were served in an action filed in the United States District Court for the District of Utah claiming that the Company promulgated false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The Plaintiff, Gelt Trading, Ltd., a Cayman Islands limited company, demands compensatory damages sustained as a result of our alleged wrongdoing in an amount to be proven at trial. We will vigorously defend this action as we do not believe it has any merit.

In July 2020, we were served in an action filed in the United States District Court for the District of Utah claiming that the Company promulgated false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The Plaintiff, Fernando Hernandez demands compensatory damages sustained as a result of our alleged wrongdoing in an amount to be proven at trial. We will vigorously defend this action as we do not believe it has any merit.

In September 2020, we were served in an action filed in the United States District Court for the District of Utah claiming that the officers and the directors harmed the Company by promulgating false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The Plaintiff, Luis Aguliera, on behalf of Co-Diagnostics, Inc. seeks damages from the individual defendants and attorneys' fees. We will vigorously defend this as we do not believe it has any merit.

16

In December 2020, we were served in an action filed in the United States District Court for the District of Utah claiming that the officers and the directors harmed the Company by promulgating false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The Plaintiff, Melvyn Klein, on behalf of Co-Diagnostics, Inc. seeks damages from the individual defendants and attorneys' fees. We will vigorously defend this as we do not believe it has any merit.

In December 2020, we were served in an action filed in the United States District Court for the District of Utah claiming that the officers and the directors harmed the Company by promulgating false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The Plaintiff, Mathew Wallace, on behalf of Co-Diagnostics, Inc. seeks damages from the individual defendants and attorneys' fees. We will vigorously defend this as we do not believe it has any merit.

From time to time, we may become involved in litigation relating to claims arising out of our operations in the normal course of business. Although we have received inquiries from FINRA, NASDAQ and the SEC, to which we have responded, to the best of our knowledge, no governmental authority is contemplating any proceeding to which we are a party or to which any of our properties or businesses are subject, which would reasonably be likely to have a material adverse effect on the Company.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER EQUITY SECURITIES

**Market Information**

Our common stock has been quoted on the NASDAQ market under the symbol "CODX" since July 12, 2017. The following table sets forth the high and low prices for our common stock for the periods indicated, as reported by NASDAQ.

| Calendar Quarter Ended: | High | | Low | |
|---|---|---|---|---|
| March 31, 2021 | $ | 20.69 | $ | 7.86 |
| June 30, 2021 | $ | 9.91 | $ | 7.01 |
| September 30, 2021 | $ | 11.82 | $ | 7.35 |
| December 31, 2021 | $ | 10.90 | $ | 7.90 |

| Calendar Quarter Ended: | High | | Low | |
|---|---|---|---|---|
| March 31, 2020 | $ | 21.75 | $ | 0.88 |
| June 30, 2020 | $ | 29.72 | $ | 6.81 |
| September 30, 2020 | $ | 30.99 | $ | 8.07 |
| December 31, 2020 | $ | 16.96 | $ | 9.01 |

**Holders**

As of March 22, 2022, the last reported sales price reported on NASDAQ for our common stock was $6.47 per share. As of March 22, 2022, we had approximately 154 record holders of our common stock. The number of record holders was determined from the records of our transfer agent and does not include beneficial owners of common stock whose shares are held in the names of various security brokers, dealers, and registered clearing agencies. The transfer agent for our common stock is VStock Transfer LLC located at 18 Lafayette Pl, Woodmere, New York 11598.

17

## Dividends

We have never declared or paid any cash dividends on our capital stock. The payment of dividends on our common stock in the future will depend on our earnings, capital requirements, operating and financial condition and such other factors as our Board of Directors may consider appropriate. We do not anticipate paying dividends on our common stock in the foreseeable future.

## Recent Sales of Unregistered Securities

We issued the unregistered securities below. For the issuances of unregistered securities, we relied on the exemption from registration requirements of the Securities Act of 1933, as amended, available under Section 4(a)(2) promulgated thereunder due to the fact that such issuances did not involve a public offering of securities.

- During the year ended December 31, 2021, we issued an aggregate of 5,548 shares of our common stock for services rendered pursuant to consulting agreements.

## Purchases of Equity Securities by the Issuer and Affiliated Purchasers

None.

## ITEM 6. RESERVED

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULT OF OPERATIONS

The following management's discussion and analysis of financial condition and results of operations describes the principal factors affecting the results of our operations, financial condition, and changes in financial condition. This discussion should be read in conjunction with the accompanying audited financial statements, and notes thereto, included elsewhere in this report. In addition to historical information, this Annual Report contains forward-looking statements that involve risks, uncertainties, and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including but not limited to those set forth under the caption "Item 1A. Risk Factors" in this Annual Report on Form 10-K.

## Business Overview

Co-Diagnostics, Inc., a Utah corporation (the "Company" or "CODX"), develops, manufactures and sells reagents used for diagnostic tests that function via the detection and/or analysis of nucleic acid molecules (DNA or RNA), including robust and innovative molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications. In connection with the sale of our tests we may sell diagnostic equipment from other manufacturers as self-contained lab systems (which we refer to as the "MDx Device"). We have also developed a unique, groundbreaking portable PCR device (the "YourTest PCR™ Device") that has been designed to bring affordable, reliable gold-standard polymerase chain reaction to patients in point-of-care and even at-home settings.

Our diagnostics systems enable dependable, low-cost, molecular testing for organisms and genetic diseases by automating historically complex procedures in both the development and administration of tests. CODX's technical advance

involves a novel, patented approach to PCR test design of primer and probe structure ("CoPrimers™") that eliminates one of the key vexing issues of PCR amplification, the exponential growth of primer-dimer pairs (false positives and false negatives) which adversely interferes with identification of the target DNA/RNA.

We believe our proprietary molecular diagnostics technology is paving the way for innovation in disease detection and life sciences research through our enhanced detection of genetic material. For various reasons, including owning our own our platform, we believe we will be able to accomplish this faster and more economically, allowing for significant margins while still positioning the Company to be a low-cost provider of molecular diagnostics and screening services.

18

In addition, continued development has demonstrated the unique properties of our CoPrimer technology that we believe makes it ideally suited for a variety of applications where specificity is key to optimal results, including multiplexing several targets, enhanced Single Nucleotide Polymorphism ("SNP") detection and enrichment for next generation sequencing.

Our scientists use the complex mathematics of DNA/RNA test design to engineer and optimize DNA/RNA tests and to automate algorithms that rapidly screen millions of possible options to pinpoint the optimum design. Dr. Brent Satterfield, our founder, developed the Company's intellectual property consisting of the predictive mathematical algorithms and patented molecular structure used in the testing process, which together represent a major advance in PCR testing systems. CODX technologies are now protected by more than 20 granted or pending US and foreign patents, as well as certain trade secrets and copyrights. Ownership of our proprietary platform permits us the advantage of avoiding payment of patent royalties required by other PCR test systems, which may allow the sale of diagnostic PCR tests at a lower price than competitors, while enabling us to maintain profit margins.

We may either sell or lease the MDx Device to labs and diagnostic centers, through sale or lease agreements, and sell the reagents that comprise our proprietary tests to those laboratories and testing facilities.

Our proprietary test design process involves identifying the optimal locations on the target genes for amplification and pair the locations with the optimized primer and probe structure to achieve outputs that meet the design input requirements identified from market research. This is done by following planned and documented processes, procedures and testing. In other words, we use the data resulting from our tests to verify whether we succeeded in designing what we intended at the outset. Verification is a series of testing that concludes that the product is ready to proceed to validation in an evaluation either in our laboratory or in an independent laboratory setting using initial production tests to confirm that the product as designed meets the user needs.

Using our proprietary test design system and proprietary reagents, we have designed and obtained regulatory approval in the European Community and/or in India to sell PCR diagnostic tests for the detection of COVID-19, influenza, tuberculosis, hepatitis B and C, human papillomavirus, malaria, chikungunya, dengue, and the zika virus. In the United States, CODX has obtained Emergency Use Authorization ("EUA") for its Logix Smart™ COVID-19 detection test from the Food and Drug Administration, or FDA, and sells that test to qualified labs. In addition, our COVID-19 detection test and certain of our other suite of COVID-19 products have been approved for sale in countries such as the United Kingdom, Australia and Mexico by the regulatory bodies in those countries and have been registered for sale in many more countries.

In addition to testing for infectious disease, the technology lends itself to identifying any section of a DNA or RNA strand that describe any type of genetic trait, which creates a number of significant applications. We, in conjunction with our customers, are active in designing and licensing tests that identify genetic traits in plant and animal genomes. We also have three multiplexed tests developed to test mosquitos for the identification of diseases carried by the mosquitos to enable municipalities to concentrate their efforts in managing mosquito populations on the specific areas known to be breeding the mosquitos that carry deadly viruses.

19

**RESULTS OF OPERATIONS**

**Results of Operations for the Years Ended December 31, 2021 and 2020**

The table below provides a comparison of our operating results for the year ended December 31, 2021 as compared to the year ended December 31, 2020.

| | Years Ended December 31, | | Year Change | |
| | 2021 | 2020 | Change | % |
|---|---|---|---|---|
| Revenue | $ 97,885,603 | $ 74,552,758 | $ 23,332,845 | 31% |
| Cost of revenue | 11,574,944 | 16,591,346 | (5,016,402) | -30% |
| Gross profit | 86,310,659 | 57,961,412 | 28,349,247 | 49% |
| Operating expenses | | | | |
| Sales and marketing | 13,397,813 | 4,665,113 | 8,732,700 | 187% |
| General and administrative | 11,550,615 | 8,278,734 | 3,271,881 | 40% |
| Research and development | 14,961,916 | 3,185,290 | 11,776,626 | 370% |
| Depreciation and amortization | 335,363 | 138,635 | 196,728 | 142% |
| Total operating expenses | 40,245,707 | 16,267,772 | 23,977,935 | 147% |
| Income from operations | 46,064,952 | 41,693,640 | 4,371,312 | 10% |
| Other income (expense) | | | | |
| Interest income | 45,631 | 97,215 | (51,584) | -53% |
| Loss on disposition of assets | (44,355) | (175) | (44,180) | 25246% |
| Gain (loss) on equity method investment in joint venture | (430,433) | 778,385 | (1,208,818) | -155% |
| Total other income (expense) | (429,157) | 875,425 | (1,304,582) | -149% |
| Income before income taxes | 45,635,795 | 42,569,065 | 3,066,730 | 7% |
| Income tax provision | 8,977,231 | 90,536 | 8,886,695 | 9816% |
| Net income | $ 36,658,564 | $ 42,478,529 | $ (5,819,965) | -14% |

**Revenues**

For the year ended December 31, 2021, we generated $97.9 million of revenue compared to revenue of $74.5 million in the year ended December 31, 2020. The increase in revenue of $23.3 million was primarily due to sales of our LogixSmart COVID-19 test throughout the world, which was developed in response to the current COVID-19 pandemic. Of the total revenue in 2021 and 2020, respectively, $0.5 million and $3.7 million was from the sale of third party manufactured equipment and supplies that we sourced and sold to customers to facilitate usage of our test.

**Cost of Revenues and Gross Profit**

Cost of revenues decreased by $5.0 million from $16.6 million for the year ended December 31, 2020 to $11.6 million for the year ended December 31, 2021. The decrease in cost of revenues was due to a reduction of production costs and the reduction in sales of third-party equipment, which have a higher cost of sales than tests, and the commission structure of certain sales of tests sold during the year. Our gross margin was 88.2% for the year ended December 31, 2021 compared to 77.7% for the year ended December 31, 2020. The increase in gross margin was due to the reduction of production costs, as well as the mix of products we sold, with the majority of our 2021 revenue came from sales of our test reagents, which has a higher profit margin than sales of equipment.

**Operating Expenses**

We incurred total operating expenses of $40.2 million for the year ended December 31, 2021 compared to total operating expenses of $16.3 million for the year ended December 31, 2020. The increase in operating expenses was primarily due to the increase in business activities experienced as a result of our increase in revenue, increased third party sales

commissions, reflected in sales and marketing, and increased investment in research and development.

Sales and marketing expenses for the year ended December 31, 2021 were $13.4 million compared to $4.7 million for the year ended December 31, 2020. The increase of $8.7 million was primarily a result of increased expenses related to stock-based compensation, and personnel related expenses, including commissions paid to our sales team and distributors, due to the growth in revenue noted above.

20

---

General and administrative expenses increased $3.3 million from $8.3 million for the year ended December 31, 2020 to $11.6 million for the year ended December 31, 2021. The increase in general and administrative expenses was primarily due to increased activity to support the growth of our business. The primary drivers of the increased expenses related to increases in stock-based compensation, employee related expenses and increased expenses for professional services.

Our research and development expenses increased by $11.8 million from $3.2 million for the year ended December 31, 2020, to $15.0 million for the year ended December 31, 2021. The primary increase in expenses related to expenditures of over $9.2 million for our point-of-care device, as well as increases in salaries and related benefits, including stock-based compensation, as we have added additional employees to our research and development team to increase our product development activities. Additionally, there has been an increase in professional and lab services utilized to further help us in our research and product development activities.

**Other Income (Expense)**

Other expense was $0.4 million for the year ended December 31, 2021, compared to other income of $0.9 million for the year ended December 31, 2020. The decrease in other income of $1.3 million was primarily related to recording a loss of $0.4 million in 2021 from our India joint venture. For the year ended December 31, 2020 we recorded a gain of $0.8 million from our India joint venture.

**Net Income**

We realized net income for the year ended December 31, 2021 of $36.7 million compared to net income of $42.5 million for the year ended December 31, 2020. The decrease in net income of $5.8 million was primarily the result of sales of our LogixSmart COVID-19 test and resulting margins from those sales offset by increased operating expenses as discussed above. Additionally, we recorded income tax expense of $9.0 million during the year ended December 31, 2021, compared to $0.1 million for the year ended December 31, 2020. During 2020, we released our deferred tax asset valuation allowance and recorded a deferred tax asset since we utilized our net operating losses from prior years during the year ended December 31, 2020.

**LIQUIDITY AND CAPITAL RESOURCES**

At December 31, 2021, we had cash and cash equivalents of $88.6 million and marketable investment securities of $1.3 million that could readily be converted into cash if needed. Additionally, our total current assets at December 31, 2021, were $115.1 million compared to total current liabilities of $12.6 million.

Net cash provided by operating activities during the year ended December 31, 2021 was $41.1 million, compared to $28.2 million for the year ended December 31, 2020. The increase in cash from operating activities was primarily due to our increased revenue and decrease in inventory, offset by increases in accounts receivable.

We received $4.1 million of cash from investing activities during the year ended December 31, 2021 as compared to $5.8 million of cash used in investing activities during the year ended December 31, 2020. The increase in cash provided by investing activities is primarily due to net cash acquired from business acquisitions and proceeds received from maturities of marketable investment securities.

Net cash provided by financing activities was $0.5 million for the year ended December 31, 2021, compared to $19.7 million for the year ended December 31, 2020. The decrease is primarily due to net proceeds of $18.0 million received from a series of three registered direct offerings in 2020 pursuant to our shelf registration in addition to receiving $1.7 million from the exercise of warrants and options for the year ended December 31, 2020.

Since commencing sales of our Logix Smart™ COVID-19 test in March 2020, we have used our cash generated from those sales to fund the purchase of inventories and the development of our point-of-care device, and to pay our operating expenses. We have increased our work force most significantly in research and development in order to continue development of a new device and additional tests that will enable continued use of our distributor network to sell additional products throughout the world.

21

We believe that our existing capital resources and the cash generated from future sales will be sufficient to meet our projected operating requirements for the next 12 months. However, our available capital resources may be consumed more rapidly than currently expected and we may need or want to raise additional financing for strategic opportunities. If needed, we expect additional investment capital to come from (i) additional issuances of our common stock with existing and new investors or (ii) the private placement of other securities with investors similar to those that have provided funding in the past. We may not be able to secure such financing in a timely manner or on favorable terms, if at all.

On October 30, 2020, we filed a Registration Statement on Form S-3 (File No: 333-249651) with the Securities and Exchange Commission (the "SEC"). The SEC declared the Form S-3 effective on November 5, 2020. Pursuant to a prospectus supplement to the Form S-3, we may offer and sell up to $100 million of the following securities separately or together, in one or more series or classes and in amounts, at prices and on terms described in one or more offerings: common stock; preferred stock; warrants to purchase our securities, each of which may be convertible into equity securities; or units comprised of, or other combinations of, the foregoing securities through underwriting syndicates managed or co-managed by one or more underwriters or dealers, through agents or directly to purchasers. Each time our securities are offered, we will provide a prospectus supplement to the Form S-3 containing more specific information about the particular offering. To date, we have not filed a prospectus supplement to, or sold any securities under, this Form S-3.

Below is a summary of the direct offerings done in 2020:

- In January 2020, we sold an aggregate of 3,448,278 shares of common stock to institutional investors for $1.45 per share for gross proceeds of approximately $5.0 million pursuant to a shelf-registration statement on Form S-3 (File No: 333-226835) declared effective by the SEC on September 7, 2018 (the "Shelf Registration Statement").

- On February 10, 2020, the Company entered into securities purchase agreements with certain institutional investors pursuant to which such investors purchased an aggregate of 3,324,676 shares of common stock at a purchase price of $3.08 per share in a registered direct offering pursuant to the Shelf Registration Statement. The aggregate gross proceeds for the sale of the shares were approximately $10.2 million. The closing of the offering occurred on or about February 13, 2020.

- On February 28, 2020, the Company entered into securities purchase agreements with certain institutional investors pursuant to which such investors purchased an aggregate of 470,000 shares of common stock at a purchase price of $9.00 per share in a registered direct offering pursuant to the Shelf Registration Statement. The aggregate gross proceeds for the sale of the shares were approximately $4.0 million. The closing of the offering occurred on or about February 28, 2020.

The foregoing estimates, expectations and forward-looking statements are subject to change as we make strategic operating decisions from time to time and as our revenue and expenses fluctuate from period to period.

**Off-Balance Sheet Arrangements**

As of December 31, 2021 and 2020, we had no off-balance sheet arrangements.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Not required.

22

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA.

**CONSOLIDATED FINANCIAL STATEMENTS**
**DECEMBER 31, 2021 AND 2020**

**Table of Contents**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 457 ) | 23 |
| Balance Sheets | 24 |
| Statements of Operations | 25 |
| Statement of Changes in Stockholders' Equity | 26 |
| Statements of Cash Flows | 27 |
| Notes to Financial Statements | 28 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of Co-Diagnostics, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Co-Diagnostics, Inc. (the Company) as of December 31, 2021 and 2020, and the related statements of operations, changes in stockholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2021, and the related notes (collectively referred to as the financial statements). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020 and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2021, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting

principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

Haynie & Company
Salt Lake City, Utah
March 24, 2022

We have served as the Company's auditor since 2016.

23

## CO-DIAGNOSTICS, INC. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 88,607,234 | $ 42,976,713 |
| Marketable investment securities | 1,255,266 | 4,335,446 |
| Accounts receivable, net | 20,839,182 | 12,136,833 |
| Inventory | 2,004,169 | 7,995,189 |
| Prepaid expenses | 2,338,444 | 369,028 |
| Note receivable | 75,000 | - |
| Total current assets | 115,119,295 | 67,813,209 |
| Property and equipment, net | 1,933,216 | 949,639 |
| Goodwill | 14,706,818 | - |
| Intangible assets, net | 27,195,000 | - |
| Investment in joint venture | 1,004,953 | 1,927,125 |
| Deferred tax asset | - | 547,224 |
| Note receivable | 75,000 | - |
| Total assets | $ 160,034,282 | $ 71,237,197 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities | | |
| Accounts payable | $ 607,506 | $ 598,318 |
| Accrued expenses, current | 3,859,652 | 2,849,503 |
| Accrued expenses (related party), current | - | 120,000 |
| Contingent consideration liabilities, current | 5,767,304 | - |
| Income taxes payable | 2,213,088 | 189,729 |
| Deferred revenue | 150,000 | 305,307 |
| Total current liabilities | 12,597,550 | 4,062,857 |
| Long-term liabilities | | |
| Income taxes payable | 1,067,853 | 447,831 |
| Deferred tax liability | 7,228,444 | - |
| Contingent consideration liabilities | 4,665,337 | - |
| Accrued expenses (related party), noncurrent | - | 30,000 |
| Total long-term liabilities | 12,961,634 | 477,831 |
| Total liabilities | 25,559,184 | 4,540,688 |
| **Commitments and contingencies (Note 14)** | | |
| **Stockholders' equity** | | |
| Convertible preferred stock, $ 0.001 par value; 5,000,000 shares authorized; 0 shares issued and outstanding as of December 31, 2021 and December 31, 2020 | - | - |

| | | |
|---|--:|--:|
| Common stock, $ 0.001 par value; 100,000,000 shares authorized; 33,819,862 and 28,558,033 shares issued and outstanding as of December 31, 2021 and December 31, 2020, respectively | 33,820 | 28,558 |
| Additional paid-in capital | 80,271,999 | 49,157,236 |
| Accumulated earnings | 54,169,279 | 17,510,715 |
| Total stockholders' equity | 134,475,098 | 66,696,509 |
| Total liabilities and stockholders' equity | $ 160,034,282 | $ 71,237,197 |

See accompanying notes to consolidated financial statements.

24

CO-DIAGNOSTICS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS

| | Years Ended December 31, | |
|---|--:|--:|
| | **2021** | **2020** |
| Revenue | $ 97,885,603 | $ 74,552,758 |
| Cost of revenue | 11,574,944 | 16,591,346 |
| Gross profit | 86,310,659 | 57,961,412 |
| Operating expenses | | |
| Sales and marketing | 13,397,813 | 4,665,113 |
| General and administrative | 11,550,615 | 8,278,734 |
| Research and development | 14,961,916 | 3,185,290 |
| Depreciation and amortization | 335,363 | 138,635 |
| Total operating expenses | 40,245,707 | 16,267,772 |
| Income from operations | 46,064,952 | 41,693,640 |
| Other income (expense) | | |
| Interest income | 45,631 | 97,215 |
| Loss on disposition of assets | ( 44,355) | ( 175) |
| Gain (loss) on equity method investment in joint venture | ( 430,433) | 778,385 |
| Total other income (expense) | ( 429,157) | 875,425 |
| Income before income taxes | 45,635,795 | 42,569,065 |
| Income tax provision | 8,977,231 | 90,536 |
| Net income | $ 36,658,564 | $ 42,478,529 |
| Earnings per common share: | | |
| Basic | $ 1.27 | $ 1.59 |
| Diluted | $ 1.23 | $ 1.52 |
| Weighted average shares outstanding: | | |
| Basic | 28,874,555 | 26,720,133 |
| Diluted | 29,903,686 | 28,000,341 |

See accompanying notes to consolidated financial statements.

25

CO-DIAGNOSTICS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

| Convertible | | Common Stock | | Additional | Accumulated | Total |
|---|---|---|---|---|---|---|

| | Preferred Stock | | | | Paid-in | Earnings | Stockholders' |
| | Shares | Amount | Shares | Amount | Capital | (Deficit) | Equity |
|---|---|---|---|---|---|---|---|
| Balance as of December 31, 2019 | 25,600 | $ 26 | 17,342,922 | $ 17,343 | $ 26,687,701 | $ (24,967,814) | $ 1,737,256 |
| Public offering, net of offering costs of $ 1,457,922 | - | - | 7,242,954 | 7,243 | 18,004,840 | - | 18,012,083 |
| Common stock issued for warrant exercises | - | - | 856,660 | 857 | 269,143 | - | 270,000 |
| Common stock issued for option exercises | - | - | 871,229 | 871 | 1,459,729 | - | 1,460,600 |
| Stock-based compensation expense | - | - | 110,935 | 111 | 2,737,930 | - | 2,738,041 |
| Conversion of preferred stock to common | (25,600) | (26) | 2,133,333 | 2,133 | (2,107) | - | - |
| Net income | - | - | - | - | - | 42,478,529 | 42,478,529 |
| Balance as of December 31, 2020 | - | $ - | 28,558,033 | $ 28,558 | $ 49,157,236 | $ 17,510,715 | $ 66,696,509 |
| Common stock issued for option exercises | - | - | 189,225 | 189 | 450,209 | - | 450,398 |
| Stock-based compensation expense | - | - | 444,050 | 444 | 5,508,960 | - | 5,509,404 |
| Common stock issued for acquisitions | - | - | 4,628,554 | 4,629 | 25,155,594 | - | 25,160,223 |
| Net income | - | - | - | - | - | 36,658,564 | 36,658,564 |
| Balance as of December 31, 2021 | - | $ - | 33,819,862 | $ 33,820 | $ 80,271,999 | $ 54,169,279 | $ 134,475,098 |

See accompanying notes to consolidated financial statements.

26

**CO-DIAGNOSTICS, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Years Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| **Cash flows from operating activities** | | |
| Net income | $ 36,658,564 | $ 42,478,529 |
| Adjustments to reconcile net income to cash used in operating activities: | | |
| Depreciation and amortization | 335,363 | 138,635 |
| Stock-based compensation expense | 5,509,404 | 2,738,041 |
| Loss (gain) from equity method investment | 430,433 | (778,385) |
| Loss on disposition of assets | 44,355 | 175 |
| Deferred income taxes | 930,081 | (547,224) |
| Bad debt expense | 69,672 | 954,804 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (8,740,851) | (12,960,255) |
| Prepaid expenses | (2,049,095) | (6,462) |
| Inventory | 5,705,361 | (7,915,241) |
| Deferred revenue | (155,307) | 303,984 |
| Income taxes payable | 2,643,381 | - |
| Accounts payable and accrued expenses | (299,937) | 3,758,634 |
| Net cash provided by operating activities | 41,081,424 | 28,165,235 |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (669,463) | (774,397) |
| Purchases of marketable investment securities | - | (9,310,000) |
| Proceeds from maturities of marketable investment securities | 3,080,180 | 4,974,554 |
| Investment in joint venture | 491,739 | (714,500) |
| Business combinations, net of cash acquired | 1,196,243 | - |
| Net cash provided by (used in) investing activities | 4,098,699 | (5,824,343) |
| **Cash flows from financing activities** | | |
| Proceeds from sale of common stock | - | 19,470,005 |
| Proceeds from exercise of options and warrants | 450,398 | 1,730,599 |
| Payment of offering costs | - | (1,457,921) |

| | | | | |
|---|---|---:|---|---:|
| Net cash provided by financing activities | | 450,398 | | 19,742,683 |
| Net increase in cash and cash equivalents | | 45,630,521 | | 42,083,575 |
| Cash and cash equivalents at beginning of period | | 42,976,713 | | 893,138 |
| Cash and cash equivalents at end of period | $ | 88,607,234 | $ | 42,976,713 |
| **Supplemental disclosure of cash flow information** | | | | |
| Interest paid | $ | - | $ | - |
| Income taxes paid | $ | 5,403,769 | $ | - |
| **Supplemental disclosure of non-cash investing and financing transactions** | | | | |
| Inventory moved to property, plant and equipment | $ | 285,659 | $ | 117,220 |
| Fair value of common stock issued as consideration for business acquisitions | $ | 25,160,223 | $ | - |
| Fair value of contingent common stock and warrants issued as consideration for business acquisitions | $ | 10,432,641 | $ | - |

See accompanying notes to consolidated financial statements.

27

**CO-DIAGNOSTICS, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 AND 2020**

## Note 1 – Overview and Basis of Presentation

### Description of Business

Co-Diagnostics, Inc., a Utah corporation (the "Company" or "CODX"), is developing robust and innovative molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications. The Company develops, manufactures and sells reagents used for diagnostic tests that function via the detection and/or analysis of nucleic acid molecules (DNA or RNA). In connection with the sale of these tests, the Company may sell diagnostic equipment and supplies from other manufacturers.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and the accompanying notes. Such estimates include receivables and other long-lived assets, legal and regulatory contingencies, income taxes, share based arrangements, and others. These estimates and assumptions are based on management's best estimates and judgments. Actual amounts and results could differ from those estimates.

### Basis of Presentation

The accompanying audited consolidated financial statements of Co-Diagnostics, Inc. and its wholly owned subsidiaries have been prepared to reflect the financial position, results of operations and cash flows of the Company and have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). All intercompany balances and transactions have been eliminated.

## Note 2 – Summary of Significant Accounting Policies

### Reclassifications

Certain prior year amounts have been reclassified to conform with the current year's presentation. These reclassifications have no impact on the previously reported results.

**Cash and Cash Equivalents**

Cash and cash equivalents consist of cash on hand, money market funds and highly liquid investments with an original maturity date of 90 days or less from the date of purchase. The fair value of cash equivalents approximated their carrying value as of December 31, 2021 and December 31, 2020. The Company has its cash and cash equivalents with a large creditworthy financial institution and the balance exceeded federally insured limits. The Company has not experienced any losses in such accounts, and management believes the Company is not exposed to any significant credit risk on cash and cash equivalents.

**Marketable Investment Securities**

The Company's marketable investment securities are comprised of investments in certificates of deposit. The Company determines the appropriate classification of its marketable investment securities at the time of purchase and reevaluates such designation at each balance sheet date. The Company has classified and accounted for its marketable investment securities as available-for-sale securities as the Company may sell these securities at any time for use in its current operations or for other purposes, even prior to maturity. As a result, the Company classifies its marketable investment securities, including securities with stated maturities beyond twelve months, within current assets in the consolidated balance sheets. Any unrealized gains or losses are immaterial.

**Accounts Receivable**

Trade accounts receivable are recorded at the invoiced amount (net of allowance) and do not bear interest. The Company maintains an allowance for doubtful accounts for amounts the Company does not expect to collect. In establishing the required allowance, management considers historical losses, current market condition, customers' financial condition, the age of receivables, and current payment patterns. Account balances are written off against the allowance once the receivable is deemed uncollectible. Recoveries of trade receivables previously written off are recorded when collected. At December 31, 2021 total accounts receivable was $ 21,508,779 with an allowance for uncollectable accounts of $ 669,597 resulting in a net amount of $ 20,839,182 . At December 31, 2020 total accounts receivable was $ 12,928,633 with an allowance for uncollectable accounts of $ 791,800 resulting in a net amount of $ 12,136,833 .

28

**Equity-Method Investments**

Our equity method investments are initially recorded at cost and are included in other long-term assets in the accompanying consolidated balance sheet. We adjust the carrying value of our investment based on our share of the earnings or losses in the periods which they are reported by the investee until the carrying amount is zero. The earnings or losses are included in other income (expense) in the accompanying consolidated statements of operations.

**Inventory**

Inventory is stated at the lower of cost or net-realizable value. Inventory cost is determined on a first-in first-out basis that approximates average cost in accordance with ASC 330-10-30-12. At December 31, 2021, the Company had $ 2,004,169 in inventory, of which $ 983,088 was finished goods and $ 1,021,081 was raw materials. At December 31, 2020, the Company had $ 7,995,189 in inventory, of which $ 598,881 was finished goods and $ 7,396,308 was raw materials. The Company establishes reserves to reduce low-moving, obsolete, or unusable inventories to their estimated useful or scrap values.

**Property and Equipment**

Property and equipment are stated at cost less accumulated depreciation and amortization. Depreciation is provided using the straight-line method over the estimated useful lives of the property, generally from three to five years . Repairs and

maintenance costs are expensed as incurred except when such repairs significantly add to the useful life or productive capacity of the asset, in which case the repairs are capitalized.

The Company reviews its long-lived assets, including property and equipment, for impairment whenever an event or change in facts and circumstances indicates that their carrying amounts may not be recoverable. Recoverability of these assets is measured by comparing the carrying amount to the estimated undiscounted future cash flows expected to be generated. If the carrying amount exceeds the undiscounted cash flows, the assets are determined to be impaired and an impairment charge is recognized as the amount by which the carrying amount exceeds fair value.

**Business Combinations**

We estimate the fair value of assets acquired and liabilities assumed in a business combination. Goodwill as of the acquisition date is measured as the excess of consideration transferred over the net of the acquisition date fair values of the assets acquired and the liabilities assumed. Such valuations require management to make significant estimates and assumptions, especially with respect to intangible assets. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable, and as a result, actual results may differ from estimates.

**Revenue Recognition**

The Company generates revenue from product sales and license sales. The Company recognizes revenue when all of the following criteria are satisfied: (i) identification of the promised goods or services in the contract; (ii) determination of whether the promised goods or services are performance obligations, including whether they are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when, or as the Company satisfies each performance obligation. Based on the criteria above, the Company typically recognizes revenue upon delivery.

The Company constrains revenue by giving consideration to factors that could otherwise lead to a probable reversal of revenue. The Company records any payments received from customers prior to the Company fulfilling its performance obligation(s) as deferred revenue.

**Deferred Revenue**

Deferred revenue primarily consists of payments received from customers prior to the Company fulfilling its performance obligation of providing the product. When this occurs, the Company records a contract liability as deferred revenue. Deferred revenue is recognized as revenue as the related performance obligations are satisfied.

29

**Research and Development**

Research and development costs are expensed when incurred. The Company expensed $ 14,961,916 and $ 3,185,290 of research and development costs for the years ended December 31, 2021 and 2020, respectively.

**Stock-based Compensation**

The Company has granted stock-based awards, including restricted stock, stock options, stock warrants and restricted stock units ("RSUs"), to its employees, certain consultants and members of its board of directors. The Company records stock-based compensation based on the grant date fair value of the awards and recognizes the fair value of those awards as expense using the straight-line method over the requisite service period of the award. The Company estimates the grant date fair value of stock options using the Black-Scholes option-pricing model. When an award is forfeited prior to the vesting date, the Company recognizes an adjustment for the previously recognized expense in the period of the forfeiture.

**Income Taxes**

The Company accounts for income taxes in accordance with the liability method of accounting for income taxes. Under this method, d eferred income tax assets and deferred income tax liabilities represent the tax effect of temporary differences between financial reporting and tax reporting measured at enacted tax rates in effect for the year in which the differences are expected to reverse. The Company recognizes only the impact of tax positions that, based on their technical merits, are more likely than not to be sustained upon an audit by the taxing authority.

Valuation allowances are provided when it is more-likely-than-not that some or all of the deferred income tax assets may not be realized. In assessing the need for a valuation allowance, the Company has considered its historical levels of income, expectations of future taxable income and ongoing tax planning strategies.

Developing the provision for income taxes, including the effective tax rate and analysis of potential tax exposure items, if any, requires significant judgment and expertise in federal and state income tax laws, regulations and strategies, including the determination of deferred income tax assets and liabilities and any estimated valuation allowances deemed necessary to value deferred income tax assets. Judgments and tax strategies are subject to audit by various taxing authorities. While the Company believes it has no significant uncertain income tax positions in the consolidated financial statements, adverse determinations by these taxing authorities could have a material adverse effect on the consolidated financial positions, result of operations, or cash flows.

**Net Income per Share**

Basic net income or loss per common share is computed by dividing net income or loss applicable to common shareholders by the weighted average number of shares outstanding during each period.

Diluted net income or loss per share is computed by dividing net income or loss attributable to common stockholders by the weighted-average number of shares of common stock outstanding during the period increased by common shares that could be issued upon conversion or exercise of other outstanding securities to the extent those additional common shares would be dilutive. The dilutive effect of potentially dilutive securities is reflected in diluted net income or loss per share by application of the treasury stock method. During periods when the Company is in a net loss position, basic net loss per share is the same as diluted net loss per share as the effects of potentially dilutive securities are anti-dilutive

**Concentrations Risk and Significant Customers**

The Company had certain customers which are each responsible for generating 10% or more of the total revenue for the years ended December 31, 2021 and 2020. Two customers together accounted for approximately 48 % and 38 % of total revenue for the years ended December 31, 2021 and 2020, respectively.

Two customers each accounted for more than 10% of accounts receivable at December 31, 2021 and 2020. These two customers together accounted for approximately 66 % and 48 % of accounts receivable at December 31, 2021 and 2020, respectively.

**Recently Issued Accounting Standards**

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") that are adopted by the Company as of the specified effective date. If not discussed, management believes that the impact of recently issued standards, which are not yet effective, will not have a material impact on the Company's financial statements upon adoption.

As an emerging growth company ("EGC"), the Company has elected to take advantage of the benefits of the extended transition period provided for in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, for complying with new or revised accounting standards which allows the Company to defer adoption of certain accounting standards until those standards

would otherwise apply to private companies.

In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842), which requires recognition of leased assets and liabilities on the balance sheet and disclosing key information about leasing arrangements. This update is effective for annual periods and interim periods with those periods beginning after December 15, 2021, for public EGC companies like us. The Company will use the modified retrospective transition method with the option to recognize a cumulative-effect adjustment at the date of adoption. The Company's balance sheet will be impacted as it records right-of-use assets and lease liabilities on its consolidated balance sheets, but the Company does not expect the adoption of this standard will have a material impact on its consolidated statements of operations and cash flows.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments-Credit Losses (Topic 326) ("ASU 2016-13"), which requires the measurement and recognition of expected credit losses for certain financial instruments, which includes the Company's accounts receivable. ASU 2016-13 replaces the existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. The update is effective for annual periods and interim periods with those periods beginning after December 15, 2021, for public EGC companies. The standard requires a cumulative effect adjustment to the balance sheet as of the beginning of the first early reporting period in which the guidance is effective. The Company is evaluating the impact of the adoption of ASU 2016-13 on its consolidated financial statements but does not expect the adoption of this standard will have a material impact on its consolidated financial statements.

**Note 3 – Business Combinations**

On December 31, 2021, the Company completed its acquisition of Advanced Conceptions, Inc. ("ACI") and Idaho Molecular Inc. ("IdMo"), which were related entities developing, with the Company, an at-home/point-of-care medical diagnostic device. Upon the completion of the acquisition, all outstanding ACI and Idaho Molecular common stock was exchanged for approximately 3.2 million shares of the Company's common stock and contingent consideration that includes up to approximately 1.4 million shares and approximately 456,000 warrants to purchase shares of the Company's common stock. The contingent consideration is based on the achievement of certain milestones, which include regulatory approval for identified products, as well as production and net revenue targets. The purchase consideration also includes a payable to a shareholder of ACI of $ 100,000 . In connection with the acquisition, the Company incurred transaction costs of approximately $ 151,000 , which is included in general and administrative expenses. Upon the completion of the acquisition, both ACI and IdMo became 100 % wholly-owned subsidiaries of the Company .

31

The fair value of assets acquired and liabilities assumed was based on a preliminary valuation, and our estimates and assumptions are subject to change within the measurement period. The primary area that remains preliminary relates to the evaluation of certain tax-related items and potential minor adjustments to the purchase consideration. The total purchase consideration was allocated to the assets acquired and liabilities assumed as set forth below:

| | | |
|---|---|---|
| Fair value of common shares issued | $ | 25,160,223 |
| Payable to shareholder | | 100,000 |
| Fair value of contingent shares | | 8,684,669 |
| Fair value of contingent warrants | | 1,747,972 |
| Total fair value of consideration transferred | $ | 35,692,864 |
| | | |
| Identifiable assets acquired and liabilities assumed | | |
| Cash | $ | 1,196,243 |
| Accounts receivable | | 31,170 |
| Prepaid expenses and other current assets | | 70,321 |
| Property and equipment | | 408,173 |
| Technology - In-process research and development | | 26,101,000 |
| Non-competition agreements | | 1,094,000 |
| Accounts payable and accrued other expenses | | ( 1,069,274) |

| | | |
|---|---|---:|
| Deferred tax liability | | ( 6,845,587) |
| Total identifiable net assets | | 20,986,046 |
| Goodwill | | 14,706,818 |
| Total | $ | 35,692,864 |

The excess of the purchase price over the net assets acquired was recorded as goodwill. Goodwill generated from the acquisition is primarily attributable to assembled workforce and expected growth from future technologies, sales to future customers and buyer specific synergies. Goodwill will not be amortized but instead will be tested for impairment at least annually and more frequently if certain indicators of impairment are present. As a result of the structure of the transaction, the balance of goodwill is not amortizable for tax purposes.

The in-process research and development is considered an indefinite-lived intangible until the completion or abandonment of the research and development activities. The non-competition agreements are being amortized over a range of 1.5 to 3 years.

As the acquisition was completed on December 31, 2021, the acquired entities did not contribute to the net revenues or to the net income of the Company during the year ended December 31, 2021. Pro forma revenue and results of operations have not been presented because the historical results of ACI and IdMo are not material to the Company's consolidated financial statements in any period presented.

**Note 4 – Fair Value Measurements**

The Company measures and records certain financial assets and liabilities at fair value on a recurring basis. Fair value is based on the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

The following three levels of inputs are used to measure the fair value of financial assets and liabilities:

Level 1: Quoted market prices in active markets for identical assets or liabilities.

Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

Level 3: Unobservable inputs that are not corroborated by market data.

32

The following table summarizes the assets and liabilities measured at fair value on a recurring basis as of December 31, 2021 and December 31, 2020, by level within the fair value hierarchy:

| | December 31, 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **(Level 1)** | | **(Level 2)** | | **(Level 3)** | | **Total** | |
| Assets: | | | | | | | | |
| Marketable securities (certificates of deposit) | $ | - | $ | 1,255,266 | $ | - | $ | 1,255,266 |
| Total assets measured at fair value | $ | - | $ | 1,255,266 | $ | - | $ | 1,255,266 |
| Liabilities: | | | | | | | | |
| Contingent consideration - common stock | $ | - | $ | - | $ | 8,684,669 | $ | 8,684,669 |
| Contingent consideration - warrants | | - | | - | | 1,747,972 | | 1,747,972 |
| Total liabilities measured at fair value | $ | - | $ | - | $ | 10,432,641 | $ | 10,432,641 |

| | December 31, 2020 | | | |
|---|---|---|---|---|
| | **(Level 1)** | **(Level 2)** | **(Level 3)** | **Total** |

| Assets: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Marketable securities (certificates of deposit) | $ | - | $ | 4,335,446 | $ | - | $ | 4,335,446 |
| Total assets measured at fair value | $ | - | $ | 4,335,446 | $ | - | $ | 4,335,446 |

The Company's financial instruments that are measured at fair value on a recurring basis consist of certificates of deposit.

In connection with the acquisitions of Idaho Molecular, Inc and Advanced Conceptions, Inc. on December 31, 2021, the Company recorded a liability for contingent consideration in the form of shares of common stock and warrants to purchase common stock. The fair value of contingent consideration is calculated using a discounted probability weighted valuation model. Discount rates used in such calculation are a significant assumption that are not observed in the market, and therefore, the resulting fair value represents a Level 3 measurement.

The changes for Level 3 items measured at fair value on a recurring basis are as follows:

| | | |
|---|---|---|
| Fair value as of December 31, 2020 | $ | - |
| Contingent considered issued for business acquisitions | | 10,432,641 |
| Fair value as of December 31, 2021 | $ | 10,432,641 |

The fair value of the contingent consideration is based on the fair value of the contingent consideration-common stock and contingent consideration-warrants. The fair value of the contingent consideration-common stock is equal to the probability-adjusted value of the Company's common stock as of December 31, 2021. The fair value of the contingent consideration-warrants is equal to the probability adjusted value of a call option with terms consistent with the terms of the warrants as of December 31, 2021. Prior to the probability adjustments, the warrants were valued based on the following inputs:

| | | December 31, 2021 |
|---|---|---|
| Stock price | $ | 8.93 |
| Strike price | $ | 9.13 |
| Volatility | | 80.00% |
| Risk-free rate | | 1.30% |
| Expected term | | 5.0 |

33

In order to calculate the probability-adjusted value of the contingent consideration-common stock and contingent consideration-warrants, the Company estimated the probability of achieving certain milestones, which include regulatory approval for identified products, as well as production and net revenue targets. The probability of achieving the milestone related to net revenues was estimated using a Monte Carlo simulation valuation model. The unobservable significant inputs to the valuation model were as follows:

| | | December 31, 2021 |
|---|---|---|
| Stock price | $ | 8.93 |
| Risk-free rate | | 1.30% |
| Expected term | | 5.0 |
| Weighted-average cost of capital | | 27.00% |
| Revenue discount rate | | 9.50% |
| Equity volatility | | 80.00% |
| Asset volatility | | 80.00% |
| Revenue volatility | | 30.00% |

**Fair Value of Other Financial Instruments**

The carrying amounts of certain financial instruments, including cash held in banks, accounts receivable, notes receivable, accounts payable, accrued liabilities, and other liabilities approximate fair value due to their short-term maturities and are excluded from the fair value tables above.

**Note 5 – Property and Equipment**

Property and equipment, net consisted of the following:

| | Estimated Useful Lives in years | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| Lab equipment | 3 - 5 | $ 2,476,813 | $ 1,212,561 |
| Leasehold improvements | 3 | 3,157 | 3,157 |
| Office equipment, furniture and other | 2 - 5 | 75,401 | 38,344 |
| Less accumulated depreciation and amortization | | ( 622,155) | ( 304,423) |
| Fixed assets, net | | $ 1,933,216 | $ 949,639 |

**Note 6 - Goodwill and Intangible Assets**

Intangible assets, net consisted of the following:

| | Estimated Useful Lives in years | December 31, 2021 | December 31, 2020 |
|---|---|---|---|
| In-process research and development | Indefinite | $ 26,101,000 | $ - |
| Non-competition agreements | 1.5 - 3 | 1,094,000 | - |
| Less accumulated amortization | | - | - |
| Intangible assets, net | | $ 27,195,000 | $ - |

34

The expected future annual amortization expense of the Company's intangible assets held as of December 31, 2021 is as follows:

| Year Ending December 31, | Amortization Expense |
|---|---|
| 2022 | $ 426,660 |
| 2023 | 364,668 |
| 2024 | 302,672 |
| Total | $ 1,094,000 |

The Company had goodwill of $14.7 million as of December 31, 2021.

**Note 7 - Accrued Expenses**

Accrued expenses consisted of the following:

| | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Payroll liabilities | $ 2,455,694 | $ 1,627,957 |
| Distributor commissions | 509,500 | 1,070,000 |
| Sales tax payable | - | 52,526 |

| | | | |
|---|---|---|---|
| Other accrued liabilities | | 894,458 | 99,020 |
| Total accrued expenses | $ | 3,859,652 | $ 2,849,503 |

## Note 8 – Revenue

The following table sets forth revenue by geographic area:

| | | Years Ended December 31, | |
|---|---|---|---|
| | | **2021** | **2020** |
| United States | $ | 52,185,812 | $ 44,862,751 |
| Rest of World | | 45,699,791 | 29,690,007 |
| Total | $ | 97,885,603 | $ 74,552,758 |
| Percentage of revenue by area: | | | |
| United States | | 53% | 60% |
| Rest of World | | 47% | 40% |

## Deferred Revenue

Changes in the Company's deferred revenue balance for the years ended December 31, 2021 and 2020 were as follows:

| | | |
|---|---|---|
| Balance as of December 31, 2019 | $ | 1,323 |
| Revenue recognized included in deferred revenue balance at the beginning of the period | | ( 1,323) |
| Increase due to prepayments from customers | | 305,307 |
| Balance as of December 31, 2020 | | 305,307 |
| Revenue recognized included in deferred revenue balance at the beginning of the period | | ( 256,110) |
| Increase due to prepayments from customers | | 79,213 |
| Increase due to note receivable | | 150,000 |
| Decrease due to refunds to customers and application to open balances | | ( 128,410) |
| Balance as of December 31, 2021 | $ | 150,000 |

The Company expects to perform its performance obligation and recognize the deferred revenue as revenue during the year ended December 31, 2022.

## Note 9 – Stockholders' Equity

### Common Stock

During the year ended December 31, 2021, the Company issued 189,225 shares of common stock upon the exercise of options and received $ 450,398 in proceeds from the exercises.

During the year ended December 31, 2021, the Company issued 5,548 shares of common stock for services provided by third parties primarily related to investor relations services.

During the year ended December 31, 2021, the Company issued 438,502 shares of common stock upon the vest and release of restricted stock units.

During the year ended December 31, 2021, the Company issued 4,628,554 shares of common stock related to the acquisitions of Idaho Molecular, Inc. and Advanced Conceptions, Inc., 1,390,430 of which are subject to forfeiture in favor of the Company if certain milestones are not achieved on or before January 1, 2027.

During the year ended December 31, 2020, the Company completed the sale of 3,448,278 shares of the Company's common stock, par value $ 0.001 per share, at a purchase price of $ 1.45 per share in a registered direct offering. The aggregate gross proceeds for the sale of the shares were $ 5,000,003 and the Company received net proceeds of $ 4,517,102 after deducting offering costs of $ 482,901 .

During the year ended December 31, 2020, the Company completed the sale of 3,324,676 shares of the Company's common stock, par value $ 0.001 per share, at a purchase price of $ 3.08 per share in a registered direct offering. The aggregate gross proceeds for the sale of the shares were $ 10,240,002 and the Company received net proceeds of $ 9,612,561 after deducting offering costs of $ 627,441 .

During the year ended December 31, 2020, the Company completed the sale of 470,000 shares of the Company's common stock, par value $ 0.001 per share, at a purchase price of $ 9.00 per share in a registered direct offering. The aggregate gross proceeds for the sale of the shares were $ 4,230,000 and the Company received net proceeds of $ 3,882,420 after deducting offering costs of $ 347,580 .

During the year ended December 31, 2020, the Company issued an aggregate of 2,133,333 shares of common stock upon conversion of all of the Company's convertible preferred stock outstanding as of December 31, 2019.

During the year ended December 31, 2020, the Company issued 856,660 shares of common stock upon the exercise of warrants and received $ 270,000 .

During the year ended December 31, 2020, the Company issued 871,229 shares of common stock upon the exercise of options and received $ 1,460,600 .

During the year ended December 31, 2020, the Company issued 83,935 shares of common stock for services provided by third parties primarily related to investor relations services.

36

## Note 10 – Earnings per Share

The following table reconciles the numerator and the denominator used to calculate basic and diluted earnings per share for years ended December 31, 2021 and 2020:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| **Numerator** | | |
| Net income, as reported | $ 36,658,564 | $ 42,478,529 |
| | | |
| **Denominator** | | |
| Weighted average shares, basic | 28,874,555 | 26,720,133 |
| Dilutive effect of stock options, warrants and RSUs | 1,029,131 | 1,280,208 |
| Shares used to compute diluted earnings per share | 29,903,686 | 28,000,341 |
| | | |
| Basic earnings per share | $ 1.27 | $ 1.59 |
| Diluted earnings per share | $ 1.23 | $ 1.52 |

For the years ended December 31, 2021 and 2020, respectively, potentially dilutive securities of 154,644 and 50,000 were excluded from the computation of diluted earnings per share because the effect would have been anti-dilutive. The computation of diluted earnings per share for the year ended December 31, 2021 also excludes the approximately 1.4 million shares of common stock and approximately 456,000 warrants to purchase shares of common stock mentioned in Note 3 that are

contingent upon the achievement of certain milestones.

**Note 11 – Stock-Based Compensation**

**Stock Incentive Plans**

The Co-Diagnostics, Inc. 2015 Long Term Incentive Plan (the "Incentive Plan") reserves an aggregate of 6,000,000 shares of common stock issuable upon the grant of awards under the Incentive Plan. The number of awards available for issuance under the Incentive Plan was 2,095,266 at December 31, 2021.

37

**Stock Options**

The following table summarizes option activity during the years ended December 31, 2021 and 2020:

| | Number of Options | | Weighted Average Exercise Price | | Weighted Average Fair Value | Weighted Average Remaining Contractual Life (Years) |
|---|---|---|---|---|---|---|
| Outstanding at December 31, 2019 | 2,021,817 | $ | 1.69 | $ | 0.83 | |
| Granted | 150,000 | | 8.14 | | 4.74 | |
| Expired | - | | - | | - | |
| Forfeited/Cancelled | - | | - | | - | |
| Exercised | ( 871,229) | | 1.68 | | 0.89 | |
| Outstanding at December 31, 2020 | 1,300,588 | $ | 2.44 | $ | 1.24 | |
| Granted | - | | - | | - | |
| Expired | - | | - | | - | |
| Forfeited/Cancelled | - | | - | | - | |
| Exercised | ( 189,225) | | 2.38 | | 1.12 | |
| Outstanding at December 31, 2021 | 1,111,363 | $ | 2.12 | $ | 1.31 | 6.62 |
| Exercisable at December 31, 2021 | 1,094,697 | $ | 2.01 | $ | 1.18 | 6.59 |

The total intrinsic value of options exercised during the years ended December 31, 2021 and 2020 was approximately $ 1.3 million and $ 11.8 million, respectively. The aggregate intrinsic value of outstanding options at December 31, 2021 and 2020 was approximately $ 7.6 million and $ 7.1 million, respectively. As of December 31, 2021, there were 16,666 unvested options and $ 78,115 of unrecognized stock-based compensation expense related to options. The unrecognized stock-based compensation expense is expected to be recognized over 0.5 years.

Stock-based compensation cost is measured at the grant date based on the fair value of the award granted and recognized as expense over the vesting period using the straight-line method. The Company uses the Black-Scholes model to value options granted. The following weighted average assumptions were used in estimating the grant date fair value of options:

| | Years Ended December 31, | |
|---|---|---|
| | **2021** | **2020** |
| Risk-free interest rate | - | 1.05% |
| Expected life (years) | - | 7.3 |
| Expected volatility | - | 62.82% |
| Expected dividend yield | - | None |

38

**Restricted Stock Units**

The grant date fair value of RSUs granted is determined using the closing market price of the Company's common stock on the grant date with the associated compensation expense amortized over the vesting period of the awards. The following table sets forth the outstanding RSUs and related activity for the years ended December 31, 2021 and 2020:

| | Number of RSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested at December 31, 2019 | - | $ - |
| Granted | 549,500 | 10.49 |
| Vested | ( 27,000) | 10.49 |
| Forfeited/Cancelled | - | - |
| Unvested at December 31, 2020 | 522,500 | $ 10.49 |
| Granted | 1,217,500 | 9.76 |
| Vested | ( 438,502) | 10.10 |
| Forfeited/Cancelled | ( 34,083) | 9.91 |
| Unvested at December 31, 2021 | 1,267,415 | $ 9.94 |

As of December 31, 2021, there was $ 11.6 million of unrecognized stock-based compensation expense related to outstanding RSUs which is expected to be recognized over a weighted-average period of 2.3 years.

**Warrants**

The Company has issued warrants related to financings, acquisitions and as compensation to third parties for services provided. The Company estimates the fair value of issued warrants on the date of issuance as determined using a Black-Scholes pricing model. The Company amortizes the fair value of issued warrants using a vesting schedule based on the terms and conditions of each warrant if granted for services.

The following table summarizes warrant activity during the years ended December 31, 2021 and 2020:

| | Number of Warrants | Weighted Average Exercise Price | Weighted Average Fair Value | Weighted Average Remaining Contractual Life (Years) |
|---|---|---|---|---|
| Outstanding at December 31, 2019 | 983,535 | $ 1.44 | $ 1.03 | |
| Granted | 20,000 | 1.40 | 15.19 | |
| Expired | ( 9,090) | 6.00 | 0.17 | |
| Forfeited/Cancelled | - | - | - | |
| Exercised | ( 924,445) | 1.42 | 1.43 | |
| Outstanding at December 31, 2020 | 70,000 | $ 1.83 | $ 5.21 | 3.3 |
| Granted | 456,281 | 9.13 | 3.83 | |
| Expired | - | - | - | |
| Forfeited/Cancelled | - | - | - | |
| Exercised | - | - | - | |
| Outstanding at December 31, 2021 | 526,281 | $ 8.15 | $ 4.01 | 4.7 |

The intrinsic value of warrants exercised during the years ended December 31, 2021 and 2020 was $ 0 and approximately $ 9.7 million, respectively. The aggregate intrinsic value of outstanding warrants at December 31, 2021 was approximately $ 497,000 .

39

70,000 warrants are exercisable at December 31, 2021. As discussed in Note 3 and Note 4, approximately 456,000 warrants to purchase shares of the Company's common stock were issued in connection with the acquisition of ACI and IdMo. The ability to exercise the warrants is contingent upon the achievement of certain development and revenue milestones on or before January 1, 2027. There was no unrecognized stock-based compensation expense related to warrants.

See Note 4 for additional information regarding the fair value calculation of the warrants issued during the year ended December 31, 2021. The fair values for the warrants issued during the year ended December 31, 2020 were estimated at the date of grant using the Black Scholes model with the following weighted average assumptions:

|  | Year Ended December 31, |
|  | 2020 |
| --- | --- |
| Risk-free interest rate | 0.34% |
| Expected life (years) | 5.0 |
| Expected volatility | 61.42% |
| Expected dividend yield | None |

## Stock Issued for Services

The Company has issued restricted stock to third parties for services provided. The grant date fair value of the restricted stock granted is determined using the closing market price of the Company's common stock on the grant date with the associated compensation expense amortized over the vesting period of the stock awards. The Company issued 5,548 and 83,935 shares of restricted stock for services during the years ended December 31, 2021 and 2020, respectively, and there was no unrecognized stock-based compensation expense related to restricted stock issued.

## Stock-Based Compensation Expense

The Company recognized stock-based compensation expense related to the types of awards discussed above as follows:

|  | Years Ended December 31, | |
|  | 2021 | 2020 |
| --- | --- | --- |
| Options | $ 292,754 | $ 901,345 |
| Restricted stock units | 5,164,750 | 500,861 |
| Warrants | - | 303,802 |
| Stock | 51,900 | 1,032,033 |
| Total stock-based compensation expense | $ 5,509,404 | $ 2,738,041 |

40

## Note 12 – Income Taxes

The components of the provision for income taxes consists of the following for the years ended December 31, 2021 and 2020:

|  | Year Ended December 31, | |
|  | 2021 | 2020 |
| --- | --- | --- |

| Current: | | | | |
|---|---|---|---|---|
| Federal | $ | 6,092,730 | $ | - |
| State | | 886,173 | | 637,760 |
| Total current | $ | 6,978,903 | $ | 637,760 |
| Deferred: | | | | |
| Federal | | 1,394,686 | | ( 452,544) |
| State | | 603,642 | | ( 94,680) |
| Total deferred | | 1,998,328 | | ( 547,224) |
| Total income tax expense | $ | 8,977,231 | $ | 90,536 |

A reconciliation of income tax expense at the statutory federal income tax rate and income taxes as reflected in the financial statements is as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2021 | 2020 |
| Federal income tax expense at statutory rate | 21.0% | 21.0% |
| State income tax expense, net of federal tax benefit | 3.9 | 3.3 |
| Permanent differences: | | |
| - Foreign derived intangible income deduction | ( 3.5 ) | ( 1.7 ) |
| - Stock based compensation | 0.2 | ( 8.8 ) |
| - Other permanent differences | 0.3 | ( 0.4 ) |
| Research and development credits | ( 2.6 ) | ( 2.0 ) |
| Change in uncertain tax positions | 1.4 | 1.1 |
| Change in valuation allowance | 0.0 | ( 12.1 ) |
| Other | ( 1.0 ) | ( 0.2 ) |
| Effective income tax rate | 19.7% | 0.2% |

41

Net deferred tax assets consist of the following components as of December 31, 2021 and 2020:

| | December 31, | | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| Deferred tax assets: | | | | |
| Accrued liabilities | $ | - | $ | 37,898 |
| Reserves and allowances | | 166,050 | | 200,049 |
| Deferred compensation | | 393,871 | | 241,652 |
| Research and development credits | | - | | 423,001 |
| Total deferred tax assets | | 559,921 | | 902,600 |
| Deferred tax liabilities: | | | | |
| Property and equipment, net | | ( 477,542) | | ( 233,951) |
| Intangibles, net | | ( 6,743,972) | | - |
| Prepaids | | ( 560,093) | | ( 66,456) |
| Other | | ( 6,758) | | ( 54,969) |
| Total deferred tax liabilities | | ( 7,788,365) | | ( 355,376) |
| Net deferred tax assets (liabilities) | | ( 7,228,444) | | 547,224 |
| Less valuation allowance | | - | | - |
| Net deferred tax assets (liabilities) | $ | ( 7,228,444) | $ | 547,224 |

At December 31, 2021, the Company had no federal or state net operating loss carryforwards and no federal or state research and development credit carryforwards.

As of each reporting date, management considers new evidence, both positive and negative, that could affect its view of the future realization of deferred tax assets. As of December 31, 2020, in part because in that year the Company achieved three years of cumulative pre-tax income, management determined that there was sufficient positive evidence to conclude that it was more likely than not that its deferred taxes were realizable. The Company therefore fully reduced its valuation allowance accordingly by $ 5,161,500 .

ASC Topic 740-10-05 requires that the impact of a tax position be recognized in the financial statements if that position is more likely than not of being sustained on audit, based on the technical merits of the position. Our unrecognized tax benefit balances included $ 1,067,853 at December 31, 2021 and $ 447,831 at December 31, 2020 of tax positions that, if recognized, would impact our effective tax rate. The Company expects no material changes to the liability for unrecognized tax benefits in the next 12 months. Interest and penalties associated with uncertain tax positions are recorded as a component of income tax expense. A reconciliation of the beginning and ending amount of unrecognized benefits is as follows:

|  | December 31, | |
|  | 2021 | 2020 |
|---|---|---|
| Unrecognized tax benefits at the beginning of the year | $ 447,831 | $ - |
| Gross increases - current year tax positions | 770,069 | 232,145 |
| Gross increases - prior year tax positions | - | 215,686 |
| Gross decreases - prior year tax positions | ( 150,047) | - |
| Unrecognized tax benefits at end of year | $ 1,067,853 | $ 447,831 |
| | | |
| Interest and penalties in year-end balance | $ - | $ - |

42

The Company is subject to taxation in the United States and other state jurisdictions. The tax years from December 31, 2017 through December 31, 2021 remain open to examination for federal income tax purposes and by the other major taxing jurisdictions to which the Company is subject. The Company is not currently under examination by any taxing authority.

## Note 13 – Related Party Transactions

The Company acquired the exclusive rights to the CoPrimer technology pursuant to an exclusive license agreement, dated April 2014 (the "Exclusive License Agreement"), between the Company and DNA Logix, Inc., which was assigned to Dr. Brent Satterfield, an executive officer, prior to the Company's acquisition of DNA Logix, Inc. On March 1, 2017, the Company entered into an amendment to its Exclusive License Agreement for its Cooperative Primers ("License") technology with Dr. Satterfield. The amendment provided in part that all accrued royalties under the License ceased as of January 1, 2017, and the Company agreed to pay to Dr. Satterfield $ 700,000 of accrued royalties at the rate of $ 10,000 per month starting in January 2017. At December 31, 2021, the aggregate balance of this related party liability was $ 0 .

## Note 14 – Commitments and Contingencies

## Lease Obligations

The Company's offices are located at 2401 S. Foothill Dr., Suite D, Salt Lake City, Utah 84109-1479. In February 2020, the Company entered into a 4 -year lease agreement for its office space and in March 2020, the Company entered into an addendum with our landlord for additional space. The aggregate space consists of approximately 13,687 square feet at a monthly rate of $ 28,825 and expires in February 2024 . As a result of business acquisitions during the year ended December 31, 2021, the Company also leases additional laboratory and office space under two month-to-month leases. For the years ended December 31, 2021 and 2020, the Company expensed $ 346,350 and $ 311,963 , respectively, for rent. The Company's future minimum lease payments were as follows as of December 31, 2021:

**Year Ending December 31,**

| | | |
|---|---|---|
| 2022 | $ | 293,595 |
| 2023 | | 303,059 |
| 2024 | | 50,774 |
| Total lease payments | $ | 647,428 |

**Litigation**

Liabilities for loss contingencies arising from claims, assessments, litigation, fines, and penalties and other sources are recorded when it is probable that a liability has been incurred and the amount can be reasonably estimated. Legal costs incurred in connection with loss contingencies are expensed as incurred.

Five different securities class action complaints were filed in July, September and December by certain stockholders of the Company against the Company claiming that the Company promulgated false and misleading press releases to increase the price of our stock to improperly benefit the officers and directors of the Company. The plaintiffs demand compensatory damages sustained as a result of the Company's alleged wrongdoing in an amount to be proven at trial. The Company believes these lawsuits are without merit and intends to defend the cases vigorously. The Company is unable to estimate a range of loss, if any, that could result were there to be an adverse final decision in these cases. As of the date of this report, the Company does not believe it is probable that these cases will result in an unfavorable outcome; however, if an unfavorable outcome were to occur in these cases, it is possible that the impact could be material to the Company's results of operations in the period(s) in which any such outcome becomes probable and estimable.

**Note 15 – Subsequent Events**

In March 2022, the Company's Board of Directors authorized a share repurchase program that would allow the Company to repurchase up to $ 30 million of CODX common stock. The repurchase program does not obligate the Company to acquire any particular amount of common shares, and the repurchase program may be suspended or discontinued at any time at the Company's discretion. The timing and amount of any share repurchases under the share repurchase program will be determined by Co-Diagnostics' management at its discretion based on ongoing assessments of the capital needs of the business, the market price of the Company's common stock, corporate and regulatory requirements, and general market conditions. Share repurchases under the program may be made through a variety of methods, which may include open market purchases, in block trades, accelerated share repurchase transactions, exchange transactions, the use of trading plans intended to qualify under Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, or any combination of such methods.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE.**

None.

**ITEM 9A. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We maintain a set of disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in rules and forms adopted by the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2021. Based on the evaluation, management has concluded that our disclosure controls and procedures are effective as of December 31, 2021 to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.

**Changes in Internal Control Over Financial Reporting**

There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a- 15(f) and 15d-15(f) under the Exchange Act) during the fourth quarter of 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our management, including our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021. In making its evaluation, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework (2013).

Based on this evaluation, management determined that our internal control over financial reporting was effective as of December 31, 2021.

44

This Annual Report does not include an attestation report by our independent registered public accounting firm regarding internal control over financial reporting since we are an emerging growth company. Management's report was not subject to attestation by our registered public accounting firm pursuant to rules of the SEC that permit emerging growth companies to provide only management's report in the 10-K.

**Inherent Limitations on Effectiveness of Controls**

Our management, including our Chief Executive Officer and Chief Financial Officer, believes that our disclosure controls and procedures and internal control over financial reporting are intended to be designed to provide reasonable assurance of achieving their objectives. However, our management does not expect that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision making can be faulty, and that breakdowns can occur because of a simple error or mistake. Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people or by management override of the controls. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with policies or procedures may deteriorate. Because of the inherent limitations in a cost–effective control system, misstatements due to error or fraud may occur and not be detected.

**ITEM 9B. OTHER INFORMATION**

None.

**ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.**

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE.**

The following table sets forth the names, ages and positions of our executive officers and directors as of March 24, 2022. Our Board of Directors is currently comprised of five members, who are elected annually to serve for one year or until their successor is duly elected and qualified, or until their earlier resignation or removal. Executive officers serve at the discretion of the Board of Directors.

| Name | Age | Position |
| --- | --- | --- |
| Dwight Egan | 68 | Chief Executive Officer, President and Chairman of the Board |
| Brian Brown | 46 | Chief Financial Officer and Secretary |
| Eugene Durenard | 52 | Director |
| James Nelson | 69 | Director |
| Richard Serbin | 77 | Director |
| Ted Murphy | 57 | Director |

**Dwight Egan** serves as our President and Chief Executive Officer and has been an officer and director of the Company since April 2013. Mr. Egan has been engaged in private investment business from February 1999 to the present. He was a senior executive at Data Broadcasting Corporation, a leading provider of wireless, real-time financial market data, news and sophisticated fixed- income portfolio analytics to 27,000 individual and professional investors from 1995 to 1999. He co-founded and served as CEO and Chairman of the Board of Broadcast International, Inc. from 1984 to 1995, when Data Broadcasting Corporation acquired Broadcast International and created *CBS MarketWatch* , a leading financial news site and participated in its initial public offering. Mr. Egan's prior experience in executive leadership positions with public companies and working with capital markets qualifies him to serve as our Chairman, President and Chief Executive Officer.

45

**Brian Brown** became our Chief Financial Officer in February 2021. From July 2020 until February 2021, Mr. Brown served as the Chief Financial Officer of A-Core Concrete Cutting, Inc. where his duties included overseeing the company's accounting and finance departments, mergers and acquisitions and responsibility for financial forecasting and budgeting. From August 2019 to December 2019, Mr. Brown served as the Vice President of Accounting, Treasury and Investor Relations at Sportsman's Warehouse Holdings, Inc., a public company reporting on Nasdaq Global Select under the symbol SPWH, where his duties included overseeing the company's accounting, treasury and investor relations departments, preparing the company's annual, quarterly and current reports with the SEC, overseeing all aspects of the company's annual audit, including, but not limited to, the preparation and review of audit support schedules, preparation of financial statements and footnotes, and providing support to the company's independent auditors. From October 2009 to August 2019, Mr. Brown served as the Director of Finance of Sportsman's Warehouse Holdings, Inc. where he assisted with the company's initial public offering in April 2014 as well as effecting private and secondary public offerings, acquisitions of a group of retail stores and preparing the company's periodic and current reports with the SEC and complying with the Sarbanes Oxley Act. From May 2005 to October 2009, Mr. Brown served as the Corporate Controller of Franklin Covey Products where he developed and maintained the company's internal controls over financial reporting structure in accordance with the control standards required under Section 404 of the Sarbanes Oxley Act. From July 2001 to May 2005, Mr. Brown served as an Assurance Senior at KPMG, LLP where he provided audit services to various clients in multiple industries. Mr. Brown holds a Bachelor of Arts in Accounting and Masters of Professional Accountancy from the University of Utah. Mr. Brown is a licensed CPA in Utah.

**Eugene Durenard** has been a member of our Board of Directors since June 2019. Dr. Durenard is the Founder and CEO of Hyperbolic Holdings, a Swiss-based holding, management consulting and strategy advisory company specialized in healthcare. Dr. Durenard brings an investment and entrepreneurial experience spanning 20 years. For the last 7 years he has

been working with family offices on direct investments and philanthropy focused on life sciences. He serves on the advisory board of several private companies in the biotech and MedTech sectors as well as an impact venture fund focused on healthcare. After an initial career in proprietary research and trading at Salomon Brothers and Credit Suisse in London, he co-founded Orion Investment Management in Bermuda specializing in quantitative asset and liability management for institutions and private clients. He subsequently sold it to Capital G Bank and co-headed their asset management. Dr. Durenard spent several years establishing personal connections with representatives of 40+ clusters of life science innovation, families operating healthcare businesses and industry leaders globally. He regularly visits labs and incubators, meets with leading scientists and innovators in order to keep abreast of current trends and developments. His advice is based on a thorough analysis that combines in-depth knowledge of science, competitive forces and financial expertise. He has published several articles in asset-liability management industry magazines as well as the book "Professional Automated Trading — Theory and Practice" (Wiley 2013). He has a PhD in Mathematics from Harvard University. Dr. Durenard brings a thorough multi-asset class investment and entrepreneurial experience spanning 20 years to the Company's Board of Directors.

**Edward Murphy** has been a member of our Board of Directors since June 2019. Mr. Murphy currently serves as a senior vice president and a partner of Dover Investments Ltd., a private investment firm. Throughout his career, Mr. Murphy's duties have included investment analysis of various types of investment projects in real estate and financial services. Currently, Mr. Murphy serves on the board of directors of several Canadian publicly reporting companies that have interests in various industries. He has been a Director at Empire Minerals Corporation Inc. since January 2016, at Digicrypts Blockchain Solutions Inc. since June 2011, at Lakefield Marketing Corporation since February 2018, CEO/CFO and Director of Credo Resources Inc. since September 2019, and at the Mosport Park Entertainment Corporation since April 30, 1997. He served as a Director at Aurquest Resources from May 2003 to December 2017. Mr. Murphy's experience in the capital markets outside the United States and his involvement in investment analysis is a benefit to the Board of Directors.

46

**Richard Serbin** has been a member of our Board of Directors since May 2017. Mr. Serbin currently serves as a consultant to many companies in the healthcare industry. He was the President of Corporate Development and In-House Legal Counsel at Life Science Institute, LLC, from June 1, 2013 to July 15, 2014. Mr. Serbin is a global strategy advisor, pharmacist and entrepreneur with credentials both in pharmacy and law, complemented by more than 40 years of service as an FDA regulatory attorney and patent attorney in the healthcare industry. He was appointed to the Advisory Board of Cure Pharmaceutical in January 2017 and has been a Member of Advisory Board at Prime Access, Inc. since September 2015. Mr. Serbin has been a Director at Rapid Nutrition Plc since November 18, 2014. He served as Director at Viropro Inc. from May 2013 to June 2014. He was Head of Business Advisory Board at Mazal Plant Pharmaceuticals Inc. from October 2006 to September 2007 and also served as its Member of Business Advisory Board. He served as Chief Executive Officer of Optigenex Inc. from July 2002 to September 15, 2005 and a director from July 2004 to September 2005. From January 1999 until July 2002 Mr. Serbin served as a consultant to various pharmaceutical companies. He served as the President of Bradley Pharmaceuticals. He served as Vice President of Corporate Development at Ortho Pharmaceuticals, a Johnson & Johnson subsidiary, and practiced Patent and FDA law at Revlon Johnson & Johnson and Schering-Plough. He served as Patent Attorney for Schering Plough Corporation and Chief FDA Counsel for Revlon Corporation and Johnson and Johnson Corporation. Subsequently, he worked at Revlon Corporation, as its Chief Food, Drug and Cosmetic Counsel. He founded Radius Scientific Corporation. He was J&J's Vice President of Corporate Development, and later led a successful public offering venture based on technology developed at Stanford Medical School. Mr. Serbin spent a large portion of his career focusing on international markets and clients. While at J&J, Mr. Serbin served on the Board of Directors of 16 US and international subsidiary companies, including Ethicon, Ortho, J&J Consumer Products, Pittman-Moore, Mc Neil, and J&J Development Corporation. He worked on multiple international acquisitions and strategic relationships, and sat on the Board of Directors of several of its international subsidiaries, including those in India, Hong Kong, Japan, Taiwan, Germany, and England. Mr. Serbin has a B.S. and a B. Pharmacy from Rutgers University and Rutgers University College of Pharmacy, a J.D. degree from Seton Hall Law School and a Master's Degree in Trade Regulations and Law from NYU Law School. Mr. Serbin's experience in business, law and medicine and knowledge gained as an advisor to the healthcare industry is critical to our Board of Directors as we continue to commercialize our products.

**James Nelson** has been a member of our Board of Directors since June 2019. Mr. Nelson is the retired Chairman and CEO of Sunworks, Inc., a NASDAQ traded commercial, agriculture, and residential solar Integrator which he helped found in

October 2010. Mr. Nelson currently serves as strategic advisor to three other publicly traded companies. Jim has spent most of his career working in private equity as a general partner with Peterson Partners and with Millennial Capital Partners. In addition to his investment and financial responsibilities, he served as CEO of two of his firms' portfolio companies. Prior to his years in private equity, Mr. Nelson served as Vice President of Marketing at Banana Republic, where he managed company-wide marketing, as well as the company's international expansion initiative. He was also general manager for Banana Republic's catalog division. He was Vice President of Marketing and Corporate Development at Saga Corporation, a multi-billion-dollar food service company. Jim began his executive career over 35 years ago at Bain and Company, a business strategy consulting firm, where he managed teams of consultants on four continents. Mr. Nelson received his MBA from Brigham Young University, where he graduated summa cum laude and was named the Outstanding Master of Business Administration Graduate. Mr. Nelson's advice to the Board of Directors from his experiences as a chief executive officer and strategic advisor is useful to the Board of Directors.

**Involvement in Certain Legal Proceedings**

To the best of our knowledge, none of our directors or executive officers has been involved in any bankruptcy or criminal proceedings (other than traffic and other minor offenses) or been subject to any of the items set forth under Item 401(f) of Regulation S-K, nor have there been any judgments or injunctions brought against any of our directors or executive officers during the last ten years that we consider material to the evaluation of the ability and integrity of any director or executive officer.

**Board and Committee Matters**

Our Board of Directors has five members. The Chairman of the Board and our Chief Executive Officer, Dwight Egan, is a member of the Board and is a full-time employee of the Company, Eugene Durenard, Edward Murphy, James Nelson and Richard Serbin are non-employee directors, and the Board has determined that these persons (who constitute a majority of the Board) are "independent directors" under the criteria set forth in Rule 5605(a)(2) of the Nasdaq Listing Rules. The Board met seven times during the year ended December 31, 2021. All directors attended more than seventy-five percent (75%) of the meetings of the Board and committee meetings of which such director was a member held during 2021.

47

We maintain an audit committee of the board, a compensation committee of the board and a corporate governance/nominating committee of the board, each of which is discussed below. Our board has determined that Messrs. Durenard, Nelson, Murphy and Serbin are "independent" under the definition of independence in the Marketplace Rules of the NASDAQ listing requirements. Our Board of Directors may from time to time establish other standing committees. In addition, from time to time, special committees may be established under the direction of our Board of Directors when necessary to address specific issues.

The following table sets forth a description of the three permanent Board committees and the chairpersons and members of those committees, all of whom are independent directors:

| Committee | Independent Chairperson | Independent Members | | |
|---|---|---|---|---|
| Audit Committee | Eugene Durenard | Edward Murphy | James Nelson | Richard S. Serbin |
| Compensation Committee | Richard S. Serbin | Edward Murphy | Eugene Durenard | James Nelson |
| Governance/Nominating Committee | James Nelson | Edward Murphy | Eugene Durenard | Richard S. Serbin |

**Audit Committee and Financial Expert**

Our audit committee currently is comprised of Messrs. Durenard, Nelson, Murphy and Serbin with Mr. Durenard

serving as chairperson of the audit committee. The functions of the audit committee include engaging an independent registered public accounting firm to audit our annual financial statements, reviewing the independence of our auditors, the financial statements and the auditors' report, and reviewing management's administration of our system of internal control over financial reporting and disclosure controls and procedures. The Board of Directors has adopted a written audit committee charter. A current copy of the audit committee charter is available to security holders on our website at www.codiagnostics.com. Our board has determined that all of our directors that are serving on the audit committee are "independent" under the definition of independence in the Marketplace Rules of the NASDAQ listing standards. The Audit Committee met four times during the year ended December 31, 2021. All committee members attended more than seventy-five percent (75%) of the meetings of the Audit Committee held during 2021.

Our Board of Directors has determined that Mr. Durenard meets the requirements of an "audit committee financial expert" as defined in applicable SEC regulations.

**Compensation Committee**

Our compensation committee currently includes Messrs. Serbin, Nelson, Murphy and Durenard with Mr. Serbin serving as chairperson of the compensation committee. The functions of the compensation committee include reviewing and approving corporate goals relevant to compensation for executive officers, evaluating the effectiveness of our compensation practices, evaluating and approving the compensation of our chief executive officer and other executives, recommending compensation for board members, and reviewing and making recommendations regarding incentive compensation and other employee benefit plans. The Board of Directors has adopted a written compensation committee charter. A current copy of the compensation committee charter is available to shareholders on our website at www.codiagnostics.com . Our board has determined that all of our directors serving on the compensation committee are "independent" under the definition of independence in the Marketplace Rules of the NASDAQ listing standards. The Compensation Committee met four times during the year ended December 31, 2021. All committee members attended more than seventy-five percent (75%) of the meetings of the Compensation Committee held during 2021.

48

**Corporate Governance/Nominating Committee**

Our corporate governance/nominating committee currently include Messrs. Nelson, Murphy, Durenard and Serbin with Mr. Nelson serving as chairperson of the corporate governance/nominating committee. Among other items, the committee is tasked by the Board of Directors to: develop and recommend to the Board the Corporate Governance Guidelines of the Company and oversee compliance therewith; assist the Board in effecting Board organization, membership and function including identifying qualified Board nominees; assist the Board in effecting the organization, membership and function of Board committees including the composition of Board committees and recommending qualified candidates therefor; evaluate and provide successor planning for the Chief Executive Officer and other executive officers; and to develop criteria for Board membership, such as independence, term limits, age limits and ability of former employees to serve on the Board and the evaluation of candidates' qualifications for nominations to the Board, its committees as well as removal therefrom, respectively. A current copy of the corporate governance/nominating committee charter is available to shareholders on our website at www.codiagnostics.com . Our board has determined all directors serving on the corporate governance committee are "independent" under the definition of independence in the Marketplace Rules of the NASDAQ listing standards. The Corporate Governance/Nominating Committee met four times during the year ended December 31, 2021. All committee members attended more than seventy-five percent (75%) of the meetings of the Audit Committee held during 2021. The nominating committee reviews the qualifications for candidates for the Board of Directors and assists in identifying, interviewing, and recruiting candidates for the Board of Directors.

**Board Nominations**

In considering Board candidates, the Board seeks individuals of proven judgment and competence who have strong reputations in their respective fields. Although we do not have a formal diversity policy, the Board considers such factors as experience, education, employment history, special talents or personal attributes, anticipated participation in Board activities,

and geographic and diversity factors. The process for identifying and evaluating nominees would include detailed consideration of the recommendations and opinions of members of our Board, our executive officers, and our stockholders. There would be no difference in the process of evaluation of candidates recommended by a stockholder and those recommended by other sources.

We do not have a formal policy concerning shareholder recommendations of candidates for board of director membership. Our board views that such a formal policy is not necessary at the present time given the board's willingness to consider candidates recommended by shareholders. Shareholders may recommend candidates by writing to our Secretary at our principal offices: 2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109, giving the candidate's name, contact information, biographical data and qualifications. A written statement from the candidate consenting to be named as a candidate and, if nominated and elected, to serve as a director should accompany any such recommendation. Shareholders who wish to nominate a director for election are generally advised to submit a shareholder proposal no later than December 31 for the next year's annual meeting of shareholders.

## Communication with the Board

We have not, to date, developed a formal process for shareholder communications with the board of directors. We believe our current informal process, in which any communication sent to the board of directors, either generally or in care of the chief executive officer, secretary or other corporate officer or director, is forwarded to all members of the board of directors, has served the board's and the shareholders' needs.

## Conflicts of Interests

On an annual basis, each director and executive officer is obligated to complete a director and officer questionnaire that requires disclosure of any transactions with our company, including related person transactions reportable under SEC rules, in which the director or executive officer, or any member of his or her immediate family, have a direct or indirect material interest. Under our company's standards of conduct for employees, all employees, including the executive officers, are expected to avoid conflicts of interest. Pursuant to our code of ethics for the chief executive officer and senior finance officers (as discussed below), such officers are prohibited from engaging in any conflict of interest unless a specific exception has been granted by the board. All of our directors are subject to general fiduciary standards to act in the best interests of our company and our shareholders. Conflicts of interest involving an executive officer or a director are generally resolved by the board.

## Role of the Board in Risk Oversight

Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. Management is responsible for the day-to-day management of the risks that we face, while our Board of Directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors is responsible for satisfying itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through our Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure, including a determination of the nature and level of risk appropriate for us. Our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors oversight of the performance of our internal audit function. Our Corporate Governance/Nominating Committee monitors the effectiveness of our corporate governance guidelines, including whether they are successful in preventing illegal or improper liability-creating conduct. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs have the potential to encourage excessive risk-taking or promote behaviors contra to our Code of Business Conduct.

**Delinquent Section 16(a) Reports**

Section 16(a) of the Exchange Act requires our directors and executive officers, and persons who own more than 10% of our common stock, to file with the SEC initial reports of ownership and reports of changes in ownership of our common stock and other equity securities. Executive officers, directors and greater than 10% shareholders are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file.

The Company prepares these reports for its directors and executive officers who request it on the basis on information obtained from them and the Company's records. The Company believes that applicable Section 16(a) filing requirements were met during 2021 by its directors and executive officers, except that due to an inadvertent administrative error, one Form 4 for Eugene Durenard was filed late.

**Code of Ethics**

We have adopted a code of ethics for our principal executive officer, principal financial officer, controller, or persons performing similar functions. A copy of the code of ethics is included on our website at www.codiagnostics.com.

**Family Relationships**

There are no family relationships among our directors and executive officers.

**ITEM 11. EXECUTIVE COMPENSATION**

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and a "smaller reporting company" as defined in the rules and regulations of the SEC. As an emerging growth company and as a smaller reporting company we may take advantage of specified reduced disclosure and other requirements that are otherwise applicable, in general, to public companies that are not emerging growth companies or smaller reporting companies. Accordingly, this Report includes reduced disclosure about our executive compensation arrangements.

**Summary Compensation Table**

The table below summarizes the total compensation paid or earned by each of the named executive officers in their respective capacities for the fiscal years ended December 31, 2021 and 2020. We have omitted in this report certain columns otherwise required to be included because there was no compensation made with respect to such columns, as permitted by applicable SEC regulations.

| Name and Principal Position | Year | Salary | Bonus (1) | Stock Awards (2) | All Other Comp (3) | Total Compensation |
|---|---|---|---|---|---|---|
| Dwight Egan<br>President & Chief Executive Officer | 2021 | $350,000 | $638,459 | $1,208,750 | $ 26,793 | $ 2,224,002 |
| | 2020 | $309,375 | $350,000 | $ 786,750 | $ 17,500 | $ 1,463,625 |
| Brian Brown<br>Chief Financial Officer and Secretary | 2021 | $209,731 | $475,014 | $1,441,600 | $ 26,793 | $ 2,153,138 |
| Reed Benson (4)<br>Former Chief Financial Officer and Secretary | 2021 | $136,250 | $154,682 | $ - | $ 26,793 | $ 317,725 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2020 | $211,458 | $225,000 | $ 288,475 | $ 17,500 | $ | 742,433 |

(1) Bonuses for the year ended December 31, 2021 include accrued bonus payments of $281,597 to Mr. Egan and $223,248 to Mr. Brown that were paid in February 2022. Bonuses for the year ended December 31, 2020 include accrued bonus payments of $272,500 to Mr. Egan and $180,000 to Mr. Benson that were paid in February 2021.

(2) The amounts reported in this column represent the aggregate grant date fair value of the restricted stock units, or RSUs, granted under our 2015 Plan as computed in accordance with FASB ASC Topic 718. Note that the amounts reported in this column reflect the accounting value for these equity awards and do not correspond to the actual economic value that may be received from the equity awards as the RSUs vest over three years.

(3) Company profit sharing payments to the Company's 401 K Plan.

(4) Mr. Benson is no longer an executive officer of the Company as of August 2021.

---

51

---

**Outstanding Equity Awards at Fiscal Year-End 2021**

The following table contain certain information concerning outstanding equity awards for the Named Executive Officers as of December 31, 2021.

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable | Unexercisable | Option Exercise Price | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) (1) | Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Dwight Egan | 50,000 | - | $ 2.63 | 09/20/28 | - | - | - | - |
| | 50,000 | - | $ 1.10 | 09/02/29 | - | - | - | - |
| | - | - | - | - | 154,167 | $1,376,711 | - | - |
| Brian Brown | - | - | - | - | 103,333 | $ 922,764 | - | - |
| Reed Benson | 41,666 | - | $ 1.10 | 09/02/29 | - | - | - | - |
| | - | - | - | - | 18,332 | $ 163,705 | - | - |

(1) Based on $8.93 per share which was the closing price of our common stock on December 31, 2021.

We do not have written employment agreements with any of our executive officers. All of our executive officers serve on an at-will basis. The base salaries, bonuses and equity awards for our named executive officers were determined by our compensation committee after reviewing a number of factors, including: company performance, achievement of goals, the responsibilities associated with the position, the seniority of the executive's position, the base salary level in prior years, and our

financial position; and for executive officers other than our Chief Executive Officer, recommendations made by our Chief Executive Officer.

**Potential Payments Upon Termination or Change of Control**

There is no compensation payable to the named executive officers upon voluntary termination, retirement, involuntary not-for-cause termination, termination following a change of control or in the event of disability or death of the executive.

**Director Compensation**

We use a combination of cash and stock-based incentive compensation to attract and retain qualified candidates to serve on its board of directors. In setting director compensation, we consider the significant amount of time that directors expend in fulfilling their duties as well as the skill-level required by our members of the board.

52

**Director Summary Compensation Table**

The table below summarizes the compensation paid or accrued by us to each of our non-employee directors for the fiscal year ended December 31, 2021.

| Name | Fees Earned or Paid in Cash | | Stock Awards: Value of Restricted Stock Units (1) | | Total | |
|---|---|---|---|---|---|---|
| Richard Serbin | $ | 100,000 | $ | 413,250 | $ | 513,250 |
| James Nelson | $ | 100,000 | $ | 413,250 | $ | 513,250 |
| Edward Murphy | $ | 100,000 | $ | 413,250 | $ | 513,250 |
| Eugene Durenard | $ | 100,000 | $ | 413,250 | $ | 513,250 |

(1) The amounts reported in this column represent the aggregate grant date fair value of the restricted stock units, or RSUs, granted under our 2015 Plan as computed in accordance with FASB ASC Topic 718. Note that the amounts reported in this column reflect the accounting value for these equity awards and do not correspond to the actual economic value that may be received from the equity awards. The RSUs vested immediately upon grant.

Our non-employee directors receive cash compensation of $75,000 per year, paid quarterly. The non-employee directors also each received 37,500 RSU's vesting 1/3 $^{rd}$ equally in January 2021, 2022, and 2023. In addition, non-employee directors may be entitled to receive special awards of stock options or RSUs from time to time as determined by the board. During 2021, the non-employee directors were also each awarded an additional $25,000 bonus. The chairman of the board and the chairperson of each of the audit, corporate governance/nomination, and compensation committees receive no additional fees for serving in such capacities. There is no additional compensation for meeting attendance. Directors who are employees of the Company receive no additional compensation for serving as directors. All stock options granted to outside directors are immediately exercisable and expire ten years from the date of grant or 30 days after the date they cease to be directors. Directors are reimbursed for ordinary expenses incurred in connection with attending board and committee meetings.

53

**Equity Compensation Plan Information**

| Plan Category | (a) Number of Shares to be | (b) Weighted-average Exercise | (c) Number of Securities |
|---|---|---|---|

| | Issued upon Exercise of Outstanding Options and Rights | Price of Outstanding Options and Rights | Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Referenced in Column (a)) |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 2,378,778(1) | $ 2.12(2) | 2,095,266 |
| Equity compensation plans not approved by stockholders | - | $ - | - |
| Total | 2,378,778(1) | $ 2.12(2) | 2,095,266 |

(1) Includes options and restricted stock units outstanding under our 2015 Equity Incentive Plan.

(2) Represents weighted-average exercise price per share of common stock acquirable upon exercise of outstanding stock options.

**Equity Incentive Plans**

Under our Amended and Restated 2015 Long-term Incentive Plan (the "2015 Plan"), the board of directors may issue incentive stock-based awards to employees, directors and consultants of the company. Options awarded generally expire ten years after being granted. Any stock-based awards granted vest in accordance with the vesting schedule determined by the board of directors. Should an employee's director's or consultant's relationship with the company terminate before the vesting period is completed, the unvested portion of each grant is forfeited. We continue to maintain and grant awards under the 2015 Plan which will remain in effect its expiration by its terms.

The purpose of our incentive plan is to advance the interests of our stockholders by enhancing our ability to attract, retain and motivate persons who are expected to make important contributions to the company by providing them with both equity ownership opportunities and performance-based incentives intended to align their interests with those of our stockholders. These plans are designed to provide us with flexibility to select from among various equity-based compensation methods, and to be able to address changing accounting and tax rules and corporate governance practices by optimally utilizing stock-based awards.

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth certain information, as of March 22, 2022, with respect to the holdings of (1) each person who is the beneficial owner of more than 5% of our Common Stock, (2) each of our directors, (3) each named executive officer, and (4) all of our current directors and executive officers as a group.

Beneficial ownership of the common stock is determined in accordance with the rules of the Securities and Exchange Commission and includes any shares of common stock over which a person exercises sole or shared voting or investment power, or of which a person has a right to acquire ownership at any time within 60 days of March 22, 2022. Except as otherwise indicated, we believe that the persons named in this table have sole voting and investment power with respect to all shares of common stock held by them. Applicable percentage ownership in the following table is based on 33,965,318 shares of common stock plus, for each individual, any securities that individual has the right to acquire within 60 days of March 22, 2022.

To the best of our knowledge, except as otherwise indicated, each of the persons named in the table has sole voting

and investment power with respect to the shares of our common stock beneficially owned by such person, except to the extent such power may be shared with a spouse. To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company. The information in the tables below is based on information known to us or ascertained by us from public filings made by the stockholders. Except as otherwise indicated in the table below, addresses of the director, executive officers and named beneficial owners are in care of Co-Diagnostics, Inc., 2401 S. Foothill Drive, Suite D, Salt Lake City, Utah 84109.

|  | Number of Shares Beneficially Owned | Percentage of Class (1) |
|---|---|---|
| **5% Stockholders** | | |
| Vanguard Group (1) | 1,795,057 | 5.3% |
| **Named Executive Officers and Directors** | | |
| Dwight Egan (2) | 124,661 | * |
| Reed Benson (3) | 44,836 | * |
| Brian Brown | 18,459 | * |
| Edward Murphy (4) | 75,000 | * |
| Eugene Durenard | 12,500 | * |
| James Nelson (5) | 62,500 | * |
| Richard Serbin (6) | 35,445 | * |
| **All Directors and Executive Officers as a Group (7 persons)** | 373,401 | 1.1% |

*Represents beneficial ownership of less than 1%.

(1)  Information obtained from Schedule 13G/A filed with the SEC on February 2, 2022. Vanguard Group has an address of 100 Vanguard Blvd, Malvern, PA, 19355.
(2)  Includes exercisable options to acquire 100,000 shares of common stock.
(3)  Includes exercisable options to acquire 41,666 shares of common stock.
(4)  Includes exercisable options to acquire 50,000 shares of common stock.
(5)  Includes exercisable options to acquire 50,000 shares of common stock.
(6)  Includes exercisable options to acquire 20,445 shares of common stock.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The Company acquired the exclusive rights to the CoPrimer technology pursuant to a license agreement dated April 2014, between us and DNA Logix, Inc., which was assigned to Dr. Satterfield prior to our acquisition of DNA Logix, Inc. Pursuant to the license the Company was to pay Dr. Satterfield minimum royalty payments of $30,000 per month until the Company receives an equity funding of at least $4,000,000, at which time the payments increase to $60,000 per month for the remainder of the year. The payment terms were orally modified to maintain the monthly royalties at $30,000 per month through December 2016. On March 1, 2017, the Company entered into an amendment effective January 1, 2017, to its Exclusive License Agreement for its CoPrimer ("License") technology with Dr. Satterfield, a former member of our Board of Directors. The amendment provides in part that all royalties under the License cease as of January 1, 2017, and we began in January 2017 to pay $700,000 of accrued royalties at the rate of $10,000 per month. In 2021 and 2020, we paid Dr. Satterfield $150,000 and $120,000, respectively, in payment of the accrued royalties.

The Company employs two persons who are related to current or former executive officers. Seth Egan is the Company's Director of Sales and Marketing, and is the son of Dwight Egan, the Company's President and Chief Executive Officer. Andrew Benson is the Company's Director of Investor Relations, and is the son of Reed Benson, the Company's former Chief Financial Officer and Secretary. During the year ended December 31, 2021, the total compensation paid to or earned by these persons, including salaries, bonuses, and the grant date fair value of equity awards which vest over three years, was $1,512,457 and $1,285,790, respectively. During the year ended December 31, 2020, the total compensation paid to or earned

by these persons, including salaries, bonuses, and the grant date fair value of equity awards which vest over three years, was $1,113,440 and $1,109,303, respectively.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table presents aggregate fees for professional services rendered by our independent auditors for the respective periods.

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Audit fees | $ 113,100 | $ 115,000 |
| Audit related fees | - | - |
| Other consulting fees | - | - |
| Tax fees | - | 1,000 |
| Total fees | $ 113,100 | $ 116,000 |

Audit fees consist of fees for professional services provided in connection with the audit of our annual consolidated financial statements, review of our quarterly consolidated financial statements and our offerings.

Tax fees included fees associated with tax compliance and tax consultations.

The audit committee has adopted a policy that requires advance approval of all services performed by the independent auditor when fees are expected to exceed $15,000. The audit committee has delegated to the audit committee chairperson, Mr. Durenard, the authority to approve services, subject to ratification by the audit committee at its next committee meeting. All fees incurred were pre-approved by the audit committee.

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules.**

(a) The following documents are filed as part of this Annual Report on Form 10-K:

(1) *Financial Statements.* The Consolidated Financial Statements filed as part of this Annual Report on Form 10-K are included in Part II, Item 8 of this Annual Report on Form 10-K.

(2) *Financial statement schedules.* There are no financial statements schedules included because they are either not applicable or the required information is shown in the consolidated financial statements or the notes thereto.

(3) Exhibits. The exhibits required by Item 601 of Regulation S-K and Item 15(b) of this Annual Report are listed in the Exhibit Index below. The exhibits listed in the Exhibit Index are incorporated by reference herein.

56

| Exhibit Number | Exhibit Description | Filed with this Report | Incorporated by Reference herein from Form or Schedule | Filing Date | SEC File/Reg. Number |
| --- | --- | --- | --- | --- | --- |
| 2.1*+ | Agreement and Plan of Merger by and between Co-Diagnostics, Inc, IDMO Acquisition Corp., Idaho Molecular Inc., and Company Representative dated as of December 21, 2021. | | Form 8-K (Exhibit 2.1) | 12/23/21 | 001-38148 |

| | | | | | |
|---|---|---|---|---|---|
| 2.2*+ | Agreement and Plan of Merger by and between Co-Diagnostics, Inc, ACI Acquisition Corp., Advanced Conceptions, Inc., and Company Representative dated as of December 21, 2021 | | Form 8-K (Exhibit 2.2) | 12/23/21 | 001-38148 |
| 3.1 | Articles of Incorporation | | Draft Registration Statement (Exhibit 3.1) | 01/12/17 | 377-01467 |
| 3.1.1 | Amendment to the Articles of Incorporation | | Draft Registration Statement (Exhibit 3.1.1) | 01/12/17 | 377-01467 |
| 3.1.2 | Articles of Amendment to Articles of Incorporation | | Form 8-K (Exhibit 3.2) | 01/03/19 | 001-38148 |
| 3.1.3 | Articles of Amendment | X | | | |
| 3.2 | Bylaws | | Draft Registration Statement (Exhibit 3.2) | 01/12/17 | 377-01467 |
| 4.1 | Description of Registrant's securities | X | | | |
| 10.1 | Exclusive Agreement between Co-Diagnostics, Inc. and DNA Logix, Inc., dated April 18, 2014 | | Draft Registration Statement (Exhibit 10.2) | 01/12/17 | 377-01467 |
| 10.2 # | Co-Diagnostics, Inc. Amended and Restated 2015 Long Term Incentive Plan | | Form S-8/A | 11/20/20 | 333-237684 |
| 10.3 | Form of Indemnification Agreement | | Form S-1/A (Exhibit 10.13.8) | 05/24/17 | 333-217542 |
| 10.4 | Shareholders' Agreement between Co-Diagnostics and Synbiotics Limited, dated January 27, 2017 | | Form S-1 (Exhibit 10.16) | 04/28/17 | 333-217542 |
| 10.5 | Amended Exclusive License Agreement between Co-Diagnostics, Brent Satterfield, and DNA Logix, Inc., dated January 1, 2017 | | Form S-1 (Exhibit 10.17) | 04/28/17 | 333-217542 |
| 10.6 | Warrant Agreement between Co-Diagnostics, Inc and VStock Transfer, LLC. Dated December 31, 2021 (ACI Warrant) | X | | | |

| | | | | | |
|---|---|---|---|---|---|
| 10.7 | Warrant Agreement between Co-Diagnostics, Inc and VStock Transfer, LLC. Dated December 31, 2021 (IDMO Warrant) | X | | | |
| 10.8 | Form of Securities Purchase Agreement, dated February 27, 2020 | | Form 8-K (Exhibit 10.1) | 02/27/20 | 001-38148 |

| | | | | | |
|---|---|---|---|---|---|
| 10.9 | Lease Agreement 2401 Foothill Drive | X | | | |
| 10.9.1 | Amendment #1 to Lease | X | | | |
| 10.9.2 | Amendment #2 to Lease | X | | | |
| 14.1 | Code of Ethics for Senior Financial Officers | | Form 10-K (Exhibit 14.1) | 03/30/20 | 001-38148 |
| 21.1 | Subsidiaries of Registrant | X | | | |
| 23.1 | Consent of Haynie & Company | X | | | |
| 31.1 | Certification of Chief Executive Officer pursuant to section 302 of the Sarbanes-Oxley Act of 2002 | X | | | |
| 31.2 | Certification of Principal Financial Officer pursuant to section 302 of the Sarbanes-Oxley Act of 2002 | X | | | |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | X | | | |
| 32.2 | Certification of Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | X | | | |
| 101 SCH | Inline XBRL Taxonomy Extension Schema Document (A) | X | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document (A) | X | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document (A) | X | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document (A) | X | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document (A) | X | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | X | | | |
| (A) | IXBRL (INLINE EXTENSIBLE BUSINESS REPORTING LANGUAGE) information is furnished and not filed for purposes of Section 11 and 12 of the Securities Act of 1933 and Section 18 of the Securities Exchange Act of 1934. | X | | | |

[#] Management Contract or Compensatory Plan or Arrangement

*Schedules and exhibits to these Exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company agrees to furnish supplementally a copy of any omitted schedule or exhibit to the SEC upon request.

+ Portions of Exhibit 2.1 and Exhibit 2.2 have been omitted as they contain information that (i) is not material and (ii) is the type of information the issuer both customarily and actually treats as private and confidential.

58

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**CO-DIAGNOSTICS, INC.**

Date: March 24, 2022

By: */s/ Dwight Egan*
Dwight Egan
Chief Executive Officer, President and Director
(Principal Executive Officer)

By: */s/ Brian Brown*
Brian Brown
Chief Financial Officer
(Principal Financial and Accounting Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| */s/ Dwight Egan*<br>Dwight Egan | Chief Executive Officer, President and Director<br>(Principal Executive Officer) | March 24, 2022 |
| */s/ Brian Brown*<br>Brian Brown | Chief Financial Officer<br>(Principal Financial and Accounting Officer) | March 24, 2022 |
| */s/ Eugen Durenard*<br>Eugene Durenard | Director | March 24, 2022 |
| */s/ Edward Murphy*<br>Edward Murphy | Director | March 24, 2022 |
| */s/ James Nelson*<br>James Nelson | Director | March 24, 2022 |
| */s/ Richard Serbin*<br>Richard Serbin | Director | March 24, 2022 |

59

**Exhibit 3.1.3**

## ARTICLES OF AMENDMENT TO THE
## ARTICLES OF INCORPORATION OF CO-DIAGNOSTICS, INC.

Pursuant to and in accordance with the provisions of Section 16-10a-1006 of the Utah Revised Business Corporation Act, as amended (the "Act") , the undersigned, Co-Diagnostics, Inc. (the "Corporation") hereby declares and certifies the following Articles of Amendment to its Articles of Incorporation.

1. The name of the Corporation is Co-Diagnostics, Inc.

2. The text of the amendment to the Articles of Incorporation of the Corporation adopted is as follows:

Following the final paragraph of ARTICLE ill-CAPITAL STOCK of the Articles of Incorporation, the following text is inserted:

"Upon the filing of these Articles of Amendment to the Articles of Incorporation, each share of Common Stock of the Corporation issued and outstanding immediately prior to these Articles of Amendment to the Articles of Incorporation, without further action, will be automatically split and converted into one-eleventh (1/11) of one (1) share of fully paid and nonassessable shares of Common Stock of the Corporation (the "Reverse Stock Split") . No fractional shares shall be issued upon the Reverse Stock Split; rather, each fractional share resulting from the Reverse Stock Split shall be rounded up to the nearest whole number. Each outstanding stock certificate of the Corporation, which prior to the filing of these Articles of Amendment represented one or more shares of Common Stock, shall immediately after such filing represent that number of shares of Common Stock equal to the product of (x) the number of shares of Common Stock represented on such certificates divided by (y) eleven (11) (such adjusted shares, the "Reclassified Shares") , with any resulting fractional shares rounded up to the nearest whole share as set forth above. Any options, warrants or other purchase rights, which prior to the filing of these Articles of Amendment represented the right to acquire one or more shares of the Corporation's Common Stock, shall immediately after such filing represent the right to acquire one-eleventh (1/11) of one (1) share of the Corporation's Common Stock for each share of the Corporation's Common Stock that such option, warrant or other purchase right previously represented the right to acquire. The exercise price of such options, warrants and purchase rights shall be adjusted by multiplying the existing exercise price by eleven (11).

The number of authorized shares of Common Stock of the Corporation and the par value of such shares will not be affected by these Articles of Amendment.

The Corporation shall, upon the request of each record bolder of a certificate representing shares of Common Stock issued and outstanding immediately prior to the filing of these Articles of Amendment to the Articles of Incorporation, issue and deliver to such holder in exchange for such certificate a new certificate or certificates representing the Reclassified Shares."

3. The amendment specified above was adopted as of May 24, 2017, by the Board of Directors of the Corporation by a unanimous consent resolution for such purpose, and in accordance with the requirements of the Act and the Bylaws of the Corporation.

4. The foregoing amendment to the Articles of Incorporation of the Corporation was authorized and approved pursuant to section 16-10a-1003 of the Act by a vote of the majority of the Corporation's shareholders entitled to vote at an Annual **Meeting** of the shareholders of the Corporation.

5. Pursuant to 16-10a-704 of the Act, this action was approved without meeting with the consent of holders of 64,457,487 shares of the Corporation's Common Stock equal to 59.3% of the shares entitled to vote on the action

IN WITNESS WHEREOF, these Articles of Amendment to the Articles of Incorporation of the Corporation are executed as of June 20, 2017.

Co-Diagnostics, Inc. a Utah corporation

*/s/ Reed L. Benson*

Title:  Chief Financial Officer

**EXHIBIT 4.1**

**DESCRIPTION OF REGISTRANT'S SECURITIES REGISTERED UNDER SECTION 12
OF THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

The following description of our capital stock summarizes certain provisions of articles of incorporation, as amended (the " **Articles of Incorporation** "), our bylaws (the " **Bylaws** "), and applicable provisions of law. Such summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, all of the provisions of our Articles of Incorporation and our Bylaws, including the definitions therein of certain terms, and all of the applicable provisions of law. Copies of our Articles of Incorporation and our Bylaws are filed or incorporated by reference as exhibits to our Annual Report on Form 10-K.

References in this Exhibit to the "Company," "us," "we," and "our" are solely to Co-Diagnostics, Inc. and not to any of its subsidiaries, unless the context requires otherwise.

**DESCRIPTION OF COMMON STOCK**

**Authorized Capital Stock**

Pursuant to our Articles of Incorporation, our authorized capital stock presently consists of 100,000,000 shares of Common Stock, par value $0.001 per share, and 5,000,000 shares of "blank check" preferred stock, par value $0.001 per share.

**Common Stock**

*Fully Paid and Non-Assessable Shares; No Liability for Corporate Obligations*

All of the outstanding shares of Common Stock are fully paid and non-assessable. A share of Common Stock is fully paid and non-assessable if such share has been issued for consideration legally permissible under the Utah Revised Business Corporation Act with a value at least equal to the par value per share of Common Stock. Holders of fully paid and non-assessable shares of the Common Stock will not be liable for any obligations or liabilities of the Company that the Company may fail to discharge.

*Voting Rights*

Each holder of shares of Common Stock is entitled to one vote for each share owned of record on all matters submitted to a vote of shareholders. Except as noted below or as otherwise required by the Utah Revised Business Corporation Act, the vote of shareholders is required to decide any matter brought before a shareholder meeting at which a quorum is present. The holders of a majority of the outstanding shares of our stock must approve any amendments to our Articles of Incorporation, any merger or consolidation to which we are a party (other than parent-subsidiary mergers), any sale of all or substantially all of our assets or our dissolution as a corporation. Our shareholders do not have cumulative voting rights as to the election of directors.

*Dividends*

Subject to the preferential rights of any holders of any series of our preferred stock that may be issued in the future, the holders of shares of Common Stock are entitled to such dividends and distributions, whether payable in cash or otherwise, as may be declared from time to time by our board of directors from legally available funds.

We have never declared or paid any cash dividends on our capital stock. The payment of dividends on our Common Stock in the future will depend on our earnings, capital requirements, operating and financial condition, and such other factors as our board of directors may consider appropriate. We currently expect to use all available funds to finance the future development and expansion of our business and do not anticipate paying dividends on our Common Stock in the foreseeable future.

*Liquidation Distributions*

Subject to the preferential rights of any holders of any series of our preferred stock that may be issued in the future, upon our liquidation, dissolution, or winding-up, and after payment of all prior claims against our assets and our outstanding obligations, the holders' shares of Common Stock will be entitled to receive, pro rata, all of our remaining assets.

*Preemptive, Conversion, Redemption, or Similar Rights*

The holders of shares of Common Stock are not entitled to any preemptive or other similar rights to subscribe for or acquire additional shares of Common Stock or any other securities of the Company. The shares of Common Stock are not subject to conversion or redemption by the Company and the holders of shares of Common Stock do not have any right or option to convert such shares into any other security or property of the Company or to cause the Company to redeem such shares of Common Stock. There are no sinking fund provisions applicable to the Common Stock.

*Listing*

Shares of the Common Stock are listed for trading on the NASDAQ Capital Markets under the symbol "CODX."

*Transfer Agent and Registrar*

The transfer agent and registrar for the Common Stock is VStock Transfer Company, Inc. located at 18 Lafayette Pl, Woodmere, New York 11598. Its telephone number is (212) 828-8436.

**Preferred Stock**

Shares of our preferred stock are **NOT** listed for trading. The description herein is provided solely to show the potential effect on our Common Stock.

Our Articles of Incorporation authorizes 5,000,000 shares of "blank check" preferred stock, par value $0.001 per share, of which 30,000 have been designated as Series A Convertible Preferred Stock.

All 30,000 previously outstanding shares of Series A Preferred Stock were converted into Common Stock during 2020 and 2019. The board of directors of the Company may provide for the issue of any or all of the unissued and undesignated shares of the preferred stock in one or more series, and to fix the number of shares and to determine or alter for each such series, such voting powers, full or limited, or no voting powers, and such designation, preferences, and relative, participating, optional, or other rights and such qualifications, limitations, or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the board of directors providing for the issuance of such shares and as may be permitted by law, without shareholder approval.

Our board of directors has the right to establish one or more series of preferred stock without shareholder approval. Unless required by law or by any stock exchange on which our Common Stock is listed, the authorized shares of preferred stock will be available for issuance at the discretion of our board of directors without further action by our shareholders. Our board of directors is able to determine, with respect to any series of preferred stock, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- whether dividends, if any, will be cumulative or non-cumulative and the dividend rate, if any, of the series;

- the dates at which dividends, if any, will be payable;

- the redemption rights and price or prices, if any, for shares of the series;

- the terms and amounts of any sinking fund provided for the purchase or redemption of shares of the series;

- the amounts payable on shares of the series in the event of any voluntary or involuntary liquidation, dissolution, or winding-up of the affairs of our company;

- whether the shares of the series will be convertible into shares of any other class or series, or any other security, of our company or any other entity, and, if so, the specification of the other class or series or other security, the conversion price or prices or rate or rates and provisions for any adjustments to such prices or rates, the date or dates as of which the shares will be convertible, and all other terms and conditions upon which the conversion may be made;

- the ranking of such series with respect to dividends and amounts payable on our liquidation, dissolution, or winding-up, which may include provisions that such series will rank senior to our Common Stock with respect to dividends and those distributions;

- restrictions on the issuance of shares of the same series or any other class or series; or

- voting rights, if any, of the holders of the series.

The issuance of preferred stock could adversely affect, among other things, the voting power of holders of Common Stock and the likelihood that shareholders will receive dividend payments and payments upon our liquidation, dissolution, or winding up. The issuance of preferred stock could also have the effect of delaying, deferring, or preventing a change in control of us.

If we issue shares of preferred stock, the shares will be fully paid and nonassessable and will not have, or be subject to, any preemptive or similar rights.

**Exhibit 10.6**

COMPANY WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this " *Agreement* "), dated as of December 31, 2021, is entered into by and between Co-Diagnostics, Inc., a Utah corporation (" *Parent* " or the " *Company* "), and VStock Transfer, LLC (the " *Warrant Agent* ").

WHEREAS, Parent consummated a merger (the " *Merger* ") of its wholly-owned subsidiary, ACI Acquisition Corp. (" *Subco* "), with and into Advanced Conceptions Inc., a Utah corporation (" *Company* "), pursuant to an Agreement and Plan of Merger (as such agreement may be amended from time to time, the " *Merger Agreement* "), by and among Parent, Company, and Subco;

WHEREAS, the Merger Agreement provides that the Company will issue warrants to purchase 232,500 shares of the Company's common stock, par value $0.001 per share, (the " *Parent Common Stock* ") exercisable subject to satisfaction of certain milestones and over a seven year period at an initial exercise price of $9.125 per share (the " *Warrants* " or the " *Company Warrants* ");

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, transfer, exchange and exercise of the Warrants; and

WHEREAS, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1. **Appointment of Warrant Agent and Depository** . The Company hereby appoints the Warrant Agent to act as agent for the Company for the Company Warrants, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the terms and conditions set forth in this Agreement.

2. **Warrants.**

2.1 Issuance of Warrants . Each Company Warrant will be uncertificated and in registered form only, substantially in the form of Exhibit 1, the provisions of which are incorporated herein. Any Warrant so issued shall have the same terms, force and effect as a certificated Warrant that has been duly countersigned by the Warrant Agent in accordance with the terms of this Agreement.

2.2 Warrant Register .

(a) The Warrant Agent shall maintain books (" *Warrant Register* ") for the registration of the original issuance and the registration of any subsequent transfer of the Warrants. Upon the initial issuance of the Warrants, the Warrant Agent shall issue and register the Warrants in the names of the respective holders thereof in such denominations and otherwise in accordance with instructions delivered to the Warrant Agent by the Company.

(b) Prior to due presentment for registration of transfer of any Warrant in accordance with Section 5.1.1 below, the Company and the Warrant Agent may deem and treat the person in whose name such Warrant is then registered in the Warrant Register (each a " *registered holder* ") as the absolute owner of such Warrant, for the purpose of any exercise thereof, and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

3. **Terms and Exercise of Warrants** .

3.1 Exercise Price . For purposes of this Agreement, " **Exercise Price** " shall mean the initial exercise price for each Warrant as set forth in the Exhibit 1, subject to adjustment as provided in Exhibit 1.

3.2 Duration of Warrants . A Warrant may be exercised only during the period (" **Exercise Period** ") specified in Exhibit 1 or as the same may be extended as hereinafter provided. Each Warrant not exercised on or before the expiration date, as set forth in Exhibit 1 (the " **Expiration Date** "), shall become void, and all rights thereunder and all rights in respect thereof under this Agreement shall cease at the close of business on the Expiration Date.

3.3 Exercise of Warrants . Warrants may be exercised, at the option of the registered holder of the Warrant, in whole or in part, at any time or from time to time during the Exercise Period, by complying with the Warrant Agent's procedures relating to the exercise of such book-entry interest in the Warrants. In addition, the registered holder shall deliver to the Warrant Agent (the " **Warrant Agent Office** ") (i) an exercise form set forth in the Warrant, executed by such registered holder or its duly authorized agent or attorney (the " **Exercise Form** ") and (ii) payment of the aggregate Exercise Price. In case an exercise of Warrants is in part only, the Warrant Agent shall make an appropriate adjustment to the account of the registered holder to reflect a number of Warrants for the number of shares of Parent Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for by such registered holder's Warrants prior to such exercise, minus the number of shares designated by the registered holder upon such exercise.

3.3.1 Payment . Subject to the provisions of the Warrant and this Agreement, a Warrant may be exercised by the registered holder thereof by delivering to the Warrant Agent at its corporate trust department (i) a warrant exercise form properly delivered by the registered holder, and (iii) the payment in full of the Exercise Price for each share of Common Stock as to which the Warrant is exercised as follows:

(a) in lawful money of the United States, in certified check or wire payable to the Warrant Agent; or

(b) as provided in Section 7.5 hereof.

3.3.2 Procedures and Validity .

(a) Any exercise of a Warrant by a registered holder pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the registered holder and the Company, enforceable in accordance with its terms.

(b) The Warrant Agent shall:

(i) examine all Exercise Forms and all other documents delivered to it by or on behalf of registered holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii) where an Exercise Form or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii) inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Forms received and the crediting of Warrants to the respective registered holders' accounts; and

(iv) advise the Company no later than two (2) business days after receipt of an Exercise Form, of (i) the

receipt of such Exercise Form and the number of Warrants exercised in accordance with the terms and conditions of this Agreement, and (ii) such other information as the Company shall reasonably require.

(c) All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant and any Exercise Form will be determined by the Company in good faith. The Company reserves the right to reject any and all Exercise Forms not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. Other than as required in Section 3.3.2(b)(ii) above, neither the Company nor the Warrant Agent shall be under any duty to give notice to the registered holders of the Warrants of any irregularities in any exercise of Warrants or any Exercise Form, nor shall it incur any liability for the failure to give such notice.

3.3.3 <u>Issuance of Shares</u> . As soon as practicable after the exercise of any Warrant and the clearance of the funds in payment of the Exercise Price, the Company shall cause its Transfer Agent to issue to the registered holder of such Warrant a certificate or certificates, or book entry position, representing the number of full shares of Parent Common Stock to which he, she or it is entitled, registered in such name or names as may be directed by him, her or it. In the event that during the last 20 business days immediately prior to the Expiration Date both (i) a registration statement with respect to the Parent Common Stock underlying the Warrants is not effective or a current prospectus is not available and (ii) the Exercise Price of the Warrants is less than the price at which the Parent Common Stock is trading on NASDAQ (or if the Parent Common Stock is no longer trading on NASDAQ, such other stock exchange on which the shares of Parent Common Stock trades), the Exercise Period shall automatically be extended for a period of 20 business days after the date that the Company causes a registration statement covering the Warrants and the Parent Common Stock underlying the Warrants to be effective and a current prospectus is made available. In no event will the Company be required to "net cash settle" the warrant exercise.

3.3.4 <u>Valid Issuance</u> . All shares of Parent Common Stock issued upon the proper exercise of a Warrant in conformity with this Agreement shall be validly issued, fully paid and nonassessable.

3.3.5 <u>Date of Issuance</u> . All shares of Parent Common Stock so issued shall be registered in the name of the registered holder or such other name as shall be designated in the Exercise Form delivered by the registered holder. Such shares of Parent Common Stock shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such shares of Parent Common Stock as of the date of delivery of the Exercise Form to the Warrant Agent Office duly executed by the registered holder thereof and upon the Company's receipt of payment of the Exercise Price.

4. **Adjustments.**

4.1 <u>Adjustments Generally</u> . The Exercise Price, the number of shares of Parent Common Stock issuable upon exercise of the Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of certain events in accordance with the provisions of Exhibit 1.

4.2 <u>Notices of Vesting and Changes in Warrant</u> . Promptly upon the satisfaction of the vesting requirements of the Warrants pursuant to the Merger Agreement, the Company shall deliver written notice of such vesting and exercisability to the Warrant Agent, which notice shall state the date upon which such warrants shall vest and become exercisable. Upon every adjustment of (i) the Exercise Price, (ii) the number of shares of Parent Common Stock issuable upon exercise of the Warrants and (iii) the number of Warrants outstanding, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in the Warrant certificate then, in any such event, the Company shall give written notice to each registered holder, at the last address set forth for such registered holder in the Warrant register maintained by the Warrant Agent, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

4.3 <u>No Fractional Shares</u> . Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants. If, by reason of any adjustment made pursuant to this Section 4, the registered holder of any Warrant would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share, the Company shall, upon such exercise, round up or down to the nearest whole number the number of shares of Parent Common Stock to be issued to the registered holder.

4.4 <u>Form of Warrant</u> . The form of Warrant certificate need not be changed as a result of any adjustment pursuant to this Section. However, the Company may, at any time, in its sole discretion, make any change in the form of Warrant certificate that the Company may deem appropriate and that does not affect the substance thereof.

5. **Transfer and Exchange of Warrants.**

5.1 <u>Exchange and Transfer.</u>

5.1.1 The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrants and exchanges and transfers of outstanding Warrants upon request to exchange or transfer such Warrants, provided, that the Warrant Agent shall have received a written instruction of transfer or exchange in form reasonably satisfactory to the Warrant Agent, duly executed by the registered holder thereof or by its or her or his duly authorized agent or attorney, providing all information required to be delivered hereunder, such signature to be guaranteed by an eligible guarantor institution to the extent required by the Warrant Agent or the Depository. Upon any such registration of transfer, a Warrant Statement shall be issued to the transferee.

5.1.2 The Company shall pay for applicable service charges for any exchange or registration of transfer of Warrants; and the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such exchange or registration of transfer. Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrants until it has been established to the Company's and the Warrant Agent's reasonable satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

5.1.3 The Warrant Agent shall not affect any exchange or registration of transfer which will result in the issuance of a Warrant evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

5.1.4 All Warrants credited to a registered holder's or transferee's account upon any exchange or transfer of Warrants in accordance with the provisions of this Agreement shall be the valid obligations of the Company evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrants that were so exchanged or transferred.

5.2 <u>Treatment of Holders of Warrants</u> . Each registered holder of Warrants, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent registered holder of such Warrants that until the due presentment for registration of transfer in accordance with Section 5.1.1 of such Warrants, the Company and the Warrant Agent may treat the registered holder of such Warrants as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

5.3 <u>Procedure for Surrender of Warrants</u> . Warrants may be surrendered to the Warrant Agent, either in certificated form or in book entry position, together with a written request for exchange or transfer, and thereupon the Warrant Agent shall issue in exchange therefor one or more new Warrants, or book entry positions, as requested by the registered holder of the

Warrants so surrendered, representing an equal aggregate number of Warrants; provided, however, that in the event that a Warrant surrendered for transfer bears a restrictive legend, the Warrant Agent shall not cancel such Warrant and issue new Warrants in exchange therefor until the Warrant Agent has received an opinion of counsel stating that such transfer may be made and indicating whether the new Warrants must also bear a restrictive legend.

5.4 <u>Cancellation of Warrants</u> . Promptly following the Expiration Date or at such earlier time that there are no longer outstanding any Warrants, the Warrant certificate shall be cancelled or destroyed and the Warrant Agent shall deliver a certificate of such cancellation or destruction to the Company.

6. [Omitted].

7. **Other Provisions Relating to Rights of Holders of Warrants** .

7.1 <u>No Rights as Stockholder</u> . No Warrant shall, and nothing contained in this Agreement, in the Warrant certificate or in the Warrant Statement shall be construed to, entitle the registered holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Parent Common Stock, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Parent Common Stock or any rights whatsoever as stockholders of the Company, until such Warrant is duly exercised in accordance with this Agreement and such registered holder is issued the Parent Common Stock to which it is entitled in connection therewith.

7.2 <u>Reservation of Common Stock</u> . The Company shall at all times reserve and keep available a number of its authorized but unissued shares of Parent Common Stock that will be sufficient to permit the exercise in full of all outstanding Warrants issued pursuant to this Agreement.

7.3 <u>[Omitted]</u> .

7.4 <u>Limitation on Monetary Damages</u> . In no event shall the registered holder of a Warrant be entitled to receive monetary damages for failure to settle any Warrant exercise if the Parent Common Stock issuable upon exercise of the Warrants has not been registered with the SEC pursuant to an effective registration statement or if a current prospectus is not available for delivery by the Warrant Agent, provided the Company has fulfilled its obligations under Section 7.5 to use its commercially reasonable efforts to effect the registration under the Securities Act of 1933 (the " ***Securities Act*** ") of the Parent Common Stock issuable upon exercise of the Warrants.

7.5 <u>Registration of Shares of Common Stock; Cashless Exercise at Company's Option</u> .

7.5.1 <u>Registration of the shares of Common Stock</u> . If the Company shall fail to have maintained an effective registration statement covering the issuance of the shares of Common Stock issuable upon exercise of the Warrants as required under the Merger Agreement, the registered holders shall have the right to exercise such Warrants on a "cashless basis," by exchanging the Warrants (in accordance with Section 3(a)(9) of the Securities Act or another exemption) for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the excess of the "Fair Market Value" (as defined below) less the Exercise Price by (y) the Fair Market Value. Solely for purposes of this subsection 7.5.1, "Fair Market Value" shall mean the volume-weighted average price of the shares of Common Stock as reported during the ten (10) trading day period ending on the trading day prior to the date that notice of exercise is received by the Warrant Agent from the registered holder of such Warrants or its securities broker or intermediary. The date that notice of "cashless exercise" is received by the Warrant Agent shall be conclusively determined by the Warrant Agent. In connection with the "cashless exercise" of a Warrant, the Company shall, upon request, provide the Warrant Agent with an opinion of counsel for the Company (which shall be an outside law firm with securities law experience) stating that (i) the exercise of the Warrants on a "cashless basis" in accordance with this subsection 7.5.1 is not required to be registered under the Securities Act and (ii) the shares of Common Stock issued upon such exercise shall be freely tradable under United States federal securities laws by anyone who is not an affiliate (as such term is defined in Rule 144 under

the Securities Act) of the Company and, accordingly, shall not be required to bear a restrictive legend. Except as provided in subsection 7.5.2, for the avoidance of doubt, unless and until all of the Warrants have been exercised or have expired, the Company shall continue to be obligated to comply with its registration obligations under the first three sentences of this subsection 7.5.1

7.5.1 <u>Cashless Exercise at Company's Option</u>. If the shares of Common Stock are at the time of any exercise of a Warrant not listed on a national securities exchange such that they satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, the Company may, at its option, (i) require holders of Warrants who exercise such Warrants to exercise such Warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act as described in subsection 7.5.1 and (ii) in the event the Company so elects, the Company shall (x) not be required to file or maintain in effect a registration statement for the registration, under the Securities Act, of the shares of Common Stock issuable upon exercise of the Warrants, notwithstanding anything in this Agreement to the contrary, and (y) use its commercially reasonable efforts to register or qualify for sale the shares of Common Stock issuable upon exercise of the Warrant under applicable blue sky laws to the extent an exemption is not available..

8. **Concerning the Warrant Agent and Other Matters.**

8.1 <u>Payment of Taxes</u>. The Company will from time to time promptly pay all taxes and charges that may be imposed upon the Company or the Warrant Agent in respect of the issuance or delivery of shares of Parent Common Stock upon the exercise of Warrants, but the Company shall not be obligated to pay any transfer taxes in respect of the Warrants or such shares.

8.2 <u>Resignation, Consolidation, or Merger of Warrant Agent</u>.

8.2.1 <u>Appointment of Successor Warrant Agent</u>. The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company and to each registered holder. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by any registered holder of a Warrant, then the registered holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost. Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a corporation organized and existing under the laws of the State of New York, in good standing and having its principal office in the Borough of Manhattan, City and State of New York, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority. After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties, and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, and rights of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent the Company shall make, execute, acknowledge, and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties, and obligations.

8.2.2 <u>Notice of Successor Warrant Agent</u>. In the event a successor Warrant Agent shall be appointed, the Company shall give notice thereof to each registered holder, the predecessor Warrant Agent and the transfer agent for the Parent Common Stock not later than the effective date of any such appointment.

8.2.3 <u>Merger or Consolidation of Warrant Agent</u>. Any corporation into which the Warrant Agent may be merged or with which it may be consolidated or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement without any further act.

8.3 **Fees and Expenses of Warrant Agent.**

8.3.1 <u>Remuneration</u> . The Company agrees to pay the Warrant Agent reasonable remuneration for its services as such Warrant Agent hereunder and will reimburse the Warrant Agent upon demand for all expenditures that the Warrant Agent may reasonably incur in the execution of its duties hereunder.

8.3.2 <u>Further Assurances.</u> The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

8.4 **Liability of Warrant Agent.**

8.4.1 <u>Reliance on Company Statement</u> . Whenever in the performance of its duties under this Agreement the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the General Counsel, President or Chairman of the Board of Directors of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon such statement for any action taken or suffered in good faith by it pursuant to the provisions of this Agreement.

8.4.2 <u>Indemnity</u> . The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct or bad faith. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted by the Warrant Agent in the execution of this Agreement, except as a result of the Warrant Agent's gross negligence, willful misconduct or bad faith.

8.4.3 <u>Exclusions</u> . The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Section 4 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Parent Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Parent Common Stock will when issued be valid and fully paid and nonassessable.

8.5 <u>Acceptance of Agency</u> . The Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same upon the terms and conditions herein set forth and, among other things, shall account promptly to the Company with respect to Warrants exercised and concurrently account for, and pay to the Company, all moneys received by the Warrant Agent for the purchase of shares of Parent Common Stock through the exercise of Warrants.

9. **Miscellaneous Provisions.**

9.1 Successors. All the covenants and provisions of this Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns.

9.2 Notices. Any notice, statement or demand authorized by this Agreement to be given or made by the Warrant Agent or by the registered holder of any Warrant to or on the Company shall be delivered by hand or sent by registered or certified mail or overnight courier service, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

Co-Diagnostics, Inc.
2401 South Foothill Dr., Suite D
Salt Lake City, UT 84109

Telephone: 801-438-1036
Attention: President

Attention: General Counsel

Any notice, statement or demand authorized by this Agreement to be given or made by the registered holder of any Warrant or by the Company to or on the Warrant Agent shall be delivered by hand or sent by registered or certified mail or overnight courier service, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

VStock Transfer, LLC
18 Lafayette Place
Woodmere, New York 11598
Attn: Compliance Department

Any notice, sent pursuant to this Agreement shall be effective, if delivered by hand, upon receipt thereof by the party to whom it is addressed, if sent by overnight courier, on the next business day of the delivery to the courier, and if sent by registered or certified mail on the third day after registration or certification thereof.

9.3 Notices to Holders of Warrants . Any notice to registered holders of Warrants which by any provisions of this Warrant Agreement or the Warrant certificate is required or permitted to be given shall be given by first class mail prepaid at such registered holder's address as it appears on the books of the Warrant Agent.

9.4 Applicable Law . The validity, interpretation and performance of this Agreement and of the Warrants shall be governed in all respects by the laws of the State of New York, without giving effect to conflicts of law principles that would result in the application of the substantive laws of another jurisdiction. The Company hereby agrees that any action, proceeding or claim against it arising out of or relating in any way to this Agreement shall be brought and enforced in the courts located or situated in New York, New York or the United States District Court for the Southern District of New York, and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. The Company hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum. Any such process or summons to be served upon the Company may be served by transmitting a copy thereof by registered or certified mail, return receipt requested, postage prepaid, addressed to it at the address set forth in Section 9.2 hereof. Such mailing shall be deemed personal service and shall be legal and binding upon the Company in any action, proceeding or claim.

9.5 Persons Having Rights under this Agreement . Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the registered holders of the Warrants, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof. All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns and of the registered holders of the Warrants.

9.6 Examination of the Warrant Agreement . A copy of this Agreement shall be available at all reasonable times at the office of the Warrant Agent in the Borough of Manhattan, City and State of New York, for inspection by the registered holder of any Warrant. The Warrant Agent may require any such registered holder to submit his, her or its Warrant Statements for inspection by it.

9.7 Counterparts . This Agreement may be executed in any number of original or facsimile counterparts and each of

such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

9.8 Effect of Headings . The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation thereof.

9.9 Amendments . This Agreement may be amended by the parties hereto without the consent of any registered holder for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provision contained herein or adding or changing any other provisions with respect to matters or questions arising under this Agreement as the parties may deem necessary or desirable and provided such amendment shall not adversely affect the interest of the registered holders. All other modifications, adjustments or amendments of this Agreement, shall require the written consent of the registered holders of a majority of the then outstanding Warrants provided that no amendment to the Warrant certificate shall be effective to charge any registered holder who has not consented thereto. The Warrant Agent may request from either the Company or the registered holders an opinion of counsel with respect to the validity of any amendment as a condition to its exercise of any amendment.

9.10 Severability . Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

[Signature page follows]

---

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

CO-DIAGNOSTICS, INC.

By:

Name: _____

VSTOCK TRANSFER, LLC

By:

Name: _____

[Signature Page to Warrant Agreement]

---

EXHIBIT 1 TO COMPANY WARRANT AGREEMENT

FORM OF GLOBAL WARRANT CERTIFICATE FOR COMPANY WARRANTS

EXERCISABLE ONLY IF AUTHENTICATED BY THE WARRANT AGENT AS PROVIDED HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 20__ OF CO-DIAGNOSTICS, INC.

Global Warrant Certificate representing Warrants to purchase _____ shares of common stock, par value $0.001 per share, as described herein

NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED, OR OTHERWISE DISPOSED OF, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

Each Warrant (each a " ***Warran*** t") represented hereby, entitles the registered holder to purchase one share (the " ***Warrant Share*** ") of common stock, $0.001 par value (the " ***Common Stock*** "), of Co-Diagnostics, Inc., a Utah corporation, (the " ***Corporation*** ") for the benefit of certain registered holders (as defined in the Warrant Agreement) of such Warrants on the following terms. This Global Warrant Certificate represents the number of outstanding Warrants from time to time endorsed hereon and the number of outstanding Warrants represented hereby may from time to time be reduced or increased, as appropriate to reflect exchanges, redemptions, exercises and other similar transactions. This Global Warrant Certificate is issued under and in accordance with that certain Warrant Agreement dated as of December 30, 2021 by and between the Corporation and VStock Transfer, LLC (as such agreement may be amended from time to time, the " ***Warrant Agreement*** "), and is subject to the terms and provisions contained therein, all of which terms and provisions the registered holders consent to by acceptance of their book-entry interests in the Global Warrant Certificate. Copies of the Warrant Agreement are on file at the Corporation's headquarters. In the event of any conflict or inconsistency between this Global Warrant Certificate and the Warrant Agreement, this Global Warrant Certificate shall control. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Warrant Agreement.

This Global Warrant Certificate is also issued under and in accordance with that certain Agreement and Plan of Merger (as such agreement may be amended from time to time, the " ***Merger Agreement*** "), by and among Co-Diagnostics, Inc., a Utah corporation, Advanced Conceptions, Inc., a Utah corporation, and ACI Acquisition Corp., and is subject to the terms and provisions contained therein. In the event of any conflict or inconsistency between this Global Warrant Certificate and the Merger Agreement, the Merger Agreement shall control.

---

1. <u>Exercise Period</u> . The Warrants shall vest in full and become exercisable immediately following either (i) satisfaction of Milestone 3 as such term is defined in the Merger Agreement or (ii) upon the occurrence of any of the events described in Section 3.1(e) of the Merger Agreement (any such date, the " ***Vesting Date*** "). Promptly upon the satisfaction of clauses (i) or (ii), the Corporation shall notify the Warrant Agent that the vesting conditions have been satisfied and the Vesting Date upon which the Warrants shall become fully exercisable pursuant to the notice provision in the Warrant Agreement. Either the Corporation or the registered holder may certify to the Warrant Agent in a form satisfactory to the Warrant Agent the occurrence of the Vesting Date. Notwithstanding anything to the contrary contained herein, the Warrants shall expire at 5:00 p.m. (New York Time) on January 1, 2027 (the " ***Termination Date*** "). Parent will provide registered holder at least fifteen (15) days' written notice prior to the consummation of any of the events described in Section 3.1(e) of the Merger Agreement.

2. <u>Exercise of Warrants</u> .

(a) The registered holder may, at any time on or after the Vesting Date and prior to the Termination Date, exercise this Warrant in whole or in part at an exercise price per share equal to $9.125 (subject to proportionate adjustment in accordance with Section 6) (the " ***Exercise Price*** "), by the delivery of the Warrant Exercise Form annexed hereto duly completed and executed to the Warrant Agent at the Warrant Agent Office or at such other agency or office of the Corporation in the United States of America as the Corporation may designate by notice in writing to the registered holder at the address of such registered holder appearing on the books of the Corporation. Upon any partial exercise of a Warrant, the Warrant Agent shall make an appropriate adjustment to the account of the registered holder to reflect a number of Warrant Shares for the account of the registered holder equal (without giving effect to any adjustment thereof) to the number of Warrant Shares subject to such registered holder's Warrants prior to such exercise, minus the number of Warrant Shares exercised by the registered holder. In the event of the exercise of the rights represented by any Warrant, a certificate or certificates for the Warrant Shares so purchased, as and if applicable, registered in the name of the registered holder, shall be delivered to the registered holder hereof

as soon as practicable after the exercise of such Warrant.

(b) Payment to the Corporation of the Exercise Price for each share of Common Stock being purchased shall be made either (i) by wire transfer or cashier's check drawn on a United States bank payable to the Corporation (to an account as designated by the Warrant Agent by notice in writing to the registered holders); or (ii) by instructing the Warrant Agent to issue Warrant Shares upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the registered holder shall surrender this Warrant in exchange for the number of Warrant Shares equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the excess of the "Fair Market Value" (as defined below) less the Exercise Price by (y) the Fair Market Value. "Fair Market Value" shall mean the volume-weighted average price of the shares of Common Stock as reported during the ten (10) trading day period ending on the trading day prior to the date that notice of exercise is received by the Warrant Agent from the registered holder of such Warrants or its securities broker or intermediary.

3. <u>Reservation of Warrant Shares</u> . The Corporation agrees that, prior to the expiration of this Warrant, it will at all times have authorized and in reserve, and will keep available, solely for issuance or delivery upon the exercise of all outstanding Warrants represented by this Global Warrant Certificate, the number of Warrant Shares as from time to time shall be issuable by the Corporation upon the exercise of this Warrant.

4. <u>No Stockholder Rights; No Rights to Net Cash Settled</u> . No Warrant shall entitle the registered holder hereof to any voting rights or other rights as a stockholder of the Corporation.

5. <u>Transferability of Warrant and Underlying Shares</u> . Prior to the Termination Date and subject to compliance with applicable Federal and State securities laws, this Warrant and all rights hereunder are transferable, in whole or in part, at the office or agency of the Corporation by the registered holder in person or by duly authorized attorney in accordance with the provisions of the Warrant Agreement and upon delivery of the Assignment Form annexed hereto properly endorsed for transfer. The Corporation or the Warrant Agent shall be entitled to require, as a condition of any such transfer, that the registered holder and the transferee execute or provide such documents and make such representations and warranties as the Corporation or the Warrant Agent may deem appropriate to evidence compliance with applicable Federal and State securities laws.

6. <u>Certain Adjustments</u> . With respect to any rights that any registered holder has to exercise any Warrant and convert into shares of Common Stock, registered holder shall be entitled to the following adjustments:

(a) <u>Merger or Consolidation</u> . If at any time there shall be a merger or a consolidation of the Corporation with or into another entity when the Corporation is not the surviving corporation, then, as part of such merger or consolidation, lawful provision shall be made so that the registered holder hereof shall thereafter be entitled to receive upon exercise of each Warrant, during the period specified herein and upon payment of the aggregate Exercise Price then in effect, the number of shares of stock or other securities or property (including cash) of the successor corporation resulting from such merger or consolidation, to which the registered holder hereof as the registered holder of the stock deliverable upon exercise of each Warrant would have been entitled in such merger or consolidation if each Warrant had been exercised immediately before such transaction. In any such case, appropriate adjustment shall be made in the application of the provisions of each Warrant with respect to the rights and interests of the registered holder hereof as the registered holder of each Warrant after the merger or consolidation.

(b) <u>Reclassification, Recapitalization, etc</u> . If the Corporation at any time shall, by subdivision, combination or reclassification of securities, recapitalization, automatic conversion, or other similar event affecting the number or character of outstanding shares of Common Stock, or otherwise, change any of the securities as to which purchase rights under each Warrant exist into the same or a different number of securities of any other class or classes, each Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities that were subject to the purchase rights under each Warrant immediately prior to such subdivision, combination, reclassification or other change and the Exercise Price shall be proportionately adjusted.

(c) <u>Split or Combination of Common Stock and Stock Dividend</u> . In case the Corporation shall at any time subdivide, redivide, recapitalize, split (forward) or change its outstanding shares of Common Stock into a greater number of shares or declare a dividend upon its Common Stock payable solely in shares of Common Stock, the Exercise Price shall be proportionately reduced and the number of Warrant Shares proportionately increased. Conversely, in case of a reverse stock split or the outstanding shares of Common Stock of the Corporation shall be combined into a smaller number of shares, the Exercise Price shall be proportionately increased and the number of Warrant Shares proportionately reduced.

(d) <u>Notices of Changes in Warrant</u> . Upon every adjustment of (i) the Exercise Price, (ii) the number of shares of Parent Common Stock issuable upon exercise of this Global Warrant Certificate and (iii) the number of Warrants outstanding, the Corporation shall give written notice thereof to the registered holder, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in this Global Warrant Certificate then, in any such event, the Corporation shall give written notice to the registered holder, at the last address set forth for such registered holder in the Warrant register maintained by the Warrant Agent, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

7. <u>Compliance with Securities Laws; Legend and Stop Transfer Orders</u> . Unless the Warrant Shares are subject to an effective registration statement under the Securities Act, upon exercise of any part of any Warrant represented hereby, (i) the Corporation shall be entitled to require that the registered holder make such representations and warranties as may be reasonably required by the Corporation to assure that the issuance of Warrant Shares is exempt from the registration requirements of applicable securities laws and (ii) the Corporation shall instruct its transfer agent to enter stop transfer orders with respect to such Warrant Shares, and the Warrant Shares shall bear on the face thereof substantially the following legend:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER APPLICABLE SECURITIES LAWS AND HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH OTHER SECURITIES LAWS. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED, OR OTHERWISE DISPOSED OF, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

8. <u>Miscellaneous</u> . This Global Warrant Certificate and each Warrant represented hereby shall be governed by and construed in accordance with the laws of the State of Utah. All the covenants and provisions of this Global Warrant Certificate and each Warrant by or for the benefit of the Corporation shall bind and inure to the benefit of its successors and assigns hereunder. Nothing in this global Warrant Certificate shall be construed to give to any person or corporation other than the Corporation and the registered holder of each Warrant represented hereby any legal or equitable right, remedy, or claim under this Global Warrant Certificate and each Warrant represented hereby. This Global Warrant Certificate and each Warrant represented hereby shall be for the sole and exclusive benefit of the Corporation and the registered holder. The section headings herein are for convenience only and are not part of this Global Warrant Certificate and shall not affect the interpretation hereof.

9. <u>Validity</u> . This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

IN WITNESS WHEREOF, the Corporation has caused this Global Warrant Certificate to be executed by its duly authorized officer, this _____ day of _____ 2021.

CO-DIAGNOSTICS, INC.

By: _____

Name:

Title:   Chief Executive Officer

---

Certificate of Authentication

This is the Global Warrant Certificate for the Warrants referred to in the within-mentioned Warrant Agreement.

VSTOCK TRANSFER, LLC, as Warrant Agent

By:

Authorized Signature

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE] SCHEDULE OF INCREASES OR DECREASES IN WARRANT CERTIFICATE

The following increases or decreases in this Warrant have been made:

Date

Amount of decrease in the number of Warrants represented by this Warrant

Amount of increase in number of Warrants represented by this Warrant

Number of Warrants represented by this Warrant following such decrease or increase.

Signature of authorized officer of the depository

---

FORM OF EXERCISE FORM

To Be Executed by the registered holder in Order to Exercise Company Warrant

The undersigned hereby irrevocably elects to exercise the right, represented by the book-entry Warrant(s), to purchase shares of the Common Stock of Co-Diagnostics, Inc. (the " *Warrant Shares* ") and the undersigned herewith makes payment of the full purchase price for such shares at the price per share provided for in such Warrant in accordance with the terms of the Warrant Agreement. Such payment takes the form of $_____ in lawful money of the United States.

In the event that the registered holder wishes to exercise through cashless exercise (i) the number of Warrant Shares that this Warrant is exercisable for would be determined in accordance with Section 2(b) of this Global Warrant Certificate which allows for such cashless exercise and (ii) the registered holder hereof shall complete the following: The undersigned hereby irrevocably elects to exercise the right, represented by this Global Warrant Certificate, through the cashless exercise provisions hereof, to receive Warrant Shares.

The undersigned hereby requests that certificates for the Warrant Shares purchased be issued in the name of:

(please print or type name and address)

(please insert social security or other identifying number)

and be delivered as follows:

(please print or type name and address)

(please insert social security or other identifying number)

and if such number of shares of Common Stock shall not be all the shares evidenced by this Global Warrant Certificate, that a new Warrant for the balance of such shares be registered in the name of, and delivered to, registered holder.

Signature of Holder

SIGNATURE GUARANTEE:

This Warrant may be exercised by delivering the Exercise Form to VStock Transfer, LLC at the following addresses:

By mail at

_____

[    ]

---

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT)

For value received, hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such number of Company Warrants listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the registered holder with respect to such Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrant on the books of the Depositary and/or the Warrant Agent with respect to the number of Warrants set forth below, with full power of substitution:

Name(s) of

Assignee(s) Address No. of Warrants

Dated: _____

Signature

(Signed exactly as name appears in the records of the Depositary)

Signature Guarantee:

**Exhibit 10.7**

COMPANY WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this " *Agreement* "), dated as of December 31, 2021, is entered into by and between Co-Diagnostics, Inc., a Utah corporation (" *Parent* " or the " *Company* "), and VStock Transfer, LLC (the " *Warrant Agent* ").

WHEREAS, Parent consummated a merger (the " *Merger* ") of its wholly-owned subsidiary, IDMO Acquisition Corporation, Inc. (" *Subco* "), with and into Idaho Molecular Inc., an Idaho corporation (" *Company* "), pursuant to an Agreement and Plan of Merger (as such agreement may be amended from time to time, the " *Merger Agreement* "), by and among Parent, Company, and Subco;

WHEREAS, the Merger Agreement provides that the Company will issue warrants to purchase 232,500 shares of the Company's common stock, par value $0.001 per share, (the " *Parent Common Stock* ") exercisable subject to satisfaction of certain milestones and over a seven year period at an initial exercise price of $9.125 per share (the " *Warrants* " or the " *Company Warrants* ");

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, transfer, exchange and exercise of the Warrants; and

WHEREAS, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1. **Appointment of Warrant Agent and Depository** . The Company hereby appoints the Warrant Agent to act as agent for the Company for the Company Warrants, and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the terms and conditions set forth in this Agreement.

2. **Warrants.**

2.1 Issuance of Warrants . Each Company Warrant will be uncertificated and in registered form only, substantially in the form of Exhibit 1, the provisions of which are incorporated herein. Any Warrant so issued shall have the same terms, force and effect as a certificated Warrant that has been duly countersigned by the Warrant Agent in accordance with the terms of this Agreement.

2.2 Warrant Register .

(a) The Warrant Agent shall maintain books (" *Warrant Register* ") for the registration of the original issuance and the registration of any subsequent transfer of the Warrants. Upon the initial issuance of the Warrants, the Warrant Agent shall issue and register the Warrants in the names of the respective holders thereof in such denominations and otherwise in accordance with instructions delivered to the Warrant Agent by the Company.

(b) Prior to due presentment for registration of transfer of any Warrant in accordance with Section 5.1.1 below, the Company and the Warrant Agent may deem and treat the person in whose name such Warrant is then registered in the Warrant Register (each a " *registered holder* ") as the absolute owner of such Warrant, for the purpose of any exercise thereof, and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

3. **Terms and Exercise of Warrants** .

3.1 Exercise Price . For purposes of this Agreement, " ***Exercise Price*** " shall mean the initial exercise price for each Warrant as set forth in the Exhibit 1, subject to adjustment as provided in Exhibit 1.

3.2 Duration of Warrants . A Warrant may be exercised only during the period (" ***Exercise Period*** ") specified in Exhibit 1 or as the same may be extended as hereinafter provided. Each Warrant not exercised on or before the expiration date, as set forth in Exhibit 1 (the " ***Expiration Date*** "), shall become void, and all rights thereunder and all rights in respect thereof under this Agreement shall cease at the close of business on the Expiration Date.

3.3 Exercise of Warrants . Warrants may be exercised, at the option of the registered holder of the Warrant, in whole or in part, at any time or from time to time during the Exercise Period, by complying with the Warrant Agent's procedures relating to the exercise of such book-entry interest in the Warrants. In addition, the registered holder shall deliver to the Warrant Agent (the " ***Warrant Agent Office*** ") (i) an exercise form set forth in the Warrant, executed by such registered holder or its duly authorized agent or attorney (the " ***Exercise Form*** ") and (ii) payment of the aggregate Exercise Price. In case an exercise of Warrants is in part only, the Warrant Agent shall make an appropriate adjustment to the account of the registered holder to reflect a number of Warrants for the number of shares of Parent Common Stock equal (without giving effect to any adjustment thereof) to the number of such shares called for by such registered holder's Warrants prior to such exercise, minus the number of shares designated by the registered holder upon such exercise.

3.3.1 Payment . Subject to the provisions of the Warrant and this Agreement, a Warrant may be exercised by the registered holder thereof by delivering to the Warrant Agent at its corporate trust department (i) a warrant exercise form properly delivered by the registered holder, and (iii) the payment in full of the Exercise Price for each share of Common Stock as to which the Warrant is exercised as follows:

(a) in lawful money of the United States, in certified check or wire payable to the Warrant Agent; or

(b) as provided in Section 7.5 hereof.

3.3.2 Procedures and Validity .

(a) Any exercise of a Warrant by a registered holder pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the registered holder and the Company, enforceable in accordance with its terms.

(b) The Warrant Agent shall:

(i) examine all Exercise Forms and all other documents delivered to it by or on behalf of registered holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii) where an Exercise Form or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii) inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Forms received and the crediting of Warrants to the respective registered holders' accounts; and

(iv) advise the Company no later than two (2) business days after receipt of an Exercise Form, of (i) the

receipt of such Exercise Form and the number of Warrants exercised in accordance with the terms and conditions of this Agreement, and (ii) such other information as the Company shall reasonably require.

(c) All questions as to the validity, form and sufficiency (including time of receipt) of an exercised Warrant and any Exercise Form will be determined by the Company in good faith. The Company reserves the right to reject any and all Exercise Forms not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. Other than as required in Section 3.3.2(b)(ii) above, neither the Company nor the Warrant Agent shall be under any duty to give notice to the registered holders of the Warrants of any irregularities in any exercise of Warrants or any Exercise Form, nor shall it incur any liability for the failure to give such notice.

3.3.3 <u>Issuance of Shares</u> . As soon as practicable after the exercise of any Warrant and the clearance of the funds in payment of the Exercise Price, the Company shall cause its Transfer Agent to issue to the registered holder of such Warrant a certificate or certificates, or book entry position, representing the number of full shares of Parent Common Stock to which he, she or it is entitled, registered in such name or names as may be directed by him, her or it. In the event that during the last 20 business days immediately prior to the Expiration Date both (i) a registration statement with respect to the Parent Common Stock underlying the Warrants is not effective or a current prospectus is not available and (ii) the Exercise Price of the Warrants is less than the price at which the Parent Common Stock is trading on NASDAQ (or if the Parent Common Stock is no longer trading on NASDAQ, such other stock exchange on which the shares of Parent Common Stock trades), the Exercise Period shall automatically be extended for a period of 20 business days after the date that the Company causes a registration statement covering the Warrants and the Parent Common Stock underlying the Warrants to be effective and a current prospectus is made available. In no event will the Company be required to "net cash settle" the warrant exercise.

---

3.3.4 <u>Valid Issuance</u> . All shares of Parent Common Stock issued upon the proper exercise of a Warrant in conformity with this Agreement shall be validly issued, fully paid and nonassessable.

3.3.5 <u>Date of Issuance</u> . All shares of Parent Common Stock so issued shall be registered in the name of the registered holder or such other name as shall be designated in the Exercise Form delivered by the registered holder. Such shares of Parent Common Stock shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such shares of Parent Common Stock as of the date of delivery of the Exercise Form to the Warrant Agent Office duly executed by the registered holder thereof and upon the Company's receipt of payment of the Exercise Price.

4. **Adjustments.**

4.1 <u>Adjustments Generally</u> . The Exercise Price, the number of shares of Parent Common Stock issuable upon exercise of the Warrants and the number of Warrants outstanding are subject to adjustment from time to time upon the occurrence of certain events in accordance with the provisions of Exhibit 1.

4.2 <u>Notices of Vesting and Changes in Warrant</u> . Promptly upon the satisfaction of the vesting requirements of the Warrants pursuant to the Merger Agreement, the Company shall deliver written notice of such vesting and exercisability to the Warrant Agent, which notice shall state the date upon which such warrants shall vest and become exercisable. Upon every adjustment of (i) the Exercise Price, (ii) the number of shares of Parent Common Stock issuable upon exercise of the Warrants and (iii) the number of Warrants outstanding, the Company shall give written notice thereof to the Warrant Agent, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of a Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in the Warrant certificate then, in any such event, the Company shall give written notice to each registered holder, at the last address set forth for such registered holder in the Warrant register maintained by the Warrant Agent, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

4.3 <u>No Fractional Shares</u> . Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants. If, by reason of any adjustment made pursuant to this Section 4, the registered holder of any Warrant would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a share, the Company shall, upon such exercise, round up or down to the nearest whole number the number of shares of Parent Common Stock to be issued to the registered holder.

4.4 <u>Form of Warrant</u> . The form of Warrant certificate need not be changed as a result of any adjustment pursuant to this Section. However, the Company may, at any time, in its sole discretion, make any change in the form of Warrant certificate that the Company may deem appropriate and that does not affect the substance thereof.

5. **Transfer and Exchange of Warrants.**

5.1 <u>Exchange and Transfer.</u>

5.1.1 The Warrant Agent shall keep, at the Warrant Agent Office, books in which, subject to such reasonable regulations as it may prescribe, it shall register Warrants and exchanges and transfers of outstanding Warrants upon request to exchange or transfer such Warrants, provided, that the Warrant Agent shall have received a written instruction of transfer or exchange in form reasonably satisfactory to the Warrant Agent, duly executed by the registered holder thereof or by its or her or his duly authorized agent or attorney, providing all information required to be delivered hereunder, such signature to be guaranteed by an eligible guarantor institution to the extent required by the Warrant Agent or the Depository. Upon any such registration of transfer, a Warrant Statement shall be issued to the transferee.

5.1.2 The Company shall pay for applicable service charges for any exchange or registration of transfer of Warrants; and the Warrant Agent and/or the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed in connection with any such exchange or registration of transfer. Neither the Warrant Agent nor the Company shall be required to pay any stamp or other tax or other charge required to be paid in connection with such transfer, and neither the Warrant Agent nor the Company shall be required to issue or deliver any Warrants until it has been established to the Company's and the Warrant Agent's reasonable satisfaction that such tax or other charge has been paid or that no such tax or other charge is due.

5.1.3 The Warrant Agent shall not affect any exchange or registration of transfer which will result in the issuance of a Warrant evidencing a fraction of a Warrant or a number of full Warrants and a fraction of a Warrant.

5.1.4 All Warrants credited to a registered holder's or transferee's account upon any exchange or transfer of Warrants in accordance with the provisions of this Agreement shall be the valid obligations of the Company evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Warrants that were so exchanged or transferred.

5.2 <u>Treatment of Holders of Warrants</u> . Each registered holder of Warrants, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent registered holder of such Warrants that until the due presentment for registration of transfer in accordance with Section 5.1.1 of such Warrants, the Company and the Warrant Agent may treat the registered holder of such Warrants as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

5.3 <u>Procedure for Surrender of Warrants</u> . Warrants may be surrendered to the Warrant Agent, either in certificated form or in book entry position, together with a written request for exchange or transfer, and thereupon the Warrant Agent shall issue in exchange therefor one or more new Warrants, or book entry positions, as requested by the registered holder of the

Warrants so surrendered, representing an equal aggregate number of Warrants; provided, however, that in the event that a Warrant surrendered for transfer bears a restrictive legend, the Warrant Agent shall not cancel such Warrant and issue new Warrants in exchange therefor until the Warrant Agent has received an opinion of counsel stating that such transfer may be made and indicating whether the new Warrants must also bear a restrictive legend.

5.4 <u>Cancellation of Warrants</u> . Promptly following the Expiration Date or at such earlier time that there are no longer outstanding any Warrants, the Warrant certificate shall be cancelled or destroyed and the Warrant Agent shall deliver a certificate of such cancellation or destruction to the Company.

6. [Omitted].

7. **Other Provisions Relating to Rights of Holders of Warrants** .

7.1 <u>No Rights as Stockholder</u> . No Warrant shall, and nothing contained in this Agreement, in the Warrant certificate or in the Warrant Statement shall be construed to, entitle the registered holder or any beneficial owner thereof to any of the rights of a holder or beneficial owner of Parent Common Stock, including, without limitation, the right to vote or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or any other matter, to receive dividends on Parent Common Stock or any rights whatsoever as stockholders of the Company, until such Warrant is duly exercised in accordance with this Agreement and such registered holder is issued the Parent Common Stock to which it is entitled in connection therewith.

7.2 <u>Reservation of Common Stock</u> . The Company shall at all times reserve and keep available a number of its authorized but unissued shares of Parent Common Stock that will be sufficient to permit the exercise in full of all outstanding Warrants issued pursuant to this Agreement.

7.3 <u>[Omitted]</u> .

7.4 <u>Limitation on Monetary Damages</u> . In no event shall the registered holder of a Warrant be entitled to receive monetary damages for failure to settle any Warrant exercise if the Parent Common Stock issuable upon exercise of the Warrants has not been registered with the SEC pursuant to an effective registration statement or if a current prospectus is not available for delivery by the Warrant Agent, provided the Company has fulfilled its obligations under Section 7.5 to use its commercially reasonable efforts to effect the registration under the Securities Act of 1933 (the " ***Securities Act*** ") of the Parent Common Stock issuable upon exercise of the Warrants.

7.5 <u>Registration of Shares of Common Stock; Cashless Exercise at Company's Option</u> .

7.5.1 <u>Registration of the shares of Common Stock</u> . If the Company shall fail to have maintained an effective registration statement covering the issuance of the shares of Common Stock issuable upon exercise of the Warrants as required under the Merger Agreement, the registered holders shall have the right to exercise such Warrants on a "cashless basis," by exchanging the Warrants (in accordance with Section 3(a)(9) of the Securities Act or another exemption) for that number of shares of Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the excess of the "Fair Market Value" (as defined below) less the Exercise Price by (y) the Fair Market Value. Solely for purposes of this subsection 7.5.1, "Fair Market Value" shall mean the volume-weighted average price of the shares of Common Stock as reported during the ten (10) trading day period ending on the trading day prior to the date that notice of exercise is received by the Warrant Agent from the registered holder of such Warrants or its securities broker or intermediary. The date that notice of "cashless exercise" is received by the Warrant Agent shall be conclusively determined by the Warrant Agent. In connection with the "cashless exercise" of a Warrant, the Company shall, upon request, provide the Warrant Agent with an opinion of counsel for the Company (which shall be an outside law firm with securities law experience) stating that (i) the exercise of the Warrants on a "cashless basis" in accordance with this subsection 7.5.1 is not required to be registered under the Securities Act and (ii) the shares of Common Stock issued upon such exercise shall be freely tradable under United States federal securities laws by anyone who is not an affiliate (as such term is defined in Rule 144 under

the Securities Act) of the Company and, accordingly, shall not be required to bear a restrictive legend. Except as provided in subsection 7.5.2, for the avoidance of doubt, unless and until all of the Warrants have been exercised or have expired, the Company shall continue to be obligated to comply with its registration obligations under the first three sentences of this subsection 7.5.1

7.5.1 <u>Cashless Exercise at Company's Option</u> . If the shares of Common Stock are at the time of any exercise of a Warrant not listed on a national securities exchange such that they satisfy the definition of a "covered security" under Section 18(b)(1) of the Securities Act, the Company may, at its option, (i) require holders of Warrants who exercise such Warrants to exercise such Warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act as described in subsection 7.5.1 and (ii) in the event the Company so elects, the Company shall (x) not be required to file or maintain in effect a registration statement for the registration, under the Securities Act, of the shares of Common Stock issuable upon exercise of the Warrants, notwithstanding anything in this Agreement to the contrary, and (y) use its commercially reasonable efforts to register or qualify for sale the shares of Common Stock issuable upon exercise of the Warrant under applicable blue sky laws to the extent an exemption is not available..

8. **Concerning the Warrant Agent and Other Matters.**

8.1 <u>Payment of Taxes</u> . The Company will from time to time promptly pay all taxes and charges that may be imposed upon the Company or the Warrant Agent in respect of the issuance or delivery of shares of Parent Common Stock upon the exercise of Warrants, but the Company shall not be obligated to pay any transfer taxes in respect of the Warrants or such shares.

8.2 <u>Resignation, Consolidation, or Merger of Warrant Agent</u> .

8.2.1 <u>Appointment of Successor Warrant Agent</u> . The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company and to each registered holder. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by any registered holder of a Warrant, then the registered holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost. Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a corporation organized and existing under the laws of the State of New York, in good standing and having its principal office in the Borough of Manhattan, City and State of New York, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority. After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties, and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, and rights of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent the Company shall make, execute, acknowledge, and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties, and obligations.

8.2.2 <u>Notice of Successor Warrant Agent</u> . In the event a successor Warrant Agent shall be appointed, the Company shall give notice thereof to each registered holder, the predecessor Warrant Agent and the transfer agent for the Parent Common Stock not later than the effective date of any such appointment.

8.2.3 <u>Merger or Consolidation of Warrant Agent</u> . Any corporation into which the Warrant Agent may be merged or with which it may be consolidated or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement without any further act.

8.3 **Fees and Expenses of Warrant Agent.**

8.3.1 <u>Remuneration</u> . The Company agrees to pay the Warrant Agent reasonable remuneration for its services as such Warrant Agent hereunder and will reimburse the Warrant Agent upon demand for all expenditures that the Warrant Agent may reasonably incur in the execution of its duties hereunder.

8.3.2 <u>Further Assurances.</u> The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

8.4 **Liability of Warrant Agent.**

8.4.1 <u>Reliance on Company Statement</u> . Whenever in the performance of its duties under this Agreement the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by the General Counsel, President or Chairman of the Board of Directors of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon such statement for any action taken or suffered in good faith by it pursuant to the provisions of this Agreement.

8.4.2 <u>Indemnity</u> . The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct or bad faith. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted by the Warrant Agent in the execution of this Agreement, except as a result of the Warrant Agent's gross negligence, willful misconduct or bad faith.

8.4.3 <u>Exclusions</u> . The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Section 4 hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Parent Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Parent Common Stock will when issued be valid and fully paid and nonassessable.

8.5 <u>Acceptance of Agency</u> . The Warrant Agent hereby accepts the agency established by this Agreement and agrees to perform the same upon the terms and conditions herein set forth and, among other things, shall account promptly to the Company with respect to Warrants exercised and concurrently account for, and pay to the Company, all moneys received by the Warrant Agent for the purchase of shares of Parent Common Stock through the exercise of Warrants.

9. **Miscellaneous Provisions.**

9.1 Successors. All the covenants and provisions of this Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns.

9.2 Notices. Any notice, statement or demand authorized by this Agreement to be given or made by the Warrant Agent or by the registered holder of any Warrant to or on the Company shall be delivered by hand or sent by registered or certified mail or overnight courier service, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

Co-Diagnostics, Inc.
2401 South Foothill Dr., Suite D
Salt Lake City, UT 84109
Telephone: 801-438-1036

Attention: President
Attention: General Counsel

---

Any notice, statement or demand authorized by this Agreement to be given or made by the registered holder of any Warrant or by the Company to or on the Warrant Agent shall be delivered by hand or sent by registered or certified mail or overnight courier service, addressed (until another address is filed in writing by the Company with the Warrant Agent) as follows:

VStock Transfer, LLC
18 Lafayette Place
Woodmere, New York 11598
Attn: Compliance Department

Any notice, sent pursuant to this Agreement shall be effective, if delivered by hand, upon receipt thereof by the party to whom it is addressed, if sent by overnight courier, on the next business day of the delivery to the courier, and if sent by registered or certified mail on the third day after registration or certification thereof.

9.3 <u>Notices to Holders of Warrants</u> . Any notice to registered holders of Warrants which by any provisions of this Warrant Agreement or the Warrant certificate is required or permitted to be given shall be given by first class mail prepaid at such registered holder's address as it appears on the books of the Warrant Agent.

9.4 <u>Applicable Law</u> . The validity, interpretation and performance of this Agreement and of the Warrants shall be governed in all respects by the laws of the State of New York, without giving effect to conflicts of law principles that would result in the application of the substantive laws of another jurisdiction. The Company hereby agrees that any action, proceeding or claim against it arising out of or relating in any way to this Agreement shall be brought and enforced in the courts located or situated in New York, New York or the United States District Court for the Southern District of New York, and irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. The Company hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum. Any such process or summons to be served upon the Company may be served by transmitting a copy thereof by registered or certified mail, return receipt requested, postage prepaid, addressed to it at the address set forth in Section 9.2 hereof. Such mailing shall be deemed personal service and shall be legal and binding upon the Company in any action, proceeding or claim.

9.5 <u>Persons Having Rights under this Agreement</u> . Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the registered holders of the Warrants, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof. All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their successors and assigns and of the registered holders of the Warrants.

---

9.6 <u>Examination of the Warrant Agreement</u> . A copy of this Agreement shall be available at all reasonable times at the office of the Warrant Agent in the Borough of Manhattan, City and State of New York, for inspection by the registered holder of any Warrant. The Warrant Agent may require any such registered holder to submit his, her or its Warrant Statements for inspection by it.

9.7 <u>Counterparts</u> . This Agreement may be executed in any number of original or facsimile counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

9.8 <u>Effect of Headings</u> . The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation thereof.

9.9 <u>Amendments</u> . This Agreement may be amended by the parties hereto without the consent of any registered holder for the purpose of curing any ambiguity, or curing, correcting or supplementing any defective provision contained herein or adding or changing any other provisions with respect to matters or questions arising under this Agreement as the parties may deem necessary or desirable and provided such amendment shall not adversely affect the interest of the registered holders. All other modifications, adjustments or amendments of this Agreement, shall require the written consent of the registered holders of a majority of the then outstanding Warrants provided that no amendment to the Warrant certificate shall be effective to charge any registered holder who has not consented thereto. The Warrant Agent may request from either the Company or the registered holders an opinion of counsel with respect to the validity of any amendment as a condition to its exercise of any amendment.

9.10 <u>Severability</u> . Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

[Signature page follows]

---

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

CO-DIAGNOSTICS, INC.

By:

Name: _____

VSTOCK TRANSFER, LLC

By:

Name: _____

[Signature Page to Warrant Agreement]

---

EXHIBIT 1 TO COMPANY WARRANT AGREEMENT

FORM OF GLOBAL WARRANT CERTIFICATE FOR COMPANY WARRANTS

EXERCISABLE ONLY IF AUTHENTICATED BY THE WARRANT AGENT AS PROVIDED HEREIN

VOID AFTER THE CLOSE OF BUSINESS ON _____, 20__ OF CO-DIAGNOSTICS, INC.

Global Warrant Certificate representing Warrants to purchase _____ shares of common stock, par value $0.001 per share, as described herein

NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED, OR OTHERWISE DISPOSED OF, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

Each Warrant (each a " *Warran* t") represented hereby, entitles the registered holder to purchase one share (the " *Warrant Share* ") of common stock, $0.001 par value (the " *Common Stock* "), of Co-Diagnostics, Inc., a Utah corporation, (the " *Corporation* ") for the benefit of certain registered holders (as defined in the Warrant Agreement) of such Warrants on the following terms. This Global Warrant Certificate represents the number of outstanding Warrants from time to time endorsed hereon and the number of outstanding Warrants represented hereby may from time to time be reduced or increased, as appropriate to reflect exchanges, redemptions, exercises and other similar transactions. This Global Warrant Certificate is issued under and in accordance with that certain Warrant Agreement dated as of December 30, 2021 by and between the Corporation and VStock Transfer, LLC (as such agreement may be amended from time to time, the " *Warrant Agreement* "), and is subject to the terms and provisions contained therein, all of which terms and provisions the registered holders consent to by acceptance of their book-entry interests in the Global Warrant Certificate. Copies of the Warrant Agreement are on file at the Corporation's headquarters. In the event of any conflict or inconsistency between this Global Warrant Certificate and the Warrant Agreement, this Global Warrant Certificate shall control. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Warrant Agreement.

This Global Warrant Certificate is also issued under and in accordance with that certain Agreement and Plan of Merger (as such agreement may be amended from time to time, the " *Merger Agreement* "), by and among Co-Diagnostics, Inc., a Utah corporation, Idaho Molecular Inc., an Idaho corporation, and IDMO Acquisition Corporation, Inc., and is subject to the terms and provisions contained therein. In the event of any conflict or inconsistency between this Global Warrant Certificate and the Merger Agreement, the Merger Agreement shall control.

1. Exercise Period . The Warrants shall vest in full and become exercisable immediately following either (i) satisfaction of Milestone 3 as such term is defined in the Merger Agreement or (ii) upon the occurrence of any of the events described in Section 3.1(e) of the Merger Agreement (any such date, the " *Vesting Date* "). Promptly upon the satisfaction of clauses (i) or (ii), the Corporation shall notify the Warrant Agent that the vesting conditions have been satisfied and the Vesting Date upon which the Warrants shall become fully exercisable pursuant to the notice provision in the Warrant Agreement. Either the Corporation or the registered holder may certify to the Warrant Agent in a form satisfactory to the Warrant Agent the occurrence of the Vesting Date. Notwithstanding anything to the contrary contained herein, the Warrants shall expire at 5:00 p.m. (New York Time) on January 1, 2027 (the " *Termination Date* "). Parent will provide registered holder at least fifteen (15) days' written notice prior to the consummation of any of the events described in Section 3.1(e) of the Merger Agreement.

2. Exercise of Warrants .

(a) The registered holder may, at any time on or after the Vesting Date and prior to the Termination Date, exercise this Warrant in whole or in part at an exercise price per share equal to $9.125 (subject to proportionate adjustment in accordance with Section 6) (the " *Exercise Price* "), by the delivery of the Warrant Exercise Form annexed hereto duly completed and executed to the Warrant Agent at the Warrant Agent Office or at such other agency or office of the Corporation in the United States of America as the Corporation may designate by notice in writing to the registered holder at the address of such registered holder appearing on the books of the Corporation. Upon any partial exercise of a Warrant, the Warrant Agent shall make an appropriate adjustment to the account of the registered holder to reflect a number of Warrant Shares for the account of the registered holder equal (without giving effect to any adjustment thereof) to the number of Warrant Shares subject to such registered holder's Warrants prior to such exercise, minus the number of Warrant Shares exercised by the registered holder. In the event of the exercise of the rights represented by any Warrant, a certificate or certificates for the Warrant Shares so purchased, as and if applicable, registered in the name of the registered holder, shall be delivered to the registered holder hereof as soon as practicable after the exercise of such Warrant.

(b) Payment to the Corporation of the Exercise Price for each share of Common Stock being purchased shall be made either (i) by wire transfer or cashier's check drawn on a United States bank payable to the Corporation (to an account as designated by the Warrant Agent by notice in writing to the registered holders); or (ii) by instructing the Warrant Agent to issue Warrant Shares upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the registered holder shall surrender this Warrant in exchange for the number of Warrant Shares equal to the quotient obtained by dividing (x) the product of the number of shares of Common Stock underlying the Warrants, multiplied by the excess of the "Fair Market Value" (as defined below) less the Exercise Price by (y) the Fair Market Value. "Fair Market Value" shall mean the volume-weighted average price of the shares of Common Stock as reported during the ten (10) trading day period ending on the trading day prior to the date that notice of exercise is received by the Warrant Agent from the registered holder of such Warrants or its securities broker or intermediary.

---

3. <u>Reservation of Warrant Shares</u> . The Corporation agrees that, prior to the expiration of this Warrant, it will at all times have authorized and in reserve, and will keep available, solely for issuance or delivery upon the exercise of all outstanding Warrants represented by this Global Warrant Certificate, the number of Warrant Shares as from time to time shall be issuable by the Corporation upon the exercise of this Warrant.

4. <u>No Stockholder Rights; No Rights to Net Cash Settled</u> . No Warrant shall entitle the registered holder hereof to any voting rights or other rights as a stockholder of the Corporation.

5. <u>Transferability of Warrant and Underlying Shares</u> . Prior to the Termination Date and subject to compliance with applicable Federal and State securities laws, this Warrant and all rights hereunder are transferable, in whole or in part, at the office or agency of the Corporation by the registered holder in person or by duly authorized attorney in accordance with the provisions of the Warrant Agreement and upon delivery of the Assignment Form annexed hereto properly endorsed for transfer. The Corporation or the Warrant Agent shall be entitled to require, as a condition of any such transfer, that the registered holder and the transferee execute or provide such documents and make such representations and warranties as the Corporation or the Warrant Agent may deem appropriate to evidence compliance with applicable Federal and State securities laws.

6. <u>Certain Adjustments</u> . With respect to any rights that any registered holder has to exercise any Warrant and convert into shares of Common Stock, registered holder shall be entitled to the following adjustments:

(a) <u>Merger or Consolidation</u> . If at any time there shall be a merger or a consolidation of the Corporation with or into another entity when the Corporation is not the surviving corporation, then, as part of such merger or consolidation, lawful provision shall be made so that the registered holder hereof shall thereafter be entitled to receive upon exercise of each Warrant, during the period specified herein and upon payment of the aggregate Exercise Price then in effect, the number of shares of stock or other securities or property (including cash) of the successor corporation resulting from such merger or consolidation, to which the registered holder hereof as the registered holder of the stock deliverable upon exercise of each Warrant would have been entitled in such merger or consolidation if each Warrant had been exercised immediately before such transaction. In any such case, appropriate adjustment shall be made in the application of the provisions of each Warrant with respect to the rights and interests of the registered holder hereof as the registered holder of each Warrant after the merger or consolidation.

(b) <u>Reclassification, Recapitalization, etc</u> . If the Corporation at any time shall, by subdivision, combination or reclassification of securities, recapitalization, automatic conversion, or other similar event affecting the number or character of outstanding shares of Common Stock, or otherwise, change any of the securities as to which purchase rights under each Warrant exist into the same or a different number of securities of any other class or classes, each Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities that were subject to the purchase rights under each Warrant immediately prior to such subdivision, combination, reclassification or other change and the Exercise Price shall be proportionately adjusted.

---

(c) <u>Split or Combination of Common Stock and Stock Dividend</u> . In case the Corporation shall at any time subdivide, redivide, recapitalize, split (forward) or change its outstanding shares of Common Stock into a greater number of shares or declare a dividend upon its Common Stock payable solely in shares of Common Stock, the Exercise Price shall be proportionately reduced and the number of Warrant Shares proportionately increased. Conversely, in case of a reverse stock split or the outstanding shares of Common Stock of the Corporation shall be combined into a smaller number of shares, the Exercise Price shall be proportionately increased and the number of Warrant Shares proportionately reduced.

(d) <u>Notices of Changes in Warrant</u> . Upon every adjustment of (i) the Exercise Price, (ii) the number of shares of Parent Common Stock issuable upon exercise of this Global Warrant Certificate and (iii) the number of Warrants outstanding, the Corporation shall give written notice thereof to the registered holder, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Upon the occurrence of any event specified in this Global Warrant Certificate then, in any such event, the Corporation shall give written notice to the registered holder, at the last address set forth for such registered holder in the Warrant register maintained by the Warrant Agent, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

7. <u>Compliance with Securities Laws; Legend and Stop Transfer Orders</u> . Unless the Warrant Shares are subject to an effective registration statement under the Securities Act, upon exercise of any part of any Warrant represented hereby, (i) the Corporation shall be entitled to require that the registered holder make such representations and warranties as may be reasonably required by the Corporation to assure that the issuance of Warrant Shares is exempt from the registration requirements of applicable securities laws and (ii) the Corporation shall instruct its transfer agent to enter stop transfer orders with respect to such Warrant Shares, and the Warrant Shares shall bear on the face thereof substantially the following legend:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER APPLICABLE SECURITIES LAWS AND HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH OTHER SECURITIES LAWS. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED, OR OTHERWISE DISPOSED OF, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CORPORATION THAT SUCH REGISTRATION IS NOT REQUIRED.

8. <u>Miscellaneous</u> . This Global Warrant Certificate and each Warrant represented hereby shall be governed by and construed in accordance with the laws of the State of Utah. All the covenants and provisions of this Global Warrant Certificate and each Warrant by or for the benefit of the Corporation shall bind and inure to the benefit of its successors and assigns hereunder. Nothing in this global Warrant Certificate shall be construed to give to any person or corporation other than the Corporation and the registered holder of each Warrant represented hereby any legal or equitable right, remedy, or claim under this Global Warrant Certificate and each Warrant represented hereby. This Global Warrant Certificate and each Warrant represented hereby shall be for the sole and exclusive benefit of the Corporation and the registered holder. The section headings herein are for convenience only and are not part of this Global Warrant Certificate and shall not affect the interpretation hereof.

9. <u>Validity</u> . This Warrant Certificate shall not be valid or obligatory for any purpose until authenticated by the Warrant Agent.

IN WITNESS WHEREOF, the Corporation has caused this Global Warrant Certificate to be executed by its duly authorized officer, this _____ day of _____ 2021.

CO-DIAGNOSTICS, INC.

By:    _____

Name:

Title:   Chief Executive Officer

---

Certificate of Authentication

This is the Global Warrant Certificate for the Warrants referred to in the within-mentioned Warrant Agreement.

VSTOCK TRANSFER, LLC, as Warrant Agent

By:

Authorized Signature

[TO BE ATTACHED TO GLOBAL WARRANT CERTIFICATE] SCHEDULE OF INCREASES OR DECREASES IN WARRANT CERTIFICATE

The following increases or decreases in this Warrant have been made:

Date

Amount of decrease in the number of Warrants represented by this Warrant

Amount of increase in number of Warrants represented by this Warrant

Number of Warrants represented by this Warrant following such decrease or increase.

Signature of authorized officer of the depository

---

FORM OF EXERCISE FORM

To Be Executed by the registered holder in Order to Exercise Company Warrant

The undersigned hereby irrevocably elects to exercise the right, represented by the book-entry Warrant(s), to purchase shares of the Common Stock of Co-Diagnostics, Inc. (the " *Warrant Shares* ") and the undersigned herewith makes payment of the full purchase price for such shares at the price per share provided for in such Warrant in accordance with the terms of the Warrant Agreement. Such payment takes the form of $_____ in lawful money of the United States.

In the event that the registered holder wishes to exercise through cashless exercise (i) the number of Warrant Shares that this Warrant is exercisable for would be determined in accordance with Section 2(b) of this Global Warrant Certificate which allows for such cashless exercise and (ii) the registered holder hereof shall complete the following: The undersigned hereby irrevocably elects to exercise the right, represented by this Global Warrant Certificate, through the cashless exercise provisions hereof, to receive Warrant Shares.

The undersigned hereby requests that certificates for the Warrant Shares purchased be issued in the name of:

(please print or type name and address)

(please insert social security or other identifying number)

and be delivered as follows:

(please print or type name and address)

(please insert social security or other identifying number)

and if such number of shares of Common Stock shall not be all the shares evidenced by this Global Warrant Certificate, that a new Warrant for the balance of such shares be registered in the name of, and delivered to, registered holder.

Signature of Holder

SIGNATURE GUARANTEE:

This Warrant may be exercised by delivering the Exercise Form to VStock Transfer, LLC at the following addresses:

By mail at

_____

    [     ]

---

[FORM OF ASSIGNMENT]

(TO BE EXECUTED TO TRANSFER THE WARRANT)

For value received, hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such number of Company Warrants listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the registered holder with respect to such Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrant on the books of the Depositary and/or the Warrant Agent with respect to the number of Warrants set forth below, with full power of substitution:

Name(s) of

Assignee(s) Address No. of Warrants

Dated: _____

Signature

(Signed exactly as name appears in the records of the Depositary)

Signature Guarantee:

**Exhibit 10.9**

LEASE AGREEMENT
2401 FOOTHILL DRIVE

THIS LEASE AGREEMENT (this " Lease ") is entered into as of the __ day of June, 2018, between YESCO Properties, LLC, a Utah company (" Landlord "), whose address is 2401 Foothill Dr., SLC, UT 84109, and Co-Diagnostics, a Utah company (" Tenant "), whose address is 2401 Foothill Drive, SLC, UT 84109.

Landlord and Tenant agree as follows:

1. Definitions . As used in this Lease, each of the following terms will have the meaning indicated:

    1.1. "Basic Monthly Rent" means:

| Period(s) | Basic Monthly Rent | Rented Square feet |
|---|---|---|
| Feb. 1, 2018 through May 31, 2018 | $11,399.30 per month | 7,209 |
| June. 1, 2018 through January 31, 2019 | $14,399.30 per month | 10,273 |
| Feb. 1, 2019 through Jan 31, 2020 | $14,831.25 per month | 10,273 |
| _____ through _____, inclusive | $n/a, per month | n.a.. |
| _____ through _____, inclusive | $n.a., per month | n.a. |

* June 2018 Rent will be discounted by $1500.

    1.2. "Building" means the building with the street address of see above , in _____County,_____ . (The Building includes, without limitation, all heating, air-conditioning, mechanical, electrical, and plumbing systems, the roof and all walls, foundations and fixtures constituting a part of the Building.)

    1.3. "Commencement Date" means Feb 1, 2018.

    1.4. Expiration Date" means the date that is_ years after the Commencement Date, plus any partial calendar month occurring between the Commencement Date and the first day of the first full calendar month following the Commencement Date, if the Commencement Date does not occur on the first day of a calendar month, as the same may be extended pursuant to Paragraph 2.2 .

    1.5. "Occupants " means any assignee, subtenant, employee, agent, licensee, invitee, patient or resident of Tenant.

    1.6. " Permitted Use " means typical office and labs use only, and no other purpose.

    1.7. " Personalty " means the following:

        1.7.1. all goods, equipment, machinery, inventory, materials, supplies, fixtures, furniture, furnishings, tools, appliances and other tangible personal property now owned or acquired after the date of this Agreement by Landlord and located in the Building: and

1.7.2. all trademarks, trade names, telephone numbers, logos, contract rights, escrow accounts. accounts receivable, chattel paper, insurance policies, agreements, instruments, documents of title, general intangibles, business records, plans. specifications, drawings, options, declarations, surveys, studies, architectural renderings, diagrams, maps, permits, licenses, certificates, zoning and subdivision development applications, filings and approvals and other intangible personal property now owned or acquired after the date of this Agreement by Landlord and used in connection with the ownership or operation of the Building or any businesses located on the Building.

---

1.8. " Premises " means the portion of the Building that is leased to Tenant as identified on Exhibit A

1.9. "Security Deposit" means $11,744.25

1.10 "Term" means the period commencing at 12:01 a.m. of the Commencement Date and expiring at midnight of the Expiration Date.

2. Agreement of Lease . Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord for the Term, together with such non-exclusive rights of ingress and egress over and across the Landlord's land upon which the: Building is located, and such portions of the Building as are designated on Exhibit A as "Common Areas" that are reasonably necessary for the use of the Premises, in accordance with the provisions set forth in this Lease. Tenant acknowledges that it has had an opportunity to inspect the Premises, and agrees that it accepts the Premises as-is and with all faults.

3. Basic Monthly Rent . Tenant covenants to pay to Landlord without abatement, deduction, offset, prior notice or demand the: Basic Monthly Rent in lawful money of the United States in equal consecutive monthly installments at such place as Landlord may designate, in advance on or before the first day of each calendar month during the: Term, commencing on the Commencement Date. If the Commencement Date occurs on a day other than the first day of a calendar month, on or before the Commencement Date the Basic Monthly Rent will be paid for the initial fractional calendar month prorated on a per diem basis and for the first full calendar month occurring after the Commencement Date. If this Lease: expires or terminates on a day other than the last day of a calendar month, the Basic Monthly Rent for such fractional month will be prorated on a per diem basis.

4. Property Taxes . Landlord will pay all property taxes applicable to the Building during the Term. Tenant is responsible for the payment of all other taxes arising in in connection with the use and occupancy of the Premises.

5. Use . Tenant will not use or occupy or permit the: Premises to be used or occupied for any purpose other than for the Permitted Use, and will not do or permit anything to be done: by Tenant's Occupants which may (a) violate the provisions of any insurance carried, with respect to the Premises, (b) create a public or private nuisance or commit waste. (c) overload the floors or otherwise damage the structure: of the Building. or (d) violate any present or future laws, ordinances, regulations, permits, licenses or requirements or any covenants. conditions and restrictions existing with respect to the Premises. Tenant \.\·ill, at Tenant's sole cost, (w) use the Premises in a careful, safe and proper manner, (x) comply with all present and future laws, ordinances, regulations. permits. licenses, and requirements and any covenants, conditions and restrictions existing with respect to the Premises. including. without limitation, those relating to chemicals. hazardous materials. hazardous substances, hazardous wastes, pollutants or contaminants, and those relating to access by disabled persons. (y) comply with the: requirements of any board of fire underwriters or other similar body relating to the Premises, and (z} not inventory, store, use: or dispose of any chemicals, hazardous materials. hazardous substances, hazardous wastes, pollutants or contaminants on the Premises, except in accordance with applicable laws, ordinances, regulations, permits, licenses and requirements. Except as set forth in this Lease, no representation or warranty has been made to, or relied on by, Tenant concerning the Premises. including, without limitation, the fitness or suitability of the Premises for the conduct of Tenant's business, nor has Landlord agreed to undertake any modification, alteration or improvement of the Premises.

2

6. Security Deposit . On the date of this Lease, Tenant shall deposit with Landlord the Security Deposit as security for the faithful performance by Tenant under this Lease. The Security Deposit shall be returned (without interest) to Tennant (or, at Landlord's option, to the last assignee of Tenant's interest under this Lease) after the expiration of the Tern or sooner termination of this Lease and delivery of possession of the Premises to Landlord in accordance with Paragraph l 6 if, at such time. Tenant is not in default under this lease. If Landlord's interest in this Lease is conveyed, transferred or assigned, Landlord shall transfer or credit the Security Deposit to Landlord's successor in interest. and Landlord shall be released from any liability for the return of the Security Deposit. Landlord may intermingle the Security Deposit with Landlord's own funds, and shall not be deemed to be a trustee of the Security Deposit. If Tenant fails to pay or perform in a timely manner any obligation under this Lease, Landlord may, prior to. concurrently with or subsequent to, exercising any other right or remedy, use, apply or retain all or any part of the Security Deposit for the payment of any monetary obligation due under this Lease, or to compensate landlord for any other expense, loss or damage that Landlord may incur by reason of Tenant's failure, including any damage or deficiency in the reletting of the Premises. If all or any portion of the Security Deposit is so used, applied or retained, Tennant shall immediately deposit with landlord cash in an amount sufficient to restore the Security Deposit to the original amount. The Security Deposit is not a limitation on Landlord's damages or other rights under this lease, a payment of liquidated damages or prepaid rent and shall not be applied by Tenant to the rent for the last (or any) month of the Term, or to any other amount due under this Lease. If this Lease is terminated due to any default of Tenant, any portion of the Security Deposit remaining at the time of such termination shall immediately inure to the benefit of Landlord as partial compensation for the costs and expenses incurred by Landlord in connection with this Lease, and shall be in addition to any other damages to which Landlord is otherwise entitled.

7. Utilities . Landlord will provide to the Premises during the Term basic water, gas, electric, and sewer services for Tenant. Tenant is responsible for all increased and differential costs for basic water, gas, electric, and sewer services associated with Tenant's use of the Premises for non-office uses; such additional costs shall be paid in addition to the Basic Monthly Rent. Tenant agrees to pay all costs associated with any other utility services it desires, including its own telecommunications, security, fire alarm, [internet services, or other desired utilities. Tenant shall pay for such services directly to the providers. If any utility or service to the Premises is interrupted for any reason (including the occurrence of any "brown outs" that interfere with Tenant's operations in any way), Landlord will not be liable to Tenant for such interruption, such interruption will not be deemed to be an eviction or interference with Tenant's use and occupancy of the Premises, and the Basic Monthly Rent and other amounts required to be paid by Tenant under this lease will not be abated as a result of such interruption. Tenant waives any claims of any kind against Landlord related to or arising out of in any way any such interruption and takes full responsibility for operation of all of their specialty equipment and ensuring against any power outages. Landlord and Tenant will cooperate in taking reasonable steps to re-instate any interrupted service.

8. Maintenance and Repairs: Alterations: Signs: Access to Premises .

8.1. Maintenance and Repairs . Landlord to provide general repairs, maintenance and janitorial service typical for office use. Tenant will keep Premises neat and tidy and in good repair and use reasonable care in use of the Building. Except for normal wear and tear, Tenant will pay for damage to the Premises or Building caused by their negligent or otherwise wrongful acts or omissions. All such repairs and replacements will be in quality and class equal to or better than the original work or installations. Tenant to provide maintenance, repairs, and replacement of specialized equipment used by Tenant such as auxiliary power generators, security systems other than keyed door locks, heating and air conditioning equipment used to maintain specified temperature ranges for lab space (if applicable), inventory, servers and other temperature sensitive items. Tenant also to provide other equipment or facilities to protect any property with any other specified environmental requirements, including moisture requirements. Tenant will also provide janitorial for lab areas (if applicable).

3

8.2. Alterations. Tenant will not make any change. addition or improvement to the Premises, unless such change, addition or improvement (a) utilizes only new and firstgrade materials, (b) is in conformity with all applicable laws, ordinances, regulations and requirements, and is made after obtaining any required permits and licenses, (c) is made with the prior written consent of Landlord, (d) is made pursuant to plans and specifications approved in writing in advance by Landlord, (e) is made after Tenant has provided to Landlord such indemnification or bonds, including, without limitation, a performance

and completion bond, in such form and amount as may be satisfactory to Landlord, to protect against claims and liens for labor performed and materials furnished, and to insure the completion of any change, addition or improvement, and (f) is carried out by persons approved in writing by Landlord, who, if required by Landlord, deliver to Landlord before commencement of their work proof of such insurance coverage as Landlord may reasonably require, with Landlord named as an additional insured. Any such change, addition or improvement will immediately become the property of Landlord. Tenant will promptly pay the entire cost of any such change, addition or improvement. Tenant will indemnify, defend and hold harmless Landlord from and against all liens, claims, damages, losses, liabilities and expenses, including attorneys' fees, which may arise out of, or be connected in any way with, any such change, addition or improvement. Within ten (10) days following the imposition of any lien resulting from any such change, addition or improvement, Tenant will cause such lien to be released of record by payment of money or posting of a proper bond.

8.3. <u>Signs</u> . Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. Tenant acknowledges that the West elevation of the Building is not available to Tenant for the installation of any signs. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements.

8.4. <u>Access to Premises</u> . Landlord and Landlord's agents, employees and contractors may enter the Premises at reasonable times on reasonable notice to Tenant for the purpose of inspecting the Premises and ascertaining compliance with the provisions of this Lease by Tenant. Landlord will have free access to the Premises in an emergency. Landlord may also show the Premises to prospective purchasers, tenants or mortgagees at reasonable times. Tenant waives any claim for any damage, injury or inconvenience to, or interference with, Tenant's business, occupancy or quiet enjoyment of the Premises and other loss occasioned by such entry, unless caused by Landlord's willful misconduct or gross negligence. Landlord will at all times have a key with which to unlock all of the doors in the Premises (excluding Tenant's vaults, safes and similar areas designated in writing by Tenant in advance). During the six (6) months prior to the expiration of the Term or other termination of this Lease, Landlord may place on the Premises "To Let," "For Sale" or other similar signs.

9. <u>Assignment.</u>

9.1. <u>Prohibition</u> . Tenant will not, either voluntarily or by operation of law, assign, transfer, mortgage, encumber, pledge or hypothecate this Lease or Tenant's interest in this Lease, in whole or in part, or sublease the Premises or any part of the Premises, without the prior written consent of Landlord, which will not be unreasonably withheld, conditioned or delayed. Any transfer of this Lease from Tenant by merger, consolidation, liquidation or transfer of assets will constitute an assignment for the purposes of this Lease. If Tenant is a corporation, an unincorporated association or a partnership, the assignment, transfer, mortgage, encumbrance, pledge or hypothecation of any stock or interest in such corporation, association or partnership in the aggregate in excess of forty-nine percent (49%) ,.vii! be deemed an assignment within the meaning of this Paragraph. Consent to any assignment or subleasing will not operate as a waiver of the necessity for consent to any subsequent assignment or subleasing and the terms of such consent will be binding on any person holding by, through or under Tenant. At Landlord's option, any assignment or sublease without Landlord's prior written consent will be void  <u>ab initio</u> .

4

9.2. <u>Landlord's Rights</u> . If this Lease is assigned or if all or any portion of the Premises is subleased or occupied by any person other than Tenant without obtaining Landlord's consent, Landlord may collect rent and other charges from such assignee or other party, and apply the amount collected to the rent and other charges payable under this Lease, but such collection will not constitute consent or waiver of the necessity of consent to such assignment or subleasing, nor will such collection constitute the recognition of such assignee or subtenant as Tenant under this Lease or a release of Tenant from the further performance of all of the covenants and obligations of Tenant contained in this Lease. No consent by Landlord to any assignment or subleasing by Tenant will relieve Tenant of any obligation to be paid or performed by Tenant under this Lease,

whether occurring before or after such consent, assignment or subleasing, but rather Tenant and Tenant's assignee or subtenant, as the case may be, will be jointly and severally primarily liable for such payment and performance. Tenant will reimburse Landlord for Landlord's attorneys' and other fees and costs incurred in connection with both determining whether to give consent and giving consent. No assignment or subleasing under this Lease will be effective unless and until Tenant provides to Landlord an executed counterpart of the assignment or sublease agreement, which will specifically state that (a) such agreement is subject to all of the provisions of this Lease, (b) in the case of an assignment, the assignee assumes and agrees to perform all of Tenant's obligations under this Lease, *(c)* the assignee or subtenant, as the case may be, may not further assign such agreement, or allow the Premises to be used by others, without the prior written consent of Landlord in each instance, (d) a consent *by* Landlord to such assignment or subleasing will not be deemed or construed to modify, amend or affect the provisions of this Lease or Tenant's obligations under this Lease, which will continue to apply to the Premises and the occupants of the Premises as if the assignment or sublease had not been made, (e) if Tenant defaults in the payment of any amounts due under this Lease, Landlord is authorized to collect any rents or other amounts due from any assignee, subtenant or other occupant of the Premises and to apply the net amounts collected to the sums payable under this Lease, and (t) the receipt by Landlord of any amounts from an assignee, subtenant or other occupant of any pan of the Premises will not be deemed or construed as releasing Tenant from Tenant's obligations under this Lease or the acceptance of that party as a direct tenant. If all or any portion of the Premises is assigned or subleased and the compensation to be received by Tenant exceeds the Basic Monthly Rent (or pro rata portion of the Basic Monthly Rent, as the case may be) applicable to the portion being assigned or subleased, Tenant \viii pay such excess to Landlord on the first day of each calendar month.

10. Indemnity: Waiver and Release .

10.1. Indemnitv . Tenant will indemnify, defend and hold harmless Landlord and Landlord's employees and agents from and against all demands, claims, causes of action, judgments, losses, damages, liabilities, fines, penalties, costs and expenses, including attorneys' fees, arising from the occupancy or use of the Premises by Tenant or Tenant's Occupants, any chemicals, hazardous materials, hazardous substances, hazardous wastes, pollutants or contaminants generated, manufactured, used, inventoried, deposited, released or stored by Tenant or Tenant's Occupants on the Premises, the conduct of Tenant's business on the Premises, any act or omission done, permitted or suffered *by* Tenant or any of Tenant's Occupants, any default or nonperformance by Tenant under this Lease, any injury or damage to the person, property or business of Tenant or Tenant's Occupants or any litigation commenced by or against Tenant to which Landlord is made a party without willful misconduct or gross negligence on the part of Landlord. If any action or proceeding is brought against Landlord or Landlord's employees or agents by reason of any of the matters set forth in the preceding sentence, Tenant, on notice from Landlord, will defend Landlord at Tenant's expense with counsel reasonably satisfactory to Landlord. The provisions of this Paragraph 10.1 will survive the expiration of the Term or sooner termination of this Lease.

10.2. Waiver and Release . Tenant waives and releases all claims against Landlord and Landlord's employees and agents with respect to all matters for which Landlord has disclaimed liability or responsibility pursuant to the provisions of this Lease. In addition, Landlord and Landlord's employees and agents will not be liable for any loss, injury, death or damage to persons, property or Tenant's business resulting from any theft, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition, order of governmental body or authority, fire. explosion, falling object, steam, water, rain, snow, ice, wind and other weather-related occurrences, breakage, leakage, obstruction or other defects of pipes, sprinklers, wires. appliances. plumbing, air-conditioning or lighting fixtures, construction, repair or alteration of the Premises or other cause beyond Landlord's reasonable control.

5

11. Insurance . On or before the Commencement Date, Tenant will, at Tenant's sole cost. procure and continue in force the following insurance coverage: (a} commercial general liability insurance with a $1,000,000 limit per occurrence for bodily injury and property damage, $2,000,000 general aggregate, and $2,000,000 products and completed operation aggregate coverage that includes without limitation, contractual liability coverage for the performance by Tenant of the indemnity agreement invitees or customers are kept in, or about the, Premises, Tennant shall maintain ,warehouser's legal liability or bailee customers insurance for the full value of the property of such invitees or customers as determined by the warehouse contract between Tenant and its customer; (b) automobile insurance with a combined single limit of not less than $1,000,000 per occurrence insuring Tenant against liability arising out of the ownership maintenance or use of any owned, hired or

borrowed automobiles, (c) all risk or special form property insurance covering all property and improvements installed or placed in the Premises by Tenant, including special causes of loss with theft coverage, insuring against fire, extended coverage risks, vandalism and malicious mischief, and including boiler and sprinkler leakage coverage, in an amount equal to the full replacement cost (without deduction for depreciation) of all furnishings, trade fixtures, leasehold improvements, equipment and other personal property from time to time situated in or on the Premises; and (d) workers' compensation insurance satisfying Tenant's obligations under the workers' compensation laws of the state in which the Premises are located. Any company writing any of Tenant's insurance shall have an A.M. Best rating of not less than A-VIII. Tenant agrees that the liability and automobile insurance will name Landlord and any other person specified from time to time by Landlord as an additional insured and the property insurance will name Landlord as loss payee as Landlord's interests may appear. All liability policies maintained by Tenant will contain a provision that Landlord and any other additional insured, although named as an insured, will nevertheless be entitled to recover under such policies for any loss sustained by Landlord and Landlord's agents and employees as a result of the acts or omissions of Tenant. Tenant will furnish Landlord with certificates of coverage. No such policy will be cancelable or subject to reduction of coverage or other modification except after thirty (30) days' prior written notice to Landlord by the insurer. All such policies will be written as primary policies, not contributing with and not in excess of the coverage that Landlord may carry, and will only be subject to such deductibles as may be approved in writing in advance by Landlord. Tenant will, at least ten (10) days prior to the expiration of such policies, furnish Landlord with renewals of, or binders for, such policies. Landlord and Tenant waive all rights to recover against each other, against any other tenant or occupant of the Building and against the officers, directors, shareholders, partners, joint venturers, employees, agents' customers, invitees or business visitors of each other or of any other tenant or occupant of the Building, for any loss or damage arising from any cause covered by any insurance carried by the waiving party, but only to the extent that such loss or damage is actually covered. Landlord and Tenant will cause their respective insurance carriers to issue appropriate waivers of subrogation rights endorsements to all policies of insurance carried in connection with the Premises or the contents of the Premises. Any mortgage lender making a loan with respect to any part of the Premises may, at Landlord's option, be afforded coverage under any policy required to be secured by Tenant under this Lease by use of a mortgagee's endorsement to the policy concerned. Notwithstanding the foregoing provisions of this Paragraph, if the holder of any mortgage then affecting Landlord's interest in the Premises requires that Landlord make monthly or other periodic payments to an escrow or reserve for use in paying insurance premiums as they fall due, Tenant will, on being so advised by Landlord and at the time of Tenant's making the monthly payments of Basic Monthly Rent required under Paragraph 3 , remit to Landlord the monthly or other periodic payments required to be paid by Landlord to such holder, and Landlord will in tum remit such payments to such holder.

6

12. <u>Damage or Destruction.</u> If the Premises are damaged or destroyed by any casualty other than a casualty caused by Tenant, Landlord will promptly repair the Premises to substantially the condition in which the Premises were immediately prior to such damage or destruction. All proceeds payable under any insurance policy maintained by Tenant pursuant to Paragraph l l(c) will be paid directly to Landlord, and not to Landlord and Tenant jointly. During such repair, the Basic Monthly Rent will not abate. If (a) by reason of such occurrence the Premises are rendered wholly untenantable, (b) the Premises are damaged in ,whole or in part during the last twelve (12) months of the Term, or (c) the Premises are damaged to the extent of twenty percent (20%) or more of the then replacement value of the Premises or to the extent that it would take, in Landlord's opinion, in excess of ninety *(90)* days to complete the requisite repairs, Landlord may either elect for Tenant to repair the damage or cancel this Lease by notice of cancellation within sixty (60) days after such event. On such notice of cancellation, Tenant will vacate and surrender the Premises to Landlord and Landlord may retain all insurance proceeds. Tenant will have no claim against Landlord for any loss suffered by reason of any such damage, destruction, repair or restoration, nor may Tenant terminate this Lease as the result of any statutory provision in effect on or after the date of this Lease pertaining to the damage and destruction of the Premises. Landlord will not be required to repair any damage to, or to make any restoration or replacement of, the Premises or any furnishings, trade fixtures, leasehold improvements, equipment or other personal property installed in the Premises. Unless this Lease is terminated by Landlord pursuant to this Paragraph, Tenant will be required to restore and replace the Premises and such furnishings. trade fixtures, leasehold improvements, equipment and other personal property on damage or destruction in at least a condition equal to that existing prior to such event, and Landlord will make available to Tenant all or a portion of the insurance proceeds (if any), as necessary for Tenant to complete such restoration and replacement. If made, the disbursement of such proceeds will be made to Tenant from an escrow account controlled by Landlord in accordance with disbursement procedures typically used by construction lenders in the metropolitan area in which the Premises are located.

3. Condemnation . As used in this Paragraph, the term "Condemnation Proceedings" means any actions or proceedings in which any interest in the Premises is taken for any public or quasipublic purpose by any lawful authority through exercise of the power of eminent domain or by purchase or other means in lieu of such exercise. If the whole of the Premises is taken through Condemnation Proceedings, this Lease **will** automatically terminate as of the date of the taking. The phrase "as of the date of the taking:" means the date of taking actual physical possession by the condemning authority or such earlier date as the condemning authority gives notice that it is deemed to have taken possession. Landlord or Tenant may terminate this Lease if more than twenty-five percent (25%) of the Premises is taken or any portion of the Premises is taken that substantially interferes with Tenant's ability to operate or use the Premises for the purposes for which the Premises were intended. Any such termination must be accomplished through written notice given no later than thirty *(30)* days after, and will be effective as of, the date of such taking. In all other cases, or if neither Landlord nor Tenant exercises its right to terminate, this Lease will remain in effect, and Tenant will promptly repair and restore the Premises as nearly as possible to the nature and character that existed immediately prior to such taking. If a portion of the Premises is taken and this Lease is not terminated, the Basic monthly Rent will be reduced in the proportion that the Building floor area taken bears to the total floor area of the Building leased by Tenant immediately prior to the taking. Whether or not this Lease is terminated as a consequence of Condemnation Proceedings, all damages or compensation awarded for a partial or total taking, including any award for severance damage and any sums compensating for diminution in the value of or deprivation of the leasehold estate under this Lease, will be the sole and exclusive property of Landlord; provided, however, that if (but only it) (a) this Lease is not terminated as a consequence of Condemnation Proceedings, and (b) Landlord receives an award in such Condemnation Proceedings expressly designated for the repair and restoration of the Premises, Landlord will make available to Tenant all or a portion of the award so designated, as necessary, for Tenant to complete its obligations of repair and restoration under this Paragraph. If made, the disbursement of such portion of the award will be made by Landlord to Tenant in accordance with disbursement procedures typically used by construction lenders in the metropolitan area in which the Premises are located. Other than as expressly set forth in the immediately preceding two sentences, Tenant will be absolutely responsible, at its sole cost and expense, to repair and restore the Premises as nearly as possible to the nature and character that existed prior to such taking if this Lease is not terminated pursuant to this Paragraph. Tenant will have no claim against Landlord for the occurrence of any Condemnation Proceedings, or for the termination of this Lease or a reduction in the Premises as a result of any Condemnation Proceedings

7

14. Landlord's Financing. This Lease will be subordinate to any existing or future first mortgage, first deed of trust, ground lease and declaration of covenants, conditions, easements and restrictions encumbering the Premises, and all renewals, modifications, amendments, consolidations, replacements and extensions of any such instruments. No documentation other than this Lease will be required to evidence such subordination. [f the holder of any mortgage or deed of mist elects to have this Lease superior to the lien of its mortgage or deed of trust and gives written notice of such election to Tenant, this Lease will be deemed prior to such mortgage or deed of trust. Tenant will execute such documents as may be required by Landlord to confirm such subordination or priority within ten (l0) days after request. Tenant will from time to time if so requested by Landlord and if doing so will not materially and adversely affect Tenant's economic interests under this Lease, join with Landlord in amending this Lease so as to meet the needs or requirements of any lender that is considering making or that has made a loan secured by all or any portion of the Premises. Any sale, assignment or transfer of Landlord's interest under this Lease or in the Premises, including any such disposition resulting from Landlord's default under a debt obligation, will be subject to this Lease and Tenant will attorn to Landlord's successors and assigns and will recognize such successors or assigns as Landlord under this Lease. regardless of any law of law to the contrary or absence of privity of contract.

15. Default .

15.1. Default bv Tenant . The occurrence of any of the following events will constitute a d fault by Tenant under this Lease: (a) Tenant fails to pay in a timely manner any installment of Basic monthly Rent or any other sum clue under this Lease within three *(3)* business clays after written notice is given to Tenant that the same is past due; (b) Tenant fails to observe or perform in a timely manner any other term, covenant or condition to be observed or performed by Tenant under this Lease within ten ( 1 0) business days after written notice is given to Tenant of such failure; provided, however, that if more than ten (10) business days is reasonably required to cure such failure, Tenant will not be in default if Tenant commences such cure within such ten (l 0) day period and diligently prosecutes such cure to completion; (c) Tenant files a petition in bankruptcy,

becomes insolvent, has taken against Tenant in any court, pursuant to state or federal statute, a petition in bankruptcy or insolvency or for reorganization or appointment of a receiver or trustee, petitions for or enters into an arrangement for the benefit of creditors or suffers this Lease to become subject to a writ of execution; or (d) Tenant vacates or abandons the Premises.

15.2. <u>Remedies</u> . On any default by Tenant under this Lease, Landlord may at any time, without waiving or limiting any other right or remedy available to Landlord, (a) perform in Tenant's stead any obligation that Ten::int has failed to perform, and Landlord will be reimbursed promptly for any cost incurred by Landlord with interest from the date of such expenditure until paid in full at the greater of the prime rate then charged by Wells Fargo Bank, N.A. (or any other bank designated by Landlord), plus four percent (4%), or eighteen percent (18%) per annum (the <u>"Interest Rate"),</u> (b) terminate Tenant's rights under this Lease by written notice, (c) reenter and take possession of the Premises by any lawful means (with or without terminating this Lease), or (d) pursue any other remedy allowed by law. Tenant will pay to Landlord the cost of recovering possession of the Premises, all costs of reletting, including reasonable renovation, remodeling and alteration of the Premises, the amount of any commissions paid by Landlord in connection with such reletting, and all other costs and damages arising out of Tenant's default, including attorneys' fees and costs. Notwithstanding any termination or reentry, the liability of Tenant for the rent payable under this Lease will not be extinguished for the balance of the Term, and Tenant agrees to compensate Landlord on demand for any deficiency, whether arising from (v) reletting the Premises at a lesser rent than applies under this Lease, (w) reletting the Premises for a term shorter than the remaining Term, *(x)* reletting less than all of the Premises, (y) any default in the payment of rent by any person to whom Landlord relets the Premises, or (z) any other cause whatsoever. No reentry to or taking possession of the Premises or other action by Landlord or its agents on or following the occurrence of any default by Tenant ,viii be construed as an election by Landlord to terminate this Lease or as an acceptance of any surrender of the Premises, unless Landlord provides Tenant written notice of such termination or acceptance.

8

15.3. Past Due Amounts: Obligations Independent. If Tenant fails to pay when due any amount required to be paid by Tenant under this Lease, such unpaid amount will bear interest at the Interest Rate from the due date of such amount to the date of payment in full, with interest. In addition, Landlord may also charge a sum of five percent (5%) of such unpaid amount as a service fee. This late payment charge is intended to compensate Landlord for Landlord's additional administrative costs resulting from Tenant's failure to perform in a timely manner Tenant's obligations under this Lease, and has been agreed on by Landlord and Tenant after negotiation as a reasonable estimate of the additional administrative costs which will be incurred by Landlord as a result of such failure. The actual cost in each instance is extremely difficult, if not impossible, to determine. This late payment charge will constitute liquidated damages and will be paid to Landlord together with such unpaid amount. The payment of this late payment charge will not constitute a waiver by Landlord of any default by Tenant under this Lease. All amounts due: under this Lease are and will be deemed to be rent or additional rent, and will be paid without abatement, deduction, offset, prior notice or demand (unless expressly provided by the terms of this Lease). Landlord will have the same remedies for a default in the payment of any amount due under this Lease as Landlord has for a default in the payment of Basic Monthly Rent. The obligations of Tenant to pay Basic Monthly Rent and all other amounts due under this Lease, and to perform all of Tenant's other obligations under this Lease, are severable from and independent of any obligation of Landlord under this lease.

14.4. <u>Default bv Landlord</u> . Landlord will not be in default under this Lease unless Landlord fails to perform an obligation required of Landlord under this Lease within thirty *(30)* days after written notice by Tenant to Landlord and the holder of any mortgage or deed of trust covering the Premises whose name and address have been furnished to Tenant in writing, specifying the respects in which Landlord has failed to perform such obligation, and such holder fails to perform such obligation with.in a second thirty (30) day period commencing on the expiration of such first thirty (30) day period. [f the nature of such obligation is such that more than thirty (30) days are reasonably required for performance or cure. Landlord will not be in default if Landlord or such holder commences performance within their respective thirty *(30)* clay periods and after such commencement diligently prosecutes the same to completion. In no event may Tenant terminate this Lease or withhold the payment of rent or other charges provided for in this Lease as a result of Landlord's default.

16. <u>Expiration or· Termination</u> .

16.1. <u>Surrender of Premises</u> . On the expiration of the Term or sooner termination of this Lease, Tenant will, at Tenant's sole cost, promptly and peaceably surrender the Premises to Landlord in good order and condition, and deliver all keys to the Premises to Landlord. All personal property, trade fixtures and other property then located on the Premises will remain on the Premises and may be used, sold or otherwise disposed of by Landlord. No sun-ender of the Premises will be effected by Landlord's acceptance of the keys or of the rent or by any other means without Landlord's written acknowledgement of such acceptance as a surrender. All accounts receivable and accounts payable will be allocated between Landlord and Tenant as of the date of the expiration of the Term or sooner termination of this Lease, and Landlord and Tenant will each cooperate with the other in such allocation and the related payment and collection.

16.2. <u>Holding Over</u> . Tenant will indemnify, defend and hold harmless Landlord from and against all claims, liabilities and expenses, including attorneys' fees, resulting from delay by Tenant in surrendering the Premises in accordance with the provisions of this Lease. If Tenant remains in possession of the Premises after the expiration of the Tern, or sooner termination of this Lease with the prior written consent of Landlord, such occupancy will be a tenancy from month to month at a rental (and not as a penalty) in the amount of one hundred fifty percent ( 1 50%) of the last monthly rental, plus all other charges payable under this Lease, and on all of the terms of this Lease applicable to a month to month tenancy.

16.3. <u>Survival</u> . The provisions of this <u>Paragraph 16</u> will survive the expiration of the Term or sooner termination of this Lease.

9

17. <u>Estoppel Certificate</u> . Tenant will, within ten (10) days after Landlord's request, execute and deliver to Landlord an estoppel certificate in favor of Landlord and such other persons as Landlord will request setting forth the following: (a) a ratification of this Lease; (b) the Commencement Date and Expiration Date; (c) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writing as will be stated); (d) that all conditions under this Lease to be performed by Landlord have been satisfied, or, in the alternative, those claimed by Tenant to be unsatisfied; (e) that no defenses or offsets exist against the enforcement of this Lease by Landlord. or, in the alternative. those claimed by Tenant to exist; (t) the amount of advance rent, if any (or none if such is the case), paid by Tenant; (g) the date to which rent has been paid: and (h) such other information as Landlord may request. Landlord ·s mortgage lenders and purchasers will be entitled to rely on any estoppel certificate executed by Tenant.

18. <u>General Provisions.</u>

18.1. <u>No Partnership</u> . landlord does not by this Lease, in any way or for any purpose, become a partner or joint venturer of Tenant in the conduct of Tenant's business or otherwise.

18.2. <u>Force Majeure</u> If either Landlord or Tenant is delayed or hindered in or prevented from the performance of any act required under this Lease by reason of acts of God, strikes, lockouts, other labor troubles, inability to procure labor or m::tterials, fire, accident, failure of power, restrictive governmental laws. ordinances, regulations or requirements of general applicability, riots, civil commotion, insurrection, war or other reason not the fault of the party delayed, hindered or prevented and beyond the control of such party (financial inability excepted), performance of the action in question will be excused for the period of delay and the period for the performance of such act will be extended for a period equivalent to the period of such delay. The provisions of this Paragraph, will not, however, operate to excuse Tenant from the prompt payment of rent or any other amounts required to be paid under this Lease.

18.3. <u>Notices.</u> Any notice or demand to be given by Landlord or Tenant to the other will be given in writing by personal service, telegram, express mail, Federal Express, DHL or any other similar form of collier or delivery service, or mailing in the United States mail, postage prepaid, certified, return receipt requested and addressed to such party as set forth ar the outset of this Lease. Either Landlord or Tenant may change the address at which such patty desires to receive notice on written notice of such change to the other party. Any such notice will be deemed to have been given, and will be effective, on delivery to the notice address then applicable for the party to which the notice is directed: <u>provided, however</u> , that refusal to accept delivery of a notice or the inability to deliver a notice because of an address change which was not properly communicated will not defeat or delay the giving of a notice.

18.4. <u>Severability</u> . If any provision of this Lease or the application of any provision of this Lease to any person or circumstance will to any extent be invalid, the remainder of this Lease or the application of such provision to persons or circumstances other than those as to which such provision is held invalid will not be affected by such invalidity. Each provision of this Lease will be valid and enforceable to the fullest extent permitted by law.

18.5. <u>Brokerage Commissions</u> . Except as agreed in writing by Landlord, Tenant represents and warrants that no claims exist for brokerage commissions or finder's f.;:es in connection with this Lease and agrees to indemnify, defend and hold harmless Landlord from and against all claims, liabilities and expenses, including attorneys' fees, arising from any such brokerage commissions or finder's fees.

18.6. <u>Use of Pronouns</u> . The use of the neuter singular pronoun to refer to Landlord or Tenant will be deemed a proper reference even though Landlord or Tenant may be an individual, partnership, association, limited liability company, corporation or a group of two or more individuals, partnerships, associations, limited liability companies or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where more than one Landlord or Tenant exists and to individuals, partnerships, associations, limited liability companies, corporations, males or females, will in all instances be assumed as though in each case fully expressed.

18.7. <u>Successors</u> . Except as otherwise provided in this Lease, all provisions contained in this Lease wilt be binding on and will inure to the benefit of Landlord and Tenant and their respective successors and assigns. On any sale or assignment (except for purposes of security or collateral) by Landlord of the Premises or this Lease, Landlord will, on and after such sale or assignment, be relieved entirely of all of Landlord's obligations under this Lease and such obligations wilt, as of the time of such sale or assignment, automatically pass to Landlord's successor in interest.

10

18.8. <u>Recourse bv Tenant</u> . Anything in this Lease to the contrary notwithstanding, Tenant will look solely to the equity of Landlord in the Premises, subject to the prior rights of the holder of any mortgage or deed of trust, for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord on any default or breach by Landlord with respect to any of the terms. covenants and conditions of this Lease to be observed or performed by Landlord, and no other asset of Landlord or any other person will be subject to levy, execution or other procedure for the satisfaction of Tenant's remedies.

18.9. <u>Quiet Enjoyment.</u> On Tenant paying the rent payable under this Lease land observing and performing all of the terms, covenants and conditions on Tenant's part to be observed and performed under this Lease, Tenant will have quiet enjoyment of the Premises for the Term without interference from Landlord, or anyone claiming by, through or under Landlord, subject to all of the provisions of this Lease.

18.10. <u>Waiver</u> . No failure by any party to insist on the strict performance of any covenant, duty or condition of this Lease or to exercise any right or remedy consequent on a breach of this Lease will constitute a waiver of any such breach or of such or any other covenant, duty or condition. Any party may, by notice delivered in the manner provided in this Lease, but will be: under no obligation to. waive any of its rights or any conditions to its obligations under this Lease, or any covenant or duty of any other party. No waiver will affect or alter the remainder of this Lease but each other covenant. duty and condition of this Lease will continue in full force and effect with respect to any other then existing or subsequently occurring breach.

18.11. <u>Rights and Remedies</u> . The rights and remedies of Landlord and Tenant will not be mutually exclusive and the exercise of one or more of the provisions of this Lease will not preclude the exercise of any other provisions. The parties confirm that damages at law may be an inadequate remedy for a breach or threatened breach by any patty of any of the provisions of this Lease. The parties' respective rights and obligations under this Lease will be enforceable by specific performance, injunction or any other equitable remedy.

18.12. <u>Authorization</u> . Each individual executing this Lease does represent and warrant to each other so

signing (and each other entity for which another person may be signing) that he has been duly authorized to deliver this Lease in the capacity and for the entity set forth where he signs.

18.13. Attorneys' Fees. If any action is brought to recover any rent or other amount under this Lease because of any default under this Lease, to enforce or interpret any of the provisions of this Lease, or for recovery of possession of the Premises, the party prevailing in such action will be entitled to recover from the other party reasonable attorneys' fees (including those incurred in connection with any appeal), the amount of which will be fixed by the court and made a part of any judgment rendered. Tenant will be responsible for all expenses, including, without limitation, attorneys' fees, incurred by Landlord in any case or proceeding involving Tenant or any assignee or subtenant of Tenant under or related to any bankruptcy or insolvency law. The foregoing provisions of this Paragraph 18.13 will survive the expiration of the Term or sooner termination of this Lease.

18.14. Merger. The surrender of this Lease by Tenant, the cancellation of this Lease by agreement of Landlord and Tenant or the termination of this Lease on account of Tenant's default will not work a merger, and will, at Landlord's option, either terminate any subleases of part or all of the Premises or operate as an assignment to Landlord of any of those subleases. Landlord's option under this Paragraph 18.14 may be exercised by notice to Tenant and all known subtenants in the Premises.

18.15. Miscellaneous. The captions to the Paragraphs of this Lease are for convenience of reference only and will not be deemed relevant in resolving questions of construction or interpretation under this Lease. Tenant will not record this Lease or a memorandum or notice of this Lease without the prior written consent of Landlord. This Lease constitutes the entire agreement between the parties. No amendment to this Lease will be binding on Landlord or Tenant unless reduced to writing and signed by both parties. Unless otherwise set forth in this Lease, all references to Paragraphs are to Paragraphs in this Lease. Each provision to be performed by Tenant will be construed to be both a covenant and a condition. This Lease will be governed by and construed and interpreted in accordance with the laws of the state in which the Premises are located. LANDLORD AND TENANT WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THEM AGAINST THE OTHER ON ALL MATTERS ARISING OUT OF THIS LEASE OR THE USE AND OCCUPANCY OF THE PREMISES. Time is of the essence of each provision of this Lease.

11

LANDLORD AND TENANT have executed this Lease on the respective dates set forth below, to be effective as of the date first set forth above.

LANDLORD:
YESCO Properties LLC

By: _____
Name: _____
Its: _____

Date: _____ Jul 5, 2018 _____

TENANT:
Co-Diagnostics

By: _____
Name: _____
Its: _____

Date: _____ 6/29/18 _____

12

ADDENDUM #1
TO
LEASE AGREEMENT

That certain Lease Agreement dated        June 5, 2018        between YESCO Properties LLC, a Utah limited liability company ("Landlord") and Co-Diagnostics, Inc. ("Tenant") (the "Lease") is by this Addendum # **1** to the Lease (this "Addendum") amended. Capitalized terms not defined in this Addendum shall have the meaning as set forth in the Lease. Notwithstanding any provision of the Lease to the contrary, the following provisions control:

1.  Tenant acknowledges that Landlord never approved the Sublease Agreement between Tenant and Isomeric Pharmacy Solutions, LLC ("Isomeric"), which was required by the terms of the lease between Landlord and Isomeric. Due to continuing events of default under Landlord's lease with Isomeric, Landlord is exercising its right under its lease with Isomeric to declare any sublease between Isomeric and Tenant void from the beginning.

2.  Landlord agrees that all payments previously made pursuant to the sublease between Tenant and Isomeric shall be deposited towards Tenant's obligations under the Lease.

3.  Tenant acknowledges that certain office furnishings and lab fixtures situated in the Premises are the property of Isomeric. Tenant agrees that the terms of the use of such furnishings and equipment is a matter between Tenant and Isomeric, and Tenant agrees to hold Landlord harmless from any claims resulting from the use of any property belonging to Isomeric. Tenant acknowledges that it is solely responsible for negotiating an agreement for the use of such property, which includes the items referred on Exhibit A attached hereto. Tenant further acknowledges and agrees that in connection with the settlement of claims between YESCO and Isomeric, Isomeric has agreed to lease the equipment identified on Exhibit A to Tenant for $1,000 for the term of the Lease and that all payments for use of the equipment is payable to Landlord for the remaining term of the Lease. Tenant agrees to pay Landlord $1,000 per month in addition to the Basic Monthly Rent during the Term of the Lease in accordance with such settlement.

Except as modified by this Addendum, the Lease remains in full force and effect. This Addendum is effective as of the date of the Lease.

Date Signed:_

CO-DIAGNOSTICS, INC.                    YESCO LLC.

By: _____                    By: _____
Title: _____                 Title: _____
Date Signed: _____           Date Signed: _____

13

**Exhibit 10.9.1**

AMENDMENT #1
TO LEASE

That certain Lease with a Commencement Date of February 1, 2018 between YESCO Properties, LLC, a Utah Limited Liability Company ("Landlord") and Co-Diagnostics, Inc., a Utah Corporation ("Tenant") (the "Lease") as amended by that First Lease Addendum dated June 5, 2018, *is* by this Amendment #1 to the Lease (this "Amendment") modified. This Amendment is dated March 26, 2020. Capitalized terms not defined in this Addendum shall have the meaning as set forth in the Lease. Notwithstanding any provision of the Lease to the contrary, the following provisions control:

**Expiration Date:** February 29, 2024.

**Basic Monthly Rent :**

| Period | | | Rentable Square Feet | Basic Monthly Rent | Less: Monthly Settlement Discount |
|---|---|---|---|---|---|
| March 1, 2020 | Through | March 31, 2020 | 10,213 | $ 19,689.92 | ($ 1,822.92) |
| April I, 2020 | Through | February 28, 2021 | 13,687 | $ 24,900.92 | ($ 1,822.92) |
| March I, 2021 | Through | February 28, 2022 | 13,687 | $ 25,647.95 | ($ 1,822.92) |
| March 1, 2022 | Through | February 28, 2023 | 13,687 | $ 26,417.39 | ($ 1 822.92) |
| March 1, 2023 | Through | February 29, 2024 | 13,687 | $ 27,209.91 | ($ 1,822.92) |

**Additional Space:** Commencing on April 1, 2020, Tenant agrees to rent additional space as described on Exhibit A.

**Settlement Agreement:** Landlord and Tenant are entering *into* a settlement agreement with Isomeric Pharmacy Solutions, LLC ("Isomeric) in connection with th.is Amendment. Pursuant to the settlement agreement, Isomeric is transferring all of its property located at the Premises in exchange for a payment of $175,000.00 from Tenant to Isomeric. Landlord and Tenant agree to distribute the Isomeric property as follows: I) Tenant will have all right, title and interest to the items referenced on Exhibit B; 2) Landlord has all right, title, and interest in the items referenced on Exhibit C; and 3) If Landlord sells the items referenced on Exhibit D, 100% of the proceeds go to the Landlord. Landlord agrees not to disrupt current production in the removal of items to be sold. If Tenant is able to sell the items referenced on Exhibit D prior to the Expiration Date it will distribute one-half of the proceeds to Landlord.

In consideration of Tenant's settlement payment to Isomeric, so long as Tenant timely and completely fulfils its obligations under the Lease and this Amendment, Landlord agrees to discount the Basic Monthly Rent by $1,822.92 each month. In the event that Tenant defaults in any of its obligations under the Lease and this Amendment, no further credit, abatement, or accommodation will be provided by Landlord and Tenant shall be liable for the remaining Basic Monthly Rent without discount and the items referenced on Exhibit B shall become the sole property of Landlord.

Except as modified by this Amendment, the Lease remains in full force and effect.

Co-Diagnostics, Inc., a Utah Corporation                    YESCO Properties, LLC

By: _____                    By: _____

Title: _____                    Title: _____

Date Signed: _____                    Date Signed: _____

**Exhibit 10.9.2**

AMENDMENT #2
TO
LEASE

That certain Lease with a Commencement Date of February 1, 2018 between YESCO Properties; LLC, a Utah Limited Liability Company ("Landlord") and Co-Diagnostics, Inc., a Utah Corporation ("Tenant") **(the** "Lease") as amended by that First Lease Addendum dated June 5, 2018, and Amendment to Lease #1 dated March 26, 2020 (Amendment #1) is by this Amendment #2 to the Lease (this "Amendment") modified. This Amendment is dated May 26; 2020. Capitalized terms not defined in this Addendum shall have the meaning as set forth in the Lease. Notwithstanding any provision of the Lease to the contrary, the following provisions control:

**Additional Space:** Commencing on June 1, 2020 and until August 31, 2020, Tenant agrees to rent additional space as described on Exhibit A. Rent will increase $1860.37 a month.

**Basic Monthly Rent included in Amendment #1 and this Amendment:**

| Period | | | Rentable Square Feet | Basic Monthly Rent | Less: Monthly Settlement Discount | Monthly Amount Due |
|---|---|---|---|---|---|---|
| March l, 2020 | Through | March 31, 2020 | 10,213 | $19,689.92 | ($1,822.92) | $17,867.00 |
| April 1, 2020 | Through | February 28, 2021 | 13,687 | $24,900.92 | ($1,822.92) | $23,078.00 |
| June 1, 2020 | Through | August 31, 2020 | 14,658 | $26,761.29 | ($1,822.92) | $24,938.37 |
| September 1, 2020 | Through | February 28, 2021 | 13,687 | $24,900.92 | ($1,822.92) | $23,078.00 |
| March l, 2021 | Through | February 28, 2022 | 13,687 | $25,647.95 | ($1,822.92) | $23,825.03 |
| March I, 2022 | Through | February 28, 2023 | 13,687 | $26,417.39 | ($1,822.92) | $24,594.47 |
| March 1, 2023 | Through | February 29, 2024 | 13,687 | $27,209.91 | ($1,822.92) | $25,386.99 |

Except as modified by this Amendment, the Lease and Amendment #1 remain in full force and effect.

Co-Diagnostics, Inc., a Utah Corporation                 YESCO Properties, LLC

By: _____                     By: _____

Title: _____                  Title: _____

Date Signed: _____            Date Signed: _____

**Exhibit 21.1**

List of Subsidiaries

**LIST OF SUBSIDIARIES**

Co-Diagnostics, Inc. (the "Company") has the following direct and indirect subsidiaries:

| Subsidiary Name | Jurisdiction of Formation | Percentage of Ownership |
| --- | --- | --- |
| DNA Logix, Inc. | Utah | 100% |
| Idaho Molecular, Inc. | Idaho | 100% |
| Advanced Conceptions, Inc. | Utah | 100% |

**EXHIBIT 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statements No. 333-226835 and 333-249651 on Form S-3 and 333-237684 on Form S-8 of Co-Diagnostics, Inc. of our report dated March 24, 2022, relating to our audits of the consolidated financial statements which appear in this Annual Report on Form 10-K of Co-Diagnostics, Inc. for the years ended December 31, 2021 and 2020.

Haynie & Company
Salt Lake City, Utah
March 24, 2022

**EXHIBIT 31.1**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES OXLEY ACT OF 2002
AND RULE 13A-14 OF THE EXCHANGE ACT OF 1934**

**<u>CERTIFICATION</u>**

I, Dwight Egan, certify that:

1.  I have reviewed this annual report on Form 10-K of Co-Diagnostics, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a – 15(f) and 15d – 15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of the annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 24, 2022                                    */s/ Dwight Egan*

Dwight Egan
Chief Executive Officer, President and Principal Executive
Officer

**EXHIBIT 31.2**

**CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES OXLEY ACT OF 2002
AND RULE 13A-14 OF THE EXCHANGE ACT OF 1934**

**<u>CERTIFICATION</u>**

I, Brian Brown, certify that:

1.  I have reviewed this annual report on Form 10-K of Co-Diagnostics, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a – 15(f) and 15d – 15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of the annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 24, 2022                                        */s/ Brian Brown*

Brian Brown
Chief Financial Officer and Principal Financial and Accounting
Officer

**EXHIBIT 32.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S. C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Co-Diagnostics, Inc. (the "Company") on Form 10-K for the year ended December 31, 2021, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Dwight Egan, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)  The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 24, 2022

*/s/ Dwight Egan*

Dwight Egan
Chief Executive Officer, President and Principal Executive Officer

**EXHIBIT 32.2**

**CERTIFICATION OF THE PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 U.S. C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Co-Diagnostics, Inc. (the "Company") on Form 10-K for the year ended December 31, 2021 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian Brown, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1)  The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 24, 2022

/s/ Brian Brown

Brian Brown
Chief Financial Officer and Principal Financial and Accounting Officer