# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>                   Defendants. | Case No. 22-cv-6978 (AS) |

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**July 26, 2024**

# Table of Contents

**Page**

I.     INTRODUCTION ....................................................................................................3

II.    QUALIFICATIONS ...............................................................................................4

III.   SUMMARY OF OPINIONS ..................................................................................5

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS...................................6

V.     DISCUSSION OF RELIANCE ELEMENT ..........................................................9

VI.    *CAMMER* FACTORS ........................................................................................11

VII.   APPLICATION OF EFFICIENCY FACTORS TO CO-DIAGNOSTICS COMMON
STOCK......................................................................................................................13

    A.     OVERVIEW.................................................................................................13

    B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME.................................14

    C.     *CAMMER* FACTOR 2: ANALYST COVERAGE .................................................16

    D.     *CAMMER* FACTOR 3: MARKET MAKERS .....................................................19

    E.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY .........................................20

    F.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION...........................21

    G.     *KROGMAN* FACTOR 1: MARKET CAPITALIZATION .......................................31

    H.     *KROGMAN* FACTOR 2: THE BID-ASK SPREAD................................................32

    I.     *KROGMAN* FACTOR 3: PUBLIC FLOAT .........................................................34

    J.     ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP.............................................34

    K.     ADDITIONAL FACTOR: AUTOCORRELATION ...........................................................35

    L.     ADDITIONAL FACTOR: OPTIONS ..........................................................................36

VIII.  DAMAGES...........................................................................................................36

IX.    CONCLUSION.....................................................................................................40

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.  I have been asked by counsel for Lead Plaintiff Stadium Capital LLC in this matter to examine and opine on whether the market for Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company") common stock ("Co-Diagnostics Common Stock") was efficient during the period from May 13, 2022 through August 11, 2022, inclusive (the "Class Period").[1,2]  In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**.  Peregrine Economics is being compensated at an hourly rate of $950 per hour for my work on this matter, and at rates between $260 and $475 for members of my staff who performed work in connection with this report under my direction and supervision.  My compensation is in no way contingent on the outcome of this case.  My qualifications are described below.

---

[1] Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws filed September 21, 2023, Case No.: 1:22-cv-06978-AS ("Complaint"), ¶ 1.

[2] The Class Period begins after market close on May 12, 2022, and ends at market close on August 11, 2022. Therefore, my analysis begins on May 13, 2022 (the next trading day after May 12, 2022) and ends on August 11, 2022 in order to capture the effects of the after-hours earnings announcements on those days. *See* Complaint ¶ 43 and "Co-Diagnostics Reports Solid First Quarter 2022 Financial Results," *PR Newswire*, May 12, 2022, 4:01 PM ET; Complaint ¶ 56 and "Co-Diagnostics, Inc. Reports Second Quarter 2022 Financial Results," *PR Newswire*, August 11, 2022, 4:01 PM ET.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago.  I am also a CFA charter-holder.  The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Peregrine Economics in January 2024.  Before starting Peregrine Economics, I served as the President of Global Economics Group, which I co-founded in March 2008.[3]  Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years.  At both Global Economics Group and Chicago Partners, I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust.  I have been engaged more than one hundred times as a securities expert both within and outside the litigation context.  My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Hon. Judge Daniel Weinstein (Ret.)) to provide economic analysis and opinions in dozens of securities class actions as well as other matters.  As a result of my involvement in these cases, much of my career has been spent analyzing how securities prices react to new information and evaluating damages in securities-related matters.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

---

[3] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

4

### III.  SUMMARY OF OPINIONS

6.    After analyzing Co-Diagnostics Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Co-Diagnostics Common Stock was efficient during the Class Period.

7.    I have also formed the opinion that consistent with plaintiff's theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology. These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Co-Diagnostics' business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory.  **Section VI** introduces the so-called *Cammer* factors and other factors that financial economists and courts, including in this Circuit, apply when evaluating market efficiency under the "fraud on the market" theory.  **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Co-Diagnostics Common Stock during the Class Period.  **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide.  Finally, **Section IX** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Co-Diagnostics was founded and incorporated in the state of Utah with its headquarters in Utah as well.[4]  Co-Diagnostics described its business during the Class Period as follows:

> Co-Diagnostics, Inc., a Utah corporation (the "Company" or "CODX"), develops, manufactures and sells reagents used for diagnostic tests that function via the detection and/or analysis of nucleic acid molecules (DNA or RNA), including robust and innovative molecular tools for detection of infectious diseases, liquid biopsy for cancer screening, and agricultural applications. In connection with the sale of our tests we may sell diagnostic equipment from other manufacturers as self-contained lab systems (which we refer to as the "MDx Device"). We are also developing a unique, groundbreaking portable PCR device and proprietary test cups (the "Co-Dx PCR Home™ platform") that have been designed to bring affordable, reliable polymerase chain reaction ("PCR") to patients in point-of-care and even at-home settings. […] Using our proprietary test design system and proprietary reagents, we have designed and obtained regulatory approval in the European Community and/or in India to sell PCR diagnostic tests for the detection of COVID-19, influenza, tuberculosis, hepatitis B and C, human papillomavirus, malaria, chikungunya, dengue, and the Zika virus. In the United States, we obtained Emergency Use Authorization ("EUA") for our Logix Smart™ COVID-19 detection test from the Food and Drug Administration, or FDA, and we sell that test to qualified labs. In addition, our COVID-19 detection test and certain of our other suite of COVID-19 products have been approved for sale in countries such as the United Kingdom, Australia and Mexico by the regulatory bodies in those countries and have been registered for sale in many more countries.[5]

11.    For the fiscal year ended December 31, 2022, Co-Diagnostics reported revenue of $34.2 million,[6] a net loss of $14.2 million,[7] and listed total assets of $123 million.[8]  The Logix Smart™ COVID-19 detection test ("Logix Smart Test") was Co-Diagnostics' primary source of

---

[4] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 1.

[5] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 4-5.

[6] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 36.

[7] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 36.

[8] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 35.

revenue.[9]  As of December 31, 2022, Co-Diagnostics employed approximately 145 employees,[10] and its Common Stock traded on the NASDAQ under the ticker "CODX."[11]

12.    The Complaint alleges that Co-Diagnostics and the Individual Defendants, as defined in the Complaint,[12] made false or misleading statements during the Class Period, ultimately causing damages to purchasers of Co-Diagnostics publicly traded securities who unknowingly bought at artificially inflated prices and suffered economic loss when the stock price ultimately reflected the concealed information.[13]

13.    More specifically, the Complaint alleges that throughout the Class Period, Co-Diagnostics concealed information about the changing demand for its Logix Smart Test.  The Logix Smart Test was Co-Diagnostics' most important product during the Class Period and the Company's primary source of revenue.[14]  Prior to the escalation of the COVID-19 pandemic,

---

[9] Complaint ¶ 33; Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 30.

[10] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 11.

[11] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 26.

[12] Complaint ¶¶ 13-16.

[13] Complaint ¶¶ 61-64, 77, 88.  I understand Plaintiffs' allegations to include all Co-Diagnostics publicly traded securities, which would include alleged artificial inflation of Co-Diagnostics call options and artificial deflation of Co-Diagnostics put options.  There are two basic types of options: call options and put options.  A call option gives the holder of the option the right to buy an asset (in this case, Co-Diagnostics Common Stock) by a certain date, called the expiration date, and at a certain price, called the strike price or exercise price.  A put option gives the holder the right to sell an asset (in this case, Co-Diagnostics Common Stock) by an expiration date at the strike price.  Options can be either American or European, with the distinction being that American options can be exercised at any time up until the expiration date, whereas European options can be exercised only on the expiration date itself.  The price of an option, also referred to as the "premium," depends on a number of factors, including how the current stock price compares to the exercise price, the amount of time until expiration, anticipated dividends, expected volatility of the underlying stock, and interest rates (*see* John Hull, *Options, Futures and Other Derivatives* (Prentice Hall 7th ed. 2009), pp. 201-204).  Option pricing theory clearly suggests that distortion in the price of a company's common stock would also cause distortion in the price of a company's publicly traded options.  For example, an often-used formula to value options is the Black-Scholes model, where the price of an option is directly impacted by the current value of the underlying stock (*see* John Hull, *Options, Futures and Other Derivatives* (Prentice Hall 7th ed. 2009), pp. 277-309).  In fact, for a call option, subtracting the option strike price (the price at which the option can be executed) from the underlying security price, is referred to as the option's "intrinsic value" (*see* John Hull, *Options, Futures and Other Derivatives* (Prentice Hall 7th ed. 2009), p. 186.  Note that the "intrinsic value" for a put option is strike price minus the price of the common stock).

[14] Complaint ¶ 33; Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2022, p. 30.

7

Co-Diagnostics produced annual revenue that was multiples below what it produced during the height of the pandemic: in 2019, its yearly revenue was merely $214,974, and that value skyrocketed to $74.6 million in 2020.[15]  However, there was a significant risk that demand for the Logix Smart Test would wane once the pandemic began to recede, as that demand hinged on the need for frequent COVID-19 testing.[16]  On May 12, 2022, after market close, Defendants announced via press release their decision to stop providing quarterly guidance due to their purported inability to accurately forecast demand for their Logix Smart Test.[17]  Plaintiffs allege that Defendants went on to tout their confidence in the continued demand for their product during the Class Period, when at the time of the alleged misstatements, this demand had already plummeted and Logix Smart Test sales had already dramatically declined.[18]  According to Plaintiffs, Defendants were able to track the daily demand for their Logix Smart Test, and had publicly admitted as such, and therefore knew or recklessly disregarded the falsity of their statements and misled investors.[19]  The Complaint alleges that through a corrective disclosure, the market finally learned of the dramatic decline in revenue, which was driven primarily by the decreased Logix Smart Test sales, and the price of Co-Diagnostics Common Stock fell, harming investors who bought at inflated prices.[20]

---

[15] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2019, p. 14; Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2020, p. 19; Complaint ¶¶ 32-34.

[16] Co-Diagnostics, Inc. SEC Form 10-K for the fiscal year ended December 31, 2020, p. 12.

[17] Complaint ¶ 44; "Co-Diagnostics Reports Solid First Quarter 2022 Financial Results," *PR Newswire*, May 12, 2022.

[18] Complaint ¶¶ 44-48, 51-55.

[19] Complaint ¶¶ 6, 66.

[20] Complaint ¶ 7-9, 61-64.

## V.    DISCUSSION OF RELIANCE ELEMENT

14.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims.  Lead Plaintiff asserts the fraud on the market theory of reliance in this matter.[21]  The fraud on the market theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price.  The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[22]

15.    The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[23]

16.    As stated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company.  If a company provides the market with misleading information regarding its financial strength or business

---

[21] Complaint Section IX.

[22] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[23] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

17. It is an empirical exercise to determine whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory.[24] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[25] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[26]

18. The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is

---

[24] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[25] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no.2 (1970): 383.

[26] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[27]  The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

19.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI.    *CAMMER* FACTORS

20.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[28]

21.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.  For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the

---

[27] *Basic,* 485 U.S. at 241.

[28] *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

ability to absorb a reasonable amount of trading with relatively small price changes).

An *efficient market* is one which rapidly reflects new information in price.

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[29]

22.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient."  In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory.  I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

23.    In the subsequent sections, I evaluate the market for Co-Diagnostics Common Stock during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

---

[29] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO CO-DIAGNOSTICS COMMON STOCK

### A.  OVERVIEW

24.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Co-Diagnostics Common Stock was efficient throughout the Class Period.  In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Co-Diagnostics Common Stock traded in an efficient market.  As further background to my analyses, **Exhibit 2** displays Co-Diagnostics Common Stock's closing price and trading volume for each day throughout the Class Period.

25.    In summary, and as discussed more fully below, Co-Diagnostics Common Stock traded in an efficient market during the Class Period.  First, the average weekly trading volume of Co-Diagnostics Common Stock during the Class Period far exceeded benchmarks that courts have established.  During the Class Period, the average weekly trading volume for Co-Diagnostics Common Stock was 2.78 million shares, which represents 8.21% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange.  Second, there were several securities analysts following and reporting on Co-Diagnostics.  Third, Co-Diagnostics Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers.  Fourth, Co-Diagnostics met the important eligibility criteria and was apparently eligible to file a Form S-3 throughout the Class Period since the Company had previously provided substantial public information to the market in its previous SEC filings.  Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Co-Diagnostics Common

13

Stock during the Class Period as well as a broader time period (the "Analysis Period").[30]  Sixth,

Co-Diagnostics Common Stock had a market capitalization that was in the interquartile range

relative to all other firms that traded on the NYSE and NASDAQ during the Class Period.

Seventh, Co-Diagnostics Common Stock had a low bid-ask spread relative to other exchange-

traded common stocks.  Eighth, insiders held on average only roughly 0.4% of the shares

outstanding while institutions, which are considered generally to be well-informed investors,

held a substantial portion of the remaining public float of Co-Diagnostics Common Stock during

the quarters of interest.  Ninth, there was no evidence of statistically significant autocorrelation

during the Class Period.  Finally, there was active trading in Co-Diagnostics options throughout

the Class Period.  My analyses of all of these factors support the conclusion that Co-Diagnostics

Common Stock traded in an open, developed, and efficient market throughout the Class Period.

### B.  *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

26.    The first *Cammer* Factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the
> outstanding shares would justify a strong presumption that the market for the
> security is an efficient one; 1% would justify a substantial presumption.[31]

27.    Volume as a fraction of shares outstanding is an important indicator of market

efficiency for several reasons.  First, volume is objectively quantifiable and comparable across

securities.  Second, high volume is generally indicative of continuity, liquidity, and market depth

---

[30] The Analysis Period is from May 13, 2021 through August 11, 2023.  For certain elements of my report, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests.  By analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I conclude that the evidence supports efficiency during the Class Period.  The Analysis Period was selected to capture one full calendar year before and one full calendar year after the Class Period.  In this case, this resulted in a total of 10 earnings announcements to evaluate and analyze.

[31] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

– which are highly indicative of market efficiency.[32]  Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security.  As Professors Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[33]

28.    Co-Diagnostics Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market.  The average weekly trading volume for Co-Diagnostics Common Stock during the Class Period was 8.21% of shares outstanding, compared to 2.40% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.  Based on this figure, the weekly trading volume for Co-Diagnostics Common Stock far exceeds the 1% or 2% threshold cited by *Cammer*.  **Exhibit 3** plots Co-Diagnostics Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[34]  Indeed, the average weekly trading volume for Co-Diagnostics Common Stock during the Class Period was 2.78 million shares.  This volume of trading supports the conclusion that the market for this security was efficient throughout the Class Period.

---

[32] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 44-45.

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud, et al. "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 317.

[33] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105, 108.  Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter was an Associate Professor of Finance at Wake Forest University.

[34] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

29.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[35] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.,* shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, Co-Diagnostics Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for Co-Diagnostics Common Stock was 411% compared with the NYSE and NASDAQ average of 125% for the Class Period.[36] Thus, Co-Diagnostics Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

30.    In short, the relatively high trading volume in Co-Diagnostics Common Stock throughout the Class Period supports the conclusion that the market for Co-Diagnostics Common Stock was efficient.

### C.  *CAMMER* FACTOR 2: ANALYST COVERAGE

31.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [analyst]

---

[35] Turnover velocity as a formula is:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

[36] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[37]

32.    Analyst coverage can be important evidence of efficiency.  Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

33.    During the Class Period, there was consistent analyst coverage for Co-Diagnostics. **Exhibit 4** shows that there were at least 25 reports issued during the Class Period and lists 8 separate firms that had equity analysts issue reports on Co-Diagnostics, including firms such as H.C. Wainwright, Sidoti, and Litchfield Hills Research.[38]  These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors.  The coverage of Co-Diagnostics by securities analysts supports the conclusion that Co-Diagnostics Common Stock traded in an efficient market throughout the Class Period.

34.    Since 1989, when the *Cammer* decision was issued, there has been a significant increase in alternative methods by which publicly available information about publicly traded securities is disseminated to investors.  For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[39] and other media, the ability of

---

[37] *Cammer*, 711 F. Supp. at 1286.

[38] I obtained Co-Diagnostics analyst reports from Plaintiff's Counsel, S&P Capital IQ, and Seeking Alpha.  The number of analyst reports I identify is likely understated because many analyst reports are not available through third party data providers.

[39] RSS is an acronym for Really Simple Syndication or Rich Site Summary.  RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content.  The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information.  Content viewed in the RSS reader or news aggregator is known as an RSS feed.  RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships.  *See*, http://www.rss-specifications.com/ and *see also*, http://www.rss-specifications.com/what-is-rss.htm.

individual and institutional investors to obtain information about publicly traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account.  Thus, in addition to the substantial analyst coverage of Co-Diagnostics, there were many other sources of public information dissemination. For example, there was substantial public press regarding Co-Diagnostics.  A search for articles classified as related to Co-Diagnostics by Factiva over the Class Period resulted in 75 unique articles (and 698 articles over the Analysis Period).[40]  In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify.  The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Co-Diagnostics in the public arena throughout the Analysis Period, and thus the Class Period.

36.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Co-Diagnostics provides evidence of a robust and

---

[40] Factiva is a business information and research tool owned by Dow Jones & Company.  Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities.  The 75 unique articles for the Class Period ("May 13, 2022 – August 11, 2022") were identified as a result of two searches: one search for "All Sources" with the company field "Co-Diagnostics, Inc." excluding the phrase "Nasdaq New 52-Week Highs and Lows," and a separate search for "Major News and Business Sources" with the keyword "Co-Diagnostics," but excluding both news with the company field "Co-Diagnostics, Inc." and the phrase "Nasdaq New 52-Week Highs and Lows."  The 698 unique articles for the Analysis Period ("May 13, 2021 – August 11, 2023") were identified as a result of the same two searches.  Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

active market for public information about the Company and evidence that Co-Diagnostics

Common Stock traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

37.   A market maker is a firm that is ready to buy or sell a particular stock on a regular

and continuous basis.[41]  The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of
> market makers is probably the best single criterion. Ten market makers for a
> security would justify a substantial presumption that the market for the
> security is an efficient one; five market makers would justify a more modest
> presumption.[42]

38.   The premise that the number of market makers can serve as an efficiency criterion

relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks'
> supply and demand conditions (*i.e.*, the "order flow"). Therefore, it is
> believed the larger the number of market makers in a given security, the more
> information is available about it and the quicker its dissemination in the
> price.[43]

39.   Co-Diagnostics Common Stock traded on a major exchange (*i.e.*, the NASDAQ)

with continuous public price and volume reporting, as opposed to an over-the-counter market

without volume reporting, which is the context in which *Cammer* indicated this was a relevant

criterion.[44]  On such over-the-counter markets, there may be reason for concern regarding

liquidity and information dissemination.  However, these concerns are generally not applicable to

---

[41] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[42] *Cammer*, 711 F. Supp. at 1293.

[43] Brad Barber, et al. "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, (1994), 291.

[44] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[45]

40.     The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day.  Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[46]  The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security.  Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

41.     Nevertheless, according to Bloomberg, throughout the Class Period, there were 35 market makers for Co-Diagnostics Common Stock.[47]  Therefore, Co-Diagnostics Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

42.     The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were

---

[45] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee* Introduction and Appendices at
https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf.  *See also*, William Sharpe, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 45-53; Frank J. Fabozzi, et al. *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.

[46] For NYSE, *see* https://www.nyse.com/market-model.  For NASDAQ, *see*
https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

[47] Bloomberg RANK function.

not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[48]

43.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[49]  In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases.  Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

44.    I have found no evidence that Co-Diagnostics was not S-3 eligible throughout the Class Period, and in fact filed a Form S-3 during the Analysis Period.[50]  Throughout the Class Period, Co-Diagnostics had been subject to SEC filing requirements for more than one year, had filed all documents in a timely manner over the preceding twelve months, and did not fail to meet its debt obligations, to my knowledge.  Therefore, Co-Diagnostics meets this *Cammer* efficiency factor, which supports the conclusion that Co-Diagnostics Common Stock traded in an efficient market.

### F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.    The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

---

[48] *Cammer*, 711 F. Supp. at 1287.

[49] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

[50] Co-Diagnostics, Inc. SEC Form S-3 filed March 16, 2023.

… [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[51]

46.    Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency.  A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study."  An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[52]  Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place.  Event studies have been used for over 50 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[53]

47.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities.  New information may include, for example, press releases, earnings reports, SEC filings, and news reports or analyst reports.  An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48.    To analyze cause and effect, I performed an event study to determine whether Co-Diagnostics Common Stock reacted to earnings announcements in a manner significantly

---

[51] *Cammer,* 711 F. Supp. 1291.

[52] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13.

[53] John J. Binder. "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111.

different from how the stock moved on days with no Co-Diagnostics-related news.[54]  Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Co-Diagnostics and the market price of Co-Diagnostics Common Stock.  I now describe in further detail the event study methodology, the events I tested, and the results.

49.    A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[55]  I have performed such an analysis in this matter where I evaluate the relationship between Co-Diagnostics Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and an equally weighted peer index, hereafter referred to as the "Peer Index."[56, 57]

---

[54] For purposes of this analysis, I analyzed the broader time period of the Analysis Period to enhance the power of my statistical tests.  After analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I conclude that the evidence supports a cause-and-effect relationship during the Class Period.

[55] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable").  In this case, the daily percentage change in Co-Diagnostics Common Stock (the Co-Diagnostics daily return) is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables.  For a general discussion of regression analysis, *see* Damodar N. Gujarati, *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.

[56] The Peer Index is an equally weighted index comprised of the seven companies that Co-Diagnostics compared its performance to throughout the Analysis Period which traded publicly on a US exchange (i.e., Siemens AG, Qiagen N.V., Cue Health Inc., LumiraDx Limited, Abbott Laboratories, Becton, Dickinson, and Company, and Johnson & Johnson), as well as eleven companies named by analysts as peers of the Company during the Class Period which also had COVID-19 testing products for humans (i.e., OraSure Technologies, Inc., Danaher Corporation, Illumina, Inc., Hologic, Inc., Guardant Health, Inc., Fulgent Genetics, Inc., Accelerate Diagnostics, Inc., Enzo Biochem, Inc., Talis Biomedical Corporation, Biomerica, Inc., and ThermoGenesis Holdings, Inc.).  *See*, Co-Diagnostics SEC Forms 10-K for the fiscal years ended December 31, 2021, December 31, 2022, and December 31, 2023; "CODX beats 1Q22 Consensus but drops forward guidance – Reiterate Buy rating and $29 PT," *Litchfield Hills*, May 16, 2022; "Co-Diagnostics, Inc.," *Jefferson Research*, June 17, 2022.

[57] The returns of the Peer Index are net of the S&P 500 Total Return Index.

50.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[58]  By using a "rolling" estimation window, it allows for the relationship between Co-Diagnostics Common Stock, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period.  Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[59]

51.    The model indicates that there is a positive correlation between Co-Diagnostics Common Stock and the control variables.  In other words, the movement of the Market Index and Peer Index helps explain the price movements of Co-Diagnostics Common Stock during the broader Analysis Period (of which the Class Period is a subset).  For instance, choosing a day in the Class Period purely as an example, June 22, 2022, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.72 which means that a 1% rise in the S&P 500 predicts a 1.72% increase in returns for Co-Diagnostics Common Stock.  The estimated coefficient for the Peer Index is 1.08, meaning that the expected return for Co-Diagnostics Common Stock is about a 1.08% increase for every 1% increase in the Peer Index over and above the return of the S&P 500.  **Exhibit 5** plots the estimated coefficients for the rolling regression model for each day during the Analysis Period (of which the Class Period is a subset), and it demonstrates that there is a consistently positive relationship between the general market, the Peer Index, and the price of Co-Diagnostics Common Stock.

---

[58] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[59] Phillip A. Braun, "Good News, Bad News Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575, 1597.

52.    Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model.  Put another way, this measure provides a metric for how much unexplained price movement remains in the price movement of Co-Diagnostics Common Stock after controlling for the Market Index and Peer Index.  For instance, on the example date, June 22, 2022, the model predicted that absent any value-relevant new firm-specific information, the price of Co-Diagnostics Common Stock would increase by 1.47% because the S&P 500 was down 0.13% while the Peer Index was up 1.36%.[60]  Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly.  In this example, I observe an actual return of 1.56%.  Thus, the "abnormal return" for this day is 0.09% (the actual return of 1.56% minus the predicted return of 1.47%).  I then rely on the standard deviation of the errors from the regression model to tell if this abnormal return of 0.09% is sufficiently large that I can reject random movement as the explanation.

53.    The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction.  For the example date, an abnormal return of 0.09% represents 0.03 standard deviations or a t-statistic of 0.03 (abnormal return of 0.09% divided by the standard deviation of the errors of 0.028).[61]  Using the standard assumption that, in the absence of new value-relevant company-specific news, abnormal returns will be normally distributed

---

[60] The predicted return of 1.47% is found as follows: 1.72 * -0.13% (coefficient on Market Index *times* Market Index return) + 1.08 * 1.36% (coefficient on Peer Index *times* Peer Index return) + 0.228% (constant term from regression).

[61] The standard deviation of the errors is plotted in **Exhibit 6**. The standard deviation of the errors is also known as the standard error.  The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd ed.) (2011): 243 ("An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates.").

around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[62,63]  Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation.  Since our example has a t-statistic of 0.03, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence.  By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

54.    **Exhibit 6** shows that the standard deviation of the errors for Co-Diagnostics Common Stock varied over the Analysis Period (of which the Class Period is a subset).  By adopting the rolling regression model, my event study explicitly adjusts for the changing Company-specific volatility.

55.    To analyze cause-and-effect, I examined the price response of Co-Diagnostics Common Stock to the ten earnings announcements during the Analysis Period.  This includes the earnings announcement that occurred during the Class Period as well as the four quarters prior to

---

[62] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean.  The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011, p. 342 ("The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area.").

[63] The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.  *See*, David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.

the start of the Class Period and the five quarters after the end of the Class Period in order to have a more robust set of observations. *See* **Exhibit 7**.

56.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[64]  Also, newly released earnings reports by a company are an objective set of news to identify and test.  Considering the first earnings release listed in **Exhibit 7** as an example, after market close on May 13, 2021, the Company announced positive quarter results for the fiscal quarter ending March 31, 2021, announcing revenue of $20 million and net income of $7.9 million, beating analyst estimates for both metrics.[65]  In response, the market price of Co-Diagnostics Common Stock increased by 18.16%, compared to the predicted return of 0.55%.  Thus, the abnormal return on May 14, 2021 was 17.60%.  With a t-statistic of 3.75, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that Co-Diagnostics Common Stock reacted rapidly to this new information.

57.     Similar to this example, I analyzed the market reaction to Co-Diagnostics' other earnings announcements I identified above.  In total, of the ten earnings announcements Co-Diagnostics issued during the Analysis Period, seven resulted in statistically significant price

---

[64] William H. Beaver, "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163; Joseph Aharony & Itzhak Swary. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

[65] *See*, "Co-Diagnostics Reports First Quarter 2021 Financial Results," *PR Newswire*, May 13, 2021, 4:01 PM ET; "Top- and Bottom-Line 1Q21 Beat; Volume Growth to Drive Sales; Reiterate Buy," *H.C. Wainwright,* May 14, 2021.

movements above the 99% confidence level, and eight resulted in statistically significant price movements above the 95% confidence level.[66]

58.    **Exhibit 7** presents a summary of the earnings releases during the Analysis Period.

59.    I then compared these results against the 207 days during the Analysis Period where I identified no Co-Diagnostics-related news from the Factiva database and when there were no analyst reports or SEC filings issued.  Of these 207 days, there were 16 statistically significant price movements.  Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level or greater on 80% of the earnings announcements, but when compared to days with no Co-Diagnostics-related news, I observed only 7.73% of the days having statistically significant reactions.[67, 68]  This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Co-Diagnostics Common Stock.

60.    Furthermore, on the 207 days with no news, the average change in price of Co-Diagnostics Common Stock was only 2.59% after controlling for market and industry factors, while the average change in Co-Diagnostics Common Stock on earnings announcement dates after controlling for market and industry factors was 12.18%.  In other words, the average magnitude of stock price movement on earnings announcement days was over 4 times higher than on no news days.[69]  Again, this demonstrates that on days when important company-specific

---

[66] It is not unusual to observe many earnings announcements that are not statistically significant.  This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[67] This difference between 80% and 7.73% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[68] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.  The observed rate of 7.73% is not statistically significantly different than 5%.

[69] This difference between 12.18% and 2.59% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

information is released to the market, the stock price moves much more than on days where there is no company-specific news.  This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of Co-Diagnostics Common Stock, and thus an efficient market.

61.    The bar charts below summarize this analysis while **Exhibit 8** gives more detail.



29



62. Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of Co-Diagnostics Common Stock also tends to be much higher[70] than on days where there is no news. For instance, the average daily trading volume of the ten days with earnings announcements was 1.7 million. Compare this to the average daily trading volume of 0.4 million for days where there is no news in the Analysis Period.[71] The bar chart below summarizes this analysis.

---

[70] William H. Beaver, "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 69, 84.

[71] This difference between 1.7 million and 0.4 million is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

**Average Daily Trading Volume**



63.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Co-Diagnostics Common Stock.  The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news.

64.    In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Co-Diagnostics Common Stock during the Analysis Period, and thus the Class Period.

### G.  *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

65.    In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[72]  The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[73]  Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[74]  Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.    Based on the market price, the market capitalization for Co-Diagnostics Common Stock averaged $191 million during the Class Period.  **Exhibit 9** shows Co-Diagnostics' market capitalization over the Class Period.  **Exhibit 10** shows that during the Class Period, Co-Diagnostics Common Stock market capitalization fell in the interquartile range (*i.e.,* between the 25th and 75th percentile) during the Class Period.[75]

67.    Given that the market capitalization for Co-Diagnostics Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Co-Diagnostics Common Stock.

## H.  *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

68.    The *Krogman* court's second additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market,

---

[72] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").  The factors identified by the *Krogman* Court are 1) market capitalization, 2) the percentage of stock not held by insiders (the float) and 3) bid-ask spread.

[73] *Krogman*, 202 F.R.D. at 478.

[74] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 117.

[75] Bloomberg EQS Function.  The end of the third quarter in 2022 falls after the Class Period and after the impact of the alleged corrective disclosure.

because it suggests that the stock is too expensive to trade."[76]  The bid-ask spread is an important indicator of the degree to which a market is developed.  The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.  In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency.  Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

69.    I analyzed bid-ask spreads for Co-Diagnostics Common Stock during the Class Period.  **Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread for Co-Diagnostics Common Stock in each month was between 0.12% and 0.23%.[77]  This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in June 2022 (the full month during the Class Period when Co-Diagnostics had the largest percentage bid-ask spread).[78,79]  **Exhibit 11** demonstrates

---

[76] *Krogman*, 202 F.R.D. at 478.

[77] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market.  That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs.  Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread.  I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 313.

[78] Quote data for Co-Diagnostics and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[79] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads.  Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology.  I determined the constituents of the NYSE and NASDAQ for June 2022 and then randomly generated a list of 100 common stock securities.  I then calculated the time-weighted average monthly bid-ask spread for June 2022.

that Co-Diagnostics Common Stock had a monthly average bid-ask spread of 0.23% in June 2022, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.78%.  Accordingly, Co-Diagnostics Common Stock's bid-ask spread was low during the Class Period, and this factor further supports market efficiency for Co-Diagnostics Common Stock.

## I.   *KROGMAN* FACTOR 3: PUBLIC FLOAT

70.   The *Krogman* court's last additional factor is that the public float (*i.e.*, the proportion of shares not held by insiders) is considered to be indicative of market efficiency.  As shown in **Exhibit 12**, during the Class Period, insiders held, on average, 0.4% of all outstanding shares of Co-Diagnostics Common Stock, meaning that approximately 99% of Co-Diagnostics' shares were held by non-insiders.  This large percentage of shares held by non-insiders – a substantial percentage of which were purchased and held by institutional investors – supports a finding of market efficiency.

## J.   ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

71.   Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own.  These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios.  As **Exhibit 12** shows, 116 institutions reported owning Co-Diagnostics Common Stock during the Class Period, holding a substantial portion of the public float.  This substantial level of institutional ownership of Co-Diagnostics Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

34

### K.  ADDITIONAL FACTOR: AUTOCORRELATION

72.    If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated."  Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

73.    Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news.  Inefficiency would only be indicated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[80]

74.    A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[81]  If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

75.    **Exhibit 13** displays the autocorrelation coefficient for Co-Diagnostics Common Stock for the Analysis Period using the abnormal returns from the event study model described above.  The coefficient is not statistically different than zero, meaning there is no evidence of autocorrelation in the trading of Co-Diagnostics Common Stock during the Analysis Period.[82] These results are consistent with the notion that an investor could not consistently predict

---

[80] Doron Avramov, et al. "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365, 2367-68; Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.

[81] William H. Greene, *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.

[82] I have also observed no evidence of autocorrelation during the Class Period.

abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that Co-Diagnostics Common Stock traded in an efficient market throughout the Analysis Period.

## L. ADDITIONAL FACTOR: OPTIONS

76.    In addition to the factors analyzed above, there was also considerable option trading in Co-Diagnostics Common Stock during the Class Period.[83] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[84] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[85] Thus, this factor also supports that Co-Diagnostics Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

77.    Counsel for the Lead Plaintiff also asked me to opine on whether per share damages could be measured for all purchasers of Co-Diagnostics Common Stock during the Class Period under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Lead Plaintiff's theory of liability.[86] There is a standard and well-accepted method for calculating class-wide damages in cases under Section 10(b) of the Exchange Act. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial

---

[83] For instance, according to Bloomberg, there were 10,651 Co-Diagnostics Common Stock put contracts and 123,469 Co-Diagnostics Common Stock call contracts that traded during the Class Period.

[84] Stephen A. Ross, "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976): 75.

[85] Raman Kumar, et al. "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717.

[86] *See*, **Section III** and **Section IV**.

inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[87]  The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.[88]

78.    Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions).  Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

79.    Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology.  The quantification of the artificial inflation per share requires a detailed loss

---

[87] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."  *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

[88] The out-of-pocket methodology applies equally to options on Co-Diagnostics Common Stock.  In other words, for each options series, one could determine the artificial inflation per option for Co-Diagnostics calls and the artificial deflation per option for Co-Diagnostics puts during the Class Period.  For example, the damages suffered by a call purchaser are the inflation per option at the time of purchase minus the inflation per option at the time of sale, subject to the statutory limitation, just like purchasers of Co-Diagnostics Common Stock.

causation analysis.[89]  Nevertheless, whatever the method for determining the artificial inflation

per share, it would be common to all class members.[90]

80.    For example, the most widely-used technique to quantify artificial inflation starts

from an event study that measures price reactions to disclosures that revealed the relevant truth,

such as the price reaction to the dramatic decline in Co-Diagnostics' revenue driven primarily by

the fallen demand for its Logix Smart Test,[91] which was concealed by the alleged material

omissions and/or misrepresentations (*i.e.,* a "corrective disclosure").[92]  Such an event study

would also need to consider whether and to what extent any non-fraud related information (*i.e.*

"confounding information") contributed to the observed price movement.  If there is such

confounding information, disaggregating the price impact of corrective disclosures from

confounding information may utilize valuation techniques and may depend on information

learned through discovery.  Determining the specific valuation approach necessary to perform a

loss causation analysis that reasonably disaggregates corrective and confounding information is

an inherently case-specific question that depends on specific facts and circumstances.  Examples

of such techniques include, but are not limited to, fundamental valuation analysis such as

discounted cash flow methods, valuation multiple methods (*i.e.,* price to earnings multiples, price

to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the

value of certain types of information, and other available valuations whether from securities

---

[89] I have not been asked to conduct a loss causation analysis at this time.  In my experience, loss causation analyses are often informed by information learned in discovery.

[90] Likewise, for each Co-Diagnostics call option and put option, there would need to be an analysis of the degree to which there was a firm-specific change in the option price at the time of the alleged corrective disclosure as a starting point for evaluating the distortion in the option price during the Class Period.

[91] Complaint ¶ 7.

[92] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

analysts or made available through discovery.  Regardless of the technique used, it is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

81.   The loss causation analysis would also require an analysis of how inflation per share may have evolved over the class period.  Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery.  For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the class period.  In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was inflated by a consistent percentage in the absence of additional disclosures.  In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery.  To summarize, the determination of how artificial inflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above.  Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

82.   Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this

action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

## IX.  CONCLUSION

83.    In sum, every factor analyzed supports my opinion that Co-Diagnostics Common Stock traded in an efficient market during the Class Period.  Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

84.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on July 26, 2024

_____
Chad Coffman

40

**Exhibit 1**
**Summary of Efficiency Factors for Co-Diagnostics, Inc.**

| Factor | Summary of Factor | Co-Diagnostics |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 8.21%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market. (Note: 2.78 million shares traded weekly on average during the Class Period.) |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 8 securities analysts issued 25 analyst reports which implies that important information relevant to trading Co-Diagnostics Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Co-Diagnostics' shares were exchange-traded on the NASDAQ during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 35 market makers for Co-Diagnostics Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Co-Diagnostics filed a Form S-3 during the Analysis Period (March 16, 2023). I have found no evidence to believe that Co-Diagnostics was not S-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Co-Diagnostics Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2022 and 6/30/2022, Co-Diagnostics' market capitalization was $210.02 million and $189.51 million, respectively, therefore during the Class Period Co-Diagnostics' market capitalization was in the interquartile range. Co-Diagnostics Common Stock therefore meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Co-Diagnostics Common Stock in each month ranged from 0.12% to 0.23%. Co-Diagnostics' average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in June 2022 (the full month when Co-Diagnostics had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average, over 99% of Co-Diagnostics shares were held by non-insiders. 116 institutions held a substantial amount of the public float throughout the Class Period, which further supports the finding that Co-Diagnostics Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Co-Diagnostics Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 10,651 Co-Diagnostics Common Stock put contracts and 123,469 Co-Diagnostics Common Stock call contracts that traded during the Class Period. Co-Diagnostics Common Stock therefore easily meets this criterion. |

**Exhibit 2**
**Co-Diagnostics Common Stock Price & Volume**
**5/13/2021 - 8/11/2023**



Sources: Complaint and S&P Capital IQ.

**Exhibit 3**
**Co-Diagnostics Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**5/13/2022 - 8/11/2022**



Source: S&P Capital IQ and SEC Filings.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on May 13, 2022 through August 11, 2022. The last week consists of two trading days (*i.e.*, 8/10/2022, and 8/11/2022), and therefore, the average of the daily trading volume on this day is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. The last week is excluded from the median calculation.

# Exhibit 4
# Summary of Securities Analyst Reports Issued for Co-Diagnostics

| | Analyst Name | Reports Issued During the Class Period: 5/13/2022 - 8/11/2022 |
|---|---|---|
| [1] | JEFFERSON RESEARCH & MANAGEMENT | 13 |
| [2] | H.C. WAINWRIGHT & CO. | 3 |
| [3] | S&P GLOBAL COMPUSTAT | 3 |
| [4] | GLOBALDATA | 2 |
| [5] | LITCHFIELD HILLS RESEARCH | 1 |
| [6] | SEEKING ALPHA | 1 |
| [7] | SIDOTI & COMPANY, LLC | 1 |
| [8] | PLUNKETT RESEARCH, LTD. | 1 |
| | **Total** | **25** |

Source: Counsel, S&P Capital IQ, and Seeking Alpha.

Note: Many analyst reports are not available through third party data providers; therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Co-Diagnostics**
**5/13/2021 - 8/11/2023**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equally weighted index comprised of the seven companies that Co-Diagnostics compared its performance to throughout the Analysis Period and which traded publicly on a US exchange (*i.e.*, Siemens AG, Qiagen N.V., Cue Health Inc., LumiraDx Limited, Abbott Laboratories, Becton, Dickinson, and Company, and Johnson & Johnson), as well as eleven companies named by analysts as peers of the Company during the Class Period which also had COVID-19 testing products for humans (*i.e.*, OraSure Technologies, Inc., Danaher Corporation, Illumina, Inc., Hologic, Inc., Guardant Health, Inc., Fulgent Genetics, Inc., Accelerate Diagnostics, Inc., Enzo Biochem, Inc., Talis Biomedical Corporation, Biomerica, Inc., and ThermoGenesis Holdings, Inc.). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure date, and two outlier dates have been removed from estimation. The outlier dates consist of 7/22/2021 (announcement of a patent award for CoPrimer technology and $1.6 billion in COVID-19 testing funds from the White House) and 3/20/2023 (continued reaction to an earnings announcement).

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for Co-Diagnostics Common Stock**
**5/13/2021 - 8/11/2023**



Class Period: 5/13/2022 - 8/11/2022

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equally weighted index comprised of the seven companies that Co-Diagnostics compared its performance to throughout the Analysis Period and which traded publicly on a US exchange (*i.e.*, Siemens AG, Qiagen N.V., Cue Health Inc., LumiraDx Limited, Abbott Laboratories, Becton, Dickinson, and Company, and Johnson & Johnson), as well as eleven companies named by analysts as peers of the Company during the Class Period which also had COVID-19 testing products for humans (*i.e.*, OraSure Technologies, Inc., Danaher Corporation, Illumina, Inc., Hologic, Inc., Guardant Health, Inc., Fulgent Genetics, Inc., Accelerate Diagnostics, Inc., Enzo Biochem, Inc., Talis Biomedical Corporation, Biomerica, Inc., and ThermoGenesis Holdings, Inc.). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure date, and two outlier dates have been removed from estimation. The outlier dates consist of 7/22/2021 (announcement of a patent award for CoPrimer technology and $1.6 billion in COVID-19 testing funds from the White House) and 3/20/2023 (continued reaction to an earnings announcement).

**Exhibit 7**
**Event Study Analysis of Co-Diagnostics Earnings Announcements**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | P-Value | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|--------|---------|-----------|
| | | | | | | | | | **Rolling Regression Model (120-day window)** | | | |
| 1 | 5/13/2021 | 4:01 PM | 5/14/2021 | Q1 2021 Earnings | Co-Diagnostics Reports First Quarter 2021 Financial Results<br>*Source - PRNewswire* | $8.46 | 18.16% | 17.60% | $1.26 | 3.75 | 0.00 | *** |
| 2 | 8/12/2021 | 4:01 PM | 8/13/2021 | Q2 2021 Earnings | Co-Diagnostics Reports Strong Second Quarter 2021 Financial Results<br>*Source - PRNewswire* | $10.60 | 9.62% | 12.46% | $1.21 | 3.20 | 0.00 | *** |
| 3 | 11/11/2021 | 4:01 PM | 11/12/2021 | Q3 2021 Earnings | Co-Diagnostics Reports Continued Strength in Third Quarter 2021 Financial Results<br>*Source - PRNewswire* | $9.31 | 7.63% | 6.27% | $0.54 | 2.11 | 0.04 | ** |
| 4 | 3/24/2022 | 4:01 PM | 3/25/2022 | Q4 2021 Earnings | Co-Diagnostics Reports Full Year 2021 Financial Results<br>*Source - PRNewswire* | $5.76 | -11.60% | -10.62% | -$0.69 | -3.64 | 0.00 | *** |
| 5 | 5/12/2022 | 4:01 PM | 5/13/2022 | Q1 2022 Earnings | Co-Diagnostics Reports Solid First Quarter 2022 Financial Results<br>*Source - PRNewswire* | $4.55 | 14.90% | 9.41% | $0.37 | 3.07 | 0.00 | *** |
| 6 | 8/11/2022 | 4:01 PM | 8/12/2022 | Q2 2022 Earnings | Co-Diagnostics, Inc. Reports Second Quarter 2022 Financial Results<br>*Source - PRNewswire* | $4.48 | -30.65% | -32.21% | -$2.08 | -10.32 | 0.00 | *** |
| 7 | 11/10/2022 | 4:13 PM | 11/11/2022 | Q3 2022 Earnings | Co-Diagnostics, Inc. Reports Third Quarter 2022 Financial Results<br>*Source - PRNewswire* | $3.65 | 5.49% | 3.84% | $0.13 | 1.19 | 0.24 | |
| 8 | 3/16/2023 | 4:01 PM | 3/17/2023 | Q4 2022 Earnings | Co-Diagnostics, Inc. Reports Full Year 2022 Financial Results<br>*Source - PRNewswire* | $2.48 | -16.22% | -16.43% | -$0.49 | -5.56 | 0.00 | *** |
| 9 | 5/11/2023 | 4:01 PM | 5/12/2023 | Q1 2023 Earnings | Co-Diagnostics, Inc. Reports First Quarter 2023 Financial Results<br>*Source - PRNewswire* | $1.33 | 7.26% | 9.76% | $0.12 | 3.03 | 0.00 | *** |
| 10 | 8/10/2023 | 4:01 PM | 8/11/2023 | Q2 2023 Earnings | Co-Diagnostics, Inc. Reports Second Quarter 2023 Financial Results<br>*Source - PRNewswire* | $1.16 | -4.13% | -3.24% | -$0.04 | -0.69 | 0.49 | |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equally weighted index comprised of the seven companies that Co-Diagnostics compared its performance to throughout the Analysis Period and which traded publicly on a US exchange (*i.e.*, Siemens AG, Qiagen N.V., Cue Health Inc., LumiraDx Limited, Abbott Laboratories, Becton, Dickinson, and Company, and Johnson & Johnson), as well as eleven companies named by analysts as peers of the Company during the Class Period which also had COVID-19 testing products for humans (*i.e.*, OraSure Technologies, Inc., Danaher Corporation, Illumina, Inc., Hologic, Inc., Guardant Health, Inc., Fulgent Genetics, Inc., Accelerate Diagnostics, Inc., Enzo Biochem, Inc., Talis Biomedical Corporation, Biomerica, Inc., and ThermoGenesis Holdings, Inc.). The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements, the alleged corrective disclosure date, and two outlier dates have been removed from estimation. The outlier dates consist of 7/22/2021 (announcement of a patent award for CoPrimer technology and $1.6 billion in COVID-19 testing funds from the White House) and 3/20/2023 (continued reaction to an earnings announcement).

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Event Study Results on Co-Diagnostics Earnings Announcements
vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 10 | 207 |
| Significant Days at 95% Confidence Level | 8 | 16 |
| % Significant Days at 95% Confidence Level [2] | 80.00% | 7.73% |
| Average Absolute Abnormal Return [3] | 12.18% | 2.59% |
| Average Volume (Millions) [4] | 1.7 | 0.4 |

Notes:

(1) Results are based on the Analysis Period. For the purposes of this analysis, I selected the 207 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued to my knowledge.

(2) 80.00% rate of statistical significance is statistically significantly different than 7.73% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 12.18% absolute return is statistically significantly different than 2.59% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 1.7 million and 0.4 million is statistically significant at the 99% confidence level.

**Exhibit 9**
**Co-Diagnostics Common Stock Market Capitalization**
**5/13/2021 - 8/11/2023**



Sources: Complaint, SEC Filings, and S&P Capital IQ.

**Exhibit 10**
**Co-Diagnostics Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (millions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q1 2022 | $210.02 | 29% |
| Q2 2022 | $189.51 | 31% |
| Q3 2022 | $99.25 | 23% |

Source: Bloomberg, SEC Filings, and S&P Capital IQ.



**Exhibit 11**
**Co-Diagnostics Common Stock Average Monthly Bid-Ask Percentage Spread**
**5/13/2022 - 8/11/2022**

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in June 2022: 0.78%

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in June 2022: 0.26%

Source: Thomson Reuters Eikon and TICK Data.
Note: May 2022 and August 2022 data are limited to the Class Period.

**Exhibit 12**
**Co-Diagnostics Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2021 | 28,666 | 126 | 1,759 | 4,091 | 30,997 | 6.14% | 9,300 | 32% | 30% |
| 6/30/2021 | 28,890 | 118 | 1,777 | 4,681 | 31,793 | 6.15% | 7,964 | 28% | 25% |
| 9/30/2021 | 28,895 | 100 | 1,775 | 2,224 | 29,343 | 6.14% | 8,705 | 30% | 30% |
| 12/31/2021 | 33,820 | 95 | 1,808 | 1,263 | 33,274 | 5.35% | 7,850 | 23% | 24% |
| 3/31/2022 | 33,984 | 98 | 111 | 1,531 | 35,404 | 0.33% | 7,386 | 22% | 21% |
| 6/30/2022 | 33,781 | 88 | 147 | 1,845 | 35,480 | 0.43% | 8,104 | 24% | 23% |
| 9/30/2022 | 30,918 | 80 | 147 | 2,329 | 33,101 | 0.47% | 6,865 | 22% | 21% |
| 12/31/2022 | 30,918 | 74 | 281 | 1,430 | 32,067 | 0.91% | 6,557 | 21% | 20% |
| 3/31/2023 | 30,632 | 67 | 334 | 1,041 | 31,339 | 1.09% | 6,182 | 20% | 20% |
| 6/30/2023 | 30,789 | 55 | 532 | 702 | 30,959 | 1.73% | 4,708 | 15% | 15% |
| 9/30/2023 | 30,789 | 55 | 532 | 581 | 30,838 | 1.73% | 4,799 | 16% | 16% |
| 12/31/2023 | 30,581 | 57 | 839 | 496 | 30,238 | 2.74% | 4,927 | 16% | 16% |

| Total Institutions over Class Period: | 116 | | | | Class Period Average: | 0.41% | | 22.64% | 21.48% |

Sources: S&P Capital IQ and SEC filings.

**Exhibit 13**
**Co-Diagnostics Common Stock**
**Test for Autocorrelation During the Analysis Period[1]**

| Quarter | Coefficient on Previous Day's Abnormal Return [2] | t-Statistic | Sig Level [3] |
|---|---|---|---|
| Q2 2021 | -0.15 | -0.88 | |
| Q3 2021 | -0.17 | -1.39 | |
| Q4 2021 | -0.03 | -0.24 | |
| Q1 2022 | -0.14 | -1.12 | |
| Q2 2022 | 0.17 | 1.28 | |
| Q3 2022 | 0.14 | 1.13 | |
| Q4 2022 | 0.14 | 1.10 | |
| Q1 2023 | 0.40 | 3.43 | *** |
| Q2 2023 | -0.02 | -0.19 | |
| Q3 2023 | -0.16 | -0.85 | |
| **Analysis Period[3]** | **0.05** | **1.16** | |

Source: S&P Capital IQ.
Notes:
(1) I also found no evidence of autocorrelation during the Class Period.
(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and the alleged corrective disclosure date have been removed from estimation.
(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

**Court Documents**

- Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws filed September 21, 2023, in *Stadium Capital LLC, on behalf of itself and all others similarly situated, v. Co-Diagnostics, Inc, et al*, No. 1:22-cv-06978-AS.

**Court Decisions and Securities Law**

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**SEC Filings**

- Co-Diagnostics, Inc. SEC Form 10-K filings submitted throughout the Analysis Period.
- Co-Diagnostics, Inc. SEC Form 10-Q filings submitted throughout the Analysis Period.
- Co-Diagnostics, Inc. SEC Forms S-3 filed on March 16, 2023.
- Co-Diagnostics, Inc. SEC Forms 424 and S-1 submitted throughout the Analysis Period.

**Security Data**

- Historical data for Co-Diagnostics, Inc. Common Stock, companies comprising the Peer Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for Co-Diagnostics, Inc. Common Stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for June 2022 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for June 2022 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Co-Diagnostics, Inc. Common Stock options data was obtained from Bloomberg.
- Co-Diagnostics, Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- Co-Diagnostics, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.

- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## Co-Diagnostics, Inc. News

- Co-Diagnostics, Inc. news headlines and select articles downloaded from Factiva for the Analysis Period. The Factiva search for news over the Class Period ("May 13, 2022 – August 11, 2022") resulted in 75 unique articles as a result of two searches: 1) one search for "All Sources" with the company field "Co-Diagnostics, Inc." excluding the phrase "Nasdaq New 52-Week Highs and Lows," and 2) a separate search for "Major News and Business Sources" with the keyword "Co-Diagnostics," but excluding news with the company field "Co-Diagnostics, Inc." as well as the phrase "Nasdaq New 52-Week Highs and Lows."  The 698 unique articles for the Analysis Period ("May 13, 2021 – August 11, 2023") were identified as a result of the same two searches.  Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Co-Diagnostics, Inc. earnings conference call and investor call transcripts during the Analysis Period.
- Co-Diagnostics, Inc. earnings and guidance update press releases during the Analysis Period, including but not limited to:
    - "Co-Diagnostics Reports First Quarter 2021 Financial Results," *PR Newswire*, May 13, 2021.
    - "Co-Diagnostics Reports Solid First Quarter 2022 Financial Results," *PR Newswire*, May 12, 2022.
    - "Co-Diagnostics, Inc. Reports Second Quarter 2022 Financial Results," *PR Newswire*, August 11, 2022.

## Co-Diagnostics, Inc. Analyst Reports

- Co-Diagnostics, Inc. analyst reports supplied by Counsel and S&P Capital IQ for the period of May 13, 2021 – August 11, 2023, including but not limited to:
    - "Top- and Bottom-Line 1Q21 Beat; Volume Growth to Drive Sales; Reiterate Buy," *H.C. Wainwright,* May 14, 2021.
    - "CODX beats 1Q22 Consensus but drops forward guidance – Reiterate Buy rating and $29 PT," *Litchfield Hills*, May 16, 2022.
    - "Co-Diagnostics, Inc.," *Jefferson Research*, June 17, 2022.
- Seeking Alpha articles or reports for Co-Diagnostics, Inc. published during the Analysis Period under the site's "Analysis" section.

### Academic Articles

- Aharony, Joseph & Swary, Itzhak. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.
- Amihud, Yakov, et al. "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 269-364.
- Avramov, Doron, et al. "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365-2394.
- Barber, Brad, et al. "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, (1994), 285-312.
- Beaver, William H. "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92.
- Binder, John J. "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111-137.
- Braun, Phillip A. "Good News, Bad News Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575-1603.
- Fabozzi, Frank J., et al. *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.
- Fama, Eugene F. "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383-417.
- Greene, William H. *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.
- Gujarati, Damodar N. *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.
- Huang, Roger D. & Stoll, Hans R. "Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 313-357.
- Hull, John, *Options, Futures and Other Derivatives* (Prentice Hall 7th ed. 2009).
- Jensen, Michael C. "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.
- Kumar, Raman, et al. "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717-732.
- MacKinlay, A. Craig. "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13-39.
- May, Robert G. "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in*

*Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163.

- Ross, Stephen A. "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976): 75-89.
- Sharpe, William, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3.
- Tabak, David I. & Dunbar, Frederick C. "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.
- The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd Ed.) (2011).
- Thomas, Randall S. & Cotter, James F. "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105-122.

**Other**

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf
- https://www.nyse.com/market-model
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf

# Appendix B

## CHAD W. COFFMAN, MPP, CFA

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:          (815) 382-0092
Email:           ccoffman@peregrine-econ.com


**EMPLOYMENT:**

### Peregrine Economics
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

### Global Economics Group, LLC
President (2008 - 2023)

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**   Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**   Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying Expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying Expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying Expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert Declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert Declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al.,</u>

Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-

WJM, United States District Court for the District of New Jersey. Filed expert report on November 1, 2021.

- Testifying Expert in In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York. Filed expert report December 1, 2021.

- Expert Declaration in Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York. Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in <u>In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York</u>. Filed expert report July 15, 2022.

- Testifying Expert in <u>BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.),  et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal.</u> Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in <u>Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division</u>. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023. Filed expert report June 11, 2024.

- Testifying Expert in <u>In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara</u>. Filed expert report December 12, 2022.

- Testifying Expert in <u>In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California</u>. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in <u>Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah.</u> Filed expert report March 3, 2023.

- Testifying Expert in <u>Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland.</u> Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in <u>Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee, and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division.</u> Filed expert report March 20, 2023.

- Testifying Expert in <u>In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts.</u> Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in <u>In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California.</u> Filed expert report August 18, 2023.

- Testifying Expert in <u>Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division</u>. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024. Deposition June 18, 2024.

- Testifying Expert in <u>Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division.</u> Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in <u>John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey.</u> Filed declaration October 23, 2023.

- Testifying Expert in <u>In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division</u>. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024.

- Testifying Expert in <u>Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois.</u> Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in <u>Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California.</u> Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in <u>In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division</u>. Filed expert report February 8, 2024.

- Testifying Expert in <u>Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan</u>

M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina. Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10, 2024.

- Testifying Expert in <u>Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California.</u> Filed expert report April 30, 2024.

- Testifying Expert in <u>Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division.</u> Filed expert report April 30, 2024.

- Testifying Expert in <u>Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York</u>. Filed expert report May 10, 2024. Deposition June 20, 2024.

- Testifying Expert in <u>John Harvey Schneider, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan, Defendants, Case No. 1:22-cv-00398-DAE, United States District Court, Western District of Texas</u>. Filed expert report June 4, 2024. Deposition July 19, 2024.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

    Associate Member CFA Society of Chicago
    Associate Member CFA Institute
    Phi Beta Kappa


**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.