# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No.: 1:22-cv-06978-AS

- - - - - - - - - - - - - - - - - - - - - - -x

STADIUM CAPITAL LLC, on behalf of
Itself and all others
Similarly situated,

                         Plaintiff,

         -against-

CO-DIAGNOSTICS, INC., DWIGHT H. EGAN,
and BRIAN L. BROWN,


                         Defendants.


 - - - - - - - - - - - - - - - - - - - - - - -x


                    Virtual Zoom Deposition


                         November 15, 2024
                         10:00 a.m.


     VIRTUAL VIDEOTAPED DEPOSITION of JOSEPH
ZICHERMAN, a 30(b)(6) witness for the
Plaintiff in the above-entitled action, held
at the above time and place, taken before
Jeremy Richman, a Shorthand Reporter and
Notary Public of the State of New York,
pursuant to the Federal Rules of Civil
Procedure, and stipulations between Counsel.
                *       *       *

APPEARANCES:


    KAPLAN FOX & KILSHEIMER LLP
         Attorneys for Plaintiff
         800 Third Avenue
         New York, New York 10022
    BY:   JASON URIS, ESQ.
         CHANG HAHN, ESQ.


    BAKER HOSTETLER LLP
         Attorneys for Defendant
         45 Rockefeller Plaza
         New York, New York 10111
    BY:   ERICA BARROW, ESQ.


PRESENT:
KEVIN ONTIVEROS, ESQ., Co-Diagnostics
LEE BOWRY, Videographer
              *     *     *

Page 3

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

                    *       *       *

J. ZICHERMAN

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:13 a.m. on November 15, 2024.  Please note that this deposition is being conducted remotely using virtual technology.  Quality of recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Joseph Zicherman, testifying as a corporate representative of Stadium Capital LLC taken by counsel for defendants in the matter of Stadium Capital LLC versus Co-Diagnostics,

Page 5

J. ZICHERMAN

Inc. et al., filed in the United States District Court, Southern District of New York, case number 1:22-cv-05978AS.

My name is Lee Bowry representing Veritext Midwest and I am the videographer. The court reporter is Jeremy Richman, also with Veritext. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance. Counsel attending remotely will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. BARROW: Good morning, Erica Barrow from BakerHostetler. I represent the defendants in this case, Co-Diagnostics, Inc., Dwight

J. ZICHERMAN

H. Egan and Brian L. Brown.

MR. URIS:  Jason Uris of
Kaplan Fox & Kilsheimer, LLP
representing the plaintiff and the
class.

MS. HAHN:  Chang Hahn with
Kaplan Fox & Kilsheimer, LLP
representing the plaintiff and the
class.

MR. ONTIVEROS:  Kevin
Ontiveros, general counsel for
Co-Diagnostics, Inc.

THE VIDEOGRAPHER:  Will the
court reporter please swear in the
witness and then counsel may
proceed.

JOSEPH ZICHERMAN, having been
called as a witness, having first
been duly sworn by a Notary Public
(Jeremy Richman) of the State of
New York, was examined and
testified as follows:

EXAMINATION BY

MS. BARROW:

J. ZICHERMAN

Q.   Good morning.  Can you please state your full name for the record?

A.   Joe Zicherman.

Q.   And how do you spell your last name?

A.   Z-I-C-H-E-R-M-A-N.

Q.   And what is your current address?

A.   11794 Marblestone Court, Wellington, Florida 33414.

Q.   Where are you currently right now?

A.   I'm in New York City.

Q.   And where in New York City?

A.   At 1056 5th Avenue.

Q.   Is that your home?

A.   It is not my legal residence, no.

Q.   Okay.  It's just a pied-a-terre?

A.   It's not my legal residence. My legal residence is in Florida.

Q.   I understand.  I'm just wondering --

J. ZICHERMAN

A.    Okay, thanks.

Q.    I'm wondering where you're Zooming in from now.

A.    That's okay, thank you.

Q.    So you're at a residential address?

A.    Pardon me?

Q.    You're at a residential address?

A.    I'm at a home in Manhattan, that's correct.

Q.    Okay, great.  And is there anyone in the room with you?

A.    There is not.

Q.    And where is your counsel located?

A.    Where is my counsel located? He's in the New York area, I mean, you want to know where he's located right this minute?

Q.    Meaning he's not present with you, correct?

A.    No, of course, I said there's nobody in the room with me.

J. ZICHERMAN

Q.    Okay.

A.    Okay.

Q.    So if anyone comes into the room, could you please let me know.

A.    Of course.

Q.    And what kind of devices are you using to participate in today's deposition?

A.    I have you on an iPad, and that's all.

Q.    So the video is coming through an iPad, but my understanding is you also have a PC that you're using to look at the exhibits; is that correct?

A.    I do.  That's correct.

Q.    Okay.

A.    Sorry, I should have said.

Q.    And do you have any other windows open on the iPad?

A.    Not unless I'm planning on jumping out of one.  No, there's no other window open on the iPad.

Q.    And do you have any other

J. ZICHERMAN

windows open on the PC other than the Exhibit Share?

A.   I do.

Q.   Okay.  Could you close out of those other windows?

A.   I cannot.

Q.   Why is that?

A.   Because I have an active business going on and I need to stay relatively informed; and therefore, I will not close any other windows, sorry.

Q.   Okay.  So today's deposition, you were just sworn in.  This is a deposition that you're testifying under oath, the same as if you were sitting on the witness stand in trial.

A.   That's correct, that's correct.

Q.   So if you were sitting on a witness stand at trial, you wouldn't be able to correspond with your business associates.

A.   Yeah, that's probably true.

J. ZICHERMAN

Q.   It's definitely true.

A.   But, you know, it's probably true, it's definitely true, whatever you want to say.  Except that I'm not sitting in a court, I'm not sitting in a chair, I'm not sitting at a trial, I'm sitting at a desk and I can give you 102 percent of my effort.  So if you want to do this at some nighttime session I'm happy to do that, when I don't -- but I don't have to put myself at financial risk in order to go through this exercise, I don't believe. And I'm not going to, so, doesn't matter.

Q.   All right, no one is asking you to put yourself at financial risk --

A.   Well, you know what, if I turn off my other -- oh, fuck, I got to do this, if I turn off my other window -- window, one -- then I will put myself at financial risk.  So you can do with that what you want, but.

J. ZICHERMAN

Q. Okay. So the rule, I don't know if you spoke to your counsel about this before, but the rules for a deposition is you can't correspond with anyone else --

A. I'm not corresponding, I didn't say I was corresponding, I'm just staying aware of the world as it turns, that's it.

Q. That's something that we can't do.

MR. URIS: Erica, he's already testified he's not corresponding with anyone, can you please go on with your questioning?

MS. BARROW: So what's this other window, then? He says he wants to know what's going on in the world.

A. I do.

Q. Okay.

A. I'm being kept -- of prices in various commodities and securities in the stock market.

J. ZICHERMAN

Q.    Okay.

A.    That's all.  And I haven't -- I haven't corresponded with anybody, nor am I planning on it.

Q.    So live during today's deposition, you're asking for permission to understand what certain stock prices are simultaneous to the deposition occurring?

A.    What does that mean?

Q.    You tell me.  What is it that you're doing simultaneously --

A.    I would like to not wake up and find out that I'm meaningfully poorer three hours later.  You know, I don't have to go and put myself in a vacuum for this, it's academic.

Q.    Okay.  So you're looking for permission to check stock prices while you were being deposed in this serious litigation?

A.    I'm not actively checking them, but I will tell you that while you're preparing another question, if I

Page 14

J. ZICHERMAN

can just get your permission to take a peek while you were preparing a question, I will answer your questions thoughtfully and accurately, but I'm not putting myself into a box here. The world is in some difficult times right here, and I don't want to get myself into trouble here. And I would think you wouldn't want me to get in trouble, either. I'm a former professional in Wall Street, and I know what I can do and I know what I can't do. And just like you're a professional at what you do, I would not ask you to do anything that you couldn't do. If you can get by under these circumstances, which I'm sure that you can, then I'm happy to cooperate with you.

Q. So with all due respect, so this is a legal proceeding, and so if you want breaks, you are entitled to it, and I was going to go through sort of the ground rules for today's

J. ZICHERMAN

deposition.  And so I'm happy to allow you breaks if you need to check stock prices.

A.   Yeah, so thanks.

Q.   But while we're in the middle of questioning, A, I have to be able to talk and you can't talk over me, and B, we need to have your full attention. You need to listen to what I'm saying --

A.   And I said you have my full attention, and I'm more than happy to have a dialogue with you.  Why don't we just try it and maybe you'll like it.

Q.   Okay.  So on the record, can you tell me what the other screen is that you're looking at during today's deposition?

A.   I'm looking at a Bloomberg screen.

Q.   Okay.  And do you have any other windows open?

A.   I don't.

Q.   And where is your cell phone

J. ZICHERMAN

located?

A.    It's, where is it, it's on my desk, right here.

Q.    Okay.  So I would ask that you do not communicate with anyone else during today's deposition.

A.    Right.

Q.    And is the cell phone, is the ringer on?

A.    Is the ringer on, well, let's see, not now.  Okay.

Q.    Okay, great.

A.    I don't think it's, it's the new phone, I don't know how -- let's see.  Is the ringer on?  It's on silent, okay.

Q.    Perfect.  And so that means not checking text messages or emails or talking to your counsel --

A.    Listen, listen, I know what it means.

Q.    Okay, great.

A.    Why don't we move forward and see if we can get through this, these

Page 17

J. ZICHERMAN

ground rules, okay?

Q.   Okay.  So one of the ground rules, Mr. Zicherman, which is extremely important, is that our court reporter here, Jeremy that you met, he is going to take down what we're saying, and he can't do that if you talk over me.  So if you could just give me an opportunity to finish what I'm saying before you respond, and I will of course give you the same courtesy, I think it would serve everybody's best interest.

A.   Got it, okay.

Q.   Okay.  Have you been deposed before?

A.   Yes.

Q.   When were you deposed?

A.   Twenty years ago.

Q.   In what matter?

A.   In a marital affair.

Q.   And what was the name of the case?

A.   I don't remember.  I don't

J. ZICHERMAN

remember.

Q.   Was it your marital affair or someone else's?

A.   It was -- I was sued in a -- I was frivolously sued in a case by a vindictive woman who ultimately her lawyer dropped her because her vindictiveness outlasted his solvency.

Q.   Okay.  And you said it was a marital action, so was it a divorce proceeding?

A.   No, it was not.

Q.   Okay.  So what do you mean by marital action?

A.   Well, what does it mean? What does that have to do with Co-Diagnostics?  I don't understand.

Q.   I'm going to ask the questions.

A.   Hold on, hold on, you asked me if I was ever deposed before, I said yes.

Q.   Correct.

A.   Why does it matter if it was

J. ZICHERMAN

a marital thing or divorce thing or whatever?  I've been deposed, what does it have to do with Co-Diagnostics?

Q.    Okay.  So just so you know, I'm the one that asks today's questions, okay?

A.    I know, and I'm the one that's answering them, and I'm asking a question.

Q.    Right.

A.    What does it have to do with Co-Diagnostics?

Q.    Sir, I'm not testifying today.  I'm not allowed to testify today.  You're the one that's testifying.

A.    I'm trying to testify to relevant things, things that are relevant.

Q.    Okay.

A.    That's all.

Q.    If you want to contact your counsel at a later time --

A.    I'm trying to say --

J. ZICHERMAN

Q.    -- to discuss the scope of today's deposition, you're happy to do so, but today we're on the record and today you're going to answer the questions I'm asking.

A.    Oh, sure.

Q.    Okay.

A.    But let's keep it relevant, okay?

Q.    You can take whatever position you want --

A.    Thank you very much, I appreciate you keeping it relevant, thank you.

Q.    So you were deposed 20 years ago --

A.    Yeah.

Q.    You were deposed 20 years ago --

A.    Yeah.

Q.    -- in a marital action, and how did that case end?

A.    It ended, I just told you, you got to pay attention.  I told you,

J. ZICHERMAN

it ended with the lawyer dropping the complaint because the complaint was so frivolous that he was not getting paid, and it was clearly a frivolous thing, and he, I told you that, it was a case of his solvency winning out over the frivolousness of the suit.

Q.    Okay.  And have you been deposed in any other matters?

A.    I have not.

Q.    Are you taking any medications that might affect your memory today?

A.    Not to my knowledge.

Q.    And do you have a medical condition that relates to your ankle?

A.    I do.

Q.    And how does that affect --

A.    How does it affect it, I walk a little funny.

Q.    And are you taking any medications for your ankle that may affect your ability to testify accurately today?

J. ZICHERMAN

A.    Nope.

Q.    Okay.  Any other issues that might prevent you from answering truthfully today?

A.    Nope.

Q.    Okay, great.  So as we discussed, there's a couple ground rules for today.  So first off, I would request that you answer questions orally, so no shaking your head or nods or --

A.    That's fine, okay.

Q.    Just because we have to have a clean record.  I would also ask that if you have any, if you're seeking any clarity from anything that I'm asking, that you ask me to rephrase and I'm happy to do so.

So there will also be some objections likely from your counsel, Mr. Uris, and so even though he objects, in all likelihood, unless he explicitly instructs you not to answer, you have to answer all the questions

J. ZICHERMAN

that I ask you.  Do you understand?

        A.    Yep.

        Q.    Breaks, as I mentioned, I will try to take a break every hour or so.  If you need a break more often or if you need to get a glass of water, use the restroom or what have you, you're entitled to do so.  I would just ask that we only take a break after you've answered a question, so there's no outstanding question before we take a break.  Is that okay?

        A.    Yep.

        Q.    And abbreviations.  So throughout today's deposition, I'm going to be referring to this case, which the court reporter outlined earlier, it's Stadium Capital versus Co-Diagnostics et al. pending in the United States District Court for the Southern District of New York.  So I'll refer to that as this case or this litigation, okay?

        A.    Yep.

J. ZICHERMAN

Q.    And the defendants in this case are Co-Diagnostics, Dwight Egan and Brian Brown, so I will likely just say defendants referring to that whole group; is that okay?

A.    Yep.

Q.    Perfect.  Okay.  So Mr. Zicherman, as we previously showed you how to access the deposition exhibits, there should be a document that's in front of you now on that page.  Can you please go into it?

A.    Yep.

Q.    Have you seen this document before?

(Exhibit 1, marked for identification, Defendant Co-Diagnostics, Inc.'s notice of deposition to Stadium Capital.)

A.    Have I seen this document, I think it was sent to me by my attorney.

Q.    Okay, great.

A.    I think, I'm not a hundred percent sure because I've been running

Page 25

J. ZICHERMAN

around like a lunatic.  But to the best of my knowledge, I would assume it was sent to me with the information that my attorney sent, but I refer you to my attorney to affirm that.

Q.   So let the record reflect I have marked Defendants' Exhibit 1, which is entitled defendant Co-Diagnostics Inc.'s notice of deposition to Stadium Capital LLC.

A.   Right.

Q.   So what do you understand this document to be?

A.   The entire complaint.

Q.   Okay.  So if I can just direct you to the third page.  It's titled Attachment A to Defendant Co-Diagnostics Inc.'s Notice of Deposition to Stadium Capital LLC.

A.   Yep.

Q.   And it has some topics here. Do you see that?

A.   Yep.

Q.   And can you just take a

J. ZICHERMAN

moment to review those topics and let me know if you've seen them before or you discussed them before?

A.   I would rather have you to refer to Jason on that, please, my attorney.  He would know if I've seen them or not.

Q.   Okay.  But so you're testifying today, so I have to ask you these questions.

A.   Yeah, okay.

Q.   Jason nor I are allowed to testify.  We want to know about you and we want to know about your understanding.

A.   Great.

Q.   That's the most important.  So either you say yes, you say no or I don't know.

A.   Okay, let's see.

MR. URIS:  Is there a question pending?

MS. BARROW:  Just asking him to review it first.

J. ZICHERMAN

A.   You want to know if I've seen this complaint, the answer is yes.

Q.   Okay.  So I can represent to you that the document you're looking at is not a complaint.

A.   Okay, good.

Q.   That's why I was giving you an opportunity to review.

A.   Okay.  Well, what are we calling it?  What is this document?

Q.   Sure.  So the title of Defendants' Exhibit 1 is Defendant Co-Diagnostics Notice of Deposition to Stadium Capital LLC.

A.   Right.

Q.   And on the third page, on the attachment A to the notice are a list of topics, and so my question for you is whether or not you've reviewed these topics before; yes, no or I don't know.

A.   I have not.

Q.   Okay.  So during today's deposition, I'm going to be asking you questions regarding these topics.  And

J. ZICHERMAN

if you can take a moment and review them, my question for you is going to be whether or not you're ready, able and capable of providing material and relevant testimony regarding every --

A.     The answer is I am.  I am.

Q.     Okay, Mr. Zicherman, we talked about this.  I have to finish the question before you respond.

A.     Go ahead.  Are you done?

Q.     Are you ready, willing and able to provide testimony regarding all of these topics?

A.     Yes.

Q.     Are you aware that you're being deposed pursuant to this subpoena, or this notice?

A.     Yes.

Q.     Who are you giving testimony on behalf of during today's deposition?

A.     I am the owner of Stadium Capital.  It's a limited liability corporation.

Q.     I'm sorry, can you repeat

J. ZICHERMAN

that?

A.   I own Stadium Capital, an LLC.

Q.   Are you giving testimony on behalf of Stadium Capital LLC?

A.   I am, because that is the organization where I, where the difficulties occurred.

Q.   Okay.  And has Stadium Capital been a party to any other litigation?

A.   It has never been a party to any other litigations.

Q.   Has Stadium Capital provided sworn -- a sworn affidavit or sworn testimony in any other litigation?

A.   Nope.

Q.   What did you do to prepare for today's deposition?

A.   I just scanned a bunch of papers and I figured that we'd walk through it today.  So I've, I have appeared here.

Q.   Did you meet with your

J. ZICHERMAN

counsel?

    A.    I spoke to him on the phone.

    Q.    When did you speak to him?

    A.    Yesterday.

    Q.    For how long?

    A.    You want to know how long I spoke to him, 20 minutes.

    Q.    And when you say your counsel, who are you referring to?

    A.    Jason.

    Q.    And Jason is affiliated with what firm?

    A.    You have to ask Jason.

    Q.    Okay.  And I assume it's Jason Uris who is on today's Zoom call?

    A.    That is correct.  That is correct.

    Q.    Okay.  Did you speak to Mr. Uris other than yesterday in preparation for today's deposition?

    A.    Yeah, probably a couple weeks ago.

    Q.    And how long did you speak then?

J. ZICHERMAN

A.    Twenty minutes.

Q.    And did you review documents together over your phone calls?

A.    No, we discussed the overview of the situation.

Q.    So you mentioned that you scanned some papers in preparation of today's deposition.  What papers did you review?

A.    Don't remember.

Q.    And how long ago did you scan those papers?

A.    A week ago or so.  10 days ago.  He sent me something, I looked at it and put it to the --

MR. URIS:  Joe, I just counsel you not to, to the extent your answer requires divulging information that was provided by me, to not divulge that information.

THE WITNESS:  You mean my conversations with you?

MR. URIS:  The substance of

J. ZICHERMAN

your conversations --

THE WITNESS: Okay, that's fine, thank you.

MR. URIS: -- depends on that.

THE WITNESS: Thanks.

Q. Sir, you mentioned you scanned some papers. Were those papers your counsel had provided to you, without telling me about your conversations?

A. Why don't you ask my counsel on that question, okay?

Q. So I tried to make this as clear as possible, I'm not going to be asking your counsel about that.

A. Okay, well, obviously, yes, these are papers that my counsel asked me to look at and I scanned them.

Q. Okay.

A. I didn't look at them closely, I scanned them.

Q. Sure. And did you discuss today's deposition with anyone else

J. ZICHERMAN

other than Mr. Uris?

A.    No.

Q.    And did you take any notes during your phone calls with Jason?

A.    No.

Q.    Do you have any notes in front of you now?

A.    No.

Q.    So I saw a brown book earlier, is that -- what's that?

A.    What brown book are you talking about?

Q.    Oh, I don't know, I just saw what looked like a brown notebook on the desk.

A.    Yeah.

Q.    Is that a notebook?

A.    I'm doodling, you want to see my doodles?

Q.    Okay, so you are just drawing --

A.    This is a pencil, this is a notebook and I'm just making aimless little lines.

J. ZICHERMAN

Q. Okay. And are there any notes on the other pages in that notebook?

A. I answered that already for you.

Q. Excuse me?

A. I answered that already. There's no other notes, I don't have any notes. I didn't make any notes. I've answered that already.

Q. Okay. So, Mr. Zicherman, I am going to be marking an additional document as Defendants' Exhibit 2 and I will let you know when that should pop up. Okay, you should have the exhibit now.

MR. URIS: You may need to just refresh the page.

A. I have Exhibit 2 right here, okay. Hold on.

(Exhibit 2, marked for identification, Defendants Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set

J. ZICHERMAN

of Request For the Production of

Documents dated April 5, 2024.)

Q.   So let the record reflect I have just marked Defendants' Exhibit 2, which is titled Defendants' First Set of Request For the Production of Documents dated April 5, 2024?

A.   I have that in front of me.

Q.   Great.  Do you recognize this document?

A.   I do not.

Q.   Were you made aware that in connection with this lawsuit, that discovery would be taken from you in connection with the claims in this case?

A.   What do you mean?  When you say discovery, what are we referring to here?  Am I -- that you have -- whatever documents you're looking for, you have to discuss with my attorney. He has all the documents.

Q.   Okay, great, so we'll discuss that today.  So in connection with this

J. ZICHERMAN

lawsuit, were you made aware that we,
as the defendants, have requested
documents from you, the plaintiff?

A.    Right, and you can get that
from my attorney.

Q.    Correct.  But right now we're
talking to you about that process.

A.    Right.  And I'm telling you
to get it from my attorney.

Q.    Okay.  And I'm going to get
the information from you.  And so in
connection with those requests, did you
collect any documents?

A.    I gave my attorney the
logistics to gather the documents.  And
he did that.

Q.    What do you mean by
logistics?

A.    Logistics means the date that
these things occurred, these events
occurred and the time when they
occurred and he proceeded to gather the
various documents, these transactions
that occurred, which were costly,

Page 37

J. ZICHERMAN

etcetera, etcetera.

Q. So you never collected documents?

MR. URIS: Objection.

A. Well, I gave them to my attorney.

Q. Okay. Can you describe what you collected, then, or where you collected documents?

MR. URIS: Objection.

A. Once again, I'm explaining here that I gave him the information and he gathered the documents.

Q. Okay. So that's what I'm seeking clarity on. So you're stating that Mr. Uris collected the documents, but I'm asking you if you specifically collected any documents.

A. You can't be asking me that, because I've already said no three times.

Q. So you have not collected --

A. I said to you --

Q. -- documents in connection

J. ZICHERMAN

with this case?

A.    Listen, I gave him the information and dates and he went back and got the information.

Q.    I understand.

A.    Any documents that you want, he will have for you.  Okay?

Q.    Okay, so that's not exactly my question.  So I've heard you, that you gave him the information --

A.    Yeah.

Q.    -- what I'm asking is whether or not you specifically collected any documents in connection with this lawsuit.

A.    I'm telling you that I gave him the logistics.

Q.    So you gave him logistics?

A.    Listen, I did not collect anything.  I gave him the information, you can't go over the same question ten times.  I gave him the information, he has the information.  He has the information, discuss it with him.

J. ZICHERMAN

Q.    Did you check your computer for any documents in response to this lawsuit?

A.    I have not.

MR. URIS:  Objection.

Q.    Did you instruct your, any family member of yours to collect documents in connection with this lawsuit?

A.    No.

Q.    Did you instruct anyone at your, at Stadium Capital to collect documents in connection with this lawsuit?

A.    I instructed nobody to collect anything.

Q.    Great.  Mr. Zicherman, I am going to be marking an initial document as an exhibit, as Defendants' Exhibit 3, and this document is titled Plaintiff Stadium Capital LLC's Responses and Objections to Defendant Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set of

J. ZICHERMAN

Requests For Production.  So that document should be available for your review on the same portal.

(Exhibit 3, marked for identification, Plaintiff Stadium Capital LLC's Responses and Objections to Defendant Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set of Requests For Production.)

A.   Okay, so this is -- wait, hold on.  I have to refresh the page -- I'm not seeing, bear with me one second.  How do I refresh this page here?  I see it, okay.  All right, Exhibit 1.

MR. URIS:  I believe it's Exhibit 3.

THE WITNESS:  I got it. Okay.  I got it.

Q.   Do you recognize this document?

A.   Do I recognize this document? I do not.

J. ZICHERMAN

Q.    Okay.  As you look at it in front of you today, what is your understanding of this document?

A.    As I look at it, it's a -- let's see, it says this is the class action, I presume.  Is that right?

Q.    I'm sorry, what's the question?

A.    This is the class action, I would presume.

Q.    Well, the document that you're looking at now is titled Plaintiffs Responses and Objections to Defendants' First Set of Documents Requests dated May 20, 2024, --

A.    Okay, I'm looking at number three here.  It says, Class action, jury trial demanded, plaintiff responses and objections, okay, got it.

Q.    What is your understanding of this document, if any?

A.    None.

Q.    Did you participate in the preparation of this document?

Page 42

J. ZICHERMAN

A.   No, I gave my attorney information, who then prepared the document.

Q.   Okay.  And so did you -- did you have objections to the requests from the defendants in this lawsuit?

MR. URIS:  Objection.

A.   I discussed it with my attorney.  I'm not, you know, in terms of objections, I looked at the thing in total, not the specifics of it, but in total, there's no objections to my lawsuit.

Q.   Okay.  Outside of your discussions with counsel, which I'm not asking about, did you have any objections to the requests that were interposed by defendants to get documents from you?

A.   No.

Q.   Mr. Zicherman, I am going to mark an additional document, which is Defendants' Exhibit 4, and that document should be available for your

Page 43

J. ZICHERMAN

review now.

(Exhibit 4, marked for
identification, Defendants' First
Set of Interrogatories to Plaintiff
dated May 14, 2024.)

Q.   Let the record reflect
Defendants' Exhibit 4 is titled
Defendants' First Set of
Interrogatories to Plaintiff dated
May 14, 2024.

A.   Got it.

Q.   Do you recognize this
document?

A.   One second, it's loading.  Do
I recognize the document?  No, I don't
offhand recognize it.  It looks to me
like the class action, because it says
class action.

Q.   Did you discuss, without
telling me what you discussed, but did
you discuss responses to
interrogatories that were asked of
Stadium Capital?

A.   And an interrogatory is what?

J. ZICHERMAN

Q.    Questions for information.

A.    From my attorney?

Q.    Let me rephrase.  Did you provide information in response to questions that were interposed in this lawsuit and which lawyers call interrogatories?

A.    And who were the questions asked by, please?

Q.    They were asked by defendants.

A.    By defendants.

Q.    Correct.

A.    No, of course not, I haven't spoken to a defendant.

Q.    Okay.  The question is whether or not you provided information to anyone, perhaps your counsel, in response to questions from defendants.

A.    Listen, the only person I've ever given information to is my attorney, that's all.  I haven't spoken to anybody else.

Q.    And the information that you

Page 45

J. ZICHERMAN

provided to your attorney, was that in response to questions from the defendants --

A.    No.

Q.    -- in the interrogatory?

A.    No, I've never spoken to a defendant.

MR. URIS:  Objection.

Q.    The question is not whether you've spoken to a defendant --

A.    Well, you asked me if I got an interrogatory from a defendant. I've never spoken to a defendant.  My lawyer has asked me questions and I've given him answers.  So anything other than that, just talk with my lawyer, if you would.  He has all the answers.

Q.    Just to clarify, did you provide information to your attorney in response to an interrogatory or not?

A.    I don't know what, if I knew what you were talking about, let's try --

MR. URIS:  Objection,

Page 46

J. ZICHERMAN

objection, Erica, Erica --

A.    Let's try English.

MR. URIS:  Erica, I think the issue is you're using legal terms that the witness is not familiar with.

MS. BARROW:  Right, and I've tried to break that down.  Let me try one more time.

MR. URIS:  If you want to say a request for information.

A.    By defendant, are you talking about Co-Diagnostics?

Q.    Yes, so --

A.    Wait, hold on, are you asking if I spoke to somebody from Co-Diagnostics?

Q.    You can answer that question if you like, but that's not what I asked.

A.    Hey, do me a favor, hon, listen, I'm trying to help you here get the answer to the question, but I'm not an attorney and if you would talk in

Page 47

J. ZICHERMAN

English I would be happy to answer it in English.  I'm asking you very simply, you want to know if I spoke to anybody from Co-Diagnostics.

Is that what you're asking me?

Q.    No.

MR. URIS:  Joe, let's let her ask a question.

THE WITNESS:  Well, let's do it in English, okay?

Q.    Mr. Zicherman, I've shown you a document that's marked as Defendants' Exhibit 4 and that document is titled Defendants' First Set of Interrogatories to Plaintiff dated May 14, 2024.  You testified that you did not recognize this document, correct?

A.    I do not recognize it offhand, that is correct.

Q.    So my follow-up question was since you don't remember this specific document, were you -- did you ever

Page 48

J. ZICHERMAN

provide information in response to this document? And I can represent to you what this document is, is a document from defendants seeking information from you.

MR. URIS: Objection.

A. Well, now you have to talk to my lawyer.

Q. Did you provide the information to your lawyer, yes or no?

MR. URIS: Objection.

Q. I'm sorry, I didn't hear your response.

A. My response is that I have to talk to my lawyer. He'll tell you what I gave him, if anything. He's the only one I discussed this case with.

Q. Did you provide a verification in response to this document?

A. What do you mean by a verification?

Q. Did you verify that certain information was truthful?

J. ZICHERMAN

A.    Listen, it's all in the record, you know, there are transactions that were done and it's all in the record, and they were all powers at Goldman Sachs, and they have all the information, and I gave the information and the dates and everything to my attorney, and he got all the records.

Q.    You just mentioned Goldman Sachs.  Can you tell me a little bit about how Goldman Sachs played a part?

A.    Oh, of course, I clear Goldman Sachs in my Stadium Capital account.

Q.    What do you mean by that?

A.    You don't know what I mean by clearing Goldman Sachs?

Q.    No.

A.    That's where I settle up all my transactions.  It's a mechanical procedure, you buy, you sell, you pay, or get paid.

Q.    So you clear your

J. ZICHERMAN

transactions through Goldman Sachs?

A.    That's correct.

Q.    Which transactions?

A.    Transactions of Stadium
Capital.

Q.    Okay.  And can you walk me
through that process?

A.    You don't know the process of
clearing trades?

Q.    That's why you're testifying.

A.    I know that's why I'm
testifying, but you don't know the
process for clearing trades?  That's
why -- well, a hell of a way to make a
living, I'll tell you.  Yeah, I buy a
stock, and the person that I buy it
from delivers it to Goldman Sachs and
they take the money out of my account
and they pay for the stock.  Settling
stock is the reverse of it.

Q.    That is your general practice
at Stadium Capital?

A.    That's not my general
practice, that's how people do business

J. ZICHERMAN

in Wall Street.

Q.    Okay.  But I'm asking about you, but I assume --

A.    I do business the way people do business.  I do it honestly and I do it legitimately, and I've been in Wall Street for 50 years, and, which is why we're here today.

Q.    And so the transaction -- you also transacted Co-Diagnostics stock through Goldman Sachs?

A.    I did.  Whichever way I transact every single transaction, I did it the same way with Co-Diagnostics stock.

Q.    Great.  So we're going to circle back to that process in a bit.  But right now I'm going to refer you to a document that I've just marked as Defendants' Exhibit 5.  So this document is titled Plaintiff Stadium Capital LLC's Responses and Objections to Defendants Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's

Page 52

J. ZICHERMAN

First Set of Interrogatories to Plaintiff.

(Exhibit 5, marked for identification, Plaintiff Stadium Capital LLC's Responses and Objections to Defendants Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set of Interrogatories to Plaintiff.)

A.    Okay, got it.

Q.    Do you recognize this document?

A.    Pardon me?

Q.    Do you recognize this document?

A.    I do.

Q.    What do you recognize it to be?

A.    I mean, I recognize it's a document, like any other documents. You have to, for the specifics, you have to talk to my attorney.

Q.    Do you recognize this document, yes or no?

Page 53

J. ZICHERMAN

A.    I do not.

Q.    Okay.  So is it fair to say you did not assist in the preparation of this document?

MR. URIS:  Objection.

A.    Pardon me?

Q.    Did you assist in the preparation of this document?

A.    I don't recognize it, how can I assist in it?

MR. URIS:  Objection.

Q.    Well, that's why I asked.

A.    Why are you asking if I tell you I don't recognize it?

Q.    Did you sign a verification in connection with this document?

A.    What is a verification?

Q.    Did you verify that the information in Defendants' Exhibit 5 was true and accurate under the penalty of perjury?

A.    Well, yeah, I did.  It's true.  All the information you're looking at is true.

Page 54

J. ZICHERMAN

Q.   And you signed something to that effect?

A.   I don't remember if I signed it, you have to talk to my attorney about that.

MS. BARROW:  Okay.  To the extent that a verification was signed, we would call for the production.

MR. URIS:  Erica, are you reaching a good breaking point for a short break?

MS. BARROW:  Sure.  Shall we come back at 11:05?

MR. URIS:  Yeah, seven minutes.

MS. BARROW:  Okay, great.

THE VIDEOGRAPHER:  All right, going off the record, the time is 10:58 a.m., this is the end of media unit one.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record, the time is

Page 55

J. ZICHERMAN

11:06 a.m., this is the beginning of media unit two.

Q.    Mr. Zicherman, so we left off discussing some of the discovery in this case.  So if I can refer you back to Defendants' Exhibit 2, which is defendants' first set of request for the production of documents.

A.    Okay, you want me to go back to number two?

Q.    Yes, please.

A.    I'm sorry, exhibit what, please?

Q.    Two.

A.    Two.  I'm there.

Q.    Can you confirm that you produced all documents responsive to Defendants' Exhibit 2?

MR. URIS:  Objection.

A.    Hello?

Q.    Did you hear my question?

A.    I didn't hear your question.  Oh, my attorney made an objection, I thought.

Page 56

J. ZICHERMAN

MR. URIS:  Yeah, you can answer.

A.    What was the question again, please?

Q.    Can you confirm that you produced all documents responsive to Defendants' Exhibit 2?

MR. URIS:  Objection.

A.    I gave my attorney everything that he requested.

Q.    Only four documents were produced by Stadium Capital, correct?

A.    Pardon me?

Q.    Only four documents were produced by Stadium Capital, correct?

A.    I'm not aware of that.

Q.    I can represent to you that four documents were produced --

A.    That's fine, then I'm aware of it now, okay.

Q.    And those four documents are the only documents that Stadium Capital possesses which are relevant to this case?

Page 57

J. ZICHERMAN

MR. URIS:  Objection,
misrepresents the testimony.

Q.    Yes or no?

A.    The four documents, I gave my
attorney whatever he asks.

Q.    Did you give him more than
four documents?

A.    I gave him whatever he
requested.  I didn't count the
documents.

Q.    Well, I'm asking you now --

A.    And I'm telling you, I gave
him what he requested.  If you need to
know, ask my attorney, okay?  I didn't
count the documents.

Q.    Did you ever communicate with
Co-Diagnostics?

A.    You know the answer to that,
right?  Why are you asking me that
question?  Anyway, on to the next,
please, you know the answer.

Q.    Sir, you have to respond.

A.    And you have to stop asking
questions that are that ridiculous.

J. ZICHERMAN

What would I communicate with Co-Diagnostics about?  I mean, come on.

Q.    Is that a yes or no?

A.    I know you want to take some time here --

MR. URIS:  Joe, just answer it.  I think we'll get through it more quickly.

A.    The answer is no.

Q.    Have you ever communicated with Dwight Egan?

A.    No.

Q.    Have you ever communicated with Brian Brown?

A.    No.

Q.    Do you have any communication regarding your decision to buy, hold or sell Co-Diagnostics?

A.    No.

Q.    How did you decide whether or not to buy, hold or sell Co-Diagnostics stock?

A.    Because of the condition of the world at the time.  It was a

J. ZICHERMAN

pandemic.

Q.    Did you conduct research on the securities of Co-Diagnostics?

A.    I did research in a, in a macroeconomic way, where I looked at some of the companies that were doing testing for the pandemic, and I chose a couple.

Q.    And how did you decide which to choose?

A.    I chose one that was where, I think it was, I guess I had a friend tell me about it and I saw something on the tape about it.  And it seemed to be in a vortex of what was going on at the time.

Q.    Well, you said that you selected a few.  What were the others other than Co-Diagnostics?

A.    I don't remember.  Honest to God, I don't remember.

Q.    How many other companies?

A.    You know what, one of the others, if I think about it I can

Page 60

J. ZICHERMAN

probably give you one or two.

Certainly Pfizer was another one,

and -- but I don't remember the

specifics.  I buy and sell a lot of

stock.

Q.     And how do you decide, what

is your strategy for buying and selling

a lot of stock?

A.     Try and make money.

Q.     Do you have a particular

strategy?

A.     Do I have -- you know, I'm a

former partner at Morgan Stanley, and I

was in the high net worth area, and I

know sort of what I'm doing, and

depending upon what's going on in a

particular day or period of days, I

tend to acclimate myself to the

environment.  So when the pandemic came

around, I reacted in a variety of ways

to try and make money.

Q.     Okay.  So not a particular

preplanned strategy?

A.     No, there's no more pre, not

                    J. ZICHERMAN

in Wall Street, there's no more

preplanned.

        Q.    Are there any policies or

procedures that are written regarding a

strategy, investment strategy, at --

        A.    No, none whatsoever.

        Q.    You mentioned a friend told

you about it.  Who is that friend?

        A.    I don't remember.  Somebody

was mentioning it in some sort of a

call.  There was a call on the pandemic

in general.  And I think it was

somebody, I do some work with CNBC or I

did some work with CNBC, and it was

somebody from the floor, but I forgot

who.  It was just a name that came up,

but I'm -- I did a little bit of work

on it.  Given the velocity of

everything that happens, I didn't do a

heck of a lot of work on it.  I did --

I take that back.  I did some work on

it, but I didn't do a lot of work on a

lot of things.  I found a couple of

things.  Pfizer was certainly one of

J. ZICHERMAN

them, and the Co-Diagnostics was a testing company. And I felt -- it made a little sense to me that, given the pandemic and how it was raging and how everybody was getting tested for the pandemic, it made some sense to me that testing companies would be more active.

Q. Did you invest in any other testing companies?

A. Not to my knowledge.

Q. And you said you saw something on the tape, what do you mean by that?

A. I saw something, when I say on the tape, it might have been on TV, it might have been something -- just how the pandemic was raging, that's all.

Q. And because you saw public coverage that the pandemic was raging, that's what led you to purchasing --

A. That's correct.

Q. -- securities --

A. That's correct.

Page 63

J. ZICHERMAN

Q.    -- for companies that are doing Covid-19 testing, correct?

A.    That is correct.

Q.    Do you have any documents regarding your knowledge of Co-Diagnostics?

A.    Nope.

Q.    Okay.  So you mentioned a couple of times your experience on Wall Street.  Can you tell me a little bit about your educational history?

A.    Yeah.  What would you like to know?

Q.    Did you go to college?

A.    I did.

Q.    Where?

A.    University of Long Island.

Q.    And when did you graduate?

A.    1965.

Q.    Did you have a particular degree?

A.    No, survival.

Q.    Did you have any other postgraduate degrees?

Page 64

J. ZICHERMAN

A. I don't.

Q. Any other education?

A. No.

Q. Any professional certifications?

A. Nope.

Q. Any licenses?

A. Well, just the securities licenses.

Q. Which ones do you have?

A. Seven, 63, I don't know what else I got.

Q. Are those licenses still active?

A. No.

Q. When did they become inactive?

A. Probably about 15 years ago.

Q. And up until 15 years ago, were you taking additional educational courses in order to satisfy the requirements for your --

A. I took continuing educational courses, but when I left Morgan Stanley

Page 65

J. ZICHERMAN

in 1998, I gave up licenses because I didn't need them any longer, setting up my own firm.

Q.   Mr. Zicherman, I'm just going to remind you that you have to let me finish the sentence in order for the record to be clear, okay?

A.   Yeah, yeah.

Q.   You mentioned you work at Morgan Stanley.  When did you first start working at Morgan Stanley?

A.   April 1, 1978.

Q.   And when did you leave?

A.   April 1, 1998.

Q.   What was your role when you departed?

A.   What was my role?  I was a managing director of the firm, a principal of the firm and I -- what else can I tell you?  What else can I tell you?  I helped start the high net worth area then.

Q.   And then you left Morgan Stanley in 1998?

Page 66

J. ZICHERMAN

A.    Yeah.

Q.    What did you do next?

A.    Well, I did some consulting, I worked for another, just a firm as a consultant.  I did some TV with CNBC. I did some, some -- I did -- and I was basically managing my own money, and then I decided that I was going to only manage my own money.

Q.    Who did you do consulting for?

A.    There was, there was -- it was not any particular formal firm. There was -- sorry, I'm having a little bit of -- can I just get a bottle of water; is that possible?

Q.    Sure.  Do you want to take a two-minute break?

A.    I don't, I just want to go inside, get a bottle of water, come right back.

Q.    Okay.

A.    Is that possible?

Q.    Yes.

J. ZICHERMAN

A.      Thank you very much.

THE VIDEOGRAPHER:  So counsel, stay on the record?

MS. BARROW:  Jason?

MR. URIS:  Yeah, that's fine.

A.      I'm back with water.  Okay. When I left Morgan Stanley, I set up a little investment partnership with some of my employees at the company called First New York Corp., And we worked there for a couple of years managing some of the money that I had under management at Morgan Stanley.  There were a bunch of entertainment people and a bunch of West Coast people and stuff like that.

And then eventually I just went off and I did some TV, and I began to manage my own money.

Q.      And when did you become the founder of Stadium Capital LLC?

A.      I will tell you it was probably 2000 or thereabouts.

Q.      Prior to that, you had only

Page 68

J. ZICHERMAN

been managing your own money?

A.    Prior to that, I was -- yeah.
When I was -- prior to that I was
managing my own money, that is correct.

Q.    What is your current role
with Stadium Capital LLC?

A.    What is my -- pardon me?

Q.    Your current role.

A.    My current role is I'm the
only employee, managing director,
that's it, I mean, it's just my money.

Q.    You only manage your own
money?

A.    That's it.

Q.    Do you have any clients at
Stadium Capital LLC?

A.    None, none.  When I gave up
my license, I had to, obviously, I
wasn't going to have clients, because
it would not be legal.

Q.    Was Barbara Streisand ever a
client of yours?

A.    Yes.

Q.    Sylvester Stallone?

Page 69

J. ZICHERMAN

A.    Yes.

Q.    Peter Guber?

A.    Yes.

Q.    Michael Crichton?

A.    Can I ask you a question? This has nothing to do with Co-Diagnostics.

Q.    Was there any else --

A.    If you want autographs I'll get them for you, but listen, this has nothing to do, come on.

Q.    Peter Guber?

A.    Next question, please.  Talk to my lawyer, he'll tell you my client list.

Q.    Was Peter Guber a client of yours, Mr. --

A.    I'm trying to tell you talk to my lawyer, I'm not answering this. This is wasting time and you know it and I know it.

MS. BARROW:  Let the record reflect that the witness is not responsive.

J. ZICHERMAN

A.    It has nothing to do with Co-Diagnostics.  Peter Guber was a client, yes.  So was John Peters, so was a whole bunch of people.

Q.    Were they clients of yours at Stadium Capital?

A.    They were clients of mine at Morgan Stanley.

Q.    So you've never had any other clients at Stadium Capital; is that right?

A.    That's correct.

Q.    You're the only employee at Stadium Capital?

A.    That's me.

Q.    Excuse me?

A.    That's me.  Just me.

Q.    So you don't have an assistant or anything?

A.    I don't.

Q.    Are you a member of any self-regulatory organizations such as FINRA?

A.    No.

Page 71

J. ZICHERMAN

Q.    Or the Certified Financial Planners?

A.    No.

Q.    Or the Chartered Financial Analyst Institute?

A.    No.

Q.    Have you ever been?

A.    No.

Q.    Have you ever been subject to any disciplinary action?

A.    My U4 is like a Bounty paper towel, I'm very proud of it.  Check it out.

Q.    Have you been subject to any disciplinary action?

A.    No.

Q.    Have you ever been subject to any inquiry by a licensing body?

A.    No.

Q.    Have you ever been denied a license?

A.    Nope.

Q.    Have you ever been subject of an investigation by a regulatory body

Page 72

J. ZICHERMAN

or a government agency?

A.    I have not been.

Q.    Have you ever been involved in arbitration related to your work in the securities industry?

A.    Hold on, hold on, I'm trying to remember what it was, oh, God, it was a hundred years ago.  I'm going to say no.  Nothing directly with me. This one marital thing, when it blew up, it blew up, not -- didn't blow up by me, it blew up on the other side. But they were trying to get it to, I think, arbitration or something and Morgan Stanley refused to even consider it.

Q.    The marital action that you had mentioned prior, that was in connection with your work at Morgan Stanley?

A.    That was -- well, as I said, it was a frivolous case.

Q.    I understand, I'm just trying to understand the scope of the

J. ZICHERMAN

allegations.  It was regarding your work at Morgan Stanley?

A.    The scope of allegations is it was a frivolous case, and it was a fictitious case that was made up.  So I couldn't even tell you the allegations, it had to do with an ex-girlfriend of mine that when I broke up with her, she decided that I should have made her money while she was dating me or something or other, and she filed a lawsuit saying that I should have made her money.  And believe it or not, we defended it until they dropped it.  So as I'm trying to tell you, it was completely frivolous, and has no relevance to anything.

Q.    How was Morgan Stanley connected to that action?

A.    Because I was an employee of Morgan Stanley at the time.

Q.    And did they cover your legal fees?

A.    They -- they did not cover my

Page 74

J. ZICHERMAN

legal fees.

Q.    Were they a party to the action?

A.    They were not a party to the action, it was me.  And I had a legal representative.

Q.    Mr. Zicherman, do you have any experience in any biotechnology companies?

A.    I do.

Q.    Can you tell me about that?

A.    When you say experience, I invest in them.

Q.    And do you conduct research in the biotechnology industry?

A.    Some.

Q.    Can you tell me --

A.    I rely upon some other people as well.

Q.    Who are the other people that you rely upon?

A.    Just acquaintances who are in, who have a better knowledge of biotechnology than I do.

Page 75

J. ZICHERMAN

Q.    Who are the acquaintances?

A.    They're my acquaintances.

Q.    Who are they?

A.    They're not important.

Q.    I understand, I still need to know who they are.

A.    You don't.  Honest to God, you don't.

MR. URIS:  Joe, if you can answer the question, I think we can --

A.    I have a friend Kevin Kinsella who runs a company called Avalon Ventures who has bought 50 biotech companies in his life, and he's an expert and therefore, when I have a question I will call him up.  That's one example.  Avalon Ventures in San Diego, California, La Jolla.

Q.    Did you speak to Mr. Kinsella in connection with your purchase or research of Co-Diagnostics?

A.    I talk to Mr. Kinsella because he's a friend for 40 years, and

J. ZICHERMAN

I talk to him about a variety of things.

Q.    And did that variety of things include Co-Diagnostics?

A.    Absolutely not.

Q.    So you've never spoken to Mr. Kinsella about Co-Diagnostics?

A.    No, I have not, there was no reason to.  It was a macroeconomic thing, not a microeconomic thing.  It had nothing to do with how Co-Diagnostics was doing, it had to do with the industry of testing for Covid, pandemic testing.  Mr. Kinsella would have no knowledge of Co-Diagnostics nor would he have any knowledge of any other companies related to that.

Q.    What was the nature of your conversation with Mr. Kinsella regarding the testing industry?

A.    I'm sorry.

Q.    What was the --

A.    None, zero, none, none, none. N-O-N-E, none.

Page 77

J. ZICHERMAN

Q.    Mr. Zicherman, you just testified that you spoke to Mr. Kinsella regarding the macro biotechnology industry.  My follow-up question was, what was the nature of that conversation?

A.    And I said none.  I talked to Mr. Kinsella about the biotech industry as a whole.  It's a big industry, and -- but never did I discuss the testing for Covid with him.  Never.

Q.    Okay, understood.  My question then is what was the nature of your conversation regarding the macro biotechnology industry?

A.    Sure.  A variety of other companies, schizophrenia companies, companies I've investigated in the past, etcetera, etcetera.  But never about Covid testing.

Q.    Who are your other acquaintances that you discussed the biotechnology industry with?

A.    You know, I don't know

Page 78

J. ZICHERMAN

anymore.  I have about 20 different people, and some of them were people that worked in what we say at the time and aren't there any longer, and I don't even remember.

Q.    Do you have any experience in the diagnostic testing industry specifically?

A.    None whatsoever.

Q.    Why is Stadium Capital suing Co-Diagnostics, Inc., Dwight Egan and Brian Brown?

A.    Why are they suing?  Because management of Co-Diagnostics spoke at a conference, which I was very keen on, because I thought that -- I thought they would be saying wonderful things at the conference, and they did say wonderful things at the conference.  But then the earnings came out subsequently, shortly thereafter, and it was completely dissimilar to what they said at the conference.  And I didn't feel that they told the truth at

J. ZICHERMAN

the conference.  And the stock went way down and cost a lot of people a lot of money.

Now, quite frankly, I understand that people win and lose, but let's just say it cost me a lot of money.

Q.    What was the conference that you're referring to?

A.    I don't remember the name of it.  Long time ago.  My lawyer will know the name.

Q.    I really need to get the testimony from you.

A.    Yeah, no, you have to understand something, if I remember I'll tell you.

Q.    What type of conference was it?

A.    It was a -- what type of conference was it?  You want to know what type of conference?  Let's say it was a securities conference.  A conference on healthcare.

Page 80

J. ZICHERMAN

Q.   Was it run by an analyst, was it run by Co-Diagnostics, was it run by somebody else?

A.   If I remember I would be happy to tell you.  This is not a great secret.

Q.   Was it -- what year did it take place in?

A.   Around 2022 maybe.

Q.   And you attended this conference?

A.   I did not.  I did not.  I got a transcript of it and I think I may have heard -- I think I got a transcript of it.

Q.   How did you get a transcript of it?

A.   After the conference.

Q.   How did you receive the transcript?

A.   Probably through a phone or a wire or an email.

MS. BARROW:  We would call for the production of this

Page 81

J. ZICHERMAN

communication.

MR. URIS:  Noted.

Q.    Did you request the transcript?

A.    I don't remember how I got it.  Believe me, I got it.

Q.    Was it something that was given to you gratuitously or did you request it?

A.    It was something I was aware that they were speaking at the conference, so I'm sure that I went and, you know, when I know that a company is speaking at a conference, I then go and try and find out what they have to say.  I own a company that spoke two days ago at a conference and I, at Guggenheim & Company, and I went and went into the archives and read what they said at the conference.  This is part of my job, to stay on top of the companies that I am invested in.

Q.    What are the other ways that you stay on top of the companies that

Page 82

J. ZICHERMAN

you're invested in?

A.    You want to know what other ways?  I watch news and I watch developments and I watch macroeconomics and I do everything that I'm supposed to do professionally to make sure that I'm staying on top of the companies that I am involved in.

Q.    What do you hope to gain by initiating this lawsuit?

A.    I think that the company lied, Co-Diagnostics, and I would like to be remunerated for my losses.

Q.    And what are your losses?

A.    I would have to check that with my attorney.  He has all the paperwork.

Q.    I understand, but I'm asking you today.

A.    I'm asking you to check with my attorney.

MR. URIS:  Joe, if you recall, you can answer.

A.    I don't recall, so please

Page 83

J. ZICHERMAN

check with my attorney.

Q.    When did Stadium Capital first become aware of these claims?

A.    When they occurred.

Q.    Which is when?

A.    I believe it was 2022.

Q.    And when you say it occurred, what was it?

A.    It was lying at a conference. Or not, you know, three weeks later, coming out with earnings that bore no relevance to anything that was factual from the conference.

Q.    Did anyone investigate the claims for Stadium Capital?

A.    What does that mean?

MR. URIS:  Objection.

A.    I don't know what it means.

Q.    Did anyone determine whether or not your claims were going to be, have any merit?

MR. URIS:  Objection, I would instruct the witness not to answer to the extent it divulges any

Page 84

J. ZICHERMAN

communications with counsel.

A.    I'll answer this one simply. I was -- when I saw what the earnings were after they spoke at the conference, I immediately thought it was a different company, because it couldn't have been the same company.  I hope that is sufficient.

Q.    Prior to initiating this lawsuit, did you investigate the claims with -- yourself?

A.    Did I investigate whose claims, please?

Q.    Stadium Capital's claims against Co-Diagnostics.

MR. URIS:  Objection.

A.    I'm Stadium Capital.

Q.    I understand.

A.    Yeah.  I know the claims because I brought the claims.

Q.    And what are the claims?

MR. URIS:  Objection.

A.    The claims are that they lied at a conference.

Page 85

J. ZICHERMAN

Q.     When did Stadium Capital decide to file suit?

A.     Well, you know, I would have to first count up my losses.

Q.     When?

A.     I have to first count up my losses.

Q.     Right.  And so then when did you decide to file suit?

A.     I was very offended by the fact that they lied, and I filed suit thereafter.  I don't remember exactly when.

Q.     Who participated in the decision on whether or not --

A.     I did --

Q.     -- to initiate --

A.     -- suit.

Q.     -- the suit?

A.     I did.

Q.     Okay.  I'm going to remind you we can't talk over each other, okay?

A.     Okay, and the answer is I

Page 86

J. ZICHERMAN

did.

Q.   Did anyone assist you in that decision-making process?

MR. URIS:  Objection, to the extent it calls for information discussed with counsel.

Q.   You still have to respond.

A.   I was very offended by the fact that I was misled and I chose to do something about it.

Q.   That wasn't my question.  My question was, did anyone else besides you --

A.   No, me, me, me, me.

Q.   Why did Stadium Capital file a class-action complaint?

MR. URIS:  Objection.

A.   Well, I think, I think that there have to be a lot of other people that are as offended as I am, and got blindsided like I did.  So I'm basically representing a class here.

Q.   How is a class-action complaint different from an individual

J. ZICHERMAN

complaint?

A.     How is it?  Well, you know what, a crime is a crime.  And I've always been, because my U4 and my disciplinary record has always been so immaculate in 50 years in the business, something I'm very proud of, I get to see good people get beaten and battered, especially with bullshit.  So therefore, I was very offended by the way that this was handled and I chose to file a class-action suit, and I will represent the class, that's all.

Q.     What is a class?

A.     What is the class?

MR. URIS:  Objection, asking for a legal conclusion.

Q.     Yes.

MR. URIS:  You can answer to the extent you know.

A.     What is the class?  What is the class, the class is a group of aggrieved holders.

Q.     And what's the class in this

Page 88

J. ZICHERMAN

case?

A.    I don't know what the hell you're talking about.  What are you talking about?  What is the class? Third grade, okay, next.  I don't know what you're talking about.  I know you're wasting time, but I understand that, but what are you talking about? How does this have any relevance to Co-Diagnostics, what is the class?

Q.    Mr. Zicherman, I'll ask one more time.  What is the class in this case?

A.    Okay, and I'm not responding. Talk to my attorney.  Next case, next question.

Q.    So is the answer you don't know?

A.    The answer is that I don't have the slightest idea what you're talking about, and I'm trying to explain that to you and you don't seem to want to accept that.  But I don't know what you mean by, What is the

Page 89

J. ZICHERMAN

class.

Q. You just responded about what a class is, so my question for you was, what was the class in this particular case that you've initiated as a class action --

A. I told you they're a bunch of aggrieved holders of Co-Diagnostics.

Q. Like I said, we have to also, we both engaged in this promise, this commitment that we weren't going to talk over each other. So I'm going to hold up my end of the bargain, I'm going to ask you to do the same.

Any other securities class actions in which Stadium Capital is the lead plaintiff?

A. Yes.

Q. What other class actions?

A. It's a company called View, V-I-E-W.

Q. Stadium Capital has initiated a class action against View?

A. Yes.

J. ZICHERMAN

Q.    And what is the status of that case?

A.    There is no status yet.  It's only been going on for three and a half years.

Q.    And when you say View, is that Mehedi, et al v. View, V-I-E-W?

A.    That's it.

Q.    Formerly known as Finance Acquisition Corp.?

A.    Once more, please.

Q.    Is that the same case that you were just referring to that I just stated on the record?

MR. URIS:  Objection.

A.    I don't know what you're talking about.

Q.    Mr. Zicherman, I just asked you if there were any other securities class actions --

A.    I answered you.  I answered you.

Q.    I understand, and I'm seeking clarity on what the name of the case

J. ZICHERMAN

is.  Is the case --

A.    View, V-I-E-W, it's the old Cantor Fitzgerald acquisition corp., they bought a company, public -- SPAC for $2 billion and they turned it into $2 million.

Q.    And that case is pending in the northern district of California?

A.    You want me to answer that, right?  I should know where the case is pending?

Q.    I'm asking you --

A.    You're wasting my time, come on.  Let's take it easy here, okay?  Am I supposed to know where the case is pending?  You think I have nothing else to do in my life but this?

MR. URIS:  Joe, if you --

THE WITNESS:  Talk to my attorney.

MR. URIS:  Joe, if you recall you can answer, otherwise you can say, I don't recall.

A.    Talk to my lawyer if you

Page 92

J. ZICHERMAN

would like to know where it's pending.

Q.    Mr. Zicherman, are you the lead plaintiff in the View case?

A.    One of.

Q.    Are you seeking to be the lead plaintiff in this case?

A.    Am I seeking to be the lead plaintiff in this case?  I believe I am the lead plaintiff in this case.

Q.    Okay.  So do you have the time to dedicate to be the lead plaintiff in this case?

MR. URIS:  Objection.

A.    Do I have -- talk to my lawyer.

Q.    I'm talking to you today.

A.    What?

Q.    I'm asking you today if you have the time, because you just mentioned you don't have the time.  I'm just seeking some clarity as to whether or not you have the time to devote to being lead plaintiff in this case.

MR. URIS:  Objection.

Page 93

J. ZICHERMAN

A. Do me a favor, listen, before we get really in trouble here, I'll tell you something. I'm trying to help you out to get answers about your issue with Co-Diagnostics. Where the case was filed on another completely different case, all you're doing is wasting time, and you know it and I know it. So I'm trying to really be a good guy and help you out here, but that's going to end. I have plenty of time to do things that matter in this world. Midafternoon today, I got to go up to the Bronx Museum so I can go take care of children that need money. But this is not something I have time for. That I have time for.

Now, you want to try and resume here a little bit and try and ask me some questions that matter, I'll give you very concise answers and we can move on, okay, but don't ask me if I have time. I'm here on time today and if you have the time, I got the

Page 94

J. ZICHERMAN

time.

Q.    I'll ask one more time.  Do you have the time to act as the lead plaintiff in this case?

MR. URIS:  Objection, vague.

A.    Ask my lawyer.

Q.    I'm asking you, today, while you sit --

A.    I know, I'm telling you the answer.

Q.    -- for today's testimony, but you can respond any way you can, but you do have to respond to the question and not defer to counsel.

A.    Okay, do I have the time, I have the time.

Q.    Did you assist in preparing Stadium Capital's amended complaint in the View case?

MR. URIS:  Objection.

A.    Did I assist in preparing Stadium Capital's, yes, I did, I gave him information, my lawyer.

Q.    Who is your lawyer in the

Page 95

J. ZICHERMAN

View case?

A.    The same lawyer I have in this case.

Q.    And that's Kaplan Fox?

A.    Yes.

Q.    And what lawyer in particular at Kaplan Fox?

A.    The same lawyer, the same people, the same firm, the same address, the same phone number.

Q.    And that's Mr. Uris?

A.    Yes.

MR. URIS:  Erica, are we getting close to a good breaking point?

MS. BARROW:  In a little bit.

Q.    Who at Stadium Capital -- strike that.

Do you supervise Stadium Capital's role as a lead plaintiff in the View case?

A.    I do.

Q.    What strategic decisions have you participated for in the View case?

Page 96

J. ZICHERMAN

MR. URIS:  Objection.  I caution the witness not to divulge any privileged communications with counsel.

A.    How does the View case have to do with Co-Diagnostics?  Can you tell me that?

Q.    What strategic decisions have you participated in the View case?

A.    The decision to sue View.

Q.    And do you supervise and engage in strategic decisions as the case proceeds?

A.    No, the case has not been proceeding.  It's very slow.  And when something comes up, I will definitely be involved.

Q.    When was this case, in this action that you're testifying in today, when was that filed?

A.    This case?

Q.    Correct.

A.    Maybe a year, year and a quarter ago.

Page 97

J. ZICHERMAN

Q.   Where was the case brought?

A.   Where was the case, which one, please?

Q.   This current case.

A.   Co-Diagnostics?

Q.   Correct.

A.   I have no idea where it was filed.  See my lawyer.

Q.   Who is the judge?

MR. URIS:  Objection.

A.   I'm going to get out of here, ma'am, this is nonsense.

MR. URIS:  Joe, you got to, you can answer if you recall.

THE WITNESS:  I'm about to fucking lose it, I'm going to completely lose it.  Who is the judge?  You know, I'm trying to be polite and I'm trying to be responsive, but I'm really going to lose it here shortly.

MR. URIS:  Joe, you can answer the question if you recall.

THE WITNESS:  Listen, I'm

J. ZICHERMAN

telling you, everybody, if you want to end the proceedings, we can end it right now and you can haul my ass into court. Be my guest. But shame on you for asking who the judge is. Shame on you. You know what, I'm trying to represent my profession respectfully, why don't you do the same? Why don't you ask me questions that are specific and to the point, and I'll be happy to answer them. But don't ask me who the judge is or what state it was filed in, because I don't have the slightest idea and you know I don't have the slightest idea. Let's try it one more time.

Q. Who is the judge?

MR. URIS: Joe, you can answer if you recall.

A. I'm not answering it, I'm not answering it.

MS. BARROW: Let the record reflect that the witness is not

Page 99

J. ZICHERMAN

responsive.

A.    Clearly we have a problem here, why don't we reconvene at a different date?

MR. URIS:  Can we go off the record for five minutes?

MS. BARROW:  There's still a question pending, so no.

A.    You know what, who is the judge?

MR. URIS:  Answer if you know, if you don't know that's fine.

A.    I said see my lawyer.  What was not clear about see my lawyer?  You want to know the judge that badly, do you know who the judge is?  Talk to my lawyer if you want to know who the judge is, that's what I said.  I'm sorry that's not sufficient.

MR. URIS:  Erica, can we take a five-minute break?

Q.    I just want to close this out.  So my question for you is, who is

J. ZICHERMAN

the judge, and your response is, other than ask my lawyer, Mr. Zicherman, are you going to respond?

A.    No, I've done it already.

Q.    Okay, can you tell me what has happened in this case?

A.    Are you asking me a new question?

Q.    I am.

A.    You want to know what's happened in this case, I filed a class-action suit and I'm the lead plaintiff.

Q.    What else has happened?

A.    Lead plaintiff in this case.

Q.    What else has happened?

A.    What else has happened?

Q.    Correct.

A.    In this case?  I'm being deposed right now.

Q.    Were any motions filed?

MR. URIS:  Objection.

A.    Ask my lawyer, please.

Q.    Do you know if any motions

Page 101

J. ZICHERMAN

were filed?

A.    I do not.  Ask my lawyer,
please.

Q.    Was a motion to dismiss
filed?

A.    Ask my lawyer, please.

Q.    Do you know whether or not a
motion to dismiss --

A.    Ask my lawyer, please.

MR. URIS:  Erica, can we take
a break?  I've been asking for the
last five minutes if we can take a
break.

MS. BARROW:  I don't think
it's been five minutes, but I'm
going to finish these last three
questions.

Q.    Do you know whether or not a
motion to dismiss was filed in this
case, Mr. Zicherman?

A.    Ask my lawyer, please.

Q.    I'm sorry, but asking your
lawyer isn't an appropriate response.

A.    No, you don't understand what

Page 102

J. ZICHERMAN

I'm saying.  Ask my lawyer, please.

          MR. URIS:  Joe, if you don't

     recall --

     A.    I don't recall.  Ask my

lawyer, please.

     Q.    Was a motion for class

certification filed?

     A.    I don't recall.  Ask my

lawyer, please.

     Q.    Any appeals?

     A.    I don't recall.  Ask my

lawyer, please.

          MS. BARROW:  Sure, we can

     take a break now.  How long do you

     want for a break?

          THE WITNESS:  I don't need a

     break, keep going.

          MS. BARROW:  Okay, we can

     keep going.

          MR. URIS:  Joe, can we please

     take a break?  I would like to use

     the bathroom.

          THE WITNESS:  I'm sorry,

     Jason, you're not allowed.

J. ZICHERMAN

Yeah, by all means, we'll take a break.

THE VIDEOGRAPHER:  All right, going off the record --

THE WITNESS:  I'll go off --

THE VIDEOGRAPHER:  Okay, going off the record.  The time is 11:51 a.m., this is the end of media unit two.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record, the time is 11:58 a.m., this is the beginning of media unit three.

Q.    Mr. Zicherman, I have marked a document that's marked as Defendants' Exhibit 6 if you could refresh your browser.  This document is titled --

A.    Wait a minute, just for the record, when I tell you to ask my lawyer, I'm not ducking the question, I'm simply just saying that he will have the information much more readily than I will.  I'm not saying I'm

J. ZICHERMAN

refusing to answer, I'm just saying that he will have all the information rather than me.

Q.   Well, let's be clear here, so Mr. Zicherman, you're testifying today on behalf of Stadium Capital, that's the plaintiff in this action --

A.   Well, if I don't know the answer --

Q.   I'm talking.  I'm talking.

A.   My bad, my bad.

Q.   You're testifying today on behalf of Stadium Capital, which has brought very serious allegations against our client and so I'm asking you questions.  Jason and I can talk all day every day offline, but today you are testifying, and you've agreed to testify for the full seven hours, so you have to respond to the questions that are posed.  Do you understand?

Do you understand, yes or no?

A.   I do understand.

MR. URIS:  Erica, just to

Page 105

J. ZICHERMAN

clarify, I think what he's trying to say is when he says, Talk to my lawyer, he's saying he doesn't know the answer to your question, but rather he's referring you to someone that he thinks would know the answer.

MS. BARROW:  That can be your position, but obviously that's not been the case.  But moving on.

Q.    So --

A.    I beg your pardon?  What did you just say?

Q.    -- I'm referring to you to Defendants' Exhibit 6 --

A.    No, I just asked you what you just said.

Q.    -- a document entitled Memorandum of Law in Support of Lead Plaintiff's Motion to Certify the Class, Appoint Class Representative and Appoint Class Counsel.

(Exhibit 6, marked for identification, Memorandum of Law

Page 106

J. ZICHERMAN

in Support of Lead Plaintiff's

Motion to Certify the Class,

Appoint Class Representative and

Appoint Class Counsel.)

Q.    Mr. Zicherman, have you seen this document before?

A.    I have not.

Q.    As you sit here today, what do you recognize it to be?

A.    I have no idea.

Q.    Did you have any input in the creation of this document?

MR. URIS:  Objection.

A.    I have no idea what it is. Please ask my lawyer.

Q.    I'm asking you for your own perspective.  Did you have any --

MR. URIS:  Asked and answered.

Q.    -- input in preparing this document?

A.    I don't know.  Please ask my lawyer.

Q.    Did you review it before it

Page 107

J. ZICHERMAN

was filed?

MR. URIS:  Objection.

A.    I don't remember.  Please ask my lawyer.

Q.    Mr. Zicherman, I'm marking a document as Defendant's Exhibit 7. That document is titled Declaration of Jason Uris in Support of Lead Plaintiff's Motion to Certify the Class, Appoint Class Representative and Appoint Class Counsel.

(Exhibit 7, marked for identification, Declaration of Jason Uris in Support of Lead Plaintiff's Motion to Certify the Class, Appoint Class Representative and Appoint Class Counsel.)

A.    Yep.

Q.    Have you seen this document before?

A.    I don't recognize it.

Q.    Were you made aware that there was an expert report submitted on behalf of Stadium Capital in connection

Page 108

J. ZICHERMAN

with this lawsuit?

A.    I was not.

Q.    So fair to say that you took no part in the creation of the expert report?

A.    That is correct.

Q.    If I can refer you to page 9.

A.    One second.  Okay, page 9. Go ahead.

Q.    Actually, if I could refer you to, would it be easier if I shared my screen for this?

A.    Nope.

Q.    Okay.  I'm asking you to look at page 9 of, not the expert report, but the one right before that, motion six -- or Defendants' Exhibit 6.

A.    Page 9, number 6?

Q.    Yes, please.

MR. URIS:  On a different exhibit, Exhibit 6?

A.    I'm looking at Exhibit -- discussion of reliance element.  Is that it?

Page 109

J. ZICHERMAN

MR. URIS:  Which exhibit are we on, Exhibit 6?

A.    I don't know what we're on.

Q.    Page 9 of Defendants' Exhibit 6, which is the memorandum of law, so I'll just read out, while you pivot, the paragraph that I would like to draw your attention to says, Further, plaintiff has demonstrated a willingness and ability to take an active role in and control of the litigation to protect the interests of the absent class members.

A.    Okay.

Q.    Do you see that?

A.    I don't see it, but I'm sure that that's correct.

Q.    What has Stadium Capital done to control this litigation?

A.    I'm appearing here today.

Q.    Anything else?

A.    Yeah.  I filed a class-action suit.

Q.    Anything else?

Page 110

J. ZICHERMAN

A.    Nope.

Q.    And the case was filed in the Southern District of New York, correct?

A.    I have no idea.

Q.    I can represent to you that the case was filed in the Southern District of New York.

A.    I'm sure it was, then.

Q.    Why did you request a remote deposition despite being requested for an in-person deposition in New York?

MR. URIS:  Objection.

A.    Why, because I have something to do later that requires -- is more important to me, to me, than -- and I need to be logistically closer to the Bronx.

Q.    Were you willing to travel to Midtown Manhattan to represent the class today?

MR. URIS:  Objection.

Q.    Mr. Zicherman, you have to answer the question.

A.    Yeah, was I willing to

J. ZICHERMAN

travel?  All depends upon my schedule and what is going on and if I'm not sick, like I've been sick for the last 10 days and stuff like that.

Q.    So you would have came if you didn't have something better to do, correct?

A.    I would have come if I was able to do that, yes.

Q.    It's not that you were able, but you "had something better to do," correct?

A.    Listen, I have been sick for the past 10 days, so I am here and, just like that.

Q.    Because you had something better to do, correct?

MR. URIS:  Objection.

A.    I'm trying to explain to you, I've been sick as a dog for the past 10 days.  You must hear it in my throat and my voice.

Q.    Is that why you're staying home today, because you're sick, or are

Page 112

J. ZICHERMAN

you going to an event?

A.   I'm staying home today
because I'm sick is one of the other
things.  There's a variety of reasons
why I'm staying home.

Q.   It seems like you're not
staying home, you're going to an event,
correct?

A.   I'm going to go up to the
Bronx later, yes.

Q.   Okay.  So not too sick for
that?

A.   Not to an event, to do
something.  A meeting.

Q.   Okay.  So you're not sick for
that?

A.   No, I'm not sick for that.

Q.   Has Stadium Capital reviewed
any other filings in this case?

A.   No.

Q.   Has Stadium Capital
communicated with any other class
members?

A.   No.

Page 113

J. ZICHERMAN

Q.   Has Stadium Capital attempted to identify any of the other class members?

A.   No.

Q.   Does Stadium Capital have an estimate of the number of class members?

MR. URIS:  Objection.

A.   No.

Q.   I'm sorry, I didn't hear your response.

A.   My answer is no.

Q.   Has Stadium Capital done any investigation or analysis regarding the total number of securities of Co-Diagnostics that were purchased and sold by punitive class members?

A.   No.

MR. URIS:  Objection.

Q.   Is Stadium Capital aware of any other complaints filed by individuals alleging the same or similar --

A.   No.

Page 114

J. ZICHERMAN

Q.    -- claims made in this case?

MR. URIS:  Objection.

A.    No.

Q.    I'm just going to remind, you because I'm sure Jeremy would love me to give him this plug, if you can let me finish what I'm saying before you give a response.

A.    The answer is no.

Q.    Mr. Zicherman, you testified earlier that Kaplan Fox is your attorneys in this case, correct?

A.    Yes.

Q.    How did Stadium Capital become aware of Kaplan Fox?

A.    Through the other case with View.

Q.    How did you meet them in connection with the other case?

A.    Through a mutual friend.

Q.    Who is the mutual friend?

A.    Willy Sutton -- no, David Sherman is his name.

Q.    Is David a lawyer, Mr. David

Page 115

J. ZICHERMAN

Sherman?

A.    No, he's not.

Q.    And who was your initial contact at Kaplan Fox?

A.    Jason Uris.

Q.    Other than the View case and this case, is Kaplan Fox representing Stadium Capital in any other matters?

A.    None.

Q.    Did you research any other law firms in connection with --

A.    No.

Q.    -- bringing this action?

A.    Nope.

Q.    Other than your mutual friend, David Sherman, does Stadium Capital have any other connections to Kaplan Fox?

A.    No.

Q.    Any family or friends of Stadium Capital that work at Kaplan Fox?

A.    Nope.

Q.    Any social interactions

Page 116

J. ZICHERMAN

between Stadium Capital and Kaplan Fox?

A.    No.

Q.    Does Stadium Capital provide financial advice or services to Kaplan Fox?

A.    No.

Q.    So to clarify, you did not consider any other firms before hiring Kaplan Fox?

A.    I did not.

Q.    Did you conduct any research on Kaplan Fox before you engaged them?

A.    I did not.

Q.    Prior to engaging Kaplan Fox, did you provide any documents to them in support of your allegations in this case?

MR. URIS:  Objection.

A.    I did not.

Q.    How often does Stadium Capital meet with its counsel regarding this case?

A.    Infrequently.

Q.    Once every few months?

Page 117

J. ZICHERMAN

A.    When needed.

Q.    And how often is needed?

A.    Whenever needed.  When there's something occurring, then we have a communication of some form.

Q.    Over the last year would you say it's been around three times?

A.    Roughly.

Q.    Mr. Zicherman, I am going to mark an additional exhibit.  It's Defendants' Exhibit 8.  Document should be available for your review at this point.

(Exhibit 8, marked for identification, Bates stamped PLTF_CODX_0003.)

Q.    Let the record reflect that this is a letter on the Kaplan Fox letterhead, re line Co-Diagnostics, Inc., securities class action.

A.    Got it.

Q.    Do you have the document in front of you?

A.    Yep.

J. ZICHERMAN

Q.    What do you recognize this document to be?

A.    Looks like a letter from Kaplan Fox.

Q.    A letter stating what?

A.    Let's see, it looks like the provisions for undertaking them as an attorney in a class-action suit.

Q.    So colloquially we call it an engagement letter.  Does that make sense?

A.    Then I'm sure it is if you say it.

Q.    Other than this particular document that you have in front of you, is there any other agreement for Stadium Capital --

A.    No.

Q.    -- between Stadium Capital and Kaplan Fox?

A.    No.

Q.    Is there any other agreement for Kaplan Fox or its attorneys to provide anything of value to Stadium

Page 119

J. ZICHERMAN

Capital?

MR. URIS:   Objection.

A.   No.

Q.   So if I can refer you to the page that's Bates stamped PLTF_CODX_003.

MR. URIS:   That's the first page of the document.

A.   Yep.

Q.   In connection -- just so you know, we're going to go through this a bit.  Some of the documents are Bates stamped, so it's just a fancy way of identifying the pages.

A.   Yep.

Q.   On the first page here it says in paragraph 3 that Kaplan Fox would undertake this matter on a contingency fee basis.

Do you know what that means?

A.   Yes.

Q.   What does that mean?

A.   Means they get a piece of whatever is gained.

Page 120

J. ZICHERMAN

Q.    And do you think it's fair that the law firm would recover a portion of the money received in connection with this lawsuit?

A.    Yes.

Q.    It says, Ultimately, in a class action, it would be up to the court to determine the amount of fees and expenses plaintiffs' counsels are to be awarded from the funds, if any, recovered for the benefit of the class.

Do you see that?

A.    Yes.

Q.    How much do you think should be given to your attorney if the class --

A.    I have no --

Q.    -- were to recover a monetary amount?

A.    I have no opinion.

MR. URIS:  Objection.

Q.    Again, we need to not talk over each other, okay?

A.    You know, some of your

J. ZICHERMAN

questions are so inciteful, that's with a C-I-T-E, I'm sure you know that, they engender my response.  I apologize once again for being abrupt, but when you're asking me how much I think the lawyer should be paid, you know, I have to use all of my restraint to remember that I need to have good decorum.

Q.    You have a problem restraining yourself to have good decorum?

A.    No.  Do you have problems with yourself?

Q.    Well, in the first paragraph of the page Bates stamped PLTK_CODX_004, the engagement letter says, The court will most likely select as lead plaintiff the investor or group of investors who apply to service lead plaintiffs, have the largest financial stake in the proposed action.

Do you see that?

A.    This is in what paragraph, please?

J. ZICHERMAN

Q.    This is in the first paragraph on the second page, that has the 4 in the Bates stamp.

A.    Hold on, I got to go to --

MR. URIS:   It's the first paragraph on the second page.

A.    Okay.  Hold on.  Page two of two, got it.  Under the law, okay, most likely, I got it.

Q.    Does Stadium Capital have the largest financial stake in the proposed class action?

MR. URIS:  Objection, calls for a legal conclusion.

Q.    You can answer.

A.    I have no idea.  Ask my lawyer.

Q.    Do you have a large financial stake in the proposed class action?

A.    That's a relative question, for me it's large, yes.

Q.    And how so?

A.    How so, it's many dollars.

Q.    About how many dollars?

Page 123

J. ZICHERMAN

A.    No idea.  Ask my lawyer, he has all of my records.

Q.    You mentioned that it's large to you.  So what is your understanding of what large is?

A.    It's not large necessarily to me, it certainly is a large amount related to the investment.

Q.    Okay.  And what's that amount?

A.    Ask my lawyer, please.

Q.    You still have to respond.

A.    Ask my lawyer, please.

MR. URIS:  Joe, if you don't know just say you don't know.

A.    I don't know, ask my lawyer, please.  It's understood if I'm saying ask my lawyer, I don't know the answer.

Q.    The engagement letter also states that the court will appoint a lead plaintiff that is "the appropriate investors to represent the interests of other members of the proposed class." Do you see that?

Page 124

J. ZICHERMAN

A.    Yes.

Q.    Is Stadium Capital an appropriate investor to represent the interests of the class?

MR. URIS:  Objection, calls for a legal conclusion.

Q.    You can answer.

A.    I think so.  I lost money.  I was cheated.

Q.    How were you cheated?

A.    I was cheated because I listened, I looked at a transcript of a big conference that led me to believe that the condition of the business was better than what was ultimately the case.

Q.    In the second paragraph of the Bates stamp 4, it says that you will have an opportunity to review the drafts of the amended complaint.

Did you review drafts of the amended complaint?

A.    No.

Q.    So moving on from this

Page 125

J. ZICHERMAN

document, we talked a little bit about this before.  What do you know about Co-Diagnostics and its business?

A.    It's a medical testing company.

Q.    Do you know anyone that works at Co-Diagnostics?

A.    I don't.

Q.    Did anyone who works at Co-Diagnostics provide Stadium Capital information related to this case?

A.    No.

Q.    Do you know who Dwight Egan is?

A.    No.

Q.    Do you know who Brian Brown is?

A.    No.

Q.    What is the total number of assets that Stadium Capital manages?

MR. URIS:  Objection.

A.    The total amount, ask my lawyer, please.

Q.    I'm asking you because you're

Page 126

J. ZICHERMAN

the one that's managing Stadium

Capital.  So what's the total amount of

assets?

A.    In the LLC right now, it's

about $3 million.  Of equities.

Q.    And you mentioned that you're

the only client insofar as you're just

managing your personal funds; is that

correct?

A.    Yeah, it's a LLC.

Q.    Any specific industries that

Stadium Capital focuses upon?

A.    No.

Q.    We talked a little --

A.    It's an investment vehicle.

Q.    And you mentioned that you

had previously invested with Pfizer.

Are there any other biotechnology

companies that you invested in?

A.    Any other biotechnology

companies?

Q.    Yes.

A.    Oh, plenty of them over the

years, but nothing relating to testing.

J. ZICHERMAN

Say outside of Pfizer, and maybe one other, but I would have to think back.

Q.   So over the last four years or so, are there any, unrelated to testing, any other biotechnology companies you can think of?

A.   A lot of them, yes.

Q.   What are some of them?

A.   Immumone, I-M-M-U-N-O-N-E. Veru, V-E-R-U.  Let's see what else we have.  Tenx, T-E-N-X.  Is that sufficient?

Q.   Well, you tell me, are there others?

A.   There's probably 50 of them.

Q.   Okay.  Over the last four years or so?

A.   Yeah, I'll give a list to my attorney.

MS. BARROW:  We would call for the production of that information.

Q.   Any other large or small cap biotech companies?

Page 128

J. ZICHERMAN

A. Well, Pfizer, Eli Lilly, Novo, see what else, I don't know.

Q. Any other industries?

A. Other industries?

Q. Mm-hmm.

A. What does that mean?

Q. Well, we talked today about the biotechnology companies. Were there any other industries that you concentrated your investment strategy in?

A. You mean like steel companies?

Q. That's a good example, yes.

A. Okay.

Q. Do you own anything else?

A. No.

Q. Does Stadium Capital purchase or sell securities that will bet against a company's positive performance?

A. Can you repeat that, please?

Q. Does Stadium Capital purchase or sell securities that bet against a

Page 129

J. ZICHERMAN

company's positive performance?

A.    Does Stadium Capital purchase or sell securities against a company's positive performance?  Is that what you're asking?

Q.    That bet against the positive performance.

A.    I don't know what that means, sorry.

Q.    Is there ever a scenario in which you would make money if a company performs poorly?

A.    Yes.

Q.    Can you tell me about that?

A.    Sure.  Buy points or you short the stock, one or the other.

Q.    Do you do that often?

A.    Sometimes.

Q.    Did you do that in connection with Co-Diagnostics?

A.    No.

Q.    Did you do that in connection with any of the other Covid testing companies?

Page 130

J. ZICHERMAN

A.    No.

Q.    Did you do that with any of the other biotechnology companies --

A.    Why would I short Co-Diagnostics after they gave such a glowing presentation at this conference?  I was expecting good things, not bad things.

Q.    Has Stadium Capital ever made an investment hoping to profit from a drop in the security price?

A.    Yes.

Q.    And did you do that in connection with Co-Diagnostics?

A.    No, of course not.

Q.    At any time?

A.    No.

Q.    In any other testing companies?

A.    No.

Q.    Can you tell me a little bit about what type of assets Stadium Capital invests its funds in?

A.    Stocks, options, bonds.

Page 131

J. ZICHERMAN

Q.   Any real estate?

A.   No.

Q.   Any index funds?

A.   No.  ETFs, ETFs would be one.

Q.   Anything else?

A.   No.

Q.   What percentage of the portfolio is in individual stocks?

A.   70 percent, thereabouts.

Q.   How many publicly traded companies has Stadium Capital purchased individual securities, if 70 percent of the portfolio is in individual securities?

A.   Over what period of time?

Q.   Today.

A.   Today?

Q.   Yeah, just, or you can pick a time frame and tell me, whatever you recall.

MR. URIS:  Objection.

A.   It's purchased one today, one.

Q.   The question isn't what

Page 132

J. ZICHERMAN

securities have you purchased today.
But given --

A.    You want the name of the
security?

Q.    No.  Let's say in 2022 --

A.    Yes.

Q.    -- how many companies did
Stadium Capital invest in for
individual securities?

MR. URIS:  Objection.

A.    Oh, probably three or 400,
maybe.

Q.    And did that change over time
--

A.    No.

Q.    -- the number?

A.    No.

Q.    Does Stadium Capital review
any third-party analyst opinions?

MR. URIS:  Objection.

A.    Sure.

Q.    Which analysts?

A.    Do I -- I get some research
from different firms and I review it.

Page 133

J. ZICHERMAN

That's part of my database.

Q.    From 2020 until today, what are some of those reports or companies or analysts that you get information from?

A.    Harvestone, Benzinger, Goldman Sachs, BTIG, you know, I can give you a list of a bunch.

Q.    Would you say it's more than five?

A.    Probably.

Q.    More than 12?

A.    No.

Q.    Okay.  What about, did you ever review analyst reports from Sidoti & Company?

A.    Did I ever review, I don't remember.  I know who Sidoti is, but are you asking me in reference to Co-Diagnostics?

Q.    In general, did you ever -- over the last --

A.    No, not in general, I'm asking, you're asking in reference to

Page 134

J. ZICHERMAN

Co-Diagnostics?

Q.    I'm going to ask you questions.  The first question is over the last four years, have you reviewed any analyst reports from Sidoti & Company?  Yes, no, I don't know.

A.    I don't know.

Q.    And over the last four years have you reviewed Sidoti & Company analyst reports as it pertains to Co-Diagnostics?

A.    I don't know.

Q.    Okay.  What about HC Wainwright & Co.?

A.    I know who they are.

Q.    Have you reviewed their analyst reports over the last four years?

A.    I have worked at other companies, not Co-Diagnostics.

Q.    I understand.  So you reviewed their analyst reports, but not as it pertains to Co-Diagnostics?

A.    That's correct.

Page 135

J. ZICHERMAN

Q.   What about Litchfield Hills?

A.   Which one?

Q.   Litchfield Hills?

A.   Litchfield Hills?

Q.   Yes.

A.   What is that?

Q.   It's an analyst.  Have you reviewed their analyst reports?

A.   No, I've never heard of them.

Q.   Have you reviewed the analyst reports for Maximum Group?

A.   No.

Q.   We talked a little bit about this before, but what kind of information does Stadium Capital review when deciding to purchase securities in a publicly traded company?

A.   What kind of --

Q.   Information?

A.   -- information I do look at in --

MR. URIS:  Objection.

A.   -- I mean what kind of, yeah, I look at, it's a combination of

J. ZICHERMAN

things.  I'm doing this for 50 years.
It's a combination of things, macro --
micro information as it relates to
macro markets.

Q.    Okay.  So can you tell me a
little bit about the macro?  Do you
read the New York Times, the Wall
Street Journal?

A.    Sorry, I didn't mean to
interrupt.  If I like the market, I
invest.  If I don't like the market, I
don't.

Q.    When you determine you're
going to purchase securities of a
publicly traded company, then where do
you look?

A.    Well, I look at the specifics
of the company.

Q.    And how do you find out the
specifics of the company?

A.    Well, I go into, I go into
research.  I go into Google and I go
into a variety of services that provide
Yahoo Finance and I go into, I look at

J. ZICHERMAN

research of brokerage firms that cover them.  And I do a whole bunch of things, and that way I can then see what's going on.

Q.    Does Stadium Capital review SEC filings?

A.    Of course.

Q.    When reviewing SEC filings, what information is Stadium Capital looking for to determine if it should invest in a publicly traded company?

A.    I'm looking at 10-Ks, 10-Qs, I'm looking at all of the filings that are relative to making an investment decision.

Q.    Any particular portion of the 10-K or the 10-Q?

A.    No.

Q.    So if I can turn your attention back to March of 2020, Covid-19.  How did the Covid-19 pandemic affect Stadium Capital's investment strategies?

MR. URIS:  Objection.

Page 138

J. ZICHERMAN

A.    How did it affect my investment?  Well, I knew that interest rates would soar, I knew that -- I knew what would be happening and the economy would fall off a cliff.  And I adjusted myself accordingly.

Q.    How did you adjust yourself --

A.    I also got very badly sick with Covid, and I was literally unconscious for six days.  So my involvement was rather limited.

Q.    So not specifically in March of 2020, but once the pandemic had started, how did you pivot as you mentioned?

A.    How did I pivot?  I raised cash, I focused on companies that were involved in a variety of things having to do with the pandemic.

Q.    Did you raise cash?

A.    I did raise cash, yes.

Q.    How?

A.    Sell stock.

J. ZICHERMAN

Q.   Was Stadium Capital aware that Congress decided not to renew certain government funding for Covid testing in March of 2022?

MR. URIS:  Objection.

A.   You know, there were a variety of things going on governmentally, and I was focused more on the companies that were doing testing and the declarations that they were making.

Q.   But were you aware that Congress decided not to review certain government funding for Covid testing in March of '22?

MR. URIS:  Objection.

A.   No, I don't remember that.

Q.   Mr. Zicherman, I am going to mark a document as Defendants' Exhibit 9.

A.   Number 9, okay.

Q.   It should be available for your review.  This document is Bates stamped PLTF_CODX_0001.  It's a

Page 140

J. ZICHERMAN

one-page document.

(Exhibit 9, marked for identification, Bates stamped PLTF_CODX_0001.)

A.    Yeah, few lines, right.  Yep.

Q.    Do you see that?

A.    Yep.

Q.    What is this document?

A.    Hold on.  Looks like a P&L statement of the money that I lost in the stock.  $70,000; is that correct?

Q.    You tell me.

A.    Look, I'm asking you -- Jesus fucking Christ.  It looks like I lost 70,000 in the stock.

Q.    Did you pull this transaction sheet for your attorneys?

A.    I don't remember.  Ask my attorneys, please.

Q.    Okay.  And so when you said you lost, are you referring to the number on the bottom that's bold in the parentheses, the 70,655.50?

A.    That is correct.

J. ZICHERMAN

Q.    So can you tell me what I'm looking at here, what other securities were purchased by Stadium Capital?

A.    It says very clearly right there, it says security, right there, you can see it, one, two, three, four, five, six, seven columns over from the left it says security.  So you want to know what security, that's right in front of your eyes, you like to know that?  It's Co-Diagnostics.

Q.    When did you first purchase Co-Diagnostics?

A.    You have to ask my lawyer. He has my records, I don't know.

Q.    Well, we're looking at the records right now.

A.    I don't know.

Q.    Well, you just told me --

A.    If you can't tell what security it is, then you certainly don't need to know when I purchased it.

Q.    So you're refusing to answer the question?

Page 142

J. ZICHERMAN

A.    Am I refusing to answer when I first purchased it?  You know what, I got to blow this thing up here, because I have to make this a little bigger.

MR. URIS:  I think if you hover your mouse over it, there's a plus sign towards the bottom.

THE WITNESS:  Yeah, let's see, hold on, yes, there is -- oh, yes there is.  Oh, there it is.  It says, hold on, a little too much, hold on.  Good.  It looks to be like, when did I first purchase it, 8/11/22.

Q.    If you look on the bottom it seems to have some earlier dates.  Was the first date that Stadium Capital purchased securities of Co-Diagnostics --

A.    7/25/22.

Q.    -- if you can let me finish. Was the first day that Stadium Capital purchased Co-Diagnostics stock July 25, 2022?

Page 143

J. ZICHERMAN

A.    Looks like it, from these records.

Q.    What time of day did you purchase it?

A.    What time of day did I purchase it?

MR. URIS:  If you remember.

A.    I don't remember.

Q.    How did you purchase it?

A.    Pardon me.

Q.    How did you purchase it?

A.    How did I purchase it?  I bought it through a brokerage firm.

Q.    What brokerage firm?

A.    Right on the top in front of your face, BTIG.

Q.    Is that the brokerage firm you usually use to purchase securities?

A.    At the time that was who I used, yes.

Q.    Okay.  And then subsequently on the next day you purchased additional securities on July 26, 2022, correct?

Page 144

J. ZICHERMAN

A.    Yes.

Q.    Of Co-Diagnostics, correct?

A.    Mm-hmm.

Q.    And when you first purchased it on July 25, 2022, the settlement, if we scroll to the right, the settlement price was 6.2917, correct?

A.    I guess.

Q.    And then it immediately went down on the next day from when you purchased it?

A.    Once again, I don't remember the specifics.  I guess it did.

Q.    Why did you continue to purchase Co-Diagnostics stock if the price had decreased?

A.    Because they had a conference, they said very glowing things and they had earnings coming out in a bit of time, few weeks, and I thought that the earnings would replicate the comments that they made in the conference.

Q.    When you purchased it on the

Page 145

J. ZICHERMAN

second day, you at that point knew that the settlement price was lower?

MR. URIS:  Objection.

A.    Of course I knew it was lower.

Q.    So then why did you purchase it?

A.    Because it was, I was building a position.  I don't average down, but I do build positions.  When I buy a stock, I figure out how much I would like to own and then ultimately I get to that level, ideally.

Q.    When you saw that they made statements at a conference, what were the statements that they made, they as in Co-Diagnostics?

A.    The statements that they made were nothing like the earnings that they reported thereafter.  They were very euphoric and very glowing and represented a lot of euphoria and promise.

Q.    What were the statements of

Page 146

J. ZICHERMAN

euphoria?

A.   I don't remember exactly. But if you get a -- my lawyer will get a copy of the transcript and you can read it.  You'll probably go out and buy it.

Q.   And you particularly relied on the statements from that conference, yes?

MR. URIS:  Objection.

A.   Did I rely upon the statements?  Well, when someone comes at a conference and it's the CEO, you rely upon, you presume they're telling you the truth.

Q.   Did you rely upon anything else?

A.   No, of course not.

Q.   So the number here, the 70,655.50 that you testified were your losses in connection with the Co-Diagnostics stock?

A.   Yes.

Q.   And is that the amount that

Page 147

J. ZICHERMAN

you're seeking in connection with this lawsuit?

MR. URIS:  Objection.

A.    Yes.

Q.    You mentioned earlier that in connection with purchasing a public company's securities, you review SEC filings.

Did you review the SEC filings of Co-Diagnostics?

A.    I did not.

Q.    In or around this time of July 25th and July 26th of 2022, did you discuss Co-Diagnostics with anyone else?

A.    Not to my remembrance, no.

Q.    What was your --

A.    I came to do a lot of my own work.

Q.    What was the most important factor in your analysis in engaging in these trades?

MR. URIS:  Objection.

A.    The fact that the business

Page 148

J. ZICHERMAN

was burgeoning, the testing was very euphoric in this country, everybody was looking to get tests, and that the pandemic was still very much on the front burner for a lot of people.

Q.   In 2022 where was Stadium Capital operating?

A.   They were operating, well, I operate from home and I cleared a firm by the name of Goldman Sachs who was referred to me by BTIG and I did all my executions through BTIG.

Q.   In summer of 2022, you were in Florida?

A.   The summer of '22, no, I was up north.

Q.   When you said you were at home, so in the summer of '22, you were at home in New York?

A.   I was at a rental home in the Hamptons.

Q.   And you said it was your experience at that time that the pandemic was at the forefront --

Page 149

J. ZICHERMAN

A.    Yes.

Q.    -- in summer of 2022?

A.    That's correct.

Q.    Did you engage in precautions for Covid in the summer of 2022?

A.    Yes, yes, I wore a mask.

Q.    Anything else?

A.    Did I -- I had the vaccines and wore a mask.

Q.    And were you --

A.    After getting very sick.

Q.    After getting very sick. When did you get very sick?

A.    January -- I can tell you exactly, January the 9th of -- sorry, March 9th of 2020.

Q.    And so two years later you were wearing a mask?

A.    Yeah.

Q.    Two and a half years or so. And you were getting your vaccines, correct?

A.    I got my vaccines, I got two sets of vaccines, yeah.

J. ZICHERMAN

Q.   And were you doing anything else two years later?

A.   What would you like me to do else?  What else could I be doing?

Q.   Great.  And --

A.   No, do you have any suggestions what else I should have done?

Q.   Really an individual decision for you.

A.   No, but is there anything else to do?  What did you do that was additional besides a mask and a vaccine?  Because I don't know of anything else I could have done.

MS. BARROW:  So Jason, we're at 12:42, do you want to take the lunch break now?

MR. URIS:  Do you know approximately how much longer your questioning is going to be?

MS. BARROW:  I still have a decent amount.

MR. URIS:  Do you have a time

J. ZICHERMAN

estimate?

MS. BARROW:  No, unfortunately, I don't, given how things have gone.

MR. URIS:  Okay, well I believe Mr. Zicherman has another commitment at 3:00, that he will have to leave probably by two for, and we have a few questions we'd like to ask as well.  So I don't know if having a shorter lunch would help us get done by that, but I -- just let me know.

THE WITNESS:  I don't need a lunch, I can just sit here.

MR. URIS:  Witness is happy to skip lunch if that works.

MS. BARROW:  Well, it's and if you want to ask questions, we're not going to finish the questions within an hour and 15 minutes even if we took a 15-minute break.  Are you saying the witness is unavailable to

Page 152

J. ZICHERMAN

testify for the full seven hours?

THE WITNESS:  First of all --

MR. URIS:  I think the witness would certainly be unavailable to testify for the full seven hours today.  You unilaterally noticed the deposition for today without coordinating with us.  We've made ourselves available at the time you requested.  I would also note that we've been able to take many of the depositions of defendants' witnesses in approximately three hours or so for many of them.  So we would request that you keep your questions to only the topics that are necessary.

MS. BARROW:  Okay, so I would object because I was just on one earlier this week, and it was eight hours, and probably six on the record.

In any event, we also accommodated Mr. Zicherman in terms

J. ZICHERMAN

of providing a remote deposition.

So it's up to you what you want to

do, because both of us aren't going

to question him within one hour.

THE WITNESS:  I can be here

until 2:30 and that's it.

MR. URIS:  Okay, let's

continue.  Do you want to take a

five-minute break and we'll

continue?

MS. BARROW:  Sure, let's do,

like, 10 minutes.

THE WITNESS:  2:30, I got to

bag it, just so you understand.

THE VIDEOGRAPHER:  Okay.

Going off the record, the time is

12:44 p.m., this is the end of

media unit three.

(Recess.)

THE VIDEOGRAPHER:  We are

back on the record, the time is

1:00 p.m.  This is the beginning of

media unit four.

Q.    Hello, Mr. Zicherman, I have

Page 154

J. ZICHERMAN

a question for you.  Who is Jeffrey Kiley?

A.    Who is Jeffrey Kiley, he's a friend of mine in California who I knew from Morgan Stanley once upon a time. He's a friend.

Q.    And what does Mr. Kiley do for a living?

A.    Does what I do.

Q.    Which is what?

A.    What do I do?

Q.    Well, what does Mr. Kiley do?

A.    Mr. Kiley does what I do.  He manages his own money in the stock market.

Q.    And does he have clients?

A.    No.

Q.    If I could refer you to a document that I've just marked as Defendants' Exhibit 10.  So that document is Bates stamped PLTF_CODX_007.

          (Exhibit 10, marked for
     identification, Bates stamped

Page 155

J. ZICHERMAN

PLTF_CODX_007.)

Q.   And what's the nature of your communication with Mr. Kiley?

A.   He's a very close friend, he's a golf partner.

Q.   And as it pertains to investment strategy, what do you generally discuss?

A.   We just compare notes, how you doing, how you doing.

Q.   How you doing as it pertains to performance in the market?

A.   Yep.  Yeah, how are you doing in the market.

Q.   So like I said, if I can refer you to Defendants' Exhibit 10, do you have that open?

A.   I don't.  I have to go get it open now.  Let's see where I am here, hold on, please.

MR. URIS:  You may have to refresh the --

THE WITNESS:  Hold on one second, got to refresh it.  Okay.

Page 156

J. ZICHERMAN

I'm refreshing it up.  Got it.

Q.    Do you recognize this document?

A.    Do I, let's see here, let's see, I do see it.

Q.    Do you recognize this document?

A.    Well, I sent it.  I don't recognize it, I haven't looked at it.

Q.    So that's a good question. So do you regularly use email from 2021 to date?

A.    I'm sorry, do I regularly use email from where, please?

Q.    Do you generally email, yes.

A.    From?

Q.    Do you use email?

A.    Yes, I do.

Q.    And what's your email address?

A.    I put it down this morning on the form, joeZ6@AOL.com.

Q.    Is that both your personal and business email address?

Page 157

J. ZICHERMAN

A.    That's my personal email address.

Q.    Do you have a separate professional one?

A.    I had a professional one when I was at BTIG called JoeZ6@StadiumCapitalLLC.com.

Q.    So you use that one as well?

A.    I do.

Q.    You when you were at BTIG. You previously worked as BTIG?

A.    No, when I had an account at BTIG.

Q.    I see.  And do you have that currently?

A.    No.

Q.    Did you have that BTIG account in 20 --

A.    I want to answer accurately. You said do I have it currently.  I never closed it, but I don't use it.

Q.    Did you use it in 2021?

A.    Yes.

Q.    Did you use it in 2022?

Page 158

J. ZICHERMAN

A.    Yes.

Q.    Okay.  Referring you back to
Defendants' Exhibit 10 here.  Is it
fair to say this is an email from you
to Jeffrey Kiley on July 26, 2022?

A.    It looks like it's an email,
yeah.

Q.    And so in the body of the
document it says, CODX peeps, forgot
about this one, I guess.

A.    Yeah.

Q.    And there's a link to what
appears to be an article.  Do you see
that?

A.    Yeah.

Q.    What did you mean by this
message?

A.    I can't open the message, so
I don't know what the body of it says.

Q.    You mean you can't click on
the link?

A.    No.

Q.    Can you see the exhibit right
now, yes or no?

Page 159

J. ZICHERMAN

A.    I see the link, but I'm not able to open it.  I'm trying to click on it.

Q.    I understand.  I can access the link for you, but do you see where you wrote, CODX peeps, forgot about this one?

A.    Absolutely.

Q.    What did you mean by that?

A.    If I knew what the body of the email said, I would tell you what I meant by it.  Can you open it for me?

Q.    Sure.  So I can show that to you now.

A.    Thank you.

Q.    Just, Mr. Zicherman, just so we have a clean record, the court reporter and the videographer are asking if you don't eat during today's deposition, if you need to take a break to eat, we're happy to accommodate that.

A.    I'm fine, we got an hour and a half at most left, so I want to give

Page 160

J. ZICHERMAN

you whatever you require.

Q.    So I have just marked Defendants' Exhibit 11, so I can represent to you that that's the article that you would go to if you clicked on the hyperlink from Defendants' Exhibit 10.

(Exhibit 11, marked for identification, Article entitled "Co-Diagnostics Ships Monkeypox Virus Tests to International Distributors to Fight Multi-Country Outbreak.")

A.    Okay.

MR. URIS:  Objection to this exhibit, I just want to confirm, can you tell us when this article was pulled?

MS. BARROW:  Does it say on the document?

MR. URIS:  I see on the document it says September 18, '24, is that when?

MS. BARROW:  Most likely,

Page 161

J. ZICHERMAN

yes.

Q.   Okay, so Mr. Zicherman --

A.   I got it, okay.  Okay, got it.  Okay.  So when was -- let's see, when was this from here?

Q.   So the article is dated July 11, 2022, and this is the article that you linked in your email to Mr. Kiley.

A.   Yeah.

Q.   So my question to you is what did you mean by CODX peeps, forgot about this one, I guess?

A.   I really don't know.  I guess maybe -- I don't know, I have -- if I'm going to speculate on something, just speculate.  But if I've told him I bought the stock, or that I like the stock, I would provide him with some background in case he ever wanted to get involved.  That's all.

Q.   I see.  So you and Mr. Kiley sort of traded information on investment strategy, correct?

Page 162

J. ZICHERMAN

A.    We've been doing it for 20-odd years.

Q.    And then on this day, July 26, 2022, was the same day that you had purchased Co-Diagnostics stock, correct?

A.    Maybe, could be, probably.

Q.    If I could -- yes, I can represent to you based upon the exhibit that we looked at previously, July 26, 2022, was on that document, do you recall?

A.    Yes.

Q.    Okay.  So on the same date that you had purchased Co-Diagnostics stock, you emailed your friend that you shared investment strategy about stating that Co-Diagnostics had forgot about this factor and then if we go to Defendants' Exhibit 11 --

MR. URIS:  Objection.

Q.    -- the article is regarding monkeypox, correct?

A.    Mm-hmm.  I got to read this

Page 163

J. ZICHERMAN

thing.  I mean, I don't even remember.
I mean, I know that my justification
for buying it was that it was right in
the eye of the storm.

Q.    Right.  And so Defendants'
Exhibit 11 is titled "Co-Diagnostics
Ships Monkeypox Virus Tests to
International Distributors to Fight
Multi-Country Outbreak."

A.    Right.

Q.    So it discusses
Co-Diagnostics' work with providing
monkeypox tests, correct?

A.    So this was for another
application, I presume.

Q.    What do you mean by that?

A.    Well, it wasn't for Covid, it
was monkeypox.

Q.    Okay.  And so when you
emailed Mr. Kiley, is it fair to say
that this article regarding monkeypox
factored into your decision into
whether or not to buy Co-Diagnostics
stock?

Page 164

J. ZICHERMAN

MR. URIS:  Objection.

A.    No, it was to show that they do something other than Covid stuff, that they're probably legitimate because they do more than one thing.

Q.    So it was a helpful fact that they were doing --

A.    It was just supporting documentation and that's all.

Q.    Supporting for your decision, correct?

A.    Supporting for my decision to consider buying this company's stock.

Q.    And on that day, July 26, 2022, you did purchase Co-Diagnostic stock, correct?

A.    I gather.  You want me to go back?  I can kill some time going back, or if you want to affirm that, we can move on.

Q.    Up to you, I have all day.

A.    I don't.

Q.    So is that a yes?

A.    As I said, I'm going to

Page 165

J. ZICHERMAN

assume that was the day I purchased it and I was probably telling him that you look into it and this company does other things.

Q.    So how did this article affect Stadium Capital's decision to purchase Co-Diagnostics securities?

MR. URIS:  Objection.

A.    It affected nothing to do with it, nothing.  Zero.

Q.    How so?

A.    Because sometimes I come across obscure companies and you look for some supporting research, what did they do last year, did they win any awards, do they have any Nobel Prize winners, etcetera, etcetera, etcetera.

Q.    So this article regarding Co-Diagnostics engaging in monkeypox testing was supporting research for purchasing the security, correct?

MR. URIS:  Objection.

A.    No.

Q.    Well, that's what you just --

Page 166

J. ZICHERMAN

A.    No, that's not correct.

Q.    -- that's what you just said.

A.    No, I don't.

Q.    Okay.

A.    I said it's supportive of the fact that it's probably a legitimate company, because they're doing other things.

Q.    I see.  Okay.  And how did the monkeypox test that Co-Diagnostics -- strike that.

I'm going to introduce another document that's Defendants' Exhibit 12.

A.    Okay.

Q.    Do you see Defendants' Exhibit 12?

MR. URIS:  You may have to refresh it one more time.

A.    Okay.

(Exhibit 12, marked for identification, Bates stamped PLTF_CODX_0006.)

Q.    For the record --

Page 167

J. ZICHERMAN

A.    I got it, I got it.

Q.    So this document I marked as Defendants' Exhibit 12 is Bates stamped PLTF_CODX_0006.

A.    Yeah.

Q.    So is it fair to say that Defendants' Exhibit 12 is a continuation of your conversation with Mr. Kiley that was in Defendants' Exhibit 10?

A.    I would say that's fair to say.

Q.    Okay.  And so this is you here emailing Mr. Kiley on -- sorry, July 27, 2022, correct?

A.    Yep.

Q.    And so here you say, I'm long 36,000, correct?

A.    Yes.

Q.    And what did you mean by that?

A.    You don't know what I meant by this?  I own 36,000 shares.

Q.    Of?

J. ZICHERMAN

A.    Of, there's a subject up there called Co-Diagnostics.

Q.    So --

A.    Of Co-Diagnostics.

Q.    So this email on July 27, 2022, is to inform Mr. Kiley that you had purchased 36,000 stocks of Co-Diagnostics, correct?

A.    Shares, yes, shares.

Q.    Sorry, shares.  That 36,000 shares, that's all of the Co-Diagnostics stocks that you have ever owned?

A.    I don't remember.

Q.    So you could have purchased additional Co-Diagnostics stock?

A.    You had those three lines up there where it shows me $70,000 loss, shows what I purchased.  That's why we went over that.  And then he responds by saying, I'm long a little.  So basically what I was telling him was that I really thought this had an opportunity, given the environment, and

J. ZICHERMAN

I told him that I bought 36,000 shares.

I'm going to tell you this happens every single day, it's like you walking into your office and getting coffee. I tell people what I own, people tell me what they own. I look at it, we send stuff back and forth. This is, I know this seems like an extraordinary event, but it truly is not anything extraordinary. It's very simply just the business as usual.

Q. You are exchanging this business as usual trade of information with Mr. Kiley in the context of also the monkeypox outbreak, correct?

A. Yeah, we went over this already.

Q. Okay.

A. We went over this.

Q. So that's a yes, right?

A. We went over it twice already. I told you I thought this company, this additional application that they had was probably a legitimate

Page 170

J. ZICHERMAN

company, because it wasn't the only thing they were doing, was Covid.

Q.    Mr. Zicherman, I'm going to mark a document as Defendants' Exhibit 13.  That document is Bates stamped PLTF_CODX_00075.

(Exhibit 13, marked for identification, Bates stamped PLTF_CODX_00075.)

Q.    Do you see that?

A.    Yep, got it.  Yep.

Q.    Do you recognize this document?

A.    It was sent to me by -- it was sent to me, it was sent to Jeff Kiley from me.  Yeah, it was just, he was just affirming the data that we were sharing.

Q.    So is it fair to say that this document is an email chain between you and Mr. Kiley on August 4, 2022, where Mr. Kiley is initially emailing you a Twitter content and then you were responding, yes?

J. ZICHERMAN

A.    Yeah, he's sending me an email.

Q.    I understand.  But is it as I just described it?

A.    Yeah, it's, yeah, it's an industry consolidation review.  It's just sharing data, that's all it is.

Q.    And so the data in this email from Twitter says, One of the big names in Covid testing is languishing among its peers and might want to acquire technology that expands its depth in testing.  Co-Diagnostics, and then it has the ticker, has a market cap of 221 million, and also appears to have been working on a monkeypox test for the past couple of weeks.  The company is positioned with approximately 97.4 million in cash equivalent.  This puts the company's enterprise value at 125 million and their book value at 4.32 shares in comparison to their stock price of 6.50.  In the last quarter they sold 22.7 million in sales

Page 172

J. ZICHERMAN

and brought in 9.8 million to the

bottom line.  Their PE ratio is a mere

5X.

Do you see that?

A.    Yep.

Q.    So Mr. Kiley was informing

you that the book value of

Co-Diagnostics was below the stock

price, correct?

MR. URIS:  Objection.

A.    You mean the book value, yes.

Q.    Can you explain what PE ratio

means?

A.    It's a price-to-earnings

ratio.  The price of the stock in

relations to the earnings per share.

Q.    Is mere 5X a good thing or a

bad thing for a stock price?

A.    It all depends on what group

it is and the market conditions and

their earnings going into, it's a

variety of factors in here that are way

too many to mention.

Q.    Okay.  So in this context is

Page 173

J. ZICHERMAN

a mere 5X a good thing or a bad thing?

A.    It is not to be construed as qualitative.  It's to be construed as informative.  It's just giving me data.  The value of -- book value $4.32, book value is meaningless in these things.

Q.    Okay.  And as you sit here today, would you say a mere 5X was good in this context or --

A.    I just said to you --

MR. URIS:  Objection.

A.    I just said to you it's not qualitative.  It's not a judgmental thing.  It's meaningless data.  It's just giving me facts.  It's like saying that the temperature is 72.  That's all.

Q.    And --

A.    Is that a good temperature or a bad temperature?  You tell me.

Q.    Well, I think it's a good temperature, that's why I'm asking your opinion.

A.    Good, I hear you.  Well.

Page 174

J. ZICHERMAN

Q.    So the lower book value is an indicator that a stock may be overvalued by the market?

A.    You got to pay attention to what I'm saying, honest to God.  Book value is meaningless I just said. Meaningless.  If you don't mention book value again we can be much more efficient.

Q.    So I'm going to be the one that asks the questions here.  I'll do my job, you do your job.

A.    I'm trying to do my job, but when I answer in English, I expect you to understand it in English.  If I say book value is meaningless -- don't interrupt me, please.  If I'm saying the book value is meaningless, you think I don't think it's meaningless? It's meaningless.  Why would you bring it up again?

Q.    So does that mean the stock was overvalued?

A.    I just said it's not a

Page 175

J. ZICHERMAN

qualitative judgment.

Q.    Okay.  I'm not asking you --

A.    I'm not speaking --

Q.    -- concerning that anymore.
I'm asking if it's overvalued.

MR. URIS:  Objection.

A.    I'm telling you that the
stock is not a qualitative thing.  The
book value is meaningless.  It's like
the same color of the suit that the
chairman wore on that day, meaningless.
I used to teach this stuff.  I know how
to teach it, honest to God.  Book value
is meaningless.  Par value is
meaningless.  Price earning multiple is
relative.  Completely meaningless, this
stuff.

Q.    Did Mr. Kiley provide any
other information regarding
Co-Diagnostics?

A.    We were sharing data only.

Q.    So what --

A.    Sharing facts, those are
facts.

Page 176

J. ZICHERMAN

Q. What other facts and data was shared between you and Mr. Kiley regarding Co-Diagnostics?

A. I would say nothing. I told him what I owned and he said he bought a little.

Q. And so this information that was provided to you by Mr. Kiley regarding the monkeypox vaccine, did you or Stadium Capital do anything to confirm this information?

MR. URIS: Objection.

A. No. No, it's an article that is, I presume is fact. Our business is very dynamic and we presume that when you read something in the Wall Street Journal, you presume it's accurate. When you hear something at a conference, you presume that it's legitimate, etcetera, etcetera. It's very dynamic, things happen quickly. You go from this one to the next one.

Q. After you received this information here from Mr. Kiley on

Page 177

J. ZICHERMAN

August 4th, why did you decide not to sell?

MR. URIS:  Objection.

A.    Why did I decide not to sell? Why would I sell?

Q.    Okay, I'll ask -- sure, you can respond.

A.    Why would I sell?

Q.    Because it was overvalued.

A.    Where do you see it's overvalued?

Q.    You testified earlier.

A.    I did not say that at all.  I did not say that at all.  I said it's not a qualitative thing.  I didn't say it was overvalued at all.  If you can pull it out of my records, I would love to hear what you perceived as me saying it was overvalued.  I didn't say anything of the kind.  Nothing.

Your turn.

MS. BARROW:  Jeremy, are you allowed to read back from the transcript, 13:17:52, line 15 where

J. ZICHERMAN

it says, So Mr. Kiley was informing you that the book value of Co-Diagnostics was below the stock price, correct?

Mr. Uris, objection.

And then you said, Yes.  The book value.

A.    Listen, I told you, how much times have I told you now the book value means nothing?

Q.    Okay.

A.    How many times have I told you the book value means nothing?

Q.    I understand.  I'm not --

A.    You cannot cherry pick a line out, I did not say that the stock was overvalued.  I had no idea, the book value means nothing, zero, nothing.  We can spend the rest of our time going over that the book value means nothing. I don't know how many different ways I can say to you that the book value means nothing.  The book value is just a number.  Just a number.  It means

J. ZICHERMAN

nothing.  In some things like banks, it means a lot.  Because stocks trade at a multiple of book values.  In companies like this, book values are constantly shifting and changing, so it means nothing.  I've told you this eight times already, and you keep referring back to where did I say that this thing was overvalued, nowhere.  Nowhere.  I have no idea whether it was overvalued or not.  I was simply dealing on raw data.

Q.   Did this information that was provided to you by Mr. Kiley factor into your decision whether or not to hold or sell your stock, your shares in Co-Diagnostics?

A.   Where do you see information that was provided to me by Mr. Kiley? Mr. Kiley didn't provide me with the information, I was providing him with the information.

Q.   The document that's Bates stamped PLTF5 on the bottom --

Page 180

J. ZICHERMAN

A.    What does it say?

Q.    We just went over this, this is an email from Mr. Kiley to you.

A.    Yeah.

Q.    And it has the excerpt from Twitter.  So that information that Mr. Kiley provided to you on August 4, 2022, and you said, Merci, which I assume means thank you, how did that factor into your decision on what to do with your Co-Diagnostics shares?

MR. URIS:  Objection.

A.    I told you, if you go back about five minutes, I told you he was just giving me data here.  Data.  Data.  Raw data.

Q.    Sir, I --

A.    So I tell him something, he tells me something, I tell him something, he tells me something.  And together we become a little stronger because of it.

Now, I don't know why you're so hung up on the book value, but

J. ZICHERMAN

listen to me very carefully and I'll go through this one more time, and maybe you can turn on a recorder so you can review it if you need to.  I bounced this off Mr. Kiley because he's a very good friend of mine, and he always tells me to let him know what I'm doing, so I let him know what I'm doing.  And he has knowledge of the business as well, so he added a little information, and I added a little information and he added a little information.

There's no place in the world where Mr. Kiley advised me what to do here, because I was much more involved with it than he was.  I was just simply telling him as a friend what I was doing.  Happens every day of the week.

The book value means nothing. Nothing.  The things that he says in here, the puts in the company, the enterprise, the enterprise value of 125 million and book value of 4.32 a share

Page 182

J. ZICHERMAN

to their stock price of 6.50.  It means nothing.  It means nothing, the book value.

Q.    So why did you say --

A.    What?

Q.    No, you can continue to go.

A.    No, go ahead.

Q.    So in response to the data that Mr. Kiley had sent you on August 4, 2022, why did you say thank you?

A.    Why did I say thank you?

Q.    Yes.

A.    Because he was kind enough to send me the data.  I have manners.

Q.    How did you interpret the data?

A.    I interpreted it as the fact that the book value at 4.32, which meant nothing to me, the enterprise value was 125 million, that mattered something to me.  That's their debt plus their market cap.  I wanted to know that that means something.  Stock

J. ZICHERMAN

price of 6.50, that I know I can look at my machine. They said they had 22.7 million in sales. That meant something to me because it's trading at an enterprise value about five times worth of sales. They brought, they had EBITDA of 9.3 million and the PE ratio is at five. Just data. It's just data.

Q. So the enterprise value did matter to you?

A. The enterprise value is not anything that would move this stock for the purpose that I was looking to make money in this name. The enterprise value is simply the number of shares times the market price plus the debt is the enterprise value. Now, you tell me what that, what matter -- all that I was focused on here, to put it very simply, there was a pandemic, there was a, there was a worldwide problem, and what we were efforting [sic] to do here is see if these guys were going to sell

Page 184

J. ZICHERMAN

more testing kits, given the nature of the pandemic.  That's all.

Enterprise value is a waste of time.  A waste of time.  The PE didn't matter or anything.  I would buy this with a PE of five if it had the right configuration, and I would buy it with a PE of 25 if it had the right configuration.

You asked me other names that I bought.  I gave you the name Immunone, it's got a PE of a thousand. So I don't know what, I don't know why we're so stuck on this thing here, but, you know, it's your time.  And I'm trying to get you to move on a little bit to some things that might be helpful to you, but you're stuck on book value, which I've now probably told you 15 times is a meaningless number when it comes to a company such as this.  Meaningless.

Q.    Do you have anything else?

A.    No, how about you?

Page 185

J. ZICHERMAN

Q.    I do.  I have plenty more.

So Mr. Zicherman, if I could just refer your attention to the top portion of this data that you were given from Mr. Kiley on August --

A.    Sure, by all means.

Q.    Sure.  And so here it says that one of the big names in Covid testing is languishing amongst its peers, and it might want to acquire technology that expands its depth in testing.

And then putting aside the other data about the market cap, it says, It also appears to have been working on a monkeypox test for the last couple of weeks.

So how did this information regarding the monkeypox test factor into your decision as it pertains to your share of Co-Diagnostics?

MR. URIS:  Objection.

A.    All right, pay attention now, okay, ready?  This company is a

J. ZICHERMAN

relatively small company.  I -- he was trying to tell me that this might be attractive as an acquisition candidate for a larger pharmaceutical company. Because they do more than just Covid testing, they test monkeypox, etcetera, etcetera.

Q.   So the monkeypox testing was a good thing?

A.   Well, if they're making money on it, I presume it's a good thing.  If you take a company that has one product, they'll make X number of dollars, and you like to think if they have 20 products they'll make 20X or thereabouts.

Q.   Okay.  So we can --

A.   Completely different product.

Q.   Completely different product suites, both from Co-Diagnostics, correct?

A.   No, no, no.  Co-Diagnostics did Covid testing and it appears they had been working, it says it right here

Page 187

J. ZICHERMAN

in front of you, on a monkeypox test for the past, what does it say, the past couple weeks.  The company's positioned well, with 97 million in cash equivalents.

So what -- the idea here is that it might be an acquisition candidate for a larger company. Certainly at that time there were many acquisitions being made in the Covid area.  Take a look at Pfizer, what they accomplished.

Q.    So if at this time Co-Diagnostics was a potential acquisition candidate for a larger company as it pertains to the Covid-19 testing and the monkeypox testing, is that a good thing for the value of the shares?

A.    Well, have you ever seen a company get taken over for less?

Q.    Is that a yes?

A.    The answer -- yeah, well, these are strategic questions you're

Page 188

J. ZICHERMAN

certainly giving.  Is it a good thing,
yes, it's a good thing.

Q.    And did Stadium Capital in
summer of 2022 know about the Logix
smart Covid-19 test sold by
Co-Diagnostics?

A.    Did they know about it?

Q.    Yes.

A.    I think after I probably read
the transcript I knew about it.  But
that's about that.

Q.    Was Stadium Capital aware of
the other product suites that
Co-Diagnostics was offering?

A.    I don't remember.  It's a
long time ago.

Q.    Was it aware of potential
tests to test both Covid and the flu at
the same time?

A.    I'm sorry?

Q.    Was Stadium Capital aware
that Co-Diagnostics was working on
other product suites, and in particular
on tests that would test for both

Page 189

J. ZICHERMAN

Covid-19 and the flu at the same time?

A.    And the flu?  I was mainly interested in the Covid test, that was what was on the front burner at the time.

Q.    And did the fact that Co-Diagnostics was potentially going to offer other product suites have an impact in your determination of what to do with those shares?

A.    Not at that moment, I was more interested in what was on the front pages.

Q.    On the front pages was the monkeypox, correct?

A.    No.  Covid was on the front pages, Covid.

Q.    Well, we just looked at --

A.    Covid.

Q.    -- article about' monkeypox.

A.    Covid.  Covid was on the front page, it's Covid.

Q.    Okay.

MR. URIS:  Objection.

Page 190

J. ZICHERMAN

Q. Okay. And monkeypox was also in articles, correct?

A. Don't you see where it says they have been working on a monkeypox test in the past couple weeks? You see that in line 3? Covid was what I was interested in, Covid.

Q. You were sharing articles regarding monkeypox, correct?

MR. URIS: Objection, he's already testified about that.

A. I can't, I can't, I can't. I just can't. I can't do this. This is terrible.

Q. Is that a yes or a no?

A. I don't know.

MR. URIS: Objection, asked and answered.

Q. So if I can refresh your recollection, Defendants' Exhibit, the article that you shared was titled "Co-Diagnostics Ships Monkeypox Virus Test to International Distributors to Fight Multi-Country Outbreak," correct?

Page 191

J. ZICHERMAN

A.    You are confusing the issue. What do you want to look at, the article that I sent or this email from Jeff Kiley?  Which one do you want to look at?

Q.    I'm just asking you --

A.    No, I'm asking you, which one do you want to look at?

Q.    Answer the question.  The question is pending.

A.    Which one do you want to look at?  I'm asking you now.

Q.    You can look at whatever you want.

A.    Thank you, I really appreciate that --

MR. URIS:  Is there a question pending?

A.    -- which one would you like to look at?  Because you're confusing the two, and now you're playing games with me and, you know, and it's unfortunate, because in a bit of time I'm going to have to leave, and you're

Page 192

J. ZICHERMAN

wasting time and then you go tell the judge that I was very uncooperative, and I'm not uncooperative, you're just playing games. And you know it and I know it.

Which one would you like to look at, do you want to look at this email here, item number 13, or do you want to look at the article? I have explained each one now for 20 minutes on this already. And I've explained each one very clearly.

MR. URIS: Do you have anymore questions on this document, Erica?

MS. BARROW: Sure.

Q. You had mentioned that you were interested in the topics that were in the headlines, and I referred you to Defendants' Exhibit 11, which was the article that you shared regarding monkeypox. And so my question for you is, are those the type of articles that you were concerned about?

J. ZICHERMAN

A. You know, thank God I can still remember what I said. I said to you very clearly that I sent that article because it shows that they're working on another thing, which seems to legitimize the company. But the big issue was Covid. That's exactly what I said to you. Covid. Now, if there's any confusion, the thing that was on the front page of the Wall Street Journal every day was Covid.

Q. And that's, Covid was on the front page of the Wall Street Journal to --

A. It was on the --

Q. Mr. Zicherman, I have to finish talking before you can talk. I'll try this again.

In summer of 2022, two years after Covid had started, it's your testimony that Covid was on the front page of the Wall Street Journal every day?

A. No, it's not my testimony.

Page 194

J. ZICHERMAN

Every day.

Q. What's your testimony?

A. Let me go get all the issues from '22 and then I'll look at every day, maybe it was on every day, I don't know.

My testimony is that it was on the front burner, you know what the front burner is? That means it's on people's minds. And people were dying from it, you might remember that. And people got sick from it, you might remember that.

Well, I'll tell you something, I was more interested in a company that was testing for Covid, and the idea that it had other products, other products, was just an article that legitimized the company's existence, I thought, that they were working on other things. I thought that was pretty good, actually.

Q. Mr. Zicherman, you had previously said that there were

Page 195

J. ZICHERMAN

statements made at a conference in 2022 that I believe you said was misleading; is that correct?

A.    I did say that, absolutely.

Q.    Okay.  And so was there a time where Co-Diagnostics corrected that disclosure?

MR. URIS:  Objection.

A.    I wish.  I wish.

MR. URIS:  Calls for a legal conclusion.

A.    There was a time when I bought the stock based upon their presentation at the conference and I sold the stock subsequently after they proved that they were, that the comments that they made were completely fabricated.

Q.    So we can talk a little bit about your selling of the stock.  So if we go back to your previous defendants' exhibit, which is the chart, you don't have to pivot to it, I can just represent to you.

Page 196

J. ZICHERMAN

So it appears that you sold the stock on August 11, 2022, correct?

A.   Yeah.

Q.   And so that was a few days after your exchange with Mr. Kiley regarding the monkeypox and whether or not the enterprise value or the book value was off, correct?

A.   Yeah.

MR. URIS:  Objection.

Q.   And so why did you wait until August 11th of 2022 to sell your shares of Co-Diagnostics?

MR. URIS:  Objection.

A.   That you have to ask my attorney, I don't remember.  These are the little specifics that I don't remember.

Q.   I think you're the best person to answer this question.  Why --

A.   I hear you, but I don't remember.

Q.   You don't remember why you sold the stock at issue in this

J. ZICHERMAN

litigation?

A.   I remember why I sold the stock, because I sold the stock because -- because they reported earnings that were completely dissimilar with what they said at the conference.

Q.   Okay.  But when did you find out about those earnings?

A.   That's why you have to ask my attorney, he has all the information. I don't remember.

Q.   If I can represent to you that they disclosed the earnings before August 11, 2022, when you sold the stock -- sorry, not August 11th, August -- yeah, August 11th, why was there a gap in time?

MR. URIS:  Objection.

Q.   Why did you wait?

MR. URIS:  Objection.

A.   I'm trying -- you know what, with all due respect, I'm trying to -- I just don't remember.  I know that

J. ZICHERMAN

you -- if I remember you would know,
but hold on.

When did they report their
earnings?

MR. URIS:  I believe Erica
represented to you that they
reported earnings on August 11th.

THE WITNESS:  Okay, okay --

Q.    No, no.  Sorry.  To clarify,
my understanding from the defendants'
exhibit with Stadium Capital's
transaction history is that you sold
the stock on August 11th.

A.    There you go, they reported
earnings on August 11th.

Q.    You're telling me or you're
asking me?

A.    The earnings were nothing
similar to anything that they spoke
about at the conference.

MS. BARROW:  Why don't we
take a five-minute break so you can
take the phone call.

THE WITNESS:  I don't need

J. ZICHERMAN

the phone call.

MS. BARROW: We're on the record now and the phone is ringing.

THE WITNESS: The phone is not ringing.

MS. BARROW: Why don't we still take a five-minute break.

THE WITNESS: Listen to me, I got 45 more minutes and I'm done.

THE VIDEOGRAPHER: Going off the record, the time is 1:43 p.m., this is the end of media unit four.

(Recess.)

THE VIDEOGRAPHER: We're back on the record, the time is 1:48 p.m. This is the beginning of media unit five.

Q. Hi, Mr. Zicherman, so when we last left off we were discussing your sale of Co-Diagnostics stock, which I believe based upon the transaction history occurred on August 11th --

A. You don't believe, it was the

Page 200

J. ZICHERMAN

11th of August.  Next case.

Q.   What was the reason for your selling?

A.   Because the company reported earnings that looked nothing like they had expressed in the conference call prior, in the research presentation at the conference prior.

Q.   So how did you learn of the earnings on August 11, 2022, about Co-Diagnostics?

A.   You want to know how I learned about the earnings?

Q.   Yes.

A.   I learned from news sources.

Q.   Did you listen to the earnings call?

A.   Did I learn, no, I didn't listen to the earnings call, because by the time the earnings came out, the stock had already dropped precipitously.  So it was academic to look at the earnings call.

Q.   So you saw that the stock had

Page 201

J. ZICHERMAN

dropped and then you looked at the earnings, yes?

A.    Yeah.

Q.    And then you decided to sell?

A.    Yes.

Q.    And so did you at any point listen to the substance of the earnings call?

A.    Pardon me?

Q.    At any point, did you ever listen or read the transcript of the earnings call?

A.    There was nothing to listen to.  There was virtually no earnings.

Q.    And so how did the information that you learned on August 11th --

A.    I just told you, Erica, I just told you.  I got it from news sources.  News sources.

Q.    Okay.  We'll try this again.

A.    Good, try it again.  Because you didn't listen, I'll wait to speak, okay, we'll share the burden of

Page 202

J. ZICHERMAN

responsibility.  You listen better and I'll be more patient.  Okay.  Fire away.

Q.    So I need to ask the question in full before you cut me off, and we've done this over a dozen times.

MR. URIS:  Erica, please, just ask the question.

MS. BARROW:  I'm trying to, but the problem is I can't get a sentence or word out edgewise --

MR. URIS:  He just said he was going to wait for your question.

MS. BARROW:  I'd appreciate that.

Q.    Was there any other information other than the drop in stock price that led you to sell the Co-Diagnostics shares?

A.    No.

Q.    And so was there ever a corrective disclosure that occurred on August 11, 2022?

Page 203

J. ZICHERMAN

MR. URIS:  Objection, calls for a legal conclusion.

Q.    You can answer.

MR. URIS:  If you know.

A.    If anything else, there's nothing else, you know, when the stock breaks like that and price drops, you can't quantify how far it's going to go down.  You sell first and then you ask questions.  But in this one, the numbers were so perverse that there were no questions to ask.

Q.    Let's suppose a hidden truth the Co-Diagnostics August 11, 2022, earnings call reveal?

MR. URIS:  Objection.

A.    You want to know what hidden truth?

Q.    Was revealed, correct.

A.    Oh, that their business stunk.

Q.    And what information in the call corrected the challenge statements?

Page 204

J. ZICHERMAN

MR. URIS:  Objection, calls for a legal conclusion.

A.    I don't understand what you're asking.

Q.    Okay, strike that.

So if your position is that the earnings results were disclosed on August 11, 2022, that led to your sale of your shares, how could that information have been disclosed earlier?

MR. URIS:  Objection.

A.    You want to know how it could have been disclosed earlier.  The first thing is they did not -- they could have -- there's a way to go about it that's time-honored and very traditional on Wall Street where you, you make a statement publicly that your sales are light or your earnings are light or business is slowing down or orders are slowing down or your biggest customer dropped dead or something or other.

Page 205

J. ZICHERMAN

There are many, many disclaimers that you can make to adjust your expectations. But this company did not do that. They went forth to a conference and they proclaimed that there was nothing out of the ordinary.

Q. Mr. Zicherman, so the emails that we just reviewed, for example, Defendants' Exhibit 13, your email with Mr. Kiley.

A. Yes, I'm looking at it.

Q. How is that collected?

A. How was it corrected?

Q. No, collected. How was that document collected?

MR. URIS: Objection.

A. You have to ask the person that collected it.

Q. Which is who?

MR. URIS: Objection.

A. My attorney.

Q. Did you give Mr. Uris access to your email?

MR. URIS: Objection.

Page 206

J. ZICHERMAN

A.    I don't, I don't know the answer to that.

Q.    So how did he get this email?

MR. URIS:  Objection, I'll instruct you not to answer any questions regarding collection of documents related to this case.

MS. BARROW:  The collection of documents for discovery is not privileged.  I'm not asking about conversations with counsel, I'm asking how this document that was produced by Mr. Zicherman on behalf of Stadium Capital was collected.

THE WITNESS:  Mr. Zicherman, to the extent you know how this email was collected, you may answer.

A.    I probably gave, I don't know, I really don't know.  I really don't know.  I don't even know what, how -- I don't know.  I don't know.

Q.    Do you know that this document was given to defendants in the

Page 207

J. ZICHERMAN

discovery phase of this case?

A. I don't know. You're asking me how a document was collected. I don't know the answer to that.

Q. Well, my follow-up question is not that, but rather, did you know that we had this document, that it was given to us, the defendants?

A. Listen, you can have any document in the world, I don't care. I mean, the truth is the truth. The reality is that these people lied and they caused a real, you know, an unfortunate episode here, and that's all, I mean, you can have any documents in the world.

Q. I appreciate that. But my question is whether or not you knew we had it.

MR. URIS: Asked and answered.

A. Once again, you can have anything, I don't care what you have. The truth is the truth.

Page 208

J. ZICHERMAN

Q.    I understand.  So it's not that I'm asking for permission, I'm wondering if you --

A.    I did not know that you had it, but I'm glad you do.

Q.    Appreciate that.

A.    Right.

Q.    Okay, just give me two more minutes to check my notes and I'll try to wrap this up.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Going off the record, the time is 1:56 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record, the time is 2:01 p.m.

MS. BARROW:  We would call for the production of the other biotechnology trades that Mr. Zicherman testified regarding.  We would call for the production of communication with David Sherman. We would call for the production of

Page 209

J. ZICHERMAN

Mr. Zicherman's notes that he was taking during today's deposition. And counsel and I had a brief discussion regarding authentication at the beginning of today's deposition. I asked him to consent to the authentication of plaintiff's production and so he could state his position on the record now.

THE WITNESS: Me?

MR. URIS: She's talking to me.

THE WITNESS: Okay.

MR. URIS: We will respond in due course to the requests for documents that you made on the record. And our position regarding any requests regarding the consent for authentication of documents is that we would have those discussions as part of a bilateral agreement regarding authentication of documents that have been

Page 210

J. ZICHERMAN

produced by both parties in this case.

MS. BARROW:  I believe I've already requested it, but in case I haven't, we would also call for the verification of plaintiff's interrogatories.

MR. URIS:  Understood.

MS. BARROW:  And so, Mr. Uris, did you want to ask some questions?

MR. URIS:  Yes, if you're done asking questions, I would like to ask a few.  I just need about five minutes or so to gather my notes.

MS. BARROW:  Sure.  We would reserve the right to have additional questioning within the scope of your redirect.

MR. URIS:  Sure.  So shall we resume at 2:08?

MS. BARROW:  Sure.

THE VIDEOGRAPHER:  Okay,

Page 211

J. ZICHERMAN

going off the record, the time is

2:03 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're back

on the record, the time is

2:07 p.m.

EXAMINATION BY

MR. URIS:

Q.    Joe?

A.    Yeah.

Q.    When you purchased
Co-Diagnostics stock, you were assuming
that the company's previous public
statements were truthful, correct?

A.    Correct.

Q.    If you had known that
defendants made misleading statements
on May 12, 2022, which artificially
inflated the stock price, would you
still have purchased the stock?

MS. BARROW:  Objection.

A.    No.

Q.    When you --

MS. BARROW:  Calls for a

Page 212

J. ZICHERMAN

legal conclusion.

Q.    When you purchased the stock, were you relying on the stock price reflecting truthful information?

A.    Always.  Always.

Q.    You and I have had multiple conversations about this litigation since you were appointed lead plaintiff, correct?

A.    Yes.

Q.    And those conversations concern multiple aspects of this litigation?

A.    Yes.

MS. BARROW:  Are you waiving privilege?

MR. URIS:  No, we're not waiving privilege, this is a high-level --

MS. BARROW:  Well, that would be waiving privilege.

MR. URIS:  It's not -- to say that we've discussed the litigation?

J. ZICHERMAN

MS. BARROW:  I mean, go ahead, I'm just telling you that that's going to be our position, but you want to talk about your conversations with your client as it pertains to this litigation, I'm just letting you know that our position is you've waived privilege.

MR. URIS:  Okay, you can make that argument.  We are not divulging the contents of any of your discussions.

Q.    You have discussed with your counsel the types of documents and information that you would have to produce in this case, correct?

A.    Yes.

MS. BARROW:  Objection.

Q.    And over the past two years so or you've been sent various documents in relation to this litigation and developments in this litigation, correct?

Page 214

J. ZICHERMAN

MS. BARROW:  Objection.

A.    Yes.

Q.    You don't recall specifically what documents you've received or reviewed relating to this litigation, correct?

A.    I do not, I do not.

Q.    You don't recall specifically how many conversations you've had with your lawyers over the past year regarding this case, correct?

MS. BARROW:  Objection.

A.    I do not.

Q.    Do you think it was more than three conversations?

A.    Maybe four.

MS. BARROW:  Asked and answered.

Q.    You've coordinated with your counsel to have a search for documents related to this case conducted, correct?

A.    Yes.

MS. BARROW:  Objection.

J. ZICHERMAN

Q.    And you're aware that your counsel in this case has produced certain documents to defendants on your behalf, correct?

A.    Yes, yes.

MR. URIS:  We have no further questions.

MS. BARROW:  Sure, I have a few questions.

CONTINUED EXAMINATION

BY MS. BARROW:

Q.    So now that you've opened up the document collection, Mr. Zicherman, can you tell me a little bit about the document collection in connection with this lawsuit?

A.    The document collection, what documents are you referring to?

Q.    Did you collect documents in connection with this lawsuit?

A.    No.

Q.    If documents were collected, how were they collected?

MR. URIS:  To the extent

Page 216

J. ZICHERMAN

you're aware, you can answer.

A.    If the documents were not collected, then they weren't collected.

MS. BARROW:  No further questions.

THE WITNESS:  No shit.

MS. BARROW:  Sorry, what did you say, Mr. Zicherman?  I didn't hear you.

THE WITNESS:  I was talking to my machine here for a second.

MS. BARROW:  Well, what did you say to your machine?

THE WITNESS:  What did I say, I said I'm a dumb shit for buying something that I bought, that's what I said.

MS. BARROW:  Are you shopping right now?

THE WITNESS:  Is that okay, if I said that?  I was being recriminating to myself.  Is that all right?

MS. BARROW:  Okay, if that's

Page 217

J. ZICHERMAN

your position.

THE WITNESS:  It's not my position.  You know what, you got to learn how to trust some people, that's my position, that's the truth.  My position also is cheated by the Co-Diagnostics, that's the truth, too.

MS. BARROW:  Okay.

MR. URIS:  Okay, are we done with the questions?

MS. BARROW:  I believe so, thank you for your time.

MR. URIS:  We'd like to read and sign.

THE VIDEOGRAPHER:  All right, we are off the record at 2:12 p.m., and this concludes today's testimony given by Joseph Zicherman.  The total number of media used was five and will be retained by Veritext.

(Time noted:  2:12 p.m.)

Page 218

I N D E X


WITNESS          EXAMINATION BY          PAGE

ZICHERMAN       MS. BARROW          6, 215

                MR. URIS            211


E X H I B I T S


EXHIBIT          DESCRIPTION                    PAGE

 Exh 1    Defendant                       24
          Co-Diagnostics, Inc.'s
          notice of deposition to
          Stadium Capital
 Exh 2    Defendants                      34
          Co-Diagnostics, Inc.,
          Dwight H. Egan and
          Brian L. Brown's First
          Set of Request For the
          Production of Documents
          dated April 5, 2024

| Exh 3 | Plaintiff Stadium Capital LLC's Responses and Objections to Defendant Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set of Requests For Production | 40 |
| Exh 4 | Defendants' First Set of Interrogatories to Plaintiff dated May 14, 2024 | 43 |
| Exh 5 | Plaintiff Stadium Capital LLC's Responses and Objections to Defendants Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown's First Set of Interrogatories to Plaintiff | 52 |

Page 220

| Exh 6 | Memorandum of Law in Support of Lead Plaintiff's Motion to Certify the Class, Appoint Class Representative and Appoint Class Counsel | 105 |
| Exh 7 | Declaration of Jason Uris in Support of Lead Plaintiff's Motion to Certify the Class, Appoint Class Representative and Appoint Class Counsel | 107 |
| Exh 8 | Bates stamped PLTF_CODX_0003 | 117 |
| Exh 9 | Bates stamped PLTF_CODX_0001 | 140 |
| Exh 10 | Bates stamped PLTF_CODX_007 | 154 |

Page 221

| Exh 11 | Article entitled "Co-Diagnostics Ships Monkeypox Virus Tests to International Distributors to Fight Multi-Country Outbreak." | 160 |
| Exh 12 | Bates stamped PLTF_CODX_0006 | 166 |
| Exh 13 | Bates stamped PLTF_CODX_00075 | 170 |

REQUESTS

| Page | Line |
| --- | --- |
| 54 | 7 |
| 80 | 24 |
| 127 | 21 |
| 208 | 19 |

Page 222

CERTIFICATION

I, JEREMY RICHMAN, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20TH day of November, 2024.

JEREMY RICHMAN

*       *       *

Page 223

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

November 20, 2024

To: Mr. Uris

Case Name: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al

Veritext Reference Number: 7008641

Witness:  Joseph Zicherman , 30(b)(6)      Deposition Date: 11/15/2024

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 224

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7008641
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 11/15/2024
WITNESS' NAME: Joseph Zicherman , 30(b)(6)

In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.

I have made no changes to the testimony
as transcribed by the court reporter.


_____          _____
Date                     Joseph Zicherman , 30(b)(6)

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
        Statement; and
Their execution of this Statement is of
        their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20_____.


_____
Notary Public
_____
Commission Expiration Date

Page 225

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7008641
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 11/15/2024
WITNESS' NAME: Joseph Zicherman , 30(b)(6)

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____        _____
Date                    Joseph Zicherman , 30(b)(6)

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
     They have read the transcript;
     They have listed all of their corrections
          in the appended Errata Sheet;
     They signed the foregoing Sworn
          Statement; and
     Their execution of this Statement is of
          their free act and deed.
     I have affixed my name and official seal
this _____ day of_____, 20____.
               _____
               Notary Public


               _____
               Commission Expiration Date

Page 226

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7008641

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Date                    Joseph Zicherman , 30(b)(6)

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____
Notary Public

_____
Commission Expiration Date

**[& - 2022]**                                                    Page 1

**&**

**&**   2:3 6:4,8
  81:19 133:17
  134:6,10,15

**0**

**0001**   139:25
  140:5 220:19
**0003**   117:17
  220:17
**0006**   166:24
  167:5 221:10
**00075**   170:7,10
  221:12
**003**   119:7
**004**   121:17
**007**   154:23
  155:2 220:21
**05978as**   5:5
**06978**   1:4

**1**

**1**   24:17 25:8
  27:13 40:17
  65:13,15
  218:12
**10**   31:14 111:5
  111:15,22
  137:13,13,18
  137:18 153:13
  154:21,24
  155:17 158:4
  160:8 167:11
  220:20
**10022**   2:5

**10111**   2:10
**102**   11:9
**105**   220:2
**1056**   7:16
**107**   220:9
**10:00**   1:15
**10:13**   4:4
**10:58**   54:21
**11**   160:4,9
  161:8 162:21
  163:7 192:21
  196:3 197:16
  200:11 202:25
  203:15 204:9
  221:2
**11/15/2024**
  223:9 224:3
  225:3
**1100**   223:1
**117**   220:16
**11794**   7:10
**11:05**   54:15
**11:06**   55:2
**11:51**   103:9
**11:58**   103:14
**11th**   196:13
  197:17,18
  198:8,14,16
  199:24 200:2
  201:18
**12**   133:13
  166:15,18,22
  167:4,8 211:19
  221:9

**125**   171:22
  181:24 182:22
**127**   221:22
**12:42**   150:18
**12:44**   153:18
**13**   170:6,8
  192:9 205:10
  221:11
**13:17:52**
  177:25
**14**   43:6,11
  47:18 219:13
**140**   220:18
**15**   1:15 4:5
  64:19,20
  151:23,24
  177:25 184:21
**154**   220:20
**160**   221:2
**166**   221:9
**16780**   222:19
**170**   221:11
**18**   160:23
**1820**   223:2
**19**   63:3 137:22
  137:22 187:17
  188:6 189:2
  221:23
**1965**   63:20
**1978**   65:13
**1998**   65:2,15,25
**1:00**   153:23
**1:22**   1:4 5:5
**1:43**   199:13

**1:48**   199:18
**1:56**   208:14

**2**

**2**   34:14,20,22
  35:5 55:7,19
  56:8 91:6,7
  218:16
**20**   20:16,19
  30:8 41:16
  78:2 157:19
  162:3 186:16
  192:11 223:4
  224:16 225:22
  226:22
**2000**   67:24
**2020**   133:3
  137:21 138:15
  149:17
**2021**   156:12
  157:23
**2022**   80:10
  83:7 132:6
  139:5 142:25
  143:24 144:6
  147:14 148:7
  148:14 149:3,6
  157:25 158:6
  161:8 162:5,12
  164:16 167:16
  168:7 170:22
  180:9 182:11
  188:5 193:20
  195:2 196:3,13
  197:16 200:11
  202:25 203:15

**[2022 - above]**

204:9 211:19
**2024** 1:15 4:5
35:3,8 41:16
43:6,11 47:18
218:22 219:14
222:17 223:4
**208** 221:23
**20th** 222:17
**20x** 186:16
**21** 221:22
**211** 218:7
**215** 218:6
**216-523-1313**
223:3
**22** 139:16
148:16,19
194:5
**22.7** 171:25
183:4
**221** 171:15
**24** 160:23
218:12 221:21
**25** 142:24
144:6 184:9
**25th** 147:14
**26** 143:24
158:6 162:5,11
164:15
**26th** 147:14
**27** 167:16
168:6
**2:01** 208:18
**2:03** 211:3
**2:07** 211:7

**2:08** 210:23
**2:12** 217:18,24
**2:30** 153:7,14

**3**

**3** 39:21 40:5,19
119:18 126:6
190:7 219:2
**30** 1:18 223:8
224:4,9 225:4
225:13 226:20
**33414** 7:11
**34** 218:16
**36,000** 167:19
167:24 168:8
168:11 169:2
**3:00** 151:8

**4**

**4** 42:24 43:3,8
47:15 122:4
124:19 170:22
180:8 182:11
219:11
**4.32** 171:23
173:6 181:25
182:20
**40** 75:25 219:2
**400** 132:12
**43** 219:11
**44114** 223:2
**45** 2:9 199:11
**4th** 177:2

**5**

**5** 35:3,8 51:21
52:4 53:20
218:22 219:15
**50** 51:8 75:15
87:7 127:16
136:2
**52** 219:15
**54** 221:20
**5th** 7:16
**5x** 172:4,18
173:2,9

**6**

**6** 1:18 103:18
105:16,24
108:18,19,22
109:3,6 218:6
220:2 223:8
224:4,9 225:4
225:13 226:20
**6.2917** 144:8
**6.50** 183:2
**6.50.** 171:24
182:2
**63** 64:12

**7**

**7** 107:7,13
220:9 221:20
**7/25/22** 142:21
**70** 131:10,13
**70,000** 140:12
140:16 168:19
**70,655.50**
140:24 146:21

**7008641** 223:7
224:2 225:2
226:2
**72** 173:17

**8**

**8** 117:12,15
220:16
**8/11/22** 142:15
**80** 221:21
**800** 2:4

**9**

**9** 108:8,9,16,19
109:5 139:21
139:22 140:3
220:18
**9.3** 183:8
**9.8** 172:2
**97** 187:5
**97.4** 171:20
**9th** 149:16,17

**a**

**a.m.** 1:15 4:4
54:21 55:2
103:9,14
**abbreviations**
23:15
**ability** 21:24
109:11
**able** 10:23 15:7
28:4,13 111:10
111:11 152:12
159:3
**above** 1:19,20
223:17

**abrupt** 121:5
**absent** 109:14
**absolutely** 76:6
  159:9 195:5
**academic** 13:18
  200:23
**accept** 88:24
**access** 24:10
  159:5 205:23
**acclimate** 60:19
**accommodate**
  159:22
**accommodated**
  152:25
**accomplished**
  187:13
**accordance**
  224:5 225:5
**account** 49:16
  50:19 157:13
  157:19
**accurate** 53:21
  176:18
**accurately** 14:5
  21:25 157:20
**acknowledge**
  224:11 225:16
**acquaintances**
  74:23 75:2,3
  77:23
**acquire** 171:12
  185:11
**acquisition**
  90:11 91:4
  186:4 187:8,16

**acquisitions**
  187:11
**act** 94:4 224:14
  225:20
**action** 1:19
  5:11 18:11,15
  20:22 41:7,10
  41:18 43:18,19
  71:11,16 72:18
  73:20 74:4,6
  86:17,24 87:13
  89:7,24 96:20
  100:13 104:8
  109:23 115:14
  117:21 118:9
  120:8 121:22
  122:13,20
  222:13
**actions** 89:17
  89:20 90:21
**active** 10:9 62:8
  64:15 109:12
**actively** 13:23
**actually** 108:11
  194:23
**added** 181:11
  181:12,13
**additional**
  34:13 42:23
  64:21 117:11
  143:24 150:14
  168:17 169:24
  210:20
**address** 7:9 8:7
  8:10 95:11

156:21,25
  157:3 223:16
**adjust** 138:8
  205:3
**adjusted** 138:6
**advice** 116:5
**advised** 181:16
**affair** 17:22
  18:3
**affect** 21:13,19
  21:20,24
  137:23 138:2
  165:7
**affected** 165:10
**affidavit** 29:16
**affiliated** 30:12
**affiliations**
  5:19
**affirm** 25:6
  164:20
**affirming**
  170:18
**affixed** 224:15
  225:21
**agency** 72:2
**aggrieved**
  87:24 89:9
**ago** 17:20
  20:17,19 30:23
  31:12,14,15
  64:19,20 72:9
  79:12 81:18
  96:25 188:17
**agree** 4:17

**agreed** 3:3,8,12
  104:19
**agreement**
  118:17,23
  209:24
**ahead** 28:11
  108:10 182:8
  213:3
**aimless** 33:24
**al** 5:2 23:20
  90:8 223:6
  224:3 225:3
**allegations**
  73:2,4,7
  104:15 116:17
**alleging** 113:23
**allow** 15:2
**allowed** 19:15
  26:13 102:25
  177:24
**amended** 94:19
  124:21,23
**amount** 120:9
  120:20 123:8
  123:11 125:23
  126:3 146:25
  150:24
**analysis** 113:15
  147:22
**analyst** 71:6
  80:2 132:20
  133:16 134:6
  134:11,18,23
  135:8,9,11

[analysts - asks]

| | | | |
|---|---|---|---|
| **analysts** 132:23 133:5 | **answers** 45:16 45:18 93:5,22 | **appreciate** 20:14 191:17 | **asked** 18:21 32:19 43:23 |
| **ankle** 21:17,23 | **anybody** 13:4 | 202:16 207:18 | 44:10,11 45:12 |
| **answer** 14:4 | 44:24 47:5 | 208:7 | 45:15 46:21 |
| 20:5 22:10,24 | **anymore** 78:2 | **appropriate** | 53:13 90:19 |
| 22:25 27:3 | 175:5 192:15 | 101:24 123:22 | 105:17 106:19 |
| 28:7 31:19 | **anyway** 57:21 | 124:4 | 184:11 190:18 |
| 46:19,24 47:2 | **aol.com.** | **approximately** | 207:21 209:7 |
| 56:3 57:19,22 | 156:23 | 150:21 152:15 | 214:18 |
| 58:7,10 75:11 | **apologize** 121:4 | 171:19 | **asking** 11:17 |
| 82:24 83:24 | **appeals** 102:11 | **april** 35:3,8 | 13:7 19:9 20:6 |
| 84:3 85:25 | **appear** 224:11 | 65:13,15 | 22:17 26:24 |
| 87:20 88:18,20 | 225:15 | 218:22 | 27:24 32:17 |
| 91:10,23 94:11 | **appearance** | **arbitration** | 37:18,20 38:13 |
| 97:15,24 98:13 | 5:16 | 72:5,15 | 42:17 46:16 |
| 98:21 99:12 | **appearances** | **archives** 81:20 | 47:3,6 51:3 |
| 104:2,10 105:5 | 2:2 5:18 | **area** 8:19 60:15 | 53:14 57:12,20 |
| 105:8 110:24 | **appeared** 29:24 | 65:23 187:12 | 57:24 82:19,21 |
| 113:13 114:10 | **appearing** | **argument** | 87:17 91:13 |
| 122:16 123:19 | 109:21 | 213:12 | 92:19 94:8 |
| 124:8 141:24 | **appears** 158:14 | **article** 158:14 | 98:6 100:8 |
| 142:2 157:20 | 171:16 185:16 | 160:6,10,18 | 101:12,23 |
| 174:15 187:24 | 186:24 196:2 | 161:7,8 162:23 | 104:16 106:17 |
| 191:10 196:21 | **appended** | 163:22 165:6 | 108:15 121:6 |
| 203:4 206:3,6 | 225:11,18 | 165:19 176:14 | 125:25 129:6 |
| 206:19 207:5 | **application** | 189:21 190:22 | 133:20,25,25 |
| 216:2 | 163:16 169:24 | 191:4 192:10 | 140:14 159:20 |
| **answered** | **apply** 121:20 | 192:22 193:5 | 173:23 175:3,6 |
| 23:11 34:5,8 | **appoint** 105:22 | 194:19 221:2 | 191:7,8,13 |
| 34:11 90:22,22 | 105:23 106:4,5 | **articles** 190:3,9 | 198:18 204:5 |
| 106:20 190:19 | 107:11,12,17 | 192:24 | 206:11,13 |
| 207:22 214:19 | 107:18 123:21 | **artificially** | 207:3 208:3 |
| **answering** 19:9 | 220:6,8,13,15 | 211:19 | 210:14 |
| 22:4 69:20 | **appointed** | **aside** 185:14 | **asks** 19:6 57:6 |
| 98:22,23 | 212:9 | | 174:12 |

**[aspects - barrow]**

aspects 212:13
ass 98:5
assets 125:21
126:4 130:23
assignment
224:2 225:2
226:2
assist 53:4,8,11
86:3 94:18,22
assistant 70:20
associates
10:24
assume 25:3
30:15 51:4
165:2 180:10
assuming
211:13
attached 225:7
attachment
25:18 27:18
attempted
113:2
attended 80:11
attending 5:17
attention 15:9
15:13 20:25
109:9 137:21
174:5 185:4,24
attorney 5:21
24:22 25:5,6
26:7 35:22
36:6,10,15
37:7 42:2,10
44:3,23 45:2
45:20 46:25

49:9 52:23
54:5 55:24
56:10 57:6,15
82:17,22 83:2
88:16 91:21
118:9 120:16
127:20 196:17
197:12 205:22
attorneys 2:4,9
114:13 118:24
140:18,20
attractive
186:4
audio 4:15
august 170:22
177:2 180:8
182:11 185:6
196:3,13
197:16,17,17
197:18 198:8
198:14,16
199:24 200:2
200:11 201:18
202:25 203:15
204:9
authentication
209:5,8,21,24
authorize
225:11
autographs
69:10
available 40:3
42:25 117:13
139:23 152:10

avalon 75:15
75:19
ave 223:1
avenue 2:4 7:16
average 145:10
awarded
120:11
awards 165:17
aware 12:9
28:16 35:13
36:2 56:17,20
81:11 83:4
107:23 113:21
114:16 139:2
139:13 188:13
188:18,22
215:2 216:2

**b**

b 1:18 15:8
218:10 223:8
224:4,9 225:4
225:13 226:20
back 38:4
51:18 54:15,25
55:6,10 61:22
66:22 67:7
103:13 127:3
137:21 153:22
158:3 164:19
164:19 169:8
177:24 179:9
180:14 195:22
199:16 208:17
211:5 223:16

background
161:21
bad 104:12,12
130:9 172:19
173:2,21
badly 99:17
138:10
bag 153:15
baker 2:8
bakerhostetler
5:23
banks 179:2
barbara 68:22
bargain 89:14
barrow 2:11
5:22,23 6:25
12:17 26:24
46:8 54:7,14
54:18 67:5
69:23 80:24
95:17 98:24
99:8 101:15
102:14,19
105:9 127:21
150:17,23
151:3,19
152:19 153:12
160:20,25
177:23 192:17
198:22 199:3,8
202:10,16
206:9 208:19
210:4,10,18,24
211:22,25
212:16,21

213:2,20 214:2 214:13,18,25 215:9,12 216:5 216:8,13,19,25 217:10,13 218:6

**based** 162:10 195:14 199:23

**basically** 66:8 86:23 168:23

**basis** 119:20

**bates** 117:16 119:6,13 121:16 122:4 124:19 139:24 140:4 154:22 154:25 166:23 167:4 170:6,9 179:24 220:16 220:18,20 221:9,11

**bathroom** 102:23

**battered** 87:10

**bear** 40:14

**beaten** 87:9

**beg** 105:13

**began** 67:19

**beginning** 5:20 55:2 103:14 153:23 199:18 209:6

**behalf** 1:6 28:21 29:6 104:7,14

107:25 206:14 215:5

**believe** 11:14 40:18 73:14 81:7 83:7 92:9 124:14 151:7 195:3 198:6 199:23,25 210:4 217:13

**benefit** 120:12

**benzinger** 133:7

**best** 17:14 25:2 196:20

**bet** 128:20,25 129:7

**better** 74:24 111:7,12,18 124:16 202:2

**big** 77:10 124:14 171:10 185:9 193:7

**bigger** 142:5

**biggest** 204:23

**bilateral** 209:23

**billion** 91:6

**biotech** 75:16 77:9 127:25

**biotechnology** 74:9,16,25 77:5,16,24 126:19,21 127:6 128:9 130:4 208:21

**bit** 49:12 51:18 61:18 63:11 66:16 93:20 95:17 119:13 125:2 130:22 135:14 136:7 144:21 184:18 191:24 195:20 215:15

**blew** 72:11,12 72:13

**blindsided** 86:22

**blood** 222:13

**bloomberg** 15:20

**blow** 72:12 142:4

**body** 71:19,25 158:9,20 159:11

**bold** 140:23

**bonds** 130:25

**book** 33:10,12 171:22 172:8 172:12 173:6,6 174:2,6,8,17,19 175:10,14 178:3,8,10,14 178:18,21,23 178:24 179:4,5 180:25 181:21 181:25 182:3 182:20 184:20 196:8

**bore** 83:12

**bottle** 66:16,21

**bottom** 140:23 142:8,16 172:3 179:25

**bought** 75:15 91:5 143:14 161:19 169:2 176:6 184:12 195:14 216:17

**bounced** 181:5

**bounty** 71:12

**bowry** 2:14 5:6

**box** 14:6

**break** 23:5,6,10 23:13 46:9 54:13 66:19 99:23 101:12 101:14 102:15 102:16,18,22 103:3 150:19 151:24 153:10 159:21 198:23 199:9

**breaking** 54:12 95:15

**breaks** 14:23 15:3 23:4 203:8

**brian** 1:10 6:2 24:4 34:25 39:25 40:10 51:25 52:9 58:15 78:13 125:17 218:19

219:8,21
**brief** 209:4
**bring** 174:21
**bringing** 115:14
**broke** 73:9
**brokerage** 137:2 143:14 143:15,18
**bronx** 93:15 110:18 112:11
**brought** 84:21 97:2 104:15 172:2 183:7
**brown** 1:10 6:2 24:4 33:10,12 33:15 58:15 78:13 125:17
**brown's** 34:25 39:25 40:10 51:25 52:9 218:19 219:8 219:21
**browser** 103:19
**btig** 133:8 143:17 148:12 148:13 157:7 157:11,12,14 157:18
**build** 145:11
**building** 145:10
**bullshit** 87:10
**bunch** 29:21 67:15,16 70:5

89:8 133:9 137:3
**burden** 201:25
**burgeoning** 148:2
**burner** 148:6 189:5 194:9,10
**business** 10:10 10:23 50:25 51:5,6 87:7 124:15 125:4 147:25 156:25 169:12,14 176:15 181:11 203:21 204:22
**buy** 49:23 50:16,17 58:18 58:22 60:5 129:16 145:12 146:7 163:24 184:6,8
**buying** 60:8 163:4 164:14 216:16

### c

**c** 7:7 121:3
**ca** 223:25
**california** 75:20 91:9 154:5
**call** 30:16 44:7 54:9 61:12,12 75:18 80:24 118:10 127:21 198:24 199:2

200:7,18,20,24 201:9,13 203:16,24 208:19,23,25 210:6
**called** 6:19 67:10 75:14 89:21 157:7 168:3
**calling** 27:11
**calls** 31:4 33:5 86:6 122:14 124:6 195:11 203:2 204:2 211:25
**camera** 4:9
**candidate** 186:4 187:9,16
**cantor** 91:4
**cap** 127:24 171:15 182:24 185:15
**capable** 28:5
**capital** 1:6 4:23 4:25 23:19 24:20 25:11,20 27:15 28:23 29:3,6,11,15 39:13,22 40:7 43:24 49:15 50:6,23 51:23 52:6 56:13,16 56:23 67:22 68:7,17 70:7 70:11,15 78:11

83:3,16 84:18 85:2 86:16 89:17,23 95:18 104:7,14 107:25 109:19 112:19,22 113:2,6,14,21 114:15 115:9 115:18,22 116:2,4,22 118:18,20 119:2 122:11 124:3 125:11 125:21 126:3 126:13 128:19 128:24 129:3 130:10,24 131:12 132:9 132:19 135:16 137:6,10 139:2 141:4 142:18 142:23 148:8 176:11 188:4 188:13,22 206:15 218:15 219:3,16 223:6 224:3 225:3
**capital's** 84:15 94:19,23 95:21 137:23 165:7 198:12
**care** 93:16 207:11,24
**carefully** 181:2

**case** 1:4 5:4,25 17:24 18:6 20:23 21:6 23:17,23 24:3 35:17 38:2 48:18 55:6 56:25 72:23 73:5,6 88:2,14 88:16 89:6 90:3,13,25 91:2,8,11,16 92:4,7,9,10,13 92:24 93:6,8 94:5,20 95:2,4 95:22,25 96:6 96:10,14,15,19 96:22 97:2,3,5 100:7,12,16,20 101:21 105:11 110:3,7 112:20 114:2,13,17,20 115:7,8 116:18 116:23 124:17 125:12 161:21 200:2 206:8 207:2 210:3,5 213:18 214:12 214:22 215:3 223:6 224:3 225:3

**cash** 138:19,22 138:23 171:20 187:6

**caused** 207:14

**caution** 96:3

**cell** 15:25 16:9

**ceo** 146:14

**certain** 13:8 48:24 139:4,14 215:4

**certainly** 60:3 61:25 123:8 141:22 152:5 187:10 188:2

**certificate** 225:11

**certification** 3:6 102:8 222:2 224:1 225:1

**certifications** 64:6

**certified** 71:2

**certify** 105:21 106:3 107:10 107:16 220:5 220:12 222:7 222:12

**chain** 170:21

**chair** 11:7

**chairman** 175:12

**challenge** 203:24

**chang** 2:6 6:7

**change** 132:14 223:14,15 225:8 226:3

**changes** 223:13 224:7 225:7,9

**changing** 179:6

**chart** 195:23

**chartered** 71:5

**cheated** 124:10 124:11,12 217:7

**check** 13:20 15:3 39:2 71:13 82:16,21 83:2 208:10

**checking** 13:23 16:19

**cherry** 178:16

**children** 93:16

**choose** 59:11

**chose** 59:8,12 86:10 87:12

**christ** 140:15

**circle** 51:18

**circumstances** 14:18

**city** 7:14,15

**civil** 1:23 224:5 225:5

**claims** 35:16 83:4,16,21 84:11,14,15,20 84:21,22,24 114:2

**clarify** 45:19 105:2 116:8 198:10

**clarity** 22:17 37:16 90:25 92:22

**class** 6:6,10 41:6,10,18 43:18,19 86:17 86:23,24 87:13 87:14,15,16,22 87:23,23,25 88:5,11,13 89:2,4,5,6,16 89:20,24 90:21 100:13 102:7 105:22,22,23 106:3,4,5 107:11,11,12 107:17,17,18 109:14,23 110:21 112:23 113:3,7,18 117:21 118:9 120:8,12,16 122:13,20 123:24 124:5 220:5,6,8,12,13 220:15

**clean** 22:15 159:18

**clear** 32:16 49:14,25 65:8 99:16 104:5

**cleared** 148:10

**clearing** 49:19 50:10,14

| | | | |
|---|---|---|---|
| **clearly** 21:5 99:3 141:5 192:13 193:4 | **collect** 36:14 38:20 39:8,13 39:17 215:20 | **commitment** 89:12 151:8 | 125:6 129:12 133:17 134:7 |
| **cleveland** 223:2 | **collected** 37:3,9 37:10,17,19,23 | **commodities** 12:24 | 134:10 135:18 136:16,19,21 |
| **click** 158:21 159:3 | 38:14 205:13 205:15,16,19 | **communicate** 16:6 57:17 58:2 | 137:12 165:4 166:8 169:24 170:2 171:18 |
| **clicked** 160:7 | 206:15,18 207:4 215:23 | **communicated** 58:11,14 | 181:23 184:22 185:25 186:2,5 |
| **client** 68:23 69:15,17 70:4 104:16 126:8 213:6 | 215:24 216:4,4 **collection** 206:7,9 215:14 215:16,18 | 112:23 **communication** 58:17 81:2 117:6 155:4 | 186:13 187:9 187:17,22 193:7 194:17 200:5 205:4 |
| **clients** 68:16,20 70:6,8,11 154:17 | **college** 63:15 **colloquially** 118:10 | 208:24 **communicati...** 84:2 96:4 | **company's** 128:21 129:2,4 147:8 164:14 |
| **cliff** 138:6 | **color** 175:11 | **companies** 59:7 | 171:21 187:4 |
| **close** 10:5,12 95:15 99:24 155:5 | **columns** 141:8 **combination** 135:25 136:3 | 59:23 62:8,10 63:2 74:10 75:16 76:18 | 194:20 211:14 **compare** 155:10 |
| **closed** 157:22 | **come** 54:15 58:3 66:21 | 77:18,18,19 81:23,25 82:8 | **comparison** 171:23 |
| **closely** 32:23 **closer** 110:17 | 69:12 91:14 111:9 165:13 | 126:20,22 127:7,25 128:9 | **complaint** 21:3 21:3 25:15 |
| **cnbc** 61:14,15 66:6 | **comes** 9:4 96:17 146:13 | 128:14 129:25 130:4,20 | 27:3,6 86:17 86:25 87:2 |
| **coast** 67:16 | 184:22 | 131:12 132:8 | 94:19 124:21 |
| **codx** 117:17 119:7 121:17 139:25 140:5 | **coming** 9:12 83:12 144:20 **comments** | 133:4 134:21 138:19 139:10 165:14 179:4 | 124:23 **complaints** 113:22 |
| 154:23 155:2 158:10 159:7 161:13 166:24 | 144:23 195:18 **commission** 224:19 225:25 | **company** 62:3 67:10 75:14 81:15,17,19 | **completed** 223:16 **completely** 73:17 78:23 |
| 167:5 170:7,10 220:17,19,21 221:10,12 | 226:25 | 82:12 84:7,8 89:21 91:5 | 93:7 97:18 |
| **coffee** 169:6 | | | |

**[completely - correct]**

175:17 186:19
186:20 195:18
197:6
**computer** 39:2
**concentrated**
128:11
**concern** 212:13
**concerned**
192:25
**concerning**
175:5
**concise** 93:22
**concludes**
217:19
**conclusion**
87:18 122:15
124:7 195:12
203:3 204:3
212:2
**condition** 21:17
58:24 124:15
**conditions**
172:21
**conduct** 59:3
74:15 116:12
**conducted** 4:7
214:22
**conference**
78:16,19,20,24
79:2,9,19,22,23
79:24,25 80:12
80:19 81:13,15
81:18,21 83:10
83:14 84:6,25
124:14 130:8

144:19,24
145:16 146:9
146:14 176:20
195:2,15 197:8
198:21 200:7,9
205:6
**configuration**
184:8,10
**confirm** 55:17
56:6 160:17
176:12
**confusing**
191:2,21
**confusion**
193:10
**congress** 139:3
139:14
**connected**
73:20
**connection**
4:10 35:14,16
35:25 36:13
37:25 38:15
39:9,14 53:17
72:20 75:22
107:25 114:20
115:12 119:11
120:5 129:20
129:23 130:15
146:22 147:2,7
215:16,21
**connections**
115:18
**consent** 209:7
209:20

**consider** 72:16
116:9 164:14
**consolidation**
171:7
**constantly**
179:5
**construed**
173:3,4
**consultant** 66:6
**consulting** 66:4
66:11
**contact** 19:23
115:5
**content** 170:24
**contents**
213:13
**context** 169:15
172:25 173:10
**contingency**
119:20
**continuation**
167:9
**continue** 4:16
144:15 153:9
153:11 182:7
**continued**
215:11
**continuing**
64:24
**control** 109:12
109:20
**conversation**
76:20 77:7,15
167:9

**conversations**
31:24 32:2,12
206:12 212:8
212:12 213:6
214:10,16
**cooperate**
14:20
**coordinated**
214:20
**coordinating**
152:9
**copy** 146:5
**corp** 67:11
90:11 91:4
**corporate** 4:22
**corporation**
28:24
**correct** 8:12,23
9:16,17 10:19
10:20 18:24
30:17,18 36:7
44:14 47:20,22
50:3 56:13,16
62:23,25 63:3
63:4 68:5
70:13 96:23
97:7 100:19
108:7 109:18
110:4 111:8,13
111:18 112:9
114:13 126:10
134:25 140:12
140:25 143:25
144:3,8 149:4
149:23 161:25

**[correct - day]**

162:7,24 163:14 164:12 164:17 165:22 166:2 167:16 167:19 168:9 169:16 172:10 178:5 186:22 189:16 190:3 190:10,25 195:4 196:3,9 203:20 211:15 211:16 212:10 213:18,25 214:7,12,23 215:5

**corrected** 195:7 203:24 205:14

**corrections** 223:13 225:17

**corrective** 202:24

**correspond** 10:23 12:5

**corresponded** 13:4

**corresponding** 12:7,8,15

**cost** 79:3,7

**costly** 36:25

**counsel** 1:24 3:4 4:23 5:17 6:12,16 8:16 8:18 12:3 16:20 19:24 22:21 30:2,10

31:18 32:10,13 32:17,19 42:16 44:19 67:4 84:2 86:7 94:15 96:5 105:23 106:5 107:12,18 116:22 206:12 209:4 213:16 214:21 215:3 220:8,15

**counsels** 120:10

**count** 57:10,16 85:5,7

**country** 148:3 160:13 163:10 190:25 221:7

**county** 224:10 225:15

**couple** 22:8 30:22 59:9 61:24 63:10 67:12 171:18 185:18 187:4 190:6

**course** 8:24 9:6 17:12 44:15 49:14 130:16 137:8 145:5 146:19 209:17

**courses** 64:22 64:25

**court** 1:2 3:15 5:3,8 6:15 7:10

11:6 17:5 23:18,21 98:5 120:9 121:18 123:21 159:18 224:7

**courtesy** 17:13

**cover** 73:23,25 137:2

**coverage** 62:21

**covid** 63:3 76:14 77:12,21 129:24 137:22 137:22 138:11 139:4,15 149:6 163:18 164:4 170:3 171:11 185:9 186:6,24 187:11,17 188:6,19 189:2 189:4,17,18,20 189:22,22,23 190:7,8 193:8 193:9,12,13,21 193:22 194:17

**creation** 106:13 108:5

**crichton** 69:5

**crime** 87:4,4

**current** 7:8 68:6,9,10 97:5

**currently** 7:12 157:16,21

**customer** 204:24

**cut** 202:6

**cv** 1:4 5:5

**d**

**d** 218:2

**data** 170:18 171:8,9 173:5 173:15 175:22 176:2 179:13 180:16,16,16 180:17 182:9 182:16,18 183:9,10 185:5 185:15

**database** 133:2

**date** 36:20 99:5 142:18 156:13 162:15 223:8 224:3,9,19 225:3,13,25 226:20,25

**dated** 35:3,8 41:16 43:6,10 47:17 161:7 218:22 219:13

**dates** 38:4 49:8 142:17

**dating** 73:11

**david** 114:23 114:25,25 115:17 208:24

**day** 60:18 104:18,18 142:23 143:4,6 143:23 144:11 145:2 162:4,5

164:15,22
165:2 169:4
175:12 181:20
193:12,24
194:2,6,6
222:17 224:16
225:22 226:22
**days** 31:14
60:18 81:18
111:5,15,22
138:12 196:5
223:19
**dead** 204:24
**dealing** 179:12
**dear** 223:10
**debt** 182:23
183:18
**decent** 150:24
**decide** 58:21
59:10 60:7
85:3,10 177:2
177:5
**decided** 66:9
73:10 139:3,14
201:5
**deciding**
135:17
**decision** 58:18
85:16 86:4
96:11 137:16
150:10 163:23
164:11,13
165:7 179:16
180:11 185:21

**decisions** 95:24
96:9,13
**declaration**
107:8,14 220:9
**declarations**
139:11
**decorum** 121:9
121:12
**decreased**
144:17
**dedicate** 92:12
**deed** 224:14
225:20
**deemed** 223:20
**defendant** 2:9
24:18 25:9,18
27:13 39:23
40:8 44:16
45:8,11,13,14
46:13 218:12
219:5
**defendant's**
107:7
**defendants**
1:11 4:24 5:24
24:2,5 25:8
27:13 34:14,23
35:5,6 36:3
39:20 41:15
42:7,19,24
43:4,8,9 44:12
44:13,20 45:4
47:14,16 48:5
51:21,24 52:7
53:20 55:7,8

55:19 56:8
103:17 105:16
108:18 109:5
117:12 139:20
152:14 154:21
155:17 158:4
160:4,8 162:21
163:6 166:14
166:17 167:4,8
167:10 170:5
190:21 192:21
195:22 198:11
205:10 206:25
207:9 211:18
215:4 218:16
219:11,18
**defended** 73:15
**defer** 94:15
**definitely** 11:2
11:4 96:17
**degree** 63:22
**degrees** 63:25
**delivers** 50:18
**demanded**
41:19
**demonstrated**
109:10
**denied** 71:21
**departed** 65:17
**department**
223:22
**depending**
60:17
**depends** 4:9
32:5 111:2

172:20
**deposed** 13:21
17:16,19 18:22
19:3 20:16,19
21:10 28:17
100:21
**deposition** 1:13
1:17 3:6,13 4:6
4:20 9:9 10:14
10:16 12:5
13:7,10 15:2
15:19 16:7
20:3 23:16
24:10,20 25:11
25:20 27:14,24
28:21 29:20
30:21 31:9
32:25 110:11
110:12 152:8
153:2 159:21
209:3,7 218:14
223:8,12 224:1
224:3 225:1,3
**depositions**
152:13
**depth** 171:13
185:12
**describe** 37:8
**described**
171:5
**description**
218:11
**desk** 11:8 16:4
33:16

**[despite - document]** Page 13

| | | | |
|---|---|---|---|
| **despite** 110:11 | 134:2,12,21,24 | 186:20 | **discussions** |
| **determination** | 141:12,14 | **difficult** 14:7 | 42:16 209:23 |
| 189:10 | 142:20,24 | **difficulties** 29:9 | 213:14 |
| **determine** | 144:3,16 | **direct** 25:17 | **dismiss** 101:5,9 |
| 83:20 120:9 | 145:18 146:23 | **directly** 72:10 | 101:20 |
| 136:14 137:11 | 147:11,15 | **director** 65:19 | **dissimilar** |
| **developments** | 160:11 162:6 | 68:11 | 78:23 197:7 |
| 82:5 213:24 | 162:16,19 | **disciplinary** | **distributors** |
| **devices** 9:7 | 163:7,13,24 | 71:11,16 87:6 | 160:13 163:9 |
| **devote** 92:23 | 165:8,20 | **disclaimers** | 190:24 221:6 |
| **diagnostic** 78:8 | 166:11 168:3,5 | 205:3 | **district** 1:2,3 |
| 164:16 | 168:9,13,17 | **disclosed** | 5:3,4 23:21,22 |
| **diagnostics** | 171:14 172:9 | 197:15 204:8 | 91:9 110:4,8 |
| 1:10 2:13 4:25 | 175:21 176:4 | 204:11,15 | **divorce** 18:11 |
| 5:25 6:13 | 178:4 179:18 | **disclosure** | 19:2 |
| 18:18 19:4,13 | 180:12 185:22 | 195:8 202:24 | **divulge** 31:21 |
| 23:20 24:3,19 | 186:21,23 | **discovery** | 96:3 |
| 25:10,19 27:14 | 187:15 188:7 | 35:15,19 55:5 | **divulges** 83:25 |
| 34:24 39:24 | 188:15,23 | 206:10 207:2 | **divulging** 31:19 |
| 40:9 46:14,18 | 189:8 190:23 | **discuss** 20:2 | 213:13 |
| 47:5 51:11,15 | 195:7 196:14 | 32:24 35:22,24 | **document** |
| 51:24 52:8 | 199:22 200:12 | 38:25 43:20,22 | 24:11,15,21 |
| 57:18 58:3,19 | 202:21 203:15 | 77:11 147:15 | 25:14 27:5,11 |
| 58:22 59:4,20 | 211:13 217:8 | 155:9 | 34:14 35:11 |
| 62:2 63:7 69:8 | 218:13,17 | **discussed** 22:8 | 39:19,21 40:3 |
| 70:3 75:23 | 219:6,19 221:3 | 26:4 31:5 42:9 | 40:23,24 41:4 |
| 76:5,8,13,16 | 223:6 224:3 | 43:21 48:18 | 41:12,22,25 |
| 78:12,15 80:3 | 225:3 | 77:23 86:7 | 42:4,23,25 |
| 82:13 84:16 | **dialogue** 15:14 | 212:24 213:15 | 43:14,16 47:14 |
| 88:11 89:9 | **diego** 75:20 | **discusses** | 47:15,19,25 |
| 93:6 96:7 97:6 | **different** 78:2 | 163:12 | 48:3,4,4,21 |
| 113:17 117:20 | 84:7 86:25 | **discussing** 55:5 | 51:20,22 52:13 |
| 125:4,8,11 | 93:8 99:5 | 199:21 | 52:16,21,25 |
| 129:21 130:6 | 108:21 132:25 | **discussion** | 53:5,9,17 |
| 130:15 133:21 | 178:22 186:19 | 108:24 209:5 | 103:17,19 |

**[document - email]**                                   Page 14

105:19 106:7
106:13,22
107:7,8,20
117:12,23
118:3,16 119:9
125:2 139:20
139:24 140:2,9
154:20,22
156:4,8 158:10
160:21,23
162:12 166:14
167:3 170:5,6
170:14,21
179:24 192:15
205:16 206:13
206:25 207:4,8
207:11 215:14
215:16,18
**documentation**
  164:10
**documents**
  31:3 35:3,8,21
  35:23 36:4,14
  36:16,24 37:4
  37:10,14,17,19
  37:25 38:7,15
  39:3,9,14
  41:15 42:20
  52:21 55:9,18
  56:7,12,15,19
  56:22,23 57:5
  57:8,11,16
  63:5 116:16
  119:13 206:8
  206:10 207:16

209:18,21,25
213:16,23
214:5,21 215:4
215:19,20,23
216:3 218:21
**dog**  111:21
**doing**  13:13
  59:7 60:16
  63:3 76:13
  93:8 136:2
  139:10 150:2,5
  155:11,11,12
  155:14 162:2
  164:8 166:8
  170:3 181:9,10
  181:20
**dollars**  122:24
  122:25 186:15
**doodles**  33:20
**doodling**  33:19
**dozen**  202:7
**drafts**  124:21
  124:22
**draw**  109:9
**drawing**  33:21
**drop**  130:12
  202:19
**dropped**  18:8
  73:15 200:22
  201:2 204:24
**dropping**  21:2
**drops**  203:8
**ducking**  103:22
**due**  14:21
  197:24 209:17

**duly**  6:20 222:9
**dumb**  216:16
**dwight**  1:10
  5:25 24:3
  34:24 39:24
  40:9 51:25
  52:8 58:12
  78:12 125:14
  218:18 219:7
  219:20
**dying**  194:11
**dynamic**
  176:16,22

─────── e ───────

**e**  7:7 76:25
  89:22 90:8
  91:3 121:3
  127:10,11,12
  218:2,10
**earlier**  23:19
  33:11 114:12
  142:17 147:6
  152:21 177:13
  204:12,15
**earning**  175:16
**earnings**  78:21
  83:12 84:4
  144:20,22
  145:20 172:15
  172:17,22
  197:6,10,15
  198:5,8,16,19
  200:6,11,14,18
  200:20,21,24
  201:3,8,13,15

203:16 204:8
204:21
**easier**  108:12
**easy**  91:15
**eat**  159:20,22
**ebitda**  183:8
**economy**  138:5
**edgewise**
  202:12
**education**  64:3
**educational**
  63:12 64:21,24
**effect**  3:14 54:3
**efficient**  174:10
**effort**  11:9
**efforting**
  183:24
**egan**  1:10 6:2
  24:3 34:25
  39:24 40:10
  51:25 52:9
  58:12 78:12
  125:14 218:18
  219:7,20
**eight**  152:22
  179:7
**either**  14:11
  26:19
**element**  108:24
**eli**  128:2
**else's**  18:4
**email**  80:23
  156:12,15,16
  156:18,20,25
  157:2 158:5,7

[email - exhibit]

159:12 161:9
168:6 170:21
171:3,9 180:4
191:4 192:9
205:10,24
206:4,18
223:17
**emailed** 162:17
163:21
**emailing**
167:15 170:23
**emails** 16:19
205:8
**employee** 68:11
70:14 73:21
**employees**
67:10
**enclosed**
223:12
**ended** 20:24
21:2
**engage** 96:13
149:5
**engaged** 89:11
116:13
**engagement**
118:11 121:17
123:20
**engaging**
116:15 147:22
165:20
**engender** 121:4
**english** 46:3
47:2,3,12
174:15,16

**entered** 225:9
**enterprise**
171:21 181:24
181:24 182:21
183:6,11,13,16
183:19 184:4
196:8
**entertainment**
67:15
**entire** 25:15
224:5 225:5
**entitled** 1:19
14:23 23:9
25:9 105:19
160:10 221:2
**environment**
60:20 168:25
**episode** 207:15
**equities** 126:6
**equivalent**
171:20
**equivalents**
187:6
**erica** 2:11 5:23
12:13 46:2,2,4
54:11 95:14
99:22 101:11
104:25 192:16
198:6 201:19
202:8
**errata** 223:14
223:19 225:7
225:10,18
226:1

**especially**
87:10
**esq** 2:6,6,11,13
**estate** 131:2
**estimate** 113:7
151:2
**et** 5:2 23:20
90:8 223:6
224:3 225:3
**etcetera** 37:2,2
77:20,20
165:18,18,18
176:21,21
186:7,8
**etfs** 131:5,5
**euphoria**
145:23 146:2
**euphoric**
145:22 148:3
**event** 112:2,8
112:14 152:24
169:10
**events** 36:21
**eventually**
67:18
**everybody** 62:6
98:2 148:3
**everybody's**
17:14
**ex** 73:8
**exactly** 38:9
85:13 146:3
149:16 193:8
**examination**
6:24 211:8

215:11 218:5
**examined** 6:22
**example** 75:19
128:15 205:9
**except** 3:9 11:5
**excerpt** 180:6
**exchange** 196:6
**exchanging**
169:13
**excuse** 34:7
70:17
**executed**
225:10
**execution**
224:14 225:19
**executions**
148:13
**exercise** 11:14
**exh** 218:12,16
219:2,11,15
220:2,9,16,18
220:20 221:2,9
221:11
**exhibit** 10:3
24:17 25:8
27:13 34:14,16
34:20,22 35:5
39:20,21 40:5
40:17,19 42:24
43:3,8 47:15
51:21 52:4
53:20 55:7,13
55:19 56:8
103:18 105:16
105:24 107:7

107:13 108:18 108:22,22,23 109:2,3,6 117:11,12,15 139:21 140:3 154:21,24 155:17 158:4 158:24 160:4,8 160:9,17 162:10,21 163:7 166:15 166:18,22 167:4,8,11 170:6,8 190:21 192:21 195:23 198:12 205:10 218:11

**exhibits** 9:15 24:10

**existence** 194:21

**expands** 171:13 185:12

**expect** 174:15

**expectations** 205:4

**expecting** 130:8

**expenses** 120:10

**experience** 63:10 74:9,13 78:7 148:24

**expert** 75:17 107:24 108:5

108:16

**expiration** 224:19 225:25 226:25

**explain** 88:23 111:20 172:13

**explained** 192:11,12

**explaining** 37:12

**explicitly** 22:24

**expressed** 200:7

**extent** 31:18 54:8 83:25 86:6 87:21 206:17 215:25

**extraordinary** 169:10,11

**extremely** 17:5

**eye** 163:5

**eyes** 141:11

**f**

**fabricated** 195:19

**face** 143:17

**fact** 85:12 86:10 147:25 164:7 166:7 176:15 182:19 189:7

**factor** 147:22 162:20 179:15 180:11 185:20

**factored** 163:23

**factors** 172:23

**facts** 173:16 175:24,25 176:2

**factual** 83:13

**fair** 53:3 108:4 120:2 158:5 163:21 167:7 167:12 170:20

**fall** 138:6

**familiar** 46:6

**family** 39:8 115:21

**fancy** 119:14

**far** 203:9

**favor** 46:22 93:2

**federal** 1:23

**fee** 119:20

**feel** 78:25

**fees** 73:24 74:2 120:9

**felt** 62:3

**fictitious** 73:6

**fight** 160:13 163:9 190:25 221:6

**figure** 145:12

**figured** 29:22

**file** 85:3,10 86:16 87:13

**filed** 5:2 73:12 85:12 93:7

96:21 97:9 98:15 100:12 100:22 101:2,6 101:20 102:8 107:2 109:23 110:3,7 113:22

**filing** 3:5

**filings** 112:20 137:7,9,14 147:9,11

**finance** 90:10 136:25

**financial** 11:13 11:18,24 71:2 71:5 116:5 121:21 122:12 122:19

**financially** 5:12

**find** 13:15 81:16 136:20 197:9 223:12

**fine** 22:13 32:4 56:20 67:6 99:14 159:24

**finish** 17:10 28:9 65:7 101:17 114:8 142:22 151:21 193:18

**finra** 70:24

**fire** 202:3

**firm** 30:13 65:4 65:19,20 66:5 66:14 95:10 120:3 143:14

Case 1:22-cv-06978-AS    Document 79-4    Filed 12/27/24    Page 244 of 276

**[firm - give]**    Page 17

143:15,18 148:10
**firms** 115:12 116:9 132:25 137:2
**first** 6:19 22:9 26:25 34:25 35:6 39:25 40:10 41:15 43:4,9 47:16 52:2,9 55:8 65:11 67:11 83:4 85:5,7 119:8,17 121:15 122:2,6 134:4 141:13 142:3,14,18,23 144:5 152:3 203:10 204:15 218:19 219:8 219:11,21
**fitzgerald** 91:4
**five** 99:7,23 101:13,16 133:11 141:8 153:10 180:15 183:6,9 184:7 198:23 199:9 199:19 210:16 217:22
**floor** 61:16
**florida** 7:11,23 148:15
**flu** 188:19 189:2,3

**focused** 138:19 139:9 183:21
**focuses** 126:13
**follow** 47:23 77:5 207:6
**follows** 6:23
**force** 3:14
**forefront** 148:25
**foregoing** 224:13 225:18
**forgot** 61:16 158:10 159:7 161:13 162:19
**form** 3:9 117:6 156:23
**formal** 66:14
**former** 14:11 60:14
**formerly** 90:10
**forth** 169:8 205:5 222:9
**forward** 16:24 223:16
**found** 61:24
**founder** 67:22
**four** 56:12,15 56:19,22 57:5 57:8 127:4,18 134:5,9,19 141:7 153:24 199:14 214:17
**fox** 2:3 6:4,8 95:5,8 114:12 114:16 115:5,8

115:19,23 116:2,6,10,13 116:15 117:19 118:5,21,24 119:18
**frame** 131:20
**frankly** 79:5
**free** 224:14 225:20
**friend** 59:13 61:8,9 75:13 75:25 114:21 114:22 115:17 154:5,7 155:5 162:17 181:7 181:19
**friends** 115:21
**frivolous** 21:4 21:5 72:23 73:5,17
**frivolously** 18:6
**frivolousness** 21:8
**front** 24:12 33:8 35:9 41:3 117:24 118:16 141:11 143:16 148:6 187:2 189:5,14,15,17 189:23 193:11 193:14,22 194:9,10
**fuck** 11:21

**fucking** 97:17 140:15
**full** 7:3 15:9,12 104:20 152:2,6 202:6
**funding** 139:4 139:15
**funds** 120:11 126:9 130:24 131:4
**funny** 21:21
**further** 3:8,12 109:10 215:7 216:5 222:12

**g**

**gain** 82:10
**gained** 119:25
**games** 191:22 192:5
**gap** 197:19
**gather** 36:16,23 164:18 210:16
**gathered** 37:14
**general** 6:12 50:22,24 61:13 133:22,24
**generally** 155:9 156:16
**getting** 21:4 62:6 95:15 149:12,13,22 169:5
**girlfriend** 73:8
**give** 11:8 17:10 17:12 57:7

www.veritext.com                                                  888-391-3376

**[give - hand]**

60:2 93:22 114:7,9 127:19 133:9 159:25 205:23 208:9

**given** 44:22 45:16 61:19 62:4 81:9 120:16 132:3 151:4 168:25 184:2 185:6 206:25 207:9 217:20 222:11

**giving** 27:8 28:20 29:5 173:5,16 180:16 188:2

**glad** 208:6

**glass** 23:7

**glowing** 130:7 144:19 145:22

**go** 4:17 11:13 12:16 13:17 14:24 24:13 28:11 38:22 55:10 63:15 66:20 81:16 93:14,15 99:6 103:6 108:10 112:10 119:12 122:5 136:22 136:22,23,23 136:25 146:6 155:19 160:6 162:20 164:18 176:23 180:14

181:2 182:7,8 192:2 194:4 195:22 198:15 203:9 204:17 213:2

**god** 59:22 72:8 75:8 174:6 175:14 193:2

**going** 4:3 10:10 11:15 12:19 14:24 17:7 18:19 20:5 23:17 27:24 28:3 32:16 34:13 36:11 39:19 42:22 51:17,19 54:20 59:16 60:17 65:5 66:9 68:20 72:9 83:21 85:22 89:12,13,15 90:5 93:12 97:12,17,21 100:4 101:17 102:18,20 103:5,8 111:3 112:2,8,10 114:5 117:10 119:12 134:3 136:15 137:5 139:8,19 150:22 151:21 153:4,17 161:17 164:19

164:25 166:13 169:3 170:4 172:22 174:11 178:20 183:25 189:8 191:25 199:12 202:14 203:9 208:13 211:2 213:4

**goldman** 49:6 49:11,13,15,19 50:2,18 51:12 133:8 148:11

**golf** 155:6

**good** 4:2 5:22 7:2 27:7 54:12 87:9 93:11 95:15 121:9,11 128:15 130:8 142:13 156:11 172:18 173:2,9 173:20,22,25 181:7 186:10 186:12 187:19 188:2,3 194:23 201:23

**google** 136:23

**government** 72:2 139:4,15

**governmenta...** 139:9

**grade** 88:6

**graduate** 63:19

**gratuitously** 81:9

**great** 8:13 16:13,23 22:7 24:23 26:17 35:10,24 39:18 51:17 54:18 80:6 150:6

**ground** 14:25 17:2,3 22:8

**group** 24:6 87:23 121:19 135:12 172:20

**guber** 69:3,13 69:17 70:3

**guess** 59:13 144:9,14 158:11 161:14 161:15

**guest** 98:5

**guggenheim** 81:19

**guy** 93:11

**guys** 183:25

**h**

**h** 1:10 6:2 7:7 34:24 39:24 40:9 51:25 52:8 218:10,18 219:7,20

**hahn** 2:6 6:7,7

**half** 90:5 149:21 159:25

**hamptons** 148:22

**hand** 222:17

handled  87:12
happen  176:22
happened
   100:7,12,15,17
   100:18
happening
   138:5
happens  61:20
   169:4 181:20
happy  11:11
   14:19 15:2,13
   20:3 22:19
   47:2 80:6
   98:12 151:17
   159:22
harvestone
   133:7
haul  98:4
hc  134:14
he'll  48:16
   69:15
head  22:11
headlines
   192:20
healthcare
   79:25
hear  48:13
   55:22,23
   111:22 113:11
   173:25 176:19
   177:19 196:22
   216:10
heard  4:13
   38:10 80:15
   135:10

heck  61:21
held  1:19
hell  50:15 88:3
hello  55:21
   153:25
help  46:23 93:4
   93:11 151:13
helped  65:22
helpful  164:7
   184:19
hereto  3:5
hereunto
   222:16
hey  46:22
hi  199:20
hidden  203:14
   203:18
high  60:15
   65:22 212:20
hills  135:2,4,5
hiring  116:9
history  63:12
   198:13 199:24
hmm  128:6
   144:4 162:25
hold  18:21,21
   34:21 40:13
   46:16 58:18,22
   72:7,7 89:14
   122:5,8 140:10
   142:10,12,13
   155:21,24
   179:17 198:3
holders  87:24
   89:9

home  7:17 8:11
   111:25 112:3,6
   112:8 148:10
   148:19,20,21
hon  46:22
honest  59:21
   75:8 174:6
   175:14
honestly  51:6
honored
   204:18
hope  82:10
   84:9
hoping  130:11
hostetler  2:8
hour  23:5
   151:22 153:5
   159:24
hours  13:16
   104:20 152:2,7
   152:15,22
hover  142:7
hundred  24:24
   72:9
hung  180:25
hyperlink
   160:7

i

idea  88:21 97:8
   98:16,17
   106:11,15
   110:5 122:17
   123:2 178:18
   179:11 187:7
   194:18

ideally  145:14
identification
   24:18 34:23
   40:6 43:4 52:5
   105:25 107:14
   117:16 140:4
   154:25 160:10
   166:23 170:9
identify  113:3
identifying
   119:15
immaculate
   87:7
immediately
   84:6 144:10
immumone
   127:10
immunone
   184:13
impact  189:10
important  17:5
   26:18 75:5
   110:16 147:21
inactive  64:18
inc.'s  24:19
   25:10,19
   218:13
inciteful  121:2
include  76:5
included
   223:14
incorporated
   225:12
index  131:4

**indicating** 223:14

**indicator** 174:3

**individual** 86:25 131:9,13 131:14 132:10 150:10

**individuals** 113:23

**industries** 126:12 128:4,5 128:10

**industry** 72:6 74:16 76:14,21 77:5,9,10,16,24 78:8 171:7

**inflated** 211:20

**inform** 168:7

**information** 25:4 31:20,22 36:12 37:13 38:4,5,11,21,23 38:24,25 42:3 44:2,5,18,22,25 45:20 46:12 48:2,5,11,25 49:7,8 53:20 53:24 86:6 94:24 103:24 104:3 125:12 127:23 133:5 135:16,20,21 136:4 137:10 161:24 169:14 175:20 176:8

176:12,25 179:14,19,22 179:23 180:7 181:12,13,14 185:19 197:12 201:17 202:19 203:23 204:11 212:5 213:17

**informative** 173:5

**informed** 10:11

**informing** 172:7 178:2

**infrequently** 116:24

**initial** 39:19 115:4

**initially** 170:23

**initiate** 85:18

**initiated** 89:6 89:23

**initiating** 82:11 84:10

**input** 106:12 106:21

**inquiry** 71:19

**inside** 66:21

**insofar** 126:8

**institute** 71:6

**instruct** 39:7 39:12 83:24 206:6

**instructed** 39:16

**instructs** 22:24

**interactions** 115:25

**interest** 17:14 138:3

**interested** 5:12 189:4,13 190:8 192:19 194:16 222:14

**interests** 109:13 123:23 124:5

**international** 160:12 163:9 190:24 221:5

**internet** 4:10

**interposed** 42:19 44:6

**interpret** 182:17

**interpreted** 182:19

**interrogatories** 43:5,10,23 44:8 47:17 52:2,10 210:8 219:12,22

**interrogatory** 43:25 45:6,13 45:21

**interrupt** 136:11 174:18

**introduce** 166:13

**invest** 62:9 74:14 132:9 136:12 137:12

**invested** 81:23 82:2 126:18,20

**investigate** 83:15 84:11,13

**investigated** 77:19

**investigation** 71:25 113:15

**investment** 61:6 67:9 123:9 126:16 128:11 130:11 137:15,24 138:3 155:8 161:25 162:18

**investor** 121:19 124:4

**investors** 121:20 123:23

**invests** 130:24

**involved** 72:4 82:9 96:18 138:20 161:22 181:17

**involvement** 138:13

**ipad** 9:10,13,21 9:24

**island** 63:18

**issue** 46:5 93:5 191:2 193:8 196:25

**issues**  22:3 194:4

**item**  192:9

**j**

**j**  4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1

98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1

168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1

**january**  149:15 149:16

**jason**  2:6 6:3 26:6,13 30:11 30:12,14,16 33:5 67:5 102:25 104:17 107:9,15 115:6 150:17 220:9

**jeff**  170:16 191:5

**jeffrey**  154:2,4 158:6

**jeremy**  1:21 5:9 6:21 17:6 114:6 177:23 222:5,20

**jesus**  140:14

**job**  81:22 174:13,13,14

**joe**  7:4 31:17 47:9 58:7 75:10 82:23 91:19,22 97:14 97:23 98:20 102:3,21 123:15 211:10

**joez6**  156:23 157:8

**john**  70:4

**jolla**  75:20

**joseph**  1:17 4:20 6:18 217:20 223:8 224:4,9 225:4 225:13 226:20

**journal**  136:9 176:18 193:12 193:14,23

**judge**  97:10,19 98:7,14,19 99:11,17,18,20 100:2 192:3

**[judgment - l]**

| | | | |
|---|---|---|---|
| **judgment** 175:2 | 155:4 158:6 | 26:3,7,14,15,20 | 141:23 142:3 |
| **judgmental** 173:14 | 161:10,23 | 27:2,21 30:7 | 150:15,20 |
| **july** 142:24 | 163:21 167:10 | 33:14 34:15 | 151:12,14 |
| 143:24 144:6 | 167:15 168:7 | 42:10 45:22 | 158:20 161:15 |
| 147:14,14 | 169:15 170:17 | 47:4 49:3,18 | 161:16 163:3 |
| 158:6 161:8 | 170:22,23 | 50:9,12,13 | 167:23 169:9 |
| 162:5,11 | 172:7 175:19 | 57:15,19,22 | 175:13 178:22 |
| 164:15 167:16 | 176:3,9,25 | 58:5 59:24 | 180:24 181:8,9 |
| 168:6 | 178:2 179:15 | 60:13,16 63:14 | 182:25 183:2 |
| **jumping** 9:23 | 179:20,21 | 64:12 69:21,22 | 184:14,14,16 |
| **jury** 41:19 | 180:4,8 181:6 | 75:7 77:25,25 | 188:5,8 190:17 |
| **justification** 163:3 | 181:16 182:10 | 79:13,22 81:14 | 191:23 192:5,6 |
| | 185:6 191:5 | 81:14 82:3 | 193:2 194:7,9 |
| **k** | 196:6 205:11 | 83:11,19 84:20 | 197:23,25 |
| **k** 137:18 | **kill** 164:19 | 85:4 87:3,21 | 198:2 200:13 |
| **kaplan** 2:3 6:4 | **kilsheimer** 2:3 | 88:3,6,7,19,25 | 203:5,7,18 |
| 6:8 95:5,8 | 6:4,8 | 90:17 91:11,16 | 204:14 206:2 |
| 114:12,16 | **kind** 9:7 135:15 | 92:2 93:9,10 | 206:17,21,21 |
| 115:5,8,19,22 | 135:19,24 | 94:10 97:19 | 206:22,22,23 |
| 116:2,5,10,13 | 177:21 182:15 | 98:7,16 99:10 | 206:23,24 |
| 116:15 117:19 | **kinsella** 75:14 | 99:13,13,17,18 | 207:3,5,7,14 |
| 118:5,21,24 | 75:21,24 76:8 | 99:19 100:11 | 208:5 213:8 |
| 119:18 | 76:15,20 77:4 | 100:25 101:8 | 217:4 |
| **keen** 78:16 | 77:9 | 101:19 104:9 | **knowledge** |
| **keep** 20:9 | **kits** 184:2 | 105:4,7 106:23 | 21:15 25:3 |
| 102:18,20 | **knew** 45:22 | 109:4 119:12 | 62:11 63:6 |
| 152:17 179:8 | 138:3,4,4 | 119:21 120:25 | 74:24 76:16,17 |
| **keeping** 20:14 | 145:2,5 154:5 | 121:3,7 123:16 | 181:10 |
| **kept** 12:23 | 159:11 188:11 | 123:16,17,19 | **known** 90:10 |
| **kevin** 2:13 6:11 | 207:19 | 125:3,7,14,17 | 211:17 |
| 75:13 | **know** 8:20 9:5 | 128:3 129:9 | **ks** 137:13 |
| **kiley** 154:3,4,8 | 11:3,20 12:3 | 133:8,19 134:7 | **l** |
| 154:13,14 | 12:19 13:16 | 134:8,13,16 | **l** 1:10 6:2 34:25 |
| | 14:12,13 16:15 | 139:7 141:10 | 39:25 40:10 |
| | 16:21 19:5,8 | 141:11,16,19 | 51:25 52:9 |

**[l - listing]**                                                          Page 23

218:19 219:8
219:21
**la** 75:20
**languishing**
171:11 185:10
**large** 122:19,22
123:4,6,7,8
127:24
**larger** 186:5
187:9,16
**largest** 121:21
122:12
**law** 105:20,25
109:7 115:12
120:3 122:9
220:2
**lawsuit** 35:14
36:2 38:16
39:4,10,15
42:7,14 44:7
73:13 82:11
84:11 108:2
120:5 147:3
215:17,21
**lawyer** 18:8
21:2 45:15,17
48:9,11,16
69:15,20 79:12
91:25 92:16
94:7,24,25
95:3,7,9 97:9
99:15,16,19
100:3,24 101:3
101:7,10,22,24
102:2,6,10,13

103:22 105:4
106:16,24
107:5 114:25
121:6 122:18
123:2,12,14,17
123:19 125:24
141:15 146:4
**lawyers** 44:7
214:11
**lead** 89:18 92:4
92:7,8,10,12,24
94:4 95:21
100:13,16
105:20 106:2
107:9,15
121:19,20
123:22 212:9
220:3,10
**learn** 200:10,19
217:5
**learned** 200:14
200:16 201:17
**leave** 65:14
151:9 191:25
**led** 62:22
124:14 202:20
204:9
**lee** 2:14 5:6
**left** 55:4 64:25
65:24 67:8
141:9 159:25
199:21
**legal** 7:18,22,23
14:22 46:5
68:21 73:23

74:2,6 87:18
122:15 124:7
195:11 203:3
204:3 212:2
223:1 226:1
**legitimate**
164:5 166:7
169:25 176:21
**legitimately**
51:7
**legitimize**
193:7
**legitimized**
194:20
**letter** 117:19
118:4,6,11
121:17 123:20
223:20
**letterhead**
117:20
**letting** 213:8
**level** 145:14
212:20
**liability** 28:23
**license** 68:19
71:22
**licenses** 64:8,10
64:14 65:2
**licensing** 71:19
**lied** 82:13
84:24 85:12
207:13
**life** 75:16 91:18
**light** 204:21,22

**likelihood**
22:23
**likely** 22:21
24:4 121:18
122:10 160:25
**lilly** 128:2
**limited** 28:23
138:13
**line** 117:20
172:3 177:25
178:16 190:7
221:18 223:14
225:7 226:3
**lines** 33:25
140:6 168:18
**link** 158:13,22
159:2,6
**linked** 161:9
**list** 27:18 69:16
127:19 133:9
**listed** 225:7,17
**listen** 15:10
16:21,21 38:3
38:20 44:21
46:23 49:2
69:11 93:2
97:25 111:14
178:9 181:2
199:10 200:17
200:20 201:8
201:12,14,24
202:2 207:10
**listened** 124:13
**listing** 225:7

**litchfield** 135:2 135:4,5
**literally** 138:11
**litigation** 13:22 23:24 29:12,17 109:13,20 197:2 212:8,14 212:25 213:7 213:24,25 214:6
**litigations** 29:14
**little** 21:21 33:25 49:12 61:18 62:4 63:11 66:15 67:9 93:20 95:17 125:2 126:15 130:22 135:14 136:7 142:5,12 168:22 176:7 180:22 181:11 181:12,13 184:17 195:20 196:18 215:15
**live** 13:6
**living** 50:16 154:9
**llc** 1:6 4:23,25 25:11,20 27:15 29:4,6 67:22 68:7,17 126:5 126:11 223:6 224:3 225:3

**llc's** 39:22 40:7 51:23 52:6 219:3,16
**llp** 2:3,8 6:4,8
**loading** 43:15
**located** 8:17,18 8:20 16:2
**logistically** 110:17
**logistics** 36:16 36:19,20 38:18 38:19
**logix** 188:5
**long** 30:6,7,24 31:12 63:18 79:12 102:15 167:18 168:22 188:17
**longer** 65:3 78:5 150:21
**look** 9:15 32:20 32:22 41:2,5 108:15 135:21 135:25 136:17 136:18,25 140:14 142:16 165:4,14 169:7 183:2 187:12 191:3,6,9,12,14 191:21 192:8,8 192:10 194:5 200:24
**looked** 31:15 33:15 42:11 59:6 124:13

156:10 162:11 189:19 200:6 201:2
**looking** 13:19 15:18,20 27:5 35:21 41:13,17 53:25 108:23 137:11,13,14 141:3,17 148:4 183:15 205:12
**looks** 43:17 118:4,7 140:10 140:15 142:13 143:2 158:7
**lose** 79:6 97:17 97:18,22
**loss** 168:19
**losses** 82:14,15 85:5,8 146:22
**lost** 124:9 140:11,15,22
**lot** 60:5,9 61:21 61:23,24 79:3 79:3,7 86:20 127:8 145:23 147:19 148:6 179:3
**love** 114:6 177:18
**lower** 145:3,6 174:2
**lunatic** 25:2
**lunch** 150:19 151:12,16,18

**lying** 83:10

**m**

**m** 7:7 127:10 127:10
**ma'am** 97:13
**machine** 183:3 216:12,14
**macro** 77:4,15 136:3,5,7
**macroecono...** 59:6 76:10
**macroecono...** 82:5
**madam** 223:10
**made** 35:13 36:2 55:24 62:3,7 73:6,10 73:13 107:23 114:2 130:10 144:23 145:15 145:17,19 152:10 187:11 195:2,18 209:18 211:18 224:7
**make** 32:15 34:10 50:15 60:10,22 82:7 118:11 129:12 142:5 183:15 186:14,16 204:20 205:3 213:11
**making** 33:24 86:4 137:15

**[making - mentioned]**

139:12 186:11
**manage**  66:10
  67:20 68:13
**management**
  67:14 78:15
**manages**
  125:21 154:15
**managing**
  65:19 66:8
  67:12 68:2,5
  68:11 126:2,9
**manhattan**
  8:11 110:20
**manners**
  182:16
**marblestone**
  7:10
**march**  137:21
  138:14 139:5
  139:16 149:17
**marital**  17:22
  18:3,11,15
  19:2 20:22
  72:11,18
**mark**  42:23
  117:11 139:20
  170:5
**marked**  24:17
  25:8 34:22
  35:5 40:5 43:3
  47:14 51:20
  52:4 103:16,17
  105:24 107:13
  117:15 140:3
  154:20,24

160:3,9 166:22
  167:3 170:8
**market**  12:25
  136:11,12
  154:16 155:13
  155:15 171:15
  172:21 174:4
  182:24 183:18
  185:15
**markets**  136:5
**marking**  34:13
  39:19 107:6
**marriage**
  222:14
**mask**  149:7,10
  149:19 150:14
**material**  28:5
**matter**  4:24
  11:16 17:21
  18:25 93:13,21
  119:19 183:12
  183:20 184:6
  222:15
**mattered**
  182:22
**matters**  21:10
  115:9
**maximum**
  135:12
**mean**  8:19
  13:11 18:14,16
  31:23 35:18
  36:18 48:22
  49:17,18 52:20
  58:3 62:13

68:12 83:17
  88:25 119:23
  128:7,13
  135:24 136:10
  158:17,21
  159:10 161:13
  163:2,3,17
  167:21 172:12
  174:23 207:12
  207:16 213:2
**meaning**  8:22
**meaningfully**
  13:15
**meaningless**
  173:7,15 174:7
  174:8,17,19,20
  174:21 175:10
  175:12,15,16
  175:17 184:21
  184:23
**means**  16:18,22
  36:20 83:19
  103:2 119:21
  119:24 129:9
  172:14 178:11
  178:14,19,21
  178:24,25
  179:3,6 180:10
  181:21 182:2,3
  182:25 185:7
  194:10
**meant**  159:13
  167:23 182:21
  183:4

**mechanical**
  49:22
**media**  4:19
  54:22 55:3
  103:10,15
  153:19,24
  199:14,19
  217:22
**medical**  21:16
  125:5
**medications**
  21:13,23
**meet**  29:25
  114:19 116:22
**meeting**  112:15
**mehedi**  90:8
**member**  39:8
  70:22
**members**
  109:14 112:24
  113:4,8,18
  123:24
**memorandum**
  105:20,25
  109:6 220:2
**memory**  21:14
**mention**  172:24
  174:8
**mentioned**  23:4
  31:7 32:8
  49:11 61:8
  63:9 65:10
  72:19 92:21
  123:4 126:7,17
  138:17 147:6

**[mentioned - need]**

192:18

**mentioning** 61:11

**merci** 180:9

**mere** 172:3,18 173:2,9

**merit** 83:22

**message** 158:18 158:19

**messages** 16:19

**met** 17:6

**michael** 69:5

**micro** 136:4

**microeconomic** 76:11

**midafternoon** 93:14

**middle** 15:6

**midtown** 110:20

**midwest** 5:7 223:17 226:1

**million** 91:7 126:6 171:16 171:20,22,25 172:2 181:25 182:22 183:4,8 187:5

**minds** 194:11

**mine** 70:8 73:9 154:5 181:7

**minute** 8:21 66:19 99:23 103:20 151:24 153:10 198:23

199:9

**minutes** 30:8 31:2 54:17 99:7 101:13,16 151:23 153:13 180:15 192:11 199:11 208:10 210:16

**misleading** 195:3 211:18

**misled** 86:10

**misrepresents** 57:3

**mm** 128:6 144:4 162:25

**moment** 26:2 28:2 189:12

**monetary** 120:19

**money** 50:19 60:10,22 66:8 66:10 67:13,20 68:2,5,12,14 73:11,14 79:4 79:8 93:16 120:4 124:9 129:12 140:11 154:15 183:16 186:11

**monkeypox** 160:11 162:24 163:8,14,19,22 165:20 166:11 169:16 171:17 176:10 185:17

185:20 186:7,9 187:2,18 189:16,21 190:2,5,10,23 192:23 196:7 221:4

**months** 116:25

**morgan** 60:14 64:25 65:11,12 65:24 67:8,14 70:9 72:16,20 73:3,19,22 154:6

**morning** 4:3 5:22 7:2 156:22

**motion** 101:5,9 101:20 102:7 105:21 106:3 107:10,16 108:17 220:4 220:11

**motions** 100:22 100:25

**mouse** 142:7

**move** 16:24 93:23 164:21 183:14 184:17

**moving** 105:11 124:25

**multi** 160:13 163:10 190:25 221:7

**multiple** 175:16 179:4

212:7,13

**museum** 93:15

**mutual** 114:21 114:22 115:16

**n**

**n** 7:7 76:25,25 127:10,10,12 218:2

**name** 5:6 7:3,6 17:23 61:17 79:11,13 90:25 114:24 132:4 148:11 183:16 184:12 223:6 224:3,4,15 225:3,4,21

**names** 171:10 184:11 185:9

**nature** 76:19 77:6,14 155:3 184:2

**necessarily** 123:7

**necessary** 152:18

**need** 10:10 15:3 15:9,10 23:6,7 34:18 57:14 65:3 75:6 79:14 93:16 102:17 110:17 120:23 121:9 141:23 151:15 159:21 181:5 198:25 202:5

**[need - offended]**

210:15
**needed**  117:2,3
  117:4
**net**  60:15 65:22
**never**  29:13
  37:3 45:7,14
  70:10 76:7
  77:11,12,20
  135:10 157:22
**new**  1:3,22 2:5
  2:5,10,10 5:4
  6:22 7:14,15
  8:19 16:15
  23:22 67:11
  100:8 110:4,8
  110:12 136:8
  148:20 222:6
**news**  82:4
  200:16 201:20
  201:21
**nighttime**
  11:10
**nobel**  165:17
**nods**  22:11
**nonsense**  97:13
**nope**  22:2,6
  29:18 63:8
  64:7 71:23
  108:14 110:2
  115:15,24
**north**  148:17
**northern**  91:9
**notarized**
  223:15

**notary**  1:22
  3:14 6:20
  222:5 223:25
  224:10,18
  225:15,23
  226:23
**note**  4:5 152:12
  223:13
**notebook**  33:15
  33:18,24 34:4
**noted**  81:3
  217:24
**notes**  33:4,7
  34:3,9,10,10
  155:10 208:10
  209:2 210:17
**notice**  24:19
  25:10,19 27:14
  27:18 28:18
  218:14
**noticed**  152:8
**noticing**  5:20
**november**  1:15
  4:5 222:17
  223:4
**novo**  128:3
**number**  5:4
  41:17 55:11
  95:11 108:19
  113:7,16
  125:20 132:17
  139:22 140:23
  146:20 178:25
  178:25 183:17
  184:22 186:14

192:9 217:21
  223:7,14
**numbers**
  203:12 225:7

**o**

**o**  76:25 127:10
**oath**  10:17
**object**  152:20
**objection**  37:5
  37:11 39:6
  42:8 45:9,25
  46:2 48:7,12
  53:6,12 55:20
  55:24 56:9
  57:2 83:18,23
  84:17,23 86:5
  86:18 87:17
  90:16 92:14,25
  94:6,21 96:2
  97:11 100:23
  106:14 107:3
  110:13,22
  111:19 113:9
  113:20 114:3
  116:19 119:3
  120:22 122:14
  124:6 125:22
  131:22 132:11
  132:21 135:23
  137:25 139:6
  139:17 145:4
  146:11 147:4
  147:24 160:16
  162:22 164:2
  165:9,23

172:11 173:12
  175:7 176:13
  177:4 178:6
  180:13 185:23
  189:25 190:11
  190:18 195:9
  196:11,15
  197:20,22
  203:2,17 204:2
  204:13 205:17
  205:21,25
  206:5 211:22
  213:20 214:2
  214:13,25
**objections**  3:9
  5:14 22:21
  39:23 40:8
  41:14,20 42:6
  42:11,13,18
  51:23 52:7
  219:4,17
**objects**  22:23
**obscure**  165:14
**obviously**
  32:18 68:19
  105:10
**occurred**  29:9
  36:21,22,23,25
  83:5,8 199:24
  202:24
**occurring**
  13:10 117:5
**odd**  162:3
**offended**  85:11
  86:9,21 87:11

**[offer - own]** Page 28

**offer** 189:9
**offering** 188:15
**offhand** 43:17
  47:22
**office** 169:5
**official** 224:15
  225:21
**offline** 104:18
**oh** 11:21 20:7
  33:14 49:14
  55:24 72:8
  126:24 132:12
  142:10,11
  203:21
**ohio** 223:2
**okay** 7:20 8:2,5
  8:13 9:2,3,18
  10:5,14 12:2
  12:22 13:2,19
  15:16,22 16:5
  16:12,13,17,23
  17:2,3,15,16
  18:10,14 19:5
  19:7,21 20:8
  20:10 21:9
  22:3,7,13
  23:13,24 24:6
  24:8,23 25:16
  26:9,12,21
  27:4,7,10,23
  28:8 29:10
  30:15,19 32:3
  32:14,18,21
  33:21 34:2,12
  34:16,21 35:24

36:11 37:8,15
38:8,9 40:12
40:16,21 41:2
41:17,20 42:5
42:15 44:17
47:12 50:7
51:3 52:11
53:3 54:7,18
55:10 56:21
57:15 60:23
63:9 65:8
66:23 67:7
77:13 85:22,24
85:25 88:6,15
91:15 92:11
93:23 94:16
100:6 102:19
103:7 108:9,15
109:15 112:12
112:16 120:24
122:8,9 123:10
127:17 128:16
133:15 134:14
136:6 139:22
140:21 143:22
151:6 152:19
153:8,16
155:25 158:3
160:15 161:3,4
161:4,5 162:15
163:20 166:5
166:10,16,21
167:14 169:19
172:25 173:8
175:3 177:7

178:12 185:25
186:18 189:24
190:2 195:6
197:9 198:9,9
201:22,25
202:3 204:6
208:9 209:15
210:25 213:11
216:21,25
217:10,11
**old** 91:3
**once** 37:12
  90:12 116:25
  121:4 138:15
  144:13 154:6
  207:23
**ones** 64:11
**ontiveros** 2:13
  6:11,12
**open** 9:21,24
  10:2 15:23
  155:18,20
  158:19 159:3
  159:13
**opened** 215:13
**operate** 148:10
**operating**
  148:8,9
**opinion** 120:21
  173:24
**opinions**
  132:20
**opportunity**
  17:10 27:9
  124:20 168:25

**options** 130:25
**orally** 22:11
**order** 11:13
  64:22 65:7
**orders** 204:23
**ordinary** 205:7
**organization**
  29:8
**organizations**
  70:23
**outbreak**
  160:14 163:10
  169:16 190:25
  221:8
**outcome** 5:13
  222:15
**outlasted** 18:9
**outlined** 23:18
**outside** 42:15
  127:2
**outstanding**
  23:12
**overvalued**
  174:4,24 175:6
  177:10,12,17
  177:20 178:18
  179:10,11
**overview** 31:5
**own** 29:3 65:4
  66:8,10 67:20
  68:2,5,13
  81:17 106:17
  128:17 145:13
  147:19 154:15
  167:24 169:6,7

**[owned - person]** Page 29

**owned** 168:14 176:6

**owner** 28:22

**p**

**p&l** 140:10

**p.m.** 153:18,23 199:13,18 208:14,18 211:3,7 217:18 217:24

**page** 24:12 25:17 27:17 34:19 40:13,15 108:8,9,16,19 109:5 119:6,9 119:17 121:16 122:3,7,8 140:2 189:23 193:11,14,23 218:5,11 221:18 223:14 223:16 225:7 226:3

**pages** 34:3 119:15 189:14 189:15,18

**paid** 21:4 49:24 121:7

**pandemic** 59:2 59:8 60:20 61:12 62:5,7 62:18,21 76:15 137:23 138:15 138:21 148:5 148:25 183:22

184:3

**paper** 71:12

**papers** 29:22 31:8,9,13 32:9 32:9,19

**paperwork** 82:18

**par** 175:15

**paragraph** 109:8 119:18 121:15,24 122:3,7 124:18

**pardon** 8:8 52:14 53:7 56:14 68:8 105:13 143:11 201:10

**parentheses** 140:24

**part** 49:13 81:22 108:5 133:2 209:23 225:9

**participants** 4:11

**participate** 9:8 41:24

**participated** 85:15 95:25 96:10

**particular** 60:11,18,23 63:21 66:14 89:5 95:7 118:15 137:17

188:24

**particularly** 146:8

**parties** 3:4 4:17 210:2 222:13

**partner** 60:14 155:6

**partnership** 67:9

**party** 5:11 29:11,13 74:3 74:5 132:20

**past** 77:20 111:15,21 171:18 187:3,4 190:6 213:21 214:11

**patient** 202:3

**pay** 20:25 49:23 50:20 174:5 185:24

**pc** 9:14 10:2

**pe** 172:3,13 183:8 184:5,7 184:9,13

**peek** 14:3

**peeps** 158:10 159:7 161:13

**peers** 171:12 185:11

**penalty** 53:21

**pencil** 33:23

**pending** 23:20 26:23 91:8,12 91:17 92:2

99:9 191:11,19

**people** 50:25 51:5 67:15,16 70:5 74:19,21 78:3,3 79:3,6 86:20 87:9 95:10 148:6 169:6,7 194:11 194:13 207:13 217:5

**people's** 194:11

**perceived** 177:19

**percent** 11:9 24:25 131:10 131:13

**percentage** 131:8

**perfect** 16:18 24:8

**performance** 128:22 129:2,5 129:8 155:13

**performs** 129:13

**period** 60:18 131:16

**perjury** 53:22

**permission** 13:8,20 14:2 208:3

**person** 44:21 50:17 110:12 196:21 205:18

**[personal - practice]**                                                    Page 30

**personal** 126:9
 156:24 157:2
**personally**
 224:11 225:15
**perspective**
 106:18
**pertains** 134:11
 134:24 155:7
 155:12 185:21
 187:17 213:7
**perverse**
 203:12
**peter** 69:3,13
 69:17 70:3
**peters** 70:4
**pfizer** 60:3
 61:25 126:18
 127:2 128:2
 187:12
**pharmaceutical**
 186:5
**phase** 207:2
**phone** 15:25
 16:9,15 30:3
 31:4 33:5
 80:22 95:11
 198:24 199:2,4
 199:6 223:3
**pick** 131:19
 178:16
**piece** 119:24
**pied** 7:21
**pivot** 109:8
 138:16,18
 195:24

**place** 1:20 4:16
 80:9 181:15
**plaintiff** 1:8,19
 2:4 6:5,9 36:4
 39:22 40:6
 41:19 43:5,10
 47:17 51:22
 52:3,5,10
 89:18 92:4,7,9
 92:10,13,24
 94:5 95:21
 100:14,16
 104:8 109:10
 121:19 123:22
 212:10 219:2
 219:13,15,23
**plaintiff's**
 105:21 106:2
 107:10,16
 209:9 210:7
 220:4,11
**plaintiffs** 41:14
 120:10 121:21
**planners** 71:3
**planning** 9:22
 13:5
**played** 49:13
**playing** 191:22
 192:5
**plaza** 2:9
**please** 4:5 5:15
 6:15 7:2 9:5
 12:16 24:13
 26:6 44:10
 55:12,14 56:5

 57:22 69:14
 82:25 84:14
 90:12 97:4
 100:24 101:4,7
 101:10,22
 102:2,6,10,13
 102:21 106:16
 106:23 107:4
 108:20 121:25
 123:12,14,18
 125:24 128:23
 140:20 155:21
 156:15 174:18
 202:8 223:12
 223:12
**plenty** 93:12
 126:24 185:2
**pltf** 117:17
 119:7 139:25
 140:5 154:23
 155:2 166:24
 167:5 170:7,10
 220:17,19,21
 221:10,12
**pltf5** 179:25
**pltk** 121:17
**plug** 114:7
**plus** 142:8
 182:24 183:18
**point** 54:12
 95:16 98:12
 117:14 145:2
 201:7,11
**points** 129:16

**policies** 61:4
**polite** 97:20
**poorer** 13:16
**poorly** 129:13
**pop** 34:15
**portal** 40:4
**portfolio** 131:9
 131:14
**portion** 120:4
 137:17 185:5
**posed** 104:22
**position** 20:12
 105:10 145:10
 204:7 209:10
 209:19 213:4,9
 217:2,4,6,7
**positioned**
 171:19 187:5
**positions**
 145:11
**positive** 128:21
 129:2,5,7
**possesses** 56:24
**possible** 32:16
 66:17,24
**postgraduate**
 63:25
**potential**
 187:15 188:18
**potentially**
 189:8
**powers** 49:6
**practice** 50:22
 50:25

**[pre - providing]**                                                    Page 31

| | | | |
|---|---|---|---|
| **pre** 60:25 | 171:24 172:10 | **procedure** 1:24 | 219:10 223:16 |
| **precautions** 149:5 | 172:15,16,19 | 49:23 224:5 | 223:17,22 |
| **precipitously** 200:23 | 175:16 178:5 | 225:5 | **products** |
| **preparation** | 182:2 183:2,18 | **procedures** 61:5 | 186:16 194:18 |
| 30:21 31:8 | 202:20 203:8 | **proceed** 6:17 | 194:19 |
| 41:25 53:4,9 | 211:20 212:4 | **proceeded** 36:23 | **profession** 98:9 |
| **prepare** 29:19 | **prices** 12:23 | **proceeding** | **professional** |
| **prepared** 42:3 | 13:9,20 15:4 | 5:15 14:22 | 14:12,15 64:5 |
| **preparing** | **principal** 65:20 | 18:12 96:16 | 157:5,6 |
| 13:25 14:3 | **prior** 67:25 | **proceedings** 98:3 | **professionally** 82:7 |
| 94:18,22 | 68:3,4 72:19 | **proceeds** 96:14 | **profit** 130:11 |
| 106:21 | 84:10 116:15 | **process** 36:8 | **promise** 89:11 |
| **preplanned** | 200:8,9 | 50:8,9,14 | 145:24 |
| 60:24 61:3 | **privilege** | 51:18 86:4 | **proposed** |
| **present** 2:13 | 212:17,19,22 | **proclaimed** 205:6 | 121:22 122:12 |
| 8:22 | 213:10 | **produce** 213:18 | 122:20 123:24 |
| **presentation** | **privileged** 96:4 | **produced** | **protect** 109:13 |
| 130:7 195:15 | 206:11 | 55:18 56:7,13 | **proud** 71:13 |
| 200:8 | **prize** 165:17 | 56:16,19 | 87:8 |
| **presume** 41:7 | **probably** 10:25 | 206:14 210:2 | **proved** 195:17 |
| 41:11 146:15 | 11:3 30:22 | 215:3 | **provide** 28:13 |
| 163:16 176:15 | 60:2 64:19 | **product** 186:14 | 44:5 45:20 |
| 176:16,18,20 | 67:24 80:22 | 186:19,20 | 48:2,10,19 |
| 186:12 | 127:16 132:12 | 188:14,24 | 116:4,16 |
| **pretty** 194:23 | 133:12 146:6 | 189:9 | 118:25 125:11 |
| **prevent** 22:4 | 151:9 152:22 | **production** | 136:24 161:20 |
| **previous** | 162:8 164:5 | 35:2,7 40:2,11 | 175:19 179:21 |
| 195:22 211:14 | 165:3 166:7 | 54:10 55:9 | **provided** 29:15 |
| **previously** 24:9 | 169:25 184:20 | 80:25 127:22 | 31:20 32:10 |
| 126:18 157:12 | 188:10 206:20 | 208:20,23,25 | 44:18 45:2 |
| 162:11 194:25 | **problem** 99:3 | 209:9 218:21 | 176:9 179:15 |
| **price** 130:12 | 121:10 183:23 | | 179:20 180:8 |
| 144:8,17 145:3 | 202:11 | | **providing** 28:5 |
| | **problems** 121:13 | | 153:2 163:13 |

**[providing - reality]** Page 32

179:22
**provisions**
118:8
**public** 1:22
3:14 6:20
62:20 91:5
147:7 211:14
222:5 224:10
224:18 225:15
225:23 226:23
**publicly** 131:11
135:18 136:16
137:12 204:20
**pull** 140:17
177:18
**pulled** 160:19
**punitive** 113:18
**purchase** 75:22
128:19,24
129:3 135:17
136:15 141:13
142:14 143:5,7
143:10,12,13
143:19 144:16
145:7 164:16
165:8
**purchased**
113:17 131:12
131:23 132:2
141:4,23 142:3
142:19,24
143:23 144:5
144:12,25
162:6,16 165:2
168:8,16,20

211:12,21
212:3
**purchasing**
62:22 147:7
165:22
**purpose** 183:15
**pursuant** 1:23
28:17
**put** 11:12,18,24
13:17 31:16
156:22 183:21
**puts** 171:21
181:23
**putting** 14:6
185:14

**q**

**qs** 137:13
**qualitative**
173:4,14 175:2
175:9 177:16
**quality** 4:8,9
**quantify** 203:9
**quarter** 96:25
171:25
**question** 3:10
13:25 14:4
19:10 23:11,12
26:23 27:19
28:3,10 32:14
38:10,22 41:9
44:17 45:10
46:19,24 47:10
47:23 55:22,23
56:4 57:21
69:6,14 75:11

75:18 77:6,14
86:12,13 88:17
89:4 94:14
97:24 99:9,25
100:9 103:22
105:5 110:24
122:21 131:25
134:4 141:25
153:5 154:2
156:11 161:12
191:10,11,19
192:23 196:21
202:5,9,15
207:6,19
**questioning**
12:16 15:7
150:22 210:20
**questions** 14:4
18:20 19:7
20:6 22:10,25
26:11 27:25
44:2,6,9,20
45:3,15 57:25
93:21 98:11
101:18 104:17
104:21 121:2
134:4 151:10
151:20,22
152:17 174:12
187:25 192:15
203:11,13
206:7 210:12
210:14 215:8
215:10 216:6
217:12

**quickly** 58:9
176:22
**quite** 79:5

**r**

**r** 7:7 127:11
**raging** 62:5,18
62:21
**raise** 138:22,23
**raised** 138:18
**rates** 138:4
**rather** 26:5
104:4 105:6
138:13 207:7
**ratio** 172:3,13
172:16 183:8
**raw** 179:12
180:17
**reaching** 54:12
**reacted** 60:21
**read** 81:20
109:7 136:8
146:6 162:25
176:17 177:24
188:10 201:12
217:15 224:5,6
224:12 225:5,6
225:17
**readily** 103:24
**reading** 223:20
**ready** 28:4,12
185:25
**real** 131:2
207:14
**reality** 207:13

**[really - relative]**

**really** 79:14
93:3,10 97:21
150:10 161:15
168:24 191:16
206:21,21
**reason** 76:10
200:3 223:15
225:8 226:3
**reasons** 112:5
**recall** 82:24,25
91:22,24 97:15
97:24 98:21
102:4,5,9,12
131:21 162:13
214:4,9
**receipt** 223:19
**receive** 80:20
**received** 120:4
176:24 214:5
**recess** 54:23
103:11 153:20
199:15 208:15
211:4
**recognize**
35:10 40:22,24
43:13,16,17
47:19,21 52:12
52:15,18,20,24
53:10,15
106:10 107:22
118:2 156:3,7
156:10 170:13
**recollection**
190:21

**reconvene** 99:4
**record** 4:4,18
5:19 7:3 15:16
20:4 22:15
25:7 35:4 43:7
49:3,5 54:20
54:25 65:8
67:4 69:23
87:6 90:15
98:24 99:7
103:5,8,13,21
117:18 152:23
153:17,22
159:18 166:25
199:4,13,17
208:14,17
209:11,19
211:2,6 217:18
222:10 225:9
**recorded** 4:14
4:20
**recorder** 181:4
**recording** 4:8
4:15
**records** 49:10
123:3 141:16
141:18 143:3
177:18
**recover** 120:3
120:19
**recovered**
120:12
**recriminating**
216:23

**redirect** 210:21
**refer** 23:23
25:5 26:6
51:19 55:6
108:8,11 119:5
154:19 155:17
185:4
**reference**
133:20,25
223:7 224:2
225:2
**referenced**
224:11 225:15
**referred** 148:12
192:20
**referring** 23:17
24:5 30:10
35:19 79:10
90:14 105:6,15
140:22 158:3
179:8 215:19
**reflect** 25:7
35:4 43:7
69:24 98:25
117:18
**reflecting**
212:5
**refresh** 34:19
40:13,15
103:18 155:23
155:25 166:20
190:20
**refreshing**
156:2

**refused** 72:16
**refusing** 104:2
141:24 142:2
**regarding**
27:25 28:6,13
58:18 61:5
63:6 73:2
76:21 77:4,15
113:15 116:22
162:23 163:22
165:19 175:20
176:4,10
185:20 190:10
192:22 196:7
206:7 208:22
209:5,19,20,24
214:12
**regularly**
156:12,14
**regulatory**
70:23 71:25
**related** 5:10
72:5 76:18
123:9 125:12
206:8 214:22
222:12
**relates** 21:17
136:4
**relating** 126:25
214:6
**relation** 213:23
**relations**
172:17
**relative** 122:21
137:15 175:17

**relatively** 10:11 186:2

**relevance** 73:18 83:13 88:10

**relevant** 19:19 19:20 20:9,14 28:6 56:24

**reliance** 108:24

**relied** 146:8

**rely** 74:19,22 146:12,15,17

**relying** 212:4

**remember** 17:25 18:2 31:11 47:24 54:4 59:21,22 60:4 61:10 72:8 78:6 79:11,17 80:5 81:6 85:13 107:4 121:8 133:19 139:18 140:19 143:8,9 144:13 146:3 163:2 168:15 188:16 193:3 194:12,14 196:17,19,23 196:24 197:3 197:13,25 198:2

**remembrance** 147:17

**remind** 65:6 85:22 114:5

**remote** 110:10 153:2

**remotely** 4:7 5:17

**remunerated** 82:14

**renew** 139:3

**rental** 148:21

**repeat** 28:25 128:23

**rephrase** 22:18 44:4

**replicate** 144:23

**report** 107:24 108:6,16 198:4

**reported** 145:21 197:5 198:8,15 200:5

**reporter** 1:21 5:9 6:15 17:6 23:18 159:19 224:7

**reports** 133:4 133:16 134:6 134:11,18,23 135:9,12

**represent** 5:24 27:4 48:3 56:18 87:14 98:8 110:6,20 123:23 124:4 160:5 162:10

195:25 197:14

**representative** 4:22 74:7 105:22 106:4 107:11,17 220:7,14

**represented** 145:23 198:7

**representing** 5:7 6:5,9 86:23 115:8

**request** 22:10 35:2,7 46:12 55:8 81:4,10 110:10 152:16 218:20 225:9 225:11

**requested** 36:3 56:11 57:10,14 110:11 152:11 210:5

**requests** 36:13 40:2,11 41:16 42:6,18 209:17 209:20 219:9 221:16

**require** 160:2

**required** 223:25

**requirements** 64:23

**requires** 31:19 110:15

**research** 59:3,5 74:15 75:23

115:11 116:12 132:24 136:23 137:2 165:15 165:21 200:8

**reserve** 210:19

**reserved** 3:10

**residence** 7:18 7:22,23

**residential** 8:6 8:9

**respect** 14:21 197:24

**respectfully** 98:9

**respective** 3:4

**respond** 17:11 28:10 57:23 86:8 94:13,14 100:4 104:21 123:13 177:8 209:16

**responded** 89:3

**responding** 88:15 170:25

**responds** 168:21

**response** 39:3 44:5,20 45:3 45:21 48:2,14 48:15,20 100:2 101:24 113:12 114:9 121:4 182:9

**responses** 39:23 40:7

**[responses - schizophrenia]** Page 35

41:14,20 43:22 51:23 52:6 219:3,16

**responsibility** 202:2

**responsive** 55:18 56:7 69:25 97:21 99:2

**rest** 178:20

**restraining** 121:11

**restraint** 121:8

**restroom** 23:8

**results** 204:8

**resume** 93:20 210:23

**retained** 217:23

**returned** 223:19

**reveal** 203:16

**revealed** 203:20

**reverse** 50:21

**review** 26:2,25 27:9 28:2 31:3 31:10 40:4 43:2 106:25 117:13 124:20 124:22 132:19 132:25 133:16 133:18 135:16 137:6 139:14 139:24 147:8

147:10 171:7 181:5 223:13 224:1 225:1

**reviewed** 27:20 112:19 134:5 134:10,17,23 135:9,11 205:9 214:6

**reviewing** 137:9

**richman** 1:21 5:9 6:21 222:5 222:20

**ridiculous** 57:25

**right** 7:12 8:20 11:17 14:8 16:4,8 19:11 25:12 27:16 34:20 36:5,7,9 40:16 41:7 46:8 51:19 54:19 57:20 66:22 70:12 85:9 91:11 98:4 100:21 103:4 108:17 126:5 140:6 141:5,6,10,18 143:16 144:7 158:24 163:4,6 163:11 169:21 184:8,9 185:24 186:25 208:8 210:19 216:20

216:24 217:17

**ringer** 16:10,11 16:16

**ringing** 199:5,7

**risk** 11:13,18 11:24

**rockefeller** 2:9

**role** 65:16,18 68:6,9,10 95:21 109:12

**room** 8:14,25 9:5

**roughly** 117:9

**rule** 12:2

**rules** 1:23 12:4 14:25 17:2,4 22:9 224:5 225:5

**run** 80:2,3,3

**running** 24:25

**runs** 75:14

**s**

**s** 218:10 223:16 225:8,8 226:3

**sachs** 49:6,12 49:13,15,19 50:2,18 51:12 133:8 148:11

**sale** 199:22 204:9

**sales** 171:25 183:4,7 204:21

**san** 75:19

**satisfy** 64:22

**saw** 33:10,14 59:14 62:12,15 62:20 84:4 145:15 200:25

**saying** 15:10 17:8,11 73:13 78:18 102:2 103:23,25 104:2 105:4 114:8 123:18 151:24 168:22 173:16 174:6 174:18 177:19

**says** 12:18 41:6 41:18 43:18 105:3 109:9 119:18 120:7 121:18 124:19 141:5,6,9 142:12 158:10 158:20 160:23 171:10 178:2 181:22 185:8 185:16 186:25 190:4

**scan** 31:12

**scanned** 29:21 31:8 32:9,20 32:23

**scenario** 129:11

**schedule** 111:2

**schizophrenia** 77:18

**[scope - shares]**                                                                 Page 36

scope  20:2
  72:25 73:4
  210:21
screen  4:13
  15:17,21
  108:13
scroll  144:7
seal  224:15
  225:21
sealing  3:5
search  214:21
sec  137:7,9
  147:8,10
second  40:15
  43:15 108:9
  122:3,7 124:18
  145:2 155:25
  216:12
secret  80:7
securities  12:24
  59:4 62:24
  64:9 72:6
  79:24 89:16
  90:20 113:16
  117:21 128:20
  128:25 129:4
  131:13,15
  132:2,10
  135:17 136:15
  141:3 142:19
  143:19,24
  147:8 165:8
security  130:12
  132:5 141:6,9
  141:10,22

165:22
see  16:12,16,25
  25:23 26:21
  33:19 40:16
  41:6 87:9 97:9
  99:15,16
  109:16,17
  118:7 120:13
  121:23 123:25
  127:11 128:3
  137:4 140:7
  141:7 142:10
  155:20 156:5,6
  156:6 157:15
  158:14,24
  159:2,6 160:22
  161:5,23
  166:10,17
  170:11 172:5
  177:11 179:19
  183:25 190:4,6
seeing  40:14
seeking  22:16
  37:16 48:5
  90:24 92:6,8
  92:22 147:2
seem  88:23
seemed  59:15
seems  112:7
  142:17 169:9
  193:6
seen  4:12 24:15
  24:21 26:3,7
  27:2 106:6
  107:20 187:21

select  121:18
selected  59:19
self  70:23
sell  49:23 58:19
  58:22 60:5
  128:20,25
  129:4 138:25
  177:3,5,6,9
  179:17 183:25
  196:13 201:5
  202:20 203:10
selling  60:8
  195:21 200:4
send  169:8
  182:16
sending  171:2
sense  62:4,7
  118:12
sent  24:22 25:4
  25:5 31:15
  156:9 170:15
  170:16,16
  182:10 191:4
  193:4 213:22
sentence  65:7
  202:12
separate  157:4
september
  160:23
serious  13:21
  104:15
serve  17:13
service  121:20
services  116:5
  136:24

session  11:11
set  34:25 35:6
  39:25 40:10
  41:15 43:5,9
  47:16 52:2,9
  55:8 67:8
  218:20 219:9
  219:11,22
  222:9,16
sets  149:25
setting  65:3
settle  49:21
settlement
  144:6,7 145:3
settling  50:20
seven  54:17
  64:12 104:20
  141:8 152:2,7
shaking  22:11
shame  98:6,7
share  10:3
  172:17 181:25
  185:22 201:25
shared  108:12
  162:18 176:3
  190:22 192:22
shares  167:24
  168:10,10,11
  168:12 169:2
  171:23 179:17
  180:12 183:17
  187:20 189:11
  196:13 202:21
  204:10

sharing 170:19 171:8 175:22 175:24 190:9
sheet 140:18 223:14 225:7 225:10,18 226:1
sherman 114:24 115:2 115:17 208:24
shifting 179:6
ships 160:11 163:8 190:23 221:3
shit 216:7,16
shopping 216:19
short 54:13 129:17 130:5
shorter 151:12
shorthand 1:21
shortly 78:22 97:22
show 159:14 164:3
showed 24:9
shown 47:13 223:16
shows 168:19 168:20 193:5
sic 183:24
sick 111:4,4,14 111:21,25 112:4,12,16,18 138:10 149:12

149:13,14 194:13
side 72:13
sidoti 133:16 133:19 134:6 134:10
sign 53:16 142:8 217:16
signature 222:19 223:15
signed 3:13,15 54:2,4,9 224:13 225:18
signing 223:20
silent 16:17
similar 113:24 198:20
similarly 1:7
simply 47:4 84:3 103:23 169:12 179:12 181:18 183:17 183:22
simultaneous 13:9
simultaneously 13:13
sincerely 223:21
single 51:14 169:4
sir 19:14 32:8 57:23 180:18 223:10

sit 94:9 106:9 151:16 173:8
sitting 10:17,21 11:6,6,7,8
situated 1:7
situation 31:6
six 108:18 138:12 141:8 152:22
skip 151:18
slightest 88:21 98:16,17
slow 96:16
slowing 204:22 204:23
small 127:24 186:2
smart 188:6
soar 138:4
social 115:25
sold 113:18 171:25 188:6 195:16 196:2 196:25 197:3,4 197:16 198:13
solutions 223:1 226:1
solvency 18:9 21:7
somebody 46:17 61:10,14 61:16 80:4
sorry 9:19 10:13 28:25 41:8 48:13

55:13 66:15 76:22 99:21 101:23 102:24 113:11 129:10 136:10 149:16 156:14 167:15 168:11 188:21 197:17 198:10 216:8
sort 14:24 60:16 61:11 161:24
sources 200:16 201:21,21
southern 1:3 5:3 23:22 110:4,7
spac 91:5
speak 30:4,19 30:24 75:21 201:24
speaking 81:12 81:15 175:4
specific 47:24 98:11 126:12
specifically 37:18 38:14 78:9 138:14 214:4,9
specifics 42:12 52:22 60:5 136:18,21 144:14 196:18
speculate 161:17,18

**[spell - stocks]**

**spell**  7:5
**spend**  178:20
**spoke**  12:3 30:3
  30:8 46:17
  47:4 77:3
  78:15 81:18
  84:5 198:20
**spoken**  44:16
  44:23 45:7,11
  45:14 76:7
**stadium**  1:6
  4:22,24 23:19
  24:20 25:11,20
  27:15 28:22
  29:3,6,10,15
  39:13,22 40:6
  43:24 49:15
  50:5,23 51:22
  52:5 56:13,16
  56:23 67:22
  68:7,17 70:7
  70:11,15 78:11
  83:3,16 84:15
  84:18 85:2
  86:16 89:17,23
  94:19,23 95:18
  95:20 104:7,14
  107:25 109:19
  112:19,22
  113:2,6,14,21
  114:15 115:9
  115:17,22
  116:2,4,21
  118:18,20,25
  122:11 124:3

125:11,21
126:2,13
128:19,24
129:3 130:10
130:23 131:12
132:9,19
135:16 137:6
137:10,23
139:2 141:4
142:18,23
148:7 165:7
176:11 188:4
188:13,22
198:12 206:15
218:15 219:2
219:15 223:6
224:3 225:3
**stadiumcapit...**
  157:8
**stake**  121:22
  122:12,20
**stallone**  68:25
**stamp**  122:4
  124:19
**stamped**
  117:16 119:6
  119:14 121:16
  139:25 140:4
  154:22,25
  166:23 167:4
  170:7,9 179:25
  220:16,18,20
  221:9,11
**stand**  10:18,22

**stanley**  60:14
  64:25 65:11,12
  65:25 67:8,14
  70:9 72:16,21
  73:3,19,22
  154:6
**start**  65:12,22
**started**  138:16
  193:21
**state**  1:22 5:15
  5:18 6:21 7:3
  98:14 209:10
  222:6 224:10
  225:15
**stated**  90:15
**statement**
  140:11 204:20
  224:13,14
  225:19,19
**statements**
  145:16,17,19
  145:25 146:9
  146:13 195:2
  203:25 211:15
  211:18
**states**  1:2 5:3
  23:21 123:21
**stating**  37:16
  118:6 162:19
**status**  90:2,4
**stay**  10:10 67:4
  81:22,25
**staying**  12:9
  82:8 111:24
  112:3,6,8

**steel**  128:13
**stipulated**  3:3,8
  3:12
**stipulations**
  1:24 3:2
**stock**  12:25
  13:9,20 15:3
  50:17,20,21
  51:11,16 58:23
  60:6,9 79:2
  129:17 138:25
  140:12,16
  142:24 144:16
  145:12 146:23
  154:15 161:19
  161:20 162:6
  162:17 163:25
  164:14,17
  168:17 171:24
  172:9,16,19
  174:3,23 175:9
  178:4,17
  179:17 182:2
  182:25 183:14
  195:14,16,21
  196:3,25 197:4
  197:4,17
  198:14 199:22
  200:22,25
  202:20 203:7
  211:13,20,21
  212:3,4
**stocks**  130:25
  131:9 168:8,13
  179:3

stop 57:24
storm 163:5
strategic 95:24
  96:9,13 187:25
strategies
  137:24
strategy 60:8
  60:12,24 61:6
  61:6 128:11
  155:8 161:25
  162:18
street 14:12
  51:2,8 61:2
  63:11 136:9
  176:17 193:11
  193:14,23
  204:19
streisand 68:22
strike 95:19
  166:12 204:6
stronger
  180:22
stuck 184:15,19
stuff 67:17
  111:5 164:4
  169:8 175:13
  175:18
stunk 203:22
subject 71:10
  71:15,18,24
  168:2
submitted
  107:24
subpoena
  28:18

subscribed
  224:10 225:14
  226:21
subsequently
  78:22 143:22
  195:16
substance
  31:25 201:8
sue 96:11
sued 18:5,6
sufficient 84:9
  99:21 127:13
suggestions
  150:8
suing 78:11,14
suit 21:8 85:3
  85:10,12,19,20
  87:13 100:13
  109:24 118:9
  175:11
suite 223:2
suites 186:21
  188:14,24
  189:9
summer 148:14
  148:16,19
  149:3,6 188:5
  193:20
superior 223:1
supervise 95:20
  96:12
support 105:20
  106:2 107:9,15
  116:17 220:3
  220:10

supporting
  164:9,11,13
  165:15,21
supportive
  166:6
suppose 203:14
supposed 82:6
  91:16
sure 14:18 20:7
  24:25 27:12
  32:24 54:14
  66:18 77:17
  81:13 82:7
  102:14 109:17
  110:9 114:6
  118:13 121:3
  129:16 132:22
  153:12 159:14
  177:7 185:7,8
  192:17 210:18
  210:22,24
  215:9
survival 63:23
sutton 114:23
swear 6:15
sworn 3:15
  6:20 10:15
  29:16,16,16
  222:9 224:10
  224:13 225:14
  225:18 226:21
sylvester 68:25

t

t 121:3 127:12
  218:10
take 4:16 14:2
  17:7 20:11
  23:5,10,12
  25:25 28:2
  33:4 50:19
  58:5 61:22
  66:18 80:9
  91:15 93:15
  99:22 101:11
  101:13 102:15
  102:22 103:3
  109:11 150:18
  152:13 153:9
  159:21 186:13
  187:12 198:23
  198:24 199:9
taken 1:20 4:23
  35:15 187:22
talk 15:8,8 17:9
  45:17 46:25
  48:8,16 52:23
  54:5 69:14,19
  75:24 76:2
  85:23 88:16
  89:13 91:20,25
  92:15 99:18
  104:17 105:3
  120:23 193:18
  195:20 213:5
talked 28:9
  77:8 125:2
  126:15 128:8

**[talked - things]**                                        Page 40

135:14
**talking**  16:20
  33:13 36:8
  45:23 46:13
  88:4,5,7,9,22
  90:18 92:17
  104:11,11
  193:18 209:13
  216:11
**tape**  59:15
  62:13,16
**teach**  175:13,14
**technology**  4:8
  171:13 185:12
**tell**  13:12,24
  15:17 48:16
  49:12 50:16
  53:14 59:14
  63:11 65:21,22
  67:23 69:15,19
  73:7,16 74:12
  74:18 79:18
  80:6 93:4 96:8
  100:6 103:21
  127:14 129:15
  130:22 131:20
  136:6 140:13
  141:2,21
  149:15 159:12
  160:18 169:3,6
  169:7 173:21
  180:19,20
  183:19 186:3
  192:2 194:15
  215:15

**telling**  32:11
  36:9 38:17
  43:21 57:13
  94:10 98:2
  146:15 165:3
  168:23 175:8
  181:19 198:17
  213:3
**tells**  180:20,21
  181:8
**temperature**
  173:17,20,21
  173:23
**ten**  38:22
**tend**  60:19
**tenx**  127:12
**terms**  42:10
  46:5 152:25
**terre**  7:21
**terrible**  190:15
**test**  166:11
  171:17 185:17
  185:20 186:7
  187:2 188:6,19
  188:25 189:4
  190:6,24
**tested**  62:6
**testified**  6:23
  12:14 47:18
  77:3 114:11
  146:21 177:13
  190:12 208:22
**testify**  19:15,18
  21:24 26:14
  104:20 152:2,6

**testifying**  4:21
  10:16 19:14,17
  26:10 50:11,13
  96:20 104:6,13
  104:19
**testimony**  28:6
  28:13,20 29:5
  29:17 57:3
  79:15 94:12
  193:22,25
  194:3,8 217:20
  222:8,11 224:6
  224:7 225:6,9
  225:12
**testing**  59:8
  62:3,8,10 63:3
  76:14,15,21
  77:12,21 78:8
  125:5 126:25
  127:6 129:24
  130:19 139:5
  139:11,15
  148:2 165:21
  171:11,14
  184:2 185:10
  185:13 186:7,9
  186:24 187:18
  187:18 194:17
**tests**  148:4
  160:12 163:8
  163:14 188:19
  188:25 221:4
**text**  16:19
**thank**  8:5 20:13
  20:15 32:4

67:2 159:16
  180:10 182:11
  182:13 191:16
  193:2 208:12
  217:14
**thanks**  8:2 15:5
  32:7
**thereabouts**
  67:24 131:10
  186:17
**thing**  19:2,2
  21:5 42:11
  72:11 76:11,11
  142:4 163:2
  164:6 170:3
  172:18,19
  173:2,2,15
  175:9 177:16
  179:9 184:15
  186:10,12
  187:19 188:2,3
  193:6,10
  204:16
**things**  19:19,19
  36:21 61:24,25
  76:3,5 78:18
  78:20 93:13
  112:5 130:9,9
  136:2,3 137:4
  138:20 139:8
  144:20 151:5
  165:5 166:9
  173:7 176:22
  179:2 181:22
  184:18 194:22

**think** 14:10
16:14 17:13
24:22,24 46:4
58:8 59:13,25
61:13 72:15
75:11 80:14,15
82:12 86:19,19
91:17 101:15
105:2 120:2,15
121:6 124:9
127:3,7 142:6
152:4 173:22
174:20,20
186:15 188:10
196:20 214:15
**thinks** 105:7
**third** 2:4 25:17
27:17 88:6
132:20
**thirty** 223:19
**thought** 55:25
78:17,17 84:6
144:22 168:24
169:23 194:21
194:22
**thoughtfully**
14:5
**thousand**
184:13
**three** 13:16
37:21 41:18
83:11 90:5
101:17 103:15
117:8 132:12
141:7 152:15

153:19 168:18
214:16
**throat** 111:22
**ticker** 171:15
**time** 1:20 3:10
5:16 19:24
36:22 46:10
54:20,25 58:6
58:25 59:17
69:21 73:22
78:4 79:12
88:8,13 91:14
92:12,20,21,23
93:9,13,17,18
93:24,24,25
94:2,3,4,16,17
98:18 103:8,13
130:17 131:16
131:20 132:14
143:4,6,20
144:21 147:13
148:24 150:25
152:11 153:17
153:22 154:6
164:19 166:20
178:20 181:3
184:5,5,16
187:10,14
188:17,20
189:2,6 191:24
192:2 195:7,13
197:19 199:13
199:17 200:21
204:18 208:14
208:17 211:2,6

217:14,24
**times** 14:7
37:22 38:23
63:10 117:8
136:8 178:10
178:13 179:8
183:6,18
184:21 202:7
**title** 27:12
**titled** 25:18
35:6 39:21
41:13 43:8
47:15 51:22
103:19 107:8
163:7 190:22
**today** 19:15,16
20:4,5 21:14
21:25 22:5,9
26:10 29:23
35:25 41:3
51:9 82:20
92:17,19 93:14
93:24 94:8
96:20 104:6,13
104:18 106:9
109:21 110:21
111:25 112:3
128:8 131:17
131:18,23
132:2 133:3
152:7,9 173:9
**today's** 9:8
10:14 13:6
14:25 15:18
16:7 19:6 20:3

23:16 27:23
28:21 29:20
30:16,21 31:9
32:25 94:12
159:20 209:3,6
217:19
**together** 31:4
180:22
**told** 20:24,25
21:6 61:8
78:25 89:8
141:20 161:18
169:2,23 176:5
178:9,10,13
179:7 180:14
180:15 184:21
201:19,20
**took** 64:24
108:4 151:23
**top** 81:22,25
82:8 143:16
185:4
**topics** 25:22
26:2 27:19,21
27:25 28:14
152:18 192:19
**total** 42:12,13
113:16 125:20
125:23 126:3
217:21
**towards** 142:8
**towel** 71:13
**trade** 169:14
179:3

**[traded - unilaterally]**

**traded** 131:11 135:18 136:16 137:12 161:24
**trades** 50:10,14 147:23 208:21
**trading** 183:5
**traditional** 204:19
**transact** 51:14
**transacted** 51:11
**transaction** 51:10,14 140:17 198:13 199:23
**transactions** 36:24 49:4,22 50:2,4,5
**transcribed** 224:7
**transcript** 80:14,16,17,21 81:5 124:13 146:5 177:25 188:11 201:12 222:10 223:12 223:13 224:5 224:12 225:5 225:11,17
**travel** 110:19 111:2
**trial** 3:11 10:18 10:22 11:7 41:19

**tried** 32:15 46:9
**trouble** 14:9,11 93:3
**true** 10:25 11:2 11:4,4 53:21 53:24,25 222:10
**truly** 169:10
**trust** 217:5
**truth** 78:25 146:16 203:14 203:19 207:12 207:12,25,25 217:7,9
**truthful** 48:25 211:15 212:5
**truthfully** 22:5
**try** 15:15 23:5 45:23 46:3,10 60:10,22 81:16 93:19,20 98:17 193:19 201:22 201:23 208:10
**trying** 19:18,25 46:23 69:19 72:7,14,24 73:16 88:22 93:4,10 97:19 97:20 98:8 105:2 111:20 159:3 174:14 184:17 186:3 197:23,24 202:10

**turn** 11:21,22 137:20 177:22 181:4
**turned** 91:6
**turns** 12:10
**tv** 62:16 66:6 67:19
**twenty** 17:20 31:2
**twice** 169:22
**twitter** 170:24 171:10 180:7
**two** 55:3,11,15 55:16 60:2 66:19 81:18 103:10 122:8,9 141:7 149:18 149:21,24 150:3 151:9 191:22 193:20 208:9 213:21
**type** 79:19,21 79:23 130:23 192:24
**types** 213:16

**u**

**u** 127:10,11
**u4** 71:12 87:5
**ultimately** 18:7 120:7 124:16 145:13
**unavailable** 151:25 152:6
**unconscious** 138:12

**uncooperative** 192:3,4
**under** 10:16 14:17 53:21 67:13 122:9
**understand** 7:24 13:8 18:18 23:2 25:13 38:6 72:24,25 75:6 79:6,17 82:19 84:19 88:8 90:24 101:25 104:22,23,24 134:22 153:15 159:5 171:4 174:16 178:15 204:4 208:2
**understanding** 9:13 26:16 41:4,21 123:5 198:11
**understood** 77:13 123:18 210:9
**undertake** 119:19
**undertaking** 118:8
**unfortunate** 191:24 207:15
**unfortunately** 151:4
**unilaterally** 152:8

**unit**  4:19 54:22
  55:3 103:10,15
  153:19,24
  199:14,19
**united**  1:2 5:2
  23:21
**university**
  63:18
**unrelated**
  127:5
**uris**  2:6 6:3,3
  12:13 22:22
  26:22 30:16,20
  31:17,25 32:5
  33:2 34:18
  37:5,11,17
  39:6 40:18
  42:8 45:9,25
  46:4,11 47:9
  48:7,12 53:6
  53:12 54:11,16
  55:20 56:2,9
  57:2 58:7 67:6
  75:10 81:3
  82:23 83:18,23
  84:17,23 86:5
  86:18 87:17,20
  90:16 91:19,22
  92:14,25 94:6
  94:21 95:12,14
  96:2 97:11,14
  97:23 98:20
  99:6,12,22
  100:23 101:11
  102:3,21

104:25 106:14
106:19 107:3,9
107:15 108:21
109:2 110:13
110:22 111:19
113:9,20 114:3
115:6 116:19
119:3,8 120:22
122:6,14
123:15 124:6
125:22 131:22
132:11,21
135:23 137:25
139:6,17 142:6
143:8 145:4
146:11 147:4
147:24 150:20
150:25 151:6
151:17 152:4
153:8 155:22
160:16,22
162:22 164:2
165:9,23
166:19 172:11
173:12 175:7
176:13 177:4
178:6 180:13
185:23 189:25
190:11,18
191:18 192:14
195:9,11
196:11,15
197:20,22
198:6 202:8,13
203:2,5,17

204:2,13
205:17,21,23
205:25 206:5
207:21 209:13
209:16 210:9
210:11,13,22
211:9 212:18
212:23 213:11
215:7,25
217:11,15
218:7 220:10
223:5
**use**  23:8 102:22
  121:7 143:19
  156:12,14,18
  157:9,22,23,25
**used**  143:21
  175:13 217:22
**using**  4:7 9:8
  9:14 46:5
**usual**  169:12
  169:14
**usually**  143:19

---

**v**

**v**  89:22 90:8,8
  91:3 127:11
  223:6 224:3
  225:3
**vaccine**  150:15
  176:10
**vaccines**  149:9
  149:22,24,25
**vacuum**  13:18
**vague**  94:6

**value**  118:25
  171:21,22
  172:8,12 173:6
  173:6,7 174:2
  174:7,9,17,19
  175:10,14,15
  178:3,8,11,14
  178:19,21,23
  178:24 180:25
  181:21,24,25
  182:4,20,22
  183:6,11,13,17
  183:19 184:4
  184:20 187:19
  196:8,9
**values**  179:4,5
**variety**  60:21
  76:2,4 77:17
  112:5 136:24
  138:20 139:8
  172:23
**various**  12:24
  36:24 213:22
**vehicle**  126:16
**velocity**  61:19
**ventures**  75:15
  75:19
**verification**
  48:20,23 53:16
  53:18 54:8
  210:7
**verify**  48:24
  53:19
**veritext**  5:7,10
  217:23 223:1,7

226:1
**veritext.com.** 223:17
**versus** 4:25 23:19
**veru** 127:11
**video** 4:15,20 9:12
**videographer** 2:14 4:2 5:8 6:14 54:19,24 67:3 103:4,7 103:12 153:16 153:21 159:19 199:12,16 208:13,16 210:25 211:5 217:17
**videotaped** 1:17
**view** 89:21,24 90:7,8 91:3 92:4 94:20 95:2,22,25 96:6,10,11 114:18 115:7
**vindictive** 18:7
**vindictiveness** 18:9
**virtual** 1:13,17 4:7
**virtually** 201:15
**virus** 160:12 163:8 190:23

221:4
**voice** 111:23
**vortex** 59:16

**w**

**w** 89:22 90:8 91:3
**wainwright** 134:15
**wait** 40:12 46:16 103:20 196:12 197:21 201:24 202:14
**waived** 3:7 213:9 223:20
**waiving** 212:16 212:19,22
**wake** 13:14
**walk** 21:20 29:22 50:7
**walking** 169:5
**wall** 14:12 51:2 51:7 61:2 63:10 136:8 176:17 193:11 193:14,23 204:19
**want** 8:20 11:5 11:10,25 14:8 14:10,23 19:23 20:12 26:14,15 27:2 30:7 33:19 38:7 46:11 47:4 55:10 58:5 66:18,20 69:10

79:22 82:3 88:24 91:10 93:19 98:2 99:17,19,24 100:11 102:16 132:4 141:9 150:18 151:20 153:3,9 157:20 159:25 160:17 164:18,20 171:12 185:11 191:3,5,9,12,15 192:8,10 200:13 203:18 204:14 210:11 213:5
**wanted** 161:21 182:24
**wants** 12:19
**waste** 184:4,5
**wasting** 69:21 88:8 91:14 93:9 192:2
**watch** 82:4,4,5
**water** 23:7 66:17,21 67:7
**way** 50:15 51:5 51:13,15 59:6 79:2 87:12 94:13 119:14 137:4 172:23 204:17 222:14
**ways** 60:21 81:24 82:4 178:22

**we've** 152:10 152:12 162:2 202:7 212:24
**wearing** 149:19
**week** 31:14 152:21 181:20
**weeks** 30:22 83:11 144:21 171:18 185:18 187:4 190:6
**wellington** 7:11
**went** 38:4 67:19 79:2 81:13,19,20 144:10 168:21 169:17,20,22 180:3 205:5
**west** 67:16
**whatsoever** 61:7 78:10
**whereof** 222:16
**whichever** 51:13
**willing** 28:12 110:19,25
**willingness** 109:11
**willy** 114:23
**win** 79:6 165:16
**window** 9:24 11:23,23 12:18
**windows** 9:21 10:2,6,12 15:23

**[winners - zicherman]**

**winners** 165:18
**winning** 21:7
**wire** 80:23
**wish** 195:10,10
**witness** 1:18
4:12 6:16,19
10:18,22 31:23
32:3,7 40:20
46:6 47:11
69:24 83:24
91:20 96:3
97:16,25 98:25
102:17,24
103:6 142:9
151:15,17,25
152:3,5 153:6
153:14 155:24
198:9,25 199:6
199:10 206:16
208:12 209:12
209:15 216:7
216:11,15,21
217:3 218:5
222:8,11,16
223:8,12 224:1
224:4,11 225:1
225:4,15
**witnesses**
152:14
**witness'** 223:15
**woman** 18:7
**wonderful**
78:18,20
**wondering**
7:25 8:3 208:4

**word** 202:12
**wore** 149:7,10
175:12
**work** 61:14,15
61:18,21,22,23
65:10 72:5,20
73:3 115:22
147:20 163:13
**worked** 66:5
67:11 78:4
134:20 157:12
**working** 65:12
171:17 185:17
186:25 188:23
190:5 193:6
194:22
**works** 125:7,10
151:18
**world** 12:9,20
14:7 58:25
93:14 181:15
207:11,17
**worldwide**
183:23
**worth** 60:15
65:23 183:7
**wrap** 208:11
**written** 61:5
**wrote** 159:7

**x**

**x** 1:5,12 127:12
186:14 218:2
218:10

**y**

**yahoo** 136:25
**yeah** 10:25
15:5 20:18,21
26:12 30:22
33:17 38:12
50:16 53:23
54:16 56:2
63:13 65:9,9
66:2 67:6 68:3
79:16 84:20
103:2 109:23
110:25 126:11
127:19 131:19
135:24 140:6
142:9 149:20
149:25 155:14
158:8,12,16
161:11 167:6
169:17 170:17
171:2,6,6
180:5 187:24
196:4,10
197:18 201:4
211:11
**year** 80:8 96:24
96:24 117:7
165:16 214:11
**years** 17:20
20:16,19 51:8
64:19,20 67:12
72:9 75:25
87:7 90:6
126:25 127:4
127:18 134:5,9

134:19 136:2
149:18,21
150:3 162:3
193:20 213:21
**yep** 23:3,14,25
24:7,14 25:21
25:24 107:19
117:25 119:10
119:16 140:6,8
155:14 167:17
170:12,12
172:6
**yesterday** 30:5
30:20
**york** 1:3,22 2:5
2:5,10,10 5:4
6:22 7:14,15
8:19 23:22
67:11 110:4,8
110:12 136:8
148:20 222:6

**z**

**z** 7:7
**zero** 76:24
165:11 178:19
**zicherman** 1:18
4:1,21 5:1 6:1
6:18 7:1,4 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
17:4 18:1 19:1
20:1 21:1 22:1
23:1 24:1,9
25:1 26:1 27:1

**[zicherman - zooming]**    Page 46

| | | |
|---|---|---|
| 28:1,8 29:1 | 111:1 112:1 | 179:1 180:1 |
| 30:1 31:1 32:1 | 113:1 114:1,11 | 181:1 182:1 |
| 33:1 34:1,12 | 115:1 116:1 | 183:1 184:1 |
| 35:1 36:1 37:1 | 117:1,10 118:1 | 185:1,3 186:1 |
| 38:1 39:1,18 | 119:1 120:1 | 187:1 188:1 |
| 40:1 41:1 42:1 | 121:1 122:1 | 189:1 190:1 |
| 42:22 43:1 | 123:1 124:1 | 191:1 192:1 |
| 44:1 45:1 46:1 | 125:1 126:1 | 193:1,17 194:1 |
| 47:1,13 48:1 | 127:1 128:1 | 194:24 195:1 |
| 49:1 50:1 51:1 | 129:1 130:1 | 196:1 197:1 |
| 52:1 53:1 54:1 | 131:1 132:1 | 198:1 199:1,20 |
| 55:1,4 56:1 | 133:1 134:1 | 200:1 201:1 |
| 57:1 58:1 59:1 | 135:1 136:1 | 202:1 203:1 |
| 60:1 61:1 62:1 | 137:1 138:1 | 204:1 205:1,8 |
| 63:1 64:1 65:1 | 139:1,19 140:1 | 206:1,14,16 |
| 65:5 66:1 67:1 | 141:1 142:1 | 207:1 208:1,22 |
| 68:1 69:1 70:1 | 143:1 144:1 | 209:1 210:1 |
| 71:1 72:1 73:1 | 145:1 146:1 | 211:1 212:1 |
| 74:1,8 75:1 | 147:1 148:1 | 213:1 214:1 |
| 76:1 77:1,2 | 149:1 150:1 | 215:1,14 216:1 |
| 78:1 79:1 80:1 | 151:1,7 152:1 | 216:9 217:1,21 |
| 81:1 82:1 83:1 | 152:25 153:1 | 218:6 223:8 |
| 84:1 85:1 86:1 | 153:25 154:1 | 224:4,9 225:4 |
| 87:1 88:1,12 | 155:1 156:1 | 225:13 226:20 |
| 89:1 90:1,19 | 157:1 158:1 | **zicherman's** |
| 91:1 92:1,3 | 159:1,17 160:1 | 209:2 |
| 93:1 94:1 95:1 | 161:1,3 162:1 | **zoom**   1:13 |
| 96:1 97:1 98:1 | 163:1 164:1 | 30:16 |
| 99:1 100:1,3 | 165:1 166:1 | **zooming**   8:4 |
| 101:1,21 102:1 | 167:1 168:1 | |
| 103:1,16 104:1 | 169:1 170:1,4 | |
| 104:6 105:1 | 171:1 172:1 | |
| 106:1,6 107:1 | 173:1 174:1 | |
| 107:6 108:1 | 175:1 176:1 | |
| 109:1 110:1,23 | 177:1 178:1 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.