P1MCstaC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

STADIUM CAPITAL LLC, on behalf
of itself and all others
similarly situated,

                    Plaintiff,

         v.                                22 Civ. 6978 (AS)

CO-DIAGNOSTICS, INC., DWIGHT
H. EGAN, and BRIAN L. BROWN,

                    Defendants.

-------------------------------x
                                        New York, N.Y.
                                        January 22, 2025
                                        4:00 p.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge

                         APPEARANCES

KAPLAN FOX & KILSHEIMER LLP
     Attorneys for Plaintiff
BY:  FREDERIC S. FOX, SR.
     JASON A. URIS

BAKER & HOSTETLER LLP
     Attorneys for Defendants
BY:  ERICA A. BARROW
     GENEVIEVE G. YORK-ERWIN
     DOUGLAS W. GREENE

THE COURT:  Do we have Mr. Zicherman?

MR. URIS:  I just contacted Mr. Zicherman.  He should be joining shortly.  I apologize.  Part of the confusion may be that he is used to using Zoom and this was a Teams link.  I went over it with him earlier today and made sure his setup was working, but it's possible he joined the wrong link, but he told me he's joining now.

Your Honor, Mr. Zicherman said he's in the --

THE DEPUTY CLERK:  Your Honor, I don't see him in the call yet at this point.

THE COURT:  Who are you?  Who's sitting over here?

MR. URIS:  Your Honor, my name is Jason Uris.

THE COURT:  Mr. Uris, when did you get here today?

MR. URIS:  About 30 minutes ago.

THE COURT:  So, Mr. Hernandez, were you here when Mr. Uris arrived?

THE DEPUTY CLERK:  Yes, your Honor, I've been here.

THE COURT:  At that time, did you talk to Mr. Zicherman and make sure that he was on at 3:30 so that he would be was ready to go at 4:00 p.m. when we started this conference?

MR. URIS:  We had a conversation before I left our office and --

THE COURT:  The answer is no, right?  When you got here at 3:30, did you call Mr. Zicherman and say, get on this

P1MCstaC

line because we need to make sure that you're ready to go at 4:00 p.m.?

MR. URIS:  I did not, your Honor.  They took my cellphone when I entered.  But I did not call him before that.

THE COURT:  Do you have your phone now?

MR. URIS:  This is my partner's phone.  I just called him and he just said that he was on.  He may be using the wrong Teams link.

THE COURT:  Who's sitting next to you?

MR. URIS:  This is my partner --

MR. FOX:  Frederic Fox, your Honor, Kaplan Fox.

MR. URIS:  I apologize, your Honor.  I believe Mr. Zicherman is trying to locate the correct link.  We had tested it earlier today to make sure he had the appropriate application to access the Teams links, and my suspicion is that he's using the same link that we used to test his access rather than the subsequent link that was circulated.

THE COURT:  Mr. Uris, to be fair, I understand that these technical issues come up, and they come up here just like they come up everywhere else, so I appreciate that.  However, as my questions indicate, I think that understanding that these things happen and, as you pointed out, understanding that you have a client who may not be well versed -- I mean, I'm not well versed with a lot of this stuff.  I think it was incumbent on counsel to make sure that Mr. Zicherman was online and this

P1MCstaC

was all set up well in advance, especially given the nature of the hearing and the issues that have been raised by the defendants. Fair?

MR. URIS: That's more than fair, your Honor.

THE COURT: Now, what we're going to do is that if Mr. Zicherman cannot come on in the next five to ten minutes, we are going to do this the old fashioned way, tomorrow, at 2:00 p.m., and Mr. Zicherman will just have to get on a plane today and get here and we'll do this live at 2:00 p.m. tomorrow. So that's what we'll do. Otherwise, we will wait and see --

Okay. We have Mr. Zicherman. Can you hear us?

THE DEPUTY CLERK: Mr. Zicherman, your microphone is muted. Can you hear us?

MR. ZICHERMAN: It's not muted any longer. It's fine.

THE COURT: Mr. Zicherman, can you hear me? This is the Judge.

MR. ZICHERMAN: I can. Zicherman is the correct spelling.

THE COURT: Thank you, Mr. Zicherman. Thank you for that.

Mr. Hernandez, let's go ahead and call the case.

(Case called)

MR. URIS: Jason Uris of Kaplan Fox and Kilsheimer for lead plaintiff and the class.

P1MCstaC

MR. FOX:  Good afternoon, your Honor.  Frederic Fox, Kaplan Fox and Kilsheimer for lead plaintiff.

THE COURT:  Good afternoon.

And for the defendants.

MS. BARROW:  Good afternoon, your Honor.  Erica Barrow from Baker Hostetler.  I'm here with my partners Genevieve York-Erwin and Douglas Greene.  We represent the defendants in this matter.

THE COURT:  Mr. Zicherman, you know why we're here today, right?

MR. ZICHERMAN:  I do.

THE COURT:  Now, let me ask you a couple questions.

So, did you do any traveling over the holidays?

MR. ZICHERMAN:  Did I do any traveling over the holidays?  No.

THE COURT:  You're in Florida right now?

MR. ZICHERMAN:  Actually, yes.  Sorry.  I did a trip to the Bahamas.

THE COURT:  Other than the trip to the Bahamas, have you been in Florida?

MR. ZICHERMAN:  Yes, I am.

THE COURT:  When did you take that trip to the Bahamas?

MR. ZICHERMAN:  When did I take the trip to the Bahamas?  I'm trying to remember.  It was in I guess December

P1MCstaC

just before Christmas.

            THE COURT:  And how many days were you in the Bahamas?

            MR. ZICHERMAN:  Six.

            THE COURT:  Do you have any trips planned for the next month or so?

            MR. ZICHERMAN:  I do.

            THE COURT:  Where to?

            MR. ZICHERMAN:  Going to New York.

            THE COURT:  When?

            MR. ZICHERMAN:  When?  The 2nd of February.

            THE COURT:  And how long will you be in New York?

            MR. ZICHERMAN:  Eight days.

            THE COURT:  All right.

            MR. ZICHERMAN:  Coming back on the 10th of February.

            THE COURT:  Any other trips?

            MR. ZICHERMAN:  Yes.

            THE COURT:  Where to?

            MR. ZICHERMAN:  Aspen, Colorado.

            THE COURT:  When are you going to Aspen?

            MR. ZICHERMAN:  On the 15th of February.

            THE COURT:  15th of February.  Will you be doing any skiing in Aspen?

            MR. ZICHERMAN:  Only on Ajax Mountain.

            THE COURT:  Why is that?

            MR. ZICHERMAN:  It's my favorite mountain.  Yes, I

P1MCstaC

will be skiing.

THE COURT:  Okay.  And out of curiosity, as I understand Stadium Capital, it is an LLC that manages your personal assets; is that fair?

MR. ZICHERMAN:  It's basically a d/b/a, and I've had it for years, couple decades maybe, and it is -- it's how I manage my own money and use it as a d/b/a because it allows me to get from Goldman Sachs where I clear -- or I used to clear and it allows me to get institutional services.

THE COURT:  Okay.  That was my question.  You answered it.  Thank you.

MR. ZICHERMAN:  A very pressing --

THE COURT:  So, Mr. Zicherman, the reason why we're here is because of your conduct during your deposition.  You did not want to attend your deposition.  That much we can probably agree on; fair?

MR. ZICHERMAN:  Well, I've never attended one before, so I was, you know, I had -- yes and no.  For me, the case is really, you know --

THE COURT:  Hold on.  Hold on.  You've got to answer my question.  Would you say you conducted yourself well at your deposition?

MR. ZICHERMAN:  Yes, I think I did.

THE COURT:  Mr. Hernandez, do we have the video?

THE DEPUTY CLERK:  Yes, your Honor.

P1MCstaC

May I ask which exhibit it is specifically?

MR. ZICHERMAN:  Your Honor, you asked me if I conducted --

THE COURT:  Hold on.  No, hold on.  You answered my question so far.  Now we're going to watch a little movie, all of us together.

MR. ZICHERMAN:  Can I amplify my answer a little?

THE COURT:  Sure.

MR. ZICHERMAN:  Okay.  Having never had much experience with depositions, I -- the other attorney took the opportunity, I feel, to bait me into something and I think that my frustration came out.  And that's what I'm going to call it.  My behavior, do I behave that ordinarily?  I'm a former managing director of Morgan Stanley, so I know how to behave and I know the right thing to do, but everybody gets frustrated and I became frustrated.

I hope that answers you a little bit and I'm now more than happy to watch your video of me being frustrated.

THE COURT:  Mr. Hernandez.

THE DEPUTY CLERK:  Yes, your Honor.

THE COURT:  Do we have it?

THE DEPUTY CLERK:  One moment.  It will be open in just a second.

(Video played)

THE COURT:  Mr. Zicherman, before we --

P1MCstaC

MR. ZICHERMAN:  Sir.

THE COURT:  Before we proceed, would you like to apologize to Ms. Borrow for your conduct during the deposition? I'll give you the opportunity to do that.

MR. ZICHERMAN:  Thanks.  I apologize if a bad word came out of it, if a word came out that was inappropriate, I absolutely apologize.  I'm known as a gentleman and I am a gentleman.  I've always conducted myself as a gentleman and I always will conduct myself as a gentleman, so -- and I hope that that's come through as we're meeting right now.

In terms of questions that she asked, they were --

THE COURT:  Hold on.  Hold on.  You've answered my question.  I suppose you apologized for a word that was used in deposition.

And just to be fair --

MR. ZICHERMAN:  I said --

THE COURT:  Just to be fair, you did call Ms. Borrow a "dumb shit," because I have eyes and I have ears, and I watched that video, and I saw what you said.  And so --

MR. ZICHERMAN:  All right.

THE COURT:  It was pretty clear that you were calling her a "dumb shit."  And I know you tried to cover it up, I know you tried to cover it up right after you said it, but I know you said that.

I know you also said on page 46 of the transcript,

P1MCstaC

"Hey, do me a favor, hun, listen, I'm trying to help you here get the answers to your question, but I'm not an attorney," et cetera, et cetera.

Is that how you talk to female colleagues that you've had at Morgan Stanley and other places you worked, called them "hun"?  Is that how you talk to people?

MR. ZICHERMAN:  Uh, yeah.  I'll tell you something, in the heat of battle on occasion, I think that in order to communicate something every once in a while, you probably say something that is inappropriate.  And it's not wildly inappropriate, but I'm sure that there are many, many worse things that have been said in the world than me mentioning the word "hun."

THE COURT:  Mr. Fox.

MR. FOX:  Yes, your Honor.

THE COURT:  Maybe I can get a better apology out of you.  Why don't you stand up and turn around.  You just watched the video.  I don't know if you've read this transcript, but that was only some of what happened at the deposition.

MR. FOX:  Yes.

THE COURT:  And I know that you're an experienced litigator, you've done a ton of these cases, you have a very prestigious and well respected firm that handles these cases. This is probably not the typical situation that you're in.  But I wanted you to see that video in case you haven't to just give

P1MCstaC

you a sense of what occurred during the deposition.  The No. 1 rule that I have in this court, if you've looked at my rules of practice, is the rule of civility.  That was violated by Mr. Zicherman in the deposition and by failure, absolute failure to prepare him for his deposition by your firm.

And so with that, you can say whatever you'd like, but you should speak to the defendants relating to this.

MR. FOX:  Your Honor, first of all, appreciate your Honor taking the time on this case and --

THE COURT:  And can you get in front of a microphone, otherwise it won't get picked up.

MR. FOX:  I'm sorry.

I just said I appreciate your Honor taking the time in this case.  I appreciate your Honor giving me the opportunity to speak here.

I would say to defense counsel, we do attempt of course always to operate in a civil way.  And I think defense counsel would say, counsel to counsel, we certainly have operated in a civil way.  I would take the opportunity to apologize to defense counsel for some of the language used by Mr. Zicherman during the deposition, and I would hope you would accept that apology.

I also apologize to your Honor.

THE COURT:  You watched the video.  Fair to say that Mr. Zicherman called defense counsel a "dumb shit," after the

P1MCstaC

deposition was done, under his breath?

MR. FOX:  Honestly, your Honor, I did not pick that up, but I trust if your Honor believes that, I trust it true.

THE COURT:  Mr. Zicherman, all I can say is that was completely inappropriate conduct across the board.  It's not just the language that was used, it was the refusal to answer basic questions, it was the hostility with which you approached the deposition, it's the deference to counsel, even though you knew you were under oath and had to answer questions, it's the failure to understand exactly what you were doing there in the deposition.  It wasn't just to say I brought this case and it's a class action, end of story.  Mr. Uris, I am sure, communicated to you what you were there to do, which is to show that you were an adequate class representative, that you were going to protect the interests of the class by monitoring counsel, monitoring the filings, and that you had an understanding of what had happened in the class, and that's what counsel's questions had gone to, and by failing and refusing to answer those questions, that's serious.

Now, Mr. Uris, I mean, this is just one of several issues that I have.  Let's go back to where we started this thing, which is that the conduct was inappropriate, but what I want to figure out is if there was outright deception at play, both in terms of this deposition and in terms of what's happening now because the same excuse that you gave for why

P1MCstaC

Mr. Zicherman could not come here for this hearing is the excuse you gave to defense counsel as to why Mr. Zicherman could not attend his deposition in person, namely his ankle injury, which you said is the reason why he was unable to travel.  At page 110 of the deposition when he was asked specifically why he could not attend the deposition in person, because, as you know, he was in New York as it turned out, surprise, he was not Florida, he was actually in New York.  He said that it wasn't an ankle injury, but that I have something to do later that requires -- is more important to me -- to me than -- and I need to be logistically closer to the Bronx. That's what Mr. Zicherman said.

And Mr. Zicherman, you stand by that testimony.  It's not the ankle injury that kept you personally there, it was your event at the Bronx.

And by the way, I applaud you, I applaud you for paying attention to your community and I understand that it was of a public-interest-nature event that you had.  It was to help kids.  That's all great.  But that was the reason why you were at a residence in Manhattan and not in the office where the deposition was taking place, right?

MR. ZICHERMAN:  Well, I'm a resident of Florida, number one.

Number two, as far as my ankle injury is concerned, I had a Cortisone shot in my ankle about two months ago, and my

P1MCstaC

ankle has been feeling better.  I have a copy of an x-ray right here, which I will forward to Jason Uris right now and he can send it over to you.  But my ankle, I had one of the worst ankle injuries known to mankind.  If you'd like to see the x-ray, I'll show it to you.  But I had this horrific accident in 2009 on a golf course, I stepped in a hole and I shattered my ankle --

THE COURT:  Hold on.  Hold on.  You can stop right there because I don't believe you, because in the deposition --

MR. ZICHERMAN:  What?

THE COURT:  In the deposition, you gave the reason why you weren't there.  You were asked very specifically why you weren't there and you gave the reason.  When I started out, when I asked you whether you had traveled over the holidays, and among the things that you mentioned -- and I'm not putting this on you Mr. Zicherman, I'm putting this on Mr. Uris because I asked where you were going, you had said you had gone to the Bahamas over December, you were coming to New York on February 2nd, and more than that, you said you had a trip to Aspen where you'd be skiing at Ajax Mountain.

MR. ZICHERMAN:  I didn't say I was skiing, I said that in an inadvert -- sorry.  Okay.  I'm 82 years old.  Are you aware of that, your Honor?

THE COURT:  I'm aware of that.  Hold on.

Mr. Uris and Mr. Fox.  Again, Mr. Fox, what's going on

P1MCstaC

here?

MR. ZICHERMAN:  I'll tell you what --

THE COURT:  I'm asking Mr. Fox.  Mr. Zicherman, please.

MR. ZICHERMAN:  My grandchildren will be in Aspen and I've got to see my grandchildren.

THE COURT:  Mr. Zicherman, please.

Mr. Fox, what's going on here?

MR. FOX:  Your Honor, I think Mr. Zicherman is trying to explain to you his injury --

THE COURT:  I understand that he has an injury.  But Mr. Uris, your partner, put in on two separate occasions, gave that injury, which I'm sure is serious.  That's why I said it's not on Mr. Zicherman.  I believe him that he has an injury.  However, the injury was not the reason why he needed to attend the deposition remotely.  Mr. Zicherman gave the reason.  It was asked as a question in the deposition, and he said what the reason was, because he was in New York.  So it wasn't a reason why he couldn't travel to New York.  He was in New York, but he needed to go to another event, and that's why he wanted to attend remotely.  And that's reflected throughout the deposition, by the way.

Same thing with this hearing.  Mr. Zicherman may not have wanted to be at this hearing in person, but I don't think that's the reason why he isn't here.  It's incumbent on

P1MCstaC

counsel, especially given the nature of this proceeding, to make sure that there's not this situation that arises again where the Court is left with doubts about the credibility of counsel or client.

MR. FOX:  Again, I do think that Mr. Zicherman -- obviously, he is here, he is here remotely, but he is here.  I understand your Honor's concerns.  I think that Mr. Zicherman understands the case here.  I do not think he's trying to deceive the Court in any way.  We're certainly not trying to deceive the Court.  I think at the moment, he was trying to -- I know you understand the injury, but I understand your Honor's concern.

MR. ZICHERMAN:  Your Honor, can I say something, please?

THE COURT:  Yes.

MR. ZICHERMAN:  Thank you.

I, you know, I've never had my credibility questioned, and the reason why I've never had -- I mean, I -- I spent a long wonderful career in Wall Street and I have a U4 that looks like a Bounty paper towel, it's completely vacant.  And I've never had my credibility questioned.  So you're putting me in a bit of an unfamiliar position.

THE COURT:  Mr. Zicherman, I'm not questioning your credibility.  So thank you for raising that.  I don't think you are being dishonest in any way.  I don't know what discussions

P1MCstaC

had you with your counsel, but your counsel — and you may not have been aware of this — gave certain reasons why you could not be at proceedings here, and you may not have been aware of that, but that's what the counsel said. And so when there's conflicting answers that you might give, it raises questions, as I'm sure you can appreciate, relating to credibility.

And by the way, just to your point, page 86 and 87 of your deposition, this is where you talk about your record and why you're bringing this case. I think that I commend you for bringing the case. You said a lot of things that I think we expect good named plaintiffs to do. You say a lot of other people are offended as I am and got blindsided like I did, so I'm representing a class here.

On the next page, you talked about your record, your clean record. You said, "I'm very proud of it. I get to see good people get beaten and battered, especially with bullshit, and I was very offended by the way that this was handled and I chose to file a class action suit and I will represent the class." And that's great stuff.

And so, just to be clear, your conduct in the deposition was deplorable, okay, but I'm not questioning your credibility, your zeal for the class. I think it comes down to just the lack of communication between you and class counsel. I think that's been absent. And so I think --

MR. ZICHERMAN: I think I have an answer to it,

P1MCstaC

though, if you'd allow me to speak for one moment.

THE COURT:  Mr. Zicherman, I'll let you take 30 seconds and then we're going to turn back to counsel.

MR. ZICHERMAN:  If you give me one minute, you'll understand where the disconnect is.  I actually think that I am -- I am responsible.  I want to be clear about that. Because I've never been deposed before and I'm still a busy guy and I, you know, to me, I guess I didn't take this as seriously as I probably should have, and I apologize to you and the court and to the defendants.  Is that the right word, "defendant"? But I've never been deposed before.  And in hindsight, if I recognize the severity -- not severity.  That's too much.  But the consequences of my actions, I probably would have handled myself way differently.  I would have handled myself differently.  So I apologize.

MR. URIS:  Your Honor, I'd just like to address --

THE COURT:  Hold on.

(Pause)

Mr. Uris.

MR. URIS:  Thank you, your Honor.  I just want to assure your Honor that I take your concerns about misleading the Court very seriously and want to fully assure your Honor that I would never attempt to mislead the Court in any way.

With respect to the deposition, I had told -- I had been requesting the accommodation of a remote deposition, I had

P1MCstaC

stated to defendants' counsel that, given Mr. Zicherman's ankle injury, he had a strong preference for a remote deposition. That is my understanding. I talked to Mr. Zicherman about his ankle injury, that is what I was told. So I just want to be clear that there's certainly no intent to mislead the Court or anyone else.

THE COURT: Yeah, I think it was sloppy. I think that it was sloppy. According to Mr. Zicherman, his preparation for his deposition consisted of a 20-minute phone call. That's how we do things. That's in the deposition. That's not how you should be doing things. Adequacy extends not just to the plaintiff, to the client, but to counsel.

So let's turn to that, because there is a declaration of Mr. Zicherman that was submitted after the deposition. How is it not just contradictory to what Mr. Zicherman said in his deposition? I mean, in his deposition, at page 112, I believe, he was asked: "Did you review the filings?" It's not clear to me exactly what filings were being referred to.
"Q. Did you review any other filings in this case?
"A. No."

THE COURT: But then in his declaration, which I'm sure counsel prepared, at paragraph 4, it indicates that he's reviewed all the documents in this case.

I mean, Mr. Zicherman, just being completely honest with the Court, have you reviewed the complaint in this case?

P1MCstaC

MR. ZICHERMAN:  I was the -- I created the complaint. Is that the right word?

THE COURT:  Yeah.  I'll take it out of the --

MR. ZICHERMAN:  I'm the person that created the complaint.

The problem with this case --

THE COURT:  Hold on.  Let me ask the question just to make sure you understand.

There was a document in this case called the complaint.

MR. ZICHERMAN:  Yes.

THE COURT:  Do you remember reviewing that document?

MR. ZICHERMAN:  I remember getting a copy of it, yes, seeing a copy of it, yes.

THE COURT:  And other documents have been filed in this case.  Do you receive those from counsel?

MR. ZICHERMAN:  I do.

THE COURT:  Through email?

MR. ZICHERMAN:  Through -- well, I think I got something hard copy once upon a time, and probably through email, or through -- or through verbal communication.

THE COURT:  And you tried to understand what has been filed and what's happened in the case, right?

MR. ZICHERMAN:  Yes.

THE COURT:  So sitting here today --

P1MCstaC

MR. ZICHERMAN:  But --

THE COURT:  -- what's your understanding, I know you know it's a class action, but do you have an understanding of where we are in the class action, what's happened?

MR. ZICHERMAN:  I do.

THE COURT:  What is that?

MR. ZICHERMAN:  I do.  That I'm representing a bunch of people.  But that's the other -- well, let me -- I'm trying to say four things at one time.  This, to me, was just a very cut-and-dry case because there was a conference and things were said in the conference.  When results were reported two and a half or three weeks later, the results were -- I thought it was actually a different company because the results didn't look like anything that was portrayed at the conference.  As time has gone on with this company now trading in violation of NASDAQ listing rules and virtually -- I don't want to say out of business, but let's just say trading at 75 cents a share or thereabouts, let's just say they're not doing well.  So as time, whatever they conducted in terms of their business practices or whatever haven't served them well, and this thing has really gone backwards.

Now, this, to me, was a very cut-and-dry thing --

THE COURT:  I got that.

Where are we in the case?  What's your understanding of what's happened in this case?

P1MCstaC

MR. ZICHERMAN:  What's happened in the case is that we have filed a class action and I'm representing the class.

THE COURT:  Do you know where we are in terms of progress of the case, meaning what's happened?  You've had conversations with Mr. Uris.  He says that you've regularly communicated.

MR. ZICHERMAN:  We have.

THE COURT:  What did he tell you about what's happened in the case?

MR. ZICHERMAN:  Well, right now I'm being deposed by the defense and they're asking me questions regarding the case. When you say, "Where are we in the case," I'm presuming that this is a case that, after this -- and if there's nothing further -- once again, I've never done this before.  I have to emphasize that again.  So I'm presuming, after this, that this case will be judged, whether it's on merits, and either it will succeed or fail on its merits.

THE COURT:  Do you understand that you're supposed to safeguard the rights of the class?

MR. ZICHERMAN:  Of course.

THE COURT:  And you got to look out, you're in charge, you're monitoring Mr. Uris and Kaplan Fox to make sure that they are protecting the rights of the class and not trying to reach a result that favors them over the class.

Do you understand that?

MR. ZICHERMAN:  Yes, I do.  But I also have to emphasize that Mr. Uris has been incredibly thorough in explaining to me what my responsibilities were as the leader of the, you know, heading of the class and was responsible -- a responsible position.  And because of the nature of the case, because, to me, once again, I've never done this before, but, to me, it was a cut-and-dry thing, you know, someone tells you something and it doesn't happen or it happens in a completely different direction, to me, it was -- it didn't seem like a lot of effort and it didn't seem like it was that complex and that I would be unable to do it.

THE COURT:  And you understand that if there are settlement discussions with the defendants, that you are going to be involved in those, right?

MR. ZICHERMAN:  Me?

THE COURT:  Yeah, you.

MR. ZICHERMAN:  Are you talking to me?  Oh, absolutely, 100 percent.

THE COURT:  And if Mr. Uris and his firm tries to lowball the class, you're going to be there to protect them, I would take it?

MR. ZICHERMAN:  I would never sign on anything that I didn't think was fair.

THE COURT:  And you got --

MR. ZICHERMAN:  For sure.  There were other people

P1MCstaC

involved in this and, you know, the monetary loss was pretty obtuse — if that's the right word — it was very startling.  And there are other people that are involved and they have a right to a fair shake just like I do.  But in the deposition, I guess I'm the jockey on the horse, right?  I'm steering it.

THE COURT:  Thank you, Mr. Zicherman.

Ms. Barrow, I'm happy to give you a chance to address anything that you'd like to.  The only question I have for you is, what are the implications of decertifying the class based on conduct of the conduct that is at issue?

MS. BARROW:  Your Honor, just a couple of points.  So, I just wanted to also point out some inconsistencies of the statements made by Mr. Zicherman today.  He said multiple times he's never been deposed, but during his deposition, on page 17, lines 16 through 23, he said he was deposed before.

Also, it's still unclear to me whether or not he actually reviewed the complaint.  He stated today that he received the complaint, also in his declaration he says he received the complaint, but in his certification for the amended complaint he said he had reviewed the complaint.  It's just a little morphosis in terms of the testimony.  So I wanted to point that out.

THE COURT:  Do you want to take his deposition again?  That was a footnote in the papers.  Do you want to do that?

MS. BARROW:  Your Honor, I think our position today is

P1MCstaC

that the adequate remedy would be to decertify the class and remove him as the class rep.

THE COURT:  If I don't decertify the class, do you want to take his deposition?

MS. BARROW:  Yes, your Honor, we would consider that.

THE COURT:  Are you going to do that?

MS. BARROW:  Yes, if he is prepared, we --

THE COURT:  Don't do something you don't want to do just to impose a penalty.  I'm saying if you feel that because of the nature of the deposition you weren't able to get answers that you need for summary judgment, then take the deposition.

MS. BARROW:  Yes, your Honor.  We would request a prepared deponent, and yes, we would like to depose him.

THE COURT:  Mr. Zicherman will be prepared this time.

Anything further?

MR. ZICHERMAN:  Your Honor, may I say one thing?

THE COURT:  No, you may not.

MR. ZICHERMAN:  I've never been deposed before --

THE COURT:  I said, no, you may not.

MR. ZICHERMAN:  Oh, sorry.  Sorry.  Sorry.  I didn't hear you.  Sorry.

THE COURT:  We're still over here.

Ms. Barrow.

MS. YORK-ERWIN:  Your Honor, if I may speak to your question about the implications of decertification.

P1MCstaC

THE COURT:  Yes.

MS. YORK-ERWIN:  As Ms. Barrow said, we do believe that is the appropriate remedy here.  I mean, both Rule 23(a)(4) and the Reform Act are intended to guard against lawyer-driven litigation.  And I appreciate that a lot of the discussion here today has been about misconduct, but I think there are serious questions also about the degree to which he's involved at all in the ways that an adequate representative should be.  And we believe the class deserves better than that, the defendants deserve to be defending against a case that isn't just lawyer-driven, but is being guarded against, you know, that where we have a meaningful class representative and not just kind of a puppet of plaintiff's counsel.

And so we, again, we laid out in our papers why we believe he is not an adequate -- and we think that is the right remedy.

I'm happy to answer any questions you have more on that.

THE COURT:  At this stage, we have a certified class. If I decertify it, doesn't that mean that the case is over as to everyone except Stadium Capital?

MS. YORK-ERWIN:  Yes.  I mean, it would -- I think we would not be opposed to giving them a chance to find someone. I mean, there was another plaintiff who filed suit.  They didn't throw their hat in the ring for lead plaintiff, but they

P1MCstaC

did file suit in the consolidated suit.  I can't speak to what they might be able to do to find --

THE COURT:  When you say "they," are you talking about --

MS. YORK-ERWIN:  I apologize.  Plaintiff's counsel -- I'm sorry.  What was the --

THE COURT:  Are you talking about Kaplan Fox?

MS. YORK-ERWIN:  Kaplan Fox did not represent the other plaintiff.  So I believe Drew Lee also filed suit shortly after Stadium did, and that action was consolidated into this one.  That was another plaintiff who cared enough about these issues to file suit.  Although, Mr. Lee did not move to be appointed as lead plaintiff when it came time for those motions, and no one else did either.

THE COURT:  When you say "Drew Lee," that's the name of the --

MS. YORK-ERWIN:  Yes.  I don't know much about him, but that appears to have been an individual who filed suit.

THE COURT:  And I take it that if Mr. Lee decided to take up the mantle of the class, that we would just proceed on the current schedule or what would happen?

MS. YORK-ERWIN:  I'm not sure what would happen on the plaintiff's side, but it was different plaintiff's counsel who were involved in that suit.  It was, I believe, Pomerantz was representing Mr. Lee.  As I said, they did not move to be

P1MCstaC

appointed lead plaintiff. I don't know if Kaplan Fox would be the appropriate plaintiff's counsel in the circumstance where Mr. Lee came in.

We're ready for summary judgment. I mean, we have been moving forward on the case schedule, presuming that it wasn't going to move. I'm not entirely sure, on the plaintiff's side, what they would need to do in the situation where this is decertified, but I think our view is that the plaintiff, the current lead plaintiff is not adequate for all the reasons that we've seen today and in his conduct and testimony.

MR. URIS: Your Honor, with respect --

THE COURT: Hold on.

(Pause)

Okay. Mr. Uris.

MR. URIS: With respect to the motion as a whole, I'll refer -- I know your Honor's reviewed the papers. I'll refer your Honor to the papers and won't belabor those points.

But with respect specifically to the suggestion that -- of lawyer-driven litigation here, in defendants' reply, as they seem to acknowledge, the PSLRA was enacted to prevent lawyer-driven lawsuits, for example, where lawyers would make deliberate efforts to find plaintiffs, you know, any plaintiff they could, even those that had purchased just a single share in a company and then would race to the courthouse and be the

P1MCstaC

first to file suit. And so in enacting the PSLRA, Congress sought to curve that type of case initiation and increase the likelihood the parties with significant holdings would step forward as the lead plaintiff.

So not only does Stadium have significant holdings here, as Mr. Zicherman testified, it was his decision and his alone to initiate this lawsuit, and as he testified that no one else participated in that decision. And it was Mr. Zicherman that first contacted us to bring about these claims and it was not the other way around. So I just wanted to make that point, that this is certainly not the type of lawyer-driven litigation that was underpinning the PSLRA.

With respect to potentially decertifying the class, certainly we don't think that the facts here would make that a necessary road to go down, but I think in that event, I think the appropriate course of conduct would be to go through some kind of procedure to have a new lead plaintiff appointed. I don't know if that would be -- again, I don't think that this is necessary, but your Honor could, for example, issue an order requesting that a class member step forward within a certain amount of time to be appointed lead plaintiff or a new PSLRA notice could be issued. Although, I don't know that that's necessary where one has already been issued. Again, I think those would -- in that event, that would be the appropriate procedure. But again, your Honor, I think on these facts, as

we laid out in our opposition, I don't think the facts here rise to the level of necessitating any change in the lead plaintiff or decertifying the class.

MS. YORK-ERWIN:  Your Honor, if I might add one thing to what I said before, and that is if there is going to be a new lead plaintiff, I think we would want the opportunity to depose them to make sure that that lead plaintiff was adequate for purposes of Rule 23, and that that might have some effect on the case schedule, given that we are very close to finishing to the complete discovery deadline and all of the subsequent case deadlines are premised on that completion of discovery.

THE COURT:  Mr. Fox.

MR. ZICHERMAN:  Your Honor, can I say something, please?

THE COURT:  I'll give you a chance, Mr. Zicherman, but I've got to talk to the lawyers for a little bit and then I'll give you a chance.

MR. ZICHERMAN:  Thank you.

THE COURT:  Mr. Fox, are you personally involved in this case?

MR. FOX:  I am, your Honor.

THE COURT:  Okay.

MR. FOX:  Yes.  I've had many, many, many discussions with Mr. Uris about the case.  When a complaint is drafted, obviously I review the pleadings in the case, I review the

P1MCstaC

briefs in the case.  And so, yes, I am involved in the case.

THE COURT:  Just one last point on the defendants' side.  In looking back at all of the filings here, I looked at the notice of non-opposition to the motion for class certification that was filed, and you had indicated in footnote 1 that the inability to depose Mr. Zicherman was a reason that defendants agreed to the parties' joint request to amend the case schedule, filed August 30th, 2024.  And so that made me think, oh, wait, they asked for an extension because they couldn't have deposed Mr. Zicherman, and that's why they were asking for the extension.

And I'll just invite you to look at ECF No. 66, which is the actual request, I take it, because that request didn't say that the reason for the adjournment was any kind of inability to take necessary discovery.  That was referenced, but that wasn't a reason for the extension.  There was one reason given for the extension.  That one reason was that the parties were about to engage in fruitful settlement talks.

So I want to remind everyone across the board, both on the plaintiff's side and on the defendants' side, that everything that is filed in this case from here on out has to be the absolute truth.  Everything that is shared among counsel has to be the absolute truth, no gilding of the lily, no combative stuff.  Read the rule of civility and operate accordingly.

P1MCstaC

Mr. Zicherman, and then I'll make my ruling.

MR. ZICHERMAN:  Thank you very much.

The other -- the attorney for the other side mentioned that I had previously been in a deposition.  30 years ago, I was in a marital --

THE COURT:  I read it.  It was a thing, you didn't make much of it, but they pushed it and then they ultimately gave up.  I read your description.

MR. ZICHERMAN:  They totally gave up completely.

Okay.  So, anyway, I just wanted to make that clear because I've never been in a securities deposition ever in my life.  And I am unaccustomed to the rules.  And I clearly, as I said before, made some -- I took some things for granted, I probably should not have, and I apologize for that.

MS. YORK-ERWIN:  And, your Honor, with respect to the adjournment request on the schedule, I apologize if it was not as clear as that request could have been.  We did have multiple reasons for that, and one was settlement discussions, which the parties did engage in shortly after that.

THE COURT:  I understand.  It's just that especially when these types of disputes arise, that's when the Court looks at these things in a close way.  So no one wants to be in a situation, either on the plaintiff's or defendants' side, where someone is looking at this and wondering if what they were told was accurate or not.

P1MCstaC

And so, to give an example, Mr. Uris, I personally, if I were sitting in your shoes, would not have said, well, there's this ankle injury.  I wouldn't have given the same reason, knowing that I'm going to read the deposition and see that was the reason given for the remote deposition request, and that, in the deposition, Mr. Zicherman gave a different reason.  I'd be thinking about that.  And so I'd want to be fully forthright with the Court and say, look, he can be there, he can be there if you need him to be there.  However, it would be better if he didn't have to be there because of this or something that made clear that it wasn't something he couldn't be there, because then I'm going to ask Mr. Zicherman is he going to be in New York.  Oh, yeah, he's going to be in New York in two weeks.

MR. URIS:  Your Honor, absolutely, I fully appreciate what you're saying.  I just want to be clear, I was not aware of any other reasons that would have been mentioned at the deposition.

THE COURT:  That's because you only talked to him for 20 minutes.  But guess what?  You're going to do this again, you're not going to spend just 20 minutes.

So what's going to happen is the motion to decertify the class will be denied.

Class certification may properly be denied with a class representative have so little knowledge of an involvement

in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.  That's from *Maywalt v. Parker Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995).  However, the Second Circuit has a general disfavor of a tax on the adequacy of a class representative based on the representative's ignorance.  And that's from *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 42 (2d Cir. 2009).

Here, while Mr. Zicherman was hazy on the details, he certainly understood the basic premise of the case, that defendants had misrepresented the true facts about the company, and when those facts were revealed, it led to a precipitous drop in the stock price at Co-Diagnostics.  He also understood that this was a class action and demonstrated an honest interest in protecting the rights of the class, which is most clearly reflected at pages 86 through 87 of the transcript.

The extent to which Mr. Zicherman has to date monitored the case and its progress is the subject of some debate.  On cross-examination, Mr. Zicherman seemed to disclaim having had many conversations with class counsel or having reviewed pleadings.  However, on redirect and in a later-filed affidavit and here in open court, Mr. Zicherman suggests that he did have several conversations with counsel and was apprized of the details.

P1MCstaC

The explanation, I take it, is that Mr. Zicherman is a newcomer to litigation. He thought that the case was pretty straightforward up to this point. And so he didn't have much of a lawyer's understanding of what was going on in terms of the day-to-day litigation. However, he was monitoring the overall progress of the case. Given his assessment of the strengths of the litigation, he believed it was — to use his words — a cut-and-dry case of liability and would, however, make every effort, as he pointed out in his statement here, to monitor and make sure that any sort of resolution of this case would be in the interests of the class and not in the interests of counsel if they were in opposition. Given Mr. Zicherman's background, his sophistication, his experience in investing, and the fact that he's held management positions in Morgan Stanley and now with respect to the management of a significant portfolio, the Court expects that he will abide by those obligations.

The Court also points out that given the incredibly combative nature of the deposition, it's unclear whether Mr. Zicherman was lost in the moment of the fight and was simply denying everything asked by opposing counsel or rather had really taken a backseat to the lawyers in terms of the progress of the case. More on that in a second.

The adequacy analysis is there to ensure that the class is protected. That's the primary purpose. The Court

P1MCstaC

doesn't see how decertifying the class under these circumstances — especially when it was not opposed initially, is now being challenged months after the fact in a case that has been pending for nearly three years, and potentially detonating the case if another lead plaintiff doesn't step forward — will protect the class.  Indeed, it would potentially frustrate the rights of all class members, which is why denial of class certification on these grounds is reserved for the most extreme of cases.

However, this case is not over.  And so there is still time.  Mr. Zicherman has pledged to take an active role in the management of this case.  Mr. Uris and Mr. Fox have done the same to avoid similar conduct in the future.  While Mr. Zicherman's deposition conduct was unquestionably, unquestionably inappropriate and perhaps some of the most inappropriate conduct this Court has seen, he is sophisticated, well trained, and seems honestly dedicated to vindicating the class's interest here.

So, the Court will require counsel and Mr. Zicherman to do the following:

Mr. Zicherman has indicated that he will be in New York from February 2nd onward for a few days.  During that time, Mr. Zicherman will personally meet with Mr. Uris and Mr. Fox to review the specifics of the litigation.  That will happen.  During the meeting, counsel will review with

P1MCstaC

Mr. Zicherman a list of his obligations as lead plaintiff, and Mr. Zicherman will review and sign that list. The list will be filed with the Court along with a sworn statement that Mr. Zicherman understands his obligations and will abide by them. Counsel will further file confirmation that this meeting happened, where it happened, and, without divulging any privilege, what was discussed.

On a monthly basis, Mr. Uris will file a letter with the Court indicating how many times he made contact with Mr. Zicherman during the preceding month, the amount of time they spent discussing the case, and without divulging any privileged matters, the nature of counsel's discussions with Mr. Zicherman.

Mr. Zicherman will sit during the time that he is in New York in person, at Kaplan Fox's expense, including any related travel expenses, not to be reimbursed from any class recovery, for a deposition in person, as the defendants have indicated that the prior deposition was insufficient and they need a suitable 30(b)(6) representative deposition. So they'll take that deposition, which will last no longer than four hours. That will happen when Mr. Zicherman is in New York.

I believe that while the initial mealy-mouthed apology that Mr. Zicherman offered was woefully deficient. Mr. Zicherman, I think that as we got into it and you heard more of what was going on, you gave an appropriate apology for

P1MCstaC

the conduct that took place during the deposition.

What I'll ask you to do is just -- and I'm not going to order you to do this, Mr. Zicherman, but it's the right thing to do.  Write a short email to defendants' counsel just saying, look, you know, I got outside of myself, just, I'm sorry.  You know, we got to teach folks that it's the right thing to do.  Sometimes when things go wrong and you apologize, you can diffuse these things without letting them get out of hand.  So I'll just ask you, Mr. Zicherman, to do that.

Does that sound okay, Mr. Zicherman?

MR. ZICHERMAN:  It does.

THE COURT:  If any further issues arise in this case, defendants may of course reurge their motion to decertify the class, otherwise we'll proceed on the current schedule.

MS. YORK-ERWIN:  Your Honor, if I may?

THE COURT:  Yes.

MS. YORK-ERWIN:  It came up at the deposition that we did not in fact have a lot of documents that we, based on his testimony, it appeared that maybe we should have received in discovery.  We only got five documents total.  And so if we are going to be deposing him again, we would ask the documents we requested on the record in that deposition be produced to us ahead of that deposition, to the extent they're not privileged, obviously.

THE COURT:  You're going to get them in the next week.

Mr. Fox, any issues with that?

MS. YORK-ERWIN:  Oh, and the results of -- I'm sorry.

THE COURT:  Well, I don't need to be here for that.

Any documents that you previously asked for, you haven't gotten, and that you raise by, I'm going to say 7:00 p.m. today, you're going to get within a week, otherwise both sides need to follow my individual practices.  We are always here.  So if you follow those practices and just contact the Court, then you get a quick resolution of any of these issues so we don't need to extend the schedule because, guess what, I'm not extending the schedule.

MS. YORK-ERWIN:  Understood, your Honor.

THE COURT:  Mr. Fox or Mr. Uris, any issues on your end?

MR. FOX:  No, your Honor.  I do think there were several meet-and-confers about the scope of the document requests that were issued.  I suppose we'll continue to meet and confer, and if defendants have an issue --

THE COURT:  I think it's in your best interest to try your best to try to get the documents over.  I read the deposition transcript.  There seem to be documents that were missing that were requested in the deposition.

And Mr. Uris, I understand that you are lead counsel here, but Mr. Fox, I'm going to hold you personally responsible for what happens in this case from here on out.

P1MCstaC

So, look, meet and confer.  You have to protect the class's rights and Stadium Capital's rights, I understand that, but please don't put the Court in this situation where we have frivolous or meritless objections being raised to discovery that clearly should be provided.  If you have a legitimate objection, then make that objection.  On the defendants' side, if you need the documents and you think you're entitled to them, bring them to the court.  But same thing on your end, don't be asking for things that honestly you don't need for this litigation.  Fair?

MS. YORK-ERWIN:  Understood.

MR. FOX:  Understood.  Thank you, your Honor.

THE COURT:  What happened to these fruitful settlement talks that were the basis for multi-month extension for everything?  Because, look, Judge, we're about to settle this case, extend everything, we've got a deal, done.  What happened to that?

MR. FOX:  We do have a mediation privilege, but I don't know what --

THE COURT:  Who spoke last?

MR. FOX:  So there was a mediation, and that was a couple of months ago.  There have been some followup discussions that have occurred.  The last thing that occurred was honestly about five days ago.  I had reached out to the mediator to see if there was any progress.  I believe the

P1MCstaC

mediator had spoken to Mr. Greene.  And so those discussions are ongoing.

THE COURT:  You're working with Eric Greene?

MR. FOX:  Not Eric Greene, Mr. Greene --

THE COURT:  Mr. Greene over here.  You're working through a private mediator?

MR. FOX:  It's Mr. Melnick.

THE COURT:  Who was the last one to communicate something?  You don't have to tell me who it was.

MR. FOX:  The last communication I believe, and I could be wrong, was I believe Mr. Melnick had a conversation with Mr. Greene or somebody on his team, and that was a few days ago.

MR. GREENE:  That's correct, your Honor.

THE COURT:  So the ball is in your court, Mr. Greene?

MR. GREENE:  It is.

THE COURT:  Come back with something.  It's up to you. I'm not ordering you, I can't order you to do anything.

I will give you something, because we're here in open court, which is if you communicate a good faith offer through Mr. Melnick, then Mr. Fox, are you committed to reviewing with Mr. Zicherman and then coming back with a good faith response to that offer?

MR. FOX:  Absolutely, your Honor.

THE COURT:  So this is just a way, if you're

P1MCstaC

interested in it, to see if you can kickstart the discussions in some way. It's something you might have done anyway. But sometimes it's helpful, I found, to just have people kind of talk about this in open court without telling me the numbers.

And look, if you don't want to do anything, that's your prerogative, you can take this the distance. That's your right, of course, to do.

Anything else, Mr. Uris or Mr. Fox?

MR. FOX: Nothing else here, your Honor. Thank you, again.

THE COURT: Ms. Barrow, anything else on your end?

MS. BARROW: Nothing further, your Honor.

THE COURT: Thank you very much. Thank you, Mr. Zicherman.

And we are adjourned.

* * *