# **Exhibit 20**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-o0o-

STADIUM CAPITAL LLC, on          )
behalf of itself and all         )
others similarly situated,       )
                                 )
          Plaintiff,             )
                                 ) Case No: 22-CV-6978-AS
     v.                          )
                                 )
CO-DIAGNOSTICS, INC.,            )
DWIGHT H. EGAN, and BRIAN        )
L. BROWN,                        )
                                 )
          Defendants.            )
_____)


REMOTE VIDEO-RECORDED DEPOSITION OF ANDREW BENSON


Taken via Zoom
On Tuesday, November 12, 2024
At 9:05 a.m.


Reported by:  Emily A. Gibb, RPR, CSR, CCR
CA CSR #14551, NV CCR #709

Page 2

A P P E A R A N C E S

For the Plaintiff:
Jason A. Uris, Esq.
Chang Hahn, Esq.
KAPLAN FOX & KILSHEIMER, LLP
800 Third Avenue
38th Floor
New York, New York  10022
(212) 687-1980
juris@kaplanfox.com
chahn@kaplanfox.com

For the Defendants:
Erica Barrow, Esq.
BAKERHOSTETLER
45 Rockefeller Plaza
New York, New York  10111
(212) 589-4200
ebarrow@bakerlaw.com

Also Present:
Kevin Ontiveros, Esq., General Counsel
McKayla Largin, Legal Videographer

* * *

Page 3

I N D E X

ANDREW BENSON                          PAGE
Examination By Mr. Uris                  7

          * * *

          E X H I B I T S

EXHIBIT      DESCRIPTION              PAGE

Exhibit 12  ** Quarterly Dashboard Graphs   39

Exhibit 4   ** Email Exchange Re: Darn,      52
       they canceled the rest of the
       COVID-K-001s from order #2410

Exhibit 33  ** February 16, 2022 Email       57
       Exchange

Exhibit 8   ** Email Exchange Re: Important  59
       Update for Product Statuses

Exhibit 44  Email Re: Updated Earnings       65
       Release with attachment

Exhibit 13  ** Email Re: Q1 CFO Script with  79
       attachment

Exhibit 14  ** Email Exchange Re: Q1 CFO     85
       Script with attachment

Exhibit 15  ** 5/4/2022 Email Re: Guidance   88
       Considerations

Exhibit 16  ** May 2022 Email Exchange Re:   115
       Guidance Considerations

Exhibit 17  ** Email Exchange Re: Guidance   117
       Considerations with attachment

Exhibit 18  ** Email Exchange Re: Call to    128
       Discuss Coverage with
       attachment

Page 4

E X H I B I T S (Continued)

EXHIBIT      DESCRIPTION              PAGE
Exhibit 19  ** Email Exchange Re: Guidance   132
       Considerations with attachment

Exhibit 20  ** Email Exchange Re: Guidance   137
       Considerations with attachment

Exhibit 21  ** 5/12/2022 Email Re: Upcoming  141
       Press Notification May 12, 2022
       with attachment

Exhibit 45  1/4/2021 Email Re: PR Draft and  151
       Initial Talking Points with
       attachment

Exhibit 46  Email Exchange Re: How are we    156
       doing on the new India test
       announcement?

Exhibit 47  Email Exchange Re: next Earning  160
       call - investor message

Exhibit 23  ** Email Exchange Re: Call       164
       w/Hudson Executive Capital

Exhibit 39  ** Email Re: Q2'22 Press         168
       Release with attachment

Exhibit 48  Email Exchange Re: Q2'22 Press   170
       Release with attachment

Exhibit 25  ** Email Exchange Re: Q2'22      174
       Press Release with attachment

Exhibit 26  ** Email Exchange Re: Final      179
       Script of Earnings Call with
       attachment

Exhibit 49  Email Exchange Re: Fluidigm Q3   186
       Revenues Drop 29 Percent on
       Supply Chain Issues, Waning
       COVID-19 Testing with
       attachment

Page 5

E X H I B I T S (Continued)

EXHIBIT      DESCRIPTION              PAGE
Exhibit 27  ** 3/8/2022 Email Re: Get their  192
       release and show me a potential
       draft with attachment

Exhibit 29  ** 3/10/2022 Email from Andrew   199
       Benson Re: Share repurchase
       release Dr 2 with attachment

Exhibit 50  3/23/2022 Email Re: Current PR   200
       with attachment

Exhibit 51  Email Exchange Re: Q4/FY21       206
       Release with attachment

Exhibit 32  ** Email Exchange Re: Current    211
       Script with attachment

Exhibit 43  ** Email Exchange Re: Financial  213
       Messages

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 6

PROCEEDINGS

-o0o-

VIDEOGRAPHER: Good morning. We are going on the record at 9:05 a.m. on November 12, 2024. This is Media 1 to the deposition recording of Andrew Benson in the matter of Stadium Capital, LLC, versus Co-Diagnostics, Inc., et al., filed in the District Court, Southern District of New York, Case No. 22-cv-6978-AS. This deposition is located over Zoom.

My name is McKayla Largin. I'm the videographer. And Emily Gibb is the court reporter.

Will all counsel please state who they represent for the video record.

MR. URIS: Jason Uris of Kaplan Fox & Kilsheimer LLP for plaintiff and the proposed class.

MS. HANG: Chang Hang for plaintiff and the proposed class from Kaplan Fox.

MS. BARROW: Erica Barrow from Baker & Hostetler on behalf of the defendants.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

///
///

Page 7

Thereupon --

Andrew Benson,

was called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. URIS:

Q. Mr. Benson, good morning, and thank you for making yourself available to provide testimony today.

A. Of course.

Q. Can you please state your full name for the record.

A. Andrew Boyce Benson.

Q. And what is your current home address?

A. 1939 South Imperial Street, Salt Lake City, Utah 84105.

Q. And I just want to go over a few -- a few ground rules before we get started.

A. Sure.

Q. Do you understand that you took an oath under penalty of perjury to tell the truth today?

A. I do.

Q. Are you aware of any reason you cannot testify truthfully today?

Page 8

A. I am not.

Q. And throughout today's deposition, if you could please let me finish my question before answering, I think that would be helpful for the court reporter. And you need to answer audibly so the court reporter can hear you, so that means no nodding or shaking your head.

Does that work for you?

A. Understood. Yep.

Q. Okay. And throughout today's deposition, your counsel may object to form. But unless your counsel specifically instructs you not to answer, you still must answer truthfully.

Do you understand?

A. I do.

Q. And if you need a break, please just let me know. However, if a question is pending, I'd prefer that you finish answering the question before we take a break.

Is that okay with you?

A. Yes, it is.

Q. Okay. And if I ask a question and you answer it, I'll assume you understood the question. But if you don't understand the question or it's unclear, please just let me know and I'll -- I'll try

Page 9

to clarify it.

A. You got it.

Q. And if you -- if you experience any technical issues, such as loss of sound or video, will you please let us know immediately?

A. Yes.

Q. And where are you today?

A. I'm at home.

Q. Is there anyone in the room with you?

A. There is not.

Q. Do you understand that you cannot communicate with defendants -- the defendants' lawyers during the time that you're providing testimony on the record?

A. Yes, I do.

Q. Have you ever been charged -- been charged with a crime?

A. No, I haven't.

Q. Have you ever been named as a defendant in any civil litigation?

A. No, I haven't.

Q. Have you had your deposition taken before today?

A. Yes, I have.

Q. In what matter or matters?

3 (Pages 6 - 9)

Page 10

A. It was in relation to a class action lawsuit against Co-Diagnostics.

Q. Do you recall the parties that were involved in that lawsuit?

A. Gelt Trading, I believe.

Q. Do you recall what the allegations were in that lawsuit?

A. I don't really know. It was regarding statements made in -- in press releases, I believe. I can't remember exactly what they -- what the matters were. I think they related to the performance of the company's -- the company's tests, statements made concerning the company's forms and the company's tests.

Q. Have you had your deposition taken in any other matters?

A. No, I haven't.

Q. When did you first become aware of today's deposition?

A. A few weeks ago, I believe, is when I was told the dates.

Q. Did you prepare for today's deposition?

A. I did.

Q. How did you prepare?

A. I had a couple meetings with counsel to

Page 11

discuss how a deposition proceeds and just reminders of -- of --

MS. BARROW: I'm just going to object to the extent that you're disclosing attorney-client communication, but you can answer otherwise.

THE WITNESS: Right. Yeah. Just -- just matters concerning best practices about a -- regarding a deposition.

BY MR. URIS:

Q. Was it two meetings?

A. It was.

Q. Do you recall when those meetings were?

A. Friday and Monday.

Q. Is that Friday of last week and Monday of this week?

A. Yes. Sorry. Yeah. Monday the 11th and Friday, two days previous.

Q. And who was present during each of those meetings?

A. Erica Barrow, Genevieve -- her surname escapes me at the moment -- and Marissa Peirsol.

Q. And the same people were at both meetings?

A. Marissa Peirsol was only at the second meeting.

And Kevin Ontiveros, company counsel,

Page 12

general counsel.

Q. He was at both meetings?

A. He was.

Q. Was anyone else present at either meeting?

A. Nope.

Q. Does the BakerHostetler law firm represent you in connection with today's deposition?

A. They do.

Q. Did you enter into -- into a written retainer agreement for purposes of their representation of you in connection with today's deposition?

A. I don't recall.

Q. Are you paying BakerHosteler's legal fees with regards to today's deposition?

A. I am not.

Q. Do you know who is paying the legal fees with respect to today's deposition?

A. I believe it's Co-Diagnostics.

Q. Did you review anything during each of the -- the two meetings that you had with counsel?

A. There were some documents reviewed.

Q. Did any of those documents help you recall or remember any events that had occurred in 2021 or 2022?

Page 13

MS. BARROW: Objection to the extent it calls for privileged information.

THE WITNESS: I believe some of them did, yes.

BY MR. URIS:

Q. And what did those documents help you recall or remember?

MS. BARROW: Objection.

I'm going to instruct the witness not to respond.

MR. URIS: It's your position that any facts that he was refreshed about are -- is privileged information?

MS. BARROW: I'm going -- our position is that attorney-client communication is privileged.

MR. URIS: I'm -- I'm not asking about attorney-client privilege. I'm asking ...

MS. BARROW: But the information you're seeking was in the course of attorney-client communication.

BY MR. URIS:

Q. Did you bring any documents or notes with you for this deposition?

A. No.

Q. Did you take any notes in preparation for

4 (Pages 10 - 13)

Page 14

this deposition?

A. I did not.

Q. Did you review any notes or outlines in preparation for this deposition?

A. Nope.

Q. Do you know what this lawsuit is about?

A. I believe so, yes.

Q. Well, can you describe your understanding.

A. I believe it concerns statements made by company management in the course of earnings -- or in connection with earnings releases regarding the decision to -- to no longer share guidance for the forthcoming quarters.

Q. Anything else?

A. That's my understanding of the -- the -- the matters at hand, in a nutshell.

Q. Have you discussed this lawsuit with anyone other than counsel?

A. Just in general with company management when we learned -- when we found out about it, although it was some time ago, and I can't remember exactly when that was.

Q. Did you discuss any of the allegations in the complaint with company management when you found out about the case?

Page 15

MS. BARROW: Objection to the extent it calls for privileged communication.

THE WITNESS: I don't recall exactly what I discussed with management when the -- when we learned the case was filed.

BY MR. URIS:

Q. Do you have any agreements in place, whether with Co-Diagnostics or anyone else, that will in any affect -- affect your testimony today?

A. Can you clarify what kind of agreements?

Q. I don't -- I don't know if I -- if I can clarify that.

A. Nothing comes to mind.

Q. Okay. I'd like to ask you a little bit about your educational background.

Did you attend college?

A. I did.

Q. Where did you go to college?

A. The University of Utah and Cambridge University.

Q. And when did you graduate?

A. I got my bachelor's in '04 and my master's in '05.

Q. And what did you obtain a master's in?

A. I have a master of philosophy and

Page 16

linguistics.

Q. And other than the University of Utah and Cambridge University, have you ever attended any other colleges or universities?

A. I -- my freshman year was in a university called Weber State University, I suppose.

Q. Do you possess any professional licenses?

A. No, I don't.

Q. Are you a member of any professional organizations?

A. No, I'm not.

Q. Can you generally describe your work experience prior to joining Co-Diagnostics.

A. I had been working as a -- in -- in finance following my master's degree and moved into venture capital. And in connection with that experience, I was helping -- I was working for the VC that was helping to raise the seed capital for Co-Diagnostics, which is how I was introduced and got to know one of the founders who asked if I was interested in -- in -- in assisting part time with some of Co-Diagnostics' operations in its early start-up days, which I -- which I did. And gradually, that part-time experience became my full-time experience, and so I've been here for about 10 1/2 years now.

Page 17

Q. And what VC firm were you with?

A. It was this small operation run by a friend of the family called Legends Capital.

Q. And approximately how many years were you at Legends Capital?

A. Seven to eight years or so.

Q. And what was your role or -- or your responsibilities at Legends Capital?

A. They varied. For a period of time, I was under the operations for the -- for the -- for the agents for the -- for the firm based out of Barcelona and Madrid for about 6 1/2 years or so.

And then following that, I was -- I had repatriated to the States and was assisting Legends Capital with running the investor relations for the private equity companies for which they were raising capital, which is how I came to know Co-Diagnostics.

Q. Do you recall what year you joined Co-Diagnostics?

A. 2014.

Q. And what was your role at that time?

A. Head of operations, I suppose.

Q. Was that your only role at that time?

A. As a start-up with a handful of employees, that was my title, but my role involved many varied

5 (Pages 14 - 17)

Page 18

responsibilities.

Q. Do you recall what the other responsibilities were at that time?

A. Investor and public relations, overseeing logistics, had a role in quality -- in the quality department. Sort of the company's nascent regulatory department as well, just a -- many hats being worn by -- by a start-up.

Q. And can -- can you describe how your role and respons- -- responsibilities have changed since then at Co-Diagnostics?

A. Sure. As the company has grown and more -- additional and -- and more specialized employees have been hired to oversee those other --

(Audio interruption.)

(Clarification by the Reporter.)

THE WITNESS: -- those other duties for which I had responsibility, my role became focused more on the investor relations and public relations for the company, nominally under the umbrella of head of corporate communications.

BY MR. URIS:

Q. Do you recall when you became head of corporate communications?

A. No, I don't.

Page 19

Q. Do you recall what year you became head of corporate communications?

A. No. Still don't.

Q. Do you recall whether you were head of corporate communications in 2021?

A. I believe I was, yes.

Q. And are you -- are you still head of corporate communications?

A. Yes.

Q. In 2021 and 2022, other than head of corporate communications, did you have any other roles or responsibilities?

A. By that time, the company was large enough and had enough specialized, experienced employees that most of my role centered around corporate communications. I did continue to oversee the logistics department for the company. There were -- there -- there were other full-time logistics staff during the time I was overseeing them, although it wasn't my full-time responsibility with the company to assist with the shipping or -- or logistics. It was just a -- a role that I -- that I assisted in and -- and helped to manage.

Q. So when you -- when you refer to the logistics department, that's -- that's shipping?

Page 20

Is -- is -- what else is it?

A. Shipping.

Q. Shipping?

A. As far as my purview was, was purely shipping, yes.

Q. And can you describe generally how that department operated? Like, would a -- when an order comes in, does it go to logistics and gets packed up? And how does -- how does that process work?

MS. BARROW: Objection. Form.

THE WITNESS: Currently or at the time?

BY MR. URIS:

Q. At the time, 2021 and 2022.

A. I don't recall exactly what the workflow was back then. It was mostly operated through a series of email chains that would come in notifying logistics that an order was being placed with communications from manufacturing indicating when the order was anticipated to be prepared or whether it was already in stock, followed by the shipping personnel preparing the shipment and other documentations required for the shipment. If it was international packaging it, arranging the courier and -- and having it ready for -- for pickup by the courier.

Page 21

Q. Did you -- did you have an employment contract in either 2021 or 2022?

A. I'm not sure. I don't know.

Q. Have you ever -- ever had an employment contract with Co-Diagnostics?

A. I don't recall whether I've ever had an employment contract with Co-Diagnostics.

Q. When you were hired at Co-Diagnostics, did you negotiate your compensation?

A. I accepted an offer.

Q. Do you recall what your compensation was at the time?

A. No, I don't.

Q. Do you recall what your compensation was in 2021 or 2022?

A. No. I -- I -- I can't recall right now.

Q. Do you recall the general structure of your compensation in 2021 or 2022?

A. Salaried employee. There were some stock options included in my compensation as well, although I can't recall the quantity or when they were granted and -- on the structure as well.

Q. Do you recall how your bonus was determined?

A. It was based on overall revenue.

Q. Do you recall how frequently bonuses were

6 (Pages 18 - 21)

Page 22

paid out in 2021 or 2022?

A. I don't recall.

Q. Do you recall approximately what percentage of your total compensation stock options were in 2021 or 2022?

A. No, I -- I don't recall the -- the structure or the quantity.

Q. Do you recall whether it was a substantial percentage of your total compensation?

A. I'm not sure how you would define "substantial," but like I said, I can't remember exactly what -- since I can't remember what the -- it's hard for me to respond to that.

Q. You don't recall whether it was more than 50 percent of your compensation?

A. I believe it was less than 50, but I -- I can't recall.

Q. Do you know if it was more than 30 percent?

MS. BARROW: Objection. Asked and answered.

THE WITNESS: Yeah. Again, I'm -- I'm not sure.

BY MR. URIS:

Q. In -- in your role as head of corporate communications, who did you primarily work with in the 2021-2022 time frame?

Page 23

A. Primarily the CEO, Dwight Egan, and occasionally the CFO as well.

Q. Anyone else?

A. In what capacity? To whom did I report or with whom did I work?

Q. With whom did you work?

A. In that capacity, it was primarily those two individuals. There was also a consulting firm that we had retained for investor relations, Lambert, and a PR firm that we worked with as well, Coltrin & Associates.

Q. And did you report to anyone at that time?

A. Just Dwight Egan and the CFO.

Q. Did anyone report to you?

A. Not in that capacity, no.

Q. And who reported to you in -- in other capacities?

A. Various shipping personnel.

Q. Anyone else?

A. No.

Q. And who were the various shipping personnel?

A. During what time period?

Q. Either 2021 or 2022.

A. I can't recall all of their surnames now. Tonya, Gary. What's that other guy's -- Ron.

Page 24

Another individual whose name escapes me at the moment. He wasn't with us for very long.

Q. In -- in your role as head of corporate communications, how do you typically communicate with the CEO or the CFO?

A. Typically by phone or in person. Occasionally by email as well.

Q. Any other means of communications or -- or messaging?

A. When Dwight calls me, it's usually via Teams, not via my -- my mobile phone. And Brian and I will occasionally -- Brian Brown and I will occasionally exchange text messages as well to arrange -- you know, confirm when a meeting is taking place or who's going to be on a call, things like that. Just basic logistics of -- of -- of the roles that I hold.

Q. Did you ever use any personal email addresses for work purposes?

A. No.

Q. During the 2021 and 2022 time frame, can you describe your responsibilities as head of corporate communications?

A. Sure.

From the public relations side, it involved

Page 25

receiving and responding to media inquiries, as well as media outreach via the PR firm to various media entities. Just in the capacity of -- of communications via the media to the public.

On the investor relations side, it would have been preparing press releases with the CEO and CFO and other members of the company as appropriate upon direction -- by direction of the CFO; assisting and preparing remarks for earnings calls, earnings press releases; coordinating with analysts -- with covering analysts in connection with inviting them to earnings calls and responding to inquiries that they would have for clarification following those calls.

I believe at that time, we were occasionally attending investor conferences, and I would have been involved in helping to coordinate those and to arrange and -- and -- and -- and assist as needed if -- if -- with whatever materials were -- were needed when -- when -- when help was -- was requested, so ...

Q. Did anybody else at Co-Diagnostics assist with investor relations matters other than the CEO or CFO?

A. Not that I recall, no.

Q. In -- in 2021 and 2022, do you know how

7 (Pages 22 - 25)

Page 26

Co-Diagnostics' sales department was set up in terms of personnel or hierarchy?

A.   I believe it was headed by Seth Egan -- I think he was VP of sales at the time -- and various sales personnel: Cameron Gundry, Dennis Crockett, some administrative personnel in Latin America and in Europe.

Q.   Was -- and Mr. Gundry was responsible for Latin America and Europe?

A.   That's my understanding.

Q.   And do you know what Mr. Crockett was responsible for?

A.   I believe so.  I think it would have been the Middle East, Asia, Africa.

Q.   Was Mr. Featherstone also on the sales team?

A.   I am not sure whether his role was sales specifically.  I know that he had customers that would -- that he worked with to -- to assist in procuring products.  I don't know whether his role was specifically sales.

Q.   In 2021 or 2022, do you know whether the sales department would have team meetings?

A.   I'm not sure how the sales department operated in that respect.

Q.   Was there a management team in 2021 or 2022?

Page 27

A.   A management team for -- that operated in -- in what capacity?  For sales or for the company or for ...

Can you -- can you clarify what -- what -- what you're asking?

Q.   Are you aware of any management teams that existed at the company in 2021 or 2022?

MS. BARROW:  Objection.

THE WITNESS:  Yes.

BY MR. URIS:

Q.   Okay.  Which management teams?

A.   The C-suite, I would regard as nominally management, different -- to the heads of the departments.

Q.   Do you know if the C-suite had any regularly scheduled meetings in 2021 or 2022?

A.   The only one that I had any involvement in -- the only one -- so the only one that I would know for sure was a Monday morning management meeting in which they participated.  That was the only one that I regularly participated with the C-suite.

Q.   And you recall -- do you recall generally what would be discussed at those Monday morning meetings?

A.   Just general matters from the heads of

Page 28

departments, as they would share what they were focused on and what their objectives were for the week and resources required.  Just general -- general housekeeping and -- and updates.

Q.   Do you recall whether Seth Egan would provide an update on sales at those meetings?

MS. BARROW:  Objection.

THE WITNESS:  To my recollection, he would, although I can't recall the nature of exactly what that would be.  But as a department head, he would give updates.

BY MR. URIS:

Q.   Updates on how sales were going?

MS. BARROW:  Objection.

THE WITNESS:  Like I said, I can't recall exactly the nature of what he would share.  It probably varied from week to week.

BY MR. URIS:

Q.   Well, in 2021 or 2022, did you ever have any separate meetings or calls with Seth Egan to discuss how sales were going?

A.   I don't recall any specific meetings to discuss sales or how they were going during that time.

Q.   Do you attend Co-Diagnostics' board

Page 29

meetings?

A.   I do not.

Q.   Have you ever prepared materials that were planned to be used at -- used at any Co-Diagnostics' board meetings?

MS. BARROW:  Objection.

THE WITNESS:  No, I haven't.

BY MR. URIS:

Q.   Were you the member of any committees at Co-Diagnostics in 2021 or 2022?

A.   What kind of committees?

Q.   Just any -- any committees that existed other than, I guess, general kind of departments.

A.   Not that I recall, no.  I don't recall ever being a member of any specific committee.

Q.   In 2021 or 2022, did you ever communicate with any individuals or firms who provided research or analyst reports to the market on Co-Diagnostics?

A.   Yes.  I would have communicated with our covering analysts during that time.

Q.   Do you recall who the covering analysts were at that time?

A.   Yi Chen from H.C. Wainwright would have been one.  I believe for -- during that period, there was some overlap with Jim Sidoti from Sidoti.  I can't

8 (Pages 26 - 29)

Page 30

remember Theo's last name from Litchfield Hills. I believe we still had a covering analyst at Maxxam, although he was fairly hands off and I had no communication with him really, and to the extent I can't even recall his name anymore.

Jason, Jason McCarthy at Maxxam.

Q.  Any other firms or individuals?

A.  I'm sorry.  I lost you for a little bit.

Q.  Any other firms or individuals?

A.  That provided research or assisted in providing research?

Those are the only firms that I recall right now.

Q.  Did you participate in Co-Diagnostics' quarterly earnings calls?

A.  Yes, I did.

Q.  Do you know whether the company maintains audio or video recordings of those calls?

A.  Sorry.  Another audio glitch there.

Can you please repeat the question.

Q.  Do you know whether the company maintains audio or -- or video recordings of those calls?

A.  The company does not, no.

Q.  Can you describe how Dwight Egan and Mr. Brown would prepare for quarterly earnings calls?

Page 31

MS. BARROW:  Objection.

THE WITNESS:  And also apologies.  The -- the only word I heard there was "describe" and "prepare."

BY MR. URIS:

Q.  Can you describe how Dwight Egan and Mr. Brown would prepare for quarterly earnings calls?

(Clarification by the Reporter.)

THE WITNESS:  If it's as bad for everybody else.  Yeah, I -- I can't -- I'm glad I'm not the only one that's having glitches here.

BY MR. URIS:

Q.  Can you describe how Dwight Egan and Mr. Brown would prepare for quarterly earnings calls?

MS. BARROW:  Objection.

THE WITNESS:  I can't really speak to what they individually would do to prepare for the calls.

BY MR. URIS:

Q.  Would you help them prepare for quarterly earnings calls?

A.  I would provide assistance in -- in -- in -- in drafting some of the remarks or at least editing some of the remarks.

Q.  Would you have any prep meetings with Dwight Egan or Mr. Brown?

Page 32

A.  Can you describe what you mean by a "prep meeting"?

Q.  Yeah.

Any kind of meeting in preparation for an earnings call?

A.  Yes, I would.

Q.  And can you describe generally what -- what you would do during those meetings?

A.  Just generally discussing the -- the messaging and the status updates for the quarter and what it was -- what would be appropriate to share with the -- with the analysts and with the shareholders in that call.

Q.  Would -- would Dwight Egan and Mr. Brown provide you with the key messaging that they wanted to go with for any particular quarter?

A.  For the most part, yes, that's how -- I believe they would.  I would communicate with them to determine what it was that they wanted to share in those calls and then help them to -- to -- to draft that.

Q.  Would you ever communicate directly with Co-Diagnostics' investors?

A.  Yes, I would.

Q.  And how would you communicate with them?

Page 33

Through -- like, through email or over the phone?

A.  Both, yes.  Typically by email or over the phone.  Occasional in-person visits.

MR. URIS:  I think this is a good time for a -- a short break if that -- that works for -- for everyone.

THE WITNESS:  Okay.

MS. BARROW:  Should we do five minutes or a little bit longer?

MR. URIS:  Yeah.  Can we maybe do ten?  I think I might try to eat something quickly, and then -- then I should be go to -- good to go until 2.

MS. BARROW:  Okay.  So 12?

THE WITNESS:  Seven past the hour?

MR. URIS:  Yeah, seven past the hour.

VIDEOGRAPHER:  We're off the record.  The time is 9:57.

(Short recess taken.)

VIDEOGRAPHER:  We're back on the record. The time is 10:09.  This is Media No. 2.

Counsel may proceed.

BY MR. URIS:

Q.  Do you know what the Logix Smart COVID-19 test is?

A.  Yes, I do.

9 (Pages 30 - 33)

Page 34

Q.  What is it?

A.  The Logix Smart COVID-19 test is a PCR test for centralized laboratories designed to detect the presence of nucleic acids that indicate the presence of SARS-CoV-2 virus in a given sample.

Q.  Do you recall when Co-Diagnostics started selling the Logix Smart COVID-19 test?

A.  In early 2020.

Q.  And once Co-Diagnostics started selling the Logix Smart COVID-19 test, do you know approximately what percentage of its revenue that test accounted for?

A.  Principally all of it.

Q.  Do you have an understanding of the process through which a customer would place an order?

A.  Not really.  I don't really work on that side of the business.

Q.  Do you know whether Co-Diagnostics uses any systems to keep track of its sales orders?

A.  What time period?

Q.  2021 or 2022?

A.  I believe they did have processes to keep track of those, yes.

Q.  And what were those processes or systems?

A.  Again, since I'm not really on that side, I

Page 35

can't say everything that they use, exactly.  I'm not -- I'm not sure.  I know of -- Monday.com I believe they use, and I'm not sure any other platforms.

Q.  Do you know what the company used Monday.com for?

A.  It depended on the department.

Q.  Do you know whether the sales team kept track of its sales orders on Monday.com?

MS. BARROW:  Objection.

THE WITNESS:  Not really my department, but I believe that they did.

BY MR. URIS:

Q.  Do you know whether there was a specific board on which they kept track of sales orders?

MS. BARROW:  Objection.

THE WITNESS:  I do believe there was such a board, yeah.  I don't know exactly how it operated or to what extent it was used, but I believe it existed.

BY MR. URIS:

Q.  Did you have access to that board?

A.  I think so, but it wasn't something that I regularly used.  It wasn't part of my -- my purview.

Q.  How often would you view that board in 2021 or 2022?

Page 36

A.  Rarely.  Usually only if -- I can't remember an exact circumstance that would require me to look at it.  I -- I recall that it existed, but it wasn't anything that I ever needed to look at for part of my -- my operations day to day.

Q.  Would you ever review it in connection with drafting quarterly earnings press releases or earnings -- earnings call scripts?

A.  No.

Q.  Do you recall in 2021 or 2022, there was a board on Monday.com titled "Quarterly Dashboard"?

A.  I recall seeing it.  It seemed that -- the title of it on the -- on the -- the menu, but it wasn't anything that I ever clicked on or -- or reviewed.  It wasn't part of my Monday operations, Monday.com operations.

Q.  Have you ever reviewed the Quarterly Dashboard?

A.  I can -- personally, I don't recall ever reviewing the Quarterly Dashboard.  Whether it was shown to me at some point, I -- that might be the case, although I don't know for sure.  But personally, I don't ever recall going and viewing that dash -- that dashboard or that -- that table.

Q.  You had access to Monday.com; correct?

Page 37

A.  I had a login to Monday.com, yes.

Q.  Are you aware of your permissions on Monday.com being restricted in any way?

A.  My understanding of how Monday.com works is that different tables can be set up to provide either general access or restricted access to individuals who need them.

And so I can't say -- there are probably any number of -- of tables that weren't ever anything that I even knew about, let alone had access to.

Q.  Did you use any private boards on Monday.com?

A.  What do you mean by a private board?

Q.  Have you ever created any boards on Monday.com?

A.  Yes, I did.

Q.  Do you recall which boards you created?

A.  I believe it was called "Shipment Records."

Q.  I think I probably know the answer to this question, but what kind of information was stored in that board?

A.  Shipment records.

Q.  Do you recall creating any other boards?

A.  I don't recall creating on any other boards.

Q.  Do you know what SharePoint is?

10 (Pages 34 - 37)

Page 38

A.  I do, yes.

Q.  Did the company use SharePoint in 2021 or 2022?

A.  I think so.  I understand some departments did.

Q.  Do you know what some departments used it for?

A.  Not really.  They -- they weren't my departments.

Q.  Did you ever use SharePoint?

A.  I don't recall any specific instances, other than maybe being sent an email with something that was being shared via SharePoint.  But I didn't have any pages or -- or -- I'm not even sure what -- what it -- what it's called because I use it so rarely, but I didn't have any SharePoint pages that were part of my department.

Q.  Do you know what NetSuite is?

A.  Yes, I believe I do.

Q.  Do you know if the company used NetSuite in 2021 or 2022?

A.  I don't recall when we began implementing NetSuite, but I don't think it was in 2021.  It might have been 2022.

Q.  Do you know what the company used NetSuite

Page 39

for?

A.  NetSuite is an ERP -- a cloud-based ERP program, so for -- it -- it's nothing that corporate communications ever uses, and so I don't know exactly how each department uses NetSuite or -- or what they use it for.

Q.  From the -- from the start of the pandemic through the first quarter of 2022, do you know approximately what the dollar value of orders that the company received for its test in each quarter was?

A.  No, not off the top of my head.

Q.  Do you know whether it was $20 million or more in each quarter?

MS. BARROW:  Objection.  Form.

THE WITNESS:  Again, I -- I'm -- I'm not sure.  It would depend on the quarter, but I would have to look at the numbers to refresh my memory.  Some quarters were more than others.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 12.

(Exhibit 12, having been previously marked, was discussed.)

BY MR. URIS:

Q.  If you refresh that Marked Exhibits folder,

Page 40

it should be available on Exhibit Share.

A.  Got it.

Q.  Do you recognize this document?

A.  It looks somewhat familiar, but I'm ...

Q.  Does it appear to be the Quarterly Dashboard on Monday.com?

A.  I believe so, yes.

MS. BARROW:  Jason, for the record, could you read in the Bates number?

THE WITNESS:  Pardon me?

MS. BARROW:  Oh, I was talking to Jason.

Jason, do you mind reading in the Bates number --

MR. URIS:  Yes.

MS. BARROW:  -- when you're offering the exhibit.

MR. URIS:  This is -- yeah, previously marked Exhibit 12, Bates No. CoDX_00501488.

BY MR. URIS:

Q.  Does that refresh your recollection that from 2021 to the second quarter of 2022, the company had received orders for its tests of at least $20 million or more in each quarter?

MS. BARROW:  Objection.

THE WITNESS:  Orders for tests are different

Page 41

than actual reported sales numbers, and I'm not sure if these are -- if this is reporting orders received or -- or sales actually made and delivered.

The numbers are also a little hard for me -- I've zoomed in, but they just kind of get a little more blurry, so I can't tell exactly what they say.

Oh, oh, the larger -- I was looking at the bars themselves.  Okay.  I see -- I see the larger number for the -- larger number for the tables now as well, for the quarters.

Again, I don't know if this represents sales or orders received.

BY MR. URIS:

Q.  Does this -- does this document refresh your recollection that from the -- the second quarter of 2020 through the first quarter of 2022, the company had received orders for its tests in -- in the ballpark of $20 million or more in each quarter?

MS. BARROW:  Objection.

THE WITNESS:  That appears to be what these numbers are stating.

BY MR. URIS:

Q.  Do you recall what Co-Diagnostics' revenue was in the second quarter of 2022?

A.  I don't.

11 (Pages 38 - 41)

Page 42

Q. You don't recall whether it was $5 million?

MS. BARROW: Objection.

THE WITNESS: If that's what's reflected on this table, then -- then I -- then I -- then I see that that's -- I see that that's what appears to be the case in the exhibit.

Again, I can't say whether this is actual revenue or just orders received because I don't know how the table was put together. But I do see that number for second quarter of 2022.

BY MR. URIS:

Q. I'll just state for the record that it's my understanding that this is -- these numbers are reflective of the orders received and is pulled from the -- the order data stored in Monday.com.

A. Sure.

MS. BARROW: Objection to the extent it's attorney testimony.

BY MR. URIS:

Q. Are you aware of any quarters during the range of -- from the second quarter of 2020 through the second quarter of 2022 in which the dollar value of orders received varied significantly from the company's reported revenue for any particular quarter?

Page 43

MS. BARROW: Objection.

THE WITNESS: Can you repeat the question, please?

BY MR. URIS:

Q. From the second quarter of 2020 through the second quarter of 2022, are you aware of any quarters in which the dollar value of orders received varied significantly from the company's reported revenue in that quarter?

A. I'm -- I'm not sure. I don't know what the -- what the disparity would be. All I know is there's a financial difference in how we report sales from when an order is received as opposed to when an order is actually delivered. And I don't know what that -- exactly what that -- what that disparity is other than just that -- I've been conditioned to understand that -- the distinction between orders received and sales made in order for -- as far as revenue recognition goes.

Q. Do you recall orders for the Logix Smart COVID-19 test beginning to fall in February of 2022?

MS. BARROW: Objection.

THE WITNESS: I -- pardon me. I don't recall that being the case, no.

///

Page 44

BY MR. URIS:

Q. You don't recall that being the case, or you don't recall whether that occurred?

MS. BARROW: Objection.

THE WITNESS: Can you ask the question again so I can make sure I'm answering it correctly?

BY MR. URIS:

Q. Do you recall orders for the Logix Smart COVID-19 test beginning to fall in February of 2022?

MS. BARROW: Objection.

THE WITNESS: Again, I -- I don't -- I don't -- pardon me. I don't recall that being the case.

BY MR. URIS:

Q. Are you saying you don't recall one way or the other?

MS. BARROW: Objection.

THE WITNESS: I recall orders fluctuating on a month-to-month basis. One month wouldn't necessarily be predictive of what the following month would be. And so to see one month with more sales and another month with fewer sales wasn't ever an indication to us that sales were -- were dropping or diminishing, just that it was part of the sales cycle.

Page 45

BY MR. URIS:

Q. If you look at this exhibit, it's a bit hard to read, but do you see the bar chart for 2022?

A. Look at where for 2022?

Q. The bar -- the bar chart towards the bottom of the exhibit --

A. Uh-huh.

Q. -- there's a bar chart that's titled "Monthly Sales Chart 2022."

A. Monthly sales 2022.

This is near the bottom of the chart?

I see quarterly sales. I don't see -- I see -- I can't really tell what each of these bars are.

Are you saying that these -- these bars are -- that they each indicate a -- a -- a monthly sales number?

Q. Yes. If -- if you zoom in, I know it gets a little blurry, but there's that first green bar which it seems to say below that "Sales Orders Ja" --

A. Okay.

Q. -- which I believe is January. And then "Sales Orders Fe," which I believe is February. "Sales Orders Mar," March.

Do you see that?

12 (Pages 42 - 45)

Page 46

A. I do.

Q. Is it your understanding that these represent the orders received in each month in 2022?

MS. BARROW: Objection.

THE WITNESS: I -- I can only take your word for it. I -- I -- I -- again, I can see some blurry -- blurry letters and maybe an "Fe," and that could possibly be an M there in the third one. So I'll take your word for it in -- in your exhibit, but --

BY MR. URIS:

Q. Is -- is that how you would read this chart if you were asked to read this chart?

MS. BARROW: Objection.

THE WITNESS: If it was legible and that's what I could -- that's what I could read, then I -- I could draw that inference.

I'm not trying to be difficult. It's a -- it's a very difficult exhibit to read.

BY MR. URIS:

Q. Do you see that it appears to show sales of 3.32 million in February of 2022?

A. I can't read the numbers, but ...

Q. Here, I can try to share my screen if that helps.

Page 47

A. The -- the more I zoom in, the more pixilated it gets.

Q. Okay. Let me -- let me see if I can share my screen.

A. Is this the pink bar that you're talking about?

Q. Yes.

Do you see that says 3.32 million? Do you see that?

A. I believe so.

Q. And do you see the next bar, which appears to be March 2022, says 2.796 million?

A. It -- it appears as though that might be what it says, yes.

Q. And do you see the next bar, which appears to be April 2022, says 1.39 million?

A. It's increasingly difficult to read. I can see it begins with a 1, and then I can't really see what comes after that, so ...

MS. BARROW: I also can't decipher the numbers in the chart.

MR. URIS: I'm going to share my screen.

THE WITNESS: I believe you. I just can't testify to something that I can't actually see.

///

Page 48

BY MR. URIS:

Q. Here. Let me ...

Are you able to see those numbers now?

A. Yes, I am.

Q. Okay. So do you see this -- this bar which appeals -- appears to be Sales Orders February? Do you see it says 3.323 million?

A. Yes, I do, yes.

Q. And then the next bar is 2.796 million?

A. I see that, yes.

Q. And then the next bar is 1.939 million?

A. I see that, yeah.

MS. BARROW: And, Jason, just for the record, so we're currently looking at a document previously marked as Exhibit 12 in the middle of the document, page 1 where it says "Monthly Sales Chart 2022"; correct?

THE WITNESS: Yes.

MR. URIS: Yes.

BY MR. URIS:

Q. By May 12 of 2022 or anytime before that, did you notice that orders had been low in February, March, and April of 2022?

MS. BARROW: Objection.

THE WITNESS: Can you describe what you mean

Page 49

by "low"?

BY MR. URIS:

Q. Prior to early 2022, do you recall the company ever having back-to-back months of less than $4 million in orders received?

A. Prior to 2022?

Q. Yes.

A. For most of our existence, we had low sales numbers.

Q. Since -- since the time you began selling the Logix Smart COVID test?

A. I don't recall. I didn't -- I didn't typically track sales numbers on a month-to-month basis, so it would hard -- be hard for me to say.

I do know that they would fluctuate, that -- like I said earlier, there would be one month with substantially more sales and one month with substantially less --

Q. So you --

A. -- but I didn't -- I didn't track on a month-to-month basis.

Q. Do you recall who the company's biggest customers were in 2021 or 2022?

A. I don't -- biggest in -- in -- in what respect?

13 (Pages 46 - 49)

Page 50

Q.  In terms of purchase volume.

A.  It wasn't really my side.  I could take some guesses, but I'm not really the one who could really speak to that.

Q.  Do you recall whether Intelligent Solutions was one of the company's bigger customers?

MS. BARROW:  Objection.

THE WITNESS:  Again, I don't -- I don't really know.  I know that -- because I would see on the logistics side shipments going out to Intelligent Solutions, but I couldn't speak to the dollar amount of what those shipments amounted to.

BY MR. URIS:

Q.  Any of -- none of the logistics documentation reflected what the dollar amount of the orders were?

MS. BARROW:  Objection.

THE WITNESS:  Occasionally they would, but it wasn't something that I was tracking.  And so seeing a number on a day-to-day basis, I couldn't immediately recall how many other sales for that customer had come across at a certain dollar value over a certain period of time.  It wasn't anything that I was -- that I was tracking.

///

Page 51

BY MR. URIS:

Q.  In either March, April, or early May of 2022, do you recall Seth Egan or any other member of the sales team ever telling you whether any of the company's biggest customers had committed to making any future purchases of the company's tests?

A.  I don't recall any conversations to that effect one way or the other.

Q.  Do you recall that in March of 2021, the company received a large purchase order from a distributor in Saudi Arabia?

MS. BARROW:  Objection.

THE WITNESS:  I recall large purchase orders from Saudi Arabia, but I don't recall exactly in what months they arrived.

BY MR. URIS:

Q.  Do you recall receiving a large purchase order from Saudi Arabia that was going to be filled in stages?

MS. BARROW:  Objection.

THE WITNESS:  I don't -- I don't recall an order that was received to be filled in stages.  I recall them mostly being filled all at once, but -- during what time period?

///

Page 52

BY MR. URIS:

Q.  2021.

A.  I don't -- I don't recall.

MR. URIS:  I'm going to introduce previously marked Exhibit 4 which bears the Bates CoDX_00043742.

(Exhibit 4 , having been previously marked, was discussed.)

BY MR. URIS:

Q.  Okay.  That should be available if you refresh the page.

MS. BARROW:  Counsel, just on housekeeping, are we just continuing the numerology?  Are they just all plaintiff's exhibits from previous depositions?

MR. URIS:  To the extent I introduce an exhibit that hasn't been marked, it would -- it would continue.  But to the extent it's been previously introduced, we're just using the same exhibit numbers.

MS. BARROW:  Okay.  Great.

THE WITNESS:  I can see the exhibit in question.

BY MR. URIS:

Q.  This is an email chain.  Top email's from Andrew Benson sent February 8, 2002, to Cameron Gundry, copying Tom Williams, Seth Egan, and Marlon

Page 53

Ramos.  The subject line: "Darn, they canceled the rest of the COVID-K-001s from order #2410."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A.  I don't have any intimate knowledge about this exhibit, but that's what it appears to say in the message line.

Q.  You appear to have written this email; correct?

A.  That's how it appears.

Q.  Do you have any reason to believe that the email reflected in this document was not sent at the time indicated on the document?

A.  I don't know.

Q.  And who is Tom Williams?

A.  He is a sales support individual for the company.

Q.  Okay.  And if you look down to Mr. Gundry's email on February 8, 2022, at 4:20 p.m., he writes:
"I spoke with Mario here.  He says due to the rise and (now) fall in demand for the COVID-K-001s, they want to cancel the rest of the order #240."

Do you see that?

14 (Pages 50 - 53)

Page 54

A.  I do.

Q.  And then above that, you respond: "Glad we shipped them a little more COV1 yesterday then, before they canceled the rest.  But that's still over a quarter million dollars we're missing out on.  Hopefully we'll see a replacement order for it later in this quarter."

Do you see that?

A.  I do.

Q.  Do you know what Mr. Gundry was referring to when he referred to "the rise and (now) fall in demand for the COVID-K-001s"?

MS. BARROW:  Objection.

THE WITNESS:  I don't know.  Other than just what it appears to say.

BY MR. URIS:

Q.  Well, do you recall whether Co-Diagnostics ever received a replacement order for that cancellation later in the quarter?

A.  I don't recall.

Q.  Do you recall whether Co-Diagnostics ever received a replacement order for that cancellation in the second quarter of 2022?

A.  I would have no knowledge about that.  I --

Page 55

I don't recall.

It wasn't uncommon for a distributor to receive an order, receive part of it, cancel, and then reorder the rest later.  Kind of depended on what their inventory was.  I -- I didn't really have any -- since I work on the sales side, I would see it happen, but I was never really aware of why it would happen or when -- whether an additional order was considered a replacement or not.

Q.  This order seemed to be from Raver, is that correct, if you look at the bottom -- the bottom email in the chain?

A.  It appears to be so, yes.

Q.  Do you recall whether that was one of the company's largest distributors?

A.  I don't know whether they would be considered one of our largest or not.  I -- I don't know.

Q.  Do you recall whether they were the company's exclusive distributor in Mexico?

A.  I do believe that was the case, yes.

Q.  Do you recall whether Raver had ever canceled any orders for the Logix Smart COVID-19 test?

A.  I don't -- I don't really recall.  Like I

Page 56

said, I -- I do --

(Audio interruption.)

(Clarification by reporter.)

VIDEOGRAPHER:  Do you want to go off the record?

MR. URIS:  Sure.

MS. BARROW:  Sure.

VIDEOGRAPHER:  We're off the record.  The time is 10:47.

(Short recess taken.)

VIDEOGRAPHER:  We're back on the record.  The time is 10:49.

Counsel may proceed.

BY MR. URIS:

Q.  Prior to February 8, 2022, do you recall whether Raver had ever canceled any orders for the Logix Smart COVID-19 test?

A.  It sounds familiar.  I -- I don't recall exactly.  I -- I know it was not uncommon for distributors to place large orders, request them in -- to be sent in batches, then later on to revise the remainder of that order.  It -- it -- it was not uncommon for one order to be sent in two, three, four shipments.

And then -- I was never -- because I don't

Page 57

work on the sales side, I -- it's opaque to me whether -- the extent to which an order that was canceled would then -- when the next order that came in would -- whether it would be considered a replacement or -- or what, so ...

Q.  Do you recall any other instances where a -- a customer canceled an order because they said demand for that test had fallen?

MS. BARROW:  Objection.

THE WITNESS:  Again, I -- I -- I wasn't ever really aware of why orders would be placed or canceled in the first place.  I don't really work on the sales side of things.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 33, document bearing Bates No. CoDX_00035960.  And that should be available.

(Exhibit 33, having been previously marked, was discussed.)

THE WITNESS:  This is Exhibit 00033; is that right?

MR. URIS:  Yes.

THE WITNESS:  Got it.

BY MR. URIS:

Q.  This is an email chain.  The top email is

15 (Pages 54 - 57)

Page 58

from Cameron Gundry dated February 16, 2022, to Seth Egan, Dwight Egan, and Andrew Benson with the subject line: "Maybe the one market survey worth it for us?"

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A.  I don't have any reason to believe otherwise.

Q.  Is your understanding of this email that Mr. Gundry is -- is suggesting that the company purchase a -- a COVID-19 diagnostics market data report?

MS. BARROW:  Objection.

THE WITNESS:  The subject line seems to indicate something in that regard, but you'd have to speak with Mr. Gundry to determine what exactly it was that he meant by writing that.

BY MR. URIS:

Q.  And in his email he writes:

"This one comes with quarterly market size update to keep the forecasts 'as sharp as possible.'  That's unique."

Do you see that?

A.  I do.

Q.  Do you know whether the company ever

Page 59

purchased this report?

A.  I don't know.

Q.  And then in the second paragraph of his email, he writes:

"Did you see Novacyte cut its revenue projections in 1/2 recently?"

Do you know who Novacyte is?

A.  (Audio interruption) sure.

Q.  I'm sorry.  What -- what did you say?

A.  I -- I am -- I'm not sure who Novacyte is.

Q.  So you don't know why Mr. Gundry was raising that with Seth Egan, Dwight Egan, and yourself?

MS. BARROW:  Objection.

THE WITNESS:  I don't know why Mr. Gundry was sharing that whoever Novacyte was cut its revenue projections in half recently, no.

MR. URIS:  Okay.  I'm going to introduce what was previously marked as Exhibit 8, a document bearing Bates No. CoDx_00042670.  And it should be available.

(Exhibit 8, having been previously marked, was discussed.)

THE WITNESS:  Exhibit 0008; is that right?

BY MR. URIS:

Q.  Yes.

Page 60

A.  Okay.  Got it.

Q.  Okay.  This is an email chain.  Top email is from Cameron Gundry to Brandy Robinson, Seth Egan, Marlon Ramos, Kenneth Casey Bramwell, Chad Apuli, and then a few email- -- two emails below that, there is an email from Cameron Gundry to Chad Apuli copying various people, including Andrew Benson.

Do you see your name listed there in that -- that email from Mr. Gundry on May 4, 2022, at 4:46 p.m.?

A.  Yes, I do.

Q.  If you'd turn to the -- the bottom email in this email chain, the email from Chad Apuli April 7, 2022, at 2:35 p.m.

Do you see that?

A.  Yes, I do.

Q.  And there, he's writing:

"In the sales meeting today, Seth asked about the Malaria test and whether or not we should sell it.  I figured it would be good to go through all the products that we have."

Then he lists various products.  And then below that, he writes:

"We have done little to no testing on these products, and I am not confident that they

Page 61

work, so I would not recommend ... we sell them."

And then it lists various tests below that.

Do you see that?

MS. BARROW:  And let the record reflect this portion of the email that we're discussing on Thursday, April 7th at 2:35 p.m. doesn't appear to have Andrew as a recipient.

MR. URIS:  Okay.  And I'll state for the record that he's on the email that -- he's on the third email of the document, and these emails below it are all attached to that email.

And, Erica, please keep all of your objections to form.

MS. BARROW:  Okay.  I was just clarifying.  It wasn't an objection per se.

MR. URIS:  Okay.  But your clarification wasn't even correct.

MS. BARROW:  Okay.  I mean, it was, but that's fine.

BY MR. URIS:

Q.  Okay.  If you'd look at the email above that, which is the email from Kyle May on May 3, 2022, he writes:

"I was wondering if Chad's message here

16 (Pages 58 - 61)

Page 62

should be regarded like the STI situation we've been discussing recently. We decided earlier that we would hold off on making the STI kits available until we have higher confidence in the test version, which seems like it might hold true for the tests listed in the second table that Chad provided here."

Do you see that?

A. Yes, now I do.

Q. And then in the email above that from Seth Egan on May 3, 2022, he writes:

"With Chad's assessment below, I would identify with Chad and not offer the tests in the second category."

Do you see that?

A. I do.

Q. Do you recall in -- in early May 2022 that a decision was made not to offer for sale certain of the company's tests?

A. I don't recall that decision, no.

Q. Okay. And then if you look at -- so the -- the -- there's a series of letters and numbers in the bottom right-hand corner of -- of the documents that we'll be looking at today which is called a Bates number.

Page 63

A. Okay.

Q. If you could turn to the page with Bates number ending in 671.

A. Okay.

Q. In the middle of that page, there is an email from Chad Apuli on May 4, 2022.

A. Yes.

Q. And he writes:

"Hey Cameron,

"Just to be clear, we won't be selling the STI or HPV, HIV, HBV, or MAL tests. You have an order, #2575, that we won't" include --

"that we won't be including the HPV kits in, as they are no longer something that we will be selling until we approve them for sale."

Do you see that?

A. I do.

Q. Okay. And then if can we go to the first page of the exhibit, there is the email from Cameron Gundry to Chad Apuli on May 4, 2022, at 4:46 p.m. that you're copied on, and he writes:

"Looks like some of the products we were promoting, and getting modest sales with, are now not available.

"We will lose five customers in Latin America

Page 64

from immediate HPV withdrawal, damaging all our customers there."

Do you know what five customers Mr. Gundry was referring to?

A. I do not.

Q. And then below that he writes:

"it will damage our ability to continue with reagent rental for five instruments, three in Venezuela and two in Bolivia, and one HBV customer in Bolivia as well."

Do you know what customer in Bolivia he's referring to?

A. No, I don't.

Q. Do you know when Co-Diagnostics began a practice of providing quarterly guidance?

A. I can't recall exactly which month, no.

Q. Do you recall if it was in 2021?

A. I believe it was in 2021.

Q. Do you recall if it was in the first half of 2021?

A. I don't recall exactly --

MS. BARROW: Objection.

THE WITNESS: I don't recall exactly when.

MR. URIS: Okay. I'm going to introduce as Exhibit 44 a document bearing Bates

Page 65

stamp CoDx_00005923.

(Exhibit 44 was marked for identification.)

BY MR. URIS:

Q. Okay. That should be available. It's Exhibit 44.

A. Got it.

Q. This is an email chain. The top email is from Brian Brown dated May 11, 2021, to Sawyer Lipari, Andrew -- and Andrew Benson, copying Mike Houston and Tyler Deur. Subject line: "Updated Earnings Release," and an attachment: "CODX 1Q21, Earnings Release_v4 BB COMMENTS."

To your knowledge, was this email reflected in this document received at the time indicated on this document?

A. I don't have any other reason to believe otherwise.

Q. And who is Sawyler -- Sawyer Lipari?

A. I believe she was one of our points of contact at Lambert.

Q. And who was Mike Houston?

A. Mike would have been our main lead at Lambert, our -- our -- our main -- our account manager representative. I'm not sure exactly how to

17 (Pages 62 - 65)

Page 66

describe him.

Q. Okay.

A. The main guy.

Q. And -- and who is Tyler Deur?

A. Another contact point there. I don't know exactly what his role was.

Q. And who from Co-Diagnostics primarily dealt with Lambert?

A. Me and Brian Brown.

Q. Take a look at Mr. Brown's email. He writes:

"See my attached changes. The guidance may still move a little as I massage it..."

Do you see that?

A. Yes, I do.

Q. Does this refresh your recollection that the company began providing quarterly guidance at least as early as May of 2021?

A. Yes, that appears to be the case.

Q. Typically, the company would provide guidance for the ongoing quarter approximately halfway through the ongoing quarter; correct?

MS. BARROW: Objection.

THE WITNESS: I don't know that I would describe it as halfway through the quarter. I think

Page 67

it was a little earlier than halfway to my recollection.

BY MR. URIS:

Q. Would you say maybe a -- a few days before the midpoint of the quarter?

MS. BARROW: Objection.

THE WITNESS: It just depends on the quarter. Some quarters it was five weeks in. Depending on when the reporting date fell, it would be within the first seven days of the second month of the following quarter, so not necessarily halfway, but could be within a -- a -- a week or two of -- of it or a week and a half or something.

BY MR. URIS:

Q. In the attachment to this email, the draft earnings release is dated May 13, 2021; is that correct?

A. That's what I'm seeing on here, yes.

Q. Is -- is May 13 approximately two days before what you would consider to be the midpoint of the second quarter of 2021?

A. Give or take, sure.

Q. And I know you -- you testified earlier that leading up to an earnings release, you would meet with Mr. Brown and Mr. Egan to discuss, you know,

Page 68

messaging for -- for the release.

Could -- could you just provide a little more context or -- or describe a bit how -- how Lambert fit into that process and -- and what their role was in preparing for an earnings release?

MS. BARROW: Objection.

THE WITNESS: Sure.

When we would have our update calls with Lambert, we would convey to them what our -- some of our -- our messaging objectives would be for the press release and for the -- for the earnings call, and Lambert would use some of the financial data that was provided and draft -- as well as -- the financial data that was provided as well as the -- the previous month's -- or previous quarter's press releases and other highlights to turn around the first draft of the press release, which they would then submit to us for our review.

I believe they would also draft Brian Brown's remarks for the earnings call, and I can't recall to what extent they would participate in -- in drafting Dwight's remarks.

BY MR. URIS:

Q. You mentioned "update calls" with -- with Lambert.

Page 69

Were those regularly scheduled update calls?

A. I would have regular, just -- yes, regular standup update calls with them.

Q. Were those calls weekly?

A. Typically, although not always.

Q. And who would typically participate in those calls?

A. Myself, usually Brian Brown, occasionally Dwight Egan.

Q. Would you take notes during those calls?

A. On occasion.

Q. And how would you take notes?

A. In a reMarkable tablet. It's a capital R, it's not -- just the name, not the description.

Q. And what -- what is that? I -- I assume it's a tablet, but I've never -- I've never heard of that.

A. It's a -- it's an E Ink tablet where you can take notes just like you would on a -- on a notepad.

Q. And then would you review your notes on the reMarkable tablet?

A. To the extent that I took notes and it was relevant to review them, then -- then I would review them.

Q. Do -- do you know whether your reMarkable

18 (Pages 66 - 69)

Page 70

tablet was searched for information --

A.  It was.  It was -- pardon me.  Didn't mean to talk over you there.

Q.  Yeah, I -- just do you know whether your -- your reMarkable tablet was searched for information related to this case?

A.  It was.  It was subject to discovery.

Q.  And did the -- do the notes that you take on a reMarkable tablet, are they -- if you were to go back and review them, are they displayed in -- in your handwriting or is it translated any way to, like, any kind of typeface?

A.  In my handwriting.

Q.  Is there any other way that you would take notes?

A.  Nothing comes to mind.

Q.  And so typically, is it correct that Lambert would do the first draft of the -- the press release?

MS. BARROW:  Objection.

BY MR. URIS:

Q.  I'll say --

A.  During what time period?

Q.  Let me clarify that.

I would say is it -- is it correct that Lambert would typically do the first draft of the

Page 71

quarterly earnings press release?

A.  That was my recollection, yes.

Q.  And do you recall whether they would do the initial first draft of Dwight's script for earnings calls?

A.  I don't recall whether they would or not.

I know there were definitely times that I drafted the first -- although I can't remember -- the first draft, although I can't remember which quarters.  And there have definitely been times when I have -- my involvement began with review of the draft, but I can't recall exactly when that would have happened or -- or by whom.

Q.  Do you recall whether Dwight Egan has a particular way he likes to say things on earnings calls?

MS. BARROW:  Objection.

THE WITNESS:  Can you explain what you mean by "a particular way" of saying things?

BY MR. URIS:

Q.  Do you recall any messages that were particularly important to Dwight Egan?

MS. BARROW:  Objection.

THE WITNESS:  What time period?

///

Page 72

BY MR. URIS:

Q.  In 2021 or 2022.

A.  It's hard for me to say what would be important for Dwight Egan or not.

Q.  Do you have an understanding of how Mr. Brown would determine any guidance that was going to be given publicly?

A.  I can't say for sure that it was a decision that was Mr. Brown's alone, but I -- I also couldn't speak to how that guidance was determined.

Q.  So Mr. Brown has never told you what he does in order to determine guidance?

A.  Again, I -- I -- I don't recall any specific method by which guidance was regularly determined on a monthly basis, whether there is a specific protocol or rubric that he followed along with -- with Dwight Egan in order to determine those numbers.  That was not my department to -- to be involved in specifically how those numbers were derived.

Q.  Do you know whether Dwight Egan was involved in deriving guidance?

A.  I believe he was.  I seem to recall him being involved in those discussions as we would need to discuss messaging and -- and what would be included.  But I can't recall specifically to what

Page 73

extent or by what means.

Q.  Leading up to the -- sorry.  Strike that.

Do you recall that there was an earnings release and call in May of 2022 with respect to the first quarter of 2022's results?

A.  I recall having an earnings call at that time for the previous month's quarter or the previous quarter's results.

Q.  And leading up to that earnings release, do you recall Dwight Egan, Mr. Brown, or yourself telling Lambert that demand for the company's tests had fallen?

MS. BARROW:  Objection.

THE WITNESS:  I don't recall such a meeting or a statement.

BY MR. URIS:

Q.  Do you recall any discussions internally at Co-Diagnostics leading up to that earnings release as to whether demand for the company's tests had fallen?

A.  I don't, no.  At -- at the time, and certainly all throughout the pandemic really, we understood sales to be -- to fluctuate on a -- on a month-to-month basis and the sales cycle to be cyclical.  But just the nature of the pandemic made it something that could be challenging to predict.

19 (Pages 70 - 73)

Page 74

And some quarters that would be easier than others, and then as the pandemic itself would evolve, we then would also have to sort of evolve our practices and -- and how we would communicate our expectations.

Q. Leading up to the May 2022 earnings call, do you recall any discussions of how sales were going to date in the second quarter of 2022?

MS. BARROW: Objection.

THE WITNESS: Yeah. I don't recall exactly what was discussed about sales to that point in that quarter, other than, like I said, my general recollection of a feeling as though sales were cyclical and -- and -- and -- and occasionally unpredictable and that there would be peaks and troughs. But I can't remember exactly what we would have discussed about Q2 at that point --

BY MR. URIS:

Q. And in --

A. -- in preparing for the Q-end remarks.

Q. In discussing guidance that would be discussed on the earnings call, is -- is sales to date in the ongoing quarter the type of thing that would be discussed?

MS. BARROW: Objection.

THE WITNESS: Again, I -- I can't recall

Page 75

exactly what it was that went in to determining what those -- what the guidance would be that would be given. It wasn't my job to determine the guidance, and so I can't really speak to what metrics were looked at in order to arrive at those numbers.

BY MR. URIS:

Q. Is sales to date in the ongoing quarter something you would consider to be important in determining guidance for the ongoing quarter?

MS. BARROW: Objection.

THE WITNESS: I suppose it depends on the quarter. It depends on the company. It depends on the sales cycle.

BY MR. URIS:

Q. Do you know what the company's sales were in the second quarter of 2022 as of May 12, 2022?

A. I don't recall what I knew at that point in terms of what -- what the sales numbers looked like. I would have had an idea roughly about January, but certainly, that was, at best, all I had.

Or wait. I'm sorry. During -- during what time period?

Q. May 12, 2022, do you know what the company's sales were as of that date in the second quarter of 2022?

Page 76

A. Pardon me. I -- I mean April.

Yeah. I -- I can't recall what I knew about the monthly -- or the quarterly sales in the beginning of May in 2022.

Q. Do you recall asking Mr. Brown what the company sales were as of that date in the second quarter of 2022?

A. I don't recall asking him that, no.

Q. Do you think that would be something important to ask him, being involved in discussions regarding guidance that would be given on that earnings -- in that earnings release?

MS. BARROW: Objection.

THE WITNESS: It wasn't up to me to determine what that guidance would be, and so there wouldn't be -- for me to ask Brian what the sales numbers were, to -- to what effect if I'm not the one that's giving the guidance?

So I -- I don't understand why I would be asking him what the sales numbers were in order to come up with numbers for guidance that I wasn't deriving myself anyways.

BY MR. URIS:

Q. Do you think knowing what the company's sales were as of May 12, 2022, in -- in this -- for

Page 77

the second quarter of 2022 was important information to know when providing input regarding any statements that the company would make regarding any guidance that they were going to give or not give?

MS. BARROW: Objection.

THE WITNESS: I don't -- I don't know that I would describe it that way. Like I said, we always saw sales as being something that was a series of -- of -- of peaks and troughs. And one month -- a previous month was never really predictive of what the following month was going to be. If you go back and look at the exhibit you shared earlier, you can always see that months would go up and down.

And so knowing that -- where -- where the company was at that given -- at that time wasn't necessarily predictive of where it was going to end up at the end of that quarter. And so I don't know that I would describe it in the way that you did, no.

BY MR. URIS:

Q. Do you think it would be important to compare where the company was at that time versus where the company was at that time -- was at that time in the prior year?

MS. BARROW: Objection.

THE WITNESS: I don't think so, no.

20 (Pages 74 - 77)

Page 78

BY MR. URIS:

Q. If the company's orders as of that time were $2 1/2 million and the company's orders as of that time in the year prior were over $9 million, you don't think that would be useful information?

MS. BARROW: Objection.

THE WITNESS: You know, it -- it's not really for me to speculate. I would say that -- that as a company, like, we were with fairly limited operating history that really only became profitable during this pandemic. We weren't a company with a 10- or 20-year operating history where you could look back and say, Okay, well, one quarter might be fairly predictive of the next quarter or certain prevailing headwinds might indicate this or that.

We were operating in a really challenging environment in -- you know, in this once-in-a-generation pandemic. And we simply weren't the kind of company where comparing prior year quarter was necessarily -- at least to my mind, and I can't speak to what would be important to anybody else. To me, that wasn't always necessarily a valuable metric because -- just because it happened to be occurring at the same time as the previous year, the entire landscape was changing regularly --

Page 79

regularly during the pandemic. It was -- vaccines were being produced and being -- being given en masse, and there were -- there were all kinds of different factors that played into it.

We just weren't the kind of company where you could look at one or two prevailing factors and say, Well, this is going to be predictive of -- of what things might look like, nor could you say, Okay, well, let's compare to a previous quarter, when the world was essentially entirely different the year before, as it was the year before that, as it was the year before that.

BY MR. URIS:

Q. From the -- the second quarter of 2020 through the first quarter of 2022, are you aware of any quarter for which the dollar value of the orders received for the company's tests was less than $5 million at the midpoint of any quarter?

A. I don't recall where we were at the midpoint of -- of those other quarters.

MR. URIS: I'm going to introduce what was previously marked as Exhibit 13, document bearing Bates stamp CoDX_00004432.

(Exhibit 13, having been previously marked, was discussed.)

Page 80

BY MR. URIS:

Q. Okay. That should be available.

A. Exhibit 00013; right?

Q. Yes.

A. Got it.

Q. This is an email chain. The top one is from Andrew Benson dated May 4, 2022, to Brian Brown. The subject line: "Fwd: Q1 CFO Script." An attachment: "1Q22 Earnings Called Script - CFO + Guidance 050322."

To your knowledge, was the email reflected in this document sent at the time indicated in the document?

A. I don't have any reason to think otherwise.

Q. If you look at the -- the bottom email from William Stack at Lambert to you.

Do you see that?

A. Yes, I do.

Q. And who is William Stack?

A. At this time, he was one of our account representatives at Lambert.

Q. And so he appears to be sending you a first draft of Mr. Brown's call script for the -- the May '22 earnings call; is that correct?

A. That's what it appears to be, yes.

Page 81

MS. BARROW: Objection.

THE WITNESS: Sorry.

BY MR. URIS:

Q. Okay. If you take a look at the attachment. In particular, if you could turn to the page with the Bates number ending in 438.

A. Okay.

Q. If you see in the -- the middle of the page, it -- it reads:

"Turning now to guidance.

"While we experienced strong demand for our products during the first quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result will be taking a more prudent approach to guidance for the second quarter of fiscal 2022."

Do you see that?

A. Yes, I do.

Q. And then there's a -- a comment bubble on that language with the initials WS.

Is it your understanding that that refers to William Stack?

A. That's what I would infer.

21 (Pages 78 - 81)

Page 82

Q. Okay. And then that comment says "Discuss."

A. Yes.

Q. So on or before May 3, 2022, which is the date that he sent you this script --

A. Yes.

Q. -- do you recall discussing with Lambert taking a more prudent approach to guidance?

MS. BARROW: Objection.

THE WITNESS: I don't -- I don't. I'm not sure even what -- what that phrase means, but I don't recall having a discussion with Lambert about a prudent approach to guidance.

BY MR. URIS:

Q. Do you think taking a more prudent approach to guidance means to guiding -- means guiding to a -- a more conservative number?

MS. BARROW: Objection.

THE WITNESS: I don't -- I can't really speculate what -- what he meant when he wrote that.

BY MR. URIS:

Q. When Lambert was doing a first draft of a script or a -- or a press release, they would typically try to incorporate comments that Co-Diagnostics had -- had given them in terms of messaging themes; correct?

Page 83

MS. BARROW: Objection.

THE WITNESS: It's my understanding that they would use feedback from us when they were drafting their -- generating their -- their first drafts. Not in every instance for every phrase, but in general.

BY MR. URIS:

Q. And you don't recall whether anyone at Co-Diagnostics had indicated to Lambert before this date that the company wanted to take a more prudent approach to guidance?

A. Again, I don't ever remember a discussion about a more prudent approach to guidance. I -- that -- that -- not sure exactly what he means by that turn of phrase. It seems, you know, something that maybe he would be able to respond to better than me.

He's also -- if you see that -- that -- he talks about --

(Clarification by the Reporter.)

THE WITNESS: I'll just say what I was saying and hope it fills in the blanks there.

But if you see the previous sentence, he also speaks about how our near-term visibility is restricted. All of these things, I would presume

Page 84

that he has determined as something that we might want to say, but I can't say exactly on what basis he made that determination. Either this was something that he is just inferring based on conversations that we had. I don't recall any specific conversations with him, though, about a more prudent approach to guidance.

BY MR. URIS:

Q. And do you recall any specific conversations on or before this date regarding challenges in the company's operating environment?

MS. BARROW: Objection.

THE WITNESS: I don't, no.

MR. URIS: I think I'm getting -- I think I'm getting pretty close to a -- a good breaking point.

Is now -- does now work? Or I could do one more document. I know it's a little bit before 2.

THE WITNESS: If you'd like to break, that's fine. I -- I'm fine doing one more document, but I'm happy to break now. I'm -- I'm -- I'm fairly indifferent.

MR. URIS: Okay. Why don't -- why don't we break now, if that works.

MS. BARROW: Okay. So how long do you want,

Page 85

Andrew? Half hour?

THE WITNESS: That's just fine, yep. We can meet in a half hour.

VIDEOGRAPHER: We're off the record. The time is 11:40.

(Lunch recess.)

VIDEOGRAPHER: We're back on record. The time is 12:24. This is Media No. 3.

Counsel may proceed.

MR. URIS: Going to introduce what was previously marked as Exhibit 14, document bearing Bates No. CoDx_00075094. And it should be available. It's Exhibit 14.

(Exhibit 14, having been previously marked, was discussed.)

THE WITNESS: Got it.

BY MR. URIS:

Q. This is an email chain, top email from Zachary Mizener sent May 4, 2022, at 2:02 p.m. to Brian Brown and Andrew Benson, copying Mike Houston and William Stack. "RE: Q1 CFO Script." Attachment: "CODX 1Q22 Earnings Release v1 (5-4-22)."

To your knowledge, was the email reflected in this document received at the time indicated on the document?

22 (Pages 82 - 85)

Page 86

A. I don't have any reason to believe that wouldn't be the case.

Q. If you could take a look at Mr. Brown's email at the bottom of the page that goes on to the second page, he appears to be asking Lambert when -- when we can expect to see the first draft of the earnings release.

And then is your understanding that in the top email, Mr. Mizener is -- is sending the first draft of the earnings release?

MS. BARROW: Objection.

THE WITNESS: That appears to be the --

Sorry, go ahead.

That appears to be the case.

BY MR. URIS:

Q. If you could take a look at the attachment, there is some language highlighted in the draft, including the language under "Second-Quarter 2022 Outlook:"

Do you see that?

A. Yes, I do.

Q. And then if you go back to the top email from Zachary Mizener, he writes:

"Please find our first draft attached. We can review/discuss on the call in 30."

Page 87

Do you recall whether that call occurred?

A. I don't have any specific recollection of a call from that long ago.

Q. Is it fair to say that you don't -- you don't recall whether the highlighted guidance language was discussed on that call?

A. Typically it was the case when we received a -- a draft of something from -- from our consultants, if they highlighted something, it would be something that they were specifically saying -- you know, it was generally something that -- that they weren't sure about, and they wanted to call it to our attention to -- to make sure that it was being -- make sure that it was being discussed because it was sort of their, you know, best guess or something. I'm not -- I'm not sure exactly how -- how to describe it, but if -- sounds like we had a call planned, and I don't recall it -- if we had that -- well, on that call, we certainly would have discussed what was included in this -- in this draft, specifically the -- the highlighted sections, I would imagine. I -- I can't remember specifically, though.

Q. You don't recall specifically what was discussed about that highlighted section?

MS. BARROW: Objection.

Page 88

THE WITNESS: Yeah. Like I said, I -- I don't remember the call, and I don't remember the specifics of it, other than if something was highlighted and we sat around, we would -- it would have been our normal -- in the normal course of events, we would have -- we would have discussed it, so ...

In this particular case, I can't say.

MR. URIS: I'm going to introduce what was previously marked as Exhibit 15, document bearing Bates stamp LAMBERT0000769.

(Exhibit 15, having been previously marked, was discussed.)

BY MR. URIS:

Q. And that should be available.

A. Okay. Got it.

Q. This is an email from Mike Houston sent May 4, 2022, at 8:44 p.m. to Brian Brown, copying Andrew Benson, William Stack, and Zachary Mizener with the subject line "Guidance Considerations."

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A. I -- yeah. I don't have any reason to believe otherwise.

Page 89

MS. BARROW: Jason, to clarify, it doesn't look like there's a "From" on the top.

Are you assuming it's from Mike from the signature block on the bottom?

MR. URIS: That's correct.

MS. BARROW: Okay.

THE WITNESS: Yeah. Again, I -- I don't have any reason to believe otherwise.

BY MR. URIS:

Q. If you look at the email, Mr. Houston writes:

"Hi Brian,

"Following up on our call yesterday, I wanted to outline a few considerations as you prepare to discuss guidance with the Board. Happy to chat through any of these ahead of the Board meeting on Monday."

Do you recall around this time Mr. Brown was preparing to discuss guidance with the board?

A. I don't really know what Mr. Brown would have been preparing to discuss there.

Q. Do -- do you know whether guidance was typically something that Mr. Brown discussed with the board?

MS. BARROW: Objection.

23 (Pages 86 - 89)

Page 90

THE WITNESS: Like I said, I -- I'm not really sure exactly how -- you know, by -- by what mechanism the numbers that were reported for guidance were generally reached. If it normally involved a board discussion or not, I'm -- I'm not really sure.

BY MR. URIS:

Q. Do you recall whether there was a board meeting around this time at which guidance was discussed?

A. I never attended any of the board meetings, so I don't know what would have been discussed at them.

Q. Do you recall whether around this time Mr. Brown told you he was going to be discussing guidance with the board?

A. Whether Mr. Brown said what?

I'm sorry. You -- I lost you for a second.

Q. Do you recall whether around this time Mr. Brown told you that he was going to be discussing guidance with the board?

A. I don't recall that specifically, no, or generally.

Q. Okay. And if you look in the email, Mr. Houston writes:

"Alternatives to providing Q2 guidance in the

Page 91

earnings call and release:"

And then appears to list four different alternatives.

Do you know why alternatives to providing Q2 guidance were being explored at this time?

MS. BARROW: Objection.

THE WITNESS: My recollection at the time was, again, kind of like I've said earlier, things were just much more volatile and unpredictable at this point than we had experienced before. The pandemic was continually evolving, and we sort of took -- we'd only started offering guidance about a year or so before this, and so it was something that we were continually evaluating on a -- you know, on a per-quarter basis.

So I can't recall specifically any of the details here, other than just that general sense of coming off of omicron and seeing these peaks and troughs and these -- these spikes. There were a lot of factors at play, and I remember that it was -- it was more difficult to -- to -- to feel like we had visibility in what things were going to be looking like.

But to your specific question, I don't rem- -- recall an exact specific conversation about

Page 92

it.

BY MR. URIS:

Q. And when you say things were "volatile," what are you referring to?

A. Just the changing market conditions. The world was, you know -- we were still in this pandemic. I just knew what we were seeing as far as numbers of infection rate --

(Audio interruption.)

(Clarification by reporter.)

THE WITNESS: -- infection rates, hospitalization, death rates, we had -- you know, we could see what those numbers were.

But there were a lot of -- a lot of factors at -- at play here. And we weren't totally sure, you know -- well, there were a lot of factors at play, and -- and it was hard for us to predict exactly which ones were going to have the most effect on what our sales were going to look like. It was a world that none of us had ever experienced before.

And when we would see fluctuations in sales, we just assumed that was always the case. We assumed that, you know, ups would be followed by downs and downs vice versa on a -- on a month-to-month basis or a quarter-to-quarter basis.

Page 93

And so feeling as though like we didn't have that visibility into it here is sort of, like, the general sense that I recall, but I don't remember, like, the exact specific details about what it was that would have caused Mike to -- to send this email to us and -- and to make these proposals.

BY MR. URIS:

Q. Do you recall what the infection rates or hospitalization rates looked like at this time?

A. I don't recall.

Q. Do you recall anything specific about any factors that -- sorry. Strike that.

Do -- do you recall anything -- do you recall any specifics or details about things you were seeing in the market that caused the company to think that visibility was reduced going forward?

MS. BARROW: Objection.

THE WITNESS: Yeah. I mean, I -- I -- I don't -- I don't recall exactly. I know that -- that there had been vaccines that now, at this point, had been on the market for roughly a year, give or take. We anticipated that would have an effect on sales, but we weren't sure exactly what, as -- you know, as -- as that vaccine adoption rate continued to tick up.

24 (Pages 90 - 93)

Page 94

But we'd also just been through omicron, and that was not the first variant, but it seemed to be the worst. And we didn't know if these waves were going to keep getting bigger. It was -- you know, omicron caught everybody by surprise. And we didn't know when there was going to be another omicron, but we assumed there would be. All we had seen from this virus was more variants and variability.

Our mix was, you know -- I -- I don't exactly recall what the percentage was between domestic and international, but those markets were also just different. I mean, the -- the international markets reacted differently, as I recall, to -- you know, in -- in some respects than the domestic markets.

And so there was just a lot happening at that time, and we didn't -- you know, we didn't -- we didn't feel comfortable or we didn't feel like it would be the responsible thing to do to take a guess if we didn't have an idea what it was going to -- what it was going to convey. Like, we had a responsibility to our shareholders to communicate accurately and honestly, and if we don't feel as though we have the ability to do so and for it to be accurate, then we're not going to say something that

Page 95

we feel is -- is -- is not accurate.
BY MR. URIS:
Q. You had mentioned that there was always the possibility that a new variant would pop up.
Isn't that the case in all quarters?
MS. BARROW: Objection.
THE WITNESS: Like I said, we -- we'd just been through omicron, and omicron had a much more surprising effect than anybody had predicted.
It's easy to look back in hindsight now and -- and -- you know, and feel like we've learned a lot. But when we were there in the moment, experiencing it all together, it was totally unpredictable and nobody knew what was going to happen next. And omicron was considerably more than anybody expected. We didn't know if there was going to be another one next week or next month, whether it was going to cause a spike, whether it be just a slight rise. It was -- it was so hard to read.
Those variants weren't something that we were constantly thinking about, you know, in the first year. In the first year, we were just dealing with lockdowns and buying toilet paper. You know, and then by the time we're here into 2022 and this is now a part of our life, we're seeing more and more

Page 96

variability as we were reading in the news and -- and monitoring industry news about how some variants could escape a vaccine which hadn't even existed, really, a year before that.

So the landscape was just always continually evolving, always continually different. There was risks of variants, but those risks were greater or less depending on what specific time point you want to zero in on. There were vaccines available, but more or less adoptability, again depending on -- on which specific time you look at.

So we didn't feel like you could look at one quarter, one month and feel like that that would be predictive of the following quarter or the following month. Or looking at prior year quarter and saying Oh, well, there were -- you know, there were variants back then, too, because it was -- it was just an evolving, volatile pandemic that -- that we were still all trying to alter and navigate together.
BY MR. URIS:
Q. You didn't think you could look at the sales history over the prior few months to make a prediction as to what revenue might look like at the end of the quarter?
MS. BARROW: Objection.

Page 97

THE WITNESS: Again, it wasn't really my role to make revenue predictions or to give guidance, so I can't really say what somebody else would have done.
But like I've said in the past, like, you couldn't -- that directly speaks to what I just said, like -- like, you couldn't ever really look at a prior month or two months and use that -- rely on that to be predictive of what was going to happen. And that was the case since the beginning. It was -- it was always ups and downs and peaks and troughs.
BY MR. URIS:
Q. But the -- but the company had previously provided guidance even though there was always ups and downs and peaks and troughs; right?
MS. BARROW: Objection.
THE WITNESS: I don't think it's fair to say the company had always provided guidance. Remember, we had only started giving it maybe a year or so before this, and prior to that, it wasn't something that we had felt comfortable doing. It was something that was continually being evolved on a month-to-month or on a quarter-to-quarter basis.
So no, I don't think it's fair to say the company had -- had always done that.

25 (Pages 94 - 97)

Page 98

BY MR. URIS:

Q. Well, the company had -- had at least provided guidance in each quarter for the past year; correct?

MS. BARROW: Objection. Asked and answered. Argumentative.

THE WITNESS: Yeah. I -- I can't recall exactly when we began providing guidance. But like I said, it's -- it was on a -- on a continually evolving, continually -- on a month-to-month review-type basis. We hadn't before that, and for a period of time we felt we had a degree of comfort that -- of -- in our predictability, and that simply wasn't always the case.

BY MR. URIS:

Q. Do you recall whether there was any specific variant that the company was concerned about that was concerned might arise in the near future that was impacting visibility?

MS. BARROW: Objection.

THE WITNESS: I don't recall any concerns about any specific variants at that time specifically.

BY MR. URIS:

Q. Do you recall --

Page 99

A. Just in general.

We didn't really know what a variant was going to be in advance. That was sort of how the whole thing worked.

Q. Do you recall if at this time there was concerns about variability that was specific to this quarter?

A. Can you explain what you mean by "variability"?

Q. Well, I -- I think in your answer, you kind of generally said that this was a very volatile time in terms of what you were seeing in the market and -- and variants that could arise.

I'm just asking if there were any specific concerns about volatility in the market that you were seeing that -- that were specific to that quarter in particular.

MS. BARROW: Objection.

THE WITNESS: Yeah. I -- again, like I -- we weren't predicting a specific variant in advance that we -- I mean, if anybody could predict a variant in advance, the world would have been a wildly different place.

But in this particular order, in terms of variability, I think it's just as I stated, that it

Page 100

was an evolving situation with a pandemic, an evolving situation with our company. And to the extent that we had a degree of comfort that we could rely upon -- give responsible predictions that we felt would be, you know, ingenuous and -- and -- and -- and would communicate honestly and fully to the market, we did so. When it got to the point where we felt like it would be irresponsible to do so, we didn't.

I think it just -- I -- it was not my determination whether we would provide guidance or not, so ...

BY MR. URIS:

Q. And you don't recall any specific concerns at this time that caused the company to feel that it was -- it would be irresponsible to provide guidance other than volatility in the market?

MS. BARROW: Objection.

THE WITNESS: I'm -- I'm not sure exactly what you're asking, but it was -- again, I feel like it's trying to get at the same question different ways. But yeah, I mean, it was -- to the extent that we felt like we could have a degree of comfort in our predictions based on the prevailing factors, we relied on those. And to the extent that we didn't,

Page 101

we stopped doing so.

But I don't recall anything specific about this quarter other than what I said, which is peaks and troughs and ups and downs. We -- our experience over the past two years had always been downs were followed by ups, and the -- you know, the -- the frequency between those -- those -- those troughs would vary. But so would the amplitude of those -- of those waves. So we just felt it was all just part of the cycle.

BY MR. URIS:

Q. Okay. If you look at the email, the -- the first alternative is:

"Pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results"

Excuse me.

There's a sub-bullet under that:

"This path will raise the most questions, but could be viewed as more positive than guiding to a figure and coming up very short"

Do you recall whether there was a concern at the time of guiding to a figure and coming up very short?

A. I don't recall that specific concern, beyond

26 (Pages 98 - 101)

Page 102

the context of not being able to reliably produce a number that we felt we could stand by full stop, whether we would come in with something that would end up being way lower than -- than we had anticipated because of a variant or because of a -- a larger push in the Southern Hemisphere or in different -- in different areas. Or if we would give a number that would be higher, and then it would be lower than we had anticipated for other -- you know, for -- for other factors that we couldn't -- that we couldn't predict.

So I don't remember anything specifically beyond kind of whatever I said there.

Q.  Okay.  And then the second alternative is:
"Convert quarterly guidance to annual
guidance, citing similar uncertainty to the
above scenario"
Then there's a sub-bullet:
"Guiding to an annual figure would tip your
hand to investors that you'll likely have a
soft quarter, or two, and provide some air
cover during the soft quarters"
Do you recall anyone from Co-Diagnostics telling some -- anyone at Lambert that Co-Diagnostics was likely to have a soft quarter or two?

Page 103

MS. BARROW:  Objection.

THE WITNESS:  Yeah.  I -- I don't remember specific conversation about that, no.

BY MR. URIS:

Q.  If you look at the third sub-bullet point under the second alternative, it says:
"This will also allow you to directionally
provide guidance on Q2, stating that Q2 is
off to a slow start without having to provide
a specific number"
Do you recall whether anyone from Co-Diagnostics told anyone from Lambert that Q2 was off to a slow start?

MS. BARROW:  Objection.

THE WITNESS:  Yeah.  I -- I don't -- I don't recall a specific conversation about that.

BY MR. URIS:

Q.  Do you think Mike Houston would put this in an email if he wasn't told that?

MS. BARROW:  Objection.  Calls for speculation.

THE WITNESS:  Yeah.  I can't really speculate what Mike Houston would say.

To me, when I read this, I see Mike basically saying there's -- I mean, company aside,

Page 104

there's four options, basically; right?
You can not pull guidance at all, you can switch to annual, you can give something lower, or you can just, you know, shoot high.  And he's -- I mean, I can't think of any four options that would apply -- I can't think of a fifth option other than that; right?  And so I just see him as breaking down the kind of pros and cons of each one here specifically or each one here in general.

BY MR. URIS:

Q.  Do you agree that the thrust of this email is that there seems to be a concern that the company would not meet whatever guidance they put out?

A.  I -- I think that was the concerns related to one of those -- one of those bullets.

Q.  If you'll look at the -- under the --

A.  That was -- that was -- that was a potential outcome of one of the options that he was presenting here.

Q.  Okay.  If you look at the third alternative, he writes:
"Keep quarterly guidance but lower your
estimates to a range that you believe is 95%
achievable"
And then below that, he writes:

Page 105

"While it would have a negative impact on the
share price, it's better to take your lumps
up front and maintain your credibility"
Do you know what Mr. Houston meant by lowering your estimates to a range that you believe is 95 percent achievable?

MS. BARROW:  Objection.

THE WITNESS:  And I would surmise it's basically just what it sounds like there, lowering the range to a degree that we thought was 95 percent achievable.  That would -- I mean ...

Just feels like it -- it's exactly what it says.  I would just kind of take it as face value.

BY MR. URIS:

Q.  Did Mr. Brown ever tell you what range he thought might be 95 percent achievable for the second quarter of 2022?

A.  I don't recall a conversation about that.

Again, my -- my recollection at the time was specifically revolved around just, like, the volatility and unpredictability of it all.  Not that there was any specific number in mind.

It was not uncommon -- well, anyways, sorry.  Yeah, go ahead.

Q.  And then when he says:

27 (Pages 102 - 105)

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 106

"While it will have" --

He says:

"While it will have a negative impact on the share price, it's better to take your lumps up front and maintain your credibility"

Do you know what he means when he says "it will have a negative impact on the share price"?

MS. BARROW: Objection.

THE WITNESS: Yeah. I mean, I would basically say, again, it's probably just what it says. If we -- if we give lower guidance, then -- you know, in -- in May, then the market would probably react negatively in a -- in a way that would be reflected in our share price.

I mean, if you --

BY MR. URIS:

Q. So --

A. -- predict lower numbers, then there would be more sellers than buyers for a period of time in your stock.

Q. So this alternative is contemplating lowering guidance to a level that's below what the market is currently expecting?

A. I can't speak exactly to what that -- you know, what he would have had in mind when he -- when

Page 107

he wrote that. It just says lower estimates. I can't say whether it would be lower than what the market was expecting. If he's lower than what -- what the market was expecting or lower than we'd had in previous quarters, I -- I don't know.

Q. Well, all else being equal, would lowering estimates have a negative impact on the share price unless it was below what the market was currently expecting?

MS. BARROW: Objection.

THE WITNESS: I can't really speak to the vicissitudes of the -- you know, of the public market. It's very unpredictable.

MS. BARROW: Jason, if you're done with this document, can we take a restroom break soon?

MR. URIS: Yeah, once I'm done with it.

BY MR. URIS:

Q. All else being equal, would you expect lowering guidance to a level below what the market was anticipating would have a negative impact on the share price?

MS. BARROW: Objection.

THE WITNESS: I mean, again, I -- I -- I just don't know. There's lots of things that impact what would happen with the share. Sometimes we would

Page 108

miss estimates and the market would go up. Sometimes we'd put out results that, you know, we were worried, and the market would go up. Sometimes we'd put out results that we thought were absolutely incredible. We thought, you know, we were beating all over the place, and the market would go down. I had no control over it and no ability to predict it.

BY MR. URIS:

Q. Right. My -- my question was just about providing guidance that was below the current expectation.

A. Oh, I mean, that's -- that's -- that's what -- what Mike is saying here, that if you lower guidance, then it's going to have a negative impact on your share price. But, I mean, it just sort of depends. I don't know.

Q. And if you look at the fourth option, fourth alternative, he writes:

"Guide to $17-19 million in topline with the hope that you come close because you've done so before"

And in the second sub-bullet under that, he writes:

"Need to ask yourself if a reasonable person (SEC official or class action lawyer

Page 109

scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter"

Do you see that?

A. I do.

Q. Do you know what he means by that?

MS. BARROW: Objection.

THE WITNESS: By which part of it?

BY MR. URIS:

Q. Let's just focus on the end of it, when he refers to "despite the weak start to the quarter."

Do you know what he's referring to?

MS. BARROW: Objection.

THE WITNESS: Yeah. I -- I can't really speculate what he was talking about. He might have been referring to what the sales numbers looked like, but -- to that point, but it's -- it's hard for me to say. I didn't -- I didn't write the email.

BY MR. URIS:

Q. Okay. So if we just look at each of these alternatives, in the first alternative, he references "guiding to a figure and coming up very short."

Under the second alternative, he references tipping "your hand to investors that you'll likely

28 (Pages 106 - 109)

Page 110

have a soft quarter, or two." And he also says -- refers to "Q2 is off to a slow start."

In the third alternative, he references "lowering your estimates to a range that you believe is 95% achievable," which would have a "negative impact on the share price."

And then under the fourth alternative, he references "the weak start to the quarter."

So isn't it correct that in all these alternatives, the -- the concern seems to be that sales are down and the company might not meet any guidance that they put out?

MS. BARROW: Objection. Mischaracterizes the evidence.

THE WITNESS: Yeah. That -- that's not -- that's not my read on it at all.

My read on it is very much more just we just can't predict it. Like I said, I mean, we didn't choose the option of lowering; right? And we know that, you know, whether you put out good sales numbers or bad sales numbers, whenever you do it, like, it's going to have whatever effect it's going to have whenever it happens.

We didn't choose any of these options, except for the first one, because that was the one

Page 111

that we felt was most responsible. It wasn't because we were worried it was going to be low or we thought it might be higher. It was simply because all of those together tell the story of an unpredictable, volatile situation.

And we had to go with what we thought was the most responsible action to communicate to our shareholders. And that wasn't to take a guess on a number that was too low or a number that was too high or to stretch it out over the year.

Any -- any one of those options would have been more irresponsible than -- to our mind than to just be honest and say, We can't -- we can't read where this is going.

BY MR. URIS:

Q. Well, if you thought there was a chance that sales might be above guidance, why wouldn't you just lower guidance and then hope to beat that lower guidance?

MS. BARROW: Objection.

THE WITNESS: Well, again, it wasn't -- it wasn't my role to determine what guidance we were going to give as a company.

But all I can speak to is our responsibility in our communications with the public market, with

Page 112

the shareholders, which is not to just take a guess, not to just throw something against the wall and hope we get there.

And I don't find it to be responsible to put a woefully low projection and then beat it by a substantial margin. That doesn't look responsible for a company either to do that.

A company has a responsibility to do what's, best to give the best number that it can. And if that -- if your best guess is, We can't give a number that we can accurate -- that we feel like we can responsibly stand behind, then it's the company's responsibility to not give a number.

BY MR. URIS:

Q. Do you recall any discussions around this time where either Lambert or internally suggesting that the company might -- the company's result -- sales in the second quarter of 2022 might exceed what the market was currently expecting?

A. I don't recall that discussion, but I also don't know that I could recall what the market would have been expecting at that time anyways.

Q. Do you recall any discussions around this time, either internally or with Lambert, suggesting that the company might have a strong second quarter

Page 113

in 2022?

A. Again, I don't really recall what any of those discussions would be other than what I said where we were just kind of focused more on it being unpredictable and all -- all these different factors at play.

People going back to -- to -- to normal life, but then interacting more in person, how much effect was that going to have? We didn't know. What was the relative vaccination rates in different -- you know, in different areas? How was that going to impact -- affect our sales mix? We didn't know.

I mean, that -- what -- my recollection of this was certainly more so around just the volatility and -- and unpredictability -- unpredictability more so than exactly what number we were going to hit at. And if -- if the latter was the case, then we would have maybe had some concerns about missing it or not or having a -- a high quarter or low quarter. It was more just like, Where is this going?

Q. Do you recall whether either you or Mr. Brown or -- do you recall whether you or Mr. Brown ever pushed back in any way on Mr. Houston's statement that the company would likely have a soft quarter or two?

29 (Pages 110 - 113)

Page 114

A. I don't -- I don't sit -- remember sitting down and discussing, you know, every single one of these bullets individually, or -- I mean, I don't -- I don't remember seeing this email at all from two and a half years ago. I -- I don't recall exactly what any discussion specifically related to it would have looked like.

Q. You don't recall seeing an email from your IR consultant saying that the company was likely to have a soft quarter or two?

MS. BARROW: Objection.

THE WITNESS: Correct. I -- you know, at any given day, I receive 50 emails, and my mind simply isn't good enough to remember the thousands of emails I've received over the last, you know, two and a half years.

MR. URIS: Okay. Do we -- do we want to take a short break?

MS. BARROW: (Nods head.)

THE WITNESS: Sure.

MS. BARROW: Yeah. We can just do five minutes, so 07 or 08.

MR. URIS: Sounds good.

THE WITNESS: 08, yeah.

VIDEOGRAPHER: We're off the record. The

Page 115

time is 1:03.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record. The time is 1:09. This is Media No. 4.

Counsel may proceed.

MR. URIS: I'm going to introduce what was previously marked as Exhibit 16, document bearing Bates stamp LAMBERT0002146.

(Exhibit 16, having been previously marked, was discussed.)

BY MR. URIS:

Q. Okay. That should be available.

A. 00016; is that right?

Q. Yes.

A. Okay. This.

Q. This is an email chain. Top email from mhouston@lambert.com sent May 6, 2022, at 8:52 p.m. to Brian Brown, copying Andrew Benson, William Stack, and Zachary Mizener. The subject line: "Guidance Considerations."

Would you take a look at Mr. Brown's -- I guess, before I get into that, to your knowledge, was the email reflected in this document received at the time indicated on the --

(Audio interruption.)

Page 116

(Clarification by reporter.)

BY MR. URIS:

Q. -- document?

A. I don't have any reason to believe otherwise.

Q. And then if you look at Mr. Brown's email on May 6, 2022, at 2:08 p.m., he writes:

What -- what are your --

He says:

"What are your thoughts for the reasoning that would be presented best?"

Do you see that?

A. Yes, I do.

Q. And in response, Mr. Houston writes:

"Sounds good. Let me give that some thought and get back to you over the weekend. I'll do some research on what others have been saying."

Do you have an understanding of what he meant by "I'll do some research on what others have been saying"?

MS. BARROW: Objection.

THE WITNESS: I could only speculate. I would imagine he's referring to other diagnostics companies related to their earnings releases, which

Page 117

wasn't uncommon for us to look and see what -- what other companies were -- were doing. But I -- I can only speculate. I -- I don't know for sure.

MR. URIS: Let me introduce what was previously marked as Exhibit 17, document bearing Bates stamp CoDx_00506169.

(Exhibit 17, having been previously marked, was discussed.)

BY MR. URIS:

Q. That should be available.

A. Got it.

Q. And this is an email chain. Top email is from Mike Houston dated May 9, 2022, at 9:05 p.m. to Brian Brown, copying William Stack, Zachary Mizener, and Andrew Benson. Subject line: "RE: Guidance Considerations," and two attachments.

A. Yeah, I see it.

Q. Would you take a look at -- if you turn to the page of the document with the Bates number ending in 171, there's an email from Mike Houston, and he writes:

"Hi Brian,

"We'll defer to you on which of the below reasons could be" --

A. Yes, I do.

30 (Pages 114 - 117)

Page 118

Q. -- "rationale for pulling guidance completely. Some are likely a stretch, but we included them anyways to at least spur discussion. LMK if you want to discuss on Monday before the Board meeting."

Do you see that?

A. Yes, I do.

Q. Is your understanding that these reasons are -- are the result of his research on what other companies were saying?

MS. BARROW: Objection.

THE WITNESS: I can't say really. I -- I'm not sure exactly what the chain of events was that led to this email coming in and when the other ones had -- the -- the other exhibits had been sent. And so I -- I can't -- I mean, I -- I can only really speculate. It's hard to see it without that -- that context.

BY MR. URIS:

Q. So if -- if you want to reference Exhibit 13 --

A. Yeah.

Q. -- you can go back to it, or -- or I'm happy to represent to you that the email where Mike Houston said he was going to get back to you over the weekend

Page 119

was sent on May 6, 2022.

A. And this is on May 8th. Okay.

It -- again, I could speculate. That seems like something that -- that I could infer, but I can't -- I can't say for sure because I wasn't the one writing the email or -- or doing the research.

Q. Do you recall if that was your interpretation at the time?

A. I don't specifically recall what I would have been thinking when I read this email.

Q. Looking at it now, would it be --

(Audio interruption.)

(Discussion held off the record.)

VIDEOGRAPHER: We're off the record. The time is 1:16.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record. The time is 1:31.

Counsel may proceed.

BY MR. URIS:

Q. I believe you had -- had said before we went off the record that looking at Mr. Houston's Sunday, May 8, 2022, email, today you could draw a logical conclusion that that was the result of the research he said he was going to do?

Page 120

A. It appears to be that's what's -- that's what's being said here, but that's -- that's all I can say from here.

Q. Okay. And then if you look at Mr. Brown's email that starts on the page prior, his Sunday, May 8, 2022, email at 6:31 p.m., he says, "I suggest we frame this around the following:" and then lists three bullet points.

A. Which page is that?

Q. It -- it's on the page with Bates number ending in 170.

A. Okay. What was that question again?

Q. Do you see his email?

A. Yes, I do. Yes.

Q. Okay. In the -- in the second bullet point -- well, I guess at the top, he says, "I suggest we frame this around the following:" and then lists three bullet points. The second bullet point is:

"Timing of orders in a particular quarter and how they are fluctuating greatly due to significant fluctuations in testing requirements in various geographic locations."

Do you see that?

Page 121

A. Sorry. Is this still on Bates No. 17 -- ending in 170?

Q. Yes.

A. Okay, yes. The second bullet. Okay, I see it now. Yeah. Sorry. Yeah.

Q. Do you know what he's referring to when he says the "Timing of orders in a particular quarter"?

MS. BARROW: Objection.

THE WITNESS: I -- I can't really speculate as to what he was saying there. I would imagine it's just taking it at face value, timing of orders in a particular quarter and how they're fluctuating.

BY MR. URIS:

Q. Do you recall in what way the -- the timing of orders was fluctuating at that time?

MS. BARROW: Objection.

THE WITNESS: No, I don't.

BY MR. URIS:

Q. You don't know what --

A. I -- I mean, I -- I can't -- I don't recall specifically that -- I don't have a specific recollection of -- of orders fluctuating, but I don't recall specific -- I mean, I'm -- I'm not sure what he meant by this when he was saying it, because I'm -- I'm not the one that -- that wrote it. So I

31 (Pages 118 - 121)

Page 122

don't have a specific memory of orders fluctuating in a -- in a quarter.

I know it was always the case that orders would -- you know, that -- that one month would be -- would be different than the previous or regularly the case. But sometimes those fluctuations were greater than others.

Q. Okay.

A. So I can only assume that's what he's talking about here.

Q. Right. But here, he seems to be suggesting that at this time, there's -- there's -- there's more fluctuation than usual; correct?

MS. BARROW: Objection.

THE WITNESS: I think it's fair to say that it was a volatile time with lots of fluctuations in a quarter. And I think that's what he's -- it -- it appears to be that's what he's commenting on here.

BY MR. URIS:

Q. Do you think by "fluctuations," he was referring to there being less orders than you might otherwise have expected?

MS. BARROW: Objection.

THE WITNESS: I think it -- if you look at his final bullet there where he says, "I don't want

Page 123

to put out guidance that I don't feel is accurate," I think that's really what he's speaking to here. It's not whether it's going to be necessarily lower or necessarily higher, just that it's more unpredictable. But I can't really speculate as to what -- what he meant when he wrote it.

BY MR. URIS:

Q. You don't know whether he's referring to putting out guidance in the 17 to 19 million range?

MS. BARROW: Objection.

BY MR. URIS:

Q. When he says he doesn't "want to put out guidance that I don't feel is accurate"?

MS. BARROW: Objection.

THE WITNESS: Again, I don't know what he's speaking to there, if he's speaking to putting out guidance that is lower than we had in the previous quarter or if he's speaking about -- if he's talking about putting out guidance in the 17 -- 17- to $19 million range. He doesn't specify and I can't speculate.

I can only assume -- I mean, I -- I -- I infer from it that he's really just talking about just the fluctuations, not that it's going to be lower or higher because that's the words that he

Page 124

wrote. It's not the lower, higher. He's just talking about the fluctuations in what I'm reading here.

BY MR. URIS:

Q. Okay. And then -- and then below the -- the bullet points on the next page, he writes:
"Andrew - what thoughts do you have on what we can point to as we pull back on guidance."
Do you see that?

A. Yes.

Q. And then he says:
"I will use these and discuss with the board tomorrow."
And then in the email above that, you write:
"I also thought the bullet point about the mask mandates being dropped while variants continue to surface and spread is insightful and accurate, especially X-US."
Do you see that?

A. Yes, I do.

Q. And what do you mean when you say "X-US"?

A. Just outside of the United States.

Q. Okay. Then the email above that, the May 9, 2022, email from Brian Brown at 4:22 p.m., he writes:
"Mike and Team -

Page 125

"The board is up with not giving guidance but providing some good reason in the script and on the earnings release. Can you" -- "Can you guys take the first stab at writing this?"
Do you see that?

A. Yes, I do.

Q. So did you understand that to mean that the -- the board was okay with not giving guidance as long as a good reason was provided?

MS. BARROW: Objection.

THE WITNESS: I don't recall what I would have understood this to mean at the time when I received it.

BY MR. URIS:

Q. And at this time, you appear to -- you were still working through what -- what reasons would be given in the script and on -- in -- in the earnings release; correct?

MS. BARROW: Objection.

THE WITNESS: I don't know exactly where we were at in our process at this time. Brian is making reference to that, but I can't recall exactly where -- or Brian appears to be making reference to that, but I can't say exactly what he's saying.

32 (Pages 122 - 125)

Page 126

BY MR. URIS:

Q.   Okay.  If you look at the top email from Mr. Houston, he writes:

"Revised versions of the script and release attached."

A.   Okay.

Q.   If you take a look at the -- the press release which starts on the page ending in -- with the Bates number ending in 174.

A.   Okay.

Q.   And there is a redline in the press release that reads:

"While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States as well as persistently low vaccination rates in many parts of world.  As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results.  For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the

Page 127

future ...."

Do you see that?

A.   I'm sorry.  As soon as you finished the quote, I -- I -- you cut out, so I --

Q.   I just said did you -- do you see that -- do you see that quote?

A.   I do see it, yes.

Q.   And so is it your understanding that Mr. Houston added this language to the press release based on the conversations that -- based on the conversations between Lambert and -- and you and Mr. Brown?

MS. BARROW:  Objection.

THE WITNESS:  I'm not sure why he added it. I can't recall specifically what -- well, I -- I mean, I -- I can't speculate as to what was in his head when he included it in here in the first place, so it's hard for me to say what his specific motivations were.

BY MR. URIS:

Q.   Just that it seemed to follow from the discussions in -- in this email thread; correct?

MS. BARROW:  Objection.

THE WITNESS:  I would agree it does seem to follow that.

Page 128

MR. URIS:  Okay.  I'm going to introduce what was previously marked as Exhibit 18, document bearing Bates stamp CoDx_00463646.

(Exhibit 18, having been previously marked, was discussed.)

BY MR. URIS:

Q.   Okay.  That should be available.

A.   This is 00018; right?

Q.   Yes.

A.   Okay.

Q.   This is an email chain.  The top email from Zachary Mizener sent May 9, 2022, at 8:15 a.m. to Brian, Andrew Benson, and William Stack, copying Seth Egan and Mike Houston with the subject line: "Re: Call to discuss coverage," and an attachment.

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A.   Yeah.  I don't have any reason to think it wouldn't have been.

Q.   And if you turn to the page with the Bates number ending in 648, there is a -- towards the top, there is an email from Mr. Brown on Sunday, May 8, 2022, at 12:13 p.m.

Do you see that?

Page 129

A.   I'm sorry.  This was Bates No. 648 -- ending 648?

Q.   Yes.

A.   Yes, I see it.

Q.   Okay.  In Mr. Brown's email, he writes:

"Can anyone on this email send over the reports for Sidoti and Maxim.  I don't seem to be on the email list to receive and I need them for our Board Meeting early Monday morning."

Do you see that?

A.   Yes, I do.

Q.   Do you have an understanding of why Mr. Brown said he needs them for the board meeting on Monday morning?

MS. BARROW:  Objection.

THE WITNESS:  No, I don't.

BY MR. URIS:

Q.   Do you know whether Mr. Brown typically went over analyst reports before board meetings?

MS. BARROW:  Objection.

THE WITNESS:  No, I don't.  I never attended those board meetings.

BY MR. URIS:

Q.   In 2021 and 2022, did you monitor analyst

33 (Pages 126 - 129)

Page 130

reports covering Co-Diagnostics?

A.  What do you mean by "monitor"?

Q.  Did you keep an eye out for them or review them?

A.  I -- they would, in about half of the cases, be sent to me once new reports were -- were -- were issued.  Not all of them.  It was -- getting letters from Maxxam were sporadic.  I think the only ones that were sent to me directly were Lambert and Litchfield Hills -- I'm sorry, not Lambert, Sidoti, and -- and Litchfield Hills.

Q.  And would you review those when you received them?

A.  It depends on the report, depends on the time.  I didn't read them all.  I can't -- I can't say that I read them all, every single report particularly, like, super thoroughly.  I just can't recall exactly what I did with each one when I received it.

Q.  In -- in 2021 and 2022, did you generally make an effort to review them?

MS. BARROW:  Objection.

THE WITNESS:  I -- depends on what you mean by "review."

I mean, I would generally try to read them,

Page 131

but I can't say that I -- that with every single report, I analyzed it thoroughly.  It just depends on the report, depends on the time.

BY MR. URIS:

Q.  Would you look at their revenue expectations?

A.  Sometimes.

Q.  And why would you look at the -- their revenue expectations?

A.  Just as -- part of my role in investor relations was to have an idea about what the shareholders were -- were seeing and what they were looking at.  And I knew shareholders were looking at it, so I wanted to be informed.

Q.  Do you recall what consensus revenue expectations were immediately prior to the May 2022 earnings call?

A.  For Q1?

Q.  For Q2.

A.  We wouldn't have had Q2 since -- Q2 estimates by that point.  Q2 estimates wouldn't have been released until after that call.  Typically, Q2 estimates weren't released until -- well, and I -- that's not necessarily true.

Oftentimes, the analyst, I guess, would have

Page 132

like a -- a -- a year prediction, but consensus itself isn't typically derived from those projections.  It's more derived from just what the analyst was predicting in the most recent report.  So I can't really -- I -- I was never really looking at what somebody would have been predicting for Q2 when we were getting ready to report Q1.  That was our -- that was our sole focus.

Q.  So you don't know generally what analysts were expecting for Q2 2022 around that time for the -- in their projected income statements?

MS. BARROW:  Objection.

THE WITNESS:  I don't -- I don't recall that.  Yeah, I don't recall that.

MR. URIS:  I'm going to introduce what was previously marked Exhibit 19, document bearing Bates No.CoDx_00506830.

(Exhibit 19, having been previously marked, was discussed.)

BY MR. URIS:

Q.  Okay.  That should be available.  It's Exhibit 19.  This is an email -- email chain, top email from Brian Brown sent May 10, 2022, at 7:32 a.m. to Mike Houston, copying William Stack, Zachary Mizener, and Andrew Benson.  The subject

Page 133

line: "RE: Guidance considerations."  Attachment: "1Q22 Earnings Call Script - CFO v2 BB REVIEW."

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A.  I don't recall, but I believe so.  Don't have any reason to believe otherwise.

Q.  In that top email, Mr. Brown writes:

"Mike--

"Attached are the changes to my script."

And do you see in the -- the description of the attachment below the subject line, it says "BB REVIEW" at the end?  Do you see that?

A.  In the subject line (audio interruption) "V2 BB REVIEW."

Q.  Sorry.  I think you -- you cut off a little bit.

Yeah, below -- below the subject line.

A.  Yes.

Q.  Is it your understanding that -- that those -- that the attachment reflects Mr. Brown's redlines to the draft script?

A.  I need to just take a moment to look at the script and the attachment.

That appears to be the case, yes, that he's

34 (Pages 130 - 133)

Page 134

returned a draft with -- with his comments, changes on it.

Q. Okay. If you could turn to page with the Bates number ending in 839.

A. Okay.

Q. If you look at the -- the paragraph at the top of the page which reads:

"The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the demand for our products and the operational and scientific teams we have established to support our future growth."

Do you see that?

A. Yes, I do.

Q. Do you know what Mr. Brown meant by "demand for our products"?

MS. BARROW: Objection.

THE WITNESS: Yeah. I -- I mean, I'm -- I'm not really sure what was in his head when he wrote it, so I can't say.

///

Page 135

BY MR. URIS:

Q. Then if you'll turn to the next page, do you see there's -- there's two comment bubbles off to the right?

A. Yes, I see those.

Q. Is it your understanding that MH is Mike Houston and BB is Brian Brown?

A. That is my understanding, yes.

Q. In the top comment, Mike Houston appears to write:

"As I was drafting this, it seems premature to cite uncertainty of Your Test revenue as a reason to drop guidance quite yet since it's not approved.  let's discuss if you have time on Tuesday."

Do you see that?

A. Yes, I do.

Q. And then below that, there's a comment from Brian Brown:

"If we were expecting to start selling the device in Q2, I would disagree. But as we are not, I would agree with your comment. I will run this by Andrew and Ike today and get their thoughts on why we are not providing guidance."

Page 136

Do you see that?

A. Yes.

Q. It's your understanding that when he refers to Andrew and Ike, he's referring to you and Dwight Egan?

A. That's my understanding, yes.

Q. Do you recall providing any additional thoughts on why the company was not providing guidance?

A. In addition to what?

Q. In -- in addition to what's already reflected in this draft.

MS. BARROW: Objection.

THE WITNESS: I have to read through the draft to see what all of the -- all of the other reasons provided were.

I don't recall any reasons beyond this. Again, he's speaking to, you know, fluctuations and/or order patterns may not necessarily just be visible within a single quarter, which makes it hard to predict what any particular quarter's performance is going to look like and how we're affected by different testing requirements and different geographic regions and -- yeah.

I mean, I'd have to see the final draft to

Page 137

see if there was anything else that I suggested goes in there.  But I don't recall anything beyond what's -- what's in here already.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 20, document bearing Bates stamp CoDx_00506183.

(Exhibit 20, having been previously marked, was discussed.)

BY MR. URIS:

Q. And it should be available.

MS. BARROW:  Did you say Exhibit 20?

MR. URIS:  Yes.

BY MR. URIS:

Q. This is an email chain.  The top email is from Andrew Benson dated May 10, 2022, at 10:38 a.m. To Brian Brown, copying Dwight Egan.  The subject line: "Re: FW: Guidance Considerations."  Attachment: "CODX 1Q22 Earnings Release v3 - AB edits."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A. I don't have any reason to believe it isn't what's reflected here.

Q. Was it your general practice when you were providing edits to a document to include your

35 (Pages 134 - 137)

Page 138

initials in the name of the document file?

A. It wasn't uncommon, although I can't say for sure that that was something that happened every time.

Q. And if you look at the email at the bottom of the first page from Brian Brown on May 10, 2022, at 7:34 a.m., he writes:

"Gents--

"We need to get this document finalized today - we can go through it at 10am. I can handle the numbers but we all need to buy off on the language used."

Do you see that?

A. Yes, I do.

Q. Do you recall going over the earnings release with Dwight Egan at 10 a.m. on May 10, 2022?

A. I don't have a specific recollection of that meeting. It was regularly the case that we would discuss earnings releases, but I don't recall that meeting specifically.

Q. Was it generally the case that you would discuss earnings releases with Dwight Egan in the days prior to its issuance?

A. Yes.

Q. Okay. If you can take a look at the

Page 139

attachment which starts on the page with the Bates number ending in 192. And you see towards the bottom, there is a -- that paragraph with the comment from Mike Houston. There's redlines in blue, which -- which appears to be the same language from the -- the -- one of the previous exhibits we looked at, although there's a redline in red of the phrase "continued emergence and spread of new variants."

Do you see that?

A. Yes, I do.

Q. Did you add that language to this draft?

MS. BARROW: Objection.

THE WITNESS: It's impossible for me to say without being able to look at the actual draft and -- and mouse over those edits and see. It -- it appears as though I did, because I was the one that sent the email, but I can't confirm that any of these changes were specifically mine.

BY MR. URIS:

Q. Do you have any reason to believe that the edits in red were not your edits?

MS. BARROW: Objection.

THE WITNESS: I don't -- yeah, I don't -- again, I don't really know what the chain of custody is in this email, whether I had passed it to Dwight

Page 140

or who had asked me to add that in or whether general counsel had seen it or something and then put that in there.

So it's hard -- it -- I don't have any reason to believe it wasn't me, but I don't have a specific recollection of me being the one making the decision to put it in there and then doing it. I just -- I just -- just don't recall from this -- from this long ago.

BY MR. URIS:

Q. Do you recall one of the previous exhibits that we looked at where Mr. Brown had asked you if you had any thoughts on what could -- on what the company could point to as you pull back on guidance, and you responded that "the bullet about mask mandates being dropped while variants continued to surface and spread is insightful and accurate"?

A. I recall that, yes.

MR. URIS: Does now work for a five-minute break for people?

THE WITNESS: That's fine.

Out of curiosity, so I know how my afternoon looks, do you have an estimate of how much time you estimate remains?

MR. URIS: Can we go off the record first,

Page 141

and I'll --

THE WITNESS: Sure.

MR. URIS: -- give you a sense.

VIDEOGRAPHER: We're off the record. The time is 2:02.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record. The time is 2:09.

Counsel may proceed.

MR. URIS: I'm going to introduce what was previously marked as Exhibit 21, document bearing Bates stamp CoDx_00466367.

(Exhibit 21, having been previously marked, was discussed.)

BY MR. URIS:

Q. That should be available. It's Exhibit 21.

A. Got it.

Q. This is an email from Andrew Benson dated May 12, 2022, at 1:29 p.m. to various recipients, copying Dwight Egan, Brian Brown, and who I believe is Kevin Ontiveros. Subject line: "Upcoming Press Notification May 12, 2022." Attachment: "CODX 1Q22 Earnings Release FINAL."

To your knowledge, was the -- is the email -- to your knowledge, was the email reflected

36 (Pages 138 - 141)

Page 142

in this document sent at the time indicated on the document?

A. To my knowledge, yes.

Q. Are the recipients of this email members of Co-Diagnostics' board of directors at the time?

A. It cut off just briefly.

Members of -- of what at the time?

Q. Of Co-Diagnostics' board of directors at the time?

A. Four of them were, yes.

Q. I'm just referring to the people in the -- the "To" --

A. Yes, yes. Those were members of the board, yes.

Q. Do you recall if there were any other members of the board?

A. At that time, I don't recall. I don't recall.

Q. Does the attachment appear to be the final version of the company's earning -- earnings release for the first quarter of 2022?

MS. BARROW: Objection.

THE WITNESS: The only way for me to really know for sure is to look and see the archived version online. So it -- it -- I can't say for absolute

Page 143

certainty there wasn't something else that changed after this email was sent.

BY MR. URIS:

Q. Was it your general practice to email the board what you understood to be the final version --

A. Yes, it was.

Q. -- of the earnings release that was going to go out?

A. Yes. Yes, it was.

Q. And if you could turn to the first page of the attachment.

A. Okay.

Q. Do you see that in the last paragraph above "First Quarter 2022 Business Highlights," which reads:

"'While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of

Page 144

precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future,' concluded Egan."

Do you see that?

A. Yes, I do.

Q. The -- the factors listed in this paragraph are -- are factors that suggested more COVID infection going forward; correct?

MS. BARROW: Objection.

THE WITNESS: I don't know that I would agree that these factors specifically suggest -- I mean, that -- the "continued emergence and spread of new variants," I would agree with, but I don't know that I would necessarily agree with the way that you said it there.

BY MR. URIS:

Q. Why not?

MS. BARROW: Objection.

THE WITNESS: Well, it was the company's belief that COVID was going to be with us forever and that a need for testing would continue to persist. That -- in fact, that -- that was one of the main

Page 145

reasons for us to continue to develop this at-home point-of-care testing platform that we reference earlier on in -- in this document. We always believed that -- that testing was going to continue because we believed that COVID was going to continue.

I don't know that I would say, like, these points here, that I would read them and say, Oh, they suggest continued existence or however -- however it was that you described it. I -- I see these as just pointing to just the -- more of the -- the unpredictability and the variability about the existence of -- of -- or the persistence of COVID. It was just hard to predict responsibly exactly and accurately, like you said, to accurately forecast what -- what it would be.

And I would say that that's -- again, I would probably just take it -- I would -- I would just take it at face value. It's our ability to accurately forecast through the remainder of the year because of these factors. We're not saying -- taking the position on what these factors specifically -- what effect they're going to have, just that they make it unpredictable. They make it hard to predict.

BY MR. URIS:

Q. Are -- are decreased mask mandates something

37 (Pages 142 - 145)

Page 146

that you would associate with increased COVID transmission?

MS. BARROW: Objection.

THE WITNESS: There could be a correlation there, but I can't -- I mean, I'm not an epidemiologist. I can't say whether one would cause the other.

BY MR. URIS:

Q. I'm just asking whether you would associate decreased max -- mask mandates with increased COVID transmission?

MS. BARROW: Objection.

THE WITNESS: With increased COVID transmission?

BY MR. URIS:

Q. Yes.

A. I could see that as being possible, but it could also have the inverse effect; right? The -- the decreased mask mandates could be a result of lower infection rates; right?

Like, it's -- I can't -- I can't say that one would lead to the other. It's -- it's hard for me to, like, draw a causative link between the two. It's a correlation. It's not a causation.

So I can only go based on what he says, just

Page 147

that is a factor that makes it difficult to predict.

Q. Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID?

MS. BARROW: Objection.

THE WITNESS: I don't know -- I don't recall what the particular sentiment was in May of -- of 2022. I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the -- the risk of infection, but I don't know exactly where we were at, you know, as a society at this point.

BY MR. URIS:

Q. Is -- is continued emergence and spread of new variants something you would associate with increased COVID infection?

A. Among other things, that's something I could associate it with, yes. But I could also associate it with high degrees of fluc- -- fluctuations and -- or unpredictability.

Believing that a variant will come isn't necessarily saying we believe that there's going to be a lot of infection or a lot of testing in the future. What it means is -- to me -- and I think

Page 148

this is what Dwight is saying here -- is that we just don't know when. We feel that COVID is still around, but we can't pin the tail on -- you know, on -- on -- on -- on the timing there, on that donkey. Who knows exactly when it's going to happen? We just feel that it's in our future, but who can say when?

Q. But if new variants were to emerge and spread, that's something you would associate with increased COVID infection; correct?

MS. BARROW: Objection.

THE WITNESS: I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- that goes hand in hand with infection. You can't spread a variant without there being infections.

BY MR. URIS:

Q. And are low vaccination rates something you that you would associate with high levels of COVID infection?

MS. BARROW: Objection.

THE WITNESS: It could. We simply didn't know at this time what effect the vaccine was going to have.

Was it going to have an effect on

Page 149

transmission? Was it going to have an effect on vaccines? Was it going to have an effect on -- one way or the other; right? Would -- would -- it -- would lower infection rates lead to more transmission? Would lower infection rates be the result of people not testing, meaning that our tests and other tests weren't being used right?

Simply saying low infection rates doesn't mean fewer people are getting it. It may just mean that fewer people are testing. And, again, it's -- it's correlatory, not causatory. Like, we just don't know, looking at that, what -- what does that mean?

BY MR. URIS:

Q. And -- and I just want to --

A. And how -- how -- how do you predict based on that?

Q. I just want to clarify. It -- it's low -- low vaccination rates, not infection rates.

Is -- are -- is low vaccination rates something you would associate with high levels of COVID infection?

MS. BARROW: Objection.

THE WITNESS: Low vaccination rates. Again -- sorry. Sorry. I -- I took a logical leap I didn't explain there.

38 (Pages 146 - 149)

Page 150

People getting -- people refusing the vaccine could also be associated with people refusing to test just because of overall COVID fatigue. And so as people are not getting the vaccine, it could be because they're just resisting the whole change through to their lifestyle and then not doing the testing at all anymore.

It's -- it's something that could have an effect either way. We felt like it was significant, but it was significant in an unpredictable way. It was a different world than it was a year before or a quarter before or three quarters before.

BY MR. URIS:

Q. Was one of the company's key messages at this time and in 2021 to emphasize that COVID was not going away?

MS. BARROW: Objection.

THE WITNESS: I can't recall whether -- I -- I recall that being a belief amongst the company, and -- and I think that's reflected in, again, our continued development of -- of an at-home and point-of-care testing. We believed that COVID would be with us till end of time, and I think Dwight has many statements to that effect.

We believed that testing would continue. It

Page 151

would just continue in different ways, in different locations.

BY MR. URIS:

Q. Do you recall whether that message was important to Dwight Egan?

MS. BARROW: Objection.

THE WITNESS: Yeah. I can't -- I can't speculate as to what was important to Dwight or not.

BY MR. URIS:

Q. Did he ever tell you that he thought that message was important?

A. I don't recall a specific conversation where he said that to me, that, I believe this message is important.

If there's statements that he made, then I would -- you know, I would just have to take him at face value, if he says it, that he believes it. But I can't speculate as to the level of importance that he placed on it.

MR. URIS: Okay. I'm going to introduce as Exhibit 45, document bearing Bates stamp CoDx_00522583.

(Exhibit 45 was marked for identification.)

///

Page 152

BY MR. URIS:

Q. Okay. That should be available.

MS. BARROW: Jason, is that a new exhibit or previously marked exhibit?

MR. URIS: Yeah, that's a new exhibit, 45.

BY MR. URIS:

Q. This is an email from Andrew Benson sent January 4, 2021, to Dwight Egan and Reed Benson, copying ty@thecadencegroup.com, Jennifer Webb, Seth Egan, BCC'ing Andrew Benson. The subject line: "PR draft and initial talking points."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A. I don't have a reason to believe otherwise. I think so.

Q. And who is Reed Benson?

A. He was the CFO of Co-Diagnostics at the time.

Q. Is there any -- any relation?

A. There is, yes.

Q. And what's that relation?

A. He is my father.

Q. And do you know who ty@thecadencegroup.com is?

Page 153

A. I -- I -- I can't remember exactly in what capacity The Cadence Group was consulting for us. This was when Reed was transitioning out of CFO, and -- and we were considering bringing somebody else in. And I believe Ty was involved in providing some consulting for financial matters, but I can't remember -- I don't know exactly what. It wasn't my department.

Q. Okay. And if you see the description of the attachment under the subject line, it -- the second attachment is "CODX - Talking Points for Fireside Chat."

And then in your email, you write:
"The talking points are the 5 core concepts that I [sic] have been rattling around in my head."

Do you see that?

A. I see that I -- do I see where I wrote that? Is that what you're asking?

Q. Yeah.

A. Yes, I see that.

Q. Okay. If you could turn to the second attachment, which starts on the page with the Bates number ending in 586.

A. Okay.

39 (Pages 150 - 153)

Page 154

Q.  This is titled "Talking Points for Fireside Chat with Yi Chen."

And who -- who is Yi Chen?

A.  He was our -- remains our covering analyst from H.C. Wainwright.

Q.  And if you take a look at the fourth talking point, it says:

"COVID will persist in a 'post-COVID' world" and then in parentheses it says "(vaccine refusal, logistic issues with vaccinating the planet, regular mutations)."

Do you see that?

A.  I do.

Q.  And so those -- those factors listed in parentheses are factors that you were saying could be cited in support of the idea that COVID would persist; correct?

MS. BARROW:  Objection.

THE WITNESS:  As factors supporting the fact that COVID would persist, it seems -- yes, it seems that those were three examples that -- that I gave in support of that belief.

BY MR. URIS:

Q.  So here, you're suggesting that vaccine refusal was something that would be associated with

Page 155

COVID persisting; correct?

MS. BARROW:  Objection.

THE WITNESS:  It looks like I'm citing that as a potential -- having a potential impact on -- on my belief that COVID will persist in -- in a -- in a world that extends beyond whatever the world turned into post pandemic.  Again, remember this was -- pandemic was less than a year old at this point.  Everybody was still learning everything.  I think we still are.

BY MR. URIS:

Q.  Okay.  You can turn back to the email.  You refer to these as the "5 core concepts."

What did you mean by that?

A.  Just seems as though, if you read the sentence before that, that these are the concepts that we anticipated coming up in -- in the course of the fireside chat with Yi.  I don't really know beyond that.  I can't recall exactly what I was referring to at this point, you know, almost four years later when I wrote it.

Q.  Do you recall if these concepts were concepts from Dwight Egan?

A.  I don't recall.

MR. URIS:  I'm going to introduce as a new

Page 156

exhibit, Exhibit 46, document bearing Bates stamp CoDx_00003013.

(Exhibit 46 was marked for identification.)

BY MR. URIS:

Q.  That should be available.

A.  Got it.

Q.  This is an email chain.  The top email is from Dwight Egan dated February 1, 2022, to Andrew Benson, Brian Brown, Joseph Featherstone, and Seth Egan.  The subject line: "Re:  How are we doing on the new India test announcement?"

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A.  Yeah.  I don't have any reason to think it wasn't.

Q.  And then in Dwight's email on the top, he seems to be referring to a new test that was approved in India; is that correct?

A.  I'd have to read through the email chain to opine on that.  I'm not sure exactly what he's referring to.

Q.  Okay.  Do you want to take a moment to -- to look at the email?

Page 157

MS. BARROW:  Jason, it's only coming up as one page for me, and it looks like there should be more since it's a Re, the subject.

Are we missing pages?

MR. URIS:  I think the -- the bottom email is --

THE WITNESS:  It's the first email in the chain.

MR. URIS:  -- is the first email.  That's just -- that's how it was produced.

THE WITNESS:  Yeah, I -- I don't know which test it's referring to here at CoSara.

BY MR. URIS:

Q.  And CoSara was the -- Co-Diagnostics --

A.  The Indian joint venture.

Q.  In India?

A.  Yeah.  Correct.  Sorry.

Q.  And then in Mr. -- in Dwight Egan's email at the top, he writes, "The overall messaging is that:" and then lists seven points.  And then Points 4 and 5 are "Eventually" --

Well, first point is:

"Many diseases were endemic before Covid."

Two:

"They are still endemic."

40 (Pages 154 - 157)

Page 158

Three:

"They constitute a large market for endemic disease tests."

Four:

"Eventually Covid will also be endemic."

Five:

That just means Covid is not going away. ever.

Does this email refresh your recollection as to whether Dwight Egan wanted to -- it was important to Dwight Egan that the company emphasize that COVID was not going away?

MS. BARROW:  Objection.

THE WITNESS:  I -- I can only say the same thing before, which is that you have to speak to Dwight to determine what was important to Dwight. I -- I've never argued that it wasn't anything that we didn't say.  In fact, I said that he has multiple statements to that effect, public statements, and it must be something that he believed.  But it's not up to me to say what was important to somebody else in -- in their head.  I don't have any specific recollection of him saying, you know -- all I can say is this is what he said.  You can draw your own inferences, but I can't opine as to what specifically

Page 159

was important to somebody else.

BY MR. URIS:

Q.  And you don't recall --

A.  I can't speculate.

Q.  You don't recall where the concept of emphasizing that COVID wasn't going away originated?

A.  Where it originated?  No, I don't -- I don't -- I don't know where that originated.

Q.  Do you recall hearing from investors that people were sick of hearing that COVID isn't going anywhere?

MS. BARROW:  Objection.

THE WITNESS:  Do I recall hearing from investors that people were sick of hearing that?

BY MR. URIS:

Q.  Generally, yes.

A.  I don't have that specific recollection, no.

Q.  Okay.  Do you have a general recollection of that?

A.  No.  Other than beyond general COVID fatigue where everybody was sick of hearing of it as a society.

MR. URIS:  I'm going to introduce as Exhibit 47, document bearing Bates stamp CoDx_0087379.

Page 160

(Exhibit 47 was marked for identification.)

BY MR. URIS:

Q.  And that should be available.

A.  Okay.

Q.  This is an email chain.  The top email from Andrew Benson, dated March 14, 2022, to Dwight Egan, copying Mike Houston, William Stack, Zachary Mizener, and Brian Brown.  The subject line: "Fwd: next Earning Call - investor message."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A.  I believe so.  No reason to think otherwise.

Q.  And in the second paragraph in your email, you write:

"Some of what he's asking for isn't feasible (sales projections for liquid biopsy/ag dx tests) but the importance of not making it sound as though we are trying to convince people that COVID isn't going away can't be overstated."

Why did you think that?

A.  I'm sorry.  I lost you after "why."

Q.  Why did you think that?

Page 161

A.  I don't recall specifically what I was thinking, what was in -- what was in my head at that time, but I -- I remember having a general sense that that wasn't something that you needed to convince people of.  People knew it.  It wasn't anything that we had to go and, you know, try to sell somebody something that they already knew.  And so it was just, you know, wasted effort trying to spend a lot of time trying to do that.

Like I said later on, they don't need to be reminded about COVID.

Q.  If you look at the -- the last sentence in that paragraph, you say:

"They already feel that way or they don't ...."

Do you see that?

A.  Yes.  Yeah.

Q.  So it's correct that some people felt that way and some people didn't feel that way?

A.  Really hard for me to speculate about what people might have thought.  I mean, that's what I wrote there, but I can't say what every individual person might think and -- and -- and might not have thought.

Q.  Okay.

41 (Pages 158 - 161)

Page 162

A. But like I said later, people were tired of hearing about it. Everybody -- and I don't -- I'm not talking about just investors. This was, you know, now two years. This is beginning of March or middle of March 2022. This is two solid years of headlines being dominated by the same thing.

Like I said, at the -- people were tired of hearing about it, so we didn't need to try to convince them. You couldn't change anybody's mind. But that didn't -- wasn't determinative about what we were going to do as a business.

Q. And then in that same middle paragraph, in the next sentence, you start off:

"I think that part of the narrative will be really useful for analysts ...."

What did you mean by that?

A. I think just what I said there, that analysts are more focused on where sales are going to be coming from and what your business is going to look like.

But I can -- I don't recall specifically writing this, but I can just go based on what -- what I've written here.

Q. Do you recall why you were saying this to Dwight Egan in particular?

Page 163

A. I would say just what I wrote here. Like I said, I don't remember writing it, but I was looking at it through this lens, through the lens of -- of what William Peppermint had said.

Q. Do you recall if at this time the -- the message that COVID isn't going away was still an important message for Dwight Egan?

MS. BARROW: Objection.

THE WITNESS: Again, I -- I mean, I know it was a part of our narrative. It was certainly a part of our -- of our business model; right? We were -- we were designing a platform, building a test, believing that respiratory diseases were going to be a part of regular testing for everybody till the end of time.

I can't speak to what was important to Dwight. I can comment on what was part of our general communications, but you'd have to speak to Dwight and ask him what -- what was important to him at this time.

BY MR. URIS:

Q. Was it your view at this time that that message should be de-emphasized?

A. Which message?

Q. That COVID isn't going away?

Page 164

A. I don't recall that specifically. I just -- like I said here, we don't need to try to convince people about it. Not trying to change anybody's mind. But that didn't mean it wasn't a part of our narrative.

We believed at this point that -- like I had already testified, at -- at this point here, sales were cyclical. We thought COVID was still going to be driving a large portion of our business for an indeterminate amount of time. We didn't think it was anything that needed to be said. It was, at this point, still as far as we knew, readily apparent, the same way it had been for the last two years.

Q. Do you recall what the sales had looked like in February of 2022 and in the first two weeks of March of 2022?

A. I don't recall. I typically wasn't looking at sales. I didn't have any visibility on sales on a, like, week-by-week basis or -- or a mid-month perspective. Rarely even mid order, so ...

MR. URIS: I'm going to introduce what was previously marked as Exhibit 23, document bearing Bates No. LAMBERT0001281.

(Exhibit 23, having been previously marked, was discussed.)

Page 165

BY MR. URIS:

Q. And that should be available.

This is an email chain with the top email from Andrew Benson sent July 12, 2022, to William Stack, copying Mike Houston and Brian Brown, with the subject line: "Re: Call w/Hudson Executive Capital."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A. I don't have any knowledge or recollection of this, but I don't have any reason to believe otherwise.

Q. Do you know who Hudson Executive Capital is?

A. I don't recall, no.

Q. If you take a look at the -- the bottom email in the thread, there's an email from a Sai Nanduri at a hudsonexecutive.com email to investors@codiagnostics.com.

Are you familiar with the investors@codiagnostics.com email address?

A. Do I -- am I familiar with it? In what respect?

Q. Do you know what -- what -- what it is?

A. Yeah. It's an email address that is put on our -- a lot of our investor communication, the

42 (Pages 162 - 165)

Page 166

inbound forward to my email address.

Q. So -- so emails sent to that email address were forwarded to your email address?

A. Yes.

Q. And is it your understanding that this Sai Nanduri was trying to set up a call with -- with management at this time?

A. That appears to be the case, yeah. I don't recall receiving it at this point.

Q. Above that, you -- you forward the email to Mike Houston and William Stack, and you say:

"Hi all,

"What's your read on taking this call?"

Do you see that?

A. Yes.

Q. And then Mr. Stack responds:

"Hi Andrew,

"The firm looks legit, but I think with earnings right around the corner, plus Q2 resulting being a surprise, it may be best to follow up after the earnings call."

Do you see that?

A. Yes.

Q. Do you know what Mr. Stack was referring to when he referred to "Q2 results being a surprise"?

Page 167

MS. BARROW: Objection.

THE WITNESS: I could only speculate as to what he was referring to.

BY MR. URIS:

Q. And?

A. Oh, would you like me to?

Q. Yes.

A. I -- I would say that it's a -- he was probably referring to the fact that the quarter was lower than the previous quarter or than what the consensus had predicted.

MR. URIS: Can we go off the record for a few minutes?

MS. BARROW: Sure. Do you think you have a lot more?

MR. URIS: Not -- not too much more.

MS. BARROW: Okay. So five minutes or so?

MR. URIS: Yeah, that works.

MS. BARROW: All right. Fifty-five.

THE WITNESS: Five till? Okay. Sounds good.

VIDEOGRAPHER: We're off the record. The time is 2:49.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record.

Page 168

Time is 2:57.

Counsel may proceed.

MR. URIS: Going to introduce previously marked Exhibit 39 bearing Bates stamp CoDx_00004880.

(Exhibit 39, having been previously marked, was discussed.)

BY MR. URIS:

Q. And that should be available.

This is an email chain. Top email is from Andrew Benson sent August 2, 2022, to William Stack, copying Brian Brown, Mike Houston, and Zachary Mizener. Subject line: "Re: Q2'22 Press Release." An attachment: "CODX 2Q22 Earnings Release v2 - AB Edits."

To your knowledge, was the -- was the email reflected in this document sent at the time indicated on the document?

A. I don't -- as -- as far as I know. I don't -- I don't have any reason to think that it wasn't.

Q. And does the attachment appear to be your edits on the prior draft of the -- of this press release?

A. It does look as though I've made edits on here, yes.

Page 169

Q. If you'd take a look at the first paragraph -- the first full paragraph under the "Second Quarter 2022 Financial Results."

A. Uh-huh.

Q. The bullet points, and then a paragraph that starts:

"'Our second quarter results were below the standards we have set for the company despite the increased activity we are experiencing thus far in the back half of the year' ...."

Do you see that?

A. I do.

Q. Do you have an understanding of what's meant by the phrase, "Our second quarter results were below the standards we have set for the company?

A. No, I don't.

Q. Do you think it's a reference to the fact that the company had achieved at least 120 million in revenue in each of the quarters since selling the Logix Smart COVID-19 test?

MS. BARROW: Objection.

THE WITNESS: You'd have to speak to the author.

I don't believe that that sentence made it into the final draft, so I wouldn't say that that's

43 (Pages 166 - 169)

Page 170

reflective of the company's actual feelings at the -- the -- or our beliefs at the time we were doing this.

MR. URIS: I'm going to introduce as Exhibit 48, document bearing Bates stamp CoDx_00004924.

(Exhibit 48 was marked for identification.)

BY MR. URIS:

Q. And it should be available.

This is an email chain. The top email from Andrew Benson sent August 8, 2022, to William Stack, copying Brian Brown, Mike Houston, and Zachary Mizener. Subject line: "Re: Q2'22 Press Release." Then attachment: "CODX 2Q22 Earnings Release v3 (8-3-22) BB Comments + Lambert + AB."

To your knowledge, was the email reflected in this document sent at the time indicated on this document?

A. I believe so. Once again, I don't have any reason to believe otherwise.

Q. And in your -- your top email, you write:

"See my note advocating for the first sentence of the quote to be removed entirely."

If you could turn to the attachment, which

Page 171

starts on the page with Bates number ending in 930.

A. Okay.

Q. And you appear to have a comment on the -- the sentence we were just talking about from the -- in the previous exhibit; is that correct?

A. I appear to, yes.

Q. And in your comment, you write:

"I find this sentence to be somewhat problematic. We haven't set any standards per se (certainly didn't give any guidance), and we're basically on track to have a similar quarter this month so I don't want to set that performance up in advance to already be 'below our standards.'"

Do you see that?

A. Yes, I do.

Q. And then you write:

"... I'm not sure we can point to any objective, measurable, or material increase in activity for Q3."

Do you see that?

A. Yes, I do.

Q. What did you mean by "we haven't set any standards per se"?

A. I would say just what it's saying there.

Page 172

There isn't, like, a particular standard as far as revenue that we've said, This is what you can expect from Co-Diagnostics as a company on a quarterly basis. It was not a quarterly standard of revenue that we were pointing to as our standard.

Q. Do you recall whether the company had ever guided to quarterly revenue of less than $20 million in any quarter?

A. What our guidance was for each quarter, topline, I can't recall.

Q. Do you recall that on the May 2022 earnings call, an analyst asked whether the company was already seeing a decline in orders for the Logix Smart COVID-19 test?

A. I don't -- I don't recall all of the analyst questions in -- in all of the calls. I don't recall that one either specifically.

Q. Do you recall a question to that effect generally?

A. About a decline in sales?

Q. About -- about a decline in orders -- about whether the company was seeing -- was already seeing a decline in orders for the Logix Smart COVID test.

MS. BARROW: Objection.

THE WITNESS: It -- I -- I -- like I said,

Page 173

I -- I don't -- I -- I was never -- it was not my responsibility to respond to those -- to those analyst questions. Oftentimes, I was just trying to monitor the platform and make sure that -- I mean, there was a delay between what was happening in realtime and what was being broadcast, and so I'm not going to have one ear listening to people and one ear listening to a 30-second delay in the broadcast. And so I was mostly on board for -- for technical support in case we dropped a call. So I wasn't always listening to -- paying attention to -- to all of those analyst Q and A. It was hard to do two things at once.

BY MR. URIS:

Q. So you -- you don't generally recall a question to that effect on that earnings call?

A. Like I said, I -- I -- I know there were regularly called -- regularly questions about revenue and forecasts. I -- we had already said we weren't giving guidance. If there was then a call -- if there was then a question afterwards asking about guidance, I mean, it wouldn't surprise me. Analysts typically ask questions that we feel like we've already answered in the -- in the earnings calls. But I don't -- I don't really retain a specific

44 (Pages 170 - 173)

Page 174

recollection of what all of the analyst questions are in those earnings calls and definitely not something from two and a half years ago.

Q.   All right.  And is it fair to say you don't recall what any response to a -- a question to that effect was?

A.   That's fair.  I could only guess that we would probably point to the fact that we already said we're not giving guidance and we're not going to give it to you now just because you've asked it -- for it in a different way.

Q.   You don't recall whether Mr. Brown said, It's not necessarily a demand issue that we're seeing, in response to that question?

MS. BARROW:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  I -- yeah.  I don't -- I don't really recall what -- the -- the question, let alone the response.  Again, trying to listen in one ear and the other at the same time, it was challenging.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 25, document bearing Bates stamp 00002035.

(Exhibit 25, having been previously marked, was discussed.)

Page 175

BY MR. URIS:

Q.   And that should be available.

This is an email chain.  Top email is from Brian Brown dated August 9, 2022, to Dan Bohrer.  Subject line: "Q2' 22 Press Release."  Attachment: "CODX 2Q22 Earnings Release v5 (8-9-22) CLEAN AB edits."

A.   Okay.  Got it.

Q.   And then below that, it appears he's forwarding the -- the current draft of the -- the press release that you sent to -- to Dan Bohrer; correct?

A.   That's what it seems to be doing here, yes.  I haven't read through the whole email chain, but based on those emails, it seems to be what's happening.

Q.   And if you -- if you could turn to the page with the Bates number ending in 039.

A.   Okay.

Q.   And at the top, there is an email from Andrew Benson sent Monday, August 8, 2022, to William Stack, copying Brian Brown, Mike Houston, and Zachary Mizener.

Do you see that?

A.   Yes, I do.

Page 176

Q.   And in that email, you write: "I'm not wild about calling out supply chain issues since I don't think we really consider that a factor.  My remarks in the script after talking to Ike refer to a reduction in mandated testing for travel and public venues, in public funding for assistance for testing programs, and an increase in overall COVID fatigue for the disruption to daily life after a multi-year pandemic, all of which were felt industry-wide."

Do you see that?

A.   Yes, I do.

Q.   So was it -- was it Dwight Egan's idea to put that language in the press release?

A.   I don't recall exactly whose idea it was.  It seems as though here I'm referencing a conversation that took place with the two of us, but I can't say with accuracy whose -- who had what ideas when we were speaking.

Q.   You don't recall whether he associated the drop in revenue in the second quarter of 2022 with a reduction in mandated testing for travel and public venues?

MS. BARROW:  Objection.

Page 177

THE WITNESS:  Yeah.  Again, I don't know whose -- I don't know to whom that idea can be attributed.  I simply can't recall the conversation and then the details of it.

BY MR. URIS:

Q.   Do you recall coming up with any of these factors?

MS. BARROW:  Objection.

THE WITNESS:  It's really hard to remember two and a half years later.  Memory is just fickle that way.  It's tough for me to say.  I mean, knowing now what I know and -- and having my certain beliefs about the fact that I think those things did have an effect, I can't recall exactly where my mind was at in a conversation that I also don't recall that was, you know, almost -- almost two and a half years ago.

So, I mean, it's -- I -- I just -- I didn't take notes after the -- the call, and I didn't -- I didn't record it, so it's hard for me to say exactly who came up about with what idea.

BY MR. URIS:

Q.   Is your understanding from that email that you put those factors in the script following your conversation with Dwight Egan?

MS. BARROW:  Objection.

45 (Pages 174 - 177)

Page 178

THE WITNESS:  I believe this email is referring to the press release, not the script.  He says my remarks in the script refer to that, but is it worthwhile putting these elements in the press release.

So are you asking me what made it into the script or what's -- or the -- the press release that's -- that's attached here?

BY MR. URIS:

Q.  The -- the script.  I'm -- I'm referring to the -- the August 8, 2022, email.

A.  Okay.  And your question again?  I'm sorry. Would -- would you mind repeating?

Q.  Is it your understanding from that email that you put those factors in the script following your conversation with Dwight Egan?

MS. BARROW:  Objection.

THE WITNESS:  Yes.  That's -- seems to be what the email is -- is saying here, although I don't recall specifically the nature of the conversation or what specifically I put in after having a specific phone call that -- or a specific conversation that -- that I don't remember having.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 26.  This is a document

Page 179

bearing Bates stamp CoDx_00086287.

(Exhibit 26, having been previously marked, was discussed.)

BY MR. URIS:

Q.  And that should be available.

This is an email chain.  Top email from Andrew Benson dated August 15, 2022, to Dan Bohrer, BCC to Andrew Benson.  "Re: Final Script of Earnings Call," and two attachments.

To your knowledge --

A.  I see it.

Q.  -- was the email reflected in this document sent at the time indicated on the document?

A.  As far as I know.  I don't have any reason to think that it wasn't.

Q.  Can you see the -- the second email on the first from Dan Bohrer?  He writes:

"Andrew -

"Would you mind sending me the script from the earnings call?"

Do you see that?

A.  Yes, I do.

Q.  And is it your understanding that what you then sent to him was the final version of the call script?

Page 180

A.  I don't recall sending it, but that's what it appears to be indicating in this email.

Q.  If you could turn to the page of the document with the Bates stamp ending in 295.

A.  Okay.

Q.  I just want to point out that this appears to be where Mr. Brown's section starts; is that correct?

A.  That's what it appears to me.

Q.  Okay.  If you could turn to the page with Bates number ending in 298.

A.  Okay.

Q.  And then in the third paragraph, first two sentence -- sentences -- or, sorry, the first three sentences read:

"Turning now to our visibility and near-term outlook.  Variability in our operating environment has restricted printed our near-term visibility.  We will continue to navigate the near-term environment with caution but as a result, will not be providing quarterly guidance at this time."

Do you see that?

A.  I do.

Q.  And this -- this appears to be the -- the

Page 181

script for the Q2 2022 earnings call held on August -- on August 11, 2022; is that correct?

A.  I believe so.

Q.  And do you recall that Mr. Brown made similar statements on the first quarter of 2022 earnings call on May 12, 2022, about changing -- changes in the -- in the company's operating environment restricting near-term visibility?

A.  Based on the documents we have reviewed today, that seems to be the case.  I don't recall it specifically happening at the time, but just based on other the exhibits I've seen, it's -- it seems as though there was similar language that was presented at that time.

Q.  But here, Mr. Brown didn't cite the specific factors of decreased mask mandates, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world; correct?

A.  I don't see any references to those things here.

Q.  Do you know why those factors weren't cited on this call as factors that restricted the company's visibility?

MS. BARROW:  Objection.

46 (Pages 178 - 181)

Page 182

THE WITNESS:  I don't recall why they -- why something was not included in here, no.

BY MR. URIS:

Q.  Do you know what the dollar amount of orders received by the company in the third quarter of 2022 at the time of this call was?

A.  I don't recall, no.

Q.  You don't recall whether it was similar to the dollar amount of orders the company had received as of the time of the May 2022 call?

MS. BARROW:  Objection.

THE WITNESS:  I -- I -- I recall a comment that you'd shown me in a -- in a document earlier where I referenced something about how this quarter was looking like the last quarter.  But that's my only recollection about it.  I don't recall it at the time.  I just recall what you've shown me here today.

BY MR. URIS:

Q.  And when you said that the third quarter was looking like the second quarter, were you referring to the orders to date in the third quarter?

A.  Again, because I don't recall actually making the statement, I just -- you've shown it to me, and I see that I've written it, but I don't recall what my mindset was at when I -- when I wrote

Page 183

it.

Q.  Are -- are you aware generally that in early 2022, various government programs were put in place to increase access to COVID-19 testing?

MS. BARROW:  Objection.

THE WITNESS:  That was in -- when?  When did that take place?

BY MR. URIS:

Q.  In -- in early 2022 -- sorry, in early 2020.

MS. BARROW:  Objection.

BY MR. URIS:

Q.  Around the time that the pandemic started.

A.  I -- I don't recall all of the government programs that were in place.  I seem to recall that they existed, but I don't know.  I -- I can't recall what they were at this point.

Q.  Do you recall whether any government funding was set to expire by the end of March of 2022?

A.  I remember there were expirations for government funding, but I can't remember exactly when they were, how much they were.  I recall it vaguely being a thing, but no details about it.

Q.  Do you recall having any discussions with Mr. Brown or Mr. -- or Dwight Egan prior to May 2022 regarding the expiration of any government funding

Page 184

programs?

A.  I -- I don't recall any conversations about that.  We had lots of conversations.  I mean, I'd speak to these men multiple times a week, and I simply can't recall whether that was a topic of one of our conversations.

Q.  Do you know whether any of the company's customers relied on funding from those programs to fund their purchases of the Logix Smart COVID-19 test?

MS. BARROW:  Objection.

THE WITNESS:  Which programs?

BY MR. URIS:

Q.  Any -- any government funding programs.

MS. BARROW:  Objection.

THE WITNESS:  So I'm not on the sales side, and so that -- I'm not -- that's not something I have a lot of overlap with, but I do know, just from the shipping side, we would send products to programs that were state funded, which is government public assistance.  I don't know to what extent they received money from the federal government, but they were state-funded programs, state-funded assistance that -- well, through there -- we just shipped from our distributor or -- or on behalf of our

Page 185

distributor.

And so we just had our distributor client, and I myself did not have a lot of visibility or if any at all into exactly who was paying for what from our -- through our end -- our end user customers.  I mean, I would put stuff in boxes and ship it, but I didn't know how something was paid for.

BY MR. URIS:

Q.  Is -- is there a particular distributor you're referring to that -- on whose behalf you would send tests to various state programs?

A.  The only one I -- I know for sure was Nomi Health.  It seems like there -- there -- there might have been others that also had activity in state-funded programs, but I -- I mean, it's too long ago for -- for me to recall accurately.  I'm not sure.

Q.  And do you recall whether Nomi was the company's biggest customer in terms of purchase volume in 2021 and 2022?

A.  I don't.  I -- I didn't have breakdowns of what those looked like.  I knew they were a big customer, but I can't say, you know, what their size is relative to others.

MR. URIS:  I'm going to introduce as

47 (Pages 182 - 185)

Page 186

Exhibit 49 a document bearing Bates stamp LAMBERT0004077.

(Exhibit 49 was marked for identification.)

BY MR. URIS:

Q.   And that should be available.

A.   Okay.  Got it.

Q.   Okay.  This is an email chain.  Top email is from Brian Brown sent November 10, 2021, at 3:52 p.m. to Andrew Benson, copying Dwight Egan and Mike Houston.

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A.   I have no reason to think it wasn't.

Q.   The subject line is "RE: FW: Fluidigm Q3 Revenues Drop 29 percent on Supply Chain Issues, Waning COVID-19 Testing."

Do you know what Fluidigm is?

A.   I don't recall.  It's some -- I recall it being associated with the diagnostic space, but I can't tell you anything about the company.

Q.   Okay.  We can take a look at -- on the second page of the document, there's an email from William McCluskey to Dwight Egan, Seth Egan, Brian

Page 187

Brown, Reed Benson, and copying two people.

Do you know William McCluskey is?

A.   He was a consultant the company had used off and on for various years, sort of regarding capital markets.

Q.   Do you know what the -- what the company used him for in particular with respect to capital markets?

A.   He consulted as the company was doing capital raises, initially for the IPO in 2017 and then subsequent following raises in 2019 and 2020.

Q.   Okay.  He writes in his email:

"A potential issue that will come on your call.

"As you know, you should be prepared to discuss this market trend."

Do you see that?

A.   Yes, I do.

Q.   And if you could go back to the -- the first page of the document, Mr. Brown writes on November 10th at 8:21 a.m.:

"This is going to be an important question that we will likely need to answer.  Thus far in Q4, we have seen slowing sales.  However, we could frame it up as we had some pull

Page 188

forward into Q3 but still expect to see a strong quarter in terms of sales (we do expect to hit around $20MM)."

Do you see that?

A.   Yes.

Q.   And then above that, you respond: "I like that framing.  Do you want to work it into the remarks, or leave it for the Q&A?"

A.   Okay.

Q.   Do you know what Mr. Brown was referring to when he said "thus far in Q4, we have seen slowing sales"?

MS. BARROW:  Objection.

THE WITNESS:  Yeah, I don't -- I -- I don't recall.  I don't recall this email specifically at all.  It's hard for me to say what he's referring to.

BY MR. URIS:

Q.   You don't recall whether the company had seen approximately two months of low sales at that time?

MS. BARROW:  Objection.

THE WITNESS:  I -- I -- I don't recall. This was, I mean, ten days into the second month of the quarter and weren't looking at, you know, sales on a per-day basis.

Page 189

It's possible that one of the months was -- was lower than -- than -- than a previous month, but if you look at our numbers, it was regularly the case, like I said before, that we'd have dips that would happen at various times, sometimes in the middle of the month, sometime at the end, sometimes at the beginning.  And while it might have been the case that thus far in that quarter that sales had been lower than -- than -- you know, based on October's, which I don't know.  I mean, I can't speculate what he was saying here.  We always believed that sales were going to be cyclical which is, in fact, how Q4 was borne out in the end.  We ended up having a -- a big -- a big December, so ...

It just wasn't uncommon for sales to fluctuate month to month.

BY MR. URIS:

Q.   And you don't recall what the sales in the second quarter of 2022 had looked like as of May 12, 2022, or how they compared to what the sales looked like in Q4 as of this date?

MS. BARROW:  Objection.

THE WITNESS:  You're asking me to compare beginning of May to the beginning of April -- or to the beginning of November, rather?

48 (Pages 186 - 189)

Page 190

I think -- I think this is a good example. It shows that, Okay, in -- November 10th, it looked like we had been looking at a soft quarter, right, based on what he's saying here. But then at the end of the quarter, it ended up being one of the best quarters on record.

And we didn't have any reason to believe that that wasn't also going to happen in Q2 of 2022. It just wasn't uncommon to see these -- see these kinds of wild fluctuations. It was really unpredictable. We didn't know what was going to happen. But, again, because it was so unpredictable, it was just too -- I mean, it wouldn't have been responsible to take a stab at something that would have just been -- you know, that we didn't have confidence in -- in -- in stating.

So I think -- I mean, regardless of -- I mean, I don't think you can compare Q4 of one month to -- or of one year to Q2 of the next two quarters that are ever -- that are ever compared to each other.

BY MR. URIS:

Q.  Do you recall any quarter, other than Q4 of 2021, in which a higher percentage of the company's sales came in after the midpoint of the quarter?

Page 191

A.  I don't recall tracking that at all one way or the other. It feels like that's something that happened, but I don't -- I don't recall.

Q.  Do you recall that 75 -- approximately 75 percent of the company's orders came in in the second half of Q4 2021 for that quarter?

A.  I don't recall the percentage. I just remember it was a big December in terms of topline revenue.

Q.  Do you recall whether anyone at the company as of May 12, 2022, had any reason to believe that more than 75 percent of the orders for the quarter would come in in the second half of that quarter?

MS. BARROW:  Objection.

THE WITNESS:  I didn't speak to everybody at the company to determine what they thought percentage of sales would look like for the back half of the quarter.

I do know that Q1 was different than Q4. Q4 had a big final month in the -- in the quarter. Q1 had a big initial month in the quarter. It was unpredictable.

It was -- it was all over the map. We just didn't know what it -- what it was going to look like. We'd have these wild peaks. I mean, it was --

Page 192

it was -- it was, frankly, impossible to predict what was going to happen next. Would there be another variant? Would there be another omicron? Would there not? What would that do? I mean, I don't recall anybody specifically stating what percentage of sales they thought would come in after the first week of May in that quarter.

BY MR. URIS:

Q.  But you don't know what -- as of November 10, 2021, you don't know what the company sales to date in that quarter were; correct?

A.  November 10 -- no, I don't recall what the quarter sales were to date in -- November 10, 2021.

MR. URIS:  I'm going to introduce what was previously marked as Exhibit 27, document bearing Bates stamp CoDx_00464876.

(Exhibit 27, having been previously marked, was discussed.)

BY MR. URIS:

Q.  That should be available.

A.  Got it.

Q.  This is an email chain. Top email from Andrew Benson sent March 8, 2022 to Dwight Egan, copying Brian Brown. Subject line: "Re: Get their release and show me a potential draft." An

Page 193

attachment: "CODX - Share buyback PR Dr 1."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A.  As far as I know. Don't have any reason to think it wouldn't be.

Q.  Do you recall in March of 2022, the company was considering initiating a share buyback program?

A.  I don't recall the specific time period around which we started considering it. It appears to be this time period.

Q.  And do you appear to be circulating a -- a draft announcing the authorization of a share repurchase program?

A.  It appears that's what I've done here, yes.

Q.  And in your email, you write:
"Ike,
"Here's what I got. You may not like the line at the end of the quote implying a post-pandemic world, but I think it's important in our messaging for people to understand we're still very bullish about our future despite the decline in COVID testing."
Do you see that?

A.  I do, yes.

49 (Pages 190 - 193)

Page 194

Q.   What were you are referring to when you referred to "the decline in COVID testing"?

A.   It's hard for me to go back and say at this point.

It was regularly the case that I would be monitoring overall market trends and what other companies were saying.  We'd just been presented with an email earlier that showed a company, whose name already escapes me, talking about how they had lower -- they had lowered their forecast based on decreased demand for COVID testing.  I can't remember exactly what it said.

And I -- it seems here I'm saying it's important that people understand that despite what other companies are saying, despite what other market sentiments are, we're still bullish about our own specific future at Co-Diagnostics.

Q.   Do you recall whether at this time the company was experiencing a similar decline in demand for the Logix Smart COVID-19 test?

MS. BARROW:  Objection.

THE WITNESS:  I don't -- I don't recall.  This was eight days into March.  I know our -- we tended to look at numbers on a quarterly basis, and at this point, our Q1 numbers probably would have

Page 195

looked pretty good, but I wasn't looking at stuff on a week-by-week basis.  And if you looked at our past quarters, we've been fairly consistent.

Like, I don't recall having any reason to believe that we weren't going to continue to see those -- you know, those -- those waves in -- in testing.  Maybe the -- the -- the frequency of those waves would change or the amplitude would change, but, I mean, I -- I don't recall having any belief that -- that they wouldn't still continue in one form or fashion.

BY MR. URIS:

Q.   And then below that, you write:

"I'd also suggest you consider attributing this quote to Brian."

Why did you make that suggestion?

A.   I seem to recall thinking that this was something that's very -- I mean, it's not uncommon for companies to attribute quotes to other members of the C-suite, and this is something that's very much the kind of thing that Brian would be -- I mean, it was in his wheelhouse.  This is something, you know, by which he would be the -- the most expert opinion in the company.  That's my recollection.  I can't recall for sure.

Page 196

Q.   Is that because he was the CFO?

A.   Correct.  Yes.

Q.   And if you look at the draft press release, in that second paragraph, starting with the second sentence, it reads:

"'We believe that our shares are currently undervalued, which has provided us with an opportunity to strategically allocate capital in a way that helps drive continued growth and demonstrates our positive outlook for the future as we, along with the rest of the world, adjust to a new reality that is no longer dominated by daily headlines about the pandemic.'"

Do you see that?

A.   Yes.

Q.   And -- and what are you referring to when you write "a new reality that is no longer dominated by daily headlines about the pandemic"?

A.   I don't really recall at this point, just that, as I've already talked about earlier, we were -- we were into this phase of -- of COVID fatigue at varying points.  This has been two years since, you know, the pandemic had been underway, since lockdowns.  I mean, this was -- you know, it

Page 197

was two years to the day that lockdowns had begun.

And it seems like at this point, there had been -- I don't know.  I -- I can't recall specifically other -- other than what I said here is that it sounds like I'm talking about in this March of 2022, that the daily headlines were no longer dominated about the, you know -- about the pandemic -- dominated by the pandemic, so ...

Q.   And -- and why did you think that Dwight wouldn't like that line?

A.   Because it was very much the case that we were still in a pandemic at that time.  People might have been -- you know, might have fallen out of the news cycle as much, but it was still very much in the pandemic.  And I -- I recall Dwight and I -- I can't remember exactly when, but I know that we had had conversations about -- you know, you would see references to a post pandemic world.  And we would say, Well, people would say that, and it's erroneous because the pandemic is not over.  We're still in a pandemic.  We still believe, because the CDC and the WHO, and the FDA, everybody still believes we're still in a pandemic at this time.

And so I would try to shy away from inferences that the pandemic was over because

50 (Pages 194 - 197)

Page 198

scientifically -- from a scientific and an epidemiological perspective, that -- that just was not the case.

MS. BARROW: Can we take a quick water break?

MR. URIS: Yeah. I just have one more question.

BY MR. URIS:

Q. Do you know whether after the first quarter of 2022, the company ever had a quarter in which it sold more than $6 million worth of the Logix Smart COVID test?

A. For Q1 '22?

Q. Following Q1 '22?

A. Just going off my recollection of -- of the exhibits you shared at the beginning of the deposition, I don't believe that was the case. I don't -- I don't really recall. Just going -- based off of that.

MR. URIS: Okay. Did -- did someone want to take a -- a break?

MS. BARROW: (Nods head.) If we could do a five-minute break. Come back 5:55 or at the 55.

MR. URIS: Sure.

VIDEOGRAPHER: We're off the record. The

Page 199

time is 3:47.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record. The time is 3:56.

Counsel may proceed.

MR. URIS: I'll introduce what was previously marked as Exhibit 29, document bearing Bates stamp CoDx_00464879.

(Exhibit 29, having been previously marked, was discussed.)

THE WITNESS: You said 29?

MR. URIS: Yes.

BY MR. URIS:

Q. This is an email from Andrew Benson sent March 10, 2022, to Dwight Egan and Brian Brown. Subject line: "Share repurchase release Dr 2." Attachments: "CODX - Share buyback PR Dr 2."

A. I see it.

Q. To your knowledge, was the email reflected in this document sent at the time indicated on this document?

A. I believe so, to my knowledge.

Q. Is it your understanding that -- that "Dr" refers to draft?

A. Yes, that's my understanding.

Page 200

Q. Does this appear to be a draft of the same press release regarding the share repurchase program that we just looked at?

A. It appears to be so, yes.

Q. And your proposed sentence regarding a new reality that is no longer dominated by daily headlines about the pandemic appears to be removed; correct?

A. It appears to be, yes.

Q. Do you recall who removed that sentence or asked that it be removed?

A. I don't recall.

Q. Do you think it would have been either Dwight Egan or Brian Brown?

MS. BARROW: Objection.

THE WITNESS: I believe it would have been one of them. I don't know for sure.

MR. URIS: I'm going to introduce as Exhibit 50, document bearing Bates stamp CoDx_00087154.

(Exhibit 50 was marked for identification.)

BY MR. URIS:

Q. Okay. That should be available.

A. Okay.

Page 201

Q. This is an email from Andrew Benson sent March 23, 2022, to Dwight Egan, copying Brian Brown, and BCC'ing Jennifer Webb. Subject line: "Current PR," and an attachment: "CODX 4Q21 Earnings Release draft v3."

To your knowledge, was the email reflected in this document sent at the time indicated on the document?

A. I don't have any reason to think it wasn't.

Q. And does this appear to be a -- a draft press release announcing full year 2021 financial results?

A. That's what it seems to be.

Q. In your email, you write:

"Hi Ike,

"See cleaned up version of the current PR. Brian and I have a minor disagreement in the sub-header (see the comment there) but I'm happy to defer to consensus."

Do you see that?

A. Yep.

Q. And if you could turn to the attachment, there appears to be various comments on the sub-header. First, I guess, the -- the -- the full header reads:

51 (Pages 198 - 201)

Page 202

"Achieved Record Full Year Revenue of $97.9 million; Strength in Sales Momentum Provides Platform for Solid" Fiscal Year -- or "FY'22."

Q. Do you see that?

A. Yes.

Q. And then do you see there's a comment from WS, who I believe is William Stack? He writes: Alternative --

"Alternative second sub-header could be: 'Provides financial guidance for First Quarter Fiscal 2022'"

Do you see that?

A. Yes.

Q. And if you take a look at -- towards the end of the -- the draft release, there -- there's a section where the company is providing "First Quarter Fiscal 2022 Outlook"; is that correct?

A. Yes.

Q. If you look at -- back at the comments, there's a comment below that from BB.

Is it your understanding that's Brian Brown?

A. Yes.

Q. And he writes:

"I like original better"

Page 203

And then below that, there's a comment from you:

"I prefer the alternative (so we're not later accused of overstating our potential by referring to it as 'solid' if AANNNNYY shareholder later disagrees with us, which they DEFINITELY WILL)" in capital letters.

Do you see that?

A. Yes, I do.

Q. Why did you not want to refer -- refer to the sales momentum as solid?

A. It appears as though I didn't want to say anything that I thought shareholders would disagree with.

Q. Why did you think that shareholders would definitely disagree with that?

A. Because my experience at this point, you know, a couple years into the pandemic is it simply just did not matter how well we performed, somebody was always complaining and said that -- saying that it wasn't good enough.

Q. Was that concern based on any understanding of what the company's sales had looked like in February or March of 2022?

A. I don't believe so.

Page 204

Q. But this line was --

A. Just shareholders -- my recollection of this is just that it is referring to that -- the difficulty in pleasing shareholders and -- and meeting their lofty expectations, that it doesn't matter how well we performed, even 2021, which was our best year ever, people still complained about it.

Q. You didn't think this was referring to the sales momentum in the first quarter of 2022?

MS. BARROW: Objection.

THE WITNESS: No. We -- we -- again, this is March, like -- as I've said before, we always thought that, you know, months with lower sales were followed by months with higher sales. I mean -- and especially when averaged out over a quarter basis, everything kind of seemed -- you know, especially at this point, this was only March in the year. We were coming off of a -- off of a -- a good quarter in 2021. No reason to predict how the rest of the -- of the year was going to go.

But I mean, this is just me being cautious and realizing that anything I put in here, shareholders, you know, potentially are going to complain about. And so I was -- looks as though I was just advocating something more objective that

Page 205

couldn't be later on argued with because somebody disagreed with the subjectivity of what was a solid year.

BY MR. URIS:

Q. The -- the -- the "solid" in -- in that second sub-header refers to sales momentum; correct?

A. I don't know. "Strength in Sales Momentum Provides Platform for Solid FY'22." I don't know what -- I mean, this would have been drafted by Lambert, and I'm -- I'm not sure what Will would have been referring to when he referred to a "solid" year FY'22. I can't speculate what was in his head at the time.

Q. Okay. But the -- sales momentum doesn't necessarily refer to the entire full year 2021 results; correct?

MS. BARROW: Objection.

THE WITNESS: I don't -- I simply don't -- yeah. Sorry. I don't know what he was -- what he was referring to here.

Was he speaking about sales momentum of full year 2021? Was he speaking about sales momentum so far in Q1 '22? I don't know.

MR. URIS: Let me introduce as Exhibit 51, document bearing Bates stamp CoDx_00087161.

52 (Pages 202 - 205)

Page 206

(Exhibit 51 was marked for identification.)

BY MR. URIS:

Q. Okay. That should be available.

This is -- this is an email chain. Top email from Andrew Benson sent March 23, 2022, to William Stack, copying Brian Brown and Mike Houston, BCC'ing Andrew Benson. Subject line: "Q4/FY21 Release," with an attachment.

And in the -- to your knowledge, was the email reflected in this document sent at the time indicated on the document?

A. As far as I know. I don't have any reason to believe it wasn't.

Q. In your email in the third paragraph, you write:

"Only thing I didn't agree with on Brian's comments is the sub-header. Yes, the original version is more punchy, but maybe I'm just too risk-averse."

Do you see that?

A. I do, yes.

Q. And other -- other than what we already discussed when looking at the other exhibit, is there any reason why you thought that language was risky?

Page 207

A. It's funny, 'cause that was actually the -- the phrase I was about to use when we were looking at the last exhibit is that I'm, you know, very risk-averse when it comes to the language that I use and prefer to, you know, not have something that later on somebody can complain that they didn't like the way that I worded things. Try to be very careful.

I mean, it's not perfect, but this was an example of something where I thought, Well, why put ourselves into a situation where somebody could later complain that they didn't like the way that we said something because they -- they disagreed with how subjective the word "solid" was?

Q. Do you think that language would be risky if the company's sales momentum was solid as of March 23, 2022?

MS. BARROW: Objection.

THE WITNESS: Like I said, even if we had outperformed 2021 by $20 million, there still would have been somebody that was complaining that it wasn't solid enough, that we should have done more.

We had no idea what was going to be happening with COVID. This was March. Again, we're coming off of -- at this point, still looked like a

Page 208

pretty decent average quarter based on what we had done before. We'd seen 2021 beat 2020. We had this new platform we were build- -- building. We had every expectation, as you can see in my other emails, to be bullish about 2022.

But I also said, you know, in my email to Ike and Brian, I'll agree with whatever consensus wants. This was my opinion that putting something like this in would cause me personally some heartache later on because a shareholder would be complaining that we didn't have solid results, according to their definition of solid. But it wasn't anything that would get us in hot water from a regulatory perspective or from an -- from being honest or authentic. It was just a preference to -- to -- to not go there.

BY MR. URIS:

Q. You felt the word "solid" was too subjective?

MS. BARROW: Objection.

THE WITNESS: It can mean a lot of things -- Thanks.

It can mean a lot of things to a lot of people.

///

Page 209

BY MR. URIS:

Q. And you don't recall whether you had any concerns about what the company's sales performance looked like in February of 2022 or to date in May -- in March of 2022?

A. I don't recall having any such concerns. I typically looked at numbers on a quarter basis, and this quarter was looking in line with what we had done in the past.

Q. If -- if the language concerned sales momentum, would you look at a -- a monthly breakdown within the quarter?

MS. BARROW: Objection.

THE WITNESS: I'm not sure what I would have done if I'd had a different understanding of it. I -- I don't know that that would have changed my concerns about it.

I can only recall what I -- what I remember; right? And it was for those reasons that it was just something that potentially later on somebody could complain about.

BY MR. URIS:

Q. Then in that same exhibit, if you could turn to the -- the next page with the Bates number ending in 1 -- 162. And do you see the top email is an

53 (Pages 206 - 209)

Page 210

email from Brian Brown sent Wednesday, March 23, 2022, at 6:49 p.m. to William Stack and Andrew Benson, copying Mike Houston?

A. I see that, yes.

Q. And if you look at Mr. Brown's email, in the third paragraph, he writes:

"Also, at first glance, I don't" want to particularly -- "I don't particularly want to address any revenue cadence by month for Q1. In the second part of Ike's quote, we make mention of sales through Feb. I would prefer not to provide any mid quarter or monthly cadence."

Do you see that?

A. Yes.

Q. Do you have an understanding of why Mr. Brown didn't want to address any revenue cadence by month for Q1?

MS. BARROW: Objection.

THE WITNESS: I mean, I -- you'd have to speak to Brian. I don't know. It was -- I would say it was never company policy to provide monthly cadence as we were reporting earnings, so this would be in line with what we had done in the past.

///

Page 211

BY MR. URIS:

Q. Do you think he might have been concerned that a monthly cadence would have shown that sales were down in February and March of 2022?

MS. BARROW: Objection.

THE WITNESS: Again, I -- I don't really want to speculate as to what was in his head, but I will again remind you that it was never the policy to provide cadence with that degree of granularity. It wasn't something that we had been doing and then were choosing not to do. It was just simply not part of our operations or standard operating procedures when it came to reporting.

MR. URIS: Introduce what was previously marked as Exhibit 32.

(Exhibit 32, having been previously marked, was discussed.)

BY MR. URIS:

Q. That should be available.

This is an email chain. Top email is from Brian Brown sent March 21, 2022, to Mike Houston, with a BCC to Andrew Benson. Subject line: "Fwd: Current script." Attachment: "Q4 2021 Earnings Call Script v3."

To your knowledge, was the email reflected

Page 212

in this document received at the time indicated on this document?

A. I believe so. No reason to believe otherwise.

Q. If you can turn to the page with the Bates number ending in 359.

A. Okay.

Q. And that first full paragraph, it reads:

"For the quarter, revenue decreased to $20.4 million compared to $27.1 million from the prior year same period. The decrease was primarily due to the timing of sales for a Logix Smart COVID-19 tests during the quarter. We experienced a significant level of demand for these tests toward the end of the fourth quarter, with that increased demand spilling over into the first quarter of this year."

Do you see that?

A. Yes, I do.

Q. And if you could turn back to the top email on the email chain where Mr. Brown writes in the second paragraph:

"Also, do most year end calls have any discussion about the quarter? I would like

Page 213

to avoid if we could and focus on full year results. Thoughts?"

Do you see that?

A. Yes, I do.

Q. Do you have an understanding of why Mr. Brown wanted to avoid any discussion of the fourth quarter?

MS. BARROW: Objection.

THE WITNESS: I don't recall.

BY MR. URIS:

Q. Do you recall whether in 2022, stock-based compensation was a significant portion of the company's spend?

A. I don't recall how that figured into our balance sheet, no -- or income statement, rather.

MR. URIS: I'm going to introduce what was previously marked as Exhibit 43, document bearing Bates stamp LAMBERT0004387.

(Exhibit 43, having been previously marked, was discussed.)

BY MR. URIS:

Q. That should be available.

This is an email chain. Top email is from William Stack sent March 7, 2022, to Brian Brown, copying Zachary Mizener, Andrew Benson, and Mike

54 (Pages 210 - 213)

Page 214

Houston.

To your knowledge, was the email reflected in this document received at the time indicated on the document?

A. I don't have any reason to believe that it wasn't.

MS. BARROW: What's the exhibit number again?

MR. URIS: Forty-three.

BY MR. URIS:

Q. And then if you look at Mr. Brown's email at the bottom of the page, he writes:

"I think the messages should be similar to what we have discussed in past:"

And then he lists five points. And then below that he writes:

Then I also -- then I --

"Then I want to also start talking more and more about adjusted EBITDA. For us, right now, that definition would be EBITDA with stock compensation added back."

Do you see that?

A. Yes, I do.

Q. Do you recall why Mr. Brown wanted to start talking more and more about adjusted EBITDA at this

Page 215

time?

MS. BARROW: Objection.

THE WITNESS: I recall him mentioning to me that that's something he did in his previous organization, and he thought it was a -- it was -- a better reflection of a company's performance was to talk about EBITDA rather than just EPS.

It's not really -- I mean, I understand the term and -- but that's not really my department. The -- I mean, that's -- that's really more Brian's realm as the CFO. I recall just that -- yeah, that he thought it was -- it was a better reflection of -- of the company's value, that a lot of information could be lost in EPS, in earnings per share.

BY MR. URIS:

Q. Do you recall if Mr. Brown had a concern that a large amount of stock-based compensation would depress the company's EBITDA?

A. No, I don't recall. Yeah. I don't recall him saying that at all. I don't recall him expressing that concern to me.

MR. URIS: Okay. Can we go off the record for a moment?

MS. BARROW: Okay.

VIDEOGRAPHER: Okay. We're off the record.

Page 216

The time is 4:21.

(Short recess taken.)

VIDEOGRAPHER: We're back on the record. The time is 4:27.

Counsel may proceed.

MR. URIS: All right. I have no further questions at this time.

However, I do want to request on the record that counsel for defendants confirm that Mr. Benson's reMarkable tablet was searched for documents and information responsive to plaintiff's document requests.

And I also want to note for the record that we are keeping this deposition open as we were still in conversations with defendants' counsel regarding the sufficiency of defendants' privilege log. And to the extent additional documents are produced, it may be necessary to call the witness back to ask questions about any of those documents.

MS. BARROW: It is our understanding that all responsive nonprivileged documents has been produced, but we're happy to confirm via email. And it's also our understanding that all nonprivileged documents have been produced as well as it pertains to the privilege log. But we're happy to discuss

Page 217

offline.

And no further questions from me either.

VIDEOGRAPHER: We're off the record. The time is 4:28.

COURT REPORTER: And you did want Andrew to read and sign; correct?

MS. BARROW: Yes.

(This deposition was concluded at 4:28 p.m.)

* * * * *

55 (Pages 214 - 217)

Page 218

REPORTER'S CERTIFICATE

STATE OF UTAH     )
                  )
COUNTY OF UTAH    )

I, EMILY A. GIBB, a Certified Shorthand Reporter and Registered Professional Reporter, hereby certify:

THAT I reported the taking of the deposition of ANDREW BENSON, commencing on November 12, 2024, at 9:05 a.m.

THAT prior to being examined, the witness was placed under oath to tell the truth, the whole truth, and nothing but the truth; that the proceedings were taken down by me in shorthand and thereafter my notes were transcribed through computer-aided transcription; and the foregoing transcript constitutes a full, true, and accurate record of such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify that I am in no way related to any of the parties, nor I am I financially interested in the outcome of the case.

(X) Review and signature was requested.
( ) Review and signature was waived.
( ) Review and signature was not requested.

IN WITNESS THEREOF, I have subscribed my name on this 25th day of November, 2024.

_____
Emily A. Gibb, RPR, CSR, CCR

Page 219

Erica Barrow, Esq.

ebarrow@bakerlaw.com

November 29, 2024

RE: STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al.

11/12/2024, Andrew Benson (#6992291)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 220

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al.
11/12/2024 - Andrew Benson (#6992291)
E R R A T A   S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____
Andrew Benson                Date

Page 221

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al.
11/12/2024 - Andrew Benson (#6992291)
ACKNOWLEDGEMENT OF DEPONENT
I, Andrew Benson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____
Andrew Benson                Date
*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.

_____
NOTARY PUBLIC

56 (Pages 218 - 221)

**[& - 19]**                                                                  Page 1

**&**

**&**   2:4 6:16,20 23:10

**0**

**00002035** 174:23
**00003013**   156:2
**00004432**   79:23
**00004880**   168:4
**00004924**   170:5
**00005923**   65:1
**00013**   80:3
**00016**   115:13
**00018**   128:8
**00033**   57:20
**00035960**   57:16
**00042670**   59:19
**00043742**   52:5
**00075094**   85:12
**0008**   59:23
**00086287**   179:1
**00087154** 200:20
**00087161** 205:25
**001s**   3:10 53:2 53:23 54:13
**00463646**   128:3
**00464876** 192:16
**00464879**   199:8
**00466367** 141:12

**00501488**   40:18
**00506169**   117:6
**00506183**   137:6
**00506830** 132:17
**00522583** 151:22
**0087379**   159:25
**039**   175:18
**04**   15:22
**05**   15:23
**050322**   80:10
**07**   114:22
**08**   114:22,24

**1**

**1**   6:6 47:18 48:16 156:9 193:1 209:25
**1.39**   47:16
**1.939**   48:11
**1/2**   16:25 17:12 59:6 78:3
**1/4/2021**   4:8
**10**   16:25 78:12 132:23 137:15 138:6,16,16 186:9 192:10 192:12,13 199:15
**10022**   2:5
**10111**   2:11
**10:09**   33:20

**10:38**   137:15
**10:47**   56:9
**10:49**   56:12
**10am**   138:10
**10th**   187:21 190:2
**11**   65:9 181:2
**11/12/2024** 219:5 220:2 221:2
**115**   3:20
**117**   3:22
**11:40**   85:5
**11th**   11:16
**12**   1:18 3:8 4:6 6:5 33:13 39:21,22 40:18 48:15,21 75:16 75:23 76:25 141:19,22 165:4 181:6 189:19 191:11 218:6
**120**   169:18
**128**   3:23
**12:13**   128:24
**12:24**   85:8
**13**   3:16 67:16 67:19 79:22,24 118:21
**132**   4:3
**137**   4:4
**14**   3:17 85:11 85:13,14 160:7

**141**   4:6
**14551**   1:25
**15**   3:19 88:10 88:12 179:7
**151**   4:8
**156**   4:10
**16**   3:11,20 58:1 115:7,9
**160**   4:12
**162**   209:25
**164**   4:13
**168**   4:15
**17**   3:22 117:5,7 121:1 123:9,19 123:19
**17-19**   108:19
**170**   4:16 120:11 121:2
**171**   117:20
**174**   4:18 126:9
**179**   4:19
**18**   3:23 128:2,4
**186**   4:21
**19**   4:3,23 33:23 34:2,7,10 43:21 44:9 55:23 56:17 58:11 123:9,20 126:16 132:16 132:18,22 143:19 169:20 172:14 183:4 184:9 186:18 194:20 212:13

**192**  5:3 139:2
**1939**  7:16
**199**  5:5
**1:03**  115:1
**1:09**  115:4
**1:16**  119:15
**1:29**  141:19
**1:31**  119:18
**1q21**  65:12
**1q22**  80:9
85:22 133:2
137:18 141:22

**2**

**2**  5:6 33:12,20
34:5 78:3
84:18 168:10
199:16,17
**2.796**  47:12
48:9
**20**  4:4 39:13
40:23 41:18
78:12 137:5,7
137:11 172:7
207:20 221:15
**20.4**  212:10
**200**  5:7
**2002**  52:24
**2014**  17:20
**2017**  187:10
**2019**  187:11
**2020**  34:8
41:16 42:21
43:5 79:14

183:9 187:11
208:2
**2021**  12:24
19:5,10 20:13
21:2,15,18
22:1,4 23:23
24:21 25:25
26:21,25 27:7
27:16 28:19
29:10,16 34:21
35:24 36:10
38:2,21,23
40:21 49:23
51:9 52:2
64:17,18,20
65:9 66:18
67:16,21 72:2
129:25 130:20
150:15 152:8
185:20 186:9
190:24 191:6
192:10,13
201:11 204:6
204:19 205:15
205:22 207:20
208:2 211:23
**2021-2022**
22:25
**2022**  3:11,20
4:6 12:25
19:10 20:13
21:2,15,18
22:1,5 23:23
24:21 25:25

26:21,25 27:7
27:16 28:19
29:10,16 34:21
35:25 36:10
38:3,21,24
39:8 40:21
41:16,24 42:10
42:22 43:6,21
44:9 45:3,4,9
45:10 46:3,22
47:12,16 48:17
48:21,23 49:3
49:6,23 51:3
53:20 54:24
56:15 58:1
60:9,14 61:24
62:11,17 63:6
63:20 72:2
73:4 74:5,7
75:16,16,23,25
76:4,7,25 77:1
79:15 80:7
81:12,18 82:3
85:19 86:18
88:18 95:24
105:17 112:18
113:1 115:17
116:7 117:13
119:1,23 120:6
124:24 128:12
128:24 129:25
130:20 131:16
132:10,23
134:13 137:15

138:6,16
141:19,22
142:21 143:14
147:9 156:9
160:7 162:5
164:15,16
165:4 168:10
169:3 170:11
172:11 175:4
175:21 176:22
178:11 179:7
181:1,2,5,6
182:5,10 183:3
183:9,18,24
185:20 189:19
189:20 190:8
191:11 192:23
193:7 197:6
198:10 199:15
201:2 202:12
202:18 203:24
204:9 206:6
207:17 208:5
209:4,5 210:2
211:4,21
213:11,24
**2022's**  73:5
**2024**  1:18 6:5
218:6,21 219:3
**206**  5:8
**20mm**  188:3
**21**  4:6 141:11
141:13,16
211:21

**[211 - 7th]**                                                                                          Page 3

**211**  5:10
**212**  2:6,11
**213**  5:11
**22**  1:6 6:10
  80:24 175:5
  198:13,14
  205:23
**23**  4:13 164:22
  164:24 201:2
  206:6 207:17
  210:1
**240**  53:24
**2410**  3:10 53:2
**25**  4:18 174:22
  174:24
**2575**  63:12
**25th**  218:21
**26**  4:19 178:25
  179:2
**27**  5:3 192:15
  192:17
**27.1**  212:10
**28531**  218:24
**29**  4:22 5:5
  186:17 199:7,9
  199:11 219:3
**295**  180:4
**298**  180:11
**2:02**  85:19
  141:5
**2:08**  116:7
**2:09**  141:8
**2:35**  60:14 61:7

**2:49**  167:23
**2:57**  168:1
**2q22**  168:13
  170:14 175:6

**3**

**3**  61:23 62:11
  82:3 85:8
**3.32**  46:22 47:8
**3.323**  48:7
**3/10/2022**  5:5
**3/23/2022**  5:7
**3/8/2022**  5:3
**30**  22:18 86:25
  173:8 219:16
**32**  5:10 211:15
  211:16
**33**  3:11 57:15
  57:18
**359**  212:6
**38th**  2:5
**39**  3:8 4:15
  168:4,5
**3:47**  199:1
**3:52**  186:9
**3:56**  199:4

**4**

**4**  3:9 49:5 52:5
  52:6 60:9 63:6
  63:20 80:7
  85:19 88:18
  115:4 152:8
  157:20

**43**  5:11 213:17
  213:19
**438**  81:6
**44**  3:14 64:25
  65:2,6
**45**  2:10 4:8
  151:21,23
  152:5
**46**  4:10 156:1,3
**47**  4:12 159:24
  160:1
**48**  4:16 170:4,6
**49**  4:21 186:1,3
**4:20**  53:20
**4:21**  216:1
**4:22**  124:24
**4:27**  216:4
**4:28**  217:4,9
**4:46**  60:10
  63:20
**4q21**  201:4

**5**

**5**  42:1 79:18
  153:14 155:13
  157:20
**5-4-22**  85:22
**5/12/2022**  4:6
**5/4/2022**  3:19
**50**  5:7 22:15,16
  114:13 200:19
  200:21
**51**  5:8 205:24
  206:1

**52**  3:9
**55**  198:23
**57**  3:11
**586**  153:24
**589-4200**  2:11
**59**  3:13
**5:55**  198:23

**6**

**6**  17:12 115:17
  116:7 119:1
  198:11
**648**  128:22
  129:1,2
**65**  3:14
**671**  63:3
**687-1980**  2:6
**6978**  1:6 6:10
**6992291**  219:5
  220:2 221:2
**6:31**  120:6
**6:49**  210:2

**7**

**7**  3:3 60:13
  213:24
**709**  1:25
**75**  191:4,5,12
**79**  3:16
**7:32**  132:24
**7:34**  138:7
**7th**  61:7

**[8 - advance]**                                                        Page 4

| 8 | a | | |
|---|---|---|---|
| **8**  3:13 52:24 53:20 56:15 59:18,21 119:23 120:6 128:23 170:11 175:21 178:11 192:23 | **a.m.**  1:19 6:5 128:12 132:24 137:15 138:7 138:16 187:21 218:7 | **account**  65:24 80:20 | 170:1 |
| **8-3-22**  170:15 | **aannnnyy** 203:5 | **accounted** 34:11 | **actually**  41:3 43:14 47:24 182:22 207:1 |
| **8-9-22**  175:6 | **ab**  137:18 168:13 170:15 175:6 | **accuracy** 176:19 219:9 | **add**  139:11 140:1 |
| **800**  2:4 | **ability**  64:7 94:24 108:7 126:15 143:18 145:18 | **accurate**  94:25 95:1 112:11 123:1,13 124:18 140:17 218:11 | **added**  127:9,14 214:21 |
| **839**  134:4 | | | **addition** 136:10,11 |
| **84105**  7:17 | | | **additional** 18:13 55:8 136:7 216:17 |
| **85**  3:17 | **able**  48:3 83:16 102:1 139:14 | **accurately** 94:23 101:16 126:15 143:18 145:14,14,19 185:16 | **additions**  221:6 |
| **88**  3:19 | | | **address**  7:15 165:20,24 166:1,2,3 210:9,17 |
| **8:15**  128:12 | **above**  54:2 61:22 62:10 102:17 111:17 124:14,23 143:13 166:10 188:6 219:6 221:7 | **accused**  203:4 | **addresses** 24:19 |
| **8:21**  187:21 | | **achievable** 104:24 105:6 105:11,16 110:5 | **adduced** 218:11 |
| **8:44**  88:18 | | | **adjust**  196:12 |
| **8:52**  115:17 | | **achieved** 169:18 202:1 | **adjusted** 214:19,25 |
| **8th**  119:2 | | | **administrative** 26:6 |
| 9 | **absolute** 142:25 | **acids**  34:4 | |
| **9**  78:4 117:13 124:23 128:12 175:4 | | **acknowledge...** 221:3 | **adoptability** 96:10 |
| | **absolutely** 108:4 | **acknowledg...** 219:12 | **adoption**  93:24 |
| **930**  171:1 | | | **advance**  99:3 99:20,22 171:13 |
| **95**  104:23 105:6,10,16 110:5 | **accepted**  21:10 | **action**  10:1 108:25 111:7 | |
| | **access**  35:21 36:25 37:6,6 37:10 183:4 | **activity**  169:9 171:20 185:14 | |
| **97.9**  202:2 | | | |
| **9:05**  1:19 6:5 117:13 218:7 | | **actual**  41:1 42:7 139:14 | |
| **9:57**  33:17 | | | |

**[advocating - appears]**

| | | | |
|---|---|---|---|
| **advocating** 170:22 204:25 | **allow** 103:7 | **andrew** 1:15 3:2 5:5 6:6 7:2 | **answered** 22:19 98:5 |
| **affect** 15:9,9 113:12 | **alter** 96:19 | 7:14 52:24 | 173:24 174:15 |
| **affected** 136:22 | **alternative** 101:13 102:14 | 58:2 60:7 61:8 | **answering** 8:4 8:18 44:6 |
| **africa** 26:14 | 103:6 104:20 | 65:10,10 80:7 | **anticipated** 20:19 93:22 |
| **afternoon** 140:22 | 106:21 108:18 | 85:1,20 88:19 | 102:5,9 155:17 |
| **ag** 160:18 | 109:22,24 | 115:18 117:15 | **anticipating** 107:20 |
| **agents** 17:11 | 110:3,7 202:9 | 124:7 128:13 | **anybody** 25:21 |
| **ago** 10:20 | 202:10 203:3 | 132:25 135:23 | 78:21 95:9,16 |
| 14:21 87:3 | **alternatives** 90:25 91:3,4 | 136:4 137:15 | 99:21 192:5 |
| 114:5 140:9 | 109:22 110:10 | 141:18 152:7 | **anybody's** 162:9 164:3 |
| 174:3 177:16 | **america** 26:6,9 | 152:10 156:9 | **anymore** 30:5 |
| 185:16 | 63:25 | 160:7 165:4 | 150:7 |
| **agree** 104:11 | **amount** 50:11 | 166:17 168:10 | **anytime** 48:21 |
| 127:24 135:22 | 50:15 164:10 | 170:11 175:21 | **anyways** 76:22 |
| 144:14,16,17 | 182:4,9 215:17 | 179:7,8,18 | 105:23 112:22 |
| 206:17 208:7 | **amounted** 50:12 | 186:10 192:23 | 118:3 |
| **agreement** 12:10 | **amplitude** 101:8 195:8 | 199:14 201:1 | **apologies** 31:2 |
| **agreements** 15:7,10 | **analyst** 29:18 | 206:6,8 210:2 | **apparent** 164:12 |
| **ahead** 86:13 | 30:2 129:20,25 | 211:22 213:25 | **appeals** 48:6 |
| 89:16 105:24 | 131:25 132:4 | 217:5 218:6 | **appear** 40:5 |
| **aided** 218:10 | 154:4 172:12 | 219:5 220:2,24 | 53:9 61:7 |
| **air** 102:21 | 172:15 173:3 | 221:2,4,12 | 125:16 142:19 |
| **al** 6:8 219:4 | 173:12 174:1 | **announcement** 4:11 156:12 | 168:21 171:3,6 |
| 220:1 221:1 | **analysts** 25:10 | **announcing** 193:13 201:11 | 193:12 200:1 |
| **allegations** 10:6 14:23 | 25:11 29:20,21 | **annual** 102:15 | 201:10 |
| **allocate** 196:8 | 32:12 132:9 | 102:19 104:3 | **appears** 41:20 |
| **allotted** 219:19 | 162:15,18 173:22 | **answer** 8:5,12 8:13,23 11:5 | 42:5 46:21 |
| | **analyzed** 131:2 | 37:19 99:10 187:23 | 47:11,13,15 |

**[appears - attribute]**                                          Page 6

48:6 53:7,11
54:16 55:13
66:19 80:22,25
86:5,12,14
91:2 120:1
122:18 125:24
133:25 135:9
139:5,15 166:8
175:9 180:2,6
180:9,25
193:10,15
200:4,7,9
201:23 203:12
**appended**
  221:7
**applicable**
  219:8
**apply** 104:6
**approach**
  81:17 82:7,12
  82:14 83:11,13
  84:6
**appropriate**
  25:7 32:11
**approve** 63:15
**approved**
  135:14 156:19
**approximately**
  17:4 22:3
  34:10 39:9
  66:21 67:19
  188:19 191:4
**april** 47:16
  48:23 51:2

60:13 61:7
76:1 189:24
**apuli** 60:4,6,13
  63:6,20
**arabia** 51:11
  51:14,18
**archived**
  142:24
**areas** 102:7
  113:11
**argued** 158:17
  205:1
**argumentative**
  98:6
**arrange** 24:14
  25:17
**arranging**
  20:23
**arrive** 75:5
**arrived** 51:15
**asia** 26:14
**aside** 103:25
**asked** 16:20
  22:19 46:13
  60:18 98:5
  140:1,12
  172:12 174:10
  174:15 200:11
**asking** 13:16,17
  27:5 76:5,8,20
  86:5 99:14
  100:20 146:9
  153:19 160:17
  173:21 178:6

189:23
**assessment**
  62:12
**assist** 19:21
  25:17,21 26:18
**assistance**
  31:21 176:7
  184:21,23
**assisted** 19:22
  30:10
**assisting** 16:21
  17:14 25:8
**associate** 146:1
  146:9 147:16
  147:19,19
  148:8,12,19
  149:20
**associated**
  150:2 154:25
  176:21 186:21
**associates**
  23:11
**assume** 8:23
  69:15 122:9
  123:22
**assumed** 92:22
  92:22 94:7
**assuming** 89:3
**attached** 61:12
  66:12 86:24
  126:5 133:10
  178:8 219:11
**attachment**
  3:15,16,18,22

3:24 4:3,5,7,9
4:15,17,18,20
4:23 5:4,6,7,9
5:10 65:12
67:15 80:8
81:4 85:21
86:16 128:15
133:1,12,21,24
137:17 139:1
141:22 142:19
143:11 153:10
153:11,23
168:13,21
170:14,25
175:5 193:1
201:4,22 206:9
211:23
**attachments**
  117:16 179:9
  199:17
**attend** 15:16
  28:25
**attended** 16:3
  90:10 129:22
**attending**
  25:15
**attention** 87:13
  173:11
**attorney** 11:4
  13:15,17,19
  42:18 219:13
**attribute**
  195:19

**attributed** 177:3

**attributing** 195:14

**audibly** 8:5

**audio** 18:15 30:18,19,22 56:2 59:8 92:9 115:25 119:12 133:14

**august** 168:10 170:11 175:4 175:21 178:11 179:7 181:2,2

**authentic** 208:15

**author** 169:23

**authorization** 193:13

**available** 7:10 40:1 52:9 57:17 59:20 62:4 63:24 65:5 80:2 85:12 88:15 96:9 115:12 117:10 128:7 132:21 137:10 141:16 152:2 156:6 160:4 165:2 168:8 170:9 175:2 179:5 186:6 192:20 200:24

206:4 211:19 213:22 219:6

**avenue** 2:4

**average** 208:1

**averaged** 204:15

**averse** 206:20 207:4

**avoid** 213:1,6

**aware** 7:24 10:18 27:6 37:2 42:20 43:6 55:7 57:11 79:15 183:2

**b**

**b** 3:6 4:1 5:1

**bachelor's** 15:22

**back** 20:15 33:19 49:4,4 56:11 70:10 77:11 78:13 85:7 86:22 95:10 96:17 113:7,23 115:3 116:16 118:23 118:25 119:17 124:8 140:14 141:7 155:12 167:25 169:10 187:19 191:17 194:3 198:23

199:3 202:20 212:21 214:21 216:3,18

**background** 15:15

**bad** 31:9 110:21

**baker** 6:20

**bakerhosteler's** 12:14

**bakerhostetler** 2:10 12:6

**bakerlaw.com** 2:12 219:2

**balance** 126:16 134:13 143:19 213:15

**ballpark** 41:18

**bar** 45:3,5,5,8 45:19 47:5,11 47:15 48:5,9 48:11

**barcelona** 17:11

**barrow** 2:9 6:20,20 11:3 11:20 13:1,8 13:14,18 15:1 20:10 22:19 27:8 28:7,14 29:6 31:1,15 33:8,13 35:10 35:16 39:15 40:8,11,15,24

41:19 42:2,17 43:1,22 44:4 44:10,17 46:4 46:14 47:20 48:13,24 50:7 50:17 51:12,20 52:11,19 54:14 56:7 57:9 58:13 59:13 61:5,15,19 64:22 66:23 67:6 68:6 70:19 71:17,23 73:13 74:8,24 75:10 76:13 77:5,24 78:6 81:1 82:8,17 83:1 84:12,25 86:11 87:25 89:1,6,25 91:6 93:17 95:6 96:25 97:16 98:5,20 99:18 100:18 103:1 103:14,20 105:7 106:8 107:10,14,22 109:8,14 110:13 111:20 114:11,19,21 116:22 118:11 121:8,16 122:14,23 123:10,14

**[barrow - believe]** Page 8

125:11,20
127:13,23
129:16,21
130:22 132:12
134:21 136:13
137:11 139:12
139:22 142:22
144:12,21
146:3,12 147:6
148:10,21
149:22 150:17
151:6 152:3
154:18 155:2
157:1 158:13
159:12 163:8
167:1,14,17,19
169:21 172:24
174:15 176:25
177:8,25
178:17 181:25
182:11 183:5
183:10 184:11
184:15 188:13
188:21 189:22
191:14 194:21
198:4,22
200:15 204:10
205:17 207:18
208:20 209:13
210:19 211:5
213:8 214:7
215:2,24
216:20 217:7
219:1

**bars** 41:8 45:13
45:15
**based** 17:11
21:24 39:2
84:4 100:24
127:10,10
146:25 149:15
162:22 175:15
181:9,11 189:9
190:4 194:10
198:18 203:22
208:1 213:11
215:17
**basic** 24:16
**basically**
103:25 104:1
105:9 106:10
171:11
**basis** 44:19
49:14,21 50:20
72:15 73:23
84:2 91:15
92:24,25 97:23
98:11 164:19
172:4 188:25
194:24 195:2
204:15 209:7
**batches** 56:21
**bates** 40:9,12
40:18 52:5
57:16 59:19
62:24 63:2
64:25 79:23
81:6 85:12

88:11 115:8
117:6,19
120:10 121:1
126:9 128:3,21
129:1 132:16
134:4 137:6
139:1 141:12
151:21 153:23
156:1 159:24
164:23 168:4
170:4 171:1
174:23 175:18
179:1 180:4,11
186:1 192:16
199:8 200:19
205:25 209:24
212:5 213:18
**bb** 65:13 133:2
133:12,15
135:7 170:15
202:21
**bcc** 179:8
211:22
**bcc'ing** 152:10
201:3 206:8
**bearing** 57:15
59:19 64:25
79:22 85:11
88:10 115:7
117:5 128:3
132:16 137:5
141:11 151:21
156:1 159:24
164:22 168:4

170:4 174:22
179:1 186:1
192:15 199:7
200:19 205:25
213:17
**bears** 52:5
**beat** 111:18
112:5 208:2
**beating** 108:5
**began** 38:22
49:10 64:14
66:17 71:11
98:8
**beginning**
43:21 44:9
76:4 97:10
162:4 189:7,24
189:24,25
198:16
**begins** 47:18
**begun** 197:1
**behalf** 1:4 6:21
184:25 185:10
**belief** 144:23
150:19 154:22
155:5 195:9
**beliefs** 170:2
177:12
**believe** 10:5,9
10:20 12:19
13:3 14:7,9
19:6 22:16
25:14 26:3,13
29:24 30:2

32:18 34:22 35:3,12,17,19 37:18 38:19 40:7 45:22,23 47:10,23 53:12 55:21 58:7 64:18 65:17,20 68:19 72:22 86:1 88:25 89:8 104:23 105:5 110:4 116:4 119:21 133:6,7 137:22 139:20 140:5 141:20 147:23 151:13 152:15 153:5 160:14 165:11 169:24 170:19,20 178:1 181:3 190:7 191:11 195:5 196:6 197:21 198:17 199:22 200:16 202:8 203:25 206:14 212:3,3 214:5

**believed** 145:4 145:5 147:4 150:22,25 158:20 164:6 189:12

**believes** 151:17 197:22

**believing** 147:22 163:13

**benson** 1:15 3:2 5:5 6:7 7:2 7:9,14 52:24 58:2 60:7 65:10 80:7 85:20 88:19 115:18 117:15 128:13 132:25 137:15 141:18 152:7,8,10,17 156:10 160:7 165:4 168:10 170:11 175:21 179:7,8 186:10 187:1 192:23 199:14 201:1 206:6,8 210:3 211:22 213:25 218:6 219:5 220:2,24 221:2 221:4,12

**benson's** 216:9

**best** 11:7 75:20 87:15 112:9,9 112:10 116:11 166:20 190:5 204:7

**better** 83:16 105:2 106:4 202:25 215:6 215:12

**beyond** 101:25 102:13 136:17 137:2 155:6,19 159:20

**big** 185:22 189:14,14 191:8,20,21

**bigger** 50:6 94:4

**biggest** 49:22 49:24 51:5 185:19

**biopsy** 160:18

**bit** 15:14 30:8 33:9 45:2 68:3 84:18 133:17

**blanks** 83:22

**block** 89:4

**blue** 139:4

**blurry** 41:6 45:19 46:7,7

**board** 28:25 29:5 35:15,18 35:21,24 36:11 37:13,21 89:15 89:17,19,24 90:5,7,10,15,20 118:5 124:12 125:1,9 129:9 129:14,20,23 142:5,8,13,16 143:5 173:9

**boards** 37:11 37:14,17,23,24

**bohrer** 175:4 175:11 179:7 179:17

**bolivia** 64:9,10 64:11

**bonus** 21:23

**bonuses** 21:25

**borne** 189:13

**bottom** 45:5,11 55:11,11 60:12 62:23 80:15 86:4 89:4 138:5 139:3 157:5 165:15 214:12

**boxes** 185:6

**boyce** 7:14

**bramwell** 60:4

**brandy** 60:3

**break** 8:16,19 33:5 84:19,21 84:24 107:15 114:18 140:20 198:5,21,23

**breakdown** 209:11

**breakdowns** 185:21

**breaking** 84:15 104:7

**brian** 1:8 24:11 24:12 65:9 66:9 68:19 69:8 76:16

80:7 85:20 88:18 89:12 115:18 117:14 117:22 124:24 125:22,24 128:13 132:23 135:7,19 137:16 138:6 141:20 156:10 160:9 165:5 168:11 170:12 175:4,22 186:9 186:25 192:24 195:15,21 199:15 200:14 201:2,17 202:22 206:7 208:7 210:1,21 211:21 213:24

**brian's** 206:17 215:10

**briefly** 142:6

**bring** 13:22

**bringing** 153:4

**broadcast** 173:6,8

**brown** 1:9 24:12 30:25 31:7,14,25 32:14 65:9 66:9 67:25 69:8 72:6,11 73:10 76:5 80:7 85:20

88:18 89:18,20 89:23 90:14,16 90:19 105:15 113:22,23 115:18 117:14 124:24 127:12 128:23 129:14 129:19 132:23 133:8 134:19 135:7,19 137:16 138:6 140:12 141:20 156:10 160:9 165:5 168:11 170:12 174:12 175:4,22 181:4 181:15 183:24 186:9 187:1,20 188:10 192:24 199:15 200:14 201:2 202:22 206:7 210:1,17 211:21 212:22 213:6,24 214:24 215:16

**brown's** 66:10 68:20 72:9 80:23 86:3 115:21 116:6 120:4 129:5 133:21 180:7 210:5 214:11

**bubble** 81:21

**bubbles** 135:3

**build** 208:3

**building** 163:12 208:3

**bullet** 101:18 102:18 103:5 108:22 120:8 120:15,18,18 121:4 122:25 124:6,15 140:15 169:5

**bullets** 104:15 114:3

**bullish** 193:22 194:16 208:5

**business** 34:17 126:14 143:14 143:17 162:11 162:19 163:11 164:9

**buy** 138:11

**buyback** 193:1 193:8 199:17

**buyers** 106:19

**buying** 95:23

**c**

**c** 2:1 6:1 27:12 27:15,21 195:20

**ca** 1:25

**cadence** 153:2 210:9,13,17,23 211:3,9

**call** 3:23 4:12 4:13,20 24:15 32:5,13 36:8 68:11,20 73:4 73:6 74:5,21 80:23,24 86:25 87:1,3,6,12,18 87:19 88:2 89:13 91:1 128:15 131:17 131:22 133:2 160:10 165:6 166:6,13,21 172:12 173:10 173:16,20 177:18 178:22 179:9,20,24 181:1,6,23 182:6,10 187:14 211:23 216:18

**called** 7:3 16:6 17:3 37:18 38:15 62:24 80:9 173:18

**calling** 176:2

**calls** 13:2 15:2 24:10 25:9,12 25:13 28:20 30:15,18,22,25 31:7,14,17,20 32:20 68:8,24 69:1,3,4,7,10 71:5,16 103:20

172:16 173:24 174:2 212:24

**cambridge** 15:19 16:3

**cameron** 26:5 52:24 58:1 60:3,6 63:9,19

**cancel** 53:23 55:3

**canceled** 3:10 53:1 54:4 55:23 56:16 57:3,7,12

**cancellation** 54:20,23

**capacities** 23:17

**capacity** 23:4,7 23:15 25:3 27:2 153:2

**capital** 1:4 4:14 6:7 16:16,18 17:3,5,8,15,17 69:13 165:6,13 187:4,7,10 196:8 203:7 219:4 220:1 221:1

**care** 145:2 150:22

**careful** 207:8

**case** 1:6 6:9 14:25 15:5 36:22 42:6

43:24 44:2,13 55:21 66:19 70:6 86:2,14 87:7 88:8 92:22 95:5 97:10 98:14 113:17 122:3,6 133:25 138:18 138:21 166:8 173:10 181:10 189:4,8 194:5 197:11 198:3 198:17 218:14

**cases** 130:5

**casey** 60:4

**category** 62:14

**caught** 94:5

**causation** 146:24

**causative** 146:23

**causatory** 149:11

**cause** 95:18 146:6 207:1 208:9

**caused** 93:5,15 100:15

**causing** 101:15

**caution** 81:16 180:21

**cautious** 204:21

**ccr** 1:24,25 218:25

**cdc** 197:21

**centered** 19:15

**centralized** 34:3

**ceo** 23:1 24:5 25:6,22

**certain** 50:22 50:23 62:18 78:14 177:12

**certainly** 73:21 75:20 87:19 113:14 163:10 171:10

**certainty** 143:1

**certificate** 218:1

**certified** 218:4

**certify** 218:5,13

**cfo** 3:16,17 23:2,13 24:5 25:7,8,23 80:8 80:9 85:21 133:2 152:18 153:3 196:1 215:11

**chad** 60:4,6,13 62:7,13 63:6 63:20

**chad's** 61:25 62:12

**chahn** 2:7

**chain** 4:22 52:23 55:12 57:25 60:2,13 65:8 80:6 85:18 115:16 117:12 118:13 128:11 132:22 137:14 139:24 156:8,21 157:8 160:6 165:3 168:9 170:10 175:3,14 176:2 179:6 186:8,17 192:22 206:5 211:20 212:22 213:23

**chains** 20:16

**challenges** 81:13 84:10

**challenging** 73:25 78:16 174:20

**chance** 111:16

**chang** 2:3 6:18

**change** 150:5 162:9 164:3 195:8,8 220:4 220:7,10,13,16 220:19

**changed** 18:10 143:1 209:16

**changes** 66:12 133:10 134:1 139:17 181:7

219:10 221:6
**changing** 78:25
  92:5 181:6
**charged** 9:16
  9:16
**chart** 45:3,5,8,9
  45:11 46:12,13
  47:21 48:16
**chat** 89:16
  153:12 154:2
  155:18
**chen** 29:23
  154:2,3
**choose** 110:19
  110:24
**choosing**
  211:11
**circulating**
  193:12
**circumstance**
  36:2
**cite** 135:12
  181:15
**cited** 154:16
  181:22
**citing** 101:14
  102:16 155:3
**city** 7:16
**civil** 9:20
**clarification**
  18:16 25:13
  31:8 56:3
  61:17 83:20
  92:10 116:1

**clarify** 9:1
  15:10,12 27:4
  70:23 89:1
  149:17
**clarifying**
  61:15
**class** 6:17,19
  10:1 108:25
**clean** 175:6
**cleaned** 201:16
**clear** 63:10
**clicked** 36:14
**client** 11:4
  13:15,17,19
  185:2
**close** 84:15
  108:20
**cloud** 39:2
**codiagnostics...**
  165:20
**codiagnostics...**
  165:18
**codx** 40:18
  52:5 57:16
  59:19 65:1,12
  79:23 85:12,22
  117:6 128:3
  137:6,18
  141:12,22
  151:22 153:11
  156:2 159:25
  168:4,13 170:5
  170:14 175:6
  179:1 192:16

193:1 199:8,17
  200:20 201:4
  205:25
**college** 15:16
  15:18
**colleges** 16:4
**coltrin** 23:10
**come** 20:16
  50:22 76:21
  102:3 108:20
  147:22 187:13
  191:13 192:6
  198:23
**comes** 15:13
  20:8 47:19
  58:20 70:16
  207:4
**comfort** 98:12
  100:3,23
**comfortable**
  94:18 97:21
**coming** 91:18
  101:21,23
  109:23 118:14
  155:17 157:1
  162:19 177:6
  204:18 207:25
**commencing**
  218:6
**comment** 81:21
  82:1 135:3,9
  135:18,22
  139:3 163:17
  171:3,7 182:12

201:18 202:7
  202:21 203:1
**commenting**
  122:18
**comments**
  65:13 82:23
  134:1 170:15
  201:23 202:20
  206:18
**committed** 51:5
**committee**
  29:15
**committees**
  29:9,11,12
**communicate**
  9:12 24:4
  29:16 32:18,22
  32:25 74:4
  94:22 100:6
  111:7
**communicated**
  29:19
**communication**
  11:5 13:15,20
  15:2 30:4
  165:25
**communicati...**
  18:21,24 19:2
  19:5,8,11,16
  20:18 22:24
  24:4,8,23 25:4
  39:4 111:25
  163:18

**[companies - consider]**

**companies** 17:16 116:25 117:2 118:10 194:7,15 195:19

**company** 11:25 14:10,19,24 18:12,20 19:13 19:17,20 25:7 27:2,7 30:17 30:21,23 35:5 38:2,20,25 39:10 40:21 41:16 49:4 51:10 53:18 58:10,25 66:17 66:20 75:12 76:6 77:3,15 77:21,22 78:9 78:11,19 79:5 83:10 93:15 97:13,18,25 98:2,17 100:2 100:15 101:15 103:25 104:12 110:11 111:23 112:7,8,17,25 113:24 114:9 136:8 140:14 150:19 158:11 169:8,15,18 172:3,6,12,22 182:5,9 186:22 187:3,6,9

188:18 191:10 191:16 192:10 193:7 194:8,19 195:24 198:10 202:17 210:22

**company's** 10:12,12,13,14 18:6 42:24 43:8 49:22 50:6 51:5,6 55:15,20 62:19 73:11,19 75:15 75:23 76:24 78:2,3 79:17 84:11 112:12 112:17 142:20 144:22 150:14 170:1 181:7,23 184:7 185:19 190:24 191:5 203:23 207:16 209:3 213:13 215:6,13,18

**compare** 77:21 79:9 189:23 190:18

**compared** 189:20 190:20 212:10

**comparing** 78:19

**compensation** 21:9,11,14,18 21:20 22:4,9

22:15 213:12 214:21 215:17

**complain** 204:24 207:6 207:12 209:21

**complained** 204:7

**complaining** 203:20 207:21 208:10

**complaint** 14:24

**complete** 221:8

**completed** 219:16

**completely** 101:14 118:2

**computer** 218:10

**concept** 159:5

**concepts** 153:14 155:13 155:16,22,23

**concern** 101:22 101:25 104:12 110:10 203:22 215:16,21

**concerned** 98:17,18 209:10 211:2

**concerning** 10:13 11:7

**concerns** 14:9 98:21 99:6,15

100:14 104:14 113:18 209:3,6 209:17

**concluded** 144:6 217:8

**conclusion** 119:24

**conditioned** 43:16

**conditions** 92:5

**conferences** 25:15

**confidence** 62:5 190:16

**confident** 60:25 126:13 143:16

**confirm** 24:14 139:17 216:9 216:22

**connection** 12:7,11 14:11 16:16 25:11 36:6

**cons** 104:8

**consensus** 131:15 132:1 167:11 201:19 208:7

**conservative** 82:16

**consider** 67:20 75:8 176:3 195:14

**considerably** 95:15

**considerations** 3:19,21,22 4:3 4:5 88:20 89:14 115:20 117:16 133:1 137:17

**considered** 55:9,17 57:4

**considering** 153:4 193:8,10

**consistent** 195:3

**constantly** 95:21

**constitute** 158:2

**constitutes** 218:11

**consultant** 114:9 187:3

**consultants** 87:9

**consulted** 187:9

**consulting** 23:8 153:2,6

**contact** 65:21 66:5

**contemplating** 106:21

**context** 68:3 102:1 118:18

**continually** 91:11,14 96:5 96:6 97:22 98:9,10

**continue** 19:16 52:16 64:7 81:15 124:17 144:24 145:1,4 145:5 150:25 151:1 180:19 195:5,10

**continued** 4:1 5:1 93:24 139:8 140:16 143:21 144:15 145:8 147:15 150:21 181:16 196:9

**continuing** 52:12

**contract** 21:2,5 21:7

**contributions** 134:12

**control** 108:7

**conversation** 91:25 103:3,16 105:18 151:12 176:18 177:3 177:15,24 178:16,20,22

**conversations** 51:7 84:4,5,9 127:10,11

184:2,3,6 197:17 216:15

**convert** 102:15

**convey** 68:9 94:21

**convince** 160:20 161:4 162:9 164:2

**coordinate** 25:16

**coordinating** 25:10

**copied** 63:21

**copies** 219:14

**copying** 52:25 60:6 65:10 85:20 88:18 115:18 117:14 128:13 132:24 137:16 141:20 152:9 160:8 165:5 168:11 170:12 175:22 186:10 187:1 192:24 201:2 206:7 210:3 213:25

**core** 153:14 155:13

**corner** 62:23 166:19

**corporate** 18:21,24 19:2 19:5,8,11,15

22:23 24:3,22 39:3

**correct** 36:25 48:17 53:10 55:11 61:18 66:22 67:17 70:17,24 80:24 82:25 89:5 98:4 110:9 114:12 122:13 125:19 127:22 144:11 148:9 154:17 155:1 156:20 157:17 161:18 171:5 175:12 180:8 181:2,19 192:11 196:2 200:8 202:18 205:6,16 217:6 221:8

**corrections** 221:6

**correctly** 44:6

**correlation** 146:4,24

**correlatory** 149:11

**cosara** 157:12 157:14

**counsel** 2:15 6:14 8:11,12 10:25 11:25 12:1,21 14:18

**[counsel - day]**

33:21 52:11 56:13 85:9 115:5 119:19 140:2 141:9 168:2 199:5 216:5,9,15 219:14

**county** 218:3

**couple** 10:25 203:18

**courier** 20:23 20:25

**course** 7:11 13:19 14:10 88:5 155:17

**court** 1:1 6:9 6:13,22 8:5,6 217:5

**cov** 34:5

**cov1** 54:3

**cover** 102:22

**coverage** 3:24 128:15

**covering** 25:11 29:20,21 30:2 130:1 154:4

**covid** 3:10 4:23 33:23 34:2,7 34:10 43:21 44:9 49:11 53:2,23 54:13 55:23 56:17 58:11 126:16 143:19 144:10

144:23 145:5 145:12 146:1 146:10,13 147:5,17 148:2 148:9,19 149:21 150:3 150:15,22 154:8,8,16,20 155:1,5 157:23 158:5,7,11 159:6,10,20 160:21 161:11 163:6,25 164:8 169:20 172:14 172:23 176:9 183:4 184:9 186:18 193:23 194:2,11,20 196:22 198:12 207:24 212:13

**created** 37:14 37:17

**creating** 37:23 37:24

**credibility** 105:3 106:5

**crime** 9:17

**crockett** 26:5 26:11

**cs** 219:15

**csr** 1:24,25 218:25

**cumulative** 126:22 144:1

**curiosity** 140:22

**current** 5:7,10 7:15 108:10 175:10 201:3 201:16 211:23

**currently** 20:11 48:14 106:23 107:8 112:19 196:6

**custody** 139:24

**customer** 34:15 50:22 57:7 64:10,11 185:19,23

**customers** 26:17 49:23 50:6 51:5 63:25 64:2,3 184:8 185:5

**cut** 59:5,15 127:4 133:16 142:6

**cv** 1:6 6:10

**cycle** 44:25 73:23 75:13 101:10 197:14

**cyclical** 73:24 74:13 164:8 189:12

|  d  |
| --- |

**d** 3:1 6:1

**daily** 176:9 196:13,19 197:6 200:6

**damage** 64:7

**damaging** 64:1

**dan** 175:4,11 179:7,17

**darn** 3:9 53:1

**dash** 36:24

**dashboard** 3:8 36:11,18,20,24 40:5

**data** 42:15 58:11 68:12,14

**date** 67:9 74:7 74:22 75:7,24 76:6 82:4 83:10 84:10 182:21 189:21 192:11,13 209:4 220:24 221:12

**dated** 58:1 65:9 67:16 80:7 117:13 137:15 141:18 156:9 160:7 175:4 179:7

**dates** 10:21

**day** 36:5,5 50:20,20 114:13 188:25 197:1 218:21 221:15

**days** 11:17 16:23 67:4,10 67:19 138:23 188:23 194:23 219:16

**de** 163:23

**dealing** 95:22

**dealt** 66:7

**death** 92:12

**december** 189:14 191:8

**decent** 208:1

**decided** 62:2

**decipher** 47:20

**decision** 14:12 62:18,20 72:8 140:7

**declare** 221:4

**decline** 172:13 172:20,21,23 193:23 194:2 194:19

**decrease** 212:11

**decreased** 126:17 143:20 145:25 146:10 146:19 181:16 194:11 212:9

**dedication** 134:8

**deemed** 221:6

**defendant** 9:19

**defendants** 1:10 2:9 6:21 9:12,12 216:9 216:15,16

**defer** 117:23 201:19

**define** 22:10

**definitely** 71:7 71:10 174:2 203:7,16

**definition** 208:12 214:20

**degree** 16:15 98:12 100:3,23 105:10 211:9

**degrees** 147:20

**delay** 173:5,8

**deliver** 134:8

**delivered** 41:3 43:14

**demand** 53:22 54:13 57:7 73:11,19 81:11 134:14,19 174:13 194:11 194:19 212:15 212:17

**demonstrates** 196:10

**dennis** 26:5

**department** 18:6,7 19:17 19:25 20:7 26:1,22,23

28:10 35:7,11 38:17 39:5 72:18 153:8 215:9

**departments** 27:14 28:1 29:13 38:4,6,9

**depend** 39:17

**depended** 35:7 55:4

**depending** 67:9 96:8,10

**depends** 67:7 75:11,12,12 108:16 130:14 130:14,23 131:2,3

**deponent** 219:13 221:3

**deposing** 219:13

**deposition** 1:15 6:6,10 8:2,10 9:22 10:15,19 10:22 11:1,8 12:7,12,15,18 13:23 14:1,4 198:17 216:14 217:8 218:6

**depositions** 52:13

**depress** 215:18

**derived** 72:19 132:2,3

**deriving** 72:21 76:22

**describe** 14:8 16:12 18:9 20:6 24:22 30:24 31:3,6 31:13 32:1,7 48:25 66:1,25 68:3 77:7,18 87:17

**described** 145:9

**description** 3:7 4:2 5:2 69:14 133:11 153:9

**designed** 34:3

**designing** 163:12

**despite** 109:3 109:12 169:8 193:23 194:14 194:15

**details** 91:17 93:4,14 177:4 183:22

**detect** 34:3

**determination** 84:3 100:11

**determinative** 162:10

**determine** 32:19 58:16 72:6,12,17 75:3 76:15

111:22 158:16 191:16

**determined** 21:23 72:10,14 84:1

**determining** 75:1,9

**deur** 65:11 66:4

**develop** 145:1

**development** 150:21

**device** 135:21

**diagnostic** 186:21

**diagnostics** 1:8 6:8 10:2 12:19 15:8 16:13,18 16:22 17:17,19 18:11 21:5,7,8 25:21 26:1 28:25 29:4,10 29:18 30:14 32:23 34:6,9 34:18 41:23 54:18,22 58:11 64:14 66:7 73:18 82:24 83:9 102:23,24 103:12 116:24 130:1 142:5,8 152:18 157:14 172:3 194:17 219:4 220:1 221:1

**difference** 43:12

**different** 27:13 37:5 40:25 79:4,10 91:2 94:12 96:6 99:23 100:21 102:7,7 113:5 113:10,11 122:5 136:23 136:23 150:11 151:1,1 174:11 191:19 209:15

**differently** 94:13

**difficult** 46:18 46:19 47:17 91:21 126:21 143:25 147:1

**difficulty** 204:4

**diminished** 126:17 143:20

**diminishing** 44:24

**dips** 189:4

**direction** 25:8 25:8

**directionally** 103:7

**directly** 32:22 97:6 130:9

**directors** 142:5 142:8

**disagree** 135:21 203:13 203:16

**disagreed** 205:2 207:13

**disagreement** 201:17

**disagrees** 203:6

**disclosing** 11:4

**discovery** 70:7

**discuss** 3:24 11:1 14:23 28:20,23 67:25 72:24 82:1 86:25 89:15,19 89:21 118:4 124:12 128:15 135:14 138:19 138:22 187:16 216:25

**discussed** 14:17 15:4 27:23 39:23 52:7 57:19 59:22 74:10,16,21,23 79:25 85:15 87:6,14,20,24 88:6,13 89:23 90:9,11 115:10 117:8 128:5 132:19 137:8 141:14 164:25 168:6 174:25 179:3 192:18

199:10 206:24 211:17 213:20 214:14

**discussing** 32:9 61:6 62:2 74:20 82:6 90:14,19 114:2

**discussion** 82:11 83:12 90:5 112:20 114:6 118:4 119:13 212:25 213:6

**discussions** 72:23 73:17 74:6 76:10 112:15,23 113:3 127:22 183:23

**disease** 158:3

**diseases** 157:23 163:13

**disparity** 43:11 43:15

**display** 134:9

**displayed** 70:10

**disruption** 176:9

**distinction** 43:17

**distributor** 51:11 55:2,20 184:25 185:1,2

185:9
**distributors** 55:15 56:20
**district** 1:1,2 6:8,9
**document** 40:3 41:14 48:14,16 53:4,5,13,14 57:15 58:5,6 59:18 61:11 64:25 65:15,16 79:22 80:12,13 84:18,20 85:11 85:24,25 88:10 88:22,23 107:15 115:7 115:23 116:3 117:5,19 128:2 128:17,18 132:16 133:4,5 137:5,20,21,25 138:1,9 141:11 142:1,2 145:3 151:21 152:13 152:14 156:1 156:14,15 159:24 160:12 160:13 164:22 165:8,9 168:16 168:17 170:4 170:17,18 174:22 178:25 179:12,13 180:4 182:13

186:1,13,14,24 187:20 192:15 193:3,4 199:7 199:20,21 200:19 201:7,8 205:25 206:11 206:12 212:1,2 213:17 214:3,4 216:11
**documentation** 50:15
**documentatio...** 20:22
**documents** 12:22,23 13:6 13:22 62:23 181:9 216:10 216:17,19,21 216:24
**doing** 4:10 82:21 84:20 97:21 101:1 117:2 119:6 140:7 150:6 156:11 170:2 175:13 187:9 211:10
**dollar** 39:9 42:22 43:7 50:11,15,22 79:16 182:4,9
**dollars** 54:6
**domestic** 94:11 94:15

**dominated** 162:6 196:13 196:18 197:7,8 200:6
**donkey** 148:4
**downs** 92:23,24 97:11,15 101:4 101:5
**dr** 5:6 193:1 199:16,17,23
**draft** 4:8 5:4 32:20 67:15 68:13,16,19 70:18,25 71:4 71:9,12 80:23 82:21 86:6,10 86:17,24 87:8 87:20 133:22 134:1 136:12 136:15,25 139:11,14 152:11 168:22 169:25 175:10 192:25 193:13 196:3 199:24 200:1 201:5,10 202:16
**drafted** 71:8 205:9
**drafting** 31:22 36:7 68:22 83:4 135:11
**drafts** 83:5

**draw** 46:17 119:23 146:23 158:24
**drive** 196:9
**driving** 147:9 164:9
**drop** 4:22 135:13 176:22 186:17
**dropped** 124:16 140:16 173:10
**dropping** 44:23
**due** 53:21 120:21 126:17 143:20 212:12
**duly** 7:3
**duties** 18:17
**dwight** 1:8 23:1 23:13 24:10 30:24 31:6,13 31:24 32:14 58:2 59:12 69:9 71:14,22 72:4,16,20 73:10 136:4 137:16 138:16 138:22 139:25 141:20 148:1 150:23 151:5,8 152:8 155:23 156:9 157:18 158:10,11,16 158:16 160:7

**[dwight - email]** Page 19

162:25 163:7 163:17,19 176:14 177:24 178:16 183:24 186:10,25 192:23 197:9 197:15 199:15 200:14 201:2

**dwight's** 68:22 71:4 156:18

**dx** 160:18

**e**

**e** 2:1,1 3:1,6 4:1 5:1 6:1,1 69:18 220:3,3,3

**ear** 173:7,7 174:19

**earlier** 49:16 62:3 67:1,23 77:12 91:8 145:3 182:13 194:8 196:21

**early** 16:22 34:8 49:3 51:2 62:17 66:18 129:9 183:2,9 183:9

**earning** 4:12 142:20 160:10

**earnings** 3:14 4:20 14:10,11 25:9,9,12 30:15,25 31:7

31:14,20 32:5 36:7,8,8 65:12 65:13 67:16,24 68:5,11,20 71:1,4,15 73:3 73:6,9,18 74:5 74:21 76:12,12 80:9,24 85:22 86:7,10 91:1 116:25 125:3 125:18 131:17 133:2 137:18 138:15,19,22 141:23 142:20 143:7 166:19 166:21 168:13 170:14 172:11 173:16,24 174:2 175:6 179:8,20 181:1 181:6 201:4 210:23 211:23 215:14

**easier** 74:1

**east** 26:14

**easy** 95:10

**eat** 33:11

**ebarrow** 2:12 219:2

**ebitda** 214:19 214:20,25 215:7,18

**editing** 31:22

**edits** 137:18,25 139:15,21,21 168:14,22,24 175:7

**educational** 15:15

**effect** 51:8 76:17 92:18 93:22 95:9 110:22 113:9 145:22 146:18 148:23,25 149:1,2 150:9 150:24 158:19 172:18 173:16 174:6 177:14

**effort** 130:21 161:8

**egan** 1:8 23:1 23:13 26:3 28:5,20 30:24 31:6,13,25 32:14 51:3 52:25 58:2,2 59:12,12 60:3 62:11 67:25 69:9 71:14,22 72:4,17,20 73:10 128:14 136:5 137:16 138:16,22 141:20 144:6 151:5 152:8,10 155:23 156:9

156:11 158:10 158:11 160:7 162:25 163:7 177:24 178:16 183:24 186:10 186:25,25 192:23 199:15 200:14 201:2

**egan's** 157:18 176:14

**eight** 17:6 194:23

**either** 12:4 21:2 23:23 37:5 51:2 84:3 112:7,16,24 113:21 150:9 172:17 200:13 217:2

**elements** 178:4

**email** 3:9,11,13 3:14,16,17,19 3:20,22,23 4:3 4:4,6,8,10,12 4:13,15,16,18 4:19,21 5:3,5,7 5:8,10,11 20:16 24:7,18 33:1,2 38:12 52:23 53:3,9 53:13,20 55:12 57:25,25 58:4 58:9,19 59:4 60:2,2,5,6,9,12

| | | | |
|---|---|---|---|
| 60:13,13 61:6 | 156:21,25 | **emerge** 148:7 | 84:11 180:18 |
| 61:10,11,12,22 | 157:5,7,9,18 | **emergence** | 180:20 181:8 |
| 61:23 62:10 | 158:9 160:6,6 | 139:8 143:22 | **epidemiologi...** |
| 63:6,19 65:8,8 | 160:11,15 | 144:15 147:15 | 198:2 |
| 65:14 66:10 | 165:3,3,7,16,16 | 181:17 | **epidemiologist** |
| 67:15 80:6,11 | 165:17,20,24 | **emily** 1:24 6:13 | 146:6 |
| 80:15 85:18,18 | 166:1,2,3,10 | 218:4,25 | **eps** 215:7,14 |
| 85:23 86:4,9 | 168:9,9,15 | **emphasize** | **equal** 107:6,18 |
| 86:22 88:17,21 | 170:10,10,16 | 150:15 158:11 | **equity** 17:16 |
| 89:10 90:23 | 170:21 175:3,3 | **emphasized** | **erica** 2:9 6:20 |
| 93:5 101:12 | 175:14,20 | 163:23 | 11:20 61:13 |
| 103:19 104:11 | 176:1 177:22 | **emphasizing** | 219:1 |
| 109:19 114:4,8 | 178:1,11,14,19 | 159:6 | **erp** 39:2,2 |
| 115:16,16,23 | 179:6,6,12,16 | **employee** 21:19 | **errata** 219:11 |
| 116:6 117:12 | 180:2 186:8,8 | **employees** | 219:13,16 |
| 117:12,20 | 186:12,24 | 17:24 18:13 | **erroneous** |
| 118:14,24 | 187:12 188:15 | 19:14 | 197:19 |
| 119:6,10,23 | 192:22,22 | **employment** | **escape** 96:3 |
| 120:5,6,13 | 193:2,16 194:8 | 21:1,4,7 | **escapes** 11:21 |
| 124:14,23,24 | 199:14,19 | **en** 79:3 | 24:1 194:9 |
| 126:2 127:22 | 201:1,6,14 | **encouraged** | **especially** |
| 128:11,11,16 | 206:5,6,11,15 | 134:13 | 124:18 204:15 |
| 128:23 129:5,6 | 208:6 209:25 | **ended** 189:14 | 204:16 |
| 129:8 132:22 | 210:1,5 211:20 | 190:5 | **esq** 2:3,3,9,15 |
| 132:22,23 | 211:20,25 | **endemic** 157:23 | 219:1 |
| 133:3,8 137:14 | 212:21,22 | 157:25 158:2,5 | **essentially** |
| 137:14,19 | 213:23,23 | **enter** 12:9 | 79:10 |
| 138:5 139:17 | 214:2,11 | **entire** 78:25 | **established** |
| 139:25 141:18 | 216:22 | 205:15 | 134:16 |
| 141:25,25 | **email's** 52:23 | **entirely** 79:10 | **estimate** |
| 142:4 143:2,4 | **emails** 60:5 | 170:24 | 140:23,24 |
| 152:7,12 | 61:11 114:13 | **entities** 25:3 | **estimates** |
| 153:13 155:12 | 114:15 166:2 | **environment** | 104:23 105:5 |
| 156:8,8,13,18 | 175:15 208:4 | 78:17 81:13,16 | 107:1,7 108:1 |

110:4 131:21
131:21,23
**et** 6:8 219:4
220:1 221:1
**europe** 26:7,9
**evaluating**
91:14
**events** 12:24
88:6 118:13
**eventually**
157:21 158:5
**everybody** 31:9
94:5 155:9
159:21 162:2
163:14 191:15
197:22
**evidence**
110:14
**evolve** 74:2,3
**evolved** 97:22
**evolving** 91:11
96:6,18 98:10
100:1,2
**exact** 36:2
91:25 93:4
**exactly** 10:10
14:21 15:3
20:14 22:12
28:9,16 35:1
35:18 39:4
41:6 43:15
51:14 56:19
58:16 64:16,21
64:23 65:25

66:6 71:12
74:9,15 75:1
83:14 84:2
87:16 90:2
92:17 93:19,23
94:10 98:8
100:19 105:12
106:24 113:16
114:5 118:13
125:21,23,25
130:18 145:13
147:12 148:5
153:1,7 155:19
156:22 176:16
177:14,19
183:20 185:4
194:12 197:16
**examination**
3:3 7:7
**examined**
218:8
**example** 190:1
207:10
**examples**
154:21
**exceed** 112:18
**except** 110:25
**exchange** 3:9
3:12,13,17,20
3:22,23 4:3,4
4:10,12,13,16
4:18,19,21 5:8
5:10,11 24:13

**exclusive** 55:20
**excuse** 101:17
**executive** 4:14
165:6,13
**exhibit** 3:7,8,9
3:11,13,14,16
3:17,19,20,22
3:23 4:2,3,4,6,8
4:10,12,13,15
4:16,18,19,21
5:2,3,5,7,8,10
5:11 39:21,22
40:1,16,18
42:6 45:2,6
46:9,19 48:15
52:5,6,15,17,20
53:7 57:15,18
57:20 59:18,21
59:23 63:19
64:25 65:2,6
77:12 79:22,24
80:3 85:11,13
85:14 88:10,12
115:7,9 117:5
117:7 118:21
128:2,4 132:16
132:18,22
137:5,7,11
141:11,13,16
151:21,23
152:3,4,5
156:1,1,3
159:24 160:1
164:22,24

168:4,5 170:4
170:6 171:5
174:22,24
178:25 179:2
186:1,3 192:15
192:17 199:7,9
200:19,21
205:24 206:1
206:24 207:3
209:23 211:15
211:16 213:17
213:19 214:7
**exhibits** 39:25
52:13 118:15
139:6 140:11
181:12 198:16
**existed** 27:7
29:12 35:19
36:3 96:3
183:15
**existence** 49:8
145:8,12
**expect** 86:6
107:18 172:2
188:1,3
**expectation**
108:11 208:4
**expectations**
74:4 131:6,9
131:16 204:5
**expected** 95:16
122:22
**expecting**
106:23 107:3,4

107:9 112:19
112:22 132:10
135:20
**experience** 9:3
16:13,16,24,24
101:4 203:17
**experienced**
19:14 81:11
91:10 92:20
212:14
**experiencing**
95:13 169:9
194:19
**expert** 195:23
**expiration**
183:25
**expirations**
183:19
**expire** 183:18
**explain** 71:18
99:8 149:25
**explored** 91:5
**expressing**
215:21
**extends** 155:6
**extent** 11:4
13:1 15:1 30:4
35:19 42:17
52:14,16 57:2
68:21 69:22
73:1 100:3,22
100:25 184:21
216:17

**eye** 130:3

**f**

**face** 105:13
121:11 145:18
151:17
**fact** 144:25
154:19 158:18
167:9 169:17
174:8 177:13
189:13
**factor** 147:1
176:4
**factors** 79:4,6
91:20 92:14,16
93:12 100:24
102:10 113:5
144:2,9,10,14
145:20,21
147:10 154:14
154:15,19
177:7,23
178:15 181:16
181:22,23
**facts** 13:11
**fails** 219:18
**fair** 87:4 97:17
97:24 122:15
174:4,7
**fairly** 30:3 78:9
78:13 84:21
195:3
**fall** 43:21 44:9
53:22 54:12

**fallen** 57:8
73:12,19
197:13
**familiar** 40:4
56:18 165:19
165:21
**family** 17:3
**far** 20:4 43:18
92:7 164:12
168:18 169:10
172:1 179:14
187:23 188:11
189:8 193:5
205:23 206:13
**fashion** 195:11
**father** 152:23
**fatigue** 150:3
159:20 176:9
196:23
**fda** 197:22
**fe** 45:23 46:7
**feasible** 160:17
**featherstone**
26:15 156:10
**feb** 210:11
**february** 3:11
43:21 44:9
45:23 46:22
48:6,22 52:24
53:20 56:15
58:1 156:9
164:15 203:24
209:4 211:4

**federal** 184:22
**feedback** 83:3
**feel** 91:21 94:18
94:18,23 95:1
95:11 96:12,13
100:15,20
112:11 123:1
123:13 148:2,5
161:14,19
173:23
**feeling** 74:12
93:1
**feelings** 170:1
**feels** 105:12
191:2
**fees** 12:14,17
**fell** 67:9
**felt** 97:21 98:12
100:5,8,23
101:9 102:2
111:1 150:9
161:18 176:11
208:18
**fewer** 44:22
149:9,10
**fickle** 177:10
**fifth** 104:6
**fifty** 167:19
**figure** 101:21
101:23 102:19
109:23
**figured** 60:20
213:14

**[file - four]** Page 23

| | | | |
|---|---|---|---|
| **file** 138:1 | **first** 7:3 10:18 | 167:19,20 | 77:11 89:13 |
| **filed** 6:8 15:5 | 39:8 41:16 | 198:23 214:15 | 96:14,14 120:7 |
| **filled** 51:18,22 | 45:19 57:12 | **floor** 2:5 | 120:17 177:23 |
| 51:23 | 63:18 64:19 | **fluc** 147:20 | 178:15 187:11 |
| **fills** 83:22 | 67:10 68:16 | **fluctuate** 49:15 | 198:14 |
| **final** 4:19 | 70:18,25 71:4 | 73:22 189:16 | **follows** 7:5 |
| 122:25 136:25 | 71:8,9 73:5 | **fluctuating** | **forecast** 143:18 |
| 141:23 142:19 | 79:15 80:22 | 44:18 120:21 | 145:14,19 |
| 143:5 169:25 | 81:12 82:21 | 121:12,15,22 | 194:10 |
| 179:8,24 | 83:4 86:6,9,24 | 122:1 | **forecasts** 58:21 |
| 191:20 | 94:2 95:22,22 | **fluctuation** | 173:19 |
| **finalized** 138:9 | 101:13 109:22 | 122:13 | **foregoing** |
| **finance** 16:14 | 110:25 125:4 | **fluctuations** | 218:10 221:5 |
| **financial** 5:11 | 127:17 134:10 | 92:21 120:22 | **forever** 144:23 |
| 43:12 68:12,13 | 138:6 140:25 | 122:6,16,20 | **form** 8:11 |
| 126:23 144:2 | 142:21 143:10 | 123:24 124:2 | 20:10 39:15 |
| 153:6 169:3 | 143:14 157:7,9 | 136:18 147:20 | 61:14 195:10 |
| 201:11 202:11 | 157:22 164:15 | 190:10 | **forms** 10:13 |
| **financially** | 169:1,2 170:22 | **fluidigm** 4:21 | **forthcoming** |
| 218:13 | 179:17 180:13 | 186:16,19 | 14:13 |
| **find** 86:24 | 180:14 181:5 | **focus** 109:11 | **forty** 214:9 |
| 112:4 171:8 | 187:19 192:6 | 132:8 213:1 | **forward** 93:16 |
| **fine** 61:20 | 198:9 201:24 | **focused** 18:18 | 144:11 166:1 |
| 84:20,20 85:2 | 202:11,17 | 28:2 113:4 | 166:10 188:1 |
| 140:21 | 204:9 210:7 | 162:18 | **forwarded** |
| **finish** 8:3,18 | 212:8,17 | **folder** 39:25 | 166:3 |
| **finished** 127:3 | **fiscal** 81:18 | **follow** 127:21 | **forwarding** |
| **fireside** 153:11 | 134:13 202:3 | 127:25 166:21 | 175:10 |
| 154:1 155:18 | 202:12,18 | **followed** 20:20 | **found** 14:20,24 |
| **firm** 12:6 17:1 | **fit** 68:4 | 72:16 92:23 | **founders** 16:20 |
| 17:11 23:8,10 | **five** 33:8 63:25 | 101:6 204:14 | **four** 56:23 91:2 |
| 25:2 166:18 | 64:3,8 67:8 | **following** 16:15 | 104:1,5 142:10 |
| **firms** 29:17 | 114:21 140:19 | 17:13 25:13 | 155:20 158:4 |
| 30:7,9,12 | 158:6 167:17 | 44:20 67:11 | |

**[fourth - going]**

**fourth** 108:17 108:17 110:7 154:6 212:16 213:7
**fox** 2:4 6:16,19
**frame** 22:25 24:21 120:7,17 187:25
**framing** 188:7
**frankly** 192:1
**frequency** 101:7 195:7
**frequently** 21:25
**freshman** 16:5
**friday** 11:13,14 11:17
**friend** 17:2
**front** 105:3 106:5
**full** 7:12 16:24 19:18,20 102:2 134:9 169:2 201:11,24 202:1 205:15 205:21 212:8 213:1 218:11
**fully** 100:6
**fund** 184:9
**funded** 184:20 184:23,23 185:15
**funding** 176:7 183:17,20,25

184:8,14
**funny** 207:1
**further** 216:6 217:2 218:13
**future** 51:6 98:18 126:22 127:1 134:16 144:2,5 147:25 148:6 193:23 194:17 196:11
**fw** 137:17 186:16
**fwd** 80:8 160:9 211:22
**fy'22** 202:4 205:8,12
**fy21** 5:8 206:8

**g**

**g** 6:1
**gary** 23:25
**gelt** 10:5
**general** 2:15 12:1 14:19 21:17 27:25 28:3,3 29:13 37:6 74:11 83:6 91:17 93:3 99:1 104:9 137:24 140:1 143:4 159:18,20 161:3 163:18

**generally** 16:12 20:6 27:22 32:7,9 87:11 90:4,22 99:11 130:20,25 132:9 138:21 159:16 172:19 173:15 183:2
**generating** 83:4
**generation** 78:18
**genevieve** 11:20
**gents** 138:8
**geographic** 120:23 136:24
**getting** 63:23 84:14,15 94:4 130:7 132:7 149:9 150:1,4
**gibb** 1:24 6:13 218:4,25
**give** 28:11 67:22 77:4,4 93:21 97:2 100:4 102:7 104:3 106:11 111:23 112:9 112:10,13 116:15 141:3 171:10 174:9
**given** 34:5 72:7 75:3 76:11

77:15 79:2 82:24 114:13 125:18 221:9
**giving** 76:18 97:19 125:1,9 173:20 174:9
**glad** 31:10 54:3
**glance** 210:7
**glitch** 30:19
**glitches** 31:11
**go** 7:18 15:18 20:8 32:16 33:12,12 56:4 60:20 63:18 70:9 77:11,13 86:13,22 105:24 108:1,3 108:6 111:6 118:23 138:10 140:25 143:8 146:25 161:6 162:22 167:12 187:19 194:3 204:20 208:16 215:22
**goes** 43:19 86:4 137:1 148:14
**going** 6:4 11:3 13:9,14 24:15 28:13,21,23 36:23 39:20 47:22 50:10 51:18 52:4 57:14 59:17

64:24 72:6
74:6 77:4,11
77:16 79:7,21
85:10 88:9
90:14,19 91:22
92:18,19 93:16
94:4,6,20,21,25
95:14,16,18
97:9 99:3
108:14 110:22
110:22 111:2
111:14,23
113:7,9,11,16
113:20 115:6
118:25 119:25
123:3,24 128:1
132:15 136:22
137:4 138:15
141:10 143:7
144:11,23
145:4,5,22
147:23 148:5
148:23,25
149:1,2 150:16
151:20 155:25
158:7,12 159:6
159:10,23
160:21 162:11
162:18,19
163:6,13,25
164:8,21 168:3
170:3 173:7
174:9,21
178:24 185:25

187:22 189:12
190:8,11
191:24 192:2
192:14 195:5
198:15,18
200:18 204:20
204:23 207:23
213:16
**good** 6:4 7:9
33:4,12 60:20
84:15 110:20
114:14,23
116:15 125:2
125:10 167:21
190:1 195:1
203:21 204:18
**government**
183:3,13,17,20
183:25 184:14
184:20,22
**gradually**
16:23
**graduate** 15:21
**granted** 21:21
**granularity**
211:9
**graphs** 3:8
**great** 52:19
**greater** 96:7
122:6
**greatly** 120:21
**green** 45:19
**ground** 7:19

**group** 153:2
**grown** 18:12
**growth** 134:16
196:9
**guess** 29:13
87:15 94:19
111:8 112:1,10
115:22 120:16
131:25 174:7
201:24
**guesses** 50:3
**guidance** 3:19
3:21,22 4:3,4
14:12 64:15
66:12,17,21
72:6,10,12,14
72:21 74:20
75:2,3,9 76:11
76:15,18,21
77:3 80:9
81:10,17 82:7
82:12,15 83:11
83:13 84:7
87:5 88:20
89:15,19,22
90:3,8,15,20,25
91:5,12 97:2
97:14,18 98:3
98:8 100:11,16
101:14 102:15
102:16 103:8
104:2,13,22
106:11,22
107:19 108:10

108:14 110:12
111:17,18,19
111:22 115:19
117:15 118:1
123:1,9,13,17
123:19 124:8
125:1,9 126:24
133:1 135:13
135:25 136:9
137:17 140:14
144:4 171:10
172:9 173:20
173:22 174:9
180:22 202:11
**guide** 108:19
**guided** 172:7
**guiding** 82:15
82:15 101:20
101:23 102:19
109:2,23
**gundry** 26:5,8
52:25 54:11
58:1,10,16
59:11,14 60:3
60:6,9 63:20
64:3
**gundry's** 53:19
**guy** 66:3
**guy's** 23:25
**guys** 125:4

**h**

**h** 1:8 3:6 4:1
5:1 220:3

**[h.c. - hope]** Page 26

**h.c.** 29:23 154:5
**hahn** 2:3
**half** 59:16
64:19 67:13
85:1,3 114:5
114:16 130:5
169:10 174:3
177:10,16
191:6,13,17
**halfway** 66:22
66:25 67:1,11
**hand** 14:16
62:23 102:20
109:25 148:14
148:14
**handful** 17:24
**handle** 138:11
**hands** 30:3
**handwriting**
70:11,13
**hang** 6:18,18
**happen** 55:7,8
95:15 97:9
107:25 148:5
189:5 190:8,12
192:2
**happened**
71:13 78:23
138:3 191:3
**happening**
94:16 173:5
175:16 181:11
207:24

**happens**
110:23
**happy** 84:21
89:16 118:23
201:19 216:22
216:25
**hard** 22:13
41:4 45:2
49:14,14 72:3
92:17 95:19
109:18 118:17
127:18 136:20
140:4 145:13
145:23 146:22
161:20 173:12
177:9,19
188:16 194:3
**hats** 18:7
**hbv** 63:11 64:9
**head** 8:7 17:22
18:20,23 19:1
19:4,7,10
22:23 24:3,22
28:10 39:12
114:19 127:17
134:23 153:16
158:22 161:2
198:22 205:12
211:7
**headed** 26:3
**header** 201:18
201:24,25
202:10 205:6
206:18

**headlines** 162:6
196:13,19
197:6 200:7
**heads** 27:13,25
**headwinds**
78:15
**health** 185:13
**hear** 8:6
**heard** 31:3
69:16
**hearing** 159:9
159:10,13,14
159:21 162:2,8
**heartache**
208:9
**held** 119:13
181:1
**help** 12:23 13:6
25:19 31:19
32:20 147:4
**helped** 19:23
**helpful** 8:4
**helping** 16:17
16:18 25:16
**helps** 46:25
196:9
**hemisphere**
102:6
**hereto** 221:7
**hey** 63:9
**hi** 89:12 117:22
166:12,17
201:15

**hierarchy** 26:2
**high** 104:4
109:3 111:9
113:19 147:20
148:19 149:20
**higher** 62:4
102:8 111:3
123:4,25 124:1
190:24 204:14
**highlighted**
86:17 87:5,9
87:21,24 88:4
**highlights**
68:16 143:14
**hills** 30:1
130:10,11
**hindsight** 95:10
**hired** 18:14
21:8
**history** 78:10
78:12 96:22
**hit** 113:16
188:3
**hiv** 63:11
**hold** 24:17 62:3
62:6
**home** 7:15 9:8
145:1 150:21
**honest** 111:13
208:14
**honestly** 94:23
100:6
**hope** 83:22
108:20 111:18

**[hope - indicating]**

112:2
**hopefully** 54:7
**hospitalization**
  92:12 93:9
**hostetler** 6:21
**hot** 208:13
**hour** 33:14,15
  85:1,3
**housekeeping**
  28:4 52:11
**houston** 65:11
  65:22 85:20
  88:17 89:10
  90:24 103:18
  103:23 105:4
  116:14 117:13
  117:20 118:24
  126:3 127:9
  128:14 132:24
  135:7,9 139:4
  160:8 165:5
  166:11 168:11
  170:12 175:22
  186:11 206:7
  210:3 211:21
  214:1
**houston's**
  113:24 119:22
**hpv** 63:11,13
  64:1
**hudson** 4:14
  165:6,13
**hudsonexecu...**
  165:17

**huh** 45:7 169:4

**i**

**idea** 75:19
  94:20 131:11
  154:16 176:14
  176:16 177:2
  177:20 207:23
**ideas** 176:19
**identification**
  65:3 151:24
  156:4 160:2
  170:7 186:4
  200:22 206:2
**identify** 62:13
**ike** 135:23
  136:4 176:5
  193:17 201:15
  208:7
**ike's** 210:10
**imagine** 87:22
  116:24 121:10
**immediate** 64:1
**immediately**
  9:5 50:21
  131:16
**impact** 105:1
  106:3,7 107:7
  107:20,24
  108:14 110:6
  113:12 126:22
  144:1 155:4
**impacting**
  98:19

**imperial** 7:16
**implementing**
  38:22
**implying**
  193:19
**importance**
  151:18 160:19
**important** 3:13
  71:22 72:4
  75:8 76:10
  77:1,20 78:21
  151:5,8,11,14
  158:10,16,21
  159:1 163:7,16
  163:19 187:22
  193:21 194:14
**imposed** 147:3
**impossible**
  139:13 192:1
**inbound** 166:1
**include** 63:12
  137:25
**included** 21:20
  72:25 87:20
  118:3 127:17
  182:2
**including** 60:7
  63:13 86:18
**income** 132:11
  213:15
**incorporate**
  82:23
**increase** 171:19
  176:8 183:4

**increased**
  146:1,10,13
  147:17 148:9
  169:9 212:16
**increasingly**
  47:17
**incredible**
  108:4
**indeterminate**
  164:10
**india** 4:10
  156:12,20
  157:16
**indian** 157:15
**indicate** 34:4
  45:16 58:15
  78:15
**indicated** 53:4
  53:14 58:5
  65:15 80:12
  83:9 85:24
  88:22 115:24
  128:17 133:4
  137:20 142:1
  152:13 156:14
  160:12 165:8
  168:16 170:17
  179:13 186:13
  193:3 199:20
  201:7 206:12
  212:1 214:3
**indicating**
  20:18 180:2

**[indication - jason]**

indication 44:23

indifferent 84:22

individual 24:1 53:17 161:22

individually 31:17 114:3

individuals 23:8 29:17 30:7,9 37:6

industry 96:2 176:11

infection 92:8 92:11 93:8 144:11 146:20 147:11,17,24 148:9,12,13,15 148:20 149:4,5 149:8,18,21

infections 148:16

infer 81:25 119:4 123:23

inference 46:17

inferences 158:25 197:25

inferring 84:4

information 13:2,13,18 37:20 70:1,5 77:1 78:5 215:13 216:11

informed 131:14

ingenuous 100:5

initial 4:8 71:4 152:11 191:21

initially 187:10

initials 81:22 138:1

initiating 193:8

ink 69:18

input 77:2

inquiries 25:1 25:12

insightful 124:17 140:17

instance 83:5

instances 38:11 57:6

instruct 13:9

instructs 8:12

instruments 64:8

intelligent 50:5 50:10

interacting 113:8

interested 16:20 218:14

internally 73:17 112:16 112:24

international 20:23 94:11,13

interpretation 119:8

interruption 18:15 56:2 59:8 92:9 115:25 119:12 133:14

intimate 53:6

introduce 39:20 52:4,14 57:14 59:17 64:24 79:21 85:10 88:9 115:6 117:4 128:1 132:15 137:4 141:10 151:20 155:25 159:23 164:21 168:3 170:3 174:21 178:24 185:25 192:14 199:6 200:18 205:24 211:14 213:16

introduced 16:19 52:17

inventory 55:5

inverse 146:18

investor 4:12 17:15 18:4,19 23:9 25:5,15 25:22 131:10 160:10 165:25

investors 32:23 102:20 109:25 159:9,14 162:3 165:18,20

inviting 25:11

involved 10:3 17:25 24:25 25:16 72:18,20 72:23 76:10 90:4 153:5

involvement 27:17 71:11

ipo 187:10

ir 114:9

irresponsible 100:8,16 111:12

issuance 138:23

issue 174:13 187:13

issued 130:7

issues 4:22 9:4 154:10 176:3 186:17

**j**

ja 45:20

january 45:22 75:19 152:8

jason 2:3 6:16 30:6,6 40:8,11 40:12 48:13 89:1 107:14

152:3 157:1
**jennifer** 152:9
  201:3
**jim** 29:25
**job** 75:3
**joined** 17:18
**joining** 16:13
**joint** 157:15
**joseph** 156:10
**july** 165:4
**juris** 2:6

**k**

**k** 3:10 53:2,23
  54:13
**kaplan** 2:4 6:16
  6:19
**kaplanfox.com**
  2:6,7
**keep** 34:19,22
  58:21 61:13
  94:4 104:22
  130:3
**keeping** 216:14
**kenneth** 60:4
**kept** 35:8,15
**kevin** 2:15
  11:25 141:21
**key** 32:15
  150:14
**kilsheimer** 2:4
  6:17
**kind** 15:10
  29:11,13 32:4

37:20 41:5
55:4 70:12
78:19 79:5
91:8 99:10
102:13 104:8
105:13 113:4
195:21 204:16
**kinds** 79:3
  190:10
**kits** 62:4 63:13
**knew** 37:10
  75:17 76:2
  92:7 95:14
  131:13 161:5,7
  164:12 185:22
**know** 8:17,25
  9:5 10:8 12:17
  14:6 15:11
  16:19 17:17
  21:3 22:18
  24:14 25:25
  26:11,17,19,21
  27:15,19 30:17
  30:21 33:23
  34:10,18 35:2
  35:5,8,14,18
  36:22 37:19,25
  38:6,18,20,25
  39:4,8,13
  41:11 42:8
  43:10,11,14
  45:18 49:15
  50:9,9 53:15
  54:11,15 55:16

55:18 56:19
58:25 59:2,7
59:11,14 64:3
64:11,14 66:5
66:24 67:23,25
69:25 70:4
71:7 72:20
75:15,23 77:2
77:6,17 78:7
78:17 83:15
84:18 87:11,15
89:20,22 90:2
90:11 91:4,14
92:6,12,16,23
93:19,23 94:3
94:4,6,9,14,17
95:11,16,21,23
96:16 99:2
100:5 101:6
102:9 104:4
105:4 106:6,12
106:25 107:5
107:12,24
108:2,5,16
109:7,13
110:19,20
112:21 113:9
113:11,12
114:2,12,15
117:3 121:6,19
122:3,4 123:8
123:15 125:21
129:19 132:9
134:19 136:18

139:24 140:22
142:24 144:13
144:16 145:6
147:7,11,12
148:2,3,23
149:12 151:16
152:24 153:7
155:18,20
157:11 158:23
159:8 161:6,8
162:4 163:9
165:13,23
166:24 168:18
173:17 177:1,2
177:12,16
179:14 181:22
182:4 183:15
184:7,18,21
185:7,12,23
186:19 187:2,6
187:15 188:10
188:24 189:9
189:10 190:11
190:15 191:19
191:24 192:9
192:10 193:5
194:23 195:6
195:22 196:24
196:25 197:3,7
197:13,16,17
198:9 200:17
203:18 204:13
204:16,23
205:7,8,19,23

206:13 207:3,5 208:6 209:16 210:21

**knowing** 76:24 77:14 177:11

**knowledge** 53:3,6 54:25 58:4 65:14 80:11 85:23 88:21 115:22 128:16 133:3 137:19 141:24 141:25 142:3 152:12 156:13 160:11 165:7 165:10 168:15 170:16 179:10 186:12 193:2 199:19,22 201:6 206:10 211:25 214:2

**knows** 148:4

**kyle** 61:23

**l**

**l** 1:9

**laboratories** 34:3

**lake** 7:16

**lambert** 23:9 65:21,24 66:8 68:4,9,12,25 70:17,25 73:11 80:16,21 82:6

82:11,21 83:9 86:5 102:24 103:12 112:16 112:24 127:11 130:9,10 170:15 205:10

**lambert.com** 115:17

**lambert0000...** 88:11

**lambert0001...** 164:23

**lambert0002...** 115:8

**lambert0004...** 186:2

**lambert0004...** 213:18

**landscape** 78:25 96:5

**language** 81:22 86:17,18 87:6 127:9 138:12 139:5,11 176:15 181:13 206:25 207:4 207:15 209:10

**large** 19:13 51:10,13,17 56:20 158:2 164:9 215:17

**larger** 41:7,8,9 102:6

**largest** 55:15 55:17

**largin** 2:16 6:12

**latin** 26:6,9 63:25

**law** 12:6

**lawsuit** 10:1,4 10:7 14:6,17

**lawyer** 108:25

**lawyers** 9:13

**lead** 65:23 146:22 149:4

**leading** 67:24 73:2,9,18 74:5

**leap** 149:24

**learned** 14:20 15:4 95:11

**learning** 155:9

**leave** 188:8

**led** 118:14

**legal** 2:16 12:14,17 219:23

**legends** 17:3,5 17:8,14

**legible** 46:15

**legit** 166:18

**lens** 163:3,3

**letters** 46:7 62:22 130:7 203:7

**level** 106:22 107:19 126:21

143:25 151:18 212:14

**levels** 148:19 149:20

**licenses** 16:7

**life** 95:25 113:8 176:10

**lifestyle** 150:6

**likely** 102:20 102:25 109:25 113:24 114:9 118:2 187:23

**likes** 71:15

**limited** 78:9

**line** 53:1,8 58:3 58:14 65:11 80:8 88:20 115:19 117:15 128:14 133:1 133:12,14,18 137:17 141:21 152:10 153:10 156:11 160:9 165:6 168:12 170:13 175:5 186:16 192:24 193:19 197:10 199:16 201:3 204:1 206:8 209:8 210:24 211:22 220:4,7 220:10,13,16 220:19

**linguistics** 16:1
**link** 146:23
**lipari** 65:10,19
**liquid** 160:18
**list** 91:2 129:8
**listed** 60:8 62:6
　144:9 154:14
**listen** 174:18
**listening** 173:7
　173:8,11
**lists** 60:22 61:3
　120:7,18
　157:20 214:15
**litchfield** 30:1
　130:10,11
**litigation** 9:20
**little** 15:14 30:8
　33:9 41:4,5
　45:19 54:3
　60:24 66:13
　67:1 68:2
　84:18 133:16
**llc** 1:4 6:7
　219:4 220:1
　221:1
**llp** 2:4 6:17
**lmk** 118:4
**located** 6:10
**locations**
　120:24 151:2
**lockdowns**
　95:23 196:25
　197:1

**lofty** 204:5
**log** 216:16,25
**logic** 109:2
**logical** 119:23
　149:24
**login** 37:1
**logistic** 154:10
**logistics** 18:5
　19:17,18,21,25
　20:8,17 24:16
　50:10,14
**logix** 33:23
　34:2,7,10
　43:20 44:8
　49:11 55:23
　56:17 126:15
　143:18 169:20
　172:13,23
　184:9 194:20
　198:11 212:13
**long** 24:2 84:25
　87:3 125:10
　126:14 140:9
　143:17 185:15
**longer** 14:12
　33:9 63:14
　196:13,18
　197:6 200:6
**look** 36:2,4
　39:18 45:2,4
　53:19 55:11
　61:22 62:21
　66:10 77:12
　78:12 79:6,8

80:15 81:4
86:3,16 89:2
89:10 90:23
92:19 95:10
96:11,12,21,23
97:7 101:12
103:5 104:16
104:20 108:17
109:21 112:6
115:21 116:6
117:1,18 120:4
122:24 126:2,7
131:5,8 133:23
134:6,12
136:22 138:5
138:25 139:14
142:24 154:6
156:25 161:12
162:20 165:15
168:24 169:1
186:23 189:3
191:17,24
194:24 196:3
202:15,20
209:11 210:5
214:11
**looked** 75:5,18
93:9 109:17
114:7 139:6
140:12 164:14
185:22 189:19
189:20 190:2
195:1,2 200:3
203:23 207:25

209:4,7
**looking** 41:7
　48:14 62:24
　91:22 96:15
　119:11,22
　131:13,13
　132:5 149:12
　163:2 164:17
　182:15,20
　188:24 190:3
　195:1 206:24
　207:2 209:8
**looks** 40:4
　63:22 140:23
　155:3 157:2
　166:18 204:24
**lose** 63:25
**loss** 9:4
**lost** 30:8 90:17
　160:24 215:14
**lot** 91:19 92:14
　92:14,16 94:16
　95:12 147:24
　147:24 161:8
　165:25 167:15
　184:18 185:3
　208:21,23,23
　215:13
**lots** 107:24
　122:16 184:3
**low** 48:22 49:1
　49:8 111:2,9
　112:5 113:19
　126:19 143:23

148:18 149:8 149:17,18,19 149:23 181:18 188:19

**lower** 102:4,9 104:3,22 106:11,18 107:1,2,3,4 108:13 111:18 111:18 123:3 123:17,25 124:1 146:20 149:4,5 167:10 189:2,9 194:10 204:13

**lowered** 194:10

**lowering** 105:5 105:9 106:22 107:6,19 110:4 110:19 147:10

**lumps** 105:2 106:4

**lunch** 85:6

**m**

**m** 46:8

**made** 10:9,13 14:9 41:3 43:18 62:18 73:24 84:3 151:15 168:24 169:24 178:6 181:4 221:5

**madrid** 17:12

**main** 65:23,24 66:3 144:25 147:9

**maintain** 105:3 106:5

**maintains** 30:17,21

**make** 44:6 77:3 87:13,14 93:6 96:22 97:2 130:21 145:23 145:23 173:4 195:16 210:10

**makes** 136:20 147:1

**making** 7:10 51:5 62:3 125:22,24 140:6 160:19 182:23

**mal** 63:11

**malaria** 60:19

**manage** 19:23

**management** 14:10,19,24 15:4 26:25 27:1,6,11,13,19 166:7

**manager** 65:25

**mandated** 176:6,23

**mandates** 124:16 126:18

140:16 143:21 145:25 146:10 146:19 147:3 147:10 181:16

**manufacturing** 20:18

**map** 191:23

**mar** 45:24

**march** 45:24 47:12 48:23 51:2,9 160:7 162:4,5 164:16 183:18 192:23 193:7 194:23 197:5 199:15 201:2 203:24 204:12,17 206:6 207:17 207:24 209:5 210:1 211:4,21 213:24

**margin** 112:6

**mario** 53:21

**marissa** 11:21 11:23

**marked** 39:21 39:23,25 40:18 48:15 52:5,7 52:15 57:15,19 59:18,22 65:2 79:22,25 85:11 85:15 88:10,13 115:7,10 117:5 117:8 128:2,5

132:16,19 137:5,8 141:11 141:14 151:23 152:4 156:3 160:1 164:22 164:25 168:4,6 170:6 174:22 174:25 178:25 179:3 186:3 192:15,18 199:7,10 200:21 206:1 211:15,17 213:17,20

**market** 29:18 58:3,11,20 92:5 93:15,21 99:12,15 100:7 100:17 101:15 106:12,23 107:3,4,8,13,19 108:1,3,6 111:25 112:19 112:21 158:2 187:16 194:6 194:15

**markets** 94:11 94:13,15 187:5 187:8

**marlon** 52:25 60:4

**mask** 124:16 126:17 140:15 143:20 145:25

**[mask - mid]**

146:10,19 147:2,10 181:16

**massage** 66:13

**masse** 79:3

**master** 15:25

**master's** 15:22 15:24 16:15

**material** 171:19

**materials** 25:18 29:3

**matter** 6:7 9:25 203:19 204:6

**matters** 9:25 10:11,16 11:7 14:16 25:22 27:25 153:6

**max** 146:10

**maxim** 129:7

**maxxam** 30:2,6 130:8

**mccarthy** 30:6

**mccluskey** 186:25 187:2

**mckayla** 2:16 6:12

**mean** 32:1 37:13 48:25 61:19 70:2 71:18 76:1 93:18 94:12 99:8,21 100:22 103:25 104:5

105:11 106:9 106:15 107:23 108:12,15 110:18 113:13 114:3 118:16 121:20,23 123:22 124:21 125:8,13 127:16 130:2 130:23,25 134:22 136:25 144:15 146:5 148:13,14 149:9,9,12 155:14 161:21 162:16 163:9 164:4 171:23 173:4,22 177:11,17 184:3 185:6,15 188:23 189:10 190:13,17,18 191:25 192:4 195:9,18,21 196:25 204:14 204:21 205:9 207:9 208:21 208:23 210:20 215:8,10

**meaning** 149:6

**means** 8:6 24:8 73:1 82:10,15 82:15 83:14 106:6 109:7

147:25 158:7

**meant** 58:17 82:19 105:4 116:20 121:24 123:6 134:19 169:13

**measurable** 171:19

**mechanism** 90:3

**media** 6:6 25:1 25:2,2,4 33:20 85:8 115:4

**meet** 67:24 85:3 104:13 110:11

**meeting** 11:24 12:4 24:14 27:19 32:2,4 60:18 73:14 89:17 90:8 118:5 129:9,14 138:18,20 204:5

**meetings** 10:25 11:10,12,19,22 12:2,21 26:22 27:16,24 28:6 28:20,22 29:1 29:5 31:24 32:8 90:10 129:20,23

**member** 16:9 29:9,15 51:3

**members** 25:7 142:4,7,13,16 195:19

**memory** 39:18 122:1 177:10

**men** 184:4

**mention** 210:11

**mentioned** 68:24 95:3

**mentioning** 215:3

**menu** 36:13

**message** 4:12 53:8 61:25 151:4,11,13 160:10 163:6,7 163:23,24

**messages** 5:12 24:13 71:21 150:14 214:13

**messaging** 24:9 32:10,15 68:1 68:10 72:24 82:25 157:19 193:21

**method** 72:14

**metric** 78:23

**metrics** 75:4

**mexico** 55:20

**mh** 135:6

**mhouston** 115:17

**mid** 164:19,20 210:12

**middle** 26:14 48:15 63:5 81:8 162:5,12 189:6

**midpoint** 67:5 67:20 79:18,19 190:25

**mike** 65:10,22 65:23 85:20 88:17 89:3 93:5 103:18,23 103:24 108:13 117:13,20 118:24 124:25 128:14 132:24 133:9 135:6,9 139:4 160:8 165:5 166:11 168:11 170:12 175:22 186:10 206:7 210:3 211:21 213:25

**million** 39:13 40:23 41:18 42:1 46:22 47:8,12,16 48:7,9,11 49:5 54:6 78:3,4 79:18 108:19 123:9,20 169:18 172:7 198:11 202:2 207:20 212:10 212:10

**mind** 15:13 40:12 70:16 78:20 105:22 106:25 111:12 114:13 162:9 164:4 177:14 178:13 179:19

**mindset** 182:25

**mine** 139:18

**minor** 201:17

**minute** 140:19 198:23

**minutes** 33:8 114:22 167:13 167:17

**mischaracteri...** 110:13

**missing** 54:6 113:18 157:4

**mix** 94:9 113:12

**mizener** 85:19 86:9,23 88:19 115:19 117:14 128:12 132:25 160:8 168:12 170:13 175:23 213:25

**mobile** 24:11

**model** 163:11

**modest** 63:23

**moment** 11:21 24:2 95:12 133:23 156:24

215:23

**momentum** 202:2 203:11 204:9 205:6,7 205:14,21,22 207:16 209:11

**monday** 11:13 11:14,16 27:19 27:23 36:15 89:17 118:5 129:9,15 175:21

**monday.com** 35:2,5,9 36:11 36:16,25 37:1 37:3,4,12,15 40:6

**monday.com.** 42:15

**money** 184:22

**monitor** 129:25 130:2 173:4

**monitoring** 96:2 194:6

**month** 44:19,19 44:19,20,21,22 46:3 49:13,13 49:16,17,21,21 64:16 67:10 73:23,23 77:9 77:10,11 92:24 92:24 95:17 96:13,15 97:8 97:23,23 98:10

98:10 122:4 164:19 171:12 188:23 189:2,6 189:16,16 190:18 191:20 191:21 210:9 210:18

**month's** 68:15 73:7

**monthly** 45:9 45:10,16 48:16 72:15 76:3 209:11 210:12 210:22 211:3

**months** 49:4 51:15 77:13 96:22 97:8 188:19 189:1 204:13,14

**morning** 6:4 7:9 27:19,23 129:10,15

**motivations** 127:19

**mouse** 139:15

**move** 66:13

**moved** 16:15

**multi** 176:10

**multiple** 158:18 184:4

**mutations** 154:11

**[n - numbers]**

**n**

**n** 2:1 3:1 6:1
**name** 6:12 7:12
  24:1 30:1,5
  60:8 69:14
  138:1 194:8
  218:21
**named** 9:19
**nanduri** 165:17
  166:6
**narrative**
  162:14 163:10
  164:5
**nascent** 18:6
**nature** 28:9,16
  73:24 178:20
**navigate** 81:15
  96:19 180:20
**near** 45:11
  81:14,15 83:24
  98:18 180:16
  180:19,20
  181:8
**necessarily**
  44:20 67:11
  77:16 78:20,22
  123:3,4 131:24
  136:19 144:17
  147:23 174:13
  205:15
**necessary**
  216:18 221:6

**need** 8:5,16
  37:7 72:23
  108:24 129:8
  133:23 138:9
  138:11 144:24
  161:10 162:8
  164:2 187:23
**needed** 25:17
  25:19 36:4
  161:4 164:11
**needs** 129:14
**negative** 105:1
  106:3,7 107:7
  107:20 108:14
  110:5
**negatively**
  106:13
**negotiate** 21:9
**netsuite** 38:18
  38:20,23,25
  39:2,5
**never** 55:7
  56:25 69:16,16
  72:11 77:10
  90:10 129:22
  132:5 158:17
  173:1 210:22
  211:8
**new** 1:2 2:5,5
  2:11,11 4:10
  6:9 95:4 130:6
  139:8 143:22
  144:16 147:16
  148:7 152:3,5

155:25 156:12
  156:19 181:17
  196:12,18
  200:5 208:3
**news** 96:1,2
  197:14
**no.codx** 132:17
**nodding** 8:7
**nods** 114:19
  198:22
**nomi** 185:12,18
**nominally**
  18:20 27:12
**nonprivileged**
  216:21,23
**nope** 12:5 14:5
**normal** 88:5,5
  113:7
**normally** 90:4
**notary** 221:13
  221:19
**note** 170:22
  216:13 219:10
**noted** 221:7
**notepad** 69:19
**notes** 13:22,25
  14:3 69:10,12
  69:19,20,22
  70:8,15 177:18
  218:10
**notice** 48:22
**notification** 4:6
  141:22

**notifying** 20:16
**novacyte** 59:5,7
  59:10,15
**november** 1:18
  6:5 186:9
  187:21 189:25
  190:2 192:10
  192:12,13
  218:6,21 219:3
**nucleic** 34:4
**number** 37:9
  40:9,13 41:9,9
  42:10 45:17
  50:20 62:25
  63:3 81:6
  82:16 102:2,8
  103:10 105:22
  109:3 111:9,9
  112:9,10,13
  113:16 117:19
  120:10 126:9
  128:22 134:4
  139:2 153:24
  171:1 175:18
  180:11 209:24
  212:6 214:7
**numbers** 39:18
  41:1,4,21
  42:13 46:23
  47:21 48:3
  49:9,13 52:18
  62:22 72:17,19
  75:5,18 76:17
  76:20,21 90:3

**[numbers - okay]**                                                    Page 36

92:8,13 106:18
109:17 110:21
110:21 138:11
189:3 194:24
194:25 209:7
**numerology**
52:12
**nutshell** 14:16
**nv** 1:25
**ny** 219:15

**o**

**o** 6:1
**o0o** 1:3 6:2
**oath** 7:21 218:8
**object** 8:11
11:3
**objection** 13:1
13:8 15:1
20:10 22:19
27:8 28:7,14
29:6 31:1,15
35:10,16 39:15
40:24 41:19
42:2,17 43:1
43:22 44:4,10
44:17 46:4,14
48:24 50:7,17
51:12,20 54:14
57:9 58:13
59:13 61:16
64:22 66:23
67:6 68:6
70:19 71:17,23

73:13 74:8,24
75:10 76:13
77:5,24 78:6
81:1 82:8,17
83:1 84:12
86:11 87:25
89:25 91:6
93:17 95:6
96:25 97:16
98:5,20 99:18
100:18 103:1
103:14,20
105:7 106:8
107:10,22
109:8,14
110:13 111:20
114:11 116:22
118:11 121:8
121:16 122:14
122:23 123:10
123:14 125:11
125:20 127:13
127:23 129:16
129:21 130:22
132:12 134:21
136:13 139:12
139:22 142:22
144:12,21
146:3,12 147:6
148:10,21
149:22 150:17
151:6 154:18
155:2 158:13
159:12 163:8

167:1 169:21
172:24 174:15
176:25 177:8
177:25 178:17
181:25 182:11
183:5,10
184:11,15
188:13,21
189:22 191:14
194:21 200:15
204:10 205:17
207:18 208:20
209:13 210:19
211:5 213:8
215:2
**objections**
61:14
**objective**
171:19 204:25
**objectives** 28:2
68:10
**obtain** 15:24
**occasion** 69:11
**occasional** 33:3
**occasionally**
23:2 24:7,12
24:13 25:14
50:18 69:8
74:13
**occurred** 12:24
44:3 87:1
**occurring**
78:24

**october's**
189:10
**offer** 21:10
62:13,18
**offering** 40:15
91:12
**official** 108:25
**offline** 217:1
**oftentimes**
131:25 173:3
**oh** 40:11 41:7,7
96:16 108:12
145:7 167:6
**okay** 8:10,20
8:22 15:14
27:11 33:7,13
41:8 45:21
47:3 48:5 52:9
52:19 53:19
59:17 60:1,2
61:9,15,17,19
61:22 62:21
63:1,4,18
64:24 65:5
66:2 78:13
79:8 80:2 81:4
81:7 82:1
84:23,25 88:16
89:6 90:23
101:12 102:14
104:20 109:21
114:17 115:12
115:15 119:2
120:4,12,15

121:4,4 122:8
124:5,23 125:9
126:2,6,10
128:1,7,10
129:5 132:21
134:3,5 138:25
143:12 151:20
152:2 153:9,22
153:25 155:12
156:24 159:18
160:5 161:25
167:17,20
171:2 175:8,19
178:12 180:5
180:10,12
186:7,8,23
187:12 188:9
190:2 198:20
200:24,25
205:14 206:4
212:7 215:22
215:24,25
**old** 155:8
**omicron** 91:18
94:1,5,6 95:8,8
95:15 192:3
**once** 34:9 51:23
78:18 107:16
130:6 170:19
173:13
**ones** 92:18
118:14 130:8
**ongoing** 66:21
66:22 74:22

75:7,9
**online** 142:25
**ontiveros** 2:15
11:25 141:21
**opaque** 57:1
**open** 216:14
**operated** 20:7
20:15 26:24
27:1 35:18
**operating**
78:10,12,16
81:13 84:11
180:17 181:7
211:12
**operation** 17:2
**operational**
134:15
**operations**
16:22 17:10,22
36:5,15,16
211:12
**opine** 156:22
158:25
**opinion** 195:23
208:8
**opportunity**
196:8
**opposed** 43:13
**option** 104:6
108:17 110:19
**options** 21:20
22:4 104:1,5
104:18 110:24
111:11

**oral** 218:11
**order** 3:10 20:7
20:17,19 34:15
42:15 43:13,14
43:18 51:10,18
51:22 53:2,24
54:7,19,23
55:3,8,10
56:22,23 57:2
57:3,7 63:12
72:12,17 75:5
76:20 99:24
136:19 164:20
**orders** 34:19
35:9,15 39:9
40:22,25 41:2
41:12,17 42:8
42:14,23 43:7
43:17,20 44:8
44:18 45:20,23
45:24 46:3
48:6,22 49:5
50:16 51:13
55:23 56:16,20
57:11 78:2,3
79:16 120:20
121:7,11,15,22
122:1,3,21
172:13,21,23
182:4,9,21
191:5,12
**organization**
215:5

**organizations**
16:10
**original** 202:25
206:19
**originated**
159:6,7,8
**outcome**
104:18 218:14
**outline** 89:14
**outlines** 14:3
**outlook** 86:19
180:17 196:10
202:18
**outperformed**
207:20
**outreach** 25:2
**outside** 124:22
**overall** 21:24
150:3 157:19
176:8 194:6
**overlap** 29:25
184:18
**oversee** 18:14
19:16
**overseeing** 18:4
19:19
**overstated**
160:22
**overstating**
203:4
**own** 158:24
194:16

**p**

**p** 2:1,1 6:1
**p.m.** 53:20
  60:10,14 61:7
  63:20 85:19
  88:18 115:17
  116:7 117:13
  120:6 124:24
  128:24 141:19
  186:9 210:2
  217:9
**packaging**
  20:23
**packed** 20:8
**page** 3:2,7 4:2
  5:2 48:16
  52:10 63:2,5
  63:19 81:5,8
  86:4,5 117:19
  120:5,9,10
  124:6 126:8
  128:21 134:3,7
  135:2 138:6
  139:1 143:10
  153:23 157:2
  171:1 175:17
  180:3,10
  186:24 187:20
  209:24 212:5
  214:12 220:4,7
  220:10,13,16
  220:19

**pages** 38:14,16
  157:4
**paid** 22:1 185:7
**pandemic** 39:7
  73:21,24 74:2
  78:11,18 79:1
  91:11 92:7
  96:18 100:1
  155:7,8 176:10
  183:12 193:20
  196:14,19,24
  197:8,8,12,15
  197:18,20,21
  197:23,25
  200:7 203:18
**paper** 95:23
**paragraph**
  59:3 134:6
  139:3 143:13
  144:9 160:15
  161:13 162:12
  169:2,2,5
  180:13 196:4
  206:15 210:6
  212:8,23
**pardon** 40:10
  43:23 44:12
  70:2 76:1
**parentheses**
  154:9,15
**part** 16:21,24
  32:17 35:23
  36:4,15 38:16
  44:24 55:3

  95:25 101:9
  109:9 131:10
  162:14 163:10
  163:10,14,17
  164:4 210:10
  211:11
**participate**
  30:14 68:21
  69:6
**participated**
  27:20,21
**particular**
  32:16 42:24
  71:15,19 81:5
  88:8 99:17,24
  120:20 121:7
  121:12 136:21
  147:8 162:25
  172:1 185:9
  187:7
**particularly**
  71:22 130:17
  210:8,8
**parties** 10:3
  218:13
**parts** 126:20
  143:24 181:18
**passed** 139:25
**past** 33:14,15
  97:5 98:3
  101:5 195:2
  209:9 210:24
  214:14

**path** 101:19
**patterns**
  136:19
**paying** 12:14
  12:17 173:11
  185:4
**pcr** 34:2
**peaks** 74:14
  77:9 91:18
  97:11,15 101:3
  191:25
**peirsol** 11:21
  11:23
**penalty** 7:22
**pending** 8:17
**people** 11:22
  60:7 113:7
  140:20 142:11
  149:6,9,10
  150:1,1,2,4
  159:10,14
  160:21 161:5,5
  161:18,19,21
  162:1,7 164:3
  173:7 187:1
  193:21 194:14
  197:12,19
  204:7 208:24
**peppermint**
  163:4
**percent** 4:22
  22:15,18 105:6
  105:10,16
  186:17 191:5

**[percent - possible]** Page 39

191:12
**percentage**
22:3,9 34:11
94:10 190:24
191:7,16 192:5
**perfect** 207:9
**performance**
10:12 134:9,10
136:21 171:13
209:3 215:6
**performed**
203:19 204:6
**period** 17:9
23:22 29:24
34:20 50:23
51:24 70:22
71:24 75:22
98:12 106:19
193:9,11
212:11
**perjury** 7:22
**permissions**
37:2
**persist** 144:24
154:8,17,20
155:5
**persistence**
145:12
**persistently**
126:19 143:23
181:18
**persisting**
155:1

**person** 24:6
33:3 108:24
113:8 161:23
**personal** 24:18
**personally**
36:19,23 208:9
**personnel**
20:21 23:18,21
26:2,5,6
**perspective**
164:20 198:2
208:14
**pertains** 216:24
**phase** 196:22
**philosophy**
15:25
**phone** 24:6,11
33:1,3 178:22
**phrase** 82:10
83:5,15 139:7
169:14 207:2
**pickup** 20:24
**pin** 148:3
**pink** 47:5
**pixilated** 47:2
**place** 15:7
24:15 34:15
56:20 57:12
99:23 108:6
127:17 176:18
183:3,7,14
**placed** 20:17
57:11 151:19
218:8

**plaintiff** 1:6 2:2
6:17,18
**plaintiff's**
52:13 216:11
**planet** 154:11
**planned** 29:4
87:18
**platform** 145:2
163:12 173:4
202:3 205:8
208:3
**platforms** 35:4
**play** 91:20
92:15,16 113:6
**played** 79:4
**plaza** 2:10
**please** 6:14,23
7:12 8:3,16,25
9:5 30:20 43:3
61:13 86:24
**pleasing** 204:4
**plus** 166:19
**point** 36:21
66:5 74:10,16
75:17 84:16
91:10 93:20
96:8 100:7
103:5 109:18
120:16,18
124:8,15
131:21 140:14
145:2 147:13
150:22 154:7
155:8,20

157:22 164:6,7
164:12 166:9
171:18 174:8
180:6 183:16
194:4,25
196:20 197:2
203:17 204:17
207:25
**pointing**
145:10 172:5
**points** 4:8
65:20 120:8,18
124:6 145:7
152:11 153:11
153:14 154:1
157:20,20
169:5 196:23
214:15
**policy** 210:22
211:8
**pop** 95:4
**portion** 61:6
164:9 213:12
**position** 13:11
13:14 126:25
144:5 145:21
**positive** 101:20
196:10
**possess** 16:7
**possibility** 95:4
**possible** 58:22
134:11 146:17
189:1

**[possibly - prior]**

| | | | |
|---|---|---|---|
| **possibly** 46:8 | **predicted** 95:9 | **presence** 34:4,4 | 167:10 171:5 |
| **post** 154:8 | 167:11 | **present** 2:14 | 189:2 215:4 |
| 155:7 193:20 | **predicting** | 11:18 12:4 | **previously** |
| 197:18 | 99:20 132:4,6 | **presented** | 39:21,22 40:17 |
| **potential** 5:3 | **prediction** | 116:11 181:13 | 48:15 52:4,6 |
| 104:17 126:14 | 96:23 132:1 | 194:7 | 52:16 57:15,18 |
| 143:17 155:4,4 | **predictions** | **presenting** | 59:18,21 79:22 |
| 187:13 192:25 | 97:2 100:4,24 | 104:18 | 79:24 85:11,14 |
| 203:4 | **predictive** | **press** 4:6,15,16 | 88:10,12 97:13 |
| **potentially** | 44:20 77:10,16 | 4:18 10:9 25:6 | 115:7,9 117:5 |
| 204:23 209:20 | 78:14 79:7 | 25:10 36:7 | 117:7 128:2,4 |
| **pr** 4:8 5:7 | 96:14 97:9 | 68:11,15,17 | 132:16,18 |
| 23:10 25:2 | **prefer** 8:17 | 70:18 71:1 | 137:5,7 141:11 |
| 152:10 193:1 | 203:3 207:5 | 82:22 126:7,11 | 141:13 152:4 |
| 199:17 201:4 | 210:11 | 127:9 141:21 | 164:22,24 |
| 201:16 | **preference** | 168:12,22 | 168:3,5 174:22 |
| **practice** 64:15 | 208:15 | 170:13 175:5 | 174:24 178:25 |
| 137:24 143:4 | **premature** | 175:11 176:15 | 179:2 192:15 |
| **practices** 11:7 | 135:11 | 178:2,4,7 | 192:17 199:7,9 |
| 74:3 | **prep** 31:24 32:1 | 196:3 200:2 | 211:14,16 |
| **precision** | **preparation** | 201:11 | 213:17,19 |
| 126:22 144:1 | 13:25 14:4 | **presume** 83:25 | **price** 105:2 |
| **predict** 73:25 | 32:4 | **pretty** 84:15 | 106:4,7,14 |
| 92:17 99:21 | **prepare** 10:22 | 195:1 208:1 | 107:7,21 |
| 101:16 102:11 | 10:24 30:25 | **prevailing** | 108:15 110:6 |
| 106:18 108:7 | 31:4,7,14,17,19 | 78:14 79:6 | **primarily** |
| 110:18 126:15 | 89:15 | 100:24 | 22:24 23:1,7 |
| 126:21 136:21 | **prepared** 20:19 | **previous** 11:17 | 66:7 212:12 |
| 143:25 145:13 | 29:3 187:15 | 52:13 68:14,15 | **principally** |
| 145:23 147:1 | **preparing** | 73:7,7 77:10 | 34:13 |
| 149:15 192:1 | 20:21 25:6,9 | 78:24 79:9 | **printed** 180:18 |
| 204:19 | 68:5 74:19 | 83:23 107:5 | **prior** 16:13 |
| **predictability** | 89:19,21 | 122:5 123:17 | 49:3,6 56:15 |
| 98:13 | | 139:6 140:11 | 77:23 78:4,19 |

**[prior - put]** Page 41

96:15,22 97:8
97:20 120:5
131:16 138:23
168:22 183:24
212:11 218:8
**private** 17:16
37:11,13
**privilege** 13:17
216:16,25
**privileged** 13:2
13:12,15 15:2
**probably** 28:17
37:8,19 106:10
106:13 145:17
167:9 174:8
194:25
**problematic**
171:9
**procedures**
211:12
**proceed** 33:21
56:13 85:9
115:5 119:19
141:9 168:2
199:5 216:5
**proceedings**
218:9,11
**proceeds** 11:1
**process** 20:9
34:14 68:4
125:22
**processes** 34:22
34:24

**procuring**
26:19
**produce** 102:1
**produced** 79:2
157:10 216:17
216:22,24
**product** 3:13
**products** 26:19
60:21,22,25
63:22 81:12
134:14,20
184:19
**professional**
16:7,9 218:4
**profitable**
78:10
**program** 39:3
193:8,14 200:2
**programs**
176:8 183:3,14
184:1,8,12,14
184:19,23
185:11,15
**projected**
132:11
**projection**
112:5
**projections**
59:6,16 132:3
160:18
**promoting**
63:23
**proposals** 93:6

**proposed** 6:17
6:19 200:5
**pros** 104:8
**protocol** 72:15
**provide** 7:10
28:6 31:21
32:15 37:5
66:20 68:2
100:11,16
102:21 103:8,9
210:12,22
211:9
**provided** 29:17
30:10 62:7
68:13,14 97:14
97:18 98:3
125:10 136:16
196:7
**provides** 202:3
202:11 205:8
**providing** 9:13
30:11 64:15
66:17 77:2
90:25 91:4
98:8 108:10
125:2 126:24
135:24 136:7,8
137:25 144:4
153:5 180:22
202:17
**prudent** 81:17
82:7,12,14
83:10,13 84:6

**public** 18:4,19
24:25 25:4
107:12 111:25
158:19 176:6,7
176:23 184:20
221:19
**publicly** 72:7
**pull** 101:14
104:2 124:8
140:14 187:25
**pulled** 42:14
**pulling** 118:1
**punchy** 206:19
**purchase** 50:1
51:10,13,17
58:11 185:19
**purchased** 59:1
**purchases** 51:6
184:9
**purely** 20:4
**purposes** 12:10
24:19
**purview** 20:4
35:23
**push** 102:6
**pushed** 113:23
**put** 42:9 103:18
104:13 108:2,3
110:12,20
112:4 123:1,12
140:2,7 165:24
176:15 177:23
178:15,21
183:3 185:6

**[put - quotes]**

204:22 207:10
**putting** 123:9
123:16,19
178:4 208:8

**q**

**q&a** 188:8
**q1** 3:16,17 80:8
85:21 131:18
132:7 191:19
191:20 194:25
198:13,14
205:23 210:9
210:18
**q2** 74:16 90:25
91:4 103:8,8
103:12 110:2
131:19,20,20
131:21,22
132:6,10
135:21 166:19
166:25 175:5
181:1 190:8,19
**q2'22** 4:15,16
4:18 168:12
170:13
**q3** 4:21 171:20
186:16 188:1
**q4** 5:8 187:24
188:11 189:13
189:21 190:18
190:23 191:6
191:19,19
206:8 211:23

**quality** 18:5,5
**quantity** 21:21
22:7
**quarter** 32:10
32:16 39:8,10
39:14,17 40:21
40:23 41:15,16
41:18,24 42:10
42:21,22,25
43:5,6,9 54:5,8
54:20,24 66:21
66:22,25 67:5
67:8,11,21
73:5,7 74:7,11
74:22 75:7,9
75:12,16,24
76:7 77:1,17
78:13,14,20
79:9,14,15,16
79:18 81:12,18
86:18 91:15
92:25,25 96:13
96:14,15,24
97:23,23 98:3
99:7,16 101:3
102:21,25
105:17 109:4
109:12 110:1,8
112:18,25
113:19,19,25
114:10 120:20
121:7,12 122:2
122:17 123:18
134:11 136:20

142:21 143:14
150:12 167:9
167:10 169:3,7
169:14 171:12
172:8,9 176:22
181:5 182:5,14
182:15,19,20
182:21 188:2
188:24 189:8
189:19 190:3,5
190:23,25
191:6,12,13,18
191:20,21
192:7,11,13
198:9,10
202:12,17
204:9,15,18
208:1 209:7,8
209:12 210:12
212:9,14,16,17
212:25 213:7
**quarter's** 68:15
73:8 136:21
**quarterly** 3:8
30:15,25 31:7
31:14,19 36:7
36:11,17,20
40:5 45:12
58:20 64:15
66:17 71:1
76:3 102:15
104:22 126:24
144:4 172:3,4
172:7 180:22

194:24
**quarters** 14:13
39:19 41:10
42:20 43:6
67:8 71:10
74:1 79:20
95:5 102:22
107:5 150:12
169:19 190:6
190:19 195:3
**question** 8:3,17
8:18,22,23,24
30:20 37:20
43:2 44:5
52:21 91:24
100:21 108:9
120:12 172:18
173:16,21
174:5,14,17
178:12 187:22
198:7
**questions**
101:19 172:16
173:3,18,23
174:1 216:7,19
217:2
**quick** 198:4
**quickly** 33:11
**quite** 135:13
**quote** 127:4,6
170:23 193:19
195:15 210:10
**quotes** 195:19

| r | | | |
|---|---|---|---|
| **r** 2:1 6:1 69:13 220:3,3 | **reached** 90:4 | 50:9 55:5,7,25 | 179:14 186:15 |
| **raise** 16:18 101:19 | **react** 106:13 | 57:11,12 73:21 | 190:7 191:11 |
| **raises** 187:10 187:11 | **reacted** 94:13 | 75:4 77:10 | 193:5 195:4 |
| **raising** 17:16 59:11 | **read** 40:9 45:3 | 78:8,10,16 | 201:9 204:19 |
| **ramos** 53:1 60:4 | 46:12,13,16,19 | 82:18 89:20 | 206:13,25 |
| **range** 42:21 104:23 105:5 105:10,15 110:4 123:9,20 | 46:23 47:17 | 90:2,5 96:4 | 212:3 214:5 |
| **rarely** 36:1 38:15 164:20 | 95:19 103:24 | 97:1,3,7 99:2 | 219:11 220:6,9 |
| **rate** 92:8 93:24 | 110:16,17 | 103:22 107:11 | 220:12,15,18 |
| **rates** 92:11,12 93:8,9 113:10 126:19 143:23 146:20 148:18 149:4,5,8,18,18 149:19,23 181:18 | 111:13 119:10 | 109:15 113:2 | 220:21 |
| **rather** 189:25 213:15 215:7 | 130:15,16,25 | 118:12,16 | **reasonable** 108:24 |
| **rationale** 109:2 118:1 | 136:14 145:7 | 121:9 123:2,5 | **reasonably** 109:1 |
| **rattling** 153:15 | 155:15 156:21 | 123:23 132:5,5 | **reasoning** 116:10 |
| **raver** 55:10,22 56:16 | 166:13 175:14 | 134:23 139:24 | **reasons** 117:24 |
| | 180:15 217:6 | 142:23 155:18 | 118:8 125:17 |
| | 219:9 221:5 | 161:20 162:15 | 126:23 136:16 |
| | **readily** 164:12 | 173:25 174:17 | 136:17 144:3 |
| | **reading** 40:12 96:1 124:2 | 176:3 177:9 | 145:1 209:19 |
| | **reads** 81:9 126:12 134:7 143:15 196:5 201:25 212:8 | 190:10 196:20 | **reassess** 126:25 144:5 |
| | **ready** 20:24 132:7 | 198:18 211:6 | **recall** 10:3,6 |
| | **reagent** 64:8 | 215:8,9,10 | 11:12 12:13,23 |
| | **reality** 196:12 196:18 200:6 | **realm** 215:11 | 13:6 15:3 |
| | **realizing** 204:22 | **realtime** 173:6 | 17:18 18:2,23 |
| | **really** 10:8 30:4 | **reason** 7:24 | 19:1,4 20:14 |
| | 31:16 34:16,16 | 53:12 58:7 | 21:6,11,14,16 |
| | 34:25 35:11 | 65:17 80:14 | 21:17,21,23,25 |
| | 38:8 45:13 | 86:1 88:24 | 22:2,3,6,8,14 |
| | 47:18 50:2,3,3 | 89:8 116:4 | 22:17 23:24 |
| | | 125:2,10 | 25:24 27:22,22 |
| | | 128:19 133:7 | 28:5,9,15,22 |
| | | 135:13 137:22 | 29:14,14,21 |
| | | 139:20 140:5 | |
| | | 152:15 156:16 | |
| | | 160:14 165:11 | |
| | | 168:19 170:20 | |

30:5,12 34:6
36:3,10,12,19
36:23 37:17,23
37:24 38:11,22
41:23 42:1
43:20,24 44:2
44:3,8,12,15,18
49:3,12,22
50:5,21 51:3,7
51:9,13,14,17
51:21,23 52:3
54:18,21,22
55:1,14,19,22
55:25 56:15,18
57:6 62:17,20
64:16,17,19,21
64:23 68:21
71:3,6,12,14,21
72:13,22,25
73:3,6,10,14,17
74:6,9,25
75:17 76:2,5,8
79:19 82:6,11
83:8 84:5,9
87:1,5,18,23
89:18 90:7,13
90:18,21 91:16
91:25 93:3,8
93:10,11,13,14
93:19 94:10,14
98:7,16,21,25
99:5 100:14
101:2,22,25
102:23 103:11

103:16 105:18
112:15,20,21
112:23 113:2
113:21,22
114:5,8 119:7
119:9 121:14
121:20,23
125:12,23
127:15 130:18
131:15 132:13
132:14 133:6
136:7,17 137:2
138:15,19
140:8,11,18
142:15,17,18
147:2,7,9
150:18,19
151:4,12
155:19,22,24
159:3,5,9,13
161:1 162:21
162:24 163:5
164:1,14,17
165:14 166:9
172:6,10,11,15
172:16,18
173:15 174:5
174:12,17
176:16,21
177:3,6,14,15
178:20 180:1
181:4,10 182:1
182:7,8,12,16
182:17,22,25

183:13,14,15
183:17,21,23
184:2,5 185:16
185:18 186:20
186:20 188:15
188:15,18,22
189:18 190:23
191:1,3,4,7,10
192:5,12 193:7
193:9 194:18
194:22 195:4,9
195:17,25
196:20 197:3
197:15 198:18
200:10,12
209:2,6,18
213:9,11,14
214:24 215:3
215:11,16,19
215:19,20
**receipt** 219:17
**receive** 55:3,3
114:13 129:8
**received** 39:10
40:22 41:2,12
41:17 42:8,14
42:23 43:7,13
43:18 46:3
49:5 51:10,22
54:19,23 58:5
65:15 79:17
85:24 87:7
88:22 114:15
115:23 125:14

128:17 130:12
130:19 133:4
156:14 182:5,9
184:22 186:13
212:1 214:3
**receiving** 25:1
51:17 166:9
**recent** 132:4
**recently** 59:6
59:16 62:2
**recess** 33:18
56:10 85:6
115:2 119:16
141:6 167:24
199:2 216:2
**recipient** 61:8
**recipients**
141:19 142:4
**recognition**
43:19
**recognize** 40:3
**recollection**
28:8 40:20
41:15 66:16
67:2 71:2
74:12 87:2
91:7 105:19
113:13 121:22
138:17 140:6
158:9,23
159:17,18
165:10 174:1
182:16 195:24
198:15 204:2

**recommend** 61:1

**record** 6:5,15 7:13 9:14 33:16,19 40:8 42:12 48:14 56:5,8,11 61:5 61:10 85:4,7 114:25 115:3 119:13,14,17 119:22 134:10 140:25 141:4,7 167:12,22,25 177:19 190:6 198:25 199:3 202:1 215:22 215:25 216:3,8 216:13 217:3 218:11

**recorded** 1:15

**recording** 6:6

**recordings** 30:18,22

**records** 37:18 37:22

**red** 139:7,21

**redline** 126:11 139:7

**redlines** 133:22 139:4

**reduce** 147:4

**reduced** 93:16

**reduction** 176:5,23

**reed** 152:8,17 153:3 187:1

**refer** 19:24 155:13 176:5 178:3 203:10 203:10 205:15

**reference** 118:20 125:23 125:24 145:2 169:17

**referenced** 182:14 219:6

**references** 109:22,24 110:3,8 181:20 197:18

**referencing** 176:17

**referred** 54:12 166:25 194:2 205:11

**referring** 54:11 64:4,12 92:4 109:13,17 116:24 121:6 122:21 123:8 136:4 142:11 155:20 156:19 156:23 157:12 166:24 167:3,9 178:2,10 182:20 185:10 188:10,16 194:1 196:17

203:5 204:3,8 205:11,20

**refers** 81:23 109:12 110:2 136:3 199:24 205:6

**reflect** 61:5

**reflected** 42:3 50:15 53:3,13 58:4 65:14 80:11 85:23 88:21 106:14 115:23 128:16 133:3 136:12 137:19,23 141:25 150:20 152:12 156:13 160:11 165:7 168:16 170:16 179:12 186:12 193:2 199:19 201:6 206:11 211:25 214:2

**reflection** 215:6,12

**reflective** 42:14 170:1

**reflects** 133:21

**refresh** 39:18 39:25 40:20 41:14 52:10 66:16 158:9

**refreshed** 13:12

**refusal** 154:10 154:25

**refusing** 150:1 150:2

**regard** 27:12 58:15

**regarded** 62:1

**regarding** 10:8 11:8 14:11 76:11 77:2,3 84:10 183:25 187:4 200:2,5 216:15

**regardless** 190:17

**regards** 12:15

**regions** 136:24

**registered** 218:4

**regular** 69:2,2 154:11 163:14

**regularly** 27:15 27:21 35:23 69:1 72:14 78:25 79:1 122:5 138:18 173:18,18 189:3 194:5

**regulatory** 18:6 208:13

**related** 10:11 70:6 104:14 114:6 116:25 218:13

**relation** 10:1 152:20,22
**relations** 17:15 18:4,19,19 23:9 24:25 25:5,22 131:11
**relative** 113:10 185:24
**release** 3:15 4:15,17,18 5:3 5:6,9 65:12,13 67:16,24 68:1 68:5,11,17 70:18 71:1 73:4,9,18 76:12 82:22 85:22 86:7,10 91:1 125:3,19 126:4,8,11 127:9 137:18 138:16 141:23 142:20 143:7 168:12,13,23 170:13,14 175:5,6,11 176:15 178:2,5 178:7 192:25 196:3 199:16 200:2 201:4,11 202:16 206:9
**released** 131:22 131:23
**releases** 10:9 14:11 25:6,10

36:7 68:15 116:25 138:19 138:22
**relevant** 69:23
**reliably** 102:1
**relied** 100:25 184:8
**rely** 97:8 100:4
**rem** 91:25
**remain** 126:13 134:13 143:16
**remainder** 56:22 145:19
**remains** 134:9 140:24 154:4
**remarkable** 69:13,21,25 70:5,9 216:10
**remarks** 25:9 31:22,23 68:20 68:22 74:19 176:4 178:3 188:8
**remember** 10:10 12:24 13:7 14:21 22:11,12 30:1 36:1 71:8,9 74:15 83:12 87:22 88:2,2 91:20 93:3 97:18 102:12 103:2 114:1,4 114:14 153:1,7

155:7 161:3 163:2 177:9 178:23 183:19 183:20 191:8 194:11 197:16 209:18
**remind** 211:8
**reminded** 161:11
**reminders** 11:1
**remote** 1:15
**removed** 170:23 200:7 200:10,11
**rental** 64:8
**reorder** 55:4
**repatriated** 17:14
**repeat** 30:20 43:2
**repeating** 178:13
**replacement** 54:7,19,23 55:9 57:5
**report** 23:4,12 23:14 43:12 58:12 59:1 130:14,16 131:2,3 132:4 132:7
**reported** 1:24 23:16 41:1 42:24 43:8

90:3 218:6
**reporter** 6:13 6:22 8:5,6 18:16 31:8 56:3 83:20 92:10 116:1 217:5 218:4,4
**reporter's** 218:1
**reporting** 41:2 67:9 210:23 211:13
**reports** 29:18 129:7,20 130:1 130:6
**represent** 6:15 12:6 46:3 118:24
**representation** 12:11
**representative** 65:25
**representatives** 80:21
**represents** 41:11
**repurchase** 5:5 193:14 199:16 200:2
**request** 56:20 216:8
**requested** 25:20 218:16 218:18

**requests** 216:12

**require** 36:2

**required** 20:22 28:3 221:13

**requirements** 120:23 136:23

**research** 29:17 30:10,11 116:17,20 118:9 119:6,24

**resisting** 150:5

**resources** 28:3

**respect** 12:18 26:24 49:25 73:4 165:22 187:7

**respects** 94:14

**respiratory** 163:13

**respond** 13:10 22:13 54:2 83:16 173:2 188:6

**responded** 140:15

**responding** 25:1,12

**responds** 166:16

**respons** 18:10

**response** 116:14 174:5 174:14,18

**responsibilities** 17:8 18:1,3,10 19:12 24:22

**responsibility** 18:18 19:20 94:22 111:24 112:8,13 173:2

**responsible** 26:8,12 94:19 100:4 111:1,7 112:4,6 190:14

**responsibly** 112:12 145:13

**responsive** 216:11,21

**rest** 3:10 53:2 53:23 54:5 55:4 196:11 204:19

**restricted** 37:3 37:6 81:14 83:25 180:18 181:23

**restricting** 181:8

**restroom** 107:15

**result** 81:16 112:17 118:9 119:24 126:20 143:24 146:19 149:6 180:21

**resulting** 166:20

**results** 73:5,8 101:16 108:2,4 126:23 144:3 166:25 169:3,7 169:14 201:12 205:16 208:11 213:2

**retain** 173:25

**retained** 23:9

**retainer** 12:10

**return** 219:13 219:16

**returned** 134:1

**revenue** 21:24 34:11 41:23 42:8,24 43:8 43:19 59:5,15 96:23 97:2 131:5,9,15 135:12 169:19 172:2,4,7 173:18 176:22 191:9 202:1 210:9,17 212:9

**revenues** 4:22 186:17

**review** 12:20 14:3 36:6 68:18 69:20,23 69:23 70:10 71:11 86:25 98:11 130:3,12 130:21,24 133:2,13,15

218:16,17,18 219:7

**reviewed** 12:22 36:15,17 181:9

**reviewing** 36:20

**revise** 56:21

**revised** 126:4

**revolved** 105:20

**right** 11:6 21:16 30:12 57:21 59:23 62:23 80:3 97:15 104:1,7 108:9 110:19 115:13 122:11 128:8 135:4 146:18,20 149:3,7 163:11 166:19 167:19 174:4 190:3 209:19 214:19 216:6

**rise** 53:22 54:12 95:19

**risk** 147:11 206:20 207:4

**risks** 96:7,7

**risky** 206:25 207:15

**robinson** 60:3

**rockefeller** 2:10

**[role - searched]**                                               Page 48

**role**  17:7,21,23
  17:25 18:5,9
  18:18 19:15,22
  22:23 24:3
  26:16,19 66:6
  68:5 97:2
  111:22 131:10
**roles**  19:12
  24:16
**ron**  23:25
**room**  9:9
**roughly**  75:19
  93:21
**rpr**  1:24 218:25
**rubric**  72:16
**rules**  7:19
**run**  17:2
  135:23
**running**  17:15

**s**

**s**  2:1 3:6 4:1 5:1
  6:1 220:3
**sai**  165:16
  166:5
**salaried**  21:19
**sale**  62:18
  63:15
**sales**  26:1,4,5
  26:15,16,20,22
  26:23 27:2
  28:6,13,21,23
  34:19 35:8,9
  35:15 41:1,3

41:11 43:12,18
44:21,22,23,24
45:9,10,12,17
45:20,23,24
46:21 48:6,16
49:8,13,17
50:21 51:4
53:17 55:6
57:1,13 60:18
63:23 73:22,23
74:6,10,12,21
75:7,13,15,18
75:24 76:3,6
76:16,20,25
77:8 92:19,21
93:22 96:21
109:17 110:11
110:20,21
111:17 112:18
113:12 126:16
143:19 160:18
162:18 164:7
164:14,18,18
172:20 184:16
187:24 188:2
188:12,19,24
189:8,12,15,18
189:20 190:25
191:17 192:6
192:11,13
202:2 203:11
203:23 204:9
204:13,14
205:6,7,14,21

205:22 207:16
209:3,10
210:11 211:3
212:12
**salt**  7:16
**sample**  34:5
**sars**  34:5
**sat**  88:4
**saudi**  51:11,14
  51:18
**saw**  77:8
**sawyer**  65:9,19
**sawyler**  65:19
**saying**  44:15
  45:15 71:19
  83:22 87:10
  96:15 103:25
  108:13 114:9
  116:18,21
  118:10 121:10
  121:24 125:25
  145:20 147:23
  148:1 149:8
  154:15 158:23
  162:24 171:25
  178:19 189:11
  190:4 194:7,13
  194:15 203:20
  215:20
**says**  47:8,12,14
  47:16 48:7,16
  53:21 82:1
  103:6 105:13
  105:25 106:2,6

106:11 107:1
110:1 116:9
120:6,16 121:7
122:25 123:12
124:11 133:12
146:25 151:17
154:7,9 178:3
**scenario**
  102:17 109:1
**scheduled**
  27:16 69:1
**scientific**
  134:15 198:1
**scientifically**
  198:1
**screen**  46:24
  47:4,22
**script**  3:16,18
  4:20 5:10 71:4
  80:8,9,23 82:4
  82:22 85:21
  125:2,18 126:4
  133:2,10,22,24
  176:4 177:23
  178:2,3,7,10,15
  179:8,19,25
  181:1 211:23
  211:24
**scripts**  36:8
**se**  61:16 171:10
  171:24
**searched**  70:1,5
  216:10

**sec** 108:25
**second** 11:23
40:21 41:15,24
42:10,21,22
43:5,6 54:24
59:3 62:7,14
67:10,21 74:7
75:16,24 76:6
77:1 79:14
81:18 86:5,18
90:17 102:14
103:6 105:16
108:22 109:24
112:18,25
120:15,18
121:4 153:10
153:22 160:15
169:3,7,14
173:8 176:22
179:16 182:20
186:24 188:23
189:19 191:6
191:13 196:4,4
202:10 205:6
210:10 212:23
**section** 87:24
180:7 202:17
**sections** 87:21
**see** 41:8,8 42:4
42:5,9 44:21
45:3,12,12,13
45:25 46:6,21
47:3,8,9,11,15
47:18,18,24

48:3,5,7,10,12
50:9 52:20
53:25 54:7,9
55:6 58:23
59:5 60:8,15
61:4 62:8,15
63:16 66:12,14
77:13 80:17
81:8,19 83:18
83:23 86:6,20
92:13,21
103:24 104:7
109:5 116:12
117:1,17 118:6
118:17 120:13
120:25 121:4
124:9,19 125:6
127:2,5,6,7
128:25 129:4
129:11 133:11
133:13 134:17
135:3,5,16
136:1,15,25
137:1 138:13
139:2,9,15
142:24 143:13
144:7 145:9
146:17 153:9
153:17,18,18
153:21 154:12
161:16 166:14
166:22 169:11
170:22 171:15
171:21 175:24

176:12 179:11
179:16,21
180:23 181:20
182:24 187:17
188:1,4 190:9
190:9 193:24
195:5 196:15
197:17 199:18
201:16,18,20
202:5,7,13
203:8 206:21
208:4 209:25
210:4,14
212:19 213:3
214:22
**seed** 16:18
**seeing** 36:12
50:20 67:18
91:18 92:7
93:15 95:25
99:12,16 114:4
114:8 131:12
172:13,22,22
174:14
**seeking** 13:19
**seem** 72:22
127:24 129:7
183:14 195:17
**seemed** 36:12
55:10 94:2
127:21 204:16
**seems** 45:20
58:14 62:5
83:15 104:12

110:10 119:3
122:11 135:11
154:20,20
155:15 156:19
175:13,15
176:17 178:18
181:10,12
185:13 194:13
197:2 201:13
**seen** 94:7 140:2
181:12 187:24
188:11,19
208:2
**sell** 60:20 61:1
161:6
**sellers** 106:19
**selling** 34:7,9
49:10 63:10,15
135:20 169:19
**send** 93:5 129:6
184:19 185:11
**sending** 80:22
86:9 179:19
180:1
**sense** 91:17
93:3 141:3
161:3
**sent** 38:12
52:24 53:4,13
56:21,23 80:12
82:4 85:19
88:17 115:17
118:15 119:1
128:12 130:6,9

**[sent - simply]** Page 50

132:23 137:20
139:16 142:1
143:2 152:7,13
160:12 165:4,8
166:2 168:10
168:16 170:11
170:17 175:11
175:21 179:13
179:24 186:9
192:23 193:3
199:14,20
201:1,7 206:6
206:11 210:1
211:21 213:24
219:14
**sentence** 83:23
155:16 161:12
162:13 169:24
170:23 171:4,8
180:14 196:5
200:5,10
**sentences**
180:14,15
**sentiment**
147:8
**sentiments**
194:16
**separate** 28:20
**series** 20:15
62:22 77:8
**set** 26:1 37:5
166:6 169:8,15
171:9,13,23
183:18

**seth** 26:3 28:5
28:20 51:3
52:25 58:1
59:12 60:3,18
62:10 128:13
152:9 156:10
186:25
**seven** 17:6
33:14,15 67:10
157:20
**shaking** 8:7
**share** 5:5 14:12
28:1,16 32:11
32:19 40:1
46:24 47:3,22
105:2 106:4,7
106:14 107:7
107:21,25
108:15 110:6
193:1,8,13
199:16,17
200:2 215:14
**shared** 38:13
77:12 198:16
**shareholder**
203:6 208:10
**shareholders**
32:13 94:22
111:8 112:1
131:12,13
203:13,15
204:2,4,23
**sharepoint**
37:25 38:2,10

38:13,16
**shares** 196:6
**sharing** 59:15
**sharp** 58:21
**sheet** 213:15
219:11
**ship** 185:6
**shipment** 20:21
20:22 37:18,22
**shipments**
50:10,12 56:24
**shipped** 54:3
184:24
**shipping** 19:21
19:25 20:2,3,5
20:20 23:18,21
184:19
**shoot** 104:4
**short** 33:5,18
56:10 101:21
101:24 109:23
114:18 115:2
119:16 141:6
167:24 199:2
216:2
**shorthand**
218:4,9
**show** 5:3 46:21
192:25
**showed** 194:8
**shown** 36:21
182:13,17,23
211:3

**shows** 190:2
**shy** 197:24
**sic** 153:15
**sick** 159:10,14
159:21
**side** 24:25 25:5
34:17,25 50:2
50:10 55:6
57:1,13 184:16
184:19
**sidoti** 29:25,25
129:7 130:10
**sign** 217:6
219:12
**signature** 89:4
218:16,17,18
218:24
**signed** 219:19
**significant**
120:22 150:9
150:10 212:14
213:12
**significantly**
42:23 43:8
**similar** 102:16
171:12 181:5
181:13 182:8
194:19 214:13
**similarly** 1:5
**simply** 78:18
98:13 111:3
114:14 148:22
149:8 177:3
184:5 203:18

**[simply - specifics]**                                              Page 51

205:18 211:11
**single**  114:2
  130:16 131:1
  136:20
**sit**  114:1
**sitting**  114:1
**situated**  1:5
**situation**  62:1
  100:1,2 111:5
  207:11
**size**  58:20
  185:23
**slight**  95:19
**slow**  103:9,13
  110:2
**slowing**  187:24
  188:11
**small**  17:2
**smart**  33:23
  34:2,7,10
  43:20 44:8
  49:11 55:23
  56:17 126:15
  143:18 169:20
  172:14,23
  184:9 194:20
  198:11 212:13
**society**  147:12
  159:22
**soft**  102:21,22
  102:25 110:1
  113:25 114:10
  190:3

**sold**  198:11
**sole**  132:8
**solid**  134:9
  162:5 202:3
  203:5,11 205:2
  205:5,8,11
  207:14,16,22
  208:11,12,18
**solutions**  50:5
  50:11 219:23
**somebody**  97:3
  132:6 153:4
  158:21 159:1
  161:6 203:19
  205:1 207:6,11
  207:21 209:20
**somewhat**  40:4
  171:8
**soon**  107:15
  127:3
**sorry**  11:16
  30:8,19 59:9
  73:2 75:21
  81:2 86:13
  90:17 93:12
  105:23 121:1,5
  127:3 129:1
  130:10 133:16
  149:24,24
  157:17 160:24
  178:12 180:14
  183:9 205:19
**sort**  18:6 74:3
  87:15 91:11

93:2 99:3
  108:15 187:4
**sound**  9:4
  160:20
**sounds**  56:18
  87:17 105:9
  114:23 116:15
  167:20 197:5
**south**  7:16
**southern**  1:2
  6:9 102:6
**space**  186:21
**speak**  31:16
  50:4,11 58:16
  72:10 75:4
  78:21 106:24
  107:11 111:24
  158:15 163:16
  163:18 169:22
  184:4 191:15
  210:21
**speaking**  123:2
  123:16,16,18
  136:18 176:20
  205:21,22
**speaks**  83:24
  97:6
**specialized**
  18:13 19:14
**specific**  28:22
  29:15 35:14
  38:11 72:13,15
  84:5,9 87:2
  91:24,25 93:4

93:11 96:8,11
  98:16,22 99:6
  99:14,16,20
  100:14 101:2
  101:25 103:3
  103:10,16
  105:22 121:21
  121:23 122:1
  127:18 138:17
  140:6 151:12
  158:22 159:17
  173:25 178:21
  178:22 181:15
  193:9 194:17
**specifically**
  8:12 26:17,20
  72:19,25 87:10
  87:21,22,23
  90:21 91:16
  98:23 102:12
  104:9 105:20
  114:6 119:9
  121:21 127:15
  138:20 139:18
  144:14 145:21
  158:25 161:1
  162:21 164:1
  172:17 178:20
  178:21 181:11
  188:15 192:5
  197:4
**specifics**  88:3
  93:14

specify 123:20
speculate 78:8
  82:19 103:23
  109:16 116:23
  117:3 118:17
  119:3 121:9
  123:5,21
  127:16 151:8
  151:18 159:4
  161:20 167:2
  189:11 205:12
  211:7
speculation
  103:21
spend 161:8
  213:13
spike 95:18
spikes 91:19
spilling 212:17
spoke 53:21
sporadic 130:8
spread 124:17
  139:8 140:17
  143:22 144:15
  147:15 148:8
  148:11,13,13
  148:15 181:17
spur 118:3
stab 125:4
  190:14
stack 80:16,19
  81:24 85:21
  88:19 115:18
  117:14 128:13

132:24 160:8
165:5 166:11
166:16,24
168:10 170:11
175:22 202:8
206:7 210:2
213:24
stadium 1:4 6:7
  219:4 220:1
  221:1
staff 19:18
stages 51:19,22
stamp 65:1
  79:23 88:11
  115:8 117:6
  128:3 137:6
  141:12 151:21
  156:2 159:24
  168:4 170:4
  174:23 179:1
  180:4 186:1
  192:16 199:8
  200:20 205:25
  213:18
stand 102:2
  112:12
standard 172:1
  172:4,5 211:12
standards
  169:8,15 171:9
  171:14,24
standup 69:3
start 16:22
  17:24 18:8

39:7 103:9,13
109:3,12 110:2
110:8 135:20
162:13 214:18
214:24
started 7:19
  34:6,9 91:12
  97:19 183:12
  193:10
starting 196:4
starts 120:5
  126:8 139:1
  153:23 169:6
  171:1 180:7
state 6:14 7:12
  16:6 42:12
  61:9 184:20,23
  184:23 185:11
  185:15 218:2
stated 99:25
statement
  73:15 113:24
  182:23 213:15
statements
  10:9,13 14:9
  77:2 132:11
  150:24 151:15
  158:19,19
  181:5
states 1:1 17:14
  124:22 126:18
  143:21
stating 41:21
  103:8 190:16

192:5
status 32:10
statuses 3:13
sti 62:1,4 63:11
stock 20:20
  21:19 22:4
  106:20 213:11
  214:21 215:17
stop 102:2
stopped 101:1
stored 37:20
  42:15
story 111:4
strategically
  196:8
street 7:16
strength 202:2
  205:7
stretch 111:10
  118:2
strike 73:2
  93:12
strong 81:11
  112:25 188:2
structure 21:17
  21:22 22:6
stuff 185:6
  195:1
sub 101:18
  102:18 103:5
  108:22 201:18
  201:24 202:10
  205:6 206:18

**subject** 53:1 58:2,14 65:11 70:7 80:8 88:20 115:19 117:15 128:14 132:25 133:12 133:14,18 137:16 141:21 152:10 153:10 156:11 157:3 160:9 165:6 168:12 170:13 175:5 186:16 192:24 199:16 201:3 206:8 211:22

**subjective** 207:14 208:19

**subjectivity** 205:2

**submit** 68:17

**subscribed** 218:20 221:14

**subsequent** 187:11

**substantial** 22:8,11 112:6

**substantially** 49:17,18

**sufficiency** 216:16

**suggest** 120:6 120:17 144:14 145:8 195:14

**suggested** 137:1 144:10

**suggesting** 58:10 112:16 112:24 122:11 154:24

**suggestion** 195:16

**suite** 27:12,15 27:21 195:20

**sunday** 119:22 120:5 128:23

**super** 130:17

**supply** 4:22 176:2 186:17

**support** 53:17 134:16 154:16 154:22 173:9

**supporting** 154:19

**suppose** 16:6 17:22 75:11

**sure** 7:20 18:12 21:3 22:10,21 24:24 26:16,23 27:19 35:2,3 36:22 38:14 39:17 41:1 42:16 43:10 44:6 56:6,7 59:8,10 65:25 67:22 68:7 72:8 82:10 83:14 87:12,13

87:14,16 90:2 90:5 92:15 93:23 100:19 114:20 117:3 118:13 119:5 121:23 127:14 134:23 138:3 141:2 142:24 156:22 167:14 171:18 173:4 185:12,17 195:25 198:24 200:17 205:10 209:14

**surface** 124:17 140:17

**surmise** 105:8

**surname** 11:20

**surnames** 23:24

**surprise** 94:5 166:20,25 173:22

**surprising** 95:9

**survey** 58:3

**swear** 6:23

**switch** 104:3

**sworn** 7:4 221:14

**systems** 34:19 34:24

**t**

**t** 3:6 4:1 5:1 220:3,3

**table** 36:24 42:4,9 62:7

**tables** 37:5,9 41:9

**tablet** 69:13,16 69:18,21 70:1 70:5,9 216:10

**tail** 148:3

**take** 8:18 13:25 46:5,9 50:2 66:10 67:22 69:10,12,19 70:8,14 81:4 83:10 86:3,16 93:21 94:19 105:2,13 106:4 107:15 111:8 112:1 114:18 115:21 117:18 125:4 126:7 133:23 138:25 145:17,18 151:16 154:6 156:24 165:15 169:1 177:18 183:7 186:23 190:14 198:4 198:21 202:15

**taken** 1:17 9:22 10:15 33:18

56:10 115:2
119:16 141:6
167:24 199:2
216:2 218:9
**talk** 70:3 215:7
**talked** 196:21
**talking** 4:8
40:11 47:5
109:16 122:10
123:18,23
124:2 152:11
153:11,14
154:1,6 162:3
171:4 176:5
194:9 197:5
214:18,25
**talks** 83:19
**team** 26:15,22
26:25 27:1
35:8 51:4
124:25 134:8
**teams** 24:11
27:6,11 134:15
**technical** 9:4
173:9
**tell** 7:4,22 41:6
45:13 105:15
111:4 151:10
186:22 218:8
**telling** 51:4
73:11 102:24
**ten** 33:10
188:23

**tended** 194:24
**term** 81:14,15
83:24 126:14
143:17 180:16
180:19,20
181:8 215:9
**terms** 26:1 50:1
75:18 82:24
99:12,24
185:19 188:2
191:8
**test** 4:10 33:24
34:2,2,7,10,11
39:10 43:21
44:9 49:11
55:24 56:17
57:8 60:19
62:5 126:16
135:12 143:19
150:3 156:12
156:19 157:12
163:12 169:20
172:14,23
184:10 194:20
198:12
**testified** 7:5
67:23 164:7
**testify** 7:25
47:24
**testimony** 7:10
9:14 15:9
42:18 218:11
219:9,17 221:8

**testing** 4:23
60:24 120:22
136:23 144:24
145:2,4 147:24
149:6,10 150:7
150:22,25
163:14 176:6,8
176:23 183:4
186:18 193:23
194:2,11 195:7
**tests** 10:12,14
40:22,25 41:17
51:6 61:3 62:6
62:13,19 63:11
73:11,19 79:17
149:6,7 158:3
160:19 185:11
212:13,15
**text** 24:13
**thank** 7:9
**thanks** 208:22
**thecadencegr...**
152:9,24
**themes** 82:25
**theo's** 30:1
**thereof** 218:12
218:20
**thing** 74:22
94:19 99:4
158:15 162:6
183:22 195:21
206:17
**things** 24:15
57:13 71:15,19

79:8 83:25
91:8,22 92:3
93:14 107:24
147:18 173:12
177:13 181:20
207:7 208:21
208:23
**think** 8:4 10:11
26:4,13 33:4
33:11 35:22
37:19 38:4,23
66:25 76:9,24
77:20,25 78:5
80:14 82:14
84:14,14 93:15
96:21 97:17,24
99:10,25
100:10 103:18
104:5,6,14
122:15,17,20
122:24 123:2
128:19 130:8
133:16 147:25
150:20,23
152:16 155:9
156:16 157:5
160:14,23,25
161:23 162:14
162:17 164:10
166:18 167:14
168:19 169:17
176:3 177:13
179:15 186:15
190:1,1,17,18

Page 55

193:6,20 197:9
200:13 201:9
203:15 204:8
207:15 211:2
214:13
**thinking**  95:21
119:10 161:2
195:17
**third**  2:4 46:8
61:11 103:5
104:20 110:3
180:13 182:5
182:19,21
206:15 210:6
**thoroughly**
130:17 131:2
**thought**  105:10
105:16 108:4,5
111:2,6,16
116:15 124:15
151:10 161:21
161:24 164:8
191:16 192:6
203:13 204:13
206:25 207:10
215:5,12
**thoughts**
116:10 124:7
135:24 136:8
140:13 213:2
**thousands**
114:14
**thread**  127:22
165:16

**three**  56:23
64:8 120:8,18
150:12 154:21
158:1 180:14
214:9
**throw**  112:2
**thrust**  104:11
**thursday**  61:7
**tick**  93:24
**till**  150:23
163:14 167:20
**time**  9:13 14:21
16:21,24,24
17:9,21,23
18:3 19:13,18
19:19,20 20:11
20:13 21:12
22:25 23:12,22
24:21 25:14
26:4 28:24
29:20,22 33:4
33:17,20 34:20
49:10 50:23
51:24 53:4,14
56:9,12 58:5
65:15 70:22
71:24 73:7,20
75:22 77:15,21
77:22,23 78:2
78:4,24 80:12
80:20 85:5,8
85:24 88:22
89:18 90:8,13
90:18 91:5,7

93:9 94:17
95:24 96:8,11
98:12,22 99:5
99:11 100:15
101:23 105:19
106:19 112:16
112:22,24
115:1,4,24
119:8,15,18
121:15 122:12
122:16 125:13
125:16,22
126:24 128:17
130:15 131:3
132:10 133:4
135:14 137:20
138:4 140:23
141:5,8 142:1
142:5,7,9,17
144:4 147:2
148:23 150:15
150:23 152:13
152:19 156:14
160:12 161:3,9
163:5,15,20,22
164:10 165:8
166:7 167:23
168:1,16 170:2
170:17 174:19
179:13 180:22
181:11,14
182:6,10,17
183:12 186:13
188:20 193:3,9

193:11 194:18
197:12,23
199:1,4,20
201:7 205:13
206:11 212:1
214:3 215:1
216:1,4,7
217:4 219:18
**timeframe**
219:8
**times**  71:7,10
184:4 189:5
**timing**  120:20
121:7,11,14
148:4 212:12
**tip**  102:19
**tipping**  109:25
**tired**  162:1,7
**title**  17:25
36:13
**titled**  36:11
45:8 154:1
**today**  7:10,22
7:25 9:7,23
15:9 60:18
62:24 119:23
135:23 138:10
181:10 182:17
**today's**  8:2,10
10:18,22 12:7
12:11,15,18
**together**  42:9
95:13 96:19
111:4

toilet  95:23
told  10:21
  72:11 90:14,19
  103:12,19
tom  52:25
  53:16
tomorrow
  124:13
tonya  23:25
took  7:21 69:22
  91:12 149:24
  176:18
top  39:12 52:23
  57:25 60:2
  65:8 80:6
  85:18 86:9,22
  89:2 115:16
  117:12 120:16
  126:2 128:11
  128:22 132:22
  133:8 134:7
  135:9 137:14
  156:8,18
  157:19 160:6
  165:3 168:9
  170:10,21
  175:3,20 179:6
  186:8 192:22
  206:5 209:25
  211:20 212:21
  213:23
topic  184:5
topline  108:19
  172:10 191:8

total  22:4,9
totally  92:15
  95:13
tough  177:11
toward  212:15
towards  45:5
  128:22 139:2
  202:15
track  34:19,23
  35:9,15 49:13
  49:20 171:11
tracking  50:19
  50:24 191:1
trading  10:5
transcribed
  218:10
transcript
  218:11 219:6
  219:19 221:5,8
transcription
  218:10
transitioning
  153:3
translated
  70:11
transmission
  146:2,11,14
  147:5 149:1,5
travel  176:6,23
trend  187:16
trends  194:6
troughs  74:15
  77:9 91:19
  97:11,15 101:4

101:7
true  62:6
  131:24 218:11
  221:8
truth  7:4,4,5,22
  218:8,9,9
truthfully  7:25
  8:13
try  8:25 33:11
  46:24 82:23
  130:25 161:6
  162:8 164:2
  197:24 207:7
trying  46:18
  96:19 100:21
  160:20 161:8,9
  164:3 166:6
  173:3 174:18
tuesday  1:18
  135:15
turn  60:12 63:2
  68:16 81:5
  83:15 117:18
  128:21 134:3
  135:2 143:10
  153:22 155:12
  170:25 175:17
  180:3,10
  201:22 209:23
  212:5,21
turned  155:6
turning  81:10
  180:16

two  11:10,17
  12:21 23:7
  56:23 60:5
  64:9 67:12,19
  79:6 97:8
  101:5 102:21
  102:25 110:1
  113:25 114:4
  114:10,15
  117:16 135:3
  146:23 157:24
  162:4,5 164:13
  164:15 173:12
  174:3 176:18
  177:10,16
  179:9 180:13
  187:1 188:19
  190:19 196:23
  197:1
ty  152:9,24
  153:5
tyler  65:11 66:4
type  74:22
  98:11
typeface  70:12
typically  24:4,6
  33:2 49:13
  66:20 69:5,6
  70:17,25 82:23
  87:7 89:23
  129:19 131:22
  132:2 164:17
  173:23 209:7

| u | | | |
|---|---|---|---|
| **uh** 45:7 169:4 | 118:8 127:8 | 111:4 113:5 | 52:8,14,22 |
| **umbrella** 18:20 | 129:13 133:20 | 123:5 145:23 | 54:17 56:6,14 |
| **uncertainty** | 135:6,8 136:3 | 150:10 190:11 | 57:14,22,24 |
| 101:14 102:16 | 136:6 166:5 | 190:12 191:22 | 58:18 59:17,24 |
| 135:12 | 169:13 177:22 | **upcoming** 4:6 | 61:9,17,21 |
| **unclear** 8:25 | 178:14 179:23 | 141:21 | 64:24 65:4 |
| **uncommon** | 199:23,25 | **update** 3:13 | 67:3,14 68:23 |
| 55:2 56:19,23 | 202:22 203:22 | 28:6 58:21 | 70:20 71:20 |
| 105:23 117:1 | 209:15 210:16 | 68:8,24 69:1,3 | 72:1 73:16 |
| 138:2 189:15 | 213:5 216:20 | **updated** 3:14 | 74:17 75:6,14 |
| 190:9 195:18 | 216:23 | 65:11 | 76:23 77:19 |
| **under** 7:22 | **understood** 8:9 | **updates** 28:4 | 78:1 79:13,21 |
| 17:10 18:20 | 8:23 73:22 | 28:11,13 32:10 | 80:1 81:3 |
| 86:18 101:18 | 125:13 143:5 | **ups** 92:23 | 82:13,20 83:7 |
| 103:6 104:16 | **undervalued** | 97:11,14 101:4 | 84:8,14,23 |
| 108:22 109:24 | 196:7 | 101:6 | 85:10,17 86:15 |
| 110:7 153:10 | **underway** | **uris** 2:3 3:3 | 88:9,14 89:5,9 |
| 169:2 218:8 | 196:24 | 6:16,16 7:8 | 90:6 92:2 93:7 |
| **understand** | **unique** 58:22 | 11:9 13:5,11 | 95:2 96:20 |
| 7:21 8:14,24 | **united** 1:1 | 13:16,21 15:6 | 97:12 98:1,15 |
| 9:11 38:4 | 124:22 126:18 | 18:22 20:12 | 98:24 100:13 |
| 43:17 76:19 | 143:21 | 22:22 27:10 | 101:11 103:4 |
| 109:1 125:8 | **universities** | 28:12,18 29:8 | 103:17 104:10 |
| 193:22 194:14 | 16:4 | 31:5,12,18 | 105:14 106:16 |
| 215:8 | **university** | 33:4,10,15,22 | 107:16,17 |
| **understanding** | 15:19,20 16:2 | 35:13,20 39:20 | 108:8 109:10 |
| 14:8,15 26:10 | 16:3,5,6 | 39:24 40:14,17 | 109:20 111:15 |
| 34:14 37:4 | **unpredictabil...** | 40:19 41:13,22 | 112:14 114:17 |
| 42:13 46:2 | 105:21 113:15 | 42:11,19 43:4 | 114:23 115:6 |
| 58:9 72:5 | 113:15 145:11 | 44:1,7,14 45:1 | 115:11 116:2 |
| 81:23 83:2 | 147:21 | 46:11,20 47:22 | 117:4,9 118:19 |
| 86:8 116:19 | **unpredictable** | 48:1,19,20 | 119:20 121:13 |
| | 74:14 91:9 | 49:2 50:13 | 121:18 122:19 |
| | 95:14 107:13 | 51:1,16 52:1,4 | 123:7,11 124:4 |

125:15 126:1 127:20 128:1,6 129:18,24 131:4 132:15 132:20 135:1 137:4,9,12,13 139:19 140:10 140:19,25 141:3,10,15 143:3 144:19 145:24 146:8 146:15 147:14 148:17 149:13 150:13 151:3,9 151:20 152:1,5 152:6 154:23 155:11,25 156:5 157:5,9 157:13 159:2 159:15,23 160:3 163:21 164:21 165:1 167:4,12,16,18 168:3,7 170:3 170:8 173:14 174:21 175:1 177:5,21 178:9 178:24 179:4 182:3,18 183:8 183:11 184:13 185:8,25 186:5 188:17 189:17 190:22 192:8 192:14,19

195:12 198:6,8 198:20,24 199:6,12,13 200:18,23 205:4,24 206:3 208:17 209:1 209:22 211:1 211:14,18 213:10,16,21 214:9,10 215:15,22 216:6

**use** 24:18 35:1 35:3 37:11 38:2,10,15 39:6 68:12 83:3 97:8 124:12 207:2,4 **used** 29:4,4 35:5,19,23 38:6,20,25 138:12 149:7 187:3,7 219:19 **useful** 78:5 162:15 **user** 185:5 **uses** 34:18 39:4 39:5 **using** 52:17 **usual** 122:13 **usually** 24:10 36:1 69:8 **utah** 7:17 15:19 16:2 218:2,3

**v**

**v** 1:7 **v1** 85:22 **v2** 133:2,15 168:13 **v3** 137:18 170:14 201:5 211:24 **v4** 65:13 **v5** 175:6 **vaccinating** 154:10 **vaccination** 113:10 126:19 143:23 148:18 149:18,19,23 181:18 **vaccine** 93:24 96:3 148:23 150:2,4 154:9 154:24 **vaccines** 79:1 93:20 96:9 149:2 **vaguely** 183:21 **valuable** 78:23 **value** 39:9 42:22 43:7 50:22 79:16 105:13 121:11 145:18 151:17 215:13

**variability** 94:8 96:1 99:6,9,25 145:11 180:17 **variant** 94:2 95:4 98:17 99:2,20,21 102:5 147:22 148:15 192:3 **variants** 94:8 95:20 96:2,7 96:16 98:22 99:13 124:16 139:8 140:16 143:22 144:16 147:16 148:7 148:14 181:17 **varied** 17:9,25 28:17 42:23 43:7 **various** 23:18 23:21 25:2 26:4 60:7,22 61:3 120:23 141:19 183:3 185:11 187:4 189:5 201:23 **vary** 101:8 **varying** 196:23 **vc** 16:17 17:1 **venezuela** 64:9 **venture** 16:15 157:15 **venues** 176:7 176:24

**verify** 219:9
**veritext** 219:14
219:23
**veritext.com.**
219:15
**versa** 92:24
**version** 62:5
142:20,24
143:5 179:24
201:16 206:19
**versions** 126:4
**versus** 6:7
77:21
**vice** 92:24
**vicissitudes**
107:12
**video** 1:15 6:15
9:4 30:18,22
**videographer**
2:16 6:4,13,22
33:16,19 56:4
56:8,11 85:4,7
114:25 115:3
119:14,17
141:4,7 167:22
167:25 198:25
199:3 215:25
216:3 217:3
**view** 35:24
163:22
**viewed** 101:20
**viewing** 36:23
**virus** 34:5 94:8

**visibility** 81:14
83:24 91:22
93:2,16 98:19
164:18 180:16
180:19 181:8
181:24 185:3
**visible** 136:20
**visits** 33:3
**volatile** 91:9
92:3 96:18
99:11 111:5
122:16
**volatility** 99:15
100:17 105:21
113:14
**volume** 50:1
185:20
**vp** 26:4
**vs** 219:4 220:1
221:1

**w**

**w** 4:14 165:6
**wainwright**
29:23 154:5
**wait** 75:21
**waived** 218:17
**wall** 112:2
**waning** 4:22
186:18
**want** 7:18
53:23 56:4
84:2,25 96:8
114:17 118:4

118:20 122:25
123:12 149:14
149:17 156:24
171:12 180:6
188:7 198:20
203:10,12
210:7,8,17
211:7 214:18
216:8,13 217:5
**wanted** 32:15
32:19 83:10
87:12 89:13
131:14 158:10
213:6 214:24
**wants** 208:8
**wasted** 161:8
**water** 198:4
208:13
**waves** 94:3
101:9 195:6,8
**way** 37:3 44:15
51:8 70:11,14
71:15,19 77:7
77:18 102:4
106:13 113:23
121:14 142:23
144:17 149:3
150:9,10
161:14,19,19
164:13 174:11
177:11 191:1
196:9 207:7,12
218:13

**ways** 100:22
151:1
**we've** 62:2
95:11 172:2
173:23 195:3
**weak** 109:3,12
110:8
**webb** 152:9
201:3
**weber** 16:6
**wednesday**
210:1
**week** 11:14,15
28:3,17,17
67:12,13 95:17
164:19,19
184:4 192:7
195:2,2
**weekend**
116:16 118:25
**weekly** 69:4
**weeks** 10:20
67:8 164:15
**went** 75:1
119:21 129:19
**wheelhouse**
195:22
**wide** 176:11
**wild** 176:2
190:10 191:25
**wildly** 99:22
**william** 80:16
80:19 81:24
85:21 88:19

115:18 117:14 128:13 132:24 160:8 163:4 165:4 166:11 168:10 170:11 175:21 186:25 187:2 202:8 206:7 210:2 213:24

**williams** 52:25 53:16

**withdrawal** 64:1

**witness** 6:23 7:3 11:6 13:3,9 15:3 18:17 20:11 22:20 27:9 28:8,15 29:7 31:2,9,16 33:7,14 35:11 35:17 39:16 40:10,25 41:20 42:3 43:2,23 44:5,11,18 46:5,15 47:23 48:18,25 50:8 50:18 51:13,21 52:20 54:15 57:10,20,23 58:14 59:14,23 64:23 66:24 67:7 68:7 71:18,24 73:14 74:9,25 75:11

76:14 77:6,25 78:7 81:2 82:9 82:18 83:2,21 84:13,19 85:2 85:16 86:12 88:1 89:7 90:1 91:7 92:11 93:18 95:7 97:1,17 98:7 98:21 99:19 100:19 103:2 103:15,22 105:8 106:9 107:11,23 109:9,15 110:15 111:21 114:12,20,24 116:23 118:12 121:9,17 122:15,24 123:15 125:12 125:21 127:14 127:24 129:17 129:22 130:23 132:13 134:22 136:14 139:13 139:23 140:21 141:2 142:23 144:13,22 146:4,13 147:7 148:11,22 149:23 150:18 151:7 154:19 155:3 157:7,11

158:14 159:13 163:9 167:2,20 169:22 172:25 174:16 177:1,9 178:1,18 182:1 182:12 183:6 184:12,16 188:14,22 189:23 191:15 194:22 199:11 200:16 204:11 205:18 207:19 208:21 209:14 210:20 211:6 213:9 215:3 216:18 218:8 218:20 219:8 219:10,12,18

**woefully** 112:5

**wondering** 61:25

**word** 31:3 46:5 46:9 207:14 208:18

**worded** 207:7

**words** 123:25

**work** 8:8 16:12 20:9 22:24 23:5,6 24:19 34:16 55:6 57:1,12 61:1 84:17 140:19 188:7

**worked** 23:10 26:18 99:4

**workflow** 20:14

**working** 16:14 16:17 125:17

**works** 33:5 37:4 84:24 167:18

**world** 79:10 92:6,19 99:22 126:20 143:24 150:11 154:8 155:6,6 181:19 193:20 196:12 197:18

**worn** 18:7

**worried** 108:2 111:2

**worst** 94:3

**worth** 58:3 198:11

**worthwhile** 178:4

**write** 109:19 124:14 135:10 153:13 160:16 170:21 171:7 171:17 176:1 193:16 195:13 196:18 201:14 206:16

**writes** 53:20 58:19 59:4

**[writes - zoomed]**

60:23 61:24 62:11 63:8,21 64:6 66:11 86:23 89:11 90:24 104:21 104:25 108:18 108:23 116:7 116:14 117:21 124:6,24 126:3 129:5 133:8 138:7 157:19 179:17 187:12 187:20 202:8 202:24 210:6 212:22 214:12 214:16

**writing** 58:17 60:17 119:6 125:4 162:22 163:2

**written** 12:9 53:9 162:23 182:24

**wrote** 82:19 107:1 121:25 123:6 124:1 134:23 153:18 155:21 161:22 163:1 182:25

**ws** 81:22 202:8

---

**x**

**x** 3:1,6 4:1 5:1 124:18,21

---

218:16

---

**y**

**yeah** 11:6,16 22:20 31:10 32:3 33:10,15 35:18 40:17 48:12 70:4 74:9 76:2 88:1 88:24 89:7 93:18 98:7 99:19 100:22 103:2,15,22 105:24 106:9 107:16 109:15 110:15 114:21 114:24 117:17 118:22 121:5,5 128:19 132:14 133:18 134:22 136:24 139:23 151:7 152:5 153:20 156:16 157:11,17 161:17 165:24 166:8 167:18 174:16,16 177:1 188:14 198:6 205:19 215:11,19

**year** 16:5 17:18 19:1 77:23 78:4,12,19,25 79:10,11,12

---

91:13 93:21 95:22,22 96:4 96:15 97:19 98:3 111:10 126:17 132:1 143:20 145:19 150:11 155:8 169:10 176:10 190:19 201:11 202:1,3 204:7 204:17,20 205:3,11,15,22 212:11,18,24 213:1

**years** 16:25 17:4,6,12 101:5 114:5,16 155:21 162:4,5 164:13 174:3 177:10,16 187:4 196:23 197:1 203:18

**yep** 8:9 85:2 201:21

**yesterday** 54:4 89:13

**yi** 29:23 154:2 154:3 155:18

**york** 1:2 2:5,5 2:11,11 6:9

---

**z**

**zachary** 85:19 86:23 88:19

---

115:19 117:14 128:12 132:25 160:8 168:11 170:12 175:22 213:25

**zero** 96:9

**zoom** 1:17 6:11 45:18 47:1

**zoomed** 41:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 220

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al. 11/12/2024 - Andrew Benson (#6992291)

E R R A T A   S H E E T

PAGE 15   LINE 25   CHANGE "and" to "in"

_____

REASON  Misspoke

PAGE  17  LINE 10   CHANGE "under" to "running"

_____

REASON Misheard

PAGE  20  LINE  23  CHANGE Remove "it"

_____

REASON Misheard

PAGE  21  LINE  22  CHANGE "on" to "or"

_____

REASON  Misheard

PAGE 30   LINE 1  CHANGE "Maxxam" to "Maxim"

_____

REASON Misspelled

PAGE 30   LINE  6  CHANGE "Maxxam" to "Maxim"

_____

REASON Misspelled

_____   12/23/24
Andrew Benson                      Date

Page 221

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al. 11/12/2024 - Andrew Benson (#6992291)

E R R A T A   S H E E T

PAGE 36  LINE 19  CHANGE "can" to "can't"

REASON  Misheard

PAGE 55  LINE 6  CHANGE "since I work on the sales"  to "since I don't work on the sales"

REASON Misheard

PAGE 107 LINE 3  CHANGE "he's" to "it's"

REASON Misheard

PAGE 130  LINE 8  CHANGE "Maxxam" to "Maxim"

REASON  Misspelled

PAGE 145  LINE 18  CHANGE "ability" to "inability"

REASON Misspoke

PAGE 149  LINE 7  CHANGE add comma after "used"

REASON Grammar

_____          12/23/24
Andrew Benson                             Date

Page 222

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et

al. 11/12/2024 - Andrew Benson (#6992291)

E R R A T A   S H E E T

PAGE 158  LINE 15  CHANGE add "as" between "thing"

and "before"; Should read: "thing as before"

REASON  Misheard

PAGE  173  LINE 6   CHANGE Delete "not"

REASON Misheard

PAGE 180  LINE  18  CHANGE Remove "printed"

REASON Misheard

PAGE 185  LINE  3  CHANGE Remove "if"

REASON  Misheard

PAGE 197  LINE  5   CHANGE Switch "in" and "this"

Should read:"I'm talking about this in March"

REASON Words transposed

PAGE 212  LINE 12   CHANGE Remove "a"

REASON Misheard

_____          12/23/24

Andrew Benson                            Date

Page 223

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al. 11/12/2024 - Andrew Benson (#6992291)

E R R A T A   S H E E T

PAGE 53 LINE 15 CHANGE "I don't know" to "I do not"

REASON Improperly transcribed

PAGE 96 LINE 19 CHANGE Delete "alter and"


REASON Nonsensical as transcribed

PAGE 121 LINE 10 CHANGE "imagine it's" to "imagine it's,"

REASON Improperly punctuated

PAGE 190 LINE 17-21 CHANGE Strike this testimony


REASON Nonsensical as transcribed

_____         12/23/24
Andrew Benson                   Date

Page 224

STADIUM CAPITAL LLC vs. CO-DIAGNOSTICS, INC., et al.

11/12/2024 - Andrew Benson (#6992291)

ACKNOWLEDGEMENT OF DEPONENT

I, Andrew Benson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    12/23/24

Andrew Benson                        Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS 23RD DAY OF DECEMBER, 2024.

_____

NOTARY PUBLIC

Dennis N. Emery
Notary Public, State of Utah
Commission # 719295
My Commission Expires
September 22, 2025