# **Exhibit 27**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 22-cv-6978-AS.

------------------------------------x

STADIUM CAPITAL LLC, on behalf of itself

and all others similarly situated,

Plaintiff,

- against -

CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and

BRIAN L. BROWN,

Defendants.

------------------------------------x

November 11, 2024

9:00 a.m.

Remote video-teleconference

deposition via Zoom of MIKE HOUSTON,

pursuant to Subpoena, before Jineen

Pavesi, a Registered Professional

Reporter, Registered Merit Reporter,

Certified Realtime Reporter and Notary

Public of the State of New York.

Page 2

APPEARANCES:

KAPLAN FOX & KILSHEIMER LLP
800 Third Avenue, 38th Floor
New York, New York 10022
    Attorneys for Lead Plaintiff and
    Proposed Class
BY: JASON A. URIS, ESQ.
    juris@kaplanfox.com
    CHANG HAHN, ESQ.
    chahn@kaplanfox.com

BAKER & HOSTETLER LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
    Attorneys for Defendants
BY: MARISSA A. PEIRSOL, ESQ.
    mpeirsol@bakerlaw.com

WARNER NORCROSS & JUDD
150 Ottawa Avenue NW
Grand Rapids, Michigan 49503
    Attorneys for Witness
BY: MICHAEL BOVILL, ESQ.
    mbovill@wnj.com

ALSO PRESENT:
SEAN ADAMS, The Video Technician

Page 3

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and between the Attorneys for the respective parties hereto that filing and sealing be and the same are hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

    IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed and sworn to before any notary public with the same force and effect as though signed and sworn to before this Court.

Page 4

    THE VIDEO TECHNICIAN: Good morning, we're going on the record at 9:03 a.m. on 11/11/2024.

    Please note that this deposition is being conducted virtually, quality of recording depends on the quality of camera and Internet connection of participants.

    What is seen from the witness and heard on screen is what will be recorded.

    Audio and video recording will continue to take place unless all parties agree to go off the record.

    This is Media Unit 1 of the video recorded deposition of Mike Houston in the matter of Stadium Capital, LLC, versus Co-Diagnostics, Inc., et al., filed in the United States District Court, Southern District of New York, Case No. 22-CV-6978-AS.

    This deposition is being conducted remotely using virtual technology.

Page 5

    My name is Sean Adams representing Veritext Legal Solutions and I am the videographer; the court reporter is Jineen Pavesi from the firm Veritext Legal Solutions.

    I am not authorized to administer an oath, I am not related to any party in this action nor am I financially interested in the outcome.

    If there are any objections to proceeding, please state them at the time of your appearance.

    Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

    MR. URIS: Jason Uris, Kaplan Fox & Kilsheimer LLP for plaintiff and the proposed class.

    MS. HAHN: Chang Hahn for plaintiff from Kaplan Fox.

    MS. PEIRSON: Marissa Peirsol with Baker Hostetler for defendants.

2 (Pages 2 - 5)

Page 6

MR. BOVILL: Michael Bovill on behalf of nonparty deponent Mike Houston.

M I C H A E L   H O U S T O N, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. URIS:

Q.    Mr. Houston, good morning and thank you for making yourself available to provide testimony today.

A.    Good morning.

Q.    Can you please state your full name for the record.

A.    Michael John Houston.

Q.    What is your current home address?

A.    17 East Silver Oak Road, Vineyard, Utah 84059.

Q.    You understand that you took an oath under penalty of perjury to tell the truth today?

A.    Yes.

Q.    Are you aware of any reason you

Page 7

HOUSTON

cannot testify truthfully today?

A.    No.

Q.    Throughout today's deposition, if you could please let me finish my questions before answering, I think that would be helpful for the court reporter.

You need to answer audibly, so that means no nodding or shaking your head.

Does that work for you?

A.    It does.

Q.    Throughout today's deposition you may hear objections to form, but unless your counsel instructs you not to answer, you must still answer truthfully.

Do you understand?

A.    Yes.

Q.    If you need a break, please just let me know; however, if a question is pending, I'd prefer that you finish answering the question before we take a break.

Does that work for you?

A.    It does.

Page 8

HOUSTON

Q.    If I ask a question and you answer it, I'll assume that you understood the question, but if you don't understand the question or it's unclear, please just let me know and I'll try to clarify it.

Where are you today?

A.    Miami, Florida.

Q.    Is there anyone in the room with you?

A.    No, there's not.

Q.    Do you understand that you cannot communicate with your lawyers during the time that you're providing testimony on the record?

A.    I do now.

Q.    Have you ever been charged with a crime?

A.    No.

Q.    Have you ever been named as a defendant in any civil litigation?

A.    No.

Q.    Have you had had your deposition taken before today?

A.    Nope.

Page 9

HOUSTON

Q.    When did you become aware of today's deposition?

A.    I don't recall the exact date, but about a few weeks ago.

Q.    Did you prepare for today's deposition?

A.    No, I had a meeting with my counsel, Mike Bovill, just really to understand what a deposition is since I haven't done one before.

Q.    When was that meeting?

A.    That was last week.

Q.    Do you recall how long that meeting was?

A.    I want to say it was about an hour.

Q.    Was anyone other than you and Mr. Bovill present at that meeting?

A.    No.

Q.    Does the Warner Norcross & Judd law firm represent you in connection with today's deposition?

A.    They do, yes.

Q.    Did you enter into a written

3 (Pages 6 - 9)

Page 10

HOUSTON

retainer agreement for the purposes of their representation of you in connection with today's deposition?

A. I don't know that it was a written retainer agreement.

There was a contract.

Q. Are you paying Warner Norcross & Judd's legal fees?

A. Yes.

Q. Did you review any documents during your meeting with Mr. Bovill in preparation for today's deposition?

A. I did, he showed me a couple of e-mails and then a script from I believe Q3 of 2022.

Q. Did you bring any notes or documents with you for today's deposition?

A. No, I did not.

Q. Did you take any notes in preparation for this deposition?

A. No, I did not.

Q. Did you review any notes or outlines in preparation for this deposition?

Page 11

HOUSTON

A. No, I didn't.

Q. Do you know what this lawsuit is about?

A. I don't, I don't know the details, no.

Q. Have you discussed this lawsuit with anyone other than your counsel?

A. Just with the partners of Lambert by LLYC.

Q. Do you recall what you discussed with the partners of Lambert by LLYC about this case?

A. Really just that there was a subpoena, that we needed to produce documents related to Co-Diagnostics, and that there would be a deposition.

So three different updates along the way.

Q. Anything regarding the substance of the case or the deposition?

A. No.

Q. What are the names of the partners of Lambert by LLYC?

A. Jeff Lambert, Don Hunt, Matt

Page 12

HOUSTON

Jackson, and Michelle Olsen.

Q. What's Jeff Lambert's position at Lambert by LLYC?

A. He is the chairman.

Q. And Mr. Hunt's position?

A. Since we have been acquired, he's now the U.S. lead of corporate affairs.

Q. And Mr. Jackson's position?

A. He's a managing partner.

Q. Who was --

A. Michelle Olsen, she's now the chief client officer for the U.S.

Q. Who was Lambert acquired by?

A. LLYC, Llorente y Cuenca, it is a Madrid-based firm.

Q. When did they acquire Lambert?

A. Mid-February of this year.

Q. Do you have any agreements in place, whether with Co-Diagnostics or anyone else, that will in any way affect your testimony today?

A. No, I do not.

Q. I would like to ask you a

Page 13

HOUSTON

little bit about your educational background.

Did you attend college?

A. I did.

Q. Where did you go to college?

A. I started at Michigan State University, did three years there, met my wife, not at the time, but she's from Utah, and talked me into moving out to Utah to finish my last year.

My undergraduate degree is technically from the University of Utah, but I did two semesters there.

Q. When did you graduate?

A. Sorry?

Q. When did you graduate?

A. May of 2007, and then did a semester of law school, interviewed for clerkships and quickly decided it wasn't for me, dropped out, then fast forward to just a couple of years ago I got my MBA at the University of Wisconsin.

Q. What year did you obtain that MBA?

Page 14

HOUSTON

A.    It was last year, so December of last year is when I finished.

Q.    Do you possess any professional licenses?

A.    No, I do not.

Q.    Are you a member of any professional organizations?

A.    I am part of NIRI, the National Investor Relations Institute.

Q.    Any others?

A.    No, that's the only one -- sorry, I am part of the Young President's Organization, YPO.

Q.    Can you generally describe your work experience prior to joining Lambert.

A.    It was heavily focused on investor relations, I had done it both at agency and in-house as well.

Q.    What companies were you at?

A.    So I began at Christianson & Associates and then went to Lambert after that and was at Lambert for about three years, went in-house for Ancestry.com to take them public, they didn't go public,

Page 15

HOUSTON

so then I found my way to a company called Amedica, small biotech in Salt Lake, and did their investor relations until they sold off the majority of the business, and then made my way back to Lambert about eight years ago.

Q.    Do you recall what Amedica's primary business was, was there a specific products they were selling or what did --

A.    It was a biomaterial company and their FDA-cleared products were spinal implants.

Q.    What year --  strike that.

When you rejoined Lambert about eight years ago, what was your role at the time?

A.    I was a senior director on the investor relations team.

Q.    What were your responsibilities as a senior director on the investor relations team?

A.    So I managed a handful of accounts and those accounts included publicly-traded micro to small cap market

Page 16

HOUSTON

capitalization companies, where we would do for the most part full-service investor relations.

There were some where we were just an extension of their team and we would do very specific things for them.

Q.    Did you know anyone at Lambert prior to joining the firm?

A.    Prior to rejoining or joining for the first time?

Q.    I suppose the first time would make more sense.

A.    I had met Jeff Lambert and one other partner, but it was more in an interview tye setting, so I hadn't known anyone prior to interviewing for the first time.

Q.    Can you describe, since being a senior director at Lambert, can you describe how your role and responsibilities have changed since then.

A.    Comparing today with back then, that time frame?

Q.    Yes.

Page 17

HOUSTON

And anything that might have happened in between.

A.    Well, today I oversee all the operations, not just within Lambert, but also within the Llorente y Cuenca operations within the U.S., so it includes investor relations, public relations, marketing solutions, so brand and advertising, creative design, really we try to position ourselves as a one-stop marketing and communications shop for a middle market public or privately-held company.

Q.    At some point did you become a managing director at Lambert?

A.    I did, I don't recall the exact date on that, but I went from senior director to managing director to chief strategy officer to president and then to CEO of the U.S. for LLYC.

Q.    Do you recall what your role was in the 2021, 2022 time frame?

A.    I would have been --  I was named president I believe February of

5 (Pages 14 - 17)

Page 18

HOUSTON

2022, but was still leading a couple of clients at that time, three clients to be exact.

Q.    Who were those clients?

A.    Did you ask who they were?

Q.    Yes.

A.    So Co-Diagnostics being one of them; MGP Ingredients; and then Heritage Insurance.

Q.    Do you recall when you started working with Co-Diagnostics?

A.    I don't recall the exact date, but I do remember starting work with them.

Q.    You don't recall whether it was early 2021?

A.    Not a hundred percent; I know it was in 2021, but to be honest, we had been courting them for nearly a year, just going back and forth, so that's one of the reasons I don't recall exactly when it was that we started with them.

Q.    Did you know anyone at Co-Diagnostics prior to working with them?

A.    No, I didn't, they came in

Page 19

HOUSTON

through a reference.

Q.    Do you recall who that reference was?

A.    I believe it was Ty Lombardi and so he was the CFO at Amedica when I was at Amedica with him.

Q.    Do you know whether he did any work for Co-Diagnostics?

A.    I don't, I don't, not for sure.

Q.    In connection with managing the Co-Diagnostics account, were there any Lambert employees that you primarily worked with that may have supported you in that effort?

A.    Related to Co-Diagnostics?

Q.    Yes.

A.    Yes, so that would have been Will Stack and Zach Mizener.

Q.    Do you recall if there was anyone else that supported that account in 2021 or 2022?

A.    Not in a meaningful way; there -- occasionally we would have a tactical item that needed to be looked on a Factset

Page 20

HOUSTON

or a Bloomberg and you would have one of the analysts look that up and get it back to the other core team members, but it was just the three of us on the team.

Q.    How would you primarily communicate with those team members?

A.    Through e-mail; you're talking about Zach Mizener and Will Stack?

Q.    Yes.

A.    Yes, it was e-mail.

Q.    Any other messaging systems or text messages or anything like that?

A.    I mean, we have Microsoft Teams, but our policy is just to have everything in e-mail, so...

Q.    Do you recall ever communicating with them over something other than e-mail regarding substantive matters concerning the Co-Diagnostics account?

A.    Nothing substantive, no.

Q.    In the 2021 and 2022 time frame, would you have any regularly scheduled meetings with Will Stack or --

Page 21

HOUSTON

A.    Zach Meisner?

Q.     -- or Zach Mizener?

A.    Related to the Co-Diagnostics --

Q.    Sorry, related to Co-Diagnostics or at which Co-Diagnostics would be discussed.

A.    No, each of them reported to someone other than myself, so really when we would connect, it was with the client or just ad hoc, but there wasn't any regularly scheduled standing meetings that we would have to discuss Co-Diagnostics.

Q.    Who did they report to?

A.    I believe at that time Zach reported to Will and Will would have reported to Jeff Tryka, I believe, I would have to go back and look though.

Q.    Who is Jeff Tryka?

A.    He is a managing director; at the time he was leading the capital markets practice group.

Q.    But they wouldn't report to him with respect to the Co-Diagnostics

6 (Pages 18 - 21)

Page 22

HOUSTON

account, correct?

A.    Correct, everything came through me on the Co-Diagnostics side, Jeff Tryka didn't see any of that or touch any of it.

Q.    Did you report to anyone with respect to the Co-Diagnostics account?

A.    Just directly to the client; nobody internally at Lambert.

Q.    What services was Lambert retained by Co-Diagnostics to provide?

A.    Primarily for generating awareness and engagement amongst what we call the buy-side or portfolio managers and analysts professional investors, as well as the sell-side, so the equity research analysts, really trying to get more coverage for Co-Diagnostics from other equity sell-side research analysts.

Secondarily, we would help them with their quarterly earnings cycle.

So it was those two, but primarily the reason that they engaged us was to generate some more awareness

Page 23

HOUSTON

amongst the professional investors on Wall Street.

Q.    Would you communicate with the individuals or firms that provided research reports to the market on Co-Diagnostics?

A.    Yes, I would.

Q.    Have you heard of H.C. Wainwright?

A.    I have, yes.

Q.    Do you recall whether they covered Co-Diagnostics in the 2021, 2022 time frame?

A.    I believe they did, yes.

Q.    Maxim Group, do you recognize that --

A.    I do recognize the name; I think they had picked up coverage a little bit later.

I don't recall exactly who covered them at that moment in time, but Maxim, I'm familiar with the firm.

Q.    Do you recall whether Sidoti & Company covered the firm around that time?

Page 24

HOUSTON

A.    I don't remember if it was in that time frame, but I do remember they covered Co-Diagnostics, but I don't remember when they dropped coverage.

Q.    Do you recall whether Litchfield Hills covered Co-Diagnostics around that time?

A.    They did around that time, yes.

Q.    Are there any other firms that you recall covering the company around that time?

A.    No, there weren't any others.

Q.    Did you monitor the reports they issued regarding Co-Diagnostics?

A.    We did, yes, there were quarterly reports that were issued after earnings were announced.

Q.    Why would you monitor those reports?

A.    We would take their models and put it into just one Excel spreadsheet where we could monitor consensus on our own and then compare that with Bloomberg or Factset just to make sure that both

Page 25

HOUSTON

reconciled.

Q.    When you refer to consensus, what do you mean by that?

A.    So just taking the average of those that were covering Co-Diagnostics at any given point in time.

Q.    The average of what?

A.    The different line items within the profit and loss statement that the sell-side equity research analysts would put together.

They call it a model, but it was really an income statement and they would give their guess as to what those quarterly amounts would be and so we kept track of all those in a spreadsheet, took the average of those so that it was a much easier way to see what that average was across each of the analysts.

Q.    Is one of those line items their expected quarterly revenue?

A.    It is, yes.

Q.    Did you ever participate in Co-Diagnostics's quarterly earnings calls?

7 (Pages 22 - 25)

Page 26

HOUSTON

A.    Is this in regard to the live earnings call?

Q.    Yes --

(Cross talking.)

A.    Are you referring to being in the live call and having a speaking part or just dialing in and listening to the call?

Q.    Being in live call and having a speaking part.

A.    No, I don't recall ever having a speaking part in the live call.

Q.    Is it fair to say you would dial in and listen to the calls?

A.    Correct, yes.

Q.    Do you know how Co-Diagnostics's executives would prepare for quarterly earnings calls?

A.    I had some view into that, yes.

Q.    What's your understanding of how they prepared for those calls?

A.    At least from my viewpoint, it was Andrew Benson, myself, Will Stack and Brian Brown that would get together at

Page 27

HOUSTON

least three weeks after the quarter end, while they were still finalizing numbers, and we would at a high level have a decent understanding of how the quarter played out.

And so from there we would help them draft key messages for the earnings press release and the call script that Ike and Brian and Andrew, for that matter, would read from every quarter.

Q.    When you refer to Ike, is that Dwight Egan?

A.    It is, yes.

Q.    Would he participate in those meetings?

A.    Occasionally, and it was usually toward the end when things were coming together.

Q.    Is it correct that starting around three weeks after the end of a quarter you would have frequent meetings I guess leading up to the quarterly earnings call?

MS. PEIRSOL:  Objection, form.

Page 28

HOUSTON

Q.    You can answer.

A.    Oh, okay.

Can you repeat the question, sorry.

Q.    Is it correct that starting around three weeks after the end of any quarter you would have frequent meetings leading up to the quarterly earnings call?

MS. PEIRSOL:  Same objection.

A.    We would typically meet once a week, sometimes that would get skipped as well.

So if by frequent you mean once a week, once every ten days, then, yes.

Q.    I guess if anything in particular came up that either you wanted to discuss or your teammates or Mr. Brown or Mr. Benson, would you have one-off conversations to discuss whatever issues came up?

A.    What do you mean by issues?

Q.    Just anything that anyone wanted to discuss; it sounded like, is it correct, it sounded like generally you

Page 29

HOUSTON

would have a weekly call, it may not occur every week, every ten days, but would you have other calls other than those regularly scheduled calls?

A.    So we did have biweekly calls scheduled throughout the year, I would say for the most part it was me, Brian, Andrew and Will that would attend those biweeklies.

I say for the most part because sometimes they just didn't happen, there wasn't anything to talk about.

Q.    Did you communicate directly with Co-Diagnostics's investors?

A.    I did, yes.

Q.    How would you communicate with them?

A.    Typically through e-mail.

Q.    How else would you communicate with them?

A.    Typically through e-mail we would confirm a time to meet and connect, then it was usually through Teams, Microsoft Teams, a video meeting.

8 (Pages 26 - 29)

Page 30

HOUSTON

Q. Do you know what the Logix Smart COVID-19 test is?

A. My understanding is that it's a PCR-based test to detect COVID.

Q. That product is sold by Co-Diagnostics?

A. Correct, at that time that was my understanding, yes.

Q. At that time was it your understanding that Co-Diagnostics had different variations of the Logix Smart COVID-19 test?

A. Yes, there was.

Q. Was it your understanding that when they refer to the Logix Smart COVID-19 test, they're referring to a suite of COVID-19 tests that the company sold?

MS. PEIRSOL: Objection, form.

A. I believe it was a technology platform that they would refer to it as.

Q. Was it your understanding that when they referred to the Logix Smart COVID-19 test, they may be referring to a

Page 31

HOUSTON

number of different tests that they sold that tested for COVID-19?

MS. PEIRSOL: Objection, form.

A. I don't know that it was that granular.

I think it was interchangeable as to how they would refer to it, that there wasn't one consistent definition as they would phrase it that way, the test.

Q. Do you recall when Co-Diagnostics started selling the Logix Smart COVID test?

A. I don't, no.

Q. Do you know approximately what percentage of Co-Diagnostics's revenue the Logix Smart COVID-19 test accounted for in 2021 and 2022?

A. I don't, the vast majority.

Q. Do you know whether it was over 90 percent?

A. I don't know for sure, no, I don't recall.

Q. Would that surprise you?

A. No.

Page 32

HOUSTON

Q. Do you know when Co-Diagnostics began a practice of providing quarterly guidance?

A. I don't recall; my belief is that it started before we started working with them.

Q. Do you recall that Mr. Brown was responsible for determining the guidance that would be provided?

A. That was my understanding as the CFO.

Q. Typically guidance for the upcoming quarter would be provided in the earnings release and on the earnings call for the results of the preceding quarter, correct?

A. Correct, when we first started working with them, correct.

Q. And those earnings releases and earnings calls were typically issued and conducted approximately halfway through the ongoing quarter, is that correct?

MS. PEIRSOL: Objection, form.

A. They were released according to

Page 33

HOUSTON

the SEC guidelines of when following a quarter closed when they should be released.

I don't know if that would hold true, that it would be in the middle of a particular quarter, if that holds true for all four quarters.

Q. Do you have an understanding of how Mr. Brown would determine guidance?

A. I don't, no.

Q. In the weeks leading up to an earnings release, what would you typically discuss with Mr. Brown or Mr. Benson or Dwight Egan?

A. Specifically Mr. Brown and Mr. Benson, but really trying to get an understanding from them as to how the quarter played out, so meaning, you know, what did the financial statements look like between the income statement, the balance sheet and the statement of cash flows, and developing key messages from there.

And so typically those key

9 (Pages 30 - 33)

Page 34

HOUSTON

messages would be, one, how did the quarter go and then how does that tie to the longer term strategy, and helping them parse through what those messages looked like, with the end goal of being as open and transparent as possible, without giving away any of the secret sauce, because our main job was to try to reduce the uncertainty and volatility around Co-Diagnostics's valuation and our philosophy is, as you provide open and transparent communication with the street, then that reduces some of that volatility and some of that risk that they might perceive in a particular micro or small cap stock.

Q.     So you would help them formulate the messaging, correct?

A.     Correct, based on the information that they would share with us.

Q.     Would they provide you with themes they wanted to message to the street?

A.     Typically we would come up with

Page 35

HOUSTON

those together, but I will say as the relationship progressed, Dwight felt more comfortable taking his script and we would help wordsmith it a little later, but it was only a handful of quarters that we really tried to give him an outline or a few thoughts.

He'd want to run with his on his own and get a few refinements typically days before earnings were announced.

Q.     Were there certain messages that Dwight Egan felt strongly about messaging to the street?

MS. PEIRSOL:  Objection, form.

A.     The one that sticks out in my mind is just their role in being able to test people reliably during the pandemic, he wanted to make sure we conveyed the importance of what that test brought to uncertainty during that pandemic time frame.

Q.     Any other themes or messages that you recall he felt strongly about?

Page 36

HOUSTON

MS. PEIRSOL:  Objection, form.

A.     That was really the one that resonated with me, that I recall.

Q.     Would you take notes during your calls leading up to an earnings release?

A.     No, typically they would just provide us with everything that we needed to be able to frame up a press release and quotes, so that really wasn't necessary to take notes.

Q.     Do you know whether Mr. Stack or Mr. Mizener would take notes during those calls?

A.     I don't believe so; typically with clients of this similar engagement, where they already had someone in-house as their IR professional, we were really just an extra set of hands.

Q.     Is the in-house IR professional you're referring to, is that Mr. Benson?

A.     It is, yes.

Q.     From the time Co-Diagnostics began selling the Logix Smart COVID-19

Page 37

HOUSTON

test through the first quarter of 2022, do you know approximately how much revenue the company had per quarter?

A.     I don't recall, no.

Q.     Do you recall whether it was at least $20 million or more in each quarter?

A.     I don't recall, no.

MR. URIS:  Is everyone okay going off the record for a short break?

MS. PEIRSOL:  Sure.

MR. BOVILL:  No issues here.

THE VIDEO TECHNICIAN: We're now going off the record, the time is 9:55 a.m.

(Recess taken.)

THE VIDEO TECHNICIAN: We're going back on the record, the time is 10:07 a.m.

BY MR. URIS:

MR. URIS:  I am going to introduce an exhibit, just bear with me a moment.

(Pause.)

Q.     Mr. Houston, do you have access

10 (Pages 34 - 37)

HOUSTON

to Exhibit Share?

A.    I don't know, I'm sure I could get access, I believe I just have the Zoom link.

(Discussion off the record regarding Exhibit Share link.)

MR. URIS:  I am going to introduce as an exhibit, it will be Exhibit 35, it is a document bearing Bates No. CODX 00002996, and that should be available if you refresh the page.

(Houston Exhibit 35, Bates No. CODX 00002996, was marked for identification, as of this date.)

A.    Yes, it is.

A.    I can see it now, Jason, it looks like a nine-page document.

Q.    Yes.

This is an e-mail thread, top e-mail is from Andrew Benson dated May 13, 2022, to Dwight Egan and Brian Brown, with the subject line forward, CODX note, with an attachment, CODX note 051322.

If you see the e-mail below

HOUSTON

that, it is an e-mail from Jim Sidoti dated May 13 to Andrew Benson copying Zachary Mizener, do you see that?

A.    I do, yes.

Q.    Zachary Mizener is the Lambert employee that you mentioned before?

A.    He is, yes.

Q.    Does the attachment to this e-mail -- is Jim Sidoti, he is the research analyst at Sidoti & Company?

A.    Correct, yes.

Q.    Does this attachment appear to be his May 13, 2022, note regarding Co-Diagnostics?

A.    It does, yes.

Q.    If you could turn to -- if you look at the bottom right-hand corner of the document, there's a series of letters and numbers which is referred to as a Bates stamp or Bates number, if you could turn to the page with Bates number ending in 000, which I guess is the third page of the income statement it looks like.

A.    Okay, I'm there.

HOUSTON

Q.    Do you see the revenue line item at the top?

A.    I do.

Q.    Does this refresh your recollection that in each quarter in 2021 and the first quarter in 2022 Co-Diagnostics had at least $20 million or more in revenue?

A.    It does, yes, thank you.

Q.    You can set that aside, if you'd like.

A.    Okay.

(Witness complying.)

Q.    In either April or May -- strike that.

In either April or early May 2022, did anyone from Co-Diagnostics tell you that demand for the Logix Smart COVID-19 test had fallen?

MS. PEIRSOL:  Objection, form.

A.    No.

Q.    Did anyone tell you that orders for the company's tests had fallen?

A.    No.

HOUSTON

Q.    Did anyone tell you that revenues were down?

A.    Not that I recall --  well, let me back up.

Are you talking about quarterly revenues, annual revenues?

Q.    In either April 2022 or May of 2022, did anyone from Co-Diagnostics tell you that revenues to date were down?

A.    Not that I recall, no.

MR. URIS:  I would like to introduce Exhibit --  bear with me a second, it was previously marked, so I don't want to double mark it.

(Pause.)

Q.    I'm introducing what was previously marked as Exhibit 13, that should be available if you refresh the page.

A.    Yes, I can see it now.

Q.    This is an e-mail thread, the top e-mail from Andrew Benson to Brian Brown, the subject line is forward: D1 CFO script, attachment 1Q22 earnings call

11 (Pages 38 - 41)

Page 42

HOUSTON

script - CFO plus guidance 505322.

If you see, the e-mail below that is from William Stack to Andrew Benson on May 3, do you see that?

A. I do.

Q. William Stack is the Lambert employee that you had referred to earlier?

A. That is correct.

Q. In that e-mail he writes, "Andrew, attached is the v1 of the CFO script. Shout with questions."

Did Lambert typically put together the first draft of the script for an earnings call?

A. For Brian, yes; for Dwight, no.

Q. Why didn't Lambert put together a first draft for Dwight?

A. Well, I mean, this is conjecture on my end, but I believe Ike liked to just have it be in his own words, so I think we probably took maybe the first quarter or two trying to draft an outline for him and he would just rewrite it and have it come from him, so...

Page 43

HOUSTON

Q. I think you touched on this a bit earlier, but can you describe the process of how Lambert would put together an initial draft of an earnings call script.

A. Typically we would have a draft of the income statement first and from there would start filling in the CFO's script.

So we would go back to see what we said last quarter, so year-over-year, so let's just say if it was a Q2, we would look at what did we say last year Q2, but then we'd also look at just the sequential past quarter Q1 and make sure that we're being consistent quarter-over-quarter and we're talking about the items that the street is looking for us to talk about.

We would look at it through lens of what is an investor or equity research analyst going to ask and what are some of the things that they want to know.

So as we're helping any client, including Co-Diagnostics, we're looking at

Page 44

HOUSTON

it through that lens and helping develop key messages that professional investors are going to be wanting answers to.

Q. Would you also try to incorporate any information you had been given by the company regarding the ongoing quarter or how the ongoing quarter was going?

A. No, we didn't have any visibility to that and we only talked about what had been done.

So if there was a Q2 earnings call, we were only talking about Q2, we didn't have any visibility into Q3; even though technically we were into that current quarter, we never talked about it.

Q. If it was a Q2 earnings call, for example, and you were giving guidance, wouldn't that guidance pertain to the Q3 quarter?

A. It would, but that wasn't part of our scope of work, helping them put together a range, and those were numbers that were given to us and we would put

Page 45

HOUSTON

them in the press release.

Q. So when you say you never talked about the current quarter to the extent guidance was being given, that would necessarily be something that was talking about the current quarter, correct?

MS. PEIRSOL: Objection, form.

A. Can you restate that question, I don't think I really understood what you were trying to ask.

Q. I think in one of your answers you said that on a Q2 earnings call, for example, you were only talking about Q2, and even though technically you might be in the current quarter, we never talked about it.

So I'm just saying, to the extent guidance was being provided, that would necessarily be about the following quarter, correct?

A. That's correct, but we would never talk about it on a quantitative basis, so whatever the company wanted to

12 (Pages 42 - 45)

Page 46

HOUSTON

put in as a range for EPS, for instance, for the next quarter, even though it would go in the Q2 release, that wasn't something that we would discuss.

Q. When you say that we would discuss, you're talking about Co-Diagnostics and Lambert?

A. Exactly, yes, Andrew and Brian.

Q. Do you recall whether you had a call with Brian prior to putting together this initial draft?

A. I don't, no.

Q. Would that have been your typical practice?

A. No, I mean, it was all done in e-mail really just to keep track of the drafts and make sure we've got good version control.

It was really all done within a Word document and versions e-mailed back and forth.

Q. You wouldn't typically have a call with Mr. Brown or Mr. Benson prior to working on a draft to see if there were

Page 47

HOUSTON

any messages they wanted to put forth or anything that they thought would be helpful to incorporate into an initial draft?

A. That we would and that would go back to the -- I think I stated usually the process was about three weeks after quarter close we would start having meetings related just to that quarter's earnings and how they would be messaged.

But there were no one-off conversations of just me and Brian or anything of that nature.

Q. If you can turn to the attachment.

A. The same one here, Exhibit 13?

Q. Yes, Exhibit 13.

If you could turn to -- the attachment appears to be the draft call script, correct?

A. Yes.

Q. If you could turn to the page Bates number ending in 438.

A. Yes, I'm there.

Page 48

HOUSTON

Q. Starting in the middle of the page, it says, "Turning now to guidance," it says, "While we experienced strong demand for our products during the first quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution, but as a result will be taking a more prudent approach to guidance for the second quarter of fiscal 2022. Outlook for the fiscal second quarter ended June 30, 2022 assumes the following."

Do you see that?

A. I do, yes.

Q. And then there is a comment on there.

A. Yes.

Q. "Discuss."

Next to that there is initials, WS; is your understanding those initials refer to Will Stack?

A. It, yes.

Q. On or before May 3, 2022, which

Page 49

HOUSTON

is when Will Stack e-mailed this draft, do you recall discussing with anyone at Co-Diagnostics taking a more prudent approach to guidance?

A. I don't remember the exact timeline of events as to how we knew that there was less visibility that Co-Diagnostics was facing and so I know we did give them a few potential ways to handle that.

I would have to go back and look, but our counsel is typically be open, be transparent and share as much as you can around any uncertainty.

And I think what further -- I have to go back and look -- I think what further compounded that too is just a lot of macro issues that all of our clients were facing, I mean, not just a pandemic, but Russia invading Ukraine, the Fed increasing interest rates, Donald Trump saying he's going to run for office again.

So if I remember correctly, I think that spring and that summer were

13 (Pages 46 - 49)

Page 50

HOUSTON

quite a tumultuous time for a lot of our micro and small cap clients.

Q.   Other than factors that were affecting all of your clients, do you recall being told anything by someone at Co-Diagnostics specifically what was causing reduced visibility?

A.   No, my recollection is that they knew there was reduced visibility, but they were really just trying to get their arms around it, hence I believe, and production would validate this, what we produced was we went back and forth to really try and nail down what exactly is at play here, is it more macro, is it internal.

But it was a process to try to really nail this down and I don't recall exactly when this version would have been drafted and where that reflected where we were at in that timeline of events.

Q.   This draft seems to contemplate that guidance would be provided, correct?

MS. PEIRSOL:  Objection, form.

Page 51

HOUSTON

A.   Typically what we do is we'll put in a placeholder of what was done in the prior quarter and use that as a starting point around discussions.

So I don't know that it can contemplate that they were considering providing guidance even though we had it in there in the script because we would just pull forward whatever we did from last quarter.

Because it was really -- it was an easier way to be able to -- hold on, I don't know what happened here.

It would be an easier way to really pull forward exactly what was discussed in the prior quarter and use that as a reminder tool, hey, we said this last quarter, how do we want to say it this quarter.

All that said, I don't think it necessarily contemplates that they were considering providing guidance other than we pulled the language forward to the next quarter.

Page 52

HOUSTON

Q.   Do you have an understanding of what was meant by "taking a more prudent approach to guidance for the second quarter"?

A.   I don't remember.

Q.   Do you think it meant guiding to a more conservative number?

A.   I wouldn't be able to say with any level of certainty.

Q.   Do you know whether Will Stack would ever have calls with Mr. Brown or Mr. Benson without you?

A.   Not that I am aware of, he made sure to run everything through me.

Q.   I will produce what was previously marked as Exhibit 14, that should be available now.

A.   I can see it.

Q.   This is an e-mail chain with the top e-mail from Zachary Mizener to Brian Brown and Andrew Benson dated May 4, 2022, at 2:02 p.m., copying Mike Houston and William Stack, subject line, re, Q1 CFO script, and then attachment.

Page 53

HOUSTON

A.   Yes, I see it.

Q.   If you look down at Mr. Brown's May 4th e-mail that starts on the bottom of the first page, he writes, "Will, when can we expect to see the first draft of the earnings release?"

Do you see that?

A.   Yes, I do.

Q.   Did Lambert typically put together the first draft of earnings releases?

A.   We would, just to get all the -- well, the body of it, everything above where the contact information goes, that's what we would supply; all the tables and everything else that goes typically after that, that's what would -- that's what Co-Diagnostics would supply.

Q.   Mr. Mizener appears to be sending the first draft of that press release, correct?

A.   It appears so, yes.

Q.   He writes, "We can review/discuss on the call in 30."

14 (Pages 50 - 53)

Page 54

HOUSTON

Do you see that?

A.   I do, yes.

Q.   Typically would you send a draft of the press release and then have a call to discuss the draft?

A.   For the first draft, yes.

Q.   If you take a look at the attachment, do you see at the bottom of the first page, second quarter 2022 outlook, do you see that?

A.   Yes, I do.

Q.   It's highlighted?

A.   Yes.

Q.   Do you know why it's highlighted?

A.   We would do this for all of our clients.

Again, we would pull forward whatever we communicated last quarter and -- I don't recall why there are some numbers in there whereas there are some Xs, but like I said with the earnings script, same with the release, we would just assume that they're going to continue

Page 55

HOUSTON

to provide quarterly guidance and so we would just pull that forward into the next first version of the draft.

None of those -- in the first version, none of those numbers were given to us by Co-Diagnostics.

Q.   Do you recall whether the call that Mr. Mizener referred to having in his e-mail ever occurred?

A.   I'm fairly certain that it would have, yes.

Q.   Do you recall what was discussed on that call?

A.   It typically would just be looking at the numbers for Q2, making sure they're entered in there properly, but then starting to discuss what those quotes for Dwight Egan could look like, because then that helps us frame up what are the key messages that we could use in the script.

So typically we start with the release and end with the script.

Q.   Do you recall whether the

Page 56

HOUSTON

highlighted guidance language was discussed or guidance was discussed generally?

A.   Likely not; that typically came together it felt like within a few days of reporting the quarter.

So it was never talked in the first couple of calls even.

And that's consistent with our other clients as well, too, that most of those smaller microcap clients, it takes them a while to really figure out what does that forecast look like.

Q.   I'm going to introduce previously marked Exhibit 15, that should be available.

A.   I can see it.

Q.   This is an e-mail from Mike Houston sent May 4, 2022, at 8:44 p.m., to Brian Brown, copying Andrew Benson, William Stack, and Zachary Mizener, the subject line is guidance considerations.

To your knowledge, was the e-mail reflected in this document sent at

Page 57

HOUSTON

the time indicated on the document?

A.   I believe so, yes.

Q.   Did you send this e-mail in the regular course of your work at Lambert?

A.   I did, yes.

Q.   You start the e-mail, "Hi Brian, following up on our call yesterday, I wanted to outline a few considerations as you prepare to discuss guidance with the board.  Happy to chat through any of these ahead of the board meeting on Monday."

Was it your understanding there was an upcoming board meeting at Co-Diagnostics on the upcoming Monday?

A.   That is, yes.

Q.   Below that you write, "Alternatives to providing Q2 guidance in the earnings call and release," and then it lists four alternatives, is that correct?

A.   Yes, yep.

Q.   Why were you exploring alternatives to providing Q2 guidance?

15 (Pages 54 - 57)

Page 58

HOUSTON

A.    Really from my seat it's to give the client as many opportunities or just options to choose from as possible.

Looking at this, it's a very similar e-mail that we would give to some of our other small microcap clients at the time that were contemplating either pulling guidance altogether, only providing annual, but it looks like there's a few items specific to Co-Diagnostics.

But I'd say this is a similar e-mail that we at that time had shared with other clients given the uncertainty.

Q.    If you look at the first alternative, you write, "Pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results."

A.    Yes.

Q.    And then there is a subbullet, the first one, "This path will raise the most questions, but could be viewed as more positive than guiding to a figure and

Page 59

HOUSTON

coming up very short."

Do you see that?

A.    I do, yes.

Q.    Do you recall that there was a concern about providing guidance and then coming up very short at this time?

MS. PEIRSOL:  Objection, form.

A.    No, it was more of a concern that they didn't really have the proper visibility that they felt they needed to be able to produce a range that could be relied on by the street.

Q.    If you look at the second alternative, "Convert quarterly guidance to annual guidance, citing similar uncertainty to the above scenario."

A.    Yes.

Q.    The first subbullet point, "Guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter or two and provide some air cover during the soft quarters."

The third subpoint there, "This will also allow you to directionally

Page 60

HOUSTON

provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number."

Do you see that?

A.    Yes, I can.

Q.    So did Mr. Brown tell you on the call yesterday that you're referring to that Q2 was off to a slow start?

A.    I don't recall that, I just recall it would have been a month into the quarter that they didn't have the visibility that they might typically have, that they had at the same time last year, as to their ability to derive a forecast.

Q.    Q2 being off to a slow start is more specific than just reduced visibility, correct?

MS. PEIRSOL:  Objection, form.

A.    Yes, that's correct.

And I would --  I venture to guess that I'm putting words in Brian's mouth to try to really get at the heart of the issue so we can help him.

Whereas if I remember

Page 61

HOUSTON

correctly, this felt more like a fishing expedition for us in really trying to get at the heart of what's going on here and let us help you.

Q.    That first bullet point under the second alternative, you say, "Guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter or two."

What did you mean by "tip your hands to investors."

A.    That we wanted them to, that we want them to be open and transparent, that even though they maybe didn't feel confident with the quantitative range for quarterly guidance, that by switching to annual guidance, those professional investors are smart enough to really determine, you know, okay, maybe there's going to be a down quarter here or there, but the annual number is still the same.

Again, trying to remove some of that uncertainty and volatility to where, maybe it doesn't read that way, but the

16 (Pages 58 - 61)

Page 62

HOUSTON

intent of that bullet to them was that we would want to tip our hand to investors and give them as much information as possible, that we still had a high level of confidence around achieving.

Q.    Is your understanding at this time that Co-Diagnostics was likely to have a soft quarter or two, is that correct?

MS. PEIRSOL:  Objection, form.

A.    That was my inference, but that's completely on me.

Q.    You don't recall whether Mr. Brown told you that Q2 was off to a slow start?

A.    I don't recall, no.

Q.    Do you think you would have written that if he didn't tell you that?

MS. PEIRSOL:  Objection, form.

A.    I don't know.

Q.    Do you know what the dollar value of the orders the company had received in Q2 of 2022 as of this date was?

Page 63

HOUSTON

A.    No, no.

Q.    So you don't know how that compared to --

A.    No, we didn't have any visibility into anything quantitative in a current quarter time frame.

Q.    If Mr. Brown had told you that Q2 was off to a slow start, that would have provided you some visibility quantitatively into the current quarter, correct?

MS. PEIRSOL:  Objection, form.

A.    There would be a lot of inferences that would have to occur, but, again, to say that there's a slow start, they had two other months to be able to rectify that.

That's why we don't -- any time there's a range or guidance or anything of that nature, every client, we'll have them figure out that forecast and just question them and, you know, make sure they understand the puts and takes of a particular range.

Page 64

HOUSTON

But that's way outside our scope of work with any client.

Q.    So you don't know how the pace of orders they had received in Q2 as of this date compared to the pace of orders they had received in 2021 in the same quarter, over a similar time period?

A.    I don't recall ever talking about that, no, in any quarter.

Q.    If you look at the third alternative, you write, "Keep quarterly guidance but lower your estimates to a range that you believe is 95 percent achievable."

A.    Uh-huh.

Q.    Below that, a subbullet, you write, "While it will have a negative impact on the share price, it's better to take your lumps up-front and maintain your credibility."

Do you see that?

A.    I do, yes.

Q.    Why did you think that that alternative would have a negative impact

Page 65

HOUSTON

on the share price?

A.    Because it introduces something different to what the street may have been anticipating, it's an inference on my end, but I think there's a lot of factors that go into whether or not it will have a negative impact, but that was really just an inference on my end more than anything.

Q.    Is that inference, that a range Mr. Brown thinks is 95 percent achievable, would be something below what the market was expecting?

MS. PEIRSOL:  Objection to form.

A.    No, more --

MS. PEIRSOL:  Sorry, I didn't mean to step over you.

A.    It more just means if you lower your estimates, all else equal, typically that's not a good sign from the investment community.

Q.    The last alternative you write, "Guide to 17 to 19 million in top line with the hope that you come close because

17 (Pages 62 - 65)

Page 66

HOUSTON

you've done so before."

A. Yes.

Q. In the second bullet under that you write, "Need to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter."

Do you see that?

A. I do, yes.

Q. What did you mean by that?

A. Again, just inferring that the quarter is not going to be good, because we probably wouldn't have this conversation if it was great, just making sure that they cover their bases and that they're able to talk through exactly how did we arrive at this forecast, here are the inputs and variables that went into it, here's why we chose the range.

Again, just really covering all their bases and helping remind them that they needed to do that.

Page 67

HOUSTON

Q. Again, here you refer to, you say "despite the weak start to the quarter."

Would you have written that if Mr. Brown didn't tell you that the quarter was off to a weak start?

MS. PEIRSOL: Objection, form.

A. So I really don't think Mr. Brown had shared anything other than he would give us some scenarios on if we were to stop quarterly guidance, if we're going to continue, what are all the puts and takes with that, and so I immediately go into, well, okay, that probably means Q2 is going to be soft.

But it was more of an inference than anything, otherwise we wouldn't be having that conversation to begin with, I wouldn't think.

Q. So it was your understanding from conversations you had from Mr. Brown that it was likely that the company would have a weak second quarter?

MS. PEIRSOL: Objection, form.

Page 68

HOUSTON

A. No, it was my inference based on him asking about quarterly guidance, whether to continue to provide it and what are all the alternatives, that's where I draw that inference.

Q. So you draw that inference because you don't think he would have asked that unless the company was off to a slow start in the second quarter?

MS. PEIRSOL: Objection, form.

A. No, if the company had visibility as to what Q2 would look like; it was more visibility for me, because I didn't have any visibility into the demand, so this is all a function of do they know enough to be able to put a range of revenue, EBITDA, EPS, together for that next quarter.

Q. The language you used throughout this e-mail isn't about visibility, you write that "guiding to an annual figure would tip your hands to investors that you'll likely have a soft quarter or two," you say "Q2 is off to a

Page 69

HOUSTON

slow start," you say "despite the weak start to the quarter," those statements aren't about visibility, correct?

MS. PEIRSOL: Objection to form.

A. Yeah, but it's me putting words into their mouth and me just assuming what is probably happening rather than Brian reaching out and saying, hey, we're having a soft quarter, can you pull together something that helps me communicate that.

Again, the language that I chose to use were the inferences based on what I've seen with other clients that are considering pulling quarterly guidance or annual guidance, for that matter, and so it's really just trying for me to give them all of the different opportunities that they have, but me inferring that there's probably less visibility or Q2 isn't off to the start they thought it would be, so let me know my options now and it's not to say this is exactly what happened and now we've got to figure out a

18 (Pages 66 - 69)

Page 70

HOUSTON

recipe to resolve the situation.

Q.    Did Mr. Brown ever tell you that he disagreed with the notion that Q2 is off to a slow start?

A.    Not that I recall, no.

Q.    I've introduced what was previously marked as Exhibit 16, that should be available, let me know when you see it.

A.    Okay, I've got it.

Q.    This is an e-mail chain, the top e-mail is from M. Houston at Lambert dot com, that's your e-mail address, correct?

A.    It is, yes.

Q.    Sent on May 6, 2022, at 8:52 p.m., to Brian Brown, copying Andrew Benson, William Stack and Zachary Mizener, subject line is, re, guidance considerations.

If you see, there's a May 6 e-mail from Brian Brown at 2:08 p.m..

A.    Yes.

Q.    He writes, "I think I would

Page 71

HOUSTON

lean to the highlighted below.  What are your thoughts for the reasoning that would be presented best?"

Do you see that?

A.    I do, yes.

Q.    You respond, "Sounds good, let me give that some thought and get back to you over the weekend.  I will do some research on what others have been saying."

A.    Uh-huh.

Q.    Were you saying that you were going to do some research on what other companies have been saying?

A.    Yeah, and I believe I would have looked up who are all the companies just in the last couple of quarters that have pulled guidance completely and how did they message that and what were some of the underlying macro factors that could be applicable to this client's situation as well.

Q.    I am going to introduce what was previously marked as Exhibit 17, it should be available.

Page 72

HOUSTON

A.    Okay, it's loaded.

Q.    This is an e-mail chain, top e-mail from Mike Houston dated May 9 at 9:05 p.m. to Brian Brown, copying William Stack, Zachary Mizener and Andrew Benson, subject is, re, guidance considerations, and two attachments.

If you look, turn to the page with the Bates number ending in 171, there is an e-mail from you on May 8 at 6:19 p.m. to Brian Brown.

A.    Uh-huh.

Q.    Is this the result of the research that you had done as to what other companies were saying?

A.    I believe that came into play, but then also trying to rack my brain as to what all the potential reasons could be for pulling guidance completely that could even remotely apply to Co-Diagnostics.

I usually use that approach to really get a dialogue going again, just get at the heart of what's really going on here and how do we message it

Page 73

HOUSTON

appropriately.

Q.    If you look at the e-mail above that, which starts on the prior page from Mr. Brown on May 8th at 6:31 p.m.

A.    Uh-huh, yes.

Q.    He writes, "I would suggest we frame this around the following," and that first bullet point he writes, "Uncertainty surrounding the revenue impact of the CODX YourTest PCR device following the FDA approval (a little differently said - what you wrote makes me feel like there is much uncertainty around being able to get the device to market)- to me the uncertainty is truly how our revenue will be impacted once we have the opportunity to start selling the device."

Do you see that?

A.    I do, yes.

Q.    Do you have an understanding of what he meant by that?

A.    I don't, no, I guess maybe if you framed it a question with more detail around this, I could probably help.

19 (Pages 70 - 73)

Page 74

HOUSTON

Q.    Do you recall that the company was developing a new device called the YourTest PCR device?

A.    I do, yes.

Q.    Is it your understanding that here he's saying that the uncertainty wasn't necessarily about sales of the Logix Smart COVID-19 test, but of this new test that hadn't been approved for sale yet?

MS. PEIRSOL:  Objection, form.

A.    No, because I think he's referring to the second bullet in my e-mail below that, which I did again try to come up with every possible scenario here, and I think he's just responding to it directly as it relates to YourTest and not any other products that Co-Diagnostics sells.

Q.    The e-mail above that from Mr. Benson on Sunday, May 8th, he writes, "I also thought the bullet about the mask mandates being dropped while variants continue to surface and spread is

Page 75

HOUSTON

insightful and accurate, especially ex-U.S."

Do you see that?

A.    I do, yes.

Q.    Do you know what he means when he says ex-U.S.?

A.    Outside of the U.S., excluding the U.S.

Q.    The e-mail above that from Mr. Brown on May 9, 2022, at 4:22 p.m., he writes, "Mike and team, the board is up with not giving guidance but providing some good reason in the script and on the earnings release.  Can you guys take a first stab at writing this."

Do you see that?

A.    I do, yes.

Q.    So at the time of that e-mail you were still working with Co-Diagnostics on determining what reason would be provided for not giving guidance, correct?

A.    That's my understanding, yes, that's what it looks like.

Q.    Do you know whether Mr. Brown

Page 76

HOUSTON

ever considered guiding to a number around $5 million?

A.    I don't, no, I don't remember that.

Q.    Do you know whether he ever considered guiding to a number around $10 million?

A.    I don't remember any numbers or that we talked about even a range.

Q.    Do you recall what analysts' revenue expectations were for the second quarter of 2022?

A.    I don't remember, no, I'd have to go back and look at the reports.

Q.    I am going to introduce what was previously marked as Exhibit 18, it should be available.

A.    I can see it.

Q.    This is an e-mail chain, top e-mail from Zachary Mizener dated May 9, 2022, to Brian Brown, Andrew Benson, William Stack, copying Seth Egan and Mike Houston, subject line, call to discuss coverage, and an attachment.

Page 77

HOUSTON

If you turn to the page with Bates number ending in 648.

A.    I'm there.

Q.    You see Mr. Brown writes an e-mail on May 8, 2022, at 12:13 p.m., he writes, "Can anyone on this e-mail send over the reports for Sidoti and Maxim? I don't seem to be on the e-mail list to receive and I need them for our board meeting early Monday morning."

Do you see that?

A.    I do, yes.

Q.    Do you have an understanding of why Mr. Brown needed them for the board meeting early Monday morning?

MS. PEIRSOL:  Objection, form.

A.    I don't, no.

Q.    Do you know whether Mr. Brown would discuss analysts' revenue expectations with the board?

MS. PEIRSOL:  Objection to form.

A.    I don't, no.

MR. URIS:  I think this is a

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 78

HOUSTON

good spot for a short break if that works for everyone.

THE VIDEO TECHNICIAN: We're now going off the record, the time is 11:13 a.m.

(Recess taken.)

THE VIDEO TECHNICIAN: We're now going back on the record, the time is 11:22 a.m.

BY MR. URIS:

Q.    Going back to Exhibit 17 for a moment, the top e-mail is from you on May 9 to Brian Brown.

A.    I see it.

Q.    You write, "Revised versions of the script and release attached."

Do you see that?

A.    I do, yes.

Q.    If you could turn to the draft earnings release.

A.    I'm there, it is 174, is that the page you're referring to?

Q.    Yes.

Do you see the language in red

Page 79

HOUSTON

line which states, "While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States as well as persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future, concluded Egan."

Do you see that?

A.    I do, yes.

Q.    So you added this language to the draft press release, is that right?

A.    I believe so, yes.

Q.    This language was based off of your e-mails and conversations with Mr. Brown and Mr. Benson, is that correct?

Page 80

HOUSTON

MS. PEIRSOL:  Objection, form.

A.    I believe so.

Q.    I am going to introduce what was previously marked as Exhibit 19, that should be available.

A.    I see it now.

Q.    The top e-mail is an e-mail from Brian Brown sent on May 10, 2022, at 7:32 a.m. to Mike Houston, copying William Stack, Zachary Mizener and Andrew Benson.

Mr. Brown writes, "Mike, attached are the changes to my script."

Do you see that?

A.    I do, yes.

Q.    Do you see on the attachment description in the e-mail, it says "1Q22 earnings call script-CFO v2 BB review."

Is it your understanding these are Mr. Brown's edits to the current draft of the script?

A.    I believe so based on this e-mail above, yes.

Q.    If you could turn to the page with Bates number ending in 839.

Page 81

HOUSTON

A.    Okay, I'm there.

Q.    The paragraph at the top reads, "The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the demand for our products and the operational and scientific teams we have established to support our scientific growth."

Do you see that?

A.    I do, yes.

Q.    So Mr. Brown appears to have added the language "demand for our products."

Do you see that?

A.    I do, it appears so, yes, it is the same color.

Q.    Do you have an understanding of what that phrase refers to?

A.    No, I don't.

Q.    If you can turn to the next

21 (Pages 78 - 81)

Page 82

HOUSTON

page, there are two comment bubbles on the right side, first one has MH next to it, is that you?

A.    Yes, it would be.

Q.    In your comment you write, "As I was drafting this, it seems premature to site uncertainty of YourTest revenues as a reason to drop guidance quite yet since it's not approved.  Let's discuss if you have time on Tuesday."

Do you see that?

A.    I do, yes.

Q.    Below that there is a comment, BB, is it your understanding that's Brian Brown?

A.    That is my understanding.

Q.    He writes, "If we were expecting to start selling the device in Q2 I would disagree.  But as we are not, I would agree with your comment.  I will run this by Andrew and Ike today and get their thoughts on why we are not providing guidance."

Do you see that?

Page 83

HOUSTON

A.    I do, yes.

Q.    Again, the decision appears to have been made that guidance would not be provided, but you're still working through what reasons would be given for not providing guidance, is that correct?

MS. PEIRSOL:  Objection, form.

A.    It appears that way, but I don't remember for certain.

Q.    Is your understanding of Mr. Brown's comment that he's going to ask Andrew and Ike if they have any other reasons that could be stated in the press release or on the earnings call as reasons not to provide guidance?

MS. PEIRSOL:  Objection, form.

A.    That would be my understanding.

MR. URIS:  I am going to introduce as Exhibit 36 document bearing Bates stamp Lambert 0001707.

(Houston Exhibit 36, Bates stamp Lambert 0001707, was marked for identification, as of this date.)

Q.    It should be available.

Page 84

HOUSTON

A.    Okay, I can see it now.

Q.    This is an e-mail chain, top e-mail from Brian Brown to Mike Houston, copying William Stack, Zachary Mizener and Andrew Benson.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.    Yes.

Q.    Did you receive this e-mail in the regular course of your work at Lambert?

A.    I did, yes.

Q.    Mr. Brown writes, "We are meeting today at 10 a.m. with Ike.  We can go through the earnings release with him and finalize."

Do you see that?

A.    I do, yes.

Q.    Do you know whether that meeting with Ike occurred?

A.    I don't know --  well, I don't remember, I was not a part of it.

Q.    Did Mr. Brown ever tell you

Page 85

HOUSTON

that that call did not occur?

A.    I don't recall him saying whether it occurred or didn't occur.

Q.    I'm introducing what was previously marked as Exhibit 21, it you should be available.

A.    I can see it now.

Q.    This is an e-mail from Andrew Benson dated May 12, 2022, to various recipients, copying Dwight Egan, Brian Brown and Kevin Ontiveros, subject line, upcoming press notification May 12, 2022.

Is your understanding that the attachment to this e-mail is the final version of the first quarter 2022 earnings release?

A.    I believe so.

Q.    If you can turn to the attachment, the last full paragraph on that first page reads, "While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year

22 (Pages 82 - 85)

Page 86

HOUSTON

has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results."

Do you see that?

A.    I do, yes.

Q.    The factors cited here are factors that suggested more COVID infection going forward, correct?

MS. PEIRSOL:  Objection, form.

A.    I don't think so.

I mean, there's other variants and low vaccination rates, but I don't read how it says that COVID would persist.

I'm sorry, is that what you asked?

Q.    The question was whether these factors are factors that suggest more COVID infection going forward.

Page 87

HOUSTON

MS. PEIRSOL:  Objection, form.

A.    It depends on the reader, I guess.

I mean, I guess I don't completely understand your question; one could infer that, if that's what you're trying to get at, but somebody could infer something differently too.

Q.    Are decreased mask mandates something you would associate with a higher transmission of COVID?

MS. PEIRSOL:  Objection, form.

A.    No, it wouldn't be.

Q.    Why not?

A.    Well, I guess -- so I would not link the two just on a personal level, but I'm not a scientist or any expert in that realm.

Q.    Is less mask-wearing something you would associate with higher COVID transmission?

MS. PEIRSOL:  Objection, form.

A.    I personally would associate it with people being tired of wearing masks

Page 88

HOUSTON

and politicians listening to that.

Q.    At this time was it your understanding that the public generally understood wearing masks to be an action that could be taken to reduce the transmission of COVID?

MS. PEIRSOL:  Objection, form.

A.    I think at this point it became so political, especially living in Utah, there were many people that felt like COVID-19 was a hoax, so I think you had all ends of the spectrum there.

I mean, just using the small sample size of Utah where I live, I would disagree, but that's just Utah.

Q.    Leaving aside any people that at the time may have viewed COVID as a hoax, was it your understanding that the public at large understood wearing masks to be something that was done in order to reduce the transmission of COVID?

MS. PEIRSOL:  Objection, form.

A.    I think that's fair, that would be a fair statement.

Page 89

HOUSTON

Q.    Is the continued emergence and spread of new variants something you would associate with increased levels of COVID infection?

A.    That I would, yes.

Q.    Are low vaccination rates something you would associate with increased levels of COVID infection?

A.    I would, yes.

Q.    Do you recall whether it was important to Dwight Egan to emphasize in the company's public statements that COVID wasn't going anywhere?

MS. PEIRSOL:  Objection, form.

A.    I don't recall that being a message from Dwight, no.

Q.    Do you recall that being a message from anyone at Co-Diagnostics?

A.    Not that I recall, no.

MR. URIS:  I will introduce as Exhibit 37 a document bearing Bates No. CODX 00505882.

(Houston Exhibit 37, Bates No. CODX 00505882, was marked for

23 (Pages 86 - 89)

Page 90

HOUSTON

identification, as of this date.)

Q.    That should be available.

A.    I can see it now.

Q.    This is an e-mail chain, top e-mail from Mike Houston dated March 16, 2022, to Andrew Benson, William Stack and Zachary Mizener, copying Brian Brown, the subject line is current script.

To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

A.    Yes.

Q.    Did you send this e-mail in the regular course of your work at Lambert?

A.    Yes.

Q.    You write, "Thanks Andrew. Attached are our edits/comments.  Please utilize with Ike as you feel appropriate since we didn't pull any punches here."

Do you see that?

A.    Yes, I do.

Q.    Do you recall what you meant by "utilize with Ike"?

A.    Like with any other client, we

Page 91

HOUSTON

typically report to the CFO or the head of IR and so we'll let them filter what they want to the CEO or to the board, but we'll give it to our main contacts as clear and transparent as possible so they don't get caught off guard, especially if they were to get a question similar to this in the live call or in a subsequent call with investors or analysts.

Q.    Is your understanding that the attachment was the current draft of Dwight Egan's script for the earnings call?

A.    I would assume so, I don't recall 100 percent, but looking at the attachment that you have in here, it looks like it could be.

Q.    The attachment, the structure of this attachment is not the form of a script that you would have put together, correct?

MS. PEIRSOL:  Objection to form.

A.    Sorry, could you say that again.

Page 92

HOUSTON

Q.    The structure of the script in the attachment, that's not  -- is that the format of scripts that Lambert would have put together?

MS. PEIRSOL:  Objection, form.

A.    I mean, it looks comparable to any script we would do for our clients.

I don't know if we put this one together, if that's what you're asking.

Q.    If you could turn to the page with Bates number ending in 885.

A.    Yes.

Q.    You see the first point in the middle of the page which reads, "COVID-19 with its variants will be a permanent, endemic disease, along with the other endemic infectious diseases circulating throughout the world."

Do you see that?

A.    Yes, I do.

Q.    Does that refresh your recollection as to whether that was a message --

A.    It did.

Page 93

HOUSTON

Q.    -- that Egan had wanted to include in the company's public statements?

A.    Yes.

And this was a Dwight-written script here now that I look at my comments and refresh my memory.

Q.    Yes, and so there is a comment there where you write, "Way too many quotes from other people.  Investors want to hear CODX strategy and execution plan. Citing other people is not a strategic vision."

Do you see that?

A.    I do, yes.

Q.    What did you mean by that?

A.    I was trying to stimulate some conversation around painting a strategic vision as to what the company is going to do and when and what the milestones were around it, rather than quote a handful of different scientists at the time.

Q.    Did you feel that Dwight Egan too often quoted other people in support

24 (Pages 90 - 93)

Page 94

HOUSTON

of the themes that were important to him rather than discuss the company's actual execution?

MS. PEIRSOL: Objection, form.

A.   I felt that he cited too many scientists, I personally felt, in a way to lend some credibility to what they were trying to accomplish as a company, and so my counsel there was move away from the citations and more to the execution and show the street what you're doing and what your vision is for the company rather than focusing on these quotes.

Q.   I am going to introduce what was previously marked as Exhibit 23.

That should be available.

A.   I can see it now.

Q.   This is an e-mail chain, top e-mail from Andrew Benson dated July 12, 2022, to William Stack, copying Mike Houston, the subject line is call with Hudson Executive Capital.

To your knowledge, was the e-mail reflected in this document received

Page 95

HOUSTON

at the time indicated on the document?

A.   Yes, I believe so.

Q.   Did you receive this e-mail in the regular course of your work at Lambert?

A.   I did, yes.

Q.   If you would look at the earliest e-mail in the chain, it's from Sai Nanduri at a Hudson Executive e-mail address, do you see that?

A.   I do, yes.

Q.   Do you know what Hudson Executive Capital is?

A.   I'm not familiar with this firm, but I'm guessing it's a professionally-managed group of investors.

Q.   Is your understanding that that group was trying to schedule a call with Co-Diagnostics's management at this time?

A.   Yes, that would be my understanding.

Q.   On the first page of the document there's a July 12 e-mail at 11:52 p.m. from William Stack, he writes, "The

Page 96

HOUSTON

firm looks legit, but I think with earnings right around the corner plus Q2 results being a surprise, it may be best to follow up after the earnings call."

Do you see that?

A.   I do, yes.

Q.   Do you have an understanding of what he's referring to when he says "Q2 results being a surprise"?

A.   I don't there, because I'm trying to figure out timeline, how this all fits in.

But I think at the heart of this, counsel to Andrew would be there's a quiet period and let's make sure that we respect that, it's just a typical -- basically every publicly-traded company has a quiet period.

So as soon as the quarter end occurs, typically most companies don't take calls with investors.

So I think, guessing, Will was trying to convey that to Andrew, it's the quiet period, let's not have any meetings

Page 97

HOUSTON

with investors.

Because you don't want to inadvertently say something you shouldn't and then have to file an 8-K, so then it would make it material public information as opposed to material non-public information.

Q.   Do you recall what Co-Diagnostics's revenues were for the second quarter of 2022?

A.   I don't, no.

Q.   You don't recall that they were $5 million?

A.   I don't, no.

Q.   And you don't recall what the market's consensus second quarter 2022 revenues were for the second quarter?

A.   I don't recall, no.

Q.   Do you think that by Q2 results being a surprise, Mr. Stack might be referring to Co-Diagnostics's second quarter 2022 revenues being below what the market was expecting?

MS. PEIRSOL: Objection, form.

25 (Pages 94 - 97)

Page 98

HOUSTON

A.    That I don't know and I don't know what other conversations we had before July 12th for Will to put that in there.

But it says Q2 results, I don't know -- again, I think it would be inferring to say it had to do with revenue, but I don't know.

Q.    Do you have a general understanding of what surprise results are in the investor relations context?

MS. PEIRSOL:  Objection, form.

A.    So there's an earnings surprise, just generally speaking, and it's either above or below what the consensus numbers are.

So generally speaking, that's what is referred to as a surprise.

But then again, I don't think any consensus is spot on, so I would venture to guess the vast majority of companies, after they report, there is some kind of surprise, either up or down, I don't think anybody ever hits it right

Page 99

HOUSTON

on the nail with consensus.

Q.    But is it your understanding that generally when someone refers to a surprise, it's a result that is outside some margin of error when comparing the actual results to the consensus expectations?

MS. PEIRSOL:  Objection, form.

A.    I would call it an unexpected event, to me that's what a surprise is.

MR. URIS:  I am going to introduce as Exhibit 38 a document bearing Bates No. Lambert 0001674.

(Houston Exhibit 38, Bates No. Lambert 0001674, was marked for identification, as of this date.)

Q.    That should be available.

A.    It is loaded.

Q.    This is an e-mail from Mike Houston dated July 12, 2022, at 5:42 p.m., to William Stack.

To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

Page 100

HOUSTON

A.    It is, yes.

Q.    Did you send this e-mail in the regular course of your work at Lambert?

A.    Yes, I did.

Q.    And you write, "Yes, I would also recommend holding off until after earnings, especially with how much of a surprise Q2 results will be for everyone. Wouldn't want the CODX team to accidently tip their hand."

Do you see that?

A.    I do, yes.

Q.    Does this refresh your recollection that Co-Diagnostics's second quarter results were below what the market was expecting?

MS. PEIRSOL:  Objection, form.

A.    I don't know if that's exactly what I meant in this e-mail.

Q.    What did you mean by "especially with how much of a surprise Q2 results will be for everyone"?

A.    I don't recall.

Q.    When you say "wouldn't want the

Page 101

HOUSTON

CODX team to accidently tip their hand," are you referring to accidently disclose that their Q2 results were poor prior to the time that they would otherwise have disclosed that?

MS. PEIRSOL:  Objection, form.

A.    I don't remember 100 percent, but I would more think that it had related to just sharing anything inadvertently about the quarter before anything is out there publicly.

Q.    Here you're specifically referring to the surprise Q2 results, correct?

A.    I don't remember exactly what the intent of this e-mail was.

I guess what I'm trying to say is I believe that it was -- we didn't want them to have a meeting with an investor during the quiet period because we didn't want them to share anything about Q2 inadvertently to where we would have to file an 8-K.

Q.    But the context of this e-mail

26 (Pages 98 - 101)

Page 102

HOUSTON

is the surprise Q2 results, correct?

MS. PEIRSOL: Objection, form.

Q. You say "especially because of how much a surprise the Q2 results will be."

MS. PEIRSOL: Objection, same objection.

A. For me the context is whether or not they have a meeting with an investor.

Q. Then you raise as a specific reason why not to do that is that the Q2 results are a surprise, correct?

MS. PEIRSOL: Objection to form.

A. That's what I wrote, correct.

Q. And so at this point, which is after the second quarter, you seem to have an understanding that the Q2 results were a surprise, correct?

MS. PEIRSOL: Objection, form.

A. I don't know when exactly Co-Diagnostics had reported, so would July 12th have been before or after the

Page 103

HOUSTON

earnings call?

The way you phrased that kind of confused me, that question.

Q. Normally I wouldn't answer your questions, but I'll represent to you this was before the earnings call and so my question is just, you seem to have an understanding, though, by this point, that their Q2 results were a surprise, correct?

MS. PEIRSOL: Objection, form.

A. I just don't remember the timeline of events well enough to say definitively.

Q. Here you use similar language regarding tipping their hand that you had used back in May of 2022 regarding tipping their hand that they were likely to have a soft quarter or two, correct?

A. It was more in the context of being open and communicative with the street is how I used tip their hand.

Q. The phrase tipping your hand, generally is your understanding that that phrase means to disclose the cards that

Page 104

HOUSTON

you're holding?

A. To share something new that they're not aware of, yes.

MR. URIS: I am going to introduce as Exhibit 39 a document bearing Bates stamp CODX 00004880.

(Houston Exhibit 39, Bates stamp CODX 00004880, was marked for identification, as of this date.)

Q. That should be available.

A. Yes, I can see it now.

Q. This is an e-mail chain, top e-mail is from Andrew Benson dated August 2, 2022, to William Stack, copying Brian Brown, Mike Houston and Zachary Mizener, subject line Q2'22 press release, with an attachment, CODX 2Q22 earnings release v2 - AB edits.

Is it your understanding the AB edits in the attachment were Andrew Benson's edits?

A. Yes, that's my understanding.

Q. To your knowledge, was the e-mail reflected in this document received

Page 105

HOUSTON

at the time indicated on the document?

A. Yes, to my knowledge.

Q. Did you receive this e-mail in the regular course of your work at Lambert?

A. Yes.

Q. If you look at the e-mail from William Stack on August 2, 2022, he appears to be circulating the first draft of this press release, correct?

A. Correct.

Q. If you turn to the attachment, there is a section of second quarter 2022 financial results and various bullet points and below that the first sentence reads, "Our second quarter results were below the standards we have set for the company despite the increased activity we are experiencing thus far in the back half of the year, said Dwight Egan, Co-Diagnostics's chief executive officer," do you see that?

A. I do, yes.

Q. What is this language referring

27 (Pages 102 - 105)

Page 106

HOUSTON

to when it says "the results were below the standards we have set for the company"?

A.    That I don't recall and I don't recall if we got that language from Co-Diagnostics to put in the first draft of the release or if we tried to frame up how maybe we saw it as an outsider's perspective looking in.

Q.    As an outsider's perspective looking in, do you think that could have referred to the fact that the company had achieved at least $20 million in revenue in each of the prior quarters?

MS. PEIRSOL:  Objection, form.

A.    I don't think we'd speculate to that level and I think we tried to get it in the back half of this sentence where it's talking about things normalizing in the back half of the year.

We were looking at it from a longer term perspective.

Q.    Lambert did the first draft of this press release, correct?

Page 107

HOUSTON

A.    Correct.

Q.    So you don't know what the language about "results being below the standards we have set for the company" refers to?

A.    I don't recall where that came from.

Q.    The language regarding "increased activity we are experiencing thus far in the back half of the year," do you have an understanding of what that language is referring to?

A.    It would be my understanding that they're referring to the Logix Smart COVID-19 test.

Q.    Do you recall specifically any increased activity that the company was experiencing in the back half of the year?

A.    No, and this was in July, so I think it would have been too early to tell from the company's perspective, but I guess from our perspective, we're just -- we're putting into a press release the information that they're giving us.

Page 108

HOUSTON

We didn't have any visibility into what the sales were actually doing or the order flow was actually doing.

MR. URIS:  I think this is a good spot for a break if that works for people.

THE VIDEO TECHNICIAN: We're now going off the record, the time is 12:12 p.m.

(Recess taken.)

THE VIDEO TECHNICIAN: We're going back on the record, the time is 12:25 p.m.

BY MR. URIS:

Q.    I am going to introduce previously marked Exhibit 26, that should be available.

A.    I can see it.

Q.    This is an e-mail chain, top e-mail from Andrew Benson to Dan Bohrer, with a bcc to Andrew Benson, subject line, re, final script of earnings call.

Do you see the second e-mail in the chain from Dan Bohrer, he writes,

Page 109

HOUSTON

"Andrew, would you mind sending me the script from the earnings call."

Do you see that?

A.    I do, yeah.

Q.    And then in the e-mail above that, Mr. Benson writes, "Coming in hot," and appears to be attaching what he says is the final version of the call script, correct?

A.    That looks to be, yes, yes.

Q.    If you can turn to the page with Bates number ending in 295.

A.    Okay, I'm there.

Q.    I just want to point out that this appears to be where Mr. Brown's section starts, correct?

A.    Correct.

Q.    If you could turn to the page with the Bates number ending in 298.

A.    Okay, I'm there.

Q.    I guess just to be clear, if it you want to look back at the first page of the attachment, this is what appears to be the scripts for the Q2-2022 call, which

28 (Pages 106 - 109)

Page 110

HOUSTON

was held on August 11, 2022.

A.    Correct.

Q.    If you look at the third paragraph on page with Bates stamp ending 298, it reads, "Turning now to our visibility and near-term outlook, variability in our operating environment has restricted our near-term visibility. We will continue to navigate the near-term environment with caution, but as a result will not be providing quarterly guidance at this time."

Do you see that?

A.    I do, yes.

Q.    This is similar to the language that was used on the first quarter 2022 earnings call that was held in May, except it didn't cite the factors such as decreased mask mandates, continued emergence and spread of new variants and low vaccination rates, correct?

MS. PEIRSOL:  Objection, form.

A.    That looks to be correct.

Q.    Do you know why those factors

Page 111

HOUSTON

weren't cited on this call?

A.    I don't, no.

Q.    Do you recall whether Lambert counseled them not to include those factors?

A.    No, I don't know that we had talked about it.

Q.    Do you know whether the first draft of Mr. Brown's script for this call included those factors?

A.    I don't recall, no.

Q.    Do you recall whether the company's third quarter results of 2022 were similar to the second quarter results of 2022?

A.    I don't, no.

MR. URIS:  I am going to introduce as Exhibit 40 document bearing Bates stamp Lambert 0006702.

(Houston Exhibit 40, Bates stamp Lambert 0006702, was marked for identification, as of this date.)

Q.    That should be available.

A.    I can see it now.

Page 112

HOUSTON

Q.    This is an e-mail chain, top e-mail from Mike Houston sent November 10, 2021, to Brian Brown, Dwight Egan and Andrew Benson, with the subject line, re, Fluidigm Q3 revenues drop 29 percent on supply chain issues, waning COVID-19 testing.

Do you see that?

A.    I do, yes.

Q.    Do you know what Fluidigm is?

A.    It was one of the other publicly-traded companies that we would keep track of just to see how they would message and how their results played out each quarter.

Q.    Do you recall what product or products they sold?

A.    I don't, no.

Q.    To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

A.    Yes, it looks like it, yes.

Q.    Did you send this e-mail in the regular course of your work at Lambert?

Page 113

HOUSTON

A.    Yes.

Q.    If you look down at the first e-mail at the bottom of the first page from William McCluskey on November 9, 2021, to Dwight Egan, Seth Egan, Brian Brown, Reed Benson, copying Lynn Briggs and William McCluskey, do you see that?

A.    I do, yes.

Q.    He writes, "A potential issue that will come on your call.  As you know, you should be prepared to discuss this market trend."

Do you see it?

A.    I do see it, yes.

Q.    Above that, Mr. Brown writes on November 10, 2021, to Dwight Egan Andrew Benson and Mike Houston, "This is going to be an important question that we will likely need to answer.  Thus far in Q4 we have seen slowing sales."

Do you see that?

A.    I do, yes.

Q.    In response you write, "I think how you've framed this would make sense.

29 (Pages 110 - 113)

Page 114

HOUSTON

I would leave it to the Q&A to discuss the details."

Q. Do you know what Mr. Brown was referring to when he said we have seen slowing sales?

A. I don't know exactly, no, I had assumed it was just total revenue.

Q. So Mr. Brown didn't tell you anything specifically regarding the slowing sales that they had seen?

A. Not that I recall, no.

Q. Do you recall whether at this time the company had seen approximately two months of low sales?

A. I don't, no, I didn't have any visibility into the monthly sales.

Q. Do you know how many months of low sales the company had experienced leading up to the May 12, 2022, earnings call?

MS. PEIRSOL: Objection, form.

A. No, I do not, I don't have any visibility into their monthly sales numbers.

Page 115

HOUSTON

Q. I've introduced what was previously marked as Exhibit 32.

A. Okay, I can see it.

Q. This is an e-mail chain, the top e-mail is from Brian Brown to Mike Houston, bcc'ing Andrew Benson, subject line, current script, and attachment Q4 2021 earnings call script v3.

The attachment appears to be current script of the Q4 in fiscal year 2021 earnings call, is that correct?

A. It looks like this, yes.

Q. If you can turn to the page with Bates number ending 359.

A. Okay, I'm there.

Q. You see the paragraph, it starts "for the quarter," question reads, "For the quarter, revenue decreased to $20.4 million compared to 27.1 million from the prior year same period. The decrease was primarily due to the timing of sales for our Logix Smart COVID-19 tests during the quarter. We experienced a significant level of demand for these

Page 116

HOUSTON

tests towards end of the fourth quarter, with that increased demand spilling over into the first quarter of this year."

Q. Do you see that?

A. Uh-huh, yes.

Q. If you could go back to the e-mail chain.

If you look at the top e-mail from Mr. Brown, second paragraph, he writes, "Also do most year-end calls have any discussion about the quarter? I would like to avoid if we could and focus on full-year thoughts."

Do you know why Mr. Brown wanted to avoid discussing the quarter?

MS. PEIRSOL: Objection, form.

A. I don't recall.

MR. URIS: I am going to introduce as Exhibit 41 a document bearing Bates stamp CODX 00006124.

(Houston Exhibit 41, Bates stamp CODX 00006124, was marked for identification, as of this date.)

Q. That should be available.

Page 117

HOUSTON

A. Okay, I can see it.

Q. This is an e-mail chain, top e-mail from Brian Brown to Mike Houston.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. Yes, to my knowledge.

Q. Did you receive this e-mail in the regular course of your work at Lambert?

A. Yes.

Q. In the third e-mail in the chain from Brian Brown to Mike Houston on March 23, 2022, at 11 a.m., he writes, "What are your thoughts on not even mentioning Q4 and just focusing on the full year?"

Do you see that?

A. I do, yes.

Q. Do you recall why Mr. Brown wanted to do that?

A. When he wanted to or why?

Q. Why.

A. I don't recall why he wanted to

30 (Pages 114 - 117)

Page 118

HOUSTON

do it.

Q. Your response you write, "Great question. I wanted to chat through that during our call today. If you're okay with it, I think we should just keep your remarks focused on the full year results."

Do you see that?

A. I do, yes.

Q. Do you recall why you were suggesting that?

A. It sounded like he wanted to go down that path anyway, but my guess is I wanted to really understand the why behind it, so that's the "I want to chat through that during our call today" comment.

Q. Do you recall whether you had a call with Mr. Brown that afternoon?

A. I don't, no.

Q. Do you recall whether Mr. Brown was concerned that discussing the Q4 results would make any demand trends more evident?

MS. PEIRSOL: Objection, form.

A. No, not that I am aware of.

Page 119

HOUSTON

Q. Do you recall that in 2021 and 2022 stock-based compensation was a significant portion of the company's spend?

MS. PEIRSOL: Objection, form.

A. I don't recall that, no.

MR. URIS: I would like to introduce as Exhibit 42 a document bearing Bates No. Lambert 0005317.

(Houston Exhibit 42, Bates No. Lambert 0005317, was marked for identification, as of this date.)

Q. And that should be available.

A. I can see it now.

Q. This is an e-mail from Zachary Mizener sent February 9, 2022, to William Stack, the subject, CODX-notes.

Is it your understanding that these are notes regarding Co-Diagnostics that Zachary Mizener had taken?

MS. PEIRSOL: Objection, form.

A. It looks like it, yes; I don't know whether it's based on a conversation that was had, but it looks like these are

Page 120

HOUSTON

notes, yes.

Q. If you look at towards the bottom of that first section of notes, the second one from the bottom states, "Stock-based comp significant portion of spend."

Do you see that?

A. Okay, yes, I do now.

Q. Does that refresh your recollection as to whether a significant portion of Co-Diagnostics's spend was going towards stock-based compensation?

MS. PEIRSOL: Objection, form.

A. No, it doesn't.

I mean, this could have been Zach just looking at it from an analytical point of view and writing down his notes and what his estimation was of the situation last year.

MR. URIS: Let me introduce as Exhibit 43 a document bearing Bates stamp Lambert 0004387.

(Houston Exhibit 43, Bates stamp Lambert 0004387, was marked for

Page 121

HOUSTON

identification, as of this date.)

Q. That should be available.

A. I can see it.

Q. This is an e-mail chain, top e-mail from William Stack dated March 7, 2022, to Brian Brown, copying Zachary Mizener, Andrew Benson and Mike Houston, the subject line, financial messages.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. Yes, to my knowledge.

Q. Did you receive this e-mail in the regular course of your work at Lambert?

A. Yes.

Q. In that first e-mail from Mr. Brown on March 7, which is to Mr. Stack and to you, he writes, "I think the messages should be similar to what we have discussed in the past," and then lists five points, and below that he writes, "Then I want to start talking more and more about adjusted EBITDA. For us

31 (Pages 118 - 121)

Page 122

HOUSTON

right now that definition would be EBITDA with stock compensation added back."

Q.    Do you see that?

A.    I do, yes.

Q.    Do you recall why Mr. Brown wanted to start talking more and more about adjusted EBITDA?

A.    I don't, no.

Q.    You don't recall whether he was concerned of the impact the company's stock-based compensation was having on the company's regular EBITDA?

MS. PEIRSOL:  Objection, form.

A.    No, I don't remember any commentary around the rationale for that.

MR. URIS:  I think this is a good spot for a short break if that works for everyone.

THE VIDEO TECHNICIAN: We're now going off the record, the time is 12:54 p.m.

(Recess taken.)

THE VIDEO TECHNICIAN: We are now going back on the record, the time is

Page 123

HOUSTON

12:59 p.m.

MR. URIS:  I have no further questions at this time.

EXAMINATION BY

MS. PEIRSOL:

Q.    Mr. Houston, if it's okay with you, we would like to ask you just a couple of more questions, I don't think we'll keep you long.

A.    Okay, yeah, fine.

Q.    I am Marissa Peirsol, by the way, it's nice to meet you.

A.    Likewise.

Q.    Mr. Houston, did Brian Brown suggest to you at any time that the company was trying to hide low sales numbers of the Logix Smart COVID-19 test to the investing public, trying to hide that from the investing public?

A.    No, never.

Q.    Did Mr. Brown suggest to you at any time that the decision to pull quarterly guidance was motivated by trying to hide low sales numbers of the COVID-19

Page 124

HOUSTON

Logix Smart test?

A.    No.

Q.    Did he suggest to you at any time that any statements included in the May 12, 2022, press release were motivated by trying to hide low sales of the COVID-19 Logix Smart test?

A.    No.

Q.    Did he suggest to you at any time that he was trying to hide low sales numbers through any statements that he made during the May 12, 2022, earnings call?

A.    No.

Q.    Did Ike Egan suggest to you at any time that he was trying to hide low sales numbers of the COVID-19 Logix Smart test from the investing public?

A.    No.

Q.    Or that he was trying to hide low sales through statements he made on May 12th, 2022?

A.    No.

Q.    I want to talk to you just

Page 125

HOUSTON

briefly about Federal funding.

Prior to May 12, 2022, did anybody at Co-Di ever discuss with you whether Federal funding for COVID tests had an impact on their test sales?

A.    No, not that I am aware of.

Q.    Fair to say in May of 2022 you did not have an expectation that changes in Federal funding for COVID testing would impact Co-Diagnostics's sales of its Logix Smart COVID-19 test?

A.    No, that's correct.

MS. PEIRSOL:  No further questions.

MR. URIS:  Nothing here.

MR. BOVILL:  I certainly don't have anything.

THE VIDEO TECHNICIAN: If we're all in agreement, I can take us off the record for the last time.

MR. URIS:  Sure.

THE VIDEO TECHNICIAN: We're off the record at 1:02 p.m. EST and this concludes today's testimony given by Mike

32 (Pages 122 - 125)

Page 126

HOUSTON

Houston.

Total number of media used was five and will be retained by Veritext Legal Solutions.

(Time noted: 1:02 p.m.)

_____

MICHAEL HOUSTON

Subscribed and sworn to before me this     day of          , 2024.

Page 127

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, MICHAEL HOUSTON, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes. I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi RPR, RMR.*

JINEEN PAVESI, RPR, RMR, CRR

Page 128

E X H I B I T S

Houston

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Bates No. CODX 00002996 | 38 |
| Exhibit 36 | Bates stamp Lambert 0001707 | 83 |
| Exhibit 37 | Bates No. CODX 00505882 | 89 |
| Exhibit 38 | Bates No. Lambert 0001674 | 99 |
| Exhibit 39 | Bates stamp CODX 00004880 | 104 |
| Exhibit 40 | Bates stamp Lambert 0006702 | 111 |
| Exhibit 41 | Bates stamp CODX 00006124 | 116 |
| Exhibit 42 | Bates No. Lambert 0005317 | 119 |
| Exhibit 43 | Bates stamp Lambert 0004387 | 120 |

EXAMINATION BY:
MR. URIS:  PAGE 6
MS. PEIRSOL: PAGE 123

Page 129

ERRATA SHEET
Veritext/New York Reporting, LLC
1-800-727-6396
330 Old Country Road    1250 Broadway
Mineola, New York 11501 New York, New York
Name of Case: Stadium v. Co-Diagnostics
Date of Deposition: 11/11/24
Name of Deponent: Michael Houston
Page   Line   Change            Reason

_____
(NAME OF WITNESS)
SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____DAY OF _____, 20__.

_____
NOTARY PUBLIC   COMMISSION EXPIRES

33 (Pages 126 - 129)

[& - 295]                                                              Page 1

**&**

**&** 2:4,9,13 5:20
  9:21 10:9
  14:21 23:24
  39:11

**0**

**000** 39:23
**00002996** 38:11
  38:14 128:7
**00004880** 104:7
  104:9 128:11
**00006124**
  116:21,23
  128:13
**0001674** 99:14
  99:16 128:10
**0001707** 83:21
  83:23 128:8
**0004387** 120:23
  120:25 128:15
**0005317** 119:10
  119:12 128:14
**0006702** 111:20
  111:22 128:12
**00505882** 89:23
  89:25 128:9
**051322** 38:24

**1**

**1** 4:16
**1-800-727-6...**
  129:3
**10** 76:7 80:9
  84:16 112:3
  113:17

**100** 91:15
  101:8
**10022** 2:5
**104** 128:10
**10:07** 37:19
**11** 1:16 110:2
  117:15
**11/11/2024** 4:4
**11/11/24** 129:5
**111** 128:11
**11501** 129:4
**116** 128:12
**119** 128:13
**11:22** 78:10
**12** 85:10,13
  94:20 95:24
  99:21 114:20
  124:6,13 125:3
**120** 128:14
**1200** 2:10
**123** 128:17
**1250** 129:3
**12:13** 77:6
**12:25** 108:14
**12:59** 123:2
**12th** 98:4
  102:25 124:23
**13** 38:21 39:3
  39:14 41:18
  47:17,18
**14** 52:17
**15** 56:16
**150** 2:14
**16** 70:8 90:6

**17** 6:19 65:24
  71:24 78:12
**171** 72:10
**174** 78:22
**18** 76:17
**19** 30:3,13,17
  30:18,25 31:3
  31:17 36:25
  40:20 65:24
  74:9 79:5 80:5
  85:24 88:12
  92:15 107:16
  112:7 115:23
  123:18,25
  124:8,18
  125:12
**1:02** 125:24
  126:6
**1q22** 41:25
  80:17

**2**

**2** 104:15 105:9
**20** 37:7 40:8
  106:14 129:21
**20.4** 115:20
**200** 2:10
**2007** 13:18
**2021** 17:23
  18:16,18 19:22
  20:23 23:13
  31:18 40:6
  64:7 112:4
  113:6,17 115:9
  115:12 119:2

**2022** 10:16
  17:23 18:2
  19:22 20:23
  23:13 31:18
  37:2 38:22
  39:14 40:7,18
  41:8,9 48:6,12
  48:14,25 52:23
  54:10 56:20
  62:24 70:17
  75:11 76:13,22
  77:6 80:9 81:9
  85:10,13,16
  90:7 94:21
  97:11,17,23
  99:21 103:17
  104:15 105:9
  105:14 110:2
  110:17 111:14
  111:16 114:20
  117:15 119:3
  119:17 121:7
  124:6,13,23
  125:3,8
**2024** 1:16
  126:14
**21** 85:6
**22** 1:4 4:22
**23** 94:16
  117:15
**26** 108:17
**27.1** 115:20
**29** 112:6
**295** 109:13

**[298 - advertising]**                                          Page 2

**298**  109:20
  110:6
**2:02**  52:23
**2:08**  70:23
**2q22**  104:18

**3**

**3**  42:5 48:25
**30**  48:14 53:25
**32**  115:3
**330**  129:3
**35**  38:10,13
  128:6
**359**  115:15
**36**  83:20,22
  128:7
**37**  89:22,24
  128:8
**38**  99:13,15
  128:6,9
**38th**  2:4
**39**  104:6,8
  128:10

**4**

**4**  52:22 56:20
**40**  111:19,21
  128:11
**41**  116:20,22
  128:12
**42**  119:9,11
  128:13
**43**  120:22,24
  128:14
**43215**  2:10

**438**  47:24
**49503**  2:14
**4:22**  75:11
**4th**  53:4

**5**

**5**  76:3 97:14
**505322**  42:2
**5108**  127:21
**5:42**  99:21

**6**

**6**  70:17,22
  128:16
**648**  77:3
**6978**  1:4 4:22
**6:31**  73:5

**7**

**7**  121:6,19
**7:32**  80:10

**8**

**8**  72:11 77:6
  97:5 101:24
**800**  2:4
**83**  128:7
**839**  80:25
**84059**  6:20
**885**  92:12
**89**  128:8
**8:44**  56:20
**8th**  73:5 74:22

**9**

**9**  72:4 75:11
  76:21 78:14
  113:5 119:17

**90**  31:21
**95**  64:14 65:11
**99**  128:9
**9:00**  1:17
**9:05**  72:5

**a**

**a.m.**  1:17 4:4
  37:15,19 78:6
  78:10 80:10
  84:16 117:15
**ab**  104:19,20
**ability**  60:15
  79:4 85:23
**able**  35:18
  36:10 51:13
  52:9 59:12
  63:17 66:19
  68:17 73:14
**above**  53:14
  59:17 73:3
  74:21 75:10
  80:23 98:16
  109:6 113:16
**access**  37:25
  38:4
**accidently**
  100:10 101:2,3
**accomplish**
  94:9
**account**  19:12
  19:21 20:21
  22:2,8
**accounted**
  31:17

**accounts**  15:24
  15:24
**accurate**  75:2
  127:12
**accurately**
  58:20 79:4
  85:24
**achievable**
  64:15 65:11
**achieved**
  106:14
**achieving**  62:6
**acquire**  12:18
**acquired**  12:7
  12:15
**action**  5:9 66:7
  88:5 127:16
**activity**  105:19
  107:10,18
**actual**  94:3
  99:7
**actually**  108:3
  108:4
**ad**  21:12
**adams**  2:20 5:2
**added**  79:20
  81:17 122:3
**address**  6:18
  70:14 95:11
**adjusted**
  121:25 122:8
**administer**  5:8
**advertising**
  17:10

**[affairs - attachment]**

| | | | |
|---|---|---|---|
| **affairs** 12:9 | **analysts** 20:3 | **answers** 44:4 | **april** 40:15,17 |
| **affect** 12:22 | 22:16,18,20 | 45:13 | 41:8 |
| **affecting** 50:5 | 25:11,20 76:11 | **anticipating** | **arms** 50:12 |
| **affiliations** | 77:20 91:10 | 65:5 | **arrive** 66:20 |
| 5:16 | **analytical** | **anybody** 98:25 | **aside** 40:11 |
| **afternoon** | 120:17 | 125:4 | 88:17 |
| 118:18 | **ancestry.com** | **anyway** 118:13 | **asked** 68:9 |
| **agency** 14:19 | 14:24 | **appear** 39:13 | 86:22 |
| **ago** 9:5 13:22 | **andrew** 26:24 | **appearance** | **asking** 68:3 |
| 15:7,16 | 27:10 29:8 | 5:13 | 92:10 |
| **agree** 4:15 | 38:21 39:3 | **appearances** | **associate** 87:11 |
| 82:21 | 41:23 42:4,11 | 5:16 | 87:21,24 89:4 |
| **agreed** 3:4,8,12 | 46:9 52:22 | **appears** 47:20 | 89:8 |
| **agreement** 10:2 | 56:21 70:18 | 53:20,23 81:16 | **associates** |
| 10:6 125:20 | 72:6 76:22 | 81:20 83:3,9 | 14:22 |
| **agreements** | 80:11 82:22 | 105:10 109:8 | **assume** 8:3 |
| 12:20 | 83:13 84:6 | 109:16,24 | 54:25 91:14 |
| **ahead** 57:12 | 85:9 90:7,17 | 115:10 | **assumed** 114:8 |
| **air** 59:23 | 94:20 96:15,24 | **applicable** | **assumes** 48:14 |
| **al** 4:19 | 104:14,21 | 71:21 | **assuming** 69:8 |
| **allow** 59:25 | 108:21,22 | **apply** 72:21 | **attached** 42:11 |
| **alternative** | 109:2 112:5 | **approach** | 78:17 80:13 |
| 58:17 59:15 | 113:17 115:7 | 48:11 49:5 | 90:18 |
| 61:7 64:12,25 | 121:8 | 52:4 72:22 | **attaching** 109:8 |
| 65:23 | **announced** | **appropriate** | **attachment** |
| **alternatives** | 24:18 35:12 | 90:19 | 38:24 39:9,13 |
| 57:19,21,25 | **annual** 41:7 | **appropriately** | 41:25 47:16,20 |
| 68:5 | 58:10 59:16,20 | 73:2 | 52:25 54:9 |
| **altogether** 58:9 | 61:8,18,22 | **approval** 73:12 | 76:25 80:16 |
| **amedica** 15:3 | 68:23 69:17 | **approved** | 85:15,20 91:12 |
| 19:6,7 | **answer** 7:8,16 | 74:10 82:10 | 91:16,18,19 |
| **amedica's** 15:8 | 7:16 8:3 28:2 | **approximately** | 92:3 104:18,21 |
| **amounts** 25:16 | 103:5 113:20 | 31:15 32:22 | 105:13 109:24 |
| **analyst** 39:11 | **answering** 7:6 | 37:3 114:14 | 115:8,10 |
| 43:22 | 7:22 | | |

**[attachments - board]** Page 4

| | | | |
|---|---|---|---|
| **attachments** 72:8 | **b** | 77:3 80:25 | 72:17 79:22 |
| **attend** 13:4 29:9 | **b** 128:2 | 83:21,22 89:22 | 80:3,22 85:18 |
| **attorney** 5:18 | **back** 15:6 | 89:24 92:12 | 95:3 101:19 |
| **attorneys** 2:5 2:11,15 3:5 | 16:23 18:20 | 99:14,15 104:7 | **benson** 26:24 |
| **audibly** 7:8 | 20:3 21:19 | 104:8 109:13 | 28:19 33:14,17 |
| **audio** 4:13 | 37:18 41:5 | 109:20 110:5 | 36:22 38:21 |
| **august** 104:14 | 43:11 46:21 | 111:20,21 | 39:3 41:23 |
| 105:9 110:2 | 47:7 49:12,17 | 115:15 116:21 | 42:5 46:24 |
| **authorized** 5:7 | 50:14 71:8 | 116:22 119:10 | 52:13,22 56:21 |
| **available** 6:11 | 76:15 78:9,12 | 119:11 120:22 | 70:19 72:6 |
| 38:12 41:19 | 103:17 105:20 | 120:24 128:6,7 | 74:22 76:22 |
| 52:18 56:17 | 106:19,21 | 128:8,9,10,11 | 79:25 80:11 |
| 70:9 71:25 | 107:11,19 | 128:12,13,14 | 84:6 85:10 |
| 76:18 80:6 | 108:13 109:23 | **bb** 80:18 82:15 | 90:7 94:20 |
| 83:25 85:7 | 116:7 122:3,25 | **bcc** 108:22 | 104:14 108:21 |
| 90:3 94:17 | **background** 13:3 | **bcc'ing** 115:7 | 108:22 109:7 |
| 99:18 104:11 | **baker** 2:9 5:25 | **bear** 37:22 | 112:5 113:7,18 |
| 108:18 111:24 | **bakerlaw.com** 2:12 | 41:13 | 115:7 121:8 |
| 116:25 119:14 | **balance** 33:22 | **bearing** 38:10 | **benson's** 104:22 |
| 121:3 | 79:6 81:9 | 83:20 89:22 | **best** 71:4 96:4 |
| **avenue** 2:4,14 | 85:25 | 99:13 104:6 | **better** 64:19 |
| **average** 25:5,8 | **based** 12:17 | 111:19 116:20 | **biomaterial** 15:11 |
| 25:18,19 | 30:5 34:20 | 119:9 120:22 | **biotech** 15:3 |
| **avoid** 116:13 | 68:2 69:14 | **began** 14:21 | **bit** 13:2 23:20 |
| 116:16 | 79:23 80:22 | 32:3 36:25 | 43:3 |
| **aware** 6:25 9:2 | 119:3,24 120:6 | **beginning** 5:17 | **biweeklies** 29:10 |
| 52:14 104:4 | 120:13 122:12 | **behalf** 1:6 6:3 | **biweekly** 29:6 |
| 118:25 125:7 | **bases** 66:18,24 | **belief** 32:5 | **bloomberg** |
| **awareness** 22:14,25 | **basically** 96:18 | **believe** 10:15 | 20:2 24:24 |
| | **basis** 45:25 | 17:25 19:5 | **board** 57:11,12 |
| | **bates** 38:10,13 | 21:16,18 23:15 | 57:15 75:12 |
| | 39:21,21,22 | 30:21 36:16 | 77:10,15,21 |
| | 47:24 72:10 | 38:4 42:20 | |
| | | 50:12 57:3 | |
| | | 64:14 71:15 | |

**[board - certify]**

91:4
**body** 53:14
**bohrer** 108:21
108:25
**bottom** 39:18
53:4 54:9
113:4 120:4,5
**bovill** 2:15 6:2
6:2 9:9,19
10:12 37:12
125:17
**brain** 72:18
**brand** 17:9
**break** 7:19,23
37:10 78:2
108:6 122:18
**brian** 1:13
26:25 27:10
29:8 38:22
41:23 42:16
46:9,11 47:13
52:22 56:21
57:8 69:9
70:18,23 72:5
72:12 76:22
78:14 80:9
82:15 84:4
85:11 90:8
104:15 112:4
113:6 115:6
117:4,14 121:7
123:15
**brian's** 60:22
**briefly** 125:2

**briggs** 113:7
**bring** 10:17
**broadway**
129:3
**brought** 35:21
**brown** 1:13
26:25 28:18
32:8 33:10,14
33:16 38:22
41:24 46:24
52:12,22 56:21
60:7 62:15
63:8 65:11
67:6,10,22
70:3,18,23
72:5,12 73:5
75:11,25 76:22
77:5,15,19
78:14 79:25
80:9,12 81:16
82:16 84:4,15
84:25 85:12
90:8 104:16
112:4 113:7,16
114:4,9 115:6
116:10,15
117:4,14,21
118:18,20
121:7,19 122:6
123:15,22
**brown's** 53:3
80:20 83:12
109:16 111:10
**bubbles** 82:2

**bullet** 61:6 62:2
66:4 73:9
74:14,23
105:15
**business** 15:5,9
79:4 85:23
**buy** 22:15

**c**

**c** 2:2 6:4 127:2
127:2
**call** 22:15
25:13 26:3,7,9
26:10,13 27:9
27:24 28:9
29:2 32:15
41:25 42:15
43:5 44:14,18
45:14 46:11,24
47:20 53:25
54:6 55:8,14
57:8,20 60:8
76:24 80:18
83:15 85:2
91:9,9,13
94:22 95:19
96:5 99:10
103:2,7 108:23
109:3,9,25
110:18 111:2
111:10 113:11
114:21 115:9
115:12 118:5
118:16,18
124:14

**called** 15:2 74:3
**calls** 25:25
26:15,19,22
29:4,5,6 32:21
36:6,15 52:12
56:9 96:22
116:11
**camera** 4:8
**cap** 15:25
34:17 50:3
**capital** 1:6 4:18
21:22 94:23
95:14
**capitalization**
16:2
**cards** 103:25
**case** 1:4 4:21
11:13,21 129:5
**cash** 33:22
**caught** 91:7
**causing** 50:8
58:19
**caution** 48:10
110:11
**center** 2:10
**ceo** 17:21 91:4
**certain** 35:13
55:11 83:10
**certainly**
125:17
**certainty** 52:10
**certified** 1:24
127:8
**certify** 127:9,14

**[cfo - compare]**

cfo   19:6 32:12 41:24 42:2,11 52:25 80:18 91:2

cfo's   43:9

chahn   2:8

chain   52:20 70:12 72:3 76:20 84:3 90:5 94:19 95:9 104:13 108:20,25 112:2,7 115:5 116:8 117:3,14 121:5

chairman   12:5

challenges   48:6

chang   2:7 5:22

change   129:7

changed   16:22

changes   80:13 125:9

charged   8:17

chat   57:11 118:4,15

chief   12:14 17:19 105:22

choose   58:4

chose   66:22 69:14

christianson   14:21

circulating   92:18 105:10

citations   94:11

cite   110:19

cited   86:13 94:6 111:2

citing   58:18 59:16 93:13

civic   2:10

civil   8:21

clarify   8:6

class   2:6 5:21 66:6

clear   91:5 109:22

cleared   15:12

clerkships   13:20

client   12:14 21:11 22:9 43:24 58:3 63:21 64:3 90:25

client's   71:21

clients   18:3,3,5 36:17 49:19 50:3,5 54:18 56:11,12 58:7 58:15 69:15 92:8

close   47:9 65:25

closed   33:3

codx   38:11,14 38:23,24 73:10 89:23,25 93:12 100:10 101:2

104:7,9,18 116:21,23 119:18 128:6,8 128:10,12

college   13:4,6

color   81:21

columbus   2:10

com   70:14

come   34:25 42:25 65:25 74:16 113:11

comfortable   35:4

coming   27:19 59:2,7 109:7

comment   48:17 82:2,6,14,21 83:12 93:9 118:16

commentary   122:16

comments   90:18 93:7

commission   129:23

communicate   8:13 20:7 23:4 29:14,17,20 69:12

communicated   54:20

communicating   20:18

communication   34:13

communicati...   17:12

communicative   103:21

community   65:22

comp   120:6

companies   14:20 16:2 71:14,16 72:16 96:21 98:23 112:13

company   15:2 15:11 17:14 23:25 24:11 30:18 37:4 39:11 44:7 45:25 58:19 62:23 67:23 68:9,12 74:2 93:20 94:9,13 96:18 105:19 106:4,13 107:5 107:18 114:14 114:19 123:17

company's   40:24 89:13 93:3 94:3 107:22 111:14 119:4 122:11 122:13

comparable   92:7

compare   24:24

**[compared - court]**

| | | | |
|---|---|---|---|
| **compared** 63:4 64:6 115:20 | **connect** 21:11 29:23 | **continued** 86:3 89:2 110:20 | 50:24 53:22 57:22 60:18,20 |
| **comparing** 16:23 99:6 | **connection** 4:8 9:22 10:3 19:11 | **contract** 10:7 **contributions** 81:8 | 62:10 63:12 69:4 70:15 75:22 79:25 |
| **compensation** 119:3 120:13 122:3,12 | **consensus** 24:23 25:3 97:17 98:17,21 99:2,7 | **control** 46:19 **conversation** 66:17 67:19 93:19 119:24 | 83:7 86:15 91:21 101:15 102:2,14,17,21 103:10,19 |
| **completely** 58:18 62:13 71:18 72:20 87:6 | **conservative** 52:8 | **conversations** 28:20 47:13 67:22 79:24 98:3 | 105:11,12 106:25 107:2 109:10,17,18 110:3,22,24 |
| **complying** 40:14 | **considerations** 56:23 57:9 70:21 72:7 | **convert** 59:15 **convey** 96:24 **conveyed** 35:20 | 115:12 125:13 **correctly** 49:24 61:2 |
| **compounded** 49:18 | **considered** 76:2,7 | **copying** 39:3 52:23 56:21 70:18 72:5 | **counsel** 5:14 7:15 9:9 11:8 49:13 94:10 96:15 |
| **concern** 59:6,9 **concerned** 118:21 122:11 | **considering** 51:7,23 69:16 | 76:23 80:10 84:5 85:11 90:8 94:21 | **counseled** 111:5 |
| **concerning** 20:20 | **consistent** 31:9 43:17 56:10 | 104:15 113:7 121:7 | **country** 129:3 **couple** 10:14 13:22 18:2 |
| **concluded** 79:16 | **contact** 53:15 **contacts** 91:5 | **core** 20:4 **corner** 39:18 96:3 | 56:9 71:17 123:9 |
| **concludes** 125:25 | **contemplate** 50:23 51:7 | **corporate** 12:8 **correct** 22:2,3 | **course** 57:5 84:12 90:15 |
| **conducted** 4:6 4:24 32:22 | **contemplates** 51:22 | 26:16 27:20 28:6,25 30:8 | 95:5 100:4 105:5 112:25 |
| **confidence** 62:6 | **contemplating** 58:8 | 32:17,18,19,23 34:19,20 39:12 | 117:10 121:15 |
| **confident** 61:16 79:3 85:22 | **context** 98:12 101:25 102:9 103:20 | 42:9 45:8,22 45:23 47:21 | **court** 1:2 3:16 4:20 5:4 7:7 |
| **confirm** 29:23 **confused** 103:4 **conjecture** 42:20 | **continue** 4:14 48:8 54:25 67:13 68:4 74:25 110:10 | | |

**[courting - diagnostics]** Page 8

courting 18:19
cover 59:23
  66:18
coverage 22:19
  23:19 24:5
  76:25
covered 23:13
  23:22,25 24:4
  24:7
covering 24:11
  25:6 66:23
covid 30:3,5,13
  30:17,18,25
  31:3,13,17
  36:25 40:20
  74:9 79:5
  85:24 86:14,20
  86:25 87:12,21
  88:7,12,18,22
  89:4,9,13
  92:15 107:16
  112:7 115:23
  123:18,25
  124:8,18 125:5
  125:10,12
creative 17:10
credibility
  64:21 94:8
crime 8:18
cross 26:5
crr 127:24
cuenca 12:16
  17:6
cumulative
  79:12 86:8

current 6:17
  44:17 45:4,7
  45:17 63:7,11
  80:20 90:9
  91:12 115:8,11
cv 1:4 4:22
cycle 22:22

**d**

d1 41:24
dan 108:21,25
date 9:4 17:18
  18:13 38:15
  41:10 62:24
  64:6 83:24
  90:2 99:17
  104:10 111:23
  116:24 119:13
  121:2 127:11
  129:5
dated 38:21
  39:3 52:22
  72:4 76:21
  85:10 90:6
  94:20 99:21
  104:14 121:6
day 126:14
  129:21
days 28:15 29:3
  35:11 56:6
december 14:2
decent 27:4
decided 13:20
decision 83:3
  123:23

decrease
  115:22
decreased 79:7
  86:2 87:10
  110:20 115:19
dedication 81:4
defendant 8:21
defendants
  1:14 2:11 5:25
definition 31:9
  122:2
definitively
  103:14
degree 13:12
deliver 81:4
demand 40:19
  48:5 68:16
  81:10,17
  115:25 116:3
  118:22
depends 4:7
  87:3
deponent 6:3
  129:6
deposition 1:20
  4:6,17,23 7:4
  7:13 8:24 9:3,7
  9:10,23 10:4
  10:13,18,21,25
  11:17,21 129:5
derive 60:15
describe 14:15
  16:19,21 43:3
description
  80:17 128:5

design 17:10
despite 66:9
  67:3 69:2
  105:19
detail 73:24
details 11:6
  114:3
detect 30:5
determine
  33:10 61:20
determining
  32:9 75:21
develop 44:2
developing
  33:23 74:3
device 73:11,15
  73:18 74:3,4
  82:19
di 125:4
diagnostics
  1:12 4:19
  11:16 12:21
  18:8,12,24
  19:9,12,16
  20:20 21:4,7,7
  21:14,25 22:4
  22:8,12,19
  23:7,13 24:4,7
  24:15 25:6
  30:7,11 31:12
  32:2 36:24
  39:15 40:8,18
  41:9 43:25
  46:8 49:4,9
  50:7 53:19

55:7 57:16 58:12 62:8 72:21 74:19 75:20 89:19 102:24 106:7 119:20 129:5

**diagnostics's** 25:25 26:18 29:15 31:16 34:11 95:20 97:10,22 100:15 105:22 120:12 125:11

**dial** 26:15

**dialing** 26:8

**dialogue** 72:23

**different** 11:18 25:9 30:12 31:2 65:4 69:19 93:23

**differently** 73:12 87:9

**difficult** 79:11 86:7

**diminished** 79:7 86:2

**directionally** 59:25

**directly** 22:9 29:14 74:18

**director** 15:18 15:21 16:20 17:16,19,19 21:21

**disagree** 82:20 88:16

**disagreed** 70:4

**disclose** 101:3 103:25

**disclosed** 101:6

**discuss** 21:14 28:18,20,24 33:14 46:5,7 48:20 53:25 54:6 55:18 57:10 76:24 77:20 82:10 94:3 113:12 114:2 125:4

**discussed** 11:7 11:12 21:8 51:17 55:14 56:3,3 121:22

**discussing** 49:3 116:16 118:21

**discussion** 38:6 116:12

**discussions** 51:5

**disease** 92:17

**diseases** 92:18

**display** 81:5

**district** 1:2,3 4:20,21

**document** 38:10,18 39:19 46:21 56:25 57:2 83:20 84:8,9 89:22

90:11,12 94:25 95:2,24 99:13 99:24,25 104:6 104:25 105:2 111:19 112:21 112:22 116:20 117:6,7 119:9 120:22 121:11 121:12

**documents** 10:11,18 11:16

**doing** 94:12 108:3,4

**dollar** 62:22

**don** 11:25

**donald** 49:22

**dot** 70:14

**double** 41:15

**draft** 27:8 42:14,18,23 43:5,7 46:12 46:25 47:5,20 49:2 50:23 53:6,11,21 54:5,6,7 55:4 78:20 79:21 80:20 91:12 105:10 106:7 106:24 111:10

**drafted** 50:21

**drafting** 82:7

**drafts** 46:18

**draw** 68:6,7

**drive** 2:10

**drop** 82:9 112:6

**dropped** 13:21 24:5 74:24

**due** 79:7 86:2 115:22

**duly** 6:5 127:11

**dwight** 1:12 27:13 33:15 35:3,14 38:22 42:16,18 55:19 85:11 89:12,17 91:12 93:6,24 105:21 112:4 113:6,17

**e**

**e** 2:2,2 6:4 10:15 20:8,11 20:16,19 29:19 29:22 38:20,21 38:25 39:2,10 41:22,23 42:3 42:10 46:17,21 49:2 52:20,21 53:4 55:10 56:19,25 57:4 57:7 58:6,14 68:21 70:12,13 70:14,23 72:3 72:4,11 73:3 74:15,21 75:10 75:19 76:20,21 77:6,7,9 78:13 79:24 80:8,8 80:17,23 84:3

**[e - except]** Page 10

84:4,8,11 85:9
85:15 90:5,6
90:11,14 94:19
94:20,25 95:4
95:9,10,24
99:20,24 100:3
100:20 101:17
101:25 104:13
104:14,25
105:4,8 108:20
108:21,24
109:6 112:2,3
112:21,24
113:4 115:5,6
116:8,9 117:3
117:4,6,9,13
119:16 121:5,6
121:11,14,18
127:2 128:2
**earlier** 42:8
  43:3
**earliest** 95:9
**early** 18:16
  40:17 77:11,16
  107:21
**earnings** 22:22
  24:18 25:25
  26:3,19 27:8
  27:23 28:9
  32:15,15,20,21
  33:13 35:11
  36:6 41:25
  42:15 43:5
  44:13,18 45:14
  47:11 53:7,11

54:23 57:20
75:15 78:21
80:18 83:15
84:17 85:16
91:13 96:3,5
98:14 100:8
103:2,7 104:18
108:23 109:3
110:18 114:20
115:9,12
124:13
**easier** 25:19
  51:13,15
**east** 6:19
**ebitda** 68:18
  121:25 122:2,8
  122:13
**edits** 80:20
  90:18 104:19
  104:21,22
**educational**
  13:2
**effect** 3:15
**effort** 19:15
**egan** 1:12
  27:13 33:15
  35:14 38:22
  55:19 76:23
  79:17 85:11
  89:12 93:2,24
  105:21 112:4
  113:6,6,17
  124:16
**egan's** 91:13

**eight** 15:7,16
**either** 28:17
  40:15,17 41:8
  58:8 98:16,24
**emergence** 86:4
  89:2 110:21
**emphasize**
  89:12
**employed**
  127:14
**employee** 39:7
  42:8
**employees**
  19:13
**encouraged**
  81:10
**ended** 48:13
**endemic** 92:17
  92:18
**ends** 88:13
**engaged** 22:24
**engagement**
  22:14 36:17
**enter** 9:25
**entered** 55:17
**environment**
  48:7,9 110:8
  110:11
**eps** 46:2 68:18
**equal** 65:20
**equity** 22:17,20
  25:11 43:21
**errata** 129:2
**error** 99:6

**especially** 75:2
  88:10 91:7
  100:8,22 102:4
**esq** 2:6,7,11,15
**est** 125:24
**established**
  81:12
**estimates** 64:13
  65:20
**estimation**
  120:19
**et** 4:19
**event** 99:11
**events** 49:7
  50:22 103:13
**evident** 118:23
**ex** 75:3,7
**exact** 9:4 17:17
  18:4,13 49:6
**exactly** 18:21
  23:21 46:9
  50:15,20 51:16
  66:19 69:24
  100:19 101:16
  102:23 114:7
**examination**
  3:13 6:8 123:5
  128:16
**examined** 6:7
**example** 44:19
  45:15
**excel** 24:22
**except** 3:9
  110:18

**[excluding - five]**

excluding 75:8
execution
93:12 94:4,11
executive 94:23
95:10,14
105:22
executives
26:18
exhibit 37:22
38:2,7,9,10,13
41:13,18 47:17
47:18 52:17
56:16 70:8
71:24 76:17
78:12 80:5
83:20,22 85:6
89:22,24 94:16
99:13,15 104:6
104:8 108:17
111:19,21
115:3 116:20
116:22 119:9
119:11 120:22
120:24 128:5,6
128:7,8,9,10,11
128:12,13,14
expect 53:6
expectation
125:9
expectations
76:12 77:21
99:8
expected 25:22
expecting
65:13 82:19

97:24 100:17
expedition 61:3
experience
14:16
experienced
48:4 114:19
115:24
experiencing
105:20 107:10
107:19
expert 87:18
expires 129:23
exploring
57:24
extension 16:6
extent 45:5,20
extra 36:20

**f**

f 127:2
facing 49:9,20
fact 106:13
factors 50:4
65:6 71:20
86:9,13,14,24
86:24 110:19
110:25 111:6
111:11
factset 19:25
24:25
fair 26:14
88:24,25 125:8
fairly 55:11
fallen 40:20,24
familiar 23:23
95:15

far 105:20
107:11 113:20
fast 13:21
fda 15:12 73:11
february 12:19
17:25 119:17
fed 49:21
federal 125:2,5
125:10
feel 61:15 73:13
90:19 93:24
fees 10:9
felt 35:3,14,25
56:6 59:11
61:2 88:11
94:6,7
figure 56:13
58:25 59:20
61:8 63:22
68:23 69:25
96:12
file 97:5 101:24
filed 4:19
filing 3:6
filling 43:9
filter 91:3
final 85:15
108:23 109:9
finalize 84:18
finalizing 27:3
financial 33:20
79:13 86:10
105:15 121:9
financially 5:10

fine 123:11
finish 7:5,21
13:11
finished 14:3
firm 5:5 9:22
12:17 16:9
23:23,25 95:16
96:2
firms 23:5
24:10
first 6:5 16:11
16:12,17 32:18
37:2 40:7
42:14,18,23
43:8 48:5 53:5
53:6,11,21
54:7,10 55:4,5
56:9 58:16,23
59:19 61:6
73:9 75:16
81:6 82:3
85:16,21 92:14
95:23 105:10
105:16 106:7
106:24 109:23
110:17 111:9
113:3,4 116:4
120:4 121:18
fiscal 48:12,13
81:9 115:11
fishing 61:2
fits 96:13
five 121:23
126:4

**[floor - good]**

**floor** 2:4
**florida** 8:8
**flow** 108:4
**flows** 33:23
**fluidigm** 112:6
  112:11
**focus** 116:13
**focused** 14:17
  118:7
**focusing** 94:14
  117:17
**follow** 96:5
**following** 33:2
  45:21 48:14
  57:8 73:8,11
**follows** 6:7
**force** 3:15
**forecast** 56:14
  60:15 63:22
  66:20 85:24
**foregoing**
  127:10,12
**form** 3:9 7:14
  27:25 30:20
  31:4 32:24
  35:16 36:2
  40:21 45:9
  50:25 59:8
  60:19 62:11,20
  63:13 65:15
  67:8,25 68:11
  69:6 74:12
  77:17,23 80:2
  83:8,17 86:16
  87:2,13,23

  88:8,23 89:15
  91:19,23 92:6
  94:5 97:25
  98:13 99:9
  100:18 101:7
  102:3,16,22
  103:11 106:16
  110:23 114:22
  116:17 118:24
  119:6,22
  120:14 122:14
**format** 92:4
**formulate**
  34:19
**forth** 18:20
  46:22 47:2
  50:14
**forward** 13:21
  38:23 41:24
  51:10,16,24
  54:19 55:3
  86:15,25
**found** 15:2
**four** 33:8 57:21
**fourth** 116:2
**fox** 2:4 5:20,23
**frame** 16:24
  17:23 20:24
  23:14 24:3
  35:23 36:10
  55:20 63:7
  73:8 106:8
**framed** 73:24
  113:25

**frequent** 27:22
  28:8,14
**front** 64:20
**full** 6:14 16:3
  81:5 85:20
  116:14 117:18
  118:7
**function** 68:16
**funding** 125:2
  125:5,10
**further** 3:8,12
  49:16,18 123:3
  125:14 127:14
**future** 79:13,16
  86:9

**g**

**general** 98:10
**generally** 14:15
  28:25 56:4
  88:4 98:15,18
  99:4 103:24
**generate** 22:25
**generating**
  22:13
**give** 25:15 35:7
  49:10 58:3,6
  62:4 67:11
  69:18 71:8
  91:5
**given** 25:7 44:7
  44:25 45:5
  55:6 58:15
  83:6 125:25
**giving** 34:8
  44:19 75:13,22

  107:25
**go** 4:15 13:6
  14:25 21:19
  34:3 43:11
  46:4 47:6
  49:12,17 65:7
  67:15 76:15
  84:17 116:7
  118:12
**goal** 34:6
**goes** 53:15,17
**going** 4:3 18:20
  37:10,14,18,21
  38:8 43:22
  44:4,9 49:23
  54:25 56:15
  61:4,21 66:15
  67:13,16 71:13
  71:23 72:23,24
  76:16 78:5,9
  78:12 80:4
  83:12,19 86:15
  86:25 89:14
  93:20 94:15
  99:12 104:5
  108:9,13,16
  111:18 113:18
  116:19 120:13
  122:21,25
**good** 4:2 6:10
  6:13 46:18
  65:21 66:15
  71:7 75:14
  78:2 108:6
  122:18

**[graduate - houston]**

**graduate** 13:15 13:17
**grand** 2:14
**granular** 31:6
**great** 66:17 118:3
**group** 21:23 23:16 95:17,19
**growth** 81:13
**guard** 91:7
**guess** 25:15 27:23 28:16 39:23 60:22 73:23 87:4,5 87:16 98:22 101:18 107:23 109:22 118:13
**guessing** 95:16 96:23
**guidance** 32:4 32:10,13 33:10 42:2 44:19,20 45:5,20 48:3 48:11 49:5 50:24 51:8,23 52:4 55:2 56:2 56:3,23 57:10 57:19,25 58:9 58:17 59:6,15 59:16 60:2 61:17,18 63:20 64:13 67:12 68:3 69:16,17 70:20 71:18 72:7,20 75:13

75:22 79:15 82:9,24 83:4,7 83:16 110:12 123:24
**guide** 65:24
**guidelines** 33:2
**guiding** 52:7 58:25 59:20 61:7 66:9 68:22 76:2,7
**guys** 75:15

**h**

**h** 1:12 6:4,4 128:2
**h.c.** 23:9
**hahn** 2:7 5:22 5:22
**half** 105:20 106:19,21 107:11,19
**halfway** 32:22
**hand** 39:18 59:21 61:8 62:3 100:11 101:2 103:16 103:18,22,23
**handful** 15:23 35:6 93:22
**handle** 49:11
**hands** 36:20 61:12 68:23
**happen** 29:12
**happened** 17:3 51:14 69:25

**happening** 69:9
**happy** 57:11
**head** 7:10 91:2
**hear** 7:14 93:12
**heard** 4:11 23:9
**heart** 60:23 61:4 72:24 96:14
**heavily** 14:17
**held** 17:13 110:2,18
**help** 22:21 27:7 34:18 35:5 60:24 61:5 73:25
**helpful** 7:7 47:4
**helping** 34:4 43:24 44:2,23 66:24
**helps** 55:20 69:12
**hereto** 3:6
**heritage** 18:9
**hey** 51:18 69:10
**hi** 57:7
**hide** 123:17,19 123:25 124:7 124:11,17,21
**high** 27:4 62:5 66:9
**higher** 87:12,21
**highlighted** 54:13,16 56:2

71:2
**hills** 24:7
**hits** 98:25
**hoax** 88:12,19
**hoc** 21:12
**hold** 33:5 51:13
**holding** 100:7 104:2
**holds** 33:7
**home** 6:17
**honest** 18:18
**hope** 65:25
**hostetler** 2:9 5:25
**hot** 109:7
**hour** 9:17
**house** 14:19,24 36:18,21
**houston** 1:20 4:17 6:3,10,16 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1,25 38:1 38:13 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1

49:1 50:1 51:1 52:1,23 53:1 54:1 55:1 56:1 56:20 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,13 71:1 72:1,4 73:1 74:1 75:1 76:1 76:24 77:1 78:1 79:1 80:1 80:10 81:1 82:1 83:1,22 84:1,4 85:1 86:1 87:1 88:1 89:1,24 90:1,6 91:1 92:1 93:1 94:1,22 95:1 96:1 97:1 98:1 99:1,15,21 100:1 101:1 102:1 103:1 104:1,8,16 105:1 106:1 107:1 108:1 109:1 110:1 111:1,21 112:1 112:3 113:1,18 114:1 115:1,7 116:1,22 117:1 117:4,14 118:1 119:1,11 120:1 120:24 121:1,8

122:1 123:1,7 123:15 124:1 125:1 126:1,2 126:11 127:10 128:4 129:6

**hudson** 94:23 95:10,13
**huh** 64:16 71:11 72:13 73:6 116:6
**hundred** 18:17
**hunt** 11:25
**hunt's** 12:6

**i**

**identification** 38:15 83:24 90:2 99:17 104:10 111:23 116:24 119:13 121:2
**ike** 27:9,12 42:20 82:22 83:13 84:16,22 90:19,24 124:16
**immediately** 67:14
**impact** 64:19 64:25 65:8 73:10 79:12 86:8 122:11 125:6,11
**impacted** 73:16
**implants** 15:13

**importance** 35:21
**important** 89:12 94:2 113:19
**inadvertently** 97:4 101:10,23
**include** 93:3 111:5
**included** 15:24 111:11 124:5
**includes** 17:7
**including** 5:15 43:25
**income** 25:14 33:21 39:24 43:8
**incorporate** 44:6 47:4
**increased** 89:4 89:9 105:19 107:10,18 116:3
**increasing** 49:22
**indicated** 57:2 84:9 90:12 95:2 99:25 105:2 112:22 117:7 121:12 127:11
**individuals** 23:5
**infection** 86:15 86:25 89:5,9

**infectious** 92:18
**infer** 87:7,8
**inference** 62:12 65:5,9,10 67:17 68:2,6,7
**inferences** 63:15 69:14
**inferring** 66:14 69:20 98:8
**information** 34:21 44:6 53:15 62:4 97:6,8 107:25
**ingredients** 18:9
**initial** 43:5 46:12 47:4
**initials** 48:21 48:22
**inputs** 66:21
**insightful** 75:2
**instance** 46:2
**institute** 14:10
**instructs** 7:15
**insurance** 18:10
**intent** 62:2 101:17
**interchangea...** 31:7
**interest** 49:22
**interested** 5:10
**internal** 50:17

**[internally - lambert]**

**internally** 22:10
**internet** 4:8
**interview** 16:16
**interviewed** 13:19
**interviewing** 16:17
**introduce** 37:22 38:9 41:13 56:15 71:23 76:16 80:4 83:20 89:21 94:15 99:13 104:6 108:16 111:19 116:20 119:9 120:21
**introduced** 70:7 115:2
**introduces** 65:3
**introducing** 41:17 85:5
**invading** 49:21
**investing** 123:19,20 124:19
**investment** 65:21
**investor** 14:10 14:18 15:4,19 15:21 16:3 17:8 43:21 98:12 101:21 102:11

**investors** 22:16 23:2 29:15 44:3 59:21 61:9,12,19 62:3 68:24 91:10 93:11 95:17 96:22 97:2
**ir** 36:19,21 91:3
**issue** 60:24 113:10
**issued** 24:15,17 32:21
**issues** 28:20,22 37:12 49:19 112:7
**item** 19:25 40:3
**items** 25:9,21 43:18 58:11

**j**

**jackson** 12:2
**jackson's** 12:10
**jason** 2:6 5:19 38:17
**jeff** 11:25 12:3 16:14 21:18,20 22:5
**jim** 39:2,10
**jineen** 1:21 5:5 127:6,24
**job** 34:9
**john** 6:16
**joining** 14:16 16:9,10

**judd** 2:13 9:21
**judd's** 10:9
**july** 94:20 95:24 98:4 99:21 102:24 107:20
**june** 48:13
**juris** 2:7

**k**

**k** 97:5 101:24
**kaplan** 2:4 5:19 5:23
**kaplanfox.com** 2:7,8
**keep** 46:17 64:12 112:14 118:6 123:10
**kept** 25:16
**kevin** 85:12
**key** 27:8 33:23 33:25 44:3 55:21
**kilsheimer** 2:4 5:20
**kind** 98:24 103:3
**knew** 49:7 50:10
**know** 7:20 8:6 10:5 11:3,5 16:8 18:17,23 19:8 26:17 30:2 31:5,15 31:20,22 32:2 33:5,19 36:13

37:3 38:3 43:23 49:9 51:6,14 52:11 54:15 61:20 62:21,22 63:3 63:23 64:4 68:17 69:23 70:9 75:6,25 76:6 77:19 84:21,23 92:9 95:13 98:2,3,7 98:9 100:19 102:23 107:3 110:25 111:7,9 112:11 113:11 114:4,7,18 116:15 119:24
**knowledge** 56:24 84:7 90:10 94:24 99:23 104:24 105:3 112:20 117:5,8 121:10 121:13
**known** 16:16

**l**

**l** 1:13 3:2 6:4
**lake** 15:3
**lambert** 11:10 11:12,24,25 12:4,15,18 14:16,22,23 15:6,15 16:8 16:14,20 17:5 17:16 19:13

22:10,11 39:6 42:7,13,17 43:4 46:8 53:10 57:5 70:13 83:21,23 84:13 90:15 92:4 95:6 99:14,16 100:4 105:6 106:24 111:4,20,22 112:25 117:11 119:10,12 120:23,25 121:16 128:7,9 128:11,13,14

**lambert's** 12:3

**language** 51:24 56:2 68:20 69:13 78:25 79:20,23 81:17 103:15 105:25 106:6 107:4,9 107:13 110:16

**large** 88:20

**law** 9:22 13:19

**lawsuit** 11:3,7

**lawyer** 66:7

**lawyers** 8:13

**lead** 2:5 12:8

**leading** 18:2 21:22 27:23 28:9 33:12 36:6 114:20

**lean** 71:2

**leave** 114:2

**leaving** 88:17

**legal** 5:3,6 10:9 126:5

**legit** 96:2

**lend** 94:8

**lens** 43:21 44:2

**letters** 39:19

**level** 27:4 52:10 62:5 79:11 86:7 87:17 106:18 115:25

**levels** 89:4,9

**licenses** 14:5

**liked** 42:21

**likely** 56:5 59:21 61:9 62:8 67:23 68:24 103:18 113:20

**likewise** 123:14

**line** 25:9,21 38:23 40:2 41:24 52:24 56:23 65:24 70:20 76:24 79:2 85:12 90:9 94:22 104:17 108:22 112:5 115:8 121:9 129:7

**link** 38:5,7 87:17

**list** 77:9

**listen** 26:15

**listening** 26:8 88:2

**lists** 57:21 121:23

**litchfield** 24:7

**litigation** 8:21

**little** 13:2 23:19 35:5 73:12

**live** 26:2,7,10 26:13 88:15 91:9

**living** 88:10

**llc** 1:6 4:18 129:2

**llorente** 12:16 17:6

**llp** 2:4,9 5:20

**llyc** 11:10,13,24 12:4,16 17:21

**loaded** 72:2 99:19

**logic** 66:8

**logix** 30:2,12 30:16,24 31:12 31:17 36:25 40:19 74:9 79:5 85:24 107:15 115:23 123:18 124:2,8 124:18 125:11

**lombardi** 19:5

**long** 9:14 79:3 85:22 123:10

**longer** 34:4 106:23

**look** 20:3 21:19 33:20 39:18 43:14,15,20 49:13,17 53:3 54:8 55:19 56:14 58:16 59:14 64:11 68:13 72:9 73:3 76:15 81:9 93:7 95:8 105:8 109:23 110:4 113:3 116:9 120:3

**looked** 19:25 34:5 71:16

**looking** 43:19 43:25 55:16 58:5 91:15 106:10,12,22 120:17

**looks** 38:18 39:24 58:10 75:24 91:16 92:7 96:2 109:11 110:24 112:23 115:13 119:23,25

**loss** 25:10

**lot** 49:18 50:2 63:14 65:6

**low** 79:9 86:5 86:19 89:7 110:22 114:15

**[low - meant]**                                                    Page 17

114:19 123:17
123:25 124:7
124:11,17,22
**lower** 64:13
  65:19
**lumps** 64:20
**lynn** 113:7

**m**

**m** 6:4 70:13
**macro** 49:19
  50:16 71:20
**made** 15:6
  52:14 83:4
  124:13,22
**madrid** 12:17
**mail** 20:8,11,16
  20:19 29:19,22
  38:20,21,25
  39:2,10 41:22
  41:23 42:3,10
  46:17 52:20,21
  53:4 55:10
  56:19,25 57:4
  57:7 58:6,14
  68:21 70:12,13
  70:14,23 72:3
  72:4,11 73:3
  74:15,21 75:10
  75:19 76:20,21
  77:6,7,9 78:13
  80:8,8,17,23
  84:3,4,8,11
  85:9,15 90:5,6
  90:11,14 94:19
  94:20,25 95:4

95:9,10,24
99:20,24 100:3
100:20 101:17
101:25 104:13
104:14,25
105:4,8 108:20
108:21,24
109:6 112:2,3
112:21,24
113:4 115:5,6
116:8,9 117:3
117:4,6,9,13
119:16 121:5,6
121:11,14,18
**mailed** 46:21
  49:2
**mails** 10:15
  79:24
**main** 34:9 91:5
**maintain** 64:20
**majority** 15:5
  31:19 98:22
**make** 16:13
  24:25 35:20
  43:16 46:18
  63:23 96:16
  97:6 113:25
  118:22
**makes** 73:13
**making** 6:11
  55:16 66:17
**managed** 15:23
  95:17
**management**
  95:20

**managers**
  22:15
**managing**
  12:11 17:16,19
  19:11 21:21
**mandates**
  74:24 79:7
  86:3 87:10
  110:20
**march** 90:6
  117:15 121:6
  121:19
**margin** 99:6
**marissa** 2:11
  5:24 123:12
**mark** 41:15
**marked** 38:14
  41:14,18 52:17
  56:16 70:8
  71:24 76:17
  80:5 83:23
  85:6 89:25
  94:16 99:16
  104:9 108:17
  111:22 115:3
  116:23 119:12
  120:25
**market** 15:25
  17:13 23:6
  58:19 65:12
  73:15 97:24
  100:16 113:13
**market's** 97:17
**marketing** 17:9
  17:12

**markets** 21:23
**mask** 74:23
  79:7 86:2
  87:10,20
  110:20
**masks** 87:25
  88:5,20
**material** 97:6,7
**matt** 11:25
**matter** 4:18
  27:10 69:17
**matters** 20:20
**maxim** 23:16
  23:23 77:8
**mba** 13:22,25
**mbovill** 2:16
**mccluskey**
  113:5,8
**mean** 20:14
  25:4 28:14,22
  42:19 46:16
  49:20 61:11
  65:18 66:13
  86:18 87:5
  88:14 92:7
  93:17 100:21
  120:16
**meaning** 33:19
**meaningful**
  19:23
**means** 7:9
  65:19 67:15
  75:6 103:25
**meant** 52:3,7
  73:22 90:23

100:20
**media** 4:16 126:3
**meet** 28:11 29:23 123:13
**meeting** 9:8,12 9:15,19 10:12 29:25 57:12,15 77:11,16 84:16 84:22 101:20 102:10
**meetings** 20:25 21:13 27:16,22 28:8 47:10 96:25
**meisner** 21:2
**member** 14:7
**members** 20:4 20:7
**memory** 93:8
**mentioned** 39:7
**mentioning** 117:17
**merit** 1:23 127:7
**message** 34:23 71:19 72:25 89:17,19 92:24 112:15
**messaged** 47:11
**messages** 20:13 27:8 33:23 34:2,5 35:13 35:24 44:3

47:2 55:21 121:9,21
**messaging** 20:12 34:19 35:15
**met** 13:8 16:14
**mgp** 18:9
**mh** 82:3
**miami** 8:8
**michael** 2:15 6:2,16 126:11 127:10 129:6
**michelle** 12:2 12:13
**michigan** 2:14 13:7
**micro** 15:25 34:16 50:3
**microcap** 56:12 58:7
**microsoft** 20:14 29:25
**mid** 12:19
**middle** 17:13 33:6 48:2 92:15
**mike** 1:20 4:17 6:3 9:9 52:23 56:19 72:4 75:12 76:23 80:10,12 84:4 90:6 94:21 99:20 104:16 112:3 113:18 115:6 117:4,14

121:8 125:25
**milestones** 93:21
**million** 37:7 40:8 65:24 76:3,8 97:14 106:14 115:20 115:20
**mind** 35:18 109:2
**mineola** 129:4
**mizener** 19:19 20:9 21:3 36:14 39:4,6 52:21 53:20 55:9 56:22 70:19 72:6 76:21 80:11 84:5 90:8 104:16 119:17 119:21 121:8
**model** 25:13
**models** 24:21
**moment** 23:22 37:23 78:13
**monday** 57:13 57:16 77:11,16
**monitor** 24:14 24:19,23
**month** 60:11
**monthly** 114:17,24
**months** 63:17 114:15,18

**morning** 4:3 6:10,13 77:11 77:16
**motivated** 123:24 124:6
**mouth** 60:23 69:8
**move** 94:10
**moving** 13:10
**mpeirsol** 2:12

**n**

**n** 2:2 3:2 6:4 127:2
**nail** 50:15,19 99:2
**name** 5:2 6:15 23:18 129:5,6 129:20
**named** 8:20 17:25
**names** 11:23
**nanduri** 95:10
**national** 14:9
**nature** 47:14 63:21
**navigate** 48:9 110:10
**near** 48:8,9 110:7,9,10
**nearly** 18:19
**necessarily** 45:6,21 51:22 74:8
**necessary** 36:11

**[need - opportunity]**

**need** 7:8,19
  66:5 77:10
  113:20
**needed** 11:15
  19:25 36:9
  59:11 66:25
  77:15
**negative** 64:18
  64:25 65:8
**never** 44:17
  45:3,17,24
  56:8 123:21
**new** 1:3,25 2:5
  2:5 4:21 6:6
  74:3,9 86:4
  89:3 104:3
  110:21 129:2,4
  129:4,4
**nice** 123:13
**nine** 38:18
**niri** 14:9
**nodding** 7:9
**non** 97:7
**nonparty** 6:3
**nope** 8:25
**norcross** 2:13
  9:21 10:8
**normalizing**
  106:20
**normally** 103:5
**notary** 1:24
  3:14 6:5 127:9
  129:23
**note** 4:5 38:23
  38:24 39:14

**noted** 126:6
**notes** 10:17,20
  10:23 36:5,12
  36:14 119:18
  119:20 120:2,4
  120:18 127:13
**noticing** 5:17
**notification**
  85:13
**notion** 70:4
**november** 1:16
  112:3 113:5,17
**number** 31:2
  39:21,22 47:24
  52:8 60:4
  61:22 66:9
  72:10 76:2,7
  77:3 80:25
  92:12 109:13
  109:20 115:15
  126:3
**numbers** 27:3
  39:20 44:24
  54:22 55:6,16
  76:9 98:17
  114:25 123:18
  123:25 124:12
  124:18
**nw** 2:14

**o**

**o** 3:2 6:4,4
  127:2
**oak** 6:19
**oath** 5:8 6:22

**objection** 27:25
  28:10 30:20
  31:4 32:24
  35:16 36:2
  40:21 45:9
  50:25 59:8
  60:19 62:11,20
  63:13 65:14
  67:8,25 68:11
  69:5 74:12
  77:17,22 80:2
  83:8,17 86:16
  87:2,13,23
  88:8,23 89:15
  91:22 92:6
  94:5 97:25
  98:13 99:9
  100:18 101:7
  102:3,7,8,15,22
  103:11 106:16
  110:23 114:22
  116:17 118:24
  119:6,22
  120:14 122:14
**objections** 3:9
  5:11 7:14
**obtain** 13:24
**occasionally**
  19:24 27:17
**occur** 29:2
  63:15 85:2,4
**occurred** 55:10
  84:22 85:4
**occurs** 96:21

**office** 49:23
**officer** 12:14
  17:20 105:22
**official** 66:6
**oh** 28:3
**ohio** 2:10
**okay** 28:3 37:9
  39:25 40:13
  61:20 67:15
  70:11 72:2
  81:2 84:2
  109:14,21
  115:4,16 117:2
  118:5 120:9
  123:7,11
**old** 129:3
**olsen** 12:2,13
**once** 28:11,14
  28:15 73:17
**ongoing** 32:23
  44:7,8
**ontiveros** 85:12
**open** 34:6,12
  49:14 61:14
  103:21
**operating** 48:7
  110:8
**operational**
  81:11
**operations** 17:5
  17:7
**opportunities**
  58:3 69:19
**opportunity**
  73:17

**[opposed - permanent]**                                                              Page 20

**opposed**  97:7
**options**  58:4
  69:23
**order**  88:21
  108:4
**orders**  40:23
  62:23 64:5,6
**organization**
  14:14
**organizations**
  14:8
**ottawa**  2:14
**outcome**  5:10
**outline**  35:7
  42:24 57:9
**outlines**  10:24
**outlook**  48:12
  54:11 110:7
**outside**  64:2
  75:8 99:5
**outsider's**
  106:9,11
**oversee**  17:4
**own**  24:24
  35:10 42:21

**p**

**p**  2:2,2 3:2
**p.m.**  52:23
  56:20 70:18
  72:5,12 73:5
  75:11 77:6
  95:25 99:21
  108:10,14
  122:22 123:2
  125:24 126:6

**p.m..**  70:23
**pace**  64:4,6
**page**  38:12,18
  39:22,23 41:20
  47:23 48:3
  53:5 54:10
  72:9 73:4 77:2
  78:23 80:24
  82:2 85:21
  92:11,15 95:23
  109:12,19,23
  110:5 113:4
  115:14 128:5
  128:16,17
  129:7
**painting**  93:19
**pandemic**
  35:19,22 49:20
**paragraph**
  81:3 85:20
  110:5 115:17
  116:10
**parse**  34:5
**part**  14:9,13
  16:3 26:7,11
  26:13 29:8,11
  44:22 84:24
**participants**
  4:9
**participate**
  25:24 27:15
**particular**
  28:17 33:7
  34:16 63:25

**parties**  3:6 4:14
**partner**  12:11
  16:15
**partners**  11:9
  11:12,24
**parts**  79:10
  86:6
**party**  5:9
  127:15
**past**  43:16
  121:22
**path**  58:23
  118:13
**pause**  37:24
  41:16
**pavesi**  1:22 5:5
  127:6,24
**paying**  10:8
**pcr**  30:5 73:11
  74:4
**peirsol**  2:11
  5:24 27:25
  28:10 30:20
  31:4 32:24
  35:16 36:2
  37:11 40:21
  45:9 50:25
  59:8 60:19
  62:11,20 63:13
  65:14,17 67:8
  67:25 68:11
  69:5 74:12
  77:17,22 80:2
  83:8,17 86:16
  87:2,13,23

88:8,23 89:15
  91:22 92:6
  94:5 97:25
  98:13 99:9
  100:18 101:7
  102:3,7,15,22
  103:11 106:16
  110:23 114:22
  116:17 118:24
  119:6,22
  120:14 122:14
  123:6,12
  125:14 128:17
**peirson**  5:24
**penalty**  6:22
**pending**  7:21
**people**  35:19
  87:25 88:11,17
  93:11,13,25
  108:7
**perceive**  34:16
**percent**  18:17
  31:21 64:14
  65:11 91:15
  101:8 112:6
**percentage**
  31:16
**performance**
  81:5,6
**period**  64:8
  96:16,19,25
  101:21 115:21
**perjury**  6:22
**permanent**
  92:16

**[persist - professional]**

| | | | |
|---|---|---|---|
| **persist** 86:20 | **point** 17:15 | **predict** 58:20 | 22:13,24 |
| **persistently** 79:9 86:5 | 25:7 51:5 | 79:5,11 86:7 | 115:22 |
| **person** 66:6 | 59:19 61:6 | **prefer** 7:21 | **primary** 15:9 |
| **personal** 87:17 | 73:9 88:9 | **premature** 82:7 | **prior** 14:16 |
| **personally** 87:24 94:7 | 92:14 102:18 | **preparation** 10:13,21,24 | 16:9,10,17 |
| **perspective** 106:10,11,23 | 103:9 109:15 | **prepare** 9:6 | 18:24 46:11,24 |
| 107:22,23 | 120:18 | 26:18 57:10 | 51:4,17 73:4 |
| **pertain** 44:20 | **points** 105:16 | **prepared** 26:22 | 101:4 106:15 |
| **philosophy** 34:12 | 121:23 | 113:12 | 115:21 125:3 |
| **phrase** 31:10 | **policy** 20:15 | **present** 2:19 | **privately** 17:13 |
| 81:23 103:23 | **political** 88:10 | 5:14 9:19 | **probably** 42:22 |
| 103:25 | **politicians** 88:2 | **presented** 71:4 | 66:16 67:15 |
| **phrased** 103:3 | **poor** 101:4 | **president** 17:20 | 69:9,21 73:25 |
| **picked** 23:19 | **portfolio** 22:15 | 17:25 | **proceeding** 5:12 |
| **place** 4:14 | **portion** 119:4 | **president's** 14:13 | **process** 43:4 |
| 12:21 | 120:6,12 | **press** 27:9 | 47:8 50:18 |
| **placeholder** 51:3 | **position** 12:3,6 | 36:10 45:2 | **produce** 11:15 |
| **plaintiff** 1:8 2:5 | 12:10 17:11 | 53:21 54:5 | 52:16 59:12 |
| 5:20,23 | 79:16 | 79:21 83:14 | **produced** 50:14 |
| **plan** 93:12 | **positive** 58:25 | 85:13 104:17 | **product** 30:6 |
| **platform** 30:22 | **possess** 14:4 | 105:11 106:25 | 112:17 |
| **play** 50:16 | **possible** 34:7 | 107:24 124:6 | **production** 50:13 |
| 72:17 | 58:4 62:5 | **previously** 41:14,18 52:17 | **products** 15:10 |
| **played** 27:5 | 74:16 81:7 | 56:16 70:8 | 15:12 48:5 |
| 33:19 112:15 | 91:6 | 71:24 76:17 | 74:19 81:11,18 |
| **please** 4:5 5:12 | **potential** 49:10 | 80:5 85:6 | 112:18 |
| 6:14 7:5,19 8:5 | 72:19 79:3 | 94:16 108:17 | **professional** 1:22 14:4,8 |
| 90:18 | 85:23 113:10 | 115:3 | 22:16 23:2 |
| **plus** 42:2 96:3 | **practice** 21:23 | **price** 64:19 | 36:19,21 44:3 |
| | 32:3 46:15 | 65:2 | 61:18 127:7 |
| | **preceding** 32:16 | **primarily** 19:13 20:6 | |
| | **precision** 79:12 86:8 | | |

**[professionally - question]**                                    Page 22

**professionally** 95:17

**profit** 25:10

**progressed** 35:3

**proper** 59:10

**properly** 55:17

**proposed** 2:6 5:21

**provide** 6:12 22:12 34:12,22 36:9 55:2 59:22 60:2,4 68:4 83:16

**provided** 23:5 32:10,14 45:20 50:24 63:10 75:22 83:5

**providing** 8:14 32:3 51:8,23 57:19,25 58:10 59:6 75:13 79:14 82:23 83:7 110:12

**prudent** 48:11 49:4 52:3

**public** 1:25 3:14 6:6 14:25 14:25 17:8,13 88:4,20 89:13 93:3 97:6,7 123:19,20 124:19 127:9 129:23

**publicly** 15:25 96:18 101:12 112:13

**pull** 51:10,16 54:19 55:3 58:17 69:11 90:20 123:23

**pulled** 51:24 71:18

**pulling** 58:9 69:16 72:20

**punches** 90:20

**purposes** 10:2

**pursuant** 1:21

**put** 24:22 25:12 42:13,17 43:4 44:23,25 46:2 47:2 51:3 53:10 68:17 91:20 92:5,9 98:4 106:7

**puts** 63:24 67:13

**putting** 46:11 60:22 69:7 107:24

**q**

**q&a** 114:2

**q1** 43:16 52:24

**q2** 43:13,14 44:13,14,18 45:14,15 46:4 55:16 57:19,25 60:2,2,9,16 62:15,24 63:9

64:5 67:16 68:13,25 69:21 70:4 82:20 96:3,9 97:20 98:6 100:9,22 101:4,14,23 102:2,5,13,20 103:10

**q2'22** 104:17

**q2-2022** 109:25

**q3** 10:16 44:15 44:20 112:6

**q4** 113:20 115:8,11 117:17 118:21

**quality** 4:7,8

**quantitative** 45:24 61:16 63:6

**quantitatively** 63:11

**quarter** 27:2,5 27:11,22 28:8 32:14,16,23 33:3,7,19 34:3 37:2,4,7 40:6,7 42:23 43:12,16 43:17,17 44:8 44:8,17,21 45:4,7,17,22 46:3 47:9 48:6 48:12,13 51:4 51:11,17,19,20 51:25 52:5 54:10,20 56:7

59:22 60:12 61:10,21 62:9 63:7,11 64:8 64:10 66:10,15 67:4,6,24 68:10,19,25 69:3,11 76:13 81:7 85:16 96:20 97:11,17 97:18,23 100:16 101:11 102:19 103:19 105:14,17 110:17 111:14 111:15 112:16 115:18,19,24 116:2,4,12,16

**quarter's** 47:10

**quarterly** 22:22 24:17 25:16,22,25 26:19 27:23 28:9 32:3 41:6 55:2 59:15 61:17 64:12 67:12 68:3 69:16 79:14 110:12 123:24

**quarters** 33:8 35:6 59:23 71:17 106:15

**question** 3:10 7:20,22 8:2,4,5 28:4 45:10 63:23 73:24

**[question - recording]** Page 23

86:23 87:6 91:8 103:4,8 113:19 115:18 118:4
**questions** 7:6 42:12 58:24 103:6 123:4,9 125:15
**quickly** 13:20
**quiet** 96:16,19 96:25 101:21
**quite** 50:2 82:9
**quote** 93:22
**quoted** 93:25
**quotes** 36:11 55:18 93:11 94:14

**r**

**r** 2:2 127:2
**rack** 72:18
**raise** 58:23 102:12
**range** 44:24 46:2 59:12 61:16 63:20,25 64:14 65:10 66:22 68:17 76:10
**rapids** 2:14
**rates** 49:22 79:9 86:5,19 89:7 110:22
**rather** 69:9 93:22 94:3,13

**rationale** 66:8 122:16
**reaching** 69:10
**read** 27:11 61:25 86:20
**reader** 87:3
**reads** 81:3 85:21 92:15 105:17 110:6 115:18
**really** 9:9 11:14 17:10 21:10 22:18 25:14 33:17 35:7 36:3,11,19 45:11 46:17,20 50:11,15,19 51:12,16 56:13 58:2 59:10 60:23 61:3,19 65:8 66:23 67:9 69:18 72:23,24 118:14
**realm** 87:19
**realtime** 1:24 127:8
**reason** 6:25 22:24 75:14,21 82:9 102:13 129:7
**reasonable** 66:6
**reasonably** 66:7

**reasoning** 71:3
**reasons** 18:21 72:19 79:14 83:6,14,15
**reassess** 79:15
**recall** 9:4,14 11:11 15:8 17:17,22 18:11 18:13,15,21 19:3,20 20:17 23:12,21,24 24:6,11 26:12 31:11,23 32:5 32:8 35:25 36:4 37:5,6,8 41:4,11 46:10 49:3 50:6,19 54:21 55:8,13 55:25 59:5 60:10,11 62:14 62:17 64:9 70:6 74:2 76:11 85:3 89:11,16,18,20 90:23 91:15 97:9,13,16,19 100:24 106:5,6 107:7,17 111:4 111:12,13 112:17 114:12 114:13 116:18 117:21,25 118:10,17,20 119:2,7 122:6 122:10

**receive** 77:10 84:11 95:4 105:4 117:9 121:14
**received** 62:24 64:5,7 84:8 94:25 104:25 117:6 121:11
**recess** 37:16 78:7 108:11 122:23
**recipe** 70:2
**recipients** 85:11
**recognize** 23:16,18
**recollection** 40:6 50:9 92:23 100:15 120:11
**recommend** 100:7
**reconciled** 25:2
**record** 4:3,15 5:17 6:15 8:15 37:10,14,18 38:6 78:5,9 81:6 108:9,13 122:21,25 125:21,24
**recorded** 4:12 4:17
**recording** 4:7 4:13

**[rectify - respond]**                                      Page 24

**rectify** 63:18
**red** 78:25
**reduce** 34:9
  88:6,22
**reduced** 50:8
  50:10 60:17
**reduces** 34:14
**reed** 113:7
**refer** 25:3
  27:12 30:16,22
  31:8 48:23
  67:2
**reference** 19:2
  19:4
**referred** 30:24
  39:20 42:8
  55:9 98:19
  106:13
**referring** 26:6
  30:17,25 36:22
  60:8 74:14
  78:23 96:9
  97:22 101:3,14
  105:25 107:13
  107:15 114:5
**refers** 81:23
  99:4 107:6
**refinements**
  35:10
**reflected** 50:21
  56:25 84:8
  90:11 94:25
  99:24 104:25
  112:21 117:6
  121:11

**refresh** 38:12
  40:5 41:19
  92:22 93:8
  100:14 120:10
**regard** 26:2
**regarding**
  11:20 20:19
  24:15 38:7
  39:14 44:7
  103:16,17
  107:9 114:10
  119:20
**registered** 1:22
  1:23 127:6,7
**regular** 57:5
  84:12 90:15
  95:5 100:4
  105:5 112:25
  117:10 121:15
  122:13
**regularly** 20:24
  21:13 29:5
**rejoined** 15:15
**rejoining** 16:10
**related** 5:8
  11:16 19:16
  21:4,6 47:10
  101:9 127:15
**relates** 74:18
**relations** 14:10
  14:18 15:4,19
  15:22 16:4
  17:8,8 98:12
**relationship**
  35:3

**release** 27:9
  32:15 33:13
  36:7,10 45:2
  46:4 53:7,22
  54:5,24 55:24
  57:20 75:15
  78:17,21 79:21
  83:15 84:17
  85:17 104:17
  104:18 105:11
  106:8,25
  107:24 124:6
**released** 32:25
  33:4
**releases** 32:20
  53:12
**reliably** 35:19
**relied** 59:13
**remain** 79:2
  81:10 85:21
**remains** 81:5
**remarks** 118:7
**remember**
  18:14 24:2,3,5
  49:6,24 52:6
  60:25 76:4,9
  76:14 83:10
  84:24 101:8,16
  103:12 122:15
**remind** 66:24
**reminder** 51:18
**remote** 1:19
**remotely** 4:24
  5:15 72:21

**remove** 61:23
**repeat** 28:4
**report** 21:15,24
  22:7 91:2
  98:23
**reported** 21:9
  21:17,18
  102:24
**reporter** 1:23
  1:23,24 5:4 7:7
  127:7,8,8
**reporting** 56:7
  129:2
**reports** 23:6
  24:14,17,20
  76:15 77:8
**represent** 9:22
  103:6
**representation**
  10:3
**representing**
  5:3
**research** 22:18
  22:20 23:6
  25:11 39:11
  43:22 71:10,13
  72:15
**reserved** 3:10
**resolve** 70:2
**resonated** 36:4
**respect** 21:25
  22:8 96:17
**respective** 3:6
**respond** 71:7

**responding** 74:17
**response** 113:24 118:3
**responsibilities** 15:20 16:22
**responsible** 32:9
**restate** 45:10
**restricted** 48:7 110:9
**result** 48:10 72:14 79:10 86:6 99:5 110:11
**results** 32:16 58:20 79:13 86:10 96:4,10 97:20 98:6,11 99:7 100:9,16 100:23 101:4 101:14 102:2,5 102:14,20 103:10 105:15 105:17 106:2 107:4 111:14 111:15 112:15 118:7,22
**retained** 22:12 126:4
**retainer** 10:2,6
**revenue** 25:22 31:16 37:3 40:2,9 68:18 73:10,16 76:12

77:20 98:9 106:14 114:8 115:19
**revenues** 41:3,7 41:7,10 82:8 97:10,18,23 112:6
**review** 10:11 10:23 53:25 80:18
**revised** 78:16
**rewrite** 42:24
**right** 39:18 79:21 82:3 96:3 98:25 122:2
**risk** 34:15
**rmr** 127:24
**road** 6:19 129:3
**role** 15:16 16:21 17:22 35:18
**room** 8:9
**rpr** 127:24
**run** 35:9 49:23 52:15 82:21
**russia** 49:21

**s**

**s** 2:2 3:2,2 6:4 128:2
**sai** 95:10
**sale** 74:10
**sales** 74:8 79:5 85:25 108:3

113:21 114:6 114:11,15,17 114:19,24 115:23 123:17 123:25 124:7 124:11,18,22 125:6,11
**salt** 15:3
**sample** 88:15
**sauce** 34:8
**saw** 106:9
**saying** 45:19 49:23 69:10 71:10,12,14 72:16 74:7 85:3
**says** 48:3,4 75:7 80:17 86:20 96:9 98:6 106:2 109:8
**scenario** 59:17 66:7 74:16
**scenarios** 67:11
**schedule** 95:19
**scheduled** 20:25 21:13 29:5,7
**school** 13:19
**scientific** 81:12 81:13
**scientist** 87:18
**scientists** 93:23 94:7

**scope** 44:23 64:3
**screen** 4:11
**script** 10:15 27:9 35:4 41:25 42:2,12 42:14 43:6,10 47:21 51:9 52:25 54:24 55:22,24 75:14 78:17 80:13,18 80:21 90:9 91:13,20 92:2 92:8 93:7 108:23 109:3,9 111:10 115:8,9 115:11
**scripts** 92:4 109:25
**sealing** 3:7
**sean** 2:20 5:2
**seat** 58:2
**sec** 33:2 66:6
**second** 41:14 48:12,13 52:4 54:10 59:14 61:7 66:4 67:24 68:10 74:14 76:12 97:11,17,18,22 100:15 102:19 105:14,17 108:24 111:15 116:10 120:5

**[secondarily - smart]**

secondarily 22:21
secret 34:8
section 105:14 109:17 120:4
see 22:5 25:19 38:17,25 39:4 40:2 41:21 42:3,5 43:11 46:25 48:15 52:19 53:2,6,8 54:2,9,11 56:18 59:3 60:5 64:22 66:11 70:10,22 71:5 73:19 75:4,17 76:19 77:5,12 78:15 78:18,25 79:18 80:7,14,16 81:14,19 82:12 82:25 84:2,19 85:8 86:11 90:4,21 92:14 92:20 93:15 94:18 95:11 96:6 100:12 104:12 105:23 108:19,24 109:4 110:14 111:25 112:9 112:14 113:8 113:14,15,22 115:4,17 116:5 117:2,19 118:8

119:15 120:8 121:4 122:4
seem 77:9 102:19 103:8
seems 50:23 82:7
seen 4:10 69:15 113:21 114:5 114:11,14
sell 22:17,20 25:11
selling 15:10 31:12 36:25 73:18 82:19
sells 74:20
semester 13:19
semesters 13:14
send 54:4 57:4 77:7 90:14 100:3 112:24
sending 53:21 109:2
senior 15:18,21 16:20 17:18
sense 16:13 113:25
sent 56:20,25 70:17 80:9 90:11 99:24 112:3,21 119:17
sentence 105:16 106:19

sequential 43:15
series 39:19
service 16:3
services 22:11
set 36:20 40:11 105:18 106:3 107:5
seth 76:23 113:6
setting 16:16
shaking 7:9
share 34:21 38:2,7 49:14 64:19 65:2 101:22 104:3
shared 58:14 67:10
sharing 101:10
sheet 33:22 129:2
shop 17:12
short 37:10 59:2,7 78:2 122:18
shout 42:12
show 94:12
showed 10:14
side 22:4,15,17 22:20 25:11 82:3
sidoti 23:24 39:2,10,11 77:8

sign 65:21
signature 127:21
signed 3:13,15
significant 115:25 119:4 120:6,11
silver 6:19
similar 36:17 58:6,13 59:16 64:8 91:8 103:15 110:16 111:15 121:21
similarly 1:7
site 82:8
situated 1:7
situation 70:2 71:21 120:20
size 88:15
skipped 28:12
slow 60:3,9,16 62:16 63:9,16 68:10 69:2 70:5
slowing 113:21 114:6,11
small 15:3,25 34:16 50:3 58:7 88:14
smaller 56:12
smart 30:3,12 30:16,24 31:13 31:17 36:25 40:19 61:19 74:9 79:5

**[smart - strongly]**

85:24 107:15
115:23 123:18
124:2,8,18
125:12
**soft** 59:22,23
61:9 62:9
67:16 68:24
69:11 103:19
**sold** 15:5 30:6
30:19 31:2
112:18
**solid** 81:5
**solutions** 5:3,6
17:9 126:5
**somebody** 87:8
**soon** 96:20
**sorry** 13:16
14:13 21:6
28:5 65:17
86:21 91:24
**sounded** 28:24
28:25 118:12
**sounds** 71:7
**southern** 1:3
4:21
**speaking** 26:7
26:11,13 98:15
98:18
**specific** 15:9
16:7 58:11
60:4,17 102:12
**specifically**
33:16 50:7
101:13 107:17
114:10

**spectrum** 88:13
**speculate**
106:17
**spend** 119:5
120:7,12
**spilling** 116:3
**spinal** 15:12
**spot** 78:2 98:21
108:6 122:18
**spread** 74:25
86:4 89:3
110:21
**spreadsheet**
24:22 25:17
**spring** 49:25
**stab** 75:16
**stack** 19:19
20:9,25 26:24
36:13 42:4,7
48:23 49:2
52:11,24 56:22
70:19 72:6
76:23 80:11
84:5 90:7
94:21 95:25
97:21 99:22
104:15 105:9
119:18 121:6
121:20
**stadium** 1:6
4:18 129:5
**stamp** 39:21
83:21,23 104:7
104:9 110:5
111:20,22

116:21,23
120:22,25
128:7,10,11,12
128:14
**standards**
105:18 106:3
107:5
**standing** 21:13
**start** 43:9 47:9
55:23 57:7
60:3,9,16
62:16 63:9,16
66:10 67:3,7
68:10 69:2,3
69:22 70:5
73:17 82:19
121:24 122:7
**started** 13:7
18:11,22 31:12
32:6,6,18
**starting** 18:14
27:20 28:6
48:2 51:5
55:18
**starts** 53:4 73:4
109:17 115:18
**state** 1:25 5:12
5:15 6:6,14
13:7
**stated** 47:7
83:14
**statement**
25:10,14 33:21
33:22 39:24
43:8 88:25

**statements**
33:20 69:3
89:13 93:4
124:5,12,22
**states** 1:2 4:20
79:2,8 86:3
120:5
**stating** 60:2
**stenographic**
127:13
**step** 65:18
**sticks** 35:17
**stimulate** 93:18
**stipulated** 3:4,8
3:12
**stock** 34:17
119:3 120:6,13
122:3,12
**stop** 17:11
67:12
**strategic** 93:13
93:19
**strategy** 17:20
34:4 93:12
**street** 23:3
34:13,24 35:15
43:19 59:13
65:4 94:12
103:22
**strike** 15:14
40:16
**strong** 48:4
**strongly** 35:14
35:25

**[structure - test]** Page 28

structure 91:18 92:2
subbullet 58:22 59:19 64:17
subject 38:23 41:24 52:24 56:23 70:20 72:7 76:24 85:12 90:9 94:22 104:17 108:22 112:5 115:7 119:18 121:9
subpoena 1:21 11:15
subpoint 59:24
subscribed 126:13 129:21
subsequent 91:9
substance 11:21
substantive 20:19,22
suggest 73:7 86:24 123:16 123:22 124:4 124:10,16
suggested 86:14
suggesting 118:11
suite 2:10 30:18

summer 49:25
sunday 74:22
supply 53:16 53:19 112:7
support 81:13 93:25
supported 19:14,21
suppose 16:12
sure 19:10 24:25 31:22 35:20 37:11 38:3 43:16 46:18 52:15 55:16 63:24 66:18 96:16 125:22
surface 74:25
surprise 31:24 96:4,10 97:21 98:11,15,19,24 99:5,11 100:9 100:22 101:14 102:2,5,14,21 103:10
surrounding 73:10
switching 61:17
sworn 3:14,16 6:5 126:13 127:11 129:21
systems 20:12

**t**

t 3:2,2 6:4 127:2,2 128:2
tables 53:16
tactical 19:24
take 4:14 7:22 10:20 14:25 24:21 36:5,12 36:14 54:8 64:20 75:15 96:22 125:20
taken 8:24 37:16 78:7 88:6 108:11 119:21 122:23
takes 56:12 63:24 67:14
talk 29:13 43:19 45:24 66:19 124:25
talked 13:10 44:11,17 45:4 45:17 56:8 76:10 111:8
talking 20:8 26:5 41:6 43:18 44:14 45:7,15 46:7 64:9 106:20 121:24 122:7
team 15:19,22 16:6 20:4,5,7 75:12 81:4 100:10 101:2

teammates 28:18
teams 20:15 29:24,25 81:12
technically 13:13 44:16 45:16
technician 2:20 4:2 37:13,17 78:4,8 108:8 108:12 122:20 122:24 125:19 125:23
technology 4:25 30:21
teleconference 1:19
tell 6:22 40:18 40:23 41:2,9 60:7 62:19 67:6 70:3 84:25 107:21 114:9
ten 28:15 29:3
term 34:4 48:8 48:9 79:3 85:22 106:23 110:7,9,10
test 30:3,5,13 30:17,25 31:10 31:13,17 35:19 35:21 37:2 40:20 74:9,10 79:5 85:25 107:16 123:18

**[test - towards]** Page 29

124:2,8,19
125:6,12
**tested** 31:3
**testified** 6:7
**testify** 7:2
**testimony** 6:12
8:15 12:23
125:25
**testing** 112:8
125:10
**tests** 30:18 31:2
40:24 115:24
116:2 125:5
**text** 20:13
**thank** 6:11
40:10
**thanks** 90:17
**themes** 34:23
35:24 94:2
**things** 16:7
27:18 43:23
106:20
**think** 7:6 23:19
31:7 42:22
43:2 45:11,13
47:7 49:16,17
49:25 51:21
52:7 62:18
64:24 65:6
67:9,20 68:8
70:25 74:13,17
77:25 86:17
88:9,12,24
96:2,14,23
97:20 98:7,20

98:25 101:9
106:12,17,18
107:21 108:5
113:24 118:6
121:20 122:17
123:9
**thinks** 65:11
**third** 2:4 39:23
59:24 64:11
110:4 111:14
117:13
**thought** 47:3
69:22 71:8
74:23
**thoughts** 35:8
71:3 82:23
116:14 117:16
**thread** 38:20
41:22
**three** 11:18
13:8 14:23
18:3 20:5 27:2
27:21 28:7
47:8
**tie** 34:3
**time** 3:11 5:12
8:14 13:9
15:17 16:11,12
16:18,24 17:23
18:3 20:23
21:16,22 23:14
23:22,25 24:3
24:8,9,12 25:7
29:23 30:8,10
35:22 36:24

37:14,18 50:2
57:2 58:8,14
59:7 60:14
62:8 63:7,20
64:8 75:19
78:5,9 79:15
82:11 84:9
88:3,18 90:12
93:23 95:2,20
99:25 101:5
105:2 108:9,13
110:13 112:22
114:14 117:7
121:12 122:21
122:25 123:4
123:16,23
124:5,11,17
125:21 126:6
**timeline** 49:7
50:22 96:12
103:13
**timing** 115:22
**tip** 59:20 61:8
61:11 62:3
68:23 100:11
101:2 103:22
**tipping** 103:16
103:17,23
**tired** 87:25
**today** 6:12,23
7:2 8:7,24
12:23 16:23
17:4 82:22
84:16 118:5,16

**today's** 7:4,13
9:3,6,23 10:4
10:13,18
125:25
**together** 25:12
26:25 27:19
35:2 42:14,17
43:4 44:24
46:11 53:11
56:6 68:18
69:11 91:20
92:5,10
**told** 50:6 62:15
63:8
**took** 6:21 25:17
42:22
**tool** 51:18
**top** 38:20 40:3
41:23 52:21
65:24 70:13
72:3 76:20
78:13 80:8
81:3 84:3 90:5
94:19 104:13
108:20 112:2
115:6 116:9
117:3 121:5
**total** 114:8
126:3
**touch** 22:5
**touched** 43:2
**toward** 27:18
**towards** 116:2
120:3,13

**[track - uris]**

| | | | |
|---|---|---|---|
| **track** 25:17 46:17 112:14 | 101:18 123:17 123:19,24 124:7,11,17,21 | 49:13 51:2 53:10,17 54:4 55:15,23 56:5 60:13 65:20 91:2 96:21 | 32:11 33:9,18 48:22 52:2 57:14 62:7 67:21 73:21 74:6 75:23 |
| **traded** 15:25 96:18 112:13 | **tryka** 21:18,20 22:5 | | 77:14 80:19 |
| **transcription** 127:13 | **tuesday** 82:11 | **u** | 81:22 82:15,17 83:11,18 85:14 |
| **transmission** 87:12,22 88:7 88:22 | **tumultuous** 50:2 | **u** 3:2 6:4 **u.s.** 12:8,14 17:7,21 75:3,7 | 88:4,19 91:11 95:18,22 96:8 98:11 99:3 |
| **transparent** 34:7,13 49:14 61:14 91:6 | **turn** 39:17,22 47:15,19,23 72:9 77:2 | 75:8,9 **uh** 64:16 71:11 72:13 73:6 | 102:20 103:9 103:24 104:20 104:23 107:12 107:14 119:19 |
| **trend** 113:13 | 78:20 80:24 81:25 85:19 | 116:6 | **understood** 8:3 45:11 88:5,20 |
| **trends** 118:22 | 92:11 105:13 | **ukraine** 49:21 | **unexpected** |
| **trial** 3:11 | 109:12,19 | **uncertainty** | 99:10 |
| **tried** 35:7 106:8,18 | 115:14 | 34:10 35:22 49:15 58:15,18 | **unit** 4:16 |
| **true** 33:6,7 127:12 | **turning** 48:3 110:6 | 59:17 61:24 73:9,14,15 | **united** 1:2 4:20 79:8 86:3 |
| **truly** 73:16 | **two** 13:14 22:23 42:23 | 74:7 82:8 | **university** 13:8 13:13,23 |
| **trump** 49:22 | 59:22 61:10 | **unclear** 8:5 | **upcoming** |
| **truth** 6:23 | 62:9 63:17 | **under** 6:22 61:6 66:4 | 32:14 57:15,16 85:13 |
| **truthfully** 7:2 7:16 | 68:25 72:8 82:2 87:17 | **undergraduate** 13:12 | **updates** 11:18 |
| **try** 8:6 17:11 34:9 44:5 | 103:19 114:15 | **underlying** 71:20 | **uris** 2:6 5:19,19 6:9 37:9,20,21 |
| 50:15,18 60:23 74:15 | **ty** 19:5 **tye** 16:16 | **understand** 6:21 7:17 8:4 | 38:8 41:12 77:25 78:11 |
| **trying** 22:18 33:17 42:23 | **typical** 46:15 96:17 | 8:12 9:10 63:24 66:8 | 83:19 89:21 99:12 104:5 |
| 45:12 50:11 61:3,23 69:18 | **typically** 28:11 29:19,22 32:13 | 87:6 118:14 | 108:5,15 |
| 72:18 87:8 93:18 94:9 | 32:21 33:13,25 34:25 35:11 | **understanding** 26:21 27:5 | |
| 95:19 96:12,24 | 36:8,16 42:13 43:7 46:23 | 30:4,9,11,15,23 | |

111:18 116:19 119:8 120:21 122:17 123:3 125:16,22 128:16
**use** 51:4,17 55:21 69:14 72:22 103:15
**used** 68:20 103:17,22 110:17 126:3
**using** 4:24 88:14
**usually** 27:18 29:24 47:7 72:22
**utah** 6:20 13:10 13:11,13 88:10 88:15,16
**utilize** 90:19,24

**v**

**v** 129:5
**v1** 42:11
**v2** 80:18 104:18
**v3** 115:9
**vaccination** 79:9 86:5,19 89:7 110:22
**validate** 50:13
**valuation** 34:11
**value** 62:23
**variability** 110:8

**variables** 66:21
**variants** 74:24 86:4,18 89:3 92:16 110:21
**variations** 30:12
**various** 85:10 105:15
**vast** 31:19 98:22
**venture** 60:21 98:22
**veritext** 5:3,5 126:4 129:2
**version** 46:19 50:20 55:4,6 85:16 109:9
**versions** 46:21 78:16
**versus** 4:19
**video** 1:19 2:20 4:2,13,17 29:25 37:13,17 78:4,8 108:8 108:12 122:20 122:24 125:19 125:23
**videographer** 5:4
**view** 26:20 120:18
**viewed** 58:24 88:18
**viewpoint** 26:23

**vineyard** 6:20
**virtual** 4:24
**virtually** 4:6
**visibility** 44:11 44:15 48:8 49:8 50:8,10 59:11 60:13,18 63:6,10 68:13 68:14,15,22 69:4,21 108:2 110:7,9 114:17 114:24
**vision** 93:14,20 94:13
**volatility** 34:10 34:14 61:24

**w**

**wainwright** 23:10
**waived** 3:7
**wall** 23:2
**waning** 112:7
**want** 9:16 35:9 41:15 43:23 51:19 61:14 62:3 91:4 93:11 97:3 100:10,25 101:20,22 109:15,23 118:15 121:24 124:25
**wanted** 28:17 28:24 34:23 35:20 45:25

47:2 57:9 61:13 93:2 116:16 117:22 117:23,25 118:4,12,14 122:7
**wanting** 44:4
**warner** 2:13 9:21 10:8
**way** 11:19 12:22 15:2,6 19:23 25:19 31:10 51:13,15 61:25 64:2 83:9 93:10 94:7 103:3 123:13
**ways** 49:10
**we've** 46:18 69:25
**weak** 66:10 67:3,7,24 69:2
**wearing** 87:20 87:25 88:5,20
**week** 9:13 28:12,15 29:3
**weekend** 71:9
**weekly** 29:2
**weeks** 9:5 27:2 27:21 28:7 33:12 47:8
**went** 14:22,24 17:18 50:14 66:21

**[wife - zoom]**                                    Page 32

| | | | |
|---|---|---|---|
| **wife** 13:9 | **works** 78:2 | **y** | **zachary** 39:4,6 |
| **william** 42:4,7 | 108:6 122:18 | **y** 12:16 17:6 | 52:21 56:22 |
| 52:24 56:22 | **world** 79:10 | **yeah** 69:7 | 70:19 72:6 |
| 70:19 72:5 | 86:6 92:19 | 71:15 109:5 | 76:21 80:11 |
| 76:23 80:10 | **write** 57:18 | 123:11 | 84:5 90:8 |
| 84:5 90:7 | 58:17 64:12,18 | **year** 12:19 | 104:16 119:16 |
| 94:21 95:25 | 65:23 66:5 | 13:11,24 14:2 | 119:21 121:7 |
| 99:22 104:15 | 68:22 78:16 | 14:3 15:14 | **zoom** 1:20 38:4 |
| 105:9 113:5,8 | 82:6 90:17 | 18:19 29:7 | |
| 119:17 121:6 | 93:10 100:6 | 43:12,12,14 | |
| **wisconsin** | 113:24 118:3 | 60:14 79:6 | |
| 13:23 | **writes** 42:10 | 85:25 105:21 | |
| **witness** 2:15 | 53:5,24 70:25 | 106:21 107:11 | |
| 4:10 40:14 | 73:7,9 74:22 | 107:19 115:11 | |
| 127:10 129:20 | 75:12 77:5,7 | 115:21 116:4 | |
| **wnj.com** 2:16 | 80:12 82:18 | 116:11,14 | |
| **word** 46:21 | 84:15 95:25 | 117:18 118:7 | |
| **words** 42:21 | 108:25 109:7 | 120:20 | |
| 60:22 69:7 | 113:10,16 | **years** 13:8,22 | |
| **wordsmith** | 116:11 117:15 | 14:24 15:7,16 | |
| 35:5 | 121:20,24 | **yep** 57:23 | |
| **work** 7:11,24 | **writing** 75:16 | **yesterday** 57:8 | |
| 14:16 18:14 | 120:18 | 60:8 | |
| 19:9 44:23 | **written** 9:25 | **york** 1:3,25 2:5 | |
| 57:5 64:3 | 10:6 62:19 | 2:5 4:21 6:6 | |
| 84:12 90:15 | 67:5 93:6 | 129:2,4,4,4 | |
| 95:5 100:4 | **wrote** 73:13 | **young** 14:13 | |
| 105:5 112:25 | 102:17 | **yourtest** 73:11 | |
| 117:10 121:15 | **ws** 48:22 | 74:4,18 82:8 | |
| **worked** 19:14 | **x** | **ypo** 14:14 | |
| **working** 18:12 | **x** 1:5,15 128:2 | **z** | |
| 18:24 32:6,19 | **xs** 54:23 | **zach** 19:19 20:9 | |
| 46:25 75:20 | | 21:2,3,16 | |
| 83:5 | | 120:17 | |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.