# **<u>Exhibit 31</u>**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

STADIUM CAPITAL LLC, on behalf of itself

and all others similarly situated,

                       PLAINTIFF,


        -against-    Case No.:

                     1:22-cv-06978-AS


CO-DIAGNOSTICS, INC., DWIGHT H. EGAN and

BRIAN L. BROWN,

                       DEFENDANTS.

------------------------------------------X

                     DATE: February 4, 2025

                     TIME: 4:11 P.M.




        CONTINUED VIDEOTAPED REALTIME

DEPOSITION of the Plaintiff, STADIUM

CAPITAL LLC, on behalf of itself and all

others similarly situated, by a Witness,

JOSEPH ZICHERMAN, taken by the Defendant,

pursuant to a Subpoena and to the Federal

Rules of Civil Procedure, held at the

offices of Baker & Hostetler LLP, 45

Rockefeller Plaza, New York, New York 1011,

before Karyn Chiusano, a Notary Public of

the State of New York.

Page 228

APPEARANCES:

KAPLAN FOX
  Attorneys for the Plaintiff
  STADIUM CAPITAL LLC, on behalf of itself
  and all others similarly situated
  800 Third Avenue
  New York, New York 10022
  BY: FRED FOX, ESQ.
    JASON URIS, ESQ.
  FFox@kaplanfox.com
  Juris@kaplanfox.com

BAKER & HOSTETLER LLP
  Attorneys for the Defendants
  CO-DIAGNOSTICS, INC., DWIGHT H. EGAN and
  BRIAN L. BROWN
  45 Rockefeller Plaza
  New York, New York 10111
  BY: ERICA BARROW, ESQ.
  ebarrow@bakerlaw.com

ALSO PRESENT:
  CHRIS MANCINI, Videographer

          *    *    *

Page 229

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

          *    *    *    *

Page 230

**JOSEPH ZICHERMAN**

THE VIDEOGRAPHER: Good afternoon.

We are going on the record at 4:11 P.M. on the 4th of February 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place, unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Joseph Zicherman, taken by counsel for defendants, in the matter of Stadium Capital LLC against Co-Diagnostics, Inc., et al, filed in the United States District Court, Southern District of New York.

Case Number 1:22-cv-06978-AS.

The location of this deposition

Page 231

**JOSEPH ZICHERMAN**

is Baker & Hostetler LLP, 4 -- 45 Rockefeller Plaza, New York, New York 10111.

My name is Christopher Mancini, representing Veritext. I am the videographer.

The court reporter is Karyn Chiusano from the firm Veritext.

I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the Noticing attorney.

MS. BARROW: Good afternoon.

Erica Barrow from the law firm Baker & Hostetler.

I represent the defendants in

2 (Pages 228 - 231)

Page 232

**JOSEPH ZICHERMAN**
this matter:  Co-Diagnostics, Inc.,
Dwight H. Egan, and Brian L. Brown.
MR. URIS:  Jason Uris, from
Kaplan Fox, on behalf of lead
plaintiff in the class.
MR. FOX:  Frederick Fox, Kaplan
Fox & Kilsheimer, on behalf of the
lead plaintiffs in the class.
THE VIDEOGRAPHER:  Will the
court reporter please swear in the
witness, and then counsel may
proceed?
THE COURT REPORTER:  Can you
raise your right hand, please?
(Witness complies.)
THE COURT REPORTER:  Do you
swear that the testimony you are
about to give will be the truth, the
whole truth, and nothing but the
truth, so help you God?
THE WITNESS:  Yes, I do.
J O S E P H   Z I C H E R M A N, called as
a witness, having been first duly sworn by
a Notary Public of the State of New York,

Page 233

**JOSEPH ZICHERMAN**
was examined and testified as follows:
THE COURT REPORTER:  Wonderful.
Can I kindly have your name;
spelling, please?
THE WITNESS:  Last name is
Z-I-C-H-E-R-M-A-N.
THE COURT REPORTER:  Wonderful.
First name?
THE WITNESS:  Joseph.
THE COURT REPORTER:  Wonderful.
THE WITNESS:  Thanks.
THE COURT REPORTER:  Wonderful.
Can I kindly have your address,
please?
THE WITNESS:  Yeah.
The address is 10794
Marblestone Court, Wellington,
Florida 33414.
MR. FOX:  Just before we start,
I just want to say one thing for the
record, which is:  Thank you,
Ms. Barrow for agreeing to start this
deposition at 4:00 to accommodate the
witness' work schedule.

Page 234

**JOSEPH ZICHERMAN**
And we note that the -- both
the plaintiffs' counsel and the
plaintiff were here promptly, at
4:00, and ready to proceed.
THE WITNESS:  Thank you, Ms.
Barrow.
I appreciate it.
MS. BARROW:  You're welcome.
EXAMINATION BY
MS. BARROW:
Q.   Mr. Zicherman, can you again
state your full name for the record?
A.   Joe -- Joseph Richard
Zicherman.
Q.   And what is your date of birth?
A.   9/25/42.
Q.   And what is your current
address?
A.   My current address is -- oh,
I'm sorry.  It's 10794 Marblestone Court,
Wellington, Florida.
Q.   Mr. Zicherman, we have met
before.  My name is Erica Borrow.
A.   Um-hum.

Page 235

**JOSEPH ZICHERMAN**
Q.   I am a litigation partner her
at this law firm, BakerHostetler, and I
represent the defendants in this case.
So, today, I'm going to be
asking you few questions, and hopefully you
can provide some answers.
A.   Great.
Q.   So, a couple of threshold
issue -- or questions.
Are you taking any medications
that may affect your memory today?
A.   No.
Q.   Any medications that may affect
your ability to answer questions truthfully
today?
A.   No.
Q.   Any other issues that may
prevent you from answering truthfully
today?
A.   No.
Q.   Great.
So, as we discussed with the
Court during the last hearing, it's very
important that we comply with certain

3 (Pages 232 - 235)

Page 236

**JOSEPH ZICHERMAN**
procedural rules for today's deposition, so I'm going to go over them with you now. Okay?

Mr. Zicherman, I'm going to ask that you respond orally, so no shakes of the head --

A. Sure.

Q. -- or no nods.

Your deposition is being transcribed by Karyn, and to make sure the transcript is accurate, I'll ask that you not begin answering a question until I finish answering -- asking it.

And I'll allow you to give a full answer before I interrupt.

That way, we don't speak over each other.

A. Great.

Q. Is that okay?

And it's important that your answers be oral. So, no head nodding, no "um-hum" type answers that are hard to transcribe.

Do you understand?

Page 237

**JOSEPH ZICHERMAN**
A. Um-hum.

No, just kidding. Just kidding.

Q. And Mr. Zicherman, your deposition is under oath. You were just sworn in.

If you do not understand a question, I'm going to ask you to reach out to me and ask for me to clarify.

And if you don't ask a clarifying question, I'm going to assume that you understand the question.

Do you understand?

A. Great.

Q. Objections.

From time to time, Mr. Uris will interpose some objections.

But unless you're explicitly told not to respond for the basis of privilege, you're going to have to respond after Mr. Uris interposes his objections.

Do you understand?

A. Yes.

Q. And breaks.

Page 238

**JOSEPH ZICHERMAN**
So, I will try my best to provide a break maybe every 60 minutes or so.

However, if you need a break, you are entitled to do so. This is not --

A. Thank you.

Q. -- a longevity contest.

You're, of course, welcome to have a snack or use the restroom.

I will just ask that we only take breaks after you answer a question. Okay?

A. Great.

Q. And in terms of abbreviations, throughout today's deposition, I am going to be referring to this case, which the videographer mentioned earlier on. It's Stadium Capital LLC versus Co-Diagnostics et al --

A. Um-hum.

Q. -- that's pending in the United States District Court for the Southern District of New York.

And so, at times, I will say

Page 239

**JOSEPH ZICHERMAN**
"this litigation" or "this case," and that's what I am referring to. Okay?

A. Great.

Q. And I will also similarly refer to "defendants."

The defendants are Co-Diagnostic -- Co-Diagnostics, Dwight H. Egan, and Brian L. Brown? Okay?

A. Great.

Q. Great.

And so, one more time, you understand that you have been sworn in, and you must answer truthfully and accurately with the penalty of perjury today; correct?

A. Um-hum.

One moment. Yes.

Q. Great.

And you're testifying today physically in our conference room at BakerHostetler, but your demeanor should be as if you are on the stand in a courtroom.

A. Yes.

Q. Okay.

MS. BARROW: Oh, sorry. Jason,

4 (Pages 236 - 239)

Page 240

**JOSEPH ZICHERMAN**

can you give him that version?

MR. URIS: Oh, thanks.

(Whereupon, Defendant's Exhibit 14, Defendant Co-Diagnostics, Inc.'s Notice of Deposition to Stadium Capital LLC, was marked for identification as of this date by the Reporter.)

Q.   Mr. Zicherman, I have handed you a document that has been Bates-stamped Defendants' Exhibit 14.

This is document is titled:

"Defendant Co-Diagnostics, Inc.'s Notice of Deposition to Stadium Capital LLC."

A.   Um-hum.

Q.   Do you recognize this document?

A.   I do.

I recognize the document.  I -- I don't know if I -- have I seen it before? I don't remember.

Q.   Okay.  As -- as you sit here today, what is your understanding of this document?

Page 241

**JOSEPH ZICHERMAN**

A.   This is a -- this is a Notice to me that will be -- that I will be deposed as a representative of Stadium Capital.

Q.   Great.

And Mr. Zicherman, if I could turn your attention to the third page that says:

"Attachment A to Defendant Co-Diagnostic, Inc.'s Notice of Deposition to Stadium Capital."

A.   Um-hum.

Q.   Do you see here where there are a list of topics?

A.   Yes.

Q.   Have you seen these topics before?

A.   Let's see.

"TOPICS."

I'm not sure.

Q.   Okay.  Can you take a moment to review it now?

A.   Yeah.

By all means.

Page 242

**JOSEPH ZICHERMAN**

(Witness reviews document.)

A.   These are the things that -- I don't know --

I'm not allowed to ask him a question.

Q.   No.

A.   No?

I just wanted a translation of this.

I'll -- I'll ask you the question:  These are the things that you're expecting me to do in the deposition?

Q.   Right.  Yes.

A.   Okay.

Q.   So, my --

A.   Okay.

Q.   -- my question for you is:  So this, as you noted, is a deposition notice.

A.   Right.

Q.   And so, this is what requires you to be here for today's deposition --

A.   Okay.

Q.   -- on behalf of Stadium Capital.

Page 243

**JOSEPH ZICHERMAN**

And so, the topics here are the topics in which are the scope of today's deposition.

A.   Right.  Fine.

Q.   So, I'm just going to direct you to the first one for -- as an example.

A.   Uh-huh.

Q.   Are you knowledgeable and prepared to testify regarding Topic 1:

"Plaintiff's answers to Defendants' Interrogatories"?

A.   Um.  I -- I am qualified and we spent some time together going over this.

So, depending upon what you specifically answer (sic), I would -- I'm qualified.

Q.   Okay.  Are you knowledgeable and prepared to testify regarding Number 2:

"Plaintiff's Responses" --

A.   Yes.

Q.   -- "to Defendants' Request for Production"?

A.   Yep.

Q.   Are you knowledgeable and

5 (Pages 240 - 243)

Page 244

**JOSEPH ZICHERMAN**
prepared to testify regarding Topic Number 3:
    "Documents Produced By Plaintiff in This Action"?
    A.  Yep.
    Q.  Are you knowledgeable and prepared to testify regarding Topic Number 4:
    "The facts and circumstances" --
    A.  Uh-huh.
    Q.  -- "relating to plaintiff's relationship with the proposed class counsel"?
    A.  Yes.
    Q.  Are you knowledgeable and prepared to testify regarding Topic Number 5:
    "Plaintiff's relationship with, knowledge of, or communication with any other punitive class member"?
    A.  Um.  I have had no direct communication with any other class members.
        So, I would have to answer

Page 245

**JOSEPH ZICHERMAN**
that -- well, I'm -- since I'm representing the class, I haven't had any direct communication with anybody else, just me.
    Q.  Okay.  I appreciate that.
        Are you knowledgeable and prepared to testify regarding Topic Number 6:
    "The facts alleged by Plaintiff in the Complaint"?
    A.  Yes.
    Q.  And so, my understanding is that you're reviewing these topics at the first -- for the first time.
        But if you skim them, are you knowledgeable and prepared to testify regarding all of these topics?
    A.  Yes.
    MR. URIS:  Objection.
    Objection.
    Q.  Would you like more time to review them?
    THE WITNESS:  What?  Can I answer?
    MR. FOX:  Yeah.

Page 246

**JOSEPH ZICHERMAN**
    THE WITNESS:  Just a joke.
    MR. FOX:  Yeah.
    You -- you -- you can answer.
    THE WITNESS:  He's a tough guy.
    MR. FOX:  What?
    THE WITNESS:  Tough guy.
    A.  Okay.  Um.  I'm -- I'm qualified to answer anything that this -- I don't want to go around in a circle on this, but anything that I've been involved with, I'm certainly happy to answer anything.
    Q.  And so, Topics 7 onwards relates to specific allegations in the Complaint.
        Would you say that you're knowledgeable --
    A.  Yes.
    Q.  -- regarding those allegations?
    A.  Yes.
    Q.  Okay.  And so, Mr. Zicherman, you've mentioned that you prepared for today's deposition.
        How did you prepare?

Page 247

**JOSEPH ZICHERMAN**
    A.  Well, I spent a few hours with the attorneys going over documents.
        And I've had a -- a trial run of a dep- -- deposition previously.
        And I -- then, of course, the episodes which caused us to be here were part of the -- of the initial preparation.
        And -- but I -- I think I'm pretty prepared to answer these questions.
    Q.  And you mentioned you had met with your counsel.
    A.  Yes.
    Q.  Who is your counsel?
    A.  These -- both these gentlemen.
    Q.  And what are their names?
    A.  What are their names?
        Jason Uris and -- and Fred Fox.
    Q.  And they're from the law firm Kaplan Fox?
    A.  They -- they are.
    Q.  And when did you met with --
    A.  Yesterday, I met with them.
    Q.  Where?
    A.  In my apartment.

6 (Pages 244 - 247)

Page 248

**JOSEPH ZICHERMAN**

Q. And you said that you met with them for a few hours?

A. Yeah.

Q. And did you discuss the deposition with anyone else?

A. No.

Q. And your meeting with the gentlemen from Kaplan Fox, was anyone else present?

A. No.

Q. And you said "a few hours," would you say --

A. I'd say two and a half, maybe. Until I got hungry.

Q. And what were -- without disclosing the actual content, what were the general topics or the --

A. He showed us -- they showed me a lot -- a lot of the documentation that I had been presented -- some of it, I had been presented before.

They familiarized me with some of the -- a lot of the information that I -- and I reacquainted myself with some of

Page 249

**JOSEPH ZICHERMAN**

the information.

Q. About how many documents did you review?

A. I don't know.

A dozen or so.

Q. And in terms of types of documents, were they court filings?

A. They were -- types of documents?

There were -- you know, I -- there -- there were -- they're official legal documents and I don't know what you would call them.

Q. Did you --

A. I don't want to plead dumb, but I'm not -- it's not my business.

Q. Sure.

Did you take any notes during your preparation?

A. No.

Q. Did you bring any notes with you today?

A. No.

Q. Mr. Zicherman, you attended a

Page 250

**JOSEPH ZICHERMAN**

hearing remotely with the court on January 22nd, 2024; correct?

A. Uh-huh.

THE COURT REPORTER: I didn't get a response.

A. Yes.

THE WITNESS: Sorry.

Q. Just as a reminder we have to --

A. My bad.

Q. -- verbally respond.

Did you prepare for that hearing with the court in January?

A. Did I prepare for that hearing with the court -- the court in January?

Yes.

But a little more -- a little more because I was in Florida. And then, I was a little more -- by phone and -- and remote with my attorneys.

Q. So, you met with your attorneys in preparation for the January 22nd hearing?

A. Yes.

Page 251

**JOSEPH ZICHERMAN**

Q. And over the phone; correct?

A. Over the phone.

Q. How long --

A. Remotely.

Q. How long did you discuss?

A. It was a bunch of different times.

So, collectively maybe three hours.

Q. And how many phone calls did you have with your attorneys?

A. Five? Six? Four?

You know, it might have been eight.

I don't know.

Q. Did you review any documents in preparation for that hearing?

A. No.

Q. Other than communication with counsel, what, if anything, did you do in response to that hearing?

A. In response to the hearing?

You mean afterwards?

Q. Yes.

7 (Pages 248 - 251)

Page 252

**JOSEPH ZICHERMAN**

MR. FOX: We object to the form of the question.

But you may answer.

THE WITNESS: What --

MR. FOX: What, if anything, related to the case or what, if anything, did he go to dinner afterwards or what?

MS. BARROW: Sure.

A. I had shrimp.

Q. Mr. Zicherman, after the hearing, did you do anything as it pertains to this case in response to what you were told at the hearing?

A. No.

Q. Mr. Zicherman, I'm going to ask you some -- a few questions about discovery in this case.

Discovery is basically a fancy word for the evidence that the attorneys --

A. Sure.

Q. -- exchanged between the parties.

Mr. Zicherman, did you collect

Page 253

**JOSEPH ZICHERMAN**

evidence for this case?

A. No.

Q. Did you instruct anyone to collect evidence for this case?

A. The only thing that I did was appoint -- was when this -- I don't -- I don't want to put words in anybody's mouth, but when this incident occurred, I appointed Jason with the fact that this was a -- I felt it was a terrible way to present information.

I mean, I -- I'm reaching for words right now.

But -- but I just felt that what occurred, the -- the incident that occurred was sort of -- it was over the line.

And I really felt there was an issue here because it was that misleading.

And then, I -- I worked with him thereafter and --

But your question -- your question -- specifically, what do you want to know?

Page 254

**JOSEPH ZICHERMAN**

Q. And just to clarify: When you say "the incident," you're pertaining to what exactly?

A. There was a -- a -- a -- a conference, and there was a call. And the CEO appeared -- and said -- and gave a lot of information.

And three weeks or thereabouts later, the company came out with earnings, and I actually was listening to the call about the earnings following the earnings.

And I thought it was actually a different company because I said -- I said:

"What's he talking about?"

Q. Okay. And which company were you listening to the call --

A. For --

Q. -- about?

A. -- Co-Diagnostics.

Q. And so, when you say "incident," you're talking about the representations that were made during that conference?

A. Yes.

Page 255

**JOSEPH ZICHERMAN**

Q. Okay. And just to pivot back:

So after you learned about the disclosures about the earnings for Co-Diagnostics, fast forward to when the case actually started and you were working with Mr. Uris, did you work with anyone, including counsel or family members or anyone else at your office, to collect evidence for this --

A. No.

Q. -- case?

MR. URIS: Objection.

MR. FOX: Can you clarify what you mean by "evidence"?

MS. BARROW: Sure.

MR. FOX: He -- he might not understand what you mean by that.

THE WITNESS: I'm -- I'm sure she means like a memo or a -- or a transcript; right?

MR. FOX: No. No.

Let her clarify what she means.

MS. BARROW: Sure.

Q. So --

8 (Pages 252 - 255)

Page 256

**JOSEPH ZICHERMAN**

THE WITNESS: I can help her.

MR. FOX: No. No. No.

Just let her -- let -- let Ms. Barrow clarify.

Q. So once this case was filed --

A. Uh-hum.

Q. -- and we were in litigation, did you collect any e-mails that would be produced in this case?

A. I offered my -- whatever I had to my attorneys.

Q. And when you -- and when you say "offer," you mean you --

A. I gave --

Q. -- allowed them access to your e-mails?

A. I gave them access -- I gave them access to any hard copy information that I had.

I allowed them, also, to go into my various computers and get data that they -- I didn't even understand what they were looking for, but they said it was imperative that they go into my computers.

Page 257

**JOSEPH ZICHERMAN**

And they -- they hired a computer fellow, in Florida, to come in and spend about a half-hour with me going into my computer.

And then, yesterday they dug up a little bit more, and they've now -- I have my phone and my iPad. Not my pacemaker.

THE WITNESS: No. I'm just kidding.

Q. And you mentioned that they hired a computer fellow to come to your place in Florida.

A. Yeah.

Q. When -- when did that occur?

A. Three weeks ago, maybe, two weeks ago.

Q. Did anything like that happen prior to three weeks ago?

MR. FOX: Objection.

A. Anything like what?

Q. Where someone gained access to your e-mails for this case?

A. No.

Page 258

**JOSEPH ZICHERMAN**

I'm not that interesting.

Q. And what is your understanding of what the computer fellow did when he gained access to your computer three weeks ago?

A. I'm going to assume that he was looking for anything that had Co-Diagnostics' name on it.

And if that were the case, I would've assumed that he would then seize the document or gather the document.

Q. Did you --

A. And that -- that's what I would assume.

Q. Did you give him consent to retrieve any documents?

A. Ab- -- absolutely.

Q. And you mentioned that you also met yesterday, where they reviewed your computer, your iPad and your phone; correct?

A. Uh-hum, yes.

Q. Did you give Kaplan Fox permission to collect evidence --

Page 259

**JOSEPH ZICHERMAN**

A. Sure.

Q. -- from those devices?

A. Why not?

Q. And prior to yesterday and the three weeks ago, was there ever a time where you gave consent for anyone to collect evidence?

A. No. No way.

Q. In connection with what we'll call "document collection" or "evidence collection," were you asked questions to identify where the evidence would be located?

A. Can you repeat that question, please?

Q. Sure.

How did you identify where Kaplan Fox and the computer fellow would look for evidence?

A. My -- any -- my instructions from my attorneys were that anywhere that there would be information on a -- any kind of a device.

Q. And thus, you knew to look at

9 (Pages 256 - 259)

Page 260

**JOSEPH ZICHERMAN**

your computer or your iPad or your phone; correct?

A. Well, I didn't think my phone, but I was told to dig up my phone. So since I al- -- it's always in my ear, it was easy.

Q. Did you look at any hard copy files?

A. No.

Q. Do you have any hard copy files?

A. No.

Q. Did you provide any credentials to log into your trading account?

A. Yes.

Q. Did you provide any other types of credentials?

A. What does that mean?

Q. Perhaps your login information for any other account?

A. Well, no.

We -- we're dealing in my -- in my Stadium Capital account.

So there's -- there are login

Page 261

**JOSEPH ZICHERMAN**

credentials, and I provided them to both the fellow who came to the house and my attorneys.

Q. And so, the Stadium Capital credentials, is that -- what does that gave -- give you access to?

A. It gives me access -- well, I -- I -- I have a fairly active trading account, and I -- it gives me access to -- to -- to everything that I possibly need from -- from outside research to my clearing broker to -- to the -- it gives me access to the outside world, basically.

Q. And on this platform, you mentioned that there's outside research saved?

A. Is there out- -- I can -- I can find it. There's nothing I can't find.

It's just -- it's kind of --
I'm trying to give you an analogy. It would be -- be like going into Google.

And, you know, if you say to me:

"What do you get when you go

Page 262

**JOSEPH ZICHERMAN**

into Google?"

I would say:

"The world."

Q. I see.

So is there anything saved in this platform?

A. Is there anything saved?

Yeah. I would think that everything is saved, depending upon the subject. I mean, I subscribe to a lot of different services.

I have a clearing broker, at Goldman Sachs, I do a lot of business with interactive brokers, I -- but it's all there, and it's all saved, and -- and whatever was related to Co-Diagnostics was provided.

Q. And do you have analyst reports available?

A. Do I have an- -- of course.

Q. Do you have any, as -- as it pertains to Co-Diagnostics?

A. I don't -- I -- you know, at this stage of the game, we're dealing now

Page 263

**JOSEPH ZICHERMAN**

with three years old, so I don't know -- you know, there was -- I felt that there was a -- a currency that was -- that was bad, and I detailed the information and then, I -- I subsequently turned it over to my attorneys.

But any kind of research reports are all public information, as you know. So they're available.

I don't know what anybody said after -- after -- you -- you know, when you -- when you have a position like that that drops out of the sky.

In terms of value? You're not really looking for a lot of analysts' support; you -- you're looking to jump out window, almost, so...

MR. URIS: And I just -- I just want to note on the -- note for the record that at the earlier deposition, you asked various questions about any analysts' support that Mr. Zicherman reviewed as to Co-Diagnostics, and he's already

10 (Pages 260 - 263)

Page 264

**JOSEPH ZICHERMAN**
answered those questions.
MS. BARROW: Okay. So I'm going to object to the speaking objection and the attorney testifying.
Q. And so, Mr. Zicherman, did you provide any search terms to your counsel or anyone else to help find the documents that would be produced in this case?
MR. URIS: Objection.
A. Search terms?
You -- you mean, like -- like, how to find certain things?
Q. Correct.
A. Yes, I do.
Q. Okay. And do you recall what those search terms are?
A. Whatever I used in my computer, iPad or phone to help me accomplish what I'm trying to accomplish.
I'm a technological baboon.
And as such, I require assistance to dig up things and find things.

Page 265

**JOSEPH ZICHERMAN**
Q. And, Mr. Zicherman, you previously testified that you do use e-mail; correct?
A. I definitely use e-mail.
Q. And is it fair to say that you regularly use the e-mail address joez6@aol.com?
A. That's what I currently use, yes.
Q. And you previously used the e-mail address joez6@stadiumcapitalllc.com?
A. That's correct.
Q. Did you search joez6@aol.com?
A. I didn't do searches.
Q. And did you also search --
A. Yes.
Q. -- joez6@stadiumcapitalllc- --
A. Yes.
Q. -- .com?
A. Yes.
Q. Mr. Zicherman, how many documents were produced in this litigation?
A. I don't know.
MR. FOX: Objection.

Page 266

**JOSEPH ZICHERMAN**
MR. URIS: Objection.
A. I don't have the slightest idea.
Q. Is it your understanding that only four documents were produced by Stadium Capital?
A. No.
It's not my understanding. I don't have the slightest idea. It could be four, it could be 12, it could be 30.
Q. Did you review any documents that were produced in this case in preparation --
A. I reviewed --
Q. -- for today's deposition?
A. -- I reviewed a number of documents yesterday, but I don't specifically recall if they were on my -- I'm sure that you can...
Q. And for the preparation that you had for today's deposition, were any of those documents for documents that were produced by Stadium Capital?
MR. URIS: Objection.

Page 267

**JOSEPH ZICHERMAN**
A. I don't understand the question.
Q. Mr. Zicherman, you previously testified that you reviewed a few documents --
A. Yes.
Q. -- to prepare for today's --
A. Yeah.
Q. -- deposition.
A. Absolutely.
Q. Is it your understanding that any of those documents were documents that were produced --
MR. FOX: I --
Q. -- to the defendants --
MR. FOX: I --
Q. -- in this case?
MR. FOX: I -- I -- I would object.
I mean, I think counsel's starting to touch on work product and what particular documents he reviewed and in what order, and I think that's -- I don't think that's

11 (Pages 264 - 267)

Page 268

**JOSEPH ZICHERMAN**

proper, and the attorney-client work product.

Q.   In preparation -- preparation for today's deposition, did you review any documents than produced to the defendants?

A.   I'm not sure.

I reviewed a whole bunch of documents, but nobody said to me:

"This may be asked tomorrow, or this -- you may be shown this tomorrow, or you may have to sign something or whatever."

You know, there was never a destination point on anything.  It was just the -- the -- that -- that -- that we'd rather -- we did a very thorough job of looking at some of -- a lot of these -- whatever documents there were yesterday.

Q.   Mr. Zicherman, you mentioned that you looked for additional documents yesterday.

Do you know if additional documents were produced?

A.   I didn't look for any

Page 269

**JOSEPH ZICHERMAN**

additional documents.  I gave Jason all of my credentials, and he went in to -- because he understands computers and I don't.

If -- if I was doing it, we would not be here, I'd still be working on it.

But he went -- I gave him my credentials.  He went in, and he got what he needed.  Although, I don't think that we found anything with Co-Diagnostics' name on it.

Q.   Okay.  So it's your understanding that after Mr. Uris searched for additional discovery, nothing else was produced; correct?

A.   That's correct.

Q.   Okay.  From January 1st, 2021 to August 31st, 2022, did you communicate with David Sherman?

A.   I --

MR. URIS:  Objection.

MR. FOX:  Objection.

THE WITNESS:  What do I do?

Page 270

**JOSEPH ZICHERMAN**

Should I answer it?  Oh.

MR. URIS:  Yeah.

MR. FOX:  I mean --

THE WITNESS:  Oh.

MR. FOX:  -- as it relates --

A.   Oh, yeah.

I play golf with him.

Q.   And did you communicate with him?

A.   Well -- well, I talk to him, when I play golf.

Q.   And did you communicate with him via e-mail?

MR. FOX:  Objection.

About Co-Diagnostics?

MS. BARROW:  No, in general.

MR. FOX:  About anything?  Any subject?

MS. BARROW:  Yes.

MR. URIS:  Objection.

MR. FOX:  Is there --

A.   Yes.

MR. FOX:  -- any topic --

THE COURT REPORTER:  One at a

Page 271

**JOSEPH ZICHERMAN**

time, gentlemen, one at a time.

A.   Yeah, no.

I -- she only spoke about what we would meet at the course and what time we were going to have lunch and how many balls I lost and things like that.

Q.   So you spoke via e-mail, as well, you said?

A.   Oh, I would -- I text him regularly.  More text than e-mail, but...

Q.   So it seems like you communicated with Mr. Sherman between January 1st, 2021 through August 31st, 2022 via text, e-mail and in person.

A.   Sure.

He's a very close friend of mine.

Q.   And during that time frame, did you discuss Co-Di- -- Di- -- Co-Diagnostics?

A.   I don't -- I don't think so.

You know, I -- I don't handle any -- in fact, I -- in 1998, I stopped handling clients.  And therefore, any

12 (Pages 268 - 271)

Page 272

**JOSEPH ZICHERMAN**

associates, like Mr. Sherman or anybody else, I would -- I wouldn't -- I wouldn't -- I would never be able to tell you if I spoke to them about a particular stock because I officially ceased to handle clients after doing it for 21 years.

So I -- I would not -- I would not of even -- in fact, I wouldn't imagine I would be discussing it with him.

Q.   Was Mr. Sherman a prior client --

A.   No.

Q.   -- of yours?

A.   Never.

Q.   Okay.  So what is your relationship with Mr. Sherman?

A.   Friend.

Q.   And what is Mr. Sherman's relationship with Kaplan Fox?

MR. FOX:  Objection.

A.   Don't know.

Q.   Did you ever discuss Kaplan Fox with Mr. Sherman?

A.   No.

Page 273

**JOSEPH ZICHERMAN**

Q.   Did you look for communication with Mr. Sherman, as evidence for this case?

MR. URIS:  Objection.

A.   Their what?  No.  No.

Mr. Sherman and I never -- there was no relevance to -- to Co-Diagnostics.

I've never mentioned it to him, I've never discussed it with him, and I don't even know what his involvement is with these things.

Q.   Mr. Zicherman, you previously testified that Co-Diagnostics made certain statements at a conference; correct?

A.   Yes.

Q.   And you previously testified that you've got a transcript of statements made by Co-Diagnostics.

A.   Yes.

Q.   And did you search -- did you search for that transcript of the conference?

A.   I did.

Page 274

**JOSEPH ZICHERMAN**

Q.   And did you find it?

A.   Yes.

Q.   And did you provide that to your attorneys?

A.   Yeah.

I told them where I found it.

Transcripts can be found in 50 different places.  You -- I commonly use a service, called Seeking Alpha, which is very timely, and it comes up with a -- very accurate transcripts.

Q.   And Mr. Zicherman, you testified previously that Co-Diagnostics is a medical testing company; correct?

A.   They are a -- they're a testing company, that's correct.

Q.   And how did you become aware of that?

A.   How did I become aware of it?

Well, COVID --

MR. URIS:  Objection; asked and answered.

Q.   You can answer.

A.   Okay.

Page 275

**JOSEPH ZICHERMAN**

MR. FOX:  Well, if he's previously answered the question -- I mean...

MS. BARROW:  We're not going to go back and forth like we -- you're not testifying; he is.

MR. FOX:  Well, I -- I understand but --

THE WITNESS:  Yeah.  But I --

MR. FOX:  But wait.  Wait. Wait.  Wait.  Wait.

Just wait a second.

You -- you're -- you're here to ask questions, but if's already been asked and answered...

MS. BARROW:  Then what?

MR. FOX:  I -- I don't think that's fair.

MS. BARROW:  Okay.

MR. FOX:  -- you ask him --

MS. BARROW:  You can lodge your objection --

MR. FOX:  And I did.

MS. BARROW:  -- tell the Judge.

13 (Pages 272 - 275)

Page 276

**JOSEPH ZICHERMAN**

MR. FOX: I -- and I did.

MS. BARROW: Thank you. Appreciate it.

MR. FOX: I did.

Q. Okay. Mr. Zicherman.

A. The question is again?

Q. How did you become aware that Co-Diagnostics is a medical testing company?

MR. FOX: You may answer.

A. How?

Because there were several medical testing companies given the COVID outbreak.

And I had had a personal experience with COVID. I was probably the -- one of the first ten people in America to get COVID.

And I got tested on March the 9th of 2020, and I got my results back on March 26th of 2020.

I was tested at the Wellington Medical Center and it took 17 days to get my results back.

Page 277

**JOSEPH ZICHERMAN**

So, I was always a little bit curious about it.

Q. When you were tested in March of 2020, were you tested with a Co-Diagnostics' product?

A. No.

Q. Do you recall --

A. No idea.

I went to an emergency room.

Q. And --

A. I said: "Kill me."

Q. And you mentioned you became "curious."

So, how did you learn more about Co-Diagnostics?

A. Just it's -- it's the same way you learn about car companies, when you -- when you are interested in cars, you -- you understand the kind of car that you're looking at and you understand what you're trying to accomplish.

I was -- there was a -- an outbreak of COVID and I was looking to see -- it seemed to be reasonable that

Page 278

**JOSEPH ZICHERMAN**

there was several ancillary things, groups that become much -- very much more in demand when there's an outbreak.

For example, face mask companies. There were many of them, similar to them. Or some of them.

So, testing companies would be one.

So, I -- I did a little homework, not a lot of homework, a little homework, on -- on testing companies and found out that Co-Diagnostics was -- had a COVID test.

Q. When you say that you "did a little homework," what did you review to determine that Co-Diagnostics --

A. I had spoke to a couple of people and I said:

"Who is testing for COVID?"

That's usually the way that I do things. After being in Wall Street as long as I had been on Wall Street, I deal with just survivors and they -- survivors tend to be pretty clever and pretty smart

Page 279

**JOSEPH ZICHERMAN**

and pretty learned.

So, I -- I asked a couple of friends of mine:

"Who tests for COVID?"

Q. And who was the friend that informed you about Co-Diag- -- Co-Diagnostics?

A. A friend of mine -- I don't need -- I don't think I have to give you his name.

THE WITNESS: Do I?

MR. FOX: You should answer Ms. Barrow's question.

Yes.

THE WITNESS: I should? Okay.

A. It -- I mean, I'm happy -- there's no great secret.

His name is Andy Pippa and Mark Neuberger. More Mark Neuberger than anything else.

Q. And what does Mark Neuberger do for a living?

A. Mark Neuberger used to run the options desk at Morgan Stanley for 20-odd

14 (Pages 276 - 279)

Veritext Legal Solutions
www.veritext.com                888-391-3376

Page 280

**JOSEPH ZICHERMAN**

years.

And now he -- he works at a firm, which is a research firm that does executions. And he gets paid in soft dollars and I am a client of his.

And -- and more -- more so, Mark is incredibly smart and incredibly experienced.

And if he doesn't have the answer, he will -- he -- he's my research guy.

Just so you know, also, there's a little byproduct here. I am not -- as I said: I'm a technical baboon. I don't have Bloomberg.

You have to be really skilled to do Bloomberg and I don't have it.

So, Mark has Bloomberg, so...

Q. What research firm does Mr. Neuberger work for?

A. AXIOM Partners (sic).

Q. Was Mr. Neuberger invested in Co-Diagnostics at any point?

A. No.

Page 281

**JOSEPH ZICHERMAN**

MR. URIS: Objection.

A. Not to my knowledge.

Q. Did Mr. Neuberger recommend that you invest in Co-Diagnostics?

A. No.

Q. What does Andy Pippa do for a living?

A. He -- he's in -- he's ill now, but he's -- he trades his own money in Puerto Rico.

He lives in Puerto Rico.

Q. Was Mr. Pippa or was Mr. Pippa at any point invested in Co-Diagnostics?

MR. URIS: Objection.

A. No.

Q. And so you said he is employed or --

A. Hum?

Q. Where is he employed now?

A. He's self-employed.

He's retired, basically.

Q. Was he retired as of 2021?

A. He's been retired for about ten years; and he does this passively.

Page 282

**JOSEPH ZICHERMAN**

Because I get most information from Mr. Neuberger and -- because he has great technological capabilities.

If I -- if I ask him: Who is testing for COVID? And he doesn't know, which he'd likely not to know, he will find it out for me in a minute.

Q. And you testified you don't have a Bloomberg terminal; correct?

A. I don't.

Q. What was the screen you had open during your prior deposition?

A. TD Ameritrade.

Q. And so, that's a platform that you can conduct trades on?

A. Yes.

It's for baboons.

Q. When did you have that conversation with Mr. Neuberger regarding Co-Diagnostics?

A. I'm sure around the time that -- that a -- that I got involved in trying to capitalize off testing companies.

Q. Which is when?

Page 283

**JOSEPH ZICHERMAN**

A. Well, it would be in 2022.

Is that right?

Q. 2022?

A. 20- -- wait. '21? I don't -- I don't --

MR. FOX: To the best -- you should answer Ms. Barrow's questions --

A. It was --

MR. FOX: -- to the best of your recollection.

A. It was prior to listening to the call from the CEO.

Q. Okay. So, I can represent to you, the pandemic, in earnest, started in America in March of 2020.

So, was it after March of 2020?

A. It was after -- definitely after March of 2020.

Q. And was it before March of 2021?

A. Don't -- don't remember.

Q. Okay. And when was your conversation with Mr. Pippa about

15 (Pages 280 - 283)

Page 284

**JOSEPH ZICHERMAN**

Co-Diagnostics?

A.   Oh.  I think I -- I -- I -- I think I had a -- if I remember, he -- he wasn't aware -- I asked him if he knew of any -- anything about companies that were involved in this because I knew he had been involved in a face mask company.

And he didn't have any great input.

THE VIDEOGRAPHER:  Hold on.

I think Mr. Zicherman you might be brushing against the microphone.

THE WITNESS:  Oh.  I'm terribly sorry.

Okay.  Is that better?

THE VIDEOGRAPHER:  Yes.

THE WITNESS:  Sorry.

THE VIDEOGRAPHER:  If you want to leave it on the table, that should you work.  Just --

(Witness complies.)

THE VIDEOGRAPHER:  Yeah.

THE WITNESS:  Just let me know if it's okay.

Page 285

**JOSEPH ZICHERMAN**

THE VIDEOGRAPHER:  Just as long as it's facing you.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Thank you.

Q.   Mr. Zicherman, after you had the conversation with Mr. Neuberger and Mr. Pippa -- Pippa, what did you do next --

MR. FOX:  Objection.

Q.   -- as it pertains to the purchase or sale of securities of Co-Diagnostics?

A.   I have no idea what I did next.

Probably had dinner.

Q.   In January of 2021, were you aware of the value of Co-Diagnostics Securities?

A.   I'm not sure.

Q.   When was the first time you became aware of the value of Co-Diagnostics stock?

A.   When I started to look up companies that -- that were involved in that business of Co- -- of -- of testing.

Q.   When was that?

Page 286

**JOSEPH ZICHERMAN**

A.   It was in '21 and '22.

Q.   So, sometime within January --

MS. BARROW:  Or sorry.

Q.   Sometime between -- during 2021 and 2022 --

A.   Yes.

Q.   -- you became aware of the value of Co-Diagnostics?

A.   I became the value of an industry (sic) that was -- that was becoming a burgeoning industry because of circumstances that were occurring with the pandemic.

Q.   And specifically, Co-Diagnostics was part of that process?

A.   It was one of the companies that -- that I -- it -- it was a company -- let me see how I could phrase this so I'm clear.

It was a company that was -- that I found out about that was -- that was involved in testing for a variety of pandemics.

So, if you remember, there was

Page 287

**JOSEPH ZICHERMAN**

an Ebola outbreak at that time and some other stuff.

Q.   And did you review any documents to become aware of the value of the Co-Diagnostics Securities?

A.   No.

Q.   Any financial analysis reports?

A.   Yeah.

You know, I -- I do it the way I always do it:  I look at the company and I see what -- I -- I look at where it's been, where it's going -- sorry -- where it's been, and what caused it to be worth what it's currently worth, and ideally, what it will be worth in the future.

Q.   Would that --

A.   But I -- I do -- I do all my own work.

Q.   Did you review any valuation appraisals of Co-Diagnostics?

A.   Yeah.

Q.   Did you review any models of Co-Diagnostics?

A.   Models?  No.

16 (Pages 284 - 287)

Page 288

**JOSEPH ZICHERMAN**

No models.

Q.   Any projections of Co-Diagnostics?

A.   Sure.

Q.   Any forecasts?

A.   I -- yeah.

You know, I -- I -- I don't remember it, specifically.

But I always look and see who has what opinion on it, what firm follows it?  What -- who -- what the earnings estimates are?  What the revenue estimates are?  What -- what new products they have?  What projections there are?

So, I do all my homework, but I do it in a much more rudimentary way than -- than someone that's just coming out -- you know, that has just got his -- his MBA from Harvard.

Q.   And where did you get this information?

A.   Where did I get it from?  A variety of places.  You know, Bloomberg is -- is one place.  And, you know, at

Page 289

**JOSEPH ZICHERMAN**

least I can dial into Bloomberg, the website.

And asking people questions.  I -- I surround myself with some pretty talented people, who -- who are -- I can rely upon to answer questions for me.

Q.   And who are those people, as it pertains to information regarding --

A.   Former colleagues.

Q.   -- Co-Diagnostics?

A.   Former colleagues.

Q.   Who are those former colleagues?

A.   Oh, no.  Nothing pertains to Co-Diagnostics.

Q.   Okay.  So, just as it pertains to Co-Diagnostics, did you review any tracking or plans for Co-Diagnostics?

A.   No.  No.

There was no reason to.

Q.   And in connection with this lawsuit, did you search for any of those documents that you reviewed regarding Co-Diagnostics?

Page 290

**JOSEPH ZICHERMAN**

A.   No.  No.

The episode that occurred was very cut -- very cut and dry for me.

Q.   Okay.  So, Mr. Zicherman, you previously testified that Stadium Capital reviews between five to 12 third-party analysts' opinions; correct?

A.   You know what, if I -- you say I previously testified.

I -- it's -- it's a unlimited number.  I do it until I get satisfied that I have the proper input.

Q.   How many analyst reports did you review until you felt satisfied as it pertained to Co-Diagnostics?

A.   No idea.

MR. URIS:  Objection.

A.   No idea.

Q.   In June of 2022, did you review any can -- any analyst reports?

A.   I don't remember.

Q.   In July of 2022, did you review any analyst reports?

A.   I don't remember.

Page 291

**JOSEPH ZICHERMAN**

It wasn't important to look at analyst reports.

It -- it -- the only thing that was important was what's going on now, and the trajectory of the business.

If you -- if you have the good fortune to listen to a CEO and he says that:

"We're going to do a million dollars this quarter, and we're going to do three million next quarter," then you know you have a big trajectory, to just keep it simple.

And all I was really concerned with was the dialogue that was going on --

Q.   And --

A.   -- from the CEO.

Q.   And how did you learn what the dialogue was from the CEO?

MR. URIS:  Objection; asked and answered.

A.   I've -- I've already answered that, I think.  It's answered.

Q.   I'm just making sure I am

17 (Pages 288 - 291)

Page 292

**JOSEPH ZICHERMAN**

understanding.

A. Transcripts.

Q. Transcript of a analyst at a conference?

A. Okay. Yeah.

Transcript -- yeah, as -- as soon as -- usually, within about 12 hours or so, transcripts become available.

And I -- I do -- I do read them a lot.

Q. So, you listened to -- and -- and you read the transcript; correct?

A. Hmm?

Q. You listened --

A. No. No. No.

I think I listened to an overview. I didn't listen to the whole call. I don't -- I don't remember, actually.

But I definitely read the transcript and familiarized myself with it.

Q. Okay.

A. Because always, by the next day, the transcripts are out, and you can

Page 293

**JOSEPH ZICHERMAN**

always enter them the following day pretty informed.

Q. Mr. Zicherman, you previously testified that Stadium communicated with Jeffrey Kiley regarding Stadium's decision to purchase, sell, or hold Co-Diagnostics Securities.

MR. URIS: Objection.

A. I don't I said that. I don't think I said that.

I think, if I did say that, that's incorrect.

Q. Okay.

A. I -- and I may -- he is a -- a dedicated biotech investor, in California.

And I -- I think what I testified to, and if I didn't, then I should have, is that I asked him if he knew anything about it.

And I don't remember his answer.

Q. So, you're clarifying that you spoke to Mr. Kiley regarding whether or not he knew anything about Co-Diagnostics?

Page 294

**JOSEPH ZICHERMAN**

A. Right. That's right.

Q. And you don't recall his response?

A. I don't recall his response.

Q. Okay. Did you communicate with anyone else regarding Stadium's decision to purchase, sell, or hold -- hold -- hold Co-Diagnostics securities?

MR. URIS: Objection.

A. I don't remember.

I don't -- I don't think so.

Q. Okay. Just so -- as a reminder, we can't talk over each other.

Your response is you don't recall anyone else?

A. That's correct.

Q. Did you search for communications for any other individual that you spoke to regarding Co-Diagnostics' stock?

MR. FOX: Objection.

MR. URIS: Objection.

A. The question is, please?

Q. Did you search for

Page 295

**JOSEPH ZICHERMAN**

communication regarding Co-Diagnostics' Securities, in connection with this lawsuit?

A. Probably.

Q. And what date range?

A. Oh, I don't know. No idea.

MS. BARROW: Before we go on to the next document, would you like to take a break?

THE WITNESS: You know what I'd like to do?

I'm -- I'm fine.

Can I just look at my phone for one second?

MR. FOX: Well, why don't we take a -- a -- a break so --

THE WITNESS: All right. Yeah.

MR. FOX: You know what? Let's take a break.

THE WITNESS: You want to take a break?

MR. FOX: Yeah.

THE WITNESS: Okay.

MS. BARROW: Okay.

18 (Pages 292 - 295)

Page 296

**JOSEPH ZICHERMAN**

MR. FOX: You can --

THE WITNESS: Okay.

MR. FOX: -- look at your phone and --

THE WITNESS: I can look at my phone? It's now or --

MR. FOX: During then break, when we're off --

THE WITNESS: During the break.

MR. FOX: -- the record.

THE WITNESS: That's --

MR. FOX: Not while we're on the record.

THE WITNESS: Okay.

MR. FOX: Let's go off the record.

THE VIDEOGRAPHER: The time is 5:02 P.M.

We are now off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: The time is 5:14 P.M.

We are now on the record.

Page 297

**JOSEPH ZICHERMAN**

Q.   Mr. Zicherman, I am going to hand you a document that has been previously marked as Defendants' Exhibit 2 (handing).

A.   Thank you.

MR. URIS: Thanks.

MR. FOX: Thank you.

A.   Okey-doke.

Q.   Do you recognize the document?

A.   Do I recognize the document?

I think I probably have seen it, in passing.

However, it looks to me like a document that you're requesting information.

Q.   Great.

MS. BARROW: So let the record reflect: Defendants' Exhibit 2 is titled:

"Defendants' First Set of Requests For Production to Plaintiff Stadium Capital LLC."

Q.   That is correct, Mr. Zicherman.

So if I can turn your attention

Page 298

**JOSEPH ZICHERMAN**

to Request Number 11, Subsection F.

(Witness complies.)

A.   Item 11?

Q.   Yes.

A.   Got it.  Okay.

Q.   So other than the deposition you and I had and today, do you recall ever looking at this document before?

A.   I've looked at a bunch of documents, and I don't specifically recall this one.

Q.   And so, I just sort of picked this by random, but -- so Request Number 11 Subsection F states:

"All tax returns and tax return schedules or other Documents or Communications reflecting how the transactions were reported for tax purposes."

Do you see that?

A.   I don't.

I'm -- am I looking at the right thing:  Page 6?

Q.   It should be Page 8.

Page 299

**JOSEPH ZICHERMAN**

A.   Oh, okay.  Again.

(Witness reviews document.)

Q.   Request 11, Subsection F?

A.   Okay.  Got it.

"All tax" -- "all tax returns and tax return schedules and other Documents or Communications reflecting on how the transactions were reported for tax purposes"?

Q.   Yes.

A.   How all tax -- all my transactions?

MR. URIS: Objection.

Q.   Did you search for documents to respond to this request?

A.   I --

MR. URIS: Objection.

A.   I was -- if I was ever asked to, I -- I can.

Q.   But you haven't previously?

A.   I don't -- I don't remember.

I'm trying to figure out, did I talk -- if I talked to my accountant.  I -- I talked to him a lot.

19 (Pages 296 - 299)

Page 300

**JOSEPH ZICHERMAN**

Q.   Did you review Stadium's tax returns for 2021, in connection with this lawsuit?

A.   I didn't --

MR. URIS:  Objection.

A.   -- review -- in connection with the lawsuit?

No.

Q.   Um --

A.   I reviewed my tax returns in connection -- in connection with me.

Q.   Correct.

And so, did you review Stadium's tax returns for 2022, in connection with this --

A.   No.

Q.   -- request?

A.   In connection with the lawsuit?

Definitely not.

Q.   And what is your understanding of how Stadium Capital reflected how the transactions reported, as it pertains to --

A.   You know, I have an accountant that -- that handles all of Stadium

Page 301

**JOSEPH ZICHERMAN**

Capital's stuff.

Stadium Capital is -- is a d/b/a.  And it -- it -- it enables me to qualify as an institutional account by -- because Goldman Sachs does not take individual accounts.

So I -- it's -- it's very much a -- a d/b/a.  It's -- and it's very common, aboveboard.

Q.   Okay.  So just as a reminder:

We can't talk over each other.

So I'm going to re-ask the question.

Do you have an understanding of how Stadium Capital reflected the profits or losses in connection with the Co-Diagnostic Securities?

A.   No.

Q.   Does Co- -- does Stadium Capital file its own tax returns?

A.   Stadium Capital is incorporated into my tax return.

Q.   So it's --

A.   Because it's a d/b/a.

Page 302

**JOSEPH ZICHERMAN**

Q.   So it's not a separate tax return?

A.   Stadium Capital and Joe Zicherman are the same.

Q.   I understand the legal entity, but...

So it's your understanding that Stadium doesn't file a separate tax return; correct?

A.   That is correct.

Q.   And so, there is one tax return that compiles the information for Stadium and for you; correct?

A.   That is correct.

Q.   And do you have any understanding, as it pertains to that tax return, the one that you're involved in, how it reflected the loss or profit for secure -- for Co-Diagnostics' Securities?

MR. URIS:  Objection.

A.   I -- I -- I can presume, if you'd like, that it was a short-term loss that was treated accordingly.

I do a -- a -- well, it's not

Page 303

**JOSEPH ZICHERMAN**

important.

THE WITNESS:  Thank you.

Q.   And --

A.   I -- I just do an awful lot of transactions a year, so it would be -- it would not necessarily stand out, except for the onerous nature of how -- of how it occurred.

Q.   Okay.  And so, do you know if it was booked as a short-term loss, or you just -- that was your practice?

A.   It would -- had -- it had to be a short-term loss.

Q.   Okay.  And so, Mr. Zicherman, you've just testified that Defendants' Exhibit 2 is a list of requests that the Defendant sent to Stadium to produce certain documents.

Did you produce documents in response to these requests?

A.   Well, I produced documents.

Whatever my attorneys asked me for, I produced.

Q.   And did this approach differ

20 (Pages 300 - 303)

Page 304

**JOSEPH ZICHERMAN**

after the hearing that we had with the Court?

A. No.

It -- except that I needed to be a little more thorough, clearly.

Q. And how were you a bit more thorough?

A. Well, as I said: We went into my devices.

They -- they didn't -- you know, I -- I don't want to get redundant in here, but I can't -- I've have been looking at documentation, should becoming better acquainted with the case.

Also, I can be a -- a lead plaintiff that -- a respectable lead plaintiff.

Q. And that was not things that you had done prior to the hearing?

MR. FOX: Objection.

A. I -- no.

I -- I didn't say that.

I -- I said that -- you asked how -- what I've done since the first

Page 305

**JOSEPH ZICHERMAN**

hearing that we -- the first deposition. And we -- we've just become more thorough, is my answer.

Q. Okay. And so, Mr. Zicherman, you just mentioned that you are the lead plaintiff.

What are the responsibilities of a lead plaintiff?

A. Well --

MR. URIS: Objection.

A. All of the -- the aggrieved people who are filing in this case, I'm representing them.

Q. And how would one be aggrieved in this case?

A. By losing money unfairly.

Q. And why would it be unfair?

A. Because they were given misinformation.

Q. What was the --

A. They were deceived.

Q. And what was the misinformation or deception?

A. I -- I feel as if they were

Page 306

**JOSEPH ZICHERMAN**

deceived by the -- by a -- a -- during a conference, where the -- the CEO represented certain business conditions that didn't exist.

And if you looked at -- today at the -- at what's happened to this piece of paper and -- you know, I think, the -- the performance that would -- sort of bears out the fact that it was -- it was a -- let's just say, it was -- was not a grade-A transaction.

Q. And when you say "business condition that didn't exist," are you talking about the expectation for sales of tests?

A. No.

Well, I'm talking about that he portrayed expectations of -- of his business or -- not "expectations."

He presented a -- a -- a state of affairs that he felt he was trying to portray that existed, which clearly did not exist, when they reported earnings shortly thereafter.

Page 307

**JOSEPH ZICHERMAN**

Q. And by "state of affairs," you mean the earnings at that point?

A. Condition of business, business conditions.

Q. Okay. Mr. Zicherman, I'm handing you a document --

MS. BARROW: You can keep that, as well.

Q. -- that was previously marked as Defendants' Exhibit 5 (handing).

MR. FOX: Thank you.

MR. URIS: Thanks.

Q. Do you recognize that document?

A. Well, I -- once again, I received a lot of documents. I'm sure that I have seen it once upon a time.

MS. BARROW: And let the record reflect that Defendants' Exhibit 5 is a document entitled:

"Plaintiff's Stadium Capital's Responses and Objections to Defendants' First Set of Interrogatories to Plaintiff."

Q. Mr. Zicherman, you just

21 (Pages 304 - 307)

Page 308

**JOSEPH ZICHERMAN**

testified that you -- you've seen a lot of documents.

You can't say for sure whether or not you've seen this document.

But during your relationship with counsel, were you ever given a draft of a document before it was finalized?

MR. URIS: Objection.

A. No.

I don't believe so.

Q. Do you have any understanding of whether or not you provided information to create this document: Defendants' Exhibit 5?

A. I provided a lot of information.

And I can't tell you which document the information was directed to.

Q. So, if I can refer you to Page 20, Interrogatory Number 13.

(Witness complies.)

Q. The Interrogatory or the question that we, the defendants, asked you, the plaintiff, was:

Page 309

**JOSEPH ZICHERMAN**

"State the type and amount of damages that you claim to have individually suffered and the class, as a whole, suffered as a result of the alleged misrepresentation or omission of material facts identified in the Complaint."

And then, it goes on.

A. Yes.

Q. Do you recall providing information in response to that question?

MR. FOX: Objection.

A. I did.

I -- I -- I provided my trade slips, which were then -- would have indicated the -- the damages that I incurred.

However, the -- I didn't, obviously, do anybody else's in the class, just mine.

Q. And if I can refer you to the bottom of Page 20 where it says:

"Response."

So, this is --

A. Yep.

Page 310

**JOSEPH ZICHERMAN**

Q. -- your response to us.

And in the last paragraph, it says:

"Subject to and without waiving the foregoing objections, plaintiff will produce any expert damages analysis at the time set forth in the scheduling order in the matter described by Federal Rules of Civil Procedure 26(a)(2)."

So I -- I understand there's a lot of legalese, but: Did you ever discuss an expert report for damages?

MR. URIS: Objection.

A. An expert?

Who's ex- -- who -- who's the expert?

Q. Were you involved in retaining any expert as the plaintiff in this case?

A. I'm the expert.

MR. URIS: Objection.

A. I'm doing this for almost 50 years and I -- I suffered a loss here that I felt was un- -- was unnecessary.

Q. Are you familiar with Jim

Page 311

**JOSEPH ZICHERMAN**

Kaufman?

A. No.

MR. URIS: Objection.

Q. Do you have any understanding as to how an expert would be paid by plaintiff?

A. I don't.

MR. FOX: Sorry, Counsel, did you say "Jim Kaufman"?

MS. BARROW: (Indicating.)

MR. FOX: Okay.

THE WITNESS: Who's that? Who's Jim Kaufman?

(Whereupon, Verification was marked as Defendant's Exhibit 15 for identification as of this date by the Reporter.)

Q. Mr. Zicherman, we just handed you a document that has been just Bates stamped (sic) Defendants' Exhibit 15.

So, this document is titled:

"Verification."

Could you review that document and let me know if you recognize this

22 (Pages 308 - 311)

Page 312

**JOSEPH ZICHERMAN**

document?

MR. FOX:  Do you have copies?

MS. BARROW:  Oh, sorry.

(Witness reviews document.)

A.  Yeah.

That is my signature.

So, I'm sure that I have seen it before.

Q.  That is your signature on the bottom of --

A.  Yes, ma'am.

Q.  -- Defendants' Exhibit 15?

A.  Absolutely.

This -- this is the one you're referring (indicating)?

Q.  Yes.

And so, you see where it says that:

"I state that I have reviewed Defendants' First Set of Interrogatories to Plaintiff and the answers to those Interrogatories, which I declare under penalty of perjury are true, according to the best of my knowledge, information and

Page 313

**JOSEPH ZICHERMAN**

belief."

Do you see that?

A.  I do.

Q.  Do you have an understanding as to what that meant?

A.  I don't -- I -- you know, I'm not even clear on what an interrogatory is.

It was -- it was explained to me yesterday, but I'm still not fully --

What is an interrogatory?

Q.  Um...

A.  If you can help me with that.

Q.  Sure.

We just went through the Interrogatory --

A.  Right.

Q.  -- in the last exhibit.

So, those are the questions that defendant sent to you.

A.  Okay.

Q.  But this document is a little bit different.

A.  Uh-huh.

Q.  Basically, this is the

Page 314

**JOSEPH ZICHERMAN**

verification.

So, the information in this document, do you have an understanding as to what it means?

A.  Well, I -- I -- I guess I'm signing that the -- that the questions that we have asked, right?

Is that correct?

Q.  That the defendants have asked.

A.  The defendants have asked have been answered by me accurately; and I signed off on that.

Q.  And --

A.  And that's easy.

Q.  And is that true?

They were --

A.  Absolutely.

Q.  -- responded to truthfully and accurately?

A.  Absolutely.

Q.  And Mr. Zicherman, this document is dated November 22nd, 2024.

A.  Yeah.

Q.  Is that on or about when you

Page 315

**JOSEPH ZICHERMAN**

signed the document?

A.  I'm -- I'm sure it is.

Q.  And so, I can represent to you, that the actual responses that we've just looked at --

A.  Uh-huh.

Q.  -- were dated June 13th, 2024.

A.  What --

Q.  Do you under- --

A.  Why is there a discrepancy?

Q.  That is my question for you.

A.  Oh.

Q.  Why is there a discrepancy between --

A.  My question to you.

Q.  So, let me just state the full question.

MR. FOX:  Yeah.

Let Ms. Barrow ask the question and you can answer.

Q.  So Mr. Zicherman, I can represent to you that document that we just reviewed that's still in front of you, that is dated June 13th, 2024.

23 (Pages 312 - 315)

Page 316

**JOSEPH ZICHERMAN**

Those are the responses to the Interrogatories.

But then, you just testified that the Verification isn't dated until November 22nd, 2024.

Do you have an understanding as to why there was a discrepancy in time?

A. Maybe I -- I signed my name slowly.

No.

I have no idea.

I -- you know, I -- I get these things, which I have no knowledge of, put in front of my face and I'm told to sign them and I sign them.

I don't know what the discrepancy would be nor do I even understand why it's meaningful.

Q. Did you, at any time, refuse to sign this document --

A. Never.

Q. -- the Verification?

A. Never.

If I refused to sign anything

Page 317

**JOSEPH ZICHERMAN**

it would be because I was not going to pursue the case.

And -- and -- that wouldn't be fair to my co-plaintiffs.

THE WITNESS: Is that such a word?

Q. So, prior to November 22nd, 2024, did you review the Interrogatory response, which is the earlier document?

A. I'm sure that I did.

What I reviewed was, basically, whatever I could understand that my lawyers presented to me.

Q. But you didn't sign the document until November of 2024?

MR. FOX: Objection; asked and answered.

A. I have no idea.

You know, you -- you gave me one document here, which says "November 22nd," and that's definitely my signature.

Q. Okay.

A. And I signed it.

I have no idea. Maybe I signed

Page 318

**JOSEPH ZICHERMAN**

a different one on -- in June. That's possible.

Q. Is it possible that you signed another document in June?

A. Possible.

I -- I imagine.

Q. You think you did?

A. I haven't -- I haven't seen the other signature.

Q. Okay.

MS. BARROW: To the extent --

A. Do you have a copy of it?

Q. I do not.

MS. BARROW: So, to the extent there is one, we're going to ask for it.

A. All right. Well, if it looks like this, you don't even have to come back to me to say this.

THE WITNESS: What?

MR. URIS: We -- we can represent on the record that there is no other Verification.

MS. BARROW: Okay. Great.

Page 319

**JOSEPH ZICHERMAN**

Q. So, Mr. Zicherman, we're going to pivot a little bit.

You can put that document aside.

(Witness complies.)

Q. We talked a little bit about this before: Who represents Stadium Capital in this case?

A. Who represents Stadium Capital? Me.

Q. Who represents you? Who are the lawyers that represent you?

A. Oh.

MR. URIS: Asked and answered.

A. These two gentlemen.

Q. And which firm are they with?

MR. URIS: Asked and answered.

A. Kaplan Fox.

Q. And do you have a relationship with Mr. Uris?

A. No.

Q. And do you have a relationship with Mr. Fox?

A. Certainly not.

24 (Pages 316 - 319)

Page 320

**JOSEPH ZICHERMAN**

MR. FOX:  Well, I mean, other than he just testified:  We're his lawyers, do you mean?

MS. BARROW:  Well, and --

MR. URIS:  I'm just saying:  The question is very broad, so --

MS. BARROW:  Right.

MR. URIS:  -- he did -- he did testify that we are his lawyers in this case.

MS. BARROW:  Um-hum.

MR. URIS:  So I'm just trying to clarify the question.

MS. BARROW:  Sure.

Q.  So, Mr. Zicherman, other than Mr. Uris and Mr. Fox being your lawyers in this case, do you have any sort of outside relationship with them?

A.  No.

Q.  Do you have a relationship with anyone else at Kaplan Fox?

A.  No.

Q.  And how did you come to learn about Mr. Uris?

Page 321

**JOSEPH ZICHERMAN**

MR. URIS:  Asked and answered.

A.  I think it's been answered:  That I was referred -- was referred by David.

THE WITNESS:  Right?

A.  Originally.  I mean, we met a long, long time ago.

Q.  You were referred by Dave?

A.  What?

Q.  You said you were referred by Dave?

A.  He was referred by -- we belong to the same country club, and I know his -- I know Jason's father.

And I -- and we were all part of a group, of which David Sherman was part of the group, et cetera, et cetera.

So, I am sure -- I don't remember specifically how I got there, but it seems to be Jason's line of work.

THE WITNESS:  It is your line of work; right?

A.  And therefore, that's how I got

Page 322

**JOSEPH ZICHERMAN**

to him.

Q.  So, just so I understand:  So when you say "Dave," you mean Mr. David Sherman?

A.  Sherman, David Sherman.

Q.  And so, David Sherman, Mr. Uris' -- or Jason Uris' father and you are all part of the same country club; is that correct?

A.  Yes.

Q.  And which country club?

A.  Brae Burn Country Club.

Q.  Where is that located?

A.  Purchase, New York.

Q.  And so, through those relationships at the country club, that's how you came to know Kaplan Fox; correct?

A.  Yep.

Q.  Okay.  Mr. Zicherman, have you ever disagreed with Kaplan Fox?

MR. FOX:  Objection.

A.  Outside of the baseball bat I carry around in my car?  No, I have not.

Q.  And would you feel comfortable

Page 323

**JOSEPH ZICHERMAN**

with disagreeing with Kaplan Fox, as it pertains to the litigation?

A.  No.

You know, the -- I don't understand a lot of the stuff that's going on, and they have been incredibly professional and incredibly precise -- concise, and I'm very pleased --

Q.  And --

A.  -- with their representation.

Q.  If Kaplan Fox took a particular legal strategy with which you disagreed, would you feel comfortable terminating Kaplan Fox?

A.  Would I feel comfort -- I would express my displeasure at the course of action that they're taking.

I can't say where that would lead.  A lot of it would depend upon their reaction to my expressing my displeasure.

THE WITNESS:  Don't ever do anything, Jason.

Q.  And if, after you expressed your displeasure at that particular legal

25 (Pages 320 - 323)

Page 324

**JOSEPH ZICHERMAN**

strategy, and they still decided to go forward with the strategy you didn't like, what would you do then?

A. Well, it's a -- that's a -- you know, it's a subjective thing.

If -- if they didn't follow my instructions and they went out and murdered somebody, what would I do?

You know, there's a million things that they can do, but I -- I know that I am representing other people, and therefore, I have to make certain that the other people are represented properly.

That's all.

Q. And so, would you feel comfortable representing other people by terminating Kaplan Fox?

A. Absolutely.

Q. And so, you mentioned, Mr. Zicherman, that you came to know Mr. Uris through the country club relationship, and so did Mr. -- did Kaplan Fox, or anyone at Kaplan Fox, reach out to you as it pertains to this lawsuit?

Page 325

**JOSEPH ZICHERMAN**

A. No.

Q. You reached out to them?

A. I -- I brought it to their attention, yeah.

Q. And who, at Kaplan Fox, did you bring it to their attention?

A. This gentleman here, Mr. Uris, the son of the father.

Q. And did -- after you brought it to their attention, did you direct Kaplan Fox to initiate this lawsuit?

A. I'm sorry?

Q. After you brought the issue regarding your losses for Co-Diagnostics to the attention of Mr. Uris, did you direct Kaplan Fox to initiate this lawsuit?

A. I told them -- yes. Yes.

Q. What is your goal, in connection with this lawsuit?

A. Well, my goal is to -- is -- is that I am a professional investor/trader, and I make and lose money all the time; but I try and do it fairly.

I have -- the thing in my

Page 326

**JOSEPH ZICHERMAN**

career that I'm most proud of is that I have a U4 that's blank. And I was in the firing line for two decades at Morgan Stanley.

So, I don't mind losing money, if it's done fairly; but when I feel like I'm being cheated or deceived -- better word: "Deceived," then I feel like I would like to get some remuneration of some kind to -- to -- to be paid back for my losses.

THE WITNESS: Sorry.

Is that -- are you still hearing okay?

Q. How do you intend to obtain the maximum recovery possible for the class?

A. I am entrusting my attorneys to get me the maximum amount that's available for me and for -- and -- and I'm presuming that if I -- if I'm well represented, the class will be well represented.

Q. Do you believe Kaplan Fox has fairly and adequately represented the interest of the class so far?

A. No question about it.

Page 327

**JOSEPH ZICHERMAN**

Q. How so?

A. I think they do a terrific job.

I think they're actually a pain in the ass, if you want to know the truth, but they do a terrific job.

Q. How are they doing a terrific job?

A. Because they don't leave me alone.

THE WITNESS: Don't use this as an advertisement.

Q. And so, Mr. Zicherman, you testified regarding David Sherman.

Is -- to your knowledge, is Mr. Sherman a client of Kaplan Fox?

A. No -- no idea.

We are all -- just to save you the effort: We are all members of a club, we play golf together, we have lunch together, and then we all go our own way.

And I don't -- I don't -- I know Mr. Sherman is in the paint business, and I have no idea what else he does.

Q. Do you know whether or not

26 (Pages 324 - 327)

Page 328

**JOSEPH ZICHERMAN**

Mr. Sherman has been a lead plaintiff in any case?

A. No.

Q. And when you say "we," you're referring to Mr. Sherman, Jason's father and yourself; correct?

A. Yes.

Q. Okay.

A. I don't know what -- what Mr. Sherman's financial activities are at all.

Q. Does Mr. Sherman have an interest in the outcome of this case?

A. No.

Q. Will he receive any compensation?

A. No. No.

Q. What was the nature of your conversation with Mr. Sherman that led him to discuss Kaplan Fox with you?

A. He -- there was no conversation. We were all together, if I remember correctly, maybe standing around. And I -- I was introduced to Jason and

Page 329

**JOSEPH ZICHERMAN**

Harvey, his father.

And I know Harvey for a long time, and I know David for a long time.

They were all -- all it -- all it was, was just a group of people in -- collected in a particular common place, and Hi, meet Joe; hi, meet Jason. That's --

Q. And --

A. -- all.

Q. And so, at that meeting, that's when you had met -- met Mr. Jason --

A. Yeah.

Q. -- Uris; correct?

THE WITNESS: Can I get a red one? Okay.

(Whereupon, Defendant's Exhibit 16, Declaration of Joseph Zicherman in Support of lead Plaintiff's Opposition to Defendants' Motion to Remove Stadium Capital as Lead Plaintiff and Class Representative and to Decertify the Class, was marked for identification as of this date by the Reporter.)

Page 330

**JOSEPH ZICHERMAN**

Q. Mr. Zicherman, I have just handed you a document that has been marked Defendants' Exhibit 16.

A. Yes.

Q. And that document, for the record, is titled:

"Declaration of Joseph Zicherman in Support of Lead Plaintiff" --

A. Uh-hum.

Q. -- "Opposition to Defendants' Motion to Remove Stadium Capital As Lead Plaintiff and Class Representative and to Decertify the Class."

A. Yeah.

Q. Do you recognize this document?

A. I do.

I signed it.

Q. Is that your signature, on Page 3?

A. It is.

Q. What -- when did you sign this document?

A. It looks to me like it was signed on, what is it, the 17th day of

Page 331

**JOSEPH ZICHERMAN**

January. It's 2025.

Q. Did you participate in the preparation of this document?

A. No.

If I did, you would know it.

Q. Okay. In Paragraph 4, if I can direct your attention --

A. Uh-hum.

Q. -- it says:

"I have monitored the progress of this litigation and have regularly conferred with counsel concerning the litigation."

A. Yes.

Q. How have you monitored the progress of this litigation?

A. Talking to my attorney.

Q. How regularly do you confer with your attorney?

A. Some -- sometimes not -- no times in a month and sometimes six times in a month.

A little more now because we're getting, apparently, towards the finish

27 (Pages 328 - 331)

Page 332

**JOSEPH ZICHERMAN**

line, I would think, so...

Q.   At -- so my understanding of this case was initiated in 2022, so about three years ago.

In the three years since this case has started, about how many times would you say you've spoke to your counsel?

A.   Spoke in person or spoke on the phone or...

Q.   Communicated in general.

A.   30?

THE WITNESS:  Is that about right?

What -- what do you think.

You don't talk.  I forgot.

Q.   And would you say most of that communication has occurred over the last three months?

MR. FOX:  Objection.

A.   Not really.

Q.   Okay.

A.   You know, it's been spread out pretty much.

It's on an as-needed basis.

Page 333

**JOSEPH ZICHERMAN**

Q.   And so, if we go back to Paragraph 4, it says:

"For example, I have received documents filed with the Court, including, but not limited to, the complaint filed in this action."

Do you see that?

A.   Yes.

Q.   How did you receive the complaint filed in this action?

A.   I'm sorry?

Q.   How did you receive the complaint filed in this action?

A.   How did I receive it?

I believe my attorney received it.

Q.   Did you receive the complaint?

A.   Did I receive the -- I've seen a copy of the complaint, but I -- I -- it's always been spearheaded by my attorney.

Q.   And was it your understanding at that point it was a draft of the complaint, or was it finalized?

A.   I never addressed that issue.

Page 334

**JOSEPH ZICHERMAN**

Q.   What do you mean by that?

A.   Well, I -- like -- like, you -- I'm holding this, and I don't know if it's a draft or if it comes -- two more coming afterwards; I just don't know.

Q.   Were you ever asked to provide feedback regarding the complaint?

A.   Yeah, probably.

Q.   Did you provide revisions or comments to the --

A.   No.

Q.   -- complaint?

A.   No.

They were -- you know, this is -- as I said before:  This is rather straightforward, in my mind, obviously.

I'm sure other people might feel differently, but in my mind, it's straightforward that a man made certain declarations that were incorrect and not true, and it cost people money.

That's the whole -- that's the whole basis of it.

Q.   Did you ever receive the

Page 335

**JOSEPH ZICHERMAN**

amended complaint in this case?

A.   I'm sure I did, but I couldn't tell you what it looks like.

Q.   Do you have an understanding of whether or not it was a draft amended complaint or finalized?

A.   I have no idea.

Q.   Did you provide feedback or revisions to the amended complaint?

A.   I've always answered any question that was ever asked of me, but I can't tell you what the feedback was, per se.

Q.   And you don't have a specific recollection of providing comments to the amended complaint?

A.   No.

Q.   And so, if we go to the last sentence in Paragraph 4, it says:

"I have also consulted with counsel concerning key events in this litigation, including document collection and review and the overall case schedule."

Do you see that?

28 (Pages 332 - 335)

Page 336

**JOSEPH ZICHERMAN**

A.   Yeah.  Uh-hum.

Q.   Is that true?

A.   I just -- yeah.

I think, isn't that what we just were discussing?

Q.   This --

A.   It -- you know, it is definitely short.

I mean, I went on an as-needed basis, whenever I -- I've always picked up the phone and I discussed anything, and whenever I had a question, I would always call Jason.

Q.   Do you have an understanding as to what the key events are in this litigation?

A.   Of course.

Q.   What are the key events that occurred in this litigation?

A.   The key events, as I just alluded to, is that certain declarations were made that it -- were false.

Q.   And once --

A.   They were untrue.

Page 337

**JOSEPH ZICHERMAN**

Q.   And once this case was commenced and was pending in the court, do you have an understanding as to what are some of the things that happened once the case had started?

A.   Not -- that's not my world.

I'm -- you know, I buy them and sell them and I rely upon accurate information; you know, who's -- who's getting a -- a brief or a motion or a -- is not -- is not my world.

I -- I have been shown collections of that -- of paperwork, from time to time.  And whenever asked to sign, I've signed.

Whenever I've been asked to read something, I've read it before I forgot about it.  So...

Q.   Do you review the papers before you sign?

A.   Sure.

Q.   Do you have an understanding of the overall case schedule in this case?

A.   The schedule?

Page 338

**JOSEPH ZICHERMAN**

I don't.

Q.   You mentioned that you -- your understanding is the case is coming to an end; is that correct?

A.   Well, after three years of this -- it's very -- in my -- once again, it's my mind.  It's a very straightforward action here.

After three years, I would think that it would be coming to an end.  I would hope that it's not the beginning of the...

Q.   If I can refer you to Paragraph 5.

(Witness complies.)

Q.   It says:

"Throughout this litigation, it has been my practice to have phone calls with Lead Counsel and Class Counsel, Kaplan Fox & Kilsheimer LLP ('Kaplan Fox') to discuss important documents or key events in the case.  For example, with respect to Defendants' discovery requests, I had numerous calls with Class Counsel to

Page 339

**JOSEPH ZICHERMAN**

discuss the scope of Defendants' requests, what documents and information would be produced, and verified any information that was to be provided by Class Counsel in response to Defendants' requests."

Do you understand what I just read?

A.   Uh-hum.

Q.   What did you --

THE COURT REPORTER:  I didn't get a response.

A.   Yes.

THE WITNESS:  Sorry.

A.   It's the -- the question I just answered, I -- I've always entertained calls and provided whatever -- whatever I was asked, and I've called, when I had a question.

We've had a dialogue and, you know, it -- it seems like we're just repeating the same question.

Q.   And so, you mentioned earlier that about three weeks ago was the first time someone came to look at your computer

29 (Pages 336 - 339)

Page 340

**JOSEPH ZICHERMAN**

Q.  in Florida; correct?

A.  Yeah.

Q.  And so, this document is dated January 17th, 2025.

A.  Um-hum.

Q.  At this point, had the gentlemen come to your house?

A.  No.

I don't remember the exact date that he came, but it was around that time.

What's today?  Today is February --

Q.  Today, I can represent today is February 4th.

A.  I think -- I think he might have come just before that.

Q.  I see.

A.  Might have.

I -- I don't want to say for certainty.

THE WITNESS:  Thanks.

MR. FOX:  Thank you.

(Whereupon, Certification was marked as Defendants' Exhibit 17 for

Page 341

**JOSEPH ZICHERMAN**

identification as of this date by the Reporter.)

(Witness reviews document.)

A.  Okay.

Q.  Mr. Zicherman, we have just handed you Defendants' Exhibit 17.

A.  Uh-huh.

Q.  So, this document is entitled: "Certification."

A.  Yes.

Q.  And it's ECF Document 1 that was filed in the court docket.

Do you recognize this document?

A.  I do.

Q.  And --

A.  I mean, it was another one that was presented to me and I'm sure that I have seen it in the past.

Q.  Is that your signature on the bottom right-hand corner?

A.  It looks like, yeah.

But it looks like I might've signed it either -- either electronically or -- it wasn't my big swooping.

Page 342

**JOSEPH ZICHERMAN**

Q.  So, it says:

"DocuSign signed by:"

A.  Yeah.

Okay.  So that would be it.

Q.  Did you provide consent to DocuSign this document?

A.  Yes.

Q.  And was it or around August 16th of 2022?

A.  It was in -- yeah.

I presume so.

Q.  So, if I can refer you to the first paragraph.

A.  Yes.

Q.  It says:

"I am fully authorized to make the certification on behalf of Stadium Capital.  I have reviewed a Complaint against Co-Diagnostics and certain executives alleging violations of the securities laws and authorized the filing of a complaint."

Prior to August 16th, 2022, did you review a draft of the complaint?

Page 343

**JOSEPH ZICHERMAN**

A.  Did I review a draft?

I'm not sure if I did or not.

But I am fully authorized on before of Stadium -- Stadium Capital.

Q.  And it says here that you:

"Authorized a complaint against certain executives."

Who were the certain executives that you authorized the complaint --

A.  Either --

Q.  -- to be filed against?

A.  -- the -- the -- the CEO and the one that made the presentation was a person that I am most focused on.

And I -- I'm sure that the -- there's a CFO in there, too, that --

Q.  Do you know the names of the certain executives?

A.  I don't.  I don't.

I mean, I can presume that there's a Brown and a -- by looking at the paperwork.

And an Egan.

THE WITNESS:  Is that his name?

30 (Pages 340 - 343)

Page 344

**JOSEPH ZICHERMAN**

Q. And so, if I can refer you to Paragraph 2, it says:

"Stadium Capital did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws."

A. That is correct.

Q. Did anyone direct you to purchase securities of Co-Diagnostics?

A. No.

I -- I made -- it was of my own volition, based upon information that I believed to be accurate, which was not.

Q. And so, you mentioned earlier that you first became interested in COVID testing due to your own experience with getting sick.

When you conducted that research for your own medical care, is that how you first started to look into it in terms of an investment opportunity?

A. No.

Page 345

**JOSEPH ZICHERMAN**

I -- I've always been -- I have always been successful in figuring out, ideally, where the world is going and then, you fill in the -- the slots and --

In the financial crisis in 2008, I was taking advantage of mismatches in the mortgage market and things in the housing market and things like that.

So, if we fast -- we fast forward to 2020, and we have a COVID outbreak and there are a lot of different aspects to the COVID outbreak.

Believe it or not, I had a friend that was buying --

THE WITNESS: It's not important.

A. -- casket manufacturing.

But -- but there's a million different ways to profit off of world events.

And this is a -- COVID testing was just one aspect of it.

Q. And so, it was your intention to profit off of the pandemic?

Page 346

**JOSEPH ZICHERMAN**

MR. FOX: Objection.

A. My intention -- my intentions were to profit off the events --

THE WITNESS: Sorry.

A. -- off the -- the -- the results or the consequences of what the pandemic brought.

You know, I would have much preferred to be able to cure the pandemic and make sure that another million people live, but I don't have that gift.

Q. And do you believe that COVID testing helped with the pandemic?

A. No.

Q. Why not?

A. Why not?

I feel that COVID testing had nothing to do with the pandemic.

Like I said: I think it had to do with people finding out if they had COVID or not.

Q. And would that help mitigate the spread of COVID?

A. Well, if you -- if you didn't

Page 347

**JOSEPH ZICHERMAN**

get tested and you had COVID, and if you could've gotten tested and did not, so chose not to, and then you spread COVID around, that would certainly exacerbate the situation.

Q. And is it your opinion that the COVID testing didn't help stymie the spread of COVID?

A. Didn't help what? I'm sorry?

MR. FOX: Do you -- do you understand Ms. Barrow's question?

THE WITNESS: No.

MR. FOX: Maybe you want to ask the question again.

THE WITNESS: Can you question again, please?

MR. FOX: May just connect it.

MS. BARROW: Sure.

Q. Is it your opinion that COVID testing did not help prevent the further spread of COVID-19?

A. I think it did help to prevent it, to a degree.

I think the -- the -- the

31 (Pages 344 - 347)

Page 348

**JOSEPH ZICHERMAN**

outbreak was so pervasive that, as we sadly found out, there wasn't a lot that could be done.

But in many individual cases, people that got tested knew that they did not have it and went to an island, or found out that they did have it and stayed out of restaurants.

Q.   So, if I can refer you to Paragraph 3 of the certification, which is Defendants' Exhibit --

A.   Uh-huh.

Q.   -- 16 [sic].

It says:

"Stadium Capital is willing to serve as a representative party on behalf of the class, including providing testimony at deposition at trial" --

A.   Yes.

Q.   -- "if necessary."

A.   Yes.

Q.   Is that true?

A.   Uh-huh.  Yes.

Q.   Were you willing to give

Page 349

**JOSEPH ZICHERMAN**

testimony at the deposition on November 15th, 2024?

A.   Yes.

Q.   Are you willing to give testimony during today's deposition?

A.   Yes.

Q.   Are you here on your own will?

A.   Yes.

Q.   Will you be willing to testify before a jury when the case goes to trial?

A.   Yes.

Q.   Are you willing to serve as a representative party on behalf of the class?

A.   Yes.

Q.   Why?

A.   Why?

Q.   Yes.

A.   Because I -- it's not the biggest case in the world, but it is -- I think I had a material loss.

And I found it particularly onerous that someone could mislead his investors or a class of investors --

Page 350

**JOSEPH ZICHERMAN**

THE WITNESS:  No, let me remove that.

A.   Not class of investors, investors, in general.

I found it particularly onerous that investors could be misled and I -- it's my way of making the system better.

Q.   Is there a particular benefit to Stadium Capital in your participation in this litigation?

A.   Well, I'm -- yes.

Stadium Capital will receive probably 20 percent or 30 percent or some small percentage.

I remove -- I would like to not put up numbers, but some -- some nominal percentage of what was lost.

I wish that Stadium Capital never heard of this thing.

But I'm happy that it would -- Stadium Capital will receive whatever monies they get.

And I'm also happy that the -- I forget who spoke, but he -- if he ever

Page 351

**JOSEPH ZICHERMAN**

chooses to do it again, maybe he will remember this.

Q.   Is it your expectation that Stadium Capital will receive compensation more than the amount that it lost?

A.   No.  No.

Certainly not.

Q.   So if I can refer your attention to Paragraph 4.

It says:

"Stadium Capital's transaction in Co-Diagnostics Securities during the proposed class period is set forth in Schedule A, which is attached hereto."

So, I can represent to you Schedule A is on the next page, and there's a chart there.

(Witness complies.)

Q.   Is that information, in Schedule A, accurate as it pertains to Stadium Capital?

A.   Looks like it is.

You know, once again, I provided the trade slips to my attorneys,

32 (Pages 348 - 351)

Page 352

**JOSEPH ZICHERMAN**

so if that's what is here, I'm sure it's correct.

Q.   So, just so I'm reading this correctly, so Stadium purchased Co-Diagnostics Securities, 15,000, at the price of $6.29 --

A.   Correct.

Q.   -- on July 25th, 2022?

A.   Yep.

Q.   And then, again, Stadium purchased Co-Diagnostics Securities on -- the next day, on July 26 --

A.   Correct.

Q.   -- 2022, 21,000, at $5.89; right?

A.   Correct.

Q.   Okay.  So, it appears that the price of the shares went down on July 26, 2022, but you purchase -- you continued to purchase more; is that correct?

A.   No.

MR. FOX:  Objection.

MR. URIS:  Objection; asked and answered.

Page 353

**JOSEPH ZICHERMAN**

A.   But it's -- but it's not correct.

Q.   Can you help me?

A.   Yes.

Stylistically, people do things different in my business.

I gather the stock.  I don't necessarily make a -- make a determination.  I don't buy and hope it goes up and sell.

I figure out how much I would like to own, and then I -- I'm a little price sensitive.

And it could be that the broad market might be softer, and maybe I want to buy a partial -- partial position one day, and then fill it in the next day or in subsequent days.

I gather stock, and I don't buy everything at once and -- traditionally.  I don't sell everything at once, traditionally.

Q.   And so, as it pertains to Co-Diagnostics at the end of July 2022, you were acquiring Co-Diagnostics --

Page 354

**JOSEPH ZICHERMAN**

A.   I probably had a number in mind that I wanted to buy, like I have always had a number in mind of what I would like to buy anything, and I bought it.

Q.   And so, it wasn't an issue for you that the value had gone down?

A.   It's -- it's the same.

You know, if you buy something at 6.10 and you buy more of if at 5.80 and you -- and then you sell it the next day, at 12, you're not happy with either one.

It's all the same price.

Q.   Okay.  And so, the information in Schedule A, did you confirm that it was accurate before you signed the certification?

A.   Well, I gave my -- my paperwork to my attorney, and it looks -- it looks accurate.

Q.   But you didn't independently confirm it's accurate?

A.   I -- I don't know what else to do.  I gave the trade slips to my attorney, and -- and then he provided me with this.

Page 355

**JOSEPH ZICHERMAN**

And I'm sure that he didn't make it up, so I don't know.

What else could I have done?

Q.   Did there come a time that you sold your Co-Diagnostics shares?

MR. URIS:  Objection; asked and answered.

A.   Yes.

I -- I did sell them, but I -- I think I -- I think I lost quite a bit of money, maybe about $75,000.00 or something.

Q.   Do you recall when you sold the shares?

A.   I would presume when -- when I got the -- the news that what was portrayed to be the condition of the company was not accurate.

I presume when the earnings came out.

Q.   Did you sell because the earnings had came out?

A.   I sold because I would like to.

Q.   Right.

But --

Veritext Legal Solutions

www.veritext.com                                           888-391-3376

Page 356

**JOSEPH ZICHERMAN**

A. And when -- once you have a -- in my business, when -- when you have -- I have always had a history of selling first and then asking questions later.

But when I get lied to, I -- there's never -- that's never an issue. You just go away, and you come back another day.

I'm pretty judicious about what I do, as witnessed by the fact that I haven't done one of these, in securities, previously.

Q. What do you mean by that?

A. Class action.

Q. This is your first class action?

A. Class action.

Yes.

Q. Are you --

A. I don't do this for a living.

Q. Are you also the lead plaintiff in a case against View?

A. Yes, I am. Yes, I am.

Q. So, this is your second --

Page 357

**JOSEPH ZICHERMAN**

A. No.

This is -- this is -- this is my -- yes. Yes. Okay.

Q. So, you are the lead plaintiff for two securities class actions; correct?

A. I am. I am.

Q. Are you in the process of becoming the lead plaintiff in any other class action?

A. I'm not.

Q. Any other class action pending?

A. I have been in the business almost 50 years. I have never been involved in one, ever.

Q. Other than these two?

A. Pretty good record.

Q. So, if I can refer your attention to Paragraph 6.

(Witness complies.)

Q. It says:

"Stadium Capital will not accept any payment for serving as a representative party on behalf of the class beyond his pro rata share of any recovery,

Page 358

**JOSEPH ZICHERMAN**

except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expenses -- or expense directly related to the representation of the class."

Is that true?

A. Sure.

Q. Would you like payment as a class representative?

A. I would like millions, but I don't see where they're going to come from.

I just want what I am entitled to, as -- as is determined by the judge.

Q. I see.

So, we talked a little bit about this last time, but for some of these questions, you were unable to give a response, and so you can let me know if you know the answer to this or if you don't know.

When was this case filed?

A. When was the case filed?

I -- I would think in '22.

Q. And where was the case brought?

Page 359

**JOSEPH ZICHERMAN**

A. Where?

I would think in New York.

Q. Federal court? State court?

A. I have no knowledge.

That -- that's not me.

Q. And who is the judge that is presiding over this case?

A. He has a -- his name is Sub something or other.

Q. And do you --

A. Subramanian. I don't know.

Q. Could you tell me what has happened in this case, if you know?

A. I don't know.

MR. FOX: Objection; asked and answered.

I mean...

THE WITNESS: You just -- I have never done this, once again. You made an objection. I --

MR. FOX: No. No. I -- you still -- yeah, my objection is just for the record.

THE WITNESS: Okay.

Veritext Legal Solutions

www.veritext.com                                        888-391-3376

Page 360

**JOSEPH ZICHERMAN**

MR. FOX: It may later come up again in other proceedings, but if --

THE WITNESS: You didn't tell me these things.

MR. FOX: You may answer Ms. Barrow's question.

A. Your question --

MR. FOX: Sorry.

THE WITNESS: I'm sorry.

A. Your question was, one more time?

THE WITNESS: I apologize.

Q. And can you tell me what has happened in this case, if you know?

A. Yeah.

We -- I -- after the violation occurred, I turned it over to my attorneys.

And they are -- we are now -- I'm being deposed, as the lead plaintiff representing the other people in the case.

And that's what's going on here. It's not that exciting.

Q. Do you have an understanding to what motions were filed?

Page 361

**JOSEPH ZICHERMAN**

A. I'm sure that I do.

But once again, that's more of my attorney will acquaint me with things.

Q. Do you know if a Motion to Dismiss was filed?

A. Yes, I do know that.

Q. Do you know --

A. I've seen it.

Q. Do you know if it was denied or granted or what the outcome was?

A. I would hope it was denied, but...

Q. And was a Motion for Class Certification filed?

A. I think so.

I'm sure there was.

Q. Do you know if there were any appeals in this case?

A. I hope not.

Q. Have there been any settlement discussions?

A. I don't know.

Q. Have -- has there been any mediations?

Page 362

**JOSEPH ZICHERMAN**

A. I don't know.

Q. Did you participate in it, a mediation?

A. No.

I -- I didn't. I don't know.

Q. Have you rejected any settlement offers?

A. I haven't been presented with any.

Q. Have you made any settlement demands?

A. No. No.

Well, in the end, when -- when -- because I'm representing the class, when -- when something is presented to me, I'll decide if it works or if it doesn't.

Q. You previously testified that you took no part in the creation of an expert report.

Is that correct?

A. That's correct.

Q. Are you aware now of whether or not there was an expert report that was filed on behalf of Stadium Capital?

Page 363

**JOSEPH ZICHERMAN**

A. I am not.

MR. FOX: Asked and answered.

Q. Have you taken an active role in and control of the litigation to protect the interest of the asset --

A. I think we --

Q. -- class members?

A. -- answered that already.

I -- I haven't -- I'm not active. I -- I follow my -- my attorneys, and they ask me questions, and I answer them, and they tell me to sign, and I sign.

Q. As it pertains to travel, were you willing to travel to New York for this deposition?

A. I'm here.

Q. Were you willing to travel from Midtown for the last deposition?

A. Was I willing to -- to travel to Midtown?

Q. Midtown Manhattan.

A. I -- I could have -- I could -- I mean, when you say was -- was I willing? I'm confused by that.

35 (Pages 360 - 363)

Page 364

**JOSEPH ZICHERMAN**

I -- here.  You want to see something?

I mean -- show you -- can I show you something?

MR. FOX:  No.  No.  No.

Q.  I'm sorry.

A.  Oh.

Q.  No.

A.  Okay.

MR. FOX:  No.  No.  No.

A.  I -- no.

I have a shattered ankle, which causes me -- has been causing me a lot of pain.  So I've been really kind of laying low recently.  And then, I have a treatment, the cortisone treatment which has really helped a lot recently by Dr. O'Malley, over here, on HSS.

But I'm willing to -- you know, this is not the most -- the biggest thing in the world, and it's not the most important thing in my life.  I'm happy -- I'm here.

I -- I think the answer to your

Page 365

**JOSEPH ZICHERMAN**

question -- as witnessed by the fact that I'm here.

Q.  And you were able to travel, I think, to the Caribbean over the Christmas time?

A.  I traveled to the -- to Parrot Cay, that's correct.

Q.  And were you willing to travel for the hearing that took place on January 2nd, 2025?

A.  Was I willing -- what -- what hearings were they?

Q.  The court hearing that we had before the judge.

A.  Um...

Q.  If you were asked to come in person, would you have came in person to the hearing?

A.  You know what?  It -- it all -- it all depends.

I mean, I have -- I have seven children, 11 grandchildren.  I have a -- I am -- I'm busy, and I'm trying to accommodate everybody in -- in my -- my

Page 366

**JOSEPH ZICHERMAN**

schedule, and everybody's been very nice, including yourself, by making this at 4:00 today, so I appreciate it.

But I -- I -- I'm willing to do anything.  You know, I'm --

Q.  I assume you're --

A.  -- trying -- trying to get this thing moved forward; not be an impediment.

Q.  I assume you're not the primary caretaker for your children or grandchildren?

A.  Well, I sure hope not.

MR. FOX:  When -- when it --

A.  I really hope not.

THE WITNESS:  Sorry.

MR. FOX:  When it's convenient, we've been going about another -- about an hour.

MS. BARROW:  Sure.

MR. FOX:  Can we take a --

MS. BARROW:  Yeah.  Just --

MR. FOX:  -- short break?

MS. BARROW:  -- after this last question.

Page 367

**JOSEPH ZICHERMAN**

MR. FOX:  Yeah.

Q.  Would you be willing to travel for any future hearings?

A.  Sure.

Q.  Any future mediations?

A.  Yeah.

But I just would like to write to see if I can make it better with my -- for my schedule.

Q.  And would you be willing to travel for a trial?

A.  Oh, sure.

MR. FOX:  Asked and answered.

MS. BARROW:  Okay.  So we can take a break now.

MR. FOX:  Yeah.

MS. BARROW:  Okay.  Do you want to take ten minutes?

MR. FOX:  Yep.

THE VIDEOGRAPHER:  The time is 6:14 P.M.

We are now off the record.

(Whereupon, a short recess was taken.)

36 (Pages 364 - 367)

Page 368

**JOSEPH ZICHERMAN**

THE VIDEOGRAPHER:  The time is 6:26 P.M.

We are now on the record.

Q.  Mr. Zicherman, can we talk a little bit about Stadium Capital's investment, generally speaking?

What is Stadium Capital's general investment strategy?

You spoke a little bit about this, in terms of just accumulating certain stocks.

A.  There are two aspects of it: One is -- I do a lot of long -- very long-term -- there are three aspects of it, actually.  There are -- I do a lot of long-term work.

The -- the most money I've ever been successful in making has been on these longer-term opportunities, where I'd like to think I can see the -- see something about tomorrow and avail myself of what it represents.

And so, I -- I try and make certain investments that will take

Page 369

**JOSEPH ZICHERMAN**

advantage of a company, if it meets its mandate.

The second part of it are -- are -- I take advantage of things where a world event's going on.  And -- and I -- I try to react to whatever the events might be.

And then, the third thing are just, opportunities that present themselves during the day.  And if I can do something on something that represents something very short-term, I'll do that, as well.

Q.  So, you mentioned "world events."

Other than the pandemic, what are some of the world events you're referring to?

A.  Sure.

Let's see, we had Enron.  That was a big deal.

Q.  Uh-hum.

A.  We had the -- the world -- the -- the financial crisis, which I took advantage of being short all kinds of

Page 370

**JOSEPH ZICHERMAN**

different financial instruments, things such as that.

Q.  And by "financial crisis," you're referring to the one in the late 2000s?

A.  2008.

Q.  And so, this general approach for the three different strategies that you have, those would've informed your decision whether to purchase or sell Co-Diagnostic Securities?

A.  Well, Co-Diagnostic, when I -- I would -- definitely, I thought it was a great opportunity.

I thought -- I thought COVID represented a great opportunity; albeit tragic, with a variety of things that I've mentioned before:  Face masks.

There were -- there were face masks stocks that -- that went up a thousand percent.  Testing companies, emergency medical units.

I mean, all kinds of different aspects of medical treatment that would be

Page 371

**JOSEPH ZICHERMAN**

applic- -- applicable to a pandemic.

Q.  Did you invest in any face mask companies?

A.  I'm sorry?

Q.  Did you invest any face mask companies?

A.  I did.

MR. FOX:  Objection.

Q.  Did you invest in any emergency medical unit companies?

MR. FOX:  Objection.

A.  I don't think so.

Q.  Do you recall the names of any of the fast mask --

A.  I don't.

MR. FOX:  Objection.

Q.  -- companies?

A.  The -- there's -- there's only one, and I -- I bought it and sold it and laughed about it because it's not the way that you're supposed to do things, but when opportunities have always presented themselves, I've always tried to be -- be similar to -- advantageous -- take

37 (Pages 368 - 371)

Page 372

**JOSEPH ZICHERMAN**

advantage of them.

Q. Did you invest in any other testing companies, other than Co-Diagnostics?

A. No.

Q. And so, how does Co- -- how does Stadium Capital identify which individual securities to sell?

MR. FOX: Objection --

A. To sell?

MR. FOX: -- time period?

Q. How does Stadium Capital identify which individual securities to sell?

MR. FOX: Objection.

Time period?

MS. BARROW: And so, I'm just going to remind counsel that the judge's local rules prohibit speaking objections.

A. The question I have -- I don't understand your question.

How do I identify companies that are -- I want to sell?

Page 373

**JOSEPH ZICHERMAN**

Q. Which -- how do you identify which individual securities you're going to sell from your portfolio?

A. Oh. It all depends upon regions. I can spend the next hour telling you.

I mean, sometimes I -- I'm -- I've -- like, for example, right now, I don't -- I think the market's in big trouble, and I'm incredibly -- I've been selling stock this afternoon, just to raise money because I don't want to be invested in anything.

I -- sometimes I anticipate an event and the event occurs, and I sell the stock. Sometimes I anticipate the event and the event does not occur, and I sell the stock. I manage risk pretty well.

I've always been a believer that if you can avoid --

THE WITNESS: God bless you.

A. -- if you can avoid losing money, then you would be able to make money. But I manage -- I'm a pretty good

Page 374

**JOSEPH ZICHERMAN**

risk manager.

And -- but the -- the question you're asking me is very -- yeah, I can spend all day on that one.

Q. And so, in or around 2021 and 2022, did you have a particular strategy to determine which securities you were going to sell?

A. No.

It has been the same for decades with me.

I -- as I mentioned before: Stylistically, I do things my way. And it seems to have worked for me in my career.

And other people would do it differently, but I am -- I would border -- I would suggest to you that I probably border on the more conservative way of doing business.

Q. And from January 1st, 2021 to August 31st, 2022, did Stadium Capital buy or sell securities in Siemans AG?

MR. URIS: Objection.

A. No.

Page 375

**JOSEPH ZICHERMAN**

Q. From January 1st, 2021 to August 31st, 2022, did Stadium Capital buy Qiagen NV?

A. Who?

Q. Q-I-A-G-E-N.

A. No.

MR. URIS: Objection.

A. No.

Q. What about QHealth?

MR. URIS: Objection.

A. No.

Q. What about LumiraDX, Limited?

MR. URIS: Objection.

A. No.

Q. What about Abbott Laboratories?

MR. URIS: Objection.

A. No.

Q. What about Becton?

MR. URIS: Objection.

A. No.

Q. What about Dickinson and Company?

MR. URIS: Objection.

A. No.

38 (Pages 372 - 375)

Page 376

**JOSEPH ZICHERMAN**

That's the same company. Becton -- it's called Becton, Dickinson. You have it as two companies. If you put it together, you will get it right.

Q. And what about Johnson & Johnson?

MR. URIS: Objection.

A. No.

MS. BARROW: And I think we can take just a two-minute recess.

MR. FOX: Okay.

THE VIDEOGRAPHER: The time is 6:33 P.M. We are now off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: The time is 6:35 P.M. We are now on the record.

MS. BARROW: Mr. Zicherman, I just have a few more questions for you.

Q. You testified earlier that you met Mr. Jason Uris through the country

Page 377

**JOSEPH ZICHERMAN**

club.

Q. Did you socialize with Mr. Jason Uris?

A. God forbid. No.

Q. So, your relationship with -- your relationship -- your social relationship was primarily with --

A. Yeah.

Q. -- Mr. Jason Uris' father?

A. At the club, there's a lot of people that you say "hello" to, and have a nice time and say "goodbye" to. But no. No socializing.

Q. It was just with his father; correct?

A. No socializing with his father, either. I have known him for years. But it's always been a pleasant relationship, "hello" and "goodbye."

Q. Okay. So, then the relationship was more with Mr. Sherman?

A. Yeah.

Q. And Mr. Sherman is closer with

Page 378

**JOSEPH ZICHERMAN**

Mr. Jason's father -- Jason Uris' father?

A. I -- I don't know. You would have to ask Mr. Sherman.

Q. Okay. So, Mr. Zicherman, you also mentioned "casket manufacturers." Did you invest in any casket manufacturers during COVID?

MR. FOX: Objection.

MR. URIS: Objection.

A. Not this trip around. I -- I -- once -- there was once something back about 30 years ago, and I remember investing in it because -- that's a little on the macabre side of it.

MS. BARROW: Okay. I think that's a fitting place for us to end. No further questions.

THE WITNESS: Thank you.

MR. URIS: I -- I may have a few questions, but if we could just take a -- like a five-minute break or so to -- to gather my notes.

THE VIDEOGRAPHER: The time is

Page 379

**JOSEPH ZICHERMAN**

6:36 P.M. We are now off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: The time is 6:42 P.M. We are now on the record.

EXAMINATION BY MR. URIS:

Q. You -- you testified earlier about the efforts of -- of your counsel to collect documents for this case; correct?

A. Yes.

Q. Is it correct that last year you provided access to your e-mail accounts to counsel in order to search for documents for this case?

A. It could have been two years ago. Certainly, last year.

MS. BARROW: Objection.

Q. You also testified earlier about in -- in -- regarding your research related to Co-Diagnostics, in terms of looking at analyst reports or -- or

Page 380

**JOSEPH ZICHERMAN**

estimates.

Is it correct that when you look at that type of information, you don't download any reports or estimates to your computer?

A.   I don't -- I can't say universally it's the case.

But in a case like that, I -- I gather the information quickly.  I find out who is in the field.  And I -- I get -- gather some quick data, and I -- I try and figure out how much I want to invest, and I -- I deploy my assets towards it.

Q.   And so, for example, you testified earlier that you reviewed a -- a transcript of the conference that the CEO of Co-Diagnostics --

A.   Somewhere I saw a -- a transcript and -- but then, again, remember that there is always -- there is drama that goes on when -- when a stock falls out of bed, based upon earnings or some news that it's completely unexpected.

So, then you go back and you

Page 381

**JOSEPH ZICHERMAN**

say, What caused this stock to go -- for example, from 10 to 5?

And there's always an answer.

You -- you can ask anybody, and they will say, Why did ABC Corporation go from 10 to 5?  And they would say, The CEO just had a heart attack, or They have a competing product or bad earnings or whatever.

So, with that said:  I'm sure, if it was done the way that I always do things, that there was a very abrupt price movement in the shares of Co-Diagnostics.

And I -- I probably turned around and said to someone that, Why is Co-Diagnostics down so much?

And they would say, Bad numbers or whatever.

And -- and my -- I am sure my response would have been, Well, you didn't say that three weeks ago or what have you.

But stocks always move for a reason, and then you just have to figure out the reason and act accordingly.

Page 382

**JOSEPH ZICHERMAN**

Q.   You mentioned, for example, that you may have reviewed a transcript on seekingalpha.com.

A.   Possibly, or somewhere else.

Q.   You -- and you would have just -- you would have just read that on the website; correct?

A.   Probably.

I don't get any hard data or anything.

Q.   And you and I have previously had discussions about efforts to mediate this case and resolve this case with defendants; correct?

MS. BARROW:  Objection; mischaracterizes his prior testimony.

A.   We've had conversations about resolving it?

Well, nobody has presented me with any conclusions yet.  I don't know if you have had discussions or what have you.

As I told you:  All you have to do is come to me with a proposal and I will say "yes" or "no."  But no one has done

Page 383

**JOSEPH ZICHERMAN**

that yet.

MR. URIS:  No further questions.

MS. BARROW:  No further questions.

THE VIDEOGRAPHER:  The time is 6:47 P.M.

We are now off the record.

(Whereupon, at 6:47 P.M., the Examination of this witness was concluded.)

THE COURT REPORTER:  Ms. Barrow, would you like a rough?

MS. BARROW:  Yes.

Thank you.

THE COURT REPORTER.  Thank you.

Mr. Uris, would you like a rough draft of the transcript?

MR. URIS:  I don't think we need one.

THE COURT REPORTER:  Do you need a copy of the transcript?

MR. URIS:  Yes.

We'll do -- do we have a

40 (Pages 380 - 383)

Page 384

**JOSEPH ZICHERMAN**

standing -- I think whatever our standing order is.

THE COURT REPORTER:  I am not sure what the standing order is:  Is it regular return?

MR. FOX:  We'll take a rough.

MR. URIS:  A rough?

Yeah.

We'll take a rough.

THE COURT REPORTER:  And do you know what the regular -- do you know what the return is:  Is it expedited?  Is it --

MR. URIS:  It's not expedited.

THE COURT REPORTER:  Okay.  So regular return, so two weeks.

MR. URIS:  Yes.

Thank you.

THE COURT REPORTER:  Thank you.

°      °      °      °

Page 385

**JOSEPH ZICHERMAN**

E X H I B I T S

DEFENDANTS' EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Defendant Co-Diagnostics, Inc.'s Notice of Deposition to Stadium Capital LLC | 240 |
| Exhibit 15 | Verification | 311 |
| Exhibit 16 | Declaration of Joseph Zicherman in Support of lead Plaintiff's Opposition to Defendants' Motion to Remove Stadium Capital as Lead Plaintiff and Class Representative and to Decertify the Class | 329 |
| Exhibit 17 | Certification | 340 |

(Exhibits retained by Court Reporter.)

Page 386

**JOSEPH ZICHERMAN**

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MS. BARROW | 234 |
| MR. URIS | 379 |

INFORMATION AND/OR DOCUMENTS REQUESTED

| INFORMATION AND/OR DOCUMENTS | PAGE |
|---|---|
| To the extent there is another document, we're going to ask for it | 318 |

QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 387

**JOSEPH ZICHERMAN**

C E R T I F I C A T E

STATE OF NEW YORK     )
                     : SS.:
COUNTY OF NEW YORK    )

I, KARYN CHIUSANO, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of February, 2025.

KARYN CHIUSANO

41 (Pages 384 - 387)

Page 388

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

February 19, 2025

To: JASON URIS

Case Name: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al

Veritext Reference Number: 7148751

Witness: Joseph Zicherman , cont.   Deposition Date:  2/4/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 389

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7148751
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 2/4/2025
WITNESS' NAME: Joseph Zicherman , cont.
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have made no changes to the testimony as transcribed by the court reporter.

_____   _____
Date              Joseph Zicherman , cont.
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn
   Statement; and
Their execution of this Statement is of
   their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public
_____
Commission Expiration Date

Page 390

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7148751
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 2/4/2025
WITNESS' NAME: Joseph Zicherman , cont.
In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.
_____   _____
Date              Joseph Zicherman , cont.
Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections
   in the appended Errata Sheet;
They signed the foregoing Sworn
   Statement; and
Their execution of this Statement is of
   their free act and deed.
I have affixed my name and official seal
this _____ day of_____, 20____.
_____
Notary Public

_____
Commission Expiration Date

Page 391

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 7148751
PAGE/LINE(S) /       CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____   _____
Date              Joseph Zicherman , cont.
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .
_____
Notary Public

_____
Commission Expiration Date

42 (Pages 388 - 391)

**[& - 4]**

**&**

**&** 227:21 228:10 229:17 231:2,24 232:8 338:21 376:6

**0**

**06978** 227:7 230:24

**1**

**1** 229:17 230:16 243:10 341:12
**10** 381:3,7
**10022** 228:6
**1011** 227:22
**10111** 228:12 231:4
**10794** 233:17 234:21
**11** 298:2,4,14 299:4 365:23
**1100** 388:1
**12** 266:11 290:7 292:8 354:12
**13** 308:21
**13th** 315:8,25 387:20
**14** 240:5,12 385:8
**15** 311:16,21 312:13 385:13

**15,000** 352:6
**15th** 349:3
**16** 329:18 330:4 348:14 385:14
**16th** 342:10,24
**17** 276:24 340:25 341:7 385:24
**17th** 330:25 340:5
**18034** 387:24
**1820** 388:2
**19** 347:22 388:4
**1998** 271:24
**1:22** 227:7 230:24
**1st** 269:19 271:14 374:21 375:2

**2**

**2** 243:19 297:4 297:19 303:17 310:10 344:3
**2/4/2025** 388:8 389:3 390:3
**20** 279:25 283:5 308:21 309:22 350:14 389:16 390:22 391:22

**2000s** 370:6
**2008** 345:7 370:7
**2020** 276:21,22 277:5 283:17 283:18,20 345:11
**2021** 269:19 271:14 281:23 283:22 285:15 286:5 300:3 374:6,21 375:2
**2022** 269:20 271:14 283:2,4 286:6 290:20 290:23 300:15 332:4 342:10 342:24 352:9 352:15,20 353:24 374:7 374:22 375:3
**2024** 250:3 314:23 315:8 315:25 316:6 317:9,16 349:3
**2025** 227:11 230:6 331:2 340:5 365:11 387:21 388:4
**21** 272:7 283:5 286:2
**21,000** 352:15
**216-523-1313** 388:3

**22** 286:2 358:24
**22nd** 250:3,23 314:23 316:6 317:8,22
**234** 386:6
**240** 385:12
**25th** 352:9
**26** 310:10 352:13,19
**26th** 276:22
**2nd** 365:11

**3**

**3** 244:3 330:20 348:11
**30** 229:16 266:11 332:12 350:14 378:14
**311** 385:13
**318** 386:13
**31st** 269:20 271:14 374:22 375:3
**329** 385:23
**33414** 233:19
**340** 385:24
**379** 386:7

**4**

**4** 227:11 231:2 244:9 331:7 333:3 335:20 351:10

**[44114 - addressed]** Page 2

**44114** 388:2
**45** 227:21
  228:12 231:3
**4:11** 227:11
  230:5
**4th** 230:5
  340:15

**5**

**5** 244:19
  307:11,19
  308:15 338:15
  381:3,7
**5.80** 354:10
**5.89** 352:15
**50** 274:8
  310:22 357:14
**5:02** 296:19
**5:14** 296:24

**6**

**6** 245:8 298:24
  357:19
**6.10** 354:10
**6.29** 352:7
**60** 238:3
**6:14** 367:22
**6:26** 368:3
**6:33** 376:14
**6:35** 376:19
**6:36** 379:2
**6:42** 379:7
**6:47** 383:8,10

**7**

**7** 246:14
**7148751** 388:7
  389:2 390:2
  391:2
**75,000.00**
  355:12

**8**

**8** 298:25
**800** 228:6

**9**

**9/25/42** 234:17
**9th** 276:21

**a**

**ab** 258:18
**abbott** 375:16
**abbreviations**
  238:15
**abc** 381:6
**ability** 235:15
**able** 272:4
  346:10 365:4
  373:24
**above** 388:17
**aboveboard**
  301:10
**abrupt** 381:13
**absolutely**
  258:18 267:11
  312:14 314:18
  314:21 324:19

**accept** 357:23
**access** 256:16
  256:18,19
  257:23 258:5
  261:7,8,10,14
  379:16
**accommodate**
  233:24 365:25
**accomplish**
  264:20,21
  277:22
**accordance**
  389:5 390:5
**account** 260:15
  260:21,24
  261:10 301:5
**accountant**
  299:24 300:24
**accounts** 301:7
  379:16
**accumulating**
  368:11
**accurate**
  236:12 274:12
  337:9 344:16
  351:21 354:16
  354:20,22
  355:18
**accurately**
  239:14 314:12
  314:20
**acknowledge**
  389:11 390:16

**acquaint** 361:4
**acquainted**
  304:15
**acquiring**
  353:25
**act** 381:25
  389:14 390:20
**action** 231:12
  244:5 323:18
  333:7,11,14
  338:9 344:6,8
  356:15,17,18
  357:10,12
  387:16
**actions** 357:6
**active** 261:9
  363:4,11
**activities**
  328:11
**actual** 248:17
  315:5
**actually** 254:11
  254:13 255:6
  292:20 327:4
  368:16
**additional**
  268:21,23
  269:2,16
**address** 233:14
  233:17 234:19
  234:20 265:7
  265:12 388:15
**addressed**
  333:25

**[adequately - appraisals]**                                    Page 3

**adequately**
  326:23
**administer**
  229:11 231:11
**advantage**
  345:7 369:2,5
  369:25 372:2
**advantageous**
  371:25
**advertisement**
  327:12
**affairs** 306:22
  307:2
**affect** 235:12
  235:14
**affiliations**
  231:20
**affixed** 389:15
  390:21
**afternoon**
  230:3 231:22
  373:12
**ag** 374:23
**aggrieved**
  305:12,15
**ago** 257:17,18
  257:20 258:6
  259:6 321:9
  332:5 339:24
  378:14 379:20
  381:22
**agree** 230:15
**agreed** 229:5
  229:20

**agreeing**
  233:23
**al** 230:21
  238:20 260:6
  388:6 389:3
  390:3
**albeit** 370:17
**allegations**
  246:15,20
**alleged** 245:9
  309:5
**alleging** 342:21
**allow** 236:15
**allowed** 242:5
  256:16,21
**alluded** 336:22
**alpha** 274:10
**amended** 335:2
  335:6,10,17
**america** 276:19
  283:17
**ameritrade**
  282:14
**amount** 309:2
  326:18 351:6
**analogy** 261:21
**analysis** 287:8
  310:7
**analyst** 262:19
  290:14,21,24
  291:3 292:4
  379:25
**analysts** 263:16
  263:23 290:8

**ancillary** 278:2
**andy** 279:19
  281:7
**ankle** 364:13
**answer** 235:15
  236:16 238:12
  239:14 243:16
  244:25 245:24
  246:4,9,12
  247:10 252:4
  270:2 274:24
  276:11 279:13
  280:11 283:8
  289:7 293:22
  305:4 315:21
  358:20 360:6
  363:12 364:25
  381:4
**answered**
  264:2 274:23
  275:3,16
  291:22,23,24
  314:12 317:18
  319:15,18
  321:2,3 335:11
  339:16 352:25
  355:8 359:17
  363:3,9 367:14
**answering**
  235:19 236:13
  236:14
**answers** 235:7
  236:22,23
  243:11 312:22

**anticipate**
  373:15,17
**anybody** 245:4
  263:11 272:2
  309:19 381:5
**anybody's**
  253:8
**aol.com** 265:8
  265:14
**apartment**
  247:25
**apologize**
  360:13
**apparently**
  331:25
**appeals** 361:19
**appear** 389:11
  390:15
**appearance**
  231:17
**appearances**
  231:19
**appeared** 254:7
**appears** 352:18
**appended**
  390:11,18
**applic** 371:2
**applicable**
  371:2
**appoint** 253:7
**appointed**
  253:10
**appraisals**
  287:21

**[appreciate - barrow]**

**appreciate**
234:8 245:5
276:4 366:4
**approach**
303:25 370:8
**approved**
358:2
**arising** 344:8
**aside** 319:5
**asked** 259:12
263:22 268:10
274:22 275:16
279:3 284:5
291:21 293:19
299:19 303:23
304:24 308:24
314:8,10,11
317:17 319:15
319:18 321:2
334:7 335:12
337:15,17
339:18 352:24
355:7 359:16
363:3 365:17
367:14
**asking** 235:6
236:14 289:4
356:5 374:4
**aspect** 345:23
**aspects** 345:13
368:13,15
370:25
**ass** 327:5

**asset** 363:6
**assets** 380:14
**assignment**
389:2 390:2
391:2
**assistance**
264:24
**associates**
272:2
**assume** 237:12
258:7,15 366:7
366:10
**assumed**
258:11
**attached**
351:15 390:7
**attachment**
241:10
**attack** 381:8
**attended**
249:25
**attention** 241:8
297:25 325:5,7
325:11,16
331:8 351:10
357:19
**attorney**
231:21 264:5
268:2 331:18
331:20 333:16
333:21 354:19
354:24 361:4
**attorneys** 228:4
228:10 247:3

250:21,22
251:12 252:21
256:12 259:22
261:4 263:7
274:5 303:23
326:17 351:25
360:18 363:11
**audio** 230:13
**august** 269:20
271:14 342:9
342:24 374:22
375:3
**authorize**
390:11
**authorized**
229:11 231:10
342:17,22
343:4,7,10
**avail** 368:22
**available**
262:20 263:10
292:9 326:18
**ave** 388:1
**avenue** 228:6
**avoid** 373:21
373:23
**award** 358:3
**aware** 274:18
274:20 276:8
284:5 285:16
285:20 286:8
287:5 362:23
**awful** 303:5

**axiom** 280:22

**b**

**b** 301:4,9,25
385:2
**baboon** 264:22
280:15
**baboons**
282:18
**back** 255:2
275:6 276:21
276:25 318:20
326:11 333:2
356:8 378:14
380:25 388:15
**bad** 250:11
263:5 381:9,18
**baker** 227:21
228:10 231:2
231:24
**bakerhostetler**
235:3 239:21
**bakerlaw.com**
228:13
**balls** 271:7
**barrow** 228:13
231:22,23
233:23 234:7,9
234:11 239:25
252:10 255:16
255:24 256:5
264:3 270:17
270:20 275:5
275:17,20,22

**[barrow - byproduct]**                                    Page 5

275:25 276:3 286:4 295:8,25 297:18 307:8 307:18 311:11 312:4 315:20 318:12,15,25 320:5,8,12,15 347:19 366:20 366:22,24 367:15,18 372:18 376:10 376:21 378:17 379:21 382:16 383:5,14,15 386:6

**barrow's** 279:14 283:8 347:12 360:7

**baseball** 322:23

**based** 344:15 380:23

**basically** 252:20 261:14 281:22 313:25 317:12

**basis** 237:20 332:25 334:24 336:11

**bat** 322:23

**bates** 240:11 311:20

**bears** 306:9

**becoming** 286:12 304:14

357:9

**becton** 375:19 376:3,3

**bed** 380:23

**beginning** 231:21 338:12

**behalf** 227:3,16 228:5 232:5,8 242:24 342:18 348:17 349:14 357:24 362:25

**belief** 313:2

**believe** 308:11 326:22 333:16 345:14 346:13

**believed** 344:16

**believer** 373:20

**belong** 321:14

**benefit** 350:9

**best** 238:2 283:7,11 312:25

**better** 284:16 304:14 326:8 350:8 367:9

**beyond** 357:25

**big** 291:13 341:25 369:21 373:10

**biggest** 349:21 364:21

**biotech** 293:16

**birth** 234:16

**bit** 257:7 277:2 304:7 313:23 319:3,7 355:11 358:16 368:6 368:10

**blank** 326:3

**bless** 373:22

**blood** 387:16

**bloomberg** 280:16,18,19 282:10 288:24 289:2

**booked** 303:11

**border** 374:17 374:19

**borrow** 234:24

**bottom** 309:22 312:11 341:21

**bought** 354:5 371:20

**brae** 322:13

**break** 238:3,5 295:10,17,20 295:22 296:8 296:10 366:23 367:16 378:23

**breaks** 237:25 238:12

**brian** 227:9 228:11 232:3 239:9

**brief** 337:11

**bring** 249:22 325:7

**broad** 320:7 353:14

**broker** 261:13 262:13

**brokers** 262:15

**brought** 325:4 325:10,14 346:8 358:25

**brown** 227:9 228:11 232:3 239:9 343:22

**brushing** 284:13

**bunch** 251:7 268:8 298:10

**burgeoning** 286:12

**burn** 322:13

**business** 249:17 262:14 285:24 291:6 306:4,13,20 307:4,4 327:23 353:7 356:3 357:13 374:20

**busy** 365:24

**buy** 337:8 353:10,16,19 354:3,5,9,10 374:22 375:3

**buying** 345:15

**byproduct** 280:14

[c - chiusano]

Page 6

| c | | | |
| --- | --- | --- | --- |

**c** 228:2 232:23 233:7 387:2,2
**ca** 388:25
**california** 293:16
**call** 249:14 254:6,11,17 259:11 283:14 292:19 336:14
**called** 232:23 274:10 339:18 376:3
**calls** 251:11 338:19,25 339:17
**capabilities** 282:4
**capital** 227:3 227:16 228:5 230:20 238:19 240:7,16 241:5 241:12 242:25 260:24 261:5 266:7,24 290:6 297:23 300:22 301:3,16,21,22 302:4 319:9,10 329:21 330:12 342:19 343:5 344:4 348:16 350:10,13,19 350:22 351:5

351:22 357:22 362:25 372:8 372:13 374:22 375:3 385:12 385:20 388:6 389:3 390:3
**capital's** 301:2 307:21 351:12 368:6,8
**capitalize** 282:24
**car** 277:18,20 322:24
**care** 344:22
**career** 326:2 374:15
**caretaker** 366:11
**caribbean** 365:5
**carry** 322:24
**cars** 277:19
**case** 227:6 230:24 235:4 238:17 239:2 252:7,14,19 253:2,5 255:6 255:12 256:6 256:10 257:24 258:10 264:10 266:13 267:18 273:4 304:15 305:13,16 310:19 317:3

319:9 320:11 320:18 328:3 328:14 332:4,7 335:2,24 337:2 337:6,24,24 338:4,23 349:11,21 356:23 358:22 358:23,25 359:8,14 360:15,21 361:19 379:13 379:18 380:8,9 382:14,14 388:6 389:3 390:3
**cases** 348:5
**casket** 345:18 378:7,8
**caused** 247:7 287:14 381:2
**causes** 364:14
**causing** 364:14
**cay** 365:8
**ceased** 272:6
**center** 276:24
**ceo** 254:7 283:14 291:8 291:18,20 306:3 343:13 380:17 381:7
**certain** 235:25 264:14 273:15 303:19 306:4

324:13 334:20 336:22 342:20 343:8,9,19 368:11,25
**certainly** 246:12 319:25 347:5 351:8 379:20
**certainty** 340:21
**certificate** 390:11
**certification** 229:8 340:24 341:10 342:18 348:11 354:17 361:15 385:24 389:1 390:1
**certify** 387:9,14
**cetera** 321:19 321:19
**cfo** 343:17
**change** 388:13 388:14 390:8 391:3
**changes** 388:12 389:7 390:7,9
**chart** 351:18
**cheated** 326:8
**children** 365:23 366:11
**chiusano** 227:23 231:9 387:7,24

**[chooses - complaint]**                                                    Page 7

| | | | |
|---|---|---|---|
| **chooses** 351:2 | 363:8 385:21 | **collectively** | **communication** |
| **chose** 347:4 | 385:23 | 251:9 | 244:21,24 |
| **chris** 228:17 | **clear** 286:20 | **com** 265:20 | 245:4 251:20 |
| **christmas** | 313:8 | **come** 257:3,13 | 273:2 295:2 |
| 365:5 | **clearing** 261:13 | 318:19 320:24 | 332:18 |
| **christopher** | 262:13 | 340:8,17 355:5 | **communicati...** |
| 231:5 | **clearly** 304:6 | 356:8 358:12 | 294:19 298:18 |
| **circle** 246:10 | 306:23 | 360:2 365:17 | 299:8 |
| **circumstances** | **cleveland** 388:2 | 382:24 | **companies** |
| 244:10 286:13 | **clever** 278:25 | **comes** 274:11 | 276:14 277:18 |
| **civil** 227:20 | **client** 268:2 | 334:5 | 278:6,8,12 |
| 310:10 389:5 | 272:12 280:6 | **comfort** 323:16 | 282:24 284:6 |
| 390:5 | 327:16 | **comfortable** | 285:23 286:17 |
| **claim** 309:3 | **clients** 271:25 | 322:25 323:14 | 370:22 371:4,7 |
| **clarify** 237:10 | 272:7 | 324:17 | 371:11,18 |
| 254:2 255:14 | **close** 271:17 | **coming** 288:18 | 372:4,24 376:4 |
| 255:23 256:5 | **closer** 377:25 | 334:5 338:4,11 | **company** |
| 320:14 | **club** 321:15 | **commenced** | 254:10,14,16 |
| **clarifying** | 322:9,12,13,17 | 337:3 | 274:15,17 |
| 237:12 293:23 | 324:22 327:19 | **comments** | 276:10 284:8 |
| **class** 232:6,9 | 377:2,12 | 334:11 335:16 | 286:18,21 |
| 244:14,22,24 | **colleagues** | **commission** | 287:11 355:17 |
| 245:3 309:4,19 | 289:10,12,14 | 389:19 390:25 | 369:2 375:23 |
| 326:16,21,24 | **collect** 252:25 | 391:25 | 376:2 |
| 329:22,23 | 253:5 255:9 | **common** | **compensation** |
| 330:13,14 | 256:9 258:25 | 301:10 329:7 | 328:17 351:5 |
| 338:20,25 | 259:8 379:13 | **commonly** | **competing** |
| 339:5 348:18 | **collected** 329:7 | 274:9 | 381:9 |
| 349:15,25 | **collection** | **communicate** | **compiles** |
| 350:4 351:14 | 259:11,12 | 269:20 270:9 | 302:13 |
| 356:15,16,18 | 335:23 | 270:13 294:6 | **complaint** |
| 357:6,10,12,24 | **collections** | **communicated** | 245:10 246:16 |
| 358:6,10 | 337:14 | 271:13 293:5 | 309:7 333:6,11 |
| 361:14 362:15 | | 332:11 | 333:14,18,20 |

**[complaint - counsel]** Page 8

| | | | |
|---|---|---|---|
| 333:24 334:8 | condition | consulted | 274:15,17 |
| 334:13 335:2,7 | 306:14 307:4 | 335:21 | 282:10 290:8 |
| 335:10,17 | 355:17 | cont 388:8 | 292:13 294:17 |
| 342:19,23,25 | conditions | 389:4,9 390:4 | 297:24 300:13 |
| 343:7,10 | 306:4 307:5 | 390:13 391:20 | 302:10,11,14 |
| completed | conduct 282:16 | content 248:17 | 302:15 314:9 |
| 388:15 | conducted | contest 238:8 | 322:10,18 |
| completely | 344:21 | continue | 328:7 329:14 |
| 380:24 | confer 331:19 | 230:14 | 338:5 340:2 |
| complies | conference | continued | 344:10 352:3,8 |
| 232:16 284:22 | 239:20 254:6 | 227:14 352:20 | 352:14,17,21 |
| 298:3 308:22 | 254:24 273:16 | control 363:5 | 353:3 357:6 |
| 319:6 338:16 | 273:24 292:5 | convenient | 362:21,22 |
| 351:19 357:20 | 306:3 380:17 | 366:17 | 365:8 377:17 |
| comply 235:25 | conferred | conversation | 379:13,15 |
| computer | 331:13 | 282:20 283:25 | 380:3 382:8,15 |
| 257:3,5,13 | confirm 354:15 | 285:7 328:20 | corrections |
| 258:4,5,21 | 354:22 | 328:23 | 388:12 390:17 |
| 259:19 260:2 | confused | conversations | correctly |
| 264:19 339:25 | 363:25 | 230:10 382:18 | 328:24 352:5 |
| 380:6 | connect 347:18 | copies 312:3 | cortisone |
| computers | connection | copy 229:14,17 | 364:17 |
| 256:22,25 | 259:10 289:22 | 256:19 260:8 | cost 334:22 |
| 269:4 | 295:3 300:3,7 | 260:11 318:13 | costs 358:4 |
| concerned | 300:12,12,16 | 333:20 383:23 | could've 347:3 |
| 291:15 | 300:19 301:17 | corner 341:21 | counsel 229:6 |
| concerning | 325:20 | corporation | 229:17 230:18 |
| 331:13 335:22 | consent 258:16 | 381:6 | 231:18 232:12 |
| concise 323:9 | 259:7 342:6 | correct 239:15 | 234:3 244:15 |
| concluded | consequences | 250:3 251:2 | 247:12,14 |
| 383:12 | 346:7 | 258:22 260:3 | 251:21 255:8 |
| conclusions | conservative | 264:15 265:4 | 264:8 308:7 |
| 382:21 | 374:19 | 265:13 269:17 | 311:9 331:13 |
| | | 269:18 273:16 | 332:8 335:22 |

**[counsel - defendant]**                                                     Page 9

338:20,20,25
339:5 344:7
372:19 379:12
379:17
**counsel's**
267:21
**country** 321:15
322:9,12,13,17
324:22 376:25
**county** 387:5
389:10 390:15
**couple** 235:9
278:18 279:3
**course** 238:9
247:6 262:21
271:5 323:17
336:18
**court** 227:2
229:13 230:22
231:8 232:11
232:14,17
233:3,8,11,13
233:18 234:21
235:24 238:23
249:8 250:2,5
250:14,16,16
270:25 304:3
333:5 337:3
339:11 341:13
358:2 359:4,4
365:14 383:13
383:17,22
384:4,11,16,20
385:25 389:7

**courtroom**
239:22
**covid** 274:21
276:14,17,19
277:24 278:14
278:20 279:5
282:6 344:18
345:11,13,22
346:13,18,22
346:24 347:2,4
347:8,9,20,22
370:16 378:9
**create** 308:14
**creation** 362:19
**credentials**
260:14,18
261:2,6 269:3
269:10
**crisis** 345:6
369:24 370:4
**cure** 346:10
**curious** 277:3
277:14
**currency** 263:4
**current** 234:18
234:20
**currently** 265:9
287:15
**cut** 290:4,4
**cv** 227:7 230:24

**d**

**d** 229:2 301:4,9
301:25 386:3

**damages** 309:3
309:16 310:7
310:13
**data** 256:22
380:12 382:10
**date** 227:11
234:16 240:8
295:6 311:17
329:25 340:10
341:2 388:8
389:3,9,19
390:3,13,25
391:20,25
**dated** 314:23
315:8,25 316:5
340:4
**dave** 321:10,13
322:4
**david** 269:21
321:5,18 322:4
322:6,7 327:14
329:4
**day** 292:25
293:2 330:25
352:13 353:16
353:17 354:11
356:9 369:11
374:5 387:20
389:16 390:22
391:22
**days** 229:16
276:24 353:18
388:18

**deal** 278:23
369:21
**dealing** 260:23
262:25
**dear** 388:10
**decades** 326:4
374:12
**deceived**
305:22 306:2
326:8,9
**deception**
305:24
**decertify**
329:23 330:14
385:23
**decide** 362:17
**decided** 324:2
**decision** 293:6
294:7 370:10
**declaration**
329:18 330:8
385:14
**declarations**
334:21 336:22
**declare** 312:23
**dedicated**
293:16
**deed** 389:14
390:20
**deemed** 388:19
**defendant**
227:18 240:5
240:14 241:10
303:18 313:20

385:8
**defendant's**
240:4 311:16
329:17
**defendants**
227:10 228:10
230:19 231:25
235:4 239:6,7
240:12 243:12
243:22 267:16
268:6 297:4,19
297:21 303:16
307:11,19,23
308:14,24
311:21 312:13
312:21 314:10
314:11 329:20
330:4,11
338:24 339:2,6
340:25 341:7
348:12 382:15
385:4,18
**definitely** 265:5
283:19 292:21
300:20 317:22
336:9 370:14
**degree** 347:24
**demand** 278:4
**demands**
362:12
**demeanor**
239:21
**denied** 361:10
361:12

**dep** 247:5
**department**
388:22
**depend** 323:20
**depending**
243:15 262:10
**depends** 365:21
373:5
**deploy** 380:14
**deposed** 241:4
360:20
**deposition**
227:15 229:8,9
229:14 230:17
230:25 233:24
236:2,10 237:6
238:16 240:6
240:15 241:11
242:13,19,22
243:4 246:24
247:5 248:6
263:22 266:16
266:22 267:10
268:5 282:13
298:7 305:2
348:19 349:2,6
363:16,19
385:11 388:8
388:11 389:1,3
390:1,3
**described**
310:9
**description**
385:7

**desk** 279:25
**destination**
268:15
**detailed** 263:5
**determination**
353:9
**determine**
278:17 374:8
**determined**
358:14
**device** 259:24
**devices** 259:3
304:10
**di** 271:20,20
**diag** 279:7
**diagnostic**
239:8 241:11
301:18 370:11
370:13
**diagnostics**
227:8 228:11
230:20 232:2
238:19 239:8
240:5,14
254:20 255:5
258:9 262:17
262:23 263:25
269:12 270:16
271:21 273:9
273:15,20
274:14 276:9
277:6,16
278:13,17
279:8 280:24

281:5,14
282:21 284:2
285:12,16,20
286:9,16 287:6
287:21,24
288:4 289:11
289:16,18,19
289:25 290:16
293:7,25 294:9
294:20 295:2
302:20 325:15
342:20 344:12
351:13 352:6
352:12 353:24
353:25 355:6
372:5 379:24
380:18 381:14
381:17 385:9
388:6 389:3
390:3
**dial** 289:2
**dialogue**
291:16,20
339:20
**dickinson**
375:22 376:3
**differ** 303:25
**different** 251:7
254:14 262:12
274:9 313:23
318:2 345:12
345:20 353:7
370:2,9,24

**differently** 334:19 374:17

**dig** 260:5 264:24

**dinner** 252:8 285:14

**direct** 243:6 244:23 245:3 325:11,16 331:8 344:11

**directed** 308:19

**direction** 344:6

**directly** 358:5

**disagreed** 322:21 323:13

**disagreeing** 323:2

**disclosing** 248:17

**disclosures** 255:4

**discovery** 252:18,20 269:16 338:24

**discrepancy** 315:11,14 316:8,18

**discuss** 248:5 251:6 271:20 272:23 310:12 328:21 338:22 339:2

**discussed** 235:23 273:11

336:12

**discussing** 272:10 336:6

**discussions** 361:22 382:13 382:22

**dismiss** 361:6

**displeasure** 323:17,21,25

**district** 227:2,2 230:22,23 238:23,24

**docket** 341:13

**document** 240:11,13,18 240:20,25 242:2 258:12 258:12 259:11 295:9 297:3,10 297:11,15 298:9 299:3 307:7,14,20 308:5,8,14,19 311:20,22,24 312:2,5 313:22 314:4,23 315:2 315:23 316:21 317:10,16,21 318:5 319:4 330:3,6,16,23 331:4 335:23 340:4 341:4,9 341:12,14 342:7 386:12

**documentation** 248:20 304:14

**documents** 244:4 247:3 249:3,8,10,13 251:17 258:17 264:9 265:23 266:6,12,18,23 266:23 267:6 267:13,13,23 268:6,9,19,21 268:24 269:2 287:5 289:24 298:11,17 299:8,15 303:19,20,22 307:16 308:3 333:5 338:22 339:3 379:13 379:17 386:9 386:10

**docusign** 342:3 342:7

**doing** 269:6 272:7 310:22 327:7 374:20

**doke** 297:9

**dollars** 280:6 291:11

**download** 380:5

**dozen** 249:6

**dr** 364:19

**draft** 308:7 333:23 334:5 335:6 342:25 343:2 383:19

**drama** 380:21

**drops** 263:14

**dry** 290:4

**due** 344:19

**dug** 257:6

**duly** 232:24 387:11

**dumb** 249:16

**dwight** 227:8 228:11 232:3 239:8

**e**

**e** 228:2,2 229:2 229:2 232:23 232:23 233:7 256:9,17 257:24 265:4,5 265:7,12 270:14 271:8 271:11,15 375:6 379:16 385:2 386:3 387:2,2

**ear** 260:6

**earlier** 238:18 263:21 317:10 339:23 344:17 376:24 379:11 379:22 380:16

**[earnest - expectations]**

earnest 283:16
earnings
  254:10,12,12
  255:4 288:12
  306:24 307:3
  355:19,22
  380:23 381:9
easy 260:7
  314:15
ebarrow
  228:13
ebola 287:2
ecf 341:12
effect 229:12
  229:15
effort 327:19
efforts 379:12
  382:13
egan 227:8
  228:11 232:3
  239:9 343:24
eight 251:15
either 341:24
  341:24 343:11
  354:12 377:19
electronically
  341:24
else's 309:19
email 388:17
emergency
  277:10 370:23
  371:10
employed
  281:18,20,21

enables 301:4
enclosed
  388:11
enron 369:20
enter 293:2
entered 390:9
entertained
  339:16
entire 389:5
  390:5
entitled 238:6
  307:20 341:9
  358:13
entity 302:6
entrusting
  326:17
episode 290:3
episodes 247:7
erica 228:13
  231:23 234:24
errata 388:13
  388:18 390:7
  390:10,18
  391:1
esq 228:7,7,13
estimates
  288:13,13
  380:2,5
et 230:21
  238:20 321:19
  321:19 388:6
  389:3 390:3
event 373:16,16
  373:17,18

event's 369:6
events 335:22
  336:16,19,21
  338:22 345:21
  346:4 369:7,15
  369:17
everybody
  365:25
everybody's
  366:2
evidence
  252:21 253:2,5
  255:10,15
  258:25 259:8
  259:11,13,20
  273:3
ex 310:16
exacerbate
  347:5
exact 340:10
exactly 254:4
examination
  234:10 379:9
  383:11 386:5
  387:10,12
examined
  233:2
example 243:7
  278:5 333:4
  338:23 373:9
  380:15 381:3
  382:2
except 229:21
  303:7 304:5

358:2
exchanged
  252:23
exciting 360:23
executed
  390:10
execution
  389:14 390:19
executions
  280:5
executives
  342:21 343:8,9
  343:19
exhibit 240:4
  240:12 297:4
  297:19 303:17
  307:11,19
  308:15 311:16
  311:21 312:13
  313:18 329:17
  330:4 340:25
  341:7 348:12
  385:6,6,8,13,14
  385:24
exhibits 385:4
  385:25
exist 306:5,14
  306:24
existed 306:23
expectation
  306:15 351:4
expectations
  306:19,20

**[expecting - first]**                                    Page 13

| | | | |
|---|---|---|---|
| **expecting** 242:13 | **face** 278:5 284:8 316:15 370:19,20 371:3,6 | 340:13,15 387:20 388:4 | **files** 260:9,12 |
| **expedited** 384:13,15 | | **federal** 227:19 310:9 344:9 359:4 | **filing** 229:7 305:13 342:22 |
| **expense** 358:5 | **facing** 285:3 | **feedback** 334:8 335:9,13 | **filings** 249:8 |
| **expenses** 358:4 | **fact** 253:10 271:24 272:9 306:10 356:11 365:2 | **feel** 305:25 322:25 323:14 323:16 324:16 326:7,9 334:19 346:18 | **fill** 345:5 353:17 |
| **experience** 276:17 344:19 | | | **finalized** 308:8 333:24 335:7 |
| **experienced** 280:9 | **facts** 244:10 245:9 309:7 | | **financial** 287:8 328:11 345:6 369:24 370:2,4 |
| **expert** 310:7,13 310:15,17,19 310:20 311:6 362:20,24 | **fair** 265:6 275:19 317:5 | **fellow** 257:3,13 258:4 259:19 261:3 | **financially** 231:13 |
| **expiration** 389:19 390:25 391:25 | **fairly** 261:9 325:24 326:7 326:23 | **felt** 253:11,15 253:19 263:3 290:15 306:22 310:24 | **find** 261:19,19 264:9,14,24 274:2 282:7 380:10 388:11 |
| **explained** 313:9 | **falls** 380:22 | | **finding** 346:21 |
| **explicitly** 237:19 | **false** 336:23 | **familiar** 310:25 | **fine** 243:5 295:13 |
| **express** 323:17 | **familiarized** 248:23 292:22 | **ffox** 228:8 | **finish** 236:14 331:25 |
| **expressed** 323:24 | **family** 255:8 | **field** 380:11 | **firing** 326:4 |
| **expressing** 323:21 | **fancy** 252:20 | **figure** 299:23 353:11 380:13 381:24 | **firm** 231:9,23 235:3 247:19 280:4,4,20 288:11 319:17 |
| **extent** 318:12 318:15 386:11 | **far** 326:24 | **figuring** 345:3 | |
| | **fast** 255:5 345:10,10 371:15 | **file** 301:21 302:9 | **first** 232:24 233:9 243:7 245:14,14 276:18 285:19 297:21 304:25 305:2 307:23 312:21 339:24 |
| **f** | **father** 321:16 322:8 325:9 328:6 329:2 377:11,16,18 378:2,2 | **filed** 230:21 256:6 333:5,6 333:11,14 341:13 343:12 358:22,23 360:25 361:6 361:15 362:25 | |
| **f** 229:2 298:2 298:15 299:4 387:2 | | | |
| | **february** 227:11 230:5 | | |

342:14 344:18 344:23 356:4 356:16

**fitting** 378:18

**five** 251:13 290:7 378:23

**florida** 233:19 234:22 250:19 257:3,14 340:2

**focused** 343:15

**follow** 324:7 363:11

**following** 254:12 293:2

**follows** 233:2 288:11

**forbid** 377:5

**force** 229:15

**forecasts** 288:6

**foregoing** 310:6 389:13 390:18

**forget** 350:25

**forgot** 332:16 337:19

**form** 229:21 252:2

**former** 289:10 289:12,13

**forth** 275:6 310:8 351:14 387:11

**fortune** 291:8

**forward** 255:5 324:3 345:11 366:9 388:15

**found** 269:12 274:7,8 278:13 286:22 348:3,7 349:23 350:6

**four** 251:13 266:6,11

**fox** 228:4,7 232:5,7,7,8 233:20 245:25 246:3,6 247:18 247:20 248:9 252:2,6 255:14 255:17,22 256:3 257:21 258:24 259:19 265:25 267:15 267:17,19 269:24 270:4,6 270:15,18,22 270:24 272:20 272:21,23 275:2,8,11,18 275:21,24 276:2,5,11 279:13 283:7 283:11 285:9 294:22 295:16 295:19,23 296:2,4,8,11,13 296:16 297:8 304:21 307:12

309:12 311:9 311:12 312:3 315:19 317:17 319:19,24 320:2,17,22 322:18,21,22 323:2,12,15 324:18,24,24 325:6,12,17 326:22 327:16 328:21 332:20 338:21,21 340:23 346:2 347:11,14,18 352:23 359:16 359:22 360:2,6 360:9 363:3 364:6,11 366:14,17,21 366:23 367:2 367:14,17,20 371:9,12,17 372:10,12,16 376:12 378:10 384:7

**frame** 271:19

**fred** 228:7 247:18

**frederick** 232:7

**free** 389:14 390:20

**friend** 271:17 272:18 279:6,9 345:15

**friends** 279:4

**front** 315:24 316:15

**full** 234:13 236:16 315:17

**fully** 313:10 342:17 343:4

**further** 229:20 347:21 378:19 383:3,5 387:14

**future** 287:16 367:4,6

**g**

**g** 375:6

**gained** 257:23 258:5

**game** 262:25

**gather** 258:12 353:8,19 378:24 380:10 380:12

**general** 248:18 270:17 332:11 350:5 368:9 370:8

**generally** 368:7

**gentleman** 325:8

**gentlemen** 247:15 248:9 271:2 319:16 340:8

**[getting - hereto]**

**getting** 331:25 337:11 344:20
**gift** 346:12
**give** 232:19 236:15 240:2 258:16,24 261:7,21 279:10 348:25 349:5 358:18
**given** 276:14 305:19 308:7 387:13
**gives** 261:8,10 261:13
**go** 230:15 236:3 246:10 252:8 256:21 256:25 261:25 275:6 295:8 296:16 324:2 327:21 333:2 335:19 356:8 380:25 381:2,6
**goal** 325:19,21
**god** 232:21 373:22 377:5
**goes** 309:8 349:11 353:10 380:22
**going** 230:4 235:5 236:3,5 237:9,12,21 238:16 243:6 243:14 247:3

252:17 257:4 258:7 261:22 264:4 271:6 275:5 287:13 291:5,10,11,16 297:2 301:13 317:2 318:16 319:2 323:6 345:4 358:12 360:22 366:18 369:6 372:19 373:3 374:8 386:12
**goldman** 262:14 301:6
**golf** 270:8,12 327:20
**good** 230:2 231:22 291:7 357:17 373:25
**goodbye** 377:14,21
**google** 261:22 262:2
**gotten** 347:3
**grade** 306:11
**grandchildren** 365:23 366:12
**granted** 361:11
**great** 235:8,22 236:19 237:15 238:14 239:4 239:10,11,18 241:6 279:18

282:4 284:9 297:17 318:25 370:15,17
**group** 321:18 321:19 329:6
**groups** 278:2
**guess** 314:6
**guy** 246:5,7 280:12

**h**

**h** 227:8 228:11 232:3,23,23 233:7 239:8 385:2
**half** 248:14 257:4
**hand** 232:15 297:3 341:21 387:20
**handed** 240:10 311:19 330:3 341:7
**handing** 297:5 307:7,11
**handle** 271:23 272:6
**handles** 300:25
**handling** 271:25
**happen** 257:19
**happened** 306:7 337:5 359:14 360:15

**happy** 246:12 279:17 350:21 350:24 354:12 364:23
**hard** 236:23 256:19 260:8 260:11 382:10
**harvard** 288:20
**harvey** 329:2,3
**head** 236:7,22
**heard** 350:20
**hearing** 235:24 250:2,14,15,24 251:18,22,23 252:13,15 304:2,20 305:2 326:14 365:10 365:14,19
**hearings** 365:13 367:4
**heart** 381:8
**held** 227:20
**hello** 377:13,21
**help** 232:21 256:2 264:9,20 313:13 346:23 347:8,10,21,23 353:4
**helped** 346:14 364:18
**hereinbefore** 387:11
**hereto** 351:15

**hereunto** 387:19
**hi** 329:8,8
**hired** 257:2,13
**history** 356:4
**hmm** 292:14
**hold** 284:11 293:7 294:8,8 294:8
**holding** 334:4
**homework** 278:11,11,12 278:16 288:16
**hope** 338:12 353:10 361:12 361:20 366:13 366:15
**hopefully** 235:6
**hostetler** 227:21 228:10 231:2,24
**hour** 257:4 366:19 373:6
**hours** 247:2 248:3,12 251:10 292:8
**house** 261:3 340:8
**housing** 345:9
**hss** 364:19
**huh** 243:8 244:12 250:4 313:24 315:7 341:8 348:13

348:24
**hum** 234:25 236:23 237:2 238:21 239:16 240:17 241:13 256:7 258:23 281:19 320:12 330:10 331:9 336:2 339:9 340:6 369:22
**hungry** 248:15

**i**

**idea** 266:4,10 277:9 285:13 290:17,19 295:7 316:12 317:19,25 327:17,24 335:8
**ideally** 287:15 345:4
**identification** 240:8 311:17 329:24 341:2
**identified** 309:7
**identify** 259:13 259:18 372:8 372:14,24 373:2
**if's** 275:15
**imagine** 272:9 318:7

**impediment** 366:9
**imperative** 256:25
**important** 235:25 236:21 291:2,5 303:2 338:22 345:17 364:23
**inc.'s** 240:5,15 241:11 385:10
**incident** 253:9 253:16 254:3 254:22
**included** 388:13
**including** 255:8 333:5 335:23 348:18 358:3 366:3
**incorporated** 301:22 390:12
**incorrect** 293:13 334:21
**incredibly** 280:8,8 323:7 323:8 373:11
**incurred** 309:17
**independently** 354:21
**indicated** 309:16

**indicating** 311:11 312:16 388:13
**individual** 294:19 301:7 348:5 372:9,14 373:3
**individually** 309:3
**industry** 286:11,12
**information** 248:24 249:2 253:12 254:8 256:19 259:23 260:20 263:5,9 282:2 288:22 289:9 297:16 302:13 308:13 308:17,19 309:11 312:25 314:3 337:10 339:3,4 344:15 351:20 354:14 380:4,10 386:9 386:10
**informed** 279:7 293:3 370:10
**initial** 247:8
**initiate** 325:12 325:17
**initiated** 332:4
**input** 284:10 290:13

institutional 301:5

instruct 253:4

instructions 259:21 324:8

instruments 370:2

intend 326:15

intention 345:24 346:3

intentions 346:3

interactive 262:15

interest 326:24 328:14 363:6

interested 231:13 277:19 344:18 387:17

interesting 258:2

interpose 237:18

interposes 237:22

interrogatories 243:12 307:24 312:21,23 316:3

interrogatory 308:21,23 313:8,11,16 317:9

interrupt 236:16

introduced 328:25

invest 281:5 371:3,6,10 372:3 378:8 380:13

invested 280:23 281:14 373:13

investing 378:15

investment 344:24 368:7,9

investments 368:25

investor 293:16 325:23

investors 349:25,25 350:4,5,7

involved 246:11 282:23 284:7,8 285:23 286:23 302:18 310:18 357:15

involvement 273:12

ipad 257:8 258:21 260:2 264:20

island 348:7

issue 235:10 253:20 325:14

333:25 354:6 356:7

issues 235:18

item 298:4

**j**

j 232:23

january 250:2 250:14,16,23 269:19 271:14 285:15 286:3 331:2 340:5 365:11 374:21 375:2

jason 228:7 232:4 239:25 247:18 253:10 269:2 322:8 323:23 328:25 329:8,12 336:14 376:25 377:4,11 378:2 388:5

jason's 321:16 321:22 328:6 378:2

jeffrey 293:6

jim 310:25 311:10,14

job 268:17 327:3,6,8

joe 234:14 302:4 329:8

joez6 265:8,12 265:14,18

johnson 376:6 376:7

joke 246:2

joseph 227:18 230:1,17 231:1 232:1 233:1,10 234:1,14 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1

286:1 287:1
288:1 289:1
290:1 291:1
292:1 293:1
294:1 295:1
296:1 297:1
298:1 299:1
300:1 301:1
302:1 303:1
304:1 305:1
306:1 307:1
308:1 309:1
310:1 311:1
312:1 313:1
314:1 315:1
316:1 317:1
318:1 319:1
320:1 321:1
322:1 323:1
324:1 325:1
326:1 327:1
328:1 329:1,18
330:1,8 331:1
332:1 333:1
334:1 335:1
336:1 337:1
338:1 339:1
340:1 341:1
342:1 343:1
344:1 345:1
346:1 347:1
348:1 349:1
350:1 351:1
352:1 353:1

354:1 355:1
356:1 357:1
358:1 359:1
360:1 361:1
362:1 363:1
364:1 365:1
366:1 367:1
368:1 369:1
370:1 371:1
372:1 373:1
374:1 375:1
376:1 377:1
378:1 379:1
380:1 381:1
382:1 383:1
384:1 385:1,14
386:1 387:1
388:8 389:4,9
390:4,13
391:20
**judge** 229:13
275:25 358:14
359:7 365:15
**judge's** 372:20
**judicious**
356:10
**july** 290:23
352:9,13,19
353:24
**jump** 263:17
**june** 290:20
315:8,25 318:2
318:5

**juris** 228:8
**jury** 349:11

**k**

**kaplan** 228:4
232:5,7 247:20
248:9 258:24
259:19 272:20
272:23 319:19
320:22 322:18
322:21 323:2
323:12,15
324:18,23,24
325:6,11,17
326:22 327:16
328:21 338:20
338:21
**kaplanfox.com**
228:8,8
**karyn** 227:23
231:8 236:11
387:7,24
**kaufman** 311:2
311:10,14
**keep** 291:13
307:8
**key** 335:22
336:16,19,21
338:22
**kidding** 237:3,4
257:11
**kiley** 293:6,24
**kill** 277:12

**kilsheimer**
232:8 338:21
**kind** 259:23
261:20 263:8
277:20 326:10
364:15
**kindly** 233:4,14
**kinds** 369:25
370:24
**knew** 259:25
284:5,7 293:19
293:25 348:6
**know** 240:21
242:4 249:5,11
249:13 251:14
251:16 253:25
261:23 262:24
263:2,3,10,11
263:12 265:24
268:14,23
271:23 272:22
273:12 280:13
282:6,7 284:24
287:10 288:8
288:19,24,25
290:9 291:12
295:7,11,19
300:24 303:10
304:12 306:8
311:25 313:7
316:13,17
317:20 321:15
321:16 322:18
323:5 324:6,10

324:11,21
327:5,23,25
328:10 329:3,4
331:6 332:23
334:4,6,15
336:8 337:8,10
339:21 343:18
346:9 351:24
354:9,23 355:3
358:19,20,21
359:12,14,15
360:15 361:5,7
361:8,10,18,23
362:2,6 364:20
365:20 366:6
378:3 382:21
384:12,12

**knowledge**
244:21 281:3
312:25 316:14
327:15 359:5

**knowledgeable**
243:9,18,25
244:7,17 245:6
245:16 246:18

**known** 377:19

**l**

**l** 227:9 228:11
229:2,2 232:3
239:9

**laboratories**
375:16

**late** 370:5
**laughed** 371:21
**law** 231:23
235:3 247:19
**laws** 342:22
344:9
**lawsuit** 289:23
295:4 300:4,8
300:19 324:25
325:12,17,20
**lawyers** 317:13
319:13 320:4
320:10,17
**laying** 364:15
**lead** 232:5,9
304:16,17
305:6,9 323:20
328:2 329:19
329:21 330:9
330:12 338:20
356:22 357:5,9
360:20 385:16
385:20
**learn** 277:15,18
291:19 320:24
**learned** 255:3
279:2
**leave** 284:20
327:9
**led** 328:20
**legal** 249:13
302:6 323:13
323:25 388:1
391:1

**legalese** 310:12
**letter** 388:19
**lied** 356:6
**life** 364:23
**likely** 282:7
**limited** 333:6
375:13
**line** 253:18
321:22,23
326:4 332:2
386:17 388:13
390:7 391:3
**list** 241:15
303:17
**listed** 390:7,17
**listen** 291:8
292:18
**listened** 292:12
292:15,17
**listening**
254:11,17
283:13
**listing** 390:7
**litigation** 235:2
239:2 256:8
265:23 323:3
331:12,14,17
335:23 336:17
336:20 338:18
350:11 363:5
**little** 250:18,18
250:20 257:7
277:2 278:10
278:11,16

280:14 304:6
313:22 319:3,7
331:24 353:12
358:16 368:6
368:10 378:16
**live** 346:12
**lives** 281:12
**living** 279:23
281:8 356:21
**llc** 227:3,16
228:5 230:20
238:19 240:7
240:16 297:23
385:12 388:6
389:3 390:3
**llp** 227:21
228:10 231:2
338:21
**local** 372:20
**located** 259:14
322:14
**location** 230:25
**lodge** 275:22
**log** 260:15
**login** 260:20,25
**long** 251:4,6
278:23 285:2
321:8,8 329:3
329:4 368:14
368:15,17
**longer** 368:20
**longevity** 238:8
**look** 259:20,25
260:8 268:25

273:2 285:22 287:11,12 288:10 291:2 295:14 296:4,6 339:25 344:23 380:4

**looked** 268:21 298:10 306:6 315:6

**looking** 256:24 258:8 263:16 263:17 268:18 277:21,24 298:9,23 304:13 343:22 379:25

**looks** 297:14 318:18 330:24 335:4 341:22 341:23 351:23 354:19,19

**lose** 325:23

**losing** 305:17 326:6 373:23

**loss** 302:19,23 303:11,14 310:23 349:22

**losses** 301:17 325:15 326:11

**lost** 271:7 350:18 351:6 355:11

**lot** 248:20,20 248:24 254:7

262:11,14 263:16 268:18 278:11 292:11 299:25 303:5 307:16 308:2 308:16 310:12 323:6,20 345:12 348:3 364:14,18 368:14,16 377:12

**low** 364:16

**lumiradx** 375:13

**lunch** 271:6 327:20

**m**

**m** 232:23 233:7

**ma'am** 312:12

**macabre** 378:16

**madam** 388:10

**made** 254:23 273:15,20 334:20 336:23 343:14 344:14 359:21 362:11 389:7

**mail** 265:4,5,7 265:12 270:14 271:8,11,15 379:16

**mails** 256:9,17 257:24

**make** 236:11 324:13 325:23 342:17 346:11 353:9,9 355:3 367:9 368:24 373:24

**making** 291:25 350:8 366:3 368:19

**man** 334:20

**manage** 373:19 373:25

**manager** 374:2

**mancini** 228:17 231:5

**mandate** 369:3

**manhattan** 363:22

**manufacturers** 378:7,9

**manufacturing** 345:18

**marblestone** 233:18 234:21

**march** 276:20 276:22 277:4 283:17,18,20 283:21

**mark** 279:19 279:20,22,24 280:8,19

**marked** 240:7 297:4 307:10 311:16 329:24 330:3 340:25 386:16

**market** 345:8,9 353:15

**market's** 373:10

**marriage** 387:16

**mask** 278:5 284:8 371:3,6 371:15

**masks** 370:19 370:21

**material** 309:6 349:22

**matter** 230:19 232:2 310:9 387:18

**maximum** 326:16,18

**mba** 288:20

**mean** 251:24 253:13 255:15 255:18 256:14 260:19 262:11 264:13 267:21 270:4 275:4 279:17 307:3 320:2,4 321:8 322:4 334:2 336:10 341:17

343:21 356:14 359:18 363:24 364:4 365:22 370:24 373:8

**meaningful** 316:19

**means** 241:25 255:20,23 314:5

**meant** 313:6

**media** 230:16

**mediate** 382:13

**mediation** 362:4

**mediations** 361:25 367:6

**medical** 274:15 276:9,14,24 344:22 370:23 370:25 371:11

**medications** 235:11,14

**meet** 271:5 329:8,8

**meeting** 248:8 329:11

**meets** 369:2

**member** 244:22

**members** 244:24 255:8 327:19 363:8

**memo** 255:20

**memory** 235:12

**mentioned** 238:18 246:23 247:11 257:12 258:19 261:16 268:20 273:10 277:13 305:6 324:20 338:3 339:23 344:17 369:14 370:19 374:13 378:7 382:2

**met** 234:23 247:11,22,23 248:2 250:22 258:20 321:8 329:12,12 376:25

**microphone** 284:13

**microphones** 230:8

**midtown** 363:19,21,22

**midwest** 388:17 391:1

**might've** 341:23

**million** 291:10 291:12 324:10 345:19 346:11

**millions** 358:11

**mind** 326:6 334:17,19 338:8 354:2,4

**mine** 271:18 279:4,9 309:20

**minute** 282:8 376:11 378:23

**minutes** 238:3 367:19

**mischaracteri...** 382:17

**misinformation** 305:20,23

**mislead** 349:24

**misleading** 253:20

**misled** 350:7

**mismatches** 345:7

**misrepresent...** 309:6

**mitigate** 346:23

**models** 287:23 287:25 288:2

**moment** 239:17 241:22

**money** 281:10 305:17 325:23 326:6 334:22 355:12 368:18 373:13,24,25

**monies** 350:23

**monitored** 331:11,16

**month** 331:22 331:23

**months** 332:19

**morgan** 279:25 326:4

**mortgage** 345:8

**motion** 329:20 330:12 337:11 361:5,14 385:18

**motions** 360:25

**mouth** 253:8

**move** 381:23

**moved** 366:9

**movement** 381:14

**murdered** 324:8

**mute** 230:11

**n**

**n** 228:2 229:2 232:23 233:7 375:6 386:3

**name** 231:5 233:4,6,9 234:13,24 258:9 269:12 279:11,19 316:9 343:25 359:9 388:6 389:3,4,15 390:3,4,21

**names** 247:16 247:17 343:18

371:14
**nature** 303:8 328:19
**necessarily** 303:7 353:9
**necessary** 348:21
**need** 238:5 261:11 279:10 383:21,23
**needed** 269:11 304:5 332:25 336:10
**neuberger** 279:20,20,22 279:24 280:21 280:23 281:4 282:3,20 285:7
**never** 268:14 272:4,15 273:7 273:10,11 316:22,24 333:25 350:20 356:7,7 357:14 359:20
**new** 227:2,22 227:22,24 228:6,6,12,12 230:23 231:3,4 232:25 238:24 288:14 322:15 359:3 363:15 387:4,5,8

**news** 355:16 380:23
**nice** 366:2 377:14
**nodding** 236:22
**nods** 236:9
**nominal** 350:17
**notarized** 388:14
**notary** 227:23 232:25 387:7 388:25 389:10 389:18 390:15 390:23 391:23
**note** 230:7 234:2 263:20 263:20 388:12
**noted** 242:19
**notes** 249:19,22 378:24
**notice** 240:6,15 241:2,11 242:19 385:10
**noticing** 231:21
**november** 314:23 316:6 317:8,16,21 349:2
**number** 230:24 243:19 244:2,8 244:18 245:7 266:17 290:12 298:2,14 308:21 354:2,4

385:7 388:7,13
**numbers** 350:17 381:18 390:7
**numerous** 338:25
**nv** 375:4

**o**

**o** 229:2 232:23
**o'malley** 364:19
**oath** 229:12 231:11 237:6
**object** 252:2 264:4 267:20
**objection** 245:19,20 255:13 257:21 264:5,11 265:25 266:2 266:25 269:23 269:24 270:15 270:21 272:21 273:5 274:22 275:23 281:2 281:15 285:9 290:18 291:21 293:9 294:10 294:22,23 299:14,18 300:6 302:21 304:21 305:11 308:9 309:12

310:14,21
311:4 317:17
322:22 332:20
346:2 352:23
352:24 355:7
359:16,21,23
371:9,12,17
372:10,16
374:24 375:8
375:11,14,17
375:20,24
376:8 378:10
378:11 379:21
382:16
**objections** 229:21 231:15 237:16,18,22 307:22 310:6 372:21
**obtain** 326:15
**obviously** 309:19 334:17
**occur** 257:16 373:18
**occurred** 253:9 253:16,17 290:3 303:9 332:18 336:20 360:18
**occurring** 286:13
**occurs** 373:16
**odd** 279:25

| | | | |
|---|---|---|---|
| **offer** 256:14 | 292:6,23 | **onwards** | **outside** 261:12 |
| **offered** 256:11 | 293:14 294:6 | 246:14 | 261:14,16 |
| **offers** 362:8 | 294:13 295:24 | **open** 282:13 | 320:18 322:23 |
| **office** 255:9 | 295:25 296:3 | **opinion** 288:11 | **overall** 335:24 |
| **offices** 227:21 | 296:15 298:6 | 347:7,20 | 337:24 |
| **official** 249:12 | 299:2,5 301:11 | **opinions** 290:8 | **overview** |
| 389:15 390:21 | 303:10,15 | **opportunities** | 292:18 |
| **officially** 272:6 | 305:5 307:6 | 368:20 369:10 | **own** 281:10 |
| **oh** 234:20 | 311:12 313:21 | 371:23 | 287:19 301:21 |
| 239:25 240:3 | 317:23 318:11 | **opportunity** | 327:21 344:14 |
| 270:2,5,7 | 318:25 322:20 | 344:24 370:15 | 344:19,22 |
| 271:10 284:3 | 326:14 328:9 | 370:17 | 349:8 353:12 |
| 284:14 289:15 | 329:16 331:7 | **opposition** | |
| 295:7 299:2 | 332:22 341:5 | 329:20 330:11 | **p** |
| 312:4 315:13 | 342:5 352:18 | 385:17 | **p** 228:2,2 229:2 |
| 319:14 364:8 | 354:14 357:4 | **options** 279:25 | 232:23 |
| 367:13 373:5 | 359:25 364:10 | **oral** 236:22 | **p.m.** 227:11 |
| **ohio** 388:2 | 367:15,18 | **orally** 236:6 | 230:5 296:19 |
| **okay** 236:4,20 | 376:12 377:22 | **order** 267:24 | 296:24 367:22 |
| 238:13 239:3,9 | 378:6,17 | 310:8 344:7 | 368:3 376:14 |
| 239:24 240:23 | 384:16 | 379:17 384:3,5 | 376:19 379:2,7 |
| 241:22 242:15 | **okey** 297:9 | **ordered** 358:2 | 383:8,10 |
| 242:17,23 | **old** 263:2 | **original** 229:9 | **pacemaker** |
| 243:18 245:5 | **omission** 309:6 | 229:17 | 257:9 |
| 246:8,22 | **once** 256:6 | **originally** | **page** 241:8 |
| 254:16 255:2 | 307:15,17 | 321:7 | 298:24,25 |
| 264:3,17 | 336:24 337:2,5 | **outbreak** | 308:20 309:22 |
| 269:14,19 | 338:7 351:24 | 276:15 277:24 | 330:20 351:17 |
| 272:16 274:25 | 353:20,21 | 278:4 287:2 | 385:6 386:5,10 |
| 275:20 276:6 | 356:2 359:20 | 345:12,13 | 386:17 388:13 |
| 279:16 283:15 | 361:3 378:13 | 348:2 | 388:15 390:7 |
| 283:24 284:16 | 378:14 | **outcome** | 391:3 |
| 284:25 285:4 | **onerous** 303:8 | 231:14 328:14 | **paid** 280:5 |
| 289:17 290:5 | 349:24 350:6 | 361:11 387:17 | 311:6 326:11 |

**[pain - plaintiff]** Page 24

| | | | |
|---|---|---|---|
| **pain** 327:4 364:15 | **particular** 267:23 272:5 323:12,25 329:7 350:9 374:7 | 374:16 377:13 | **phone** 250:20 251:2,3,11 257:8 258:21 260:2,4,5 264:20 295:14 296:4,7 332:10 336:12 338:19 388:3 |
| **paint** 327:23 | | **percent** 350:14 350:14 370:22 | |
| **pandemic** 283:16 286:14 345:25 346:8 346:10,14,19 369:16 371:2 | | **percentage** 350:15,18 | |
| | **particularly** 349:23 350:6 | **performance** 306:9 | |
| **pandemics** 286:24 | **parties** 229:7 230:15 252:24 387:15 | **period** 351:14 372:12,17 | **phones** 230:11 |
| **paper** 306:8 | **partner** 235:2 | **perjury** 239:15 312:24 | **phrase** 286:19 |
| **papers** 337:20 | **partners** 280:22 | **permission** 258:25 | **physically** 239:20 |
| **paperwork** 337:14 343:23 354:18 | **party** 231:12 290:7 348:17 349:14 357:24 | **person** 271:15 332:9 343:15 365:18,18 | **pick** 230:9 |
| | | | **picked** 298:13 336:11 |
| **paragraph** 310:3 331:7 333:3 335:20 338:15 342:14 344:3 348:11 351:10 357:19 | **passing** 297:13 | **personal** 276:16 | **piece** 306:7 |
| | **passively** 281:25 | **personally** 389:11 390:15 | **pippa** 279:19 281:7,13,13 283:25 285:8,8 |
| | **past** 341:19 | **pertained** 290:16 | **pivot** 255:2 319:3 |
| **parrot** 365:7 | **payment** 357:23 358:9 | | |
| **part** 247:8 286:16 321:17 321:18 322:9 362:19 369:4 390:9 | **penalty** 239:15 312:24 | **pertaining** 254:3 | **place** 230:14 257:14 288:25 329:7 365:10 378:18 |
| | **pending** 238:22 337:3 357:12 | **pertains** 252:13 262:23 285:10 289:9,15,17 300:23 302:17 323:3 324:25 351:21 353:23 363:14 | |
| | | | **places** 274:9 288:24 |
| **partial** 353:16 353:16 | **people** 276:18 278:19 289:4,6 289:8 305:13 324:12,14,17 329:6 334:18 334:22 346:11 346:21 348:6 353:6 360:21 | | **plaintiff** 227:5 227:15 228:4 232:6 234:4 244:5 245:9 297:22 304:17 304:18 305:7,9 307:24 308:25 |
| **participate** 331:3 344:8 362:3 | | **pervasive** 348:2 | |
| **participation** 350:10 | | | |

310:6,19 311:7 312:22 328:2 329:22 330:9 330:13 356:22 357:5,9 358:4 360:20 385:21

**plaintiff's** 243:11,20 244:13,20 307:21 329:19 344:7 385:16

**plaintiffs** 232:9 234:3 317:5

**plans** 289:19

**platform** 261:15 262:7 282:15

**play** 270:8,12 327:20

**plaza** 227:22 228:12 231:3

**plead** 249:16

**pleasant** 377:20

**please** 230:7,11 231:16 232:11 232:15 233:5 233:15 259:16 294:24 347:17 388:11,11

**pleased** 323:9

**point** 268:15 280:24 281:14 307:3 333:23

340:7

**portfolio** 373:4

**portray** 306:23

**portrayed** 306:19 355:16

**position** 263:13 353:16

**possible** 318:3 318:4,6 326:16

**possibly** 261:11 382:5

**practice** 303:12 338:19

**precise** 323:8

**preferred** 346:10

**preparation** 247:8 249:20 250:23 251:18 266:14,21 268:4,4 331:4

**prepare** 246:25 250:13,15 267:8

**prepared** 243:10,19 244:2,8,18 245:7,16 246:23 247:10

**present** 228:16 231:18 248:10 253:12 369:10

**presentation** 343:14

**presented** 248:21,22 306:21 317:14 341:18 362:9 362:16 371:23 382:20

**presiding** 359:8

**presume** 302:22 342:12 343:21 355:15 355:19

**presuming** 326:19

**pretty** 247:10 278:25,25 279:2 289:5 293:2 332:24 356:10 357:17 373:19,25

**prevent** 235:19 347:21,23

**previously** 247:5 265:3,11 267:4 273:14 273:18 274:14 275:3 290:6,10 293:4 297:4 299:21 307:10 356:13 362:18 382:12

**price** 352:7,19 353:13 354:13 381:13

**primarily** 377:9

**primary** 366:10

**prior** 257:20 259:5 272:11 282:13 283:13 304:20 317:8 342:24 382:17

**private** 230:9 344:8

**privilege** 237:21

**pro** 357:25

**probably** 276:17 285:14 295:5 297:12 334:9 350:14 354:2 374:18 381:15 382:9

**procedural** 236:2

**procedure** 227:20 310:10 389:5 390:5

**proceed** 232:13 234:5

**proceeding** 231:16

**proceedings** 360:3

**process** 286:16 357:8

produce 303:18 303:20 310:7

produced 244:4 256:10 264:10 265:23 266:6,13,24 267:14 268:6 268:24 269:17 303:22,24 339:4

product 267:22 268:3 277:6 381:9

production 243:23 297:22 388:15,17,22

products 288:14

professional 323:8 325:22

profit 302:19 345:20,25 346:4

profits 301:16

progress 331:11,17

prohibit 372:20

projections 288:3,15

promptly 234:4

proper 268:2 290:13

properly 324:14

proposal 382:24

proposed 244:14 351:14

protect 363:5

proud 326:2

provide 235:7 238:3 260:14 260:17 264:8 274:4 334:7,10 335:9 342:6

provided 261:2 262:18 308:13 308:16 309:14 339:5,17 351:25 354:25 379:16

providing 309:10 335:16 348:18

public 227:23 232:25 263:9 387:7 389:10 389:18 390:15 390:23 391:23

puerto 281:11 281:12

punitive 244:22

purchase 285:11 293:7 294:8 322:15 344:5,12 352:20,21 370:11

purchased 352:5,12

purposes 298:20 299:10

pursuant 227:19

pursue 317:3

put 253:8 316:14 319:4 350:17 376:4

**q**

qhealth 375:10

qiagen 375:4

qualified 243:13,17 246:9

qualify 301:5

quarter 291:11 291:12

question 236:13 237:9 237:12,13 238:12 242:6 242:12,18 252:3 253:23 253:24 259:15 267:3 275:3 276:7 279:14 294:24 301:14 308:24 309:11 315:12,16,18 315:20 320:7 320:14 326:25

335:12 336:13 339:15,19,22 347:12,15,16 360:7,8,11 365:2 366:25 372:22,23 374:3 386:17

questions 235:6 235:10,15 247:10 252:18 259:12 263:23 264:2 275:15 283:9 289:4,7 313:19 314:7 356:5 358:18 363:12 376:22 378:19,22 383:4,6 386:16

quick 380:12

quickly 380:10

quite 355:11

**r**

r 228:2 229:2 232:23 233:7 387:2

raise 232:15 373:12

random 298:14

range 295:6

rata 357:25

rather 268:17 334:16

[reach - relationship]

**reach** 237:9 324:24
**reached** 325:3
**reaching** 253:13
**reacquainted** 248:25
**react** 369:7
**reaction** 323:21
**read** 292:10,13 292:21 337:18 337:18 339:8 382:7 389:5,6 389:12 390:5,6 390:17
**reading** 352:4 388:19
**ready** 234:5
**really** 253:19 263:16 280:17 291:15 332:21 364:15,18 366:15
**realtime** 227:14
**reason** 289:21 381:24,25 388:14 390:8 391:3
**reasonable** 277:25 358:4
**recall** 264:17 266:19 277:8 294:3,5,16 298:8,11

309:10 355:13 371:14
**receipt** 388:18
**receive** 328:16 333:10,13,15 333:18,19 334:25 350:13 350:22 351:5
**received** 307:16 333:4 333:16
**recently** 364:16 364:18
**recess** 296:21 367:24 376:11 376:16 379:4
**recognize** 240:18,20 297:10,11 307:14 311:25 330:16 341:14
**recollection** 283:12 335:16
**recommend** 281:4
**record** 230:4 230:15 231:20 233:22 234:13 263:21 296:11 296:14,17,20 296:25 297:18 307:18 318:23 330:7 357:17 359:24 367:23

368:4 376:15 376:20 379:3,8 383:9 387:12 390:9
**recorded** 230:17
**recording** 230:13
**recovery** 326:16 357:25
**red** 329:15
**redundant** 304:12
**refer** 239:5 308:20 309:21 338:14 342:13 344:2 348:10 351:9 357:18
**reference** 388:7 389:2 390:2
**referenced** 389:11 390:15
**referred** 321:4 321:4,10,12,14
**referring** 238:17 239:3 312:16 328:6 369:18 370:5
**reflect** 297:19 307:19
**reflected** 300:22 301:16 302:19

**reflecting** 298:18 299:8
**refuse** 316:20
**refused** 316:25
**regarding** 243:10,19 244:2,8,18 245:7,17 246:20 282:20 289:9,24 293:6 293:24 294:7 294:20 295:2 325:15 327:14 334:8 379:23
**regions** 373:6
**regular** 384:6 384:12,17
**regularly** 265:7 271:11 331:12 331:19
**rejected** 362:7
**related** 231:11 252:7 262:17 358:5 379:24 387:15
**relates** 246:15 270:6
**relating** 244:13
**relationship** 244:14,20 272:17,20 308:6 319:20 319:23 320:19 320:21 324:23

377:7,8,9,20,23
**relationships**
  322:17
**relevance**
  273:8
**rely** 289:7
  337:9
**remember**
  240:22 283:23
  284:4 286:25
  288:9 290:22
  290:25 292:19
  293:21 294:11
  299:22 321:21
  328:24 340:10
  351:3 378:15
  380:20
**remind** 372:19
**reminder** 250:9
  294:14 301:11
**remote** 250:21
**remotely** 250:2
  251:5
**remove** 329:21
  330:12 350:2
  350:16 385:19
**remuneration**
  326:10
**repeat** 259:15
**repeating**
  339:22
**report** 310:13
  362:20,24

**reported**
  298:19 299:9
  300:23 306:24
**reporter** 231:8
  232:11,14,17
  233:3,8,11,13
  240:9 250:5
  270:25 311:18
  329:25 339:11
  341:3 383:13
  383:17,22
  384:4,11,16,20
  385:25 389:7
**reports** 262:19
  263:9 287:8
  290:14,21,24
  291:3 379:25
  380:5
**represent**
  231:25 235:4
  283:15 315:4
  315:23 318:23
  319:13 340:14
  351:16
**representation**
  323:11 358:6
**representations**
  254:23
**representative**
  241:4 329:22
  330:13 348:17
  349:14 357:24
  358:3,10
  385:22

**represented**
  306:4 324:14
  326:20,21,23
  370:17
**representing**
  231:6 245:2
  305:14 324:12
  324:17 360:21
  362:15
**represents**
  319:8,10,12
  368:23 369:12
**request** 243:22
  298:2,14 299:4
  299:16 300:18
  390:9,11
**requested**
  386:9
**requesting**
  297:15
**requests**
  297:22 303:17
  303:21 338:24
  339:2,6
**require** 264:23
**required**
  388:25
**requires**
  242:21
**research**
  261:12,16
  263:8 280:4,11
  280:20 344:22
  379:23

**reserved**
  229:22
**resolve** 382:14
**resolving**
  382:19
**respect** 338:23
**respectable**
  304:17
**respective**
  229:6
**respond** 236:6
  237:20,21
  250:12 299:16
**responded**
  314:19
**response** 250:6
  251:22,23
  252:14 294:4,5
  294:15 303:21
  309:11,23
  310:2 317:10
  339:6,12
  358:19 381:21
**responses**
  243:20 307:22
  315:5 316:2
**responsibilities**
  305:8
**restaurants**
  348:9
**restroom**
  238:10
**result** 309:5

results 276:21 276:25 346:7

retained 385:25

retaining 310:18

retired 281:22 281:23,24

retrieve 258:17

return 298:16 299:7 301:23 302:3,9,12,18 384:6,13,17

returned 388:18

returns 298:16 299:6 300:3,11 300:15 301:21

revenue 288:13

review 241:23 245:22 249:4 251:17 266:12 268:5 278:16 287:4,20,23 289:18 290:15 290:20,23 300:2,7,14 311:24 317:9 335:24 337:20 342:25 343:2 388:12 389:1 390:1

reviewed 258:20 263:24

266:15,17 267:5,23 268:8 289:24 300:11 312:20 315:24 317:12 342:19 380:16 382:3

reviewing 245:13

reviews 242:2 290:7 299:3 312:5 341:4

revisions 334:10 335:10

richard 234:14

rico 281:11,12

right 232:15 242:14,20 243:5 253:14 255:21 283:3 294:2,2 295:18 298:24 313:17 314:8 318:18 320:8 321:6,24 332:14 341:21 352:16 355:24 373:9 376:5

risk 373:19 374:2

rockefeller 227:22 228:12 231:3

role 363:4

room 239:20 277:10

rough 383:14 383:19 384:7,8 384:10

rudimentary 288:17

rules 227:20 236:2 310:9 372:20 389:5 390:5

rulings 386:16

run 247:4 279:24

**s**

s 228:2 229:2,2 232:23 385:2 388:15 390:8,8 391:3

sachs 262:14 301:6

sadly 348:2

sale 285:11

sales 306:15

satisfied 290:12 290:15

save 327:18

saved 261:17 262:6,8,10,16

saw 380:19

saying 320:6

says 241:9 291:8 309:22 310:4 312:18 317:21 331:10

333:3 335:20 338:17 342:2 342:16 343:6 344:3 348:15 351:11 357:21

schedule 233:25 335:24 337:24,25 351:15,17,21 354:15 366:2 367:10

schedules 298:17 299:7

scheduling 310:8

scope 243:3 339:2

screen 282:12

se 335:14

seal 389:15 390:21

sealing 229:7

search 264:8,12 264:18 265:14 265:16 273:22 273:23 289:23 294:18,25 299:15 379:17

searched 269:15

searches 265:15

second 275:13 295:15 356:25

369:4
**secret** 279:18
**secure** 302:20
**securities**
  285:11,17
  287:6 293:8
  294:9 295:3
  301:18 302:20
  342:22 344:5,9
  344:12 351:13
  352:6,12
  356:12 357:6
  370:12 372:9
  372:14 373:3
  374:8,23
**see** 241:14,19
  262:5 277:25
  286:19 287:12
  288:10 298:21
  312:18 313:3
  333:8 335:25
  340:18 358:12
  358:15 364:2
  367:9 368:21
  368:21 369:20
**seeking** 274:10
**seekingalpha....**
  382:4
**seemed** 277:25
**seems** 271:12
  321:22 339:21
  374:15
**seen** 240:21
  241:17 297:12

307:17 308:2,5
  312:8 318:9
  333:19 341:19
  361:9
**seize** 258:11
**self** 281:21
**sell** 293:7 294:8
  337:9 353:10
  353:21 354:11
  355:10,21
  370:11 372:9
  372:11,15,25
  373:4,16,18
  374:9,23
**selling** 356:4
  373:12
**sensitive** 230:8
  353:13
**sent** 303:18
  313:20
**sentence**
  335:20
**separate** 302:2
  302:9
**serve** 348:17
  349:13
**service** 229:16
  274:10
**services** 262:12
**serving** 357:23
**set** 297:21
  307:23 310:8
  312:21 351:14
  387:11,20

**settlement**
  361:21 362:8
  362:11
**seven** 365:22
**several** 276:13
  278:2
**shakes** 236:6
**share** 357:25
**shares** 352:19
  355:6,14
  381:14
**shattered**
  364:13
**sheet** 388:13
  390:7,10,18
  391:1
**sherman**
  269:21 271:13
  272:2,11,17,24
  273:3,7 321:18
  322:5,6,6,7
  327:14,16,23
  328:2,6,13,20
  377:23,25
  378:5
**sherman's**
  272:19 328:11
**short** 296:21
  302:23 303:11
  303:14 336:9
  366:23 367:24
  369:13,25
  376:16 379:4

**shortly** 306:24
**show** 364:4,5
**showed** 248:19
  248:19
**shown** 268:11
  337:13 388:16
**shrimp** 252:11
**sic** 243:16
  280:22 286:11
  311:21 348:14
**sick** 344:20
**side** 378:16
**siemans** 374:23
**sign** 268:12
  316:15,16,21
  316:25 317:15
  330:22 337:15
  337:21 363:13
  363:13
**signature** 312:7
  312:10 317:22
  318:10 330:19
  341:20 387:24
  388:14
**signed** 229:10
  229:12,15
  314:13 315:2
  316:9 317:24
  317:25 318:4
  330:18,25
  337:16 341:24
  342:3 354:16
  389:13 390:18

**[signing - state]**

**signing** 314:7 388:19

**similar** 278:7 371:25

**similarly** 227:4 227:17 228:5 239:5

**simple** 291:14

**sincerely** 388:21

**sir** 388:10

**sit** 240:23

**situated** 227:4 227:17 228:5

**situation** 347:6

**six** 251:13 331:22

**skilled** 280:17

**skim** 245:15

**sky** 263:14

**slightest** 266:3 266:10

**slips** 309:15 351:25 354:24

**slots** 345:5

**slowly** 316:10

**small** 350:15

**smart** 278:25 280:8

**snack** 238:10

**social** 377:8

**socialize** 377:3

**socializing** 377:15,18

**soft** 280:5

**softer** 353:15

**sold** 355:6,13 355:23 371:20

**solutions** 388:1 391:1

**somebody** 324:9

**son** 325:9

**soon** 292:8

**sorry** 234:21 239:25 250:8 284:15,18 286:4 287:13 311:9 312:4 325:13 326:12 333:12 339:14 346:5 347:10 360:9,10 364:7 366:16 371:5

**sort** 253:17 298:13 306:9 320:18

**southern** 227:2 230:22 238:23

**speak** 236:17

**speaking** 264:4 368:7 372:20

**spearheaded** 333:21

**specific** 246:15 335:15

**specifically** 243:16 253:24

266:19 286:15 288:9 298:11 321:21

**spelling** 233:5

**spend** 257:4 373:6 374:5

**spent** 243:14 247:2

**spoke** 271:4,8 272:5 278:18 293:24 294:20 332:8,9,9 350:25 368:10

**spread** 332:23 346:24 347:4,8 347:22

**ss** 387:4

**stadium** 227:3 227:15 228:5 230:19 238:19 240:6,15 241:4 241:12 242:24 260:24 261:5 266:7,24 290:6 293:5 297:23 300:22,25 301:3,16,20,22 302:4,9,13 303:18 307:21 319:8,10 329:21 330:12 342:18 343:5,5 344:4 348:16 350:10,13,19

350:22 351:5 351:12,22 352:5,11 357:22 362:25 368:6,8 372:8 372:13 374:22 375:3 385:12 385:19 388:6 389:3 390:3

**stadium's** 293:6 294:7 300:2,15

**stadiumcapit...** 265:18

**stadiumcapit...** 265:12

**stage** 262:25

**stamped** 240:11 311:21

**stand** 239:22 303:7

**standing** 328:24 384:2,3 384:5

**stanley** 279:25 326:5

**start** 233:20,23

**started** 255:6 283:16 285:22 332:7 337:6 344:23

**starting** 267:22

**state** 227:24 231:16,19

232:25 234:13 306:21 307:2 309:2 312:20 315:17 359:4 387:4,8 389:10 390:15

**statement** 389:13,14 390:19,19

**statements** 273:16,19

**states** 227:2 230:22 238:23 298:15

**stayed** 348:8

**stipulated** 229:5,20

**stock** 272:6 285:21 294:21 353:8,19 373:12,17,19 380:22 381:2

**stocks** 368:12 370:21 381:23

**stopped** 271:24

**straightforward** 334:17,20 338:8

**strategies** 370:9

**strategy** 323:13 324:2,3 368:9 374:7

**street** 278:22 278:23

**stuff** 287:3 301:2 323:6

**stylistically** 353:6 374:14

**stymie** 347:8

**sub** 359:9

**subject** 262:11 270:19 310:5 344:6

**subjective** 324:6

**subpoena** 227:19

**subramanian** 359:12

**subscribe** 262:11

**subscribed** 389:10 390:14 391:21

**subsection** 298:2,15 299:4

**subsequent** 353:18

**subsequently** 263:6

**successful** 345:3 368:19

**suffered** 309:4 309:5 310:23

**suggest** 374:18

**suite** 388:2

**superior** 388:1

**support** 263:17 263:23 329:19 330:9 385:15

**supposed** 371:22

**sure** 236:8,11 241:21 249:18 252:10,22 255:16,19,24 259:2,17 266:20 268:7 271:16 282:22 285:18 288:5 291:25 307:16 308:4 312:8 313:14 315:3 317:11 320:15 321:20 334:18 335:3 337:22 341:18 343:3 343:16 346:11 347:19 352:2 355:2 358:8 361:2,17 366:13,20 367:5,13 369:19 381:11 381:20 384:5

**surround** 289:5

**survivors** 278:24,24

**swear** 232:11 232:18

**swooping** 341:25

**sworn** 229:10 232:24 237:7 239:13 387:11 389:10,13 390:14,18 391:21

**system** 350:8

**t**

**t** 229:2,2 385:2 387:2,2

**table** 284:20

**take** 230:14 238:12 241:22 249:19 295:10 295:17,20,21 301:6 366:21 367:16,19 368:25 369:5 371:25 376:11 378:23 384:7 384:10

**taken** 227:18 230:18 296:22 363:4 367:25 376:17 379:5

**talented** 289:6

**talk** 270:11 294:14 299:24 301:12 332:16

**[talk - think]**   Page 33

368:5
**talked**  299:24 299:25 319:7 358:16
**talking**  254:15 254:22 306:15 306:18 331:18
**tax**  298:16,16 298:19 299:6,6 299:7,9,12 300:2,11,15 301:21,23 302:2,9,12,17
**td**  282:14
**technical** 280:15
**technological** 264:22 282:4
**tell**  272:4 275:25 308:18 335:4,13 359:13 360:4 360:14 363:13
**telling**  373:6
**ten**  276:18 281:24 367:19
**tend**  278:25
**term**  302:23 303:11,14 368:15,17,20 369:13
**terminal** 282:10

**terminating** 323:14 324:18
**terms**  238:15 249:7 263:15 264:8,12,18 344:24 368:11 379:24
**terrible**  253:11
**terribly**  284:14
**terrific**  327:3,6 327:7
**test**  278:14
**tested**  276:20 276:23 277:4,5 347:2,3 348:6
**testified**  233:2 265:3 267:5 273:15,18 274:14 282:9 290:6,10 293:5 293:18 303:16 308:2 316:4 320:3 327:14 362:18 376:24 379:11,22 380:16
**testify**  243:10 243:19 244:2,8 244:18 245:7 245:16 320:10 349:10
**testifying** 239:19 264:6 275:7

**testimony** 232:18 348:18 349:2,6 382:17 387:13 389:6,7 390:6,9,12
**testing**  274:15 274:16 276:9 276:14 278:8 278:12,20 282:6,24 285:24 286:23 344:19 345:22 346:14,18 347:8,21 370:22 372:4
**tests**  279:5 306:16
**text**  271:10,11 271:15
**thank**  233:22 234:6 238:7 276:3 285:5 297:6,8 303:3 307:12 340:23 378:20 383:16 383:17 384:19 384:20
**thanks**  233:12 240:3 297:7 307:13 340:22
**thereabouts** 254:9
**thing**  233:21 253:6 291:4

298:24 324:6 325:25 350:20 364:21,23 366:9 369:9
**things**  242:3,12 264:14,24,25 271:7 273:13 278:2,22 304:19 316:14 324:11 337:5 345:8,9 353:6 360:5 361:4 369:5 370:2,18 371:22 374:14 381:13
**think**  247:9 260:4 262:9 267:21,24,25 269:11 271:22 275:18 279:10 284:3,4,12 291:24 292:17 293:11,12,17 294:12 297:12 306:8 318:8 321:3 327:3,4 332:2,15 336:5 338:11 340:16 340:16 346:20 347:23,25 349:22 355:11 355:11 358:24 359:3 361:16 363:7 364:25

365:5 368:21
371:13 373:10
376:10 378:17
383:20 384:2
**third** 228:6
241:8 290:7
369:9
**thirty** 388:18
**thorough**
268:17 304:6,8
305:3
**thought** 254:13
370:14,16,16
**thousand**
370:22
**three** 251:9
254:9 257:17
257:20 258:5
259:6 263:2
291:12 332:5,6
332:19 338:6
338:10 339:24
368:15 370:9
381:22
**threshold**
235:9
**time** 227:11
229:22 230:12
231:17 237:17
237:17 239:12
243:14 245:14
245:21 259:6
271:2,2,5,19
282:22 285:19

287:2 296:18
296:23 307:17
310:8 316:8,20
321:9 325:24
329:4,4 337:15
337:15 339:25
340:11 355:5
358:17 360:12
365:6 367:21
368:2 372:12
372:17 376:13
376:18 377:14
378:25 379:6
383:7
**timely** 274:11
**times** 238:25
251:8 331:22
331:22 332:7
**titled** 240:13
297:20 311:22
330:7
**today** 235:5,12
235:16,20
239:15,19
240:24 249:23
298:8 306:6
340:12,12,14
340:14 366:4
**today's** 236:2
238:16 242:22
243:3 246:24
266:16,22
267:8 268:5
349:6

**together**
243:14 327:20
327:21 328:23
376:5
**told** 237:20
252:15 260:5
274:7 316:15
325:18 382:23
**tomorrow**
268:10,11
368:22
**took** 276:24
323:12 362:19
365:10 369:24
**topic** 243:10
244:2,8,18
245:7 270:24
**topics** 241:15
241:17,20
243:2,3 245:13
245:17 246:14
248:18
**touch** 267:22
**tough** 246:5,7
**towards** 331:25
380:14
**tracking**
289:19
**trade** 309:14
351:25 354:24
**trader** 325:23
**trades** 281:10
282:16

**trading** 260:15
261:9
**traditionally**
353:20,22
**tragic** 370:18
**trajectory**
291:6,13
**transaction**
306:12 351:12
**transactions**
298:19 299:9
299:13 300:23
303:6
**transcribe**
236:24
**transcribed**
236:11 389:7
**transcript**
236:12 255:21
273:19,23
292:4,7,13,22
380:17,20
382:3 383:19
383:23 388:11
388:12 389:5
389:12 390:5
390:11,17
**transcripts**
274:8,12 292:3
292:9,25
**translation**
242:9
**travel** 363:14
363:15,18,20

365:4,9 367:3 367:12

**traveled** 365:7

**treated** 302:24

**treatment** 364:17,17 370:25

**trial** 229:22 247:4 348:19 349:11 367:12

**tried** 371:24

**trip** 378:12

**trouble** 373:11

**true** 312:24 314:16 334:22 336:3 348:23 358:7 387:12

**truth** 232:19,20 232:21 327:5

**truthfully** 235:15,19 239:14 314:19

**try** 238:2 325:24 368:24 369:7 380:12

**trying** 261:21 264:21 277:22 282:24 299:23 306:22 320:13 365:24 366:8,8

**turn** 241:8 297:25

**turned** 263:6 360:18 381:15

**two** 248:14 257:17 319:16 326:4 334:5 357:6,16 368:13 376:4 376:11 379:19 384:17

**type** 236:23 309:2 380:4

**types** 249:7,9 260:17

**u**

**u** 229:2

**u4** 326:3

**uh** 243:8 244:12 250:4 256:7 258:23 313:24 315:7 330:10 331:9 336:2 339:9 341:8 348:13 348:24 369:22

**um** 234:25 236:23 237:2 238:21 239:16 240:17 241:13 243:13 244:23 246:8 300:10 313:12 320:12 340:6 365:16

**un** 310:24

**unable** 358:18

**under** 237:6 312:23 315:10 344:9

**understand** 236:25 237:8 237:13,14,23 239:13 255:18 256:23 267:2 275:9 277:20 277:21 302:6 310:11 316:19 317:13 322:3 323:6 339:7 347:12 372:23

**understanding** 240:24 245:12 258:3 266:5,9 267:12 269:15 292:2 300:21 301:15 302:8 302:17 308:12 311:5 313:5 314:4 316:7 332:3 333:22 335:5 336:15 337:4,23 338:4 360:24

**understands** 269:4

**unexpected** 380:24

**unfair** 305:18

**unfairly** 305:17

**unit** 230:16 371:11

**united** 227:2 230:21 238:22

**units** 370:23

**universally** 380:8

**unlimited** 290:11

**unnecessary** 310:24

**unsigned** 229:14

**untrue** 336:25

**uris** 228:7 232:4,4 237:17 237:22 240:3 245:19 247:18 255:7,13 263:19 264:11 266:2,25 269:15,23 270:3,21 273:5 274:22 281:2 281:15 290:18 291:21 293:9 294:10,23 297:7 299:14 299:18 300:6 302:21 305:11 307:13 308:9 310:14,21 311:4 318:22 319:15,18,21

320:6,9,13,17 320:25 321:2 322:8,8 324:22 325:8,16 329:14 352:24 355:7 374:24 375:8,11,14,17 375:20,24 376:8,25 377:4 377:11 378:2 378:11,21 379:10 383:3 383:18,20,24 384:8,15,18 386:7 388:5

**use** 238:10 265:3,5,7,9 274:9 327:11

**used** 229:14 264:19 265:11 279:24

**usually** 278:21 292:8

**v**

**v** 388:6 389:3 390:3

**valuation** 287:20

**value** 263:15 285:16,20 286:9,10 287:5 354:7

**variety** 286:23 288:24 370:18

**various** 256:22 263:22

**verbally** 250:12

**verification** 311:15,23 314:2 316:5,23 318:24 385:13

**verified** 339:4

**veritext** 231:6,9 388:1,7 391:1

**veritext.com.** 388:17

**version** 240:2

**versus** 238:19

**video** 230:13 230:17

**videographer** 228:17 230:2 231:7 232:10 238:18 284:11 284:17,19,23 285:2,5 296:18 296:23 367:21 368:2 376:13 376:18 378:25 379:6 383:7

**videotaped** 227:14

**view** 356:23

**violation** 360:17

**violations** 342:21

**volition** 344:15

**w**

**wait** 275:11,11 275:12,12,12 275:13 283:5

**waived** 229:9 388:19

**waiving** 310:5

**wall** 278:22,23

**want** 233:21 246:10 249:16 253:8,24 263:20 284:19 295:21 304:12 327:5 340:20 347:14 353:15 358:13 364:2 367:18 372:25 373:13 380:13

**wanted** 242:9 354:3

**way** 236:17 253:11 259:9 277:17 278:21 287:10 288:17 327:21 350:8 371:21 374:14 374:19 381:12 387:17

**ways** 345:20

**we've** 305:3 315:5 339:20 366:18 382:18

**website** 289:3 382:8

**weeks** 254:9 257:17,18,20 258:5 259:6 339:24 381:22 384:17

**welcome** 234:9 238:9

**wellington** 233:18 234:22 276:23

**went** 269:3,9 269:10 277:10 304:9 313:15 324:8 336:10 348:7 352:19 370:21

**whereof** 387:19

**whispering** 230:9

**willing** 348:16 348:25 349:5 349:10,13 363:15,18,20 363:24 364:20 365:9,12 366:5 367:3,11

**window** 263:18

**wish** 350:19

**witness** 227:17 229:10,16,18 232:12,16,22 232:24 233:6 233:10,12,16 233:25 234:6 242:2 245:23 246:2,5,7 250:8 252:5 255:19 256:2 257:10 269:25 270:5 275:10 279:12,16 284:14,18,22 284:24 285:4 295:11,18,21 295:24 296:3,6 296:10,12,15 298:3 299:3 303:3 308:22 311:13 312:5 317:6 318:21 319:6 321:6,23 323:22 326:12 327:11 329:15 332:13 338:16 339:14 340:22 341:4 343:25 345:16 346:5 347:13,16 350:2 351:19 357:20 359:19 359:25 360:4 360:10,13

366:16 373:22 378:20 383:11 387:10,13,19 388:8,11 389:1 389:4,11 390:1 390:4,15

**witnessed** 356:11 365:2

**witness'** 388:14

**wonderful** 233:3,8,11,13

**word** 252:21 317:7 326:9

**words** 253:8,14

**work** 233:25 255:7 267:22 268:2 280:21 284:21 287:19 321:22,24 368:17

**worked** 253:21 374:15

**working** 255:6 269:7

**works** 280:3 362:17

**world** 261:14 262:4 337:7,12 345:4,20 349:21 364:22 369:6,14,17,23

**worth** 287:14 287:15,16

**would've** 258:11 370:10

**write** 367:8

---
**x**
---

**x** 227:3,10 385:2 386:3

---
**y**
---

**yeah** 233:16 241:24 245:25 246:3 248:4 257:15 262:9 267:9 270:3,7 271:3 274:6 275:10 284:23 287:9,22 288:7 292:6,7 295:18 295:23 312:6 314:24 315:19 325:5 329:13 330:15 334:9 336:2,4 340:3 341:22 342:4 342:11 359:23 360:16 366:22 367:2,7,17 374:4 377:10 377:24 384:9

**year** 303:6 379:15,20

**years** 263:2 272:7 280:2 281:25 310:23 332:5,6 338:6

338:10 357:14 377:19 378:14 379:19

**yep** 243:24 244:6 309:25 322:19 352:10 367:20

**yesterday** 247:23 257:6 258:20 259:5 266:18 268:19 268:22 313:10

**york** 227:2,22 227:22,24 228:6,6,12,12 230:23 231:3,4 232:25 238:24 322:15 359:3 363:15 387:4,5 387:8

---
**z**
---

**z** 232:23 233:7

**zicherman** 227:18 230:1 230:18 231:1 232:1 233:1 234:1,12,15,23 235:1 236:1,5 237:1,5 238:1 239:1 240:1,10 241:1,7 242:1 243:1 244:1 245:1 246:1,22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.