# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,   :   Case No.: 22-cv-6978 (AS)

        Plaintiff,   :

vs.   :

CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,   :

        Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY REPORT OF VINITA JUNEJA, Ph.D.

**January 10, 2025**

## Table of Contents

I.    Introduction and Summary of Opinions ........................................................................1

    A. Qualifications...........................................................................................................4

    B. Materials Relied Upon ............................................................................................4

    C. Remuneration..........................................................................................................4

II.   The Coffman Report's Assumption of What a But-For Disclosure Would Have Been
    Is Flawed as It Fails to Consider What Could Have Been Disclosed to the Market on
    May 12, 2022 ..................................................................................................................4

III.  The Coffman Report's Analysis of Loss Causation and Alleged Inflation in the Co-
    Diagnostics' Common Stock Is Unreliable and Likely Overstates Alleged Inflation,
    Assuming Liability...........................................................................................................7

    A. The Coffman Report Fails to Consider All the Information Introduced on August 11,
    2022.........................................................................................................................7

    B. The Coffman Report Assumes without Basis that Alleged Inflation Is Constant during
    the Class Period.....................................................................................................17

IV.   The Coffman Report's Offers a Flawed Approach to Estimating Damages for Options
    Holders..........................................................................................................................21

    A. Inflation and Damages for Co-Diagnostics' Options Are Similarly Overstated ...............21

    B. The Damages Calculations for Co-Diagnostics' Options in the Coffman Report
    Contain Obvious Errors .........................................................................................21

    C. Mr. Coffman's Option Damages Are Based on Unreliable Bid-Ask Based
    Calculations...........................................................................................................23

V.    Mr. Coffman Report's Analysis of Damages Makes No Effort to Account for Benefits
    from Sales at Allegedly Inflated Prices ..........................................................................24

VI.   Conclusion ...................................................................................................................25

VII.  Miscellaneous ..............................................................................................................27

## I.    INTRODUCTION AND SUMMARY OF OPINIONS

1.    I previously submitted a report in this matter on November 20, 2024 ("**the Juneja Report**"). All defined terms introduced in the Juneja Report have the same meaning when used in this report (**"the Juneja Rebuttal Report"**).

2.    I have been asked by counsel for Defendants to evaluate the views and opinions expressed in the expert report by Mr. Chad Coffman, filed on November 20, 2024 (the **"Coffman Report"**). In his report, Mr. Coffman forms several conclusions:[1]

    a) "The alleged misstatements and omissions regarding the declining demand and the resultant impact on the Company's sales concealed important information from investors";

    b) There was "a single Corrective Disclosure Event on August 12, 2022," and "the Corrective Disclosure Event dissipated artificial inflation from the market price of Co-Diagnostics Common Stock on August 12, 2022";

    c) "There is a clear economic link between the alleged misrepresentations and omissions and the foreseeable investor losses that occurred on the Corrective Disclosure Event";

    d) "The corrective information caused the price of Co-Diagnostics Securities to decline on the Corrective Disclosure Event";

    e) "[T]he total fraud-related abnormal price movement (net of market, industry, and confounding effects) associated with the Corrective Disclosure Event for Co-Diagnostics Common Stock is $2.08 per share";

    f) "[T]hat it is reasonable to assume that the valuation impact of the misstatements and/or omissions would not have been substantially

---

[1] Expert Report of Chad Coffman, dated November 20, 204, ¶¶13-21.

1

different had the relevant truth been revealed earlier in the Class Period"; and

g) "[T]hat the market for Co-Diagnostics Options was efficient during the Class Period," and that "the amount of artificial inflation (deflation) per share for Co-Diagnostics Call (Put) Options" is as stated in the Coffman Report.

3.  As explained in further detail below, my primary opinions are as follows:

4.  **Materiality**: Coffman Report's evaluation of a "but-for" disclosure is flawed and unreliable. His analysis fails to consider what reasonably could have been disclosed at the time of the Alleged Misrepresentations and whether that would have impacted the price of Co-Diagnostics shares and options.

5.  Moreover, as stated in the Juneja Report, I found that "[t]he Alleged Misrepresentations were perceived as negative news by the market," and that "[i]nformed participants interpreted the suspension of quarterly guidance to be negative news, and adjusted their future outlook for the Company's performance accordingly."[2]

6.  **Loss Causation and Damages**: Whether the Alleged Misrepresentations on May 12, 2022 were false or misleading in light of the Company's alleged failure to disclose intra-quarter sales numbers at that time is a legal opinion on which I take no position. But if the finder of fact determines that the Alleged Misrepresentations on May 12, 2022 were not false or misleading, then there is no loss caused and subsequently there are no damages to the class members.

7.  For purposes of this analysis, I have been asked to assume that the finder of fact will find Defendants liable for failing to disclose intra-quarter sales numbers as of May 12, 2022.

8.  The Coffman Report's calculated inflation and damages are flawed, incomplete, and unreliable:

a) The Coffman Report fails to adjust its analysis of alleged inflation for confounding information introduced to the market at the time of the

---

[2] Juneja Report, ¶4.

2

Alleged Corrective Disclosure. Mr. Coffman's alleged inflation and damage per share (before applying applicable statutory caps) would be reduced to no more than $0.40 if one implements an adjustment that Mr. Coffman has implemented in similar situations in his prior testimony in other matters.

b) The Coffman Report assumes without any reasonable basis that alleged inflation from the Alleged Misrepresentations can be observed and measured by the market-adjusted stock price drop following the August 11, 2022 earnings release and that the inflation is constant during the Alleged Class Period. Specifically, he does not take into account: (1) the difference between the specific full-quarter results announced on August 11, 2022 and the more general nature of the Alleged Misrepresentations, (2) Co-Diagnostics' COVID-19 test sales to date in 2Q 2022, (3) the changing COVID-19 environment throughout the class period, and (4) the price appreciation of Co-Diagnostics shares, or the resulting impact of these factors on alleged inflation.

c) The Coffman Report's analysis of inflation and damages of Co-Diagnostics' options relies on the analysis of alleged inflation in Co-Diagnostics' common stock, and is, thus, likewise flawed. Moreover, there are clear errors in the estimates of the inflation dissipated upon the Alleged Corrective Disclosure, casting doubt on the reliability of the Coffman Report's analysis of damages for options traders.

d) The Coffman Report's analysis of damages overstates the economic harm allegedly caused by the Alleged Misrepresentations, as it does not consider the benefits to those investors who sold at allegedly inflated prices.

9.    My opinions are subject to revision based on any new information or evidence in this matter that may subsequently come to my attention.

3

### A. Qualifications

10.    My qualifications are as described in the Juneja Report. My updated curriculum vitae listing publications from the past ten years and testifying experience from the past four years is attached as **Appendix 1**.

### B. Materials Relied Upon

11.    The materials relied upon in the preparation of this report that were not included in Appendix 2 of the Juneja Report are listed in **Appendix 2**.

### C. Remuneration

12.    NERA is compensated through hourly billing rates for its employees. My hourly billing rate was $1,200 in 2024 and is currently $1,250. The hourly rates for other NERA professionals involved in this case range from $165 to $1,250. Payments to NERA are not contingent in any way on the opinions expressed in this declaration, or on the outcome of this matter.

## II.    THE COFFMAN REPORT'S ASSUMPTION OF WHAT A BUT-FOR DISCLOSURE WOULD HAVE BEEN IS FLAWED AS IT FAILS TO CONSIDER WHAT COULD HAVE BEEN DISCLOSED TO THE MARKET ON MAY 12, 2022

13.    When setting out his theory of inflation throughout the Class Period, Mr. Coffman concludes that constant dollar inflation is a reliable method of estimating damages in this matter. Mr. Coffman claims that "the nature of the concealed information in this matter did not change over the Class Period. As described above, at all times during the Class Period, the concealed information was that decreased demand for the Company's flagship product was adversely impacting Co-Diagnostics' revenue and expected revenue."[3]

14.    The allegedly concealed information, i.e. decreased sales in the second quarter, was changing daily over the Class Period as each day of the quarter passed, and so defendants could not have *known* on May 12, 2022, what the sales would be for the rest of the second quarter, which ends on June 30, 2022. The Coffman Report acknowledges he was asked to

---

[3] Coffman Report, ¶79.

4

assume that "Plaintiff will be successful in proving that as of the start of the Class Period, Defendants were aware of the sales for Q2 2022 up to that time (nearly halfway through the quarter), and that sales were on track to be substantially lower than preceding quarters and market expectations."[4]

15. Mr. Coffman makes no effort to quantify how the allegedly concealed information changed throughout the Class Period or how the value of any such information changed over time. What Mr. Coffman claims to be the concealed information, "that decreased demand for the Company's flagship product was adversely impacting Co-Diagnostics' revenue and expected revenue," is not what Co-Diagnostics announced to the market on August 11, 2022. Setting aside other, unrelated news that Co-Diagnostics announced to the market on that date, which I discuss below, on August 11, 2022 Co-Diagnostics announced EPS of -$0.08 per share and revenue of $5.0 million for 2Q 2022.[5] On May 12, 2022, Defendants had no way of knowing what the revenues would end up being for the rest of 2Q 2022.

16. Even if one were to assume that Defendants were made aware of every single sale right as it happened, disclosing Co-Diagnostics' exact sales through May 12, 2022 is not the same as telling the market what Co-Diagnostics' exact sales through June 30, 2022 were and what the sales through August 12, 2022 were. For example, consider a hypothetical announcement at the end of April 1, 2022, the first day of the second quarter, that sales on April 1st, i.e. one day's worth of sales, showed that sales for 2Q 2022 were on track to be $5 million for the quarter. This would matter far less than an announcement on June 29, 2022, the penultimate day of the second quarter, that sales were on track to be $5 million. The Coffman Report does not address this issue and, instead, incorrectly assumes that an announcement regarding sales through May 12, 2022 would have the same effect as an announcement regarding sales through June 30, 2022, the last day of the quarter.

17. Forecasting earnings is not a precise science and is typically subject to assumptions. Predicting the demand for COVID-19 tests for Q2 2022 was especially difficult given the changing nature of the pandemic and various regulatory requirements. As shown in the Juneja Report, "[p]ublic data and news stories showed that the number of COVID-19 PCR tests

---

[4] Coffman Report, ¶79.

[5] "Co-Diagnostics, Inc. Reports Second Quarter 2022 Financial Results," *PR Newswire*, August 11, 2022, 4:01 PM.

administered had declined in March and April 2022 and that there was substantial variability in the number of COVID-19 PCR test levels week to week."[6] A May 10, 2022 news article from *The Associated Press* highlights the significant decline in COVID-19 testing across the globe, noting that many people were experiencing pandemic fatigue, and thus making it much harder for scientists to track the course of the pandemic and identify new mutants as they emerged.[7] On May 17, 2022 New York City officials announced that the city was being put on "high COVID alert" following a rise in COVID-19 cases and hospitalizations.[8] Additionally, in June 2022, the CDC announced that it would no longer require a negative pre-departure COVID-19 test for travelers flying into the country, illustrating the changing landscape of pandemic regulations and reduced testing requirements.[9] On July 19, 2022, *Science* published an article highlighting that with all the changes, "scientists have no idea what comes next."[10] On August 11, 2022, the CDC announced several changes to its COVID-19 guidance and testing recommendations.[11] Similarly, Defendants' industry expert, Dr. Thomas Tsai, in his November 20, 2024 report, finds that "historical volatility in COVID testing demand, exacerbated by the factors discussed herein, made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year."[12]

18.     Moreover, Mr. Coffman does not contend with the apparent disconnect between the more general nature of the Alleged Misrepresentations in this case—some of which were deemed opaque and "cryptic" by the Court—compared to the specificity of the Alleged Corrective Disclosure, which announced final full quarter 2Q 2022 sales.[13]

---

[6] Juneja Report, ¶4.

[7] "Pandemic Gets Tougher to Track as COVID Testing Plunges," *The Associated Press*, May 10, 2022, 12:09 PM. Available at https://apnews.com/article/covid-us-testing-decline-14bf5b0901260b063e4fa444633f4d31.

[8] "New York City Coronavirus Cases Reach 'High' Alert Level," *The New York Times,* May 17, 2022. Available at https://www.nytimes.com/2022/05/17/nyregion/nyc-covid-high-alert.html.

[9] "CDC Rescinds Order Requiring Negative Pre-Departure COVID-19 Test Prior to Flight to the US," *CDC Newsroom*, June 10, 2022. Available at https://www.cdc.gov/media/releases/2022/s0610-COVID-19-test.html.

[10] "As Omicron Rages On, Scientists Have No Idea What Comes Next," *Science*, July 19, 2022, 4:00 PM. Available at https://www.science.org/content/article/omicron-rages-scientists-have-no-idea-what-comes-next.

[11] "CDC Streamlines COVID-19 Guidance to Help the Public Better Protect Themselves and Understand Their Risk, *CDC Newsroom*, August 11, 2022, 3:00 PM. Available at https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html.

[12] Expert Report of Thomas C. Tsai, dated November 20, 2024, ¶14.

[13] MTD Opinion and Order, p. 5.

6

19.      In all, Mr. Coffman's assumption of what a but-for disclosure would have been is overly simplistic and inaccurate. He fails to consider what the defendants could have possibly known or disclosed as of the Alleged Misrepresentations date, and Mr. Coffman offers no evidence for his claim that announcing sales-to-date would have the exact same price impact no matter when in the quarter they are disclosed. Furthermore, he also does not consider how the changing COVID-19 environment would have affected the market's interpretation of sales-to-date as of the Alleged Misrepresentations date or any other date. Mr. Coffman also does not consider whether and to what extent a stock drop following the disclosure of specific full-quarter 2Q 2022 results can reasonably be taken as a proxy for alleged inflation from any of the Alleged Misrepresentations, which discussed the Company's decision not to provide quarterly guidance and uncertainty in the testing market generally.

III.      **THE COFFMAN REPORT'S ANALYSIS OF LOSS CAUSATION AND ALLEGED INFLATION IN THE CO-DIAGNOSTICS' COMMON STOCK IS UNRELIABLE AND LIKELY OVERSTATES ALLEGED INFLATION, ASSUMING LIABILITY**

   **A. The Coffman Report Fails to Consider All the Information Introduced on August 11, 2022**

      **1. The Coffman Report Assumes without Basis that a Disclosure on May 12, 2022 Would Result in the Same Amount of Price Drop as the one that Followed August 11, 2022 2Q 2022 Earnings Announcement**

20.      In his report, Mr. Coffman concludes that there was a single corrective disclosure event, on August 11, 2022, after trading hours, when "Defendants revealed far worse than expected revenue and profitability for Q2 2022 and directly attributed them to lower demand for the Logix Smart Test."[14] The Coffman Report then goes on to conclude that the entire subsequent excess price drop on August 12, 2022, of $2.08, is the amount of alleged inflation and loss caused in this case.[15]

21.      As such, and as explained in the section above, Mr. Coffman's analysis does not consider whether the information that was disclosed on August 11, 2022 could have been

---

[14] Coffman Report, ¶14.

[15] Coffman Report, ¶¶18, 75-76.

disclosed at the time of the Alleged Misrepresentation. In fact, it is reasonable to conclude that the same information could not have been disclosed on May 12, 2022. He is without basis to conclude that the price drop following an allegedly truthful disclosure at the time of the Alleged Misrepresentations would result in the same drop, $2.08, as it did after the full quarter was announced on August 11, 2022. In this section, I elaborate on some of the reasons why that is the case.

22.    A but-for disclosure on May 12, 2022 would not have caused the same reaction as the information that was disclosed on August 11, 2022, because (1) the announcements would have contained different information regarding 2Q 2022 sales (the first would have been based on sales through May 12, 2022, while the second would have been based on sales through the end of the quarter), and (2) the pandemic was ongoing and it was not knowable on May 12, 2022, what turn it would take from May to August and how the testing requirements would change in response.

23.    In fact, while announcing lower sales-to-date would have indicated a period of temporary weakness for Co-Diagnostics, announcing lower 2Q 2022 sales at the end of the quarter indicated that such weakness affected the entire quarter, not only the intra-period through May 12, 2022. In its 2Q 2022 earnings announcement on August 11, 2022, Dwight Egan, Co-Diagnostics' CEO, noted that "second quarter results reflect lower volumes for our Logix Smart™ COVID-19 Test, which we believe is primarily the result of a reduction in mandated testing in travel and public venues and in government funding for testing programs."[16] Mr. Coffman's analysis fails to take account of the evolving pandemic and its impact on sales of the Logix Smart™ COVID-19 test; thus, his measure of alleged inflation is likely overstated.

### 2.  The August 11, 2022 News Included Confounding Information

24.    In order for the stock price decline at the time of the corrective disclosure to be used as a direct measurement of alleged (or artificial) inflation and loss caused, there cannot be any material additional news released at the time of the Alleged Corrective Disclosure that is not related to the allegations. Such additional news is generally referred to as "confounding news." The Coffman Report recognizes this and states, "I did not identify any confounding information

---

[16] "Co-Diagnostics, Inc. Reports Second Quarter 2022 Financial Results," *PR Newswire*, August 11, 2022, 4:01 PM.

and thus, reasonably attribute the full abnormal price decline on August 12, 2022, to the alleged corrective information."[17]

25.    However, this conclusion is belied by Mr. Coffman's own descriptions of (1) what he claims Co-Diagnostics should have disclosed on May 12, 2022 and (2) what it did disclose, after hours on August 11, 2022. In describing what Co-Diagnostics would have had to have disclosed as of May 12, 2022, the Coffman Report states, "Such a disclosure would explicitly state that the Company was aware of the reduced demand and that its sales to date for Q2 2022 were far less than what it had seen in prior quarters."[18] Notably, this statement is about sales up to May 12, 2022.

26.    In contrast, on August 11, 2022, in addition to disclosing sales for the *entire* second quarter of 2022 (i.e., from April 1, 2022 through June 30, 2022), the Coffman Report states that "Co-Diagnostics also disclosed that the lower demand for their test was expected to continue for the foreseeable future."[19] In other words, in addition to disclosing actual sales for the then-completed quarter, Co-Diagnostics also spoke about uncertainty regarding future sales.

27.    Elsewhere, the Coffman Report recognizes that Co-Diagnostics' guidance was important to the market:[20]

> a)   "Analysts relied on guidance from Co-Diagnostics management when reporting and forming their opinions on demand trends and the valuation of the company."
>
> b)   "Similarly, analysts at H.C. Wainwright were unsurprised by the Logix Smart Test being the primary source of revenue for the full year 2021, and speculated about future demand for the test, using management guidance as a factor in their valuation[.]"

---

[17] Coffman Report, ¶76.

[18] Coffman Report, ¶34.

[19] Coffman Report, ¶15. During the August 11, 2022 conference call, Defendants stated that they did not believe the decline in sales to be the result of a buildup in inventory by customers, and that they expected "orders will continue to come in at a measured pace." *See*, also Coffman Report ¶68: "The company also indicated that they did not anticipate demand to dramatically rise in upcoming quarters, stating that the Company believed its 'orders will continue to come in at a measured pace.'"

[20] Coffman Report, ¶¶42-48.

c) "Analysts also asked specific questions about the Logix Smart Test that Defendants had to field during conference calls, and quoted guidance from management in their reporting on the product and the Company."

28. Given that, according to the Coffman Report, (1) the Alleged Corrective Disclosure on August 11, 2022 contained company guidance that the lower demand was expected to continue for the foreseeable future, (2) such guidance was not part of the allegedly required disclosure about sales-to-date as of on or about May 12, 2022, and (3) that Co-Diagnostics' guidance was something that analysts relied upon and factored into their valuation of the company during the Class Period, on Mr. Coffman's own theory, this forward-looking guidance is negative confounding news on August 11, 2022 that needs to be accounted for to obtain a reliable estimate of alleged inflation as of August 11, 2022, immediately preceding the Alleged Corrective Disclosure. The Coffman Report fails to do so and thus overstates any alleged inflation as of August 11, 2022, as well as throughout the Class Period.

29. During the August 11, 2022 conference call, Co-Diagnostics' executives also stated that they expected the at-home PCR device to commence clinical trials soon, noting they "look forward to announcing soon that we have commenced clinical trials."[21] When asked, Defendants did not provide an updated timeline, instead stating that they would begin clinical trials "in the near term," and that they "will commence when we're highly confident that we have the very best product that we can present to the FDA."[22] These statements represented a delay from the timeline Defendants had previously offered during the 1Q 2022 conference call: "We are on track for commencement of clinical trials by our second quarter earnings call this August."[23] This delay in the clinical trials was important to the market. Analysts viewed the at-home PCR platform as important for the future of the company, stating that "it will represent a

---

[21] Co-Diagnostics conference call for quarter ending June 30, 2022, dated August 11, 2022, 4:30 PM.

[22] Co-Diagnostics conference call for quarter ending June 30, 2022, dated August 11, 2022, 4:30 PM.

[23] Co-Diagnostics conference call for quarter ending March 31, 2022, dated May 12, 2022, 4:30 PM.

major new growth vehicle for the company," and "we look for sales and earnings to rebound in 2024 with the launch of the new point-of-care system."[24]

30.     The delay and uncertain timeline for the at home platform were noted by analysts during the conference call. Sidoti asked if the trials are "something you expect in weeks or months longer than that? [sic]."[25] Sidoti also revised their estimate for device approval from 1H 2023 to 2H 2023 following the August 11, 2022 announcement.[26]

### 3.  The Coffman Report's Alleged Inflation Is Overstated and Loss Causation Is Not Demonstrated

31.     As described above, the August 12, 2022 excess stock price change was affected by several factors. The Coffman Report makes no effort to isolate the portion of the total excess or abnormal price drop that was in response to the allegedly corrective information – the news of lower-than-expected 2Q 2022 earnings – from the impact of other information that impacted the price of Co-Diagnostics shares on August 12, 2022 (e.g., statements about future sales and demand, and the revised uncertain timeline in beginning clinical trials for Co-Diagnostics' PCR device). As such, Mr. Coffman's analysis of alleged inflation is fatally flawed, resulting in an overstated loss caused, even assuming liability.

32.     His analysis of alleged inflation must be adjusted to remove the impact of confounding information. The presence of confounding news on the date of the Alleged Corrective Disclosure does not necessarily prevent an expert from isolating the impact of the news alleged to be corrective on the price of the stock. The particular method one uses to disaggregate the impact on price of different pieces of information may depend on several factors – nature of the news, characteristics of the stock, particular allegations, to name a few. One commonly used method to estimate the impact of earnings news on a stock price is a so-called

---

[24] Litchfield Hills Research, "Lowering Estimates and Price Target Post 2Q22 Results – Reiterate Buy Rating and $25 PT, Down From $29," August 15, 2022, and Sidoti & Company, LLC, "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target To $5 (From $14); Downgrade Rating To NEUTRAL (From BUY)," August 12, 2022.

[25] Co-Diagnostics conference call for quarter ending June 30, 2022, dated August 11, 2022, 4:30 PM.

[26] Sidoti & Company, LLC, "1Q:22 Results Exceed Expectations; Expect Earnings To Decline in 2022, As Covid Cases Level Off, Before Rebounding in 2023 With Release Of Point-Of-Care System; Maintain $14 Target, Buy Rating," May 13, 2022, and Sidoti & Company, LLC, "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls-Faster-Than-Expected; Lower Price Target To $5 (From $14); Downgrade Rating to NEUTRAL (From BUY)," August 12, 2022.

Earnings Response Coefficient ("ERC"). ERCs are "a measure of relation of stock returns to earnings surprises around the time of corporate earnings announcements."[27]. In other words, the ERC is the relationship between the change in a company's stock price and an announcement of earnings that is different than expected, all other things held equal.[28] ERCs have been used in securities litigation and courts have found ERC models reliable when used to disaggregate the price impact of certain information from other information disclosed to the market at the same time.[29]

33.     In this section I present a simple series of adjustments based on Mr. Coffman's prior work. Mr. Coffman has conducted similar disaggregation analysis in his prior work on other matters, using ERCs to isolate the impact of earnings news from the impact of other news. For example, in *Kasper vs. AAC Holdings, Inc.*, Mr. Coffman uses an ERC analysis, which, he says, "provides a reasonable means to quantify the stock price reaction that is expected due to a company's earnings results." Specifically, he uses the ERC analysis to "properly evaluate the magnitude of the price response to AAC's [alleged corrective disclosure]," as "one needs to first perform an analysis to control for the confounding positive information."[30] Further, in his deposition for *In Re HP Securities Litigation*, in response to a question about what methods Mr. Coffman's has used in the past to "separate out the impact of fraud-related information from non-fraud-related information", Mr. Coffman stated, "if there are two pieces of information revealed on a particular day and … you have a valuation model for how you would value one of those, then you can infer what the -- what the other piece may have been worth. I have seen that technique used. I have performed that technique before. … I've seen or I've participated in doing work in some cases where you look at something called an 'earning [sic] response coefficient' where you look at how a change in earnings affected the stock price versus things other than that

---

[27] This definition can be located by searching "Earnings response coefficient" at the following NASDAQ website: https://www.nasdaq.com/glossary/e/earnings-response-coefficient.

[28] This Coffman Report defines an ERC as "the valuation multiple applied to the earnings shock". See Coffman Report, footnote 53.

[29] *See*, e.g. Opinion and Order, *AP-Fonden v. General Electric Company*, Southern District of New York District Court, Case No. 17-CV-8457 (JMF), dated September 28, 2023. (accepting plaintiffs' expert's use of an ERC model for disaggregation, noting "Plaintiffs' academic citations supporting their argument that 'ERC regression models have been used by economists for over 50 years to measure stock price reactions to earnings surprises'").

[30] Expert Rebuttal Report of Chad Coffman, *Kasper vs. AAC Holdings Inc., et al.,* Middle District of Tennessee District Court, Case No. 3:15-cv-00923, dated February 10, 2017. ¶¶25, 27.

change in earnings. Those are just examples of types of methods economists can use to disaggregate. But, again, which method you use and exactly how you perform it really depends in great detail upon the facts and circumstances of each individual case. "[31]

34.    In *In Re DVI Securities Litigation*, he used an ERC model to estimate how DVI's price would have reacted to a hypothetical timely disclosure of accurate loan loss reserves in the but-for world based on the estimated impact of the loan loss reserves on earnings.[32] In *In Re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation* Mr. Coffman used an ERC analysis to disaggregate Bank of America's 4Q 2008 losses from Merrill's 4Q 2008 losses, calculating an ERC for the firm as a whole, and for both Bank of America and Merrill Lynch separately.

### 4. Implementing an ERC Disaggregation Analysis Using a Method Mr. Coffman Has Used in Prior Work Would Reduce Alleged Inflation and Damage Per Share to at Most $0.40 of Mr. Coffman's August 12, 2022 Abnormal Price Reaction of $2.08

35.    In this section, assuming liability, I adjust Mr. Coffman's estimate of alleged inflation using approaches that Mr. Coffman has implemented in his previous work, as an example of how Mr. Coffman could have adjusted his analysis of alleged inflation and damages. This analysis indicates that the vast majority of the excess price reaction on August 12, 2022 can be explained by factors other than the miss in 2Q 2022 earnings, the news that Plaintiffs allege is corrective.

36.    As Mr. Coffman has acknowledged in the past, there are different ways one can implement an ERC analysis.[33] To minimize disputes with Mr. Coffman and by way of example, here I apply the same general methodology as Mr. Coffman used in his prior work, as described

---

[31] Deposition of Chad Coffman, *In Re HP Securities Litigation* Northern District of California District Court, Case No. 3:12-cv-05980-CRB, dated December 3, 2014, 56:5 - 57:17.

[32] Expert Report of Chad Coffman, *In Re DVI Securities Litigation,* Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated October 1, 2008.

[33] Rebuttal Report of Chad Coffman *In re DVI Securities Litigation,* Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated December 17, 2008,, "I cited the academic studies for the purpose of making clear that there is well-developed, peer-reviewed empirical research and valuation theory that underlies the concept of an ERC, not that there is a single method by which to calculate them." I agree that there are various methods, and, for purposes of illustration, I have chosen one method that follows what Mr. Coffman has done in his prior testimony.

13

above. The methodology has two steps: first, estimate an applicable ERC, then use the ERC to calculate the expected excess price reaction associated specifically with the earnings surprise based on the historically observed ERC. Following Mr. Coffman's approach, I use a historical Co-Diagnostics ERC to estimate the expected price change associated with the 2Q 2022 earnings surprise on August 12, 2022, allowing me to isolate the impact of the 2Q 2022 earnings surprise from the impact of confounding news on August 12, 2022.

37.    First, I estimate an ERC. I use the sole other earnings announcement during the Class Period, the May 12, 2022 announcement of 1Q 2022, to estimate an ERC.[34] On May 12, 2022, Co-Diagnostics announced earnings that differed substantially from consensus estimates.[35] As such, this announcement demonstrates how sensitive the price of Co-Diagnostics shares is to surprises in earnings at the start of the Class Period. Moreover, the Coffman Report concludes that "it is reasonable to assume that the valuation impact of the misstatements and/or omissions would not have been substantially different had the relevant truth been revealed earlier in the Class Period."[36] If Mr. Coffman is correct, then the sensitivity of Co-Diagnostics' share price to earnings news did not change over the course of the Class Period.[37]

38.    Following Mr. Coffman's methodology in prior work, I estimate the ERC as the ratio of excess price change to earnings surprise.[38] For the 1Q 2022 earnings announcement, I estimate an ERC of 2.27, calculated as the ratio of the market-adjusted price reaction on May 13, 2022 of $0.37 (calculated by Mr. Coffman) and the earnings surprise of $0.16.[39] This

---

[34] *See* Expert Rebuttal Report of Chad Coffman, *Kasper vs. AAC Holdings Inc., et al.,* Middle District of Tennessee District Court, Case No. 3:15-cv-00923, dated February 10, 2017 and Expert Report of Chad Coffman, *In Re DVI Securities Litigation*, Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated October 1, 2008 where Mr. Coffman considers earnings announcements only during the class period.

[35] Co-Diagnostics 10-Q for the period ending March 31, 2022, filed on May 12, 2022.

[36] Coffman Report, ¶19.

[37] If Mr. Coffman's conclusion is incorrect then his assumption of constant dollar inflation is incorrect, as the valuation impact of the misstatements and/or omissions would have to have been different had the relevant truth been revealed earlier.

[38] *See* Expert Rebuttal Report of Chad Coffman, *Kasper vs. AAC Holdings Inc., et al.,* Middle District of Tennessee District Court, Case No. 3:15-cv-00923, dated February 10, 2017, Expert Report of Chad Coffman, *In Re DVI Securities Litigation*, Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated October 1, 2008, and Expert Rebuttal Report of Chad Coffman, *In Re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* Southern District of New York District Court, Case No. 1:09-md-02058-PKC, dated April 29, 2012.

[39] The market-adjusted price reaction of $0.37 is from Coffman July Report, Exhibit 7. Consensus estimates for 1Q 2022 are calculated based on analyst reports.

14

ratio indicates that each cent of earnings surprise is associated with 2.27 cents of abnormal price change.

39.     I also estimate an ERC using the median of a broader sample of earnings announcements, consistent with Mr. Coffman's prior work in *AAC*. Again, to minimize potential dispute with Mr. Coffman, I used the same earnings announcements that Mr. Coffman used in the analysis of market efficiency in the report he filed on July 26, 2024 (the **"Coffman July Report"**).[40] Similarly, I use the excess price returns Mr. Coffman calculates for each of these earnings dates. In this analysis I exclude earnings surprises of $0.03 or less in absolute value, consistent with Mr. Coffman's approach in *DVI*. The results of my analysis are presented in **Table 1** below.

---

[40] Expert Report of Mr. Chad Coffman, filed on July 26, 2024.

**Table 1**
**Co-Diagnostics**
**Earnings Response Coefficients**
**1Q 2021-2Q 2023**

| | | Earnings per Share ("EPS") | | | | |
|---|---|---|---|---|---|---|
| Quarter | Date | Consensus Estimate | Actual | Surprise | Abnormal Dollar Price Change | ERC |
| (1) | (2) | (3) | (4) | (5) =(4)-(3) | (6) | (7) =(6)/(5) |
| 1Q 2021 | 5/14/2021 | $0.22 | $0.26 | $0.04 | $1.26 | 29.38 |
| 2Q 2021 | 8/13/2021 | $0.22 | $0.33 | $0.11 | $1.21 | 11.17 |
| 3Q 2021 | 11/12/2021 | $0.21 | $0.38 | $0.18 | $0.54 | 3.08 |
| 4Q 2021 | 3/25/2022 | $0.12 | $0.25 | $0.13 | ($0.69) | (5.37) |
| 1Q 2022 | 5/13/2022 | $0.17 | $0.34 | $0.16 | $0.37 | 2.27 |
| **2Q 2022** | **8/12/2022** | **$0.10** | **($0.08)** | **($0.18)** | **($2.08)** | |
| 3Q 2022 | 11/11/2022 | ($0.04) | ($0.04) | $0.00 | $0.13 | N/A |
| 4Q 2022 | 3/17/2023 | ($0.15) | ($0.70) | ($0.55) | ($0.49) | 0.89 |
| 1Q 2023 | 5/12/2023 | ($0.23) | ($0.20) | $0.03 | $0.12 | N/A |
| 2Q 2023 | 8/11/2023 | ($0.24) | ($0.31) | ($0.07) | ($0.04) | 0.60 |
| | | | | | 1Q 2022: | 2.27 |
| | | | | | Median: | 2.27 |

**Notes and Sources:**
Data are from Co-Diagnostics earnings press releases, SEC filings, and analyst reports from H.C. Wainwright, Maxim, Litchfield, and Sidoti. Date is the date of the first trading close after the earnings announcement. Abnormal dollar price change is as calculated in the Coffman July Report. Analysis uses exact figures from "CODX Event Study.xlsx" that Mr. Coffman produced in this litigation. Earnings per share are calculated as the net income for the applicable period divided by the weighted average number of fully diluted shares outstanding. Median is based on earnings announcements with a surprise of at least 3 cents in absolute value.

40.     As shown above, the median across this expanded sample of seven applicable earnings announcements is the same as the ERC for 1Q 2022, providing further support the use of 1Q 2022 as the ERC estimate for the disaggregation analysis.

41.     I then use this ERC along with the 2Q 2022 earnings surprise announced on August 11, 2022 to calculate the estimated price reaction on August 12, 2022 that is attributable to the surprise in 2Q 2022 earnings. This calculation is shown in **Table 2** below.

16

**Table 2**
**Co-Diagnostics**
**Calculation of Expected Abnormal Price Change due to 2Q 2022 Earnings Miss**
**Announced on August 11, 2022 at 4:01 PM**

| Item | Formula | Value |
|---|---|---|
| (1) | (2) | (3) |
| **A.** ERC Estimate | | 2.27 |
| **B.** Consensus Estimate for 2Q 2022 EPS | | $0.10 |
| **C.** Actual 2Q 2022 EPS | | ($0.08) |
| **D.** 2Q 2022 Earnings Surprise | = C - B | ($0.18) |
| **E. Expected Abnormal Price Movement due to Earnings Surprise** | = A * D | **($0.40)** |
| **F.** Abnormal Dollar Price Change on August 12, 2022 (as Calculated by Mr. Coffman) | | ($2.08) |
| **G. Portion of Abnormal Price Movement due to Earnings Surprise** | = E / F | **19.3%** |

**Notes and Sources:**
Earnings data are from Co-Diagnostics' press release, 10-Q for 2Q 2022, and analyst reports from H.C. Wainwright, Sidoti, Litchfield, and Maxim. ERC is for 1Q 2022. See Table 1. Abnormal return on August 12, 2022 is as calculated in the Coffman Report.

42.    As shown in **Table 2** above, using the ERC ratio of 2.27 for 1Q 2022 implies that of the $2.08 excess price reaction calculated by Mr. Coffman on August 12, 2022, $0.40 can be attributed to the announcement of below-expectation 2Q 2022 earnings. As the allegations in this case are that Co-Diagnostics did not disclose the effect of its second quarter sales through its May 12, 2022 announcement, and not that it failed to disclose that sales would remain low *after* the end of the second quarter of 2022, this additional forward-looking information is confounding news and its effect should not be included in inflation and damages.[41]

## B. The Coffman Report Assumes without Basis that Alleged Inflation Is Constant during the Class Period

43.    The Coffman Report assumes that inflation is constant during the Class Period.[42] Specifically, the Coffman Report states, "Based on my understanding of Plaintiff's allegations and assumptions provided by Counsel for Lead Plaintiff, coupled with my review of the

---

[41] To the extent that one asks whether the low sales in 2Q 2022 would cause the market to anticipate lower sales in the future, that is precisely what the ERC accounts for. The fact that Co-Diagnostics' stock price fell by *more than predicted* by the ERC analysis indicates that there was *additional* negative news about future financial results given in the 2Q 2022 earnings announcement.

[42] Coffman Report, ¶19.

documents and information identified in Appendix A, I conclude that constant dollar inflation is reasonable in this matter."[43]

44.    In other words, after purporting to determine that the August 11, 2022 Alleged Corrective Disclosure caused a $2.08 decline in Co-Diagnostics' share price, the Coffman Report assumes that inflation per share is always $2.08 over the entire Class Period.[44] There are several reasons why this assumption does not make economic sense.

### 1. Coffman Report's Alleged Inflation Does Not Vary with the Amount of Sales to Date in 2Q 2022

45.    First, the primary allegation in this matter is that Co-Diagnostics failed to disclose that it had already observed lower sales in 2Q 2022 by the time of its May 12, 2022 announcement.[45] Yet, notably, the Coffman Report's analysis of alleged inflation does not take into account the amount of sales as of May 12, 2022 or as of a date shortly before that (i.e., the most recent information that Defendants allegedly had as of when they made the May 12, 2022 statements at issue in this matter). In other words, the alleged inflation in the Coffman Report would be the same whether Co-Diagnostics 2Q 2022 sales as of May 12, 2022 were $0.1 million or $5.0 million. Yet, if the amount of sales-to-date did not matter with respect to the amount of inflation they introduced to the market, then there could be no effect on the market (i.e., no price impact) from failing to disclose the amount of sales as of May 12. Mr. Coffman's inflation calculation is completely divorced from what Defendants knew at the time of the Alleged Misrepresentations.

### 2. The Coffman Report's Conclusion that Constant Dollar Inflation is Appropriate Is Inconsistent with the Price Appreciation of Co-Diagnostics throughout the Class Period

46.    Second, other evidence that Mr. Coffman's constant dollar approach is incorrect is the significant price appreciation of Co-Diagnostics stock over the Class Period.

47.    Specifically, the Coffman Report's constant dollar inflation assumption results in an unexplained increase in Co-Diagnostics' alleged true value over the course of the Class Period

---

[43] Coffman Report, ¶78.

[44] Coffman Report, ¶75.

[45] Coffman Report, ¶34. See also MTD Opinion and Order, pp. 5-6.

that may artificially inflate the Coffman Report's inflation estimate over much of the Class Period. Co-Diagnostics' stock price closed at $3.96 per share on May 12, 2022, the start of the Class Period, and at $6.46 on August 11, 2022, right before the Alleged Corrective Disclosure, an increase of 63%. This is itself a large increase but is dwarfed by the change in the Coffman Report's "alleged true value" (i.e. calculated as stock price less alleged inflation), which goes from $1.88 (equal to the closing price of $3.96 on May 13, 2022 less $2.08 of alleged inflation) to $4.38 (equal to the closing price on August 11, 2022 of $6.46 less alleged inflation of $2.08), an increase of 133%, over the same time period. As such, if one were to accept Mr. Coffman's $2.08 constant dollar inflation as given, that would mean the alleged true value of Co-Diagnostics more than doubles over the Class Period. The Coffman Report has not provided an explanation for this substantial increase in Co-Diagnostic's alleged true value over a three-month period.

48.    This large, unexplained stock price increase itself affects the calculation and interpretation of the alleged inflation in the Coffman Report. The Coffman Report assumes that none of the increase in Co-Diagnostics' stock price from $3.96 per share on May 12, 2022, the start of the Class Period to $6.46 on August 11, 2022, right before the Alleged Corrective Disclosure represents an increase in alleged inflation that entered the stock price after the start of the Class Period.

49.    To illustrate this point, consider an example where the increase in Co-Diagnostics' stock price over this period was solely due to an expected increase in profit margins via reductions in costs over the same period. If that was the case, any negative information about the decrease in sales would have had a smaller effect on May 12, when profit margins were low, than it would have had on August 11, when profit margins were expected to be high. This means that even if the $2.08 that the Coffman Report claims to be the effect of the August 11 Alleged Corrective Disclosure were the correct amount of alleged inflation on that date (which it is not), the alleged inflation on May 12 would be lower.

50.    Another example would be that the entire increase in Co-Diagnostics' stock price from May 12, 2022 to August 11, 2022 is due to an increase in expected sales over that period.[46]

---

[46] This increase would occur after analysts and the market had already lowered their estimates for 2022 sales following the 1Q 2022 earnings announcement.

In that case, the increase of $2.50 in the stock price from $3.96 to $6.46 would more than explain the $2.08 alleged inflation. One interpretation of this is that after May 12, the market correctly interpreted Defendants' statement that day and there was no inflation in the stock at that point. In this example, as time passed, the market grew more optimistic regarding Co-Diagnostics' 2Q 2022 sales based on later statements or new non-company specific information (i.e., not due to the alleged misstatements or omission on May 12, 2022), only to be disappointed in August with the actual sales figures for the second quarter.

51.     While these two examples are possible reasons that the price increase may have been related to the alleged inflation, it is more difficult to provide an example that is consistent with the constant dollar inflation in the Coffman Report, which implies that the price increase is completely unrelated to the allegations. The $2.50 increase in Co-Diagnostics' stock price over 2Q 2022 could not come from anything that changed profitability per dollar sold nor could it come from any change in market estimates of what sales would ultimately be in 2Q 2022. Instead, the entirety of that $2.50 increase would have to come from something else. What this "something else" is is never addressed in the Coffman Report, much less is there any evidence that this "something else" accounts for the entirety of the $2.50 increase in Co-Diagnostics' stock price. This increase in the true value over the course of the Class Period is at odds with two of Mr. Coffman's other findings, (1) that the Logix Smart Test was Co-Diagnostics' "flagship product," and "primary source of revenue and expected future revenue," and (2) that, as a natural conclusion of inflation being constant throughout the Class Period, there was no new news about the Logix Smart test.[47] Mr. Coffman offers no explanation for how the alleged true value could more than double over three months for reasons unrelated to Co-Diagnostics' primary source of revenue. Indeed, if the true value doubled for such a reason, the Logix Smart test would no longer be Co-Diagnostic's primary source of value. By avoiding this question, the Coffman Report has essentially assumed the maximum possible inflation over the Class Period with no theoretical or empirical basis.

52.     As discussed above, a plausible explanation for the actual stock price increase indicates that some share of that price increase represents an increase in inflation over the Class

---

[47] Coffman Report, ¶25.

20

Period, meaning that even if the figure of $2.08 is correct for the end of the Class Period, inflation would be lower earlier on.

**IV.    THE COFFMAN REPORT'S OFFERS A FLAWED APPROACH TO ESTIMATING DAMAGES FOR OPTIONS HOLDERS**

### A. Inflation and Damages for Co-Diagnostics' Options Are Similarly Overstated

53.    Mr. Coffman's methodology for estimating damages for options requires the calculation of a 'but-for' stock price and "changing the underlying price of the security [i.e., the stock] in the equation to reflect the removal of the artificial inflation."[48] As described in **Section II** and **Section III** above, I find that Mr. Coffman's estimates of inflation in Co-Diagnostics stock throughout the Class Period are overstated and unreliable. Therefore, Mr. Coffman's calculations of options damages, which rely on his estimate of alleged inflation in the Co-Diagnostics' common shares, are also overstated and unreliable for all the same reasons. In addition, there are other issues with Mr. Coffman's damages methodology for the options that I detail below.

### B. The Damages Calculations for Co-Diagnostics' Options in the Coffman Report Contain Obvious Errors

54.    Mr. Coffman's analysis of damages for options is flawed. In his calculated inflation dissipated on the date of the Alleged Corrective Disclosure, presented in Appendix D of his report, Mr. Coffman claims that for several options, the inflation dissipated from the option was greater than $2.08, the amount of inflation that Mr. Coffman claims was in the price of Co-Diagnostics shares throughout the Class Period.

55.    When pricing an option, an important characteristic of the option is what is referred to as the delta of the option. The delta is how much the price of the option will change in response to a change in the price of the underlying security. In this case, the delta for each option is how much the price of each option would change following the change in the price of Co-Diagnostics stock. The value of the delta can vary for different options, however the absolute maximum the delta can be is 1. In other words, the most the price of an option can move

---

[48] Coffman Report, ¶98.

21

following a theoretical $1 change in the price of the underlying security is $1. This maximum bound is commonly known and often referenced in textbooks and academic literature.[49]

56.    As an example, imagine a call option giving someone the right to buy a share of a stock for $5. Now consider what happens when the option expires. If the stock price is less than $5, the option expires worthless. If the stock price is more than $5, then the option holder can exercise the option to buy the stock at $5 and make a profit. (For example, if the stock price is $8, then the option holder can use the option to buy the stock at $5 and then sell it in the market for $8, making a profit of $3.) Now suppose that, instead, the stock is a dollar higher than it otherwise would have been when the option expires. If the stock price was already above $5, then the option holder makes $1 more in profit (e.g., making a $4 profit if, instead of being $8, the stock price is $9). If the stock price was going to be between $4 and $5, the option holder goes from making no profit to a profit of under $1 (e.g., a stock price of $4.75 yields no profit, while a stock price of $5.75 yields a profit of $0.75). Finally, if the stock price was going to be less than $4, the option holder makes no profit either way. In each case, the increase in profits, and thus the increase in the value of the option, is $1 or less.

57.    This cardinal rule of options pricing does not hold in Mr. Coffman's analysis. In his Appendix D, Mr. Coffman calculates that more than $2.08, the amount of inflation he claims is in the stock price of Co-Diagnostics, is removed from the value of several of the options at the time of the Alleged Corrective Disclosure. For example, Mr. Coffman calculates the alleged *deflation* that dissipated following the Alleged Corrective Disclosure to be $2.25 for the puts expiring on January 20, 2023 with a strike price of $15, and $2.75 for puts expiring January 19, 2024 with a strike price of $20. Mr. Coffman also calculates the alleged *inflation* that dissipated following the Alleged Corrective Disclosure to be $2.30 for calls with a strike price of $5 expiring on September 9, 2022.[50] As these conclusions are impossible, Mr. Coffman's calculations of damages for options are clearly flawed, and this is true even if his calculations of damages for shares were correct (which they are not).

---

[49] *See* Hull, J.C. (2012). *Options, Futures, and Other Derivatives* (8th ed.). Pearson pp. 383-384. "Toward the end of the life of the option, it becomes apparent that the option will be exercised and the delta of the option approaches 1.0." and "As it becomes clear that the option will not be exercised, delta approaches zero."

[50] Coffman Report, Appendix D.

### C. Mr. Coffman's Option Damages Are Based on Unreliable Bid-Ask Based Calculations

58.    Mr. Coffman's reliance on bids and asks to estimate the inflation that dissipated on August 12, 2022, following the Alleged Corrective Disclosure also leads to flawed and unreliable results.[51] Mr. Coffman appears to rely on bids (i.e., a quote offering to buy the option) and asks (i.e., a quote offering to sell the option), rather than actual trade prices for this analysis.[52] By relying on the midpoint of the bid and ask, and not actual trading prices, Mr. Coffman's analysis calculates theoretical changes in prices even though no trading occurred.

59.    On occasion, changes in certain large spreads make it appear as though prices changed substantially, even though zero trading occurred.

60.    To illustrate how Mr. Coffman's analysis can lead to specious results, consider the data for a call option with a $5 strike price and a September 9, 2022 expiration date, shown in **Table 3** below. Appendix D of the Coffman Report claims that $2.30 of inflation dissipated from this option on August 12, 2022.[53] While the Coffman Report provides no formula or explanation showing how the $2.30 was calculated, it appears to be based on the $2.25 difference between the bid-ask midpoint on August 11, 2022 of $2.48 and the bid-ask midpoint on August 12, 2022 of $0.23, with some additional adjustment explaining the additional five cents.

61.    On August 11, this option contract did not trade. However, the bid and ask prices both changed. The bid *fell* from $1.65 on August 10 to $1.15 on August 11, while the ask *rose* from $1.80 to $3.80 over the same period, and the stock price *decreased*. These movements of the option bid and ask in opposite directions cannot both reflect an expected movement in the price of the option that would have been observed had it traded that day. Instead, they may reflect some uncertainty or lack of competition in the market for this option, as evidenced by the

---

[51] Coffman Report, Appendix D.

[52] The Coffman Report does not describe the calculation that results in the numbers presented in Appendix D. My understanding of the calculation that Mr. Coffman performed is based on my review of the backup documents produced by Mr. Coffman.

[53] I also note that Appendix E reports the alleged inflation on August 11, 2022 in this contract as $1.42. The Coffman Report does not provide an explanation for why the estimate of alleged inflation that dissipated on August 12, 2022 (as reported in Appendix D) is different from the alleged inflation for the same contract on the day before the Alleged Corrective Disclosure, August 11, 2022.

increase in the bid-ask spread from $0.15 on August 10, 2022 to $2.65 on August 11, 2022. Notably, on August 12, 2022, when the option traded, the bid-ask spread fell back to $0.15.

**Table 3**
**Co-Diagnostics Call Option with $5 Strike Price and September 9, 2022 Expiration**
**Extract from Option Data Used in the Coffman Report**

| Date | Last Price | # of Contracts Traded | 3:45 PM Bid | 3:45 PM Ask | Bid-Ask Spread | Bid-Ask Midpoint |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) =avg((4),(5)) |
| 8/10/2022 | $1.60 | 5 | $1.65 | $1.80 | $0.15 | $1.73 |
| 8/11/2022 | N/A | 0 | $1.15 | $3.80 | $2.65 | $2.48 |
| 8/12/2022 | $0.25 | 3 | $0.15 | $0.30 | $0.15 | $0.23 |
| **Difference Between Values (As Used in Coffman's Analysis):** | | | ($1.00) | ($3.50) | | ($2.25) |
| **Inflation Allegedly Dissipated on August 12, 2022 (Coffman Report, Appendix D):** | | | | | | $2.30 |
| **Difference Between Values Using Prior Day's Value:** | | | ($1.50) | ($1.50) | | ($1.50) |

**Notes and Sources:**
Data are from the file "CODX CBOE Options Data.xlsx" as produced by Mr. Coffman in this matter and Coffman Report Appendix D.

62.     Had Mr. Coffman relied only on trading prices on the days when this option traded (i.e., August 10 and 12), he would have found a price decline of $1.35 (from $1.60 to $0.25). Had he relied on the bid-ask midpoint for those same days, he would have found a price decline of $1.50 (from $1.73 to $0.23), not the same as $1.35, but not nearly as far off as the $2.30 that he claims represents alleged inflation dissipating from this option on August 12, 2022.

63.     In short, by relying on bids and asks on days when a Co-Diagnostic option does not trade, Mr. Coffman's analysis is vulnerable to unreliable values for those bids and asks.

## V.     MR. COFFMAN REPORT'S ANALYSIS OF DAMAGES MAKES NO EFFORT TO ACCOUNT FOR BENEFITS FROM SALES AT ALLEGEDLY INFLATED PRICES

64.     The Coffman Report's damages analysis considers only the damages to investors who purchased stock or call options or sold put option during the Class Period. However, in practice, investors will often have multiple transactions during a period, both selling and buying

24

stock, or they may execute several transactions at the same time in a hedging strategy meant to limit any potential losses. Such trading is especially common with options. For example, investors may potentially trade in both options and in shares based on the volatility of the underlying share price. An analysis of damages may need to take into account offsets, i.e., benefits from sales at inflated prices.

65.    Consider the following example: two different potential claimants each bought 500 shares on May 16, 2022, i.e., during the Class Period, and each sold these shares on August 12, 2022, i.e., after the Alleged Corrective Disclosure. Under the Coffman Report's damages analysis, both investors would receive the same damages as they bought and sold on the same date. However, suppose that one of these investors also owned 500 shares of Co-Diagnostics that they purchased prior to the Class Period and sold these shares during the Class Period, on May 15, 2022. As such, this investor sold 500 shares at inflated prices and also bought 500 shares at inflated prices, and from an economic perspective, the net harm to that investor is zero if one follows the Coffman Report's view that inflation is constant over the Class Period. Yet, under the Coffman Report's analysis of damages, this investor would receive the same damages as an investor who only allegedly suffered from purchasing at an inflated price.

66.    As another example, an investor may expect the volatility in Co-Diagnostics' stock price to increase and purchase the same amount of calls and puts on Co-Diagnostics' stock. Unless one accounted for the benefits of buying the puts at deflated prices, this investor's damages claim would overstate their actual loss (if any) due to the Alleged Misrepresentations. In contrast, another investor may have only purchased the call options and, if liability is proven, may be entitled to damages based on the inflation in the call options. As such, not considering offsets may result in asymmetrical economic treatment of different claimants and can result in overstated damages.

## VI.    CONCLUSION

67.    In conclusion, I find that the analysis presented in the Coffman Report is incomplete and unsupported and, therefore, unreliable. In assessing whether the Alleged Misrepresentations were relevant to investors, Mr. Coffman disregards the mismatch between the specific Alleged Corrective Disclosure and the more general Alleged Misrepresentations as well as what could have been disclosed to investors at the time of the Alleged Misrepresentations. He

does not properly consider factors indicating that any disclosure would have a different effect on Co-Diagnostics' share price at different points during the Class Period. He further assumes without basis that financial results for only a portion of a quarter would have the same impact as results for the full quarter. This flawed analysis leads him to incorrectly conclude that the stock price drop on August 12, 2022 is a proxy for the inflation allegedly caused by the Alleged Misrepresentations, and that inflation remained constant throughout the Class Period. This means that whether Defendants had sold 1% or 99% of their quarterly total as of the date of the Alleged Misrepresentations makes no difference in Mr. Coffman's analysis of damages. Mr. Coffman's finding that alleged inflation was constant and did not depend on what sales numbers could have been disclosed contradicts Plaintiff's allegation that the Alleged Misrepresentations were misleading due to the omission of intra-quarter sales, and further demonstrates the unreliability of Mr. Coffman's methodology.

68.     Additionally, although the Alleged Corrective Disclosure regarding 2Q 2022 results was accompanied by confounding news, Mr. Coffman makes no effort to disaggregate the resulting price change. Adjusting Mr. Coffman's alleged inflation in the stock price using methodologies he has used in other cases leaves only $0.40 as potentially attributable to the 2Q 2022 earnings miss.

69.     Finally, his analysis of options damages has the same shortcoming as it is derived from the alleged inflation in the stock. The Coffman Report's options' damages analysis further uses inaccurate pricing, and his damages calculations include estimates of damages for certain options above the theoretical maximum of what damages could be.

26

## VII.    MISCELLANEOUS

70.    My work in this matter is ongoing, and I reserve the right to supplement this analysis in response to any new information I receive.

71.    I declare under penalty of perjury under the laws of the United Stated of America that the foregoing is true and correct.

Executed on the 10th day of January 2025 at Greenwich, Connecticut.

_____
Vinita Juneja, Ph.D.

27



NERA Economic Consulting
1166 Avenue of the Americas
New York, NY 10036
Tel: 212-345-3148
vinita.juneja@nera.com
www.nera.com

# Appendix 1
# Vinita Juneja, Ph.D.
## Senior Managing Director

## Education

**Harvard University**
Ph.D., Economics, 1988
Social Sciences and Humanities Research Council of Canada
     Doctoral Fellow, 1982-1985
A.M., Economics, 1983

**University of Western Ontario** (now known as **Western University**)
B.A., Honors, Economics, 1980
     U.W.O. Continuing Scholar, 1976-1980
     Dean's Honors List, 1976-1979

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2017 – 2024 | Chair, White Collar, Investigations & Enforcement Practice |
| 2013 – 2017 | Co-Chair, White Collar, Investigations & Enforcement Practice |
| 2006 – 2011 | Board of Directors |
| 2006 – 2009 | Chair, Securities and Finance Practice |
| 2000 – | Senior Managing Director (f/k/a/ Managing Director and Senior Vice President) |
| |     Directs projects in the areas of valuation, finance, and securities economics. |
| 1995 – 2000 | Vice President |
| 1988 – 1995 | Senior Consultant |
| 1988 | Senior Economic Analyst |
| 1985 – 1987 | Economic Analyst |

**Harvard University**

| | |
|---|---|
| 1983 – 1985 | Assistant Head Tutor, Department of Economics |
| | Helped coordinate and administer the undergraduate program in economics at Harvard College; advised undergraduates on their course of study. |
| 1982 – 1985 | Teaching Fellow, Department of Economics |
| | Participated in teaching courses on microeconomics, economics of business regulation, and economics of bureaucracy. |
| 1981 – 1985 | Resident Tutor, Cabot House (1982-1985), Nonresident Tutor, Pforzheimer House (1981-1982), Harvard College |
| | Served as economics tutor, resident assistant and academic advisor. |

Vinita Juneja, Ph.D.

**Shell Canada**

1981 – 1982   Economic Consultant, Strategic Planning Department
Responsible for a study of multinationals and foreign investment with focus on the oil and natural gas sectors.

Summer 1981  Junior Economist, Strategic Planning Department
Responsible for economic forecasting of the world oil market, policy analysis, and macroeconomic research.

**University of Western Ontario** (now known as **Western University**)

1979 – 1980   Teaching Assistant, Department of Economics
Taught microeconomics and labor economics.

**Toronto Investment Management**

Summer 1979  Economic Consultant
Conducted research for various projects, including reports on forecasting and the size of the market sector in Canada.

**University of Toronto**

Summer 1979 Teaching Assistant, Department of Economics
Taught introductory economics.

## Professional Activities

Member, FINRA Board of Arbitrators, 2007 – 2009

Member, NASD Board of Arbitrators, 1990 – 2007

## Testimony (Last Four Years)

Deposition before the Circuit Court of the Fourteenth Judicial Circuit in and for Bay County, Florida, in the matter of *Zachary Young and Nemex Enterprises, Inc. v. Cable News Network, Inc.*, 2025.

Deposition before the United States District Court, Northern District of Illinois, Eastern Division in the matter of *United States Securities and Exchange Commission, v. John M. Fife, Chicago Venture Partners, L.P., Iliad Research and Trading L.P., St. George Investments LLC, Tonaquint, Inc., and Typenex Co-Investment, LLC.*, 2024.

Testimony and Deposition before the American Arbitration Association, in the matter of *Texas Brine Company, LLC, v. Occidental Chemical Corporation*, 2023.

Deposition before the United States District Court for the Southern District of Texas, Houston Division, in the matter of *Occidental Petroleum Corporation and Anadarko Petroleum Corp v. Wells Fargo Bank, N.A.,* 2022.

Deposition before the United States District Court for the Southern District of New York, in the matter of *Rohan Ramchandani v. Citigroup, Inc, Citicorp and Citibank, N.A.*, 2022.

Deposition before the United States District Court for the Northern District of California, in the matter of *Jonathan Davis and Roei Azar, Individually and on Behalf of All Others Similarly Situated v. Yelp, Inc., Jeremy Stoppelman, Lanny Baker, and Jed Nachman,* 2021.

January 2025

**Appendix 2**
**Materials Relied Upon**

| Number | Item |
|:---:|:---:|
| **(1)** | **(2)** |

**Case-Specific Legal Filings**

| | |
|:---:|:---|
| 1 | Expert Report of Chad Coffman, dated July 26, 2024, *Stadium Capital LLC v. Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown* , Southern District of New York District Court, Case.No. 22-cv-6978 (AS). |
| 2 | Expert Report of Chad Coffman, dated November 20, 2024, *Stadium Capital LLC v. Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown* , Southern District of New York District Court, Case.No. 22-cv-6978 (AS). |
| 3 | Expert Report of Thomas C. Tsai, dated November 20, 2024. *Stadium Capital LLC v. Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown* , Southern District of New York District Court, Case.No. 22-cv-6978 (AS). |
| 4 | Expert Report of Vinita Juneja, dated November 20, 2024, *Stadium Capital LLC v. Co-Diagnostics, Inc., Dwight H. Egan and Brian L. Brown* , Southern District of New York District Court, Case.No. 22-cv-6978 (AS). |

**Other Legal Decisions, Briefings, and Filings**

| | |
|:---:|:---|
| 5 | Deposition of Chad Coffman, *In Re HP Securities Litigation,* Northern District of California District Court, Case No. 3:12-cv-05980-CRB, dated December 3, 2014. |
| 6 | Expert Rebuttal Report of Chad Coffman, *Kasper vs. AAC Holdings Inc., et al.,* Middle District of Tennessee District Court, Case No. 3:15-cv-00923, dated February 10, 2017. |
| 7 | Expert Report of Chad Coffman, *In re DVI Securities Litigation,* Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated October 1, 2008. |
| 8 | Rebuttal Report of Chad Coffman, *In re DVI Securities Litigation,* Eastern District of Pennsylvania District Court, Case No. 2:03-CV-05336-LDD, dated December 17, 2008. |
| 9 | Expert Rebuttal Report of Chad Coffman, *In Re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation,* Southern District of New York District Court, Case No. 1:09-md-02058-PKC, dated April 29, 2012*.* |
| 10 | Opinion and Order, *AP-Fonden v. General Electric Company* , Southern District of New York District Court, Case No. 17-CV-8457 (JMF), dated September 28, 2023. |

**Co-Diagnostics Market Data**

| | |
|:---:|:---|
| 11 | Co-Diagnostics, Inc. SEC Form 10-Ks and 10-Qs from 2023 from FactSet Research Systems, Inc. |
| 12 | Co-Diagnostics, Inc. press releases and earnings call transcripts from 2023 from FactSet Research Systems, Inc. |
| 13 | News stories regarding or related to Co-Diagnostics, Inc. from 2023 from Dow Jones Factiva. |
| 14 | Analyst reports on Co-Diagnostics, Inc. from 2023 from LSEG Data & Analytics and counsel for Co-Diagnostics. |

**Other**

| | |
|:---:|:---|
| 15 | "As Omicron Rages On, Scientists Have No Idea What Comes Next," *Science* , July 19, 2022. Available at https://www.science.org/content/article/omicron-rages-scientists-have-no-idea-what-comes-next. |
| 16 | "CDC Rescinds Order Requiring Negative Pre-Departure COVID-19 Test Prior to Flight to the US," *CDC Newsroom* , June 10, 2022. Available at https://www.cdc.gov/media/releases/2022/s0610-COVID-19-test.html |
| 17 | "CDC Streamlines COVID-19 Guidance to Help the Public Better Protect Themselves and Understand Their Risk, CDC Newsroom, August 11, 2022, 3:00 PM. Available at https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html, August 11, 2022, 3:00 PM. |
| 18 | https://www.nasdaq.com/glossary/e/earnings-response-coefficient |
| 19 | Hull, J.C. (2012). *Options, Futures, and Other Derivatives* (8th ed.) Pearson. |
| 20 | Materials Produced by Mr. Coffman |
| 21 | "New York City Coronavirus Cases Reach 'High' Alert Level," *The New York Times* , May 17, 2022. Available at https://www.nytimes.com/2022/05/17/nyregion/nyc-covid-high-alert.html. |
| 22 | "Pandemic Gets Tougher to Track as COVID Testing Plunges," *The Associated Press* , May 10, 2022, 12:09. Available at https://apnews.com/article/covid-us-testing-decline-14bf5b0901260b063e4fa444633f4d31. |
| | To the extent not mentioned above, all sources, references, and citations in the report and the Juneja Report, dated November 20, 2024. |