# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STADIUM CAPITAL LLC, on          )
behalf of Itself and all         )
others similarly situated        )
                                 )
            Plaintiffs,          ) No.
                                 ) 1:22-CV-06978-AS
vs.                              )
                                 )
CO-DIAGNOSTICS, INC., DWIGHT     )
H. EGAN, and BRIAN L. BROWN,     )
                                 )
            Defendants.          )

REMOTE VIDEOTAPED DEPOSITION
Via ZOOM of
CHAD COFFMAN
January 28, 2025
9:21 a.m.

STENOGRAPHICALLY REPORTED BY:
JO ANN LOSOYA, CSR, RPR, CRR
LICENSE #:  084-002437

Page 2

APPEARANCES
(All participants appearing remotely)

KAPLAN FOX & KILSHEIMER LLP
Jason Uris
800 Third Avenue,
New York, New York 10022
Juris@kaplanfox.com
    Appeared on behalf of Plaintiffs.

BAKER & HOSTETLER LLP
Genevieve G. York-Erwin
45 Rockefeller Plaza
New York, New York 10111
Gyorkerwin@bakerlaw.com
    Appeared on behalf of Defendants.

ALSO PRESENT:

Nita Juneja

VIDEOGRAPHER: Jamie Pritzker

Page 3

EXAMINATION

Witness                         Page   Line
CHAD COFFMAN
 By Ms. York-Erwin               5    23

***************

INDEX OF EXHIBITS

EXHIBIT          DESCRIPTION          PAGE
Exhibit 1   First Merits Report of Chad      10
        Coffman
Exhibit 2   Rebuttal Report of Chad          12
        Coffman
Exhibit 3   Monday.com dashboard         54
Exhibit 4   DVI Coffman report           89
Exhibit 5   Dr. Tsai's report       146

Page 4

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:21 a.m. on January 28, 2025.

Please note this deposition is being conducted virtually.  The quality of the recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Chad Coffman taken by counsel for defendant in the matter of Stadium Capital LLC on behalf of itself and all other similarly situated versus Co-Diagnostics Inc., Dwight H. Egan and Brian L. Brown filed in the United States District Court Southern District of New York, Case No. 22-CV-06978-AS.

My name is Jamie Pritzker representing Veritext.  I am the videographer.  The court reporter is JoAnn Losoya from the firm Veritext.

I am not authorized to administer an

Page 5

oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel and all present remotely will now state their appearances and affiliations for the record beginning with the noticing attorney.

MS. YORK-ERWIN:  Genevieve York-Erwin from Baker & Hostetler for the defendants, and our expert, Dr. Nita Juneja, is sitting in as well.

MR. URIS:  Jason Uris from Kaplan Fox & Kilsheimer LLP for lead plaintiff and the class.

THE VIDEOGRAPHER:  Thank you.  Will the court reporter please swear in the witness and then counsel you may proceed.

(Witness sworn at 9:24 a.m.)

WHEREUPON:

CHAD COFFMAN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. YORK-ERWIN:

Q.   Good morning, Mr. Coffman.

A.   Good morning.

2 (Pages 2 - 5)

Page 6

Q.   Would you please state your full name and current address for the record?

A.   Sure.  Chad William Coffman, 301 West Concord Place, Chicago, Illinois, 60614.

Q.   Is that where you're located today?

A.   Yes.

Q.   Because we're on Zoom, would you please tell me -- so you are there today.  Is there anyone else in the room with you --

A.   No.

Q.   -- right now?

And aside from the computer you're using, do you have any devices with you in the room?

A.   I have a phone, but it's on silent and not where I can see it.

Q.   Okay.  And we would just ask that you not communicate with anyone else besides me in any way while we're on the record.

A.   Sure.

Q.   Do you have any other materials with you that you're looking at?

A.   No.

Q.   No documents or papers?

A.   No.

Q.   No pens?

Page 7

A.   No.

Q.   Are you represented by counsel here today?

A.   No.

Q.   Have you ever been a party to a lawsuit before?

A.   Divorce proceeding many years ago.  I think that's the only time I was actually a party to a litigation.

Q.   Have you been deposed before?

A.   Yes.

Q.   So I just want to -- even though you have been deposed before, I want to lay a few ground rules which you probably heard before.

First, your deposition is being transcribed.  So just to make sure the transcript is accurate, I would ask that you not begin answering my question before I begin asking it and I allow you to give a full answer before I ask the next question.  That way we don't speak over each other.

Second, it is important that your answer be oral, yes or no, not nodding.

Third, your deposition is under oath, obviously.  If you don't understand a question that I ask, please say so.  If you do answer, I'll assume

Page 8

that you understood it; is that fair?

A.   Yes.

Q.   Throughout the day, your counsel or the counsel who is here may object to the questions that I'm asking, but unless instructed otherwise, you still need to answer the question.  Does that make sense?

A.   Yes.

Q.   And I will try to regular breaks.  If you need a break, just let me know, and I'll try to accommodate that.  The only thing I ask is that there be no breaks while a question is pending.

A.   Okay.

Q.   Do you have any questions before we begin?

A.   No.

Q.   What did you do to prepare for this deposition?

A.   I reread my reports, I reread the other expert reports in this matter, I had a meeting with plaintiff's counsel, I reviewed some -- and I reviewed some other backup material.

Q.   How much time did you spend doing that preparatory work?

A.   I would estimate a total of six or seven

Page 9

hours.

Q.   And when you met with plaintiff's counsel, are you referring to Mr. Uris?

A.   Mr. Uris and Mr. Hall was on the call as well.

Q.   And anyone else?

A.   No.

Q.   Was that one call or multiple calls?

A.   One call.

Q.   For approximately how long?

A.   About an hour.

Q.   Other than the documents identified in your initial and reply reports, did you review any documents to prepare for today's deposition?

A.   No.

Q.   Did you discuss today's deposition with anyone other than plaintiff's counsel?

A.   No.  Other than -- I gave an instruction to my staff to send me certain materials, but other than that, no.

Q.   Did you graduate from college?

A.   I did.

Q.   Where did you go?

A.   For undergraduate I went to Knox College.  I have a bachelor's in economics with honors from

3 (Pages 6 - 9)

Page 10

Knox College, and then I went to graduate school as well.

Q. Where did you go the graduate school?

A. The University of Chicago.

Q. And what was your degree?

A. Master in public policy.

Q. Do you have any other graduate degrees?

A. No.

Q. Any other schooling that's pertinent to your work?

A. Not schooling I would say, but I hold a -- I'm a CFA charter holder, which is a designation for people that have passed a series of exams and have sufficient professional experience to earn that charter.

Q. Any other training or licenses?

A. No.

Q. I'm going to mark as Exhibit 1 -- I'm going to introduce as Exhibit 1 a document. It should pop up in your Exhibit Share folder now.

(Deposition Exhibit 1 was marked for identification.)

BY MS. YORK-ERWIN:

Q. Do you see that?

A. Yes, I do.

Page 11

Q. Could you open that please take a look?

A. Yes, I see that document.

Q. Are you familiar with this document?

A. Yes. This is a report I prepared in this matter.

Q. Did you draft this report?

A. It's certainly my report. There are certainly portions of it I drafted. I also had assistance from my staff. So there was a series of people working at my direction that assisted in the preparation of it, but it's my report.

Q. And this report reflects your opinions in this case?

A. At least the ones in this report. Yes. I have another report that expresses other opinions. But yes, this contains some of the opinions I have reached in this case.

Q. What materials and data did you consider in drafting this report?

A. It would be the materials that are listed in the appendix.

Q. Are there any additional materials not listed there that you considered in forming the opinions in this report?

A. Not that I'm aware of, no.

Page 12

Q. I'm going to refer to this today as your first merits report. Is that all right?

A. Okay. That's fine.

Q. I am also going to introduce Exhibit 2.

(Deposition Exhibit 2 was marked for identification.)

BY MS. YORK-ERWIN:

Q. You should see Exhibit 2 pop up soon in Exhibit Share.

A. I see that.

Q. Are you familiar with this document?

A. Yes, this is another report I prepared in this matter.

Q. Did you draft this report?

A. I did. Again, I had some assistance from staff, but this is my report and reflects my opinions.

Q. And does -- so this -- this report is dated January 10, 2025; is that right?

A. Yes.

Q. Does it reflect your opinions in this case?

A. It's a subset of my opinions. It's my views as to essentially that nothing in either of the reports I was responding to changed the opinions

Page 13

I had already offered in the case.

Q. I'm going to refer to this as your reply report. Is that all right?

A. That's fine. Yes.

Q. And what materials and data did you consider in drafting this reply report?

A. The documents listed in Appendix A.

Q. Are all of the materials and data that you considered in forming your opinion identified in Appendix A?

A. Yes.

Q. So I'd like to turn to Appendix B, which -- in this document which is your CV. You're able to look through the document yourself; is that right?

A. Yes.

Q. Starting at the bottom your employment section, it says you worked at Chicago Partners in a variety of roles from 1995 to 2008; is that right?

A. Yes.

Q. What is Chicago Partners LLC?

A. Well, it was -- at the time it was a company that performed -- that provided expert services and consulting services in the area of economics, finance, accounting, and other areas, so,

4 (Pages 10 - 13)

Page 14

it was a consulting firm.

Q.   Is Chicago Partners no longer in existence?

A.   They were acquired by Navigant Economics sometime in 2008 I believe.

Q.   And what was the primary focus of your work when you were working at Chicago Partners?

A.   It really varied across a number of areas.  I did a lot of work on securities class action matters both, you know, for defendants, for D&O insurers, also as neutral as well as some work for plaintiffs.  I worked on a number of antitrust cases supporting other experts on antitrust cases. I worked on a number of very large labor discrimination related matters, also did some non-litigation consulting in valuation in other areas.  So it really spanned a lot of different roles.

Q.   Did you do any testifying work while you were at Chicago Partners?

A.   I think there was one declaration I filed but I had not -- I had not done any live testimony or anything like that at Chicago Partners.  I take that back.  There were a couple of expert reports I filed right at the very end while I was at Chicago

Page 15

Partners.

Q.   You filed expert reports.  Did you also testify at deposition or at trial while you were at Chicago Partners?

A.   I'm trying to recall.  I don't think I was deposed in those matters, and there was a matter that I was prepared to testify, it was at trial, but I don't think -- I don't think I ever actually testified.

Q.   Do you recall when your first testifying role in a Section 10b case was?

A.   Yes.  It would have been sometime in -- sometime in 2008 or 2009.

Q.   When I say Section 10b, you understand the statute I'm referring to?

A.   I do, yes.

Q.   What is Global Economics Group?

A.   That was the firm that I co-founded when I left Chicago Partners that again was focused on providing economic analysis both inside and outside of litigation.

Q.   And you were there from 2008 through 2023; is that right?

A.   That's correct.  Yes.

Q.   What were your responsibilities as

Page 16

president of Global Economics Group?

A.   It was to, No. 1, run my own practice and provide consulting services and, 2, to provide day-to-day -- I had day-to-day responsibility for operation of the firm.

Q.   How much of your work while you were there was as a testifying expert?

A.   That's not something I ever calculated. It would be a majority, but that's not a number I ever calculated.

Q.   During your time at Global Economics Group, approximately what portion of your testifying engagements were in Section 10b securities cases?

A.   Again, that's not something I ever calculated.  It certainly wasn't exclusively, but it would be a -- I would imagine it would be a majority, but I don't -- I can't give you a number more precise than that.

Q.   Do you think it was probably more than half?

A.   Yes.

Q.   Do you have any testifying expert work at Global Economics Group that was on behalf of defendants in the cases you were working on?

A.   I had been engaged by defendants to

Page 17

potentially provide testimony.  I don't think that -- I don't think those engagements actually led to testimony.

Q.   At any point in your career?

A.   Well, I have certainly testified on behalf of defendants in non-10b-5 related matters. I have certainly done a huge amount of consulting work for defendants in my career in 10b related matters and a large amount of work for also D&O insurers that are effectively on the defense side of 10b-5 matters as well as a substantial number of cases as a neutral expert working for mediators in 10b-5 related matters.  I don't think I ever testified on behalf of defendants.

Q.   Understood.  What is Market Platform Dynamics LLC?

A.   That was a company that performed consulting services for -- in the area of platform businesses, two-sided markets related businesses, really providing management consulting services was its primary role.  That firm has since dissolved.

Q.   Was it related in any way to Global Economics Group?

A.   There wasn't any direct ownership relationship.  There were partners in both so there

5 (Pages 14 - 17)

Page 18

was some common ownership, but there was no official -- there was no sub-ownership of one or the other.

Q.   And you worked for both Market Platform Dynamics and Global Economics Group at the same time; is that right?

A.   I did.  I mean, my role at Market Platform Dynamics was really administrative not in a consulting role so I didn't spend that much time doing work there.  But yes, I was doing for both at the same time.

Q.   It says here you became president of Peregrine Economics in 2024; is that right?

A.   That's correct.  The firm was founded earlier this year -- I guess it's not this year anymore.  It was at the beginning of last year.

Q.   Why did you decide to found Peregrine?

A.   It was really a strategic business decision having to do with the direction some of the other partners were taking at Global Economics Group.  I determined it was better for me and my team and some others to start our own firm.

Q.   And it says here practice areas include data science, general damages, labor and unemployment, regulatory economics and securities

Page 19

valuation.  What -- is that right?

A.   That's what it says, yes.

Q.   What do you consider your primary focus as an expert at Peregrine?

A.   Again, I think in terms of what takes up most of my time, it's primarily securities related matters, but I have assisted and consulted in other areas as well.

Q.   What portion of your personal income in '24 is from testifying engagements, approximately?

A.   I don't know the answer to that.  I take on a host of testifying and non-testifying engagements, and so that's not a number I have ever calculated.  I actually just don't know.

Q.   If you go to the next page, you have listed here professional experience.  There are a couple of bullet points.

Do you see that?

A.   Yes.

Q.   So the second one says "expert consultant for the American Stocks Exchange, AMEX, where I evaluated issues related to multiple listing of options, performed econometric analysis of various measures of options spread using tens of millions of trades."

Page 20

Do you see that?

A.   Yes.

Q.   Is this an ongoing consulting engagement?

A.   No.

Q.   What work was involved in this consulting experience you're describing here?

A.   Yeah, I can't go too deep into it for confidentiality reasons, but it was essentially analyzing the costs to trade for options that were listed on multiple exchanges versus those that were listed on one single options exchange and whether there was a difference in the cost to trade those options.

Q.   Are you familiar with the Option Greeks?

A.   Generally.  Yes.

Q.   Could you name them?

A.   There's a bunch of them.  Certainly there's delta, there's gamma, there's rho.

Q.   Can you tell me --

A.   Like it's -- I'm sure if I thought about it for a little longer, I could come up with a couple of more and what their meaning is but those are the ones that come to mind as I sit here immediately.

Q.   Can you tell me what delta is a measure

Page 21

of?

A.   Sure.  It is a measure of how sensitive an option price is to the change in the price of the underlying stock.

Q.   And if there's put-call parity, what range of values can delta take for a call option?

A.   Zero to one, holding everything else constant.

Q.   And what about for puts, what's the range of values that delta can take?

A.   Zero to minus one, again holding everything else constant.

Q.   Okay.

A.   Again, just to be clear, delta is a -- delta is a theoretical value based on an options pricing formula of how sensitive an option should be to changes in the underlying.  Then you can also empirically measure delta, but it's harder to keep everything else constant when you're empirically measuring delta.  So I mean, again, the idea that the delta takes on the values I just expressed is a theoretical concept assuming other things remain constant.

Q.   Look at the next section, testimony in the last four years.  Are all of the cases in which

6 (Pages 18 - 21)

Page 22

you have given testimony in the past four years listed here in Appendix B?

A. I believe so, yes. The only reason I'm hesitating is trying to think if there's been anything additional since I filed this report. I don't recall there being anything, but give me just a second to think about that.

I did give a deposition in the Boeing case I believe since this was filed but that case is already listed, it's the last one on the list, but I believe I did give a deposition in that matter as well since I filed this. I don't recall anything else.

Q. Of the cases here from the past four years where you have testified, approximately what portion are Section 10b cases?

A. Again I don't know a exact number. It would definitely be a majority. Some -- I think there are a few of the cases that may have been purely Section 11 cases and not had a 10b component but I think the vast majority of these had a 10b-5 component.

Q. And in approximately what portion of these testifying engagements did you submit a merits report?

Page 23

A. Again, that's not something I know off the top of my head. It would certainly be less than all of them. I certainly have not done merits reports in all of them. It may even be a minority. I just don't recall. I would have to go through and -- I mean, I could try to go through right now if you would like me to and try to remember, but it would certainly not be all of them.

Q. No. I was just looking for an approximate guess. That's fine.

Were any of these testifying engagements on behalf of defendants?

A. I don't believe so, no.

Q. How many times have you testified before a jury?

A. Zero.

Q. How many times have you testified at a bench trial?

A. Just to be -- so I understand your question, are you talking about the actual trial or just at a hearing in cases as well as in open court? Like I just want to be sure I'm answering what you --

Q. Well, I was referring to a bench trial so which -- so usually a trial is in front of a jury,

Page 24

right, but sometimes parties will agree to have a trial in front -- where the judge is the fact finder instead. It would be a different type of a trial where there was no jury but it was still a trial.

A. Sure, I can recall one.

Q. A one bench trial?

A. Yes.

Q. Okay. And how many times have you testified at arbitration?

A. Zero.

Q. Has your testimony ever been excluded in whole or in part?

A. In part, never in whole, again, for what I understand were legal reasons related to the fit of my testimony to the law in particular cases.

Q. Approximately how many times has your testimony been excluded in part?

A. There could be other times I'm not remembering, but there are three that come to mind off the top of my head.

Q. Could you describe each of those, please?

A. I recall the DVI matter. I had put forth two alternative theories of loss causation, one was sort of the more traditional out-of-pocket measure looking at corrective disclosures and the other was

Page 25

effectively based on a starting assumption that the company should have been in bankruptcy from the very beginning and I think I called it the solvency model or the bankruptcy model, which basically said the true value was zero and so then as the price approached zero, even when there weren't disclosures, that that reflected economic loss that would have occurred but for the fraud. The court in that case ruled that that didn't have sufficient fit with the law and excluded my testimony on that particular theory, but let my -- but the testimony on the more traditional corrective disclosure theory went forward.

I think as part of that, there were also certain corrective disclosures that were excluded, a minority of them, but there were some disclosures that the court ruled neither I nor the defense expert could testify about.

I remember another matter, and again, I don't remember the name of this case, but it was -- I filed a rebuttal report and the opposing side argued that I was offering a new opinion, not a rebuttal. And for reasons I don't understand, I don't think that claim was resisted in any way and the court ultimately ended up ruling one of my

7 (Pages 22 - 25)

Page 26

opinions was not a rebuttal opinion.

Again, I don't remember which case that was.

And then in the Valeant case, which was an opt out securities case, certain -- I forget the exact number but certain corrective disclosures were ruled as to be not actionable and my testimony related to those was excluded but went forward for all the others.

Those are the ones that I recall as I sit here.

Q. If we look -- looking again at your CV, when we -- on page 10 of the CV, you list publications.

Do you see that?

A. Yes.

Q. The first one is a 1998 publication entitled Railroad Construction and Land Value in the Journal of Real Estate and Finance; is that right?

A. Yes.

Q. Did that publication have anything to do with Section 10b claims?

A. No.

Q. And the second publication listed there, Empirical Analysis of the Impact of Legacy

Page 27

Preferences on Alumni giving at Top Universities, did that have anything to do with Section 10b?

A. No.

Q. Have you published any other written materials in the past ten years other than what's shown here?

A. No.

Q. Have you published any written materials on Section 10b related issues in your career?

A. No.

Q. As a testifying expert, have you ever refused to take a case?

A. Yes.

Q. In what circumstances without betraying any confidence?

A. When I thought the economic theory being advanced didn't make any sense.

Q. How many times roughly do you think that's happened in your career?

A. Well, let me take a step back. There's other reasons as well.

So on many occasions, I have been asked questions and reached an opinion which ultimately then resulted in that opinion not being part of a report or it being asked not to do a

Page 28

report so there -- or certain sections of a report that I was prepared to do.

So there certainly have been cases where I have refused to take entire cases because I didn't believe the theory made any sense as to why -- what was being alleged was defrauding shareholders.

There have been cases where I have looked -- been asked to look at, for example, the efficiency of a number of different securities and determined there was insufficient evidence to support an opinion that the market for a particular securities or groups of securities were efficient during the time I was being asked to look at them.

There have been times where I have described to a client or a potential client, you know, this is the opinion I'm willing to give, I'm not willing to say anything more than that, and then the decision was made not to engage me or continue the engagement. So that's happened a fair number of times.

Q. Have you ever opined in a Section 10b case as to whether a statement was false or misleading?

A. That's not the role I typically play.

Page 29

I'm trying to think whether there's -- I mean there's probably some examples where the falsity of the statement was so obvious that I was willing to say that was a false statement.

But my role in these cases is typically to start from the assumption that the statements that are being alleged are false and misleading in some way or conceal something in some way. So it's not my role to testify about whether the statement is or is not false or misleading.

Q. So you don't recall having ever offered that kind of an opinion in a Section 10b case?

A. I don't believe so. Again, I may have been asked a question in deposition or something where I basically said my belief is this was false and misleading for the following reasons because I had some reason or evidence to believe that, but that's -- I've never offered an opinion, a formal opinion or been asked to form an opinion or offered a formal opinion "is this statement false or misleading."

Q. Because that would generally be outside of your lane in a case?

A. That would typically be outside of my role in the case.

8 (Pages 26 - 29)

Page 30

Q.   Have you ever had a testifying engagement where you concluded that the alleged misstatements did not cause artificial inflation in the defendant company's stock price?

A.   Yes.

Q.   Had that happened often?

A.   I would say not too often, but -- and certainly even in cases where there were multiple misstatements or multiple theories or reasons why certain misstatements were false or misleading, I can recall having reached conclusions that at least for some misstatements, I couldn't identify any corrective information that corrected that misstatement and, therefore, there was no inflation related to those particular statements or something like that.

So I can certainly recall reviewing cases where, yeah, where I turned the case down because I didn't -- I didn't believe that it was economically coherent to say that this caused artificial inflation.  So again, it's not happened often, but it has happened, you know, a series of times.

Q.   Have you had any testifying engagements where you concluded that the alleged corrective

Page 31

disclosure didn't actually correct the challenged statements?

A.   Well, again, I have certainly been involved in numerous cases where there were multiple alleged corrective disclosures, and I was only willing to give an opinion about some subset of them being corrective and others that were alleged by plaintiffs were not corrective in my view and proceeded with that opinion.

Q.   Have you had any testifying engagements where you disaggregated a portion of the stock price decline following a corrective disclosure?

A.   Yes.

Q.   Has that happened often?

A.   Yes.

Q.   What were the -- in general, what are the circumstances that have led you to disaggregate in other cases?

A.   When there is contemporaneous information that is being disclosed with the corrective information that clearly falls outside what would be corrective and that in my view had at least some value relevance and contributed in some way to the stock price movement that's being alleged.

Q.   You would agree when there's confounding

Page 32

news, disaggregation is appropriate?

A.   If it truly is confounding information and if it is truly contemporaneous, in other words, there's no way to separate it even on an interday basis of some kind and it's an economically meaningful piece of information such that it is reasonable to conclude that it was value relevant and there's some evidence it was value relevant to the market, and to the extent it's moving -- it would move the market in the same direction as the corrective information.

So that's important because, for example, I have certainly come across corrective disclosures where there's confounding positive information and the claim is that the corrective information caused the stock price to go down and, therefore, not disaggregating is actually a conservative measure because it's not taking into account whatever positive influence that other confounding information might have had.  So in that case, you know, it's a conservative -- you know, not actively disaggregating is actually a conservative measure.

So but if there -- just to be clear, if there is in a case where the corrective

Page 33

disclosure or alleged corrective disclosure is -- has confounding information, value relevant confounding information that's also moving the stock the same direction, then I think it's important to disaggregate, yes.

MS. YORK-ERWIN:  I have like a good break here before we launch into your report.  Would anybody like to take a short break, bathroom or anything?

THE WITNESS:  Yeah, I could take a two-minute break, that would be great.

MS. YORK-ERWIN:  About five minutes.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:03 a.m. and this is the end of Media Unit 1.

(Break in the proceedings taken at 10:03 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:09 a.m. and this is the beginning of Media Unit 2.

BY MS. YORK-ERWIN:

Q.   So Mr. Coffman, I'd like to go back to your first merits report which is Exhibit 1.  Are you able to pull that up again?

A.   Yep, give me just a second.  Okay.  I

9 (Pages 30 - 33)

Page 34

have it up.

Q. I'd like to start with paragraphs 2 through 4. Can you take a quick look at those and let me know when you have refreshed yourself.

A. Okay, I recall.

Q. It says here you were retained in this action to opine on the efficiency of the market for Co-Diagnostics Securities; is that right?

A. Yes. I'm sorry. I lost my train of thought for one second.

Q. Were you retained in this action to opine on the efficiency of the market for Co-Diagnostics Securities?

A. Yes.

Q. And were you retained to opine on materiality with respect to the challenged statement?

A. Again, I recall or I certainly was asked to opine on whether the information that was allegedly concealed was -- would be considered important to the mix of investors. I realize that comports in some way with the legal concept of materiality, but I was not asked the legal question, I was asked whether in my view as an economist the information that was concealed would be considered

Page 35

important to reasonable investors.

Q. Understood. And you were asked to opine whether investor losses were proximally caused by the alleged misstatements; is that right?

A. Yes.

Q. And you were asked to opine with respect to damages calculations; is that right?

A. Yes.

Q. Were you retained to opine on any other matters in this suit?

A. Well, I believe in my opening report, I was asked to opine on the availability of a class-wide damages methodology even before actually calculating damages. So that's an opinion I have given in this case.

I have also been asked for my views on the rebuttal reports issued or the rebuttal report issued by Dr. Juneja. So I have views on that and am prepared to testify about that.

But other than that, I think that covers the scope of my opinions.

Q. Were you retained to opine on whether the challenged statements were false or misleading?

A. No.

Q. Or whether the challenged statements were

Page 36

made with scienter? Do you understand the term scienter in securities case?

A. I have a general understanding of what scienter is referring to, yes, and no, I was not engaged to opine on scienter.

Q. Do you have any expertise that would be relevant as to whether the challenged statements were false or misleading?

MR. URIS: Objection.

BY THE WITNESS:

A. To the extent that -- I guess the answer is I don't know. To the extent that expertise in economics or statistics or valuation or finance generally would be relevant to that question, yes, but I haven't thought about whether that could or would be the case in any given circumstance.

Q. Paragraph 6 it says that materials you considered are described in the Appendix A to this report. Do you see that?

A. I think I used the word identified, but yes. Yes, you're right.

Q. Let's look briefly at Appendix A. Can you scroll down to that?

A. Yep. Give me just a second.

Q. It appears these are all publicly

Page 37

available documents; is that right?

A. Yes. Some are things that require subscription and things like that and have to be paid for, but yes, they're all generally publicly available with the exception of my prior expert report and the underlying materials.

Q. These are all of the materials you reviewed in preparing this report; is that right?

A. Yes, I mean some of them are summarized. So for example, under SEC filings, I don't -- or I'm sorry. Not under SEC filings. But under -- I'm thinking about my market efficiency report, sorry. Yeah, each of the documents I reviewed other than material that was summarized in my prior reports, all the additional material that I reviewed for preparation of this report is identified here, yes.

Q. You did not review any documents produced in this litigation; is that true?

A. I don't believe so, no.

Q. You did not review any deposition testimony in this action either?

A. That's correct.

Q. Go to footnote 10 in your report here. I think it is on page 9. Can you take a minute to read that, please?

10 (Pages 34 - 37)

Page 38

A. Okay.

Q. Am I reading this footnote right that your view of the class period is that the class period for this action should run from the beginning of the trading day on May 13, 2022 through the end of the trading day on August 11, 2022?

A. I'm not taking a view on what the class period should be or shouldn't be. All I'm saying is that my understanding of when the inflation would have entered the stock would have been after the first alleged misstatement, which occurred after the market closed on May 12. So in my view at least during the market trading hours of May 12 there was not artificial inflation.

Q. Okay. So -- so there's no economic reason to believe it was inflated during the trading day on May 12, 2022; is that right?

A. Based on my understanding of plaintiff's claims, that's correct.

Q. Okay. What basis could there be then for including purchasers that day in the class on May 12?

A. That's a legal question, whether they're technically part of the class or should be part of the class or shouldn't be part of the class, that's

Page 39

not really what I'm being asked about. I'm just being asked about whether they paid artificial inflation based on what's being alleged.

Q. Let's go to paragraph 12 in this report.

A. Okay.

Q. It starts with "my opinions regarding materiality, lost causation, and damages are premised upon defendants being found to have knowingly or recklessly issued false or misleading statements and/or omitted material information during the class period regarding a declining demand for Logix Smart test --" is that -- wait. I apologize. That's not what that says.

Oh, I see. Okay. I'd like to ask you about the first sentence there. Do you see the first sentence?

A. Yes.

Q. Okay. So you're assuming, not opining, on the falsity of the challenged statements in scienter; is that right?

A. That's correct, yes.

Q. Do you have any understanding as to how plaintiff plans to prove the assumption that the statements were false and made with scienter?

A. Not beyond what's in the complaint, and

Page 40

then any other references to that, I don't -- I believe would be privileged and I'm not prepared to testify about.

Q. Okay. Have you reviewed any of the evidence that plaintiff will use to prove falsity?

A. Only to the extent it's materials I have already described that I have relied on. I don't know precisely what they plan on using.

Q. Did you ask to see any evidence on that point?

A. No, I was asked to assume that the -- that these were false statements for -- false or misleading statements for the reasons alleged.

Q. And you didn't ask to see any support for those assumptions; is that right?

MR. URIS: Objection.

BY THE WITNESS:

A. I'm being very careful here because I don't want to disclose anything that could be considered attorney-client privileged information. I didn't specifically ask to see any specific information.

Q. Looking, again, at paragraph 12, after that first sentence, you say "specifically I understand that plaintiff expects to prove that

Page 41

during the class period defendants were aware of or recklessly disregarded and failed to disclose that sales of their COVID-19 test, the Logix Smart test, had dramatically declined using the -- causing the company's sales to plummet. The complaint alleges that defendants misled investors by reassuring them that the demand for the Logix Smart test remained strong and by withdrawing their quarterly guidance citing an inability to accurately forecast sales and demand for the company's primary revenue generating product, when in reality defendants publicly admitted to tracking demand daily and were already aware sales had substantially declined compared to recent quarters. These underlying facts allegedly rendered Co-Diagnostics' public statements around the product's demand and the other alleged misstatements/admissions to be misleading."

Do you see that?

A. Yes.

Q. Do you have any understanding as to how plaintiff expects to prove that lower sales in the first week of the second quarter 2022 at Co-Diagnostics rendered the statements on May 12, 2022, misleading?

MR. URIS: Objection.

11 (Pages 38 - 41)

Page 42

BY THE WITNESS:

A.   I don't know if that's a component of what they expect to prove or not or what conclusions they would expect to draw from that.

Q.   Do you have any expertise with respect to COVID-19 testing demand?

A.   Well, I have general economic expertise in the area of supply and demand and things that can affect supply and demand, and -- but I have not studied or being offered as an expert in this matter on the specific factors that drive demand for this particular product.

Q.   You are not an expert on COVID-19 testing products?

A.   Well, again, I mean, to the extent expert is defined as somebody with a better than layperson's understanding walking off the street of COVID-19 related issues and demand for products related to COVID-19, I would say I probably am.

If you are asking in this particular case have I studied all the factors that impact demand for this particular product or COVID testing products more generally, I'm not being offered in this case as an expert on that and I haven't studied all the issues I would need to to be offering

Page 43

opinions on that subject.

But am I -- you know, do I have enough background and training in economics to understand those issues and to have a better than layperson's understanding of those issues?  I think I probably do.

Q.   But you haven't ever specifically studied like COVID-19 test sale patterns at any point?

A.   I mean, I certainly observed some of those patterns in the reports I have seen in other cases I have been involved in related to COVID-19. I have not done anything like a demand study, if that's what you're asking.  Again, I'm -- that's that -- and that is not the focus of my work or opinions in this case.

Q.   So even if plaintiff proves that sales of the Logix test sales were low in the first few weeks of the second quarter 2022, which is immediately prior to the May 12 statements, do you have any basis for knowing whether low sales at that time would indicate that the statements were false or misleading?

MR. URIS:  Objection.

BY THE WITNESS:

A.   When you say a few weeks, I mean, my

Page 44

understanding is that roughly half the quarter had expired by the time they made the alleged false and misleading statements.  So are you -- when you say a few weeks, I just want to make sure --

Q.   I'm referring to the time period before May 12, yes, before the statements were made.

A.   I have not formed an opinion about whether the information they had available to them at the time was sufficient to render the statements misleading.  I'm starting from an assumption that's true.  I have not been asked to form my own conclusion about that.

Q.   So going to paragraph 13, it says the alleged misstatements and omissions regarding the declining demand and the resultant impact on the company's sales concealed important information from investors.

Do you see that?

A.   Yes.

Q.   The important information that you are referring to here, is that the fact that quarterly sales to date as of May 12, 2022 were lower than at other times?

A.   I certainly think of it as including that, and that's my understanding of part of what

Page 45

plaintiffs are alleging, but it's not -- that may not be the only thing plaintiffs are relying on to evaluate whether the statements were false and misleading, given what they may have known.  I mean, I certainly understand that's part of what's being alleged, but whether there's other facts and circumstances that also contribute to an understanding that those were false and misleading statements, I just don't have an opinion on.

Q.   But this statement that we just read, that first sentence in paragraph 13, that's your opinion; is that right, not an assumption?

A.   Well, I'm saying if what they're alleging is true, which is that there was substantially lower demand for the Logix Smart test and defendants knew that and yet made the statements they did and that that rendered them sufficiently false and misleading, I am answering the question if all that is true, in my view, did that conceal important information from investors, and my answer to that is yes, for the reasons described in that section of my report.

Q.   Okay.  So my question is what is that important information that you're opining on here?

A.   That the company was facing far less

12 (Pages 42 - 45)

Page 46

demand than implied by their statements.

Q.    And what information besides sales would that -- would have given the company information about demand?

MR. URIS:  Objection.

BY THE WITNESS:

A.    I don't know that I can describe all the potential things, but I mean, when you talk about sales, I mean, there can be -- there are steps in a sales process.  So there can be communications with customers.  There can be orders.  There can be cancelling orders.  There can be amended orders.

So, I mean, sales, the actual sales is certainly one data point that would be relevant, but maybe there's other information and data points that would also be relevant to that.

I'm just not -- I'm not expressing a view that the specific sales numbers at that moment in time would be the only thing relevant to an assessment of demand, but I do understand that an important component at least as it is laid out in the complaint of evidence is that the sales to date were far lower than expectations in other quarters as of the beginning of the class period.  I'm just not saying that's the only evidence that might be

Page 47

relevant.

Q.    Okay.  But that's the only evidence that you were specifically aware of from the complaint, that is -- that was allegedly concealed at the time?

MR. URIS:  Objection.

BY THE WITNESS:

A.    Again, I think I say demand, I mean demand can include sales to date, it can include, you know, what the expected sales going forward are, so which might entail other information.

So, you know, I think the complaint stands for itself obviously.  There's, you know, it's a fairly substantial document.  I'm not trying to remember everything that's in there off the top of my head.

All I'm saying is that I recognize that an important part of plaintiff's claim is that sales to date were much lower than had been experienced in prior quarters and relative to market expectations, but I'm just not speculatively saying that's the only thing that mattered.  There may be other relevant pieces of evidence to that as well.

Q.    Did you assume if Co-Diagnostics' quarterly sales to date as of May 12 were low, then that indicated the demand for the full quarter would

Page 48

be lower than recent quarters?

A.    I'm not making that particular assumption, no.

Q.    How else could sales -- low sales to date matter if they didn't indicate anything about the full quarter?

A.    I'm not saying they didn't.  I'm just saying my understanding -- maybe I misunderstood the question.  Could I have that question read back?

Q.    Yeah.  Would you rather I restate it?

A.    If you could restate it, that's fine. Because I -- again, I'm assuming that plaintiffs are correct that demand for the product was -- had substantially declined relative to other quarters and relative to market expectations, and that the company's statements concealed that.  That doesn't require a specific assumption about whether the sales to date predict anything in particular about the full quarter sales other than -- in other words, it, I'm not making any sort of specific numerical conclusion from the sales at that moment in time other than assuming plaintiffs will be able to prove that suggested that demand had fallen substantially and it rendered the statements misleading.

Q.    My question is whether -- whether you're

Page 49

assuming that lower sales in that first period prior to May 12 in the quarter, whether that needs to mean something broader about demand long-term --

MR. URIS:  Objection.

BY MS. YORK-ERWIN:

Q.    -- or whether that's an important assumption for your opinion?

A.    I think it's fair to say that part of plaintiff's claim is that what they had observed, as the beginning of the class period indicated, that demand for their flagship product was substantially down relative to other quarters and market expectations, and that that wasn't some necessarily temporary reduction in demand.  In other words, the market upon understanding the demand was down could draw its conclusions about to what extent that might have been a temporary or more permanent impact.

So I don't think it's limited to that specific quarter.  Like, in other words, the company coming out and giving a more truthful statement according to plaintiffs saying demand for its flagship product was down wouldn't just be interpreted by the market as necessarily only impacting the current quarter.  It would be generally that demand was down substantially.

13 (Pages 46 - 49)

Page 50

Q.   I guess are you assuming, though, that lower sales equals lower demand?

MR. URIS:  Objection.

BY THE WITNESS:

A.   I don't think there's any part of my opinion that depends on that sort of equality you're drawing.  In other words, demand is -- the word demand encompasses more than just current sales.  It's, you know, how much demand out there -- is there in the market for this product given all the factors that are affecting demand.  So it could encompass things more than just a particular sales number at a particular moment in time.

Q.   If a few weeks of sales does not, in fact, render, reflect broader demand, then would the failure to disclose that still be material, like would that still matter to investors?

MR. URIS:  Objection.

BY THE WITNESS:

A.   Well, I think, again, you keep saying a few weeks.  I mean, we're talking about halfway through -- my understanding is we're talking about halfway through the quarter.

So, again, if there was -- if sales are essentially -- halfway through a quarter are

Page 51

essentially on track to be something substantially lower than market expectations and that that information had some predictive power as to how the total quarter's revenue and future demand for the product would look, which it's hard to imagine it wouldn't, then, yes, I think that would be important to investors.

But my understanding is plaintiff's claim isn't about a specific number, it's about a characterization of what they were seeing with respect to demand more broadly.

Q.   But an important component of what allegedly was concealed that mattered to investors was sales to date as of May 12.  Is that your understanding as well?

A.   Well, I think that's important information to consider if you're going to characterize demand in a particular way, but my understanding is the company didn't regularly provide intra-quarter sales numbers.  So I don't understand plaintiff's claim to be that they didn't disclose a particular sales number at a particular point in time intra-quarter.  It's that they characterized demand in the way they did or -- and failed to disclose the substantial decline in demand

Page 52

that they were observing.

So it's the claim -- I don't understand the claim to be that they should have disclosed a particular sales number at a particular point in time.  My understanding of the claim is that they misled the market by essentially describing there as being not a substantial demand decline already occurring.

Q.   We're going to paragraph 14 in your report.  The last sentence in that paragraph you opine that "based upon the alleged misrepresentations and omissions and my understanding of economic principals relevant to loss causation, I identified a single corrective disclosure event on August 12, 2022, when defendants revealed far worse than expected revenue and profitability for Q2 2022 and directly attributed them to lower demand for the Logix Smart test."  Is that your opinion?

A.   Yes.

Q.   What about the alleged misrepresentations and omissions led you to conclude that the second quarter 2022 earnings announcement corrected the challenged statement?

A.   Because plaintiffs are directly alleging

Page 53

that there had been a substantial decline in demand, and the obvious foreseeable consequence of that if you are not going to disclose it before the next earnings announcement is for that earnings announcement to reflect that lower demand that the company had been facing, and so when they announced far worse than expected revenue and profitability for Q2 2022 and directly attributed that worse than expected performance to lower demand for this specific product, to me, that provides a clear causal link between -- that that is the relevant truth that had been concealed by the alleged misstatements.

So the lower demand was reflected in the quarterly performance, and I think that's borne out by the analyst commentary following that disclosure as well, that the negative value relevant news was that there was lower demand for their flagship product and the results reflected that.

Q.   Did you review any of the company's internal sales data in preparing your opinions in this case?

A.   No.

Q.   Okay.  I'd like to -- I'm going to introduce another exhibit here.  I'm introducing as

14 (Pages 50 - 53)

Page 54

Exhibit 3 a document Bates numbered CODX_0051488. I would like to state that's the same document that was previously submitted as Plaintiff's Exhibit 12 to the Brian Brown deposition on November 5th, 2024. I just replaced the Plaintiff's Exhibit stamp with this one to avoid confusion.

A.   Okay.

(Deposition Exhibit 3 was marked for identification.)

BY MS. YORK-ERWIN:

Q.   Have you seen this document before?

A.   I have not, no.

Q.   So you did not consider it in forming your opinions at all?

A.   That's correct.

Q.   I'll represent to you that this was produced by Co-Diagnostics in this litigation, and it is a dashboard from an order tracking system called Monday.com that reflects Co-Diagnostics' orders by month from 2020 through 2022. Because it's a PDF, it's not perfect in terms of looking at it. Are you able to zoom in on it?

A.   Yes.

Q.   Do you see towards the middle a second entitled Monthly Sales Chart 2021?

Page 55

A.   Yes.

Q.   And it looks like the labels for the bars there are cut-off, they keep saying sales order -- the first one to -- the farthest to the left says sales order J, sales order F, sales order M.

Do you see that?

A.   Yes, I see that.

Q.   I'll represent that those are month by month starting from January. So January, February, March, April, May, June, July, August, September, October, November, December, ending with December, the red column there on the far right.

Do you see that?

A.   I'm a little confused because I see the brown bar is sales order N, which would be November, then I see sales order D, which would be December, and there is another bar which is -- that's what's confusing me.

Q.   Yes. I can see why. I believe that's some relic of the way orders come in. But for present purposes, I would just like to ask you to look at those last three months for right now, the October, November, December.

A.   Okay.

Q.   The green, the brown, and then the red

Page 56

one on the right.

A.   Okay.

Q.   Assuming that these numbers are substantially accurate, and I understand you have no knowledge one way or another, does it look like low sales numbers in the first and second months of the fourth quarter of 2021 predicted the numbers for the full quarter?

MR. URIS:  Objection.

BY THE WITNESS:

A.   I mean, for that particular quarter I'm not going to dispute that the sales were lower in the first two months. I do note that that's not a regular pattern of the data throughout the year.

So maybe there was some unique demand factor in December of 2021 that that some underlying reason behind that, but I don't see it -- I certainly don't see -- and even looking at the other years, I'm sort of not seeing a regular quarterly pattern where the first two months are lower than the third month, but for sure, in the fourth quarter of 2021, the third month had huge sales relative to the other two months.

Q.   The last month had huge sales relative to the first two months, is that what you said, for

Page 57

that quarter?

A.   For the fourth quarter of 2021, that appears to be the case.

All I'm saying is that doesn't seem to be a regular pattern throughout the data and, you know, I'd have -- to draw any particular conclusions about the predictive power of the first two quarters or first two months relative to the third, you know, there's a lot more I would have to look at and in particular understand if there was some, you know, highly anomalous thing that happened in the third particular month here that couldn't be predicted.

So that -- I'm not disputing, just to be clear, that the third month of that particular quarter had much higher sales than the first two, but that that doesn't seem to be a regular pattern, and to draw any conclusion about whether the first two quarters or first two months of a quarter are predictive of the third month in some way in terms of sales would require a lot more detailed analysis than just looking at this chart.

Q.   But it looks like there are other quarters here where one month is very different than other months. Would you agree with that?

A.   There's certainly example months that

15 (Pages 54 - 57)

Page 58

deviate from the months around it in some substantial way, but again, without studying the underlying causes of that, it's -- I think it's hard to evaluate, it's hard to make a generalized statement about how predictive one month's sales is for another month's sales.

Q. But this -- would you agree that the fourth quarter here in 2021 is a recent example where the first couple of months -- first couple of months, not even just the first half, but the first couple of months of the quarter were not -- do not appear to have been predictive of the entire quarter?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I'm not going to offer an opinion about what could or couldn't reasonably be expected at any given point in time at that point because maybe there were other important changes in demand that were happening at that time than there were at other times. So I'm just not going to make some broad, general statement about what you could or couldn't predict from the first or second months.

I'm not disputing that the third month of that quarter had much higher sales than the

Page 59

first two months, if that's what these numbers represent.

Q. But doesn't that contradict the assumption that low sales in the first portion of a quarter would indicate something significant about demand for the quarter?

MR. URIS: Objection.

BY THE WITNESS:

A. Not necessarily. Again, I think it would depend on an evaluation of all the factors that might be influencing demand at that point.

And if -- again if -- yeah, I am not going to speculate about what you could or couldn't predict about demand going forward from the information you had at any given one point in time. That's not what I was engaged to evaluate in this particular case.

Q. Okay. I'd like to go back to your first merit report, Exhibit 1. Specifically I'd like to turn to paragraph 34 of that report.

A. Okay.

Q. Second sentence, could you read, starting from the second sentence in that paragraph, please to the end of that paragraph.

Sorry, I actually meant out loud.

Page 60

A. Oh, sure. Yeah. "In this matter, based on plaintiff's allegations, I understand that any corrective disclosure would have had to disclose the relevant truth that Co-Diagnostics was aware of declining demand for and sales of its Logix Smart test. Such a disclosure would explicitly state that the company was aware of the reduced demand and that its sales to date for Q2 2022 were far less than what it had seen in prior quarters."

And then I have a footnote where I provide further explanation. I don't know if you want me to read the footnote as well.

Q. No, that's all right. Thank you.

The view you're expressing here that there would have to have been an explicit disclosure that Co-Diagnostics was aware of declining demand for and sales of its Logix test, is that an assumption, an economic opinion, a legal opinion, or something else?

A. That's an assumption based on what plaintiffs are alleging was concealed from the market.

Q. Are you assuming that there needed to be like, quote, an explicit disclosure or is that part of your opinion?

Page 61

A. Well, my understanding of plaintiff's claim is that to make the statements that were made not misleading, that they would have had to have disclosed one way or another that it was aware of reduced demand and that its sales to date were far less than what it had seen in prior quarters, like I don't know exact what -- exactly what words they would have had to have used, but those economic concepts would need to be stated to make the statements not misleading. That's my understanding of plaintiff's complaint and that's what I'm assuming.

Q. Okay. With respect to the awareness of reduced demand, which is one of the things you're saying here needed to be explicitly stated, suppose the company didn't make an explicit statement but instead said something that implicitly made it clear to the market that the demand was lower, would that have functioned as a corrective disclosure with respect to reduced demand?

MR. URIS: Objection.

BY THE WITNESS:

A. I guess it could be in some sense a partial disclosure. I -- I -- you are asking me to hypothetically assume something less than what I'm

16 (Pages 58 - 61)

Page 62

assuming here. I would have to, like, think about what exact language you're -- you have in mind, if you are asking me to economically analyze what the market would take from such a statement. So it's hard to answer that in, you know, in some general way.

Q. My question is from an economic perspective, would -- does something have to be explicitly stated as opposed to implicitly indicated, you know, like if the same information comes to the market without an explicit statement, that's still -- the market still receives that same information, doesn't it?

A. I mean, I guess something like that is conceivable. Again, the evidence would be, you know, do the market's expectations, you know, properly reflect the reduction in demand that is actually occurring?

In other words, was it an explicit enough statement to render the statements no longer misleading?

You know, you are asking me to assume hypothetical implicit disclosures without sort of a better understanding of exactly what you're referring to. It's hard for me to answer those

Page 63

questions.

I mean, is it conceivable that they could have said words that basically gave the market the impression -- the correct impression as to what demand looked like than what they were seeing? Maybe. I don't know. I would have to look at those disclosures.

Q. But so suppose that Co-Diagnostics made a statement on May 12, 2022, that indicated a likely decrease in future earnings performance, would that have disclosed reduced demand for purposes of what you're discussing here in 34?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I guess what you're asking me to assume is that they gave some additional incremental disclosure than what they actually did that would have better reflected expected reductions in demand or that demand had already -- see, again, you sort of just switched the question to be about future periods, where my understanding is that plaintiffs are alleging they had information available to them at that moment in time that demand was already down.

I mean, could -- again, could they have issued incrementally additional information

Page 64

that would have moved the market a little closer to the relevant truth without explicitly stating demand was down? I don't know. Possibly. Maybe there's some way they could have partially disclosed the relevant truth that way. I just don't -- without seeing a specific hypothetical disclosure, it's hard for me to evaluate that. And those aren't the statements that I have been asked to evaluate. So it's hard to do in the -- in the hypothetical.

Q. Would disclosing a likely decrease in future demand earnings performance be different somehow than disclosing decreased demand like for purposes of the market's reaction?

A. It could be. Yeah. I mean, those two things can be different in the sense that if you're looking at longer term trends and saying, you know, over time, we think our earnings are going to fall because we think demand might fall in the future, that's a different statement than saying we have already observed substantially reduced demand and, therefore, you know, here's our -- you know, we -- you know, your expectations should be different than they were before. That -- those are -- can be two very different things.

Q. But wouldn't investors mostly care about

Page 65

demand to the extent it was expected to impact future earnings performance?

A. Well, I think it's a combination. I mean, if sales are down substantially in the current quarter, that includes information about what's already occurred through some portion of the quarter, which is highly relevant and predictive of what is likely to continue happening, and then statements about -- and so even statements about current demand have relevance for the market's assessment of financial performance for future periods.

So, of course, investors care about cash flows from future periods, but current demand is an important aspect of being able to predict those. So I don't think they can be as neatly separated as you're talking about.

Q. I'm actually more asking if one can be a substitution for the other, like would announcing -- would disclosing an expected decrease in future earnings performance accomplish the same thing as disclosing reduced demand?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I don't think it would be

17 (Pages 62 - 65)

Page 66

necessarily exactly the same.

Like, is it theoretically possible? Maybe. But, again, part of -- I mean, if the explanation behind it that we're reducing guidance for future quarters or we're reducing our earnings expectations for future years because we are seeing much lower demand now might be somewhat different than just saying, you know, we expect based on, you know, a whole host of factors that earnings -- our earnings expectations are going down in the future. Those could be two very different things and not precisely the same thing. I think the information that demand is currently down has its own weight for sure.

Q. Going back to paragraph 34, you say that a corrective disclosure had to also explicitly disclose that the company's sales to date for Q2 2022 were far less than what it had seen in prior quarters. That's your opinion, right?

A. Well, that's my understanding of what plaintiffs are alleging a corrective disclosure would need to reveal. In other words, the hypothetical disclosure I'm considering for evaluating the inflation per share is that to make the statements they made not misleading, they would

Page 67

have had to disclose in some way this information.

Q. So for purposes of this, how much is far less?

A. I haven't thought about exactly what that -- a threshold of far less would be. I mean, look, the reality is in this, this was not like some narrow miss of expectation. The company -- the expectations in the market were somewhere around -- were for revenue in the quarter of being somewhere around 20 million and they came in I think at 5 million or something like that.

So, you know, in this case, the revenue was 75 percent less than expectations. That's clearly far less. Where the threshold for far less would be, that's not something I'm giving an opinion on.

Q. I'd like you to consider two hypotheticals here. So in both Co-Diagnostics says everything that it said on May 12, 2022, except that it also revealed sales to date.

So in the first hypothetical, Co-Diagnostics announced on May 12, 2022, the quarterly sales to date were $1 million, and then in the second hypothetical, Co-Diagnostics announced on May 12, 2022, that sales to date were $5 million.

Page 68

Keeping in mind that everything else is the same in the two hypotheticals, do you believe that Co-Diagnostics' stock price movement following the May 12 announcement would be the same?

MR. URIS: Objection.

BY THE WITNESS:

A. I'm not making that assumption, no. I think the market could react differently to those two announcements.

Q. Would you have expected it to react differently to those two announcements?

A. I would expect it not to create the exact same stock price movement, but again, I think the critical information in there would be that clearly demand was substantially down, but I'm not suggesting it would react exactly the same to those two different things.

Q. But so -- but in the hypotheticals, there's no additional statement about demand, right? They say all the same things and the additional information that's being disclosed is just the sales to date, right? So it is either $1 million or it is $5 million. Would you -- so no additional statement explicitly about demand one way or another, right?

Would you expect the stock reaction

Page 69

to be the same following those two different -- in those two different hypothetical situations?

A. You are asking from each other, the one case --

Q. Yes, I'm sorry, different from each other. One with 1 million in sales versus 5 million in sales disclosed.

A. I could see how the market could respond differently to those two.

Q. You would expect it to?

A. That would not surprise me.

Q. Is it generally true that different amounts of sales to date through May 12, 2022, that you would expect that to result in different stock price movements following the announcement, all else being kept equal?

A. I could see how the market could value that differently, yes.

Q. So what amount of announced sales to date on May 12, 2022, would have resulted in the same stock price movement that you measure on August 12, 2022?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I'm not suggesting that they had

18 (Pages 66 - 69)

Page 70

to disclose a particular sales figure. I'm assuming they had to reveal that there was substantially reduced demand, and that its sales were far less than what it had seen in prior quarters.

I'm not saying there was a specific number they needed to disclose. So that -- that's not part of what I'm describing as the corrective information that would have been released on an earlier corrective disclosure.

My understanding is that it wasn't their regular practice to disclose intra-quarter sales figures.

Q. So what your opinion here is saying is that some information about sales to date needed to be disclosed. The fact that they -- that they were less than what had been seen in prior quarters is not actual sales to date?

A. Again, that's not my opinion. That's what I'm being asked to evaluate was the concealed information that should have been disclosed is that there was a substantially reduced demand and that sales were far less than they had seen in prior quarters.

Q. What basis do you have for saying that disposing -- that the company was aware of reduced

Page 71

demand and that its sales to date from Q2 2022 were far less than what it had seen in prior quarters would yield the same -- on May 12 would yield the same stock price movement as the specific full quarter sales that are announced on August 12 -- on August 11, I'm sorry, with the August 12 drop?

A. Because the most economically reliable proxy we have for measuring how much this information mattered to the market is to observe how the stock price reacted when the lower demand was revealed to the market.

And my understanding is that the essence of the concealed information didn't change during the class period. It was that there was far lower demand for the product than implied by the company's statements, and that was ultimately revealed at the end of the class period, and the most reliable economic proxy available for what that information was worth is the stock price decline that occurred at that time. So in my view that's the most reasonable economic conclusion to be drawn.

Q. How about we take -- is it all right if we take ten minutes. Also when do you want lunch? I realize --

A. No. Look if people are hungry there now,

Page 72

I realize you guys are an hour ahead.

Q. I'm actually two hours behind you.

A. I would prefer to go another hour before lunch, but I don't want to hold up others if they want to.

Q. That's fine.

MR. URIS: That's fine with me, too. I can also eat quickly in this ten minutes.

MS. YORK-ERWIN: Let's take ten. We will take a break for you in an hour, hour and a half.

THE VIDEOGRAPHER: We're going off the record. The time is 11:12 a.m. and this is the end of Media Unit 2.

(Break in the proceedings taken
at 11:12 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:22 and this is the beginning of Media Unit 3.

BY MS. YORK-ERWIN:

Q. So Mr. Coffman, did your analysis in this case disaggregate any confounding news on August 11, 2022?

A. I certainly considered whether there was any confounding news and came to the conclusion there was not any value relevant confounding news so

Page 73

there was no need to disaggregate.

Q. Were there particular aspects of the earnings announcement on August 11 that you analyzed to determine whether they were confounding or not?

A. Well, I viewed the earnings results themselves and the lower guidance that was provided as reflecting the lower demand that the company was facing, that plaintiffs are alleging that substantial lower demand should have been disclosed earlier, and so I clearly viewed those elements as corrective and not confounding.

Q. Were there any -- I'm sorry. Are you done?

A. No, no, I was going to stop there.

Q. Were there any other aspects of that announcement that you considered that could be confounding and you determined were not?

A. I didn't see any evidence that anything else from that announcement would be negative and value relevant in any substantial way.

So my -- when I reviewed the details of those disclosures or of those company statements, I did not find there to be any negative value relevant information that would have substantially contributed to the stock price decline observed on

19 (Pages 70 - 73)

Page 74

that day, and that was backed up by what the analyst reports disclosed or that were -- that were published in the wake of that earnings announcement supported that conclusion.

Q. I would like to turn to paragraph 51 of your report. Do you still have that up?

A. Yeah. Give me a second to get there.

Q. Of your first merits report.

A. I see that.

Q. Could you read that first sentence of that paragraph, out loud please.

A. Sure. "Furthermore another fundamental theory in financial economics is that a more permanent earnings shortfall relative to expectations will have a larger negative impact on the market value of a security than more transitory means."

Q. Can you explain what you mean by that?

A. Sure. I mean, the idea being that -- I give an example in the next paragraph in my report, but the general idea is investors are trying to anticipate what the present value of future cash flows are from the security, and if you tell the market my earnings are going to be down this period but they're going to rebound because this is really

Page 75

a one-time impact and that the sort of normal course of earnings will continue in future periods, that's going to have a more than one-time impact of the earnings surprise in that particular period and not reflect lower earnings for all future periods.

Whereas, an announcement that essentially provides information that has not only current meaning but also future meaning in terms of lowering the path of earnings into the future is going to have a much more -- a much larger effect on a security.

And I provide an example in -- and the logic of that in paragraph 52, and I also cite to the economic literature for that concept as well.

Q. In general, the effects on a stock price of announcements of one-time changes in demand in a given period would be less than announcements of permanent changes in demand made at the same time; is that right?

A. Yes.

Q. And if the change was long-term but not permanent, then holding everything else constant, would you expect it to still have a larger effect on the stock price than a one-time change?

A. Yes.

Page 76

Q. I'd like to look back at paragraph 34 in your report in the same report.

A. Okay.

Q. So then, again, you say in paragraph 34, that such a disclosure -- and we're talking about a corrective disclosure here -- would explicitly state that the company was aware of the reduced demand and the sales to date of Q2 2022 were far less than what it had seen in prior quarters.

Do you state anywhere here that Co-Diagnostics had to announce a permanent change in demand on May 12 to correct the misrepresentations?

A. I don't state that explicitly, but I'm certainly not excluding that the market would evaluate and react to the reduced demand in such a way that it wasn't like an obvious one-time event.

In other words, the market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods as well regardless about whether they explicitly said anything about future periods or not.

Q. But explicitly saying something about future periods, you would expect to have more of an

Page 77

impact than not; is that right?

A. Not necessarily. In other words, just announcing the lower demand without any additional information and without any language suggesting there was a reason to believe it was one-time short-term in nature, the market would use that information to update its expectations about all future periods, regardless of whether the company explicitly provided updated guidance or not.

Q. Maybe I'm still confused. So in that last sentence in paragraph 34, when you're talking about the disclosure that needed -- that a corrective disclosure had to announce that the company was aware of reduced demand, are you -- when you talk about saying reduced demand, are you referring to reduced demand currently or a future-looking reduced demand?

A. Well, my understanding is plaintiffs are alleging that they were aware of reduced demand at that time currently. I'm saying that the market, if it were given that information, would not on its own assume that that was one-time temporary in nature but would use that updated information to update its expectations for future quarters as well.

Q. But what we just discussed in

20 (Pages 74 - 77)

Page 78

paragraph 51, you were saying that an announcement about like a longer term expectation would be expected to have more of an impact than a current -- than a one-time or a current condition?

A. Well, again, let's be clear about what we're talking about a one-time event in paragraph 51 which is, if a company announces look, we're taking a -- or just one example would be, for example, a -- let's say a one-time change in tax policy or something. Like this period we're going to have lower earnings because we had a capital gains tax on some sale we made so our taxes this quarter are going to be higher than normal, but it's going to return to -- return to regular levels at some -- in all future periods, an explicit statement that this is literally a one-time event, that this has no bearing whatsoever on future earnings would be viewed differently than a broader statement about a change in demand, which would have obvious implications, not only in the current period, but for future periods. So that's the distinction.

It is that if a company is explicitly saying this is a one-time event. For example, you know, we sold off a business and we got, you know, $50 million more than we expected out the

Page 79

transaction and, therefore, we have $50 million more -- our asset value would, therefore, be $50 million higher than the market expected because we got that cash. That's clearly a one-time event that doesn't mean anything from earnings for the remaining businesses in other quarters.

So that's the sort of thing I'm talking about is where it's very explicitly a one-time event.

When companies are announcing earnings generally, I mean the market obviously cares about current earnings, but even more importantly what is that current demand and current earnings mean for the future? That's what investors are trying to evaluate.

So if they just generically announced lower demand of their flagship product, the market is not going to interpret that as just a one-time event unless the company explicitly had reason to say it was a one-time event.

Q. Wouldn't you agree that explicitly stating that there -- so that there's an expectation of longer term expectation about demand, that that would have more of an impact than not specifying one way or another?

Page 80

A. Again, I think it depends on the facts and circumstances of like why that demand has changed. The market can intuit for itself. You know, if all of a sudden demand is 80 percent less than it was before, that's unlikely to be a one-time impact. That that's -- you know, in other words, the market might be able to infer without any explicit discussion that this represents a longer term problem.

So I don't know that I can say with 100 percent confidence that an explicit discussion of that would change the market's reaction.

Q. If you turn back to paragraph 5 of your report of the first merits report.

A. Yes, I see it.

Q. I want to look at the last two sentences here, and this paragraph is the the alleged corrective disclosure on August 11, 2022; is that right?

A. I'm sorry. I must have misheard you -- oh, paragraph 15?

Q. Yes.

A. Okay. I'm was on 16. Sorry. Yep. Okay.

Q. Is that right, that this paragraph is

Page 81

discussing the alleged corrective disclosure event?

A. Yes.

Q. So looking -- can you read the last two sentences in that paragraph for me, please?

A. Sure. Starting "with defendants"?

Q. Yes, yes, please.

A. "Defendants directly attributed the decline in revenue to lower demand for the company's Logix Smart test, Co-Diagnostics also disclosed that the lower demand for their test was expected to continue for the foreseeable future."

Q. In that final sentence, you use the word "also" to distinguish what Co-Diagnostics disclosed about demand in the second quarter of 2022 from what it disclosed about demand in the foreseeable future; is that right?

A. Yes. And I think later in my report, I describe that there's an element of describing what their current earnings were as -- or what their earnings had been in second quarter 2022 and then they provided updated guidance is my understanding by saying they expected it to continue, yes. Those are two -- those are two things.

Q. Two different things?

A. I don't know if I would say different

21 (Pages 78 - 81)

Page 82

things, but it's two different pieces -- it's two -- certainly two pieces of information. It's not one. There are clear economic relations between them but yes, there's two pieces of information there.

Q. But you're opining here that the expectation of lower demand for the test would continue for the foreseeable future was additional information that was disclosed on August 11?

A. Yes. That is a component of what was disclosed on August 11.

Q. Okay. Why isn't that confounding information?

A. Because an earlier disclosure of lower demand would have caused the market to update its expectations not only for the current quarter but for further quarters. The market is not naive. It's going to evaluate what that information means for future periods as well.

Q. Do you know if plaintiff alleges that a disclosure in the August 11 earnings call about lower demand was expected to continue for the foreseeable future was corrective?

A. I don't recall precisely how that allegation is worded or to what extent that information was incorporated in what they allege is

Page 83

corrective.

In my view, it is clearly part of the corrective information because for the reason I just gave, which is, as an economic matter, the disclosure of lower demand for a company's flagship product, the market is going to update its expectations based on that information, not just for the current quarter, but for all future quarters as well.

So an acknowledgement that it was going to impact future quarters as well is not a confounding distinct economic message that would have been -- wouldn't have been derived from the disclosure of lower demand.

Q. But isn't it -- isn't it by definition a confounding information if it's not what is alleged to have been corrective?

MR. URIS: Objection.

BY THE WITNESS:

A. That's certainly not how I see it. I mean, I see it as consistent with what would have been disclosed at an earlier point in time in the sense that the market would have anticipated as a matter of economics what the lower demand disclosure would mean, not just for the current quarter, but

Page 84

for future quarters.

In other words, the market would not have just naively assumed that lower demand was a highly temporary thing that was only going to affect the current quarter. That's just not how investors would look at a disclosure like that.

Q. Was that additional -- I mean, this additional piece of information then about how it expected demand to be in the foreseeable future, did that not -- did that not disclose any additional information to the market beyond the fact that the quarterly results?

A. No, I think it did disclose additional information. I think it would reinforce the market's belief that this wasn't a temporary reduction in demand. I'm just saying I don't see that as economically inconsistent with what the market would have taken from an earlier corrective disclosure.

Q. You don't know one way or the other?

A. I'm sorry. To just try to put it in a sharper relief. I mean if a company comes out and basically says, look, our demand is way down, it is down, you know, where, you know, 75 percent, 80 percent, whatever the right number is at that

Page 85

moment in time, and they don't reassure the market that somehow that's, you know, a completely anomalous one-time thing, the market is clearly going to take that information and update their expectations for future demand as well beyond the current quarter.

And so the company come out -- coming out and saying this is going to continue to affect us for the foreseeable future is not something different than the market would have assumed had it just been given the information of the lower demand.

Q. That makes it sound like that additional information in that last sentence then doesn't really matter, is that --

A. Well, I think it would be largely confirmatory of what the market would have assumed, but is it technically a separate piece of information that I'm acknowledging they said? It is, but I don't think it's distinct or falls -- I don't think it falls outside of what would be considered corrective.

Q. And you don't know one way or another whether the -- whether the amended complaint alleges that any forward-looking aspect of what was announced on August 11 was corrected of the

22 (Pages 82 - 85)

Page 86

challenged statements; is that right?

MR. URIS: Objection.

BY THE WITNESS:

A. As I sit here right now, I don't recall exactly how it characterized that, but in my economic opinion, regardless of how they characterize it in the complaint, it's proper as a matter of economics to think about the linkage between an announcement of lower demand and how the market would interpret that, not just in the current quarter but for future quarters.

Q. Would it change your opinion at all if the amended complaint did characterize the corrective aspect of the August 11 announcement differently than that?

MR. URIS: Objection.

BY THE WITNESS:

A. As I said, I don't recall as I sit here exactly how it was alleged. So I mean, if it changed in some fundamental way, I mean, and it gave me a different understanding of what plaintiffs are alleging was concealed, it's -- it's conceivable but in terms of whether it's just characterized whether that piece of information is itself corrective or just reflective of the corrective information or how

Page 87

the market would have reacted, that doesn't matter to me because I perform my own independent economic evaluation of how the market would have reacted to this information.

Q. Okay. Has any court ever faulted you for failing to disaggregate confounding information in a securities case?

A. There's one that comes to mind. There may be more, but there's one that comes to mind.

Q. What case was that? What do you remember about it?

A. I think the one that comes to mind is the GFI case where I think there was just a -- the court had just a very different view of what the corrective versus confounding information was in that particular case than I did.

Q. Do you recall any other cases where the court faulted you for not disaggregating?

A. Not off the top of my head. I mean, I'm not saying it doesn't exist. It could exist. I have analyzed hundreds of corrective disclosures and, you know, I don't recall if -- I mean, certainly I recall courts excluding corrective disclosures that I had opined on, but whether it was on the basis of failing to disaggregate or some

Page 88

other issue, I just don't have perfect recall of those issues. So I just don't recall. I don't recall one explicitly as I sit here, but that's not to say it might not exist.

Q. Have you ever performed earnings response coefficient analysis before?

A. Yes.

Q. Have you used an ERC, earnings response coefficient, for purposes of disaggregating price reactions on earning states before?

A. When it's absolutely necessary, I have used that technique, yes.

Q. You say when it's absolutely necessary. Is it not a preferred technique for you?

A. Many times there's ways to disaggregate earnings announcements. When there's multiple issues within an earnings announcement, there are often a number of other methods one can use to look at the relative importance of the corrective versus confounding pieces of earnings.

The times where an earnings response coefficient has been necessary is when there's really no other way to separate the earnings announcement as a whole, the earnings component as a whole, from the other confounding information or

Page 89

corrective information, depending on which is which, but if there's a need to remove the earnings component as a whole in several cases because of the specifics of that case, I felt it was an appropriate methodology.

Q. But you have applied it in cases before, that's right?

A. I have, yes.

Q. Can you name some cases on which you have used an ERC?

A. I know Dr. Juneja mentioned a couple in her rebuttal report that I used an ERC in. The one that comes to mind is AAC, that one I certainly recall using it, and I'm sure there are a couple of others that she had referenced. I just don't recall off the top of my head the case names for those.

Q. I'm going to introduce another exhibit. I have marked as Exhibit 4 report from the case In Re DVI Inc. Securities Litigation in the Eastern District of Pennsylvania.

(Deposition Exhibit 4 was marked for identification.)

BY MS. YORK-ERWIN:

Q. Do you recognize this document?

A. Give me just a second.

23 (Pages 86 - 89)

Page 90

Q.    Yeah, sure.

A.    It has been a long time since I've seen this document. I was confused by the mark of filed 9/23/13. That was confusing me at the first on the top -- but, yes, I recognize this. This seems to be a report I filed in the DVI matter.

Q.    Did you author this report?

A.    I did, yes.

Q.    And did you perform ERC analysis in it?

A.    I would have to look at it to be sure. So give me some time.

Q.    I would refer you to pages 16 to 19 if you wanted to do it the fast way, but take as much time as you want.

A.    Sure. Give me just a second. Yes, this is an application of an ERC method, but it's not --

Q.    I think my only question was whether you applied ERC here.

A.    I definitely used an ERC method here to make an economic point. It was not being used to disaggregate an earnings announcement from other factors.

MS. YORK-ERWIN: Okay. Actually now is a good time for lunch if you're hungry.

THE WITNESS: Okay.

Page 91

THE VIDEOGRAPHER: We are going off the record. The time is 11:53 a.m. This is the end of Media Unit 3.

(Break in the proceedings taken at 11:53 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:44 p.m. This is the beginning of Media Unit 4.

BY MS. YORK-ERWIN:

Q.    Mr. Coffman, you employ a constant dollar inflation in your damages model; is that right?

A.    That's correct. Yes.

Q.    Could you briefly explain the assumptions behind a constant dollar inflation model?

A.    Sure. It essentially assumes that had the relevant truth been disclosed at an earlier point during the class period, that it would have resulted in the same price reaction that is measured on the corrective disclosure, and another way to say it is barring some intervening event, the inflation at time T is the same as the inflation at time T minus one.

Q.    The amount of inflation in the stock price doesn't change over the course of the class period; is that right?

Page 92

A.    At least in this circumstance, correct. I mean, it could be constant over certain periods. In other cases, they still call it constant dollar assumption.

But yeah, in this particular case, the application implies because there's just one corrective disclosure and this is obviously a fairly short class period, that the constant dollar approach assumes that the $2.08 broad related price decline I observe on the corrective disclosure is carried back throughout the class period as the best or at least most reasonable estimate of what the corrective information would have been worth on each day during the class period.

Q.    And you testified earlier that you reviewed Dr. Nita Juneja's reply report dated January 10, 2025?

A.    I did, yes.

Q.    Are you aware that in that report, Dr. Juneja states that Co-Diagnostics' stock price rose substantially over the course of the class period?

A.    Yes.

Q.    Did you analyze the price movement of Co-Diagnostics during the class period?

Page 93

A.    Well, I certainly as part of my market efficiency report had done an event study throughout the class period. So I certainly noted that there were a couple of positive events that explained some of that increase. I noticed that at least over the second half or so of the class period, the market and industry indices were increasing, and certainly right towards the end of the class period, there was an increase. So that explains some of it. But I did not attempt to nor was it necessary to try to explain the entirety of the stock price movement over the class period.

Q.    But you would agree that Co-Diagnostics' stock price did rise over the class period as Dr. Juneja describes in her report?

A.    Yes. Obviously it fluctuates some, but from the time of the beginning of the class period to end of the class period, the stock price rose, yes.

Q.    And using constant dollar inflation means that none of that price increase during the class period impacted the inflation that you estimated; is that right?

A.    That's correct.

Q.    Is it correct that in your inflation

24 (Pages 90 - 93)

Page 94

model, all of that price increase is associated with a change in the true value of Co-Diagnostics' stock and none of that price increase is associated with the change in the level of inflation?

A. That's the implication of using the constant dollar model as I have, yes.

Q. Can you explain why you believe that all of the increased value that the market perceived in Co-Diagnostics over the class period was a change in true value?

A. I hadn't seen any evidence inconsistent with that. Again, I think some of that, like I said, is explained by some positive news during the class period, especially related to their development of the monkeypox testing. Some of that is likely related to increases in the market and industry index over the second half of the class period.

I did look to see whether there were any additional alleged misstatements that would, you know, possibly have increased the inflation, which would imply that some of the movement wasn't, you know, related to its true value, and I didn't see any of that.

I did look for statistically

Page 95

significant positive days that in theory could have increased the inflation so as to, you know, result in some sort of adjustment. I didn't find if any of that was necessary.

So I didn't see any -- I didn't find any reliable economic evidence that the impact of the corrective information would have been less at the beginning of the class period than later. So that led me to the conclusion that the constant dollar approach was reasonable.

Q. Let's take a hypothetical in which the market initially believes that Co-Diagnostics will earn an 80 percent profit margin on all sales. Are you with me?

A. Okay.

Q. So in that example, if some misrepresentations caused the market to overestimate Co-Diagnostics' sales for a quarter by $100 million, by how much would the market overestimate its profits for that quarter?

MR. URIS: Objection.
BY THE WITNESS:

A. Well, I think based on your assumption, there would be $80 million in gross profit reduction, but that that -- there's obviously other

Page 96

line items that ultimately affect net income and what shareholders would obtain, but it certainly at the gross profit level, it would reduce estimates of their gross profit.

Q. So I understand there are a lot of other pieces of this that are not being discussed, but in general, it sounded like you indicated probably $80 million potentially?

A. Well, no. I think that's before tax obviously. So, tax has to come out of that. Other support line, you know, does that also then impact how much they're spending on SG&A and things like that. In other words, it's hard to just isolate and say that would mean, you know, that there's $80 million less in cash flows to security holders. That's a much more complicated scenario.

Q. Sure. Well, so continuing the same hypothetical, assume that at some point the market believed that Co-Diagnostics' profit margin for the entire quarter had increased from 80 to 90 percent, but it's still overestimated sales by the same amount $100 million for the quarter.

A. Okay.

Q. So now by how much would the market overestimate Co-Diagnostics' profits for the

Page 97

quarter?

MR. URIS: Objection.
BY THE WITNESS:

A. Well, again, I don't think you're getting anywhere close to the right measure of what investors ultimately care about, but if you're talking about gross profits because you're talking about gross margin, there would be an additional 10 million in gross profits that -- or at that level, at least, under the calculation you are giving me, but again, that's a far cry from what the metric that investors would ultimately --

Q. I understand. So holding everything else equal, though, would you -- would that change the $80 million -- like the rough $80 million estimate of profits to something different?

A. It could. Again, I just can't emphasize enough, gross profits isn't what investors focus on, but it would change the gross profit margin by an additional $10 million it sounds like under your hypothetical.

Q. If a market -- if the market's expectation of the profit margins increased during the class period, holding everything else the same, then wouldn't a miss in sales have impacted the

25 (Pages 94 - 97)

Page 98

price Co-Diagnostics more than if the expectation of profit margin hadn't increased?

A. Well, again, you would have to think about -- I mean, that's theoretically potentially true. But again, you would have to focus not on gross profits, but you would want to -- and gross profit margin, but you would want to focus not only on, A, is this a temporary change in profit margins, is this a longer term change in profit margins, because ultimately what the market cares about is free cash flows to security holders, and if the gross profit margin isn't really leading to greater cash flows to security holders because there's other effects goes on, you know, for example, are they achieving these greater gross margins by removing costs in some way that impact the business, you know, largely going forward?

There's just so many ways you have to boil it down to say is this really a long-term increase in the value of the firm being caused by increases in profit margin. Theoretically that's possible, but there's a lot that would have to go into that sort of calculation.

Q. So a change in expected profit margin is an example of something that could have caused an

Page 99

increase in-stock price that would -- and it would also have increased the inflation in the company's stock price; is that true?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I think it's theoretically possible, but it's not that simple.

Q. Can you give me an example of something that could have caused an increase in stock price without causing an increase in inflation?

A. Sure. Sure. If the market was -- sure, if the market was placing more value on the growth opportunities in its other products besides the COVID smart test.

Q. Do you have any evidence that's what happened here?

A. Well, there was some good news related to the development of the monkeypox test, I believe, during the period. I don't recall if there's other examples of that, but I certainly recall the analysts, even on the date of the corrective disclosure, talking about the other areas of their firm as potential growth areas, and to the extent there was higher confidence in that as time went on and the market saw the company focusing on those

Page 100

other growth areas, that could certainly increase the value of the company that has nothing to do with the Logix Smart test.

Q. Did you do any analysis to determine whether any of those other announcements were impacting the stock price?

A. Well, I think I said there was some positive news related to the monkeypox test that did impact the stock price at one point in time I think, and like I said, I also looked and saw that the market indices could explain at least part of the increase over the second half of the class period.

I didn't do any formal testing of like trying to dissect exactly what caused the stock price to move up, but there are certainly ways in which the stock price could have moved up independent of the alleged fraud in this case.

Q. Let's turn to paragraph 80 of your first merits report. Do you have still have that up or can you pull that up for me?

A. Yes. I think I might have gotten booted off of it. Oh, wait, I think I'm back now. Hold on. Yes, I'm back in now.

You said paragraph 80.

Q. Yes, please. Page 36.

Page 101

A. Page 36.

Q. Could you read the first few sentences down to class period in the second-to-last line and read those out loud, please?

A. Sure. "As such, from an economic standpoint, it is reasonable to assume that a full corrective disclosure of the relevant truth at the beginning of the class period would have caused the market to understand that Co-Diagnostics' revenue would be much lower than was previously anticipated as was ultimately announced on the corrective disclosure event. Such a corrective disclosure would have allowed the market to understand that Co-Diagnostics was facing decreased demand for the Logix Smart test due to changing COVID-19 testing environment and some idea as to the extent to which this was adversely impacting Co-Diagnostics' revenue. As such, this would have resulted in a similar stock price decline at any point that the relevant truth was disclosed during the class period."

Q. What is your basis for stating that a disclosure that Co-Diagnostics' revenue, quote, would be much lower than was previously expected, end quote, would have resulted in what you call a

26 (Pages 98 - 101)

Veritext Legal Solutions

www.veritext.com                                                                 888-391-3376

Page 102

similar stock price decline as the actual specific full quarter results reported on August 11?

A. Well, I think I explain some of that in the prior paragraph. So I say, "more specifically, I understand that the nature of the concealed information in this matter did not change over the class period. As described above, at all times during the class period, the concealed information was the decreased demand for the company's flagship product was adversely impacting Co-Diagnostics revenue and expected revenue. Furthermore, I was asked to assume that plaintiff will be successful in proving that as of the start of the class period defendants were aware of the sales for Q2 2022 up to that time (nearly halfway through the quarter) and that sales were on track to be substantially lower than proceeding quarters and market expectations."

So that's -- that's the underlying basis for the conclusion I'm drawing. I don't see any --

Q. That sounds like a set of assumptions; is that right?

A. Well, I think there's assumptions as well as concluding that under those assumptions, it's reasonable to believe that the type of disclosure

Page 103

that's being considered here would result in a similar stock price decline, and that the -- and, again, I said this earlier in my testimony is that in my view, the most reliable economic proxy available for knowing the value of that information is to look to the stock price decline that occurs when the relevant truth is revealed that there is far less demand than the market expected for the company's flagship product.

And so in my view, the price decline on the corrective disclosure event is a very good proxy for how the price would have reacted to the disclosure of the corrective information, and I don't see any economic evidence that is suggesting otherwise.

Q. You used the word similar here, a similar stock price decline. Quantitatively how close is similar?

A. Well, again, I mean, my understanding is that a damages calculation needs to be reasonable. And so am I opining that at every moment in time that it would have been exact? No.

I mean -- I mean, this is a -- you know, we're trying to reprice a stock under a different information set and I'm trying to use the

Page 104

most reasonable economic evidence available.

I don't think the standard is that it has to be perfect, but do I think that the essence of this disclosure would have been interpreted by the market in the same way if the relevant truth had been disclosed earlier? I do.

And so I think that's a -- there would have been a reasonably similar stock price movement upon the revelation of the truth.

So I don't have a particular threshold in mind for what similar means, but it's not, you know -- I don't believe it would be an economically meaningful different price response.

Q. But you were opining that $2.08 is the right measure of what that correction would have looked like on May 12?

A. I think it is a reasonable measure.

Q. Do you think $2.07 would be reasonable too?

A. I don't view that as economically meaningfully different, no. So I think that would be a reasonable conclusion as well. But $2.08 I think is the most precise measure that's available.

Q. Is there an error rate associated with your measurement of the effect of the theoretical

Page 105

generic disclosure of demand being much lower than previously expected using a disclosure of the specific actual sales figure?

A. Well, I don't know what you mean by a generic.

Q. I mean, is there an error rate associated I guess with a -- with the imprecision in what you acknowledge you're measuring?

A. Well, there's an error rate in the sense that when performing a statistical test to evaluate the statistical significance of the price decline we're seeing, there's a test to determine how confident can you be that that -- that there really was a causal connection between this new information and the stock price declining, and that was, you know, significant -- let me make sure I look at the right number.

Let me just -- so if you look at Exhibit 1 of my report, the T statistic for this stock price movement was over 10, which means it's essentially zero probability of seeing that big a stock price movement based on chance alone and just due to, therefore, an error in the logic of the conclusion you're drawing from the test.

I mean, it's a -- T statistic of 10

27 (Pages 102 - 105)

Page 106

is like 1 in -- you know, there's a 1 in probably millions chance that that's randomness alone.

So there's a high degree of confidence and an extraordinarily low error rate in concluding that the stock price decline on this date was caused by the information.

Now, the question -- so now the question is is there an error rate around the $2.08 such that is it -- could it be 2 -- is a better measure $2.07, is the reality $2.06?

Like, of course, there is some imprecision in those estimates, but the point is based on the statistical test you're performing, it is just as likely to be too low as it is to be too high.

Are you saying is there some probability that the right number is $2.10 when you're getting $2.08? Yes. There is some probability of that, but it's equal to the probability that you should be $2.06.

In other words, there's a bell curve around this $2.08 metric, and the $2.08 metric is the mean and most highly expected value in that distribution. But yes, there's -- of course, it's not measured with absolute precision.

Page 107

I mean, the mean is measured with precision. Just to be clear what I'm talking about. I've measured the mean with precision. In other words, the mean is $2.08.

The question is is there some randomness factor in that that some other random factor could cause it to -- the reality to be closer to $2.10 or $2.06, some deviation from that, the answer is yes. There's always, you know, potential for randomness to be affecting these numbers, but this is the -- this is the proper mean and expected value based on all the statistics of the best estimate of what that impact was.

Q. Even allowing for imprecision, how could -- how could the actual correction on May 12 have been more than the stock drop that happens on August 13?

A. Oh, because, I mean, one easy answer is you're introducing even more uncertainty as to what exactly the path of demand is. Right. So if I'm announcing at the end of the quarter -- in this corrective disclosure, you know, the company announces they achieved $5 million of revenue during the quarter. If they had provided more information about the trends they were seeing in demand as of

Page 108

the middle of the quarter, there would still be some uncertainty as to whether they would even get to $5 million.

So, of course, there could be additional uncertainty introduced that would potentially at least yield an even bigger stock price decline upon an earlier disclosure.

It's possible. I'm not saying it would be. I'm just saying that that's why the $2.18 is the most reasonable estimate we have is because that's what we actually empirically observe when they do announce a reduction in demand of the size that was happening within that quarter.

So it represents a reasonable economic estimate of how an earlier disclosure would have been, but an earlier disclosure could have, theoretically, resulted in a bigger stock price movement.

Q. If Co-Diagnostics had announced second quarter 2022 sales of $15 million instead of the $5 million they did announce on August 11, would the stock price reaction likely have been different?

A. Yes. That would reflect a much lower decrease in demand than what actually happened. So sure, that could have resulted in a smaller price

Page 109

decline.

Q. So the amount of sales between May 12 and the end of the quarter would have an impact on the stock price reaction on August 12, correct?

A. Yes. That's certainly true.

Q. Well, what basis do you have then for saying that the truthful disclosure made on May 12 would have caused the same stock price drop observed on August 12 when there could have been different sales figures announced on August 11 based on how the second quarter progressed?

MR. URIS: Objection.

BY THE WITNESS:

A. Well, my general understanding is that the demand trend that would have been -- that the company knew about as of May was roughly in line with the demand trend that existed throughout the quarter.

So that's -- so that's what I think is -- helps support that this is a reasonable assumption. Like I said, given that there would have been even more uncertainty about what the quarterly revenue might have been had they just said demand was, you know, severely negatively impacted during the quarter and not given any numbers, the

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 110

market might have assumed it would have been worse than what actually occurred.

That's what I mean is the -- the most reliable economic proxy we have is this $2.08. I think that's a reasonable assumption to use given that what defendants or given what plaintiffs are alleging defendants would have had to disclose at an earlier time, that there was -- there had been severe demand impacts.

Q. But isn't there a lot of additional information, at a minimum, the additional sales numbers built into the earnings results that are shared on August 11 that could have been -- couldn't have been disclosed earlier?

A. Yes, of course. But -- but that -- again, my understanding of the allegation is not that they needed to report specific numbers at a given point in time, but just that they needed to properly disclose that they had seen a tremendous fall off in demand at the point in which an analyst explicitly asked them if there's any demand issues and they gave an answer that reflected -- that didn't reflect that they knew there had been a steep fall off in demand.

That's my understanding of the

Page 111

essence of the complaint and that the disclosure wouldn't have necessarily had to have been specific numbers or specific numbers for the full quarter, just that they had experienced a massive decline in demand.

Q. For this hypothetical we had been talking about Co-Diagnostics announcing an extra $10 million of sales on August 11, right? Would your estimate of inflation have been exactly the same regardless of whether those sales came before or after May 12?

MR. URIS: Objection.

BY THE WITNESS:

A. Well, that would suggest a very different pattern of demand.

My general understanding of what plaintiffs are alleging is that demand had fallen and -- I mean, now you're talking about that somehow they would have demand over the second half of the quarter that would have been in line with market expectations generally of what the whole quarter should have looked like and so that this decrease in demand at the beginning of the quarter was literally just transitory in some way, and that's not my understanding of plaintiff's claims.

So I mean, hypothetically, if that

Page 112

had occurred, I feel like this would be -- the facts of this case would just be different. So, I --

Q. I could ask the same question, like a small number of sales, right? There were an extra 2 million in sales for the quarter, and, you know, would your estimate of inflation have been exactly the same regardless of whether there's an additional 2 million of sales that came before or after May 12?

A. I think the conclusions would be the same so long as the overall decrease in demand was -- that should have been disclosed at the beginning of the period, that that statement -- that that corrective statement could have been made essentially at any point between the start of the class period and the end of the class period.

Now -- and I also have a general understanding that plaintiffs expect to prove that the sales that were in place halfway through the period were a pretty good reflection of what ultimately happened.

Now, if that were somehow different, would it change my opinion? I don't know. You are asking me to assume facts that I don't know to be true.

I guess the short answer is I don't

Page 113

know, but as long as the same substantive announcement could have been made at any point during the class period, I don't think it makes sense to start changing the metric of artificial inflation because if there had been two more million in sales, maybe the stock price movement wouldn't have been as much, and that would get reflected in my estimate then.

So as long as at any point during the class period they would have had to announce a substantial decrease in demand and that that was the truthful statement that needed to be made, I think my general approach is reasonable.

Q. The inflation you measure would be the same regardless of whether -- okay -- Strike that.

Shouldn't the inflation you measured based on the five million of sales that were actually announced and the inflation that's hypothetical based on additional sales represent the effect of exactly the same concealed information that had been provided on May 12?

MR. URIS: Objection.

BY THE WITNESS:

A. Again, I think you're mixing a couple of things.

29 (Pages 110 - 113)

Page 114

So if you're saying hypothetically what if revenue had not been 5 million but more like 7 million or 8 million, something like that, I think there's -- that hypothetically would have caused a lower stock price change on the corrective disclosure, and that would be built into whatever inflation calculation I was doing. It wouldn't necessarily change whether I use constant dollar.

Q. I want to go back to paragraph 80 in your report, the second sentence, that says "such a corrective disclosure would have allowed the market to understand that Co-Diagnostics was facing decreasing demand for the Logix Smart test due to a change in COVID-19 testing environment and some idea as to the extent to which this was adversely impacting Co-Diagnostics' revenue."

Do you see that?

A. Yes.

Q. How much of a range do you need to suggest with the words "some idea" as to the extent to which this was impacting revenue?

A. Well, again, I think that the -- that my general what I'm trying to convey is there that it would be, you know, not just some immaterial change in demand or that it was, you know, behind by some

Page 115

small amount, but that there was a drastic change in the demand conditions that we're facing.

And again, my understanding of plaintiff's theory is that there was enough intra-quarter information at that point that the revenue expectations they could have provided or should have provided or the qualitative nature of what they said should have conveyed that, you know, they were on pace for a much lower sales and earnings during the quarter and/or that the market would at least be able to intuit from what they said that that were the case.

Q. If the market would only have had a general idea of how revenue was impacted, how was -- in the type of disclosure that you're contemplating, how is that comparable to August 11 when the market learned exactly how much revenue had been active?

A. Well, because, again, I think you have to think about it from an uncertainty point of view.

Of course, the Co-Diagnostics did not know on May 12 exactly what revenue it was going to be announcing on August 11. That's not the claim. That's not what I'm assuming. That's not what plaintiffs are alleging.

But it would have suggested that they

Page 116

were on pace for a much lower revenue than market expectations. At that point in time maybe the market overestimates it a little bit, maybe it underestimates a little bit, but the most reasonable data point we have for the value of that information is how the market reacted on the corrective disclosure date, and that's what I'm using.

I'm not suggesting they would have known exactly or that they could have anticipated it exactly, but in that -- given the uncertainty surrounding that, the most reasonable data and economic evidence available for the value of that information is how the market moved on the corrective disclosure date and that's what I'm using.

Q. Can you give me any idea of how much you think it could be off when comparing some idea of an impact with the actual impact?

MR. URIS: Objection.

BY THE WITNESS:

A. Well, this isn't, you know, a calculation I've done or anything, but I mean, one of the most logical things one could do is look to see how revenue had changed up to the quarter to that point and then project forward based on that.

Page 117

So, again, if they gave some sense as to what that was or how severe the demand shortfall was relative to the same time in other quarters or what they had seen in prior quarters or what their expectations were, that sort of information would have been enough to reflect -- my understanding is plaintiff's view is that there would have been enough information for the market to understand the severity of the demand shortfall at that point. Exactly what they would have disclosed or how much or how much detail they would go into, I'm not assuming anything in particular, but that that somehow the corrective disclosure would have had to have -- whether it was through their statements, themselves, or in response to analysts questions, it would be obvious to ask after that somehow they would give some sense of -- that this was not just some small change in revenue, but there had been a sort of falling off the cliff of demand that they were facing.

That's the essence of what I understand plaintiff's claim is, and that at any point, they would have had to disclose that their revenue or that their sales had and demand they were facing had declined very substantially.

30 (Pages 114 - 117)

Page 118

Q.   I feel like I have heard a couple of times that the drop on August 12 is just the best available economic information on this.  Is that because it's the only information you feel like you have that makes sense, or I mean, are you simply assuming that the stock price drop would be the same even though early it's a pretty different announcement that what could have been made earlier?

A.   I don't think it is that different.  I mean there are certainly differences.  I'm not suggesting again that they knew the exact numbers, but again this is a -- at its base, it's a pretty simple case in the sense that for a very short class period, there's a claim that they had actually faced far lower demand than expectations, misled the market that that wasn't the case, and then within several weeks disclosed much lower revenue and earnings that were consistent with there being much less demand and analyst reports that echoed the company's statements that the demand for -- the lower demand for this very product was responsible for the lower than expected revenue and earnings and earnings expectations and why the stock price declined.  I think it's -- so no, it's not just an assumption.  It's that that event, those disclosures

Page 119

closely mirror the economic substance of what plaintiffs are alleging was hidden the entire time.

Q.   Take a look at paragraph 80, again.  You also used the word similar to describe the price decline.  So it looks like in this section, there are two different sources of uncertainty here, the similar and the some idea.

Is there any way to kind of tell us what the total uncertainty is when you combine those two?

MR. URIS:  Objection.

BY THE WITNESS:

A.   Well, again, I think the use of the word "similar" and the use of the words "some idea" are meant to reflect exactly some of the things you're talking about, which is that there's no way to go back in time and measure with absolute precision how the stock price would have been different under some different information set.  It's challenging.

And so, you know, all I'm saying is that, of course, there's some uncertainty in these metrics, and they're not perfect substitutes for one another, but I do believe it is a very good proxy and a very good substitute for how the market would have reacted to that similar information.

Page 120

So I think the $2.08 is the most relevant and reliable economic evidence.  There is some, as I described, some bell curve around that based on just the nature of the statistics we're measuring around that mean estimate, but the mean estimate is the best estimate we have.

So I'm not giving you a particular like standard deviation around the estimate or anything like that or what -- again, I'm trying to convey the economic concept that these are -- this is a similar announcement and a good proxy for what I'm trying to measure but acknowledging it's not absolutely perfect.  That's what I'm conveying here.

Q.   In other Section 10b cases, have you opined that the level of inflation was not constant over the course of a class period, either in dollar or percentage terms, putting aside changes due to misrepresentations or other corrective disclosures?

A.   Yes.

Q.   Do you recall any specific cases where you opined that way?

A.   I recall in the Bank of America case.  There was a claim that Bank of America should have been disclosing the losses that were occurring at Merrill, which it had just acquired, and when you're

Page 121

dealing with a bank, you can literally -- since they're marking things to market on a daily basis for many of their assets, you could get a reasonable estimate of what the losses were that, in theory, should have been disclosed on a daily basis.  And in that case, we used that information to scale the inflation per share at different points in time during the class period.

Again, in a number of cases I have used the concept percentage method, which implicitly then has the dollar value and thus the damages resulting from purchases at different points in time, having a different inflation -- dollar inflation per share.  And I have used that in a number of different cases.  The Valeant case comes to mind where the inflation moved substantially over time during the class period as the value of Valeant changed.

So those are two cases that come to mind immediately.  I'm sure there are others, but those are the ones that stick in my mind right now.

Q.   We talked before about how in Appendix A of your merits report you listed all the documents you considered, right?

A.   Yes.  Just to be clear, it's additional

31 (Pages 118 - 121)

Page 122

documents beyond what I had looked at after my market efficiency report. I make general reference to all the materials in the market efficiency report, but yes, it lists the additional documents I looked at.

Q. So one of the items in that list is the memorandum opinion and order filed February 5th, 2024. I don't know if you want to look at it or not in the list. You're welcome to.

A. I see it on the list. I have a vague recollection of reviewing that document.

Q. Do you recall what that document is?

A. I believe.

Q. Just in general.

A. Yeah, no, my general recollection is that it's the order following defendants motion to dismiss in the motion to dismiss portion of the case.

Q. How, if at all, did that document inform your damages analysis?

A. I think it confirmed for me which statements were still in the case to consider. I believe what plaintiffs asked me to consider and still in the case was consistent with what that document defined as what was still in the case.

Page 123

That was my general recollection. Again, it's been a while since I looked at that document.

Q. Are you aware of any claims that survived the February 5th -- the report -- the opinion we're talking about right now that are no longer in the case?

A. Not as I sit here. I would have to go back and review it to know the answer to that.

Q. I'll represent to you that certain claims, specifically those related to alleged violations of Item 303 have been dropped from the case following this motion to dismiss order.

Sitting here, do you know if our damages analysis is still appropriate if you accept that representation?

A. Well, again, my damages analysis is based solely on the three statements that are listed in the appendix to my report, and those are the only statements I considered, and the only -- and the rationale for why those statements were misleading and how I approached the valuation of artificial inflation is consistent with what's described in my report.

So I have not studied -- I have no reason to believe that other claims that are no

Page 124

longer in the case would somehow have any impact on my damages analysis because I don't think I was considering it.

Q. Do you agree if there's $2.08 of inflation in Co-Diagnostics' common stock throughout the class period, then the maximum amount of inflation there could be in Co-Diagnostics' call option is also $2.08?

A. Not necessarily, no.

Q. Why not?

A. Because when a corrective disclosure occurs, that can lead to changes in the beliefs in investors of things besides just a change in the underlying price. It could lead to changes in the expected volatility of the stock.

So I think the idea that an options price can't be inflated by more than the stock price relies on a theoretical construct that might not be true in the actual but-for world.

Q. Are you referring to the delta that we discussed earlier?

A. Well, delta is one of the concepts there, yeah.

So the idea is if nothing but the underlying stock price changes that you wouldn't

Page 125

expect the -- holding all else constant, you wouldn't expect the price of the option to move by more than the underlying -- the change in the underlying price is true, but if you allow for a change in the volatility of the stock as well, that may not be true.

Q. Are you aware that in Appendix D to your first merits report, certain of the call options on August 12 about the inflation dissipated is indicated to be higher than $2.08?

A. In certain cases, it's slightly higher than $2.08, yes, and I just gave a reason why that theoretically you could expect to observe that.

Now, I think it's also true that because I perform the inflation calculations for the options during the class period -- so -- takes into account the use of an options pricing formula, which ultimately will restrict it to be less than $2.08 during the period. So let me go through an example of that.

Give me just one second.

Q. Are you looking at a part of your report?

A. Yeah, I'm looking at Appendix D and then I'm also going to look at Appendix E for options. Give me just one second. I just wanted to make sure

32 (Pages 122 - 125)

Page 126

that this example makes sense.

So if you go on Appendix D and look at the put option with a strike price of $15 that expires on January 20, 2023, this is on page 2 of 2 of Appendix D, and it's the fourth line down in the data. So, see, where the expiration is 1/20/23, there's a strike price of $15, and the artificial deflation dissipated on that day is $2.25, which, again, is larger than the $2.08.

Now, why could that be? Well, that could be because not only is there a change in the underlying price, but there could also be changes in other inputs to how options are valued and so you can't look at that $2.25 and say because it's larger than 2.08, that means that there's something illogical going on because, you know, deltas are supposed to be less than one, which means the price reaction -- if you just change the underlying and nothing else, it means you would expect a price decline of less $2.08 but we're not holding everything else constant so.

And we actually observed this $2.25 move. So that is just an empirical fact that we see that size of price movement.

Now the question, though, is there

Page 127

ever a time that I'm allowing any class member for that put to collect more than $2.08?

And to see that, you have to go to Appendix E, and so in Appendix E -- let me find the right page where we can look at that option. If you look at page 48 of 70 in Appendix E. Sorry. Actually it starts on page --

Q.   48 of 70, the page --

A.   46 of 70, at the bottom of the page is where the $15 strike price starts. It changes from $12 to $15. That option -- the first data point is on page 46 of 70 about roughly ten lines from the bottom.

Q.   Okay.

A.   Okay. So you see that that's the expiration of 1/20/23, $15 strike price, and then the last column is measuring the deflation in this put option. So it's a dollar 53.

Do you see that.

Q.   Yes.

A.   Because I'm repricing the option using the Black Scholes formula throughout the class period, it's going to restrict the price change to be less than $2.08 because this is using the theoretically construct of how much different should

Page 128

the put price be.

So if you look throughout that data continuing over the next couple of pages, you see that the inflation that I'm assuming at any point during the class period is never above $2.08 because those values are being calculated using that theoretical construct. So even though the price changed by more than $2.08, I'm never allowing someone to collect more than $2.08.

MS. YORK-ERWIN:  Okay.  I think now is a good time for another break if that works for everybody.

THE VIDEOGRAPHER:  We are going off the record.  The time is 1:39 p.m. and this is the end of Media Unit 4.

(Break in the proceedings taken at 1:39 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:50 p.m.

This is the beginning of Media Unit 5.

BY MS. YORK-ERWIN:

Q.   So before the break, we were talking about your calculations of the artificial inflation or deflation dissipated on August 12 for the put and

Page 129

call options, right?

A.   Yes.

Q.   With respect to that, were you saying that the reason -- your explanation for how there -- how those -- the artificial inflation or deflation might be more than $2.08, is that -- were you saying that there could have been a change in volatility and that would explain that?

A.   Yes, so I'm trying to describe. There's two different metrics going on here. One is the price reaction to the corrective disclosure itself. And that's being -- that's an empirical measurement, and I think what Dr. Juneja was noting in her report was that some of those measurements were greater than $2.08 and you wouldn't necessarily expect to see that, theoretically, because if nothing else changed but the price of the underlying, and that change was $2.08, you wouldn't expect an option price to move more than $2.08.

We actually observed for some of the options, a price movement bigger than $2.08 and one of the reasons you can see that is because of a change in one of the other variables that matters for valuing an option, like a change in the expected volatility of the stock going forward.

33 (Pages 126 - 129)

Page 130

So that could explain a price movement in an option being bigger than a price movement in the common stock. So that's -- and my table and the results in my table reflect that that can occur.

But that is just one piece of how I'm getting to the damages for option holders. In addition, I'm not using the constant dollar assumption for the options. I'm saying if we have -- I'm taking the pricing of each option and recomputing it on each day of the class period using an options formula where then what I'm assuming is that the underlying price is $2.08 less, consistent with my constant dollar assumption for the common stock.

And when I do that, the options pricing formula itself will constrain what we were talking about earlier, delta, to be less than one, and therefore, the resulting inflation at the time of purchase for a call or the time of sale or entering, you know, writing a put, will be less than $2.08 because I'm using that theoretical construct she's talking about and that's implicit in the option pricing formula.

So that's why I say when you look at

Page 131

Appendix E, which is the actual inflation I'm calculating for each of the options at each date during the class period, it's less than $2.08.

In other words that $2.25 price movement never translates in any of the options or any of the calculations to actually be that high. It is always going to be less than $2.08.

Q. But the movement that you're observing or the dissipated inflation or deflation in Appendix D could be due to changes in volatility, is that --

A. There could be a component of that the new information coming to market not only changed the price of the underlying stock, which it did obviously, but could also change the assumptions investors are going to start using going forward about the expected volatility, and that could have its own influence on the price, which is also part of the response to the corrective information.

So there's no reason to exclude that from the price reaction that we're seeing on that day, but that could -- that could explain or that does explain why you can observe an option price movement larger than the underlying stock price movement.

Q. Would that be a result of the change in

Page 132

demand that's revealed on August 12 -- August 11 with the movement on the 12th?

A. Yes, because that's the market -- that's the news that -- that's the new news in the market that the market is reacting to. So a similar increase in volatility could also occur on an earlier corrective disclosure.

So yes, I'm saying that the news on that day is what's causing the movement in the options price, and part of that reason for the underlying move in the option price could be that the corrective information is influencing expected volatility as well.

Q. Could that be a result of a disclosure that the change in demand is a long-term change in demand?

A. That's could be an element of it, sure. But, again, I don't see that as distinct from the corrective information, but the -- how the company describes the nature of the demand change, sure, could -- and its persistence could influence the market's perception of expected volatility, yes.

Q. I would like to go back to -- I believe I introduced your reply report earlier as Exhibit 2. Could you pull up that up again, please?

Page 133

A. Yep.

Q. I'd like to start by looking at paragraph 9.

A. Okay.

Q. Why don't you read paragraph 9 to yourself, you don't have to read it out loud, and let me know when you're done.

A. All right.

Q. I think you testified you reviewed Dr. Juneja's initial report when preparing this reply report; is that right?

A. Yes.

Q. Do you disagree the articles and other public sources Dr. Juneja cites in her report were public information to the extent they -- prior to May 12 to, the extent that they are indicated as being prior to May 12?

A. No, I don't know that I checked that every one was that widely public -- widely disseminated and public, but I don't recall disagreeing with her that any of the information she cited was public. But I also don't know that I validated that for every single piece of information.

Q. Understood. Does market-wide data on the

34 (Pages 130 - 133)

Page 134

use of COVID tests provide investors with information relevant to Co-Diagnostics' business in your view?

A.    It could be a piece of relevant information, yes.  I am not saying it has no influence.

Q.    What kind of information does that type of data give the market?

A.    Again, I think it probably is correlated in some way with the addressable market that they had.  It could be showing trends.

So it certainly could be a piece of information that one would want -- if one were trying to forecast saying sales and demand for the company's products, that might certainly be something one would look at to see if there's any general trends that might be -- that one could glean from that, but again, just to be clear, it is looking at a much broader thing than just Co-Diagnostics' revenue.  Right.  It's looking at PCR tests in general, and it could depend on what geography you're looking at, it could depend on whether Co-Diagnostics' penetration in different markets was sufficiently different, whether it was US data or foreign data, et cetera.

Page 135

So I'm not discounting that it's a potentially relevant thing to look at, but it certainly isn't substitute for knowing their actual sales.

Q.    In an efficient market, though, you would assume that the market was aware of public information related to COVID testing demand?

A.    As long as it was widely disseminated, yes.

Q.    Okay.  If we turn -- let's turn to paragraph 13.

A.    Okay.

Q.    You say nothing in the Tsai report discusses the information defendants already in at the time of the misstatements about Q2 2022 sales and demand for the company's COVID test.

Did you review Dr. Tsai's report dated November 20, 2024, in preparing your reply report?

A.    I did, yes.

Q.    Did you review the list of materials that he considered?

A.    I wasn't focused on that as much as I was focused on what his -- his analysis and his exhibits.  I don't recall -- I don't recall

Page 136

specifically going through every document that was on his list and evaluating it.  No.

Q.    Do you know whether he considered any Co-Diagnostics sales data or other internal documents as of May 12, 2022 when he formed his opinion?

A.    I don't.  I just noted that he doesn't discuss it in the text of his report, but whether he looked at it or not, I just don't recall or don't know that I ever knew.

Q.    Okay.  I want to go back to 9 for just a second.  So in paragraph 9, you say "Dr. Juneja additionally asserts that it was public information that by late February and March 2022 the number PCR tests performed had fallen substantially when compared to the preceding months and, therefore, at the time of the false and misleading statements, the market was aware that demand for the tests had been far fewer than it had been in recent quarters."

Do you disagree with that assertion?

A.    I don't disagree with her assertion that the number of PCR tests performed had fallen substantially.  I don't disagree that might mean that the market was aware that overall demands for tests was fewer than it had been in earlier

Page 137

quarters.

Again, I don't know that that tells you necessarily a whole lot about the demand Co-Diagnostics was facing at the time.  But I don't disagree -- I don't have an opinion about how good a proxy that is for the demand they could ultimately be facing in the market, but I don't disagree with the data she presented.

Q.    If we go to paragraph 14 in your reply report, are you there?

A.    Yes.

Q.    You say "the Tsai report focuses on statements made by public officials and public discourse, not company-specific details about future demand for the Logix Smart test."

When you say company-specific details about future understand, what kinds of details are you referring to?

A.    Just whatever statements the company had made or that the company had about its own demand. I'm just saying his focus was on information external to the company not internal to the company is the gist of what I'm trying to say there.

Q.    Did you review any company-specific details about future demand when forming your

35 (Pages 134 - 137)

Page 138

opinions?

A.   Well, I certainly looked at their earnings announcements and the statements that they were making about demand, and then what occurred on the corrective disclosure, and the statements they made about demand at that time.  If you're talking about internal documents that were not public, no.

Q.   Is it possible that statements made by public officials or statements made in public discourse could have affected the company's beliefs regarding future demand for its COVID tests?

MR. URIS:  Objection.

BY THE WITNESS:

A.   It's possible.

Q.   Would you agree that statements made by public officials or made in public discourse would form part of the total mix of information available to investors when they reviewed the alleged misstatements?

A.   If they were widely disseminated statements, then -- and were in the general public, then, yes, it's part of the mix of public information.

Q.   Also in paragraph 14 you say "Even if everything Dr. Tsai says is true, it does nothing

Page 139

but prove, 1, whether or not defendants statements were false and misleading or 2 the economic impact of those alleged misstatements."

Do you see that at the bottom of 14?

A.   Yes.

Q.   But you testified earlier that you're not offering an opinion as to whether defendant's statements in this case were false or misleading; is that right?

A.   Correct.  And yeah, no.  And I'm not. I'm just saying there's nothing in Dr. Tsai's report that suggests that one way one way or the other either.

Let me say it a different way or a better way that I think conveys what I'm trying to say.

There's nothing in the Tsai report, even if everything he says is true, that precludes there from having been misstatements made by the defendants, and for those misstatements to have impacted the stock price.

Q.   But you are not opining on whether they're false or misleading, right?

A.   I'm not.  That's correct.

Q.   And you told us earlier that was because

Page 140

you didn't really review -- you didn't -- you haven't reviewed a full set of materials that would put you in a position to do that?

MR. URIS:  Objection.

MS. YORK-ERWIN:  Is that right?

BY THE WITNESS:

A.   That's simply not something I was asked to do so I didn't seek to have all the information to evaluate that.

Q.   I'm wondering what expert basis do you have for opining as to the value of Dr. Tsai's opinion with respect to issues that you are not opining on?

A.   Well, what I'm saying is as an economist, in looking at all the data he presents and all the ideas he presents, in my view as an economist, there's nothing in that analysis or data that would prove to an economist that defendants couldn't have mislead the market, that somehow the full truth was out there, and that there was no way for defendants to have mislead the market about the demand they were facing.  There's just nothing in his report that in my view comes anywhere close to what economic evidence that would somehow suggest that he precluded that possibility.

Page 141

Q.   But you're -- when you say that, you are still holding the assumptions that plaintiffs can prove that the statements were false or misleading?

A.   No.  I think I'm saying something different here.  I think I'm saying that there's nothing in the Tsai report that suggests defendants were incapable or that they somehow didn't lie to the market.  There is just nothing in his report that would lead one from an economic point of view to that conclusion.

He doesn't even talk -- as I said, he doesn't even talk about what defendants knew or didn't know about their own sales.  So I don't see how he could possibly be precluding defendants from having lied to the market about what demand they were facing.  That's my opinion based on reading his report and what he does and doesn't do.

Q.   Okay.  Is whether a statement is false or misleading usually an economic question?

A.   There could certainly be economic aspects to it, yes.

Q.   I might be misremembering.  Did you testify that you have ever been retained to opine on falsity, whether a statement was false or misleading in that Section 10b case?

36 (Pages 138 - 141)

Page 142

A. That's not usually what I'm engaged to evaluate, and I don't recall ever offering a formal opinion as to whether a statement was false or misleading.

Again, I believe there have been times in testimony that somebody has asked me whether I thought something was false or misleading and I gave my view of that based on what I knew at that point in time, but I have never -- I don't think I have ever written an opinion in a report that says I think this statement was false or misleading.

Q. Because that's not usually an economic expert question; is that right?

MR. URIS: Objection.

BY THE WITNESS:

A. Well, I don't presume to know all the reasons why economists aren't asked that question or I've not been asked that question. Whether it's impossible to or inappropriate to or couldn't be done, I'm not opining on that.

Q. I'd like to turn to paragraph 15. Could you read the first sentence down to footnote 13. You don't need to read footnote 13. Could you read out loud the first --

Page 143

A. Read it out loud? "Dr. Tsai opines that historical volatility in COVID-19 'made it increasingly difficult to accurately predict demand for COVID-19 PCR tests over the summer and for the rest of the year' and that 'statements by industry and public health and government officials in spring 2022 show that they reasonably expected long-term demand for COVID-19 tests to remain strong since future variants and waves inevitably would emerge and bring increased demand again. It was just unknown as to when this would happen.'" And then I cite to the Tsai report.

Q. Do you disagree with any of the opinion -- the Dr. Tsai opinions that are being described in this sentence?

A. I'm not expressing an opinion one way or another on that.

Q. And could you read the next sentence out loud as well, please?

A. Dr. Tsai details how demand for COVID-19 tests had been highly volatile and dependent on the new waves of COVID-19 that were emerging and changes in the public health response to the disease with some localities engaging in much more testing than others, and then I cite to Dr. Tsai's report again.

Page 144

Q. Do you disagree with any of the opinions -- Dr. Tsai's opinions that you're describing in this sentence?

A. I have not evaluated them for their accuracy. I don't have a view one way or another.

Q. And then further down in the same paragraph, you say "despite this high volatility, Dr. Tsai claims that multiple public health agencies and experts in spring 2022 anticipated an increase in COVID cases in the near future."

Do you see that?

A. Yes.

Q. Do you disagree with that opinion expressed by Dr. Tsai?

A. I did not evaluate whether that was accurate or not, so I don't have a view one way or the other.

Q. And you go on to say he also discusses how the US had been a leader initially in rolling out vaccines, but that by spring 2022, the US was lagging behind other countries, which was further complicating the outlook for immunizations and testing demand.

Do you see that?

A. I do.

Page 145

Q. Do you disagree with those Dr. Tsai opinions being described there?

A. I haven't evaluated the accuracy of those, so I don't have a view one way or the other.

Q. It says "Dr. Tsai notes that pandemic fatigue behaviors lead to lower perceived risk by the public as to the dangers of subsequent variants which could lead to fewer tests taken, however, those same behaviors also may lead to higher rates." I think it says or disease and, therefore, higher demand for testing.

Do you see that?

A. I do.

Q. Do you disagree with any of those opinions by Dr. Tsai described there?

A. I have not evaluated the accuracy of those, so I don't have a view one way or the other.

Q. Would you read the first sentence out loud in the next paragraph, paragraph 16?

A. Sure. "Dr. Tsai's opinion that the demand COVID-19 test was expected to remain strong despite the uncertain environment is also inconsistent with Dr. Juneja's claim that the simple withdrawal of guidance and the trend in PCR tests alone would be enough to inform the market about the

37 (Pages 142 - 145)

Page 146

decline in demand for the company's COVID-19 tests."

Q. You then cite Dr. Tsai's report; is that right?

A. Yes.

Q. I'd like to look at -- I'm going to introduce as an exhibit Dr. Tsai's report.

A. Okay. I have got it.

(Deposition Exhibit 5 was marked for identification.)

BY MS. YORK-ERWIN:

Q. Would you please -- is this the report that you reviewed in connection with preparing your reply report?

A. It appears to be, yes.

Q. Would you please to turn paragraph 14 and read that out loud?

A. "It was widely understood by myself and stated by others in the COVID testing industry in April and May 2022 that the historical volatility in COVID testing demand exacerbated by the factors discussed herein made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and the rest of the year. This uncertainty was widely discussed in the press and in statements by public health experts including those

Page 147

with whom I worked. At the same time, statements by industry and public health and government officials in spring 2022 show that they reasonably expected long-term demand for COVID tests to remain strong since future variants and waves inevitably would emerge and bring increased demand again, it was just unknown as to when this would happen."

Q. Just to be clear, those are not your opinions, those are Dr. Tsai's opinions.

A. Correct.

Q. So in paragraph 16 that we had read before -- looking at paragraph 14 here, is Dr. Tsai's opinion that demand for COVID-19 tests was expected to remain strong, is that opinion he's expressing with respect to long-term demand or short-term demand based on what you see here?

A. Paragraph 14, give me just a second.

I think this paragraph is talking about some shorter term things and some longer term things. I think when you -- when -- if you're making reference to the demand remaining strong, in the last sentence, that seems to be focused on long-term demand.

Q. And that is the language that is mirrored in the paragraph -- paragraph 16 of your reply

Page 148

report; is that right?

A. Let me go look, again, at that. Just a second.

Yeah, that first sentence in 16 in my report seems to be making reference to his statement about demand remaining strong and he puts that in the context of longer term, yes.

Q. So paragraph 16 of your reply report when you reference -- when you -- when you reference his opinion about demand, you are referring to his opinion about long-term demand?

A. Yes. Yes.

Q. When you are referring to Dr. Juneja's opinion about the decline in demand for the company's COVID-19 test in that same sentence in paragraph 16, is that with respect to long-term demand or temporary demand, if you know?

A. I don't recall her opinion being specific. So it could be referencing both. I just don't recall off the top of my head if she was very specific about that.

Q. You don't cite a particular part of her report here in paragraph 16; is that right?

A. Give me just one second.

In paragraph 8, I quote her report.

Page 149

Q. Sorry. Which paragraph?

A. Paragraph 8 of Exhibit 2, and in quoting her report, I say "Dr. Juneja states that 'ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance.'" So -- and then I cite to her report.

So I don't think she was restricting it to just be a specific quarter. I think she was saying future earnings performance and not really putting an end to that.

Q. If Dr. Tsai is talking about long-term demand and Dr. Juneja is talking about -- you're saying you believe Dr. Juneja is talking about short-term and long-term demand, is that your view?

A. I'm saying future earnings performance is ambiguous. It could be referring to both.

Q. How are these statements inconsistent?

A. I'm seeing there's an inconsistency in what they seem to be arguing in a broader level, which is I understand Dr. Juneja to be arguing that somehow the company had already dampened earnings expectations simply by withdrawing guidance, and that the market would interpret that as an indication of reduced demand.

38 (Pages 146 - 149)

Page 150

And Dr. Tsai seems to be arguing to the court that given the public information that was out there, that it was consistent to be expecting to see strong demand going forward.

So I'm saying that there's an inconsistency in the message that the two of them seem to be delivering to the court on what the market was perceiving about whether demand was going up or down or was going to be strong or weaker.

Q. Well, they're talking about demand over different horizons, wouldn't that explain -- I mean, wouldn't that mean they were not inconsistent?

A. Again, I don't think there's anything in Dr. Juneja's reports that suggests she's talking about only revenue in that particular quarter. She said future financial performance.

Q. There's nothing indicating she's not talking about just for that quarter; isn't that true?

A. My interpretation was she was including the possibility of it being beyond the current quarter.

Q. Even if it were two or three quarters, couldn't that be consistent with a view that COVID was an ongoing disease and that there would

Page 151

long-term continue to be a need for testing that would drive some level of demand?

A. I think both of those things could be true. Again, what I -- what I'm trying to articulate is that the two of them seem to be sending different messages to the court, though, in terms of arguing what the public information was telling the market about the direction of demand.

She seems to somehow be leaving the impression that by withdrawing guidance, the company was sending a clear negative signal about demand, and Dr. Tsai is articulating reasons why demand was expected to remain strong. That's the inconsistency that I'm talking about.

Q. But believing that demand could remain strong or could be strong long-term is not inconsistent with the idea that there might be -- that there could be messaging in the market about a short-term downturn in demand; is that true?

A. That's true. That's possible.

MS. YORK-ERWIN: I want to talk to my team, but I don't actually have any more questions at the moment. So let me take ten minutes to look at my notes and then we can come back, and I may have a couple of more or we may be done.

Page 152

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are going off the record. The time is 2:26 p.m.

(Break in the proceedings taken at 2:27 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:36 p.m.

BY MS. YORK-ERWIN:

Q. I'm almost done. I just want clarification on a couple of questions.

Have you identified any errors that need to be corrected in either of your reports?

A. No.

Q. And nothing -- and no aspects of your opinions that you need to change?

A. No.

MS. YORK-ERWIN: Then I have no further questions at this time.

MR. URIS: I know we just took a break but could we take another ten minutes or so so I can see if I have any questions I may want to ask. I don't think there will be, but I just want to make sure.

MS. YORK-ERWIN: Sounds good.

THE VIDEOGRAPHER: We are going off the

Page 153

record. The time is 2:37 p.m.

(Break in the proceedings taken at 2:37 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:45 p.m.

MR. URIS: I don't have any questions.

MS. YORK-ERWIN: Thank you for your time, Mr. Coffman.

THE WITNESS: Thank you.

MR. URIS: We'd like to read and sign.

THE VIDEOGRAPHER: We are off the record at 2:46 p.m., And this concludes today's testimony, given by Chad Coffman.

The total number of media units used was five and will be retained the by Veritext.

(Off the record at 2:46 p.m.)

39 (Pages 150 - 153)

Page 154

REPORTER CERTIFICATE

I, JO ANN LOSOYA, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein; That the foregoing deposition transcript was reported stenographically by me, and the foregoing constitutes a true record of the testimony given and the proceedings had; That the said deposition was taken before me at the time and place specified; That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand this day, February 11, 2025.

JO ANN LOSOYA, CSR, RPR, CRR
C.S.R. 84-002437

Page 155

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

February 11, 2025

To: Jason Uris

Case Name: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al

Veritext Reference Number: 7113324

Witness: Chad Coffman    Deposition Date: 1/28/2025

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 156

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7113324
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 1/28/2025
WITNESS' NAME: Chad Coffman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_____    _____
Date                      Chad Coffman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Page 157

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 7113324
CASE NAME: Stadium Capital LLC v. Co-Diagnostics Inc., Et Al
DATE OF DEPOSITION: 1/28/2025
WITNESS' NAME: Chad Coffman

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____    _____
Date                      Chad Coffman

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

40 (Pages 154 - 157)

Page 158

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7113324

PAGE/LINE(S) /      CHANGE      /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____   _____

Date          Chad Coffman

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

41 (Page 158)

**[& - 2.10]**                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&** 2:3,8 5:10,12 | | | |

**&**

**&** 2:3,8 5:10,12

**0**

**0051488** 54:1
**06978** 1:5 4:20
**084-002437**
  1:22

**1**

**1** 3:9 4:13
  10:18,19,21
  16:2 33:15,23
  59:19 67:23
  68:22 69:6
  105:19 106:1,1
  139:1
**1/20/23** 126:6
  127:16
**1/28/2025**
  155:8 156:3
  157:3
**10** 3:9 12:19
  26:13 37:23
  92:17 97:8,20
  105:20,25
  111:7
**100** 80:11
  95:18 96:22
**10022** 2:4
**10111** 2:9
**10:03** 33:14,17
**10:09** 33:19

**10b** 15:11,14
  16:13 17:6,8
  17:11,13 22:16
  22:20,21 26:22
  27:2,9 28:22
  29:12 120:14
  141:25
**11** 22:20 38:6
  71:6 72:21
  73:3 80:18
  82:8,10,20
  85:25 86:14
  102:2 108:21
  109:10 110:13
  111:8 115:16
  115:22 132:1
  154:21 155:4
**1100** 155:1
**11:12** 72:12,15
**11:22** 72:17
**11:53** 91:2,5
**12** 3:11 38:12
  38:13,17,22
  39:4 40:23
  41:23 43:19
  44:6,22 47:24
  49:2 51:14
  52:15 54:3
  63:9 67:19,22
  67:25 68:4
  69:13,20,21
  71:3,5,6 76:12
  104:16 107:15
  109:2,4,7,9

  111:10 112:8
  113:21 115:21
  118:2 125:9
  127:11 128:25
  132:1 133:16
  133:17 136:5
**12:44** 91:7
**12th** 132:2
**13** 38:5 44:13
  45:11 107:17
  135:11 142:23
  142:24
**14** 52:9 137:9
  138:24 139:4
  146:15 147:12
  147:17
**146** 3:15
**15** 80:21
  108:20 126:3,7
  127:10,11,16
  142:22
**16** 80:23 90:12
  145:19 147:11
  147:25 148:4,8
  148:16,23
**1820** 155:2
**19** 41:3 42:6,13
  42:18,19 43:8
  43:11 90:12
  101:15 114:14
  143:2,4,8,20,22
  145:21 146:1
  147:13 148:15

**1995** 13:19
**1998** 26:17
**1:22** 1:5
**1:39** 128:14,17
**1:50** 128:19

**2**

**2** 3:11 12:4,5,8
  16:3 33:20
  34:2 72:13
  106:9 112:4,8
  126:4,4 132:24
  139:2 149:2
**2.06** 106:10
  107:8
**2.06.** 106:20
**2.07** 104:18
  106:10
**2.08** 92:9
  104:14,22
  106:8,18,22,22
  120:1 124:4,8
  125:10,12,18
  126:15,20
  127:2,24 128:5
  128:8 129:6,15
  129:18,21
  130:13,22
**2.08.** 107:4
  110:4 126:9
  128:9 129:19
  131:3,7
**2.10** 106:17
  107:8

**2.18** 108:9
**2.25** 126:8,14
126:22 131:4
**20** 67:10 126:4
135:18 156:16
157:22 158:22
**2008** 13:19
14:5 15:13,22
**2009** 15:13
**2020** 54:20
**2021** 54:25
56:7,16,22
57:2 58:8
**2022** 38:5,6,17
41:22,24 43:18
44:22 52:15,17
52:23 53:8
54:20 60:8
63:9 66:18
67:19,22,25
69:13,20,22
71:1 72:22
76:8 80:18
81:14,20
102:14 108:20
135:15 136:5
136:14 143:7
144:9,20
146:19 147:3
**2023** 15:23
126:4
**2024** 18:13
54:4 122:8
135:18

**2025** 1:13 4:3
12:19 92:17
154:21 155:4
**216-523-1313**
155:3
**2166** 154:23
**22** 4:20
**23** 3:4
**24** 19:10
**28** 1:13 4:2
**2:26** 152:3
**2:27** 152:5
**2:36** 152:7
**2:37** 153:1,3
**2:45** 153:5
**2:46** 153:12,16

**3**

**3** 3:13 54:1,8
72:18 91:3
**301** 6:3
**303** 123:11
**34** 59:20 63:12
66:15 76:1,4
77:11
**36** 100:25
101:1

**4**

**4** 3:14 34:3
89:18,21 91:8
128:15
**44114** 155:2
**45** 2:9

**46** 127:9,12
**48** 127:6,8

**5**

**5** 3:4,15 17:6
17:11,13 22:21
67:10,25 68:23
69:6 80:13
107:23 108:3
108:21 114:2
128:21 146:8
**50** 78:25 79:1,3
**51** 74:5 78:1,6
**52** 75:13
**53** 127:18
**54** 3:13
**5th** 54:4 122:7
123:4

**6**

**6** 36:17
**60614** 6:4

**7**

**7** 114:3
**70** 127:6,8,9,12
**7113324** 155:7
156:2 157:2
158:2
**75** 67:13 84:24

**8**

**8** 114:3 148:25
149:2
**80** 80:4 84:25
95:13,24 96:7

96:14,20 97:15
97:15 100:18
100:24 114:9
119:3
**800** 2:4
**84-002437**
154:24
**89** 3:14

**9**

**9** 37:24 133:3,5
136:11,12
**9/23/13** 90:4
**90** 96:20
**9:21** 1:14 4:2
**9:24** 5:17

**a**

**a.m.** 1:14 4:2
5:17 33:14,17
33:19 72:12,15
91:2,5
**aac** 89:13
**able** 13:14
33:24 48:22
54:22 65:15
80:7 115:11
**above** 102:7
128:5 155:17
**absolute**
106:25 119:17
**absolutely**
88:11,13
120:13

| | | | |
|---|---|---|---|
| accept 123:14 | 37:21 38:4 | 121:25 122:4 | 93:13 124:4 |
| accommodate 8:11 | 154:19 | additionally 136:13 | 138:15 |
| accomplish 65:21 | actionable 26:7 | address 6:2 | ahead 72:1 |
| accordance 156:5 157:5 | active 115:17 | 155:15 | al 155:6 156:3 157:3 |
| account 32:19 125:17 | actively 32:22 | addressable 134:10 | allegation 82:24 110:16 |
| accounting 13:25 | actual 23:20 46:13 70:17 | adjustment 95:3 | allegations 60:2 |
| accuracy 144:5 145:3,16 | 102:1 105:3 107:15 116:18 | administer 4:25 | allege 82:25 |
| accurate 7:17 56:4 144:16 | 124:19 131:1 135:3 | administrative 18:8 | alleged 28:6 29:7 30:2,25 |
| accurately 41:9 143:3 146:22 | actually 7:8 15:8 17:2 | admissions 41:17 | 31:5,7,24 33:1 35:4 38:11 |
| achieved 107:23 | 19:14 31:1 32:17,22 35:13 | admitted 41:12 | 39:3 40:13 41:16 44:2,14 |
| achieving 98:15 | 59:25 62:18 63:17 65:18 | advanced 27:17 | 45:6 52:11,21 53:12 80:17 |
| acknowledge 105:8 156:11 | 72:2 90:23 108:11,24 | adversely 101:17 102:10 | 81:1 83:16 86:19 94:20 |
| 157:16 | 110:2 113:18 118:14 126:22 | 114:15 | 100:17 123:10 138:18 139:3 |
| acknowledge... 83:10 | 127:7 129:20 131:6 151:22 | affect 42:9 84:4 85:8 96:1 | allegedly 34:20 41:14 47:4 |
| acknowledging 85:18 120:12 | addition 130:8 | affected 138:10 | 51:13 |
| acquired 14:4 120:25 | additional 11:22 22:5 | affecting 50:11 107:10 | alleges 41:5 82:19 85:23 |
| act 156:14 157:20 | 37:15 63:16,25 68:19,20,23 | affiliations 5:7 | alleging 45:1 45:13 52:25 |
| action 5:1 14:10 34:7,11 | 77:3 82:7 84:7 84:8,10,13 | affixed 156:15 157:21 | 60:21 63:22 66:21 73:8 |
| | 85:12 94:20 97:8,20 108:5 | agencies 144:8 | 77:19 86:22 110:7 111:16 |
| | 110:10,11 112:7 113:19 | ago 7:7 | 115:24 119:2 |
| | | agree 4:11 24:1 31:25 57:24 | |
| | | 58:7 79:21 | |

allow   7:18 125:4

allowed   101:13 114:11

allowing   107:14 127:1 128:8

alternative   24:23

alumni   27:1

ambiguous   149:17

amended   46:12 85:23 86:13

america   120:22 120:23

american   19:21

amex   19:21

amount   17:7,9 69:19 91:23 96:22 109:2 115:1 124:6

amounts   69:13

analysis   15:20 19:23 26:25 57:20 72:20 88:6 90:9 100:4 122:20 123:14,16 124:2 135:24 140:17

analyst   53:16 74:1 110:20 118:19

analysts   99:21 117:15

analyze   62:3 92:24

analyzed   73:3 87:21

analyzing   20:9

ann   1:21 154:4 154:23

announce   76:11 77:13 108:12,21 113:10

announced   53:6 67:22,24 69:19 71:5 79:16 85:25 101:11 108:19 109:10 113:18

announcement   52:23 53:4,5 68:4 69:15 73:3,16,19 74:3 75:6 78:1 86:9,14 88:17 88:24 90:21 113:2 118:8 120:11

announcements   68:9,11 75:16 75:17 88:16 100:5 138:3

announces   78:7 107:23

announcing   65:19 77:3 79:10 107:21 111:7 115:22

anomalous   57:11 85:3

answer   7:19,22 7:25 8:6 19:11 36:11 45:20 62:5,25 107:9 107:18 110:22 112:25 123:8

answering   7:17 23:22 45:18

anticipate   74:22

anticipated   83:23 101:10 116:9 144:9

antitrust   14:12 14:13

anybody   33:8

anymore   18:16

apologize   39:13

appear   58:12 156:11 157:15

appearance   5:5

appearances   2:1 5:7

appeared   2:6 2:11

appearing   2:1

appears   36:25 57:3 146:14

appended   157:11,18

appendix   11:21 13:7,10,12 22:2 36:18,22 121:22 123:18 125:7,23,24 126:2,5 127:4 127:4,6 131:1 131:9

application   90:16 92:6

applied   89:6 90:18

approach   92:9 95:10 113:13

approached   25:6 123:21

appropriate   32:1 89:4 123:14

approximate   23:10

approximately   9:10 16:12 19:10 22:15,23 24:16

april   55:10 146:19

arbitration   24:9

area   13:24 17:18 42:8

**areas** 13:25 14:9,17 18:23 19:8 99:22,23 100:1
**argued** 25:22
**arguing** 149:20 149:21 150:1 151:7
**articles** 133:13
**articulate** 151:5
**articulating** 151:12
**artificial** 30:3 30:21 38:14 39:2 113:4 123:21 126:7 128:24 129:5
**aside** 6:12 120:17
**asked** 27:23,25 28:9,14 29:14 29:19 34:18,23 34:24 35:2,6 35:12,16 39:1 39:2 40:11 44:11 64:8 70:19 102:12 110:21 122:23 140:7 142:6,18 142:19
**asking** 7:18 8:5 42:20 43:13 61:24 62:3,22

63:15 65:18 69:3 112:23
**aspect** 65:15 85:24 86:14
**aspects** 73:2,15 141:20 152:14
**assertion** 136:20,21
**asserts** 136:13
**assessment** 46:20 65:11
**asset** 79:2
**assets** 121:3
**assignment** 156:2 157:2 158:2
**assistance** 11:9 12:15
**assisted** 11:10 19:7
**associated** 94:1 94:3 104:24 105:6
**assume** 7:25 40:11 47:23 61:25 62:22 63:16 77:22 96:18 101:6 102:12 112:23 135:6
**assumed** 84:3 85:10,16 110:1
**assumes** 91:15 92:9

**assuming** 21:22 39:18 48:12,22 49:1 50:1 56:3 60:23 61:12 62:1 70:1 115:23 117:12 118:6 128:4 130:12
**assumption** 25:1 29:6 39:23 44:10 45:12 48:3,17 49:7 59:4 60:18,20 68:7 92:4 95:23 109:21 110:5 118:25 130:9 130:14
**assumptions** 40:15 91:13 102:21,23,24 131:14 141:2
**attached** 157:7
**attempt** 93:10
**attorney** 5:8 40:20 154:16 154:17
**attributed** 52:17 53:8 81:7
**audio** 4:10
**august** 38:6 52:15 55:10 69:21 71:5,6,6

72:21 73:3 80:18 82:8,10 82:20 85:25 86:14 102:2 107:17 108:21 109:4,9,10 110:13 111:8 115:16,22 118:2 125:9 128:25 132:1,1
**author** 90:7
**authorize** 157:11
**authorized** 4:25
**availability** 35:12
**available** 37:1 37:5 44:8 63:22 71:18 103:5 104:1,23 116:12 118:3 138:17
**ave** 155:1
**avenue** 2:4
**avoid** 54:6
**aware** 11:25 41:1,13 47:3 60:4,7,16 61:4 70:25 76:7 77:14,19 92:19 102:14 123:3 125:7 135:6 136:18,24

**awareness** 61:13

**b**

**b** 13:12 22:2
**bachelor's** 9:25
**back** 14:24
  27:20 33:18,22
  48:9 59:18
  66:15 72:16
  76:1 80:13
  91:6 92:11
  100:22,23
  114:9 119:17
  123:8 128:18
  132:23 136:11
  151:24 152:6
  153:4 155:15
**backed** 74:1
**background** 43:3
**backup** 8:22
**bad** 149:5
**baker** 2:8 5:10
**bakerlaw.com** 2:10
**bank** 120:22,23
  121:1
**bankruptcy** 25:2,4
**bar** 55:15,17
**barring** 91:20
**bars** 55:2

**base** 118:12
**based** 21:15
  25:1 38:18
  39:3 52:11
  60:1,20 66:8
  83:7 95:23
  105:22 106:13
  107:12 109:10
  113:17,19
  116:25 120:4
  123:16 141:16
  142:8 147:16
**basically** 25:4
  29:15 63:3
  84:23
**basis** 32:5
  38:20 43:20
  70:24 87:25
  101:22 102:19
  109:6 121:2,5
  140:10
**bates** 54:1
**bathroom** 33:8
**bearing** 78:17
**beginning** 5:8
  18:16 25:3
  33:20 38:4
  46:24 49:10
  72:17 91:8
  93:17 95:8
  101:8 111:22
  112:11 128:20
**behalf** 1:3 2:6
  2:11 4:16

16:23 17:6,14
  23:12
**behaviors** 145:6,9
**belief** 29:15
  84:15
**beliefs** 124:12
  138:10
**believe** 14:5
  22:3,9,11
  23:13 28:5
  29:13,17 30:19
  35:11 37:19
  38:16 40:2
  55:19 68:2
  77:5 94:7
  99:18 102:25
  104:12 119:23
  122:13,23
  123:25 132:23
  142:5 149:14
**believed** 96:19
**believes** 95:12
**believing** 151:15
**bell** 106:21
  120:3
**bench** 23:18,24
  24:6
**best** 92:11
  107:12 118:2
  120:6
**betraying** 27:14

**better** 18:21
  42:16 43:4
  62:24 63:18
  106:9 139:15
**beyond** 39:25
  84:11 85:5
  122:1 150:21
**big** 105:21
**bigger** 108:6,17
  129:21 130:2
**bit** 116:3,4
**black** 127:22
**boeing** 22:8
**boil** 98:19
**booted** 100:21
**borne** 53:15
**bottom** 13:17
  127:9,13 139:4
**break** 8:10 33:6
  33:8,11,16
  72:10,14 91:4
  128:11,16,23
  152:4,19 153:2
**breaks** 8:9,12
**brian** 1:7 4:18
  54:4
**briefly** 36:22
  91:13
**bring** 143:10
  147:6
**broad** 58:22
  92:9
**broader** 49:3
  50:15 78:18

**[broader - certified]** Page 7

134:19 149:20
**broadly** 51:11
**brown** 1:7 4:18
54:4 55:15,25
**built** 110:12
114:6
**bullet** 19:17
**bunch** 20:17
**business** 18:18
78:24 98:16
134:2
**businesses**
17:19,19 79:6

**c**

**c.s.r.** 154:24
**ca** 155:25
**calculated** 16:8
16:10,15 19:14
128:6
**calculating**
35:14 131:2
**calculation**
97:10 98:23
103:20 114:7
116:21
**calculations**
35:7 125:15
128:24 131:6
**call** 9:4,8,9 21:5
21:6 82:20
92:3 101:25
124:7 125:8
129:1 130:20

**called** 5:20 25:3
54:19
**calls** 9:8
**camera** 4:6
**cancelling**
46:12
**capital** 1:3 4:16
78:11 155:6
156:3 157:3
**care** 64:25
65:13 97:6
**career** 17:4,8
27:9,19
**careful** 40:18
**cares** 79:12
98:10
**carried** 92:11
**case** 4:20 11:13
11:17 12:22
13:1 15:11
22:9,9 25:9,20
26:2,4,5 27:12
28:23 29:12,23
29:25 30:18
32:21,25 35:15
36:2,16 42:21
42:24 43:15
53:22 57:3
59:17 67:12
69:4 72:21
87:7,10,13,16
89:4,16,18
92:5 100:17
112:2 115:12

118:13,16
120:22 121:6
121:15 122:18
122:22,24,25
123:6,12 124:1
139:8 141:25
155:6 156:3
157:3
**cases** 14:13,13
16:13,24 17:12
21:25 22:14,16
22:19,20 23:21
24:15 28:3,4,8
29:5 30:8,18
31:4,18 43:11
87:17 89:3,6,9
92:3 120:14,20
121:9,15,19
125:11 144:10
**cash** 65:14
74:22 79:4
96:15 98:11,13
**causal** 53:11
105:14
**causation**
24:23 39:7
52:14
**cause** 30:3
107:7
**caused** 30:20
32:16 35:3
82:14 95:17
98:20,25 99:9
100:14 101:8

106:6 109:8
114:4
**causes** 58:3
**causing** 41:4
99:10 132:9
**ceasing** 149:3
**certain** 9:19
25:15 26:5,6
28:1 30:10
92:2 123:9
125:8,11
**certainly** 11:7,8
16:15 17:5,7
20:17 23:2,3,8
28:3 30:8,17
31:3 32:13
34:18 43:9
44:24 45:5
46:14 56:18
57:25 72:23
76:14 82:2
83:20 87:23
89:13 93:1,3,7
96:2 99:20
100:1,15 109:5
118:10 134:12
134:15 135:3
138:2 141:20
**certificate**
154:2 157:11
**certification**
156:1 157:1
**certified** 154:4

certify 154:6
cetera 134:25
cfa 10:12
chad 1:12 3:3,9
  3:11 4:14 5:19
  6:3 153:13
  155:8 156:4,9
  157:4,13
  158:20
challenged
  31:1 34:16
  35:23,25 36:7
  39:19 52:24
  86:1
challenging
  119:19
chance 105:22
  106:2
change 21:3
  71:13 75:21,24
  76:11 78:9,19
  80:12 86:12
  91:24 94:2,4,9
  97:14,19 98:8
  98:9,24 102:6
  112:22 114:5,8
  114:14,24
  115:1 117:18
  124:13 125:3,5
  126:11,18
  127:23 129:7
  129:18,23,24
  131:14,25
  132:15,15,20

152:15 155:13
155:14 157:8
158:3
changed 12:25
  80:3 86:20
  116:24 121:18
  128:8 129:17
  131:12
changes 21:17
  58:19 75:16,18
  120:17 124:12
  124:14,25
  126:12 127:10
  131:10 143:22
  155:12 156:7
  157:7,9
changing
  101:15 113:4
characterizati...
  51:10
characterize
  51:18 86:7,13
characterized
  51:24 86:5,23
chart 54:25
  57:21
charter 10:12
  10:15
checked 133:18
chicago 6:4
  10:4 13:18,21
  14:2,7,20,23,25
  15:4,19

circumstance
  36:16 92:1
circumstances
  27:14 31:17
  45:7 80:2
cite 75:13
  143:12,25
  146:2 148:22
  149:7
cited 133:22
cites 133:14
citing 41:9
civil 156:5
  157:5
claim 25:24
  32:15 47:17
  49:9 51:9,21
  52:2,3,5 61:2
  115:22 117:22
  118:14 120:23
  145:23
claims 26:22
  38:19 111:24
  123:3,10,25
  144:8
clarification
  152:10
class 5:13 14:9
  35:13 38:3,3,7
  38:21,24,25,25
  39:11 41:1
  46:24 49:10
  71:14,17 91:17
  91:24 92:8,11

92:14,21,25
93:3,6,8,12,14
93:17,18,21
94:9,14,17
95:8 97:24
100:12 101:3,8
101:20 102:7,8
102:13 112:15
112:15 113:3
113:10 118:13
120:16 121:8
121:17 124:6
125:16 127:1
127:22 128:5
130:11 131:3
clear 21:14
  32:24 53:10
  57:14 61:17
  78:5 82:3
  107:2 121:25
  134:18 147:8
  151:11
clearly 31:21
  67:14 68:14
  73:10 79:4
  83:2 85:3
cleveland 155:2
client 28:16,16
  40:20
cliff 117:19
close 97:5
  103:17 140:23
closed 38:12

**[closely - conclusion]**                                                      Page 9

| | | | |
|---|---|---|---|
| **closely** 119:1 | **coming** 49:20 | **company's** | **comports** 34:22 |
| **closer** 64:1 | 85:7 131:12 | 30:4 41:5,10 | **computer** 6:12 |
| 107:7 | **commencem...** | 44:16 48:16 | **conceal** 29:8 |
| **codx** 54:1 | 154:7 | 53:20 66:17 | 45:19 |
| **coefficient** 88:6 | **commentary** | 71:16 81:8 | **concealed** |
| 88:9,22 | 53:16 | 83:5 99:2 | 34:20,25 44:16 |
| **coffman** 1:12 | **commission** | 102:9 103:9 | 47:4 48:16 |
| 3:3,10,12,14 | 156:19 157:25 | 118:20 134:15 | 51:13 53:12 |
| 4:14 5:19,24 | 158:25 | 135:16 138:10 | 60:21 70:19 |
| 6:3 33:22 | **common** 18:1 | 146:1 148:15 | 71:13 86:22 |
| 72:20 91:10 | 124:5 130:3,14 | **comparable** | 102:5,8 113:20 |
| 153:8,13 155:8 | **communicate** | 115:16 | **conceivable** |
| 156:4,9 157:4 | 6:17 | **compared** | 62:15 63:2 |
| 157:13 158:20 | **communicati...** | 41:13 136:16 | 86:22 |
| **coherent** 30:20 | 46:10 | **comparing** | **concept** 21:22 |
| **collect** 127:2 | **companies** | 116:17 | 34:22 75:14 |
| 128:9 | 79:10 | **complaint** | 120:10 121:10 |
| **college** 9:21,24 | **company** 13:23 | 39:25 41:5 | **concepts** 61:9 |
| 10:1 | 17:17 25:2 | 46:22 47:3,11 | 124:22 |
| **column** 55:12 | 45:25 46:3 | 61:11 85:23 | **concerning** |
| 127:17 | 49:19 51:19 | 86:7,13 111:1 | 154:9 |
| **combination** | 53:6 60:7 | **completed** | **conclude** 32:7 |
| 65:3 | 61:16 67:7 | 155:15 | 52:22 |
| **combine** 119:9 | 70:25 73:7,22 | **completely** | **concluded** 30:2 |
| **come** 20:21,23 | 76:7 77:8,14 | 85:2 | 30:25 |
| 24:19 32:13 | 78:7,22 79:19 | **complicated** | **concludes** |
| 55:20 85:7 | 84:22 85:7 | 96:16 | 153:12 |
| 96:10 121:19 | 99:25 100:2 | **complicating** | **concluding** |
| 151:24 | 107:22 109:16 | 144:22 | 102:24 106:5 |
| **comes** 62:11 | 132:19 137:14 | **component** | **conclusion** |
| 84:22 87:8,9 | 137:16,19,20 | 22:20,22 42:2 | 44:12 48:21 |
| 87:12 89:13 | 137:22,22,24 | 46:21 51:12 | 57:17 71:21 |
| 121:15 140:23 | 149:22 151:10 | 82:9 88:24 | 72:24 74:4 |
| | | 89:3 131:11 | 95:9 102:19 |

104:22 105:24 141:10

**conclusions** 30:11 42:3 49:16 57:6 112:9

**concord** 6:4

**condition** 78:4

**conditions** 115:2

**conducted** 4:5

**confidence** 27:15 80:11 99:24 106:4

**confident** 105:13

**confidentiality** 20:8

**confirmatory** 85:16

**confirmed** 122:21

**confounding** 31:25 32:2,14 32:20 33:2,3 72:21,24,25 73:4,11,17 82:11 83:12,16 87:6,15 88:20 88:25

**confused** 55:14 77:10 90:3

**confusing** 55:18 90:4

**confusion** 54:6

**connection** 4:7 105:14 146:12

**consequence** 53:2

**conservative** 32:18,21,22

**consider** 11:18 13:6 19:3 51:17 54:13 67:17 122:22 122:23

**considered** 11:23 13:9 34:20,25 36:18 40:20 72:23 73:16 85:21 103:1 121:24 123:19 135:22 136:3

**considering** 66:23 124:3

**consistent** 83:21 118:18 122:24 123:22 130:13 150:3 150:24

**constant** 21:8 21:12,19,23 75:22 91:10,14 92:2,3,8 93:20 94:6 95:9 114:8 120:15 125:1 126:21

130:8,14

**constitutes** 154:12

**constrain** 130:17

**construct** 124:18 127:25 128:7 130:22

**construction** 26:18

**consultant** 19:20

**consulted** 19:7

**consulting** 13:24 14:1,16 16:3 17:7,18 17:20 18:9 20:3,5

**contains** 11:16

**contemplating** 115:15

**contemporan...** 31:19 32:3

**context** 148:7

**continue** 4:11 28:19 65:8 75:2 81:11,22 82:7,21 85:8 151:1

**continuing** 96:17 128:3

**contradict** 59:3

**contribute** 45:7

**contributed** 31:23 73:25

**convey** 114:23 120:10

**conveyed** 115:8

**conveying** 120:13

**conveys** 139:15

**correct** 15:24 18:14 31:1 37:22 38:19 39:21 48:13 54:15 63:4 76:12 91:12 92:1 93:24,25 109:4 139:10 139:24 147:10

**corrected** 30:13 52:23 85:25 152:12

**correction** 104:15 107:15

**corrections** 155:12 157:17

**corrective** 24:25 25:12,15 26:6 30:13,25 31:5,7,8,12,20 31:22 32:11,13 32:15,25 33:1 52:14 60:3 61:19 66:16,21 70:7,9 73:11 76:6 77:13

80:18 81:1 82:22 83:1,3 83:17 84:18 85:21 86:14,24 86:25 87:15,21 87:23 88:19 89:1 91:19 92:7,10,13 95:7 99:21 101:7,11,12 103:11,13 107:22 112:13 114:5,11 116:6 116:14 117:13 120:18 124:11 129:11 131:18 132:7,12,19 138:5

**correlated** 134:9

**cost** 20:12

**costs** 20:9 98:16

**counsel** 4:15 5:6,16 7:2 8:3 8:4,21 9:3,17 154:16,17

**countries** 144:21

**county** 156:10 157:15

**couple** 14:24 19:17 20:22 58:9,9,11

89:11,14 93:4 113:24 118:1 128:3 151:25 152:10

**course** 65:13 75:1 91:24 92:21 106:11 106:24 108:4 110:15 115:20 119:21 120:16

**court** 1:1 4:19 4:23 5:15 23:21 25:8,17 25:25 87:5,13 87:18 150:2,7 151:6 156:7

**courts** 87:23

**covers** 35:21

**covid** 41:3 42:6 42:13,18,19,22 43:8,11 99:14 101:15 114:14 134:1 135:7,16 138:11 143:2,4 143:8,20,22 144:10 145:21 146:1,18,20,22 147:4,13 148:15 150:24

**create** 68:12

**critical** 68:14

**crr** 1:21 154:23

**cry** 97:11

**csr** 1:21 154:23

**current** 6:2 49:24 50:8 65:4,10,14 75:8 78:3,4,20 79:12,13,13 81:19 82:15 83:8,25 84:5 85:6 86:10 150:21

**currently** 66:13 77:16,20

**curve** 106:21 120:3

**customers** 46:11

**cut** 55:3

**cv** 1:5 4:20 13:13 26:12,13

**d**

**d** 55:16 125:7 125:23 126:2,5 131:9

**d&o** 14:11 17:9

**daily** 41:12 121:2,5

**damages** 18:24 35:7,13,14 39:7 91:11 103:20 121:11 122:20 123:14 123:16 124:2 130:7

**dampened** 149:22

**dangers** 145:7

**dashboard** 3:13 54:18

**data** 11:18 13:5 13:8 18:24 46:14,15 53:21 56:14 57:5 116:5,11 126:6 127:11 128:2 133:25 134:8 134:25,25 136:4 137:8 140:15,17

**date** 44:22 46:22 47:8,18 47:24 48:4,18 51:14 60:8 61:5 66:17 67:20,23,25 68:22 69:13,19 70:14,17 71:1 76:8 99:21 106:5 116:7,14 131:2 155:8 156:3,9,19 157:3,13,25 158:20,25

**dated** 12:19 92:16 135:18

**day** 8:3 16:4,4 16:4,4 38:5,6 38:17,21 74:1

92:14 126:8 130:11 131:21 132:9 154:21 156:16 157:22 158:22

**days** 95:1 155:18

**dealing** 121:1

**dear** 155:10

**december** 55:11,11,16,23 56:16

**decide** 18:17

**decision** 18:19 28:19

**declaration** 14:21

**decline** 31:12 51:25 52:8 53:1 71:19 73:25 81:8 92:10 101:19 102:1 103:2,6 103:10,17 105:11 106:5 108:7 109:1 111:4 119:5 126:20 146:1 148:14

**declined** 41:4 41:13 48:14 117:25 118:24

**declining** 39:11 44:15 60:5,16

105:15

**decrease** 63:10 64:10 65:20 108:24 111:21 112:10 113:11 149:6

**decreased** 64:12 101:14 102:9

**decreasing** 114:13

**deed** 156:14 157:20

**deemed** 155:19

**deep** 20:7

**defendant** 4:15 30:3

**defendant's** 139:7

**defendants** 1:8 2:11 5:10 14:10 16:24,25 17:6,8,14 23:12 39:8 41:1,6,11 45:15 52:15 81:5,7 102:14 110:6,7 122:16 135:14 139:1 139:20 140:18 140:20 141:6 141:12,14

**defense** 17:10 25:18

**defined** 42:16 122:25

**definitely** 22:18 90:19

**definition** 83:15

**deflation** 126:8 127:17 128:25 129:5 131:9

**defrauding** 28:6

**degree** 10:5 106:3

**degrees** 10:7

**delivering** 150:7

**delta** 20:18,25 21:6,10,14,15 21:18,20,21 124:20,22 130:18

**deltas** 126:16

**demand** 39:11 41:7,10,12,16 42:6,8,9,11,18 42:22 43:12 44:15 45:15 46:1,4,20 47:7 47:8,25 48:13 48:23 49:3,11 49:14,15,21,25 50:2,7,8,9,11 50:15 51:4,11 51:18,24,25

52:7,18 53:1,5 53:9,14,18 56:15 58:19 59:6,11,14 60:5,7,16 61:5 61:14,18,20 62:17 63:5,11 63:18,19,23 64:2,11,12,18 64:20 65:1,10 65:14,22 66:7 66:13 68:15,19 68:24 70:3,21 71:1,10,15 73:7,9 75:16 75:18 76:7,12 76:15,18 77:3 77:14,15,16,17 77:19 78:19 79:13,17,23 80:2,4 81:8,10 81:14,15 82:6 82:14,21 83:5 83:14,24 84:3 84:9,16,23 85:5,11 86:9 101:14 102:9 103:8 105:1 107:20,25 108:12,24 109:15,17,24 110:9,20,21,24 111:5,14,16,18 111:22 112:10

113:11 114:13 114:25 115:2 117:2,9,19,24 118:15,19,20 118:21 132:1 132:15,16,20 134:14 135:7 135:16 136:18 137:3,6,15,20 137:25 138:4,6 138:11 140:21 141:15 143:3,8 143:10,20 144:23 145:11 145:21 146:1 146:20,22 147:4,6,13,15 147:16,21,23 148:6,10,11,14 148:17,17 149:13,15,25 150:4,8,10 151:2,8,11,12 151:15,19

**demands** 136:24

**department** 155:22

**depend** 59:10 134:21,22

**dependent** 143:21

**depending** 89:1

**depends** 4:6 50:6 80:1

**deposed** 7:10 7:13 15:6

**deposition** 1:10 4:4,14 7:15,23 8:18 9:14,16 10:21 12:5 15:3 22:8,11 29:14 37:20 54:4,8 89:21 146:8 154:10 154:14 155:8 155:11 156:1,3 157:1,3

**derived** 83:13

**describe** 24:21 46:7 81:18 119:4 129:9

**described** 28:16 36:18 40:7 45:21 102:7 120:3 123:22 143:15 145:2,15

**describes** 93:15 132:20

**describing** 20:6 52:7 70:7 81:18 144:3

**description** 3:8

**designation** 10:13

**despite** 144:7 145:22

**detail** 117:11

**detailed** 57:20

**details** 73:21 137:14,16,17 137:25 143:20

**determine** 73:4 100:4 105:12

**determined** 18:21 28:11 73:17

**development** 94:15 99:18

**deviate** 58:1

**deviation** 107:8 120:8

**devices** 6:13

**diagnostics** 1:7 4:17 34:8,12 41:15,23 47:23 54:17,19 60:4 60:16 63:8 67:18,22,24 68:3 76:11 81:9,13 92:20 92:25 93:13 94:2,9 95:12 95:18 96:19,25 98:1 101:9,14 101:17,23 102:10 108:19 111:7 114:12 114:16 115:20

124:5,7 134:2 134:20,23 136:4 137:4 155:6 156:3 157:3

**difference** 20:12

**differences** 118:10

**different** 14:17 24:3 28:10 57:23 64:11,15 64:19,22,24 66:7,11 68:17 69:1,2,5,12,14 81:24,25 82:1 85:10 86:21 87:14 97:16 103:25 104:13 104:21 108:22 109:9 111:13 112:2,21 118:7 118:9 119:6,18 119:19 121:7 121:12,13,15 127:25 129:10 134:23,24 139:14 141:5 150:11 151:6

**differently** 68:8 68:11 69:9,18 78:18 86:15

**difficult** 143:3 146:21

**direct** 17:24
**direction** 11:10
18:19 32:10
33:4 151:8
**directly** 52:17
52:25 53:8
81:7 154:18
**disaggregate**
31:17 33:5
72:21 73:1
87:6,25 88:15
90:21
**disaggregated**
31:11
**disaggregating**
32:17,22 87:18
88:9
**disaggregation**
32:1
**disagree**
133:13 136:20
136:21,23
137:5,7 143:13
144:1,13 145:1
145:14
**disagreeing**
133:21
**disclose** 40:19
41:2 50:16
51:22,25 53:3
60:3 66:17
67:1 70:1,6,11
84:10,13 110:7
110:19 117:23

**disclosed** 31:20
52:4 61:4
63:11 64:4
68:21 69:7
70:15,20 73:9
74:2 81:9,13
81:15 82:8,10
83:22 91:16
101:20 104:6
110:14 112:11
117:10 118:17
121:5
**disclosing**
64:10,12 65:20
65:22 120:24
**disclosure**
25:12 31:1,12
33:1,1 52:15
53:17 60:3,6
60:15,24 61:19
61:24 63:17
64:6 66:16,21
66:23 70:9
76:5,6 77:12
77:13 80:18
81:1 82:13,20
83:5,14,24
84:6,19 91:19
92:7,10 99:22
101:7,12,12,23
102:25 103:11
103:13 104:4
105:1,2 107:22
108:7,15,16

109:7 111:1
114:6,11
115:15 116:7
116:14 117:13
124:11 129:11
132:7,14 138:5
149:5
**disclosures**
24:25 25:7,15
25:17 26:6
31:5 32:14
62:23 63:7
73:22 87:21,24
118:25 120:18
**discounting**
135:1
**discourse**
137:14 138:10
138:16
**discrimination**
14:15
**discuss** 9:16
136:8
**discussed** 77:25
96:6 124:21
146:21,24
**discusses**
135:14 144:18
**discussing**
63:12 81:1
**discussion** 80:8
80:11
**disease** 143:23
145:10 150:25

**dismiss** 122:17
122:17 123:12
**disposing** 70:25
**dispute** 56:12
**disputing** 57:13
58:24
**disregarded**
41:2
**dissect** 100:14
**disseminated**
133:20 135:8
138:20
**dissipated**
125:9 126:8
128:25 131:9
**dissolved** 17:21
**distinct** 83:12
85:19 132:18
**distinction**
78:21
**distinguish**
81:13
**distribution**
106:24
**district** 1:1,1
4:19,19 89:20
**divorce** 7:7
**document**
10:19 11:2,3
12:11 13:13,14
47:13 54:1,2
54:11 89:24
90:3 122:11,12
122:19,25

123:2 136:1
**documents**
6:23 9:12,14
13:7 37:1,13
37:17 121:23
122:1,4 136:5
138:7
**doing**  8:23
18:10,10 114:7
**dollar**  91:10,14
92:3,8 93:20
94:6 95:10
114:8 120:16
121:11,13
127:18 130:8
130:14
**downturn**
151:19
**dr**  3:15 5:11
35:18 89:11
92:16,20 93:15
129:13 133:10
133:14 135:17
136:12 138:25
139:11 140:11
143:1,14,20,25
144:2,8,14
145:1,5,15,20
145:23 146:2,6
147:9,13
148:13 149:3
149:12,13,14
149:21 150:1
150:14 151:12

**draft**  11:6
12:14
**drafted**  11:8
**drafting**  11:19
13:6
**dramatically**
41:4
**drastic**  115:1
**draw**  42:4
49:16 57:6,17
**drawing**  50:7
102:19 105:24
**drawn**  71:21
**drive**  42:11
151:2
**drop**  71:6
107:16 109:8
118:2,6
**dropped**
123:11
**due**  101:15
105:23 114:13
120:17 131:10
**duly**  5:20 154:9
**dvi**  3:14 24:22
89:19 90:6
**dwight**  1:7 4:18
**dynamics**
17:16 18:5,8

**e**

**e**  5:22 125:24
127:4,4,6
131:1

**earlier**  18:15
70:9 73:10
82:13 83:22
84:18 91:16
92:15 103:3
104:6 108:7,15
108:16 110:8
110:14 118:8
124:21 130:18
132:7,24
136:25 139:6
139:25
**early**  118:7
**earn**  10:15
95:13
**earning**  88:10
**earnings**  52:23
53:4,4 63:10
64:11,17 65:2
65:21 66:5,9
66:10 73:3,5
74:3,14,24
75:2,4,5,9
78:11,17 79:5
79:11,12,14
81:19,20 82:20
88:5,8,16,17,20
88:21,23,24
89:2 90:21
110:12 115:10
118:18,22,23
138:3 149:6,10
149:16,22

**eastern**  89:19
**easy**  107:18
**eat**  72:8
**echoed**  118:19
**econometric**
19:23
**economic**  15:20
25:7 27:16
38:15 42:7
52:13 60:18
61:8 62:7
71:18,21 75:14
82:3 83:4,12
86:6 87:2
90:20 95:6
101:5 103:4,14
104:1 108:15
110:4 116:12
118:3 119:1
120:2,10 139:2
140:24 141:9
141:19,20
142:13
**economically**
30:20 32:5
62:3 71:7
84:17 104:13
104:20
**economics**  9:25
13:25 14:4
15:17 16:1,11
16:23 17:23
18:5,13,20,25
36:13 43:3

74:13 83:24 86:8

**economist** 34:24 140:14 140:16,18

**economists** 142:18

**effect** 75:10,23 104:25 113:20

**effectively** 17:10 25:1

**effects** 75:15 98:14

**efficiency** 28:10 34:7,12 37:12 93:2 122:2,3

**efficient** 28:13 135:5

**egan** 1:7 4:18

**either** 12:24 37:21 68:22 120:16 139:13 152:12

**element** 81:18 132:17

**elements** 73:10

**email** 155:17

**emerge** 143:9 147:6

**emerging** 143:22

**emphasize** 97:17

**empirical** 26:25 126:23 129:12

**empirically** 21:18,19 108:11

**employ** 91:10

**employee** 154:16,17

**employment** 13:17

**enclosed** 155:11

**encompass** 50:12

**encompasses** 50:8

**ended** 25:25

**engage** 28:19

**engaged** 16:25 36:5 59:16 142:1

**engagement** 20:3 28:20 30:1

**engagements** 16:13 17:2 19:10,13 22:24 23:12 30:24 31:10

**engaging** 143:24

**entail** 47:10

**entered** 38:10 157:9

**entering** 130:21

**entire** 28:4 58:12 96:20 119:2 156:5 157:5

**entirety** 93:11

**entitled** 26:18 54:25

**environment** 101:16 114:14 145:22

**equal** 69:16 97:14 106:19

**equality** 50:6

**equals** 50:2

**erc** 88:8 89:10 89:12 90:9,16 90:18,19

**errata** 155:13 155:18 157:7 157:10,18 158:1

**error** 104:24 105:6,9,23 106:4,8

**errors** 152:11

**erwin** 2:8 3:4 5:9,9,23 10:23 12:7 33:6,12 33:21 49:5 54:10 72:9,19 89:23 90:23 91:9 128:10,22

140:5 146:10 151:21 152:8 152:17,24 153:7

**especially** 94:14

**essence** 71:13 104:3 111:1 117:21

**essentially** 12:24 20:8 50:25 51:1 52:6 75:7 91:15 105:21 112:14

**estate** 26:19

**estimate** 8:25 92:12 97:15 107:13 108:10 108:15 111:8 112:6 113:8 120:5,6,6,8 121:4

**estimated** 93:22

**estimates** 96:3 106:12

**et** 134:25 155:6 156:3 157:3

**evaluate** 45:3 58:4 59:16 64:7,8 70:19 76:15 79:15 82:17 105:10

140:9 142:2 144:15

**evaluated** 19:22 144:4 145:3,16

**evaluating** 66:24 136:2

**evaluation** 59:10 87:3

**event** 52:15 76:16 78:6,16 78:23 79:4,9 79:19,20 81:1 91:20 93:2 101:12 103:11 118:25

**events** 93:4

**everybody** 128:12

**evidence** 28:11 29:17 32:8 40:5,9 46:22 46:25 47:2,22 62:15 73:18 94:11 95:6 99:15 103:14 104:1 116:12 120:2 140:24

**exacerbated** 146:20

**exact** 22:17 26:6 61:7 62:2 68:12 103:22 118:11

**exactly** 61:7 62:24 66:1 67:4 68:16 86:5,19 100:14 107:20 111:9 112:6 113:20 115:17,21 116:9,10 117:10 119:15

**examination** 3:1 154:8

**examined** 5:21

**example** 28:9 32:13 37:10 57:25 58:8 74:20 75:12 78:8,8,23 95:16 98:14,25 99:8 125:19 126:1

**examples** 29:2 99:20

**exams** 10:14

**except** 67:19

**exception** 37:5

**exchange** 19:21 20:11

**exchanges** 20:10

**exclude** 131:19

**excluded** 24:11 24:17 25:10,16 26:8

**excluding** 76:14 87:23

**exclusively** 16:15

**executed** 157:10

**execution** 156:14 157:19

**exhibit** 3:8,9,11 3:13,14,15 10:18,19,20,21 12:4,5,8,9 33:23 53:25 54:1,3,5,8 59:19 89:17,18 89:21 105:19 132:24 146:6,8 149:2

**exhibits** 3:7 135:25

**exist** 87:20,20 88:4

**existed** 109:17

**existence** 14:3

**expect** 42:3,4 66:8 68:12,25 69:10,14 75:23 76:25 112:17 125:1,2,13 126:19 129:15 129:18

**expectation** 67:7 78:2 79:22,23 82:6

97:23 98:1

**expectations** 46:23 47:20 48:15 49:13 51:2 62:16 64:22 66:6,10 67:8,13 74:15 76:21 77:7,24 82:15 83:7 85:5 102:17 111:20 115:6 116:2 117:5 118:15,23 149:23

**expected** 47:9 52:16 53:7,9 58:17 63:18 65:1,20 68:10 76:19 78:3,25 79:3 81:10,22 82:21 84:9 98:24 101:24 102:11 103:8 105:2 106:23 107:11 118:22 124:15 129:24 131:16 132:12 132:22 143:7 145:21 147:3 147:14 151:13

**expecting** 150:3

**expects** 40:25 41:21

**experience**
10:14 19:16
20:6
**experienced**
47:19 111:4
**expert**  5:11
8:20 13:23
14:24 15:2
16:7,22 17:12
19:4,20 25:18
27:11 37:5
42:10,13,15,24
140:10 142:14
**expertise**  36:6
36:12 42:5,7
**experts**  14:13
144:9 146:25
**expiration**
126:6 127:16
156:19 157:25
158:25
**expired**  44:2
**expires**  126:4
**explain**  74:18
91:13 93:11
94:7 100:11
102:3 129:8
130:1 131:21
131:22 150:11
**explained**  93:4
94:13
**explains**  93:9
**explanation**
60:11 66:4

129:4
**explicit**  60:15
60:24 61:16
62:11,19 78:15
80:8,11
**explicitly**  60:6
61:15 62:9
64:2 66:16
68:24 76:6,13
76:22,24 77:9
78:22 79:8,19
79:21 88:3
110:21
**expressed**
21:21 144:14
**expresses**  11:15
**expressing**
46:17 60:14
143:16 147:15
**extent**  32:9
36:11,12 40:6
42:15 49:16
65:1 82:24
99:23 101:16
114:15,20
133:15,16
**external**  137:22
**extra**  111:7
112:4
**extraordinarily**
106:4

**f**

**f**  55:5
**faced**  118:14
**facing**  45:25
53:6 73:8
101:14 114:12
115:2 117:20
117:25 137:4,7
140:22 141:16
**fact**  24:2 44:21
50:15 70:15
84:11 126:23
**factor**  56:16
107:6,7
**factors**  42:11
42:21 50:11
59:10 66:9
90:22 146:20
**facts**  41:14
45:6 80:1
112:1,23
**failed**  41:2
51:25
**failing**  87:6,25
**failure**  50:16
**fair**  8:1 28:20
49:8
**fairly**  47:13
92:7
**fall**  64:17,18
110:20,24
**fallen**  48:23
111:16 136:15

136:22
**falling**  117:19
**falls**  31:21
85:19,20
**false**  28:23 29:4
29:7,10,15,20
30:10 35:23
36:8 39:9,24
40:12,12 43:21
44:2 45:3,8,17
136:17 139:2,8
139:23 141:3
141:18,24
142:3,7,11
**falsity**  29:2
39:19 40:5
141:24
**familiar**  11:3
12:11 20:14
**far**  45:25 46:23
52:16 53:7
55:12 60:8
61:5 66:18
67:2,5,14,15
70:3,22 71:2
71:14 76:8
97:11 103:8
118:15 136:19
**farthest**  55:4
**fast**  90:13
**fatigue**  145:6
**faulted**  87:5,18
**february**  55:9
122:7 123:4

136:14 154:21 155:4

**feel** 112:1 118:1 118:4

**felt** 89:4

**fewer** 136:19 136:25 145:8

**figure** 70:1 105:3

**figures** 70:12 109:10

**filed** 4:18 14:21 14:25 15:2 22:5,9,12 25:21 90:3,6 122:7

**filings** 37:10,11

**final** 81:12

**finance** 13:25 26:19 36:13

**financial** 65:11 74:13 150:16

**financially** 5:2

**find** 73:23 95:3 95:5 127:4 155:11

**finder** 24:2

**fine** 12:3 13:4 23:10 48:11 72:6,7

**firm** 4:23 14:1 15:18 16:5 17:21 18:14,22 98:20 99:23

**first** 3:9 5:20 7:15 12:2 15:10 26:17 33:23 38:11 39:15,16 40:24 41:22 43:17 45:11 49:1 55:4 56:6,13 56:20,25 57:7 57:8,15,17,18 58:9,9,10,10,23 59:1,4,18 67:21 74:8,10 80:14 90:4 100:18 101:2 125:8 127:11 142:23,25 145:18 148:4

**fit** 24:14 25:9

**five** 33:12 113:17 153:15

**flagship** 49:11 49:22 53:19 79:17 83:5 102:9 103:9

**flows** 65:14 74:23 96:15 98:11,13

**fluctuates** 93:16

**focus** 14:6 19:3 43:14 97:18 98:5,7 137:21

**focused** 15:19 135:23,24 147:22

**focuses** 137:12

**focusing** 99:25

**folder** 10:20

**following** 29:16 31:12 53:16 68:3 69:1,15 122:16 123:12

**follows** 5:21

**footnote** 37:23 38:2 60:10,12 142:23,24

**forecast** 41:9 134:14

**foregoing** 154:10,12 156:13 157:18

**foreign** 134:25

**foreseeable** 53:2 81:11,15 82:7,22 84:9 85:9

**forget** 26:5

**form** 29:19 44:11 138:17

**formal** 29:18 29:20 100:13 142:2

**formed** 44:7 136:5

**forming** 11:23 13:9 54:13

137:25

**formula** 21:16 125:17 127:22 130:12,17,24

**forth** 24:22

**forward** 25:13 26:8 47:9 59:14 85:24 98:17 116:25 129:25 131:15 150:4 155:15

**found** 18:17 39:8

**founded** 15:18 18:14

**four** 21:25 22:1 22:14

**fourth** 56:7,21 57:2 58:8 126:5

**fox** 2:3 5:12

**fraud** 25:8 100:17

**free** 98:11 156:14 157:20

**front** 23:25 24:2

**full** 6:1 7:19 47:25 48:6,19 56:8 71:4 101:6 102:2 111:3 140:2,19

**functioned** 61:19

**[fundamental - government]**

**fundamental** 74:12 86:20
**further** 60:11 82:16 144:6,21 152:17
**furthermore** 74:12 102:11
**future** 51:4 63:10,20 64:11 64:18 65:2,11 65:14,20 66:5 66:6,10 74:22 75:2,5,8,9 76:21,23,25 77:8,17,24 78:15,17,21 79:14 81:11,15 82:7,18,22 83:8,11 84:1,9 85:5,9 86:11 137:14,17,25 138:11 143:9 144:10 147:5 149:6,10,16 150:16

**g**

**g** 2:8
**gains** 78:11
**gamma** 20:18
**general** 18:24 31:16 36:3 42:7 58:22 62:5 74:21

75:15 96:7 109:14 111:15 112:16 113:13 114:23 115:14 122:2,14,15 123:1 134:17 134:21 138:21
**generalized** 58:4
**generally** 20:15 29:22 36:14 37:4 42:23 49:25 69:12 79:11 111:20
**generating** 41:10
**generic** 105:1,5 149:5
**generically** 79:16
**genevieve** 2:8 5:9
**geography** 134:22
**getting** 97:4 106:18 130:7
**gfi** 87:13
**gist** 137:23
**give** 7:19 16:17 22:6,8,11 28:17 31:6 33:25 36:24 74:7,20 89:25 90:11,15 99:8

116:16 117:17 125:21,25 134:8 147:17 148:24
**given** 22:1 35:15 36:16 45:4 46:3 50:10 58:18 59:15 75:17 77:21 85:11 109:21,25 110:5,6,18 116:10 150:2 153:13 154:13
**giving** 27:1 49:20 67:15 97:10 120:7
**glean** 134:17
**global** 15:17 16:1,11,23 17:22 18:5,20
**go** 4:12 9:23 10:3 19:15 20:7 23:5,6 32:16 33:22 37:23 39:4 59:18 72:3 98:22 114:9 117:11 119:16 123:7 125:19 126:2 127:3 132:23 136:11 137:9 144:18 148:2

**goes** 98:14
**going** 4:2 10:18 10:19 12:1,4 13:2 33:13 44:13 47:9 51:17 52:9 53:3,24 56:12 58:16,21 59:13 59:14 64:17 66:10,15 72:11 73:14 74:24,25 75:3,10 78:10 78:13,13 79:18 82:17 83:6,11 84:4 85:4,8 89:17 91:1 98:17 115:21 125:24 126:16 127:23 128:13 129:10,25 131:7,15,15 136:1 146:5 150:4,8,9 152:2,25
**good** 4:1 5:24 5:25 33:6 90:24 99:17 103:11 112:19 119:23,24 120:11 128:11 137:5 152:24
**gotten** 100:21
**government** 143:6 147:2

**graduate** 9:21 10:1,3,7
**great** 33:11
**greater** 98:12 98:15 129:14
**greeks** 20:14
**green** 55:25
**gross** 95:24 96:3,4 97:7,8,9 97:18,19 98:6 98:6,12,15
**ground** 7:13
**group** 15:17 16:1,12,23 17:23 18:5,21
**groups** 28:13
**growth** 99:12 99:23 100:1
**guess** 18:15 23:10 36:11 50:1 61:23 62:14 63:15 105:7 112:25
**guidance** 41:8 66:4 73:6 77:9 81:21 145:24 149:4,23 151:10
**guys** 72:1
**gyorkerwin** 2:10

**h**

**h** 1:7 4:18
**half** 16:20 44:1 58:10 72:10 93:6 94:17 100:12 111:18
**halfway** 50:21 50:23,25 102:15 112:18
**hall** 9:4
**hand** 154:21
**happen** 143:11 147:7
**happened** 27:19 28:20 30:6,21,22 31:14 57:11 99:16 108:24 112:20
**happening** 58:20 65:8 108:13
**happens** 107:16
**hard** 51:5 58:3 58:4 62:5,25 64:6,9 96:13
**harder** 21:18
**head** 23:2 24:20 47:15 87:19 89:16 148:20

**health** 143:6,23 144:8 146:25 147:2
**heard** 4:9 7:14 118:1
**hearing** 23:21 76:18
**helps** 109:20
**hereto** 154:18
**hereunto** 154:20
**hesitating** 22:4
**hidden** 119:2
**high** 106:3,15 131:6 144:7
**higher** 57:15 58:25 78:13 79:3 99:24 125:10,11 145:9,10
**highly** 57:11 65:7 84:4 106:23 143:21
**historical** 143:2 146:19
**hold** 10:11 72:4 100:22
**holder** 10:12
**holders** 96:15 98:11,13 130:7
**holding** 21:7,11 75:22 97:13,24 125:1 126:20 141:2

**honors** 9:25
**horizons** 150:11
**host** 19:12 66:9
**hostetler** 2:8 5:10
**hour** 9:11 72:1 72:3,10,10
**hours** 9:1 38:13 72:2
**huge** 17:7 56:22,24
**hundreds** 87:21
**hungry** 71:25 90:24
**hypothetical** 62:23 64:6,9 66:23 67:21,24 69:2 95:11 96:18 97:21 111:6 113:19
**hypothetically** 61:25 111:25 114:1,4
**hypotheticals** 67:18 68:2,18

**i**

**idea** 21:20 74:19,21 101:16 114:14 114:20 115:14 116:16,17

119:7,14 124:16,24 151:17

**ideas** 140:16

**identification** 10:22 12:6 54:9 89:22 146:9

**identified** 9:12 13:9 36:20 37:16 52:14 152:11

**identify** 30:12

**illinois** 6:4 154:5

**illogical** 126:16

**imagine** 16:16 51:5

**immaterial** 114:24

**immediately** 20:24 43:18 121:20

**immunizations** 144:22

**impact** 26:25 42:21 44:15 49:17 65:1 74:15 75:1,3 77:1 78:3 79:24 80:6 83:11 95:6 96:11 98:16 100:9 107:13

109:3 116:18 116:18 124:1 139:2

**impacted** 93:22 97:25 109:24 115:14 139:21

**impacting** 49:24 100:6 101:17 102:10 114:16,21

**impacts** 110:9

**implication** 94:5

**implications** 78:20

**implicit** 62:23 130:23

**implicitly** 61:17 62:9 121:10

**implied** 46:1 71:15

**implies** 92:6

**imply** 94:22

**importance** 88:19

**important** 7:21 32:12 33:4 34:21 35:1 44:16,20 45:19 45:24 46:21 47:17 49:6 51:6,12,16 58:19 65:15

**importantly** 79:13

**impossible** 142:20

**imprecision** 105:7 106:12 107:14

**impression** 63:4,4 151:10

**inability** 41:9

**inappropriate** 142:20

**incapable** 141:7

**include** 18:23 47:8,8

**included** 155:13

**includes** 65:5

**including** 38:21 44:24 146:25 150:20

**income** 19:9 96:1

**inconsistency** 149:19 150:6 151:13

**inconsistent** 84:17 94:11 145:23 149:18 150:12 151:17

**incorporated** 82:25 157:12

**increase** 93:5,9 93:21 94:1,3 98:20 99:1,9 99:10 100:1,12 132:6 144:9

**increased** 94:8 94:21 95:2 96:20 97:23 98:2 99:2 143:10 147:6

**increases** 94:16 98:21

**increasing** 93:7

**increasingly** 143:3 146:21

**incremental** 63:16

**incrementally** 63:25

**independent** 87:2 100:17

**index** 3:7 94:17

**indicate** 43:21 48:5 59:5

**indicated** 47:25 49:10 62:10 63:9 96:7 125:10 133:16

**indicating** 149:6 150:17 155:13

**indication** 149:25

**indices** 93:7 100:11

**indirectly** 154:19

**industry** 93:7 94:17 143:5 146:18 147:2

**inevitably** 143:9 147:5

**infer** 80:7

**inflated** 38:16 124:17

**inflation** 30:3 30:14,21 38:9 38:14 39:3 66:24 91:11,14 91:20,21,23 93:20,22,25 94:4,21 95:2 99:2,10 111:9 112:6 113:5,14 113:16,18 114:7 120:15 121:7,13,14,16 123:22 124:5,7 125:9,15 128:4 128:24 129:5 130:19 131:1,9

**influence** 32:19 131:17 132:21 134:6

**influencing** 59:11 132:12

**inform** 122:19 145:25

**information** 30:13 31:19,21 32:2,6,11,15,16 32:20 33:2,3 34:19,25 39:10 40:20,22 44:8 44:16,20 45:20 45:24 46:2,3 46:15 47:10 51:3,17 59:15 62:10,13 63:22 63:25 65:5 66:12 67:1 68:14,21 70:8 70:14,20 71:9 71:13,19 73:24 75:7 76:20 77:4,7,21,23 82:2,4,8,12,17 82:25 83:3,7 83:16 84:8,11 84:14 85:4,11 85:13,18 86:24 86:25 87:4,6 87:15 88:25 89:1 92:13 95:7 102:6,8 103:5,13,25 105:14 106:6 107:24 110:11 113:20 115:5 116:5,13 117:5

117:8 118:3,4 119:19,25 121:6 131:12 131:18 132:12 132:19 133:15 133:21,24 134:2,5,7,13 135:7,14 136:13 137:21 138:17,23 140:8 150:2 151:7

**initial** 9:13 133:10

**initially** 95:12 144:19

**inputs** 126:13

**inside** 15:20

**instructed** 8:5

**instruction** 9:18

**insufficient** 28:11

**insurers** 14:11 17:10

**interday** 32:4

**interested** 5:2 154:18

**internal** 53:21 136:4 137:22 138:7

**internet** 4:6

**interpret** 79:18 86:10 149:24

**interpretation** 150:20

**interpreted** 49:23 104:4 149:4

**intervening** 91:20

**intra** 51:20,23 70:11 115:5

**introduce** 10:19 12:4 53:25 89:17 146:6

**introduced** 108:5 132:24

**introducing** 53:25 107:19

**intuit** 80:3 115:11

**investor** 35:3

**investors** 34:21 35:1 41:6 44:17 45:20 50:17 51:7,13 64:25 65:13 74:21 79:14 84:5 97:6,12 97:18 124:13 131:15 134:1 138:18

**involved** 20:5 31:4 43:11

**isolate** 96:13

**issue** 88:1
**issued** 35:17,18
  39:9 63:25
**issues** 19:22
  27:9 42:18,25
  43:4,5 88:2,17
  110:21 140:12
**item** 123:11
**items** 96:1
  122:6

**j**

**j** 55:5
**jamie** 2:16 4:21
**january** 1:13
  4:2 12:19 55:9
  55:9 92:17
  126:4
**jason** 2:3 5:12
  155:5
**jo** 1:21 154:4
  154:23
**joann** 4:23
**journal** 26:19
**judge** 24:2
**july** 55:10
**june** 55:10
**juneja** 2:13
  5:11 35:18
  89:11 92:20
  93:15 129:13
  133:14 136:12
  149:3,13,14,21

**juneja's** 92:16
  133:10 145:23
  148:13 150:14
**juris** 2:5
**jury** 23:15,25
  24:4

**k**

**kaplan** 2:3 5:12
**kaplanfox.com**
  2:5
**keep** 21:18
  50:20 55:3
**keeping** 68:1
**kept** 69:16
**kilsheimer** 2:3
  5:13
**kind** 29:12 32:5
  119:8 134:7
**kinds** 137:17
**knew** 45:15
  109:16 110:23
  118:11 136:10
  141:12 142:8
**know** 8:10
  14:10 19:11,14
  22:17 23:1
  28:17 30:22
  32:21,21 34:4
  36:12 40:8
  42:2 43:2 46:7
  47:9,11,12
  50:9 57:6,8,10
  60:11 61:7

62:5,10,16,16
62:22 63:6
64:3,16,21,21
64:22 66:8,9
67:12 78:24,24
80:4,6,10
81:25 82:19
84:20,24,24
85:2,22 87:22
89:11 94:21,23
95:2 96:11,14
98:14,17
103:24 104:12
105:4,16 106:1
107:9,22
109:24 112:5
112:22,23
113:1 114:24
114:25 115:8
115:21 116:21
119:20 122:8
123:8,13
126:16 130:21
133:7,18,22
136:3,10 137:2
141:13 142:17
148:17 152:19
**knowing** 43:20
  103:5 135:3
**knowingly** 39:9
**knowledge**
  56:5
**known** 45:4
  116:9

**knox** 9:24 10:1

**l**

**l** 1:7 4:18
**labels** 55:2
**labor** 14:14
  18:24
**lagging** 144:21
**laid** 46:21
**land** 26:18
**lane** 29:23
**language** 62:2
  77:4 147:24
**large** 14:14
  17:9
**largely** 85:15
  98:17
**larger** 74:15
  75:10,23 126:9
  126:14 131:23
**late** 136:14
**launch** 33:7
**law** 24:15
  25:10
**lawsuit** 7:5
**lay** 7:13
**layperson's**
  42:17 43:5
**lead** 5:13
  124:12,14
  141:9 145:6,8
  145:9
**leader** 144:19

**leading**  98:12
**learned**  115:17
**leaving**  151:9
**led**  17:2 31:17
  52:22 95:9
**left**  15:19 55:4
**legacy**  26:25
**legal**  24:14
  34:22,23 38:23
  60:18 155:1
  158:1
**letter**  155:19
**level**  94:4 96:3
  97:9 120:15
  149:20 151:2
**levels**  78:14
**license**  1:22
**licenses**  10:16
**lie**  141:7
**lied**  141:15
**likely**  63:9
  64:10 65:8
  94:16 106:14
  108:22 149:6
**limited**  49:18
**line**  3:2 96:1,11
  101:3 109:16
  111:19 126:5
  155:13 157:7
  158:3
**lines**  127:12
**link**  53:11
**linkage**  86:8

**list**  22:10 26:13
  122:6,9,10
  135:21 136:2
**listed**  11:20,23
  13:7 19:16
  20:10,11 22:2
  22:10 26:24
  121:23 123:17
  157:7,17
**listing**  19:22
  157:7
**lists**  122:4
**literally**  78:16
  111:22 121:1
**literature**
  75:14
**litigation**  7:9
  14:16 15:21
  37:18 54:17
  89:19
**little**  20:21
  55:14 64:1
  116:3,4
**live**  14:22
**llc**  1:3 4:16
  13:21 17:16
  155:6 156:3
  157:3
**llp**  2:3,8 5:13
**localities**
  143:24
**located**  6:5
**logic**  75:13
  105:23

**logical**  116:23
**logix**  39:12
  41:3,7 43:17
  45:15 52:18
  60:5,17 81:9
  100:3 101:15
  114:13 137:15
**long**  9:10 49:3
  75:21 90:2
  98:19 112:10
  113:1,9 132:15
  135:8 143:7
  147:4,15,23
  148:11,16
  149:12,15
  151:1,16
**longer**  14:2
  20:21 62:20
  64:16 78:2
  79:23 80:8
  98:9 123:5
  124:1 147:19
  148:7
**look**  11:1 13:14
  21:24 26:12
  28:9,14 34:3
  36:22 51:5
  55:22 56:5
  57:9 63:6 67:6
  71:25 76:1
  78:7 80:16
  84:6,23 88:18
  90:10 94:19,25
  103:6 105:16

  105:18 116:23
  119:3 122:8
  125:24 126:2
  126:14 127:5,6
  128:2 130:25
  134:16 135:2
  146:5 148:2
  151:23
**looked**  28:9
  63:5 100:10
  104:16 111:21
  122:1,5 123:2
  136:9 138:2
**looking**  6:21
  23:9 24:25
  26:12 40:23
  54:21 56:18
  57:21 64:16
  77:17 81:3
  85:24 125:22
  125:23 133:2
  134:19,20,22
  140:15 147:12
**looks**  55:2
  57:22 119:5
**losoya**  1:21
  4:23 154:4,23
**loss**  24:23 25:7
  52:14
**losses**  35:3
  120:24 121:4
**lost**  34:9 39:7
**lot**  14:9,17 57:9
  57:20 96:5

98:22 110:10 137:3

**loud** 59:25 74:11 101:4 133:6 142:25 143:1,19 145:19 146:16

**low** 43:17,20 47:24 48:4 56:5 59:4 106:4,14

**lower** 41:21 44:22 45:14 46:23 47:18 48:1 49:1 50:2 50:2 51:2 52:18 53:5,9 53:14,18 56:12 56:20 61:18 66:7 71:10,15 73:6,7,9 75:5 76:19 77:3 78:11 79:17 81:8,10 82:6 82:13,21 83:5 83:14,24 84:3 85:11 86:9 101:10,24 102:16 105:1 108:23 114:5 115:9 116:1 118:15,17,21 118:22 145:6

**lowering** 75:9

**lunch** 71:23 72:4 90:24

**m**

**m** 5:22 55:5

**madam** 155:10

**made** 28:5,19 36:1 39:24 44:2,6 45:16 61:2,17 63:8 66:25 75:18 78:12 109:7 112:13 113:2 113:12 118:8 137:13,20 138:6,8,9,15,16 139:19 143:2 146:21 156:7

**majority** 16:9 16:17 22:18,21

**make** 7:16 8:6 27:17 44:4 58:4,21 61:2,9 61:16 66:24 90:20 105:16 122:2 125:25 152:22

**makes** 85:12 113:3 118:5 126:1

**making** 48:2,20 68:7 138:4 147:21 148:5

**management** 17:20

**march** 55:10 136:14

**margin** 95:13 96:19 97:8,19 98:2,7,12,21,24

**margins** 97:23 98:8,9,15

**mark** 10:18 90:3

**marked** 10:21 12:5 54:8 89:18,21 146:8

**market** 17:15 18:4,7 28:12 32:9,10 34:7 34:12 37:12 38:12,13 47:19 48:15 49:12,15 49:23 50:10 51:2 52:6 60:22 61:18 62:4,11,12 63:3 64:1 67:8 68:8 69:8,17 71:9,11 74:16 74:24 76:14,17 77:6,20 79:3 79:11,17 80:3 80:7 82:14,16 83:6,23 84:2 84:11,18 85:1 85:3,10,16

86:10 87:1,3 93:1,6 94:8,16 95:12,17,19 96:18,24 97:22 98:10 99:11,12 99:25 100:11 101:9,13 102:17 103:8 104:5 110:1 111:19 114:11 115:10,13,16 116:1,3,6,13 117:8 118:16 119:24 121:2 122:2,3 131:12 132:3,4,5 133:25 134:8 134:10 135:5,6 136:18,24 137:7 140:19 140:21 141:8 141:15 145:25 149:5,24 150:8 151:8,18

**market's** 62:16 64:13 65:10 80:12 84:15 97:22 132:22

**markets** 17:19 134:24

**marking** 121:2

**massive** 111:4

**master** 10:6

**[material - million]** Page 27

material 8:22 37:14,15 39:10 50:16

materiality 34:16,23 39:7

materials 6:20 9:19 11:18,20 11:22 13:5,8 27:5,8 36:17 37:6,7 40:6 122:3 135:21 140:2

matter 4:15 8:20 11:5 12:13 15:6 22:11 24:22 25:19 42:10 48:5 50:17 60:1 83:4,24 85:14 86:8 87:1 90:6 102:6

mattered 47:21 51:13 71:9

matters 14:10 14:15 15:6 17:6,9,11,13 19:7 35:10 129:23 154:10

maximum 124:6

mean 18:7 21:20 23:6 29:1 37:9

42:15 43:9,25 45:4 46:8,9,13 47:7 49:2 50:21 56:11 62:14 63:2,24 64:14 65:4 66:3 67:5 74:18,19 79:5 79:11,14 83:21 83:25 84:7,22 86:19,20 87:19 87:22 92:2 96:14 98:4 103:19,23,23 105:4,6,25 106:23 107:1,1 107:3,4,11,18 110:3 111:17 111:25 116:22 118:5,10 120:5 120:5 136:23 150:11,12

meaning 20:22 75:8,8

meaningful 32:6 104:13

meaningfully 104:21

means 74:17 82:17 93:20 104:11 105:20 126:15,17,19

meant 59:25 119:15

measure 20:25 21:2,18 24:24 32:18,23 69:21 97:5 104:15,17 104:23 106:10 113:14 119:17 120:12

measured 91:18 106:25 107:1,3 113:16

measurement 104:25 129:12

measurements 129:14

measures 19:24

measuring 21:20 71:8 105:8 120:5 127:17

media 4:13 33:15,20 72:13 72:18 91:3,8 128:15,20 153:14

mediators 17:12

meeting 8:20

member 127:1

memorandum 122:7

mentioned 89:11

merit 59:19

merits 3:9 12:2 22:24 23:3 33:23 74:8 80:14 100:19 121:23 125:8

merrill 120:25

message 83:12 150:6

messages 151:6

messaging 151:18

met 9:2

method 90:16 90:19 121:10

methodology 35:13 89:5

methods 88:18

metric 97:11 106:22,22 113:4

metrics 119:22 129:10

middle 54:24 108:1

midwest 155:17 158:1

million 67:10 67:11,23,25 68:22,23 69:6 69:6 78:25 79:1,3 95:18 95:24 96:8,15 96:22 97:9,15 97:15,20

107:23 108:3 108:20,21 111:7 112:5,8 113:5,17 114:2 114:3,3

**millions** 19:24 106:2

**mind** 20:23 24:19 62:2 68:1 87:8,9,12 89:13 104:11 121:16,20,21

**minimum** 110:11

**minority** 23:4 25:16

**minus** 21:11 91:22

**minute** 33:11 37:24

**minutes** 33:12 71:23 72:8 151:23 152:20

**mirror** 119:1

**mirrored** 147:24

**misheard** 80:20

**mislead** 140:19 140:21

**misleading** 28:24 29:8,10 29:16,21 30:10 35:23 36:8 39:9 40:13

41:17,24 43:22 44:3,10 45:4,8 45:18 48:24 61:3,10 62:21 66:25 123:20 136:17 139:2,8 139:23 141:3 141:19,24 142:4,7,12

**misled** 41:6 52:6 118:15

**misremember...** 141:22

**misrepresent...** 52:12,21 76:12 95:17 120:18

**misstatement** 30:14 38:11

**misstatements** 30:2,9,10,12 35:4 41:17 44:14 53:13 94:20 135:15 138:19 139:3 139:19,20

**misunderstood** 48:8

**mix** 34:21 138:17,22

**mixing** 113:24

**model** 25:3,4 91:11,14 94:1 94:6

**moment** 46:18 48:21 50:13 63:23 85:1 103:21 151:23

**monday.com** 3:13 54:19

**monkeypox** 94:15 99:18 100:8

**month** 54:20 55:8,9 56:21 56:22,24 57:12 57:14,19,23 58:25

**month's** 58:5,6

**monthly** 54:25

**months** 55:22 56:6,13,20,23 56:25 57:8,18 57:24,25 58:1 58:9,10,11,23 59:1 136:16

**morning** 4:1 5:24,25

**motion** 122:16 122:17 123:12

**move** 32:10 100:15 125:2 126:23 129:19 132:11

**moved** 64:1 100:16 116:13 121:16

**movement** 31:24 68:3,13 69:21 71:4 92:24 93:11 94:22 104:9 105:20,22 108:18 113:6 126:24 129:21 130:2,3 131:5 131:8,23,24 132:2,9

**movements** 69:15

**moving** 32:9 33:3

**multiple** 9:8 19:22 20:10 30:8,9 31:4 88:16 144:8

**n**

**n** 5:22,22 55:15

**naive** 82:16

**naively** 84:3

**name** 4:21 6:1 20:16 25:20 89:9 155:6 156:3,4,15 157:3,4,21

**names** 89:16

**narrow** 67:7

**nature** 77:6,22 102:5 115:7 120:4 132:20

**[navigant - obviously]**

**navigant** 14:4
**near** 144:10
**nearly** 102:15
**neatly** 65:16
**necessarily**
  49:13,23 59:9
  66:1 77:2
  111:2 114:8
  124:9 129:15
  137:3
**necessary**
  88:11,13,22
  93:10 95:4
**need** 8:6,10
  42:25 61:9
  66:22 73:1
  89:2 114:19
  142:24 151:1
  152:12,15
**needed** 60:23
  61:15 70:6,14
  77:12 110:17
  110:18 113:12
**needs** 49:2
  103:20
**negative** 53:17
  73:19,23 74:15
  151:11
**negatively**
  109:24
**neither** 25:17
**net** 96:1
**neutral** 14:11
  17:12

**never** 24:13
  29:18 128:5,8
  131:5 142:9
**new** 1:1 2:4,4,9
  2:9 4:20 25:22
  105:14 131:12
  132:4 143:22
**news** 32:1
  53:18 72:21,24
  72:25 94:13
  99:17 100:8
  132:4,4,8
  149:5
**nita** 2:13 5:11
  92:16
**nodding** 7:22
**non** 14:16 17:6
  19:12
**normal** 75:1
  78:13
**notarized**
  155:14
**notary** 155:25
  156:10,18
  157:15,23
  158:23
**note** 4:4 56:13
  155:12
**noted** 93:3
  136:7
**notes** 145:5
  151:24
**noticed** 93:5

**noticing** 5:8
**noting** 129:13
**november** 54:4
  55:11,15,23
  135:18
**number** 14:8
  14:12,14 16:9
  16:17 17:11
  19:13 22:17
  26:6 28:10,20
  50:13 51:9,22
  52:4 70:6
  84:25 88:18
  105:17 106:17
  112:4 121:9,15
  136:14,22
  153:14 155:7
  155:13
**numbered** 54:1
**numbers** 46:18
  51:20 56:3,6,7
  59:1 107:10
  109:25 110:12
  110:17 111:3,3
  118:11 157:7
**numerical**
  48:20
**numerous** 31:4

**o**

**o** 5:22
**oath** 5:1 7:23
**object** 8:4

**objection** 36:9
  40:16 41:25
  43:23 46:5
  47:5 49:4 50:3
  50:18 56:9
  58:14 59:7
  61:21 63:13
  65:23 68:5
  69:23 83:18
  86:2,16 95:21
  97:2 99:4
  109:12 111:11
  113:22 116:19
  119:11 138:12
  140:4 142:15
**objections** 5:3
**observe** 71:9
  92:10 108:11
  125:13 131:22
**observed** 43:9
  49:9 64:20
  73:25 109:8
  126:22 129:20
**observing** 52:1
  131:8
**obtain** 96:2
**obvious** 29:3
  53:2 76:16
  78:19 117:16
**obviously** 7:24
  47:12 79:11
  92:7 93:16
  95:25 96:10
  131:14

occasions 27:22
occur 130:5
  132:6
occurred 25:8
  38:11 65:6
  71:20 110:2
  112:1 138:4
occurring 52:8
  62:18 120:24
occurs 103:6
  124:12
october 55:11
  55:23
offer 58:16
offered 13:1
  29:11,18,19
  42:10,23
offering 25:22
  42:25 139:7
  142:2
official 18:2
  156:15 157:21
officials 137:13
  138:9,16 143:6
  147:2
oh 39:14 60:1
  80:21 100:22
  107:18
ohio 155:2
okay 6:16 8:13
  12:3 21:13
  24:8 33:25
  34:5 38:1,15
  38:20 39:5,14

39:18 40:4
45:23 47:2
53:24 54:7
55:24 56:2
59:18,21 61:13
76:3 80:23,24
82:11 87:5
90:23,25 95:15
96:23 113:15
127:14,15
128:10 133:4
135:10,12
136:11 141:18
146:7 152:1
omissions
  44:14 52:12,22
omitted 39:10
ones 11:14
  20:23 26:10
  121:21
ongoing 20:3
  150:25
open 11:1
  23:21
opening 35:11
operation 16:5
opine 34:7,11
  34:15,19 35:2
  35:6,9,12,22
  36:5 52:11
  141:23
opined 28:22
  87:24 120:15
  120:21

opines 143:1
opining 39:18
  45:24 82:5
  103:21 104:14
  139:22 140:11
  140:13 142:21
opinion 13:9
  25:22 26:1
  27:23,24 28:12
  28:17 29:12,18
  29:19,19,20
  31:6,9 35:14
  44:7 45:9,12
  49:7 50:6
  52:19 58:16
  60:18,18,25
  66:19 67:16
  70:13,18 86:6
  86:12 112:22
  122:7 123:4
  136:6 137:5
  139:7 140:12
  141:16 142:3
  142:10 143:14
  143:16 144:13
  145:20 147:13
  147:14 148:10
  148:11,14,18
opinions 11:12
  11:15,16,24
  12:17,21,23,25
  26:1 35:21
  39:6 43:1,15
  53:21 54:14

138:1 143:14
144:2,2 145:2
145:15 147:9,9
152:15
opportunities
  99:13
opposed 62:9
opposing 25:21
opt 26:5
option 20:14
  21:3,6,16
  124:8 125:2
  126:3 127:5,11
  127:18,21
  129:18,24
  130:2,7,10,24
  131:22 132:11
options 19:23
  19:24 20:9,11
  20:13 21:15
  124:16 125:8
  125:16,17,24
  126:13 129:1
  129:21 130:9
  130:12,16
  131:2,5 132:10
oral 7:22
order 54:18
  55:3,5,5,5,15
  55:16 122:7,16
  123:12
orders 46:11,12
  46:12 54:20
  55:20

**outcome** 5:2 154:19
**outlook** 144:22
**outside** 15:20 29:22,24 31:21 85:20
**overall** 112:10 136:24
**overestimate** 95:17,19 96:25
**overestimated** 96:21
**overestimates** 116:3
**own** 16:2 18:22 44:11 66:13 77:21 87:2 131:17 137:20 141:13
**ownership** 17:24 18:1,2

**p**

**p.m.** 91:7 128:14,17,19 152:3,5,7 153:1,3,5,12,16
**pace** 115:9 116:1
**page** 3:2,8 19:15 26:13 37:24 100:25 101:1 126:4 127:5,6,7,8,9

127:12 155:13 155:15 157:7 158:3
**pages** 90:12 128:3
**paid** 37:4 39:2
**pandemic** 145:5
**papers** 6:23
**paragraph** 36:17 39:4 40:23 44:13 45:11 52:9,10 59:20,23,24 66:15 74:5,11 74:20 75:13 76:1,4 77:11 78:1,6 80:13 80:17,21,25 81:4 100:18,24 102:4 114:9 119:3 133:3,5 135:11 136:12 137:9 138:24 142:22 144:7 145:19,19 146:15 147:11 147:12,17,18 147:25,25 148:8,16,23,25 149:1,2
**paragraphs** 34:2

**parity** 21:5
**part** 24:12,13 24:17 25:14 27:25 38:24,24 38:25 44:25 45:5 47:17 49:8 50:5 60:24 66:3 70:7 83:2 93:1 100:11 125:22 131:17 132:10 138:17,22 148:22 157:9
**partial** 61:24
**partially** 64:4
**participants** 2:1 4:7
**particular** 24:15 25:11 28:12 30:15 42:12,20,22 48:2,18 50:12 50:13 51:18,22 51:22 52:4,4 56:11 57:6,10 57:12,14 59:17 70:1 73:2 75:4 87:16 92:5 104:10 117:12 120:7 148:22 150:15
**parties** 4:11 24:1 154:18

**partners** 13:18 13:21 14:2,7 14:20,23 15:1 15:4,19 17:25 18:20
**party** 5:1 7:5,8
**passed** 10:13
**past** 22:1,14 27:5
**path** 75:9 107:20
**pattern** 56:14 56:20 57:5,16 111:14
**patterns** 43:8 43:10
**pcr** 134:21 136:14,22 143:4 145:24 146:22
**pdf** 54:21
**pending** 8:12
**penetration** 134:23
**pennsylvania** 89:20
**pens** 6:25
**people** 10:13 11:10 71:25
**perceived** 94:8 145:6
**perceiving** 150:8

**percent** 67:13 80:4,11 84:24 84:25 95:13 96:20

**percentage** 120:17 121:10

**perception** 132:22

**peregrine** 18:13,17 19:4

**perfect** 54:21 88:1 104:3 119:22 120:13

**perform** 87:2 90:9 125:15

**performance** 53:9,15 63:10 64:11 65:2,11 65:21 149:7,10 149:16 150:16

**performed** 13:23 17:17 19:23 88:5 136:15,22

**performing** 105:10 106:13

**period** 38:3,4,8 39:11 41:1 44:5 46:24 49:1,10 71:14 71:17 74:24 75:4,17 78:10 78:20 91:17,25 92:8,11,14,22

92:25 93:3,6,8 93:12,14,17,18 93:22 94:9,14 94:18 95:8 97:24 99:19 100:12 101:3,8 101:21 102:7,8 102:13 112:12 112:15,15,19 113:3,10 118:14 120:16 121:8,17 124:6 125:16,19 127:23 128:5 130:11 131:3

**periods** 63:21 65:12,14 75:2 75:5 76:19,21 76:23,25 77:8 78:15,21 82:18 92:2

**permanent** 49:17 74:14 75:18,22 76:11

**persistence** 132:21

**personal** 19:9

**personally** 156:11 157:15

**perspective** 62:8

**pertinent** 10:9

**phone** 6:14 155:3

**piece** 32:6 84:8 85:17 86:24 130:6 133:23 134:4,12

**pieces** 47:22 82:1,2,4 88:20 96:6

**place** 4:11 6:4 112:18 154:15

**placing** 99:12

**plaintiff** 5:13 39:23 40:5,25 41:21 43:16 82:19 102:12

**plaintiff's** 8:21 9:2,17 38:18 47:17 49:9 51:8,21 54:3,5 60:2 61:1,11 111:24 115:4 117:7,22

**plaintiffs** 1:5 2:6 14:12 31:8 45:1,2 48:12 48:22 49:21 52:25 60:21 63:21 66:21 73:8 77:18 86:21 110:6 111:16 112:17 115:24 119:2 122:23 141:2

**plan** 40:8

**plans** 39:23

**platform** 17:15 17:18 18:4,8

**play** 28:25

**plaza** 2:9

**please** 4:4 5:4 5:15 6:1,7 7:25 11:1 24:21 37:25 59:23 74:11 81:4,6 100:25 101:4 132:25 143:19 146:11,15 155:11,11

**plummet** 41:5

**pocket** 24:24

**point** 17:4 40:10 43:8 46:14 51:23 52:5 58:18,18 59:11,15 83:22 90:20 91:17 96:18 100:9 101:19 106:12 110:18,20 112:14 113:2,9 115:5,19 116:2 116:5,24 117:9 117:23 127:11 128:4 141:9 142:9

**points** 19:17 46:15 121:7,12

**policy** 10:6 78:9

**pop** 10:20 12:8

**portion** 16:12 19:9 22:16,23 31:11 59:4 65:6 122:17

**portions** 11:8

**position** 140:3

**positive** 32:14 32:19 93:4 94:13 95:1 100:8

**possibility** 140:25 150:21

**possible** 66:2 98:22 99:7 108:8 138:8,14 151:20

**possibly** 64:3 94:21 141:14

**potential** 28:16 46:8 99:23 107:9

**potentially** 17:1 96:8 98:4 108:6 135:2

**power** 51:3 57:7

**practice** 16:2 18:23 70:11

**preceding** 136:16

**precise** 16:18 104:23

**precisely** 40:8 66:12 82:23

**precision** 106:25 107:2,3 119:17

**precluded** 140:25

**precludes** 139:18

**precluding** 141:14

**predict** 48:18 58:23 59:14 65:15 143:3 146:22

**predicted** 56:7 57:12

**predictive** 51:3 57:7,19 58:5 58:12 65:7

**prefer** 72:3

**preferences** 27:1

**preferred** 88:14

**premised** 39:8

**preparation** 11:11 37:16

**preparatory** 8:24

**prepare** 8:17 9:14

**prepared** 11:4 12:12 15:7 28:2 35:19 40:2

**preparing** 37:8 53:21 133:10 135:18 146:12

**present** 2:12 5:6 55:21 74:22

**presented** 137:8

**presents** 140:15,16

**president** 16:1 18:12

**press** 146:24

**presume** 142:17

**pretty** 112:19 118:7,12

**previous** 154:7

**previously** 54:3 101:10,24 105:2

**price** 21:3,3 25:5 30:4 31:11,24 32:16 68:3,13 69:15 69:21 71:4,10 71:19 73:25 75:15,24 88:9 91:18,24 92:9 92:20,24 93:11

93:14,18,21 94:1,3 98:1 99:1,3,9 100:6 100:9,15,16 101:19 102:1 103:2,6,10,12 103:17 104:8 104:13 105:11 105:15,20,22 106:5 108:7,17 108:22,25 109:4,8 113:6 114:5 118:6,23 119:4,18 124:14,17,17 124:25 125:2,4 126:3,7,12,17 126:19,24 127:10,16,23 128:1,7 129:11 129:17,19,21 130:1,2,13 131:4,13,17,20 131:22,23 132:10,11 139:21

**pricing** 21:16 125:17 130:10 130:17,24

**primarily** 19:6

**primary** 14:6 17:21 19:3 41:10

**principals** 52:13

**prior** 37:5,14 43:19 47:19 49:1 60:9 61:6 66:18 70:4,16 70:22 71:2 76:9,19 102:4 117:4 133:15 133:17

**pritzker** 2:16 4:21

**privileged** 40:2 40:20

**probability** 105:21 106:17 106:19,20

**probably** 7:14 16:19 29:2 42:19 43:6 96:7 106:1 134:9

**problem** 80:9

**procedure** 156:5 157:5

**proceed** 5:16

**proceeded** 31:9

**proceeding** 5:4 7:7 102:17

**proceedings** 33:16 72:14 91:4 128:16 152:4 153:2 154:13

**process** 46:10

**produced** 37:17 54:17

**product** 41:11 42:12,22 48:13 49:11,22 50:10 51:5 53:10,19 71:15 76:18 79:17 83:6 102:10 103:9 118:21

**product's** 41:16

**production** 155:15,17,22

**products** 42:14 42:18,23 99:13 134:15

**professional** 10:14 19:16

**profit** 95:13,24 96:3,4,19 97:19,23 98:2 98:7,8,9,12,21 98:24

**profitability** 52:17 53:7

**profits** 95:20 96:25 97:7,9 97:16,18 98:6

**progressed** 109:11

**project** 116:25

**proper** 86:7 107:11

**properly** 62:17 110:19

**prove** 39:23 40:5,25 41:21 42:3 48:22 112:17 139:1 140:18 141:3

**proves** 43:16

**provide** 16:3,3 17:1 51:20 60:11 75:12 134:1 149:4

**provided** 13:23 73:6 77:9 81:21 107:24 113:21 115:6,7

**provides** 53:10 75:7

**providing** 15:20 17:20

**proving** 102:13

**proximally** 35:3

**proxy** 71:8,18 103:4,12 110:4 119:23 120:11 137:6

**public** 10:6 41:15 133:14 133:15,19,20 133:22 135:6 136:13 137:13

137:13 138:7,9 138:9,16,16,21 138:22 143:6 143:23 144:8 145:7 146:25 147:2 150:2 151:7 156:10 156:18 157:15 157:23 158:23

**publication** 26:17,21,24

**publications** 26:14

**publicly** 36:25 37:4 41:11

**published** 27:4 27:8 74:3

**pull** 33:24 100:20 132:25

**purchase** 130:20

**purchasers** 38:21

**purchases** 121:12

**purely** 22:20

**purposes** 55:21 63:11 64:13 67:2 88:9

**put** 21:5 24:22 84:21 126:3 127:2,18 128:1 128:25 130:21 140:3

puts  21:9 148:6
putting  120:17
  149:11

**q**

q2  52:17 53:8
  60:8 66:17
  71:1 76:8
  102:14 135:15
qualitative
  115:7
quality  4:5,6
quantitatively
  103:17
quarter  41:22
  43:18 44:1
  47:25 48:6,19
  49:2,19,24
  50:23,25 51:20
  51:23 52:23
  56:7,8,11,21
  57:1,2,15,18
  58:8,11,13,25
  59:5,6 65:5,7
  67:9 70:11
  71:5 78:12
  81:14,20 82:15
  83:8,25 84:5
  85:6 86:11
  95:18,20 96:20
  96:22 97:1
  102:2,15
  107:21,24
  108:1,13,20

109:3,11,18,25
111:3,19,20,22
112:5 115:5,10
116:24 149:9
150:15,18,22
quarter's  51:4
quarterly  41:8
  44:21 47:24
  53:15 56:19
  67:23 84:12
  109:23 149:4
quarters  41:14
  46:23 47:19
  48:1,14 49:12
  57:7,18,23
  60:9 61:6 66:5
  66:19 70:4,16
  70:23 71:2
  76:9 77:24
  79:6 82:16
  83:8,11 84:1
  86:11 102:17
  117:3,4 136:19
  137:1 150:23
question  7:18
  7:20,24 8:6,12
  23:20 29:14
  34:23 36:14
  38:23 45:18,23
  48:9,9,25 62:7
  63:20 90:17
  106:7,8 107:5
  112:3 126:25
  141:19 142:14

142:18,19
questions  8:4
  8:14 27:23
  63:1 117:15
  151:22 152:10
  152:18,21
  153:6
quick  34:3
quickly  72:8
quote  60:24
  101:23,25
  148:25
quoting  149:2

**r**

railroad  26:18
random  107:6
randomness
  106:2 107:6,10
range  21:6,9
  114:19
rate  104:24
  105:6,9 106:4
  106:8
rates  145:9
rather  48:10
rationale
  123:20
reached  11:17
  27:23 30:11
react  68:8,10
  68:16 76:15
reacted  71:10
  87:1,3 103:12

116:6 119:25
reacting  132:5
reaction  64:13
  68:25 80:12
  91:18 108:22
  109:4 126:18
  129:11 131:20
reactions  88:10
read  37:25
  45:10 48:9
  59:22 60:12
  74:10 81:3
  101:2,4 133:5
  133:6 142:23
  142:24,24
  143:1,18
  145:18 146:16
  147:11 153:10
  156:5,6,12
  157:5,6,17
reading  38:2
  141:16 155:19
real  26:19
reality  41:11
  67:6 106:10
  107:7
realize  34:21
  71:24 72:1
really  14:8,17
  17:20 18:8,18
  39:1 74:25
  85:14 88:23
  98:12,19
  105:13 140:1

149:10
**reason** 22:3
29:17 38:16
56:17 77:5
79:19 83:3
123:25 125:12
129:4 131:19
132:10 155:14
157:8 158:3
**reasonable**
32:7 35:1
71:21 92:12
95:10 101:6
102:25 103:20
104:1,17,18,22
108:10,14
109:20 110:5
113:13 116:4
116:11 121:3
**reasonably**
58:17 104:8
143:7 147:3
**reasons** 20:8
24:14 25:23
27:21 29:16
30:9 40:13
45:21 129:22
142:18 151:12
**reassure** 85:1
**reassuring** 41:6
**rebound** 74:25
**rebuttal** 3:11
25:21,23 26:1
35:17,17 89:12

**recall** 15:5,10
22:6,12 23:5
24:5,22 26:10
29:11 30:11,17
34:5,18 82:23
86:4,18 87:17
87:22,23 88:1
88:2,3 89:14
89:15 99:19,20
120:20,22
122:12 133:20
135:25,25
136:9 142:2
148:18,20
**receipt** 155:18
**receives** 62:12
**recent** 41:14
48:1 58:8
136:19
**recklessly** 39:9
41:2
**recognize**
47:16 89:24
90:5
**recollection**
122:11,15
123:1
**recomputing**
130:11
**record** 4:2,12
5:8 6:2,18
33:14,19 72:12
72:17 91:2,7
128:14,19

152:3,7 153:1
153:5,11,16
154:12 157:9
**recorded** 4:9
4:14
**recording** 4:5
4:10
**red** 55:12,25
**reduce** 96:3
**reduced** 60:7
61:5,14,20
63:11 64:20
65:22 70:3,21
70:25 76:7,15
77:14,15,16,17
77:19 149:25
**reducing** 66:4,5
**reduction**
49:14 62:17
84:16 95:25
108:12
**reductions**
63:18
**refer** 12:1 13:2
90:12
**reference** 122:2
147:21 148:5,9
148:9 155:7
156:2 157:2
**referenced**
89:15 156:11
157:15
**references** 40:1

**referencing**
148:19
**referring** 9:3
15:15 23:24
36:4 44:5,21
62:25 77:16
124:20 137:18
148:10,13
149:17
**reflect** 12:21
50:15 53:5
62:17 75:5
108:23 110:23
117:6 119:15
130:4
**reflected** 25:7
53:14,19 63:18
110:22 113:7
**reflecting** 73:7
**reflection**
112:19
**reflective** 86:25
**reflects** 11:12
12:16 54:19
**refreshed** 34:4
**refused** 27:12
28:4
**regarding** 39:6
39:11 44:14
138:11
**regardless**
76:21 77:8
86:6 111:9
112:7 113:15

**[regular - representing]**

| | | | |
|---|---|---|---|
| **regular**  8:9 56:14,19 57:5 57:16 70:11 78:14 | 53:11,17 60:4 64:2,5 65:7 72:25 73:20,24 91:16 101:7,20 103:7 104:5 | **render**  44:9 50:15 62:20 | 125:8,22 129:13 132:24 133:10,11,14 |
| **regularly**  51:19 | 120:2 134:2,4 135:2 | **rendered**  41:15 41:23 45:17 48:24 | 135:13,17,19 136:8 137:10 |
| **regulatory** 18:25 | **reliable**  71:7,18 95:6 103:4 | **replaced**  54:5 | 137:12 139:11 139:17 140:22 |
| **reinforce**  84:14 | 110:4 120:2 | **reply**  9:13 13:2 13:6 92:16 | 141:6,8,17 142:10 143:12 |
| **related**  5:1 14:15 17:6,8 17:13,19,22 19:6,22 24:14 26:8 27:9 30:15 42:18,19 43:11 92:9 94:14,16,23 99:17 100:8 123:10 135:7 | **relic**  55:20 **relied**  40:7 **relief**  84:22 **relies**  124:18 **relying**  45:2 **remain**  21:22 143:8 145:21 147:4,14 151:13,15 | 132:24 133:11 135:18 137:9 146:13 147:25 148:8 **report**  3:9,11 3:14,15 11:4,6 11:7,11,12,14 11:15,19,24 12:2,12,14,16 | 143:25 146:2,6 146:11,13 148:1,5,8,23,25 149:3,7 **reported**  1:21 102:2 154:11 **reporter**  4:23 5:15 154:2,5 156:7 |
| **relations**  82:3 **relationship** 17:25 | **remained**  41:7 **remaining**  79:6 147:21 148:6 | 12:18 13:3,6 22:5,25 25:21 27:25 28:1,1 33:7,23 35:11 | **reports**  8:19,20 9:13 12:25 14:24 15:2 |
| **relative**  47:19 48:14,15 49:12 56:22,24 57:8 74:14 88:19 117:3 154:15 154:16 | **remember**  23:7 25:19,20 26:2 47:14 87:10 **remembering** 24:19 | 35:18 36:19 37:6,8,12,16,23 39:4 45:22 52:10 59:19,20 74:6,8,20 76:2 76:2 80:14,14 | 23:4 35:17 37:14 43:10 74:2 118:19 150:14 152:12 **represent** 54:16 55:8 |
| **released**  70:8 **relevance** 31:23 65:10 | **remote**  1:10 **remotely**  2:1 5:6 | 81:17 89:12,18 90:6,7 92:16 92:19 93:2,15 | 59:2 113:19 123:9 **representation** |
| **relevant**  32:7,8 33:2 36:7,14 46:14,16,19 47:1,22 52:13 | **remove**  89:2 **removing** 98:15 | 100:19 105:19 110:17 114:10 121:23 122:2,4 123:4,18,23 | 123:15 **represented**  7:2 **representing** 4:22 |

| | | | |
|---|---|---|---|
| **represents** 80:8 108:14 | **restate** 48:10 48:11 | **revenue** 41:10 51:4 52:16 | 35:4,7 36:21 37:1,8 38:2,17 |
| **reprice** 103:24 | **restrict** 125:18 127:23 | 53:7 67:9,13 81:8 101:9,18 | 39:20 40:15 45:12 55:12,22 |
| **repricing** 127:21 | **restricting** 149:8 | 101:23 102:11 102:11 107:23 | 56:1 60:13 66:19 68:19,22 |
| **request** 157:9 157:11 | **result** 69:14 95:2 103:1 | 109:23 114:2 114:16,21 | 68:24 71:22 75:19 77:1 |
| **require** 37:2 48:17 57:20 | 131:25 132:14 | 115:6,14,17,21 116:1,24 | 80:19,25 81:16 84:25 86:1,4 |
| **required** 155:25 | **resultant** 44:15 | 117:18,24 118:17,22 | 89:7 91:11,25 93:8,23 97:5 |
| **reread** 8:19,19 | **resulted** 27:24 69:20 91:18 | 134:20 150:15 | 102:22 104:15 105:17 106:17 |
| **resisted** 25:24 | 101:18,25 108:17,25 | **review** 9:13 37:17,20 53:20 | 107:20 111:8 112:4 121:21 |
| **respect** 34:16 35:6 42:5 | **resulting** 121:12 130:19 | 123:8 135:17 135:21 137:24 | 121:24 123:5 127:5 129:1 |
| 51:11 61:13,20 129:3 140:12 | **results** 53:19 73:5 84:12 | 140:1 155:12 156:1 157:1 | 133:8,11 134:20 139:9 |
| 147:15 148:16 | 102:2 110:12 130:4 | **reviewed** 8:21 8:22 37:8,13 | 139:23 140:5 142:14 146:3 |
| **respond** 69:8 | **retained** 34:6 34:11,15 35:9 | 37:15 40:4 73:21 92:16 | 148:1,23 |
| **responding** 12:25 | 35:22 141:23 153:15 | 133:9 138:18 140:2 146:12 | **rise** 93:14 |
| **response** 88:5,8 88:21 104:13 | **return** 78:14,14 | **reviewing** 30:17 122:11 | **risk** 145:6 |
| 117:15 131:18 143:23 | **returned** 155:18 | **rho** 20:18 | **rockefeller** 2:9 |
| **responsibilities** 15:25 | **reveal** 66:22 70:2 | **right** 6:11 12:2 12:19 13:3,15 | **role** 15:11 17:21 18:7,9 |
| **responsibility** 16:4 | **revealed** 52:16 67:20 71:11,17 | 13:19 14:25 15:23 18:6,13 | 28:25 29:5,9 29:25 |
| **responsible** 118:21 | 103:7 132:1 | 19:1 23:6 24:1 26:19 34:8 | **roles** 13:19 14:18 |
| **rest** 143:5 146:23 | **revelation** 104:9 | | **rolling** 144:19 |

**room** 6:9,13
**rose** 92:21
  93:18
**rough** 97:15
**roughly** 27:18
  44:1 109:16
  127:12
**rpr** 1:21 154:23
**ruled** 25:9,17
  26:7
**rules** 7:14
  156:5 157:5
**ruling** 25:25
**run** 16:2 38:4

**s**

**s** 155:15 157:8
  157:8 158:3
**sale** 43:8 78:12
  130:20
**sales** 41:3,5,9
  41:13,21 43:16
  43:17,20 44:16
  44:22 46:2,9
  46:10,13,13,18
  46:22 47:8,9
  47:18,24 48:4
  48:4,18,19,21
  49:1 50:2,8,12
  50:14,24 51:14
  51:20,22 52:4
  53:21 54:25
  55:3,5,5,5,15
  55:16 56:6,12

56:22,24 57:15
57:20 58:5,6
58:25 59:4
60:5,8,17 61:5
65:4 66:17
67:20,23,25
68:21 69:6,7
69:13,19 70:1
70:3,12,14,17
70:22 71:1,5
76:8 95:13,18
96:21 97:25
102:14,16
105:3 108:20
109:2,10
110:11 111:8
111:10 112:4,5
112:8,18 113:6
113:17,19
115:9 117:24
134:14 135:4
135:15 136:4
141:13
**saw** 99:25
  100:10
**saying** 38:8
  45:13 46:25
  47:16,20 48:7
  48:8 49:21
  50:20 55:3
  57:4 61:15
  64:16,19 66:8
  70:5,13,24
  76:24 77:15,20

78:1,23 81:22
84:16 85:8
87:20 106:16
108:8,9 109:7
114:1 119:20
129:3,6 130:9
132:8 134:5,14
137:21 139:11
140:14 141:4,5
149:10,14,16
150:5
**says** 13:18
  18:12,23 19:2
  19:20 34:6
  36:17 39:13
  44:13 55:4
  67:18 84:23
  114:10 138:25
  139:18 142:11
  145:5,10
**scale** 121:6
**scenario** 96:16
**scholes** 127:22
**school** 10:1,3
**schooling** 10:9
  10:11
**science** 18:24
**scienter** 36:1,2
  36:4,5 39:20
  39:24
**scope** 35:21
**screen** 4:9
**scroll** 36:23

**seal** 156:15
  157:21
**sec** 37:10,11
**second** 7:21
  19:20 22:7
  26:24 33:25
  34:10 36:24
  41:22 43:18
  52:22 54:24
  56:6 58:23
  59:22,23 67:24
  74:7 81:14,20
  89:25 90:15
  93:6 94:17
  100:12 101:3
  108:19 109:11
  111:18 114:10
  125:21,25
  136:12 147:17
  148:3,24
**section** 13:18
  15:11,14 16:13
  21:24 22:16,20
  26:22 27:2,9
  28:22 29:12
  45:21 119:5
  120:14 141:25
**sections** 28:1
**securities** 14:9
  16:13 18:25
  19:6 26:5
  28:10,13,13
  34:8,13 36:2
  87:7 89:19

**[security - similar]** Page 40

**security** 74:16 74:23 75:11 96:15 98:11,13
**see** 6:15 10:24 11:2 12:8,10 19:18 20:1 26:15 36:19 39:14,15 40:9 40:14,21 41:18 44:18 54:24 55:6,7,13,14,16 55:19 56:17,18 63:19 69:8,17 73:18 74:9 80:15 83:20,21 84:16 94:19,23 95:5 102:19 103:14 114:17 116:23 122:10 126:6,23 127:3 127:15,19 128:3 129:16 129:22 132:18 134:16 139:4 141:13 144:11 144:24 145:12 147:16 150:4 152:21
**seeing** 51:10 56:19 63:5 64:6 66:6 105:12,21 107:25 131:20 149:19

**seek** 140:8
**seem** 57:4,16 149:20 150:7 151:5
**seems** 90:5 147:22 148:5 150:1 151:9
**seen** 4:8 43:10 54:11 60:9 61:6 66:18 70:4,16,22 71:2 76:9 90:2 94:11 110:19 117:4
**send** 9:19
**sending** 151:6 151:11
**sense** 8:7 27:17 28:5 61:23 64:15 83:23 105:9 113:4 117:1,17 118:5 118:13 126:1
**sensitive** 21:2 21:16
**sentence** 39:15 39:16 40:24 45:11 52:10 59:22,23 74:10 77:11 81:12 85:13 114:10 142:23 143:15 143:18 144:3 145:18 147:22

148:4,15
**sentences** 80:16 81:4 101:2
**separate** 32:4 85:17 88:23
**separated** 65:17
**september** 55:10
**series** 10:13 11:9 30:22
**services** 13:24 13:24 16:3 17:18,20
**set** 102:21 103:25 119:19 140:2 154:20
**seven** 8:25
**several** 89:3 118:17
**severe** 110:9 117:2
**severely** 109:24
**severity** 117:9
**sg&a** 96:12
**share** 10:20 12:9 66:24 121:7,14
**shared** 110:13
**shareholders** 28:7 96:2
**sharper** 84:22
**sheet** 155:13 157:7,10,18

158:1
**short** 33:8 77:6 92:8 112:25 118:13 147:16 149:15 151:19
**shorter** 147:19
**shortfall** 74:14 117:2,9
**shorthand** 154:4
**show** 143:7 147:3
**showing** 134:11
**shown** 27:6 155:16
**side** 17:10 25:22
**sided** 17:19
**sign** 153:10
**signal** 151:11
**signature** 154:23 155:14
**signed** 156:13 157:18
**significance** 105:11
**significant** 59:5 95:1 105:16
**signing** 155:19
**silent** 6:14
**similar** 101:19 102:1 103:2,16 103:16,18 104:8,11 119:4

119:7,14,25
120:11 132:5
**similarly**  1:4
4:17
**simple**  99:7
118:13 145:23
**simply**  118:5
140:7 149:23
**sincerely**
155:21
**single**  20:11
52:14 133:23
**sir**  155:10
**sit**  20:23 26:11
86:4,18 88:3
123:7
**sitting**  5:11
123:13
**situated**  1:4
4:17
**situations**  69:2
**six**  8:25
**size**  108:12
126:24
**slightly**  125:11
**small**  112:4
115:1 117:18
**smaller**  108:25
**smart**  39:12
41:3,7 45:15
52:18 60:5
81:9 99:14
100:3 101:15
114:13 137:15

**sold**  78:24
**solely**  123:17
**solutions**  155:1
158:1
**solvency**  25:3
**somebody**
42:16 142:6
**somewhat**  66:7
**soon**  12:8
**sorry**  34:9
37:11,12 59:25
69:5 71:6
73:12 80:20,23
84:21 127:6
149:1
**sort**  24:24
48:20 50:6
56:19 62:23
63:19 75:1
79:7 95:3
98:23 117:5,19
**sound**  85:12
**sounded**  96:7
**sounds**  97:20
102:21 152:24
**sources**  119:6
133:14
**southern**  1:1
4:19
**spanned**  14:17
**speak**  7:20
**specific**  40:21
42:11 46:18
48:17,20 49:19

51:9 53:10
64:6 70:5 71:4
102:1 105:3
110:17 111:2,3
120:20 137:14
137:16,24
148:19,21
149:9
**specifically**
40:21,24 43:7
47:3 59:19
102:4 123:10
136:1
**specifics**  89:4
**specified**
154:15
**specifying**
79:24
**speculate**  59:13
**speculatively**
47:20
**spend**  8:23
18:9
**spending**  96:12
**spread**  19:24
**spring**  143:6
144:9,20 147:3
**stadium**  1:3
4:15 155:6
156:3 157:3
**staff**  9:19 11:9
12:16
**stamp**  54:5

**standard**  104:2
120:8
**standpoint**
101:6
**stands**  47:12
**start**  18:22
29:6 34:2
102:13 112:14
113:4 131:15
133:2
**starting**  13:17
25:1 44:10
55:9 59:22
81:5
**starts**  39:6
127:7,10
**state**  5:4,7 6:1
54:2 60:6 76:6
76:10,13 154:5
156:10 157:15
**stated**  61:9,15
62:9 146:18
**statement**
28:23 29:3,4
29:10,20 34:17
45:10 49:20
52:24 58:5,22
61:16 62:4,11
62:20 63:9
64:19 68:19,23
78:15,18
112:12,13
113:12 141:18
141:24 142:3

**[statement - sufficiently]**

142:11 148:5
156:13,14
157:19,19
**statements**
29:7 30:15
31:2 35:23,25
36:7 39:10,19
39:24 40:12,13
41:15,23 43:19
43:21 44:3,6,9
45:3,9,16 46:1
48:16,24 61:2
61:10 62:20
64:8 65:9,9
66:25 71:16
73:22 86:1
117:14 118:20
122:22 123:17
123:19,20
136:17 137:13
137:19 138:3,5
138:8,9,15,21
139:1,8 141:3
143:5 146:25
147:1 149:18
**states** 1:1 4:19
88:10 92:20
149:3
**stating** 64:2
79:22 101:22
**statistic** 105:19
105:25
**statistical**
105:10,11

106:13
**statistically**
94:25
**statistics** 36:13
107:12 120:4
**statute** 15:15
**steep** 110:23
**stenographic...**
1:21 154:11
**step** 27:20
**steps** 46:9
**stick** 121:21
**stock** 21:4 30:4
31:11,24 32:16
33:3 38:10
68:3,13,25
69:14,21 71:4
71:10,19 73:25
75:15,24 91:23
92:20 93:11,14
93:18 94:2
99:1,3,9 100:6
100:9,14,16
101:19 102:1
103:2,6,17,24
104:8 105:15
105:20,22
106:5 107:16
108:6,17,22
109:4,8 113:6
114:5 118:6,23
119:18 124:5
124:15,17,25
125:5 129:25

130:3,15
131:13,23
139:21
**stocks** 19:21
**stop** 73:14
**strategic** 18:18
**street** 42:17
**strike** 113:15
126:3,7 127:10
127:16
**strong** 41:8
143:8 145:21
147:4,14,21
148:6 150:4,9
151:13,16,16
**studied** 42:10
42:21,24 43:7
123:24
**study** 43:12
93:2
**studying** 58:2
**sub** 18:2
**subject** 43:1
**submit** 22:24
**submitted** 54:3
**subscribed**
156:10 157:14
158:21
**subscription**
37:3
**subsequent**
145:7
**subset** 12:23
31:6

**substance**
119:1
**substantial**
17:11 47:13
51:25 52:7
53:1 58:2 73:9
73:20 113:11
**substantially**
41:13 45:14
48:14,23 49:11
49:25 51:1
56:4 64:20
65:4 68:15
70:2,21 73:24
76:18 92:21
102:16 117:25
121:16 136:15
136:23
**substantive**
113:1
**substitute**
119:24 135:3
**substitutes**
119:22
**substitution**
65:19
**successful**
102:12
**sudden** 80:4
**sufficient** 10:14
25:9 44:9
**sufficiently**
45:17 134:24

**suggest**  111:13 114:20 140:24
**suggested** 48:23 115:25
**suggesting** 68:16 69:25 77:4 103:14 116:8 118:11
**suggests**  139:12 141:6 150:14
**suit**  35:10
**suite**  155:2
**summarized** 37:9,14
**summer**  143:4 146:23
**superior**  155:1
**supply**  42:8,9
**support**  28:12 40:14 96:11 109:20
**supported**  74:4
**supporting** 14:13
**suppose**  61:15 63:8
**supposed** 126:17
**sure**  6:3,19 7:16 20:20 21:2 23:22 24:5 44:4 56:21 60:1 66:14 74:12,19

81:5 89:14 90:1,10,15 91:15 96:17 99:11,11,11 101:5 105:16 108:25 121:20 125:25 132:17 132:20 145:20 152:23
**surprise**  69:11 75:4
**surrounding** 116:11
**survived**  123:3
**swear**  5:15
**switched**  63:20
**sworn**  5:17,21 154:9 156:10 156:13 157:14 157:18 158:21
**system**  54:18

**t**

**t**  5:22 91:21,21 105:19,25
**table**  130:4,4
**take**  4:11 11:1 14:23 19:11 21:6,10 27:12 27:20 28:4 33:8,10 34:3 37:24 62:4 71:22,23 72:9 72:10 85:4

90:13 95:11 119:3 151:23 152:20
**taken**  4:14 33:16 72:14 84:18 91:4 128:16 145:8 152:4 153:2 154:14
**takes**  19:5 21:21 125:16
**talk**  46:8 77:15 141:11,12 151:21
**talked**  121:22
**talking**  23:20 50:21,22 65:17 76:5 77:11 78:6 79:8 97:7 97:7 99:22 107:2 111:6,17 119:16 123:5 128:23 130:18 130:23 138:6 147:18 149:12 149:13,14 150:10,14,18 151:14
**tax**  78:9,11 96:9,10
**taxes**  78:12
**team**  18:22 151:22

**technically** 38:24 85:17
**technique** 88:12,14
**tell**  6:8 20:19 20:25 74:23 119:8
**telling**  151:8
**tells**  137:2
**temporary** 49:14,17 77:22 84:4,15 98:8 148:17
**ten**  27:5 71:23 72:8,9 127:12 151:23 152:20
**tens**  19:24
**term**  36:1 49:3 64:16 75:21 77:6 78:2 79:23 80:9 98:9,19 132:15 143:7 147:4,15 147:16,19,19 147:23 148:7 148:11,16 149:12,15,15 151:1,16,19
**terms**  19:5 54:21 57:19 75:8 86:23 120:17 151:7
**test**  39:12 41:3 41:3,7 43:8,17

45:15 52:18 60:6,17 81:9 81:10 82:6 99:14,18 100:3 100:8 101:15 105:10,12,24 106:13 114:13 135:16 137:15 145:21 148:15

**testified** 5:21 15:9 17:5,14 22:15 23:14,17 24:9 92:15 133:9 139:6

**testify** 15:3,7 25:18 29:9 35:19 40:3 141:23 154:9

**testifying** 14:19 15:10 16:7,12 16:22 19:10,12 19:12 22:24 23:11 27:11 30:1,24 31:10

**testimony** 14:22 17:1,3 21:24 22:1 24:11,15,17 25:10,11 26:7 37:21 103:3 142:6 153:12 154:13 156:6,7 157:6,9,12

**testing** 42:6,13 42:22 94:15 100:13 101:15 114:14 135:7 143:24 144:23 145:11 146:18 146:20 151:1

**tests** 134:1,21 136:15,18,22 136:25 138:11 143:4,8,21 145:8,24 146:1 146:22 147:4 147:13

**text** 136:8

**thank** 5:14 60:13 153:7,9

**theoretical** 21:15,22 104:25 124:18 128:7 130:22

**theoretically** 66:2 98:4,21 99:6 108:17 125:13 127:25 129:16

**theories** 24:23 30:9

**theory** 25:11,12 27:16 28:5 74:13 95:1 115:4 121:4

**thing** 8:11 45:2 46:19 47:21

57:11 65:21 66:12 79:7 84:4 85:3 134:19 135:2

**things** 21:22 37:2,3 42:8 46:8 50:12 61:14 64:15,24 66:11 68:17,20 81:23,24 82:1 96:12 113:25 116:23 119:15 121:2 124:13 147:19,20 151:3

**think** 7:8 14:21 15:5,8,8 16:19 17:1,2,13 19:5 22:4,7,18,21 25:3,14,24 27:18 29:1 33:4 35:20 36:20 37:24 43:5 44:24 47:7,11 49:8 49:18 50:5,20 51:6,16 53:15 58:3 59:9 62:1 64:17,18 65:3 65:16,25 66:12 67:10 68:8,13 80:1 81:17 84:13,14 85:15 85:19,20 86:8

87:12,13 90:17 94:12 95:23 96:9 97:4 98:3 99:6 100:7,9 100:21,22 102:3,23 104:2 104:3,7,17,18 104:21,23 109:19 110:5 112:9 113:3,12 113:24 114:3 114:22 115:18 115:19 116:17 118:9,24 119:13 120:1 122:21 124:2 124:16 125:14 128:10 129:13 133:9 134:9 139:15 141:4,5 142:10,11 145:10 147:18 147:20 149:8,9 150:13 151:3 152:22

**thinking** 37:12

**third** 2:4 7:23 56:21,22 57:8 57:11,14,19 58:24

**thirty** 155:18

**thought** 20:20 27:16 34:10 36:15 67:4

142:7
**three** 24:19
55:22 123:17
150:23
**threshold** 67:5
67:14 104:11
**time** 5:4 7:8
8:23 13:22
16:11 18:6,9
18:11 19:6
28:14 33:14,19
43:20 44:2,5,9
46:19 47:4
48:21 50:13
51:23 52:5
58:18,20 59:15
63:23 64:17
71:20 72:12,17
75:1,3,16,18,24
76:16 77:5,20
77:22 78:4,6,9
78:16,23 79:4
79:9,18,20
80:5 83:22
85:1,3 90:2,11
90:14,24 91:2
91:7,21,21
93:17 99:24
100:9 102:15
103:21 110:8
110:18 116:2
117:3 119:2,17
121:7,13,17
127:1 128:11

128:14,19
130:19,20
135:15 136:17
137:4 138:6
142:9 147:1
152:3,7,18
153:1,5,7
154:14
**times** 23:14,17
24:8,16,18
27:18 28:15,21
30:23 44:23
58:21 88:15,21
102:7 118:2
142:6
**today** 6:5,8 7:3
12:1
**today's** 9:14,16
153:12
**told** 139:25
**took** 152:19
**top** 23:2 24:20
27:1 47:14
87:19 89:16
90:5 148:20
**total** 8:25 51:4
119:9 138:17
153:14
**towards** 54:24
93:8
**track** 51:1
102:16
**tracking** 41:12
54:18

**trade** 20:9,12
**trades** 19:25
**trading** 38:5,6
38:13,16
**traditional**
24:24 25:12
**train** 34:9
**training** 10:16
43:3
**transaction**
79:1
**transcribed**
7:16 156:7
**transcript** 7:16
154:11 155:11
155:12 156:5
156:12 157:5
157:11,17
**transitory**
74:16 111:23
**translates**
131:5
**tremendous**
110:19
**trend** 109:15
109:17 145:24
**trends** 64:16
107:25 134:11
134:17
**trial** 15:3,7
23:18,20,24,25
24:2,3,4,6
**true** 25:5 37:18
44:11 45:14,19

69:12 94:2,10
94:23 98:5
99:3 109:5
112:24 124:19
125:4,6,14
138:25 139:18
150:19 151:4
151:19,20
154:12
**truly** 32:2,3
**truth** 53:12
60:4 64:2,5
91:16 101:7,20
103:7 104:5,9
140:19 154:9
**truthful** 49:20
109:7 113:12
**try** 8:9,10 23:6
23:7 84:21
93:10
**trying** 15:5
22:4 29:1
47:13 74:21
79:15 100:14
103:24,25
114:23 120:9
120:12 129:9
134:14 137:23
139:15 151:4
**tsai** 135:13
137:12 138:25
139:17 141:6
143:1,12,14,20
144:8,14 145:1

**[tsai - uris]**

145:5,15
149:12 150:1
151:12
**tsai's** 3:15
135:17 139:11
140:11 143:25
144:2 145:20
146:2,6 147:9
147:13
**turn** 13:12
59:20 74:5
80:13 100:18
135:10,10
142:22 146:15
**turned** 30:18
**two** 17:19
24:23 33:11
56:13,20,23,25
57:7,8,15,18,18
59:1 64:14,23
66:11 67:17
68:2,9,11,17
69:1,2,9 72:2
80:16 81:3,23
81:23,24 82:1
82:1,2,4 113:5
119:6,10
121:19 129:10
150:6,23 151:5
**type** 24:3
102:25 115:15
134:7
**typically** 28:25
29:6,24

**u**

**ultimately**
25:25 27:24
71:16 96:1
97:6,12 98:10
101:11 112:20
125:18 137:6
**uncertain**
145:22
**uncertainty**
107:19 108:2,5
109:22 115:19
116:10 119:6,9
119:21 146:24
**under** 7:23
37:10,11,11
97:10,20
102:24 103:24
119:18
**underestimates**
116:4
**undergraduate**
9:24
**underlying**
21:4,17 37:6
41:14 56:16
58:3 102:18
124:14,25
125:3,4 126:12
126:18 129:17
130:13 131:13
131:23 132:11

**understand**
7:24 15:14
23:19 24:14
25:23 36:1
40:25 43:4
45:5 46:20
51:21 52:3
56:4 57:10
60:2 96:5
97:13 101:9,13
102:5 114:12
117:8,22
137:17 149:21
**understanding**
36:3 38:9,18
39:22 41:20
42:17 43:5
44:1,25 45:8
48:8 49:15
50:22 51:8,15
51:19 52:5,13
61:1,10 62:24
63:21 66:20
70:10 71:12
77:18 81:21
86:21 103:19
109:14 110:16
110:25 111:15
111:24 112:17
115:3 117:6
**understood** 8:1
17:15 35:2
133:25 146:17

**unemployment**
18:25
**unique** 56:15
**unit** 4:13 33:15
33:20 72:13,18
91:3,8 128:15
128:20
**united** 1:1 4:19
**units** 153:14
**universities**
27:1
**university** 10:4
**unknown**
143:11 147:7
**update** 76:20
77:7,23 82:14
83:6 85:4
**updated** 77:9
77:23 81:21
**uris** 2:3 5:12,12
9:3,4 36:9
40:16 41:25
43:23 46:5
47:5 49:4 50:3
50:18 56:9
58:14 59:7
61:21 63:13
65:23 68:5
69:23 72:7
83:18 86:2,16
95:21 97:2
99:4 109:12
111:11 113:22
116:19 119:11

138:12 140:4 142:15 152:19 153:6,10 155:5

**use** 40:5 76:20 77:6,23 81:12 88:18 103:25 110:5 114:8 119:13,14 125:17 134:1

**used** 36:20 61:8 88:8,12 89:10 89:12 90:19,20 103:16 119:4 121:6,10,14 153:14

**using** 6:13 19:24 40:8 41:4 89:14 93:20 94:5 105:2 116:7,15 127:21,24 128:6 130:8,11 130:22 131:15

**usually** 23:25 141:19 142:1 142:13

**v**

**v** 155:6 156:3 157:3

**vaccines** 144:20

**vague** 122:10

**valeant** 26:4 121:15,17

**validated** 133:23

**valuation** 14:16 19:1 36:13 123:21

**value** 21:15 25:5 26:18 31:23 32:7,8 33:2 53:17 69:17 72:25 73:20,23 74:16 74:22 79:2 94:2,8,10,23 98:20 99:12 100:2 103:5 106:23 107:12 116:5,12 121:11,17 140:11

**valued** 126:13

**values** 21:6,10 21:21 128:6

**valuing** 129:24

**variables** 129:23

**variants** 143:9 145:7 147:5

**varied** 14:8

**variety** 13:19

**various** 19:23

**vast** 22:21

**veritext** 4:22,24 153:15 155:1,7 158:1

**veritext.com.** 155:17

**versus** 4:17 20:10 69:6 87:15 88:19

**video** 4:10,14

**videographer** 2:16 4:1,22 5:14 33:13,18 72:11,16 91:1 91:6 128:13,18 152:2,6,25 153:4,11

**videotaped** 1:10

**view** 31:8,22 34:24 38:3,7 38:12 45:19 46:18 60:14 71:20 83:2 87:14 103:4,10 104:20 115:19 117:7 134:3 140:16,23 141:9 142:8 144:5,16 145:4 145:17 149:15 150:24

**viewed** 73:5,10 78:18

**views** 12:24 35:16,18

**violations** 123:11

**virtually** 4:5

**volatile** 143:21

**volatility** 124:15 125:5 129:7,25 131:10,16 132:6,13,22 143:2 144:7 146:19

**vs** 1:6

**w**

**wait** 39:12 100:22

**waived** 155:19

**wake** 74:3

**walking** 42:17

**want** 7:12,13 23:22 40:19 44:4 60:12 71:23 72:4,5 80:16 90:14 98:6,7 114:9 122:8 134:13 136:11 151:21 152:9,21,22

**wanted** 90:13 125:25

**waves** 143:9,22 147:5

**[way - yep]**

**way** 6:17 7:20 17:22 25:24 29:8,9 31:23 32:4 34:22 51:18,24 55:20 56:5 57:19 58:2 61:4 62:6 64:4,5 67:1 68:24 73:20 76:16 79:25 84:20,23 85:22 86:20 88:23 90:13 91:19 98:16 104:5 111:23 119:8 119:16 120:21 134:10 139:12 139:12,14,15 140:20 143:16 144:5,16 145:4 145:17

**ways** 88:15 98:18 100:15

**weaker** 150:9

**week** 41:22

**weeks** 43:17,25 44:4 50:14,21 118:17

**weight** 66:13

**welcome** 122:9

**went** 9:24 10:1 25:13 26:8 99:24

**west** 6:3

**whatsoever** 78:17

**whereof** 154:20

**wide** 35:13 133:25

**widely** 133:19 133:19 135:8 138:20 146:17 146:24

**william** 6:3

**willing** 28:17 28:18 29:3 31:6

**withdrawal** 145:24

**withdrawing** 41:8 149:23 151:10

**witness** 3:2 4:8 5:15,17,20 33:10 36:10 40:17 42:1 43:24 46:6 47:6 50:4,19 56:10 58:15 59:8 61:22 63:14 65:24 68:6 69:24 83:19 86:3,17 90:25 95:22 97:3 99:5 109:13 111:12 113:23 116:20

119:12 138:13 140:6 142:16 152:1 153:9 154:8,8,20 155:8,11 156:1 156:4,11 157:1 157:4,15

**witness'** 155:14

**wondering** 140:10

**word** 36:20 50:7 81:12 103:16 119:4 119:13

**worded** 82:24

**words** 32:3 48:19 49:14,19 50:7 61:7 62:19 63:3 66:22 76:17 77:2 80:6 84:2 96:13 106:21 107:4 114:20 119:14 131:4

**work** 8:24 10:10 14:7,9 14:11,19 16:6 16:22 17:8,9 18:10 20:5 43:14

**worked** 13:18 14:12,14 18:4 147:1

**working** 11:10 14:7 16:24 17:12

**works** 128:11

**world** 124:19

**worse** 52:16 53:7,8 110:1

**worth** 71:19 92:13

**writing** 130:21

**written** 27:4,8 142:10

**x**

**x** 5:22

**y**

**yeah** 20:7 30:18 33:10 37:13 48:10 59:12 60:1 64:14 74:7 90:1 92:5 122:15 124:23 125:23 139:10 148:4

**year** 18:15,15 18:16 56:14 143:5 146:23

**years** 7:7 21:25 22:1,15 27:5 56:19 66:6

**yep** 33:25 36:24 80:23 133:1

**yield** 71:3,3
108:6
**york** 1:1 2:4,4,8
2:9,9 3:4 4:20
5:9,9,23 10:23
12:7 33:6,12
33:21 49:5
54:10 72:9,19
89:23 90:23
91:9 128:10,22
140:5 146:10
151:21 152:8
152:17,24
153:7

**z**

**zero** 21:7,11
23:16 24:10
25:5,6 105:21
**zoom** 1:11 6:7
54:22

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 158

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 7113324

PAGE/LINE(S) /      CHANGE      /REASON

27:25-28:1 | "or it being asked not to" to "or being asked not to" | Clarification

28:12-13 | "market for a particular securities" to "market for a particular security" | Clarification

32:4-5 | "even on an interday basis" to "even on an intraday basis" | Transcription error

39:7 | "lost causation" to "loss causation" | Transcription error

75:2-3 | "that's going to have a more" to "that's not going to have a more" | Clarification

81:5 | "Starting "with defendants"?" to "Starting with "Defendants"?" | Transcription error

88:10 | "on earning states" to "on earnings dates" | Transcription error

92:9-10 | "broad related price decline" to "fraud-related price decline" | Transcription error

98:13-14 | "other effects goes on" to "other effects going on" | Clarification

98:16 | "some way that impact" to "some way that impacts" | Clarification

108:9 | "why the $2.18" to "why the $2.08" | Transcription error

121:10 | "concept percentage method" to "constant percentage method" | Transcription error

127:24-25 | "the theoretically construct" to "the theoretical construct" | Transcription error

137:17 | "about future understand" to "about future demand" | Transcription error

138:25-139:1 | "it does nothing but prove" to "it does nothing to prove" | Transcription error

03-07-2025

Date          Chad Coffman

SUBSCRIBED AND SWORN TO BEFORE ME THIS ___7___

DAY OF _March_          ,20_25_ .

_____
Notary Public

_May 2, 2028_

Commission Expiration Date



DEMETRICE SOLOMON WEATHERSBY JR
OFFICIAL SEAL
NOTARY PUBLIC STATE OF ILLINOIS
Notary Public - State of Illinois
Commission No. 990196
My Commission Expires May 02, 2028