**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>Defendants. | Case No.: 1:22-cv-06978-AS<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT...........................................................................................1

UNDISPUTED MATERIAL FACTS................................................................................2

      A.      CoDx Develops and Sells the Logix Test Worldwide. ...........................................2

      B.      Logix Test Sales Largely Tracked COVID Waves..................................................3

      C.      Testing Demand Became Even More Unpredictable in Spring 2022, Causing Defendants Not to Provide Guidance. ...................................................................4

      D.      On May 12, CoDx Announces Strong 1Q22 Results and Decision Not to Provide Guidance.....................................................................................................6

      E.      On August 11, CoDx Announces Disappointing 2Q22 Results and Other Bad News. .....................................................................................................................7

ARGUMENT......................................................................................................................8

I.      The Challenged Statements Were True and Not Misleading.............................................9

      A.      The Challenged Statements Truthfully Described the Market Conditions at the Time and Defendants' Reasons for Not Providing Guidance...........................9

      B.      Omission of Sales-to-Date Did Not Render Any Statement Misleading...............13

II.      The Alleged Misrepresentations Were Not Material. .........................................................15

III.      The Defendants Did Not Act With Scienter. .....................................................................16

IV.      Plaintiff Cannot Prove Reliance........................................................................................20

V.      Plaintiff Cannot Prove Loss Causation .............................................................................23

CONCLUSION.................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) .........................................................................................18

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).................................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................8

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ..................................................................................21, 22

*Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*,
477 F.Supp.3d 88 (S.D.N.Y. 2020).........................................................................25

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988).....................................................................................15, 16, 23

*Bazzelle v. Novocure Ltd.*,
2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ...........................................................18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................23, 24

*In re Ferroglobe PLC Sec. Litig.*,
2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020)..........................................................12

*In re Focus Media Holding Ltd. Litig.*,
701 F.Supp.2d 534 (S.D.N.Y. 2010)........................................................................13

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021).............................................................................................20, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).................................................................................................20

*IBEW Loc. Union v. Royal Bank of Scotland Grp.*,
783 F.3d 383 (2d Cir. 2015).....................................................................................12

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)........................................................................................17

*In re Keryx Biopharms., Inc., Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ................................................................... 19

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ......................................................... 22, 23

*Macquarie v. Moab*,
601 U.S. 257 (2024) .................................................................................................. 8, 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................................................ 9

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022) ............................................................................................ 8

*Menorah Mivtachim Ins. v. Sheehan*,
2024 WL 1613907 (2d Cir. Apr. 15, 2024) .......................................................... 24, 25

*In re Mylan N.V. Sec. Litig.*,
666 F.Supp.3d 266 (S.D.N.Y. 2023), *aff'd sub nom. Menorah Mivtachim Ins.*
*v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024) ............................... 16, 19, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 ................................................................................................................. 11

*In re Omnicom Grp. Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ..................................................................................... 23, 26

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
548 F. App'x 16 (2d Cir. 2013) .................................................................................... 24

*In re Puda Coal Sec. Inc., Litig.*,
30 F.Supp.3d 230 (S.D.N.Y. 2014) .............................................................................. 25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009) ........................................................................................... 17

*Siegel v. Bos. Beer Co.*,
2022 WL 17417111 (S.D.N.Y. Dec. 5, 2022) ............................................................. 12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) ........................................................................................................ 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................................... 16

*In re Williams Sec. Litig.–WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ............................................................................. 24, 25

**Statutes**

15 U.S.C. §78u-4(b)(4) ........................................................................................................23

15 U.S.C. §78u-5 ................................................................................................................12

**Rules**

Fed. R. Civ. P. 56(a) ..............................................................................................................8

**PRELIMINARY STATEMENT**

This case is built on a fundamentally wrong assumption: that sales of Co-Diagnostics, Inc.'s ("CoDx" or the "Company") flagship product—a COVID-19 diagnostic test ("Logix test")—followed predictable patterns such that low sales in the first several weeks of the second quarter of 2022 ("2Q22") must have signified a demand "problem" and indicated that full-quarter revenue would be down. This speculation may have had some intuitive appeal at the pleading stage, but discovery has disproved it: there was *not* a cognizable downward trend in demand for the Logix test when the challenged statements were made on May 12, 2022. Those statements thus were not false or misleading, much less intentionally so.

As detailed below, there is no genuine dispute that (i) Logix test sales were always volatile, swingingly widely with the rise and fall of new COVID waves and other factors, (ii) this volatility became even more pronounced from late 2021 through spring 2022, as the Omicron variant surged and then receded, and (iii) Defendants genuinely did not view lower sales in the weeks leading up to May 12 as indicating a broader decline in demand when they made the challenged statements. The individual defendants, CEO Dwight ("Ike") Egan and CFO Brian Brown, told the market exactly what they knew to be true on May 12: changing conditions in the COVID-testing market and increasingly volatile fluctuations in CoDx's sales made it impossible to predict full-quarter 2Q22 revenue at that time, regardless of sales-to-date. All six of CoDx's deponents testified to this effect, supported by the undisputed opinion of leading COVID-testing expert Dr. Thomas Tsai, independent testimony from the investor relations ("IR") firm that helped prepare the May 12 earnings release, and internal documents. No facts suggest otherwise.

Nonetheless, Plaintiff claims that the challenged statements—explaining Defendants' decision not to provide quarterly guidance on May 12 due to increased uncertainty, but expressing

1

continued confidence about long-term demand for CoDx's products—were materially false and misleading because Defendants knew but failed to disclose that "demand had already plummeted." Consol. Am. Comp. (Dkt. #31;"AC") ¶48. After extensive document discovery and numerous depositions, not a single fact supports this hindsight speculation. As detailed below, there is no genuine issue of material fact, and the undisputed, material facts demonstrate that Plaintiff cannot prove any of the required elements for its §10(b) claim—falsity, materiality, scienter, reliance, or loss causation. Each of these failures of proof is independently fatal to Plaintiff's claims and compels summary judgment for Defendants.

**UNDISPUTED MATERIAL FACTS[1]**

**A.  CoDx Develops and Sells the Logix Test Worldwide.**

CoDx develops and sells proprietary diagnostic testing technology, including polymerase-chain reaction ("PCR") tests. 56.1 ¶¶1-2. When COVID emerged in early 2020, CoDx's novel PCR technology enabled it to quickly develop the Logix test, which became the first U.S.-based COVID test to obtain regulatory clearance in the E.U. and received Emergency Use Authorization soon after. *Id.* ¶¶3-4, 11-15. From 2Q20 through 1Q22, CoDx sold tens of millions of dollars' worth of the Logix test each quarter to labs and distributors around the world. *Id.* ¶¶17-26, 28 (about half of 2021 revenue came from abroad); Exs. 96, 112 (quarterly and monthly sales charts).

At the same time, CoDx was clear with investors about the risks inherent in this dramatic, COVID-driven rise in revenue. 56.1 ¶¶29 ("we do not have any way to predict how long our market for [Logix] test will continue"). Defendants regularly discussed the need to plan for a future where COVID shifted to an "endemic" pattern, and an important part of that was CoDx's development

---

[1] This summarizes key evidence from Defs' Rule 56.1 Statement ("56.1 ¶_"; incorporated by reference), and exhibits ("Ex._") to the Greene Declaration, filed concurrently herewith.

of a new at-home/point-of-care testing platform that could test for multiple diseases at once. *Id.* ¶¶30-39. CoDx provided regular updates on this new product's progress (*id.* ¶¶32-38), and analyst reports reflect that the market understood it to be important to CoDx's future prospects (*id.* ¶39).

**B. Logix Test Sales Largely Tracked COVID Waves.**

From 2Q20 through 1Q22, demand for COVID tests largely tracked the unpredictable rise and fall of new COVID variants, as did demand for the Logix test. Dr. Tsai's report explains these historical trends, describing how the emergence of new COVID variants was highly unpredictable and did not follow regular seasonal patterns; how severity, transmissibility, and vaccine-efficacy differed dramatically between variants; how government policies at federal, state, and local levels (e.g., masking, vaccination, and testing requirements, funding initiatives) had disparate and often conflicting impacts on test demand in different places; and how the interplay of all of these factors made testing demand highly unpredictable throughout the pandemic. 56.1 ¶¶43-102, 146-154, 244-250; Ex. 91. As Dr. Tsai explains, it was impossible to predict when the next COVID wave would emerge, but experts were certain at all relevant times that it *would* emerge and drive continued testing demand. It was simply a matter of when. 56.1 ¶¶55, 86-87, 89-92, 103, 109.

CoDx's Logix test sales mirrored this volatile, cyclical rise and fall of new COVID variants. CoDx's internal sales data show that sales varied enormously month-to-month and week-to-week from 2Q20 through 1Q22: some quarters started extremely high and ended with low sales, while others did the opposite. 56.1 ¶¶123-133; Exs. 96, 112. It was not unusual for these swings to be extreme. In each of 1Q21, 2Q21, and 1Q22, ~50% of sales came in just two or three weeks of the quarter. *id.* ¶133. In 4Q21—shortly before the class period—almost 60% of sales came in just the *last two weeks* of the quarter, as Omicron surged. *Id.* ¶129. Nonetheless, from 2Q20 through 1Q22, these highs and lows consistently averaged out to between ~$20-30 million in quarterly revenue. *Id.* ¶¶19-26. Several CoDx employees testified (and no one disputed) that it was

3

common to see a big drop in Logix test sales for a while after a large surge in orders and that this did not concern them or signal a demand problem—it was simply the expected, cyclical nature of Logix test sales, which waxed and waned with new waves. *Id.* ¶¶123, 137-138, 144-145. And this was particularly so following the Omicron wave, which was more contagious than any previous variant and drove testing demand higher than at any previous point. *Id.* ¶¶46-47, 59-63, 71-73, 90-93, 137-139. COVID test sales dropped in early 2022 following Omicron's all-time highs—a fact widely reported in the press (*id.* ¶110)—but this was to be expected: Dr. Tsai and the CoDx deponents uniformly testified that they viewed this as a temporary lull and expected additional waves to emerge and drive testing in coming months. *Id.* ¶¶87-88, 92-93, 103, 137-138, 192-193.

## C. Testing Demand Became Even More Unpredictable in Spring 2022, Causing Defendants Not to Provide Guidance.

Even as experts warned of inevitable future waves, it was increasingly clear in March, April, and May 2022 that policies, practices, and personal behaviors with respect to COVID were shifting, making it even more difficult to predict testing demand. By spring 2022, testing requirements and utilization rates, vaccination rates, masking policies, and other factors varied even more widely across the U.S. and changed frequently, creating increased uncertainty. 56.1 ¶¶68-70, 74-86, 89-104, 108, 111. Congress's decision in March 2022 not to renew certain COVID funding for the uninsured was extensively covered in the press, but other federal programs continued to bolster demand for PCR testing. *Id.* ¶¶88, 110, 148-154 (private plans, Medicare, and Medicaid still required to reimburse lab-based COVID tests until mid-2023). Individual testing and preventative behaviors also appeared to be changing as COVID fatigue set in, but had not yet settled into new patterns. This too was widely reported. *Id.* ¶¶81-85, 100-102, 108-111.

At the same time, public health agencies and experts continued to warn of an anticipated increase in COVID cases in the near future as new variants and waves emerged. *Id.* ¶¶90-93, 103,

109. Indeed, two new Omicron sub-variants (BA.2 and BA.5) had just recently begun to circulate in the U.S. and were expected to increase test demand by Summer 2022. *Id.* ¶¶47, 51, 53, 93, 109(f) (5/6/22 NPR: "[C]ases are rising across the country again").

As a result of these numerous, conflicting factors—many of which could drive demand higher or lower—it became even more difficult to predict testing demand for the Logix test in spring 2022. *Id.* ¶¶86, 89-102, 139-141, 187-191, 194-196, 244-250; ¶139 (volatility was "more present than it had been in the past, especially on a weekly basis"). When it came time to start preparing for the 1Q22 earnings release, in late April, Defendants went through their usual preparatory process against the backdrop of this uncertainty—closing the books and reviewing the prior quarter's numbers, consulting with their outside IR firm (Lambert), and figuring out what to say about the past and upcoming quarters given current conditions. 56.1 ¶¶169-186, 197-219. They concluded that while 1Q22 revenue had come in strong, they could not accurately forecast sales for 2Q22 or the rest of the year in light of the many complex factors creating increased uncertainty. 56.1 ¶¶187-193, 220-222. Mr. Brown, Mr. Egan, Andrew Benson, and Mike Houston at Lambert (the four people most involved in this process) each testified that they were trying to be transparent about challenging market conditions and did not want to provide inaccurate guidance. 56.1 ¶¶174-175, 187-191, 194-196, 203-207, 209-221. Each also testified that this was *not* an attempt to hide low quarter-to-date sales: they did not view sales-to-date as good indicators of full-quarter performance, and to the extent they were aware of quarter-to-date sales leading up to May 12 (~$1.9 million in April), they did not view them as concerning, particularly in light of the similarly slow start to 4Q21, which had finished strong, and other quarters where the majority of sales had come in short, unpredictable spurts. *See id.*; ¶¶114-117, 120-121, 135-36, 138-39, 143-45, 178-85, 188-89, 205-19.

5

**D. On May 12, CoDx Announces Strong 1Q22 Results And Decision Not to Provide Guidance.**

On May 12, 2022, after the market closed,[2] Defendants announced strong 1Q22 financial results that beat consensus estimates: revenue of $22.7 million "primarily driven by increased global sales of our [Logix tests]." 56.1 ¶224; *see also* ¶¶223-234. At the same time, however, they announced that a variety of shifting market factors made it too difficult to predict near-term sales so they would not be providing guidance until visibility improved:

> *While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results*. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future. (AC ¶44 (emphasis in AC); similar *id.* ¶ 45; 56.1 ¶¶229-230)
>
> *…. Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results.* (AC ¶45 (emphasis in AC); 56.1 ¶233)

Defendants also answered questions from analysts about why they were not providing guidance:

> **Analyst**: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing guidance mainly because it's tough to like predict the environment moving forward? [And in the same context, I was wondering if you could, I know you spoke about it during your prepared remarks, but I was wondering if you could essentially summarize how you could leverage your CoPrimer technology for other indications, assuming COVID-19 testing decreases throughout the rest of this year?]"
>
> **B. Brown**: *"It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in*. [And the last thing we want to do is provide guidance that we're not confident in. And so that's one thing you'll know

---

[2] It is undisputed that the alleged misstatements were made after market-close on May 12, 2022, so if any part of this action proceeds, the class period must start on *May 13*, 2022. 56.1 ¶225.

going forward is if we're not confident in providing guidance, then we won't provide guidance.]"

AC ¶46 (emphasis in AC); 56.1 ¶234 (bracketed text omitted from AC)).

These three statements (the only challenged statements still at issue in this case (AC ¶¶44-46)) truthfully explained that while the short-term was hard to predict, the Defendants "remain[ed] very confident about the long-term potential of our business and the demand for our products" (*id.* ¶44; 56.1 ¶233)—after all, further COVID waves were widely viewed as inevitable, two new Omicron subvariants had just recently been identified as an emerging threat, and development of CoDx's new at-home testing platform was moving towards clinical trials. 56.1 ¶¶36, 47, 53, 87, 109.

The stock price increased following the positive 1Q22 earnings results, but the financial analyst reports covering CoDx indicate that they understood CoDx's decision not to provide guidance, and the uncertainty Defendants described, as bad news for likely 2Q22 revenue. 56.1 ¶¶255-265. Each analyst report commented on the suspension of guidance, with comments being overwhelmingly negative—no analyst considered it to indicate anything positive. 56.1 ¶¶255-265; ¶257 (Wainwright: "Of note, management did not provide quarterly sales guidance …. We continue to project a gradually decreasing demand for COVID-19 testing in the coming quarters."). No analyst revised their forecasts upward for 2Q, 3Q, or 4Q22, and both Wainwright and Litchfield decreased their earnings per share ("EPS") estimates for 2Q, 3Q, and 4Q22. 56.1 ¶¶258-262. Defendants' economic expert, Dr. Vinita Juneja, opined that these analyst reports and other market evidence demonstrate that the market perceived the challenged statements as "negative news and interpreted [them] as indicating a likely decline in future revenues and earnings." 56.1 ¶263.

**E. On August 11, CoDx Announces Disappointing 2Q22 Results and Other Bad News.**

On August 11, 2022, CoDx announced full-quarter 2Q22 revenue of just $5 million (a large

drop year-over-year and from the prior quarter) driven by "lower volumes for our Logix [test]." 56.1 ¶¶266-271. Mr. Egan identified several factors that, in retrospect, Defendants believed had contributed to lower sales, "including a reduction in mandated testing for travel and public venues, a reduction in public funding assistance for testing programs and an increase in overall weariness for the disruption to daily life after a multiyear pandemic, specifically the Omicron variant earlier this year." *Id.* ¶273 ("This dramatic shift in testing behavior was widely felt across the diagnostics industry."). In addition to sharing full-quarter results, Defendants also expressed uncertainty about future sales in light of these changed market conditions and did not provide guidance, and they indicated that clinical trials for CoDx's new at-home testing platform had again been delayed. *Id.* ¶¶273-280. This delay was noted by analysts following the call, causing one to revise its estimate for device approval from 1H23 to 2H23. 56.1 ¶¶282-285.

CoDx's stock price dropped following these announcements, and this case was filed a few days later. The Court narrowed the claims on the motion to dismiss (and subsequently dismissed the Item 303 claim in light of *Macquarie v. Moab*, 601 U.S. 257 (2024)), but allowed discovery to proceed with respect to the three May 12 statements quoted above. Dkt. #42, 53.

## ARGUMENT

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant need only "point[] to a lack of evidence … on an essential element of the nonmovant's claim." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). Plaintiff then "must come forward with evidence that would be sufficient to support a jury verdict in its favor." *Id.* This requires more than "a scintilla of evidence" or unsupported allegations—Plaintiff must offer "significant probative evidence" supporting its claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249, 252 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To prevail under §10(b), Plaintiff must prove: a materially false or misleading statement; made with scienter; reliance; and loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Here, there is no genuine issue of material fact, and no rational juror could find for Plaintiff on any of these five independently dispositive elements.

## I.   THE CHALLENGED STATEMENTS WERE TRUE AND NOT MISLEADING.

Only three challenged statements remain in this case. *See supra* 6-7; AC ¶¶44-46. Plaintiff's theory of falsity is the same for each, and boils down to the assumption that, in light of the low full-quarter revenue announced on August 11, the information available to Defendants on May 12 (specifically, recent, lower sales numbers) must have indicated that "demand for [the] Logix [test] had already plummeted," and Defendants' failure to disclose this rendered each statement misleading. AC ¶48. This Court found that theory "plausible" at the pleading stage because "[e]ven if [the Company] had earned every dime by May 12, it still would have been at half its usual pace." Dkt. #42, at 5. With the benefit of a full factual record, however, it is now clear that Plaintiff's foundational assumption is false: there was no usual pace for CoDx's quarterly sales—they swung widely and unpredictably month-to-month and week-to-week—and neither sales-to-date nor any other information available to Defendants on May 12 rendered the challenged statements false or misleading. No rational trier-of-fact could find for Plaintiff on this element.

### A. The Challenged Statements Truthfully Described the Market Conditions at the Time and Defendants' Reasons for Not Providing Guidance.

First, the undisputed, material facts establish that the statements were true—they accurately described the extreme unpredictability of near-term test sales in spring 2022, and several of the

factors contributing to it; how this made it impossible to provide accurate guidance at the time; Defendants' belief, nonetheless, that present conditions did not indicate a "demand issue"; and their genuine optimism about long-term demand for the Logix test and CoDx's other products.

Dr. Tsai's undisputed testimony establishes that the factors identified in the challenged statements (and many others) did in fact create tremendous uncertainty at the time regarding near-term demand for COVID testing. *See supra* 3-5; 56.1 ¶¶57-58, 86, 243-250. He describes how, by spring 2022, the world had seen the lifecycle of new COVID waves play out several times: it was impossible to predict when the next variant would emerge, or how severe and transmissible it would be, but everyone understood that future waves were inevitable and that demand for tests would cycle up and down with future waves. 56.1 ¶¶43-103. However, the interplay between different masking and testing requirements, vaccination policies and rates, and other public health responses had become increasingly complicated and unpredictable in early 2022 as Omicron receded. *Id.* ¶¶86, 89-102, 244-250. Public policies in 2021 had shifted away from testing in favor of vaccination, but Omicron proved highly contagious despite vaccination, leading many people, institutions, and governments to turn back to testing as a primary defense. *Id.* ¶¶70-71. This caused test sales to spike to their highest-ever levels in late 2021 and early 2022, and reinforced the continued importance of testing moving forward even as Omicron subsided and test sales dropped. *Id.* ¶¶53, 73, 85. March, April, and May 2022 saw extensive public discussion of the fact that COVID policies, practices, and individual behaviors across the country were shifting, but no one yet knew how those changes would play out or what it would mean for test demand. *Id.* ¶¶72-85, 100-02, 108-09, 111. Consistent with all this, CoDx saw greater volatility and increased fluctuations in its test orders from the end of 2021 through spring 2022, making it even harder to forecast sales:

Brown: "There had been fluctuations on a weekly basis and it was becoming more apparent that the fluctuations were becoming more defined … it was just happening more often …. based on the outside influences, how society was responding to COVID, how different countries were responding to the [] pandemic at that point in time because we recently had had an Omicron spike that caused a significant amount of volatility when it came to how revenue came in and was recognized." (*Id.* ¶215; *see also* ¶¶137, 187-191, 194-196).

None of this is disputed, and it both supports the veracity of the challenged statements and provides critical context for them. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190-91, 194 (statement only misleading if it would have misled a "reasonable investor" viewing it "fairly and in context"). All of the CoDx individuals involved in preparing the challenged statements testified that these complicated market conditions made it impossible to accurately predict sales at the time and that this drove their decision not to provide 2Q22 guidance. 56.1 ¶187 (D. Egan: "We decided not to give quarterly guidance because we didn't have the ability to predict it. We didn't have those optics. It wasn't clear to us."), *id.* (Brown: "[T]here was a lot of volatility … things going on externally in terms of society and dealing with COVID … [so we] withh[eld] guidance because we couldn't provide accurate guidance that we felt comfortable with[.]"); ¶194 (Benson: "things were just much more volatile and unpredictable at this point than we had experienced before …. we didn't feel it would be the responsible thing to do to take a guess"); *see also* ¶¶235-250 (explaining why factors identified in statements could have driven sales up or down); ¶¶155-156. This is backed up by internal emails showing the same individuals wrestling with this decision and how to communicate it, as well as by testimony from CoDx's outside IR consultant, Mr. Houston. *See* 56.1 ¶221 & Ex. 108 (Brown email: "I don't want to put out guidance that I don't feel is accurate."), ¶¶197, 203, 217-219 (Houston: "macro" issues created uncertainty for all his clients at the time, and CoDx "didn't have the visibility that they might typically have, that they had at the same time last year, as to their ability to derive a forecast"). Plaintiff may disagree with the sentiments expressed in this testimony, but no facts dispute it.

11

The undisputed, material facts also demonstrate that, in spite of this uncertainty, Defendants remained, as they stated on May 12, "very confident about the long-term potential of our business and the demand for our products."[3] AC ¶¶44-45. As Mr. Egan explained:

> Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up. So that's the kind of expectation we were focusing on, not a near-term situation with respect to our sales orders, which was coming off one of the most vicious COVID onslaughts in the entire pandemic that occurred in the fourth quarter and first quarters of '21 and '22.

56.1 ¶192; ¶252 (Brown testifying he did not believe there was a demand issue as of May 12, 2022); *see also* ¶251 (Benson: "We thought COVID was still going to be driving a large portion of our business for an indeterminate amount of time."). CoDx's historical sales patterns supported this: for the past two years, CoDx had weathered the unpredictable peaks and troughs of wave after wave of COVID, and sales had always picked up again with the next wave. *Id.* ¶124 (Benson: "sales were cyclical … there would be peaks and troughs"); ¶¶123, 125, 133. Moreover, Defendants believed CoDx's new at-home testing platform would be perfectly positioned to capitalize on an endemic-COVID future. *Id.* ¶¶30-38, 271. All of this gave Defendants confidence that CoDx's prospects were bright, and no facts suggest Mr. Egan's or Mr. Brown's statements expressing optimism about long-term demand were not true statements of belief. *See Siegel v. Bos. Beer Co.*, 2022 WL 17417111, at *7-8 (S.D.N.Y. Dec. 5, 2022) (statements anticipating continued demand true and not misleading opinions); *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715,

---

[3] This statement (AC ¶¶44-45) is also puffery and a forward-looking statement protected under the Reform Act's safe harbor, both because Defendants genuinely believed it and it was identified as such and accompanied by meaningful cautionary language. *See IBEW Loc. Union v. Royal Bank of Scotland Grp.*, 783 F.3d 383, 392 (2d Cir. 2015); 15 U.S.C. §78u-5; 56.1 ¶¶29, 226-27, 231-32.

at *9 (S.D.N.Y. Nov. 10, 2020) (similar).

### B. Omission of Sales-to-Date Did Not Render Any Statement Misleading.

Plaintiff also contends that these true statements were rendered misleading by omission of the fact that CoDx's quarter-to-date sales on May 12 were lower than they had been at other times. To begin, this theory is a trend-omission claim forbidden by *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264-65 (2024) (omission of known trend in violation of Item 303 cannot by itself ground §10(b) claim). The Amended Complaint asserted an express Item 303 claim, which this Court dismissed following *Macquarie*. Dkt. #53. Yet Plaintiff's omission theory still asserts, at core, the same forbidden claim: omitting quarterly sales-to-date from the March 12 statements allegedly masked that 2Q22 was trending to be a bad quarter.

Even if allowed by *Macquarie*, the claim still fails. Undisputed, material facts show that it was not CoDx's practice to provide intra-quarter sales numbers on quarterly earnings calls, and with good reason—they were not good indicators of full-quarter results. 56.1 ¶¶134-136, 177, 179-185; *In re Focus Media Holding Ltd. Litig.*, 701 F.Supp.2d 534, 539-40 (S.D.N.Y. 2010) (positive statements days before quarter-end not misleading; "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress"). CoDx's weekly and monthly sales charts show that sales were all over the place—some quarters started high and ended low, others the opposite, and it was common for more than half of a quarter's sales to come in just two or three weeks. *See* Exs. 96, 112; 56.1 ¶¶125-133. Not surprisingly, Mr. Egan, Mr. Brown, and the other CoDx deponents uniformly testified that they did not view intra-quarter sales numbers—even those halfway through a quarter—as predictive of full-quarter results or as good indicators of broader demand trends:

> What the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter because sometimes a quarter came together all in the last month of the quarter or in the last two or three weeks of the quarter. You know,

again, this is not a hamburger store, having people come through a drive-up window and you have certain patterns of the day when people are buying a lot. This is a pandemic…. There are a lot of variables.

56.1 ¶180 (D. Egan); ¶124 (Benson: "One month wouldn't necessarily be predictive of [the next] so to see one month with more sales and another month with fewer sales wasn't ever an indication to us that sales [] were dropping or diminishing, just that it was part of the sales cycle."), ¶123 (S. Egan: "We would have the big months and then we would have lower months…. There was never really a defined set of what we'd expect on a monthly basis, and things changed a lot really fast[.]"); ¶136 (D. Egan: "You keep asking me about a few months and up to a mid-quarter. That's not how we view things[.]"); ¶¶138-39 (Brown). Indeed, for exactly that reason, the Defendants did not consider quarter-to-date sales important information for setting guidance:

> D. Egan: One month does not a quarter make and if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how [it] might ultimately present itself based on what we see in that short of a time[.]

*Id.* ¶181; ¶185 (Brown looked at intra-quarter sales but the "key driver" for quarterly guidance was historical data: "I would … look at prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number.").

Accordingly, when sales dropped following the Omicron surge and stayed low for the first few weeks of 2Q22, no one at CoDx saw this as concerning or as indicating that demand had "plummeted." AC ¶48. Every CoDx deponent asked about this issue said the same thing: in the context of the Logix test's highly volatile, cyclical historical sales patterns—and especially its recent experience in 4Q21, when ~60% of sales came in the final two weeks—low quarter-to-date sales on May 12, 2022 did *not* indicate a fundamental change in demand, a "demand issue," or that full-quarter revenue would be lower than prior quarters:

> D. Egan: "A month did not a quarter make. Two months did not necessarily prognosticate what a quarter would be. We were watching very carefully and we did develop a viewpoint

14

that it was volatile and that we, as a prudent measure in the context of our investing public, that we did not feel comfortable prognosticating future quarters at this point." (56.1 ¶188)

Brown: "[W]e were five weeks into the quarter and still had seven weeks to go and we could see in recent history, Q1 of '22, Q4 of '21, that we had two weeks we did 14 million dollars … We just didn't know at that time. There wasn't enough information to feel comfortable with the accuracy of providing guidance." (56.1 ¶189)

*See also* 56.1 ¶¶137-138, 144-145, 251-254. Thus, when an analyst pressed Mr. Brown on May 12 about why CoDx was not providing guidance—if it was due to declining orders or more about uncertainty—he truthfully said the bigger issue was uncertainty regarding timing and that he was not seeing a "demand issue." AC ¶46. As he explained, "we didn't [think there was a demand issue], that's not what we saw…. [W]e felt like it was a timing of orders at that given point in time…. [We] had the biggest month in Q1 that we've ever had so the volatility there didn't necessarily lean to a reduction in demand. It felt like more of a change potentially in fluctuation order patterns." 56.1 ¶252.

No facts genuinely dispute any of this. No facts suggest that Mr. Brown did not believe the answer he gave, or that his answer was misleading in light of sales-to-date. Indeed, every other deponent agreed with him that sales-to-date on May 12 did not indicate a demand issue or predict a bad quarter; no witness or document contradicts this. Nor can Plaintiff point to any other fact that rendered the challenged statements misleading at the time. Ultimately, Plaintiff is left only with speculation that low sales-to-date must have meant something they did not. This is insufficient to create a genuine issue of material fact, and judgment should be entered for Defendants.

## II.     THE ALLEGED MISREPRESENTATIONS WERE NOT MATERIAL.

Even if Plaintiff could show falsity, it cannot prove that disclosing the allegedly hidden truth that Logix test sales-to-date were lower than at other times would have been material—*i.e.* that it would have "significantly altered the total mix of information" available to investors. *Basic,*

15

*Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The market was already aware of the volatile, cyclical nature of COVID-test sales, the fact that sales had decreased following the Omicron spike, and that testing requirements, policies, and individual practices were in flux. *See* 56.1 ¶¶43-103, 108,110-111. And Defendants explained in the challenged statements that these widely acknowledged, rapidly changing conditions were creating enormous uncertainty about CoDx's sales and making it impossible to provide guidance. 56.1 ¶¶187-196, 214-216, 220-221.

The analyst reports following May 12 show that the market understood from these statements, in context, the same thing that disclosing lower quarter-to-date sales would have communicated: CoDx's revenue for 2Q22 would likely end up lower than previous estimates but that this remained highly uncertain. 56.1 ¶¶256-257, 263-264 (Litchfield: lowering revenue and EPS estimates; "Our only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside."); (Wainwright: lowering EPS estimate); (Sidoti: "net income should slow the remainder of 2022, as Covid-19 testing levels off"). Accordingly, disclosing quarter-to-date sales would not have changed the total mix of information, and no rational juror could find any misrepresentation (even if proven) material.

## III.    THE DEFENDANTS DID NOT ACT WITH SCIENTER.

Summary judgment is also appropriate because no reasonable trier of fact could conclude that any Defendant acted with "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To prove scienter, Plaintiff must offer (1) "specific facts demonstrating … both a motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Mylan N.V. Sec. Litig.*, 666 F.Supp.3d 266, 294 (S.D.N.Y. 2023), *aff'd sub nom. Menorah Mivtachim Ins. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). But recklessness in this context is "a state of

16

mind *approximating actual intent … not merely a heightened form of negligence.*" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).[4] Here, no facts suggest Mr. Egan or Mr. Brown made the challenged statements with scienter.

First, the undisputed material facts uniformly demonstrate that Mr. Egan and Mr. Brown acted in good faith and did not intend to mislead investors. Both men testified that they believed their May 12 statements accurately described the volatile and uncertain market conditions CoDx was facing, the enormous unpredictability those conditions created with respect to sales, the fact that this made it impossible to provide accurate guidance for the quarter or the rest of the year, and that they still remained confident about long-term demand for CoDx's current and future products. 56.1 ¶¶139-140, 165, 187-193, 214-215, 221, 251-254, 278. Both emphasized that they simply could not get comfortable with providing *any* guidance because it seemed certain to be inaccurate:

> D. Egan: "[T]hings were volatile enough that we didn't have a clear sense…our view was that it was the prudent thing to do to say that we didn't have the kind of optics and clarity that we would like to have in order to provide guidance…. [T]hat was in the investors' best interest to let them know [] that we did not have that kind of clarity such that we were willing to give that." (56.1 ¶191)

> Brown: "[M]y job is to provide accurate information to the Street…. At this point in time there was even more volatility and more noise in society, et cetera, in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate to the Street[.]" (56.1 ¶190)

*See also* 56.1 ¶¶221, 234 (Brown: "[T]he last thing I want to do is provide guidance that we're not confident in …. [I]f we're not confident … then we won't provide guidance.").

This testimony was corroborated by Andrew Benson, who helped prepare the challenged

---

[4] For a corporate defendant, courts generally look to the state of mind of "an individual defendant who made the challenged statements"—Mr. Egan and Mr. Brown. *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). The scienter of "other officers or directors" involved in making challenged statements may also be imputed to the corporation, but no facts support that here. *Id.*

statements and who similarly testified that the volatility and uncertainty described in the challenged statements made it impossible to predict sales and that this drove Defendants' decision not to provide guidance on May 12. 56.1 ¶¶141, 194-196, 204, 220, 239-242; ¶220 ("A company has a responsibility to … give the best number that it can…. [I]f your best guess is, We can't give a number that we … feel like we can responsibly stand behind, then it's the company's responsibility to not give a number."). Defendants' testimony was also corroborated by Mr. Houston—the only non-CoDx individual closely involved in preparing the challenged statements—who testified that he never got the impression any Defendant was trying to "hide" low sales or anything else from investors; they were trying to be transparent in the face of significant uncertainty and did not want to provide inaccurate guidance. 56.1 ¶¶174-175, 203-205, 209, 217-219. All this is further buttressed by Dr. Tsai's expert opinion, detailing the many factors, including those identified by Defendants on May 12, that made it increasingly difficult to predict test sales at the time. *id.* ¶243 (Tsai: challenged statements "were consistent with my own understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022").

Against this strong, undisputed evidence of good faith, Plaintiff has nothing—no facts evidencing intent to deceive, no motive, and nothing suggesting Mr. Egan or Mr. Brown acted with a recklessness approximating actual intent. Neither Defendant sold stock for profit during the class period (indeed, their holdings increased) or personally benefitted from the purported fraud in any way, and this lack of motive cuts strongly against scienter. *See* 56.1 ¶291 (only small sales to cover taxes from vesting RSUs); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (increased holdings undermine scienter); *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *22

18

(S.D.N.Y. Mar. 18, 2025) (sales for tax reasons not indicative of fraud); *In re Keryx Biopharms., Inc., Sec. Litig.*, 2014 WL 585658 at *13 (S.D.N.Y. Feb. 14, 2014) (same).

All Plaintiff has is its unsupported assertion that "demand had already plummeted" by May 12 (AC ¶48), so Mr. Brown and Mr. Egan must have known the statements were misleading, or recklessly disregarded it. But the undisputed, material facts establish that weeks or months of low sales were simply an expected part of the sales cycle—a lull before the next, inevitable COVID wave—and did not signal a "demand" problem. *See supra* 3-5, 9-15; 56.1 ¶¶62-63, 123-129, 137-138, 145. Mr. Brown testified that while he was aware of sales-to-date when he prepared quarterly guidance and earnings remarks, those data were not key drivers of CoDx's forecasts because they were not good indicators of how a quarter would turn out. 56.1 ¶185. Indeed, this is precisely why Mr. Brown told the analyst on the May 12 call that they were not seeing a "demand issue": he did not view sales-to-date, or any other information at the time, as indicating a demand problem or a fundamental change in demand patterns. *Id.* ¶¶251-253. Every other CoDx deponent said the same thing: periods of low sales, even for many weeks at a time, were not concerning or indicative of how a quarter would turn out. *Id.* ¶¶136, 138, 177-183, 189; ¶138 (S. Egan: low sales for a few months following Omicron not concerning; "you could never place any [] real assurances on anything until you got through an entire quarter because things change fast"). Moreover, the good-faith nature of these beliefs is bolstered by the undisputed fact that epidemiologists and health officials shared Defendants' view that future COVID waves were inevitable and would drive demand for testing. The only question was when. *Id.* ¶¶55, 87.

No reasonable juror could find that it was reckless for Mr. Brown or Mr. Egan to make the challenged statements, much less that they did so intending to deceive investors. *See In re Mylan*, 666 F.Supp.3d at 295 (granting summary judgment; "Not just any failure to 'see the obvious'

19

suffices … [it] must be an 'egregious refusal to see the obvious.'").

## IV.    PLAINTIFF CANNOT PROVE RELIANCE.

Defendants are also entitled to summary judgment because the undisputed, material facts prove the alleged misstatements did not artificially inflate Co-Dx's stock price, which rebuts the fraud-on-the-market presumption on which Plaintiff depends. The fraud-on-the-market theory "recogniz[es] a rebuttable presumption of classwide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). The "fundamental premise" is that "investors rely on the market price of a company's security," which, in an efficient market, quickly incorporates all available information, including any misstatements. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117-18 (2021). If the challenged statements did not actually impact the stock price, however, then "*Basic*'s fundamental premise 'completely collapses.'" *Id*. at 119. Defendants may rebut the presumption with any "appropriate evidence" indicating the challenged statements did not in fact artificially inflate the stock price. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-80 (2014). "[W]ithout [this] presumption . . . a [§10(b)] suit cannot proceed as a class action [and] [e]ach plaintiff [must] prove reliance individually." *Id.* at 281-82.

Plaintiff claims that the alleged fraud "artificially inflated Co-Dx's stock price" (AC ¶61) but the undisputed facts show it was the positive 1Q22 results announced with the challenged statements—not the challenged statements themselves—that caused the stock price increase on May 13. Dr. Juneja examined the analyst reports and other market evidence following the May 12 earnings release and concluded that the challenged statements were seen by the market as *bad*, not good, news: analysts viewed CoDx's decision not to provide guidance as indicating likely lower earnings for 2Q22, leading at least one to reduce its price target, specifically citing the suspension

of guidance due to increased uncertainty around testing demand. 56.1 ¶¶256-265. No analyst raised its price target following the challenged statements or indicated that it viewed the challenged statements as good news. *Id.* ¶¶258-263. Plaintiff's expert, Mr. Coffman, does not dispute this (*id.* ¶264), and neither his merits reports nor his class certification report opines on the challenged statements' alleged price impact on May 13. *See id.* ¶265. This undisputed evidence shows lack of front-end price impact. *See Goldman*, 594 U.S. at 123 ("front-end inflation," observed directly or indirectly, is the price impact that matters for *Basic* presumption).

Nor can the "back-end" price drop observed following the 2Q22 earnings release on August 11, 2022 provide indirect evidence of a front-end price impact, where, as here, there is a significant mismatch between generic alleged misstatements (generally discussing CoDx's decision not to provide guidance due to significant uncertainty), and a highly specific alleged corrective disclosure (full-quarter financial results). As the Supreme Court explained in *Goldman*, the inference that a "back-end price drop equals front-end inflation [] starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure" because "it is less likely that the specific disclosure actually corrected the generic misrepresentation [so] there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.* at 123. Such a mismatch "often will be important evidence" tending to rebut price impact. *Id*. Thus, the Second Circuit directs courts to conduct a "searching price impact analysis" where, as here, (a) "there is a considerable gap in front-end-back-end genericness," (b) the corrective disclosure does not directly refer to the alleged misstatement, and (c) plaintiff claims the generic alleged misstatement was misleading by omission. *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*ATRS*"). In these circumstances, courts must evaluate "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have

21

impacted the stock price." *Id.*

Applying *ATRS*'s framework here, the challenged statements generally announced that CoDx was not providing guidance due to uncertain market conditions but expressed optimism about long-term demand for its products; in contrast, the alleged corrective disclosure announced *specific full-quarter* earnings results. *See* 56.1 ¶¶230, 233-234, 266-271, 273. Under *ATRS*, then, the Court must ask: "what would have happened if [CoDx] had spoken *truthfully . . .* at an *equally generic level*"? 77 F.4th at 99. Plaintiff claims the allegedly hidden truth was that quarter-to-date sales were low, so a truthful substitute at the *same level of specificity* as the challenged statements would have been: "Quarterly sales-to-date are lower than in past quarters, but they have not usually been good predictors of our full-quarter results, and there is so much market uncertainty right now that we can't predict whether full-quarter sales will end up higher or lower than past quarters and we don't feel comfortable providing guidance."

This is essentially what the Defendants said on May 12. This hypothetical "truthful" substitute, on May 12, could not have caused exactly the same stock drop observed after the 2Q22 earnings release because that release reported a *full quarter* of low sales—far more specific, negative information than the few weeks' worth of sales the hypothetical truthful disclosure would have referenced. 56.1 ¶269. Moreover, Dr. Juneja's undisputed testimony shows the analysts covering CoDx understood the challenged statements precisely as one would expect them to have understood the hypothetical truthful substitute—as vaguely bad news indicating quarterly revenue would likely be worse than previously estimated. *Id.* ¶¶256-266. Both the undisputed evidence and common sense compel the conclusion that the August 12 price drop—following specific, disappointing full-quarter results that could not have been disclosed on May 12—cannot serve as a proxy for the front-end inflation Plaintiff has failed to prove. *See In re Kirkland Lake Gold Ltd.*

22

*Sec. Litig.*, 2024 WL 1342800, at *6, 8-10 (S.D.N.Y. Mar. 29, 2024) (analyst reports, expert evidence, and common-sense rebutted price impact under *ATRS*).

Because the undisputed, material facts establish that the challenged statements did not artificially inflate the stock price, Defendants have rebutted the presumption of reliance and each class member must prove reliance individually. *Basic*, 485 U.S. at 248. Stadium cannot do so—its corporate representative testified that it relied *only* on statements at a conference in June 2022, and *not* the challenged statements (56.1 ¶¶41-42)—so judgment must be entered against it. And because Defendants have rebutted the presumption of reliance, the class must be decertified.

## V.    PLAINTIFF CANNOT PROVE LOSS CAUSATION.

Nor can Plaintiff prove that the challenged statements "caused the loss for which [it] seeks to recover." 15 U.S.C. §78u-4(b)(4). Under *Dura Pharms., Inc. v. Broudo*, Plaintiff must prove (1) the alleged corrective disclosure revealed a truth previously hidden by the purported fraud, and (2) Plaintiff's losses were caused by that revelation and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts [or] conditions," or myriad other factors. 544 U.S. 336, 343 (2005) (must disaggregate non-fraud-related losses); *see In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged").

The central premise of Plaintiff's case is that Defendants artificially inflated the stock price by announcing on May 12 that they were not providing guidance due to significant market uncertainty while allegedly hiding the fact that demand (i.e., sales) had already "plummeted," and that Plaintiff suffered losses when this supposedly hidden "truth" was revealed by the disappointing full-quarter earnings announced on August 11. AC ¶¶48, 63. But the August 11 earnings release did not "correct" any challenged statement—it did not reveal as false any of

23

Defendants' statements about why they decided not to provide guidance on May 12, the uncertainty they saw in the market at the time, or their faith in the Company's long-term prospects. Rather, the call announced a number of subsequent developments: it informed the market of disappointing *full-quarter* results; identified additional market factors that, in hindsight, Defendants believed may have impacted sales during 2Q22; expressed uncertainty regarding sales for the remainder of the year in light of market conditions in August; and announced that the timeline for clinical trials of CoDx's new at-home PCR platform had been further delayed. *See* AC ¶¶56-57; 56.1 ¶¶266-274, 277-280. None of this could have been "hidden" by the challenged statements on May 12—it did not even exist yet—and it certainly did not "correct" any of those earlier statements. *See, e.g.*, *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 17 (2d Cir. 2013) (affirming dismissal where alleged corrective disclosure "d[id] not reveal to the market the falsity of the prior [statements]").

Even if Plaintiff could show that the August 11 earnings release "corrected" the challenged statements, Plaintiff has made no attempt to disaggregate the losses attributable to that correction from the market's reaction to other, non-corrective and negative news the same day—i.e., "confounding" information. Plaintiff cannot, as a matter of law, prove loss causation without "disaggregat[ing] those losses caused by 'changed economic circumstances . . . or other events,' from disclosures of the truth behind the alleged misstatements." *Menorah*, 2024 WL 1613907, at *2; *Dura*, 544 U.S. at 343; *In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (failure to disaggregate was "fatal flaw" compelling summary judgment); *In re Mylan*, 666 F.Supp.3d at 325 ("Disaggregation is a threshold evidentiary showing [] plaintiff must meet to withstand summary judgment.").

Here, the undisputed, material facts demonstrate that CoDx's August 11 announcements

24

included several confounding news items: full-quarter 2Q22 results (as opposed to sales-to-date on May 12), resulting from additional market developments and changed conditions; CoDx's forward-looking uncertainty in light of those changed conditions; and the delay in clinical trials for its new at-home PCR platform. *See* 56.1 ¶¶266-274, 277-280. Plaintiff's expert, Mr. Coffman, failed to account for any confounding news on August 11, and Defendants have moved to exclude his opinions on loss causation, inflation, and damages on that basis as methodologically flawed and unreliable. If the Court grants that motion, it must grant summary judgment as well.

But even if the Court were to allow Mr. Coffman's testimony on loss causation, it would not create a genuine issue of material fact. Dr. Juneja's reply report identifies and analyzes confounding news items, and it explains why Mr. Coffman's failure to consider them or disaggregate their impacts renders his opinion methodologically unsupported and unreliable. *See* 56.1 ¶¶289-290. In contrast, all Mr. Coffman offers on this point is the conclusory assertion that he "analyzed the degree to which information arguably unrelated to the corrective information … potentially impacted the stock price … [and] did not identify any confounding information." *Id.* ¶¶287-288. This is insufficient as a matter of law to create a genuine dispute as to whether there was any confounding news or to justify Plaintiff's failure to disaggregate non-fraud-related losses. *See Menorah*, 2024 WL 1613907, at *2 (affirming summary judgment where plaintiff failed to disaggregate); *Williams*, 558 F.3d at 1137 (same); *Atlantica Holdings, Inc.* v. *Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F.Supp.3d 88, 111-12 (S.D.N.Y. 2020) (dismissing); *In re Puda Coal Sec. Inc., Litig.*, 30 F.Supp.3d 230, 250 (S.D.N.Y. 2014) ("[E]xperts may not simply offer conclusory opinions … [which] are a form of '*ipse dixit*.'"). No rational juror could find that the challenged statements—as opposed to confounding news—caused Plaintiff's losses, thus Defendants are entitled to summary judgment.

25

**CONCLUSION**

Plaintiff cannot prove its §10(b) claim, therefore it cannot prove its §20(a) claim either. *In re Omnicom*, 597 F.3d at 514 n.6. Defendants respectfully ask that the Court grant summary judgment for Defendants and enter final judgment against Plaintiff on all claims.

Dated: March 21, 2025
      New York, New York

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:   */s/ Douglas W. Greene*
      Douglas W. Greene (*pro hac vice*)
      dgreene@bakerlaw.com
      Genevieve G. York-Erwin
      gyorkerwin@bakerlaw.com
      Marissa Peirsol (*pro hac vice*)
      mpeirsol@bakerlaw.com
      45 Rockefeller Plaza
      New York, NY 10111
      Telephone: 212.589.4200

      *Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C)**

Pursuant to Hon. Subramanian's Individual Practices Rule 8(C) and Local Civil Rule 7.1(c), I hereby certify that on March 21, 2025, I electronically filed the foregoing Memorandum of Law in Support of Defendants' Motion for Summary Judgment. As measured by the word processing system used to prepare it, the memorandum has a word count of 8,743 and complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

BAKER & HOSTETLER LLP

By:     */s/ Douglas W. Greene*
        Douglas W. Greene