**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>       Defendants. | Case No.: 1:22-cv-06978-AS<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF CHAD COFFMAN**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

LEGAL STANDARD...................................................................................................5

ARGUMENT ...............................................................................................................6

     I.     MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION REGARDING THE FINANCIAL RESULTS FOR THE SECOND HALF OF Q2 2022. ...........................................7

     II.    MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION ON AUGUST 11 REGARDING FORWARD-LOOKING SALES AND DEMAND................................................11

     III.    MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION THAT THE AUGUST 11 CALL ALSO DISCLOSED DELAY IN THE TIMELINE FOR CLINICAL TRIALS FOR CO-DIAGNOSTICS' NEW AT-HOME TESTING PLATFORM. ......................13

     IV.    THE COURT MUST EXCLUDE MR. COFFMAN'S TESTIMONY FOR FAILURE TO CONSIDER AND DISAGGREGATE POTENTIALLY CONFOUNDING INFORMATION. .................................................................16

CONCLUSION...........................................................................................................17

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).......................................................................................5, 17

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020),
    *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18, 2022)....................................................1, 6

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
    853 F. Supp. 2d 181 (D. Mass. 2012) .............................................................................6

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014)......................................................................................6, 16

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
    2022 WL 902402, (S.D.N.Y. Mar. 28, 2022) .................................................................6

*Country Rd. Music, Inc. v. MP3.com, Inc.*,
    279 F. Supp. 2d 325 (S.D.N.Y. 2003)...........................................................................16

*DeMarco v. Lehman Bros., Inc.*,
    222 F.R.D. 243 (S.D.N.Y. 2004) ....................................................................................6

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ........................................................................................16

*Microsoft Corp. v. DataTern, Inc.*,
    2012 WL 3682915 (S.D.N.Y. Aug. 24, 2012)..............................................................16

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F.Supp.2d 546 (S.D.N.Y.2008).................................................................................6

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004).............................................................................6

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000).....................................................................................................1, 5

*In re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007),
    *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .......................................................................................6

**Rules**

Federal Rule of Evidence 702..................................................................................................1, 5, 7

**INTRODUCTION**

It is axiomatic under Federal Rule of Evidence 702 and *Daubert* that an expert must "adequately account[] for obvious alternative explanations." Fed. R. Evid. 702. Relatedly, in the context of loss causation, it is equally axiomatic that an expert must "disaggregate losses caused by non-fraud factors," i.e. potentially confounding information. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 111 (S.D.N.Y. 2020), *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18, 2022). Where an expert fails to even consider whether certain information is potentially confounding, such failure goes to the admissibility, not weight, of the expert's testimony. *Infra* at 5-6. Similarly, where an expert only provides a conclusory assertion that no potentially confounding information affected the company's stock price, but provides no facts or analysis to substantiate that conclusion, the expert's testimony is unreliable and must be excluded. *Infra* at 6.

Although Mr. Coffman's expert reports in this case total 225 pages, the sum total of his analysis and opinions on whether there was any potentially confounding information that may have impacted Co-Diagnostics' stock price on August 12 is the following statement: "I did not identify any confounding information." Ex. 1 (the Expert Report of Chad Coffman) ¶76.[1] That is simply not enough to qualify as an expert opinion at all, much less a reliable one under *Daubert*'s "exacting" standards for reliability. *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

Mr. Coffman's one-sentence analysis and conclusion is also not remotely credible. According to Mr. Coffman, Defendants allegedly misled investors on May 12 when they announced that they were not providing guidance for 2Q22 due to market uncertainty but did not

---

[1] "Ex. _" refers to Exhibits 1-17 to the Greene Dec. in Support of this Motion to Exclude the Testimony of Chad Coffman, filed herewith.

disclose that, as of May 12, they allegedly were aware that the demand for and sales of the Logix test had "plummeted." Ex. 1 ¶50. Mr. Coffman then determined that when the Company announced its full-quarter financial results for Q2 2022 on August 11, the information allegedly "concealed" by the challenged statements on May 12 came to light and caused the *entirety* of the Company's stock price drop ($2.08) on August 12. *Id.* ¶76. This conclusion ignores the fact that the very market evidence Mr. Coffman relies upon—market analyst reports—discussed several categories of information that were in no way "fraud related" when they revised their estimates for the Company downward after the August 11 call. These three categories of potentially confounding information include: (1) financial results for the last seven weeks of Q2 2022, from May 13 to June 30, 2022, and the potential impacts of market-wide developments during that period; (2) forward-looking uncertainty regarding demand in light of changed market conditions, and the Company's inability to provide guidance given such uncertainty; and (3) the delayed timeline for the Company's clinical trials for its revolutionary at-home PCR testing platform.

Without considering this potentially confounding information or providing any analysis of why this information was not confounding or did not affect the Company's stock price on August 12, Mr. Coffman's conclusions as to the cause(s) of the August 12 stock price drop, and that the entirety of that stock price drop was attributable to correction of the alleged misstatements, is not reliable.

Accordingly, Defendants respectfully ask the Court to exclude Mr. Coffman's testimony on loss causation, inflation, and damages.[2]

---

[2] Because Mr. Coffman did not identify or disaggregate any confounding information, he uses the entirety of the $2.08 stock price drop on August 12, 2022 as the proxy measure of the alleged artificial inflation in the Company's stock price on May 13, 2022, the start of the class period. Ex. 1 at ¶¶ 19, 76-77. As explained here, because Mr. Coffman's opinions as to the cause(s) of the

## BACKGROUND

Plaintiff claims that three statements made by Defendants on May 12, 2022 artificially inflated the Company's stock price by allegedly concealing the fact that as of May 12, 2022, demand for Co-Diagnostic's Logix test had "plummeted." Dkt. 31, Consol. Am. Class Action Compl. ("AC") ¶48; Ex. 1 ¶50. Plaintiff claims that Co-Diagnostics' stock price dropped, and investors suffered losses, on August 12, 2022 after this supposedly "concealed information" was revealed in the Company's August 11, 2022 Q2 2022 earnings announcement. AC ¶¶63-64; Ex. 1 ¶¶67-69.

Specifically, Plaintiff alleges that the following statements on May 12 were false and misleading:

1. May 12, 2022 Press Release (AC ¶44):

   a. "While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]"

2. May 12, 2022 Earnings Call (AC ¶45):

   a. "Turning now to our visibility around the outlook for the balance of the year. While we experienced strong demand for our products during the first quarter of 2022, changes in our operating environment and markets have restricted our near term visibility. We will continue to navigate the near term environment with caution, but as a result, we'll not be providing quarterly guidance at this time."

   b. "To be clear, we remain very confident about the long-term potential of our business and the demand for our products. Our ability to accurately forecast

---

August 12, 2022 stock price drop are unreliable, Mr. Coffman's opinions as to artificial inflation and damages are also necessarily unreliable.

Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world."

c. "Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results."

3. May 12, 2022 Earnings Call (AC ¶46):

a. Analyst: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?"

b. Defendant Brown: "It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in."

Mr. Coffman asserts that there was a single corrective disclosure event after trading hours on August 11, 2022 that allegedly revealed the information previously "concealed" by the challenged statements on May 12. Specifically, Mr. Coffman points to the Company's August 11 announcement of the Company's full-quarter results for Q2 2022 and Defendants' statements attributing the lower-than-expected quarterly revenue to "lower demand" for the Logix test. Ex. 1 ¶¶67-69. Mr. Coffman concluded that the August 11 disclosures "revealed far worse than expected revenue and profitability for Q2 2022 and directly attributed them to lower demand for the Logix Smart Test." *Id.* ¶14. From this, Mr. Coffman concluded that the entirety of $2.08 stock price drop on August 12 was the result of the revelation of information previously allegedly "concealed" by the May 12 disclosures. *Id.* ¶76.

However, three categories of information beyond the information purportedly concealed in the May 12 press release were announced along with the allegedly corrective information on

4

August 11: (1) the *full*-quarter Q2 2022 financial results, which included financial results for the last seven weeks of the quarter from May 13 through June 30, 2022, and which CoDx indicated were impacted by market-wide developments during that period; (2) forward-looking uncertainty as to market conditions and demand in future quarters, and the Company's inability to provide guidance in light of those current conditions; and (3) the delayed timeline for the Company's clinical trials for its new at-home testing platform.

Mr. Coffman's reports did not provide any analysis of whether this information constituted potentially confounding information, nor did he attempt to disaggregate the impact of this information on the Company's stock price on August 12 from the purported impact of correction of the alleged misstatements. Ex. 1 ¶76. The sum total of Mr. Coffman's opinion on this issue is that he "did not identify any confounding information." *Id.*

## LEGAL STANDARD

"[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). The standards for reliability are "exacting." *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000). "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

Reliability depends partly on whether the expert "has adequately accounted for obvious alternative explanations." Fed. R. Evid. 702. For loss causation, "[t]o establish a causal link between stock price movement and misrepresentations or corrective disclosures, an economist must control for confounding factors, i.e., other industry- or company-specific information

5

released to the market unrelated to the alleged fraud." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) (citing *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F.Supp.2d 546, 554 (S.D.N.Y.2008)); *see also U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004) ("Before a conclusion on causation can be reliably drawn, the expert must make some reasonable attempt to eliminate some of the most obvious causes.").

Where an expert does "not establish any reliable means of addressing" confounding factors, but rather "seemingly ma[kes] a judgment call as to confounding information without any methodological underpinning," such expert testimony must be excluded. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014); *Atlantica*, 477 F. Supp. 3d at 111 (rejecting "general statement" from loss causation expert "that any . . . information [about other causes] was insignificant"); *City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, 2022 WL 902402, at *12 (S.D.N.Y. Mar. 28, 2022) (excluding expert testimony because expert did "not attempt to control for, or disentangle the effects of, other factors" relevant to losses); *DeMarco v. Lehman Bros., Inc.*, 222 F.R.D. 243, 249 (S.D.N.Y. 2004) (excluding expert testimony that did "not distinguish between the effect on the market price of . . . confounding news"); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1267 (N.D. Okla. 2007) (excluding as unreliable expert testimony that failed "to address the obvious alternative [non-fraud] explanations as required by the law of loss causation."), *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009).

## ARGUMENT

Courts have repeatedly excluded loss causation expert testimony that fails to adequately consider potentially confounding information and/or that fails to adequately disaggregate the

6

effects of potentially confounding information on the stock price. *Supra* at 6. Indeed, Mr. Coffman himself concedes that in order "[t]o obtain a reasonable and reliable measure" of loss causation, an expert must "consider[] and analyze[] the degree to which . . . confounding information potentially impacted the stock price." Ex. 1 ¶ 76.[3] Yet, Mr. Coffman did not provide any analysis of whether the information identified above (*supra* at 4-5) constituted potentially confounding information in either of his Reports, nor did he attempt to disaggregate their effects on the Company's stock price on August 12. Accordingly, Mr. Coffman's opinion as to the cause of the August 12 stock price drop, and the extent to which the drop was attributable to the Alleged Corrective Disclosures, is unreliable under Rule 702, *Daubert*, and his own purported methodology.

I. **MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION REGARDING THE FINANCIAL RESULTS FOR THE SECOND HALF OF Q2 2022.**

The only alleged misrepresentations in this case concern Defendants' alleged failure to disclose that demand for and sales of the Logix test allegedly had fallen as of May 12, 2022. Mr. Coffman concedes this when describing what would qualify as corrective information: "I understand that any corrective disclosure would have had to disclose the relevant truth that Co-Diagnostics was aware of declining demand for and sales of its Logix Smart Test. Such a disclosure would explicitly state that the Company was aware of the reduced demand and that its sales *to date* for Q2 2022," i.e., by May 12, "were far less than what it had seen in prior quarters." Ex. 1 ¶34 (emphasis added); *see also id.* ¶79 (describing the allegedly corrective information as being that "Defendants were aware of the sales for Q2 2022 *up to [May 12] (nearly halfway through the*

---

[3] *See also* Ex. 3 (the deposition transcript of Mr. Coffman) at 32:24-33:5 ("[J]ust to be clear, if there is in a case where the corrective disclosure or alleged corrective disclosure [] has confounding information, value relevant confounding information that's also moving the stock price back, then I think it's important to disaggregate, yes.").

*quarter)*, and that sales were on track to be substantially lower than preceding quarters and market expectations.") (emphasis added). Thus, according to Mr. Coffman's own approach, any corrective disclosure must have revealed what Defendants knew about or expected regarding Co-Diagnostics' demand and sales *as of May 12*. Ex. 2 (the Reply Expert Report of Dr. Vinita Juneja) ¶25.

However, the Company's statements on August 11 revealed far more information than what Defendants allegedly "concealed" on May 12—they revealed disappointing sales and financial results for the *entirety* of Q2 2022. The sales that occurred, and whatever information Defendants learned, between May 13 and June 30, 2022 could not have been "concealed" by the alleged misstatements on May 12 because they did not yet exist. Ex. 2 ¶¶14-17. There was no way for Defendants to have prognosticated what demand or sales would be for the remaining seven weeks of Q2 2022, particularly given the fluctuating regulatory and market conditions as the pandemic unfolded, including the unknown impacts of changes in government mandates and funding, individual behavior, and when a new COVID-19 strain would emerge. *Id.*; *infra* at 9-11. Because the allegedly "concealed information" could only possibly relate to what Defendants knew or expected on *May 12*, the portion of the full-quarter financial results attributable to May 13 through June 30 represent confounding, and thus not corrective, information. Ex. 2 ¶25-26.

Mr. Coffman attempts to gloss over this obvious fact by asserting that the "nature of the concealed information in this matter did not change over the class period." Ex. 1 ¶79; Ex. 2 ¶¶13-15. But this makes no sense. The intra-quarter sales data allegedly hidden by the May 12 statements was preliminary and covered a far smaller time period than the full-quarter results disclosed on August 11. Common sense dictates that preliminary intra-quarter sales numbers on May 12 would have been received by the market very differently than the full-quarter results announced on August 11—the latter contained far more, and more concerning, information than the former. Mr.

8

Coffman does not consider or address whether this post-May 12 information, also revealed by the financial results on August 11, constitutes potentially confounding information. Nevertheless, Mr. Coffman opines, without analysis, that the entirety of the August 12 stock price drop is attributable to revelation of the information allegedly concealed on May 12.

No economic facts or scientific methodology support this unreasonable opinion. It defies logic to suggest that disclosure of 5 or 6 weeks' worth of lower sales would have had the same (if any) impact on stock price as disappointing full-quarter revenue based on 12 weeks of sales. *See* Ex. 2 ¶16. Yet, Mr. Coffman makes no attempt to analyze or otherwise disaggregate the effect of the Company's financial results *after* May 12 from the allegedly concealed information *as of* May 12. Failure to consider this potentially confounding information or disaggregate the impact it appears to have had is methodologically unsound and renders his testimony unreliable. *Id.* ¶21-23, 25-26.

Relatedly, after the May 12 press release, there were significant regulatory developments that directly impacted industry-wide demand for COVID testing, none of which Defendants could have known or concealed on May 12. For example, on May 17, 2022, New York City officials announced that the city was being put on "high COVID alert" following a surge in COVID-19 cases. Ex. 2 ¶17. In June 2022, the CDC announced that it would no longer require a negative COVID-19 test for travelers flying into the country. *Id.* And on August 11, 2022—*the same day as the alleged corrective disclosures*—the CDC relaxed its COVID-19 guidance and testing recommendations moving forward. *Id.*

On the August 11 call, Defendants described some of these changed market conditions and identified, in retrospect, certain factors that they believed had contributed to lower sales during

9

2Q22.[4] *See* Ex. 4 (Press Release) at 1 ("[W]e believe [the 2Q 2022 sales decline] is primarily the result of a reduction in mandated testing in travel and public venues and in government funding for testing programs."); Ex. 5 at 4 (explaining in retrospect that "an increase in overall weariness for the disruption to daily life" following the Omicron spike also appeared to have contributed to the lower sales in 2Q22). And immediately following the August 11 earnings release, several market analysts discussed these post-May 12 market and industry developments in making downward revisions to their estimates for the Company:

1. "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target To $5 (From $14); Downgrade Rating To NEUTRAL (From BUY)," Sidoti & Company, August 12, 2022 (cited at Ex. 1 ¶70): "**We lower our price target to $5 (from $14) and downgrade CODX to NEUTRAL (from BUY). We now expect net income will slow for the remainder of 2022 and in 2023 as COVID-19 testing levels off[.]**" Ex. 6 at 2.

2. "2Q22 Financial Results Reported; Reiterate Buy; Lowering PT to $9," H.C. Wainwright, August 15, 2022 (cited at Ex. 1 ¶71): "**We continue to project a gradually decreasing demand for COVID-19 testing, and we believe the company's top-line revenue may fluctuate in the coming quarters**. . . . **On August 11, 2022, Centers for Disease Control and Prevention (CDC) updated its COVID-19 guidance**. Specifically, it no longer recommends screening testing of asymptomatic people without known exposure, and it no longer recommends routine testing in K-12 schools unless COVID-19 community transmission levels are high in the area. . . . **With this updated CDC guidance, the net effect on the testing volume for the coming months is not clear at this juncture, in our view. Potentially lower testing demand may result in lower number of orders for COVID-19 test kits in the coming quarters.**" Ex. 7 at 1.

3. "**Easing of Testing Mandates and Lack of Government Funding for Testing Programs Result in Revenue Decline**," Maxim Group, August 12, 2022 (cited at Ex. 1 ¶70): "[W]e are reducing 2022 revenue estimate to $48.8M, from $60.3M and our 2023 revenue estimate to $33.6M, from $63.4M, and we are reducing our expense estimates for 2022 to $42.0M, from $56.3M and for 2023 to $41.7M, from $60.2M. We have also removed COVID-19 mass testing revenues from our model post-2022." Ex. 8 at 1.

---

[4] The Company also disclosed that COVID-19 appeared to be transitioning from a "pandemic to an endemic environment" and discussed changes in U.S. "society" and "culture," including "very little testing in the main compared to what we saw earlier" and the lack of "mitigation measures when it comes to masks or social distancing or other things." Ex. 5 at 8, 10.

None of these developments existed at the time of the May 12 statements or could have been "concealed" by the challenged statements on May 12. Yet, Mr. Coffman in his Reports does not address them at all, nor does he make any attempt to disaggregate their effects on the Company's sales in the second half of Q2 2022—and resulting stock price drop—from the impact of the revelation of the allegedly concealed information. He simply presumes that the "lower demand" he assumes was hidden on May 12 was the same in nature and degree as what was disclosed on August 11, and therefore the stock drop would have been exactly the same at that earlier time. *See, e.g.,* Ex. 3 at 71:12-21;102:3-103:15. This defies common sense—and Mr. Coffman provides no analysis or justification for it—particularly in light of obvious, market-wide developments that occurred after May 12. Mr. Coffman's failure to consider this information or disaggregate the impact it appears to have had is methodologically unsound and renders his testimony unreliable.

## II. MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION ON AUGUST 11 REGARDING FORWARD-LOOKING SALES AND DEMAND.

On August 11, 2022, in addition to disclosing *backward-looking* sales declines for the second quarter of 2022 (i.e., the allegedly corrective information), Co-Diagnostics also discussed forward-looking uncertainty regarding future sales of the Logix test in light of post-May 12 market developments, Defendants' lack of visibility regarding the timing of future waves, and the shifting dynamics, policies, and practices related to COVID-19 testing. Ex. 2 ¶26; *see* Ex. 5 at 7 ("Turning now to our visibility and near-term outlook. Variability in our operating environment has restricted our near-term visibility."); *id.* at 9 ("[W]e're just going to have to see where it normalizes. . . . [W]e don't have optics on it. And so we're not giving guidance as to what level or timing of the surges may obtain.").

Needless to say, Defendants could not have known (or concealed) on May 12 how they would view forward-looking sales or demand in the changed circumstances that existed on August 11. Indeed, several market analysts cited by Mr. Coffman discussed this future uncertainty and the Company's decision not to provide forward-looking guidance in making downward revisions to their estimates for the Company:

1. "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target To $5 (From $14); Downgrade Rating To NEUTRAL (From BUY)," Sidoti & Company, August 12, 2022 (cited at Ex. 1 ¶70): "**The company did not provide 3Q:22 guidance**, citing uncertain order timing. Based on 2Q:22 results **and the lack of visibility** regarding demand for COVID-19 testing, we lower 2022 estimates to $44 million (from $77 million) of revenue and $0.17 (from $0.45) EPS. . . . Based on the 2Q:22 results **and factoring in the lack of visibility regarding near-term demand** for COVID-19 testing, we lower our 2022 revenue and EPS estimate to $44 million (from $77 million) and $0.17 (from $0.45)." Ex. 6 at 1-2.

2. "2Q22 Financial Results Reported; Reiterate Buy; Lowering PT to $9," H.C. Wainwright, August 15, 2022 (cited at Ex. 1 ¶71): "**We continue to project a gradually decreasing demand for COVID-19 testing, and we believe the company's top-line revenue may fluctuate in the coming quarters**." Ex. 7 at 1.

3. "Lowering estimates and price target post 2Q22 results - Reiterate Buy rating and $25 PT, down from $29," Litchfield Hills Research, August 15, 2022 (cited at Ex. 1 ¶72): "**The company provided no guidance**." Ex. 9 at 4.

Mr. Coffman's report acknowledges that the forward-looking uncertainty conveyed on the August 11 call was separate from its announcement of full-quarter results and attribution of those results to lower demand. *See* Ex. 1 ¶15 (noting Co-Diagnostics "also" announced forward-looking expectations on call). Yet he provides no substantive analysis of whether this information—or the Company's inability to provide guidance on August 11—represented confounding information. Ex. 1 ¶15; Ex. 2 ¶¶26-28. Nor can Mr. Coffman's high-level, off-the-cuff answers at deposition to a few questions on this point stand in for the analysis he failed to perform in any of his reports. He simply speculates that disclosing the "lower demand" that he assumes existed on May 12 would

12

have caused investors to update their expectations not only for Q2 2022, but for future quarters as well, and to exactly the same degree as they did following the August 11 call. Ex. 3 at 73:2-11; 82:13-18; 86:4-11. But Mr. Coffman provides no substantive analysis or justification for these conclusions.[5] And. Mr. Coffman's failure to consider or analyze in his reports whether the forward-looking aspects of the Company's statements on August 11, in light of changed market conditions, constituted potentially confounding information, or to disaggregate the effect of this confounding information on the Company's stock price from the impact of the allegedly concealed information, renders his opinion methodologically flawed and unreliable. Ex. 2 ¶¶26-28.

### III. MR. COFFMAN FAILED TO ACCOUNT FOR OR DISAGGREGATE CONFOUNDING INFORMATION THAT THE AUGUST 11 CALL ALSO DISCLOSED DELAY IN THE TIMELINE FOR CLINICAL TRIALS FOR CO-DIAGNOSTICS' NEW AT-HOME TESTING PLATFORM.

Finally, Mr. Coffman's methodology is also unreliable because he failed entirely to consider, let alone disaggregate, the impact of Co-Diagnostics' disclosures related to the timeline for clinical trials of its revolutionary at-home and point-of-care PCR testing platform. Ex. 2 ¶29. Each of the analyst reports cited by Mr. Coffman in his Report demonstrate that the market perceived the timeline for the clinical trials, development, and commercialization of this new testing platform to be of particular importance for the Company's future sales and earnings, both prior to and during the class period:

1. "New Sales Record in 3Q21; Reiterate Buy; Modulating PT to $15," H.C. Wainwright, November 12, 2021 (cited at Ex. 1 ¶42): "**Co-Diagnostics has been developing a point-of-care or at-home PCR testing** . . . . **In our view, this device could provide accurate molecular test results rapidly onsite** at an affordable price, which could help monitor the viral spread among various types of public venues, schools, and workplace. **Management expects to submit an Emergency Use Authorization (EUA) application . . . to the FDA by the end of 2021**." Ex. 10 at 1.

---

[5] Mr. Coffman's factual foundation is also simply incorrect—the Company did *not* provide "lower guidance" on August 11. Rather, it announced that it was *not* providing guidance, due to some of the same and additional market factors creating uncertainty. *See generally* Ex. 5.

2.  "Delta Surge Drives a Record Quarter, but Developments in COVID Treatment are Likely to Change the Testing Landscape," Maxim Group, November 12, 2021 (cited at Ex. 1 ¶43): "**CDI is working on a point-of-care rapid PCR test** . . . . **Currently, the company is preparing to initiate a clinical trial to start in 4Q21** . . . . **The [] platform is also attractive internationally** as it may provide cheap COVID-19 tests with similar efficacy to PCR tests on volume." Ex. 11 at 2.

3.  "4Q:21 EPS Doubles Our Estimate; **Clinical Trial For YourTest Point-Of-Care System Delayed A Few Months**; Still Expect EPS Rebound In 2023; Maintain $14 Price Target, BUY Rating," Sidoti & Company, March 25, 2022 (cited at Ex. 1 ¶44): "**The start of the trial for the [] PCR point-of-care systems has been delayed a few months** . . . . **[C]hanges have delayed the start of the clinical trial a few months, but we still expect approval before year-end. We assume that the company introduces [] PCR in 4Q:22, with sales ramping over the ensuing quarters. By 2023, we estimate total revenue will advance 11% to $83 million as [] PCR gains traction** and company's non-COVID-19 tests gains share. On these assumptions, we forecast 2023 EPS of $0.45." Ex. 12 at 1-2.

4.  "Strong Financial Performance in 4Q21; Reiterate Buy," H.C. Wainwright, March 25, 2022 (cited at Ex. 1 ¶45): "Point-of-care PCR device may be submitted for EUA this year. . . . **Management expects to start clinical trials of the device in the near term**." Ex. 13 at 1.

5.  "1Q:22 Results Exceed Expectations; Expect Earnings To Decline In 2022, As Covid Cases Level Off, Before Rebounding In 2023 With Release Of Point-Of-Care System; Maintain $14 Target, BUY Rating," Sidoti & Company, May 13, 2022 (cited at Ex. 1 ¶46): "**Management indicated that trial for the PCR point-of-care systems is due to start in the next three months** . . . . [C]hange[s] delayed the start of the clinical trial a few months, and we now expect approval 1H:23. **We assume that the company introduces the Co-Dx PCR Home Device in 2023, with sales ramping over the ensuing quarters**." Ex. 14 at 1-2.

6.  "CODX beats 1Q22 Consensus but drops forward guidance – Reiterate Buy rating and $29 PT" Litchfield Hills Research, May 16, 2022 (cited at Ex. 1 ¶46): "**New diagnostic platform, the CO-DX is tracking to plan. . . . We expect it to enter clinical trials soon and we believe it will represent a major new growth vehicle for the company**." Ex. 15 at 1.

7.  "1Q22 Financial Results Reported; Reiterate Buy; Modulating PT to $12" H.C. Wainwright & Co., May 16, 2022 (cited at Ex. 1 ¶46): "**Management expects to start clinical trials of the device this summer**. . . . In our view, the Co-Dx platform's ability . . . may **potentially drive top-line growth in the future**." Ex. 16 at 1.

14

Additionally, at the May 12, 2022 earnings call, the Company stated that "[w]e are on track for commencement of clinical trials [for the at-home PCR test] by our second quarter earnings call this August." Ex. 17 at 5. And analysts at the May 12, 2022 earnings call asked specific questions about the at-home PCR test and the clinical trials. Ex. 17 at 9, 11-12 (inquiring about features of the at-home PCR test and timelines for FDA submission and approval); *see also* Ex. 2 ¶29.

To use Mr. Coffman's words, "[i]t is evident from the quotes above that analysts had an interest in information" regarding the Company's clinical trials for the at-home PCR testing platform. Ex. 1 ¶48. Indeed, when the Company disclosed during the August 11 conference call that it had not yet commenced clinical trials—contrary to its May 12 statement that they were on track to commence trials by that date—and that the Company would only submit the test for clinical trials once it was "confident in how it's performing," market analysts asked specific questions about the revised timeline. *See* Ex. 5 at 9 (Sidoti & Company: "And you said you expect to commence clinical trials soon from the new point-of-care device. Can you give us a little more color on what that means? Is that something you expect in weeks and months?"). Market analysts also discussed the clinical trial timeline for the at-home PCR testing platform in reports following the August 11 disclosures. *See, e.g.,* Ex. 6 at 2 (August 12, 2022 Sidoti & Company Report: describing "delays in new product approvals" as a "key risk" and stating that "changes have delayed the start of the clinical trial a few months, and we now expect 2H:23 approval."); *see also* Ex. 8 at 1; Ex. 9 at 1; Ex. 2 ¶30.

Yet, Mr. Coffman's Reports are devoid of any substantive reference to Co-Diagnostics' at-home testing platform, and he does not indicate whether he considered this delay in clinical trials as potentially confounding information, how he performed any such analysis, or what conclusion he came to or why. He simply states, without any explanation or analysis, that he "did not identify

15

any confounding information." Ex. 1 ¶76. Failure to consider this potentially confounding information or disaggregate the impact it appears to have had is methodologically unsound and renders his testimony unreliable.

### IV.    THE COURT MUST EXCLUDE MR. COFFMAN'S TESTIMONY FOR FAILURE TO CONSIDER AND DISAGGREGATE POTENTIALLY CONFOUNDING INFORMATION.

Plaintiff will likely argue that any failure by Mr. Coffman to properly disaggregate potentially confounding information goes to the weight, not admissibility, of his testimony on loss causation. That is not the case here, however, where Mr. Coffman did not provide *any* analysis of the potentially confounding information at all *or any* details regarding whether or to what extent the potentially confounding information impacted the Company's stock price on August 12. *Supra* at 7-16. The sum total of Mr. Coffman's testimony on this point is a one-sentence conclusion that he "did not identify any confounding information." Ex. 1 ¶76; *see also* Ex. 3 at 73:18-20 ("I didn't see any evidence that anything else from that [August 11 announcement] would be negative and value relevant in any substantial way."). This purported conclusion is methodologically unsupported and untenable given the potentially confounding information described above and discussed in Dr. Juneja's report. Nor is such a cursory conclusion, bereft of any detail, explanation, or scientific basis admissible evidence on summary judgment. *Microsoft Corp. v. DataTern, Inc.*, 2012 WL 3682915, at *3 (S.D.N.Y. Aug. 24, 2012) ("[A] court should not consider mere *ipse dixit* of an expert—that is, conclusory statements without analytical basis[.]"); *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 330–31 (S.D.N.Y. 2003) (similar); *Bricklayers*, 752 F.3d at 95 (an expert's "judgment call as to confounding information without any methodological underpinning" is not reliable and must be excluded); *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 423 (7th Cir. 2015) ("As things stand, the record reflects only the expert's general statement that any such information was insignificant. That's not enough.").

An expert's opinion must be based on data, a methodology, and studies that are sufficient to support the conclusions reached. *Amorgianos*, 303 F.3d at 265-66. And in reaching any conclusions, an expert must demonstrate that he has "adequately accounted for obvious alternative explanations." Fed. R. Evid. 702. Where, as here, an expert ignores key facts and fails to provide any analysis or methodological basis for disregarding such key facts, the Court must exercise its gatekeeper function and exclude the opinion as unreliable. *Id*.

## CONCLUSION

Because Mr. Coffman's opinions concerning the August 12, 2022 stock price drop are methodologically flawed, results driven, and unreliable, Mr. Coffman's testimony on loss causation, inflation, and damages should be excluded in their entirety.

Dated: March 21, 2025                                       Respectfully submitted,


**BAKER & HOSTETLER LLP**


By:     */s/ Douglas W. Greene*
        Douglas W. Greene (*pro hac vice*)
        dgreene@bakerlaw.com
        Genevieve G. York-Erwin
        gyorkerwin@bakerlaw.com
        Zachary R. Taylor
        ztaylor@bakerlaw.com
        45 Rockefeller Plaza
        New York, NY 10111
        Telephone: 212.589.4200

        Marissa A. Peirsol (*pro hac vice*)
        mpeirsol@bakerlaw.com
        200 S. Civic Center Dr.
        Columbus, OH 43215
        Telephone: 614.462.2656

        *Attorneys for Defendants*


17

**Certificate of Compliance**

The undersigned certifies that, in accordance with Rule 7.1 of the Local Rules of the United States District Courts of the Southern and Eastern Districts of New York, dated January 2, 2025, and Rule 8.C. of the Individual Practices in Civil Cases of Judge Subramanian dated March 14, 2025, this memorandum complies with all formatting requirements set forth therein and contains 6,247 words (including footnotes but excluding the cover page, table of contents, table of authorities, signature blocks, and this certification of compliance).

BAKER & HOSTETLER LLP

By:    */s/ Douglas W. Greene*

Douglas W. Greene