## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>               Defendants. | Case No.: 22-cv-6978-AS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## <u>MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................................. ii

I.      INTRODUCTION .................................................................................................................. 1

II.     STATEMENT OF UNDISPUTED FACTS ......................................................................... 5

        A.      The Company Tracked Daily Sales Information; Information That Showed
                that Sales Had Significantly Declined by The Start of the Class Period ................ 5

        B.      Defendants Had Access to, and Monitored, Daily Sales Information .................... 6

                1.      Egan ........................................................................................................... 6

                2.      Brown.......................................................................................................... 7

        C.      Lead-Up to the Issuance of the May 12, 2022 Statements ..................................... 7

        D.      The May 12, 2022 Press Release and Earnings Call ........................................... 12

        E.      The August 11, 2022 Press Release and Earnings Call ....................................... 13

III.    ARGUMENT........................................................................................................................ 14

        A.      Summary Judgment Should be Granted as to the Falsity of Defendants'
                May 12, 2022 Statements..................................................................................... 15

        B.      Summary Judgment Should be Granted as to Materiality .................................... 17

        C.      Summary Judgment Should be Granted as to Scienter......................................... 18

IV.     CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................... 14

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ........................................................................................ 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................................... 14

*Delchi Carrier SpA v. Rolorex Corp.*,
71 F.3d 1024 (2d Cir. 1995)......................................................................................... 22

*FDIC v. Great Am. Ins. Co.*,
607 F.3d 288 (2d Cir. 2010).......................................................................................... 14

*Fresno County Employees' Ret. Assoc. v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................... 18

*In re Allergan, Inc. Proxy Violation Securities Litig.*,
2018 WL 3912934 (C.D. Cal. Aug. 14, 2018)............................................................. 18

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2010 WL 6397500 (S.D. Fla. Aug. 18, 2010)............................................................... 17

*In re Kidder Peabody Sec. Litig.*,
10 F. Supp. 2d 398 (S.D.N.Y. 1998)............................................................................. 18

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................... 23

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010).......................................................................................... 15

*In re Perrigo Co. PLC Sec. Litig.*,
2021 WL 3005657 (S.D.N.Y. July 15, 2021) .......................................................... 17, 18

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)............................................................................ 18

*Kronefeld v. Trans World Airlines, Inc.*,
832 F.2d 726 (2d Cir. 1987).......................................................................................... 17

*Meyer v. Jinkosolar Holdings Co.*,
 761 F.3d 245 (2d Cir. 2014)..................................................................................... 15

*Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*,
 277 F.3d 232 (2d Cir. 2002)..................................................................................... 14

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)..................................................................................... 18

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
 874 F. Supp. 2d 341 (S.D.N.Y. 2012)....................................................................... 23

*SEC v. Constantin*,
 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ...................................................................... 22

*SEC v. Frohling*,
 851 F.3d 132 (2d Cir. 2016)..................................................................................... 19

*SEC v. Gallison*,
 588 F. Supp. 3d 509 (S.D.N.Y. 2022)....................................................................... 19

*SEC v. Honig*,
 2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023).......................................................... 19

*SEC v. Laura*,
 680 F. Supp. 3d 204 (E.D.N.Y. 2023) ...................................................................... 23

*SEC v. Lyttle*,
 538 F.3d 601 (7th Cir. 2008) ................................................................................... 22

*SEC v. Mayhew*,
 121 F.3d 44 (2d Cir. 1997)....................................................................................... 17

*SEC v. Milan Capital Grp., Inc.*,
 2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000)............................................................ 22

*SEC v. Monterosso*,
 756 F.3d 1326 (11th Cir. 2014) ............................................................................... 22

*SEC v. Musella*,
 678 F. Supp. 1060 (S.D.N.Y. 1988).......................................................................... 22

*SEC v. Platforms Wireless Int'l Corp.*,
 617 F.3d 1072 (9th Cir. 2010) ................................................................................. 22

*SEC v. Research Automation Corp.*,
 585 F.2d 31 (2d Cir. 1978)....................................................................................... 22

*SEC v. Rosenberger*,
  2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023) .......................................................................... 23

*SEC v. StratoComm Corp.*,
  652 F. App'x 35 (2d Cir. 2016) ............................................................................................. 22

*SEC v. Yorkville Advisors, LLC*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) .................................................................................... 23

*Setzer v. Omega Healthcare Inv'rs*,
  968 F.3d 204 (2d Cir. 2020) ................................................................................................... 15

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ..................................................................................................... 23

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008) ................................................................................................... 23

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ................................................................................................................ 17

*US Airways, Inc. v. Sabre Holdings Corp.*,
  105 F. Supp. 3d 265 (S.D.N.Y. 2015) .................................................................................... 14

*In re Worldcom, Inc. Securities Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) .................................................................................... 17

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................. 1, 14

Lead Plaintiff Stadium Capital LLC ("Plaintiff") respectfully submits this memorandum of law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), for partial summary judgment as to falsity, materiality, and scienter.

## I.      INTRODUCTION

This securities fraud class action arises from Defendants' misleading statements and omissions regarding demand for the Logix Smart COVID-19 Test[TM] (the "Logix Test"), which was the Company's core product before, during, and after the Class Period.[1]  On May 12, 2022, Defendants informed investors that they would cease providing quarterly revenue guidance due to changes in "near term visibility" and "sizable fluctuations in order patterns," but refuted analyst concerns about demand, assuring them "[i]t's not necessarily a demand issue that we're seeing." ¶¶56-57.  At the time they made these and the other alleged misstatements, Defendants knew that quarterly sales of the Logix Test to date were *less than half of what they had been in each of the last eight consecutive quarters*. ¶¶11, 14. Now, at the conclusion of fact and expert discovery, the undisputed facts confirm that: (1) by the start of the Class Period, demand for the Logix Test had plummeted; (2) Defendants' failure to disclose that demand for the Logix Test had plummeted was unquestionably material; and (3) Defendants had access to, and monitored, information showing that sales of the Logix Test had plummeted. For these reasons, as further described below, Plaintiff is entitled to summary judgment on the elements of falsity, materiality, and scienter.

Upon commencing sales of its Logix Test in late February and March of 2020, the test immediately became Co-Dx's sole material source of revenue. ¶1.  As noted by the Court, "[f]rom

---

[1] Plaintiff has asserted claims against Defendants Co-Diagnostics, Inc. ("Co-Dx" or "the Company"), Dwight H. Egan (Co-Dx's CEO), and Brian L. Brown (Co-Dx's CFO) (together, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. All emphasis herein is added unless stated otherwise, and all "¶__" cites are to Lead Plaintiff's Rule 56.1 Statement of Undisputed Facts filed herewith.

the second quarter of 2020 through the first quarter of 2022, it made at least $20 million per quarter. Then came the falloff. For the second quarter of 2022, Co-Diagnostics reported revenue of just $5 million. *Id.*" ECF No. 42 (the "MTD Order") at 1; ¶¶2, 12, 59.

It is undisputed that during the Class Period (May 12, 2022 through the close of the market on August 11, 2022), sales of the Logix Test was the company's core operation and sole material source of revenue, and Defendants monitored, and had access to, the "daily influx" of demand for the Logix Test. ¶¶1, 7-10, 21-22, 24-26, 28-29. As early as Q2 2021, Defendants began a practice of offering revenue guidance for the upcoming quarter, typically approximately halfway through the current quarter. ¶¶3-4. In the final earnings release before the start of the Class Period, Defendant Egan continued to tout "persist[ent]" demand for the Logix Test and provided revenue guidance in the range of $21.0 to $22.0 million for Q1 2022. ¶6.

The Class Period starts on May 12, 2022, when Defendants announced record earnings and made various statements concerning sales of their Logix Test. Defendants announced that, while they "remain encouraged by the demand for our products", and similarly "remain very confident about the long-term potential of our business and the demand for our products", they had decided to stop providing quarterly guidance based on various factors that "restricted[] near term visibility", and thereby purportedly affected their ability to "accurately forecast" Logix Test sales through the balance of the year. ¶¶56-57. The Company also announced that "we are experiencing sizable fluctuations in order patterns from our customers . . . ." ¶57.

Importantly, none of the cited factors suggested to the market that test sales may be reduced going forward. In fact, each of the cited factors ("decreased mask mandates," "continued emergence and spread of new variants," and "persistently low vaccination rates") were factors that a reasonable person would have understood to be suggestive of ***more COVID-19 infection***, thereby

2

requiring more testing, going forward. *Id*.; *see also* MTD Order at 5 ("Fewer masks, new COVID variants, and low vaccination rates are things that one would think would lead to more COVID and greater demand for tests.") ¶¶47-52. As illustrated by an analyst's question on the May 12, 2022 earnings call, that is what the market understood Defendants to be suggesting: "I just want to be clear on the guidance. I mean based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022 . . . ." ¶53. Defendant Brown answered emphatically: "Yes, you're absolutely right." *Id*.

On that same earnings call, Defendants were asked point blank whether they were seeing a decline in demand: "So with the Logix Smart detection test, *are you already seeing a decline in customer orders*? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?" ¶58. Defendant Brown reassured investors about continued demand for the Logix Test, stating that only their ability to forecast demand moving forward was compromised: "Brown: . . . *It's not necessarily a demand issue that we're seeing*. It's more of just timing of being able to accurately forecast what's coming in." *Id*.

However, unbeknownst to investors, as Defendants were aware, sales of the Logix Test had plummeted by the start of the Class Period.  As of May 12, 2022, the Company had received Q2 2022 orders of just approximately $2.5 million. ¶11.  This put them on track to have by far the worst quarter since they began selling the Logix Test two years prior.  Not only that, but sales of the Logix Test had slowed prior to 2Q 2022. ¶¶16-19.

On August 11, 2022, after the market closed, Co-Dx issued a press release and filed a report with the SEC on Form 8-K that disclosed its Q2 2022 financial results and conducted a conference call with investors and analysts. Defendants disclosed revenue of just $5.0 million for Q2 2022, down from $27.4 million during the prior year period, a decline of almost 82%. ¶¶12, 59. The

3

Company primarily attributed the decrease to "lower volumes for our Logix Smart™ COVID-19 Test". ¶59.

In light of these undisputed facts, Plaintiff is entitled to judgment as a matter of law as to the elements of falsity, materiality, and scienter. **First**, there is no genuine dispute with respect to the fact that sales had fallen dramatically by May 12, 2022. As such, as this Court previously held, "it was misleading to describe the situation as "fluctuations" or to disclose the Company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." MTD Order at 5; *see also id*. at 6 (with respect to the Company's ability to forecast demand, "[b]y listing some potentially positive trends [that the difficulty was "due to"] but omitting the negative elephant in the room, the statement was plausibly misleading."). Discovery has only strengthened these facts, further revealing that Defendants had not in fact earned every dime for the second quarter of 2022 by May 12, but rather, Defendants had earned just approximately **half**, $2.5 million, far less than the Company had ever earned by the midpoint in any previous quarter since they began selling the Logix Test. ¶14.

**Second**, there is no dispute whatsoever as to the materiality of Defendant's failure to disclose that sales of the Logix Test had plummeted; Defendants have never argued that the substantial drop in sales was immaterial. MTD Order at 6 (acknowledging that "Co-Diagnostics doesn't argue that the statements were immaterial"), at 7 n.1 ("[T]he defendants don't argue that declining sales would be immaterial.").

**Third**, there can be no genuine dispute as to scienter. It is undisputed that Defendants either knew, or had access, to sales data on Monday.com showing that Logix Test sales had plummeted by May 12, 2022. ¶¶21-30.

For these reasons, Plaintiff's motion for partial summary judgment as to falsity, materiality,

and scienter should be granted.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    The Company Tracked Daily Sales Information; Information That Showed that Sales Had Significantly Declined by The Start of the Class Period

Monday.com is a project management platform that the Company used to keep track of placed orders. ¶8. Within Monday.com, the company had a workspace (or "board") titled "Co-Diagnostics Orders 2020, 2021, 2022 . . ." (the "Orders Board") which kept track of each individual order. ¶9. The Company also had a board on monday.com titled "Quarterly Dashboard" which displayed "monthly and quarterly results." ¶10. As such, as Dwight Egan admitted prior to the Class Period, on a May 13, 2021 conference call with investors and analysts in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, "we are also, of course, able to monitor the daily influx of demand for our tests . . . ." ¶7.

As of May 12, 2022, the Company had received Q2 2022 orders of approximately $2.5 million. ¶11. In contrast, since the Company began selling the Logix Test, prior to Q2 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter (and often had far more in sales by the quarter midpoint). ¶¶14. For example, in Q2 2021, as of May 12, 2021, the Company had quarterly sales of approximately $14.33 million, and in Q2 2020, as of May 12, 2020, the Company had quarterly sales in excess of $14.16 million. ¶15. Unsurprisingly, the Company ultimately reported second quarter 2022 revenues of approximately $5.02 million (almost exactly double the midpoint sales). ¶11-13, 59.

Moreover, the poor sales through May 12, 2022 continued the trend of abnormally low sales in the preceding months. As shown in both the Orders Board and Quarterly Dashboard, Co-Diagnostics had sales of $3.32 million in February 2022, $2.80 million in March 2022, $1.94 million in April 2022, and $574,915 in May through May 12. ¶16. Since the Company began

5

selling its Logix Test, prior to March 2022, it had never before experienced back-to-back months with sales below $4 million, let alone three consecutive such months. ¶17. Similarly, since the Company began selling its Logix Test, prior to March and April 2022, it had never before experienced back-to-back months with revenue below $3 million. *Id.*

In fact, other than March 2020 (when the Company began selling the Logix Test in earnest), March 2022 and April 2022 represented the second-worst and worst months in terms of sales volume, respectively, since the Company began selling the Logix Test. ¶18. Indeed, excluding March 2020, in only two of the 22 months prior to February 2022 (June 2020 and November 2021) did the Company have monthly revenues below $4 million. ¶19. November 2021 was the only such month in which the Company had sales below $3 million. *Id.*

### B.    Defendants Had Access to, and Monitored, Daily Sales Information

#### 1.    Egan

Defendant Egan testified that he had access to the Orders Board and that he would "look at it from time to time." ¶21. Egan also testified that he had access to the Quarterly Dashboard. *Id.*

When asked whether he made any effort to determine whether sales had slowed on or around May 9, 2022, Dwight Egan testified that "[s]ales were what they were." ¶22. When asked "[b]y May 12th of 2022 or any time before that, did you notice that orders had been low in February, March, April or the beginning of May of 2022?" Dwight Egan testified "[w]e became aware of – we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be." ¶23. As he admitted with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." *Id.* In Egan's view, since "we did not make decisions based on one or two or three or four months of activity . . . our real view as a company is that investors ought to focus more on

6

what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." *Id.*

### 2.    Brown

Brown, who was the primary person responsible for determining quarterly guidance, similarly testified that he had access to Monday.com. ¶¶24-25.  Brown further testified that he used the Company's sales data to calculate the Company's guidance. ¶26 ("[A]s I prepared guidance, I would see what is in the system at that point in time" and "would look at the company's orders to date").  To determine guidance, Brown would "look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." ¶27.

He would also "have discussions with Seth Egan", the Company's Head of Sales, about "how sales were going." ¶28. Seth Egan reviewed the Orders Board "very often," "sometimes every day, sometimes every other day, sometimes once a week." ¶29.

### C.    Lead-Up to the Issuance of the May 12, 2022 Statements

In order to prepare for earnings calls, in the weeks leading up to the earnings call Defendants would "meet with [their] investor relations firm" and discuss "operations that are going on at that time, developments that we're working on and discuss kind of a tone of call and what it would be like and then we would move forward in preparing a script, preparing an 8-K with an earnings release, preparing guidance, preparing a Q or a K. That would just move forward until we actually had our earnings call so all that stuff fit into a few week period of time." ¶31. Brown testified that "we had calls with Lambert [Global] on a weekly basis." ¶34. Mike Houston (Managing Director at Lambert Global ("Lambert"), Co-Diagnostics Investor Relations consultant) testified that he would help "formulate the messaging [for an earnings release]" "based on the information that they would share with us." ¶35.

7

In a May 3, 2022 email from William Stack (a Manager at Lambert) that was forwarded to Brown, Stack attached a draft of the CFO portion of the May 12, 2022 earnings call script that contained the following language: "While we experienced strong demand for our products during the first quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result will be taking a more prudent approach to guidance for the second quarter of fiscal 2022" and included a placeholder for quarterly guidance. ¶36.  This language had a comment on it to "Discuss".  *Id*. Brown testified that "[w]e would normally have a discussion – it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script." ¶37.

In a May 5, 2022 email to Brown, Houston wrote "[f]ollowing up on our call yesterday, I wanted to outline a few considerations as you prepare to discuss guidance with the Board."  ¶38. In the email, Mr. Houston outlined "[a]lternatives to providing Q2 guidance in the earnings call and release:" (1) "Pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results"; (2) "Convert quarterly guidance to annual guidance, citing similar uncertainty to the above scenario", (3) Keep quarterly guidance but lower your estimates to a range that you believe is 95% achievable", and (4) "Guide to $17-$19 million in topline with the hope that you come close because you've done so before[.]"  *Id*.

With respect to alternative 2, Houston noted that ***"[g]uiding to an annual figure would tip your hand to investors*** that you'll likely have a soft quarter, or two, and provide some air cover during the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that ***Q2 is off to a slow start*** without having to provide a specific number". ¶39 (emphasis added). When asked whether he recalled telling "Mr. Houston on a call [the day prior] that the company was likely to have a soft quarter or two", Brown testified "I don't recall that but . . . at that point

in time we would have been able to see what the numbers were through Monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a). Similarly, when asked whether he recalled "telling Mr. Houston that Q2 was off to a slow start," Brown testified "we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide." ¶39(b) ( "we had a call and we discussed where we were . . . ."). Houston testified that his "inference [at this time]" was that "Co-Diagnostics was likely to have a soft quarter or two." ¶39(c). Houston testified that Brown never told him "that he disagreed with the notion that Q2 [was] off to a slow start." ¶39(d).

With respect to alternative 3, lowering quarterly guidance to a "95% achievable" number, Houston stated: "[w]hile it *will have a negative impact on the share price*, it's better to take your lumps up front and maintain your credibility" and "[i]f the forecast calls for CODX to make up for the soft quarters throughout the balance of the year, it might be beneficial to offer an annual topline guidance range as well". ¶40 (emphasis added).

With respect to alternative 4, Houston stated: "[n]eed to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter[.]" ¶41. When asked what he meant by this, Houston testified that "Again, just inferring that the quarter is not going to be good, because we probably wouldn't have this conversation if it was great . . . ." ¶41(a).

With respect to alternative 1, pulling guidance completely, Houston noted that "[t]his path will raise the most questions, but could be viewed as more positive than guiding to a figure and coming up very short" and further noted that the approach would help Defendants "[m]aintain[] some level of credibility if delivered well". ¶42. In response, Brown noted that he "would lean into [that option]" and asked Houston: "What are you [sic] thoughts for *the reasoning that would*

*be presented best*?" *Id* (emphasis added).  Houston responded that he would "get back to [Brown] over the weekend [after] do[ing] some research on what others have been saying." *Id*.  On May 8, 2022, Houston responded with a list of "***reasons [that] could be [the] rationale for pulling guidance completely***. Some are likely a stretch, but we included them anyways to at least spur discussion." *Id*.  Two of those reasons that Houston came up with were "[m]ask mandates being dropped while variants remain, and OUS vaccination rates continue to be low" and "[t]iming of orders in a particular quarter and how they are beginning to fluctuate greatly." *Id*.  Defendant Brown responded, suggesting "[i]nability to confidently project testing requirements through the remainder of the year" as an additional reason Defendants could "point to as we pull back on guidance." *Id*.

Following a May 9, 2022 meeting with Co-Diagnostics' Board of Directors, Brown emailed Houston and his Lambert team members to note that "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release. Can you guys take the first stab at writing this?" ¶43.  Houston circulated updated drafts of the earnings release and earnings call script later that day, and made edits based on subsequent emails and conversations.  *Id*. In the updated draft, the placeholder for guidance was deleted, and the following paragraph inserted:

> While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States as well as persistently low vaccination rates in many parts of the world.  As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results.  For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future," concluded Egan.

*Id*. Houston included a comment on that paragraph stating "Purposefully left this high level. Let's discuss if you also want to cite timing of orders in this paragraph or leave it to the script how we have it now." *Id*.

10

Brown circulated edits to the script on May 10, 2022. ¶44. Those edits included the following, which was incorporated into the final version of the script that Brown used on the May 12, 2022 earnings call (Brown's redline edits bolded):

> The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the **demand for our products and the** operational and scientific teams we have established to support our future growth.

*Id*.

With respect to the following paragraph in the script discussing the decision to not provide quarterly guidance, in response to a comment from Houston about potential reasoning to be included in the script, Brown stated that he would get Benson's and Dwight Egan's "thoughts on why we are not providing guidance." ¶44(a). Houston acknowledged that he was still working with the Company on determining the rationale that would be provided for not giving guidance. ¶44(b).

On May 10, 2022, in advance of a call scheduled for 10 a.m. with Benson, Brown, and Dwight Egan, Benson circulated a draft of the May 12, 2022 earnings release to Brown and Dwight Egan. ¶45. Those edits included the following (Benson's redline edits bolded):

> While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix Smart$^{TM}$ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States**, continued emergence and spread of new variants, and ~~as well as~~** persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future," concluded Egan.

*Id*. As Dwight Egan testified, the Company made an effort to "emphasize [the] theme" that COVID was not going away. ¶51.

**D.      The May 12, 2022 Press Release and Earnings Call**

On May 12, 2022, after the market closed, the Company issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the quarter ended March 31, 2022 (the "May 12, 2022 Press Release"). ¶55. The May 12, 2022 Press Release reported Q1 2022 "Revenue of $22.7 million, primarily due to sales of the Logix Smart™ COVID-19 Test", representing a revenue increase of 13.5% as compared to $20.0 million during the prior year period. *Id*. The press release reiterated that "[a]s we look to the balance of fiscal 2022, we remain encouraged by the demand for our products . . . ." ¶57.

The May 12, 2022 Press Release, issued approximately halfway through Q2 2022, announced Defendants' decision to stop providing quarterly guidance at that time based on various factors that purportedly affected their ability to accurately forecast demand for their Logix Smart™ COVID-19 test, and quoted Defendant Egan as stating:

> "***While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results.*** For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]"

¶56.

On that same day, during a conference call with investors and analysts after the disclosure of Co-Dx's financial results, Defendant Brown similarly stated:

> The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the demand for our products and the operational and scientific teams we have established to support our future growth.
>
> Turning now to our visibility around the outlook for the balance of the year.

12

While we experienced strong demand for our products during the first quarter of 2022, changes in our operating environment and markets have restricted our near term visibility. We will continue to navigate the near term environment with caution, but as a result, we'll not be providing quarterly guidance at this time.

*To be clear, we remain very confident about the long-term potential of our business and the demand for our products. Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world.*

*Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results.*

¶57.

During the same conference call, in response to a question from an analyst regarding whether Defendants were already seeing a decline in customer orders, Defendant Brown reassured investors regarding current demand for Logix Smart™ COVID-19 detection test:

[Analyst]: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?"

Defendant Brown: *"It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in."*

¶58.

E.      The August 11, 2022 Press Release and Earnings Call

On August 11, 2022, after the market closed, Co-Dx issued a press release and filed a report with the SEC on Form 8-K that disclosed its Q2 2022 financial results, and conducted a conference call with investors and analysts. ¶59.  The press release disclosed revenue of just $5.0 million for Q2 2022, down from $27.4 million during the prior year period (a decline of almost 82%). *Id*. The Company primarily attributed the decrease to lower demand of the Logix Smart™ COVID-

13

19 Test, with Defendant Egan explaining that "[o]ur second quarter results reflect lower volumes for our Logix Smart™ COVID-19 Test . . . ." *Id.*

On an August 11, 2022 conference call with investors and analysts, in which Dwight Egan, Brown, and Benson participated, Egan admitted that "we certainly saw the -- as the second quarter progressed, the falloff and we've cited the reasons we think that falloff occurred in terms of public funding of testing initiatives and just the swaging of the pressure put on by Omicron. . . ." ¶60.

## III.    ARGUMENT

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002). To defeat a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). Rather, the non-moving party must make a specific showing of material facts that are in dispute, and only a dispute "over facts which might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 276 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019) (at the summary judgment stage, the non-moving party "cannot rely merely on allegations or denials of the factual assertions of the moving party.").

To establish Defendants' liability under § 10b and Rule 10b-5, a plaintiff must prove (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale

14

of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps.*, 28 F.4th at

351–52. As described below, the summary judgment standards for the first two elements is

satisfied and Plaintiff's motion should be granted.

A.    **Summary Judgment Should be Granted as to the Falsity of Defendants' May 12, 2022 Statements**

As this Court previously held in its order on Defendants' motion to dismiss, "once a

company speaks on an issue or topic, there is a duty to tell the whole truth."  MTD Order at 4

(citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)).  "That obligation is

triggered once a defendant puts the topic 'in play,' based on 'an examination of defendants'

representations, taken together and in context.'"  MTD Order at 4 (citing *Setzer*, 968 F.3d at 214

n.15; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal

quotation marks omitted)).

The undisputed evidence shows that the alleged misrepresentations were false and

misleading when made. Defendants gave investors a pretextual excuse for their decision to stop

providing guidance, when in reality, they were simply trying to delay delivering the bad news of

the cratering sales for Co-Diagnostics' only real product. By the date of their statements,

Defendants knew that sales for the quarter were a meagre $2.5 million (¶11, 12, 59), representing

a tremendous drop from the norm for the last eight consecutive quarters.

In no quarter since the beginning of the pandemic were the Co-Diagnostics' sales at the

midpoint of a quarter ever less than $5 million, and it was often more. ¶14; Uris Decl., Exs. 3, 7.

For example, in 2Q 2021, as of May 12, 2021, the Company had quarterly sales of approximately

$14.33 million, and in 2Q of 2020, as of May 12, 2020, the Company had quarterly sales in excess

of $14.16 million. ¶15. In fact, sales of the Logix Test had begun to decline even prior to the start

of 2Q 2022. The Company had sales of $3.32 million in February 2022, $2.80 million in March

15

2022, $1.94 million in April 2022, and May sales, as of May 12, of $574,915. ¶16.

But rather than reveal to investors that demand for the Logix Test had cratered by revising guidance downward, which they knew would "***have a negative impact on the share price***," (¶40), they strategized an excuse to stop providing guidance which "could be viewed as more positive than guiding to a figure and coming up very short" (¶42). Defendant Brown workshopped excuses with Defendants' IR consultant, Mike Houston, for "the reasoning that would be presented best" to investors (*id.*), and landed on the "fluctuations" and "timing" issues cited in their May 12, 2022 statements based on Lambert's research. Defendants' cited reasons for ceasing guidance "emphasize[d] [the] theme" that COVID was not going away (¶51), which provided reassurance about future demand. Further, in response to a direct question on the analyst call about whether Co-Diagnostics was "already seeing a decline in customer orders," Brown stuck to the scripted excuses and said "It's not necessarily a demand issue that we're seeing." ¶58.

As the Court ruled on Defendants' motion to dismiss, "[r]eferences to 'near term visibility' and 'fluctuations' imply current or potential volatility, not that sales have already cratered.  And if anything, [Defendants] refer[red] to trends that a reasonable investor would expect to prop up sales. Fewer masks, new COVID variants, and low vaccination rates are things that one would think would lead to more COVID and greater demand for tests." *Id*. at 5; ¶¶47-52 (testimony showing that reasonable investors would associate these factors with increased COVID infection). Further, "[b]y listing some potentially positive trends [that the difficulty was "due to"] but omitting the negative elephant in the room, the statement was plausibly misleading." MTD Order at 6. Plaintiff's allegations have been borne out by discovery, and are no longer merely plausible, but irrefutable. Thus "no genuine issue of fact exists as to the falsity" of Defendants' statements. *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *30 (S.D. Fla. Aug. 18, 2010)

16

(granting plaintiffs' motion for partial summary judgment on falsity); *In re Perrigo Co. PLC Sec. Litig.*, No. 19CV70 (DLC), 2021 WL 3005657, at *6-7 (S.D.N.Y. July 15, 2021) (same).

### B.    Summary Judgment Should be Granted as to Materiality

"[T]o be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997). Material facts include "those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 658 (S.D.N.Y. 2004) (citing *Kronefeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir. 1987)).

Given the extent to which sales of the Logix Test had declined, there is no genuine dispute as to materiality.  Indeed, as of May 12, 2022, the Company was on track to have its worst quarter ever, by far, since the beginning of the pandemic.  Moreover, Defendants did not even dispute materiality in their motion to dismiss filed in this action.  MTD Order at 6 ("Co-Diagnostics doesn't argue that the statements were immaterial"), at 7 n.1 ("the defendants don't argue that declining sales would be immaterial.")

As Defendants also concede, the Logix Test was the Company's sole material source of revenue before, during, and after the Class Period. ¶1. As such, the magnitude of the decrease in revenue that Co-Diagnostics was on track for (nearly 82% year-over-year) demonstrates that it would be material to a reasonable investor.  ¶59; *see TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (where "established omissions are so obviously important to an investor, the "issue of materiality [is] appropriately resolved as a matter of law for summary judgment*")*; *In re Perrigo Co. PLC Sec. Litig.*, No. 19CV70 (DLC), 2021 WL 3005657, at *7 (S.D.N.Y. July 15, 2021) ("the sheer size of the calculated tax liability . . . demonstrates that it would be material to a

17

reasonable investor."); *In re Allergan, Inc. Proxy Violation Sec. Litig.*, No. 8:14-cv-2004-DOC-KESX, 2018 WL 3912934, at *34 (C.D. Cal. Aug. 14, 2018) ("[P]articularly in light of the magnitude of the potential acquisition, reasonable minds cannot disagree that the nonpublic information may have affect[ed] the desire of investors to buy, sell, or hold the company's securities").

The clear materiality of this information to investors is further confirmed by the fact that Co-Diagnostics' stock plummeted more than 30% in a single day in response to Co-Diagnostics' ultimate disclosure of the decline in sales. ¶59, 61-62; *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015) (where "Petrobras' share price dropped dramatically when news of the corruption scheme emerged," that "indicated that investors did, in fact, consider that information to be material"); *Fresno County Employees' Ret. Assoc. v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) ("comScore's significant stock drop further supports an inference of materiality").

## C.    Summary Judgment Should be Granted as to Scienter

"To prove scienter under § 10(b) and Rule 10b–5, plaintiffs must demonstrate that defendants acted with knowledge of the falsity of their statements and with an intent to deceive investors . . . or with such recklessness that an intent to deceive may be inferred." *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 414 (S.D.N.Y. 1998) (internal citation omitted). Moreover, a claim based on recklessness can be proven based on "defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Here, it is undisputed that Egan and Brown either knew, or had access to sales data on Monday.com showing, that Logix Test sales had in fact plummeted by May 12, 2022. ¶¶7-10, 21-22, 24-26, 28-29.

18

Indeed, Defendants admit their knowledge of facts contradicting their public statements. As Dwight Egan testified, "[s]ales were what they were."  ¶22; *see also, e.g.,* ¶39 (Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter"); *SEC v. Honig*, No. 18-CV-8175 (ER), 2023 WL 6386918, at *30 (S.D.N.Y. Sept. 29, 2023) (finding SEC "proved scienter under a theory of conscious misbehavior or recklessness" where defendant "had access to information that contradicted his statements", and "[e]ven if [defendant] did not access [the contradictory information], at the very least, he would be acting recklessly by not doing so before signing the [alleged false or misleading statement].") (citing *Gallison*, 588 F. Supp. 3d at 523 (granting summary judgement where defendant was aware of facts that "directly contract[ed] the content of the [statement at issue]")); *Frohling,* 851 F.3d at 138 (affirming district court's grant of summary judgment to SEC where defendant admitted he knew the facts that made his statements false).

As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. When asked about Houston's email stating that Co-Diagnostics was "likely to have a soft quarter, or two", as Brown admitted, "at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a).[2] Given that there is no genuine dispute that sales had in fact plummeted, these facts are sufficient to show recklessness.

Furthermore, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix

---

[2] As Brown further testified, in order to determine guidance he would "look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide."  Had Brown looked at "the comparable quarter of the prior year" he would have seen that in 2Q 2021, as of May 12, 2021, the Company had quarterly sales of approximately $14.33 million.

19

Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id*. Indeed, as Brown described it, a few days later on May 9, "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release." ¶43. On May 10, Defendants continued working up to the last minute to edit and make changes to their post-hoc reasoning for deciding not to provide quarterly guidance. *See* ¶¶44, 44(a), 44(b) (Houston testifying that as of May 10, after the decision had been made that guidance would not be provided, they were still working though what reasons would be given for not providing guidance), 45.

In Egan's view, since "we did not make decisions based on one or two or three or four months of activity . . . our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." ¶23. While Dwight Egan may very well have had confidence in his Company and its long-term prospects (like any CEO might), it is an admission of recklessness. Given that sales of the Logix Test, the sole material source of Co-Diagnostics' revenue, had in fact plummeted by the start of the Class Period, Defendants had an obligation to disclose that they were

20

seeing a significant decline in orders, regardless of whether their "view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." ¶23. Defendants' disclosure obligations under the Exchange Act do not turn on what they thought "investors ought to focus more on". Rather, as the Court previously held, "it was misleading to describe the situation as 'fluctuations' or to disclose the company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." MTD Order at 5.

As the Court noted at the motion to dismiss stage, where Plaintiff was required to plead a "strong inference" of scienter, the Court noted that "Co-Diagnostics flagged that it was varying from its usual practice of 'providing quarterly guidance' due to its restricted 'near term visibility.' One cogent and compelling inference to draw from this change is that they knew demand was down, but hoped they could mask that fact until it rebounded. That scenario would support a claim of recklessness." MTD Order at 8; *id*. at 10 (without the benefit of the evidence, finding that "the most cogent and compelling inference to draw from all the statements, taken together, is that Brown and Egan knew sales were down by mid-May 2022 and tried to obscure that fact by simply declining to offer quarterly guidance and offering vague assurances regarding 'fluctuations,' 'timing,' and 'near term visibility.'"). At his deposition, Dwight Egan effectively admitted to that exact scenario: "There's enough going on in terms of our not having a clear view of the future to not want to predict it. So Brian's characterizing is sizable fluctuations in order patterns. I would have tended to look at it in the context of the entire global landscape of what's going on with COVID, but the fact still remains that we had every expectation that there would be a resurgence come fall and winter." ¶46; *see also* ¶41(b) ("our decision was to not provide guidance at all, which would obviate the need to do a preannouncement since we were not going to give guidance.").

21

Given the uncontroverted evidence and Defendants many admissions showing that they were aware of, and had access to, information showing that sales were down, finding scienter on summary judgment is appropriate. *See SEC v. StratoComm Corp.*, 652 F. App'x 35, 38 (2d Cir. 2016) (affirming summary judgment on the issue of scienter); *SEC v. Constantin*, 939 F. Supp. 2d 288, 309-10 & n.14 (S.D.N.Y. 2013) (granting summary judgment on scienter against executives based on circumstantial evidence and imputing scienter to company); *SEC v. Milan Capital Grp., Inc.*, No. 00-cv-108, 2000 WL 1682761, at *6-7 (S.D.N.Y. Nov. 9, 2000) (finding scienter on summary judgment based on "warning signs … that the sales were not legitimate" and defendant's "participation in the scheme"); *SEC v. Musella*, 678 F. Supp. 1060, 1062-64 (S.D.N.Y. 1988) (finding scienter on summary judgment based on one defendant's deposition admission and evidence that defendants tried to conceal their trading).[3]  Indeed, the Second Circuit has stated, in affirming summary judgment against defendants in a securities fraud case, that "the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." *SEC v. Research Automation Corp.*, 585 F.2d 31, 33-34 (2d Cir. 1978); *see also Delchi Carrier SpA v. Rolorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995) (affirming grant of plaintiff's motion for summary judgment based on "ample admissions").

Moreover, while ample direct evidence exists here, "[p]roof of scienter need not be direct, but may be a matter of inference from circumstantial evidence." *SEC v. Rosenberger*, No. 22CV4736 (DLC), 2023 WL 1928093, at *5 (S.D.N.Y. Feb. 10, 2023).  "A court may infer

---

[3] There are numerous other examples of scienter being decided in favor of plaintiffs at summary judgment. *See, e.g., SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014); *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010).

recklessness at the summary judgment stage if it finds that a defendant exhibited an 'egregious refusal to see the obvious, or to investigate the doubtful.'" *SEC v. Laura*, 680 F. Supp. 3d 204, 225 (E.D.N.Y. 2023) (quoting *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018)).  For example, in addition to the evidence referenced above, Houston testified that based on his conversation with Brown "my inference [at this time]" was that "Co-Diagnostics was likely to have a soft quarter or two." ¶39(c).  Based on Houston's inference, the only logical conclusion is that Brown told him sales were down, as Houston would have no reason to make such an inference if Brown had told him sales were good.  Additionally, in comparison to the Company's historically poor sales in February, March, April and early May 2022, in a November 10, 2021 email to Dwight Egan, Benson, and Houston, after October 2021 sales of $4,627,158.90 and November sales through November 10, 2021 of $315,824, Brown stated that "[t]hus far in Q4, we have seen slowing sales."  ¶20.

Finally, it is well-settled in this Circuit that the scienter of a company's agent is imputed to the company. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012). Indeed, "[a] corporation can only act through its employees and agents." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). Dwight Egan's and Brown's scienter is imputed to Co-Diagnostics.[4]

---

[4] Seth Egan's scienter may also be attributed to Co-Diagnostics. *See, e.g., In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.").

IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's

motion for partial summary judgment.

Dated: March 21, 2025                              **KAPLAN FOX & KILSHEIMER LLP**

                                                   */s/  Jason A. Uris*_____
                                                   Frederic S. Fox
                                                   Donald R. Hall
                                                   Jason A. Uris
                                                   800 Third Avenue, 38th Floor
                                                   New York, NY 10022
                                                   Telephone: (212) 687-1980
                                                   Facsimile: (212) 687-7714
                                                   *ffox@kaplanfox.com*
                                                   *dhall@kaplanfox.com*
                                                   *juris@kaplanfox.com*

                                                   *Lead Counsel for Lead Plaintiff and the Class*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 8,045 words and complies with the type-volume limitation of Local Civil Rule 7.1(c) of the Local Rules of United States District Courts for the Southern and Eastern District of New York. I also certify that this brief complies with the typeface and type style requirements of Local Civil Rule 7.1(b)(1)(2)(3).

*/s/ Jason A. Uris*
Jason A. Uris