# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

STADIUM CAPITAL LLC, on        )
behalf of itself and           )
all others similarly           )
situated,                      )
           Plaintiff,     )Case No.
                 )22-cv-6978-AS
      vs.                      )
                 )
CO-DIAGNOSTICS, INC.,          )
DWIGHT H. EGAN, and            )
BRIAN L. BROWN,                )
         Defendants.    )
_____     )

REMOTE VIDEOTAPED DEPOSITION OF

BRIAN BROWN

Salt Lake City, Utah

Tuesday, November 5, 2024

Reported By:

CATHI IRISH, RPR, CRR, CLVS

Page 2

November 5, 2024

8:59 a.m.

Remote videotaped deposition of BRIAN BROWN, with all participants appearing via videoconference, before Cathi Irish, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

KAPLAN FOX & KILSHEIMER LLP
Attorneys for Plaintiff
    800 Third Avenue
    38th Floor
    New York, New York 10022
BY:  JASON A. URIS, ESQ.
    CHANG HAHN, ESQ.

BAKER & HOSTETLER LLP
Attorneys for Defendants
    200 Civic Center Drive
    Suite 1200
    Columbus, Ohio 43215
BY:  MARISSA A. PEIRSOL, ESQ.
    GENEVIEVE G. YORK-ERWIN, ESQ.

ALSO PRESENT:
    CHRIS HANLON, videographer
    KEVIN ONTIVEROS

Page 4

THE VIDEOGRAPHER:  Good morning. We are going on the record.  The date today is November 5, 2024.  The time is 8:59 a.m. Eastern time.

This is media unit number 1 of the video recorded deposition of Mr. Brian Brown taken in the matter of Stadium Capital LLC, et al., versus Co-Diagnostics, Incorporated, et al., filed in the U.S. District Court for the Southern District of New York. This is case number 22-cv-6978.

My name is Christopher Hanlon. I'm a certified legal videographer. Our court reporter today is Cathi Irish and we are with Veritext New York.

I will just note that I cannot go off the video record unless all parties agree.  All attorney appearances have been noted on the stenographic record and at this time I would ask our court reporter, Ms. Irish, to please administer the

Page 5

oath and we can proceed.

BRIAN  BROWN,  called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. URIS:

Q.  Good morning, Mr. Brown.  Thank you for making yourself available to provide testimony today.  I know it's a bit early where you are.

A.  That's okay.

Q.  Can you please state your full name for the record?

A.  It's Brian Lee Brown.

Q.  What is your current home address?

A.  5322 West Briar Park Road, Herriman, Utah 84096.

Q.  I just want to go over a few ground rules before we get started.

A.  Sure.

Q.  Do you understand that you took an oath under penalty of perjury to tell

2 (Pages 2 - 5)

Page 6

BROWN

the truth today?

A. Yes.

Q. Are you aware of any reason why you cannot testify truthfully today?

A. No.

Q. Are you on any medications that would affect your ability to give truthful testimony?

A. No.

Q. Okay. And then throughout the day if you could please let me finish my questions before answering, I think that would be helpful to have a clean record. And you need to answer audibly so the court reporter can hear you so that means no nodding or shaking your head.

A. Okay.

Q. And then throughout today's deposition, your counsel may object to form, but unless your counsel instructs you not to answer, you still must answer.

A. Okay.

Q. And if you need a break, just let me know. However, if a question is

Page 7

BROWN

pending, I would prefer that you finish answering the question before we take a break. Does that work for you?

A. Absolutely.

Q. And if I ask you a question and you answer it, I assume you understood the question but if my question is unclear, please let me know and I'll try to clarify.

A. I can do that.

Q. Thank you.
    Is there anyone in the room with you today?

A. No.

Q. Do you understand that you cannot communicate with your lawyers during the time you're providing testimony on the record?

A. Yes, I understand that.

Q. Have you ever been charged with a crime?

A. No.

Q. Have you ever been -- other than in this case, have you ever been named as

Page 8

BROWN

a defendant in a civil litigation?

A. No.

Q. Have you had your deposition taken before today?

A. No.

Q. When did you first become aware of today's deposition?

A. The actual scheduled date would have been -- knowing today would have been probably a week ago approximately.

Q. And when did you first become aware that you may be deposed in this litigation?

A. I can't recall exactly the date when that would have happened.

Q. Did you prepare for today's deposition?

A. Yes.

Q. How did you prepare?

A. I met with counsel.

Q. When did you meet with counsel?

A. I met with counsel three different times over the past five or six days.

Page 9

BROWN

Q. Do you know approximately how long those meetings were?

A. Oh, I would say approximately three and a half to four hours each one.

Q. Does the Baker Hostetler firm represent you?

A. Yes.

Q. Did you enter into a written retainer agreement for the purposes of their representation of you in connection with this case?

A. I can't recall but they represent me so I assume we did. I just can't recall exactly signing that.

Q. Who was present during each of the three meetings that you had with counsel to prepare for today's deposition?

A. You mean present on the call?

Q. Yes.

A. It would have been myself, Marissa Peirsol and Genevieve York-Erwin.

Q. Anyone else?

A. I don't think so.

Q. Did you review any documents

3 (Pages 6 - 9)

Page 10

BROWN

during those meetings?

A. Yes.

Q. Did any particular documents help you recall or remember any events that occurred in the past three or four years?

A. I don't know -- I couldn't say any specific documents, no.

Q. Did you bring any documents or notes with you to this deposition?

A. No.

Q. Did you take any notes in preparation for this deposition?

A. Yes.

Q. When did you take those notes?

A. Generally it would have been at the first meeting where most of my notes occurred.

Q. Do you still have those notes?

A. I do.

MR. URIS: Counsel, plaintiffs request the production of those notes and any other notes that Mr. Brown took in preparation for today's deposition.

Page 11

BROWN

MS. PEIRSOL: To the extent that they are responsive to your discovery requests within the relevant time period and not privileged, we will produce them. If they are privileged, we will only log according to our agreement that we have in place where we had agreed not to log privileged documents relevant to the litigation.

MR. URIS: That's fine but I assume when you say the relevant period, you don't mean the fact that they were drafted within the past few weeks that that would fall outside the relevant period; correct?

MS. PEIRSOL: I would have to go back and look at your discovery request and our objections and the agreements we came to about what the relevant time period is.

MR. URIS: We would certainly disagree with that so please let us know if you're taking the position that notes taken in preparation for

Page 12

BROWN

today's deposition would not be responsive because they fall outside of the relevant time period. And if that is your position, then we are making a new request for those documents and the same would apply for any documents that we've requested at any other deposition in this case.

MS. PEIRSOL: I state the same objections and response that I did before.

BY MR. URIS:

Q. Were you asked to search for any documents in connection with this litigation?

A. No.

Q. Do you know what this lawsuit is about?

A. Because I'm not an attorney, I don't know the details, the legal details but in general, yes.

Q. Can you describe your general understanding?

A. That we made statements on an

Page 13

BROWN

earnings call that somebody found to be misleading.

Q. Do you know what those statements concerned?

A. I can't say specifically. It generally was about guidance, I believe, is what we're focused on.

Q. Have you discussed this lawsuit with anyone other than counsel?

A. Discussed that it exists, yes.

Q. Who did you discuss this lawsuit with?

A. My wife is clearly aware. When you're a named defendant, you tell your wife. And then Andrew Benson is aware. Basically the people who are also being deposed are the ones that are aware and then also my VP of finance and accounting, Dan Bohrer.

Q. Other than discussing that the lawsuit exists, did you discuss anything about this case with anyone being deposed in this case or with Dan Bohrer?

A. No, nothing substantive.

4 (Pages 10 - 13)

Page 14

BROWN

Q. Do you have any agreements in place, whether with Co-Diagnostics or anyone else, that will in any way affect your testimony today?

A. No.

Q. Did you receive a litigation hold related to this litigation?

A. Explain to me a litigation hold, what does that mean?

Q. It would be any kind of notice asking you to save your documents or not delete any documents or dispose of any documents.

A. Yes.

Q. What did you do as a result of receiving that communication?

A. I can't recall exactly but I assume that I would have just made sure that I kept all my documents moving forward, just followed whatever the instructions were.

Q. Is it fair to say after receiving that communication you didn't delete any e-mails or text messages or any other

Page 15

BROWN

messages?

A. That's correct.

Q. I'd like to ask you a little bit about your educational background. Did you attend college?

A. I did.

Q. And where did you attend college?

A. I attended college, I did two years at Utah Valley State College at the time and then I attended the University of Utah for my bachelor's degree and then I also attended the University of Utah for my master's degree.

Q. What areas -- was it a specific type of bachelor's degree?

A. Yeah, the bachelor's was in accounting and then the master's was a master's of professional accountancy.

Q. Do you possess any professional licenses?

A. I do.

Q. What licenses?

A. I have a CPA license in the state of Utah.

Page 16

BROWN

Q. How did you obtain that license?

A. By getting the proper education and sitting for the CPA exam and taking an ethics course in the state of Utah.

Q. Are you a member of any professional organizations?

A. I am not.

Q. Can you generally describe your work experience prior to joining Co-Diagnostics?

A. Upon finishing my master's degree at the University of Utah I worked for KPMG in Salt Lake City for approximately four years in their insurance practice where I was a staff and senior on different audit engagements. After that I left to work as the controller at FranklinCovey Products and did that for about four to five years. After that I went to Sportsman's Warehouse and I was the VP of finance and accounting for approximately 10 years. Following that time, I was unemployed for approximately nine months during COVID and then was able

Page 17

BROWN

to get a job as the CFO at Acore Construction which is a concrete -- Acore Concrete Cutting. It's a concrete cutting company here in the west and did that for about seven months and then I had the opportunity to come to Co-Diagnostics as the CFO and have been here since that time.

Q. Do you recall approximately when you joined Co-Diagnostics?

A. It was February or March of 2021. I can't remember the exact date.

Q. Were you also the secretary when you joined?

A. At first I was not and that changed, I don't remember at what point.

Q. Have you held any other roles at Co-Diagnostics other than CFO and secretary?

A. I have not.

Q. Who -- do you recall who recruited you to join Co-Diagnostics?

A. It was a gentleman by -- a consultant that had done some consulting

5 (Pages 14 - 17)

Page 18

BROWN

work for Co-Diagnostics.  His name is Ty Lombardi.

Q.  Do you know what kind of consulting work he did for Co-Diagnostics?

A.  It was accounting, public filings, things like that.

Q.  Did you know Ty Lombardi at the time he recruited you?

A.  Yes.

Q.  How did you know Ty Lombardi?

A.  I went to high school with him, so a number of years.  I've known him for years, his family also for years.

Q.  Did you have an employment contract when you joined Co-Diagnostics?

A.  I did not.

Q.  When you were hired did you negotiate your compensation?

A.  Yes.

Q.  What was your compensation when you joined?

A.  Oh, I believe it was right around 230,000 in salary.

Q.  Was there any other components of

Page 19

BROWN

your compensation?

A.  There would have been a grant of RSUs at the beginning also.

Q.  Do you recall how many RSUs?

A.  I can't off the top of my head, 20- to 30,000 I think is what it was, but the exact number I can't recall.

Q.  Was there a bonus component?

A.  No.

Q.  Has your compensation changed over time since you joined Co-Diagnostics?

A.  Yes.

Q.  And how did it change?

A.  It increased.

Q.  Do you recall what it was in 2021?

A.  In 2021 that's when I started so it would have been that 230,000.

Q.  Do you recall what it was in 2022?

A.  Specifically no, I don't and it would be based on whatever time, I don't know whatever time we're talking about specifically but in general, I couldn't

Page 20

BROWN

say specifically.

Q.  Did you know anyone at Co-Diagnostics prior to joining the company?

A.  Yes.

Q.  Who did you know?

A.  Dennis Emery.

Q.  What was his role at the time you joined?

A.  I believe at the time I joined he was our accounts payable clerk, or accounts payable manager.  We had one person doing it, so clerk, manager, probably manager.

Q.  And how did you know him?

A.  I play softball with his son.

Q.  Can you explain your role as CFO?

A.  Can you be a little more specific?  That's pretty general.

Q.  What are your responsibilities as CFO?

A.  In general, it would be to oversee the finance and accounting functions of the company, oversee

Page 21

BROWN

financial reporting, SEC reporting, participate in earnings calls, review press releases and other, you know, public facing documents.  I'm sure there's much more.

Q.  Have your responsibilities changed over time at all?

A.  I don't believe so.

Q.  Can you explain what your responsibilities are as secretary?

A.  Signing documents is probably the biggest thing as secretary is signing documents, participating in board calls, making sure minutes are taken, things like that.

Q.  I guess starting from the time that you joined the company, who did you work -- who did you primarily work with in your role as CFO?

A.  So the former CFO/in-house counsel Reed Benson is probably the one I worked most closely with initially, and then I worked with Randy Turner who was the I'll say the VP of finance at that

6 (Pages 18 - 21)

Page 22

BROWN

time, so early on that's what it is, and of course, Ike, Dwight Egan, and then now it's Dan Bohrer and of course, all the finance and accounting staff and our HR staff that I oversee and then Kevin our in-house counsel, it's Andrew Benson, all the leadership of the company, Seth Egan, Kevin Ontiveros.

Q. How do you communicate with those people?

A. Generally it would be verbally or through e-mail.

Q. Any other means of communication?

A. Generally no. There might be Teams every once in awhile but I generally lean to just using e-mail or verbally.

Q. Teams is Microsoft Teams?

A. Yeah, just the tool that's built into the Microsoft products.

Q. Do you know if people at the company use Teams for anything other than scheduling calls or video calls?

A. I don't. I couldn't answer for anybody else.

Page 23

BROWN

Q. Do you have a Co-Diagnostics e-mail address?

A. I do.

Q. And what is it?

A. It's b.brown@co-diagnostics.com and it's also b.brown@co-dx.com.

Q. Do you ever use your personal e-mail for work?

A. No.

Q. Do you ever use text messaging for work?

A. Not for anything substantive, no.

Q. Any other messaging platform like WhatsApp?

A. No, no. I almost just shook my head there and didn't say no and I caught myself.

Q. It will be hard to remember.

A. Yeah.

Q. As secretary were you required to keep minutes of all meetings of the board of directors or committees of the board of director?

A. I don't know if I was required to

Page 24

BROWN

but I made sure that we had somebody taking minutes on those board meetings.

Q. Do you recall any board meetings that you didn't take the minutes for?

A. I can't recall if there were any.

Q. So it may be that there weren't any but I guess if there were any, do you know who you would have assigned to take those minutes?

A. It probably would have started with Reed Benson who was the in-house and CFO role when I first started. He probably was the one who took those minutes at that time and then we transitioned to a consultant which was Kevin and then when he became in-house counsel, he continued with those minutes.

Q. Can you explain how Co-Diagnostics' finance and accounting division was structured?

A. Do you mean in terms of people, is that what you mean?

Q. Yes.

A. We had a -- when I started there

Page 25

BROWN

was a CFO. We had a VP of finance. We had a controller and we had a AP manager. I'm trying to think. And then shortly thereafter we hired an AR manager and I think that was the entire staff at that time.

Q. What's AP and AR?

A. Do you mean the terms, what they mean?

Q. Yes.

A. Accounts payable is AP and AR is accounts receivable.

Q. Did those people report to you?

A. Not directly but directly and indirectly.

Q. In 2021 and 2022, who reported to you?

A. It probably would have been the VP of finance and accounting and our director of people, HR. Those are the two individuals who reported directly to me.

Q. What were their names?

A. In '21 and '22 would have been Randy Turner and then he left, so VP of

7 (Pages 22 - 25)

Page 26

BROWN

finance and accounting would have started out as Randy Turner and it became Dan Bohrer, and we did not have an HR leader in 2021 and I believe it was in 2022 where we hired Ron McCabe who is our director of people.

Q. That's effectively an HR role?

A. Correct.

Q. Did you report to anyone?

A. I reported to Dwight Egan.

Q. Do people refer to him as Ike?

A. Yes, both Dwight and Ike, both.

Q. In 2021 and 2022, the company had a sales division; correct?

A. Yes.

Q. Do you know how the sales division was set up in terms of hierarchy?

A. Not specifically. I think in general, I know that the head of the sales division was Seth Egan and I don't know the people underneath him how that structure worked.

Q. Do you know who was underneath him?

Page 27

BROWN

A. I think in 2021 and 2022 you would have had Cameron Gundry, Joseph Featherstone and Danny Crockett. I think that's it.

Q. Do you know whether the sales department would have team meetings?

A. I don't know.

Q. Was there a management team?

A. We had leaders. I don't know that it was a structured management team per se but we did have leaders.

Q. Do you know who was on that team or who you would describe as leaders?

A. What time period are we talking about because clearly the company has evolved a bit.

Q. Yeah, 2021 and 2022.

A. 2021 and 2022. I think the leadership probably was clearly Dwight Egan, myself, for a time our former CFO and in-house counsel, Reed Benson. Seth Egan I would say is probably one of the leadership group. We were a pretty small staff back then. I would say that's

Page 28

BROWN

probably, those are probably the people that I can recall best.

Q. Would the leadership group have any regularly scheduled meetings?

A. Not necessarily for that leadership group. We did have a every Monday morning we called it a management meeting but it effectively was almost everybody in the company on the call, just trying to keep track of everything that was going on in the business at that time.

Q. Was anything in particular discussed on those calls or just anything that someone thought was important?

MS. PEIRSOL: Objection, form. You can answer.

THE WITNESS: Okay. Generally it was just whatever was going on at the company.

BY MR. URIS:

Q. Was there a steering committee?

A. Yes, we did, we started a steering committee shortly after we acquired two entities to help transition

Page 29

BROWN

the companies to working together.

Q. Did the steering committee have any purpose other than helping to transition the companies to working together?

A. That was the main purpose that we put that committee together was to help bring three different companies together into one.

Q. Do you recall who was on that steering committee?

A. Let's see if I can remember. At the beginning so once our acquisition was complete, we started that committee, I'm not sure the exact time period, sometime in 2022 because that was shortly after the acquisition and on the committee would have been myself, Dwight Egan, Seth Egan, Kirk Ririe, Rocky Taylor, and at some point Joseph Featherstone. Those are the people that I can recall.

Q. Who is Rocky Taylor?

A. He was the CFO of the two entities we acquired.

8 (Pages 26 - 29)

Page 30

BROWN

Q. And what were those entities?

A. Let's see if I can remember their names now. Advance Conceptions, Inc. and I believe it was Idaho Molecular was the other one. They worked together.

Q. What did those companies do?

A. We had engaged them some point in time to help us develop the Kodiak's PCR testing platform.

Q. In 2021 and 2022, did you have any regularly scheduled meetings with Dwight Egan?

A. Me specifically?

Q. You specifically or in a group that regularly met with him.

A. Okay. Yeah, we had our -- so we had our Monday morning management meeting which he participated in and then we started a steering committee and that would have been sometime in 2022. Those were the two meetings that were regularly scheduled with Ike that I participated in and he participated in.

Q. Did you have any other regularly

Page 31

BROWN

scheduled meetings with Seth Egan?

A. No, just those meetings.

Q. Do you attend Co-Diagnostics board meetings?

A. Yes.

Q. How do you prepare for a board meeting?

A. Generally my role is to -- I put an agenda together and communicate it to the board and any financial information to be reviewed I would prepare that for the board.

Q. How would you communicate the agenda to the board?

A. Generally it would be through e-mail.

Q. Would you also communicate any financial information that was prepared through e-mail?

A. Yes.

Q. In 2021 and 2022, were you a member of any committees at Co-Diagnostics?

A. I mean aside from the steering

Page 32

BROWN

committee, no, we didn't have necessarily any specific committees.

Q. Were you a member of any board committees?

A. No.

Q. Would you regularly meet with any board committees?

A. No, except as a part of a board meeting, that would be it.

Q. Would you regularly meet with the audit committee of the board?

A. Yes.

Q. Do you know what the purpose of the audit committee is?

A. Yes.

Q. What is it?

A. It is generally to oversee the reporting function of the company. We meet each quarter before finishing up the audit or review procedures and before filing our Qs or Ks.

Q. Do you recall who was on the audit committee in 2021?

A. In -- it would have been the same

Page 33

BROWN

board members that we have today. Eugene Durenard would have been the audit committee chair and then the other three independent members of the board were the other members of the audit committee.

Q. What are those people's names?

A. Ted Murphy, Richard Serbin and Jim Nelson.

Q. Was it the company's practice to keep minutes of all audit committee meetings?

A. Yes.

Q. Is any specific person tasked with maintaining or holding minutes of the board or any committees of the board?

A. It would be -- depending on the time period clearly, it would just be whoever was taking the board minutes, same person.

Q. In 2021 or 2022, did you ever communicate with individuals who provided research reports or analyst reports to the market on Co-Diagnostics?

A. In 2021 or 2022, so over that two

9 (Pages 30 - 33)

Page 34

BROWN

years? Yeah, we had analysts and we would have follow-up calls after an earnings call with an analyst. That was kind of a normal practice just like any other public company.

Q. And generally, do you know who would be on those calls from Co-Diagnostics?

A. Yeah, it would be myself, Dwight Egan and at times Andrew Benson.

Q. What was Andrew Benson's role at the company?

A. He oversaw or still oversees our IR function, so investor relations function, and also he's our director of corporate communications so he would help administer those calls at times.

Q. Did he have any other roles in 2021 or 2022?

A. I can't say specific for him but I know he had a lot of roles because we were a small company that everybody participated in in getting stuff done.

Q. I believe you testified earlier

Page 35

BROWN

that you participated in investor conference calls; is that right?

A. Analyst, analyst conference calls, yeah.

Q. Right. Sorry, I was referring specifically to investor conference calls that would be scheduled with respect to the company's quarterly earnings announcements.

A. That would actually be analyst. Maybe I misspoke. Those were always analyst. We never held investor specific calls at the quarters. That would just be the analyst that covered us.

Q. Okay. Do you know whether Co-Diagnostics maintains audio or video recordings of those calls?

A. I don't know.

Q. Do you know who would know?

A. Likely Andrew Benson but as I recall -- I don't believe we ever have recorded those calls.

Q. How did Co-Diagnostics' executives prepare for analyst calls?

Page 36

BROWN

MS. PEIRSOL: Objection, form.

BY MR. URIS:

Q. You can answer.

A. Okay. I wanted to make sure.
Can you be a little more specific? It's pretty broad.

Q. I guess let's start with how would you generally prepare for analyst calls?

A. I don't know that there would be a specific preparation for analyst calls. We would prepare for earnings calls and then hold the analyst call shortly thereafter so I don't know that there was any different preparation.

Q. How would you prepare for earnings calls?

A. That's generally a process where we would typically meet with our investor relations firm and start to discuss results of the quarter. I'd probably say close to the end of the quarter. We discuss kind of things, operations that are going on at that time, developments

Page 37

BROWN

that we're working on and discuss kind of a tone of call and what it would be like and then we would move forward in preparing a script, preparing an 8-K with an earnings release, preparing guidance, preparing a Q or a K. That would just move forward until we actually had our earnings call so all that stuff fit into a few week period of time.

Q. Would you have prep meetings with Dwight Egan in connection with earnings calls?

A. Yes, not just individually with Dwight but with that group, Andrew Benson and our IR firm typically.

Q. Who was your IR firm?

A. In what period of time are we talking about?

Q. 2021 and 2022.

A. That was likely the -- it was Lambert and at some point we switched but I think that was after 2022.

Q. Who did you switch to?

A. Gilmartin.

10 (Pages 34 - 37)

Page 38

BROWN

Q. Is that a person or a company?
A. It's a company, it's a firm.
Q. Do you recall why you switched?
A. I don't recall.
Q. Do you know who would have made that decision to switch?
A. I think it was probably myself and Dwight and Andrew Benson.
Q. But you don't recall why you switched?
A. I don't. I don't recall off the top of my head, no.
Q. Do you recall generally how much time you would spend in prep meetings preparing for earnings calls?
A. I don't recall. It probably varied by quarter but I don't recall.
Q. Did you use scripts for those calls?
A. Sorry, for which calls?
Q. For earnings calls.
A. When we presented our -- had our earnings call we used a script.
MR. URIS: Marissa, I'm about to

Page 39

BROWN

start getting into more substantive questions. I don't know if people want to take a short break before getting into that or we can keep going.
MS. PEIRSOL: I don't mind taking a quick break. Should we take five, 10-minute break?
THE VIDEOGRAPHER: This is the videographer. The time is 9:54. We're going off the record.
(Recess taken from 9:54 a.m. to 10:01 a.m.)
THE VIDEOGRAPHER: We are back on the record. The time is 10:01. This begins media file 2.
BY MR. URIS:
Q. What is the Logix Smart COVID-19 detection test?
A. The specific name is different I think internally. I don't know what -- that's not the name we use. We have a COVID-19 test, a lab-based test which I think you're referring to.

Page 40

BROWN

Q. Yes, and what is that test?
A. It's a lab-based test that's used to detect COVID, COVID-19.
Q. It's a PCR test?
A. That's correct.
Q. Okay. And throughout today's deposition if I refer to the Logix test or the Logix COVID-19 test, will you understand that I'm referring specifically to the COVID test that Co-Diagnostics sells?
A. Yes.
Q. Does the company still sell COVID-19 tests?
A. Yes, we do.
Q. When did the company start selling the Logix COVID-19 test?
A. I can't recall because it was prior to me coming to the company so I can't -- I don't know the answer to that.
Q. Would you consider labs and distributors to be the company's primary customers for the Logix test?
A. Can you say that one more time,

Page 41

BROWN

what are the two groups you identified?
Q. Labs and distributors.
A. Yes, I would say that's correct.
Q. Any other category of customer?
A. Not that I can think of.
Q. When you joined the company, do you recall approximately what percentage of its revenue the Logix test accounted for?
A. I don't know at that time. I can't recall at that time.
Q. Do you know approximately?
A. You're talking specifically in February and March of 2021, is that what you're asking?
Q. Anytime in 2021 or 2022.
A. If we're talking about that broad a range, it probably accounted for while I was here, probably 95 plus percent of our sales.
Q. Do you recall whether at some point in 2021 the company began a practice of providing quarterly guidance?
A. Yes.

11 (Pages 38 - 41)

Page 42

BROWN

Q.  Do you recall when that was?

A.  I don't recall specifically which quarter we started doing that.

Q.  Were you responsible for determining the guidance that would be provided?

A.  Yes.

Q.  And typically the company provided guidance approximately halfway through the ongoing quarter; is that correct?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't know that I would say approximately.  Generally we would have our earnings calls four to five weeks into the next quarter so you still had an additional seven to eight weeks of the quarter so it's not quite halfway.

BY MR. URIS:

Q.  Do you recall around what date the company would have its first quarter earnings calls?

A.  I can't recall each date, no.

Page 43

BROWN

Yeah.

Q.  You don't recall on what date in 2021 the company had its first quarter earnings call?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I can't recall -- I can't recall the exact date.

BY MR. URIS:

Q.  Would it surprise you to learn that it was on May 11th or May 12th of 2021?

A.  No, it wouldn't surprise me, no.

Q.  That's more than four or five weeks into the second quarter; correct?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  That's approximately five weeks into the quarter.

BY MR. URIS:

Q.  Would you consider May 15th to be the midpoint of the quarter?

A.  Yeah, that's about the midpoint, sure.

Q.  So that would be three or four

Page 44

BROWN

days prior to the midpoint of the quarter?

A.  The math would say that, yes.

Q.  So would you agree then that the company typically provided guidance approximately halfway through the ongoing quarter?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Or approximately five weeks into the quarter, five, maybe add two days.  If we want to add two days, we can add two days.  That's fine.

BY MR. URIS:

Q.  Okay.  Can you describe what you would do in order to determine guidance?

A.  Yeah --

MS. PEIRSOL:  Objection, form. You can answer.

THE WITNESS:  Okay.  Typically I would look at the prior quarter's numbers, the results for the prior quarter and then just base it off of those prior year, prior quarter numbers to determine, look at the

Page 45

BROWN

prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide.

BY MR. URIS:

Q.  The guidance was a forward looking number; correct?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Yes, guidance is a forward looking number.

BY MR. URIS:

Q.  Is there anything you would do other than look at the company's historical results in determining guidance?

A.  That was the key driver.  Clearly I would have discussions with Seth Egan, that's about it.

Q.  Do you recall generally what you would discuss with Seth Egan in that respect?

A.  Just how sales were going.

Q.  Would you review the company's quarterly order data to date when

12 (Pages 42 - 45)

Page 46

BROWN

determining the guidance you would provide for the following quarter?

MS. PEIRSOL: Objection, form.

THE WITNESS: You said for the following quarter --

BY MR. URIS:

Q. Sorry, for the current quarter, for the quarter for which you would provide guidance.

A. Yeah, sure. Sure, I would look at the results that had happened up to that point in time.

Q. Other than speaking with Seth Egan, is there anyone else you would speak to about how sales were going?

A. Not that I can recall.

Q. Do you have an understanding of the process of how a customer would place an order?

A. I do not.

Q. Did the company use any systems to keep track of its sales orders?

A. Yes.

Q. And I guess, sorry, before I

Page 47

BROWN

follow up on that, did you use any models or forecasts to forecast the company's orders or revenues associated with the Logix test?

A. Sorry, you said models or forecast. I don't quite understand what that means.

Q. Like a financial model or any kind of documents forecasting into the future what you expected the company's revenues to be.

A. I would use an Excel document and drop in historical numbers. That's about it. There was no science to that side, no external tools or anything used, no.

Q. But you had -- what would you call it, a model or a forecast?

MS. PEIRSOL: Objection.

BY MR. URIS:

Q. What would you call it?

MS. PEIRSOL: Objection, form.

THE WITNESS: I use an Excel spreadsheet and just pulled in historical results from our Qs that we

Page 48

BROWN

had filed in the past.

BY MR. URIS:

Q. Do you have a name for that spreadsheet?

A. I don't know off the top of my head what the name.

Q. I don't mean like a specific name but would you call that your forecast or your model? I'm just trying to think of what I should refer to that as.

MS. PEIRSOL: Objection, form. Is there a question?

BY MR. URIS:

Q. Do you recall how often you updated that spreadsheet?

A. Probably on a quarterly basis.

Q. Was there a specific time, specific -- were there specific months that you would update it during?

A. I can't -- I can't recall. Off the top of my head, I can't recall.

Q. Do you recall if you updated that spreadsheet in March of 2022?

A. March of 2022? I don't recall.

Page 49

BROWN

Generally I would update it at the end of the quarter so with the results from that quarter. That's generally what would be put in there. So once I had some final numbers, I would put it in that file. The timing I don't remember specifically.

Q. You don't recall if you updated it in either April or May of 2022?

A. I don't recall specifically, no.

Q. I believe you testified earlier that the company uses certain systems to keep track of its sales orders?

A. Yes.

Q. What are those systems?

A. I believe the sales team uses monday.com to keep their eye on the orders and then we have an accounting software that we use. We used QuickBooks at one point in time and now we use a different software, the name -- I forgot what our software is but we have a different software now.

Q. Is it NetSuite?

A. NetSuite, yes, sorry. I'm glad

13 (Pages 46 - 49)

Page 50

BROWN

you remembered for me.

Q. I know more than I want to about the systems that you use.

Did you have access to monday.com?

A. I did.

Q. Do you know whether Dwight Egan had access to monday.com?

A. I don't know.

Q. Do you know whether the sales team used monday.com for any purpose other than tracking sales orders?

A. I don't know. You'd have to ask the sales team, I don't know.

Q. Did you use monday.com for any other purpose?

A. No.

Q. How often would you review the information in monday.com?

A. I don't know that I could say a frequency per se. I would generally access it close to the end of the quarter to see where we are going to end up in a quarter and then I would look at it as I

Page 51

BROWN

prepared guidance, I would see what is in the system at that point in time.

Q. Do you know what SharePoint is?

A. Yes.

Q. And what is it?

A. That is our document repository for the network, network depository.

Q. Do you know, did you use SharePoint for anything?

A. Just to archive documents.

Q. Any particular types of documents?

A. No, no specific types.

Q. Is that the system that the company used to store all of its documents?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know that I can recall that's the system they used where we stored all of our documents.

BY MR. URIS:

Q. Was it the company's primary document storage system?

MS. PEIRSOL: Objection, form.

Page 52

BROWN

THE WITNESS: I couldn't say. You'd have to ask the IT department.

BY MR. URIS:

Q. If you had a work document that you wanted to save, where would you save it generally?

A. It depends on the nature of the document.

Q. Which types of documents would you save to SharePoint?

A. You know, potentially corporate structure documents, articles of incorporation, those types of things.

Q. Do you know what QT9 is?

A. Yes.

Q. What is it?

A. That was a quality system that we used in the past.

Q. So it was -- when you say quality, are you referring to quality of the tests?

A. No, no. I'm referring to that we have tests registered with different agencies and you're required to have a

Page 53

BROWN

quality system that documents the different tests and anything surrounding that test.

Q. Now I'm going to introduce an exhibit. Bear with me one moment.

A. No problem.

Q. I'm introducing what was previously marked as Exhibit 1. It should be available in the marked exhibits folder. There's a pdf which is just a cover slip sheet and the exhibit itself is the spreadsheet.

You may have difficulty opening it up through the Exhibit Share preview function or you can download the spreadsheet or I'm happy to also share my screen if that's easier.

A. Yeah. Just bear with me one second. I think it's refreshing or something.

I see a pdf and an Excel file.

Q. It's the spreadsheet. The pdf is just basically a blank cover.

A. Bear with me just a minute for it

14 (Pages 50 - 53)

Page 54

BROWN

to come up here.

Q.  Do you have the spreadsheet?

A.  It's not quite opening.  It says generating file preview.

Q.  So it's the preview -- I'm happy to -- we're having some difficulty with the spreadsheets but I can share my screen.  It's really only a couple areas that I wanted to focus you on.  I think for the spreadsheets you have to actually download the files but let me just share my screen.

Are you able to see that?

A.  I can see a document, yes.

Q.  Can you see at the top it says Co-Diagnostics Orders, 2020, 2021, 2022, 2023 & 2024, do you see that?

A.  I do see that.

Q.  Over here it says powered by monday.com?

A.  Um-hum.

Q.  We can see it says sales orders August 2022.  My understanding is that defendants only produced data from I

Page 55

BROWN

believe it was the beginning of 2021 through August of 2022 which is why it stops at August.

Do you recognize this document?

A.  I do not.

Q.  Does this appear to be the sales order information that was stored on monday.com?

A.  I don't know because it's not familiar to me.

Q.  Do you recall whether the sales order information on monday.com would list the customer, for example, in one of the columns?

MS. PEIRSOL:  Objection, form.  Sorry, I didn't mean to step on you.

THE WITNESS:  I should pause a second.  Sorry, my bad.  I don't know.  I don't know because it's not familiar to me.

BY MR. URIS:

Q.  Do you recall what information was stored in monday.com with respect to sales orders?

Page 56

BROWN

A.  I don't know the details of what was stored in monday.com for sales orders.

Q.  But you would review that information towards the end of the quarter and with respect to determining guidance; correct?

A.  I would review the overall sales for a period of time, not details.

Q.  But you had access to this information; correct?

A.  I don't know if I had access to this or not.  I don't know what the limitations were on monday.com to what I had access to or not.

Q.  But you had access to the information on monday.com?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Again, I don't know what information.  I had access to monday.com but this information is not familiar to me.

BY MR. URIS:

Q.  When you would access monday.com either at the end of the quarter or with

Page 57

BROWN

respect to determining guidance, what information would you look at?

A.  Just looking at overall sales numbers, that's it.

Q.  So monday.com had overall sales numbers?

A.  It just had a bar chart or a graph, a pie chart, whatever you want to call it.  It had a chart on there that showed you what the orders were during a certain period.  It was by month.

Q.  Do you recall whether that was called the quarterly dashboard?

A.  I can't recall what the name of it was.

Q.  Do you recall that on the May 13, 2021 earnings call Dwight Egan stated that, quote, we are also of course able to monitor the daily influx of demand for tests?

A.  I don't recall that.  It would have been his statement so I don't recall that off the top of my head.

Q.  Do you know what he may have been

15 (Pages 54 - 57)

Page 58

BROWN

referring to when he said that?

A. I don't know -- again, I don't recall it so I wouldn't know.

Q. Do you recall how you set up or got provided access to monday.com?

A. No, I don't recall.

Q. Do you have any reason to believe that your access to information stored on monday.com was limited in any way?

A. I don't know the answer to that.

Q. Do you have any reason to believe that it was limited in any way?

A. Again, I don't have any way to answer that. I don't know because I didn't set it up.

Q. So do you have a reason to believe that it was limited?

MS. PEIRSOL: Objection, form.

THE WITNESS: Isn't that the same question you just asked?

BY MR. URIS:

Q. Unless there's something unclear about it that I'm missing, I would think either you have a reason to believe that

Page 59

BROWN

your access was limited or you don't have a reason to believe it was limited.

A. Or I don't know one way or another whether it was limited or not. I don't know.

Q. But you have no reason to believe that it was; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: It's the same question. I don't know. I know what I accessed on there which was that one chart and that's it. I don't know what access I had.

BY MR. URIS:

Q. Were you aware of the orders the company was bringing in for the Logix test?

A. At what point in time were you speaking about? It's kind of a general.

Q. While you were CFO of the company.

A. At what point in time? I mean --

Q. At any point in 2021 through August of 2022.

Page 60

BROWN

A. I'm sure there were points of time during that that I was aware of what the sales were.

Q. From the time the company began selling the Logix tests through the first quarter of 2022, do you know approximately how much revenue the company brought in per quarter?

A. It varied by quarter so I couldn't say approximately because it varied by quarter.

Q. Do you recall whether it was at least 20 million dollars or more each quarter?

A. I don't. I think that information was provided so if you could show it to me, I'm happy to look at it.

Q. Do you have any reason to doubt that it was at least 20 million or more each quarter?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know unless I see the numbers. I mean that's three years' worth of data and it

Page 61

BROWN

varied by quarter, I do know that.

MR. URIS: I'll introduce an exhibit. One moment.

THE WITNESS: By the way, that Excel file never did come up. I couldn't get it to come up. Hopefully the others aren't Excel files.

MR. URIS: For the most part they're not. I think it's just an issue with the preview in Exhibit Share.

(Exhibit 12, document Bates labeled CoDx_00501488, marked for identification.)

BY MR. URIS:

Q. I believe we're up to Exhibit 12. Introducing as Exhibit 12 a document bearing Bates stamp CoDx_00501488. And that should be available in Exhibit Share if you refresh the folder.

A. I see it. Let me click on it. Okay, I see it.

Q. Do you recognize this document?

A. Yes, it's familiar.

16 (Pages 58 - 61)

Page 62

BROWN

Q.  What is it?

A.  It looks like the dashboard that I would view in monday.com.

Q.  Does looking at this document remind you that the company's quarterly revenue in each quarter from the second quarter of 2020 through the first quarter of 2022 was at least 20 million dollars or more?

A.  So this is sales information that would not be recognized revenue information so the numbers here may be different than what we reported in our Qs, so I'm more familiar with the Q numbers than I am with these numbers but the numbers are relatively close, I believe.

Q.  So does this refresh your recollection that the company's sales orders in each quarter from the second quarter of 2020 through the first quarter of 2022 were approximately 20 million dollars or more?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't know if it

Page 63

BROWN

helps me recall but I can see the numbers, yeah.

BY MR. URIS:

Q.  Do you recall what the company's revenue was in the second quarter of 2022?

A.  I do not recall what the reported revenue on our Q was exactly.

Q.  Do you recall if it was approximately five million dollars?

A.  Yes, it was probably approximately five million.  I can't recall the exact number though.

Q.  Does that number surprise you?

A.  I don't know that it would surprise me, no.

Q.  Why not?

A.  Because that's what the actual numbers were.  I'm not sure I understand the question "surprise."

Q.  Let me rephrase.  Do you recall being surprised at the time to learn that the second quarter of 2022 revenue was approximately five million dollars?

A.  At what point in time?

Page 64

BROWN

Q.  Whenever you learned that information.

A.  I wouldn't have learned that information until close to the end of the quarter, very end of the quarter so I don't know that I would classify it as surprised.  I don't know.

Q.  Do you recall orders for the Logix test beginning to fall in February of 2022?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  In February of 2022?

BY MR. URIS:

Q.  Yes.

A.  I don't know that I can recall that was the case.  I can see on here that the numbers were lower than they were in January of 2022.

Q.  Do you recall orders -- sorry, strike that.

Do you recall orders in February of 2022 being approximately 3.32 million dollars?

Page 65

BROWN

A.  I don't recall that.  I don't remember sales on a monthly basis, you know, over the past four years, I don't remember the specifics.

Q.  Do you recall orders in March of 2022 being approximately 2.8 million dollars?

A.  Again, I think it's the same answer as the last question, I don't recall specific months.

Q.  So is it fair to say you don't recall what the sales orders were in April of 2022 or May of 2022?

A.  Yeah, I don't recall off the top -- I couldn't say off the top of my head what the revenue numbers or sales numbers were for those periods.

Q.  By May 12 of 2022 or anytime before that, did you notice that orders had been low in February, March and April of 2022?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  They were certainly, I mean they were lower than

17 (Pages 62 - 65)

Page 66

BROWN

what they were in January.

BY MR. URIS:

Q. Do you recall at that time having any thoughts about the order levels in those months?

A. I don't think specifically. If you look at other periods of time, we always had thoughts about orders and COVID and what was coming. We had those thoughts all the time. It wasn't unique to that period of time.

Q. Prior to early 2022, do you recall ever having back-to-back months of sub four million dollar in orders?

A. Again, I can't recall on a monthly basis exactly what the revenue was. I can look at revenue numbers by month and answer that but I can't recall specifically.

Q. Looking at this chart, can you identify any -- other than early 2022, can you identify any back-to-back months where the company brought in less than four million dollars in orders?

Page 67

BROWN

A. I don't know if I can zoom in on this at all. There we go.

Bear with me one second and I'll look at this chart and see.

(Witness perusing document.)

I do see that October of 2021, I believe that's 4.5 million and the next month was -- I can't tell if that's 2.8 or 3.8 so those would be close to what you're talking about, and that was just the end of Q4 of '21.

Q. I believe October says 4.6 million. I had asked back-to-back months of less than four million.

A. Okay, yeah. No, there weren't any.

Q. Okay. And in February, March and April of 2022, that was actually three months in a row of less than four million in revenue; correct?

A. February, March -- that's correct.

Q. So three months in a row beginning in February of 2022 of sub four

Page 68

BROWN

million dollars in orders was unusual; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: I couldn't say whether it was unusual or not. We had peaks and valleys all through COVID.

BY MR. URIS:

Q. So it wasn't unusual to you that the company had experienced three months in a row of sub four million dollars in orders while the company had never even experienced back-to-back months of sub four million dollars in orders?

MS. PEIRSOL: Objection, form.

THE WITNESS: No, because four million dollars was not a measuring tool or a measuring guide for us. We had experienced volatility throughout COVID and we continued to experience volatility in Q1 and Q2 of 2022.

BY MR. URIS:

Q. Do you recall what the dollar amount of orders placed for the Logix tests in the second quarter of 2022 was as

Page 69

BROWN

of May 12, 2022?

A. I don't.

Q. Do you recall whether it was less than two and a half million dollars?

MS. PEIRSOL: Objection.

THE WITNESS: I don't recall the number so I wouldn't recall, I don't recall.

BY MR. URIS:

Q. Do you have any reason to doubt that number?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know how to answer that. I don't recall so...

BY MR. URIS:

Q. From the second quarter of 2020 through the first quarter of 2022, do you recall what Co-Diagnostics' lowest revenue at the midpoint of any quarter was?

A. No, because generally at the midpoint of the quarter, I don't recall exactly what that number was because it wasn't a reported number. It's a lot of numbers to remember.

Veritext Legal Solutions

212-267-6868    www.veritext.com    516-608-2400

Page 70

BROWN

Q. But when determining guidance that would be provided, you would look at the company's orders to date; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Yes, yeah.

BY MR. URIS:

Q. Do you recall if in any quarter from the second quarter of 2020 through the first quarter of 2022 whether the company's revenue at the midpoint of the quarter was ever below five million dollars?

A. Again, I don't recall specific numbers. If I could look at numbers, I'd be happy to tell you at the midpoint. I don't recall specific quarters in the midpoints.

Q. If the company's midpoint revenue in the second quarter of 2022 was less than half of what it had been in any prior quarter since the beginning of the pandemic, would that have indicated anything to you?

MS. PEIRSOL: Objection, form.

Page 71

BROWN

THE WITNESS: No, not necessarily. If I look back, for example, Q4 of 2021, you'll see I think it was 4. -- I'm not sure what that number is, 4.5, something like that and then it went down to, I think that's 2 or 3.8 and then it spiked up in December. In that period of time in December was approximately most of that revenue happened in about a two-week period of time. So there was volatility, especially Q4-21, Q1-22, Q2-22, there was continued volatility that was maybe more present than it had been in the past, especially on a weekly basis.

BY MR. URIS:

Q. I can represent to you that in Q4 of 2021, the midpoint revenue was approximately 5.1 million dollars.

A. So it's close to five.

Q. Yeah.

A. Okay.

Q. And you mentioned a significant

Page 72

BROWN

portion of the orders had come in after the midpoint there. That was when the Omicron variant was present; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Yes, that is correct.

BY MR. URIS:

Q. So I guess related to what you just raised, in Q4 of 2021, the company had approximately five million dollars at the midpoint of the quarter and ended up with approximately 20 million in revenue for the quarter. Do you recall that?

A. I can look at the numbers and see that and you represented what the midpoint was so...

Q. So in that quarter, the company had only approximately 25 percent of its quarterly revenue at the midpoint, correct, there was I guess five million at the midpoint and then it ended up with 20 million?

MS. PEIRSOL: Objection, form.

THE WITNESS: Sure, yeah.

Page 73

BROWN

BY MR. URIS:

Q. Do you recall any other quarter in which the company had a lower percentage of quarterly revenue at the midpoint of the quarter?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't recall.

BY MR. URIS:

Q. So based on the company's historical results since the second quarter of 2020, if you were to assume that the company was going to bring in 75 percent of its quarterly orders in the second half of the quarter, the second quarter of 2022, which is the most it had ever done previously since the start of the pandemic, if Co-Diagnostics' second quarter 2022 midpoint revenues were 2.5 million, that would mean that the most you would expect in quarterly orders was at most 10 million; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: I'm not sure I understand your question. That was a

Page 74

BROWN

lot of stuff in one question so if you could restate it, that would be great.

BY MR. URIS:

Q. Let me try.

A. No worries.

Q. So we were just looking at the Q4-2021 numbers and we saw that approximately 75 percent of the quarterly revenue came in after the midpoint of the quarter; correct?

A. You're talking Q4-21?

Q. Yes.

A. Yeah, okay.

Q. And you're not aware of any other quarter where a higher percentage of the revenues came in after the midpoint; correct?

A. I couldn't say one way or the other.

MS. PEIRSOL: Jason, just for the record, I want to be clear that he's looking at the monday.com data and not the revenue data.

MR. URIS: Yeah.

Page 75

BROWN

BY MR. URIS:

Q. I guess for a clear record, let me clarify, I guess. Looking at this data, this order data, the same holds true. If I refer to the order data as opposed to revenue, would you agree those are the same?

A. They are actually two different things. You know, the orders, once they are entered, they have to meet certain recognition, revenue recognition standards for us to be able to record them as revenue. So there are probably some slight timing differences between this data and the data we would have reported on a quarterly filing.

Q. Understood. I guess what I'm trying to say is going back to Q4-2021, where it appears that there was five million dollars in orders as of the midpoint of the quarter and you ended that quarter with approximately 20 million dollars of orders, so 75 percent of the orders came in after the midpoint;

Page 76

BROWN

correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Yeah, based on the sales data in monday.com, yes, you could say that.

MS. PEIRSOL: We've been going for an hour, Jason, can we take another quick break?

MR. URIS: Yeah, once we're done. I just have a few more questions on this.

BY MR. URIS:

Q. As of the midpoint of the second quarter of 2022, did you have any reason to believe that more than 75 percent of the sales orders might come in after the midpoint for the second quarter of 2022?

A. Can you restate that one more time?

Q. Do you recall as of May 12, 2022, whether you had any reason to believe that more than 75 percent of the quarterly orders might come in after the midpoint of that quarter?

Page 77

BROWN

A. Based on the recent history we'd had with COVID, we didn't know when the next variant would hit. Omicron had a significant impact in recent memory here because this is the quarter before what we're talking about. We had our biggest sales month we've ever had in January of 2022 so we didn't know what was to come because the history had been so volatile.

Q. Right, but as we just went through, you don't recall any order where in terms of volatility more than 75 percent of the quarterly orders had come after the midpoint; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Okay. I also don't recall any month that was any greater than January of 2022 sales as I look at this data, so I don't know how to answer that for you.

BY MR. URIS:

Q. Can you identify any reason that you may have thought -- strike that. Can you identify any reason why

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 78

BROWN

on May 12, 2022 you may have expected the second quarter, that quarter to display more volatility than had ever been displayed in the company's sales orders historically?

MS. PEIRSOL: Objection, form.

THE WITNESS: I mean we had a significant amount of volatility throughout COVID and there was even more volatility at the time we're speaking of and it is what it is. That was the volatility at the time.

MR. URIS: Okay, I think this is a good spot for a break.

THE VIDEOGRAPHER: Thank you. This is the videographer. The time is 11:02. We're going off the record.

(Recess taken from 11:02 a.m. to 11:14 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:14. This begins media file 3.

BY MR. URIS:

Q. Do you recall who the company's

Page 79

BROWN

biggest customers were in terms of purchase volume in 2021 and 2022?

A. I don't recall specifically, no, because I think it varied by quarter.

Q. Do you know who Intelligent Solutions is?

A. Yes.

Q. And who are they?

A. That was one of our distributors that we sold tests to.

Q. Do you recall who at Co-Diagnostics was in charge of handling that account?

A. I believe it was Joseph Featherstone.

Q. Are you aware that Intelligent Solutions' last substantial order was in January of 2022?

MS. PEIRSOL: Objection, form.

THE WITNESS: I'm not aware of that.

BY MR. URIS:

Q. In February, March, April or May of 2022, did Mr. Featherstone ever tell

Page 80

BROWN

you that Intelligent Solutions had committed to making further purchases?

A. I can't recall that.

Q. Do you know who Raver is, or Raver?

A. I know who they are. I believe they are one of our customers.

Q. Do you recall who the salesperson at Co-Diagnostics was that was in charge of that account?

A. I believe because I think they were either in Mexico or South America, it probably would have been Cameron, Cameron Gundry.

Q. Are you aware that their last substantial order was in January of 2022?

MS. PEIRSOL: Objection, form.

THE WITNESS: I'm not aware of that.

BY MR. URIS:

Q. Are you aware that in February of 2022, they cancelled a portion of the order they had placed in January of 2022?

A. Not aware.

Page 81

BROWN

Q. In February, March, April or May of 2022, did Mr. Gundry ever tell you that Raver had committed to making any further purchases of the Logix test?

A. I can't recall that, not that I'm aware of.

Q. You testified earlier that Lambert was the company's investor relations consultant; is that correct?

A. At that point in time, yes.

Q. In either April of 2022 or early May of 2022, did you tell any representatives at Lambert that demand for the Logix test had fallen?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't recall saying that specifically, no.

BY MR. URIS:

Q. Would you typically communicate directly with people from Lambert?

A. Typically we would have a call that would include Andrew Benson, myself and Dwight Egan, and then whoever on Lambert's side, we would have calls. We

21 (Pages 78 - 81)

Page 82

BROWN

would have those to just discuss investor relations matters and then as we prepared for our earnings calls.

Q. Do you recall telling anyone from Lambert in March, April or early May of 2022 anything regarding demand or orders for the Logix test?

A. I don't recall. I don't recall any communication specifically around that with them from me.

MR. URIS: I would like to introduce an exhibit. Bear with me a moment.

THE WITNESS: No problem.

(Exhibit 13, document Bates labeled CoDx_00004432, marked for identification.)

BY MR. URIS:

Q. I would like to introduce as Exhibit 13 a document bearing Bates stamp CoDx_00004432. It should be available on Exhibit Share if you refresh. This is an e-mail from Andrew Benson dated May 4 to Brian Brown with the subject line FWD: Q1

Page 83

BROWN

CFO Script with an attachment 1Q22 Earnings Call Script - CFO + Guidance 050322.

Do you recognize this document?

A. Yeah, it's familiar.

Q. What is it?

A. It's what you said it was. It's an e-mail. It looks like it's an e-mail from Andrew Benson to me with it looks like my portion of the script for our Q1-2022 earnings call.

Q. And to your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. I don't have any reason to believe otherwise.

Q. It appears that Mr. Benson is forwarding you a draft that was put together by William Stack. Do you see that?

A. I see William Stack on there, yeah.

Q. And he worked at Lambert?

A. That's correct.

Page 84

BROWN

Q. Is there anyone else from Lambert that you recall dealing with?

A. That I dealt with?

Q. Yeah, either you specifically or Mr. Benson or anyone at Co-Diagnostics.

A. I couldn't --

MS. PEIRSOL: Objection, form.

THE WITNESS: I couldn't speak for anybody else. I work with Mike Houston. He was our main contact was Mike Houston and I think William, and there was another individual, I can't remember his name, that also helped Mike with preparing documents and setting up calls and things like that.

BY MR. URIS:

Q. Did Lambert typically put together the first draft of your portion of call scripts that were used for earnings calls?

A. Generally.

Q. If you can take a look at the attachment, specifically I'm going to refer to the Bates number which is the

Page 85

BROWN

number on the bottom right-hand corner of each page with the pre-fix CoDx.

A. I'm sorry, what's that called?

Q. The Bates number.

A. Okay. Is that just legal --

Q. I'm not sure exactly where the term comes from but it's definitely a legal term.

A. Okay.

Q. If you can turn to the page ending in 438.

A. Yes.

Q. If you look on the right side where there's a comment bubble, do you see in brackets there's a WS2, do you see that?

A. I do.

Q. Is your understanding that that refers to William Stack, his initials, WS?

A. That would be my understanding.

Q. And if we look at this language that he has the comment bubble over, the draft reads, "While we experienced strong demand for our products during the first

22 (Pages 82 - 85)

Page 86

BROWN

quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result we will be taking a more prudent approach to guidance for the second quarter of fiscal 2022."

Do you see that?

A. I do.

Q. And you see Mr. Stack appears to have the comment bubble stating "Discuss" on that, do you see that?

A. That's correct, I see that.

Q. Just going back to the e-mails for a second, do you see that Mr. Stack's e-mail was dated May 3, 2022?

A. Yes, I see that.

Q. On or before May 3, 2022, do you recall discussing taking a more prudent approach to guidance?

A. I don't recall specifically. Based on a specific date, I don't recall. I know we had calls with Lambert on a weekly basis so it could have been

Page 87

BROWN

discussed before that point in time. I just don't know specifically by date.

Q. Do you recall generally in that time frame in the weeks prior to May 3rd discussing taking a more prudent approach to guidance?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't recall. Like I say, based on dates, I don't recall specific dates and what was said before or after.

BY MR. URIS:

Q. Do you have an understanding of what is meant by taking a more prudent approach to guidance?

A. I'm not sure what was in William's mind as he wrote that, if that's what you're asking. I don't recall.

Q. What would be your interpretation of that language?

A. My interpretation would be that there was a lot of volatility at that point and there was a lot of, you know, things going on externally in terms of

Page 88

BROWN

society and dealing with COVID that we -- that we would withhold guidance because we couldn't provide accurate guidance that we felt comfortable with to the Street.

Q. If you look below that paragraph, do you see there appears to be a placeholder for second quarter guidance?

A. That's correct.

Q. You think rather than withholding guidance, taking a more prudent approach to guidance could mean guiding to a more conservative number?

MS. PEIRSOL: Objection, form.

THE WITNESS: Again, I don't know what William was thinking in this specific instance.

BY MR. URIS:

Q. Mr. Stack seems to have an understanding that the company's orders for the Logix test were down at this point; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: I can't say what Mr. Stack's knowledge was about our

Page 89

BROWN

sales.

BY MR. URIS:

Q. Do you think Mr. Stack would have sent a draft stating that the company will be taking a more prudent approach to guidance unless he had been given some indication that the company wanted to do that?

MS. PEIRSOL: Objection, form.

THE WITNESS: We may have discussed it prior to this draft. That would be my expectation, that we had some discussion about guidance prior to the first draft which is normal. We would normally have a discussion -- it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script.

BY MR. URIS:

Q. Either on or before May 3, 2022, do you know if anyone from Co-Diagnostics told anyone from Lambert that orders for the Logix tests were down?

23 (Pages 86 - 89)

Page 90

BROWN

A.  I can't recall.

MR. URIS:  I'm going to introduce another exhibit.

(Exhibit 14, document Bates labeled CoDx_00075094, marked for identification.)

BY MR. URIS:

Q.  I'm going to introduce as Exhibit 14 a document bearing Bates number CoDx_00075094, and that should be available.

A.  What was that number again?

Q.  So it's Exhibit 14.

A.  Let me refresh that again.

Q.  I think it should say Exhibit 00014.

A.  Okay, there it is.  Okay, it came up now.

Q.  This is an e-mail chain where the top e-mail is an e-mail from Zachary Mizener to Brian Brown, Andrew Benson, copying Mike Houston and William Stack. This was sent on May 4, 2022 at 2:02 p.m. The subject line Q1 CFO Script and

Page 91

BROWN

attachment CODX 1Q22 Earnings Release v1 (5-4-22).

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I don't see why it wouldn't be.

Q.  If you look at your e-mail that starts at the bottom of the page where you're writing to Mr. Stack, you appear to be asking for a first draft of the earnings release; correct?

A.  I'm sorry, at the bottom of which page?

Q.  Bottom of the first page going on to the second page.

A.  So it's 94, 95?

Q.  Yes, yes.

A.  Okay.

Q.  You just appear to be asking Mr. Stack when you can expect to see the first draft of the earnings release; correct?

A.  Yes.

Q.  And then in the top e-mail from

Page 92

BROWN

May 4 at 2:02 p.m. he appears to be sending the first draft of the earnings release, is that your understanding?

A.  Yeah.

Q.  So this top e-mail is actually from Mr. Mizener.  He also writes, "We can review/discuss on the call in 30."

Do you see that?

A.  I do see that.

Q.  Do you recall whether that call occurred?

A.  I don't recall if that call occurred or not.

Q.  Is it fair to say you don't recall -- if that call occurred, you don't recall who was on that call?

A.  I don't.  I don't recall who was on that call.

Q.  Do you recall what would have been discussed on that call?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't recall if the call happened.  Again, we had -- at this point in time when you're

Page 93

BROWN

preparing for an earnings call, we had weekly calls with our advisors.

BY MR. URIS:

Q.  If you'd take a look at the attachment starting on the page ending in Bates number 097.

A.  Okay.

Q.  Do you see at the bottom where it says Second-Quarter 2022 Outlook?

A.  I do.

Q.  The outlook including guidance appears to be highlighted; is that correct?

A.  That's correct.

Q.  Do you recall whether you had a call on May 4th with Lambert to discuss guidance?

A.  I don't recall specifically on a date if I had a call to discuss guidance.

MR. URIS:  I would like to introduce as Exhibit 15 a document bearing Bates stamp LAMBERT0000769. And it should be available.

(Exhibit 15, document Bates

24 (Pages 90 - 93)

Page 94

BROWN

labeled LAMBERT0000769, marked for identification.)

THE WITNESS:  What was the exhibit number again?

BY MR. URIS:

Q.  15.

A.  15.

Q.  This is an e-mail from Mike Houston to Brian Brown, copying Andrew Benson, William Stack and Zachary Mizener, sent on May 4, 2022 at 8:44 p.m. with the subject line Guidance Considerations.

A.  Okay, yeah, I have it up now.

Q.  Do you recognize this document?

A.  It's familiar.

Q.  To your knowledge, was the e-mail reflected on this document received at the time indicated on the document?

A.  I have no reason to believe otherwise.

Q.  Okay, so if we start at the top here, Mr. Houston writes, "Following up on our call yesterday, I wanted to outline a few considerations as you prepare to

Page 95

BROWN

discuss guidance with the board.  Happy to chat through any of these ahead of the board meeting on Monday."

So Mr. Houston appears to be referencing a call from the day prior, do you see that?

A.  I do see that.

Q.  And he appears to be referencing a board meeting to occur on Monday.  Do you recall whether there was a meeting with the board scheduled around this time to discuss guidance?

A.  It was our general practice to have board meetings either Monday or Tuesday ahead of an earnings release, but it wasn't designed to discuss guidance, it was just a regular board meeting where we would review results, financial results, et cetera.

Q.  Do you recall telling Mr. Houston that you were going to discuss guidance with the board at that meeting?

A.  I don't recall because I don't recall exactly what was said on the call

Page 96

BROWN

that he's referring to.

Q.  Do you agree that Mr. Houston appears to be under the impression that you were preparing to discuss guidance with the board at that meeting?

A.  Yeah.

Q.  Below that he writes, "Alternatives to providing Q2 guidance in the earnings call and release."

Do you see that?

A.  I do.

Q.  And then he appears to list out four different alternatives to providing Q2 guidance, is that your understanding?

A.  That's correct but I don't know that it would be alternatives to providing guidance because one of the options is to not provide guidance, so four different options, yes.

Q.  Why were you exploring alternatives to providing Q2 guidance at this time?

A.  I think anytime as I think about the time during COVID, there was always

Page 97

BROWN

volatility and so providing guidance was always a concern.  One thing that I want to make sure I do is provide accurate guidance to the Street.  I want to provide -- that's my job is to provide accurate information to the Street.  And so I would say at every juncture, you know, when we were providing guidance, that was something you had to consider. At this point in time there was even more volatility and more noise in society, et cetera, in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate to the Street and therefore, that's why this discussion would happen.

Q.  If you look at the first option or first alternative listed here, Mr. Houston writes, "Pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results."

Then in the first bullet point

25 (Pages 94 - 97)

Page 98

BROWN

under that he writes, "This path will raise the most questions, but could be viewed as more positive than guiding to a figure and coming up very short."

Do you see that?

A. Yes.

Q. Do you recall that there was a concern at the time of providing guidance and then coming up very short?

A. I don't recall that specifically. There's always a concern that you don't hit guidance. When we provide guidance, I want it to be accurate so we achieve that guidance, and so I think there's always anytime you put guidance out there's a concern that you won't hit that guidance or you'll be above it or below it.

Q. But you had previously provided guidance; correct?

A. What do you mean previously?

Q. In previous quarters.

A. Yeah, in certain quarters we provided guidance, yes.

Q. If you look at the second bullet

Page 99

BROWN

point, Mr. Houston writes, "Convert quarterly guidance to annual guidance, citing similar uncertainty to the above scenario."

And then in the first bullet point he writes, "Guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two, and provide some air cover during the soft quarters."

Do you see that?

A. Yes.

Q. Do you have an understanding of what Mr. Houston meant when he wrote tip your hand to investors that you will likely have a soft quarter or two?

A. I don't. That's not my language so I don't.

Q. At the very beginning of the e-mail, he writes that this e-mail is a follow-up on your call yesterday; correct?

A. That's correct.

Q. And you're the only one listed in the "to" line of the e-mail; correct?

Page 100

BROWN

A. Yes, and then there are people that are cc'd.

Q. Do you recall whether the day prior you had told Mr. Houston on a call that the company was likely to have a soft quarter or two?

A. I don't recall that but we're talking about the 4th of May which is four and a half weeks into the quarter, so at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time, again four and a half weeks into a 12-week quarter.

Q. Do you think Mr. Houston would have written guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter or two unless you had told him that that was the case?

A. I can't opine on what somebody else wrote and how they wrote it and why they wrote it.

Q. Under that same bullet point, the

Page 101

BROWN

third sub-bullet, Mr. Houston writes, "This will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number."

Do you see that?

A. Yes.

Q. Do you recall telling Mr. Houston that Q2 was off to a slow start?

A. I don't recall. Again, we were four and a half weeks into the quarter so we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide.

Q. If you look at the bullet point for the third alternative, Mr. Houston writes, "Keep quarterly guidance but lower your estimates to a range that you believe is 95 percent achievable."

Do you see that?

A. I do.

Q. Do you have an understanding of what he means by that?

26 (Pages 98 - 101)

Page 102

BROWN

A.  I think he means just what he said, is to lower your quarterly guidance to a number you felt like was 95 percent achievable.

Q.  Do you know if he has in mind a range that you did not believe was 95 percent achievable?

A.  I don't know what he had in his mind, I couldn't say.

Q.  And then the first bullet point below that one, the sub-bullet point, he writes, "While it will have a negative impact on the share price, it's better to take your lumps up front and maintain your credibility."

Do you see that?

A.  Yes.

Q.  Do you know why he wrote that lowering your estimates to a range that you believe is 95 percent achievable would have a negative impact on the share price?

A.  I don't know.  Again, he wrote it.  I don't know what he was thinking in his mind as he wrote it.

Page 103

BROWN

Q.  Could it be that in order to do so you would have had to lower your guidance to a range that was below what the market was expecting?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Can you restate that question?

BY MR. URIS:

Q.  Could it be that lowering your estimates to a range that you believe is 95 percent achievable would have required you to lower your guidance to a range that was below what the market was expecting?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I think that would be speculation more than anything.  I don't know that I could answer that.

BY MR. URIS:

Q.  If you look at the fourth alternative, Mr. Houston writes, "Guide to 17 to 19 million in topline with the hope that you come close because you've done so before."

And then in the second bullet

Page 104

BROWN

point under that he writes, "Need to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the week start to the quarter."

Do you see that?

A.  Yes.

Q.  Do you recall telling Mr. Houston around this time that the company was off to a weak start to the quarter?

A.  I think you've asked that question before but I will say it again, is we had a call and we discussed where we were four and a half weeks into a quarter with another, you know, seven and a half weeks to go.  We would have a discussion around that.

MR. URIS:  I'm going to introduce another exhibit.

(Exhibit 16, document Bates labeled LAMBERT0002146, marked for identification.)

Page 105

BROWN

BY MR. URIS:

Q.  I would like to introduce as Exhibit 16 a document bearing Bates stamp LAMBERT0002146.  It should be available.

A.  Sorry, what was the Bates number or the exhibit number?

Q.  16.

A.  16, okay.  Okay, I have that available.

Q.  And this is an e-mail chain.  The top e-mail is from mhouston@lambert.com to Brian Brown, copying Andrew Benson, William Stack and Zachary Mizener.  This is dated May 6th at 8:52 p.m.  The subject line Re:  Guidance Considerations.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I don't have any reason to believe otherwise.

Q.  If you see under the top e-mail, there appears to be an e-mail from you dated May 6, 2022 at 2:08 p.m.  Do you see that?

27 (Pages 102 - 105)

Page 106

BROWN

A.  Yes.

Q.  And you write, "I think I would lean to the highlighted below.  What are your thoughts for the reasoning that would be presented best?"

Do you see that?

A.  I do.

Q.  When you say what are your thoughts for the reasoning that would be presented best, what did you mean by that?

A.  Lambert is our investor relations expert and that's why we hired them is to help us with communication to the Street and so my question would be asking him what would be the best way to present this.

Q.  When you refer to the Street, are you referring to investors?

A.  Yeah, investors or analysts, anybody who gives that information, yeah.

Q.  And in Mr. Houston's reply, the top e-mail, he writes, "Sounds good.  Let me give that some thought and get back to you over the weekend.  I'll do some

Page 107

BROWN

research on what others have been saying."

Do you see that?

A.  Yes.

Q.  Did you understand him to mean that he was going to do some research on what other companies have been saying?

A.  Yes, that's what I understand.

MR. URIS:  I'll introduce another exhibit.

(Exhibit 17, document Bates labeled CoDx_00506169, marked for identification.)

BY MR. URIS:

Q.  I'm going to introduce as Exhibit 17 a document bearing Bates stamp CoDx_00506169.  That should be available.  Exhibit 17.  The top e-mail is an e-mail from Mike Houston.

A.  Sorry, Mr. Uris, it's not up quite yet.  It's spinning so just give me a second.  Do you want me to say Mr. Uris, can I call you Jason; is that okay or not?  I mean...

Q.  That's fine, Jason is fine.

Page 108

BROWN

A.  Okay, thank you.  Okay.  Just came up.

Q.  So the top e-mail is an e-mail from Mike Houston to Brian Brown, copying William Stack, Zachary Mizener and Andrew Benson, sent on May 9, 2022 at 9:05 p.m. with the subject Re:  Guidance Considerations with attachments CODX 1Q22 Earnings Release v3 and 1Q22 Earnings Call Script - CFO v2.  To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I don't have any reason to believe otherwise.

Q.  And if we look at the -- if you turn to the page ending in Bates stamp 171 there's an e-mail from Mike Houston to yourself on Sunday May 8, 2022 at 6:19 p.m.  Do you see that?

A.  I do.

Q.  Mr. Houston writes, "Hi Brian, We'll defer to you on which of the below reasons could be rationale for pulling

Page 109

BROWN

guidance completely.  Some are likely a stretch, but we included them anyways to at least spur discussion.  LMK if you want to discuss on Monday before the board meeting."

Do you see that?

A.  I do.

Q.  Is it your understanding that these bullet points were the result of the research that he had done looking into what other companies were saying?

A.  I don't know where he would have obtained that information specifically, no, I don't know.  You would have to ask him.

Q.  But is it your understanding that this was the result of the research he had done and said he would get back to you?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Again, I don't know if that was from his research or not.  I don't know if I had an understanding of where exactly he got it from.

///

28 (Pages 106 - 109)

Page 110

BROWN

BY MR. URIS:

Q. I'm not asking if you know where he got it. When you received this e-mail was it your understanding that this was him? In the previous e-mail he said I'm going to do some research to see what others are saying. Is it your understanding that this e-mail was him following up on that previous e-mail?

A. Again, I don't know the answer to that. It's him responding to me with some reasoning, a reason to pull guidance. That's all I know.

Q. If you turn to the page ending in Bates stamp 170, so the page before.

A. Okay.

Q. At the bottom there is an e-mail from you sent on Sunday, May 8, 2022 at 6:31 p.m. Do you see that?

A. Yes.

Q. You write, "I would suggest we frame this around the following."

In that first bullet point you write, "Uncertainty surrounding the

Page 111

BROWN

revenue impact of CoDx YourTest PCR device following FDA approval (a little differently said - what you wrote makes me feel like there is much uncertainty around being able to get the device to market) - to me the certainty is truly how our revenue will be impacted once we have the opportunity to start selling the device."

Do you see that?

A. I do.

Q. What did you mean by to me the uncertainty is truly how our revenue will be impacted once we have the opportunity to start selling the device?

A. It means at that point in time I didn't know how this new product platform we were developing would impact revenue in the near-term.

Q. So the uncertainty wasn't necessarily about sales of the Logix test but of this new product that you were developing?

A. I think that there are multiple things to consider when providing

Page 112

BROWN

guidance. One of them would have been this new platform, but that doesn't mean I'm excluding the COVID test.

Q. But with respect to the uncertainty, your focus seems to be on the new product that you were developing?

A. No, because if you read the next two bullet points I'm talking about the COVID test in the next two bullet points. I certainly wouldn't make guidance decision based on one product.

Q. In the second and third bullet point you don't refer to any uncertainty; correct?

A. No, I refer to fluctuations in the timing and inability to project what testing requirements throughout year and emphasize in the end I don't want to put out guidance I don't feel is accurate.

Q. But with respect to these three bullet points, the only bullet point you stated that you had uncertainty about was the first bullet point; correct?

MS. PEIRSOL: Objection, form.

Page 113

BROWN

THE WITNESS: The other bullet points are just concerns that are phrased differently. There's more than one concern you may have when providing guidance. You can't make a determination based on one item.

BY MR. URIS:

Q. These are concerns that you're suggesting that you frame the decision not to provide guidance on; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: That's correct, these are the things that were happening that we -- helped me to feel like it was appropriate to not provide guidance because again, I didn't want to provide guidance that was not accurate.

BY MR. URIS:

Q. In the second bullet point you refer to "Timing of orders in a particular quarter and how they are fluctuating greatly due to significant fluctuations in testing requirements in various geographic

29 (Pages 110 - 113)

Page 114

BROWN

locations."

Q. Do you see that?

A. Yes.

Q. Are you saying that in this bullet point, are you saying that -- strike that.

Were the timing of orders for the Logix test fluctuating greatly at this time?

A. Yes, they had been over the past two quarters prior to this. There had been fluctuations on a weekly basis and it was becoming more apparent that the fluctuations were becoming more defined, there were more defined fluctuations, it was just happening more often.

Q. What do you mean by fluctuations?

A. Just the timing of orders. If you look back at the history of the sales during COVID, they fluctuated, and even at this time it fluctuated even more based on the outside influences, how society was responding to COVID, how different countries were responding to the COVID

Page 115

BROWN

pandemic at that point in time because we recently had had an Omicron spike that caused a significant amount of volatility when it came to how revenue came in and was recognized.

Q. Is it fair to describe those fluctuations as a high volume of orders in December of 2021 and January of 2022 and then a lower volume of orders in February, March, April and the beginning of May of 2022?

MS. PEIRSOL: Objection, form.

THE WITNESS: If you look at the numbers the revenue was lower in those periods than it was in December and January. That's what the numbers tell you.

BY MR. URIS:

Q. And if you look at the next e-mail above your e-mail from Andrew Benson on Sunday, May 8, 2022 at 8:18 p.m. to you and copying Mr. Houston, Mr. Stack and Mr. Mizener, he writes, "I also thought the bullet about the mask mandates

Page 116

BROWN

being dropped while variance continued to surface and spread is insightful and accurate, especially X-U.S."

Q. Do you see that?

A. I do.

Q. Is your understanding by X-U.S. he means across the United States?

A. No, my understanding is outside of the U.S.

Q. Okay, if we go to the next e-mail above that, the e-mail from you on May 9, 2022 at 4:22 p.m., you write, "Mike and Team - The board is up with not giving guidance but providing some good reason in the script and on the earnings release. Can you guys take a first stab at writing this?"

Q. Do you see that?

A. Yes.

Q. So by this, did you mean that the -- are you saying that the board is okay with not giving guidance as long as you can come up with a good reason?

A. I don't know that I would say

Page 117

BROWN

come up with a good reason. They were -- they were okay with us not providing guidance as long as there was a good reason for it, not come up.

Q. At this point you're still determining what reasons you're going to give; correct?

A. We're still discussing what would be the best presentation for those reasons.

Q. Did you ever consider providing guidance for the second quarter of 2022 of five million dollars?

A. I don't know that I can recall a specific amount of guidance. Are you talking about revenue?

Q. Yes.

A. I don't recall any specific numbers that we discussed aside from what Mike had sent in his original four points that we talked about earlier.

Q. Do you recall discussing any numbers of what revenue for the second quarter of 2022 might be at this time?

30 (Pages 114 - 117)

Page 118

BROWN

A.  No.  Again, we were five weeks into the quarter and still had seven weeks to go and we could see in recent history, Q1 of '22, Q4 of '21, that we had two weeks we did 14 million dollars and if you've got seven weeks left in a quarter and you're sitting at week five, there's a chance that it could be another one of those if another variant popped up.  We just didn't know at that time.  There wasn't enough information to feel comfortable with the accuracy of providing guidance.

Q.  Another variance hadn't popped up at that time; correct?

A.  At what time, are you talking about the date of this e-mail?

Q.  Yes.

A.  Not at that time, no, because if it had, then we would have different information.

Q.  Did you ever consider providing second quarter 2022 guidance of 10 million dollars in revenue?

Page 119

BROWN

A.  Again, as I said on the previous question, I didn't have a specific dollar amount that we discussed aside from what was suggested by Lambert in a previous e-mail.

Q.  And in this e-mail where you write the board is up with not giving guidance, you wrote this e-mail after the Monday board meeting that was referenced in the previous exhibits; correct?

A.  I hope so, yes.

Q.  Do you recall what was discussed during that board meeting?

A.  I don't recall that specific board meeting because that was part of our normal process every quarter.

Q.  Do you know if there are minutes of that board meeting?

A.  There should be minutes of that board meeting.

Q.  Do you know who would have a copy of those board minutes?

A.  I don't know off the top of my head.  I could have Kevin try to find

Page 120

BROWN

those.

MR. URIS:  Counsel, I don't believe we have a copy of those board minutes so we request defendants conduct a search for and produce a copy of those board minutes and any other minutes of any committees that also met on or around that date.

MS. PEIRSOL:  Okay, your request is noted and I can't represent whether or not they are in the production already or if they are going to be in the forthcoming production, but we will produce them to the extent that they are responsive to this request and not privileged.

BY MR. URIS:

Q.  Do you know if anyone -- other than any board minutes, do you know if anyone took notes concerning what was discussed in that meeting?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Not that I'm aware of.  If you have somebody taking

Page 121

BROWN

minutes, I don't know why somebody else would also take minutes.  If you're asking if I took any notes, I didn't take any notes.

MR. URIS:  That was my next question.

THE WITNESS:  Okay.

MR. URIS:  Counsel, I think this might be a good point for a break, if that works for you.

MS. PEIRSOL:  That works for us.  How long would you like to take?

MR. URIS:  Up to you.  I think I might -- maybe let's -- can we go off the record first?

THE VIDEOGRAPHER:  Thank you.  This is the videographer.  The time is 12:18.  We're going off the record.

(Lunch recess taken at 12:18 p.m.)

31 (Pages 118 - 121)

Page 122

BROWN

AFTERNOON SESSION

(Time noted: 12:42 p.m.)

BRIAN BROWN, resumed and testified as follows:

THE VIDEOGRAPHER: We are back on the record. The time is 12:42. This begins media file 4.

MR. URIS: I would like to introduce another exhibit.

(Exhibit 18, document Bates labeled CoDx_00463646, marked for identification.)

CONTINUED EXAMINATION
BY MR. URIS:

Q. I'm introducing as Exhibit 18 a document bearing Bates stamp CoDx_00463646 and it should be available.

A. What was the exhibit number one more time?

Q. 18.

A. 18, okay. Bear with me one second.

Okay, it's now loaded.

Q. This is an e-mail chain. Top

Page 123

BROWN

e-mail is from Zachary Mizener to Brian Brown, Andrew Benson, William Stack, copying Seth Egan and Mike Houston, sent on May 9, 2022 at 8:15 a.m. The subject line Re: [External] Re: Call to discuss coverage and attachment.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. Yes.

Q. Turn to the page ending in -- the Bates stamp ending in 648.

A. Bear with me one second. I'm just going to scroll to the end of the document so I make sure I understand what's in here.

Q. Sure.

A. (Witness perusing document.)

Sorry, it's a long document.

Okay, what was the Bates number again for the page?

Q. Ending in 648.

A. 648. Okay. I'm on page 648.

Q. At the top of that page there's

Page 124

BROWN

an e-mail from you dated May 8, 2022 at 12:13 p.m. to Andrew Benson, copying Mike Houston, William Stack, Zachary Mizener and Seth Egan. And you write, "Can anyone on this e-mail send over the reports for Sidoti and Maxim? I don't seem to be on the e-mail list to receive and I need them for our board meeting early Monday morning."

Do you see that?

A. I do.

Q. Who is Sidoti?

A. Sidoti was one of the analysts that covered us.

Q. Who is Maxim?

A. That's also another analyst that at the time was covering us.

Q. Is H.C. Wainwright another analyst that was covering you at the time?

A. That's correct.

Q. And Litchfield Hills?

A. I don't remember exactly the time period that Litchfield Hills covered us but it may have been at that time.

Page 125

BROWN

Q. Are there any other analysts that you recall covering the company at that time?

A. Not that I can recall, no.

Q. Was it your practice to monitor those analyst reports?

A. Generally, I would use those reports, and you can see that I didn't actually receive those reports because they never ever sent them to me. We would use them at the end of the quarter as we had our call to compare our results from the prior quarter before we had our earnings call.

Q. Well, here you seem to be asking for them for the board meeting the next day; correct?

A. That's correct.

MS. PEIRSOL: Objection, objection, form.

THE WITNESS: We provide financial results to the board for the prior quarter that we're just reporting on and then compare it to

32 (Pages 122 - 125)

Page 126

BROWN

what the analysts had expected.

BY MR. URIS:

Q. Would you monitor or review what analysts' revenue expectations were going forward?

MS. PEIRSOL: Objection, form.

THE WITNESS: If it was in the reports. Really what I use this report for was to compare results for the quarter that just ended and how we would compare to what the analysts had put out there.

BY MR. URIS:

Q. To the extent any of those reports had revenue expectations going forward would you look at them?

A. I'm sure I saw them in the reports. I'm sure they were -- if they were there I'm sure I saw them.

Q. Do you recall whether any analyst reports were reviewed during the May 9th board meeting?

A. No, at the board meetings we wouldn't review analyst reports. That was

Page 127

BROWN

not a practice of ours and we never have.

Q. But you might discuss what their expectations were?

A. No, as I said before, I use these reports for these board meetings to compare actual results for the quarter that just ended to the expectation the analysts had for that quarter. That was what was discussed in the board meetings or audit committee meeting or whatever meeting we had with the board.

Q. As of the date of this e-mail -- or strike that.

As of May 8, 2022, do you recall what H.C. Wainwright's revenue expectations were for the company for the second quarter of 2022?

A. No, I wouldn't be able to recall that.

Q. Would it surprise you to learn that they were expecting 20 million in revenue for the second quarter of 2022?

A. I don't know how to -- surprise me, I don't know. I don't think I'd be

Page 128

BROWN

surprised or not surprised. It's the number they put out there.

Q. Do you recall what other analysts were projecting as of this time for second quarter 2022 revenue?

A. No.

Q. Do you recall if you had any thoughts about their projections at this time?

A. Not that I'm aware of. We didn't provide guidance based on analysts and what they thought the numbers would be for the company. We provided the most accurate information that we could regardless of what an analyst might say.

Q. Do you recall thinking that analysts' projections were too high?

A. I don't recall that.

MR. URIS: I'll introduce as Exhibit 19 a document bearing Bates stamp CoDx_00506830.

(Exhibit 19, document Bates labeled CoDx_00506830, marked for identification.)

Page 129

BROWN

BY MR. URIS:

Q. That should be available.

A. Okay. You said Exhibit 19?

Q. Yes.

A. Okay. Bear with me, it's still spinning. Okay. It's up now.

Q. This is an e-mail chain. The top e-mail is from Brian Brown to Mike Houston, copying William Stack, Zachary Mizener and Andrew Benson, sent on May 10, 2022 at 7:32 a.m. The subject line Re: Guidance Considerations, attachments 1Q22 Earnings Call Script - CFO v2 BB REVIEW.

To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

A. I have no reason to believe otherwise.

Q. When you would make comments on a particular document, was it your practice to put in the document name BB review or BB comments or something to indicate your initials?

A. That's correct. Form of document

33 (Pages 126 - 129)

Page 130

BROWN

control.

Q. If you could turn to the attachment, specifically the page ending, with the Bates stamp ending in 839.

A. 839, okay.

Okay.

Q. We don't need to go through it in detail but you see the paragraph starting "Turning now to our visibility" and then it continues on to the next page?

A. Yes, I do.

Q. Within this paragraph this seems to be the current draft of the discussion which includes a discussion of guidance; is that correct?

A. Yeah, this would be the current version of my script at that point in time.

Q. Okay. If we take a look at the last page where there's two comment bubbles, do you see there's a comment bubble in blue with the initials MH, do you see that?

A. Yes, I do.

Page 131

BROWN

Q. Is it your understanding that MH refers to Mike Houston?

A. Yes.

Q. And in his comment bubble he writes, "As I was drafting this, it seems premature to cite uncertainty of your test revenues as a reason to drop guidance quite yet since it's not approved. Let's discuss if you have time on Tuesday."

Do you see that?

A. I do.

Q. And then below that there's a comment BB. Is it your understanding that was your comment?

A. Yes.

Q. And your comment below that is "If we were expecting to start selling the device in Q2, I would disagree. But as we are not, I would agree with your comments. I will run this by Andrew and Ike today and get their thoughts on why we are not providing guidance."

Do you see that?

A. Yes, I do.

Page 132

BROWN

Q. What did you mean when you wrote I will run this by Andrew and Ike today and get their thoughts on why we are not providing guidance?

A. I'm sorry, what did I mean by that? Is that what you're asking, what I meant by what I wrote?

Q. Yes.

A. I meant what I wrote which is I will run it by Andrew and Ike and get their thoughts on why we are not providing guidance. This is my portion of the script so clearly I want to make sure that both Andrew and Ike are comfortable with my section of the script just as I'm comfortable with Ike's section of the script.

Q. It appears at this point the decision has been made not to provide guidance; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Let's see. What was the date of this again? Let me scroll up to the top. Bear with me.

Page 133

BROWN

5/10, yeah, it probably would have been because we were going to have the call in two days.

BY MR. URIS:

Q. But based on your comment you appear to still be determining what reasons you're going to give on the earnings call for why guidance isn't going to be provided?

MS. PEIRSOL: Objection, form.

THE WITNESS: As you're preparing for an earnings call and drafting a script, that script changes oftentimes the day of. There are changes to the script the day of. So it's a living, working document.

BY MR. URIS:

Q. From your comment are you suggesting that there might be reasons to be given for not providing guidance that you're not aware of at this time?

MS. PEIRSOL: Objection, form.

THE WITNESS: There were many factors that were affecting the

34 (Pages 130 - 133)

Page 134

BROWN

environment at that time.  Can I in an earnings call in a script provide every single reason for the volatility in the market in terms of COVID testing?  No, I can't but I can point to the things that we think most accurately impact the market and the environment at that time.

MR. URIS:  I'm going to introduce as Exhibit 20 a document bearing Bates stamp CoDx_00506183.

(Exhibit 20, document Bates labeled CoDx_00506183, marked for identification.)

BY MR. URIS:

Q.  That should be available.

A.  You said Exhibit 20?

Q.  Yes.

A.  Okay.

Okay, it just came up.

Q.  This is an e-mail chain, the top e-mail from Andrew Benson to Brian Brown, copying Dwight Egan, sent on May 10, 2022 at 10:38 a.m. with the subject line Re:

Page 135

BROWN

FW:  Guidance Considerations with an attachment, CODX 1Q22 Earnings Release v3 AB edits.

Is it your understanding that the AB edits indicates that Andrew Benson was sending his edits to the document attached?

A.  Yes.

Q.  To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  No reason to believe otherwise.

Q.  And if you look at the bottom of that first page, there's an e-mail from you on May 10, 2022 at 7:34 a.m. and you write, "Gents - We need to get this document finalized today.  We can go through it at 10 a.m.  I can handle the numbers but we all need to buy off on the language used."

Do you see that?

A.  I do.

Q.  Do you recall whether you went over the earnings release with Andrew

Page 136

BROWN

Benson and Dwight Egan at 10 a.m. on May 10?

A.  I don't recall.  I don't recall if we specifically met at that time.

Q.  Was it your practice to go over any press releases with Andrew Benson and Dwight Egan in the days prior to the issuance of such a release?

A.  Yeah, typically that would happen via e-mail, just reviewing the document individually and providing comments.

Q.  So was it uncommon to go over it on a phone call or at a meeting?

A.  Unless we had already had a meeting scheduled, it could have been we had a pre-read of the script at that point in time, I don't know.  I can't recall exactly if we had a call or what we did.

Q.  So when you say we can go through it at 10 a.m., is it your understanding that you had either a call or meeting scheduled for 10 a.m.?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  We may have.  It

Page 137

BROWN

was probably for another matter.  We could just cover this in that same discussion.  There are many meetings you have in preparation for an earnings call.

BY MR. URIS:

Q.  Right.  I'm just asking, you wouldn't have said we can go through it at 10 a.m. unless you had something scheduled for 10 a.m.; correct?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I would not have scheduled a specific meeting just to review an earnings release.

BY MR. URIS:

Q.  I don't think that answered the question but I can maybe ask it a slightly different way.

Does the fact that you wrote we can go through it at 10 a.m. indicate to you that you had a meeting scheduled for 10 a.m., not necessarily specific to this but that you had a meeting scheduled for 10 a.m.?

35 (Pages 134 - 137)

Page 138

BROWN

A.  I can assume that, yes.

Q.  Okay.

A.  It may have started at though, I'm not sure.

Q.  If you could turn to the page ending in -- with the Bates stamp ending in 192 which I believe is the first page of the attachment.

A.  Sure.  I'm there.

Q.  Do you see there's -- most of the line edits are in red, however there's a paragraph towards the bottom that's in blue and there's also a comment bubble attached to that paragraph in blue with the initials MH.  Do you see that?

A.  I do.

Q.  Is it your understanding that that refers to Mike Houston?

A.  Yes.

Q.  And is your understanding that the edits reflected in red are Andrew Benson's edits?

A.  I don't know that I can answer that question.  I'm not sure.

Page 139

BROWN

Q.  Do you recall in one of the exhibits that we reviewed earlier today Andrew Benson had commented that continued emergence and spread of new variants was a factor that could be cited as a reason not to provide guidance?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't recall if it was Andrew.  If you want to tell me which document to go to, I can certainly go back to it.

BY MR. URIS:

Q.  I don't think we need to go back. I don't think it's particularly important.

A.  Okay.

MR. URIS:  I think that's fine. I don't think we need to discuss that further.

I'm going to introduce as Exhibit 21 a document bearing Bates stamp CoDx_00466367 and that should be available.

(Exhibit 21, document Bates labeled CoDx_00466367, marked for

Page 140

BROWN

identification.)

THE WITNESS:  That was Exhibit 21; is that right?

BY MR. URIS:

Q.  Yes.

A.  I have it up now.

Q.  This is an e-mail from Andrew Benson dated May 12, 2022 at 1:29 p.m. to Ted whose e-mail is elm_grove@hotmail.com, Richard Serbin, Eugene Durenard, James Nelson, copying Dwight Egan, Brian Brown and LSLAW e-mail kontiveros@ lifesciencelawpc.net, subject line Upcoming Press Notification May 12, 2022 and an attachment.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I have no reason to believe otherwise.

Q.  Is it your understanding that this e-mail is Mr. Benson sending the board the final version of the earnings release that would be issued that

Page 141

BROWN

afternoon at 4:01 p.m. ET?

A.  That's correct.

Q.  This first person, Ted, on the grove e-mail, do you know who that is?

A.  Yeah, that's Ted Murphy.  I think Edward Murphy also he goes by.

Q.  He was on the Co-Diagnostics board of directors at this time?

A.  Yes.

Q.  And if you could turn to the attachments, specifically the page with the Bates number ending in 368.

A.  That would be the first page of the release.

Q.  Yes.

A.  Okay, I'm there.

Q.  Do you see the paragraph towards the bottom of the page starting with "While we remain," do you see that?

A.  Yes.

Q.  So this paragraph states, "While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart

36 (Pages 138 - 141)

Page 142

BROWN

COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world."

Do you see that?

A. I do.

Q. The factors listed here are factors that suggest more COVID infection going forward; correct?

A. I don't know that I would say that, I don't know that I would agree with that.

Q. Why not?

A. You know, if I even look at the first one, the decreased mask mandates in the United States doesn't necessarily mean that COVID would spread more, it could be that the spread has decreased and so there was less risk. It could be one side or the other.

Q. So you read that factor as going one way or the other?

Page 143

BROWN

A. Yeah, I think that's the case. There were many things that were impacting it both negatively and positively at that point in time.

Q. So you think decreased mask mandates could lead to less COVID infection?

A. Certainly, there could be less COVID infection and that's why you don't have the mask mandates.

Q. Right, but this is -- this statement is attributing reduced visibility to specific factors; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Sure.

BY MR. URIS:

Q. So it's indicating that decreased mask mandates is one of the factors that is causing that reduced visibility; correct?

A. Ike was stating reasons why we were unable to accurately forecast sales moving forward and there are certainly things that are going to impact and drive

Page 144

BROWN

that number to be higher and some things that will drive it lower. There was uncertainty in the market.

Q. But are you saying one of the factors that caused that uncertainty was decreased mask mandates in the United States; correct?

A. Yes, and you would have to ask Ike exactly whether he meant that was a positive or a negative.

Q. Okay. Then continued emergence and spread of new variants, is that -- does that factor suggest to you more COVID infection going forward?

A. Not necessarily. I don't think that because we didn't know when the next variant would hit. You didn't know and that was the point. We can't accurately predict when a variant is going to rear its head, so therefore it's difficult to determine whether sales were going to be up or down because we don't know when the next variant is going to come.

Q. Right, it refers specifically to

Page 145

BROWN

continued emergence and spread of new variants.

A. Sure.

Q. Do you understand the emergence and spread of variants to be a factor that indicates more COVID infection?

MS. PEIRSOL: Objection, form.

THE WITNESS: Again, not necessarily. I mean you don't know so there have been various variants that hit during COVID. Some were more impactful than others. So a variant could spread and you could see a variant that maybe didn't have the same impact that Omicron did. Again, we just didn't know. We didn't know when the next variant would hit and the impact it would have to revenue.

BY MR. URIS:

Q. Generally when a new variant emerged and spread, was that associated with an increase of COVID testing?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know I can

37 (Pages 142 - 145)

Page 146

BROWN

say that specifically because I don't know all the variants, I'm not a scientist per se. I can tell you Omicron, we had an increase in sales due to Omicron, yes. Other variants I don't know because that's the only one I really know.

BY MR. URIS:

Q. Are you aware of any variants that emerged and spread that were then followed by reduced levels of COVID testing?

A. I don't know.

Q. And the last factor, low vaccination rates, are low vaccination rates something you would associate with an increase in the spread of COVID?

A. I don't know. You would have to ask Dwight who made that statement. You'd have to ask him.

Q. Do you recall on the May 12, 2022 earnings call being asked by an analyst whether you were already seeing a decline in customer orders for the Logix Smart

Page 147

BROWN

Test?

A. I do recall that.

Q. Do you recall stating on that call that it's more about timing and not being able to forecast the timing of orders is the bigger issue, it's not necessarily a demand issue that we're seeing, it's more of just timing of being able to accurately forecast what's coming in?

MS. PEIRSOL: Objection, form.

THE WITNESS: It's familiar. It would be more helpful if I could see -- I know we have a transcript of our call so that might be more helpful so that I can see that and read it in complete context.

BY MR. URIS:

Q. Do you generally recall responding in that manner?

MS. PEIRSOL: Objection, form.

THE WITNESS: Is it not possible to bring that up so that I can see it? Because I can't remember exactly what

Page 148

BROWN

I said and it would be nice to be able to see exactly what the question was and how I responded.

BY MR. URIS:

Q. Do you recall saying it was not necessarily a demand issue that we're seeing?

MS. PEIRSOL: Objection, form.

THE WITNESS: Again I can't answer that question. Is it possible to just bring up the transcript so I can read it in its context? It's hard for me to remember exactly what I said two and a half years ago.

MR. URIS: I will represent to you that is what the transcript reflects.

MS. PEIRSOL: Is there a question? You made a representation.

BY MR. URIS:

Q. Why did you think it was not necessarily a demand issue that you were seeing?

MS. PEIRSOL: Objection,

Page 149

BROWN

misstates the evidence and his testimony.

MR. URIS: Can we go off the record for a moment?

MS. PEIRSOL: Sure.

THE VIDEOGRAPHER: You agree, Counsel? Thank you. One moment. The time is 1:26 p.m. We're going off the record.

(Recess taken from 1:26 p.m. to 1:36 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:36. We're continuing media file 4.

(Exhibit 22, declaration of Douglas W. Greene, marked for identification.)

MR. URIS: I didn't put the exhibit stamp on but the title of the document should be Exhibit 22. Following the deposition can the court reporter have the stamp for Exhibit Number 22 added to the document?

(Discussion off the record.)

38 (Pages 146 - 149)

Page 150

BROWN

BY MR. URIS:

Q. Mr. Brown, Exhibit 22 should be available in the Exhibit Share folder.

A. Okay.

Q. This is an excerpt of a document that was submitted by your counsel in this case.

A. Okay, it's been pulled up.

Q. This is the Declaration of Douglas W. Greene in Support of Defendant's Motion to Dismiss the Consolidated Amended Complaint. It attaches various exhibits. This excerpt only includes the first exhibit which if you can see on the first page is described as "a transcript of Co-Diagnostics' first quarter 2022 earnings call held on May 12, 2022."

Do you see that?

A. I do see that.

Q. Okay. If you scroll to Exhibit 1, after the first few pages does this appear to be a transcript of that earnings call?

Page 151

BROWN

A. Bear with me as I scroll down through here.

Q. It looks like it starts on internal page 4 of Exhibit 1.

A. I'm just scrolling to the bottom to make sure I understand everything that's in there. Yeah, it appears to be the transcript.

Q. If you could go to internal page 9 which on the top right it would say page 10 of 16.

A. Okay. Okay, yeah.

Q. Okay.

And then at the bottom of the page, the very last speaker, you see where it says Yi Chen, H.C. Wainwright & Co LLC?

A. I do.

Q. Do you know who Yi Chen is?

A. Yeah, he's the analyst that works for H.C. Wainwright that was covering our company at the time.

Q. So you see where the transcript says, "Sure. Sorry about that. So with the Logix Smart detection test, are you

Page 152

BROWN

already seeing a decline in customer orders?" Do you see that?

A. I do.

Q. And then on the next page, it says Brian L. Brown, CFO & Company Secretary, and it states, "Yes. This is Brian. I can respond to the first question that you asked. It's more about timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing, it's more of just timing of being able to accurately forecast what's coming in."

Do you see that?

A. I do.

Q. Why did you think it was not necessarily a demand issue that you were seeing?

A. Because at the time we didn't, that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time. It was just recently if you think about Q1

Page 153

BROWN

which is not that far in the past here, Q1, we had the biggest month in Q1 that we've ever had so the volatility there didn't necessarily lean to a reduction in demand. It felt like more of a change potentially in fluctuation order patterns.

Q. And that biggest month in Q1 that you're referring to, that was in January of 2022; correct?

A. That's correct.

Q. And then as we discussed earlier, following January in February, March and April of 2022, the company experienced three months in a row of test orders below four million dollars per month; correct?

A. Yes, if I'm looking at those numbers, that's correct.

Q. And to you that didn't seem to be a decline in orders?

MS. PEIRSOL: Objection, form.

THE WITNESS: The orders were lower. I don't know that there would be necessarily you could point to a decline as in a trend per se. There

39 (Pages 150 - 153)

Page 154

BROWN

was volatility in when orders were coming in, plain and simple.

BY MR. URIS:

Q. As we discussed earlier, prior to this time the company had never had two months in a row of less than four million dollars in test orders; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Sorry, can you say that one more time?

BY MR. URIS:

Q. Prior to February, March and April of 2022, the company had never before experienced two back-to-back months in which the company received orders for four million dollars or less; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: Based on looking at the numbers, that would be correct but I'll remind you we never had a month that was 16 million dollars except for January of 2022.

BY MR. URIS:

Q. Are there any specific test

Page 155

BROWN

orders that you were expecting to come in following the May 12, 2022 call?

A. I didn't have any expectations of test orders. That wasn't my job.

Q. Did any Co-Diagnostics salespersons tell you that they were expecting orders to come in after that date?

A. I can't recall any communication around that.

Q. I want to introduce --

A. Is it possible we can read the last two sentences of my response also, is that possible? I just want to emphasize my thought process here is that the last thing I want to do is provide guidance that we're not confident in, so that's one thing you'll know going forward, is if we're not confident in providing guidance, then we won't provide guidance. I just want to make sure that's clear.

MR. URIS: I'm going to introduce as Exhibit 23 a document bearing Bates stamp LAMBERT0001281. That should be

Page 156

BROWN

available.

THE WITNESS: Sorry, it was 23 did you say?

MR. URIS: Yes, 23.

THE WITNESS: Sorry, I get confused with the other numbers you were saying. 23, okay.

(Exhibit 23, document Bates labeled LAMBERT0001281, marked for identification.)

THE WITNESS: Okay, I have it up now.

BY MR. URIS:

Q. This is an e-mail chain. The top e-mail is from Andrew Benson to William Stack, copying Mike Houston and Brian Brown, sent on July 12 2022 at 7:22 p.m. Subject line Re: Call with Hudson Executive Capital.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. I have no reason to believe otherwise.

Page 157

BROWN

Q. If you see the first e-mail below the top e-mail from William Stack on July 12, 2022 at 11:52 p.m., he starts off by saying, "The firm looks legit."

Is your understanding that he's referring to Hudson Executive Capital?

A. Let me read the e-mail before that first to see.

Yeah, I think I can assume that.

Q. So in that e-mail he says, "The firm looks legit, but I think with earnings" -- let's start with -- I guess let's turn to the earliest so it's a bit clear. It's the July 12 e-mail at the end of the thread, at the bottom of the thread from Sai Nanduri, do you see that, and it appears to have a hudsonexecutive.com e-mail?

A. Yes, I do see that.

Q. Is it your understanding that he was trying to set up a call with management over the next week?

A. That's what I understand from the e-mail.

40 (Pages 154 - 157)

Page 158

BROWN

Q.  Okay.  So turning back to Mr. Stack's July 12 e-mail at 11:52 a.m. he writes, "The firm looks legit but I think with earnings right around the corner, plus Q2 results being a surprise, it may be best to follow up after the earnings call."

Do you see that?

A.  I do.

Q.  Do you have an understanding of what Mr. Stack is referring to when he writes plus Q2 results being a surprise?

A.  I don't because I can't get into his head and say why he would think it was a surprise or not.  This is his statement.

Q.  You don't know whether he was referring to the second quarter of 2022 revenues being below what the market was expecting?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't know the answer to that.  You would have to ask him what his expectation was when he wrote that.  Again, it's not my

Page 159

BROWN

statement, I don't know.

BY MR. URIS:

Q.  Do you recall how you understood that statement when you read it?

A.  I don't recall that because the e-mail was to Andrew.  I'm not even sure that was an e-mail to me down there.

Q.  If you see on the top e-mail he copied you and this was -- this whole thread was below the top e-mail.

A.  I can't recall.  I can't recall two years ago what my thoughts were on an e-mail about somebody requesting a call.

Q.  You don't recall what your thoughts were about your IR consultants referring to Q2 results being a surprise?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I don't.  You want me to say otherwise, but I don't.

MR. URIS:  Okay.  I think this is a good spot for a break if that works for everyone.

THE WITNESS:  That would be fine.

THE VIDEOGRAPHER:  Thank you.

Page 160

BROWN

The time is 1:51.  We're going off the record.

(Recess taken from 1:51 p.m. to 2:31 p.m.)

THE VIDEOGRAPHER:  Good afternoon.  We're back on the record.  The time is 2:31.  This begins media file 5.

MR. URIS:  I would like to introduce as Exhibit Number 24 a document bearing Bates stamp CoDx_00004897.

(Exhibit 24, document Bates labeled CoDx_00004897, marked for identification.)

BY MR. URIS:

Q.  And that should be available.

A.  Did you say Exhibit 24?

Q.  Yes.  This is an e-mail chain, the top e-mail from William Stack, sent August 3, 2022 at 7:16 a.m. to Brian Brown and Andrew Benson, copying Mike Houston and Zachary Mizener, the subject line Re: Q2'22 Press Release and attachment CODX

Page 161

BROWN

2Q22 Earnings Release v3 (8-3-22).

To your knowledge, was the e-mail reflected in this document received at the time indicated on this document?

A.  I have no reason to believe otherwise.

Q.  If you turn to the attachment which starts on page ending in Bates number 899.

A.  Okay.

Q.  Does this appear to be a draft of the earnings release that Mr. Stack had e-mailed?

A.  Yeah, for the second quarter of 2022, yeah.

Q.  Do you see in the middle of the page there's language in this draft and that paragraph starts, "'Our second quarter results were below the standards we had set for the company despite the increased activity we are experiencing thus far in the back half of the year,' said Dwight Egan, Co-Diagnostics Chief Executive Officer.  'This was the result

41 (Pages 158 - 161)

Page 162

BROWN

of challenging operating dynamics including lower than expected volumes and continued inflationary pressures,'" although some of that language is crossed out.

Do you see that?

A. I do.

Q. And then there are a few comments attached to that paragraph with various what I believe are initials. There's AB, WS, MH. I think you testified earlier your understanding is that WS refers to William Stack; is that correct?

A. I think so.

Q. You see in the second comment bubble on the right he writes, "Andrew, do you have any insight into the lower sales, was it simply less demand for COVID tests or did we run into some sort of supply constraint?"

Do you see that?

A. I do.

Q. Do you know whether the company ran into some sort of supply constraint?

Page 163

BROWN

A. Not that I'm aware of.

Q. So would you say it was simply less demand?

A. I don't know. It wasn't a supply constraint. I can tell you that. There are multiple things that impact demand so I don't know that I can point to specifics. There were many things that impacted demand at that time.

MR. URIS: I want to introduce another exhibit.

(Exhibit 25, document Bates labeled CoDx_00002035, marked for identification.)

BY MR. URIS:

Q. I would like to introduce as Exhibit 25 a document bearing Bates stamp CoDx_00002035. That should be available.

A. Did you say Exhibit 25?

Q. Yes.

A. Okay.

I have that document up now.

Q. This is an e-mail chain from -- with the top e-mail it's from Brian Brown

Page 164

BROWN

to Dan Bohrer, sent August 9, 2022 at 12:20 p.m.

To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

A. Again, I have no reason to believe otherwise.

Q. And if you could turn to the page of the document with the Bates number ending in 039.

A. Okay.

Q. And there is -- the top e-mail on that page is an e-mail from Andrew Benson to William Stack, copying yourself, Mike Houston and Zachary Mizener. And Mr. Benson in that e-mail he writes, "I'm not wild about calling out supply chain issues since I don't think we really consider that a factor. My remarks in the script after talking to Ike refer to a reduction in mandated testing for travel and public venues, in public funding assistance for testing programs, and an increase in overall COVID fatigue for the

Page 165

BROWN

disruption to daily life after a multiyear pandemic, all of which were felt industry-wide."

Do you see that?

A. Yes.

Q. So is it your understanding from this e-mail that Ike, or Dwight, that it was his idea to refer to these factors in connection with reduced sales of the Logix Smart Test?

A. I don't know that I could infer that it was specifically Ike's idea. It sounds like it was a discussion and since I wasn't on the call, I couldn't tell you whose idea it was or whose thought it was to identify those as drivers.

Q. Okay, if you could turn to the page of the document with Bates number ending in 044.

A. Okay.

Q. And about halfway down through the page where there's the quote attributed to Dwight Egan it reads, "Our second quarter results reflect lower

42 (Pages 162 - 165)

Page 166

BROWN

volumes for our Logix Smart COVID-19 Test, which we believe is primarily the result of a reduction in mandated testing in travel and public venues and in government funding for testing programs."

Do you see that?

A. I do.

Q. And those were some of the factors that Mr. Benson referred to in his e-mail; correct?

A. Yes, they are.

MR. URIS: I'm going to introduce as Exhibit 26 a document bearing Bates stamp CoDx_00086287.

THE WITNESS: What was that exhibit number again?

MR. URIS: 26.

THE WITNESS: 26.

(Exhibit 26, document Bates labeled CoDx_00086287, marked for identification.)

THE WITNESS: Okay, I have that up now.

///

Page 167

BROWN

BY MR. URIS:

Q. This is an e-mail chain. The top e-mail is from Andrew Benson to Dan Bohrer, sent August 15, 2022, its subject line Re: Final Script of Earnings Call.

Do you see the second e-mail on the chain, the e-mail from Dan Bohrer on August 15, 2022, he appears to be asking Mr. Benson to send him the script from the earnings call, do you see that?

A. Yes, I see that.

Q. And then in response, Mr. Benson replies and attaches two documents, and does the first document appear to be the script from the Q2-2022 earnings call?

A. It appears to be the transcript from the Q2-2022 earnings call.

Q. If you could turn to the page of the document ending in -- the Bates stamp ending in 295.

A. Okay.

Q. I just wanted to point your attention in the middle of the page, it says Brian Brown. Is that where your

Page 168

BROWN

portion of the script starts?

A. Yes.

Q. Then if you could turn to the page ending in 298.

A. Okay.

Q. And in the third paragraph on that page, it reads, "Turning now to our visibility and near-term outlook, variability in our operating environment has restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result, we will not be providing quarterly guidance at this time."

Do you see that?

A. Yes.

Q. Is that in reference to the quarterly guidance for the third quarter of 2022?

A. Yeah, and any future quarters at that point in time moving forward, yeah.

Q. Do you recall why you were not providing guidance at this point going forward?

Page 169

BROWN

A. Because the variability in our operating environment restricted our near-term visibility. What I said is exactly what it was. We didn't know. The dust still hadn't settled in terms of what was going on and how people were dealing with COVID at that point in time.

Q. So you made similar statements on the earnings call for the first quarter results of 2022; correct?

MS. PEIRSOL: Objection, form.

THE WITNESS: That's correct.

BY MR. URIS:

Q. But here, you didn't cite those same factors that were diminishing your ability to accurately forecast the Logix test going forward; correct?

A. I would have to compare them side by side to see what I didn't say or did say in this one versus the other one.

Q. If you could go back and pull Exhibit 22 that we previously introduced was the transcript.

A. Can I pull two exhibits at the

43 (Pages 166 - 169)

Page 170

BROWN

same time?

Q.  You might be able to just create another window for Exhibit Share.

A.  Let's see.

Q.  You can open up a separate browser window.

A.  And then just go into that Exhibit Share again as a guest, I guess.

Q.  Yeah, either that or you can download each document, I suppose.

A.  Okay, I think that may have worked.  What was the other exhibit?  I'm in Exhibit 26.  What was the other one?

Q.  22.

A.  22.  What page should we be looking at on --

Q.  Internal page 7 of the transcripts or on the top right of the document it would say page 8 out of 16.

A.  I'm with you.  Okay.

Q.  I guess if you want to scroll up one page, you can see that it says Brian L. Brown about halfway through?

A.  Yeah.

Page 171

BROWN

Q.  And then continuing on to page 7, the second to last paragraph on that page.

A.  Okay.

Q.  Do you see in the second sentence it states, "Our ability to accurately forecast Logix Smart COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world"?

A.  Yeah, I can read that.

Q.  Does that refresh your recollection that you cited to those factors on the May 12, 2022 call?

A.  Sure.

Q.  So why didn't you refer to those same factors in the August 2022 earnings call?

A.  I can't recall specifically why I may not have referred to those factors specifically at that point in time.

Q.  Do you recall what the dollar

Page 172

BROWN

amount of orders received in the third quarter of 2022 was at the time of the August 2022 earnings call?

A.  I don't recall, no.

Q.  Do you recall if it was similar to the dollar amount of orders received in the second quarter of 2022 at the time of the May 2022 call?

A.  I don't recall.  I don't recall exactly those numbers.

Q.  Do you recall what the company's third quarter of 2022 revenue ended up being?

A.  I don't recall but certainly I can look in the script here.

Q.  Do you recall if it was similar to the company's revenue in the second quarter of 2022?

A.  I don't recall.  I know I'm looking at the script here and for Q2 of 2022 it was five million and I'm not sure off the top of my head what Q3 was.

Q.  You don't recall that it was approximately 5.1 million dollars?

Page 173

BROWN

MS. PEIRSOL:  Objection, form.

THE WITNESS:  If I told you I didn't recall, then I don't recall.

BY MR. URIS:

Q.  Do you have any reason to doubt that it was 5.1 million dollars?

A.  Again, I don't recall the specific numbers.  If you want to pull up the filing of the Q, I'd be happy to say yes, this is the number, no problem.

Q.  Are you aware that in early 2020, various government funding programs and initiatives were put in place in order to increase access to COVID-19 diagnostic testing?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  In 2020?

BY MR. URIS:

Q.  Yes.

A.  I was not here in 2020 so that was not something that I even thought about in 2020.  I was not employed by Co-Diagnostics.

Q.  At any time did you become aware

44 (Pages 170 - 173)

Page 174

BROWN

of that?

A.  At any time is vague.  Can you give me a time frame?  What are we talking about?

Q.  At any time in 2021 or 2022.

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I mean that had been an item that had been discussed.  I had heard about public funding or government funding for testing.

BY MR. URIS:

Q.  Do you recall when you heard that?

A.  No, I don't recall.

Q.  Are you aware that since the beginning of the pandemic, the Health Resources and Services Administration provided approximately 24.5 billion in reimbursement for COVID-19 related claims, including reimbursement for COVID-19 testing?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  No.

///

Page 175

BROWN

BY MR. URIS:

Q.  Do you know when that funding expired?

A.  I have no idea.

Q.  Would you be surprised to learn that that funding expired in March of 2022?

A.  As I had no expectation, I would not be surprised -- surprised or not surprised.  I had no expectation, I have no idea.

Q.  So that's not something you considered when you were thinking about guidance in 2022?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Restate again exactly what you are asking.  I was thinking about when providing guidance.  What was the statement before that because I'm a little confused.  Are we talking about the number you put out there from the HR, Health whatever it was you said?  I can't remember.

Page 176

BROWN

BY MR. URIS:

Q.  I had asked whether you were aware that funding from the Health Resources and Services Administration had expired in May -- in March of 2022.

A.  Yes, I'm not aware of that.

Q.  So when you were considering whether or not to provide guidance in May of 2022, that's not something you considered?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  If I wasn't aware of a number or a specific program, then I certainly wouldn't have thought about it when providing guidance if I wasn't aware of it.

(Exhibit 27, document Bates labeled CoDx_00464876, marked for identification.)

BY MR. URIS:

Q.  I'm going to introduce as Exhibit 27 a document bearing Bates stamp CoDx_00464876.  That should be available.

A.  What was the exhibit number?

Page 177

BROWN

Q.  Sorry, 27.

A.  27.

Q.  Exhibit 27.

A.  I heard the 76 and that confused me.

Okay, I have that up now.

Q.  And this is an e-mail chain.  Top e-mail is from Andrew Benson to Dwight Egan, copying Brian Brown.  The subject line Re:  Get their release and show me a potential draft.  The attachment CODX - Share buyback PR Dr l.  To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I have no reason to believe otherwise.

Q.  If you look at Mr. Benson's e-mail, he writes, "Here's what I got.  You may not like the line at the end of the quote implying a post-pandemic world, but I think it's important in our messaging for people to understand we're still very bullish about our future

45 (Pages 174 - 177)

Page 178

BROWN

despite the decline in COVID testing."
Do you see that?
A. I see that.
Q. Do you know what Mr. Benson is referring to when he refers to the decline in COVID testing?
A. I don't because he doesn't make reference to what numbers he's looking at or talking about.
Q. You don't know generally what he's referring to?
MS. PEIRSOL: Objection, form.
THE WITNESS: I don't. I'd have to ask him. He made the statement. I'm not sure.
BY MR. URIS:
Q. Then below that he writes, "I'd also suggest you consider attributing this quote to Brian."
Do you see that?
A. I do.
Q. Is it your understanding that he's referring to you?
A. Yes, I'm the only Brian that

Page 179

BROWN

works here.
Q. Do you have an understanding of why he made that suggestion?
A. I do not. You would have to ask him.
Q. Do you think it's because you're the CFO of the company?
MS. PEIRSOL: Objection, form.
THE WITNESS: Again, I don't know. That would be getting into his head and saying one way or the other. I don't know.
BY MR. URIS:
Q. If you could turn to the first page of the attachment which starts on the page with Bates number ending in 877.
A. Okay.
Q. Take a look at second paragraph starting with the second sentence which states, "We believe that our shares are currently undervalued which has provided us with an opportunity to strategically allocate capital in a way that helps to drive continued growth and demonstrates

Page 180

BROWN

our positive outlook for the future as we, along with the rest of the world, adjust to a reality that is no longer dominated by daily headlines about the pandemic."
Do you see that?
A. I do see that but it was new reality. I think you missed a word.
Q. I apologize.
A. No, worries.
Q. Do you have an understanding of what he was referring to when he referenced a new reality that is no longer dominated by daily headlines about the pandemic?
A. I don't. You would have to ask him exactly what he meant.
(Exhibit 28, document Bates labeled CoDx_00005309, marked for identification.)
BY MR. URIS:
Q. I'm going to introduce as Exhibit 28 a document bearing Bates stamp CoDx_00005309. That should be available.
A. That was number 28?

Page 181

BROWN

Q. Yes.
A. Okay, I have that up now.
Q. And this is an e-mail thread, the top e-mail from Brian Brown to Andrew Benson and Dwight Egan dated March 9, 2022 at 7:36 a.m.
To your knowledge, was the e-mail reflected in this document sent at the time indicated on this document?
A. I have no reason to believe otherwise.
Q. You appear to be responding to Mr. Benson's previous e-mail attaching a draft of that draft press release; correct?
A. Yes, although the press release isn't attached but yes, I believe that was related to the last document also.
Q. In your e-mail you write, "Let's make sure Kevin gets a good look at this when ready."
Do you see that?
A. I do.
Q. Who is Kevin?

46 (Pages 178 - 181)

Page 182

BROWN

A.  Kevin Ontiveros.  At the time he was our legal advisor, outside counsel.

Q.  And why did you want to make sure that Kevin gets a good look at this when ready?

MS. PEIRSOL:  Objection, calls for privileged information.  I instruct him not to answer.

MR. URIS:  I just want to clarify, Marissa, your position is that the entirety of the answer of why he wanted Kevin to get a look at the press release is privileged?

MS. PEIRSOL:  The reason that he's seeking legal advice from his counsel is privileged.

MR. URIS:  It doesn't state that he's seeking legal advice from his counsel.

MS. PEIRSOL:  To the extent that you were reaching out to Kevin to seek legal advice, Brian, I instruct you not to answer.  If you were seeking any other kind of advice from Kevin,

Page 183

BROWN

please go ahead.

THE WITNESS:  That's fair.  I think the way I can explain this is anytime -- we have a process in place, a process with controls to review press releases before they go out to the public and part of that is also a legal review, so that happens on all press releases.

BY MR. URIS:

Q.  Was there any other reason you wanted Kevin to get a look at the press release other than as part of his legal review?

A.  No.

Q.  Would you consider the question of whether to initiate a share buyback program to be a business decision?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  Can you say that one more time?

BY MR. URIS:

Q.  Would you consider the question of whether or not to initiate a share

Page 184

BROWN

buyback program to be a business decision?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I'm not sure what the definition of -- are you trying to define what a business decision is versus not?  I'm a little confused at what you mean by business decision.

BY MR. URIS:

Q.  Would you consider that decision to be something within the purview of the executives of the company in their roles as executives of the company?

A.  Yes, along with the board of directors, yes.

Q.  Do you consider the question of whether or not to initiate a share buyback program -- strike that.

Whether or not to initiate a share buyback program involves a question of capital allocation; correct?

A.  Yes.

Q.  In your e-mail, you didn't push back in any way on Mr. Benson regarding the decline in COVID testing; correct?

Page 185

BROWN

MS. PEIRSOL:  Objection, form.

THE WITNESS:  I just responded to make sure that legal had a chance to review the release.

(Exhibit 29, document Bates labeled CoDx_00464879, marked for identification.)

BY MR. URIS:

Q.  I'm going to introduce as Exhibit 29 a document bearing Bates stamp CoDx_00464879.  It should be available.  It's Exhibit 29.

A.  In order of the last few so I could have guessed 29.  Okay, I have that up.

Q.  This is an e-mail from Andrew Benson to Dwight Egan and Brian Brown dated March 10, 2022 at 10:48 a.m.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I have no reason to believe otherwise.

Q.  And if you could turn to the

47 (Pages 182 - 185)

Page 186

BROWN

first page of the attachment.

A.  Okay.

Q.  Bates number 880.

A.  I'm there.

Q.  Take a look at the second paragraph.  The sentence that Mr. Benson had referred to in the previous exhibit regarding a new reality that is no longer dominated by daily headlines about the pandemic appears to be removed; is that correct?

A.  It's not in this press release, no.

Q.  Do you know why that was removed from this draft?

A.  I don't recall.  These type of releases go through a number of iterations just like any document that you release to the public.

Q.  You don't recall suggesting that that language be removed?

A.  No, I don't.

Q.  Can you say definitively that you did not make that suggestion or you just

Page 187

BROWN

don't recall one way or the other?

A.  I don't recall one way or the other.  It was 32 months ago.

MR. URIS:  This is a good spot for a break, if that works for everyone.

MS. PEIRSOL:  That works for us.

THE VIDEOGRAPHER:  Thank you.  This is the videographer.  The time is 3:19.  We're going off the record.

(Recess taken from 3:19 p.m. to 3:31 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:32.  This begins media file 6.

MR. URIS:  I am going to -- I'm going to introduce as Exhibit 30 a document bearing Bates stamp CoDx_00464890.

(Exhibit 30, document Bates labeled CoDx_00464890, marked for identification.)

BY MR. URIS:

Q.  It should be available.  It's

Page 188

BROWN

Exhibit 30.

A.  I don't see it quite yet.  There we go, okay.

Q.  This is an e-mail from Andrew Benson dated March 14, 2022 at 6:31 p.m. to various persons.  Are those people listed in the "to" line, is that the Co-Diagnostics board of directors?

A.  Yes, that's correct.

Q.  Copying Dwight Egan, Brian Brown and Kevin Ontiveros, the subject line Upcoming Press Notification March 15, 2022, attachment CODX Share buyback PR Final.

To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A.  I have no reason to believe otherwise.

Q.  Is it your understanding that this was the final press release announcing the company's authorization of a 30 million dollar share repurchase program?

Page 189

BROWN

A.  Yes.

Q.  Take a look at the first page of the attachment ending in Bates number 891.

A.  Okay.

Q.  Take a look at the second paragraph which reads, "'This share repurchase program is in line with our commitment to return value to our shareholders and reflects confidence in our balance sheet and strong cash flow generation,' remarked Brian Brown, Chief Financial Officer of Co-Diagnostics.  'We believe that the current share price provides us with an opportunity to strategically allocate capital in a way that helps drive continued growth and demonstrates our positive outlook for the company's future.'"

Do you see that?

A.  Yes.

Q.  Did you believe at that time that the company's share price reflected an opportunity to -- for the company to strategically allocate capital?

48 (Pages 186 - 189)

Page 190

BROWN

A. I don't know. Specifically at March 15th specifically? Sorry, is that what you're asking about, specifically on March 15th did I believe that?

Q. On or around March 15th or in the week or two prior, that general time frame.

A. I mean the reason we set up the share buyback program was basically because we saw an opportunity to buy shares back at a fair value.

Q. Do you recall how many shares the company purchased in either March or April of 2022 under this program?

A. I don't recall specifically. I mean I could pull up that data. I don't recall top of my head.

Q. I will represent to you that the company's second quarter 2022 10-Q states that the company did not purchase any shares under the program in March and April of 2022. Do you recall why the company didn't purchase any shares in March or April of 2022?

Page 191

BROWN

A. Sorry, state that one more time. What did you say? What file said that we didn't purchase any in March or April? March and April are two different quarters.

Q. That's a fair point. I believe the disclosure for the second quarter, in the 10-Q for the second quarter of 2022 represented that none were -- that's a fair point. Strike that.

A. I get it.

Q. But based on memory but...

A. Yeah, I get it.

Q. How about I'll make a different representation and if you want, I can potentially get the documents but I don't --

A. No problem.

Q. Hopefully it's not necessary. I will represent to you that the company did not purchase any shares under this program in March and April of 2022. So my question is whether or not you recall why no purchases were made in those months.

Page 192

BROWN

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know how you would get March and April in one statement. Again, that's over two quarters. If you want to pull it up I'm happy to respond to it. Those would not be in the same statement because they would be in two separate quarters, disclosed separately.

BY MR. URIS:

Q. Do you recall whether the company repurchased any shares in March of 2022?

A. I don't recall.

Q. Do you recall whether the company repurchased any shares in April of 2022?

A. I don't recall. I would have to look at my tracking file.

Q. Is it fair to assume you don't know why the company didn't purchase any shares in March or April of 2022?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't know if you can assume. I don't recall exactly specifically why we didn't purchase in

Page 193

BROWN

those months. I know we got the purchase program set up in March of 2022 halfway through the period.

BY MR. URIS:

Q. Do you recall that in May of 2022 the company repurchased approximately 2.1 million shares at an average price per share of $4.86 under that program?

A. Again, I don't recall specifics without being able to look at the file, my own tracker. I track that information so...

Q. Do you recall how decisions were made concerning whether or not to repurchase shares under that program?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't recall any specific reasons to buy or not buy. We just purchased when we felt like it was a good opportunity to buy.

BY MR. URIS:

Q. Can you describe generally how such a purchase would be made?

A. Generally I would communicate to

49 (Pages 190 - 193)

Page 194

BROWN

the firm that would do the purchasing for us. I can't remember their name. I would instruct them to purchase based on a certain price for a week or a day at a time. It was different all throughout.

Q. And prior to providing that instruction, would there be any internal discussions at the company as to whether the company should make a purchase at any given point in time?

MS. PEIRSOL: Objection, form.

THE WITNESS: Not formally, no. It was informal.

BY MR. URIS:

Q. Do you recall anyone at the company ever approaching you about whether the company should make a share repurchase under that program?

A. That's pretty vague. I mean anybody? I'm not sure what we're talking about.

Q. Any executive so Dwight Egan, for example, or Kevin Ontiveros or Andrew Benson.

Page 195

BROWN

A. Generally I would be the one that would initiate any discussions around share repurchase.

Q. Do you recall that in June of 2022, the company purchased $489,000 worth of shares at an average price of $4.98?

A. As I didn't recall other months, I certainly am not going to recall specifically that month without looking at my own documentation.

Q. Do you recall that in July of 2022, the company did not purchase any shares under that program?

A. Same answer. Unless I look at my files, I can't recall specific months and how many shares we repurchased or didn't repurchase.

Q. Was there a stock price above which the company had decided it would not repurchase shares under that program?

A. It depended on the period of time. You know, the share prices fluctuate all the time so just depended on at that given point in time what the share

Page 196

BROWN

price was and where we felt comfortable re-buying shares.

Q. So there was no set price above which either the company or you had decided you didn't want to repurchase shares under that program?

A. Not that I can recall. It varied by period.

(Exhibit 31, document Bates labeled CoDx_00516950, marked for identification.)

BY MR. URIS:

Q. I would like to introduce as Exhibit 31 documents bearing Bates stamp CoDx_005169 -- hold on. I seem to have two different. Hold on.

I'm going to introduce as Exhibit 31 a document bearing Bates stamp CoDx_00516950. It should be available. Exhibit 31.

A. 31, okay.

Okay, I have that up now.

Q. This is an e-mail chain. Top e-mail is from kontiveros, that's Kevin

Page 197

BROWN

Ontiveros; correct?

A. Yes.

Q. The e-mail was sent on April 26 at 11:46 a.m. to Brian Brown and Dan Bohrer, subject line Re: BOD Minutes Q1-2022 and there appear to be various attachments and those appear to be minutes of either various board meetings or meetings of committees of the board.

A. Let me just scroll through all of them to see.

Q. If it helps, in that e-mail he writes, "Attached are signed final versions of the board and audit committee meeting minutes for your records and the auditors."

A. It helps but I would still like to look at the document.

Q. Sure, sure.

A. Okay, yeah.

Q. To your knowledge, was the e-mail reflected in this document received at the time indicated on the document?

A. I have no reason to believe

50 (Pages 194 - 197)

Page 198

BROWN

otherwise.

Q. If you can turn to the first attachment, it starts on the page ending in Bates number 953.

A. Okay, I'm there.

Q. Does this appear to be the board minutes for the board meeting that occurred on March 11, 2022?

A. Yes.

Q. If you look at the third paragraph in the minutes which states, "Following Mr. Egan's presentation, he indicated that the company was considering implementing a share repurchase program. Mr. Brown reviewed with the board the financial position of the company, particularly its cash balances and why management felt that given the current price of the company's common shares it may be an opportune time to announce a share buyback program to be in a position to repurchase shares if the stock price became attractive to do so."

Do you see that?

Page 199

BROWN

A. I do.

Q. At this meeting, do you recall indicating that the company's stock price was not yet at an attractive level that would -- at which the company would like to purchase?

MS. PEIRSOL: Objection, form.

THE WITNESS: I don't recall that.

BY MR. URIS:

Q. Does the language that it may be an opportune time to announce a share buyback program to be in a position to repurchase shares if the stock price became attractive to do so, does that language suggest to you that it was not yet attractive?

A. No, not necessarily because we say it may be now might be an opportune time to set up a program, so it could have been an opportune time at that time but the program wasn't set up yet.

Q. Right, it says it may be an opportune time to announce the program;

Page 200

BROWN

correct?

A. Correct. Because there wasn't one in place, I can't say one way or the other if that was an opportune time on March 11 or March 15 because the program wasn't yet in place.

Q. Right. So in order to be able to purchase shares under the program, the program had to be in place; correct?

A. Yes.

Q. But you don't recall whether or not you felt that the stock price as of March 11 was attractive?

MS. PEIRSOL: Objection, form.

THE WITNESS: Yeah, I don't recall that. We had almost a hundred million dollars of cash in the bank and we were trying to decide how to best use that to -- for shareholders and for us as a company and best put us in a good place.

BY MR. URIS:

Q. Do you think if the stock price was attractive as of March 11, 2022 it

Page 201

BROWN

would have been more accurate --

MS. PEIRSOL: Objection, form.

Q. -- that the stock price is currently attractive rather than if the stock price became attractive to do so?

MS. PEIRSOL: Objection, form.

THE WITNESS: That's a very confusing question. Can you restate it, please, because I don't quite follow it?

BY MR. URIS:

Q. If you had indicated at that meeting that as of that date the stock price was attractive relative to the repurchase program, would it -- do you think it would have been more accurate to state in the minutes that the stock price was attractive at that time rather than if the stock price became attractive to do so?

MS. PEIRSOL: Objection, form.

THE WITNESS: Jason, the fact of the matter is the program wasn't in place so I can't speculate, you know,

51 (Pages 198 - 201)

Page 202

BROWN

something that didn't happen in the past.

BY MR. URIS:

Q.  So you're saying if it became attractive to do so during the time that such a program was in place?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  The program wasn't in place so I can't speculate on if I believed at that point in time was a good time or not because we had no program.  That was the point is to put the program in place so we could buy shares back when the opportunity presented itself.

BY MR. URIS:

Q.  Do you recall what the company's stock price was on March 11, 2022?

A.  I don't because it's different every day.

Q.  Do you recall if it was above $5 per share?

A.  I don't recall.

Q.  Do you recall whether in May,

Page 203

BROWN

June and July of 2022 the company's stock price rose above $5 per share?

A.  I don't recall.

Q.  Do you recall that in August of 2022 the company repurchased approximately 7.4 million dollars of shares at an average price per share of $3.82?

A.  I think we've gone over this with other months.  I don't remember specific months unless I look at my own tracking data.

Q.  If you could turn back to the previous exhibit, number 30.

A.  Okay, I have that open.

Q.  If you could turn to the attachment, the press release.

A.  Okay.

Q.  If you look at the third paragraph, the last sentence in that paragraph which states, "Share repurchases under the program may be made through a variety of methods, which may include open market purchases, in block trades, accelerated share repurchase transactions,

Page 204

BROWN

exchange transactions, the use of trading plans intended to qualify under Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, or any combination of such methods."

Do you see that?

A.  Yes.

Q.  I believe you testified to some of this earlier, but do you recall how any of the repurchases under that program were made?

A.  I communicated with -- I did remember, B. Riley, a contact at B. Riley who then made the share purchases.  I don't know how they were made, how they made them.  I don't understand their systems.

Q.  Do you recall through what methods any of those purchases were made in terms of the various methods that are listed in this sentence?

A.  I don't.

Q.  Do you recall if any of those purchases were made under a Rule 10b5-1

Page 205

BROWN

plan?

A.  Again my communication would have been with B. Riley and they made the purchases.

Q.  Did you ever create a 10b5-1 plan with respect to repurchases to be made under this plan?

A.  I've never created a 10b5-1 plan for anything.

Q.  Do you know if anyone else at the company created a 10b5-1 plan with respect to repurchases to be made under this program?

A.  Not that I'm aware of.

(Exhibit 32, document Bates labeled CoDx_00005351, marked for identification.)

BY MR. URIS:

Q.  I would like to introduce as Exhibit 32 a document bearing Bates number CoDx_00005351.  And that should be available.

A.  You said 32; right?

Q.  Yes.

52 (Pages 202 - 205)

Page 206

BROWN

A.  I have that up.

Q.  This is an e-mail chain, the top e-mail from Brian Brown dated March 21, 2022 at 8:46 p.m. to Mike Houston, bcc'ing Andrew Benson, the subject line Current script, the attachment Q4 2021 Earnings Call Script v3.

To your knowledge, was the e-mail reflected in this document sent at the time indicated on the document?

A.  Yeah.  I don't have any reason to believe otherwise.

Q.  Turn to the attachment that starts on page ending in 356.  Does this appear to be the current draft of the Q4-2021 earnings call scripts?

A.  Current meaning as of that given point in time when the e-mail was sent?

Q.  Yes.

A.  Yeah, I would believe that.

Q.  Turn to the page ending in 359.

A.  Okay.

Q.  If you look at the page right before that, do you see it says Brian

Page 207

BROWN

Brown in the middle of the page?

A.  Yes.

Q.  This appears to be in your section of the script?

A.  It appears to be the case.

Q.  Take a look at that first full paragraph on the page ending 359.  It reads, "For the quarter, revenue decreased to 20.4 million dollars compared to 27.1 million from the prior year same period.  The decrease was primarily due to the timing of sales for our Logix Smart COVID-19 tests during the quarter.  We experienced a significant level of demand for these tests toward the end of the fourth quarter, with that increased demand spilling over into the first quarter of this year."

Do you see that?

A.  Yes.

Q.  If you could turn back to the top e-mail on the first page of this document.

A.  Just scroll up to the top?

Q.  Sure.  The top e-mail from you to

Page 208

BROWN

Mike Houston.

A.  Yeah.

Q.  You see in that second paragraph you write, "Also, do most year end calls have any discussion about the quarter?  I would like to avoid if we could and focus on the full year.  Thoughts?"

Do you see that?

A.  I do.

Q.  Do you recall why you wanted to avoid any discussion about the quarter?

A.  The reason I would have made that statement is because when you file for Q4 you're filing for a full year, a 10-K, so that covers the entire year, and so I wanted my comments to address the same as what we filed in our 10-K and be consistent.

Q.  Would you agree that on earnings calls for the full year, information can be gleaned regarding the fourth quarter of that year?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  People can do math

Page 209

BROWN

so yes, people can figure out what Q4 is but generally you don't -- you're filing a 10-K so that includes a full year.  People can back into the Q4 if they'd like to.

BY MR. URIS:

Q.  If you look at the attachment, the title of the attachment is Q4 and FY 2021 Earnings Results Conference Call, do you see that?

A.  I do.

Q.  At this time were you concerned that that draft language that we went over in the draft script could have indicated to the market that much of the sales in the first quarter of 2022 were due to orders that came in in January of 2022?

MS. PEIRSOL:  Objection, form.

THE WITNESS:  No, I wasn't concerned.

MR. URIS:  Can we go off the record for a moment?

MS. PEIRSOL:  Sure.

THE VIDEOGRAPHER:  Thank you.

53 (Pages 206 - 209)

Page 210

BROWN

The time is 4:10.  We're going off the record.

(Recess taken from 4:10 p.m. to 4:25 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:25.  This begins -- I'm sorry, this continues media file 6.

MR. URIS:  I have no further questions at this time.  However, I do want to note for the record that we are leaving this deposition open as defendants are still in the process of producing documents and we are currently in discussions with defendants' counsel regarding the sufficiency of their privilege log.  So to the extent additional documents are produced, it may be necessary to call the witness back to answer questions about any of those documents.

MS. PEIRSOL:  Thank you.

THE VIDEOGRAPHER:  Nothing else

Page 211

BROWN

for the record, Counsel?

MS. PEIRSOL:  Nothing else from us.

THE VIDEOGRAPHER:  Thank you very much.  The time is 4:26.  We're going off the record.  This ends media file 6 and that concludes today's testimony.

(Time noted:  4:26 p.m.)

_____

BRIAN BROWN

Subscribed and sworn to before me this ___ day of _____, 2024.

_____

Page 212

BROWN

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NASSAU     )

I, CATHI IRISH, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York, do hereby certify:

That BRIAN BROWN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of November, 2024.

_____

CATHI IRISH, RPR, CRR, CLVS

Page 213

BROWN

--------------- I N D E X ---------------

WITNESS        EXAMINATION BY      PAGE
BRIAN BROWN       MR. URIS          5


----------------- EXHIBITS ---------------
EXHIBIT NUMBER    DESCRIPTION       PAGE
Exhibit 12, document Bates labeled    61
CoDx_00501488
Exhibit 13, document Bates labeled    82
CoDx_00004432
Exhibit 14, document Bates labeled    90
CoDx_00075094
Exhibit 15, document Bates labeled    93
LAMBERT0000769
Exhibit 16, document Bates labeled    104
LAMBERT0002146
Exhibit 17, document Bates labeled    107
CoDx_00506169
Exhibit 18, document Bates labeled    122
CoDx_00463646
Exhibit 19, document Bates labeled    128
CoDx_00506830

54 (Pages 210 - 213)

Page 214

BROWN

Exhibit 20, document Bates labeled   134
CoDx_00506183
Exhibit 21, document Bates labeled   139
CoDx_00466367
Exhibit 22, declaration of Douglas   149
W. Greene
Exhibit 23, document Bates labeled   156
LAMBERT0001281
Exhibit 24, document Bates labeled   160
CoDx_00004897
Exhibit 25, document Bates labeled   163
CoDx_00002035
Exhibit 26, document Bates labeled   166
CoDx_00086287
Exhibit 27, document Bates labeled   176
CoDx_00464876
Exhibit 28, document Bates labeled   180
CoDx_00005309
Exhibit 29, document Bates labeled   185
CoDx_00464879
Exhibit 30, document Bates labeled   187
CoDx_00464890
Exhibit 31, document Bates labeled   196
CoDx_00516950

Page 215

BROWN

Exhibit 32, document Bates labeled   205
CoDx_00005351

Page 216

BROWN
    *** ERRATA SHEET ***
NAME OF CASE:  Stadium Capital vs.
Co-Diagnostics, Inc.
DATE OF DEPOSITION:  November 5, 2024
WITNESS:  Brian Brown

PAGE LINE      FROM               TO
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____

                    _____
                    BRIAN BROWN


  Witness and sworn to before me
this ____ day of _____, 2024.

_____   _____
  (Notary Public)    My Commission Expires:

55 (Pages 214 - 216)

[& - 180]

Page 1

**&**

**&**  3:4,12 54:18
  151:17 152:6

**0**

**00002035**
  163:14,19
  214:13
**00004432**  82:17
  82:22 213:12
**00004897**
  160:13,15
  214:11
**00005309**
  180:19,24
  214:19
**00005351**
  205:17,22
  215:3
**00014**  90:17
**00075094**  90:6
  90:11 213:14
**00086287**
  166:15,21
  214:15
**00463646**
  122:12,17
  213:22
**00464876**
  176:19,24
  214:17
**00464879**  185:7
  185:12 214:21
**00464890**
  187:20,22
  214:23

**00466367**
  139:22,25
  214:5
**00501488**  61:14
  61:19 213:10
**00506169**
  107:12,17
  213:20
**00506183**
  134:12,14
  214:3
**00506830**
  128:22,24
  213:24
**005169**  196:16
**00516950**
  196:11,20
  214:25
**039**  164:11
**044**  165:20
**050322**  83:4
**097**  93:7

**1**

**1**  4:6 53:9
  150:23 151:5
**10**  16:23 39:9
  73:22 118:24
  129:11 134:24
  135:16,19
  136:2,3,21,23
  137:10,11,21
  137:23,25
  151:12 185:19
  190:20 191:9
  208:15,18

  209:4
**10022**  3:8
**104**  213:17
**107**  213:19
**10:01**  39:14,16
**10:38**  134:25
**10:48**  185:19
**10b5-1**  204:4
  204:25 205:6,9
  205:12
**11**  198:9 200:6
  200:14,25
  202:19
**11:02**  78:18,19
**11:14**  78:20,22
**11:46**  197:5
**11:52**  157:4
  158:3
**11th**  43:11
**12**  61:13,17,18
  65:19 69:2
  76:21 78:2
  100:15 140:9
  140:15 146:22
  150:18 155:3
  156:18 157:4
  157:15 158:3
  171:17 213:9
**1200**  3:15
**122**  213:21
**128**  213:23
**12:13**  124:3
**12:18**  121:19
  121:21

**12:20**  164:3
**12:42**  122:3,7
**12th**  43:11
**13**  57:17 82:16
  82:21 213:11
**134**  214:2
**139**  214:4
**14**  90:5,10,14
  118:6 188:6
  213:13
**149**  214:6
**15**  93:22,25
  94:7,8 167:5,9
  188:13 200:6
  213:15
**156**  214:8
**15th**  43:21
  190:3,5,6
**16**  104:23
  105:4,8,9
  151:12 154:22
  170:20 213:17
**160**  214:10
**163**  214:12
**166**  214:14
**17**  103:22
  107:11,16,18
  213:19
**170**  110:16
**171**  108:18
**176**  214:16
**18**  122:11,16,21
  122:22 213:21
**180**  214:18

**[185 - 25]** Page 2

**185** 214:20
**187** 214:22
**19** 39:19,24
  40:4,9,15,18
  103:22 128:21
  128:23 129:4
  142:2 166:2
  171:7 173:15
  174:20,21
  207:14 213:23
**192** 138:8
**1934** 204:5
**196** 214:24
**19th** 212:22
**1:26** 149:9,11
**1:29** 140:9
**1:36** 149:12,14
**1:51** 160:2,4
**1q22** 83:2 91:2
  108:9,10
  129:13 135:3

**2**

**2** 39:17 71:8
**2.1** 193:7
**2.5** 73:19
**2.8** 65:7 67:9
**20** 19:7 60:14
  60:20 62:9,22
  72:13,22 75:23
  127:22 134:11
  134:13,18
  214:2
**20.4** 207:10
**200** 3:14

**2020** 54:17
  62:8,21 69:17
  70:9 73:12
  173:12,18,21
  173:23
**2021** 17:12
  19:17,18 25:17
  26:5,14 27:2
  27:18,19 30:11
  31:22 32:24
  33:21,25 34:20
  37:20 41:15,17
  41:23 43:4,12
  54:17 55:2
  57:18 59:24
  67:7 71:4,20
  72:10 79:3
  115:9 174:6
  206:7 209:10
**2022** 19:21
  25:17 26:5,14
  27:2,18,19
  29:17 30:11,21
  31:22 33:21,25
  34:20 37:20,23
  41:17 48:24,25
  49:9 54:17,24
  55:3 59:25
  60:7 62:9,22
  63:6,23 64:11
  64:14,20,24
  65:7,14,14,19
  65:22 66:13,22
  67:19,25 68:21
  68:25 69:2,18

70:10,20 73:16
73:19 76:15,18
76:21 77:9,19
78:2 79:3,19
79:25 80:17,23
80:24 81:3,12
81:13 82:7
86:2,8,17,19
89:22 90:24
93:10 94:12
105:24 108:7
108:20 110:19
115:9,12,22
116:13 117:13
117:25 118:24
123:5 124:2
127:15,18,23
128:6 129:12
134:24 135:16
140:9,15
146:22 150:18
150:19 153:10
153:14 154:14
154:23 155:3
156:18 157:4
158:18 160:22
161:16 164:2
167:5,9 168:20
169:11 171:17
171:20 172:3,4
172:8,9,13,19
172:22 174:6
175:8,15 176:6
176:10 181:6
185:19 188:6

188:14 190:15
190:20,23,25
191:9,23
192:13,16,21
193:4,6 195:6
195:13 198:9
200:25 202:19
203:2,6 206:5
209:17,18
**2023** 54:18
**2024** 1:17 2:8
  4:4 54:18
  211:16 212:23
  216:5,23
**205** 215:2
**21** 25:24 67:12
  118:5 139:21
  139:24 140:4
  206:4 214:4
**22** 1:7 4:13
  25:24 118:5
  149:16,21,24
  150:3 169:23
  170:15,16
  214:6
**23** 155:24
  156:3,5,8,9
  214:8
**230,000** 18:24
  19:19
**24** 160:11,14,19
  214:10
**24.5** 174:19
**25** 72:19
  163:13,18,20

**[25 - a.m.]**

214:12
**26** 166:14,18,19
166:20 170:14
197:4 214:14
**27** 176:18,23
177:2,3,4
214:16
**27.1** 207:10
**28** 180:18,23,25
214:18
**29** 185:6,11,13
185:15 214:20
**295** 167:21
**298** 168:5
**2:02** 90:24 92:2
**2:08** 105:24
**2:31** 160:5,8
**2q22** 161:2

**3**

**3** 78:23 86:17
86:19 89:22
160:22
**3.32** 64:24
**3.8** 67:10 71:8
**3.82** 203:8
**30** 92:8 187:18
187:21 188:2
188:24 203:14
214:22
**30,000** 19:7
**31** 196:10,15,19
196:21,22
214:24
**32** 187:4
205:16,21,24

215:2
**356** 206:15
**359** 206:22
207:8
**368** 141:13
**38th** 3:7
**3:19** 187:11,12
**3:31** 187:13
**3:32** 187:15
**3rd** 87:5

**4**

**4** 71:5 82:24
90:24 92:2
94:12 122:8
149:15 151:5
**4.5** 67:8 71:6
**4.6** 67:13
**4.86** 193:9
**4.98** 195:7
**43215** 3:16
**438** 85:12
**489,000** 195:6
**4:01** 141:2
**4:10** 210:2,4
**4:22** 116:13
**4:25** 210:5,7
**4:26** 211:6,10
**4th** 93:17 100:9

**5**

**5** 1:17 2:8 4:4
160:9 202:22
203:3 213:4
216:5

**5-4-22** 91:3
**5.1** 71:21
172:25 173:7
**5/10** 133:2
**5027** 212:24
**5322** 5:19

**6**

**6** 105:24
187:16 210:9
211:8
**61** 213:9
**648** 123:13,23
123:24,24
**6978** 1:7 4:13
**6:19** 108:21
**6:31** 110:20
188:6
**6th** 105:15

**7**

**7** 170:18 171:2
**7.4** 203:7
**75** 73:13 74:9
75:24 76:16,23
77:13
**76** 177:5
**7:16** 160:22
**7:22** 156:18
**7:32** 129:12
**7:34** 135:16
**7:36** 181:7

**8**

**8** 37:5 108:20
110:19 115:22
124:2 127:15

170:20
**8-3-22** 161:2
**800** 3:6
**82** 213:11
**839** 130:5,6
**84096** 5:20
**877** 179:17
**880** 186:4
**891** 189:4
**899** 161:10
**8:15** 123:5
**8:18** 115:22
**8:44** 94:12
**8:46** 206:5
**8:52** 105:15
**8:59** 2:9 4:5

**9**

**9** 108:7 116:12
123:5 151:11
164:2 181:6
**90** 213:13
**93** 213:15
**94** 91:17
**95** 41:20 91:17
101:21 102:4,7
102:21 103:12
**953** 198:5
**9:05** 108:7
**9:54** 39:11,13
**9th** 126:22

**a**

**a.m.** 2:9 4:5
39:13,14 78:19
78:20 123:5

**[a.m. - america]** Page 4

129:12 134:25 135:16,19 136:2,21,23 137:10,11,21 137:23,25 158:3 160:22 181:7 185:19 197:5

**ab** 135:4,6 162:11

**ability** 6:8 141:25 169:17 171:6

**able** 16:25 54:14 57:19 75:13 100:11 100:13 111:6 127:19 147:6 147:10 148:2 152:10,14 170:3 193:11 200:8

**above** 98:18 99:4 115:21 116:12 195:19 196:4 202:22 203:3

**absolutely** 7:5

**accelerated** 203:25

**access** 50:5,9 50:23 56:10,12 56:15,16,20,24 58:6,9 59:2,14 173:15

**accessed** 59:12

**account** 79:14 80:11

**accountancy** 15:19

**accounted** 41:9 41:19

**accounting** 13:19 15:18 16:22 18:6 20:24 22:5 24:20 25:20 26:2 49:18

**accounts** 20:12 20:13 25:12,13

**accuracy** 118:13

**accurate** 45:5 88:4 97:4,7,16 98:14 112:20 113:19 116:4 128:15 201:2 201:17

**accurately** 97:24 134:8 141:25 143:23 144:19 147:10 152:14 169:17 171:6

**achievable** 101:21 102:5,8 102:21 103:12

**achieve** 98:14

**acore** 17:2,3

**acquired** 28:25 29:25

**acquisition** 29:14,18

**act** 204:4

**action** 104:4 212:18

**activity** 161:22

**actual** 8:9 63:18 127:7

**actually** 35:11 37:8 54:11 67:19 75:9 92:6 125:10

**add** 44:11,11 44:12

**added** 149:24

**additional** 42:18 210:19

**address** 5:18 23:3 208:17

**adjust** 180:3

**administer** 4:25 34:18

**administration** 174:18 176:5

**advance** 30:4

**advice** 182:16 182:19,23,25

**advisor** 182:3

**advisors** 93:3

**affect** 6:8 14:4

**affecting** 133:25

**afternoon** 141:2 160:7

**agencies** 52:25

**agenda** 31:10 31:15

**ago** 8:11 148:15 159:13 187:4

**agree** 4:21 44:4 75:7 96:3 131:20 142:14 149:7 208:20

**agreed** 11:9

**agreement** 9:10 11:8

**agreements** 11:20 14:2

**ahead** 95:3,16 183:2

**air** 99:10

**al** 4:9,10

**allocate** 179:24 189:16,25

**allocation** 184:21

**allow** 101:3

**alternative** 97:20 101:18 103:21

**alternatives** 96:9,14,17,22

**amended** 150:13 204:5

**america** 80:13

**amount** 68:24 78:9 115:4 117:16 119:4 172:2,7

**analyst** 33:23 34:4 35:4,4,11 35:13,15,25 36:9,12,14 124:17,20 125:7 126:21 126:25 128:16 146:23 151:20

**analysts** 34:2 106:20 124:14 125:2 126:2,5 126:12 127:9 128:4,12,18

**andrew** 13:16 22:7 34:11,12 35:21 37:15 38:9 81:23 82:24 83:10 90:22 94:10 105:13 108:6 115:21 123:3 124:3 129:11 131:21 132:3 132:11,15 134:23 135:6 135:25 136:7 138:22 139:4 139:10 140:8 156:16 159:7 160:23 162:17 164:14 167:4

177:9 181:5 185:17 188:5 194:24 206:6

**announce** 198:21 199:13 199:25

**announcements** 35:10

**announcing** 188:23

**annual** 99:3,7 100:17

**answer** 6:15,22 6:22 7:7 22:24 28:17 36:4 40:21 44:19 58:11,15 65:10 66:19 69:15 77:21 103:18 110:11 138:24 148:11 158:23 182:9,12,24 195:15 210:21

**answered** 137:17

**answering** 6:13 7:3

**anybody** 22:25 84:10 106:21 194:21

**anytime** 41:17 65:19 96:24 98:16 183:5

**anyways** 109:3

**ap** 25:3,8,12

**apologize** 180:9

**apparent** 114:14

**appear** 55:7 91:10,20 133:7 150:24 161:12 167:15 181:13 197:7,8 198:7 206:16

**appearances** 4:22

**appearing** 2:13

**appears** 75:20 83:18 86:11 88:7 92:2 93:13 95:5,9 96:4,13 105:23 132:19 151:8 157:18 167:9 167:17 186:11 207:4,6

**apply** 12:7

**approach** 86:7 86:21 87:6,16 88:11 89:6

**approaching** 194:17

**appropriate** 113:16

**approval** 111:3

**approved** 131:9

**approximately** 8:11 9:2,4

16:14,23,24 17:10 41:8,13 42:10,15 43:18 44:6,9 60:7,11 62:22 63:10,12 63:24 64:24 65:7 71:10,21 72:11,13,19 74:9 75:23 172:25 174:19 193:7 203:6

**april** 49:9 65:13,21 67:19 79:24 81:2,12 82:6 115:11 153:14 154:14 190:14,23,25 191:4,5,23 192:4,16,21 197:4

**ar** 25:5,8,12

**archive** 51:11

**areas** 15:15 54:9

**articles** 52:13

**aside** 31:25 117:20 119:4

**asked** 12:14 58:21 67:14 104:14 146:23 152:9 176:3

**asking** 14:12 41:16 87:19 91:11,20 106:15 110:3

121:4 125:16 132:7 137:8 167:9 175:18 190:4

**assigned**  24:9

**assistance** 164:24

**associate** 146:17

**associated**  47:4 145:22

**assume**  7:7 9:14 11:12 14:19 73:12 138:2 157:10 192:19,24

**attached**  135:8 138:15 162:10 181:18 197:14

**attaches**  150:14 167:14

**attaching** 181:14

**attachment** 83:2 84:24 91:2 93:6 123:7 130:4 135:3 138:9 140:16 160:25 161:8 177:12 179:16 186:2 188:14 189:4 198:4 203:17 206:7,14 209:8 209:9

**attachments** 108:9 129:13 141:12 197:8

**attend**  15:6,8 31:4

**attended**  15:9 15:11,13

**attention** 167:24

**attorney**  4:21 12:20

**attorneys**  3:5 3:13

**attractive** 198:24 199:5 199:16,18 200:14,25 201:5,6,15,19 201:20 202:6

**attributed** 165:24

**attributing** 143:13 178:19

**audibly**  6:15

**audio**  35:17

**audit**  16:17 32:12,15,21,24 33:3,6,11 127:11 197:15

**auditors** 197:17

**august**  54:24 55:3,4 59:25 160:22 164:2 167:5,9 171:20

172:4 203:5

**authorization** 188:23

**available**  5:10 53:10 61:20 82:22 90:12 93:24 105:5,10 107:17 122:18 129:3 134:17 139:23 150:4 156:2 160:18 163:19 176:24 180:24 185:12 187:25 196:20 205:23

**avenue**  3:6

**average**  193:8 195:7 203:8

**avoid**  208:7,12

**aware**  6:4 8:7 8:13 13:14,16 13:18 59:16 60:3 74:15 79:17,21 80:16 80:19,22,25 81:7 120:24 128:11 133:22 146:10 163:2 173:12,25 174:16 176:4,7 176:13,17 205:15

**awhile**  22:16

**b**

**b**  5:3,3 122:4,4 204:14,14 205:4

**b.brown**  23:6,7

**bachelor's** 15:12,16,17

**back**  11:18 27:25 39:15 66:14,14,23,23 67:14,14 68:13 68:13 71:3 75:19 78:21 86:15 106:24 109:19 114:20 122:6 139:12 139:14 149:13 154:15,15 158:2 160:7 161:23 169:22 184:24 187:14 190:12 202:15 203:13 207:22 209:5 210:6,21

**background** 15:5

**bad**  55:19

**baker**  3:12 9:6

**balance**  142:2 171:8 189:11

**balances** 198:18

**bank**  200:18

**bar**  57:8

**[base - best]**                                                        Page 7

**base** 44:23
**based** 19:23
  39:24 40:3
  73:10 76:4
  77:2 86:23
  87:10 112:12
  113:7 114:22
  128:12 133:6
  154:19 191:13
  194:4
**basically** 13:17
  53:24 152:23
  190:10
**basis** 48:17
  65:3 66:17
  71:17 86:25
  114:13
**bates** 61:13,19
  82:16,21 84:25
  85:5 90:5,10
  93:7,23,25
  104:23 105:4,6
  107:11,16
  108:18 110:16
  122:11,17
  123:13,21
  128:21,23
  130:5 134:11
  134:13 138:7
  139:21,24
  141:13 155:24
  156:9 160:12
  160:14 161:9
  163:13,18
  164:10 165:19

166:14,20
167:20 176:18
176:23 179:17
180:18,23
185:6,11 186:4
187:19,21
189:4 196:10
196:15,19
198:5 205:16
205:21 213:9
213:11,13,15
213:17,19,21
213:23 214:2,4
214:8,10,12,14
214:16,18,20
214:22,24
215:2
**bb** 129:14,22
  129:23 131:14
**bcc'ing** 206:5
**bear** 53:6,19,25
  67:4 82:13
  122:22 123:14
  129:6 132:25
  151:2
**bearing** 61:19
  82:21 90:10
  93:23 105:4
  107:16 122:17
  128:21 134:11
  139:21 155:24
  160:12 163:18
  166:14 176:23
  180:23 185:11
  187:19 196:15

196:19 205:21
**becoming**
  114:14,15
**began** 41:23
  60:5
**beginning** 19:4
  29:14 55:2
  64:10 67:25
  70:22 99:20
  115:11 174:17
**begins** 39:17
  78:23 122:8
  160:8 187:16
  210:8
**behalf** 1:5
**believe** 13:7
  18:23 20:11
  21:9 26:5 30:5
  34:25 35:22
  49:11,16 55:2
  58:8,12,18,25
  59:3,7 61:17
  62:17 67:8,13
  76:16,22 79:15
  80:7,12 83:17
  94:20 101:20
  102:7,21
  103:11 105:21
  108:16 120:4
  129:18 135:13
  138:8 140:20
  156:24 161:6
  162:11 164:8
  166:3 177:17
  179:21 181:11

181:18 185:23
188:19 189:14
189:22 190:5
191:7 197:25
204:9 206:13
206:21
**believed** 202:11
**benson** 13:16
  21:22 22:7
  24:12 27:22
  34:11 35:21
  37:15 38:9
  81:23 82:24
  83:10,18 84:6
  90:22 94:11
  105:13 108:7
  115:22 123:3
  124:3 129:11
  134:23 135:6
  136:2,7 139:4
  140:9,23
  156:16 160:23
  164:14,17
  166:10 167:4
  167:10,13
  177:9 178:5
  181:6 184:24
  185:18 186:7
  188:6 194:25
  206:6
**benson's** 34:12
  138:23 177:19
  181:14
**best** 28:3 106:6
  106:11,16

**[best - brown]**

117:10 158:7
200:20,21
**better** 102:14
**bigger** 147:7
152:11
**biggest** 21:13
77:7 79:2
153:3,8
**billion** 174:19
**bit** 5:12 15:4
27:17 157:14
**blank** 53:24
**block** 203:24
**blood** 212:18
**blue** 130:23
138:14,15
**board** 21:14
23:22,23 24:3
24:4 31:5,7,11
31:13,15 32:4
32:8,9,12 33:2
33:5,16,16,19
95:2,4,10,12,15
95:18,23 96:6
109:5 116:14
116:22 119:8
119:10,14,16
119:19,21,23
120:4,7,20
124:9 125:17
125:23 126:23
126:24 127:6
127:10,12
140:24 141:9
184:14 188:9

197:9,10,15
198:7,8,16
**bod** 197:6
**bohrer** 13:20
13:24 22:4
26:4 164:2
167:5,8 197:6
**bonus** 19:9
**bottom** 85:2
91:9,13,15
93:9 110:18
135:14 138:13
141:19 151:6
151:15 157:16
**brackets** 85:16
**break** 6:24 7:4
39:4,8,9 76:9
78:15 121:10
159:22 187:6
**brian** 1:10,15
2:12 4:8 5:16
82:25 90:22
94:10 105:13
108:5,23 123:2
129:9 134:23
140:12 152:6,8
156:17 160:22
163:25 167:25
170:23 177:10
178:20,25
181:5 182:23
185:18 188:11
189:12 197:5
206:4,25
211:13 212:11

213:4 216:6,20
**briar** 5:19
**bring** 10:9 29:9
73:13 147:24
148:12
**bringing** 59:17
**broad** 36:7
41:18
**brought** 60:8
66:24
**brown** 1:10,15
2:12 4:8 5:9,16
6:1 7:1 8:1 9:1
10:1,23 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1

75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1,25
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1,22
91:1 92:1 93:1
94:1,10 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1,13 106:1
107:1 108:1,5
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1,3 124:1
125:1 126:1
127:1 128:1
129:1,9 130:1
131:1 132:1
133:1 134:1,23
135:1 136:1
137:1 138:1
139:1 140:1,12
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1,3

151:1 152:1,6
153:1 154:1
155:1 156:1,18
157:1 158:1
159:1 160:1,22
161:1 162:1
163:1,25 164:1
165:1 166:1
167:1,25 168:1
169:1 170:1,24
171:1 172:1
173:1 174:1
175:1 176:1
177:1,10 178:1
179:1 180:1
181:1,5 182:1
183:1 184:1
185:1,18 186:1
187:1 188:1,11
189:1,12 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1,5 198:1
198:16 199:1
200:1 201:1
202:1 203:1
204:1 205:1
206:1,4 207:1
207:2 208:1
209:1 210:1
211:1,13 212:1
212:11 213:1,4
214:1 215:1
216:1,6,20

**browser** 170:7
**bubble** 85:15
85:23 86:12
130:23 131:5
138:14 162:17
**bubbles** 130:22
**built** 22:19
**bullet** 97:25
98:25 99:6
100:25 101:2
101:17 102:11
102:12 103:25
109:10 110:24
112:9,10,13,22
112:22,24
113:2,21 114:6
115:25
**bullish** 177:25
**business** 28:12
141:24 183:19
184:2,6,8
**buy** 135:20
190:11 193:19
193:19,21
202:14
**buyback**
177:13 183:18
184:2,17,20
188:14 190:10
198:22 199:14
**buying** 196:3

**c**

**c** 3:2 212:2,2
**call** 9:19 13:2
28:10 34:4

36:14 37:3,9
38:24 43:5
47:18,21 48:9
57:10,18 81:22
83:3,12 84:20
92:8,11,13,16
92:17,19,21,24
93:2,17,20
94:24 95:6,25
96:10 99:22
100:5 101:15
104:16 107:23
108:10 123:6
125:13,15
129:14 133:4,9
133:13 134:3
136:14,19,22
137:6 146:23
147:5,16
150:18,25
155:3 156:19
157:22 158:8
159:14 165:15
167:6,11,16,18
169:10 171:17
171:21 172:4,9
206:8,17
209:10 210:21
**called** 5:3 28:8
57:14 85:4
**calling** 164:18
**calls** 21:3,14
22:23,23 28:14
34:3,8,18 35:3
35:5,7,14,18,23

35:25 36:10,12
36:13,18 37:13
38:16,20,21,22
42:16,24 81:25
82:4 84:16,21
86:24 93:3
182:7 208:5,21
**cameron** 27:3
80:14,14
**cancelled** 80:23
**capital** 1:5 4:9
156:20 157:7
179:24 184:21
189:16,25
216:3
**case** 1:7 4:13
7:25 9:12 12:9
13:23,24 64:18
100:21 143:2
150:8 207:6
216:3
**cash** 189:11
198:18 200:18
**category** 41:5
**cathi** 1:23 2:14
4:16 212:7,25
**caught** 23:17
**caused** 115:4
144:6
**causing** 97:23
143:20
**caution** 86:6
168:13
**cc'd** 100:3

**center** 3:14
**certain** 49:12
  57:12 75:11
  98:23 194:5
**certainly** 11:22
  65:25 112:11
  139:12 143:9
  143:24 172:15
  176:15 195:9
**certainty** 111:7
**certified** 2:15
  4:15 212:8
**certify** 212:10
  212:16
**cetera** 95:20
  97:13
**cfo** 17:2,8,19
  20:18,22 21:20
  21:21 24:13
  25:2 27:21
  29:24 59:21
  83:2,3 90:25
  108:11 129:14
  152:6 179:8
**chain** 90:20
  105:11 122:25
  129:8 134:22
  156:15 160:20
  163:24 164:18
  167:3,8 177:8
  196:24 206:3
**chair** 33:4
**challenges** 86:2
**challenging**
  162:2

**chance** 118:9
  185:4
**chang** 3:10
**change** 19:14
  153:6
**changed** 17:17
  19:11 21:8
**changes** 133:14
  133:15
**charge** 79:13
  80:10
**charged** 7:21
**chart** 57:8,9,10
  59:13 66:21
  67:5
**chat** 95:3
**chen** 151:17,19
**chief** 161:24
  189:12
**chris** 3:22
**christopher**
  4:14
**cite** 131:7
  169:15
**cited** 139:6
  171:16
**citing** 97:22
  99:4
**city** 1:16 16:14
**civic** 3:14
**civil** 8:2
**claims** 174:20
**clarify** 7:10
  75:4 182:11

**class** 104:4
**classify** 64:7
**clean** 6:14
**clear** 74:22
  75:3 155:22
  157:15
**clearly** 13:14
  27:16,20 33:18
  45:17 132:14
**clerk** 20:12,14
**click** 61:22
**close** 36:23
  50:23 62:17
  64:5 67:10
  71:22 103:23
**closely** 21:23
**clvs** 1:23
  212:25
**codx** 61:14,19
  82:17,22 85:3
  90:6,11 91:2
  107:12,17
  108:9 111:2
  122:12,17
  128:22,24
  134:12,14
  135:3 139:22
  139:25 160:13
  160:15,25
  163:14,19
  166:15,21
  176:19,24
  177:12 180:19
  180:24 185:7
  185:12 187:20

  187:22 188:14
  196:11,16,20
  205:17,22
  213:10,12,14
  213:20,22,24
  214:3,5,11,13
  214:15,17,19
  214:21,23,25
  215:3
**college** 15:6,8,9
  15:10
**columbus** 3:16
**columns** 55:15
**combination**
  204:5
**come** 17:7 54:2
  61:6,7 72:2
  76:17,24 77:9
  77:14 103:23
  116:24 117:2,5
  144:24 155:2,8
**comes** 85:8
**comfortable**
  88:5 97:15
  118:13 132:15
  132:17 196:2
**coming** 40:20
  66:10 98:5,10
  147:10 152:15
  154:3
**comment** 85:15
  85:23 86:12
  130:21,22
  131:5,14,15,17
  133:6,19

138:14 162:16
**commented**
  139:4
**comments**
  129:20,23
  131:20 136:12
  162:9 208:17
**commission**
  216:25
**commitment**
  189:9
**committed**  80:3
  81:4
**committee**
  28:22,24 29:3
  29:8,12,15,18
  30:20 32:2,12
  32:15,24 33:4
  33:6,11 127:11
  197:15
**committees**
  23:23 31:23
  32:3,5,8 33:16
  120:8 197:10
**common**
  198:20
**communicate**
  7:17 22:10
  31:10,14,18
  33:22 81:20
  193:25
**communicated**
  204:13
**communication**
  14:17,24 22:14

82:10 106:14
155:10 205:3
**communicati...**
  34:17
**companies**  29:2
  29:5,9 30:7
  107:7 109:12
**company**  17:5
  20:5,25 21:18
  22:8,22 26:14
  27:16 28:10,20
  32:19 34:6,13
  34:23 38:2,3
  40:14,17,20
  41:7,23 42:9
  42:23 43:4
  44:5 46:22
  49:12 51:16
  59:17,22 60:5
  60:8 66:24
  68:10,12 72:10
  72:18 73:4,13
  89:5,8 97:23
  100:6 104:12
  125:3 127:17
  128:14 151:22
  152:6 153:14
  154:6,14,16
  161:21 162:24
  179:8 184:12
  184:13 189:24
  190:14,21,24
  191:21 192:12
  192:15,20
  193:7 194:9,10

194:17,18
195:6,13,20
196:5 198:14
198:17 199:6
200:21 203:6
205:12
**company's**
  33:10 35:9
  40:23 45:14,24
  47:3,11 51:23
  62:6,19 63:5
  70:4,11,19
  73:10 78:5,25
  81:9 88:20
  172:12,18
  188:23 189:19
  189:23 190:20
  198:20 199:4
  202:18 203:2
**comparable**
  45:3
**compare**
  125:13,25
  126:10,12
  127:7 169:19
**compared**
  207:10
**compensation**
  18:19,21 19:2
  19:11
**complaint**
  150:13
**complete**  29:15
  147:18

**completely**
  97:22 109:2
**component**
  19:9
**components**
  18:25
**conceptions**
  30:4
**concern**  97:3
  98:9,12,17
  113:5
**concerned**  13:5
  209:13,21
**concerning**
  120:21 193:15
**concerns**  113:3
  113:9
**concludes**
  211:8
**concrete**  17:3,4
  17:4
**conduct**  120:6
**conference**
  35:3,4,7
  209:10
**confidence**
  189:10
**confident**
  141:23 155:18
  155:20
**confused**  156:7
  175:22 177:5
  184:7
**confusing**
  201:9

**[connection - covid]**

**connection**
9:11 12:15
37:12 165:10
**conservative**
88:13
**consider** 40:22
43:21 97:10
111:25 117:12
118:23 164:20
178:19 183:17
183:24 184:10
184:16
**considerations**
94:13,25
105:16 108:9
129:13 135:2
**considered**
175:14 176:11
**considering**
176:8 198:14
**consistent**
208:19
**consolidated**
150:13
**constraint**
162:21,25
163:6
**construction**
17:3
**consultant**
17:25 24:16
81:10
**consultants**
159:16

**consulting**
17:25 18:5
**contact** 84:11
204:14
**context** 147:18
148:13
**continue** 86:4
168:12
**continued**
24:18 68:20
71:14 116:2
122:14 139:4
142:5 144:12
145:2 162:4
171:10 179:25
189:17
**continues**
130:11 210:8
**continuing**
149:15 171:2
**contract** 18:16
**control** 130:2
**controller**
16:18 25:3
**controls** 183:6
**convert** 99:2
**copied** 159:10
**copy** 119:22
120:4,7
**copying** 90:23
94:10 105:13
108:5 115:23
123:4 124:3
129:10 134:24
140:12 156:17

160:23 164:15
177:10 188:11
**corner** 85:2
158:6
**corporate**
34:17 52:12
**correct** 11:16
15:3 26:9,15
40:6 41:4
42:12 43:15
45:8 56:7,11
59:8 67:21,23
68:3 70:4 72:4
72:7,21 73:22
74:11,18 76:2
77:15 81:10
83:25 86:14
88:9,22 91:12
91:23 93:14,15
96:16 98:20
99:22,23,25
112:15,24
113:11,13
117:8 118:16
119:11 124:21
125:18,19
129:25 130:16
132:21 137:11
141:3 142:12
143:14,21
144:8 153:10
153:11,16,18
154:8,17,20
162:14 166:11
169:11,13,18

181:16 184:21
184:25 186:12
188:10 197:2
200:2,3,10
**counsel** 6:20,21
8:21,22,23
9:18 10:21
13:10 21:22
22:7 24:18
27:22 120:3
121:9 149:8
150:7 182:3,17
182:20 210:17
211:2
**countries**
114:25
**county** 212:5
**couple** 54:9
**course** 16:5
22:3,4 57:19
**court** 1:2 4:11
4:16,24 6:16
149:22
**cover** 53:12,24
99:10 137:3
**coverage** 123:7
**covered** 35:15
124:15,24
**covering**
124:18,20
125:3 151:21
**covers** 208:16
**covid** 16:25
39:19,24 40:4
40:4,9,11,15,18

**[covid - demand]**

66:9 68:7,20 77:3 78:10 88:2 96:25 112:4,10 114:21,24,25 134:5 142:2,11 142:20 143:7 143:10 144:14 145:7,12,23 146:12,18 162:19 164:25 166:2 169:8 171:7 173:15 174:20,21 178:2,7 184:25 207:14

**cpa** 15:24 16:4
**create** 170:3 205:6
**created** 205:9 205:12
**credibility** 102:16
**crime** 7:22
**crockett** 27:4
**crossed** 162:5
**crr** 1:23 212:25
**current** 5:17 46:8 130:14,17 189:14 198:19 206:6,16,18
**currently** 179:22 201:5 210:16

**customer** 41:5 46:19 55:14 146:25 152:2
**customers** 40:24 79:2 80:8
**cutting** 17:4,4
**cv** 1:7 4:13

**d**

**d** 213:2
**daily** 57:20 165:2 180:5,14 186:10
**dan** 13:20,24 22:4 26:3 164:2 167:4,8 197:5
**danny** 27:4
**dashboard** 57:14 62:3
**data** 45:25 54:25 60:25 74:23,24 75:5 75:5,6,16,16 76:5 77:20 190:17 203:12
**date** 4:3 8:9,15 17:13 42:22,25 43:3,8 45:25 70:4 86:23 87:3 93:20 118:18 120:9 127:13 132:24 155:9 201:14 216:5

**dated** 82:24 86:17 105:15 105:24 124:2 140:9 181:6 185:19 188:6 206:4
**dates** 87:10,11
**day** 6:12 95:6 100:4 125:18 133:15,16 194:5 202:21 211:16 212:22 216:23
**days** 8:25 44:2 44:11,12,12 133:4 136:8
**dealing** 84:3 88:2 169:7
**dealt** 84:4
**december** 71:9 71:10 115:9,16
**decide** 200:19
**decided** 195:20 196:6
**decision** 38:7 112:12 113:10 132:20 183:19 184:2,6,8,10
**decisions** 193:14
**declaration** 149:16 150:10 214:6
**decline** 146:24 152:2 153:20

153:25 178:2,6 184:25
**decrease** 207:12
**decreased** 142:3,18,21 143:6,18 144:7 171:9 207:9
**defendant** 8:2 13:15
**defendant's** 150:12
**defendants** 1:10 3:13 54:25 120:5 210:14,17
**defer** 108:24
**define** 184:6
**defined** 114:15 114:16
**definitely** 85:8
**definition** 184:5
**definitively** 186:24
**degree** 15:12 15:14,16 16:12
**delete** 14:13,24
**demand** 57:20 81:14 82:7 85:25 147:8 148:7,23 152:12,19 153:6 162:19 163:4,7,10

207:15,17
**demonstrates**
  179:25 189:18
**dennis** 20:8
**department**
  27:7 52:3
**depended**
  195:22,24
**depending**
  33:17
**depends** 52:8
**deposed** 8:13
  13:18,23
**deposition** 1:14
  2:11 4:7 6:20
  8:4,8,18 9:18
  10:10,13,25
  12:2,9 40:8
  149:22 210:13
  212:12,13
  216:5
**depository** 51:8
**describe** 12:23
  16:9 27:14
  44:15 115:7
  193:23
**described**
  150:16
**description**
  213:8
**designed** 95:17
**despite** 104:7
  161:21 178:2
**detail** 130:9

**details** 12:21
  12:21 56:2,9
**detect** 40:4
**detection** 39:20
  151:25
**determination**
  113:7
**determine**
  44:16,25 45:4
  144:22
**determining**
  42:6 45:15
  46:2 56:6 57:2
  70:2 117:7
  133:7
**develop** 30:9
**developing**
  111:18,23
  112:7
**developments**
  36:25
**device** 111:2,6
  111:9,15
  131:19
**diagnostic**
  173:15
**diagnostics** 1:9
  4:10 14:3
  16:11 17:7,11
  17:19,23 18:2
  18:5,16 19:12
  20:4 23:2
  24:20 31:4,24
  33:24 34:9
  35:17,24 40:11

54:17 69:19
  73:18 79:13
  80:10 84:6
  89:23 141:8
  150:17 155:6
  161:24 173:24
  188:9 189:13
  216:4
**diagnostics.c...**
  23:6
**differences**
  75:15
**different** 8:24
  16:17 29:9
  36:16 39:21
  49:20,22 52:24
  53:3 62:14
  75:9 96:14,19
  114:24 118:21
  137:19 191:5
  191:15 194:6
  196:17 202:20
**differently**
  111:4 113:4
**difficult** 144:21
**difficulty** 53:14
  54:7
**diminished**
  142:3 171:9
**diminishing**
  169:16
**directionally**
  101:3
**directly** 25:15
  25:15,22 81:21

**director** 23:24
  25:21 26:6
  34:16
**directors** 23:23
  141:9 184:15
  188:9
**disagree** 11:23
  131:19
**disclosed**
  192:10
**disclosure**
  191:8
**discovery** 11:3
  11:18
**discuss** 13:12
  13:22 36:21,24
  37:2 45:21
  82:2 86:12
  89:18 92:8
  93:17,20 95:2
  95:13,17,22
  96:5 100:13
  101:16 109:5
  123:6 127:3
  131:10 139:18
**discussed** 13:9
  13:11 28:14
  87:2 89:12
  92:21 104:16
  117:20 119:4
  119:13 120:22
  127:10 153:12
  154:5 174:9
**discussing**
  13:21 86:20

**[discussing - drive]**

| | | | |
|---|---|---|---|
| 87:6 117:9,23 | 105:18,19 | 205:16,21 | 71:21 72:11 |
| **discussion** | 107:11,16 | 206:10,11 | 75:21,24 |
| 89:14,17 97:17 | 108:12,14 | 207:23 213:9 | 117:14 118:6 |
| 104:19 109:4 | 122:11,17 | 213:11,13,15 | 118:25 153:16 |
| 130:14,15 | 123:9,10,16,19 | 213:17,19,21 | 154:8,17,22 |
| 137:4 149:25 | 123:20 128:21 | 213:23 214:2,4 | 172:25 173:7 |
| 165:14 208:6 | 128:23 129:16 | 214:8,10,12,14 | 200:18 203:7 |
| 208:12 | 129:17,21,22 | 214:16,18,20 | 207:10 |
| **discussions** | 129:25 133:17 | 214:22,24 | **dominated** |
| 45:18 194:9 | 134:11,13 | 215:2 | 180:4,14 |
| 195:3 210:16 | 135:7,11,12,18 | **documentation** | 186:10 |
| **dismiss** 150:12 | 136:11 139:11 | 195:11 | **doubt** 60:19 |
| **display** 78:3 | 139:21,24 | **documents** | 69:11 173:6 |
| **displayed** 78:5 | 140:18,19 | 9:25 10:4,8,9 | **douglas** 149:17 |
| **dispose** 14:13 | 149:21,24 | 11:10 12:7,8 | 150:11 214:6 |
| **disruption** | 150:6 155:24 | 12:15 14:12,13 | **download** |
| 165:2 | 156:9,22,23 | 14:14,20 21:5 | 53:16 54:12 |
| **distributors** | 160:12,14 | 21:12,14 47:10 | 170:11 |
| 40:23 41:3 | 161:4,5 163:13 | 51:11,13,17,21 | **dr** 177:13 |
| 79:10 | 163:18,23 | 52:10,13 53:2 | **draft** 83:19 |
| **district** 1:2,3 | 164:5,6,10 | 84:15 167:14 | 84:19 85:24 |
| 4:11,12 | 165:19 166:14 | 191:17 196:15 | 89:5,12,15,20 |
| **division** 24:21 | 166:20 167:15 | 210:15,19,23 | 91:11,22 92:3 |
| 26:15,18,21 | 167:20 170:11 | **doing** 20:14 | 130:14 161:12 |
| **document** | 170:20 176:18 | 42:4 | 161:18 177:12 |
| 47:13 51:7,24 | 176:23 177:14 | **dollar** 66:15 | 181:15,15 |
| 52:5,9 54:15 | 177:16 180:18 | 68:23 119:3 | 186:16 206:16 |
| 55:5 61:13,18 | 180:23 181:9 | 171:25 172:7 | 209:14,15 |
| 61:24 62:5 | 181:10,19 | 188:24 | **drafted** 11:14 |
| 67:6 82:16,21 | 185:6,11,21,22 | **dollars** 60:14 | **drafting** 131:6 |
| 83:5,14,15 | 186:19 187:19 | 62:9,23 63:10 | 133:13 |
| 90:5,10 91:5,6 | 187:21 188:17 | 63:24 64:25 | **drive** 3:14 |
| 93:22,25 94:15 | 188:18 196:10 | 65:8 66:25 | 143:25 144:3 |
| 94:18,19 | 196:19 197:19 | 68:2,11,14,17 | 179:25 189:17 |
| 104:23 105:4 | 197:23,24 | 69:5 70:13 | |

**[driver - either]**

**driver** 45:17
**drivers** 165:17
**drop** 47:14
 131:8
**dropped** 116:2
**due** 113:24
 142:3 146:6
 171:9 207:12
 209:17
**duly** 5:4 212:13
**durenard** 33:3
 140:11
**dust** 169:6
**dwight** 1:9 22:3
 26:11,13 27:20
 29:19 30:13
 34:10 37:12,15
 38:9 50:8
 57:18 81:24
 134:24 136:2,8
 140:12 146:20
 161:24 165:8
 165:24 177:9
 181:6 185:18
 188:11 194:23
**dx.com.** 23:7
**dynamics**
 162:2

**e**

**e** 3:2,2 14:25
 22:13,17 23:3
 23:9 31:17,20
 82:24 83:9,9
 83:14 86:15,17
 90:20,21,21

91:4,8,25 92:6
94:9,17 99:21
99:21,25
105:11,12,17
105:22,23
106:23 107:18
107:18 108:4,4
108:12,19
110:4,6,9,10,18
115:21,21
116:11,12
118:18 119:6,7
119:9 122:2,2
122:25 123:2,8
124:2,6,8
127:13 129:8,9
129:15 134:22
134:23 135:10
135:15 136:11
140:8,10,13,17
140:23 141:5
156:15,16,21
157:2,3,8,11,15
157:19,25
158:3 159:7,8
159:9,11,14
160:20,21
161:3,14
163:24,25
164:4,13,14,17
165:8 166:11
167:3,4,7,8
177:8,9,14,20
181:4,5,8,14,20
184:23 185:17

185:20 188:5
188:16 196:24
196:25 197:4
197:13,22
206:3,4,9,19
207:23,25
212:2,2 213:2
**earlier** 34:25
 49:11 81:8
 117:22 139:3
 153:12 154:5
 162:12 204:10
**earliest** 157:14
**early** 5:12 22:2
 66:13,22 81:12
 82:6 124:9
 173:12
**earnings** 13:2
 21:3 34:3 35:9
 36:13,18 37:6
 37:9,12 38:16
 38:22,24 42:16
 42:24 43:5
 57:18 82:4
 83:3,12 84:21
 91:2,12,22
 92:3 93:2
 95:16 96:10
 108:10,10
 116:16 125:15
 129:14 133:9
 133:13 134:3
 135:3,25 137:6
 137:15 140:24
 146:23 150:18

150:24 157:13
158:5,8 161:2
161:13 167:6
167:11,16,18
169:10 171:20
172:4 206:7,17
208:20 209:10
**easier** 53:18
**eastern** 4:5
**edits** 135:4,6,7
 138:12,22,23
**education** 16:3
**educational**
 15:5
**edward** 141:7
**effectively** 26:8
 28:9
**egan** 1:9 22:3,8
 26:11,21 27:21
 27:23 29:19,19
 30:13 31:2
 34:11 37:12
 45:18,21 46:15
 50:8 57:18
 81:24 123:4
 124:5 134:24
 136:2,8 140:12
 161:24 165:24
 177:10 181:6
 185:18 188:11
 194:23
**egan's** 198:13
**eight** 42:19
**either** 49:9
 56:25 58:25

80:13 81:12 84:5 89:22 95:15 136:22 170:10 190:14 196:5 197:9

**elm** 140:10

**emerged** 145:22 146:11

**emergence** 139:5 142:5 144:12 145:2,5 171:10

**emery** 20:8

**emphasize** 112:19 155:15

**employed** 173:23

**employment** 18:15

**ended** 72:12,22 75:22 126:11 127:8 172:13

**ends** 211:7

**engaged** 30:8

**engagements** 16:17

**enter** 9:9

**entered** 75:11

**entire** 25:6 208:16

**entirety** 182:12

**entities** 28:25 29:25 30:2

**environment** 86:3,5 134:2,9

168:10,13 169:3

**errata** 216:2

**erwin** 3:18 9:22

**especially** 71:13,16 116:4

**esq** 3:9,10,17 3:18

**estimates** 101:20 102:20 103:11

**et** 4:9,10 95:20 97:13 141:2

**ethics** 16:5

**eugene** 33:2 140:11

**events** 10:5

**everybody** 28:10 34:23

**evidence** 149:2

**evolved** 27:17

**exact** 17:13 19:8 29:16 43:8 63:13

**exactly** 8:15 9:15 14:18 63:8 66:17 69:23 85:7 95:25 109:24 124:23 136:19 144:10 147:25 148:3,14 169:5 172:11 175:18 180:17 192:24

**exam** 16:4

**examination** 5:7 122:14 213:3

**examined** 5:5

**example** 55:14 71:4 194:24

**excel** 47:13,23 53:22 61:6,8

**except** 32:9 154:22

**excerpt** 150:6 150:14

**exchange** 204:2 204:4

**excluding** 112:4

**executive** 156:20 157:7 161:25 194:23

**executives** 35:25 184:12 184:13

**exhibit** 53:6,9 53:12,15 61:4 61:11,13,17,18 61:20 82:13,16 82:21,23 90:4 90:5,9,14,16 93:22,25 94:5 104:22,23 105:4,7 107:10 107:11,15,18 122:10,11,16 122:19 128:21

128:23 129:4 134:11,13,18 139:20,24 140:3 149:16 149:20,21,23 150:3,4,15,22 151:5 155:24 156:9 160:11 160:14,19 163:12,13,18 163:20 166:14 166:17,20 169:23 170:4,9 170:13,14 176:18,22,25 177:4 180:18 180:22 185:6 185:10,13 186:8 187:18 187:21 188:2 196:10,15,18 196:21 203:14 205:16,21 213:8,9,11,13 213:15,17,19 213:21,23 214:2,4,6,8,10 214:12,14,16 214:18,20,22 214:24 215:2

**exhibits** 53:10 119:11 139:3 150:14 169:25 213:7

**exists** 13:11,22
**expect** 73:21
  91:21
**expectation**
  89:13 127:8
  158:24 175:9
  175:11
**expectations**
  126:5,16 127:4
  127:17 155:4
**expected** 47:11
  78:2 126:2
  162:3
**expecting**
  103:5,14
  127:22 131:18
  155:2,8 158:20
**experience**
  16:10 68:20
**experienced**
  68:10,13,19
  85:24 153:14
  154:15 207:15
**experiencing**
  161:22
**expert** 106:13
**expired** 175:4,7
  176:6
**expires** 216:25
**explain** 14:9
  20:18 21:10
  24:19 183:4
**exploring**
  96:21

**extent** 11:2
  120:15 126:15
  182:21 210:19
**external** 47:16
  123:6
**externally**
  87:25
**eye** 49:17

**f**

**f** 122:2 212:2
**facing** 21:5
**fact** 11:13
  137:20 201:23
**factor** 139:6
  142:24 144:14
  145:6 146:15
  164:20
**factors** 133:25
  142:10,11
  143:14,19
  144:6 165:9
  166:10 169:16
  171:17,20,23
**fair** 14:23
  65:12 92:15
  115:7 183:3
  190:12 191:7
  191:11 192:19
**fall** 11:15 12:3
  64:10
**fallen** 81:15
**familiar** 55:11
  55:20 56:22
  61:25 62:15
  83:6 94:16

  147:13
**family** 18:14
**far** 153:2
  161:23
**fatigue** 164:25
**fda** 111:3
**featherstone**
  27:4 29:21
  79:16,25
**february** 17:12
  41:15 64:10,13
  64:23 65:21
  67:18,22,25
  79:24 80:22
  81:2 115:10
  153:13 154:13
**feel** 97:15 111:5
  112:20 113:15
  118:12
**felt** 45:4 88:5
  89:18 102:4
  152:23 153:6
  165:3 193:20
  196:2 198:19
  200:13
**figure** 98:5
  99:8 100:17
  209:2
**file** 39:17 49:6
  53:22 54:5
  61:6 78:23
  122:8 149:15
  160:9 187:16
  191:3 192:18
  193:11 208:14

  210:9 211:7
**filed** 4:11 48:2
  208:18
**files** 54:12 61:8
  195:16
**filing** 32:22
  75:17 173:10
  208:15 209:4
**filings** 18:7
**final** 49:5
  140:24 167:6
  188:15,22
  197:14
**finalized**
  135:18
**finance** 13:19
  16:22 20:24
  21:25 22:5
  24:20 25:2,20
  26:2
**financial** 21:2
  31:11,19 47:9
  95:19 125:23
  189:13 198:17
**find** 119:25
**fine** 11:11
  44:13 107:25
  107:25 139:17
  159:24
**finish** 6:12 7:2
**finishing** 16:12
  32:20
**firm** 9:6 36:21
  37:16,17 38:3
  157:5,12 158:4

**[firm - four]**

194:2
**first** 8:7,12
  10:17 17:16
  24:13 42:23
  43:4 60:6 62:8
  62:21 69:18
  70:10 84:19
  85:25 89:15,20
  91:11,15,22
  92:3 97:19,20
  97:25 99:6
  102:11 110:24
  112:24 116:17
  121:16 135:15
  138:8 141:4,14
  142:18 150:15
  150:16,17,23
  152:8 157:2,9
  167:15 169:10
  179:15 186:2
  189:3 198:3
  207:7,18,23
  209:17
**fiscal** 86:8
**fit** 37:9
**five** 8:24 16:20
  39:8 42:17
  43:14,18 44:10
  44:10 63:10,12
  63:24 70:12
  71:22 72:11,21
  75:20 117:14
  118:2,8 172:22
**fix** 85:3

**floor** 3:7
**flow** 189:11
**fluctuate**
  195:24
**fluctuated**
  114:21,22
**fluctuating**
  113:23 114:9
**fluctuation**
  153:7
**fluctuations**
  112:16 113:24
  114:13,15,16
  114:18 115:8
**focus** 54:10
  112:6 208:7
**focused** 13:8
**folder** 53:11
  61:21 150:4
**follow** 34:3
  47:2 99:22
  158:7 201:11
**followed** 14:21
  146:12
**following** 16:23
  46:3,6 94:23
  110:10,23
  111:3 149:22
  153:13 155:3
  198:13
**follows** 5:6
  122:5
**forecast** 47:3,7
  47:18 48:9
  141:25 143:23

147:6,10
152:10,14
169:17 171:7
**forecasting**
  47:10
**forecasts** 47:3
**forgot** 49:21
**form** 6:21
  28:16 36:2
  42:13 43:6,16
  44:8,18 45:9
  46:4 47:22
  48:12 51:18,25
  55:16 56:18
  58:19 59:9
  60:22 62:24
  64:12 65:23
  68:4,15 69:13
  70:5,25 72:5
  72:24 73:7,23
  76:3 77:16
  78:7 79:20
  80:18 81:16
  84:8 87:8
  88:14,23 89:10
  92:22 103:6,15
  109:20 112:25
  113:12 115:13
  120:23 125:21
  126:7 129:25
  132:22 133:11
  133:23 136:24
  137:12 139:8
  143:15 145:8
  145:24 147:12

147:22 148:9
153:21 154:9
154:18 158:21
159:18 169:12
173:2,17 174:7
174:23 175:16
176:12 178:13
179:9 183:20
184:3 185:2
192:2,22
193:17 194:12
199:8 200:15
201:3,7,22
202:8 208:24
209:19
**formally**
  194:13
**former** 21:21
  27:21
**forth** 212:12
**forthcoming**
  120:14
**forward** 14:21
  37:4,8 45:7,11
  126:6,17
  142:12 143:24
  144:15 155:19
  168:22,25
  169:18
**forwarding**
  83:19
**found** 13:2
**four** 9:5 10:6
  16:15,20 42:16
  43:14,25 65:4

**[four - government]** Page 20

66:15,24 67:15
67:20,25 68:11
68:14,16 96:14
96:19 100:9,14
101:12 104:17
117:21 153:16
154:7,17
**fourth** 103:20
207:17 208:22
**fox** 3:4
**frame** 87:5
110:23 113:10
174:4 190:8
**franklincovey**
16:19
**frequency**
50:22
**front** 102:15
**full** 5:14 207:7
208:8,15,21
209:4
**function** 32:19
34:15,16 53:16
**functions** 20:25
**funding** 164:23
166:6 173:13
174:10,11
175:3,7 176:4
**further** 80:3
81:4 139:19
210:10 212:16
**future** 47:11
168:21 177:25
180:2 189:19

**fw** 135:2
**fwd** 82:25
**fy** 209:9

**g**

**g** 3:18
**general** 12:22
12:23 19:25
20:20,23 26:20
59:20 95:14
190:7
**generally** 10:16
13:7 16:9
22:12,15,16
28:18 31:9,16
32:18 34:7
36:9,19 38:14
42:15 45:20
49:2,4 50:22
52:7 69:21
84:22 87:4
125:8 145:21
147:20 178:11
193:23,25
195:2 209:3
**generating**
54:5
**generation**
189:12
**genevieve** 3:18
9:22
**gentleman**
17:24
**gents** 135:17
**geographic**
113:25

**getting** 16:3
34:24 39:2,5
179:11
**gilmartin** 37:25
**give** 6:8 106:24
107:21 117:8
133:8 174:4
**given** 89:7
133:21 152:24
194:11 195:25
198:19 206:18
212:14
**gives** 106:21
**giving** 97:15
116:14,23
119:8
**glad** 49:25
**gleaned** 208:22
**go** 4:19 5:21
11:17 67:3
104:19 116:11
118:4 121:15
130:8 135:18
136:6,13,20
137:9,21
139:11,12,14
149:4 151:10
169:22 170:8
183:2,7 186:18
188:4 209:22
**goes** 141:7
**going** 4:3 28:12
28:19 36:25
39:6,12 45:23
46:16 50:24

53:5 73:13
75:19 76:7
78:18 84:24
86:15 87:25
90:3,9 91:15
95:22 104:21
107:6,15 110:7
117:7 120:13
121:19 123:15
126:5,16 133:3
133:8,9 134:10
139:20 142:12
142:24 143:25
144:15,20,22
144:24 149:9
155:19,23
160:2 166:13
168:24 169:7
169:18 176:22
180:22 185:10
187:11,17,18
195:9 196:18
210:2 211:6
**good** 4:2 5:9
78:15 106:23
116:15,24
117:2,4 121:10
159:22 160:6
181:21 182:5
187:5 193:21
200:22 202:12
**government**
166:5 173:13
174:11

**grant** 19:3
**graph** 57:9
**great** 74:3
**greater** 77:18
**greatly** 113:24
  114:9
**greene** 149:17
  150:11 214:7
**ground** 5:22
**group** 27:24
  28:4,7 30:15
  37:15
**groups** 41:2
**grove** 140:10
  141:5
**growth** 179:25
  189:17
**guess** 21:17
  24:8 36:8
  46:25 72:9,21
  75:3,4,18
  157:13 170:9
  170:22
**guessed** 185:15
**guest** 170:9
**guidance** 13:7
  37:6 41:24
  42:6,10 44:5
  44:16 45:7,10
  45:16 46:2,10
  51:2 56:6 57:2
  70:2 83:3 86:7
  86:21 87:7,16
  88:3,4,8,11,12
  89:7,14,18,19

93:12,18,20
94:13 95:2,13
95:17,22 96:5
96:9,15,18,19
96:22 97:2,5,9
97:21 98:9,13
98:13,15,16,17
98:20,24 99:3
99:3 101:4,16
101:19 102:3
103:4,13
105:16 108:8
109:2 110:13
112:2,11,20
113:6,11,17,18
116:15,23
117:4,13,16
118:14,24
119:9 128:12
129:13 130:15
131:8,23 132:5
132:13,21
133:9,21 135:2
139:7 155:17
155:20,21
168:15,19,24
175:15,20
176:9,16
**guide** 68:18
  103:21
**guiding** 88:12
  98:4 99:7
  100:17 104:6
**gundry** 27:3
  80:15 81:3

**guys** 116:17

**h**

**h** 1:9
**h.c.** 124:19
  127:16 151:17
  151:21
**hahn** 3:10
**half** 9:5 69:5
  70:21 73:15
  100:10,15
  101:12 104:17
  104:18 148:15
  161:23
**halfway** 42:10
  42:20 44:6
  165:22 170:24
  193:4
**hand** 85:2 99:8
  99:16 100:18
  212:22
**handle** 135:19
**handling** 79:13
**hanlon** 3:22
  4:14
**happen** 97:18
  136:10 202:2
**happened** 8:16
  46:12 71:11
  92:24
**happening**
  113:15 114:17
**happens** 183:9
**happy** 53:17
  54:6 60:18
  70:16 95:2

173:10 192:7
**hard** 23:19
  148:13
**head** 6:17 19:6
  23:17 26:20
  38:13 48:7,22
  57:24 65:17
  119:25 144:21
  158:15 172:23
  179:12 190:18
**headlines** 180:5
  180:14 186:10
**health** 174:17
  175:24 176:4
**hear** 6:16
**heard** 174:10
  174:13 177:5
**held** 17:18
  35:13 150:18
**help** 10:4 28:25
  29:8 30:9
  34:17 106:14
**helped** 84:14
  113:15
**helpful** 6:14
  147:14,16
**helping** 29:4
**helps** 63:2
  179:24 189:17
  197:13,18
**hereinbefore**
  212:12
**hereunto**
  212:21

**herriman** 5:20
**hi** 108:23
**hierarchy** 26:18
**high** 18:12 104:6 115:8 128:18
**higher** 74:16 144:2
**highlighted** 93:13 106:4
**hills** 124:22,24
**hired** 18:18 25:5 26:6 106:13
**historical** 45:15 47:14,25 73:11
**historically** 78:6
**history** 77:2,10 114:20 118:4
**hit** 77:4 98:13 98:17 144:18 145:12,18
**hold** 14:7,9 36:14 196:16 196:17
**holding** 33:15
**holds** 75:5
**home** 5:17
**hope** 103:22 119:12
**hopefully** 61:7 191:20

**hostetler** 3:12 9:6
**hotmail.com** 140:10
**hour** 76:8
**hours** 9:5
**house** 21:21 22:7 24:12,17 27:22
**houston** 84:11 84:12 90:23 94:10,23 95:5 95:21 96:3 97:21 99:2,15 100:5,16 101:2 101:9,18 103:21 104:11 107:19 108:5 108:19,23 115:23 123:4 124:4 129:10 131:3 138:19 156:17 160:23 164:16 206:5 208:2
**houston's** 106:22
**hr** 22:5 25:21 26:4,8 175:23
**hudson** 156:19 157:7
**hudsonexecu...** 157:18
**hum** 54:22

**hundred** 200:17

## i

**idaho** 30:5
**idea** 165:9,13 165:16 175:5 175:12
**identification** 61:15 82:18 90:7 94:3 104:25 107:13 122:13 128:25 134:15 140:2 149:18 156:11 160:16 163:15 166:22 176:20 180:20 185:8 187:23 196:12 205:18
**identified** 41:2
**identify** 66:22 66:23 77:23,25 165:17
**ike** 22:3 26:12 26:13 30:23 131:21 132:3 132:11,15 143:22 144:10 164:21 165:8
**ike's** 132:17 165:13
**impact** 77:5 102:14,22 111:2,18 134:8 143:25 145:16

145:19 163:7
**impacted** 111:8 111:14 163:10
**impactful** 145:13
**impacting** 143:3
**implementing** 198:15
**implying** 177:22
**important** 28:15 139:15 177:23
**impression** 96:4
**inability** 112:17
**include** 81:23 203:23
**included** 109:3
**includes** 130:15 150:15 209:4
**including** 93:12 162:3 174:21
**incorporated** 4:10
**incorporation** 52:14
**increase** 145:23 146:5,18 164:25 173:15
**increased** 19:15 161:22 207:17

**independent** 33:5
**indicate** 129:23 137:21
**indicated** 70:23 83:15 91:6 94:19 105:19 108:13 123:10 129:17 135:12 140:19 156:23 161:5 164:6 177:15 181:10 185:22 188:18 197:24 198:14 201:13 206:11 209:15
**indicates** 135:6 145:7
**indicating** 143:18 199:4
**indication** 89:8
**indirectly** 25:16
**individual** 84:13
**individually** 37:14 136:12
**individuals** 25:22 33:22
**industry** 165:4
**infection** 142:11 143:8 143:10 144:15 145:7

**infer** 165:12
**inflationary** 162:4
**influences** 114:23
**influx** 57:20
**informal** 194:14
**information** 31:11,19 50:20 55:8,13,23 56:5,11,17,20 56:21 57:3 58:9 60:17 62:11,13 64:3 64:5 97:7 106:21 109:14 118:12,22 128:15 182:8 193:12 208:21
**initially** 21:23
**initials** 85:20 129:24 130:23 138:16 162:11
**initiate** 183:18 183:25 184:17 184:19 195:3
**initiatives** 173:14
**insight** 162:18
**insightful** 116:3
**instance** 88:17
**instruct** 182:9 182:23 194:4

**instruction** 194:8
**instructions** 14:22
**instructs** 6:21
**insurance** 16:15
**intelligent** 79:6 79:17 80:2
**intended** 204:3
**interested** 212:19
**internal** 151:5 151:10 170:18 194:8
**internally** 39:22
**interpretation** 87:20,22
**introduce** 53:5 61:3 82:13,20 90:3,9 93:22 104:21 105:3 107:9,15 122:10 128:20 134:10 139:20 155:12,23 160:11 163:11 163:17 166:13 176:22 180:22 185:10 187:18 196:14,18 205:20
**introduced** 169:23

**introducing** 53:8 61:18 122:16
**investor** 34:15 35:2,7,13 36:20 81:9 82:2 106:12
**investors** 99:8 99:16 100:18 106:19,20
**involves** 184:20
**ir** 34:15 37:16 37:17 159:16
**irish** 1:23 2:14 4:17,25 212:7 212:25
**issuance** 136:9
**issue** 61:11 147:7,8 148:7 148:23 152:11 152:12,19
**issued** 140:25
**issues** 164:19
**item** 113:7 174:9
**iterations** 186:18

**j**

**james** 140:11
**january** 64:20 66:2 77:8,19 79:19 80:17,24 115:9,17 153:9 153:13 154:23 209:18

**jason**  3:9 74:21
  76:8 107:23,25
  201:23
**jim**  33:9
**job**  17:2 97:6
  155:5
**join**  17:23
**joined**  17:11,15
  18:16,22 19:12
  20:10,11 21:18
  41:7
**joining**  16:10
  20:4
**joseph**  27:3
  29:21 79:15
**july**  156:18
  157:3,15 158:3
  195:12 203:2
**juncture**  97:8
**june**  195:5
  203:2

**k**

**k**  37:5,7 208:15
  208:18 209:4
**kaplan**  3:4
**keep**  23:22
  28:11 33:11
  39:5 46:23
  49:13,17
  101:19
**kept**  14:20
**kevin**  3:23 22:6
  22:9 24:17
  119:25 181:21
  181:25 182:2,5

  182:13,22,25
  183:13 188:12
  194:24 196:25
**key**  45:17
**kilsheimer**  3:4
**kind**  14:11 18:4
  34:4 36:24
  37:2 47:10
  59:20 101:16
  182:25
**kirk**  29:20
**know**  5:11 6:25
  7:9 9:2 10:7
  11:24 12:18,21
  13:4 18:4,8,11
  19:24 20:3,7
  20:16 21:4
  22:21 23:25
  24:9 26:17,20
  26:21,24 27:6
  27:8,10,13
  32:14 34:7,22
  35:16,19,20,20
  36:11,15 38:6
  39:3,22 40:21
  41:11,13 42:14
  48:6 50:3,8,10
  50:11,14,15,21
  51:4,9,19
  52:12,15 55:10
  55:19,20 56:2
  56:12,13,19
  57:25 58:3,4
  58:11,15 59:4
  59:6,11,11,13

  60:7,23 61:2
  62:25 63:15
  64:7,8,17 65:4
  67:2 69:14
  75:10 77:3,9
  77:20 79:6
  80:5,7 86:24
  87:3,24 88:15
  89:23 96:16
  97:9 102:6,9
  102:19,23,24
  103:18 104:18
  109:13,15,21
  109:23 110:3
  110:11,14
  111:17 116:25
  117:15 118:11
  119:18,22,24
  120:19,20
  121:2 127:24
  127:25 136:18
  138:24 141:5
  142:13,14,17
  144:17,18,23
  145:10,17,17
  145:25 146:3,7
  146:8,14,19
  147:15 151:19
  153:23 155:19
  158:17,22
  159:2 162:24
  163:5,8 165:12
  169:5 172:20
  175:3 178:5,11
  179:11,13

  186:15 190:2
  192:3,20,23
  193:2 195:23
  201:25 204:16
  205:11
**knowing**  8:10
**knowledge**
  83:13 88:25
  91:4 94:17
  105:17 108:11
  123:8 129:15
  135:10 140:17
  156:21 161:3
  164:4 177:13
  181:8 185:20
  188:16 197:22
  206:9
**known**  18:13
**kodiak's**  30:9
**kontiveros**
  140:13 196:25
**kpmg**  16:14
**ks**  32:22

**l**

**l**  1:10 152:6
  170:24 177:13
**lab**  39:24 40:3
**labeled**  61:14
  82:17 90:6
  94:2 104:24
  107:12 122:12
  128:24 134:14
  139:25 156:10
  160:15 163:14
  166:21 176:19

180:19 185:7 187:22 196:11 205:17 213:9 213:11,13,15 213:17,19,21 213:23 214:2,4 214:8,10,12,14 214:16,18,20 214:22,24 215:2

**labs** 40:22 41:3

**lake** 1:16 16:14

**lambert** 37:22 81:9,14,21 82:6 83:24 84:2,18 86:24 89:24 93:17 106:12 119:5

**lambert's** 81:25

**lambert.com** 105:12

**lambert0000...** 93:23 94:2 213:16

**lambert0001...** 155:25 156:10 214:9

**lambert0002...** 104:24 105:5 213:18

**language** 85:22 87:21 99:18 135:21 161:18 162:5 186:22

199:12,17 209:14

**lawsuit** 12:18 13:9,12,22

**lawyer** 104:4

**lawyers** 7:17

**lead** 143:7

**leader** 26:4

**leaders** 27:10 27:12,14

**leadership** 22:8 27:20,24 28:4 28:7

**lean** 22:17 106:4 153:5

**learn** 43:10 63:22 127:21 175:6

**learned** 64:2,4

**leaving** 210:13

**lee** 5:16

**left** 16:18 25:25 118:7

**legal** 4:15 12:21 85:6,9 182:3,16,19,23 183:9,14 185:4

**legit** 157:5,12 158:4

**level** 199:5 207:15

**levels** 66:5 146:12

**license** 15:24 16:2

**licenses** 15:21 15:23

**life** 165:2

**lifesciencela...** 140:14

**likely** 35:21 37:21 99:9,17 100:6,19 109:2

**limitations** 56:14

**limited** 58:10 58:13,18 59:2 59:3,5

**line** 82:25 90:25 94:13 99:25 105:16 123:6 129:12 134:25 138:12 140:14 156:19 160:24 167:6 177:11,21 188:8,12 189:8 197:6 206:6 216:8

**list** 55:13 96:13 124:8

**listed** 97:20 99:24 142:10 188:8 204:22

**litchfield** 124:22,24

**litigation** 8:2 8:14 11:10 12:16 14:7,8,9

**little** 15:4 20:19 36:6 111:3 175:21 184:7

**living** 133:16

**llc** 1:5 4:9 151:17

**llp** 3:4,12

**lmk** 109:4

**loaded** 122:24

**locations** 114:2

**log** 11:7,9 210:18

**logic** 104:6

**logix** 39:19 40:8,9,18,24 41:9 47:5 59:17 60:6 64:10 68:24 81:5,15 82:8 88:21 89:25 111:21 114:9 141:25 146:25 151:25 165:10 166:2 169:17 171:7 207:13

**lombardi** 18:3 18:8,11

**long** 9:3 116:23 117:4 121:13 123:20 141:24

**longer** 180:4,13 186:9

**look** 11:18 44:21,25 45:2 45:14 46:11

50:25 57:3
60:18 66:8,18
67:5 70:3,15
71:3 72:15
77:19 84:23
85:14,22 88:6
91:8 93:5
97:19 98:25
101:17 103:20
108:17 114:20
115:14,20
126:17 130:20
135:14 142:17
172:16 177:19
179:19 181:21
182:5,13
183:13 186:6
189:3,6 192:18
193:11 195:15
197:19 198:11
203:11,19
206:24 207:7
209:8
**looking**   45:8,11
57:4 62:5
66:21 74:7,23
75:4 109:11
153:17 154:19
170:17 172:21
178:9 195:10
**looks**   62:3 83:9
83:10 151:4
157:5,12 158:4
**lot**   34:22 69:24
74:2 87:23,24

**low**   65:21
142:6 146:15
146:16 171:12
**lower**   64:19
65:25 73:4
101:19 102:3
103:3,13
115:10,15
144:3 153:23
162:3,18
165:25
**lowering**
102:20 103:10
**lowest**   69:19
**lslaw**   140:13
**lumps**   102:15
**lunch**   121:20

**m**

**made**   12:25
14:19 24:2
38:6 132:20
146:20 148:20
169:9 178:15
179:4 191:25
193:15,24
203:22 204:12
204:15,16,17
204:20,25
205:4,7,13
208:13
**mail**   22:13,17
23:3,9 31:17
31:20 82:24
83:9,9,14
86:17 90:20,21

90:21 91:4,8
91:25 92:6
94:9,17 99:21
99:21,25
105:11,12,17
105:22,23
106:23 107:18
107:18 108:4,4
108:12,19
110:4,6,9,10,18
115:21,21
116:11,12
118:18 119:6,7
119:9 122:25
123:2,8 124:2
124:6,8 127:13
129:8,9,15
134:22,23
135:10,15
136:11 140:8
140:10,13,17
140:23 141:5
156:15,16,21
157:2,3,8,11,15
157:19,25
158:3 159:7,8
159:9,11,14
160:20,21
161:3 163:24
163:25 164:4
164:13,14,17
165:8 166:11
167:3,4,7,8
177:8,9,14,20
181:4,5,8,14,20

184:23 185:17
185:20 188:5
188:16 196:24
196:25 197:4
197:13,22
206:3,4,9,19
207:23,25
**mailed**   161:14
**mails**   14:25
86:15
**main**   29:7
84:11
**maintain**
102:15
**maintaining**
33:15
**maintains**
35:17
**make**   36:5 97:4
112:11 113:6
123:16 129:20
132:14 151:7
155:22 178:8
181:21 182:4
185:4 186:25
191:15 194:10
194:18
**makes**   111:4
**making**   5:10
12:6 21:15
80:3 81:4
**management**
27:9,11 28:8
30:18 157:23
198:19

**manager** 20:13
20:14,15 25:3
25:5
**mandated**
164:22 166:4
**mandates**
115:25 142:4
142:18 143:7
143:11,19
144:7 171:9
**manner** 147:21
**march** 17:12
41:15 48:24,25
65:6,21 67:18
67:22 79:24
81:2 82:6
115:11 153:13
154:13 175:7
176:6 181:6
185:19 188:6
188:13 190:3,5
190:6,14,22,25
191:4,5,23
192:4,13,21
193:3 198:9
200:6,6,14,25
202:19 206:4
**marissa** 3:17
9:22 38:25
182:11
**marked** 53:9
53:10 61:14
82:17 90:6
94:2 104:24
107:12 122:12

128:24 134:14
139:25 149:17
156:10 160:15
163:14 166:21
176:19 180:19
185:7 187:22
196:11 205:17
**market** 33:24
97:23 103:5,14
111:6 134:5,8
144:4 158:19
203:24 209:16
**marriage**
212:18
**mask** 115:25
142:4,18 143:6
143:11,19
144:7 171:9
**master's** 15:14
15:18,19 16:12
**math** 44:3
208:25
**matter** 4:8
137:2 201:24
212:20
**matters** 82:3
**maxim** 124:7
124:16
**mccabe** 26:6
**mean** 9:19
11:13 14:10
24:22,23 25:9
25:10 31:25
48:8 55:17
59:23 60:24

65:25 73:20
78:8 88:12
98:21 106:11
107:5,24
111:12 112:3
114:18 116:21
132:2,6 142:19
145:10 174:8
184:8 190:9,17
194:20
**meaning**
206:18
**means** 6:16
22:14 47:8
101:25 102:2
111:16 116:8
**meant** 87:15
99:15 132:8,10
144:10 180:17
**measuring**
68:17,18
**media** 4:6
39:17 78:23
122:8 149:15
160:8 187:16
210:9 211:7
**medications**
6:7
**meet** 8:22 32:7
32:11,20 36:20
75:11
**meeting** 10:17
28:9 30:18
31:8 32:10
95:4,10,11,18

95:23 96:6
109:6 119:10
119:14,16,19
119:21 120:22
124:9 125:17
126:23 127:11
127:12 136:14
136:16,22
137:14,22,24
197:16 198:8
199:3 201:14
**meetings** 9:3,17
10:2 23:22
24:3,4 27:7
28:5 30:12,22
31:2,3,5 33:12
37:11 38:15
95:15 126:24
127:6,10 137:4
197:9,10
**member** 16:6
31:23 32:4
**members** 33:2
33:5,6
**memory** 77:5
191:13
**mentioned**
71:25
**messages** 14:25
15:2
**messaging**
23:11,14
177:24
**met** 8:21,23
30:16 120:9

136:5
**methods** 203:23 204:6 204:20,21
**mexico** 80:13
**mh** 130:23 131:2 138:16 162:12
**mhouston** 105:12
**microsoft** 22:18,20
**middle** 161:17 167:24 207:2
**midpoint** 43:22 43:23 44:2 69:20,22 70:11 70:16,19 71:20 72:3,12,16,20 72:22 73:6,19 74:10,17 75:22 75:25 76:14,18 76:24 77:15
**midpoints** 70:18
**mike** 84:10,12 84:15 90:23 94:9 107:19 108:5,19 116:13 117:21 123:4 124:3 129:9 131:3 138:19 156:17 160:23 164:15 206:5 208:2

**million** 60:14 60:20 62:9,22 63:10,12,24 64:24 65:7 66:15,25 67:8 67:14,15,20 68:2,11,14,17 69:5 70:12 71:21 72:11,13 72:21,23 73:20 73:22 75:21,23 103:22 117:14 118:6,24 127:22 153:16 154:7,17,22 172:22,25 173:7 188:24 193:8 200:18 203:7 207:10 207:11
**mind** 39:7 87:18 102:6,10 102:25
**minute** 39:9 53:25
**minutes** 21:15 23:22 24:3,5 24:10,15,18 33:11,15,19 119:18,20,23 120:5,7,8,20 121:2,3 197:6 197:8,16 198:8 198:12 201:18

**misleading** 13:3
**missed** 180:8
**missing** 58:24
**misspoke** 35:12
**misstates** 149:2
**mizener** 90:22 92:7 94:11 105:14 108:6 115:24 123:2 124:4 129:11 160:24 164:16
**model** 47:9,18 48:10
**models** 47:2,6
**molecular** 30:5
**moment** 53:6 61:4 82:14 149:5,8 209:23
**monday** 28:8 30:18 95:4,10 95:15 109:5 119:10 124:9
**monday.com** 49:17 50:6,9 50:12,16,20 54:21 55:9,13 55:24 56:3,14 56:17,21,24 57:6 58:6,10 74:23 76:5 100:13
**monday.com.** 62:4

**monitor** 57:20 125:6 126:4
**month** 57:12 66:19 67:9 77:8,18 153:3 153:8,16 154:21 195:10
**monthly** 65:3 66:17
**months** 16:25 17:6 48:19 65:11 66:6,14 66:23 67:14,20 67:24 68:10,13 153:15 154:7 154:15 187:4 191:25 193:2 195:8,16 203:10,11
**morning** 4:2 5:9 28:8 30:18 124:10
**motion** 150:12
**move** 37:4,8
**moving** 14:20 143:24 168:22
**multiple** 111:24 163:7
**multiyear** 165:2
**murphy** 33:8 141:6,7

**[n - objection]**

**n**

**n** 3:2 5:3,3 122:2,2,2,4,4 213:2

**name** 4:14 5:15 18:2 39:21,23 48:4,7,8 49:21 57:15 84:14 129:22 194:3 216:3

**named** 7:25 13:15

**names** 25:23 30:4 33:7

**nanduri** 157:17

**nassau** 212:5

**nature** 52:8

**navigate** 86:5 168:12

**near** 86:4,5 111:19 168:9 168:11,12 169:4

**necessarily** 28:6 32:2 71:3 111:21 137:23 142:19 144:16 145:10 147:8 148:7,23 152:12,19 153:5,24 199:19

**necessary** 191:20 210:20

**need** 6:15,24 104:2 124:8 130:8 135:17 135:20 139:14 139:18

**negative** 102:13,22 144:11

**negatively** 143:4

**negotiate** 18:19

**nelson** 33:9 140:12

**netsuite** 49:24 49:25

**network** 51:8,8

**never** 35:13 61:6 68:12 125:11 127:2 154:6,14,21 205:9

**new** 1:3 2:17 3:8,8 4:12,18 12:6 111:17,22 112:3,7 139:5 142:5 144:13 145:2,21 171:11 180:7 180:13 186:9 212:3,10

**nice** 148:2

**nine** 16:25

**nodding** 6:17

**noise** 97:12

**normal** 34:5 89:16,17 119:17

**normally** 89:16

**notary** 2:16 5:5 212:9 216:25

**note** 4:19 210:12

**noted** 4:22 120:11 122:3 211:10

**notes** 10:10,12 10:15,17,19,22 10:23 11:25 120:21 121:4,5

**notice** 14:11 65:20

**notification** 140:15 188:13

**november** 1:17 2:8 4:4 212:22 216:5

**number** 4:6,13 18:13 19:8 45:5,8,11 63:13,14 69:8 69:12,23,24 71:6 84:25 85:2,5 88:13 90:10,13 93:7 94:5 97:15 101:6 102:4 104:7 105:6,7 122:19 123:21 128:3 141:13

144:2 149:24 160:11 161:10 164:10 165:19 166:17 173:11 175:23 176:14 176:25 179:17 180:25 186:4 186:18 189:4 198:5 203:14 205:21 213:8

**numbers** 44:22 44:25 47:14 49:6 57:5,7 60:24 62:13,15 62:16,17 63:3 63:19 64:19 65:17,18 66:18 69:25 70:15,15 72:15 74:8 100:12 115:15 115:17 117:20 117:24 128:13 135:20 153:18 154:20 156:7 172:11 173:9 178:9

**o**

**o** 5:3 122:2,2,2 122:4

**oath** 5:2,25

**object** 6:20

**objection** 28:16 36:2 42:13 43:6,16 44:8 44:18 45:9

**[objection - order]**

46:4 47:19,22
48:12 51:18,25
55:16 56:18
58:19 59:9
60:22 62:24
64:12 65:23
68:4,15 69:6
69:13 70:5,25
72:5,24 73:7
73:23 76:3
77:16 78:7
79:20 80:18
81:16 84:8
87:8 88:14,23
89:10 92:22
103:6,15
109:20 112:25
113:12 115:13
120:23 125:20
125:21 126:7
132:22 133:11
133:23 136:24
137:12 139:8
143:15 145:8
145:24 147:12
147:22 148:9
148:25 153:21
154:9,18
158:21 159:18
169:12 173:2
173:17 174:7
174:23 175:16
176:12 178:13
179:9 182:7
183:20 184:3

185:2 192:2,22
193:17 194:12
199:8 200:15
201:3,7,22
202:8 208:24
209:19
**objections**
  11:19 12:11
**obtain**  16:2
**obtained**
  109:14
**occur**  95:10
**occurred**  10:6
  10:18 92:12,14
  92:16 198:9
**october**  67:7,13
**officer**  161:25
  189:13
**official**  104:4
**oftentimes**
  133:14
**oh**  9:4 18:23
**ohio**  3:16
**okay**  5:13 6:11
  6:18,23 28:18
  30:17 35:16
  36:5 40:7
  44:15,20 61:23
  67:16,18 71:24
  74:14 77:17
  78:14 85:6,10
  90:18,18 91:19
  93:8 94:14,22
  105:9,9 107:23
  108:2,2 110:17

116:11,22
117:3 120:10
121:8 122:22
122:24 123:21
123:24 129:4,6
129:7 130:6,7
130:20 134:20
134:21 138:3
139:16 141:17
144:12 150:5,9
150:22 151:13
151:13,14
156:8,12 158:2
159:21 161:11
163:22 164:12
165:18,21
166:23 167:22
168:6 170:12
170:21 171:4
177:7 179:18
181:3 185:15
186:3 188:4
189:5 196:22
196:23 197:21
198:6 203:15
203:18 206:23
**omicron**  72:4
  77:4 115:3
  145:16 146:5,6
**once**  22:16
  29:14 49:5
  75:10 76:10
  111:8,14
**ones**  13:18

**ongoing**  42:11
  44:6
**ontiveros**  3:23
  22:9 182:2
  188:12 194:24
  197:2
**open**  170:6
  203:15,23
  210:13
**opening**  53:14
  54:4
**operating**  86:3
  162:2 168:10
  169:3
**operations**
  36:24
**opine**  100:22
**opportune**
  198:21 199:13
  199:20,22,25
  200:5
**opportunity**
  17:7 111:9,14
  179:23 189:15
  189:24 190:11
  193:21 202:15
**opposed**  75:7
**option**  97:19
**options**  96:18
  96:20
**order**  44:16
  45:25 46:20
  55:8,13 66:5
  75:5,6 77:12
  79:18 80:17,24

103:2 153:7 173:14 185:14 200:8

**orders** 46:23 47:4 49:13,17 50:13 54:17,23 55:25 56:3 57:11 59:16 62:20 64:9,21 64:23 65:6,13 65:20 66:9,15 66:25 68:2,12 68:14,24 70:4 72:2 73:14,21 75:10,21,24,25 76:17,24 77:14 78:5 82:7 88:20 89:24 113:22 114:8 114:19 115:8 115:10 146:25 147:7 152:3,11 152:24 153:15 153:20,22 154:2,8,16 155:2,5,8 172:2,7 209:18

**organizations** 16:7

**original** 117:21

**outcome** 212:19

**outline** 94:24

**outlook** 93:10 93:12 168:9

180:2 189:18

**outside** 11:15 12:3 114:23 116:9 182:3

**overall** 56:8 57:4,6 164:25

**oversaw** 34:14

**oversee** 20:24 20:25 22:6 32:18

**oversees** 34:14

**own** 193:12 195:11 203:11

**p**

**p** 3:2,2

**p.m.** 90:24 92:2 94:12 105:15 105:24 108:7 108:21 110:20 115:22 116:13 121:21 122:3 124:3 140:9 141:2 149:9,11 149:12 156:18 157:4 160:4,5 164:3 187:12 187:13 188:6 206:5 210:4,5 211:10

**page** 85:3,11 91:9,14,15,16 93:6 108:18 110:15,16 123:12,22,24 123:25 130:4

130:11,21 135:15 138:6,8 141:12,14,19 150:16 151:5 151:10,11,16 152:5 161:9,18 164:9,14 165:19,23 167:19,24 168:5,8 170:16 170:18,20,23 171:2,3 179:16 179:17 186:2 189:3 198:4 206:15,22,24 207:2,8,23 213:3,8 216:8

**pages** 150:23

**pandemic** 70:23 73:18 115:2 165:3 174:17 177:22 180:5,15 186:11

**paragraph** 88:6 130:9,13 138:13,15 141:18,22 161:19 162:10 168:7 171:3 179:19 186:7 189:7 198:12 203:20,21 207:8 208:4

**park** 5:19

**part** 32:9 61:9 119:16 183:8 183:14

**participants** 2:12

**participate** 21:3

**participated** 30:19,23,24 34:24 35:2

**participating** 21:14

**particular** 10:4 28:13 51:12 113:22 129:21

**particularly** 139:15 198:18

**parties** 4:21 212:17

**parts** 142:7 171:13

**past** 8:24 10:6 11:14 48:2 52:19 65:4 71:16 114:11 153:2 202:3

**path** 98:2

**patterns** 153:7

**pause** 55:18

**payable** 20:12 20:13 25:12

**pcr** 30:9 40:5 111:2

**pdf** 53:11,22,23
**peaks** 68:7
**peirsol** 3:17
  9:22 11:2,17
  12:10 28:16
  36:2 39:7
  42:13 43:6,16
  44:8,18 45:9
  46:4 47:19,22
  48:12 51:18,25
  55:16 56:18
  58:19 59:9
  60:22 62:24
  64:12 65:23
  68:4,15 69:6
  69:13 70:5,25
  72:5,24 73:7
  73:23 74:21
  76:3,7 77:16
  78:7 79:20
  80:18 81:16
  84:8 87:8
  88:14,23 89:10
  92:22 103:6,15
  109:20 112:25
  113:12 115:13
  120:10,23
  121:12 125:20
  126:7 132:22
  133:11,23
  136:24 137:12
  139:8 143:15
  145:8,24
  147:12,22
  148:9,19,25

149:6 153:21
154:9,18
158:21 159:18
169:12 173:2
173:17 174:7
174:23 175:16
176:12 178:13
179:9 182:7,15
182:21 183:20
184:3 185:2
187:8 192:2,22
193:17 194:12
199:8 200:15
201:3,7,22
202:8 208:24
209:19,24
210:24 211:3
**penalty** 5:25
**pending** 7:2
**people** 13:17
  22:11,21 24:22
  25:14,21 26:7
  26:12,22 28:2
  29:22 39:3
  81:21 100:2
  169:7 177:24
  188:7 208:25
  209:2,5
**people's** 33:7
**percent** 41:20
  72:19 73:14
  74:9 75:24
  76:16,23 77:14
  101:21 102:4,8
  102:21 103:12

**percentage**
  41:8 73:5
  74:16
**period** 11:5,13
  11:16,21 12:4
  27:15 29:16
  33:18 37:10,18
  56:9 57:12
  66:12 71:9,12
  124:24 193:4
  195:22 196:9
  207:11
**periods** 65:18
  66:8 115:16
**perjury** 5:25
**persistently**
  142:6 171:12
**person** 20:14
  33:14,20 38:2
  104:3 141:4
**personal** 23:8
**persons** 188:7
**perusing** 67:6
  123:19
**phone** 136:14
**phrased** 113:4
**pie** 57:9
**place** 11:8 14:3
  46:19 173:14
  183:5 200:4,7
  200:10,22
  201:25 202:7
  202:10,14
**placed** 68:24
  80:24

**placeholder**
  88:8
**plain** 154:3
**plaintiff** 1:7 3:5
**plaintiffs** 10:21
**plan** 205:2,6,8
  205:9,12
**plans** 204:3
**platform** 23:14
  30:10 111:17
  112:3
**play** 20:17
**please** 4:25
  5:14 6:12 7:9
  11:23 183:2
  201:10
**plus** 41:20
  158:6,13
**point** 17:17
  29:21 30:8
  37:22 41:23
  46:13 49:20
  51:3 59:19,23
  59:24 63:25
  81:11 87:2,24
  88:22 92:25
  97:11,25 99:2
  99:7 100:11,14
  100:25 101:14
  101:17 102:11
  102:12 104:2
  110:24 111:16
  112:14,22,24
  113:21 114:6
  115:2 117:6

**[point - probably]**                                          Page 33

121:10 130:18
132:19 134:6
136:17 143:5
144:19 152:24
153:24 163:8
167:23 168:22
168:24 169:8
171:24 191:7
191:11 194:11
195:25 202:11
202:13 206:19
**points** 60:2
109:10 112:9
112:10,22
113:3 117:21
**popped** 118:10
118:15
**portion** 72:2
80:23 83:11
84:19 132:13
168:2
**position** 11:24
12:5 182:11
198:17,22
199:14
**positive** 98:4
144:11 180:2
189:18
**positively**
143:4
**possess** 15:20
**possible** 97:14
147:23 148:11
155:13,15

**post** 177:22
**potential**
141:24 177:12
**potentially**
52:12 101:13
153:7 191:17
**powered** 54:20
**pr** 177:13
188:14
**practice** 16:15
33:10 34:5
41:23 89:17
95:14 125:6
127:2 129:21
136:6
**pre** 85:3 136:17
**predict** 97:24
144:20
**prefer** 7:2
**premature**
131:7
**prep** 37:11
38:15
**preparation**
10:13,24 11:25
36:12,16 137:5
**prepare** 8:17
8:20 9:18 31:7
31:12 35:25
36:9,13,17
94:25
**prepared** 31:19
51:2 82:3
**preparing** 37:5
37:5,6,7 38:16

84:15 93:2
96:5 133:12
**present** 3:21
9:16,19 71:15
72:4 106:16
**presentation**
117:10 198:13
**presented**
38:23 106:6,11
202:16
**press** 21:4
136:7 140:15
160:25 181:15
181:17 182:14
183:7,10,13
186:13 188:13
188:22 203:17
**pressures**
162:4
**pretty** 20:20
27:24 36:7
194:20
**preview** 53:15
54:5,6 61:11
**previous** 98:22
110:6,10 119:2
119:5,11
181:14 186:8
203:14
**previously** 53:9
73:17 98:19,21
169:23
**price** 102:14,22
189:14,23
193:8 194:5

195:7,19 196:2
196:4 198:20
198:23 199:4
199:15 200:13
200:24 201:4,6
201:15,18,20
202:19 203:3,8
**prices** 195:23
**primarily**
21:19 166:3
207:12
**primary** 40:23
51:23
**prior** 16:10
20:4 40:20
44:2,21,22,24
44:24 45:2,3
66:13 70:21
87:5 89:12,15
95:6 100:5
114:12 125:14
125:24 136:8
154:5,13 190:7
194:7 207:11
**privilege**
210:18
**privileged** 11:5
11:6,9 120:17
182:8,14,17
**probably** 8:11
20:15 21:12,22
24:11,14 25:19
27:20,23 28:2
28:2 36:22
38:8,17 41:19

**[probably - q1]**

41:20 48:17
63:11 75:14
80:14 133:2
137:2
**problem** 53:7
82:15 173:11
191:19
**procedures**
32:21
**proceed** 5:2
**process** 36:19
46:19 119:17
155:16 183:5,6
210:14
**produce** 11:6
120:6,15
**produced**
54:25 210:20
**producing**
210:15
**product** 111:17
111:22 112:7
112:12
**production**
10:22 120:12
120:14
**products** 16:19
22:20 85:25
**professional**
2:14 15:19,20
16:7 212:8
**program**
176:14 183:19
184:2,18,20
188:25 189:8

190:10,15,22
191:22 193:3,9
193:16 194:19
195:14,21
196:7 198:15
198:22 199:14
199:21,23,25
200:6,9,10
201:16,24
202:7,9,13,14
203:22 204:11
205:14
**programs**
164:24 166:6
173:13
**project** 112:17
**projecting**
128:5
**projections**
128:9,18
**proper** 16:3
**provide** 5:11
45:5 46:2,10
88:4 96:19
97:4,6,6 98:13
99:10 101:4,6
101:16 113:11
113:16,18
125:22 128:12
132:20 134:3
139:7 155:17
155:21 176:9
**provided** 33:22
42:7,10 44:5
58:6 60:17

70:3 98:19,24
128:14 133:10
174:19 179:22
**provides**
189:15
**providing** 7:18
41:24 96:9,14
96:17,22 97:2
97:9 98:9
111:25 113:6
116:15 117:3
117:12 118:13
118:23 131:23
132:5,12
133:21 136:12
155:20 168:14
168:24 175:19
176:16 194:7
**prudent** 86:7
86:20 87:6,15
88:11 89:6
**public** 2:16 5:5
18:6 21:4 34:5
164:23,23
166:5 174:10
183:8 186:20
212:9 216:25
**pull** 97:21
110:13 169:22
169:25 173:9
190:17 192:6
**pulled** 47:24
150:9
**pulling** 108:25

**purchase** 79:3
190:21,24
191:4,22
192:20,25
193:3,24 194:4
194:10 195:13
199:7 200:9
**purchased**
190:14 193:20
195:6
**purchases** 80:3
81:5 191:25
203:24 204:15
204:20,25
205:5
**purchasing**
194:2
**purpose** 29:4,7
32:14 50:12,17
**purposes** 9:10
**purview** 184:11
**push** 184:23
**put** 29:8 31:9
49:5,6 83:19
84:18 98:16
112:19 126:13
128:3 129:22
149:19 173:14
175:23 200:21
202:13

| q |
|---|
| **q1** 68:21 82:25 90:25 118:5 152:25 153:3,3 153:8 |

**q1-2022**  83:12 197:7
**q1-22**  71:13
**q2**  68:21 96:9 96:15,22 101:4 101:4,10 131:19 158:6 158:13 159:17 172:21
**q2'22**  160:25
**q2-2022**  167:16 167:18
**q2-22**  71:14
**q3**  172:23
**q4**  67:12 71:4 71:19 72:10 118:5 206:7 208:14 209:2,5 209:9
**q4-2021**  74:8 75:19 206:17
**q4-21**  71:13 74:12
**qs**  32:22 47:25 62:14
**qt9**  52:15
**qualify**  204:3
**quality**  52:18 52:21,21 53:2
**quarter**  32:20 36:22,23 38:18 42:4,11,17,19 42:23 43:4,15 43:19,22 44:2 44:7,10,23,24

45:3 46:3,6,8,9 49:3,4 50:23 50:25 56:5,25 60:7,9,10,12,15 60:21 61:2 62:7,8,8,20,21 62:21 63:6,23 64:6,6 68:25 69:17,18,20,22 70:8,9,10,12,20 70:22 72:12,14 72:18 73:3,6 73:12,15,16,19 74:11,16 75:22 75:23 76:15,18 76:25 77:6 78:3,3 79:5 86:2,8 88:8 93:10 99:9,17 100:7,10,15,19 101:12,15 104:8,13,17 113:23 117:13 117:25 118:3,7 118:24 119:17 125:12,14,24 126:11 127:7,9 127:18,23 128:6 150:18 158:18 161:15 161:20 165:25 168:19 169:10 172:3,8,13,19 190:20 191:8,9 207:9,14,17,18

208:6,12,22 209:17
**quarter's**  44:21
**quarterly**  35:9 41:24 45:25 48:17 57:14 62:6 72:20 73:5,14,21 74:9 75:17 76:23 77:14 99:3 101:19 102:3 168:14 168:19
**quarters**  35:14 45:2 70:17 98:22,23 99:11 114:12 168:21 191:6 192:6,10
**question**  6:25 7:3,6,8,8 48:13 58:21 59:11 63:20 65:10 73:25 74:2 103:8 104:15 106:15 119:3 121:7 137:18 138:25 148:3 148:11,20 152:9 183:17 183:24 184:16 184:20 191:24 201:9
**questions**  6:13 39:3 76:11 98:3 210:11,22

**quick**  39:8 76:9
**quickbooks** 49:19
**quite**  42:20 47:7 54:4 107:21 131:9 188:3 201:10
**quote**  57:19 165:23 177:22 178:20

**r**

**r**  3:2 5:3,3 122:2,4,4 212:2
**raise**  98:3
**raised**  72:10
**ran**  162:25
**randy**  21:24 25:25 26:3
**range**  41:19 101:20 102:7 102:20 103:4 103:11,13
**rates**  142:7 146:16,17 171:12
**rather**  88:10 201:5,19
**rationale**  104:5 108:25
**raver**  80:5,6 81:4
**reaching** 182:22

**[read - recently]** Page 36

**read** 112:8 136:17 142:24 147:17 148:13 155:13 157:8 159:5 171:14

**reads** 85:24 165:24 168:8 189:7 207:9

**ready** 181:22 182:6

**reality** 180:4,8 180:13 186:9

**really** 54:9 126:9 146:8 164:19

**realtime** 2:15 212:8

**rear** 144:20

**reason** 6:4 58:8 58:12,17,25 59:3,7 60:19 69:11 76:15,22 77:23,25 83:16 94:20 105:20 108:15 110:13 116:15,24 117:2,5 129:18 131:8 134:4 135:13 139:6 140:20 156:24 161:6 164:7 173:6 177:17 181:11 182:15 183:12 185:23 188:19 190:9 197:25 206:12 208:13

**reasonable** 104:3

**reasonably** 104:5

**reasoning** 106:5,10 110:13

**reasons** 108:25 117:7,11 133:8 133:20 143:22 193:19

**recall** 8:15 9:13 9:15 10:5 14:18 17:10,22 19:5,8,16,20 24:4,6 28:3 29:11,22 32:23 35:22 38:4,5 38:10,12,14,17 38:18 40:19 41:8,12,22 42:2,3,22,25 43:3,7,8 45:20 46:17 48:15,21 48:22,23,25 49:8,10 51:20 55:12,23 57:13 57:15,17,22,23 58:4,5,7 60:13 63:2,5,7,9,13 63:21 64:9,17 64:21,23 65:2 65:6,11,13,15 66:4,14,16,19 68:23 69:4,7,8 69:9,15,19,22 70:8,14,17 72:14 73:3,8 76:21 77:12,18 78:25 79:4,12 80:4,9 81:6,17 82:5,9,9 84:3 86:20,22,23 87:4,9,11,19 90:2 92:11,13 92:16,17,18,20 92:23 93:16,19 95:11,21,24,25 98:8,11 100:4 100:8 101:9,11 104:11 117:15 117:19,23 119:13,15 125:3,5 126:21 127:15,19 128:4,8,17,19 135:24 136:4,4 136:18 139:2,9 146:22 147:3,4 147:20 148:6 155:10 159:4,6 159:12,12,15 168:23 171:22 171:25 172:5,6 172:10,10,12 172:15,17,20 172:24 173:4,4 173:8 174:13 174:15 186:17 186:21 187:2,3 190:13,16,18 190:23 191:24 192:12,14,15 192:17,24 193:6,10,14,18 194:16 195:5,8 195:9,12,16 196:8 199:3,9 200:12,17 202:18,22,24 202:25 203:4,5 204:10,19,24 208:11

**receivable** 25:13

**receive** 14:7 124:8 125:10

**received** 83:14 91:5 94:18 105:18 108:13 110:4 123:9 135:11 140:18 154:16 156:22 161:4 172:2,7 177:15 185:21 188:17 197:23

**receiving** 14:17 14:23

**recent** 77:2,5 118:4

**recently** 115:3 152:25

**[recess - remember]**

**recess** 39:13 78:19 121:20 149:11 160:4 187:12 210:4

**recognition** 75:12,12

**recognize** 55:5 61:24 83:5 94:15

**recognized** 62:12 115:6

**recollection** 62:19 171:16

**record** 4:3,20 4:23 5:15 6:14 7:19 39:12,16 74:22 75:3,13 78:18,22 121:16,19 122:7 149:5,10 149:14,25 160:3,7 187:11 187:15 209:23 210:3,7,12 211:2,7 212:14

**recorded** 4:7 35:23

**recordings** 35:18

**records** 197:16

**recruited** 17:23 18:9

**red** 138:12,22

**reduced** 143:13 143:20 146:12

165:10

**reduction** 153:5 164:22 166:4

**reed** 21:22 24:12 27:22

**refer** 26:12 40:8 48:11 75:6 84:25 106:18 112:14 112:16 113:22 164:21 165:9 171:19

**reference** 168:18 178:9

**referenced** 119:10 180:13

**referencing** 95:6,9

**referred** 166:10 171:23 186:8

**referring** 35:6 39:25 40:10 52:21,23 58:2 96:2 106:19 153:9 157:7 158:12,18 159:17 178:6 178:12,24 180:12

**refers** 85:20 131:3 138:19 144:25 162:13 178:6

**reflect** 165:25

**reflected** 83:14 91:5 94:18 105:18 108:12 123:9 129:16 135:11 138:22 140:18 156:22 161:4 164:5 177:14 181:9 185:21 188:17 189:23 197:23 206:10

**reflects** 148:18 189:10

**refresh** 61:21 62:18 82:23 90:15 171:15

**refreshing** 53:20

**regarding** 82:7 184:24 186:9 208:22 210:17

**regardless** 128:16

**registered** 2:14 52:24 212:7

**regular** 95:18

**regularly** 28:5 30:12,16,22,25 32:7,11

**reimbursement** 174:20,21

**related** 14:8 72:9 174:20 181:19 212:17

**relations** 34:15 36:21 81:10 82:3 106:12

**relative** 201:15

**relatively** 62:17

**release** 37:6 91:2,12,22 92:4 95:16 96:10 108:10 116:16 135:3 135:25 136:9 137:15 140:25 141:15 160:25 161:2,13 177:11 181:15 181:17 182:14 183:14 185:5 186:13,19 188:22 203:17

**releases** 21:4 136:7 183:7,10 186:18

**relevant** 11:4 11:10,12,16,21 12:4

**remain** 141:20 141:23

**remarked** 189:12

**remarks** 164:20

**remember** 10:5 17:13,17 23:19 29:13 30:3 49:7 65:3,5

69:25 84:14
124:23 147:25
148:14 175:25
194:3 203:10
204:14
**remembered**
50:2
**remind**  62:6
154:21
**remote**  1:14
2:11
**removed**
186:11,15,22
**rephrase**  63:21
**replies**  167:14
**reply**  106:22
**report**  25:14
26:10 126:10
**reported**  1:22
25:17,22 26:11
62:14 63:7
69:24 75:16
**reporter**  2:15
2:15 4:16,24
6:16 149:23
212:8,9
**reporting**  21:2
21:2 32:19
125:25
**reports**  33:23
33:23 124:6
125:7,9,10
126:9,16,19,22
126:25 127:6

**repository**  51:7
**represent**  9:7
9:13 71:19
120:11 148:16
190:19 191:21
**representation**
9:11 148:20
191:16
**representatives**
81:14
**represented**
72:16 191:10
**repurchase**
188:24 189:8
193:16 194:18
195:4,18,21
196:6 198:15
198:23 199:15
201:16 203:25
**repurchased**
192:13,16
193:7 195:17
203:6
**repurchases**
203:21 204:11
205:7,13
**request**  10:22
11:19 12:6
120:5,10,16
**requested**  12:8
**requesting**
159:14
**requests**  11:4
**required**  23:21
23:25 52:25

103:12
**requirements**
112:18 113:25
**research**  33:23
107:2,6 109:11
109:18,22
110:7
**resources**
174:18 176:5
**respect**  35:8
45:22 55:24
56:6 57:2
112:5,21 205:7
205:12
**respond**  152:8
192:7
**responded**
148:4 185:3
**responding**
110:12 114:24
114:25 147:21
181:13
**response**  12:11
155:14 167:13
**responsibilities**
20:21 21:7,11
**responsible**
42:5
**responsive**  11:3
12:3 120:16
**rest**  180:3
**restate**  74:3
76:19 103:7
175:17 201:9

**restricted**  86:3
168:11 169:3
**result**  14:16
86:6 109:10,18
161:25 166:3
168:13
**results**  36:22
44:22 45:15
46:12 47:25
49:3 73:11
95:19,19 97:24
125:13,23
126:10 127:7
158:6,13
159:17 161:20
165:25 169:11
209:10
**resumed**  122:4
**retainer**  9:10
**return**  189:9
**revenue**  41:9
60:8 62:7,12
63:6,8,23
65:17 66:17,18
67:21 69:19
70:11,19 71:11
71:20 72:13,20
73:5 74:10,24
75:7,12,14
111:2,8,13,18
115:5,15
117:17,24
118:25 126:5
126:16 127:16
127:23 128:6

**[revenue - scrolling]**

145:19 172:13 172:18 207:9

**revenues** 47:4 47:12 73:19 74:17 131:8 158:19

**review** 9:25 21:3 32:21 45:24 50:19 56:4,8 92:8 95:19 126:4,25 129:14,22 137:15 183:6,9 183:15 185:5

**reviewed** 31:12 126:22 139:3 198:16

**reviewing** 136:11

**richard** 33:8 140:11

**right** 18:23 35:3,6 77:11 85:2,14 137:8 140:4 143:12 144:25 151:11 158:5 162:17 170:19 199:24 200:8 205:24 206:24

**riley** 204:14,14 205:4

**ririe** 29:20

**risk** 142:22

**road** 5:19

**rocky** 29:20,23

**role** 20:9,18 21:20 24:13 26:8 31:9 34:12

**roles** 17:18 34:19,22 184:12

**ron** 26:6

**room** 7:13

**rose** 203:3

**row** 67:20,24 68:11 153:15 154:7

**rpr** 1:23 212:25

**rsus** 19:4,5

**rule** 204:3,25

**rules** 5:22

**run** 131:21 132:3,11 162:20

**s**

**s** 3:2 122:2,2,2

**sai** 157:17

**salary** 18:24

**sales** 26:15,17 26:20 27:6 41:21 45:23 46:16,23 49:13 49:16 50:11,13 50:15 54:23 55:7,12,25 56:3,8 57:4,6 60:4 62:11,19

65:3,13,17 76:5,17 77:8 77:19 78:5 89:2 111:21 114:20 142:2 143:23 144:22 146:5 162:18 165:10 171:7 207:13 209:16

**salesperson** 80:9

**salespersons** 155:7

**salt** 1:16 16:14

**save** 14:12 52:6 52:6,11

**saw** 74:8 126:18,20 152:22 190:11

**saying** 81:18 107:2,7 109:12 110:8 114:5,6 116:22 144:5 148:6 156:8 157:5 179:12 202:5

**says** 54:4,16,20 54:23 67:13 93:10 151:17 151:24 152:6 157:11 167:25 170:23 199:24 206:25

**scenario** 99:5 104:4

**scheduled** 8:9 28:5 30:12,23 31:2 35:8 95:12 136:16 136:23 137:10 137:14,22,24

**scheduling** 22:23

**school** 18:12

**science** 47:15

**scientist** 146:4

**screen** 53:18 54:9,13

**script** 37:5 38:24 83:2,3 83:11 89:20 90:25 108:11 116:16 129:14 130:18 132:14 132:16,18 133:14,14,16 134:3 136:17 164:21 167:6 167:10,16 168:2 172:16 172:21 206:7,8 207:5 209:15

**scripts** 38:19 84:20 206:17

**scroll** 123:15 132:25 150:22 151:2 170:22 197:11 207:24

**scrolling** 151:6

**se** 27:12 50:22 146:4 153:25
**search** 12:14 120:6
**sec** 21:2 104:3
**second** 43:15 53:20 55:19 62:7,20 63:6 63:23 67:4 68:25 69:17 70:9,20 73:11 73:15,15,18 76:14,18 78:3 86:8,16 88:8 91:16 93:10 98:25 103:25 107:22 112:13 113:21 117:13 117:24 118:24 122:23 123:14 127:18,23 128:5 158:18 161:15,19 162:16 165:25 167:7 171:3,5 172:8,18 179:19,20 186:6 189:6 190:20 191:8,9 208:4
**secretary** 17:14 17:20 21:11,13 23:21 152:7
**section** 132:16 132:17 207:5

**securities** 204:4
**see** 29:13 30:3 50:24 51:2 53:22 54:14,15 54:16,18,19,23 60:24 61:22,23 63:2 64:18 67:5,7 71:4 72:15 83:20,22 85:15,16 86:9 86:11,13,14,16 86:18 88:7 91:7,21 92:9 92:10 93:9 95:7,8 96:11 98:6 99:12 100:12 101:7 101:22 102:17 104:9 105:22 105:24 106:7 107:3 108:21 109:7 110:7,20 111:10 114:3 116:5,19 118:4 124:11 125:9 130:9,22,24 131:11,24 132:23 135:22 138:11,16 141:18,20 142:8 145:14 147:15,17,24 148:3 150:16 150:20,21 151:16,23

152:3,16 157:2 157:9,17,20 158:9 159:9 161:17 162:7 162:16,22 165:5 166:7 167:7,11,12 168:16 169:20 170:5,23 171:5 178:3,4,21 180:6,7 181:23 188:3 189:20 197:12 198:25 204:7 206:25 207:20 208:4,9 209:11
**seeing** 146:24 147:9 148:8,24 152:2,13,20
**seek** 182:22
**seeking** 182:16 182:19,24
**seem** 124:7 125:16 153:19 196:16
**seems** 88:19 112:6 130:13 131:6
**seen** 101:14
**sell** 40:14
**selling** 40:18 60:6 111:9,15 131:18
**sells** 40:12

**send** 124:6 167:10
**sending** 92:3 135:7 140:23
**senior** 16:16
**sent** 89:5 90:24 94:12 108:7 110:19 117:21 123:4 125:11 129:11,16 134:24 156:18 160:21 164:2,5 167:5 181:9 197:4 206:10 206:19
**sentence** 171:5 179:20 186:7 203:20 204:22
**sentences** 155:14
**separate** 170:6 192:9
**separately** 192:10
**serbin** 33:8 140:11
**services** 174:18 176:5
**set** 26:18 58:5 58:16 157:22 161:21 190:9 193:3 196:4 199:21,23 212:12,22

**[seth - specific]**

**seth** 22:8 26:21 27:22 29:19 31:2 45:18,21 46:14 123:4 124:5
**setting** 84:16
**settled** 169:6
**seven** 17:6 42:18 104:18 118:3,7
**shaking** 6:17
**share** 53:15,17 54:8,12 61:12 61:20 82:23 102:14,22 150:4 170:4,9 177:13 183:18 183:25 184:17 184:20 188:14 188:24 189:7 189:14,23 190:10 193:9 194:18 195:4 195:23,25 198:15,22 199:13 202:23 203:3,8,21,25 204:15
**shareholders** 189:10 200:20
**sharepoint** 51:4,10 52:11
**shares** 179:21 190:12,13,22 190:24 191:22

192:13,16,21 193:8,16 195:7 195:14,17,21 196:3,7 198:20 198:23 199:15 200:9 202:15 203:7
**sheet** 53:12 189:11 216:2
**shook** 23:16
**short** 39:4 98:5 98:10
**shortly** 25:4 28:24 29:17 36:14
**show** 60:18 177:11
**showed** 57:11
**side** 47:15 81:25 85:14 142:22 169:19 169:20
**sidoti** 124:7,13 124:14
**signature** 212:24
**signed** 197:14
**significant** 71:25 77:5 78:9 113:24 115:4 207:15
**signing** 9:15 21:12,13
**similar** 99:4 169:9 172:6,17

**similarly** 1:6
**simple** 154:3
**simply** 162:19 163:3
**single** 134:4
**sitting** 16:4 118:8
**situated** 1:6
**six** 8:24
**slight** 75:15
**slightly** 137:18
**slip** 53:12
**slow** 101:5,10
**small** 27:24 34:23
**smart** 39:19 141:25 146:25 151:25 165:11 166:2 171:7 207:13
**society** 88:2 97:12 114:23
**soft** 99:9,11,17 100:6,19
**softball** 20:17
**software** 49:18 49:21,22,23
**sold** 79:11
**solutions** 79:7 79:18 80:2
**somebody** 13:2 24:2 100:22 120:25 121:2 159:14

**son** 20:17
**sorry** 35:6 38:21 46:8,25 47:6 49:25 55:17,19 64:21 85:4 91:13 105:6 107:20 123:20 132:6 151:24 154:10 156:3,6 177:2 190:3 191:2 210:8
**sort** 162:20,25
**sounds** 106:23 165:14
**south** 80:13
**southern** 1:3 4:12
**speak** 46:15 84:9
**speaker** 151:16
**speaking** 46:14 59:20 78:12
**specific** 10:8 15:15 20:20 32:3 33:14 34:21 35:13 36:7,12 39:21 48:8,18,19,19 51:14 65:11 70:14,17 86:23 87:11 88:17 101:6 117:16 117:19 119:3 119:15 137:14

**[specific - stock]**                                                    Page 42

137:23 143:14
154:25 173:9
176:14 193:19
195:16 203:10
**specifically**
13:6 19:22,25
20:2 26:19
30:14,15 35:7
40:10 41:14
42:3 49:7,10
66:7,20 79:4
81:18 82:10
84:5,24 86:22
87:3 93:19
98:11 109:14
130:4 136:5
141:12 144:25
146:2 165:13
171:22,24
190:2,3,4,16
192:25 195:10
**specifics** 65:5
163:9 193:10
**speculate**
201:25 202:10
**speculation**
103:17
**spend** 38:15
**spike** 115:3
**spiked** 71:8
**spilling** 207:18
**spinning**
107:21 129:7
**sportsman's**
16:21

**spot** 78:15
159:22 187:5
**spread** 116:3
139:5 142:5,20
142:21 144:13
145:2,6,14,22
146:11,18
171:11
**spreadsheet**
47:24 48:5,16
48:24 53:13,17
53:23 54:3
**spreadsheets**
54:8,11
**spur** 109:4
**ss** 212:4
**stab** 116:17
**stack** 83:20,22
85:20 86:11
88:19 89:4
90:23 91:10,21
94:11 105:14
108:6 115:23
123:3 124:4
129:10 156:17
157:3 158:12
160:21 161:13
162:14 164:15
**stack's** 86:16
88:25 158:3
**stadium** 1:5 4:9
216:3
**staff** 16:16 22:5
22:6 25:6
27:25

**stamp** 61:19
82:21 93:23
105:4 107:16
108:18 110:16
122:17 123:13
128:22 130:5
134:12 138:7
139:21 149:20
149:23 155:25
160:12 163:18
166:15 167:20
176:23 180:23
185:11 187:19
196:15,19
**standards**
75:12 161:20
**start** 36:8,21
39:2 40:17
73:17 94:22
101:5,10 104:7
104:13 111:9
111:15 131:18
157:13
**started** 5:22
19:18 24:11,13
24:25 26:2
28:23 29:15
30:20 42:4
138:4
**starting** 21:17
93:6 130:9
141:19 179:20
**starts** 91:9
151:4 157:4
161:9,19 168:2

179:16 198:4
206:15
**state** 2:16 5:14
12:10 15:10,24
16:5 182:18
191:2 201:18
212:3,10
**stated** 57:18
112:23
**statement**
57:23 143:13
146:20 158:16
159:2,5 175:20
178:15 192:5,8
208:14
**statements**
12:25 13:4
169:9
**states** 1:2 116:8
141:22 142:4
142:19 144:8
152:7 171:6,10
179:21 190:20
198:12 203:21
**stating** 86:12
89:5 101:4
143:22 147:4
**steering** 28:22
28:24 29:3,12
30:20 31:25
**stenographic**
4:23
**step** 55:17
**stock** 195:19
198:23 199:4

**[stock - talked]**

199:15 200:13 200:24 201:4,6 201:14,18,20 202:19 203:2

**stood** 100:14

**stops** 55:4

**storage** 51:24

**store** 51:16

**stored** 51:21 55:8,24 56:3 58:9

**strategically** 179:23 189:16 189:25

**street** 88:5 97:5 97:7,16 106:14 106:18

**stretch** 109:3

**strike** 64:22 77:24 114:7 127:14 184:18 191:11

**strong** 85:24 189:11

**structure** 26:23 52:13

**structured** 24:21 27:11

**stuff** 34:24 37:9 74:2

**sub** 66:15 67:25 68:11,13 101:2 102:12

**subject** 82:25 90:25 94:13

105:15 108:8 123:5 129:12 134:25 140:14 156:19 160:24 167:5 177:10 188:12 197:6 206:6

**submitted** 150:7

**subscribed** 211:15

**substantial** 79:18 80:17

**substantive** 13:25 23:13 39:2

**sufficiency** 210:18

**suggest** 110:22 142:11 144:14 178:19 199:17

**suggested** 119:5

**suggesting** 113:10 133:20 186:21

**suggestion** 179:4 186:25

**suite** 3:15

**sunday** 108:20 110:19 115:22

**supply** 162:20 162:25 163:5 164:18

**support** 150:11

**suppose** 170:11

**sure** 5:23 14:19 21:5,15 24:2 29:16 36:5 43:24 46:11,11 60:2 63:19 71:5 72:25 73:24 85:7 87:17 97:4 123:16,18 126:18,19,20 132:14 138:5 138:10,25 143:16 145:4 149:6 151:7,24 155:22 159:7 171:18 172:22 178:16 181:21 182:4 184:4 185:4 194:21 197:20,20 207:25 209:24

**surface** 116:3

**surprise** 43:10 43:13 63:14,16 63:20 127:21 127:24 158:6 158:13,16 159:17

**surprised** 63:22 64:8 128:2,2 175:6 175:10,10,11

**surrounding** 53:3 110:25

**switch** 37:24 38:7

**switched** 37:22 38:4,11

**sworn** 5:4 211:15 212:13 216:22

**system** 51:3,15 51:20,24 52:18 53:2

**systems** 46:22 49:12,15 50:4 204:18

**t**

**t** 122:2 212:2,2

**take** 7:3 10:12 10:15 24:5,9 39:4,8 76:8 84:23 93:5 102:15 116:17 121:3,5,13 130:20 179:19 186:6 189:3,6 207:7

**taken** 4:8 8:5 11:25 21:15 39:13 78:19 121:20 149:11 160:4 187:12 210:4

**talked** 101:13 117:22

**[talking - thought]**                                    Page 44

**talking** 19:24
27:15 37:19
41:14,18 67:11
74:12 77:7
100:9 112:9
117:17 118:17
164:21 174:4
175:22 178:10
194:21
**tasked** 33:14
**taylor** 29:20,23
**team** 27:7,9,11
27:13 49:16
50:12,15
116:14
**teams** 22:16,18
22:18,22
**ted** 33:8 140:10
141:4,6
**tell** 5:25 13:15
67:9 70:16
79:25 81:3,13
115:17 139:10
146:4 155:7
163:6 165:15
**telling** 82:5
95:21 101:9
104:11
**term** 85:8,9
86:4,5 111:19
141:24 168:9
168:11,12
169:4
**terms** 24:22
25:9 26:18

77:13 79:2
87:25 97:13
134:5 169:6
204:21
**test** 39:20,24,24
40:2,3,5,8,9,11
40:18,24 41:9
47:5 53:4
59:18 64:10
81:5,15 82:8
88:21 111:21
112:4,10 114:9
131:7 142:2
147:2 151:25
153:15 154:8
154:25 155:5
165:11 166:2
169:18 171:7
**testified** 5:6
34:25 49:11
81:8 122:5
162:12 204:9
**testify** 6:5
**testimony** 5:11
6:9 7:18 14:5
149:3 211:9
212:14
**testing** 30:10
97:13 112:18
113:25 134:6
145:23 146:13
164:22,24
166:4,6 173:16
174:11,22
178:2,7 184:25

**tests** 40:15
52:22,24 53:3
57:21 60:6
68:25 79:11
89:25 162:19
207:14,16
**text** 14:25
23:11
**thank** 5:9 7:12
78:16 108:2
121:17 149:8
159:25 187:9
209:25 210:24
211:5
**thing** 21:13
97:3 155:17,19
**things** 18:7
21:15 36:24
52:14 75:10
84:16 87:25
97:13 111:25
113:14 134:7
143:3,25 144:2
163:7,9
**think** 6:13 9:24
19:7 25:4,6
26:19 27:2,4
27:19 37:23
38:8 39:22,25
41:6 48:10
53:20 54:10
58:24 60:16
61:10 65:9
66:7 71:5,7
78:14 79:5

80:12 84:12
88:10 89:4
90:16 96:24,24
98:15 100:16
102:2 103:16
104:14 106:3
111:24 121:9
121:14 127:25
134:7 137:17
139:14,15,17
139:18 141:6
143:2,6 144:16
148:22 152:18
152:25 157:10
157:12 158:5
158:15 159:21
162:12,15
164:19 170:12
177:23 179:7
180:8 183:4
200:24 201:17
203:9
**thinking** 88:16
102:24 128:17
175:14,19
**third** 3:6 101:2
101:18 112:13
168:7,19 172:2
172:13 198:11
203:19
**thought** 28:15
77:24 106:24
115:25 128:13
155:16 165:16
173:22 176:15

**[thoughts - top]** Page 45

**thoughts** 66:5,9
66:11 106:5,10
128:9 131:22
132:4,12
159:13,16
208:8
**thread** 157:16
157:16 159:11
181:4
**three** 8:23 9:5
9:17 10:6 29:9
33:4 43:25
60:25 67:19,24
68:10 112:21
153:15
**time** 4:4,5,23
7:18 11:4,21
12:4 15:11
16:24 17:9
18:9 19:12,23
19:24 20:9,11
21:8,17 22:2
24:15 25:7
27:15,21 28:12
29:16 30:9
33:18 36:25
37:10,18 38:15
39:11,16 40:25
41:11,12 46:13
48:18 49:20
51:3 56:9
59:19,23 60:3
60:5 63:22,25
66:4,8,11,12
71:9,12 76:20

78:11,13,17,22
81:11 83:15
87:2,5 91:6
92:25 94:19
95:12 96:23,25
97:11 98:9
100:11,14
101:14 104:12
105:19 108:13
111:16 114:10
114:22 115:2
117:25 118:11
118:16,17,20
121:18 122:3,7
122:20 123:10
124:18,20,23
124:25 125:4
128:5,10
129:17 130:19
131:10 133:22
134:2,9 135:12
136:5,18
140:19 141:9
143:5 149:9,14
151:22 152:21
152:24 154:6
154:11 156:23
160:2,8 161:5
163:10 164:6
168:15,22
169:8 170:2
171:24 172:3,8
173:25 174:3,4
174:6 177:15
181:10 182:2

183:22 185:22
187:10,15
188:18 189:22
190:7 191:2
194:6,11
195:23,24,25
197:24 198:21
199:13,21,22
199:22,25
200:5 201:19
202:6,11,12
206:11,19
209:13 210:2,7
210:11 211:6
211:10
**times** 8:24
34:11,18
**timing** 49:7
75:15 112:17
113:22 114:8
114:19 147:5,6
147:9 152:10
152:11,13,23
207:13
**tip** 99:8,15
100:18
**title** 149:20
209:9
**today** 4:4,16
5:11 6:2,5 7:14
8:5,10 14:5
33:2 131:21
132:3 135:18
139:3

**today's** 6:19
8:8,17 9:18
10:24 12:2
40:7 211:8
**together** 29:2,6
29:8,9 30:6
31:10 83:20
84:19
**told** 89:24
100:5,20 173:3
**tone** 37:3
**took** 5:24 10:24
24:14 120:21
121:4
**tool** 22:19
68:18
**tools** 47:16
**top** 19:6 38:13
48:6,22 54:16
57:24 65:16,16
90:21 91:25
92:6 94:22
105:12,22
106:23 107:18
108:4 119:24
122:25 123:25
129:8 132:25
134:22 151:11
156:15 157:3
159:9,11
160:21 163:25
164:13 167:3
170:19 172:23
177:8 181:5
190:18 196:24

**[top - understanding]**                                                  Page 46

206:3 207:22
207:24,25
**topline** 103:22
**toward** 207:16
**towards** 56:5
138:13 141:18
**track** 28:11
46:23 49:13
193:12
**tracker** 193:12
**tracking** 50:13
192:18 203:11
**trades** 203:24
**trading** 204:2
**transactions**
203:25 204:2
**transcript**
147:15 148:12
148:17 150:17
150:24 151:9
151:23 167:17
169:24
**transcripts**
170:19
**transition**
28:25 29:5
**transitioned**
24:16
**travel** 164:22
166:5
**trend** 153:25
**true** 75:6
212:14
**truly** 111:7,13

**truth** 6:2
**truthful** 6:8
**truthfully** 6:5
**try** 7:9 74:5
119:25
**trying** 25:4
28:11 48:10
75:19 157:22
184:5 200:19
**tuesday** 1:17
95:16 131:10
**turn** 85:11
108:18 110:15
123:12 130:3
138:6 141:11
157:14 161:8
164:9 165:18
167:19 168:4
179:15 185:25
198:3 203:13
203:16 206:14
206:22 207:22
**turner** 21:24
25:25 26:3
**turning** 130:10
158:2 168:8
**two** 15:9 25:21
28:25 29:24
30:22 33:25
41:2 44:11,12
44:12 69:5
71:12 75:9
99:10,17 100:7
100:19 112:9
112:10 114:12

118:5 130:21
133:4 148:15
154:6,15
155:14 159:13
167:14 169:25
190:7 191:5
192:5,9 196:17
**ty** 18:2,8,11
**type** 15:16
186:17
**types** 51:12,14
52:10,14
**typically** 36:20
37:16 42:9
44:5,20 81:20
81:22 84:18
136:10

**u**

**u.s.** 4:11 116:4
116:7,10
**um** 54:22
**unable** 143:23
**uncertainty**
97:22 99:4
110:25 111:5
111:13,20
112:6,14,23
131:7 144:4,6
**unclear** 7:8
58:23
**uncommon**
136:13
**under** 5:25
96:4 98:2
100:25 104:2

105:22 190:15
190:22 191:22
193:9,16
194:19 195:14
195:21 196:7
200:9 203:22
204:3,4,11,25
205:8,13
**underneath**
26:22,24
**understand**
5:24 7:16,20
40:10 47:7
63:19 73:25
104:5 107:5,8
123:16 145:5
151:7 157:24
177:24 204:17
**understanding**
12:24 46:18
54:24 85:19,21
87:14 88:20
92:4 96:15
99:14 101:24
109:9,17,23
110:5,9 116:7
116:9 131:2,14
135:5 136:21
138:18,21
140:22 157:6
157:21 158:11
162:13 165:7
178:23 179:3
180:11 188:21

**[understood - variety]**

| | | | |
|---|---|---|---|
| **understood** 7:7 75:18 159:4 | 69:16 70:7 71:18 72:8 73:2,9 74:4,25 | 169:14 173:5 173:19 174:12 175:2 176:2,21 | **v** |
| **undervalued** 179:22 | 75:2 76:10,13 77:22 78:14,24 | 178:17 179:14 180:21 182:10 | **v1** 91:2 **v2** 108:11 129:14 |

**understood** 7:7
  75:18 159:4
**undervalued**
  179:22
**unemployed**
  16:24
**unique** 66:11
**unit** 4:6
**united** 1:2
  116:8 142:4,19
  144:7 171:10
**university**
  15:11,13 16:13
**unusual** 68:2,6
  68:9
**upcoming**
  140:15 188:13
**update** 48:20
  49:2
**updated** 48:16
  48:23 49:8
**uris** 3:9 5:8
  10:21 11:11,22
  12:13 28:21
  36:3 38:25
  39:18 42:21
  43:9,20 44:14
  45:6,12 46:7
  47:20 48:3,14
  51:22 52:4
  55:22 56:23
  58:22 59:15
  61:3,9,16 63:4
  64:15 66:3
  68:8,22 69:10

69:16 70:7
71:18 72:8
73:2,9 74:4,25
75:2 76:10,13
77:22 78:14,24
79:23 80:21
81:19 82:12,19
84:17 87:13
88:18 89:3,21
90:3,8 93:4,21
94:6 103:9,19
104:21 105:2
107:9,14,20,22
110:2 113:8,20
115:19 120:3
120:18 121:6,9
121:14 122:9
122:15 126:3
126:14 128:20
129:2 133:5,18
134:10,16
137:7,16
139:13,17
140:5 143:17
145:20 146:9
147:19 148:5
148:16,21
149:4,19 150:2
154:4,12,24
155:23 156:5
156:14 159:3
159:21 160:10
160:17 163:11
163:16 166:13
166:18 167:2

169:14 173:5
173:19 174:12
175:2 176:2,21
178:17 179:14
180:21 182:10
182:18 183:11
183:23 184:9
185:9 187:5,17
187:24 192:11
193:5,22
194:15 196:13
199:11 200:23
201:12 202:4
202:17 205:19
209:7,22
210:10 213:4
**use** 22:22 23:8
  23:11 38:19
  39:23 46:22
  47:2,13,23
  49:19,20 50:4
  50:16 51:9
  125:8,12 126:9
  127:5 200:20
  204:2
**used** 38:24 40:3
  47:16 49:19
  50:12 51:16,20
  52:19 84:20
  135:21
**uses** 49:12,16
**using** 22:17
**utah** 1:16 5:20
  15:10,12,13,25
  16:5,13

**v**

**v1** 91:2
**v2** 108:11
  129:14
**v3** 108:10
  135:3 161:2
  206:8
**vaccination**
  142:6 146:16
  146:16 171:12
**vague** 174:3
  194:20
**valley** 15:10
**valleys** 68:7
**value** 189:9
  190:12
**variability**
  168:10 169:2
**variance** 116:2
  118:15
**variant** 72:4
  77:4 118:10
  144:18,20,24
  145:13,15,18
  145:21
**variants** 139:5
  142:6 144:13
  145:3,6,11
  146:3,6,10
  171:11
**varied** 38:18
  60:10,12 61:2
  79:5 196:8
**variety** 203:23

**[various - withholding]**

**various** 113:25 145:11 150:14 162:10 173:13 188:7 197:7,9 204:21

**venues** 164:23 166:5

**verbally** 22:12 22:17

**veritext** 4:17

**version** 130:18 140:24

**versions** 197:15

**versus** 4:9 169:21 184:7

**video** 4:7,20 22:23 35:17

**videoconfere...** 2:13

**videographer** 3:22 4:2,15 39:10,11,15 78:16,17,21 121:17,18 122:6 149:7,13 159:25 160:6 187:9,10,14 209:25 210:6 210:25 211:5

**videotaped** 1:14 2:11

**view** 62:4

**viewed** 98:4

**visibility** 86:4 130:10 143:14

143:20 168:9 168:11 169:4

**volatile** 77:10

**volatility** 68:19 68:21 71:13,14 77:13 78:4,9 78:11,13 87:23 97:2,12 115:4 134:4 153:4 154:2

**volume** 79:3 115:8,10

**volumes** 162:3 166:2

**vp** 13:19 16:22 21:25 25:2,20 25:25

**vs** 1:8 216:3

**w**

**w** 5:3 122:4 149:17 150:11 214:7

**wainwright** 124:19 151:17 151:21

**wainwright's** 127:16

**want** 5:21 39:4 44:11 50:3 57:9 74:22 97:3,5 98:14 107:22 109:4 112:19 113:17 132:14 139:10 155:12,15,17

155:22 159:19 163:11 170:22 173:9 182:4,10 191:16 192:6 196:6 210:12

**wanted** 36:5 52:6 54:10 89:8 94:24 167:23 182:13 183:13 208:11 208:17

**warehouse** 16:21

**way** 14:4 58:10 58:13,14 59:4 61:5 74:19 106:16 137:19 142:25 179:12 179:24 183:4 184:24 187:2,3 189:16 200:4 212:19

**we've** 12:8 76:7 77:8 153:4 203:9

**weak** 104:13

**week** 8:11 37:10 71:12 100:15 104:7 118:8 157:23 190:7 194:5

**weekend** 106:25

**weekly** 71:17 86:25 93:3

114:13

**weeks** 11:15 42:17,19 43:15 43:18 44:10 87:5 100:10,15 101:12 104:17 104:19 118:2,3 118:6,7

**went** 16:21 18:12 71:7 77:11 135:24 209:14

**west** 5:19 17:5

**whatsapp** 23:15

**whereof** 212:21

**wide** 165:4

**wife** 13:14,16

**wild** 164:18

**william** 83:20 83:22 84:12 85:20 88:16 90:23 94:11 105:14 108:6 123:3 124:4 129:10 156:16 157:3 160:21 162:14 164:15

**william's** 87:18

**window** 170:4 170:7

**withhold** 88:3

**withholding** 88:10

**[witness - year]**

**witness** 5:4 28:18 42:14 43:7,17 44:9 44:20 45:10 46:5 47:23 51:19 52:2 55:18 56:19 58:20 59:10 60:23 61:5 62:25 64:13 65:24 67:6 68:5,16 69:7 69:14 70:6 71:2 72:6,25 73:8,24 76:4 77:17 78:8 79:21 80:19 81:17 82:15 84:9 87:9 88:15,24 89:11 92:23 94:4 103:7,16 109:21 113:2 113:13 115:14 120:24 121:8 123:19 125:22 126:8 132:23 133:12,24 136:25 137:13 139:9 140:3 143:16 145:9 145:25 147:13 147:23 148:10 153:22 154:10 154:19 156:3,6 156:12 158:22 159:19,24 166:16,19,23 169:13 173:3 173:18 174:8 174:24 175:17 176:13 178:14 179:10 183:3 183:21 184:4 185:3 192:3,23 193:18 194:13 199:9 200:16 201:8,23 202:9 208:25 209:20 210:21 212:11 212:15,21 213:3 216:6,22

**word** 180:8

**work** 7:4 16:10 16:18 18:2,5 21:19,19 23:9 23:12 52:5 84:10

**worked** 16:13 21:23,24 26:23 30:6 83:24 170:13

**working** 29:2,5 37:2 133:17

**works** 121:11 121:12 151:20 159:22 179:2 187:6,8

**world** 142:7 171:13 177:22

180:3

**worries** 74:6 180:10

**worth** 60:25 195:6

**write** 106:3 110:22,25 116:13 119:8 124:5 135:17 181:20 208:5

**writes** 92:7 94:23 96:8 97:21 98:2 99:2,7,21 101:2,19 102:13 103:21 104:2 106:23 108:23 115:24 131:6 158:4,13 162:17 164:17 177:20 178:18 197:14

**writing** 91:10 116:17

**written** 9:9 100:17

**wrote** 87:18 99:15 100:23 100:23,24 102:19,23,25 111:4 119:9 132:2,8,10 137:20 158:25

**ws** 85:20 162:12,13

**ws2** 85:16

**x**

**x** 116:4,7 213:2

**y**

**yeah** 15:17 22:19 23:20 27:18 30:17 34:2,10 35:5 43:2,23 44:17 46:11 53:19 63:3 65:15 67:16 70:6 71:23 72:25 74:14,25 76:4 76:10 83:6,23 84:5 92:5 94:14 96:7 98:23 106:20 106:21 130:17 133:2 136:10 141:6 143:2 151:8,13,20 157:10 161:15 161:16 168:21 168:22 170:10 170:25 171:14 191:14 197:21 200:16 206:12 206:21 208:3

**year** 44:24 45:2 45:4 112:18 142:3 161:23 171:8 207:11 207:19 208:5,8

**[year - zoom]**

208:15,16,21
208:23 209:5
**years**  10:6
15:10 16:15,20
16:23 18:13,14
18:14 34:2
60:25 65:4
148:15 159:13
**yesterday**
94:24 99:22
**yi**  151:17,19
**york**  1:3 2:17
3:8,8,18 4:12
4:18 9:22
212:3,10
**yourtest**  111:2

**z**

**zachary**  90:21
94:11 105:14
108:6 123:2
124:4 129:10
160:24 164:16
**zoom**  67:2

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.