**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>                 Plaintiff,<br><br>    v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>                 Defendants. | Case No.: 22-cv-6978-AS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO EXCLUDE THE TESTIMONY OF CHAD COFFMAN</u>**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES..................................................................................................... ii

I.      PRELIMINARY STATEMENT............................................................................. 1

II.     BACKGROUND FACTS ....................................................................................... 4

III.    LEGAL STANDARDS........................................................................................... 7

IV.     COFFMAN'S TESTIMONY IS ADMISSIBLE BECAUSE IT IS RELIABLE
        AND RELEVANT ................................................................................................. 8

        A.      The Financial Results for the Second Half of Q2 2022 Are Not
                Confounding News Because They Are Part of the Corrective Information ........... 8

        B.      Statements Indicating Future Demand Uncertainty Are Not Confounding
                News Because They Are Mere Repetitions of Previous Statements..................... 12

        C.      The Slightly Revised Start of a Clinical Trial Is Not Confounding News
                Because It Is Immaterial ................................................................................. 14

        D.      There Is No Basis To Exclude Coffman's Testimony ......................................... 17

V.      CONCLUSION..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) .......................................................................................... 12

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) .............................................................................................. 10

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878 (S.D. Cal. 2019) ............................................................................ 19

*Bazemore v. Friday*,
   478 U.S. 385 (1986).................................................................................................... 3, 16

*Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*,
   2024 WL 1158811 (E.D.N.Y. Mar. 18, 2024) ................................................................. 7

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................................ 2

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
   2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024) ...................................................... 2, 7, 16

*Gruber v. Gilbertson*,
   2021 WL 2482109 (S.D.N.Y. June 17, 2021) ............................................................... 16

*Hasemann v. Gerber Prod. Co.*,
   2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024) ................................................................. 7

*In re DVI, Inc. Sec. Litig.*,
   2014 WL 4634301 (E.D. Pa. Sept. 16, 2014) ................................................................ 19

*In re Iridium Operating LLC*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007)............................................................................. 8

*In re Lehman Bros. Sec. & Erisa Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015) ........................................................................... 12

*In re Perrigo Co. Plc Sec. Litig.*,
   2021 WL 3073976 (S.D.N.Y. July 13, 2021)................................................................. 19

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ................................................................................... *passim*

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .................................................................................. 3, 17

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................. 2, 16

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020) ................................................................................ 16

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................11, 12

*Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) .......................................................................................11

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................ 19

*SEC v. Terraform Lab*s Pte. Ltd.,
    708 F. Supp. 3d. 450 (S.D.N.Y. 2023) ..................................................................... 19

*Shupe v. Rocket Companies, Inc.*,
    752 F. Supp. 3d 689 (E.D. Mich. 2024) ................................................................... 19

*Shupe v. Rocket Companies, Inc.*,
    752 F. Supp. 3d 735 (E.D. Mich. 2024) ..................................................................... 3

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024) ............................................................ 12

*Sjunde AP-Fonden*,
    2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023), *on reconsideration in part*,
    722 F. Supp. 3d 347 (S.D.N.Y. 2024). .............................................................. 14, 16

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ............................................................... 2

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ....................................................................................... 12

*Thor Equities, LLC v. Factory Mut. Ins. Co.*,
    627 F. Supp. 3d 330 (S.D.N.Y. 2022) ....................................................................... 3

*Ultra Recs., LLC v. Ultra Int'l Music Publ'g, LLC*,
    2024 WL 4663011 (S.D.N.Y. Nov. 4, 2024) ............................................................ 7

*U.S. v. Napout*,
    963 F.3d 163 (2d Cir. 2020) ...................................................................................... 7

**Rules**

Fed. R. Evid. 702 ................................................................................................................. 7

**Other Authorities**

Jill E. Fisch et. al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018) ..............................................................................................11

## I.   PRELIMINARY STATEMENT

Defendants' motion attempts to manufacture some (implausible) "alternative explanations" for the dramatic stock price drop on August 12, 2022 that was obviously, and demonstrably, caused by the Company's disclosure that demand for the Logix test had dramatically declined, as reflected in their Q2 2022 reporting of an *82% year-over-year* (and 78% quarter-to-quarter) fall in revenues. Their attempts should be rejected. Co-Diagnostics had *one product* that was responsible for virtually all its revenues: the Logix test. In the earnings announcement comprising the sole corrective event, Defendants directly attributed the Company's poor results "primarily to lower demand of the Logix Smart COVID-19 Test," (ECF No. 111-4 at 5), which is precisely the information they allegedly misrepresented and concealed from investors on May 12, 2022 due to a supposed lack of "near term visibility" in demand and "sizable fluctuations" in order patterns.

Defendants argue that Chad Coffman's expert opinion that this news caused Plaintiff's losses is fatally flawed because he did not disaggregate any price effects of purportedly confounding, non-fraud related news released at the same time, which is as follows: (1) the financial results for the second half of Q2 2022 (post-May 12, 2022); (2) statements about the uncertainty of future sales and demand; and (3) the announcement that the initial clinical trial of an at-home and point-of-care PCR test would start "soon". None of this information is "confounding"—i.e., "negative value-relevant information that would have substantially contributed to the stock price decline" (ECF No. 111-3 at 73:23-25 (Coffman Dep.))—ergo, there was nothing to disaggregate from the fraud-related price reaction. This is not a tough call.

The first category, disappointing sales and demand for the second half of Q2 2022 is not confounding because *it is part of the corrective information*. Some of the alleged misrepresentations concerned ending revenue guidance due to limited "visibility" that diminished Defendants' ability to forecast sales "*through the balance of the year,*" in language that both

explicitly and implicitly put the "risks to future demand on the table[.]" *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024). The second category, statements about demand uncertainty, so closely mirror the alleged misrepresentations that they could not possibly cause a stock price reaction; the market had "already digested that information and incorporated it into the price." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016). But even if there was some incremental new future demand information conveyed by the statements, it was part of the corrective information for the same reasons as the first category. And finally, the only actually non-fraud related information Defendants flag is the continued delay of a clinical trial for a test under development which would commence "soon," and analyst response shows this was not viewed by the market as negative material news. *See infra*, Section IV.C.

None of this purportedly confounding news is a basis for excluding Coffman's testimony under a long line of authority from *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 153 (1999) that disagreements such as these are within "the range where experts might reasonably differ" and must be decided by the jury, not the trial court. "[I]dentifying news, categorizing which news is 'material,' and determining whether news should have a certain (albeit rough) magnitude of positive or negative influence on price are all subjective determinations, as to which reasonable minds may disagree." *DoubleLine Capital LP v. Odebrecht Fin., Ltd*., 2024 WL 1115944, at *11 (S.D.N.Y. Mar. 14, 2024) (internal quotation omitted); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) ("As a practical matter, researchers conducting event studies will often have to rely on subjective assessments. While this methodology may detract from the ***weight*** one might place on the results, it does not affect admissibility.") (emphasis in original).

Defendants try to evade this body of authority by claiming that Coffman's opinions are unreliable because he failed to even consider or provide analysis of their "confounding" news. But Coffman *did* consider whether there was confounding news, and Defendants merely disagree with his conclusions. Experts are not required to account for every imaginable variable that could theoretically impact a stock price; "[w]here the expert's analysis accounts for all 'major factors,' the failure to include additional variables 'will affect the analysis' probativeness, not its admissibility.'" *Thor Equities, LLC v. Factory Mut. Ins. Co.*, 627 F. Supp. 3d 330, 339 (S.D.N.Y. 2022) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring)). Coffman's analysis plainly accounts for the "major factors." His event study controlled for the effects of market and industry movements, and he identified the major source of Company-specific price movements, which was news about the sales and demand of its keystone product, the Logix test. Moreover, he "considered and analyzed the degree to which information arguably unrelated to the corrective information (*i.e.*, confounding information) potentially impacted the stock price . . . ." ECF No. 111-1 at ¶76 (Coffman Rep.). He found no confounding news because there was none, but even if there were, it could not compete with the major factor impacting share prices on August 12, 2022, which was the corrective news about the evisceration of sales and demand for Co-Diagnostics' only real product.

Coffman is undisputedly a qualified and trusted authority on loss causation and damages in securities litigation.[1] He performed an event study "[c]onsistent with what has now become

---

[1] Among his vast body of experience, Coffman has served as the loss causation and damages expert in some of the largest securities litigations of our times, including, most notably, in *In re Bank of America Corp. Sec., Derivative and ERISA Litig.*, No. 09-2058-PKC (S.D.N.Y.), which settled shortly before trial for $2.425 billion. He has a bachelor's degree in economics, a master's degree in public policy, and is a chartered financial analyst "who has spent most of his twenty-year career analyzing how securities prices react to new information." *Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 764 (E.D. Mich. 2024) (quotation omitted); ECF No. 111-1 at Appendix B.

'standard operating procedure in federal securities litigation[.]'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016). No part of his study or analysis is rendered unreliable by his disagreements with Defendants' claims of confounding news, so no part of his opinions should be excluded.

## II.    BACKGROUND FACTS

Coffman was retained to: (1) assess the importance of the allegedly misrepresented information to investors, (2) determine whether, and the extent to which, investors' losses were caused by the alleged fraud (assuming Plaintiff establishes liability); (3) provide a means of calculating investors' damages; and (4) evaluate whether Co-Diagnostics' options traded efficiently during the Class Period. ECF No. 111-1 at ¶¶3-4. Defendants' motion challenges only number (2) of the foregoing, so this section will focus on Coffman's analysis relevant to loss causation.[2]

Coffman first considered the alleged misrepresentations in the context of Co-Diagnostics' business. Those misrepresentations, fully listed in his report appendices, included statements that:

- "While we remain very confident about the long-term potential of our business, ***our ability to accurately forecast Logix Smart(TM) COVID-19 Test sales through the balance of the year has diminished*** due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world . . . *. **For these reasons, we are not providing quarterly guidance at this time*** and will reassess this position in the future."

- "***Turning now to our visibility around the outlook for the balance of the year***. While we experienced strong demand for our products during the first quarter of 2022, ***changes in our operating environment and markets have restricted our near term visibility***. We will continue to navigate the near term environment with caution, but as a result, we'll not be providing quarterly guidance at this time. ***To be clear, we remain very confident about the long-term potential of our business and the demand for our products***. ***Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year***

---

[2] In a footnote, Defendants argue that Coffman's opinion on (3), damages, is also unreliable on the same grounds argued for loss causation. Defendants' arguments fail as to damages for the same reasons they are wrong on loss causation.

*has diminished* . . . ."

- [Responding to a question of whether he was "already seeing a decline in customer orders"] Defendant Brown: "It's more about the timing and being able to forecast the timing of orders is the bigger issue. ***It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in***."

ECF No. 111-1 at Appendix C; *id*. at ¶¶28-29. By contrast, "Defendants allegedly knew by the start of the Class Period that falling demand amid a changing COVID-19 testing environment had already had a huge negative impact on the sales and revenue that was being generated relative to prior periods and the market's expectations." *Id*. at ¶30.

Coffman reviewed and analyzed Co-Diagnostics' pre-Class Period earnings announcements (*id*. at ¶¶36-40), noting that "Defendants acknowledged at every turn that the Logix Smart Test was the primary driver of revenue and profitability for the Company." *Id*. at ¶41. He also reviewed analyst commentary from pre-Class Period through the alleged May 12, 2022 earnings announcement, which similarly "acknowledged that the [Logix Smart Test] was the backbone of the Company's revenue and [analysts] monitored and discussed its sales along with the COVID-19 testing landscape in general." *Id*. at ¶42; ¶¶43-48.

Coffman identified one corrective event, an after-hours earnings announcement on August 11, 2022, when "Defendants revealed far worse than expected revenue and profitability for Q2 2022 and directly attributed them to lower demand for the Logix Smart Test." *Id*. at ¶14. To determine whether the corrective information in the Q2 2022 earnings announcement caused Co-Diagnostics' share price to decline and by how much, he conducted an exhaustive analysis, which included: (1) analysis of the content of the information disclosed, (2) review of the analyst and investor reaction and commentary regarding the information disclosed, (3) review of news articles published in the wake of the Corrective Disclosure Event, and (4) an event study analysis that demonstrates, after controlling for market and industry factors, that there was a statistically

significant abnormal decline in the market price of Co-Diagnostics Common Stock at beyond the 99% confidence level. *Id*. at ¶17. "As part of my analysis, I also specifically evaluated whether there was information released contemporaneous with the corrective information that is unrelated to the alleged fraud (i.e., "confounding" information)." *Id*.; *see also*, *id*. at ¶¶67-74 (discussing August 11, 2022 earnings announcement and related commentary). He found a clear economic link between the alleged misrepresentations and omissions and this corrective event. He "did not identify any confounding information and thus, reasonably attribute[d] the full abnormal price decline on August 12, 2022, to the alleged corrective information." *Id*. at ¶76.

In his deposition, Coffman was asked when it is appropriate to disaggregate confounding news, and he responded: "When there is contemporaneous information that is being disclosed with the corrective information that ***clearly falls outside what would be corrective*** and that in my view ***had at least some value relevance*** and contributed in some way to the stock price movement that's being alleged." ECF No. 111-3 at 31:19-24. When asked if there were any aspects of the earnings announcement that he considered to be confounding, Coffman stated:

> ***I didn't see any evidence that anything else from that announcement would be negative and value relevant in any substantial way***. So my -- when I reviewed the details of those disclosures or of those company statements, I did not find there to be any negative value relevant information that would have substantially contributed to the stock price decline observed on that day, ***and that was backed up by what the analyst reports disclosed or that were -- that were published in the wake of that earnings announcement supported that conclusion***.

*Id*. at 73:18-74:4. And he specifically, repeatedly rejected the notion that the earnings announcement's indication of lower demand for the Logix Smart test going forward was confounding news, explaining, "it is clearly part of the corrective information because . . . as an economic matter, the disclosure of lower demand for a company's flagship product, the market is going to update its expectations based on that information, not just for the current quarter, but for all future quarters as well." *Id*. at 83:2-9; *see also id*. at 76:17-23; 82:13-18; 83:20-84:6; 84:22-

6

85:11. He was not asked about the purported confounding news that the clinical trial of Co-Diagnostics' home and point-of-care PCR test would be starting "soon." The contention that the clinical trial news is confounding was first raised in Dr. Juneja's reply report, to which Coffman did not have an opportunity to respond.

## III.    LEGAL STANDARDS

Under Federal Rule of Evidence 702, a witness is allowed to testify as an expert if the proponent of that testimony shows that "his or her 'specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue'; the 'testimony is based on sufficient facts or data' and 'is the product of reliable principles and methods'; and the witness 'has reliably applied the principles and methods to the facts of the case.'" *U.S. v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020). "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]" *Ultra Recs., LLC v. Ultra Int'l Music Publ'g, LLC*, 2024 WL 4663011, at *1 (S.D.N.Y. Nov. 4, 2024) (Subramanian, J.). "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 2024 WL 1158811, at *5 (E.D.N.Y. Mar. 18, 2024).

"[I]f an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court . . . . Moreover, 'exclusion remains the exception rather than the rule.'" *DoubleLine*, 2024 WL 1115944, at *6 (internal citations omitted). "Where only part of an expert's testimony meets the Rule 702 standard of admissibility, the court should limit the expert's testimony, rather than 'throw the good out with the bad.'" *Hasemann v. Gerber Prod. Co.*, 2024 WL 1282368, at *10 (E.D.N.Y. Mar. 25, 2024) (quoting *Pfizer*, 819 F.3d at 665). "The 'gatekeeping' function under *Daubert* is fundamentally about 'ensur[ing] the reliability and

7

relevancy of expert testimony,' and district courts may not stray from those goals." *Pfizer*, 819 F.3d at 658.

## IV. COFFMAN'S TESTIMONY IS ADMISSIBLE BECAUSE IT IS RELIABLE AND RELEVANT

### A. The Financial Results for the Second Half of Q2 2022 Are Not Confounding News Because They Are Part of the Corrective Information

Defendants argue that the financial results for the second half of Q2 2022 are outside the scope of the alleged fraud and must be disaggregated from fraud-related losses because the alleged misrepresentations on May 12, 2022 concerned reduced demand and sales *to date*, and Defendants did not know the full amount of Q2 sales at that time. Defs.' Br. at 7-8. Their arguments are meritless and should be rejected.

The alleged misrepresentations both explicitly and implicitly related to demand beyond May 12, 2022. By their explicit terms, the alleged misrepresentations claimed to cease guidance due to an inability "to accurately forecast Logix Smart COVID-19 Test sales *through the balance of the year*" and the reduced "visibility around the *outlook for the balance of the year.*" AC ¶¶44-45. Accordingly, the statements indicated that demand would be uncertain through the end of the year despite Defendants' knowledge that demand had already plummeted. That misrepresented and concealed drop in demand was revealed by the announcement of full quarter results substantially below expectations, and there is absolutely no reason to attempt to "disaggregate" anything from this fraud-related information.

Likewise, the misrepresented and concealed drop in demand and sales implicitly concerned demand and sales beyond May 12 because "the market would have anticipated as a matter of economics what the lower demand disclosure would mean, not just for the current quarter, but for future quarters." ECF No. 111-3 at 83:23-84:1. *See also, In re Iridium Operating LLC*, 373 B.R. 283, 333 (Bankr. S.D.N.Y. 2007) ("A stock price represents a consensus estimate of *expectations*

*for the future* of a company based on the discounted value of future cash flows and all manner of other information about the company.") (emphasis added); ECF No. 111-1 at ¶49 ("[A] security's value is the sum of the estimated future cash flows discounted at a rate that reflects their riskiness."). Truthful information about the drop in demand for the Company's primary revenue-generating product means that future cash flows would likely be lower than historical numbers and may indicate a higher discount rate be applied in valuing the Company's stock. Thus, as Coffman further explained, the precipitous drop in sales as of May 12, 2022 was "highly relevant and predictive of what [was] likely to continue happening, and . . . statements about current demand have relevance for the market's assessment of financial performance for future periods." ECF No. 111-3 at 65:3-12.

If Defendants had truthfully disclosed at the start of the Class Period what Plaintiff alleges was misrepresented and concealed—that sales had already cratered and demand was down substantially—investors would have anticipated dramatically lower sales for the rest of the quarter (and future periods), and would have lowered revenue estimates in line with what was reported on August 11, 2022.[3] Indeed, because the disappointing full-quarter sales are *almost exactly* double the amount of the sales achieved halfway through the quarter,[4] there is no reason to believe that a truthful disclosure on the date of the alleged misrepresentations would have elicited a significantly greater or lesser response than what actually occurred at the end of the period. "[T]he demand trend . . . that the company knew about as of May was roughly in line with the demand trend that

---

[3] Defendants' expert admits that analysts updated their earnings forecasts based on the misleading information Defendants provided in the May 12, 2022 analyst call. *See* Juneja Rep. at ¶¶19-20 (ECF No. 111-2). Likewise, as Coffman testified, "an earlier disclosure of lower demand would have caused the market to update its expectations not only for the current quarter but for further quarters. The market is not naive. It's going to evaluate what that information means for future periods as well." ECF No. 111-3 at 82:13-18.

[4] Specifically, Logix test sales for the first half totaled $2.5 million, and sales for the second half were almost identical at $2.52 million. ECF No. 115 at ¶¶11-12.

9

existed throughout the quarter." ECF No. 111-3 at 109:14-18.

Nevertheless, Defendants argue that the disclosure of "preliminary intra-quarter sales numbers on May 12" would not have been as impactful as the full-quarter sales on August 11. ECF No. 10 at 12-13. This misstates the allegations, which do not claim that Defendants needed to disclose "intra-quarter sales numbers on May 12," a notion that Coffman expressly refuted: "I'm not suggesting that [Defendants] had to disclose a particular sales figure. I'm assuming they had to reveal that there was ***substantially reduced demand***, and that [the test's] sales were far less than what [the Company] had seen in prior quarters." ECF No. 111-3 at 69:25-70:4; *see also*, AC ¶48. Thus, a truthful disclosure would have revealed that "***demand was already declining rapidly***" at that time. ECF No. 42 at 5 (emphasis added). Such a disclosure could possibly have resulted in an even ***greater*** stock price drop on May 13 than what occurred on August 12 because "you're introducing even more uncertainty as to what exactly the path of demand is" than you would with a disclosure of hard numbers. ECF No. 111-3 at 107:15-20. Thus, "the most economically reliable proxy we have for measuring how much this [lower demand] information mattered to the market is to observe how the stock price reacted when the lower demand was revealed to the market." *Id*. at 71:7-11. Defendants' argument, which is untethered from the factual allegations, is simply inapplicable and wrong.

Defendants also argue that "significant regulatory developments" after the alleged May 12th misrepresentations "directly impacted industry-wide demand for COVID testing" but that Coffman did not make any attempt to disaggregate their effects from the fraudulent inflation. Defs.' Br. at 9-11. They are wrong again. As in any event study on loss causation and damages, Coffman's "regression methodology specifically isolates and removes any market-wide or industry-wide phenomenon that may have been affecting the price of Co-Diagnostics Common

Stock." ECF No. 111-1 at ¶56 and n. 58; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 86 n.5 (2d Cir. 2023) (noting that "an event study isolates the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) . . . .").[5] To the extent that any of the ***admittedly*** "industry-wide" events impacted Co-Diagnostics' share prices, those price effects were excluded using an industry index as described in Coffman's report and regression analysis, which Defendants do not challenge. Moreover, the factual premise of Defendants' argument—that there were significant regulatory developments post-May 12—is directly contradicted by the testimony of Defendant Egan that, with regard to the factors impacting visibility, "***generally speaking, we're looking at the same overall environment***" from May 12, 2022 to August 11, 2022. ECF No. 102-23 (Egan Dep.) at 180:2-5.

Finally, Defendants' argument that sales or demand post-May 12 is not fraud-related is inconsistent with the law of loss causation. The law is clear that Coffman's inclusion of any share price drop caused by the disappointing full-quarter results is proper because "the ***subject*** of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Specifically, the key subject of both the alleged misrepresentations and the earnings announcement is the demand for Logix Smart tests. But even if the Court were to agree with Defendants' argument that disclosure of the specific revenues for the second half of the quarter could potentially cause a share price response on top of what would have occurred with a truthful disclosure of radically reduced sales and demand through May 12 alone, that additional response would still properly be included in Plaintiff's losses as the

---

[5] *See also*, Jill E. Fisch et. al., *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 571 (2018) ("Market conditions typically are measured using a broad index of other stocks' returns on each date considered in the event study or an index of returns of other firms engaged in similar business (since firms engaged in common business activities are likely to be affected by similar types of information").

materialization of a concealed risk. Under a materialization of the risk analysis, the alleged misrepresentations are "the 'proximate cause' of an investment loss[,] if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173).[6] Here, it is beyond dispute that the revelation that caused the loss—a significant Q2 2022 earnings miss—is within the zone of risk concealed by the misrepresentations and omissions of plummeting demand and sales for Logix tests, the Company's only real source of revenues. Any share price drop caused by the earnings miss is thus properly proof of loss causation and damages.

**B.    Statements Indicating Future Demand Uncertainty Are Not Confounding News Because They Are Mere Repetitions of Previous Statements**

Next, Defendants argue there was additional confounding news in the Q2 2022 earnings call that they would not give guidance due to uncertainty which "restricted our near-term visibility" on future demand for Logix Smart tests. Defs.' Br. at 11. They claim that Coffman's analysis is flawed because it did not disaggregate the effects, if any, of this purportedly confounding, non-fraud-related news from fraud-induced losses. Not so.

First and foremost, there is no reason to believe that Defendants' August 11 statements about demand "uncertainty" are new news which could potentially elicit a stock price reaction in an efficient market. Statements containing the same information "as earlier misrepresentations will not cause a change in the stock price . . . because the market has already digested that information and incorporated it into the price." *Pfizer*, 819 F.3d at 659; *see also*, *Sjunde AP-Fonden v. Goldman*

---

[6] *See, e.g.*, *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 180 (2d Cir. 2020) (alleged misrepresentations concealing risk of improper drug trial design materialized when the drug trial failed); *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001) (misrepresentations concealing CEO's lack of managerial ability materialized when he mismanaged liquidity crisis causing the business to fail); *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 265 (S.D.N.Y. 2015) (collapse of Lehman was within zone of risk concealed by balance sheet misrepresentations that made company look healthier than it arguably was).

*Sachs Grp., Inc.*, 2024 WL 1497110, at *22 (S.D.N.Y. Apr. 5, 2024) (rejecting purported confounding news that "was not truly new"). Defendants' statements at issue here are nearly identical to what they said on May 12, 2022. Specifically, on August 11, Defendants said that "[v]ariability in our operating environment has restricted our near-term visibility," (Defs.' Br. at 11), which is virtually indistinguishable from their May 12 statement that, "changes in our operating environments and markets have restricted our near term visibility" (AC ¶45). And, as noted above, Defendant Egan has admitted that "the same overall environment" existed throughout the Class Period. Likewise, the August 11 comment that the Company would not provide guidance was merely a continuation of a policy that was first announced on May 12. Guidance was suspended indefinitely on May 12, and there is no indication that the market expected it would resume in the near term. These supposedly confounding statements would not have elicited any stock price drop whatsoever, much less one that must be disaggregated from the effects of the alleged fraud.

To the extent that Defendants' statements of future demand uncertainty may be understood as conveying reduced future demand for the Logix Smart test (*i.e.*, with the statement that the Company believed its "orders will continue to come in at a measured pace" (ECF No. 111-1 at ¶ 68)), that information is squarely included in the corrective information for the reasons given in Section IV.B, above.[7] If Defendants had spoken truthfully on May 12, 2022, "the market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods as well regardless about whether [Defendants] explicitly said anything about future periods or not." ECF

---

[7] To be clear, the direct statements about demand in the August 11 earnings call are generally a mix of positive and negative indicators, reiterating many of the same factors as were noted in the May 12 earnings call. Nevertheless, the disappointing revenue announcement clearly informed the market that demand had plummeted and gave no indication that a rebound could be expected.

13

No. 111-3 at 76:17-23. So the claimed confounding news is either the immaterial repetition of prior statements about demand uncertainty or fraud-related; either way, there's nothing to disaggregate.

Finally, contrary to Defendants' arguments, Coffman did not fail to consider whether there was confounding news on August 11, 2022; he reviewed all potential news and affirmatively found there was nothing confounding. When asked by defense counsel why he did not consider any future demand-related information confounding, Coffman explained:

> ***In my view, it is clearly part of the corrective information*** because . . . as an economic matter, the disclosure of lower demand for a company's flagship product, the market is going to update its expectations based on that information, not just for the current quarter, but for all future quarters as well. So ***an acknowledgement that it was going to impact future quarters as well is not a confounding distinct economic message that . . . wouldn't have been derived from the disclosure of lower demand***.

ECF No. 111-3 at 83:2-14 (emphasis added). "Defendants' quarrel with that explanation is fodder for cross-examination, not exclusion." *Sjunde AP-Fonden*, 2023 WL 6314939, at *16, *on reconsideration in part,* 722 F. Supp. 3d 347 (S.D.N.Y. 2024).

### C.     The Slightly Revised Start of a Clinical Trial Is Not Confounding News Because It Is Immaterial

Lastly, Defendants argue that Coffman's methodology is unreliable because he did not disaggregate any potential price impacts of a slight delay to the start of a clinical trial from the fraud-related price impact of the Q2 2022 earnings announcement. But Defendants simply disagree with Coffman's conclusion—which is strongly supported by the evidence—that this news was not "value relevant confounding news so there was no need to disaggregate". ECF No. 111-3 at 72:23-73:1. His conclusion is well founded and not a basis for exclusion.

On the August 11, 2022 earnings call, Defendant Egan touted the progress the Company made in developing a potential at-home and point-of-care PCR test and said that "we look forward to announcing soon that we have commenced clinical trials," which would happen "in the near

14

term" and was "not far away." ECF No. 111-5 at 6, 10. In fact, Defendant Egan stated "***we're --***

***basically in the last mile of delivery here in terms of being ready for our clinical trials***". *Id*. at

10. Defendants now seize on this as negative news because the trial was previously indicated to

start by mid-August, but pointedly, they did not describe it in negative terms at the time. They did

not call it a "delay" and extolled their "world-class team of developers, scientist and engineers

working tirelessly to bring this platform to market with significant breakthroughs and

optimizations that have been made since formally initiating its development." *Id*. at 6. They stated,

as analysts surely understood, that "***time lines for such innovations are always fluid***." *Id.* at 10

(emphasis added).

Accordingly, analysts reported on it the same way: neither Litchfield Hills or H.C.

Wainwright & Co mentioned any delay, commenting only that they expected the test "to enter

clinical trials soon" (ECF No. 111-9 at 2) and that "clinical trials of the device could be completed

later this year" (ECF No. 111-7 at 3), respectively. Moreover, as Defendants' brief clearly indicates,

the start of the clinical trial had been repeatedly pushed back since its announcement in 3Q 2021,

further decreasing the likelihood that the market would respond significantly to this news.[8] Even

Sidoti & Company's August 12, 2022 report, which Defendants cite because it noted the delay, did

not lower 2022 revenue and EPS estimates on that basis. Rather, Sidoti lowered 2022 revenue

estimates to $44 million (from $77 million) and EPS to $0.17 (from $0.45) "[b]ased on the 2Q:22

results and factoring in the lack of visibility regarding near-term demand for COVID-19 testing,"

(ECF No. 111-6 at 2), supporting Coffman's conclusion that reduced Logix test demand was the

---

[8] At the time of its announcement, management anticipated completion of the clinical trial well before the end of 2021 so that emergency use authorization could be requested that year. *See* Defs.' Br. at p. 13. But by 4Q 2021, the Company announced that changes "delayed the start of the clinical trial by a few months," and in 1Q 2022, management projected August for the start of the trials. *Id*. at pp. 14-15. Again, given the "fluid" timeline Defendants suggested, the fact that the trial had not begun by the date of the earnings call was no surprise.

cause of the share price drop that day. Thus, Coffman's opinions that there was no confounding information in the earnings release and that the fraud-related sales and demand information caused investors' losses are reasonable and well supported by the record.

Contrary to Defendants' argument, the fact that Coffman did not explain in his report why this minor piece of information was not confounding is not a basis to find his analysis unreliable. There is no requirement that an expert describe every business point addressed in an earnings announcement and attempt to disaggregate any possible price effects in his regression analysis. "Where a study accounts for the 'major factors' but not 'all measurable variables,' it is admissible." *Gruber v. Gilbertson*, 2021 WL 2482109, at *10 (S.D.N.Y. June 17, 2021); *see also*, *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring) ("[I]t is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case."); *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) ("We acknowledge that [the expert]'s model fails to consider some arguably significant variables, but, '[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility.'"). Here, Co-Diagnostics is a company with ***only one significant source of revenues***—the Logix Smart test—which makes the sales of that test the overwhelming focus of analyst commentary and the driver of changes to projected revenues and price targets. The revenues and demand for this test were indisputably the major variables affecting Co-Diagnostics share prices (after controlling for market and industry movements, as Coffman did).

If Defendants want to argue that the August 12 share price response was caused in substantial part by the Company's slight shift in starting a clinical trial—or any other information from the earnings call—that is an argument for the trier of fact, not a basis for exclusion. *DoubleLine*, 2024 WL 1115944, at *11 (finding experts' disagreement over the significance of

16

news "is within the range 'where experts might reasonably differ,' . . . and therefore goes to 'the weight, not the admissibility,' of his causation and valuation opinion.") (quoting *Kumho Tire*, 526 U.S. at 153); *Sjunde AP-Fonden*, 2023 WL 6314939, at \*16 (admitting expert's testimony about magnitude of inflation caused by fraud because "[t]o the extent that Defendants contend that there is evidence in the record to the contrary . . . the remedy is not exclusion, but '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"); *Vivendi*, 838 F.3d at 256 (upholding admission of expert testimony and stating "[i]t was up to the ***jury*** to determine how much, if any, of the artificial inflation identified by [plaintiffs' expert] was caused by Vivendi's alleged fraud . . . by assessing the alleged misstatements and their connection to the misconception in question.") (emphasis in original).

> **D.     There Is No Basis To Exclude Coffman's Testimony**

Defendants argue that Coffman's testimony must be excluded because he "did not provide ***any*** analysis" of potentially confounding information or "***any*** details" of the extent to which such information impacted Co-Diagnostics' share prices. Defs.' Br. p.16. Their arguments grossly mischaracterize Coffman's report. Moreover, as discussed above, Coffman's analysis addressed the major factors impacting Co-Diagnostics' share prices and Defendants' dubious quibbles over supposedly confounding news are well within the realm where experts might reasonably disagree. Coffman's testimony is therefore admissible.

Defendants incorrectly argue that Coffman failed "to even consider whether certain information is potentially confounding." Defs.' Br. at 1. The Coffman Report expressly states that:

> To obtain a reasonable and reliable measure of the artificial inflation that was dissipated as a result of the Corrective Disclosure Event, *I also considered and analyzed the degree to which information arguably unrelated to the corrective information (i.e., confounding information) potentially impacted the stock price . . . . I did not identify any confounding information* and thus, reasonably attribute the full abnormal price decline on August 12, 2022, to the alleged corrective information.

ECF No. 111-1 at ¶76 (emphasis added). His finding of no confounding news was "backed up by what the analyst reports disclosed . . . that were published in the wake of that earnings announcement[.]" ECF No. 111-3 at 73:21-74:4; *see also*, ECF No. 111-1 at ¶17 (describing analysis supporting his opinion). This support was provided in his report, which quoted analyst reports and news commentary showing that disappointing Logix Smart COVID-19 test sales and reduced demand drove the market response to the earnings release:

- "***Co-Diagnostics stock sinks ~37% after hours on Q2 results miss, hurt by lower volumes***," *Seeking Alpha*, August 11, 2022, 4:55 PM: "***Shares of Co-Diagnostics (NASDAQ:CODX) have slumped 36.5% to $4.10 in Thursday postmarket trading, after the molecular diagnostics company posted Q2 results that missed estimates, with its revenue hit by volume declines.*** Its Q2 revenue of $5.02M fell 81.7% Y/Y and missed expectations by $13.98M. ***The decrease was primarily due to lower demand of the company's Logix Smart COVID-19 test***."

- "***Co-Diagnostics Plunges as Lower Covid Test Demand Hits Results***," *Bloomberg*, August 12, 2022, 4:47 AM: "***Co-Diagnostics shares plunge as¶ much as 40% in US premarket trading, after the molecular diagnostics firm flagged lower volumes for its Covid-19 test***."

- "***2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected***; Lower Price Target To $5 (From $14); Downgrade Rating To NEUTRAL (From BUY)," *Sidoti & Company*, August 12, 2022: "June-quarter sales declined to $5 million from $27 million in 2Q:21, ***$11 million below our estimate, as demand for COVID-19 tests declined much faster than expected*** due to the easing of mandates for travel and lower government funding."

- "Easing of Testing Mandates and Lack of Government Funding for Testing Programs Result in Revenue Decline," *Maxim Group*, August 12, 2022: "Co-Diagnostics (CDI) reported 2Q22 results yesterday (8/11), post-close with revenue of $5.0M, ***coming in below consensus of $19.0M and down 78% q/q as the COVID-19 testing market continues to slow . . . .*** Shares are down ~30%."

- "2Q22 Financial Results Reported; Reiterate Buy; Lowering PT to $9," *H.C. Wainwright*, August 15, 2022: "Last week, Co-Diagnostics reported its 2Q22 financial results. ***Total revenue was $5.0M, representing 82% YoY decline and missing our projection of $20.0M.*** Net loss was $2.7M, or ($0.08) per share, missing our estimated income of $4.9M. ***We note that revenue primarily comprised sales of the Logix Smart COVID-19 Test.***"

ECF No. 111-1 at ¶¶69-74; *see also*, *id*. at ¶¶42-48 (discussing earlier analyst reports likewise showing the central role of the Logix Smart test in share price valuation). Coffman also explained

18

the bedrock economic and valuation principles that support his view that a truthful disclosure of the allegedly concealed information that demand had plummeted would have factored into investors' estimates of future sales and demand, supporting his opinion that post-May 12 sales and demand information are part of the corrective information and not confounding. *Id*. at ¶¶49-53.

Thus, "[w]hile cast as an argument about methodology, defendants' gripes appear to be mere disagreements with" Coffman's "categorizations and conclusion." *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d. 450, 467 (S.D.N.Y. 2023). That is not a basis for excluding Coffman's testimony, rather, courts have consistently rejected arguments to exclude Coffman's opinions on disagreements such as those raised here. *In re Perrigo Co. Plc Sec. Litig.*, 2021 WL 3073976, at *1 (S.D.N.Y. July 13, 2021) (denying motion to exclude Coffman's testimony "on the ground that his report fails to disaggregate confounding information" because "[t]o the extent the defendants' contention is true, it goes to the weight of Coffman's testimony, not its admissibility."); *Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 689, 719 (E.D. Mich. 2024) ("Defendants' instant argument that Coffman should have considered an *additional* factor goes to weight, not admissibility."); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 906–07 (S.D. Cal. 2019) ("Coffman supports his conclusions with facts from the Company's statements made on August 13, 2014, analyst reports, attendance data, and economic principles. As such, Coffman's disaggregation opinions are admissible."); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019) (rejecting argument that Coffman "failed to articulate a means to . . . 'disaggregate from damages price declines resulting from non-actionable confounding information'" because "[i]n fact, Coffman's expert report considered all of these things."); *In re DVI, Inc. Sec. Litig.*, 2014 WL 4634301, at *6–7 (E.D. Pa. Sept. 16, 2014) (denying motion to exclude testimony that "does not proffer opinions that disaggregate non-fraud related influences on the price of DVI's

securities" because it "might assist the jury in resolving factual disputes as to whether certain events were a substantial factor in proximately causing declines in the price of DVI's securities, thereby creating actual economic losses for Plaintiffs.").

Indeed, in *Pfizer*, 819 F.3d at 660–61, the Second Circuit found it was "an abuse of discretion to prevent [the expert] from testifying on the grounds that he did not disaggregate the stock price inflation caused or maintained by Pfizer's own statements from that caused or maintained by [third parties'] statements" because the plaintiffs argued "that Pfizer is liable for ***all*** of the artificial inflation." 819 F.3d at 660-661 (emphasis in original). The Second Circuit did not decide whether plaintiffs' argument was "either legally or factually sustainable," but found that in the context of the plaintiffs' theory of the case, the expert's testimony "can be helpful to the jury ***without*** disaggregating the effects of Pfizer's specific misrepresentations because it shows that the discovery of information Pfizer allegedly concealed caused shareholders to lose money and calculates the amount of money they lost." *Id*. (emphasis in original). Similarly, in the context of Plaintiff's arguments here, Coffman's testimony will "be helpful to the jury without disaggregating" the information claimed by Defendants because it shows that the alleged misrepresentations caused Plaintiff's losses and calculates the amount lost under Plaintiff's theory of the claims.

In sum, Coffman's well-reasoned and supported analyses related to loss causation and damages are reliable, relevant, and should be admitted.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the testimony of Chad Coffman should be denied in its entirety.

Dated:  May 2, 2025

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Jason A. Uris*

Frederic S. Fox
Donald R. Hall
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
ffox@kaplanfox.com
dhall@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATION OF COMPLIANCE**

The undersigned certifies that, in accordance with Rule 7.1 of the Local Rules of the United States District Courts of the Southern and Eastern Districts of New York, dated January 2, 2025, and Rule 8.C. of the Individual Practices in Civil Cases of Judge Subramanian dated March 14, 2025, this memorandum complies with all formatting requirements set forth therein and contains 7,010 words (including footnotes but excluding the cover page, table of contents, table of authorities, signature blocks, and this certification of compliance).

_/s/ Jason Uris_
Jason Uris
