**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>     Defendants. | Case No.: 22-cv-6978-AS<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Court-appointed Lead Plaintiff Stadium Capital LLC respectfully submits this Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 108).

**GENERAL OBJECTIONS**

1.      Plaintiff objects to Defendants' submission of unsubstantiated facts that are not supported by a citation to admissible evidence, as required by Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(d).

2.      Evidence cited by Plaintiff in support or in contradiction of any particular fact or proposition should not be construed as the only evidence supporting or contradicting the fact or proposition in question, and Plaintiff specifically reserves the right to provide additional evidence as is necessary and appropriate.

3.      The phrases "undisputed", "does not dispute" and "not disputed", shall not be construed as a concession by Plaintiff that a statement is material, complete, supports the proposition which is cited, would be admissible at trial, or is otherwise relevant.

4.      Plaintiff reserves its right to challenge the admissibility of any statement and any cited materials at trial.

5.      Plaintiff's assertion that it "does not dispute" any particular fact or proposition is solely for purposes of Defendants' motion for summary judgment, and Plaintiff reserves all other objections including, but not limited to, its right to object to or contest each of Defendants' assertions of fact at the appropriate time, including the right to challenge such assertions of fact at trial.

6.      Because Defendants' section headings are not statements of material undisputed facts, no response is needed or provided as to any such headings.

7.      Defendants' rely largely on expert opinion testimony to support their alleged statements of undisputed material fact.  *See, e.g.,* ¶¶ 44, 50-51, 53-57, 58, 59, 60-104, 106, 147, 150, 153-54, 243-50, 256, 263, 289-90. However, opinions are not "facts" that properly may be presented under Local Rule 56.1.  *See, Ofudu v. Barr Labs., Inc.*, 98 F. Supp. 2d 510, 513 (S.D.N.Y. 2000) (disregarding 56.1 statement and "hesitat[ing] to use the word 'facts' because so many of the entries in the Rule 56.1 Statement are obviously opinions or arguments"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (refusing to consider "opinions" undisputed).  Indeed, Dr. Tsai's and Dr. Juneja's expert testimony is the subject of Plaintiff's *Daubert* Motion. ECF No. 105; *see, e.g., id*. at 6-9 (noting, for example, that Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions despite acknowledging that Co-Diagnostics operated globally with close to half of the Company's revenues derived from foreign sales).

## I.     BACKGROUND INFORMATION ON CO-DIAGNOSTICS

### A.      Company Background

1.      Co-Diagnostics is a Utah Corporation, headquartered at 2401 S. Foothill Drive, Salt Lake City, Utah 84109, that develops, manufactures, and sells reagents used for diagnostic tests that function via the detection and analysis of nucleic acid molecules (DNA or RNA), including robust and innovative molecular tools for detection of infectious diseases, liquid biopsy for cancer

screening, and agricultural applications. *See* Greene Decl. ¶ 13, Ex. 12,[1] Co-Diagnostics 2021 Form 10-K ("2021 10-K"), filed March 24, 2022; AC ¶ 2.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of the 2021 10-K.  Plaintiff has no independent basis to confirm or dispute whether Co-Diagnostics' molecular tools are "robust and innovative."

2.      Using proprietary test design systems and proprietary reagents, Co-Diagnostics has designed, developed, and obtained regulatory approval in countries around the world to sell various polymerase chain reaction ("PCR") diagnostic tests, including for the detection of COVID-19, influenza, tuberculosis, hepatitis B and C, human papillomavirus, malaria, chikungunya, dengue, and the zika virus. *See* Ex. 12, 2021 10-K, at 19; Greene Decl. ¶ 111, Ex. 110, Co-Dx (Nasdaq: CODX) Investor Presentation, dated November 2022 ("November 2022 Investor Presentation"), at 8 (setting forth menu of Co-Diagnostics' diagnostic tests).

**Plaintiff's Response**: Partially disputed to the extent "countries around the world" refers to countries beyond the United States, the "European Community", India, the United Kingdom, Australia, and Mexico.  Ex. 12, 2021 10-K, at 19.

3.      When COVID emerged in early 2020, CoDx's novel PCR technology enabled it to quickly develop a PCR test for COVID (the "Logix test"). *Id.*

**Plaintiff's Response**: Partially disputed to the extent this suggests COVID-19 emerged in "early 2020" as opposed to late 2019.  AC ¶ 3.  The 2021 10-K at 19, cited by Defendants, does not state that COVID emerged in early 2020.

---

[1] "Ex. __" refers to Exhibits 1-112 attached to the Declaration of Douglas W. Greene. ECF Nos. 102, 103.

4.      The Logix test and some of Co-Diagnostic's other COVID products have been approved for sale in countries such as the United States, United Kingdom, Australia, and Mexico by the regulatory bodies in those countries and have been registered for sale in many more countries. *See* Ex. 12, 2021 10-K, at 4.

**Plaintiff's Response**: Undisputed.

5.      Mr. Dwight Egan joined the Company as an officer and director in April 2013. *See* Greene Decl. ¶ 24, Ex. 23, Deposition of Dwight Egan ("D. Egan Dep.") 17:5-9 (testifying he became CEO in or about July 2017); AC ¶ 14

**Plaintiff's Response**: Undisputed.

6.      Mr. Dwight Egan is, and has served as, the Company's Chief Executive Officer, President and Chairman of the Board throughout the Class Period.[2] *See id.*

**Plaintiff's Response**: Undisputed.  With respect to footnote 2, partially disputed.  Plaintiff does not dispute that any alleged artificial inflation would not have entered the stock price during market hours on May 12, 2022.   Ex. 22 Coffman Dep. at 38:7-14 ("I'm not taking a view on what the class period should be or shouldn't be. All I'm saying is that my understanding of when the inflation would have entered the stock would have been after the first alleged misstatement, which occurred after the market closed on May 12. So in my view at least during the market trading hours of May 12 there was not artificial inflation.").

---

[2] The "Class Period" is alleged to run from May 12, 2022 through the close of the market on August 11, 2022 at 4:00 p.m. ET. *See* AC ¶ 1. However, it is undisputed that the challenged statements were made after the market closed on May 12, 2022 and that any alleged artificial inflation would not have entered the stock price until May 13, 2022. Greene Decl. ¶ 95, Ex. 94 (Expert Report of Chad Coffman, CFA, dated Nov. 20, 2024 ("Initial Coffman Rpt.")), ¶ 81 n.76 (acknowledging same).

7.      Mr. Brown joined the Company as the Chief Financial Officer in February 2021 and reports to Mr. Dwight Egan. Ex. 23, D. Egan Dep. 25:21-26:2 (testifying to same); AC ¶ 15.

**Plaintiff's Response**: Undisputed.

8.      Mr. Brown is, and has served as, the Company's Chief Financial Officer and Secretary throughout the Class Period. *See* Greene Decl. ¶ 5, Ex. 4, Co-Diagnostics Form 8-K, dated Feb. 22, 2021; *id.* ¶ 9, Ex. 8, Co-Diagnostics Form 8-K, dated July 8, 2021; *id.* ¶ 22, Ex. 21, Deposition of Brian Brown ("Brown Dep.") 17:10-12 (estimating a February or March 2021 start date), 20:21-21:9 (setting forth responsibilities as CFO); AC ¶ 15.

**Plaintiff's Response**: Undisputed.

**B.      The COVID-19 Outbreak And The Logix Test**

9.      On or about December 31, 2019, the Wuhan Municipal Health Commission informed the World Health Organization (the "WHO") about a cluster of pneumonia cases in Wuhan, China, with no known cause. *See* Greene Decl. ¶ 2, Ex. 1, Co-Diagnostics Form 10-Q for the quarter ended Mar. 31, 2020, filed May 14, 2020 ("2020 Q1 10-Q"), at 15; AC ¶ 3.

**Plaintiff's Response**: Undisputed.

10.      In January 2020, public health officials in China confirmed human-to-human transmission of the virus and identified a novel coronavirus as the causative agent of the outbreak, later referred to as COVID-19. *Id.*

**Plaintiff's Response**: Undisputed.

11.      Because COVID-19 can be detected by DNA-based testing and Co-Diagnostics was already in the DNA-based testing business, the world's need for COVID-19 testing presented a unique opportunity to Co-Diagnostics. *See* Greene Decl. ¶ 6, Ex. 5, Co-Diagnostics 2020 Form 10-K, filed March 25, 2021 ("2020 10-K"), at 11 (describing Co-Diagnostic's ability to "respond rapidly and produce quality product" in response to the COVID pandemic); Ex. 110, November

2022 Investor Presentation, at 6 (illustrating the speed with which Co-Diagnostics was able to bring the Logix test to market); AC ¶ 25.

> **Plaintiff's Response**: Undisputed.

12.    In January 2020, Co-Diagnostics began developing a COVID-19 diagnostic test using the Company's previously patented CoPrimer technology. *See* Ex. 1, 2020 Q1 10-Q, at 15; AC ¶ 26.

> **Plaintiff's Response**: Undisputed.

13.    On January 23, 2020, Co-Diagnostics announced that it had completed the principal design work for the Logix test, which was intended to address the potential need for detection of the COVID-19 virus. *See* Ex. 1, 2020 Q1 10-Q, at 15; AC ¶ 3.

> **Plaintiff's Response**: Undisputed.

14.    On February 24, 2020, Co-Diagnostics announced that the Logix test received a CE-marking, making it the first U.S.-based company to obtain approval in the E.U. and allowing the Logix test to be sold in the European market and other markets that accept CE-marking as valid regulatory approval. *See* Ex. 1, 2020 Q1 10-Q, at 15; November 2022 Investor Presentation, at 6; AC ¶¶ 4, 28.

> **Plaintiff's Response**: Undisputed.

15.    On April 6, 2020, Co-Diagnostics announced that it had received an Emergency Use Authorization for the Logix test from the U.S. Food and Drug Administration ("FDA"), allowing the Company to sell the test to certified clinical laboratories in the United States for the diagnosis of COVID-19. *See* Greene Decl. ¶ 33, Ex. 32, Co-Diagnostics Press Release, Apr. 6, 2020; AC ¶¶ 4, 29.

> **Plaintiff's Response**: Undisputed.

**16.**    After commencing sales, the Logix test accounted for the vast majority of the Company's revenues. *See* Ex. 23, D. Egan Dep. 47:5-13; Ex. 21, Brown Dep. 41:7-21 (estimating sales of the Logix test accounted for "95 plus percent" of the Company's revenue in 2021 and 2022); *see also* Greene Decl. ¶ 21, Ex. 20, Deposition of Andrew Benson ("Benson Dep.") 34:9-13 (testifying Logix test sales accounted for almost all of Co-Diagnostics' revenue during the relevant time period); AC ¶ 5.

**Plaintiff's Response**: Undisputed.

**17.**    At all relevant times, Co-Diagnostics customers were primarily laboratories and distributors. *See* Greene Decl. ¶ 25, Ex. 24, Deposition of Seth Egan ("S. Egan Dep.") 39:23-40:5.

**Plaintiff's Response**: Undisputed.

**18.**    Co-Diagnostics' revenue for the three months ended March 31, 2020 was $1,548,528. Ex. 1, 2020 Q1 10-Q, at 4, 21.

**Plaintiff's Response**: Undisputed with the clarification that the Q1 10-Q states that Co-Diagnostics did not begin selling the Logix test until "February and March 2020". *Id*. at 15.

**19.**    Co-Diagnostics' revenue for the six months ended June 30, 2020 was $25,588,802, and $24,040,274 for Q2 2020 alone. Greene Decl. ¶ 3, Ex. 2, Co-Diagnostics Amended Form 10-Q for the quarter ended June 30, 2020, filed November 3, 2020 ("Amended 2020 Q2 10-Q"), at 4.

**Plaintiff's Response**: Undisputed.

**20.**    Co-Diagnostics' revenue for the nine months ended September 30, 2020 was $47,407,555, and $21,818,753 for Q3 2020 alone. Greene Decl. ¶ 4, Ex. 3, Co-Diagnostics Form 10-Q for the quarter ended September 30, 2020, filed November 16, 2020 ("2020 Q3 10-Q"), at 4.

**Plaintiff's Response**: Undisputed.

21.     Co-Diagnostics' revenue for the fiscal year ended December 31, 2020 was $74,552,758, and $27,145,203 for Q4 2020 alone. Ex. 5, 2020 10-K, at 19.

**Plaintiff's Response**: Undisputed.

22.     Co-Diagnostics' revenue for the three months ended March 31, 2021 was $20,024,769. Greene Decl. ¶ 8, Ex. 7, Co-Diagnostics Form 10-Q for the quarter ended March 31, 2021, filed May 13, 2021 ("2021 Q1 10-Q"), at 4.

**Plaintiff's Response**: Undisputed.

23.     Co-Diagnostics' revenue for the six months ended June 30, 2021 was $47,382,909, and $27,358,140 for Q2 2021 alone. Greene Decl. ¶ 10, Ex. 9, Co-Diagnostics Form 10-Q for the quarter ended June 30, 2021, filed August 12, 2021 ("2021 Q2 10-Q"), at 4.

**Plaintiff's Response**: Undisputed.

24.     Co-Diagnostics' revenue for the nine months ended September 30, 2021 was $77,484,262, and $30,101,353 for Q3 2021 alone. Greene Decl. ¶ 11, Ex. 10, Co-Diagnostics Form 10-Q for the quarter ended September 30, 2021, filed November 12, 2021 ("2021 Q3 10-Q"), at 4.

**Plaintiff's Response**: Undisputed.

25.     Co-Diagnostics' revenue for the fiscal year ended December 31, 2021 was $97,885,603, and $20,401,341 for Q4 2021 alone. Ex. 12, 2021 10-K, at 20.

**Plaintiff's Response**: Undisputed.

26.     Co-Diagnostics' revenue for the three months ended March 31, 2022 was $22,699,044. Greene Decl. ¶ 15, Ex. 14, Co-Diagnostics Form 10-Q for the quarter ended March 31, 2021, filed May 12, 2022 ("2022 Q1 10-Q"), at 5.

**Plaintiff's Response**: Undisputed.

**27.**     Co-Diagnostics' revenue for the six months ended June 30, 2022 was $27,722,270, and $5,023,226 for Q2 2022 alone. Greene Decl. ¶ 19, Ex. 18, Co-Diagnostics Form 10-Q for the quarter ended June 30, 2022, filed August 11, 2022 ("2022 Q2 10-Q"), at 5.

**Plaintiff's Response**: Undisputed.

**28.**     In 2021, just over 50% of Co-Diagnostics' revenue was derived from sales in the United States, with just under 50% coming from international sales. Ex. 110, November 2022 Investor Presentation, at 16 ("In 2021, 53% of revenues were derived from the U.S. while 47% were from the rest of the world.").

**Plaintiff's Response**: Undisputed.

**29.**     Co-Diagnostics' 2021 Form 10-K identified and discussed risk factors related to its business, including:

> ***We have a limited commercial history upon which to base our prospects and are not certain that we will sustain profitability in the future.*** . . . We were able to achieve net income during the prior two fiscal years because we were able to develop, market and profitably sell our . . . COVID-19 tests, but we do not have any way to predict how long our market for that test will continue. . . .
>
> ***Our near-term success has been dependent on the market for our COVID-19 tests and future success is dependent on continued demand for COVID-19 diagnostics and upon our ability to develop and market other commercially accepted diagnostic tests.*** Our future success will depend, in part, on the continued market for COVID-19 tests, our ability to develop and sell sufficient quantities of other diagnostics tests, and our ability to successfully receive regulatory approval for and profitably market our [new at-home and point-of-care multi-plex PCR testing platform]. . . . Any failure to continue sales of our tests in sufficient quantities to maintain profitability would adversely affect our operating results. . . .

Ex. 12, 2021 10-K, at 13-14 (emphasis in original).

**Plaintiff's Response**: Undisputed that the above accurately represents excerpted language from Co-Diagnostics' Form 10-K, for the fiscal year ending December 31, 2021, filed with the

SEC on March 24, 2022. However, Plaintiff respectfully refers the Court to the full contents of these risk factors. *Id*.

### C. Development of Co-Diagnostics' At-Home And Point-Of-Care PCR Platform

30. During 2021 and 2022, the Company was actively developing a new testing platform for at-home and point-of-care settings that could simultaneously test for COVID-19 and other diseases. *See* Ex. 23, D. Egan Dep. 38:20-39:5 (referring to the new platform as the "Co-Dx PCR Pro"), 79:6-19; Greene Decl. ¶ 103, Ex. 102, Company Presentation, dated May 2022 (providing product overview and quoting White House COVID-19 Coordinator, Dr. Ashish Jha: "As we head into the fall, we are all going to have a lot more vulnerability to a virus that has a lot more immune escape than even it does today and certain than it did six months ago. That leaves a lot of us vulnerable."); *id.* ¶ 102, Ex. 101, Co-Diagnostics Board Presentation, dated May 2022 (informing board of market research showing interest in at-home diagnostic testing is high among consumers).

**Plaintiff's Response**: Undisputed that the Company was developing such a platform during 2021 and 2022. However, the cited documents do not state whether the device could "simultaneously test for COVID-19 and other diseases", and as such, lacks foundation and Plaintiff has no basis to agree or disagree with that portion of the statement. *See, e.g.*, Ex. 23, D. Egan Dep. 156:17-23 ("the new project . . . is going to be able to treat -- not treat, but to diagnose or to screen for COVID specifically and for other pathogens down the road. And, in fact, the current FDA filing is solely COVID."); *id.* at 40:24-41:4 (testifying that the Co-Dx PCR Pro is not currently approved for sale).

31. The at-home and point-of-care PCR platform was a priority in large part because Co-Diagnostics believed that COVID was "going to be here as a permanent part of our landscape going forward." *See* Ex. 23, D. Egan Dep. 155:17-158:15.

10

**Plaintiff's Response**: Disputed as Defendants' mischaracterize Dwight Egan's testimony. In the testimony cited, Dwight Egan did not state that "[t]he at-home and point-of-care PCR platform was a priority in large part *because* Co-Diagnostics believed that COVID was 'going to be here as a permanent part of our landscape going forward.'" (emphasis added).  Rather, he testified that Co-Diagnostics was "emphasizing that that theme [that COVID was not going away], *because* we're spending a lot of money putting up a new platform for at home and point of care use . . . ."  *Id.* at 155:17-25 (emphasis added); 156:13-157:6 ("So when we're making an argument that the COVID is going to be here as a permanent part of our landscape going forward, we're making the argument that the new project that we're investing a lot of shareholder money on is going to be able to . . . diagnose or to screen for COVID specifically. . . it was going to be a long-term viable and important product").

**32.**    On March 24, 2022, after the markets closed and following the disclosure of Co-Diagnostics' 2021 financial results, Co-Diagnostics hosted a conference call with investors and analysts (the "March 24, 2022 Earnings Call"). *See* Greene Decl. ¶ 76, Ex. 75, S&P Global, Co-Diagnostics (CODX) Q4 2021 Earnings Call Transcript, dated March 24, 2022 ("March 24, 2022 Earnings Call Transcript").

**Plaintiff's Response**: Undisputed.

**33.**    During the March 24, 2022 Earnings Call, Mr. Dwight Egan updated investors regarding Co-Diagnostics' development of a new at-home PCR platform:

> We believe that our new powerful platform represents the future of at-home and point-of-care testing. We continue to invest in the platform and expect that it will drive significant growth and expand our market reach. There is a substantial domestic and international market that remains for COVID-19 testing, especially for advanced and innovative technologies such as the Co-Dx YourTest PCR platform. Our team is highly focused and committed to bringing this exciting device to commercialization.

Ex. 75, March 24, 2022 Earnings Call Transcript, at 6.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Dwight Egan's statements during the March 24, 2022 Earnings Call.

34.     Also during the March 24, 2022 Earnings Call, Mr. Dwight Egan answered a question from Theodore O'Neill, an analyst for Litchfield Hills Research ("Litchfield"), as follows:

**Theodore O'Neill**
*Litchfield Hills Research*
[I]f the US government does not reauthorize any additional money for COVID testing, would this have an impact on your business?

**Dwight H. Egan**
*Chief Executive Officer & Director, Co-Diagnostics, Inc.*
I think we would have to say that the free money from the government certainly would enhance sales. So I think it would have an impact on us or anybody else that's in the COVID space, which is the reason why we have had the foresight a 1.5 years ago to say, what happens after COVID traverses from a pandemic to an endemic phase? Molecular diagnostics was a big business before COVID. It will continue to be a big business after COVID.

The question becomes what kind of platform will win in a post-COVID environment if that is a post-pandemic environment. And we believe, and I think other people believe such as Dr. Scott Gottlieb that this paradigm shift in the FDA allowing the at-home testing is going to make it so these other endemic diseases will also have an opportunity, as Dr. Gottlieb says, that it opens up a whole new range of home testing for a whole – a big range of products of different pathogens.

So I think it's just important to realize that we had the foresight more than 1.5 years ago to recognize that and to begin the development of a product so that when we came through that whole period, our product offering would have applicability to lots of other diseases. And keep in mind that COVID is so pernicious in terms of its lethality that these other things like the Flu and RSV, even strep for example, they will need to be tested along with COVID. COVID will have to be part of the mix of what people are tested for. And in that regard, the multiplexing capability of our device will be critical in making it so people can test for a number of different diseases, for a very small price at home or at the point-of-care. And that's all part of the strategy going forward.

So I think if you were to look before COVID and say, what would have been the best device to have on the market during COVID? Had we been able to do this two years ago, that would have, of course, been awesome. But going forward, it is clearly the best solution and going to be very powerful in our belief.

12

Ex. 75, March 24, 2022 Earnings Call Transcript, at 13.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Dwight Egan's statements during the March 24, 2022 Earnings Call.  Portions of the above are incorrectly quoted.  *See, e.g.*, (quoting "post-COVID environment that is a post-pandemic environment" as "post-COVID environment if that is a post-pandemic environment").

35.    On May 12, 2022, after the markets closed and following the disclosure of Co-Diagnostics' Q1 2022 financial results, Co-Diagnostics hosted a conference call with investors and analysts (the "May 12, 2022 Earnings Call"). Greene Decl. ¶ 77, Ex. 76, S&P Global, Co-Diagnostics (CODX) Q1 2022 Earnings Call Transcript, dated May 12, 2022 ("May 12, 2022 Earnings Call Transcript").

**Plaintiff's Response**: Undisputed.

36.    Co-Diagnostics provided additional updates regarding the at-home PCR test during the May 12, 2022 Earnings Call:

**Dwight H. Egan**
*Chief Executive Officer & Director, Co-Diagnostics, Inc.*

[T]he final optimizations of the new PCR platform are underway, and we are confident that pending FDA review, we will be able to launch a product that has revolutionary ramifications for the molecular diagnostics market worldwide. We are on track for commencement of clinical trials by our second quarter earnings call this August in anticipation of submission of the device to the FDA following the successful completion of those trials.

We would like to emphasize that we believe this PCR platform will come to represent the highest level of utility for at-home point-of-care applications, extending far beyond COVID. . . . [I]t facilitates gold standard PCR results in around 30 minutes, utilizing a disposable sample collection cup or a cartridge that is considerably less expensive than other molecular non-PCR COVID-19 product offerings.

In addition, a significant benefit of the platform is its ability to multiplex, that is to test for numerous disease states with 1 sample. Ultimately, we anticipate end users will be able to differentiate between diseases that have similar symptoms through

the multiplex syndromic panels that the company expects to introduce over time. . . .

Our patented CoPrimer molecule has unique properties associated with multiplexing PCR, and we intend to bring the full power and capabilities of our proprietary technology to our new Co-Dx PCR platform. With the forthcoming product launch of the platform, we believe the company will be at the epicenter of at-home point-of-care testing throughout the world.

We have been aggressively setting the stage for our product launch through attendance at multiple international and domestic conferences as we position ourselves to participate in a whole new field of at-home point-of-care testing for a range of pathogens when we are cleared to begin marketing activities for the product.

Ex. 76, May 12, 2022 Earnings Call Transcript, at 5.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Dwight Egan's statements during the May 12, 2022 Earnings Call.

37.    On August 11, 2022, at 4:30 p.m. ET, after the markets closed and following the disclosure of Co-Diagnostics' Q2 2022 financial results, Co-Diagnostics hosted a conference call with investors and analysts (the "August 11, 2022 Earnings Call"). *See* Greene Decl. ¶ 18, Ex. 17, Co-Diagnostics Form 8-K, filed August 11, 2022 ("August 11, 2022 8-K"); *id.* ¶ 78, Ex. 77, S&P Global, Co-Diagnostics (CODX) Q4 2021 Earnings Call Transcript, dated August 11, 2022 ("August 11, 2022 Earnings Call Transcript").

**Plaintiff's Response**: Undisputed.

38.    On the August 11, 2022 Earnings Call, Co-Diagnostics provided additional updates regarding the at-home PCR test and indicated that it had not yet commenced clinical trials:

**Dwight H. Egan**
*Chief Executive Officer & Director, Co-Diagnostics, Inc.*

It is important to remember the high standard to which we hold ourselves and our goal of delivering products that are high quality, reliable and durable, and we look forward to announcing soon that we have commenced clinical trials. This device and platform is transformative and it will fundamentally alter the way the world thinks about at-home and point-of-care testing. However, time lines for such

innovations are always fluid. To put it simply, if it were easy, anyone could do it. . . .

Our progress in the development of the Co-Dx PCR Home platform is reflected in the expansion of our campus, where it is being developed, optimized and manufactured.

We have expanded our operations to include 4 buildings, housing, more than 70 engineers, scientists and support staff working to help make gold standard PCR ubiquitously available, including in areas of the world where infrastructure and pricing have traditionally made PCR unfeasible.

Ex. 77, August 11, 2022 Earnings Call Transcript, at 5; *see also id.* at 9 ("We'll have it into clinical trials, as we said, in the near term, but we're not going to put it in before we are totally confident in how it's performing and how much we've been able to optimize it. But it's not far away.").

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Dwight Egan's statements during the August 11, 2022 Earnings Call. However, Defendants omit other relevant context for these statements. Also on the August 11, 2022 Earnings Call, Dwight Egan answered a question from an analyst regarding the timing of clinical trials as follows:

**James Philip Sidoti**, *Sidoti & Company, LLC - Research Analyst*:

And you said you expect to commence clinical trials soon from the new point-of-care device. Can you give us a little more color on what that means? Is that something you expect in weeks or months or longer than that?

**Dwight H. Egan,** *Co-Diagnostics, Inc. - Chairman, CEO & President*:

We expect that they will commence when we're highly confident that we have the very best product that we can present to the FDA. ***And we're -- basically in the last mile of delivery here in terms of being ready for our clinical trials***. And we're not trying to put out a product that would just be good enough to get through EUA. We're trying to put out a product that we have total confidence in as we put it out into the market. And so we're really doing some terrific optimizations of the product. . . .

. . . We'll have it into clinical trials, as we said, ***in the near term***, but we're not going to put it in before we are totally confident in how it's performing and how much we've been able to optimize it. ***But it's not far away***.

15

Supp. Uris Decl., Ex. 1 at 7 (emphasis added).[3]

Disputed to the extent Defendants imply that this represented material, confounding information.  *See* Response to No. 279.

**39.**    Analysts, including Sidoti & Company, LLC ("Sidoti"), H.C. Wainwright & Co. ("H.C. Wainwright"), Litchfield, and Maxim Group ("Maxim"), regularly reported on Co-Diagnostics' ongoing development of the at-home PCR platform:

**Sidoti**

**Management indicated that trial for the PCR point-of-care systems is due to start in the next three months** . . . . **The company is in the final stages of developing a unique point-of-care PCR test system for multiple diseases**. Co-Diagnostics' current test must be completed in a clinical lab using standard diagnostic equipment designed to run samples in large batches. The company is developing the Co-Dx PCR Home Device, a portable system that can complete a large menu of tests, including the presence of genetic material for Covid-19, on a single patient sample taken in the home or office. The systems are expected to be more accurate than current point-of-care antigen tests. . . . [C]hange[s] delayed the start of the clinical trial a few months, and we now expect approval 1H:23. We assume that the company introduces the Co-Dx PCR Home Device in 2023, with sales ramping over the ensuing quarters.

Greene Decl. ¶ 79, Ex. 78, Sidoti & Company, LLC, "1Q:22 Results Exceed Expectations; Expect Earnings To Decline In 2022, As Covid Cases Level Off, Before Rebounding In 2023 With Release Of Point-Of-Care System; Maintain $14 Target, Buy Rating," May 13, 2022 ("Sidoti May 2022 Report"), at 1-2 (emphasis in original).

**H.C. Wainwright**

**Point-of-care PCR device may be submitted for EUA later this year.** Co-Diagnostics continues to develop the at-home/point-of-care PCR diagnostic platform Co-Dx based on its proprietary CoPrimer technology. This device has a test menu that includes COVID-19 and other infectious diseases. . . . Management expects to start clinical trials of the device this summer. We believe the clinical trials could be completed later this year, followed by an [EUA] application

---

[3] All references to "Supp. Uris Decl. Ex. __" are to exhibits accompanying the Supplemental Declaration of Jason A. Uris in Support of Lead Plaintiff's Opposition to Defendants' Motion for Summary Judgment (the "Supp. Uris Decl.").

submission to the FDA. . . . In our view, the Co-Dx platform's ability . . . may potentially drive top-line growth in the future.

Greene Decl. ¶ 80, Ex. 79, H.C. Wainwright & Co., "1Q22 Financial Results Reported; Reiterate Buy; Modulating PT to $12," May 16, 2022 ("H.C. Wainwright May 2022 Report"), at 1 (emphasis in original).

### Litchfield

**New diagnostic platform, the CO-DX is tracking to plan.** The company is advancing the development of its low-cost, highly accurate, multiplexable Point-of-Care (POC) and at-home diagnostic PCR cartridge-based platform for a variety of diseases and COVID. We expect it to enter clinical trials soon and we believe it will represent a major new growth vehicle for the company. We can imagine this product in every home as one of the ways we "live with COVID."

Greene Decl. ¶ 81, Ex. 80, Litchfield Hills Research, "CODX beats 1Q22 Consensus but drops forward guidance – Reiterate Buy rating and $29 PT," May 16, 2022 ("Litchfield May 2022 Report"), at 1 (emphasis in original).

### Maxim

Beyond COVID-19, the company is working on a number of infectious disease products including a multi STI panel which is in ongoing development and its monkeypox PCR test which has completed design, and reagents have been shipped to a distributor. In addition, the company continues to advance its at-home rapid PCR device.

Greene Decl. ¶ 82, Ex. 81, Maxim, "Easing of Testing Mandates and Lack of Government Funding for Testing Programs Result in Revenue Decline," Aug. 12, 2022 ("Maxim August 2022 Report"), at 1.

### Sidoti

**The company is in the final stages of developing a unique point-of-care PCR test system for multiple diseases**. . . . [C]hanges have delayed the start of the clinical trials a few months, and we now expect 22H:23 approval . . . .

Greene Decl. ¶ 83, Ex. 82, Sidoti & Company, LLC, "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target To $5 (From

$14); Downgrade Rating To NEUTRAL (From BUY)," August 12, 2022 ("Sidoti August 2022 Report"), at 2 (emphasis in original); *see also id.* (identifying "Delays in new product approvals" as the only "Key Risk"); Greene Decl. ¶¶ 86 - 90, Exs. 85 - 89 (additional analyst reports on Co-Diagnostics from Sidoti, dated March 4, 2022 and March 25, 2022; Litchfield, dated March 28, 2022; and H.C. Wainwright, dated March 25, 2022 and July 12, 2022).

**Plaintiff's Response**: Undisputed insofar as this accurately reflects excerpts from analyst reports. Disputed to the extent that "regularly" is vague and undefined. Disputed to the extent Defendants imply that any announcements on August 11, 2022 regarding the at-home PCR platform represented material, confounding information. *See* Response to No. 279.

## II. STADIUM CAPITAL LLC

40. Stadium Capital purchased 15,000 shares of Co-Diagnostics' publicly traded common stock on July 25, 2022 and 21,000 shares of Co-Diagnostics' publicly traded common stock on July 26, 2022. *See* ECF No. 1, Initial Compl., at 16-17.

**Plaintiff's Response**: Undisputed.

41. Joseph Zicherman is the Managing Director of Stadium Capital and brought this lawsuit on behalf of a class of all persons and entities who purchased Co-Diagnostics' publicly traded common stock during the Class Period. *See* AC ¶ 1.

**Plaintiff's Response**: Partially disputed. This lawsuit is brought on behalf of a class of all persons and entities who purchased the publicly traded securities of Co-Dx, which includes investors that purchased or otherwise acquired Co-Dx common stock or call options, or sold Co-Dx put options, during the Class Period. *See* AC ¶ 1; ECF No. 73 at 1.

42. Joseph Zicherman testified that he purchased Co-Diagnostics stock based on statements Mr. Dwight Egan made at a conference in June 2022. Greene Decl. ¶ 31, Ex. 30, Deposition of Joseph Zicherman, dated Nov. 15, 2024 ("Zicherman Dep. I") 78:11-80:16; 83:3-

14, 84:22-25, 124:3-17, 144:15-146:16; *id.* ¶ 32, Ex. 31, Deposition of Joseph Zicherman, dated Feb. 4, 2025 ("Zicherman Dep. II") 253:4-254:25, 273:14-274:3, 305:8-307:5.

**Plaintiff's Response**: Partially disputed to the extent Defendants' imply that Mr. Zicherman solely relied on statements made in June 2022. Mr. Zicherman testified that he would not have purchased the stock if he had known that defendants made misleading statements on May 12, 2022 which artificially inflated the stock price.  Ex. 30, Zicherman Dep. I at 211:17-23; *see also id.* at 211:12-16 (testifying that when he purchased Co-Diagnostics stock, he was assuming that the company's previous public statements were truthful); *id*. at 212:3-6 (testifying that when he purchased the stock, he was relying on the stock price reflecting truthful information).

## III.    VOLATILITY IN THE COVID TESTING MARKET

### A.    COVID Evolves In Waves With Variation In Transmissibility And Severity

**43.**    Over 40 known COVID mutations have emerged since the disease was first observed in December 2019. *See* Greene Decl. ¶ 92, Ex. 91, Expert Report of Thomas C. Tsai, MD, MPH, dated Nov. 20, 2024 ("Tsai Rpt.") ¶ 15.

**Plaintiff's Response**: Undisputed.

**44.**    The high number of COVID mutants and variants, and the continued evolution of future variants, makes it difficult to predict the virus's behavior and spread. *Id.* ¶ 15.

**Plaintiff's Response**: Disputed, as the above statement mischaracterizes the content of the cited paragraph of the Tsai Rpt.  Plaintiff respectfully refers the Court to the actual statement in ¶ 15 of the Tsai Rpt: "the existence of numerous COVID variants and lineages, and the continued evolution of COVID leading to future variants, complicates the task of predicting the virus's behavior and disease spread."[4]

---

[4] Defendants' rely largely on expert opinion testimony to support their alleged statements of undisputed material fact.  *See, e.g.,* ¶¶ 44, 50-51, 53-57, 58, 59, 60-104, 106, 147, 150, 153-54,

**45.**     By early 2022, five COVID variants of concern had emerged, each with its own subvariants and varying rates of transmission and severity. *Id.* ¶ 16.

**Plaintiff's Response**: Undisputed insofar as this is an accurate reflection of a statement from Dr. Tsai's report.  Disputed insofar as Defendants imply each of the "five COVID variants of concern" emerged in early 2022.  *See id.* (describing five "variants of concern" that had emerged from the start of the pandemic through "early 2022").

**46.**     In May of 2022, Omicron was the dominant global COVID variant, which exhibited significant resistances to vaccines. *Id.*

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a sentence in Dr. Tsai's report.  Disputed to the extent "significant" is vague and undefined.

**47.**     Omicron's lineages also had increased transmissibility compared to previous COVID variants, and by the spring of 2022, Omicron subvariants BA.2 and BA.2.12.1 were circulating and beginning to surge in the United States. *Id.*

**Plaintiff's Response**: Partially disputed.  Dr. Tsai's report states that Omicron's lineages demonstrated "increased transmissibility compared to Delta", *not* "previous COVID variants".  *Id.* For additional context, the cited source also noted "lower severity compared to Delta".  "COVID-19 Weekly Epidemiological Update," World Health Organization, Ed. 93, May 25, 2022, p. 7.

---

243-50, 256, 263, 289-90. However, opinions are not "facts" that properly may be presented under Local Rule 56.1.  *See, Ofudu v. Barr Labs., Inc.*, 98 F. Supp. 2d 510, 513 (S.D.N.Y. 2000) (disregarding 56.1 statement and "hesitat[ing] to use the word 'facts' because so many of the entries in the Rule 56.1 Statement are obviously opinions or arguments"); *Congregation Rabbinical Coll. Of Tartikov*, 138 F. Supp. 3d at 396 (refusing to consider "opinions" undisputed). Indeed, Dr. Tsai's and Dr. Juneja's expert testimony is the subject of Plaintiff's *Daubert* Motion. ECF No. 105; *see, e.g., id*. at 6-9 (noting, for example, that Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions despite acknowledging that Co-Diagnostics operated globally with close to half of the Company's revenues derived from foreign sales).

**48.**     COVID demonstrates a pattern of rising and falling waves—furthermore, multiple variants and lineages exist and circulate at any point in time, with one lineage often becoming dominant until a new mutation emerges. *Id.* ¶ 17; *see also* Greene Decl. ¶ 30, Ex. 29, Deposition of Thomas C. Tsai, MD, MPH ("Tsai Dep.") 57:15-58:4, 88:22-89:17, 90:16-91:9; *see also id.* 61:12–62:11.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report and testimony, with the clarification that in the referenced paragraph of Dr. Tsai's report he stated that "*the natural history of* COVID demonstrates a pattern of rising and falling waves." (emphasis added) Greene Decl. ¶ 92, Ex. 91, ¶17.

**49.**     The following figure illustrates the pattern of rising and falling waves throughout COVID:

**COVID Variant Sequences in the U.S.**



Ex. 91, Tsai Rpt. ¶ 17, Fig. 1.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects the figure in Dr. Tsai's report. Defendants appear to have omitted the Y-axis description which reads "Proportion of Total Number of Sequences." *Id*.

50.    Different properties of COVID variants—e.g., transmissibility and severity—result in different impacts on public health with each wave. *See* Ex. 91, Tsai Rpt. ¶ 17; *see also* Ex. 29, Tsai Dep. 58:6-59:5.

**Plaintiff's Response**: Disputed. The cited sources do not support the specific statement that "[d]ifferent properties of COVID variants—e.g., transmissibility and severity—result in different impacts on public health." Disputed to the extent "public health" is vague and undefined. Further disputed to the extent the cited testimony is not specific to "different properties of COVID variants". *Id*. Further disputed to the extent the testimony is not specific to "transmissibility and severity". *Id*.

51.    COVID demonstrates a certain degree of seasonality, often with winter and summer peaks, but the U.S. Centers for Disease Control and Prevention (the "CDC") has stated "[t]here is no distinct COVID-19 season"—as illustrated here:

22



**COVID Cases in North and South America
March 1, 2020 through December 31, 2022**

Ex. 91, Tsai Rpt. ¶ 24, Fig. 3 (quoting Nat'l Ctr. for Immunization & Respiratory Disease, "COVID-19 Can Surge throughout the Year," CDC, July 3, 2024, https://www.cdc.gov/ncird/whats-new/covid-19-can-surge-throughout-the-year.html (the "NCIRD July 3, 2024 Article")).

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes portions of Dr. Tsai's report, a figure in Dr. Tsai's report, and his citation to a page on the CDC's website, dated July 3, 2024. Disputed to the extent the above omits the remainder of the quoted statement in the NCIRD July 3, 2024 Article. The full sentence, of which the quoted language is a phrase, is as follows: "There is no distinct COVID-19 season like there is for influenza (flu) and respiratory syncytial virus (RSV). While flu and RSV have a generally defined fall/winter seasonality and circulate at low levels in most parts of the United States in the summer, meaningful COVID-19

23

activity occurs at other times of the year." NCIRD July 3, 2024 Article.  Additionally, in the same paragraph, the NCIRD July 3, 2024 Article also states "COVID-19 activity tends to fluctuate with the seasons, meaning it has some seasonal patterns." *Id*.

52.    Irregular surges in COVID have frequently emerged due to waning immunity and the impact of new COVID variants. *Id*. ¶ 24.

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes a portion of Dr. Tsai's report.  Disputed to the extent that "irregular" is vague and undefined. To the extent Defendants ascribe any meaning to the word "irregular" beyond what is described in Dr. Tsai's report, Plaintiff respectfully refers the Court to the full contents of the cited paragraph.

53.    As illustrated in paragraph 51 above, an off-season wave of Omicron lineages BA.2 and BA.2.12.1 as well as an unanticipated surge of BA.5 were beginning to emerge before and during the Class Period, while another surge was expected in the fall of 2022. *Id*.

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes a portion of Dr. Tsai's report.  Disputed to the extent "unanticipated" is vague and undefined.  Disputed as to the characterization of the wave of Omicron lineages BA.2 and BA.2.12.1 as "off-season".  Indeed, in Dr. Tsai's footnote to this statement, he notes that "[a] similar surge was observed in the Spring of 2021." *Id*. ¶ 24 fn. 45; *see also* Ex. 20, Benson Dep. 98:16-23 ("**Q.** Do you recall whether there was any specific variant that the company was concerned about that was concerned might arise in the near future that was impacting visibility? **A.** I don't recall any concerns about any specific variants at that time specifically.").

54.    Public health experts, including the CDC, recognize that "the evolution of new variants remains unpredictable," even today. *Id*. ¶ 24 (quoting the NCIRD July 3, 2024 Article).

**Plaintiff's Response**: Partially disputed.  Insofar as this accurately paraphrases the statement in Dr. Tsai's report, and his partial quotation of the NCIRD July 3, 2024 Article, Plaintiff does not dispute this statement.  However, because neither the cited paragraph of Dr. Tsai's report nor the quoted language in the NCIRD July 3, 2024 Article make reference to any specific "public health experts", Plaintiff has no basis to agree or disagree with this statement.

55.    By the spring of 2022, scientists, public health officials, and epidemiologists agreed that COVID would continue to evolve and spread, producing new variants with fluctuating impacts on public health. *Id.* ¶ 25.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

**B.    Factors Influencing Demand In The COVID-Testing Market**

56.    Demand for COVID testing from 2020 through 2022 was volatile. Ex. 91, Tsai Rpt. ¶ 23.

**Plaintiff's Response**: Partially disputed.  This statement appears to be a reference to the header in Dr Tsai's report that precedes paragraph 23, and which contains no citations.  While Plaintiff does not dispute that the Section header states that "Demand for COVID testing from 2020 through 2022 was highly volatile . . .", Plaintiff refers the Court to the full contents of paragraph 23, which does not state that "demand for COVID testing from 2020 through 2022 was volatile."  Disputed to the extent "volatile" is vague and undefined.  Moreover, Plaintiff disputes this overly generalized statement.  For example, from the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter.  Plaintiff's 56.1 Statement, ¶2.

**57.**    Public health experts believe there are many factors that interact with each other and influence the demand for COVID tests, including: 1) disease susceptibility and severity (i.e., how contagious and serious the symptoms associated with infection are), 2) the response of public health experts and policymakers, and 3) the perception of risk (i.e., the public's views on the risks associated with infection or not following professional guidance). *Id.*

**Plaintiff's Response**: Undisputed insofar as this statement accurately paraphrases a portion of Dr. Tsai's report.

**58.**    By Spring of 2022, it was widely discussed among experts that that these factors were highly variable and difficult to accurately predict given COVID's continued evolution. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.  For context, Dr. Tsai provides no citation or reference to any "experts" in support of this statement.

**59.**    One of the primary drivers of demand for COVID tests is the change in cases of infection. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

**60.**    Accordingly, demand for tests has generally tracked the patterns of the COVID waves, rising when cases of COVID rose and declining when cases of COVID declined—as illustrated below:

**U.S. COVID Lab Testing Tracked Cases of COVID Pre-Class Period
March 1, 2020 through May 8, 2022**



Ex. 91, Tsai Rpt. ¶ 26, Fig. 4.

**Plaintiff's Response**: Undisputed insofar as this accurately recites a portion of Dr. Tsai's report and a figure in Dr. Tsai's report. Disputed as to the portion of the statement stating "and declining when cases of COVID declined" as lacking foundation, as it is not found in the cited paragraph of Dr. Tsai's report. Rather, Dr. Tsai only stated: "Demand for tests generally tracked the patterns of these COVID waves, rising when cases of COVID rose, as shown in [the referenced figure]." Ex. 91, Tsai Rpt. ¶ 26.

61.     Given the strong correlation between the use of COVID tests and surges in cases, demand for tests fluctuated with the relative transmissibility of each COVID variant. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

27

**62.**     This variability in COVID demand is reflected in the shipment patterns for COVID tests; COVID molecular test manufacturers experienced cyclical demand for their products because of new-emerging variants. *Id.* ¶ 26.

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

**63.**     Data from the AdvaMed COVID-19 Diagnostics Supply Registry—which reports weekly testing data compiled from thirteen leading diagnostic companies who together comprise roughly 80% of total molecular testing in the U.S.—demonstrate the cyclical and unpredictable nature of COVID testing demand, with shipments rising as a response to increasing demand for tests at the onset of the Delta and Omicron variants and falling as cases decreased. *Id.* ¶ 26 (referring to data set forth in "Diagnostics Industry Mobilization," AdvaMed, May 2022).

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a portion of Dr. Tsai's report.  As additional context, Dr. Tsai did not use Co-Diagnostics data in connection with these statements.  Ex. 29, Tsai Dep. at 79:5-81:4.  Disputed to the extent that "unpredictable" is vague and undefined.

**64.**     Variability in demand was further compounded by varying amounts of inventory held by testing distributors and diagnostics labs as well as uncertainty regarding expirations of existing testing inventory. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a portion of Dr. Tsai's report.  As additional context, Dr. Tsai did not use Co-Diagnostics data in connection with these statements.  Ex. 29, Tsai Dep. at 79:5-81:4.  Disputed as to the portion of the statement stating "as well as uncertainty regarding expirations of existing testing inventory" as lacking foundation, as it is not found in the cited paragraph of Dr. Tsai's report.  Rather, Dr. Tsai only

stated: "Variability in demand was further compounded by varying inventory held by testing distributors and diagnostics labs." Ex. 91, Tsai Rpt. ¶ 26.

**65.**    The severity of a COVID wave also informed demand for COVID tests; increases in the intensity or severity of symptoms are associated with an increasing testing propensity. *Id.* ¶ 27.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects excerpted portions of Dr. Tsai's report.  For context and clarification, Dr. Tsai stated that "Kim, *et al*. (2023) observed evidence that increases in the intensity of symptoms were associated with an 'increasing testing propensity.'" *Id*.

**66.**    Due to the irregularity of patterns in COVID transmissibility and severity from variant to variant and wave to wave, along with other factors, it was difficult to predict demand for tests in 2022. *Id.*

**Plaintiff's Response**: Undisputed insofar as this accurately recites a portion of Dr. Tsai's report.  Disputed as to the portion of the statement stating "along with other factors" as lacking foundation, as it is not found in the cited paragraph of Dr. Tsai's report.  Rather, Dr. Tsai only stated: "Due to the irregularity of patterns in COVID transmissibility and severity from variant to variant and wave to wave, it was difficult to predict demand for tests in 2022." Ex. 91, Tsai Rpt. ¶ 27.  Disputed to the extent "irregularity" is vague and undefined.

**67.**    The evolution of COVID variants and differential impacts on public health also led to varying responses by public health professionals and policymakers. *Id.* ¶¶ 28-29.

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

**68.**    The decisions of policymakers, messaging of public health experts, and impact of particular policies in different jurisdictions all changed over time as new variants came and went, making it very difficult to predict infections and testing demand in coming months. *Id.* ¶ 28.

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

**69.**    The rollout of vaccines throughout 2021 complicated the dynamics of COVID transmission and testing in the United States. *Id.* ¶ 30.

**Plaintiff's Response**:  Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

**70.**    As vaccines became more available in the United Stated in 2021, public policies shifted away from testing in favor of vaccination criteria—a change that was widely discussed at the time. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

**71.**    When Omicron emerged late in 2021, however, it was highly contagious despite vaccination, leading some institutions and governments to reinstitute some of the testing mandates and restrictions they had recently rolled back. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

**72.**    The initial Omicron wave receded in the spring of 2022, but there remained uncertainty as to whether and how vaccination rates and policies would continue to impact demand for COVID tests. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

74. Experts recognize that the potential for future variants to evade immunity, coupled with increased risk of transmission as employees returned to workplaces, could generate demand for tests, despite the shift to vaccine mandates. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

74. Government travel restrictions and travel-related testing mandates also impacted demand for COVID tests in 2022. *Id.* ¶¶ 31-32.

**Plaintiff's Response**:  Undisputed insofar as this accurately recites a portion of Dr. Tsai's report.  Disputed as to the portion of the statement stating "in 2022" as lacking foundation, as it is not found in the cited sentence of Dr. Tsai's report.  Rather, Dr. Tsai only stated: "Government travel restrictions and travel-related testing mandates also impacted demand for tests."  Ex. 91, Tsai Rpt. ¶ 31.

75. Changes in government travel restrictions and travel-related testing mandates impacted demand both directly (through testing mandates) and indirectly (through increased/decreased transmission), driving demand for tests higher or lower at different times. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

76. State and local health policies varied significantly across geographies and over time and impacted testing demand. *Id.* ¶ 32.

**Plaintiff's Response**: Undisputed insofar as this accurately recites a portion of Dr. Tsai's report.  Disputed as to the portion of the statement stating "across geographies and over time" as

vague and lacking foundation, as it is not found in the cited sentence of Dr. Tsai's report. Rather, Dr. Tsai only stated: "state and local health policies varied significantly and meaningfully impacting testing demand." Ex. 91, Tsai Rpt. ¶ 32.

77.    By 2022, state-specific testing and vaccination mandates, mask requirements, and school closures were regularly being adjusted based on evolving health data, public opinion, and economic factors that differed by state. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

78.    This continual change in regulations resulted in erratic increases and decreases in testing demand both within states and nationwide, as people reacted to the newest guidelines issued by their states and their sense of risk fluctuated. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate recitation of a sentence in Dr. Tsai's report.

79.    Guidelines from professional health societies further informed demand for tests throughout the COVID pandemic. *Id.* ¶ 33.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

80.    In many cases, patients seeking care in healthcare facilities in early 2022 were encouraged or required to take routine pre-procedural COVID tests and hospitals needed a consistent supply of COVID tests to adhere to these recommendations. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a portion of Dr. Tsai's report.

**81.**     At all times, demand for COVID tests has also depended on changing public perceptions of the risk of contracting or transmitting COVID, which have varied significantly over time and across individuals and geographies, leading to differential adoption of protective behaviors. *Id.* ¶ 34.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a portion of Dr. Tsai's report.  Disputed as to the portion of the statement stating "at all times" as vague and lacking foundation, as it is not found in the cited paragraph of Dr. Tsai's report.

**82.**     Studies have found that when individuals perceive higher risks associated with COVID, they are more likely to report adopting protective behaviors such as social distancing, wearing masks, and limiting travel, as well as getting tested. *See id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

**83.**     Studies show that the perceived risk associated with COVID declined as the pandemic continued. *Id.* ¶ 35.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

**84.**     Variation and fluctuations in public perceptions of risk and adherence to public health guidelines affected demand for COVID tests—for example: in the United States, research showed increased hesitancy in getting COVID vaccines between 2021 and 2022, with up to 44.6% of the surveyed population expressing concerns. *Id.*

**Plaintiff's Response**:  Disputed insofar as this is an inaccurate paraphrase of a portion of Dr. Tsai's report.  What Dr. Tsai's report states is that "[v]ariation in public perceptions of risk and adherence to public health guidelines exacerbated the difficulty in predicting demand for

33

COVID tests." Dr. Tsai's report also states "[i]n the U.S., some research showed increased hesitancy in getting COVID vaccines between 2021 and 2022, with up to 44.6% of the surveyed population expressing concerns." It also states that "[r]esearch also shows that the perceived risk associated with COVID declined as the pandemic continued." *Id.* Plaintiff does not dispute that Dr. Tsai made these statements in his report.

**85.** High rates of vaccine hesitancy, lack of policy adherence, and waning vaccine efficacy over time, created a risk in the spring of 2022 that COVID cases (and testing demand) would expand with the next COVID wave. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

### C. Predicting COVID Testing Demand Was Even More Challenging In Spring 2022

**86.** In April and May 2022, it was widely understood and stated by those in the COVID testing industry that the historical volatility in COVID testing demand, exacerbated by other factors, made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year. Ex. 91, Tsai Rpt. ¶ 14.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report. For the avoidance of doubt, the actual language found in Dr. Tsai's report is: "It was widely understood by myself and stated by others in the COVID testing industry in April and May 2022 that the historical volatility in COVID testing demand, exacerbated by the factors discussed herein, made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year." *Id.*

Further disputed because while Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions, he

acknowledges the fact that Co-Diagnostics operated globally, with close to half of the Company's revenue derived from foreign sales. *See* Plaintiff's *Daubert* Motion at 6-9. Similarly, Dr. Tsai offers no basis for his repeated claim that it was "***increasingly*** difficult" in the Spring of 2022 to accurately predict demand for COVID-19 PCR tests. *Id*. at 8. Although he posited explanations of why there was uncertainty in the U.S. market in 2022, he gave no factual support for the contention that that uncertainty was any ***greater than*** it had been in 2020, when the world was first confronted with the unknown scourge of COVID-19, or in 2021, when new COVID-19 variants were proliferating and there were divergent and shifting public policies at local, state, and federal levels. *Id*.

Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on whether it was "increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year."

**87.** At the same time, statements by industry and public health and government officials in the spring of 2022 show that they reasonably expected long-term demand for COVID tests to remain strong since future variants and waves inevitably would emerge and bring increased demand again, it was just unknown as to when this would happen. *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report. The cited paragraph of Dr. Tsai's report contains no citations or references. Without citation to specific support for Dr. Tsai's assertion, Plaintiff has no basis to agree or disagree.

**88.** Factors indicating that there would be continued demand for lab-based PCR tests, like the Logix test, throughout 2022, included:

**a.** Prior to November 2022, there was not a reliable method of reporting results of at-home COVID antigen test, meaning that lab PCR tests remained an important source of data to monitor public health. *Id.* ¶ 21.

**Plaintiff's Response**: Disputed.  Dr. Tsai's report does not state that this factor indicated there would be continued demand for lab-based PCR tests, like the Logix test, throughout 2022.  *See, e.g., id.* at ¶ 14 ("It was widely understood by myself and stated by others in the COVID testing industry in April and May 2022 that the historical volatility in COVID testing demand, exacerbated by the factors discussed herein, ***made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year***.") (emphasis added); *see also* ¶ 21 generally (describing uncertainties that may have caused "PCR tests [to] remain[] relevant" despite the rise of at-home antigen tests).  Additionally, Plaintiff disputes this statement to the extent it is an inaccurate paraphrase of the language in Dr. Tsai's report, which states: "before November 2022, there was not a robust mechanism to report at home antigen tests, meaning PCR tests performed in labs remained an important source of pandemic monitoring for public health agencies." *Id.* ¶ 21.

**b.** In January 2022, the federal government was committed to "increase[ing] capacity for lab-based COVID-19 testing" and noted the United States was "conducting more lab-based tests per capita than many peer countries, including Germany, Canada, and Japan." *Id.* (quoting *FACT SHEET: The Biden Administration to Begin Distributing At-Home, Rapid COVID-19 Tests to Americans for Free*, The American Presidency Project, Jan. 14, 2022, available at https://www.presidency.ucsb.edu/documents/fact-sheet-the-biden-administration-begin-distributing-home-rapid-covid-19-tests-americans).

**Plaintiff's Response**:  Partially disputed. Plaintiff refers the Court to the actual content of Dr. Tsai's report, in which he states: "Even as the federal government announced the launch of covidtests.gov, the White House still iterated the importance of lab-based molecular tests by emphasizing federal efforts to "increase capacity for lab-based COVID-19 testing; the U.S. is now conducting more lab-based tests per capita than many peer countries, including Germany, Canada, and Japan." *Id.* ¶ 21.  Plaintiff does not dispute that Dr. Tsai made these statements in his report.

**c.** Clinical guidelines requiring molecular testing at hospitals and other medical institutions remained in place in the spring of 2022, and hospitals needed a consistent supply of COVID tests to adhere to these recommendations.[5] *Id.* ¶¶ 33, 41.

---

[5] The recommendation for universal COVID testing upon admission at hospitals was not lifted until December 21, 2022 by the Society for Healthcare Epidemiology of America ("SHEA") and American Society of Anesthesiologists ("ASA"); the American College of Surgeons did not withdraw the recommendation for routine preprocedural COVID testing until January 2023; and

36

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of portions of Dr. Tsai's report. As Dr. Tsai noted in his report, "clinical guidelines requiring molecular testing at hospitals and other medical institutions remained in place in Spring 2022, providing some continued demand for molecular testing, but there was uncertainty in the industry as to how long those guidelines would remain in place." *Id*., ¶41. Plaintiff does not dispute that Dr. Tsai made these statements in his report.

d. By the spring of 2022, scientists, public health officials, and epidemiologists believed that COVID would continue to evolve, producing new variants with fluctuating impacts on public health. *Id.* ¶ 25.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report.

e. As of April 7, 2022, public health experts predicted a surge in COVID cases in the fall of 2022. *Id.* ¶ 24.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a sentence in Dr. Tsai's report. The cited paragraph of the Tsai report states: "another surge was expected in the Fall 2022" (citing Thomas, Naomi, "US Likely to See a Surge of Covid-19 in the Fall, Fauci Says," *CNN*, April 7, 2022). Plaintiff does not dispute that Dr. Tsai made this statement in his report.

f. In the spring of 2022, as employees returned to in-office work following the Omicron surge, public health experts anticipated the need for increased COVID testing. *Id.* ¶ 30.

**Plaintiff's Response**: Disputed, as the cited paragraph of Dr. Tsai's report does not state this. Plaintiff refers the Court to the full content of paragraph 30 of Dr. Tsai's report, which states in relevant part: "As experts recognized, the potential for future variants to evade immunity, coupled with increased risk of transmission as employees returned to workplaces, could generate demand for tests, despite the shift to vaccine mandates." Plaintiff does not dispute that Dr. Tsai made this statement in his report.

g. In spring 2022, certain travel-related testing mandates remained in effect. *Id.* ¶¶ 31, 40 n.89.

**Plaintiff's Response**: Partially disputed, as the cited paragraphs of Dr. Tsai's report, including the referenced materials, do not appear to support this vague

---

U.S. nursing homes were guided to perform screening testing for COVID among staff and admitted patients until the end of the public health emergency in May 2023. Ex. 91, Tsai Rpt. ¶ 41.

37

statement.  As such, the statement appears to be without foundation, and Plaintiff has no other basis to agree or disagree with this statement.

89.    Many other factors in the spring of 2022 made it especially difficult to predict testing demand through the end of 2022 after the peak of the initial Omicron lineage, including concern for and difficulties in predicting the health impacts of new Omicron variants, changes to the public health response to the pandemic, and shifting public perception of risk. *Id.* ¶ 36.

**Plaintiff's Response**: Partially disputed to the extent this statement suggests Dr. Tsai referred to any factors other than those specifically referenced in this paragraph.  Dr. Tsai stated: "Many factors in Spring 2022 made it especially difficult to predict testing demand through the end of 2022 after the peak of the initial Omicron lineage."  *Id*.  Dr. Tsai then went on to refer to solely the following factors: "concern for and difficulties in predicting the health impacts of new Omicron variants, changes to the public health response to the pandemic, and shifting public perception of risk."  *Id*.  Plaintiff does not dispute that Dr. Tsai made these statements in his report.

90.    Omicron raised concerns about potential new and severe waves, especially in light of Omicron's vaccine evasion, but the timing and impact of future waves were increasingly difficult to accurately predict. *Id.* ¶ 37.

**Plaintiff's Response**: Partially disputed in that this statement appears to be a reference to the header in Dr Tsai's report that precedes paragraph 37, and which contains no citations.  While Plaintiff does not dispute that the Section header states that "Omicron Raised Concerns About Potential New and Severe Waves but the Timing and Impact Were Increasingly Difficult to Accurately Predict", Plaintiff refers the Court to the full contents of paragraph 37. Plaintiff does not dispute that Dr. Tsai made this statement in his report.

91.    The newly emergent Omicron variants demonstrated a high degree of antigenic divergence compared with earlier variants, threatening the efficacy of vaccines and treatments

based on any single variant and further limiting forecasters' ability to project public health developments. *See id.* ¶ 37; Ex. 29, Tsai Dep. 59:7-17.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of a portion of Dr. Tsai's report.

92.    The Biden Administration's National COVID-19 Preparedness Plan released in or about March 2022 highlighted concerns about potential new and severe waves, listing "[p]repare for new variants" as one of four top goals. Ex. 91, Tsai Rpt. ¶ 37.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.  Disputed as to the portion of the statement stating "about potential new and severe waves" as lacking foundation, as it is not found in the cited paragraph of Dr. Tsai's report.  Rather, Dr. Tsai stated: "The Biden Administration's National COVID-19 Preparedness Plan released on March 2022 highlighted th[e] risk [that heterogeneity across Omicron strains threatened the efficacy of vaccines and treatments based on any single variant], listing '[p]repare for new variants' as one of four top goals." *Id*. Plaintiff does not dispute that Dr. Tsai made this statement in his report.

93.    By the spring of 2022, public health experts and policymakers expressed concerns that the Omicron lineages BA.2 and BA.5, which had recently emerged, were expected to increase cases and thus demand for testing by the summer of 2022. *Id.*

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a sentence of Dr. Tsai's report.  For context, this paraphrased sentence from Dr. Tsai's report contains no citations. Disputed to the extent Defendants imply that the excerpts of press releases and articles in Table 1 of Dr. Tsai's report, one of which is dated nearly two months before the Class Period begins, one of which says "the U.S. is turning another corner in this pandemic", and another which refers to

"potential[] . . . infections this fall and winter", establish that "demand for testing [was expected to increase] by the summer of 2022." *Id*.

94.     In the spring of 2022, complications in the rollout and adoption of vaccines continued to add uncertainty regarding demand for tests—for example, the Biden Administration's vaccine mandates became mired in legal challenges, casting doubt on the scope, scale, and enforceability of vaccine mandates in the United States. *Id.* ¶ 39.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

95.     These legal battles included litigation over the vaccine mandate for federal employees, which a federal court of appeals upheld in April 2022, reversing an injunction from a lower court. *Id*.

**Plaintiff's Response**: Undisputed insofar as this accurately recites a sentence of Dr. Tsai's report.

96.     While the Supreme Court upheld vaccine mandates for healthcare workers in January 2022, sixteen states commenced new litigation in February 2022. *See id.*

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a sentence of Dr. Tsai's report.

97.     The United States was an early leader globally in terms of its initial rollout of booster vaccines, but it then became a laggard by the spring of 2022, further complicating the outlook for immunization and testing demand. *Id.*

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a sentence of Dr. Tsai's report.

40

**98.** Regional variation in testing utilization and vaccination rates (both internationally and within the United States) also existed in the spring of 2022. *Id.* ¶ 40.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

**99.** Immunization levels varied widely by geography heading into the spring of 2022, with some states registering "first-jab" vaccination rates over 90% and others between 50% and 60% vaccinated as of January 31, 2022, which laid the foundation for divergent conditions on a state-by-state basis and added public health crosscurrents nationally. *Id.*

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

**100.** In the spring of 2022, individual behavior appeared to be changing in the wake of multiple COVID waves, but these changes had not yet settled into a new "endemic" pattern. *Id.* ¶ 42, Tbl. 2.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

**101.** Variations in perceived risk as well as "pandemic fatigue" behaviors complicated any attempt to predict testing demand in the spring of 2022: on the one hand, given the continued high risk of infection from Omicron, lower perceived risk by the public might lead to fewer preventive measures taken, including tests taken, whereas on the other hand, a reduction in preventive measures might contribute to an increase in COVID cases and, in turn, demand for tests. *Id.* ¶ 43.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.

41

102.    By May 2022, the difficulty in accurately predicting future COVID cases and testing demand was well documented and widely discussed. *Id.* ¶¶ 43-44; *see also* Greene Decl. ¶ 94, Ex. 93, Reply Report of Vinita Juneja, Ph.D., dated Jan. 10, 2024 ("Juneja Reply"), ¶ 17.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases a portion of Dr. Tsai's report.  Dr. Tsai's report stated: "By May 2022, there was widespread public discussion of the significant difficulty in accurately predicting COVID cases during new waves."  Plaintiff does not dispute that Dr. Tsai made this statement in his report.

103.    On May 6, 2022, the Biden Administration warned that the United States could see a renewed wave of COVID-19 in the coming fall and winter, predicting up to 100 million new COVID-19 infections and a potential surge of COVID related deaths. Ex. 91, Tsai Rpt. ¶37, Tbl. 1; *see also* Greene Decl. ¶ 110, Ex. 109, Email to S. Egan and D. Egan re NY Times: Coronavirus: Expecting a fall surge, dated May 9, 2022.

**Plaintiff's Response**: Partially disputed.  In the sources cited by Defendants, it is noted that the Biden administration was preparing for the "possibility" that 100 million Americans will be infected.  Greene Decl. ¶ 110, Ex. 109.  Moreover, the Biden Administration was not affirmatively predicting up to 100 million new infections, rather "the projection of [up to] 100 million potential infections [was] an estimate based on a range of outside models" Tsai Rpt. ¶37, Tbl. 1 (citing LeBlanc, Paul, "Here's What the White House's Grim Coronavirus Warning Mean for You," *CNN*, May 9, 2022).  Moreover, none of the Defendants' cited sources in this statement refer to a May 6, 2022 date with respect to any comments from the Biden Administration.

104.    Uncertainty regarding the future of the COVID-19 pandemic continued in the summer of 2022, as demonstrated by article published on July 19, 2022 in *Science*, which

proclaimed that "scientists have no idea what comes next." Ex. 93, Juneja Reply ¶ 17 (quoting Kai Kupferschmidt, *As Omicron Rages On, Scientists Have No Idea What Comes Next*, Science, July 19, 2022, https://www.science.org/content/article/omicron-rages-scientists-have-no-idea-what-comes-next).

**Plaintiff's Response**: Disputed insofar as this is an inaccurate paraphrase of a sentence in Dr. Juneja's report. Dr. Juneja stated "[o]n July 19, 2022, *Science* published an article highlighting that with all the changes, "scientists have no idea what comes next." *Id*. Plaintiff does not dispute that Dr. Juneja made this statement in her report. Disputed to the extent Defendants' imply this excerpt from the referenced article "demonstrate[s]" that "uncertainty regarding the future of the COVID-19 pandemic continued in the summer of 2022" which is vague and non-specific.

105.    On June 10, 2022, the CDC rescinded its order requiring a negative pre-departure COVID-19 test prior to boarding a flight bound for the United States. *Id.*

**Plaintiff's Response**: Undisputed.

106.    On August 11, 2022, at 3:00 p.m. ET—an hour and a half prior to Co-Diagnostics' earnings call—the CDC published updated COVID-19 guidance, which stated that "screening testing of asymptomatic people without known exposures will no longer be recommended in most community settings." *Id.* (quoting Press Release, CDC, CDC Streamlines COVID-19 Guidance to Help the Public Better Protect Themselves and Understand Their Risk, Aug. 11, 2022, https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html).

**Plaintiff's Response**: Partially disputed. The full text of the quoted language in this stated is "***Recommending*** screening testing of asymptomatic people without known exposures will no longer be recommended in most community settings." (emphasis added). Disputed insofar as

43

Defendants suggest that this was material confounding information or is evidence of material confounding information in Defendants' August 11, 2022 earnings announcement. *See* Response to No. 286.

107. The COVID public health emergency lasted until May of 2023. Ex. 29, Tsai Dep. 90:18–91:9.

**Plaintiff's Response**: Partially disputed. Plaintiff does not dispute that the federal COVID-19 public health emergency declaration ended in May 2023.

## IV.    RELEVANT PUBLIC COVERAGE

108. In the months leading up to and during the Class Period, numerous public sources discussed how COVID-19 safety protocols and guidance in different parts of the country were changing, including changes to mandates requiring masks, negative COVID-19 tests, and proof of vaccination in schools, public venues, and travel:

    a. **February 9, 2022, Associated Press:** "Illinois Gov. J.B. Pritzker said Wednesday that at the end of the month he will lift the requirement for wearing face coverings in most indoor spaces to slow the spread of COVID-19, but the mandate will stay in place for K-12 schools where students, teachers and staff are clustered together. Pritzker said masks will no longer be required to enter restaurants, grocery stores or other indoor spaces starting Feb. 28." Greene Decl. ¶ 36, Ex. 35, John O'Connor, *Illinois Governor to Lift Mask Mandate Except for Schools*, AP News, Feb. 9, 2022, https://apnews.com/article/coronavirus-pandemic-health-illinois-899f9fbb9455ad25c82fb82327a7c652.

    b. **February 10, 2022, San Antonio Report:** "Northside Independent School District will return to 'strongly encouraging' instead of requiring the wearing of masks Monday, three weeks after reinstating the districtwide mandate. . . . The district restored the mask mandate Jan. 20 while trying to combat the supercontagious omicron variant of the coronavirus and the high rates of absenteeism that accompanied it." Greene Decl. ¶ 37, Ex. 36, Brooke Crum, *San Antonio's Largest School District to Lift Mask Mandate*, San Antonio Report, Feb. 10, 2022, https://sanantonioreport.org/northside-isd-to-lift-mask-mandate/.

    c. **February 11, 2022, NPR:** "Vaccinated travelers can enter Britain without taking any coronavirus tests starting Friday, after the government scrapped one of the final restrictions imposed over the past two years in response to COVID-19." Greene Decl. ¶ 38, Ex. 37, *U.K. Lifts All Testing Requirements for Vaccinated Travelers*

*Starting        Today*,        NPR,        Feb.        11,        2022, https://www.npr.org/2022/02/11/1080053580/u-k-lifts-all-testing-requirements-for-vaccinated-travelers-starting-today.

d.  **February 25, 2022, NBC News:** "Most Americans are safe going without a mask in indoor settings, including in schools, the Centers for Disease Control and Prevention said Friday. . . . It's a dramatic shift from the previous guidance, which recommended masks in counties with substantial or high transmission, a category that covered the vast majority of the country." Greene Decl. ¶ 40, Ex. 39, Berkeley Lovelace Jr., *Indoor Mask Use No Longer Necessary Across Most of the U.S., CDC Says*, NBC News, Feb. 25, 2022, https://www.nbcnews.com/health/health-news/cdc-indoor-masking-no-longer-necessary-us-rcna17686.

e.  **March 3, 2022, 10TV News:** "Columbus City Schools announced on Thursday masks will be optional inside buildings and buses for students, staff and visitors starting next week. According to a release by school officials Thursday, the district's mask mandate will be lifted starting March 8." Greene Decl. ¶ 42, Ex. 41, *Columbus City Schools Lifting Mask Mandate for Students & Staff*, 10TV News, Mar. 3, 2022, https://www.10tv.com/article/news/health/coronavirus/columbus-city-schools-masks-mandate/530-44f39930-66bb-4a9a-9d6b-dc1b610ab4e4.

f.  **March 10, 2022, NBC News:** "The Transportation Security Administration is extending the mask mandate on public transportation until April 18, according to a White House official and a TSA official. . . . The requirement was set to expire on March 18 after having been extended twice before." Greene Decl. ¶ 43, Ex. 42, Heidi Przybyla, *TSA to Extend Mask Mandate for Planes, Public Transportation Until       April       18*,       NBC       News,       Mar.       10,       2022, https://www.nbcnews.com/politics/white-house/tsa-extend-mask-mandate-planes-public-transportation-april-18-rcna19514.

g.  **March 17, 2022, Washington Post:** "Fully vaccinated travelers soon will be able to travel to Canada without presenting a negative coronavirus test, the country's public health agency announced Thursday. The eased policy goes into effect April 1 and applies to visitors who arrive by air, land or sea." Greene Decl. ¶ 48, Ex. 47, Gabe Hiatt, *Canada to Drop Testing Requirements for Vaccinated Travelers Starting       April       1*,       Wash.       Post,       Mar.       17,       2022, https://www.washingtonpost.com/travel/2022/03/17/canada-lifts-testing-restrictions-vaccinated-travel/.

h.  **March 30, 2022, NBC News:** "A city of Los Angeles mandate requiring people to show proof of COVID-19 vaccination to enter many indoor businesses and large outdoor events is being eliminated. . . . Meanwhile, Los Angeles County will align with the state on Friday and lift the requirement that attendees of indoor mega-events with 1,000 or more people—such as sporting events or concerts—show proof of COVID vaccination or a negative test." Greene Decl. ¶ 52, Ex. 51, *City Council Lifts LA's Proof of COVID-19 Vaccination Mandate*, NBC News, Mar. 30,

45

2022, https://www.nbclosangeles.com/news/local/la-city-council-vaccine-proof-mandate-covid-coronavirus/2859298/.

i. **April 1, 2022, New York Times:** "Mayor Eric Adams announced on Friday that New York City will keep its school mask mandate in place for children under 5 in response to rising coronavirus cases in the city. Mr. Adams had planned to lift the mask mandate starting on Monday if coronavirus cases remained low. But he decided on Friday that preschoolers should continue to wear masks because they are too young to be vaccinated and cases are increasing again in the city, a rise fueled by an Omicron subvariant, BA.2, that is now dominant in the United States." Greene Decl. ¶ 54, Ex. 53, Emma Fitzsimmons, *New York City Keeps Mask Mandate for Kids Under 5 as Cases Rise*, N.Y. Times, Apr. 1, 2022, https://www.nytimes.com/2022/04/01/nyregion/eric-adams-mask-mandate-children.html.

j. **April 1, 2022, San Francisco Chronicle:** "A Bay Area elementary school has restored its mask mandate after reporting a sudden increase in COVID-19 cases. . . . 'This is to be expected,' said UC Berkeley infectious disease expert Dr. John Swartzberg, referring to the spike. 'We still have circulating virus in our community, albeit at a much lower level than we've had since last year ... but it's not like there's no virus here.'" Greene Decl. ¶ 55, Ex. 54, Annie Vainshtein, *This Bay Area School is Reinstating its Mask Mandate After a COVID-19 Spike*, San Francisco Chronicle, Apr. 1, 2022, https://www.sfchronicle.com/bayarea/article/This-Bay-Area-school-is-reinstating-its-mask-17052224.php.

k. **April 13, 2022, PBS News:** "The Biden administration announced Wednesday that it is extending the nationwide mask requirement for public transit for 15 days as it monitors an uptick in COVID-19 cases. The Centers for Disease Control and Prevention said it was extending the order, which was set to expire on April 18, until May 3 to allow more time to study the BA.2 omicron subvariant that is now responsible for the vast majority of cases in the U.S." Greene Decl. ¶ 59, Ex. 58, Zeke Miller, *CDC Extends Public Transit Mask Requirement to May 3 as COVID Cases Tick Up*, PBS News, Apr. 13, 2022, https://www.pbs.org/newshour/nation/cdc-extends-public-transit-mask-requirement-to-may-3-as-covid-cases-tick-up.

l. **April 17, 2022, NBC News:** "Last week, Philadelphia announced it was reinstating an indoor mask mandate until rates drop again. Meanwhile, the Centers for Disease Control and Prevention changed course and said masks will continue to be required on commercial flights until at least May 3. That mandate had originally been set to expire Monday." Greene Decl. ¶ 61, Ex. 60, Dante Chinni, *Covid Infections Rise, but Hospitalizations Remain Low*, NBC News, Apr. 17, 2022, https://www.nbcnews.com/meet-the-press/fear-uncertainty-apathy-covid-infections-rise-hospitalizations-remain-low-n1294490.

46

m. **April 22, 2022, CBC News:** "The United States government is extending a requirement that non-U.S. citizens crossing land or ferry terminals at the U.S.-Mexico and U.S.-Canada borders must be vaccinated against the coronavirus. The requirements were first adopted in November as part of reopening the United States to land crossings by foreign tourists after the borders had been closed to most visitors since March 2020. The vaccination requirements had been set to expire on Thursday." Greene Decl. ¶ 62, Ex. 61, *U.S. Extends COVID-19 Vaccination Requirement for Those Entering at Land, Ferry Points*, CBC News, Apr. 22, 2022, https://www.cbc.ca/news/world/us-covid-border-extension-1.6427514.

n. **May 27, 2022, California Healthline:** "[California] Democrats blamed the failure of their vaccine mandates on the changing nature and perception of the pandemic. They said the measures became unnecessary as case rates declined earlier this year and the public became less focused on the pandemic. . . . Other states have also largely failed to adopt covid vaccine requirements this year. Washington, D.C., was the only jurisdiction to pass legislation to add the covid vaccine to the list of required immunizations for K-12 students once the shots have received full federal authorization for kids of those ages." Greene Decl. ¶ 72, Ex. 71, Rachel Bluth, *Politics and Pandemic Fatigue Doom California's Covid Vaccine Mandates*, California Healthline, May 27, 2022, https://californiahealthline.org/news/article/politics-and-pandemic-fatigue-doom-californias-covid-vaccine-mandates/.

o. **June 10, 2022, CDC Press Release:** "Today, CDC is announcing that the Order requiring persons to show a negative COVID-19 test result or documentation of recovery from COVID-19 before boarding a flight to the United States, will be rescinded, effective on June 12, 2022 at 12:01 AM ET." Greene Decl. ¶ 73, Ex. 72, Press Release, CDC, "CDC Rescinds Order Requiring Negative Pre-Departure COVID-19 Test Prior to Flight to the US," June 10, 2022, https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2022/s0610-COVID-19-test.html; *see also* Ex. 93, Juneja Reply ¶ 17.

p. **August 11, 2022, CDC Press Release:** "Recommending screening testing of asymptomatic people without known exposures will no longer be recommended in most community settings." Greene Decl. ¶ 75, Ex. 74, Press Release, CDC, "CDC Streamlines COVID-19 Guidance to Help the Public Better Protect Themselves and Understand Their Risk," Aug. 11, 2022, https://archive.cdc.gov/#/details?url=https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html; *see also* Ex. 93, Juneja Reply ¶ 17.

**Plaintiff's Response**: Undisputed insofar as the referenced articles "discussed how COVID-19 safety protocols and guidance in different parts of the country were changing,

including changes to mandates requiring masks, negative COVID-19 tests, and proof of vaccination in schools, public venues, and travel."

109. Numerous public sources from March through May 2022 discussed the potential for new surges in COVID-19 infections in the coming months:

a. **March 17, 2022, ABC News:** "Experts fear that COVID-19 cases in the United States will rise in the next few weeks as the new BA.2 variant continues to spread. Data from the Centers for Disease Control and Prevention shows BA.2, which is a subvariant of omicron, has been tripling in prevalence every two weeks." Greene Decl. ¶ 46, Ex. 45, Mary Kekatos, *COVID Cases Predicted to Rise in Coming Weeks Because of New BA.2 Variant*, ABC News, Mar. 17, 2022, https://abcnews.go.com/Health/covid-cases-predicted-rise-coming-weeks-ba2-variant/story?id=83501592.

b. **March 19, 2022, New York Times:** "Scarcely two months after the Omicron variant drove coronavirus case numbers to frightening heights in the United States, scientists and health officials are bracing for another swell in the pandemic and, with it, the first major test of the country's strategy of living with the virus while limiting its impact. . . . 'I expect we'll see a wave in the U.S. sooner than what most people expect,' said Kristian Andersen, a virologist at the Scripps Research Institute in La Jolla, Calif. He said that it could come as soon as April, or perhaps later in the spring or the early summer." Greene Decl. ¶ 50, Ex. 49, Benjamin Mueller, *Another Covid Surge May Be Coming. Are We Ready for It?*, N.Y. Times, Mar. 19, 2022, https://www.nytimes.com/2022/03/19/health/covid-ba2-surge-variant.html.

c. **March 30, 2022, New York Times:** "The next wave of Covid-19 is coming, and in some parts of the United States, it's already here. Are you ready? The culprit this time is BA.2, a subvariant of the highly infectious Omicron variant. Nobody knows for sure how much havoc it will cause, but BA.2 has already led to a surge of cases in Europe and is now the dominant version of the coronavirus in the United States and around the world." Greene Decl. ¶ 53, Ex. 52, Tara Parker-Pope, *A New Wave of Covid-19 Is Coming. Here's How to Prepare*, N.Y. Times, Mar. 30, 2022, https://www.nytimes.com/2022/03/30/well/live/ba2-omicron-covid.html; *see also* Ex. 91, Tsai Rpt. ¶ 42.

d. **April 7, 2022, CNN:** "Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, said on Wednesday that he thinks there will be an uptick in cases of Covid-19 over the next few weeks and that it is likely that there could be a surge in the fall." Greene Decl. ¶ 56, Ex. 55, Naomi Thomas, *US Likely to See a Surge of Covid-19 in the Fall, Fauci Says*, CNN, Apr. 7, 2022, https://www.cnn.com/2022/04/07/health/fauci-covid-fall-surge/index.html; *see also* Ex. 91, Tsai Rpt. ¶ 24.

e.  **April 10, 2022, NBC News:** "At first glance, U.S. Covid cases appear to have plateaued over the past two weeks, with a consistent average of around 30,000 cases per day, according to NBC News' tally. But disease experts say incomplete data likely masks an upward trend. In Washington, D.C., for example, several high-profile government figures recently tested positive, including House Speaker Nancy Pelosi, White House press secretary Jen Psaki and Attorney General Merrick Garland. 'I do think we are in the middle of a surge, the magnitude of which I can't tell you,' Zeke Emanuel, vice provost of global initiatives at the University of Pennsylvania, said." Greene Decl. ¶ 57, Ex. 56, Aria Bendix, *Incomplete Data Likely Masks a Rise in U.S. Covid Cases as Focus on Infection Counts Fades*, NBC News, Apr. 10, 2022, https://www.nbcnews.com/health/health-news/incomplete-data-likely-masks-rise-us-covid-cases-rcna23652; *see also* Ex. 91, Tsai Rpt. ¶ 37.

f.  **May 6, 2022, NPR:** "For a few months, it looked like COVID-19 was retreating in the United States. But cases are rising across the country again. Still, public health leaders are signaling that the U.S. is turning another corner in this pandemic, and that continued COVID surges might just be part of the new normal." Greene Decl. ¶ 63, Ex. 64, *As COVID-19 Cases Surge Again, Public Health Leaders See a Turning Point*, NPR, May 6, 2022, https://www.npr.org/2022/05/04/1096757468/as-covid-19-cases-surge-again-public-health-leaders-see-a-turning-point.

g.  **May 6, 2022, Washington Post:** "Several experts agreed that a major wave this fall and winter is possible given waning immunity from vaccines and infections, loosened restrictions and the rise of variants better able to escape immune protections. Many have warned that the return to more relaxed behaviors, from going maskless to participating in crowded indoor social gatherings, would lead to more infections. The seven-day national average of new infections more than doubled from 29,312 on March 30 to nearly 71,000 Friday, a little more than five weeks later." Greene Decl. ¶ 66, Ex. 65, Yasmeen Abutaleb, *Coronavirus Wave This Fall Could Infect 100 Million, Administration Warns*, Wash. Post, May 6, 2022, https://www.washingtonpost.com/health/2022/05/06/fall-winter-coronavirus-wave/.

h.  **May 9, 2022, CNN:** "The Biden administration is issuing a new warning that the US could potentially see 100 million Covid-19 infections this fall and winter, as officials publicly stress the need for more funding from Congress to prepare the nation." Greene Decl. ¶ 67, Ex. 66, Paul LeBlanc, *Here's What the White House's Grim Coronavirus Warning Means for You*, CNN, May 9, 2022, https://www.cnn.com/2022/05/09/politics/white-house-100-million-covid-infections-projection-what-matters/index.html; *see also* Ex. 91, Tsai Rpt. ¶ 37.

i.  **May 9, 2022, New York Times:** "The Biden administration is preparing for the possibility that 100 million Americans will be infected with the coronavirus this fall and winter, according to an administration official. . . . The official predicted that the wave would begin this summer in the South as people move indoors to

escape the heat. In the fall, it would begin to spread across the rest of the country as the weather turned cold." Greene Decl. ¶ 68, Ex. 67, Amelia Nierenberg, *A Coming Fall Surge? U.S. Officials Predict Another 100 Million Cases in Late 2022*, N.Y. Times, May 9, 2022, https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

j.  **May 17, 2022, New York Times:** "For two months now there has been a persistent rise in known infections, driven almost entirely by Omicron subvariants. In recent days, the city logged on average more than 3,500 new daily cases, although those numbers significantly understate the virus's prevalence, as many infections are detected by at-home tests but never counted by the health authorities. Greene Decl. ¶ 71, Ex. 70, Joseph Goldstein, *New York City Coronavirus Cases Reach "High" Alert Level*, N.Y. Times, May 17, 2022, https://www.nytimes.com/2022/05/17/nyregion/nyc-covid-high-alert.html; *see also* Ex. 93, Juneja Reply ¶ 17.

**Plaintiff's Response**: Undisputed insofar as the referenced articles "discussed the potential for new surges in COVID-19 infections in the coming months."  For context, the same thing could be said for nearly all of the pandemic prior to "March through May 2022" as well – that "public sources . . . discussed the potential for new surges in COVID-19 infections in the coming months."

110.    Numerous public sources from late 2021 through spring 2022 discussed the dramatic rise in testing that accompanied the Omicron wave and the drop in testing that followed, as Omicron subsided and market conditions began to change, including changes to certain federal funding related to the COVID-19 pandemic:

a.  **December 17, 2021, NBC News:** "As Americans prepare to travel for holiday gatherings, the celebrations appear increasingly likely to overlap with surging Covid-19 cases and the rapid spread of the omicron variant. Those threats, in turn, are spurring a clamor for PCR testing, rapid tests and at-home kits." Greene Decl. ¶ 34, Ex. 33, Erik Ortiz, *Covid Testing Demand Spikes Ahead of Holidays, With Long Lines at Sites*, NBC News, Dec. 17, 2021, https://www.nbcnews.com/news/us-news/covid-testing-demand-spikes-ahead-christmas-lines-sites-rcna9140.

b.  **January 10, 2022, Wall Street Journal:** "Escalating demand for Covid-19 tests is prompting some laboratories to ration access, giving priority to people with symptoms or other health concerns as the Omicron variant quickly spreads. . . . Laboratories in the U.S. were processing about 1.7 million Covid-19 tests a day as of Jan. 3, according to federal data, comparable to the number processed during last

winter's surge." Greene Decl. ¶ 35, Ex. 34, Brianna Abbott, *Labs Limit Covid-19 Test Access as Demand Soars*, Wall Street Journal, Jan. 10, 2022, https://www.wsj.com/articles/labs-limit-covid-19-test-access-as-demand-soars-11641724202.

c. **February 11, 2022, SGMC Health:** "South Georgia Medical Center has recently seen a dramatic drop in demand for COVID-19 testing and vaccination requests and is adjusting its operations accordingly. Because of this decline and the availability of home tests, SGMC will no longer operate the Drive-Thru Testing Site." Greene Decl. ¶ 39, Ex. 38, SGMC Health, *SGMC Adjusts Testing and Vaccinations for COVID-19*, Feb. 11, 2022, https://www.sgmc.org/sgmc-adjusts-testing-and-vaccinations-for-covid-19/.

d. **March 1, 2022, CNN:** "As the United States emerges from the Omicron wave, Covid-19 testing has slowed to a fraction of what it was at the beginning of the year. . . . During a White House Covid-19 briefing last month, Dr. Tom Inglesby, senior adviser to the White House on coronavirus response, acknowledged that demand for tests will wane as cases decline but announced a plan to help sustain testing momentum. Officials have sent a formal request to the testing industry for proposals on how to face market volatility and supply chain struggles, as well as ideas about how to scale up manufacturing." Greene Decl. ¶ 41, Ex. 40, Amanda Sealy, *Demand for Covid-19 Testing is Falling, But Experts Caution it's as Important as Ever*, CNN, Mar. 1, 2022, https://www.cnn.com/2022/03/01/health/covid-testing-demand-decline/index.html.

e. **March 15, 2022, ABC News:** "Americans will feel the impact of cuts to the U.S. COVID response as early as next week, the White House said Tuesday in a letter to congressional leaders, as efforts to get more funding sit stalled. . . . The funding crunch comes as cases of the BA.2 variant, a more transmissible strain of omicron, rise in other countries." Greene Decl. ¶ 45, Ex. 44, Cheyenne Haslett, *White House Says 1st Cuts to COVID Efforts will Hit Americans Next Week as Funding Stalls in Congress*, ABC News, Mar. 15, 2022, https://abcnews.go.com/Politics/white-house-1st-cuts-covid-efforts-hit-americans/story?id=83447485.

f. **March 17, 2022, CBS News:** "What the models are saying, like all the experts are saying right now, is that we should be prepared to see growth in COVID over the next few months." Greene Decl. ¶ 47, Ex. 46, CBS News, *What's in the COVID-19 Forecast? New Variants Moving into Massachusetts*, Mar. 17, 2022, https://www.cbsnews.com/boston/news/covid-variant-ba2-deltacron-massachusetts-forecast/; *see also* Ex. 91, Tsai Rpt. ¶ 37.

g. **March 29, 2022, NPR News:** "The first real-world consequences of dwindling federal COVID-19 funds have started to be felt in recent days. . . . Lost access to free care could fuel future outbreaks[.] As federal funds begin to dwindle, the strain on hospitals' budgets and the reduced access to COVID-19 prevention and care for

uninsured patients could have ripple effects." Greene Decl. ¶ 51, Ex. 50, Selena Simmons-Duffin, *Free COVID Tests and Treatments No Longer Free for Uninsured, as Funding Runs Out*, NPR, Mar. 29, 2022, https://www.npr.org/sections/health-shots/2022/03/29/1089355997/free-covid-tests-and-treatments-no-longer-free-for-uninsured-as-funding-runs-out.

h. **May 10, 2022, Associated Press:** "Testing increases as infections rise and people develop symptoms — and it falls along with lulls in new cases. Testing is rising again in the U.S. along with the recent surge. But experts are concerned about the size of the drop after the first omicron surge, the low overall levels of testing globally, and the inability to track cases reliably." Greene Decl. ¶ 69, Ex. 68, Laura Ungar, *Pandemic Gets Tougher to Track as COVID Testing Plunges*, Associated Press, May 10, 2022, https://apnews.com/article/covid-us-testing-decline-14bf5b0901260b063e4fa444633f4d31; *see also* Ex. 93, Juneja Reply ¶ 17.

**Plaintiff's Response**: Undisputed insofar as the referenced articles discussed "rise in testing that accompanied the Omicron wave and the drop in testing that followed". For context, this statement says nothing about how "market conditions" changed throughout the pandemic (let alone outside the U.S.).

111. In the months leading up to and during the Class Period, numerous public sources also reflected increasing uncertainty and difficulty in predicting future COVID waves, particularly in the wake of the Omicron surge, compounded by changes in individual behavior and "pandemic fatigue":

a. **March 13, 2022, CNN:** "With the unpredictability of the coronavirus, it's hard to know what will happen in the fall and winter, said David Montefiori, a virologist at Duke University Medical Center. 'This virus has thrown us some real curveballs,' Montefiori said. Some experts say the coronavirus could eventually become seasonal like flu, but he doesn't think it's there yet." Greene Decl. ¶ 44, Ex. 43, Jen Christensen, *Here's What Could Lie Ahead for the US in the Third Year of the Pandemic*, CNN, Mar. 13, 2022, https://www.cnn.com/2022/03/13/health/pandemic-year-three-predictions/index.html; *see also* Ex. 91, Tsai Rpt. ¶ 24.

b. **March 19, 2022, NPR News:** "[T]he impacts of the [BA.2] subvariant are hard to predict, because the 'landscape of immunity' varies by time and place, says Lauren Ancel Meyers, director of the COVID-19 Modeling Consortium at University of Texas at Austin. She says it's hard at this stage to know, 'whether we're going to see a wave, how deadly that wave will be, and all the other things that we would

like to be able to anticipate.'" Greene Decl. ¶ 49, Ex. 48, Pien Huang, *U.K. COVID Cases are Rising. Health Officials are Watching to See if the U.S. is Next*, NPR, Mar. 19, 2022, https://www.npr.org/sections/health-shots/2022/03/19/1087682826/omicron-variant-ba2-surge.

c.  **March 30, 2022, New York Times:** "But other variables could turn the BA.2 wave into a more damaging surge. . . . And then there's the question of whether pandemic fatigue will prevent some people from taking reasonable precautions, like wearing masks and social distancing, when Covid numbers start to rise in their area." Ex. 52, Tara Parker-Pope, *A New Wave of Covid-19 Is Coming. Here's How to Prepare*, N.Y. Times, Mar. 30, 2022, https://www.nytimes.com/2022/03/30/well/live/ba2-omicron-covid.html; *see also* Ex. 91, Tsai Rpt. ¶ 42.

d.  **April 12, 2022, Philadelphia Inquirer:** "Angie Gonzalez, 35, thinks the [mask] mandate is a waste of time. After two years of restrictions being imposed, lifted, then imposed again, the latest message from the city Department of Public Health will be ignored by many, she predicted. . . . Therein lies the latest chapter of a challenge that has bedeviled public health agencies since the start of the pandemic: How to implement precautions in such a way that people will pay attention." Greene Decl. ¶ 58, Ex. 57, Tom Avril, *Philly's Return of Masks Gets Both Eyerolls and Support from Residents. Can Health Officials Bridge This Divide?*, Philadelphia Inquirer, Apr. 12, 2022, https://www.inquirer.com/health/coronavirus/philadelphia-mask-mandate-reaction-20220412.html; *see also* Ex. 91, Tsai Rpt. ¶ 42.

e.  **April 14, 2022, New York Times:** "[T]he record wave of recorded infections was a significant undercount of reality. In New York City, for example, officials logged more than 538,000 new cases between January and mid-March, representing roughly 6 percent of the city's population. But a recent survey of New York adults suggests that there could have been more than 1.3 million additional cases that were either never detected or never reported — and that 27 percent of the city's adults may have been infected during those months." Greene Decl. ¶ 60, Ex. 59, Emily Anthes, *Many Virus Cases Go Uncounted. Are There Better Ways to Track the Pandemic?*, N.Y. Times, Apr. 14, 2022, https://www.nytimes.com/2022/04/14/health/covid-cases-tracking.html.

f.  **April 17, 2022, NBC News:** "People may want reassurances about the virus and what's coming next, but they are hard to find in the data. Instead, the numbers point to a murky picture of Covid, particularly looking at case counts and hospital occupancy." Ex. 60, Dante Chinni, *Covid Infections Rise, but Hospitalizations Remain Low*, NBC News, Apr. 17, 2022, https://www.nbcnews.com/meet-the-press/fear-uncertainty-apathy-covid-infections-rise-hospitalizations-remain-low-n1294490.

g.  **April 28, 2022, The Atlantic:** "For a while, COVID waves were not all that difficult to detect. Even at the beginning of the pandemic, when the country was

53

desperately short of tests, people sought out medical help that showed up in hospitalization data. Later, when Americans could easily access PCR tests at clinics, their results would automatically get reported to government agencies. But what makes this moment so confusing is that the COVID metrics that reveal the most about how the coronavirus is spreading are telling us less and less." Greene Decl. ¶ 63, Ex. 62, Yasmin Tayag, *Are We in the Middle of an Invisible COVID Wave?*, The Atlantic, Apr. 28, 2022, https://www.theatlantic.com/health/archive/2022/04/covid-ba2-omicron-invisible-wave/629708/.

h. **May 5, 2022, L.A. Times:** "In New York City, cases are again rising and this week crossed the city's threshold for "medium risk" due to the widening spread of the Omicron subvariant knowns as BA.2. But there appears to be little appetite from Mayor Eric Adams to do an about-face just a few months after allowing residents to shed masks and put away vaccination cards that were once required to enter restaurants and concert halls." Greene Decl. ¶ 64, Ex. 63, Bobby Caina Calvan, *Even as COVID Cases Rise, Mask Mandates Stay Shelved*, L.A. Times, May 5, 2022, https://www.latimes.com/science/story/2022-05-05/even-as-covid-cases-rise-mask-mandates-stay-shelved; *see also* Ex. 91, Tsai Rpt. ¶ 42.

i. **May 10, 2022, Associated Press:** "Testing for COVID-19 has plummeted across the globe, making it much tougher for scientists to track the course of the pandemic and spot new, worrisome viral mutants as they emerge and spread." Ex. 68, Laura Ungar, *Pandemic Gets Tougher to Track as COVID Testing Plunges*, Associated Press, May 10, 2022, https://apnews.com/article/covid-us-testing-decline-14bf5b0901260b063e4fa444633f4d31; *see also* Ex. 93, Juneja Reply ¶ 17.

j. **May 16, 2022, San Francisco Chronicle:** "What happens in the Bay Area this spring and summer will depend on a wide variety of factors, experts said, including new variants emerging, the durability of immunity from vaccines and previous infection, people's behavior, and the will of health officials to enact more mitigation measures—such as putting mask mandates back in place." Greene Decl. ¶ 70, Ex. 69, Erin Allday, *COVID Cases in California Are Leveling Off, but Here's How BA.2 Variant Might Change That*, San Francisco Chronicle, Mar. 29, 2022, https://www.sfchronicle.com/health/article/One-of-the-calmest-moments-so-far-but-Bay-17037530.php; *see also* Ex. 91, Tsai Rpt. ¶ 42.

k. **July 19, 2022, Science:** "Even if a variant emerges in a place with good surveillance, it may be harder than in the past to predict how big a threat it poses, because differences in past COVID-19 waves, vaccines, and immunization schedules have created a global checkerboard of immunity. That means a new variant might do well in one place but run into a wall of immunity elsewhere. 'The situation has become even less predictable,' [Aris Katzourakis, an evolutionary biologist at the University of Oxford] says." Greene Decl. ¶ 74, Ex. 73, Kai Kupferschmidt, *As Omicron Rages On, Scientists Have No Idea What Comes Next*,

Science, July 19, 2022, https://www.science.org/content/article/omicron-rages-scientists-have-no-idea-what-comes-next; *see also* Ex. 93, Juneja Reply ¶ 17.

**Plaintiff's Response**: Undisputed to the extent this represents accurate quotations from the referenced articles. Disputed to the extent Defendants imply that these excerpts of the referenced articles establish that there was "increasing uncertainty and difficulty in predicting future COVID waves" compared to earlier stages of the pandemic. *See* Plaintiff's *Daubert* Motion at 8; *see also* Ex. 20, Benson Dep. 98:16-23 ("**Q.** Do you recall whether there was any specific variant that the company was concerned about that was concerned might arise in the near future that was impacting visibility? **A.** I don't recall any concerns about any specific variants at that time specifically.").

## V.    CO-DIAGNOSTICS' LOGIX TEST SALES

### A.    The Co-Diagnostics' Sales Team

112.    The Co-Diagnostics' sales team is led by Mr. Seth Egan, who reports directly to Mr. Dwight Egan. *See* Ex. 24, S. Egan Dep. 21:9-20 (setting forth his responsibilities), 25:14-15 (testifying he reports to Mr. Dwight Egan); Ex. 23, D. Egan Dep. 26:17-27:16 (same).

**Plaintiff's Response**: Undisputed.

113.    During 2021 and 2022, the Co-Diagnostics sales team comprised: Seth Egan, Cameron Gundry, Denny Crockett, and Joseph Featherstone. *See* Ex. 23, D. Egan Dep. 26:17-27:16; Ex. 21, Brown Dep. 26:17-27:5; Ex. 20, Benson Dep. 25:25-26:20.

**Plaintiff's Response**: Undisputed.

114.    The sales team regularly attended the Company's Monday Morning Management Meetings, during which the sales team would provide updates on marketing and manufacturing logistics, but generally would not discuss sales orders or demand. *See* Ex. 24, S. Egan Dep. 27:4-28:4, 30:12-31:10; Ex. 23, D. Egan Dep. 22:11-24:12; Ex. 21, Brown Dep. 28:4-20.

**Plaintiff's Response**: Partially disputed.  Plaintiff disputes the portion of this statement that "generally [the sales team] would not discuss sales orders or demand" during Monday Morning Management Meetings.  When asked whether he "ever g[ave] an update on sales at any management meetings" Seth Egan testified "***I don't know if I recall*** giving ***specific sales numbers*** in those meetings." Ex. 24, S. Egan Dep. 30:23-31:4 (emphasis added).  When asked whether he "recall[ed] ever giving an update on what you were seeing in terms of sales generally or demand for your tests at any of those meetings" he testified "I don't ***recall*** specific, you know, subject – you know, things that we discussed every week in that meeting, so no, ***I don't remember***."  *Id*. at 31:5-10 (emphasis added).

**115.**    Aside from the Monday Morning Management Meetings, the sales team did not hold regular meetings, but would communicate any important developments regarding client accounts to Mr. Seth Egan directly. *See* Ex. 24, S. Egan Dep. 25:6-11, 26:16-25, 27:15-28:4.

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes Seth Egan's testimony.  Disputed to the extent this statement implies that any such updates were communicated to Seth Egan exclusively. *See id.* at 25:6-12 (agreeing that salespersons "would keep [him] up to date with respect to any important developments with respect to the accounts that they were overseeing").  Seth Egan also testified that, while the sales team didn't have a standing meeting, "we would meet just as we were in the office." *Id*. 24:15-17; *see also* 23:7-9 ("we were generally in the office, and so we would – we would meet up often and talk about different things.").

**116.**    Outside of the Monday Morning Management Meeting, Mr. Dwight Egan and Mr. Brown did not have standing meetings to discuss sales with Mr. Seth Egan, or anybody else on the sales team. *See* Ex. 23, D. Egan Dep. 31:2-13; Ex. 21, Brown Dep. 30:25-31:3; Ex. 24, S.

Egan Dep. 31:11-23; *see also* Ex. 20, Benson Dep. 28:19-15 (testifying he does not recall having any separate meetings with Mr. Seth Egan to discuss sales during 2021 or 2022).

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes Seth Egan's testimony.  Disputed to the extent this statement implies that no such discussions occurred.  Seth Egan testified that "of course we would talk often about a lot of different things about the company, between my father [Dwight Egan] and I."  Ex. 24, S. Egan Dep. 26:4-6; 26:7-9 (testifying that [my father and I] certainly would discuss sales at times").

117.    Mr. Dwight Egan and Mr. Brown did not have any standing meetings to discuss sales or other Company matters, except for the Monday Morning Management Meeting, the Steering Committee Meeting (which was focused on the integration of two companies acquired by Co-Diagnostics in 2021), and board meetings. *See* Ex. 23, D. Egan Dep. 21:15-24:19, 30:17-34:14; Ex. 21, Brown Dep. 28:22-31:6.

**Plaintiff's Response**: Undisputed insofar as this accurately summarizes the referenced testimony.  Disputed to the extent this statement implies that no such discussions occurred.  Seth Egan testified that "of course we would talk often about a lot of different things about the company, between my father [Dwight Egan] and I."  Ex. 24, S. Egan Dep. 26:4-6; 26:7-9 (testifying that [my father and I] certainly would discuss sales at times").  Seth Egan also testified that he "attend[s] a portion of the [board] meeting[s] to give the update on activities that I'm working on."  *Id*. 32:19-25.  Further disputed as the referenced Brown testimony does not state that he did not have any standing meetings to discuss sales or other Company matters.

**B.    The Sales Order Process**

118.    The sales team tracked sales orders using a software program called Monday.com. *See* Ex. 24, S. Egan Dep. 41:15-42:11; Ex. 23, D. Egan Dep. 49:4-16.

**Plaintiff's Response**: Undisputed, with the clarification that access to Monday.com was not limited to the sales team. Dwight Egan testified that he had access to the Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024 board. Ex. 23 at 49:17-23 ("**Q.** Did you have access to the page or board on monday.com that reflected the sales orders that were coming into the company? **A.** I had the ability to go in and look at that page."); *id*. at 50:18-23 (**Q.** Do you recall if that page was titled Co-Diagnostics Orders 2020, 2021 and so forth? **A.** I believe – I believe that's correct."); 51:16-19 ("There wasn't any set pattern or schedule that I would check it. I had access to it. I would look at it from time to time."); *see also id.* at 66:16-20 (with respect to the Quarterly Dashboard, testifying "I would have to say I probably looked at this but not regularly and I don't know when during the course of the calendar year I would have looked at it.").

Brown also testified that he had access to Monday.com. Ex. 21, Brown Tr. at 50:5-7.

119.    Product sales were also entered into another program called NetSuite, which was primarily used by the Company's finance group for accounting purposes. *See* Ex. 24, S. Egan Dep. 48:8-22; Ex. 21, Brown Dep. 49:11-25.

**Plaintiff's Response**: Undisputed with the clarification that this statement makes no assertion as to when anyone at Co-Diagnostics began using NetSuite.

120.    While the Company is able to monitor its own inventory levels internally, it does not—nor does it have the ability to—monitor customers' inventory levels. *See* Ex. 24, S. Egan Dep. 72:9-12, 76:4-7; Ex. 23, D. Egan Dep. 62:6-16.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases the referenced testimony. Plaintiff otherwise has no independent basis to confirm or dispute this statement.

**121.**    Co-Diagnostics also did not receive monthly sales projections from its distributor or laboratory customers during the COVID pandemic, mostly because it was a fast-changing environment and sales were unpredictable. *See* Ex. 24, S. Egan Dep. 75:22-76:3.

**Plaintiff's Response**:  Partially disputed, in that Seth Egan testified that Co-Diagnostics did not receive monthly projections from customers "during these periods generally." *Id*.  Internal documents produced by Defendants indicate that Co-Diagnostics likely did receive monthly sales projections from some of its customers.  *See e.g.,* Supp. Uris Decl., Ex. 2 (CoDx_00003854) (March 30, 2022 email from Seth Egan to Brian Brown stating "We don't have monthly projections for ***these*** customers ***yet*** . . . .  Given that this is the first time the government has opened COVID testing to the private market, it will be difficult to get projections right away without more development.").

**122.**    Monitoring customers' inventory levels and sales projections was unnecessary given Co-Diagnostics' ability to fill orders quickly. *See* Ex. 23, D. Egan Dep. 61:14-23 ("One of the critical things about our niche in this business is our ability to fill orders, sometimes overnight orders, but to fill them rapidly in any event. Sometimes we can fill them the very day that an order comes in.").

**Plaintiff's Response**: Disputed, as this mischaracterizes Dwight Egan's testimony.  In the portion of his testimony cited by Defendants, when asked what he was "referring to when you said we keep a close eye on every day" he testified "I'm talking about the inventory levels that the company has. One of the critical things about our niche in this business is our ability to fill orders, sometimes overnight orders, but to fill them rapidly in any event. Sometimes we can fill them the very day that an order comes in." *Id*.  While Dwight Egan does mention the Company's ability to fill orders quickly, nowhere in the cited testimony does he testify that monitoring customers'

inventory levels and sales projections was unnecessary given Co-Diagnostics' ability to fill orders quickly.

### C.    Co-Diagnostics Experienced Significant Volatility in Logix Test Sales

**123.**    Throughout the COVID pandemic, Co-Diagnostics' sales of its Logix test were volatile—as Mr. Seth Egan explained:

> We would have the big months and then we would have lower months. We would have distributors that had a lot of product that had ordered product and they needed to distribute it. And – and oftentimes with big corp -- big months followed by smaller months, you know, sometimes we would have a really big month at the beginning of a quarter and then a -- and then lower months later in that quarter. There was never really a defined set of what we'd expect on a monthly basis, and things changed a lot really fast with orders with these numbers.

Ex. 24, S. Egan Dep. 58:6-17; *see also id.* 57:19-20.

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes testimony from Seth Egan's deposition.  Disputed as the generalized statement that "Co-Diagnostics' sales of its Logix test were volatile" is vague and unsupported by the record.  As Seth Egan himself recognized, when asked "even with low months and high months, prior to [2Q 2022] you had always received at least $20 million in orders per quarter, correct?" he answered "That's what it shows, yes." *Id*. at 57:22-25.  He also acknowledged that since the Company began selling the Logix test, prior to 2022, never before had the Company had back-to-back months in which the Company had received less than $4 million in orders (let alone *three* months in a row).  *Id*. at 59:11-60:10.  Faced with the Company's sales numbers in February, March, April, and the first half of May 2022, when asked "sales had never been that low for that long, correct?" Seth Egan conceded "Yeah, looking at – hindsight, looking at the chart, you're correct." *Id*. at 65:6-66:3; *see also* Plaintiff's 56.1 Statement ¶¶ 16-19.

Moreover, as of May 12, 2022, the Company received 2Q 2022 orders of $2,514,682.30. *Id.*, ¶ 11.  Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter.  *Id.* ¶ 14.

**124.**    Mr. Benson, who is the head of corporate communications for Co-Diagnostics and also assists in managing the Company's logistics or shipping department, similarly testified:

> I recall orders fluctuating on a month-to-month basis. One month wouldn't necessarily be predictive of what the following month would be. And so to see one month with more sales and another month with fewer sales wasn't ever an indication to us that sales were -- were dropping or diminishing, just that it was part of the sales cycle.

Ex. 20, Benson Dep. 44:18-25; *see also id.* 73:17-74:16 (testifying to the general feeling that "sales were cyclical . . . and occasionally unpredictable and that there would be peaks and troughs"); *id.* 97:5-11 (same).

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes testimony from Andrew Benson's deposition.  Disputed to the extent Defendants imply that this testimony supports a vague assertion that sales of the Logix test were volatile.  As Benson testified, "it wasn't really my role to make revenue predictions or to give guidance, so I can't really say what somebody else would have done." *Id*. at 97:1-4; s*ee also* Plaintiff's Response to Nos. 123; 184.

**125.**    Some quarters would start off with stronger sales of the Logix test while other quarters would start off with lower sales compared to the remainder of the quarter. *See* Greene Decl. ¶ 97, Ex. 96, Monday.com Quarterly Dashboard; *see also* Ex. 20, Benson Dep. 171:23-172:5 (explaining Co-Diagnostics did not have an expected standard for quarterly revenue).

**Plaintiff's Response**:  Partially disputed.  While this statement is generally true, additional context is necessary.  Even in quarters that "would start off with lower sales compared to the remainder of the quarter", since the Company began selling the Logix Test, prior to 2Q 2022, the

Company never had less than $5.1 million in sales by the midpoint of any quarter. Plaintiff's 56.1 Statement ¶ 14. Additionally, since the Company began selling its Logix Test, prior to February, March, and April 2022, it had never before experienced back-to-back months with sales below $4 million, let alone back-to-back-to-back months. *Id*. ¶17.

Defendants also mischaracterize Benson's testimony. Benson did not testify that "Co-Diagnostics did not have an expected standard for quarterly revenue." Rather, he testified that Co-Diagnostics had not explicitly stated publicly such a standard: "**Q.** What did you mean by 'we haven't set any standard per se'?" **A.** I would say just what it's saying there. There isn't, like, a particular standard as far as revenue that we've said, This is what you can expect from Co-Diagnostics as a company on a quarterly basis. It was not a quarterly standard of revenue that we were pointing to as our standard." Greene, Decl. Ex. 20, Benson Dep. 171:23-172:5. However, as Benson acknowledged, from the second quarter of 2020 through the first quarter of 2022, the Company had always received orders for $20 million or more in each quarter. *Id*. at 41:14-21.

126.    For example, in the first two months of Q4 2021, Co-Diagnostics' sales were approximately $4,627,159 (October) and $2,824,248 (November), and in the final month of Q4 2021, sales were approximately $12,939,658 (December). Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed.

127.    Co-Diagnostics' sales in December 2021 were more than $8 million higher than in October 2021 and more than $10 million higher than November 2021. Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed.

62

128.    Roughly 64% of Co-Diagnostics' Q4 2021 sales came in the final month of the quarter. *See* Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed with the clarification that by "roughly 64%" Defendants appear to be referring to approximately 63.46%.

129.    Further, almost 60% of Co-Diagnostics' Q4 2021 sales came in the final two weeks of Q4 2021. *See* Greene Decl. ¶ 113, Ex. 112, Compilation of sales data from Monday.com showing weekly Logix test sales from January 2021 through August 2022, in reverse chronological order ("Weekly Sales Data Compilation"); Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Disputed. First, by "almost 60%" Defendants appear to be referring to approximately 58.68%.  More importantly, however, Easton Egan, who on December 30, 2024 "created a compilation of Co-diagnostics' weekly sales data . . . using data from Monday.com produced in th[is action]" (Ex. 112), appears to have manipulated the sales data in a way that differs from the way the sales data was kept in the ordinary course, in order to inflate the sales data in the final two weeks of Q4 2021.

As shown in Uris Decl. (ECF No. 114), Ex. 7, the Company received orders totaling $8,366,062 between December 20-30, 2021. *Compare* Uris Decl., Ex. 7 at lines 729-788; *with* Ex. 112 (showing sales totaling $11,966,158 for the two weeks comprising December 20-31, 2021). This amounts to approximately 41.03% of Co-Diagnostics' Q4 2021 sales.  Rather, in order to come up with the "almost 60%" number, Easton Egan appears to have included an additional $3,600,096 in sales that were received in the final two weeks of Q4 2021, but were allocated by Co-Diagnostics to Q1 2022 in the ordinary course (*not* Q4 2021 as asserted in this statement). *See* Ex. 1 (lines 483-500, 502-504).  As Seth Egan testified, Co-Diagnostics' "general practice" was that "[i]f we received an order at a certain – at a time and a month where it wasn't going to be

delivered in that month, we would often move it to the month that the product would have been delivered to them.  That would also depend on if we had to manufacture the product for them and needed a few days to do it, so there were several factors of that.  But it would typically be -- if it wasn't going to be delivered in that calendar month, we would push it to the next month.".  Ex. 24, Seth Egan Dep. at 79:19-80:9.

130.    Conversely, in the first month of Q1 2022, Co-Diagnostics' sales were approximately $16,753,805 (January), followed by sales of approximately $3,323,125 in the second month of the quarter (February), and $2,796,516 in the final month of the quarter (March). Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed.  However, it is notable that the $16,753,805 of January 2022 sales include the same $3,600,096 in sales that Defendants have simultaneously attempted to frame as December 20-30, 2021 sales in the preceding statement.

131.    Co-Diagnostic's sales in January 2022 were more than $13 million higher than in February 2022 and about $14 million higher than in March 2022. Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed.

132.    Roughly 73% of Co-Diagnostics' Q1 2022 sales came in the first month of the quarter. *See* Ex. 96, Monday.com Quarterly Dashboard.

**Plaintiff's Response**: Undisputed.

133.    Further, in each of 1Q21, 2Q21, and 1Q22, about 50% of sales came in just two or three weeks of the quarter. *See* Ex. 112, Weekly Sales Data Compilation.

**Plaintiff's Response**: Disputed as vague and ambiguous. This statement is improperly vague in that it not only refers to "two or three" weeks without specifying a number of weeks for

each referenced quarter, but it does not even specify whether it is referring to consecutive weeks within each quarter, or to the "two or three weeks" in which the most sales occurred in each quarter. Without providing a more specific statement, Plaintiff has no basis to agree or disagree with Defendants' characterization of the Monday.com sales data.

134.    Co-Diagnostics did not formally track or monitor intra-quarter sales. *See* Ex. 23, D. Egan Dep. 31:2-8 (testifying he received update on sales from Mr. Brown or Mr. Seth Egan at the end of a quarter), 50:25-51:19 (testifying he would "intermittently" log into Monday.com, but was "more interested in quarterly results than on daily, weekly, or monthly results"); Ex. 24, S. Egan Dep. 62:14-24, 64:1-65:5, 66:4-10; *see also id.* 68:21-69:9 (testifying he assessed sales by customers over periods of years, not months or even quarters); Ex. 20, Benson Dep. 49:12-21 (testifying he did not track sales numbers on a month-to-month basis), 209:2-9 (testifying he "typically looked at numbers on a quarter basis").

**Plaintiff's Response**: Disputed.  The record shows that Co-Diagnostics tracked daily sales information.  On a May 13, 2021 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, Egan stated that they tracked daily demand for their Logix Smart™ COVID-19 Test: "While we observe the daily infection and death counts around the world, we are also, of course, able to monitor the daily influx of demand for our tests . . . ." Plaintiff's 56.1 Statement, ¶7.  The Company used Monday.com to track the company's purchase orders.  *Id*. ¶¶8-10.

Dwight Egan testified that he had access to the "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024" board. Ex. 23, Dwight Egan Tr. at 49:17-23 ("**Q.** Did you have access to the page or board on monday.com that reflected the sales orders that were coming into the company? **A.** I had the ability to go in and look at that page."); *id*. at 50:18-23 (**Q.** Do you recall if that page was

titled Co-Diagnostics Orders 2020, 2021 and so forth? **A.** I believe – I believe that's correct."); 51:16-19 ("There wasn't any set pattern or schedule that I would check it. I had access to it. I would look at it from time to time."); *see also id.* at 66:16-20 (with respect to the Quarterly Dashboard, testifying "I would have to say I probably looked at this but not regularly and I don't know when during the course of the calendar year I would have looked at it.").

Brown also testified that he had access to Monday.com. Ex. 21, Brown Tr. at 50:5-7. Brown testified that in determining guidance he would also "have discussions with Seth Egan" about "how sales were going." *Id*. at 45:13-23. Seth Egan testified that "of course we would talk often about a lot of different things about the company, between my father [Dwight Egan] and I." Ex. 24, S. Egan Dep. 26:4-6; 26:7-9 (testifying that [my father and I] certainly would discuss sales at times"). *See also* Response to No. 179 (discussing Brown's use of sales data to determine quarterly guidance).

Seth Egan testified that he would review the Co-Diagnostics orders board on Monday.com "very often." He further testified that he would review it "sometimes every day, sometimes every other day, sometimes once a week." Seth Egan Tr. at 54:8-17.

**135.** As Mr. Benson testified, it was not the Company's practice to report intra-quarter sales or revenue numbers on earnings calls:

> [I]t was never company policy to provide monthly cadence as we were reporting earnings. . . . It wasn't something that we had been doing and then were choosing not to do. It was just simply not part of our operations or standard operating procedures when it came to reporting.

Ex. 20, Benson Dep. 210:22-211:13.

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes portions of testimony from Andrew Benson's deposition. Disputed insofar as this statement mischaracterizes Benson's testimony. Mr. Benson's testimony was specific to monthly revenue

numbers in a press release. *See* 210:8-9, 210:17 (referring to revenue cadence by month with respect to draft press release). He did not testify specifically about "intra-quarter sales" or practices with respect to earnings calls.

**136.**    Mr. Dwight Egan testified that Co-Diagnostics did not consider a few months of sales data or intra-quarter sales to be indicative of future sales or full-quarter revenue: "You keep asking me about a few months and up to a mid quarter. That's not how we view things, not how we view things today." Ex. 23, D. Egan Dep. 80:17-20; *see also id.* 54:15-57:05 ("What the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter because sometimes a quarter came together all in the last month of the quarter or in the last two or three weeks of the quarter. . . . There are a lot of variables."), 57:16-23 ("One month does not a quarter make and if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how a quarter might ultimately present itself based on what we see in that short of a time period."), 75:11-16 ("[W]e would not have viewed that our monthly results were indicative of what the future held. A month did not a quarter make. Two months did not necessarily prognosticate what a quarter would be.").

**Plaintiff's Response**: Undisputed insofar as this accurately reflects portions of Dwight Egan's testimony. Disputed insofar as it is inconsistent with other testimony and the record. For example, Dwight Egan's testimony that "if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how a quarter might ultimately present itself based on what we see in that short of a time period" ignores that, to the contrary, the Company had previously provided revenue guidance at the midpoint of the quarter. *See, e.g.*, Ex. 21, Brown Dep. at 43:22-44:13. Moreover, his testimony that "[w]hat the company's sales were to date in a quarter was in many respects irrelevant" is belied by other testimony. For example,

67

Brown, who was the primary person responsible for determining guidance, testified that he would look at the company's historical results in determining guidance, and in addition, "[c]learly I would have discussions with Seth Egan . . . [about] how sales were going." Ex. 21, Brown Dep. at 45:13-23; *see also id*. at 46:11-13 (testifying that he "would look at the results that had happened up to that point in time [in the quarter]" in order to determine guidance); Ex. 23, Dwight Egan Dep. 79:20-25 ("**Q.** In thinking about guidance for any particular quarter, would you compare the company's results so far in that quarter to the results in that same quarter in the previous year? **A.** I believe we did . . . ."). *See also* Response to No. 179.

> **D.** **Omicron Created Even More Uncertainty and Contributed To Co-Diagnostics' Lack Of Visibility**

**137.** In late-2021 and early-2022, the Omicron variant caused sales of the Logix test to soar and thus lower sales following that wave were expected until another variant or wave emerged. Ex. 112, Weekly Sales Data Compilation; Ex. 21, Brown Dep. 71:19-72:7 (explaining the vast majority of sales for Q4 2021 were made in December due to the Omicron variant); Greene Decl. ¶ 27, Ex. 26, Deposition of Cameron Gundry ("Gundry Dep.") 86:20-88:10, 104:13-106:5 (explaining reduced sales expected immediately following surge).

**Plaintiff's Response**: Disputed.  This statement lacks foundation and is unsupported by the cited sources.  While the Omicron variant did cause increased sales of the Logix test, Defendants do not cite any sources to support the part of the statement stating "and thus lower sales following that wave were expected until another variant or wave emerged." Defendants cite to Gundry's testimony at 104:13-106:5, however in that testimony Gundry testified that he wasn't surprised that *one* of his customers had not placed an order for the Logix test in the months following January 2022 because that customer had ordered a large number of tests in January 2022. *Id*.  Indeed, that customer "cancel[ed] part of the order because it[ was] harder to sell than we

thought." *Id*. at 89:18-25; *see also* 111:5-112:9.  In fact, rather than expecting more orders once "another variant or wave emerged" from that particular customer, Gundry testified that "I did assume that if we got huge orders from a particular customer, that particular customer wouldn't need volumes for some time.  ***Maybe almost a year***." *Id*. at 180:7-181:10 (emphasis added).

138.    Lower sales volumes in the weeks and months leading up to May 12, 2022 did not alarm Mr. Dwight Egan, Mr. Brown, or anybody else at the Company. *See id.*; *see also*, *e.g.*, *See* Ex. 23, D. Egan Dep. 70:20-78:8 (testifying there were many indicators that sales would rebound and further, the Company did not "make judgments about the future based on what happens in a few-month period"); Ex. 21, Brown Dep. 65:19-66:12 (testifying sales in February, March, and April of 2022 were lower than they were in January 2022, but does not recall any concerns at that time), 68:9-21 (testifying he was not concerned that sales in February, March and April were below $4 million because that number "was not a measuring tool or a measuring guide" for the Company); Ex. 24, S. Egan Dep. 58:22-59:5 (testifying that sales leading up to May 12, 2022 did not concern him: "it really wasn't apparent maybe until later in the year that numbers were lower . . . because we would often have big months followed by lower months"), 60:7-61:1 (testifying it was not concerning to have lower sales for a few months following the spike in sales the Company experienced in December 2021 and January 2022), 65:6-24 (testifying he does not recall being concerned about sales in the spring of 2022 because "you could never place any – any real assurances on anything until you got through an entire quarter because things change fast"), 83:18-86:3, 91:8-92:18, 97:16-98:9; Ex. 20, Benson Dep. 209:2-9 (testifying he does not recall having any concerns regarding the Company's sales in February and March 2022), 44:18-25; Ex. 26, Gundry Dep. 104:20–105:10, 105:24–106:12; Greene Decl. ¶ 26, Ex. 25, Deposition of Joseph Featherstone ("Featherstone Dep.") 70:14-23.

69

**Plaintiff's Response**: Disputed insofar as this statement is too vague and non-specific to be factual. Dwight Egan's testimony that "we certainly aren't going to make judgments about the future based on what happens in a few-month period" is inconsistent with other testimony and the record. For example, that testimony ignores that, to the contrary, the Company had previously provided revenue guidance at the midpoint of the quarter. *See, e.g.*, Ex. 21, Brown Dep. at 43:22-44:13. Indeed, Brown, who was the primary person responsible for determining guidance, testified that he would look at the company's historical results in determining guidance, and in addition, "[c]learly I would have discussions with Seth Egan . . . [about] how sales were going." *Id*. at 45:13-23; *see also id*. at 46:11-13 (testifying that he "would look at the results that had happened up to that point in time [in the quarter]" in order to determine guidance).

Moreover, that Brown could not "recall" any concerns at the time is too vague and non-specific to be factual and not probative of what actually occurred, and Defendants' suggestion that he was not concerned about low sales is belied by the fact that, by May 2022, he had discussed with Lambert "taking a more prudent approach to guidance". Plaintiff's 56.1 Statement ¶37. Indeed, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two. *Id*. ¶¶37-42; *see also* Responses to Nos. 187, 180.

As Seth Egan himself recognized, when asked "even with low months and high months, prior to [2Q 2022] you had always received at least $20 million in orders per quarter, correct?" he answered "That's what it shows, yes." Ex. 21, S. Egan Dep. at 57:22-25. He also acknowledged that since the Company began selling the Logix test, prior to 2022, never before had the Company had back-to-back months in which the Company had received less than $4 million in orders (let alone *three* months in a row). *Id*. at 59:11-60:10. Faced with the Company's sales numbers in

70

February, March, April, and the first half of May 2022, when asked "sales had never been that low for that long, correct?" Seth Egan conceded "Yeah, looking at – hindsight, looking at the chart, you're correct." *Id.* at 65:6-66:3; *see also* Plaintiff's 56.1 Statement ¶¶ 16-19. And although Seth Egan referred to his review of the Quarterly Dashboard at his deposition as "hindsight", he testified that he would review the Co-Diagnostics orders board on Monday.com "very often" and that he would review it "sometimes every day, sometimes every other day, sometimes once a week." Seth Egan Tr. at 54:8-17.

Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on whether Defendants were "alarmed" by the low sales.

139. Mr. Brown testified that the end of 2021 and early-2022 was a particularly volatile time in the COVID testing market:

> If I look back, for example, Q4 of 2021, you'll see I think [sales for the Logix test] was [$4 million]. -- I'm not sure what that number is, 4.5, something like that and then it went down to, I think that's 2 or 3.8 and then it spiked up in December. In that period of time in December was approximately most of that revenue happened in about a two-week period of time. So there was volatility, especially Q4-21, Q1-22, Q2-22, there was continued volatility that was maybe more present than it had been in the past, especially on a weekly basis.

Ex. 21, Brown Dep. 71:3-17; *see also* Ex. 26, Gundry Dep. 88:8-10 (describing Omicron wave as "an unprecedented surge in demand, which I never expected").

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes testimony from Brown's deposition. Disputed as a mischaracterization of Brown's testimony. Plaintiff does not dispute that sales increased in December 2021 and January 2022. However, Brown did not identify any volatility other than the increase in sales in December 2021 and January 2022, before quickly falling back down to record low levels. Brown testified that the "timing of orders for the Logix test [were] fluctuating greatly [on or around May 12, 2022]" and when asked

71

"[i]s it fair to describe those fluctuations as a high volume of orders in December of 2021 and January of 2022 and then a lower volume of orders in February, March, April and the beginning of May of 2022?" Brown testified "If you look at the numbers the revenue was lower in those periods that it was in December and January. That's what the numbers tell you." Ex. 21, Brown Dep. 114:8-115:18; *see also* Response to No. 140. As Seth Egan conceded, sales had never been that low for that long. Ex. 24, S. Egan Dep. 65:6-66:3. Such an extended period of low sales is not "volatility."

In fact, prior to brief reprieve provided by the Omicron wave, in a November 10, 2021 email to Dwight Egan, Benson, and Houston, after October 2021 sales of $4,627,158.90 and November sales through November 10, 2021 of $315,824, Brown stated that "[t]hus far in Q4, we have seen slowing sales." Plaintiff's 56.1 Statement ¶20.

**140.**    The increased volatility in the COVID testing market in spring 2022 made it even more difficult for Mr. Brown to predict sales for the Logix test in Q2 2022:

> Based on the recent history we'd had with COVID, we didn't know when the next variant would hit. Omicron had a significant impact in recent memory here because this is the quarter before what we're talking about. We had our biggest sales month we've ever had in January of 2022 so we didn't know what was to come because the history had been so volatile.

Ex. 21, Brown Dep. 77:2-10; *see also id.* 78:8-13 ("I mean we had a significant amount of volatility throughout COVID and there was even more volatility at the time we're speaking of and it is what it is. That was the volatility at the time.").

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes testimony from Brown's deposition. Disputed as the reference to "[t]he increased volatility in the COVID testing market in spring 2022" is unsupported. As Brown testified, the only "volatility" was the fact that sales had increased in December 2021 and January 2022, before quickly falling back down to record low levels. Ex. 21, Brown Dep. 114:8-115:18. Indeed, Brown conceded that

sales were low in February, March, April and the beginning of May 2022. *Id*. As Seth Egan conceded, sales had never been that low for that long. Ex. 24, S. Egan Dep. 65:6-66:3. Such an extended period of low sales is not "volatility."

Moreover, Defendants' suggestion that it was "more difficult for Mr. Brown to predict sales for the Logix test in Q2 2022" is inconsistent with the record. Indeed, by the beginning of the Class Period, sales had been down for three and a half months. The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." Plaintiff's 56.1 Statement, ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." *Id.* ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" *Id.* ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id*.

Indeed, despite the same risk of not "know[ing] when the next variant would hit" existing in previous quarters, the Company had provided guidance.

**141.** Mr. Benson also testified that Omicron created a lot of unpredictability in the cadence of Logix test sales:

> I do know that Q1 was different than Q4. Q4 had a big final month in the -- in the quarter. Q1 had a big initial month in the quarter. It was unpredictable.

It was -- it was all over the map. We just didn't know what it -- what it was going to look like. We'd have these wild peaks. I mean, it was . . . frankly, impossible to predict what was going to happen next. Would there be another variant? Would there be another omicron? Would there not? What would that do? I mean, I don't recall anybody specifically stating what percentage of sales they thought would come in after the first week of May in that quarter.

Ex. 20, Benson Dep. 191:19-192:7.

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes testimony from Benson's deposition. Disputed as a mischaracterization of Benson's testimony, which is belied by the record. To the contrary, Omicron did not "create" "a lot of unpredictability n the cadence of Logix test sales." While Benson describes Q4 2021 having a big final month and Q1 2022 having a big initial month as being "unpredictable", that is exactly what you would expect. Given that those sales were the result of the same Omicron wave, it is logical, and predictable, that the timing of sales in Q4 2021 and Q1 2022 would correspond to the timing of the Omicron wave (beginning towards the end of Q4 2021 and spilling over into the beginning of Q1 2022).

### E.    Customer Order Patterns In Q1 and Q2 2022 Did Not Cause Concern

**142.**    In 2021 and 2022, the Company's largest customers included, among others, Nomi Health; Genesis Reference Laboratories; Raver Aplicaciones S.A. de C.V.; Intelligent Solutions; NTL Laboratory; and Safeguard DNA Diagnostics, Inc. *See* Greene Decl. ¶ 112, Ex. 111, Co-Diagnostics' Suppl. Rog Responses, dated May 15, 2024, ¶ 1.

**Plaintiff's Response**: Undisputed.

**143.**    Neither Mr. Dwight Egan nor Mr. Brown tracked specific customer orders or purchase history. *See* Ex. 23, D. Egan Dep. 87:12-20 (testifying to same regarding Intelligent Solutions); *id.* 87:24-88:8 (testifying to same regarding Raver); Ex. 21, Brown Dep. 79:6-22 (testifying to same regarding Intelligent Solutions), 80:5-25 (testifying to same regarding Raver),

74

155:4-5 ("I didn't have any expectation of test orders. That wasn't my job."); *see also* Ex. 20, Benson Dep. 50:5-24 (testifying to same regarding Intelligent Solution).

**Plaintiff's Response**: Disputed as mischaracterizations of the cited testimony. Further disputed insofar as Defendants suggest that Defendants did not "track[] specific customer orders or purchase history" as too vague to be taken as undisputed fact, and inconsistent with the record.

Dwight Egan did not testify that he did not track Intelligent Solutions' orders or purchase history.  Rather, he testified "I can't tell you how big they figured in the group of distributors but I know we did business with them." Ex. 23, D. Egan Dep. at 87:18-20.  Nor did he testify that he did not track Raver's orders or purchase history.  Rather, in the cited testimony he testified that he was not aware that Raver's last substantial order was placed in January of 2022 or that in February of 2022 they cancelled a portion of their January 2022 order.  *Id*. at 87:24-88:8.

Similarly, Brown did not testify that he did not track Intelligent Solutions' orders or purchase history.   Rather, he testified that he was not aware that Intelligent Solutions' last substantial order was in January of 2022.  Ex. 21, Brown Dep. 79:17-22. Nor did he testify that he did not track Raver's orders or purchase history.  Rather, in the cited testimony he testified that he was not aware that Raver's last substantial order was placed in January of 2022 or that in February of 2022 they cancelled a portion of their January 2022 order.  *Id*. at 80:16-25.

Moreover, that Brown testified that he "didn't have any expectation of test orders [that he was expecting to come in following the May 12, 2022 earnings call]" does not mean that he did not "track[] specific customer orders or purchase history." *Id*. at 154:25-155:5.

Additionally, in Benson's cited testimony, he testified that "I would see on the logistics side shipments going out to Intelligent Solutions, but I couldn't speak to the dollar amount of what those shipments amounted to."  Ex. 20, Benson Dep. 50:9-12.

Moreover, the record shows that Co-Diagnostics tracked daily sales information (including "specific customer orders or purchase history") for all customers, and that Defendants Egan and Brown had access to that information. Plaintiff's 56.1 Statement ¶¶ 7-10, 21-23, 24-29.

**144.**    Mr. Seth Egan testified that he does not recall raising any concerns regarding sales of the Logix test to the Company's executives or board members in April or early-May of 2022. *See* Ex. 24, S. Egan Dep. 135:13-24; *see also id.* 67:5-6 ("[T]here was no reason [as of May 12, 2022] to think that a big order wasn't going to be coming.").

**Plaintiff's Response**: Disputed as the statement mischaracterizes Seth Egan's testimony. The cited testimony was not about, nor did it make any reference to, "concerns regarding sales". Rather, Seth Egan testified that he did not "recall any specific conversations" "about how sales were going". *Id*. at 135:13-24.  Moreover, Seth Egan also testified that he did not "recall any conversations [with Brown] about [any particular orders for the Logix tests that [he] expected to come in in the second half of the second quarter of [2022]." *Id*. at 135:7-11.

Moreover, with respect to Seth Egan's testimony that "there was no reason to think that a big order wasn't going to be coming [as of May 12, 2022]", the reason Seth Egan provided was vague and non-specific to that time period: he did testified "we were dealing with many distributors around the world, and we would often have large quotes out to them that they had requested that then needed to be approved by their customers or their government officials or others."  *Id*. at 66:23-67:2.  He confirmed that such was the case in all quarters, and was not specific to 2Q 2022 as of May 12, 2022.  *Id*. at 67:8-13.

**145.**    Nor did customer order patterns, including cancelled or modified orders, in February, March, or April of 2022 cause concern about demand for the Logix test or Co-Diagnostics' other products. *See supra* ¶ 139; *see also* Ex. 26, Gundry Dep. 104:20-106:12

76

(testifying he does not recall Raver Aplicaciones's (a Mexican distributor of the Logix test) cancellation causing concern and noting the large January 2022 order was for tests with extended expiration dates), 180:23-181:10 (explaining that because Raver's January 2022 order was for "over a million reactions," he did not expect Raver to need additional tests for several months, or "maybe almost a year"); Greene Decl. ¶ 98, Ex. 97, Email re Darn, they canceled the rest of the COVID-K-001s from order #2410, dated Feb. 8, 2022 (indicating Mr. Benson was optimistic that Raver would submit a replacement order later in Q1 2021); Ex. 20, Benson Dep. 19:10-20:5, 52:23-55:2-9, 56:18-57:5 (testifying "it was not uncommon for customers to place large orders, request the product to be sent in batches, and then later revise the order after the first shipment"); Ex. 24, S. Egan Dep. 91:8-25 (testifying Co-Diagnostics was expecting "large orders" from Raver in the near future), 84:22-86:3 (same), 97:16-98:9 (testifying Intelligent Solution's reduction in orders did not concern him because there were a lot of "factors at play"), 107:9-111:3 (testifying it did not concern him that Nomi Health was no longer outsourcing the processing of COVID kits to a third party in February 2022); *see also* Ex. 23, D. Egan Dep. 88:5-8 (testifying he was not aware Raver cancelled a portion of its January 2022 order); Ex. 21, Brown Dep. 80:22-25 (same); Ex. 25, Featherstone Dep. 60:23-61:9 (testifying he does not recall whether Intelligent Solutions made a "substantial purchase" of the Logix test in February 2022).

**Plaintiff's Response**: Disputed. This statement is inconsistent with the record. Defendants suggestion that Defendants were not concerned about "order patterns" is belied by the fact that, by May 2022, he had discussed with Lambert "taking a more prudent approach to guidance". Plaintiff's 56.1 Statement ¶37. Indeed, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two. *Id*. ¶¶37-42.

77

The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." Plaintiff's 56.1 Statement, ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." *Id.* ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" *Id.* ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id.*; *see also* Response to No. 187.

While Defendants cite to Benson's unsupported optimism regarding future orders from Raver, even Benson in March of 2022 acknowledged the decline in COVID testing. *See* Ex. 98 at Page 2 of 4 (stating in a March 8, 2022 email to Dwight Egan, copying Brian Brown, stating "I think it's important in our messaging for people to understand we're still very bullish about our future despite the decline in COVID testing.").

Moreover, Defendants mischaracterize Seth Egan's testimony regarding "expecting 'large orders' from Raver in the near future" – his testimony concerned *other* non-COVID tests (of which Co-Diagnostics made de minimis sales) for which he testified they "were expecting to bring large orders from." Ex. 24 at 91:8-25.

78

## VI.    FEDERAL FUNDING PROGRAMS RELATED TO COVID TESTING

146.    Since at least early 2020, various COVID-related government funding programs and initiatives were implemented to increase access to COVID-19 diagnostic testing. *See* Ex. 91, Tsai Rpt. ¶ 29; AC ¶ 39.

**Plaintiff's Response**: Undisputed.

147.    One set of policies and programs impacting demand for COVID tests was public and private funding for test manufacturing and purchasing. Ex. 91, Tsai Rpt. ¶ 29.

**Plaintiff's Response**: Undisputed insofar as this is an accurate quote of a sentence in Dr. Tsai's report.  For additional context, however, Dr. Tsai does not cite to any support for the portion of this statement referencing "private funding".

148.    The U.S. federal government made various investments at different times to "stabilize test production rates and related supplies and to reduce vulnerabilities associated with import delays, increased costs, and offshore sourcing." *See id.* ¶ 29 (quoting "Public Health Supply Chain and Industrial Base One-Year Report," Department of Health and Human Services, February 2022, at 24).

**Plaintiff's Response**: Undisputed insofar as this is an accurate quote of a sentence in Dr. Tsai's report.

149.    Various state and federal legislation, programs, and public policies prior to the Class Period ensured coverage for testing among Medicare and Medicaid patients as well as the privately insured and uninsured. For example:

a.    By March 2022, the American Rescue Plan Act of 2021 ("ARP"), Families First Coronavirus Response Act ("FFCRA"), and Paycheck Protection Program and Health Care Enhancement Act allocated $6.8 billion in combined reimbursements for testing the uninsured administered through the Health Resources & Services Administration ("HRSA").

79

    **b.** HRSA spent $11.4 billion on reimbursement of tests for the uninsured by March 2022, including funding from the Coronavirus Aid, Relief, and Economic Security Act ("CARES") and Coronavirus Response and Relief Supplemental Appropriations Act.

    **c.** The ARP specifically allocated $47.8 billion to the U.S. Department of Health and Human Services to detect, diagnose, trace, and monitor COVID–19 infections.

    **d.** Congress, through the ARP, appropriated an additional $1.75 billion for genomic sequencing, analytics, and disease surveillance.[6]

*See id.* ¶ 29.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of portions of Dr. Tsai's report.

**150.** After the cessation of the uninsured program administered through the HRSA in March 2022, the FFCRA and the Coronavirus Aid, Relief, and Economic Security Act both still required coverage and reimbursement for lab-based COVID testing, including the cost of the test itself and other services related to testing without cost-sharing for individuals covered by most private health plans, Medicare, and Medicaid. *See id.* ¶ 38; *see also* AC ¶ 41.

**Plaintiff's Response**: Partially disputed. In support of this statement, which concerns the time period following March 2022, Dr. Tsai cited articles from 2020 and 2021. Ex. 91, Tsai Rpt. ¶ 38, fn. 81. Ex. 29, Tsai Dep. at 92:2-24. Dr. Tsai also conceded that he did not know whether private health plans, Medicare, or Medicaid were actually consistently covering the costs of PCR tests by May of 2022. *Id*. at 93:22-94:10; 95:1-24. He also conceded that the interpretation by federal agencies of the law requiring coverage and/or reimbursement "did change and evolve over time." *Id*. at 94:7-10. He further conceded that he did not recall the specifics of how those interpretations changed over time. *Id*. at 94:12-25. Additionally, while he did not recall the

---

[6] Because genomic sequencing can only occur through molecular tests performed at diagnostic labs, federal efforts to expand genomic sequencing were expected to support molecular testing at public health laboratories, clinical diagnostic laboratories, and healthcare facilities. *See id.*

specifics as to whether tests needed to be ordered and administered by a health care professional in order to fall under the purview of the Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act, he conceded that "for a lot of the reimbursement for a diagnostic reimbursement, in order to fall under coverage, as I recall there were regulatory guidance around the testing ordered by a medical provider and in a medical setting in order to qualify for reimbursement which is a medical encounter." *Id*. at 95:25-97:18.

151.    The CDC Increasing Community Access to Testing program provided no-cost testing, including PCR tests, to individuals at over 17 thousand pharmacies and community-sites across the United States from early 2021 through 2024. Ex. 91, Tsai Rpt. ¶ 38.

**Plaintiff's Response**: Partially disputed.  Dr. Tsai testified that he does not know to what extent the Logix test was purchased through the CFC Increasing Community Access to Testing program.  Dr. Tsai Ex. 29, Tsai Dep. at 98:19-99:3.

152.    Operation Expanded Testing continued to fund no-cost PCR testing hubs to K-12 schools, colleges, and under-resourced communities, among other qualified sites through December 31, 2022, with $650 million in allocated funds. *Id.* ¶ 38.

**Plaintiff's Response**: Partially disputed.  Dr. Tsai testified that he does not know to what extent the Logix test was purchased through Operation Expanded Testing.  Ex. 29, Tsai Dep. at 99:4-10.

153.    By April 2022, hundreds of billions of dollars of the total budget of all COVID-related funds were not yet obligated for spending, some of which was potentially available to support COVID testing. *Id.*

81

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of portions of a sentence in Dr. Tsai's report. Disputed as to the phrase "hundreds of billions", which is not found in the cited paragraph.

154. Accordingly, Defendants' COVID-testing expert Dr. Thomas Tsai, MD, MPH opined that "despite public discussion of Congress's decision not to renew funding for HRSA's reimbursement for testing among the uninsured after March 2022, the cessation of that funding itself was not expected to have a clear impact on molecular testing demand in 2022 due to the existence of other programs to bolster testing and existing funds from other sources in 2022." *Id.*

**Plaintiff's Response**: Undisputed insofar as this is an accurate quotation of a portion of a sentence in Dr. Tsai's report. Disputed as factually unsupported given Dr. Tsai's lack of knowledge regarding the specifics of the details cited in this paragraph. *See* Responses to Nos. 150-53.

155. The individuals who were asked about it at deposition in this lawsuit—including Mr. Dwight Egan and Mr. Brown—were not aware of any specifics regarding the expiration of government funding in March of 2022. *See* Ex. 23, D. Egan Dep. 189:13-191:20 (testifying he was "not particularly aware" of the end of HRSA funding for uninsured: "[W]e didn't view ourselves as being in sort of a total landscape aggregate effect of it. We didn't really view it necessarily impacting our customers in the same way that it may affect others."); Ex. 21, Brown Dep. 174:16-175:12, 176:3-17; Ex. 24, S. Egan Dep. 137:11-138:11; Ex. 20, Benson Dep. 183:17-22; Greene Decl. ¶ 28, Ex. 27, Deposition of Michael Houston ("Houston Dep.") 125:8-13; *see also* Ex. 23, D. Egan Dep. 189:8-11 ("We did not generally view our customers as being heavily reliant on government sponsored programs.").

82

**Plaintiff's Response**:  Undisputed insofar as this accurately reflects the quoted portions of the referenced depositions. Disputed as to the statement that Dwight Egan and Brown "were not aware of any specifics regarding the expiration of government funding in March 2022" as incorrect and unsupported by the record.   To the contrary, Dwight Egan testified that he was "aware that the government had various programs and there were a lot of them that dealt with lots of different constituencies, so I don't have a strong knowledge of all the programs the government promulgated but I am aware that they provided supportive funding to try and mitigate the effects of COVID, of the COVID pandemic." Ex. 23, Dwight Egan Dep. at 188:6-20.  His testimony also demonstrates that he was in fact aware of the expiration of certain government funding, testifying that in the Spring of 2022 "Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up."  *Id*. at 28:12-15; AC ¶42.

Moreover, while Dwight Egan testified that "w[e] didn't really view it necessarily impacting our customers in the same way that it may affect others" (which is too vague and non-specific to be treated as undisputed fact), Dwight Egan also conceded on the March 24, 2022 earnings call that "if the U.S. government does not reauthorize any additional money for COVID testing" that "would have an impact on us . . . ." Greene Decl. ¶ 76, Ex. 75 at 13.

Moreover, while Brown testified that he was not aware of the expiration of government funding in March of 2022, he participated in the March 24, 2022 earnings call during which the expiration of such funding was discussed.  *Id*.

While Seth Egan did not recall which program expired in March of 2022, he did testify that "it seems that something did expire at that period, but I don't know exactly which funding source that would have been or what it covered." Ex. 24 at 138:6-11.

**156.**    Nor was the Company aware of how government funding impacted its customers or sales of the Logix test in the spring of 2022. *See* Ex. 23, D. Egan Dep. 188:22-189:11, 190:25-191:6; Ex. 24, S. Egan Dep. 138:12-141:25; Ex. 20, Benson Dep. 184:7-185:7; Ex. 25, Featherstone Dep. 73:24-74:7.

**Plaintiff's Response**: Partially disputed to the extent Defendants imply that they were not aware that government funding did impact its customers or sales of the Logix test.  As Dwight Egan conceded on the March 24, 2022 earnings call, "if the U.S. government does not reauthorize any additional money for COVID testing" that "would have an impact on us . . . ." Ex. 75 at 13.

## VII.    SHARE BUYBACK PROGRAM

**157.**    Co-Diagnostics authorized a share buyback program in March 2022. *See* Greene Decl. ¶ 19, Ex. 18, 2022 Q2 10-Q, at 16; *see also id.* ¶ 12, Ex. 11, Form 8-K and attached press release, filed with the SEC on March 15, 2022 ("March 15, 2022 8-K").

**Plaintiff's Response**: Undisputed.

**158.**    Mr. Brown testified that "the reason [Co-Diagnostics] set up the share buyback program was basically because [the Company] saw an opportunity to buy shares back at a fair value." Ex. 21, Brown Dep. 190:9-12.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Brown's testimony.  Disputed insofar as Defendants suggest this was the only (or actual) reason they "set up the share buyback program".  On March 8, 2022, Dwight Egan forwarded a press release to Andrew Benson that had the headline "Fulgent Genetics stock gains on $250M share buyback program". Ex. 98; *see also* Supp. Uris Decl. Ex 3.  In the subject line of his email he wrote to Benson: "Get their release and show me a potential draft." Supp. Uris Decl. Ex 3. Twenty minutes later he also emailed a member of Co-Diagnostics board of directors, copying Brian Brown, forwarding the same Fulgent Genetics press release, with the subject line: "One of our competitors

84

announced share repurchase this morning-FYI". Supp. Uris Decl. Ex. 4. As such, evidence makes clear that the impetus for pursuing a share buyback program was Dwight Egan's reception of the headline that a competitor's stock "gain[ed] on [its own] share buyback program." *Id*.

Later that day Benson emailed Dwight Egan, copying Brian Brown, circulating a draft press release concerning a share buyback program for Co-Diagnostics. Ex. 98. In his email, Benson wrote "I think it's important in our messaging for people to understand we're still very bullish about our future despite the decline in COVID testing." *Id*.

Moreover, when asked if he believed around the March 15, 2022 time frame whether the company's share price reflected an opportunity for the company to strategically allocate capital, he testified "I don't know." Ex. 21, 189:22-190:2. At that time, Co-Diagnostics stock was trading above $5.00/share, yet, the Company never purchased shares at or above that price.

After purchasing no shares in March and April 2022, in May 2022 Co-Dx purchased approximately $2.11 million of shares at an average price per share of $4.86. Supp. Uris Decl. Ex. 5 at 23. Once the Class Period started on May 12, 2022, Co-Dx's stock price began to rise consistently through the end of the Class Period. Perhaps recognizing the inflated value of the stock, Co-Dx greatly reduced its repurchase rate in June 2022, purchasing only approximately $489,000 of shares at an average price per share of $4.98. Then, in July 2022, with Co-Dx's stock price continuing to rise, Co-Dx completely halted its repurchase program, purchasing zero shares. Supp. Uris Decl. Ex. 6 at 23. In fact, it wasn't until after the Class Period, when the share price dropped over 30%, that Co-Dx resumed repurchasing shares when it purchased approximately $7.4 million of shares at an average price per share of $3.82. In September 2022, Co-Dx repurchased another approximately $3 million of shares at an average price per share of $3.17.

159.    Mr. Brown also explained that the Company did not have specific criteria for when it would repurchase under the program, but that it "varied by period" and they repurchased shares when "we felt like it was a good opportunity to buy." *Id.* 193:20-21, 196:4-9; *see also id.* 195:23-196:3 ("[T]he share prices fluctuate all the time so just depended on at that given point in time what the share price was and where we felt comfortable re-buying shares.").

**Plaintiff's Response**: Undisputed insofar as this accurately reflects a portion of Brown's testimony.  However, Co-Diagnostics' share repurchase history shows that the Company never repurchased shares at an average price per share at or above $5.00 per share in any given month. *See* Response to No. 158.

160.    In preparing to announce the share buyback program, in his role as head of corporate communications at Co-Diagnostics, Mr. Benson prepared a draft press release. *See* Ex. 20, Benson Dep. 19:4-9 (testifying he was head of corporate communications in 2021 and 2022), 193:12-15 (testifying to the preparation of the draft press release).

**Plaintiff's Response**: Undisputed.

161.    In drafting the share buyback press release, Mr. Benson wanted to convey that Co-Diagnostics was "still bullish" about the future of the COVID testing market despite what other companies were saying. *Id.* 194:13-17; *see also* Greene Decl. ¶ 99, Ex. 98, Email from Benson to D. Egan, dated March 8, 2022, attaching CODX – Share buyback PR Dr 1.docx ("Email re Initial Draft of Share Buyback Program Press Release").

**Plaintiff's Response**: Disputed, as this mischaracterizes the document and testimony. Rather, in his March 8, 2022 email to Dwight Egan, copying Brian Brown, Benson wrote "I think it's important in our messaging for people to understand we're still very bullish about our future ***despite the decline in COVID testing***." Ex. 98.  Moreover, in his testimony, Benson similar stated:

"It was regularly the case that I would be monitoring overall market trends and what other companies were saying. We'd just been presented with an email earlier that showed a company, whose name already escapes me, talking about how they had lower -- they had lowered their forecast based on decreased demand for COVID testing. I can't remember exactly what it said. And I -- it seems here I'm saying it's important that people understand that despite what other companies are saying [referring to, for example a company that had lowered their forecast based on decreased demand for COVID testing], despite what other market sentiments are, we're still bullish about our own specific future at Co-Diagnostics." Ex. 20, Benson Dep. at 194:1-17.

162.    When Co-Diagnostics announced the share buyback program, Mr. Benson does not recall thinking the Company was experiencing a decline in demand for the Logix test, testifying:

> This was eight days into March. I know our -- we tended to look at numbers on a quarterly basis, and at this point, our Q1 numbers probably would have looked pretty good, but I wasn't looking at stuff on a week-by-week basis. And if you looked at our past quarters, we've been fairly consistent.
>
> Like, I don't recall having any reason to believe that we weren't going to continue to see those -- you know, those -- those waves in -- in testing. Maybe . . . frequency of those waves would change or the amplitude would change, but, I mean, I -- I don't recall having any belief that -- that they wouldn't still continue in one form or fashion.

Ex. 20, Benson Dep. 194:23-195:11.

**Plaintiff's Response**: Disputed as this selective quoting of Benson's testimony mischaracterizes the testimony.  When asked whether he recalled "whether at this time the company was experiencing a similar decline in demand for the Logix Smart COVID-19 test?" Benson testified "I don't – I don't recall. This was eight days into March . . ." *Id*. at 194:18-23. Benson's testimony that he didn't "recall having any reason to believe we weren't going to continue to see those [waves]" does not speak to whether he recalled that Co-Diagnostics had already experienced a decline is sales for the Logix test.

**163.** Mr. Benson's initial draft included the following proposed statement:

We believe that our shares are currently undervalued, which as provided us with an opportunity to strategically allocate capital in a way that helps to drive continued growth and demonstrates our positive outlook for the future as we, along with the rest of the world, adjust to a new reality that is no longer dominated by daily headlines about the pandemic.

*See* Ex. 98, Email re Initial Draft of Share Buyback Program Press Release.

**Plaintiff's Response**: Undisputed.

**164.** Mr. Dwight Egan disagreed with Mr. Benson's sentiment that March 2022 was "a post-pandemic world." *See* Ex. 98, Email re Initial Draft of Share Buyback Program Press Release; Ex. 23, D. Egan Dep. 203:8-204:3 (explaining same: "let's be clear, the pandemic went more than a year from this date of this particular e-mail before the United States and the WHO, World Health Organization acted on it"), 206:23-207:17 ("I don't know what he's referring to that and I'd like to see the final version of this because I think I would have taken exception to his characterization. My goodness, we're March 10 of '22. It's not until another year that the World Health Organization and the United States government, you know, ends their public health emergency. The public health emergency of international concern is the highest level of emergency that these organizations have, and you cited earlier the enormous amount of money that the United States government had spent in order to mitigate the effects of COVID."); *see also* Ex. 20, Benson Dep. 197:9-23 (recognizing Mr. Dwight Egan would not agree that it was a "post-pandemic world" because "it was very much the case that we were still in a pandemic at that time [and] because the CDC and the WHO, and the FDA, everybody still believes we're still in a pandemic at this time.").

**Plaintiff's Response**: Undisputed insofar as this accurately quotes from the referenced depositions. Disputed as Defendants' characterization that Dwight Egan "disagreed" with Benson's "sentiment" is vague. As Dwight Egan testified "[Benson is] mentioning this issue of post-pandemic world and he knows from previous discussions with me that I wouldn't appreciate

him jumping that kind of a conclusion . . . .").  Ex. 23 at 203:8-12; *see also id.* at 202:23-203:2 ("[Benson] and I could have sharp disagreements about . . . what positions the company should take.").

Dwight Egan did not agree that Co-Diagnostics should take that "position", because as Dwight Egan testified, Co-Diagnostics was "emphasizing that th[e] theme [that COVID was not going away] because we're spending a lot of money putting up a new platform for at home and point of care use . . . ."  *Id*. at 155:17-25 (emphasis added); 156:13-157:6 ("So when we're making an argument that the COVID is going to be here as a permanent part of our landscape going forward, we're making the argument that the new project that we're investing a lot of shareholder money on is going to be able to . . . diagnose or to screen for COVID specifically. . . it was going to be a long-term viable and important product").  Indeed the persistence of Covid in a post-COVID world is a talking point that the Company, and Dwight Egan, had been pushing since as early as January 2021.  *See* Plaintiff's 56.1 Statement ¶52.

**165.**    Mr. Dwight Egan did not believe that a "decline in COVID testing" meant that there was not long-term demand for COVID testing:

> Well, the numbers speak for themselves. I think I've expressed many, many times, we did not make decisions based on one or two or three or four months of activity. If we did that, we would be, you know, have a big time problem with everything we're trying to do in our vision for what we're doing as a company. We're in the middle of a heavy development project that is also centered on COVID but other disease states as well, and our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of a myopic view on a couple of quarters. It's not how we view the world.

Ex. 23, D. Egan Dep. 204:7-23.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes from Dwight Egan's deposition.  Disputed insofar as Defendants mischaracterize the testimony, in which he does not specifically state he thought there was "long-term demand for COVID testing" specifically, rather

he referenced "a heavy development project that is also centered on COVID but other diseases states as well . . . ." *Id*. Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on whether Dwight Egan believed there was "long-term demand for COVID testing."

166.    The final draft of the March 15, 2022 press release announcing the share buyback program was revised to state:

> We believe that the current share price provides us with an opportunity to strategically allocate capital in a way that helps drive continued growth and demonstrates our positive outlook for the Company's future.

*See* Ex. 11, March 15, 2022 8-K.

**Plaintiff's Response**: Undisputed.

167.    In May and June 2022, Co-Diagnostics repurchased a total of 532,440 shares of common stock at a total purchase price of approximately $2,599,454.40 pursuant to the share buyback program. *See* Ex. 18, 2022 Q2 10-Q, at 23.

**Plaintiff's Response**: Undisputed.  For additional context, Co-Diagnostics purchased no shares in March and April 2022. *Id*.  And, more specifically, in May 2022 Co-Diagnostics purchased 343,140 shares at an average price per share of $4.86 (for approximately $2.11 million). In June, 2022, Co-Diagnostics purchased only 98,300 shares at an average price per share of $4.98 (for approximately $489,000).  *Id*.

168.    In August and September, Co-Diagnostics repurchased an additional 2,881,886 shares of common stock at a total purchase price of approximately $10,403,608.46 pursuant to the share buyback program. Greene Decl. ¶ 20, Ex. 19, Co-Diagnostics Form 10-Q for the quarter ended September 30, 2022, filed November 10, 2022 ("2022 Q3 10-Q"), at 4, 23.

**Plaintiff's Response**: Undisputed.  For additional context, Co-Diagnostics purchased zero shares in July 2022. *Id*. After the Class Period, when the share price dropped over 30%, Co-

Diagnostics resumed repurchasing shares when in August 2022 it purchased 1,938,355 shares at an average price per share of $3.82 (for approximately $7.4 million). *Id.* In September 2022 Co-Diagnostics purchased 943,531 shares at an average price per share of $3.17 (for approximately $3 million).

## VIII.   DECISION NOT TO PROVIDE GUIDANCE ON MAY 12, 2022

### A.   Overview of Quarterly Revenue Guidance

**169.**   On May 13, 2021, concurrent with announcing its financial results for Q1 2021, Co-Diagnostics began a practice of offering revenue guidance for the upcoming quarter as part of the Company's quarterly earnings release. *See* Greene Decl. ¶ 7, Ex. 6, Co-Diagnostics Form 8-K Press Release, filed on May 13, 2021; D. Egan Dep. 79:20-80:7 (explaining that providing quarterly guidance was a relatively new practice for the Company); AC ¶ 37.

**Plaintiff's Response**: Partially disputed.  Co-Diagnostics first began a practice of offering revenue guidance for the upcoming quarter when it offered quarterly guidance on its March 25, 2021 earnings call.  Supp. Uris. Decl. Ex. 7 (March 25, 2021 Earnings Call at 4).  Disputed as to Dwight Egan's testimony that "making predictions about the future was a rather recent practice of the company" (D. Egan Dep. 80:3-5) as vague and non-specific.

**170.**   Mr. Brown was in charge of determining the quarterly revenue guidance, with input from Mr. Dwight Egan and the board. *See* Ex. 21, Brown Dep. 42:5-8 (testifying he was primarily responsible for determining the guidance provided); Ex. 23, D. Egan Dep. 99:14-24 (testifying to same).

**Plaintiff's Response**: Partially disputed as to the portion of the statement regarding "input from . . . the board."  None of the cited testimony states anything to that effect.

**171.**   Mr. Brown's primary goal in providing quarterly guidance was to provide accurate information to the investing public:

When we provide guidance, I want it to be accurate so we achieve that guidance, and so I think there's always anytime you put guidance out there's a concern that you won't hit that guidance or you'll be above it or below it.

Ex. 21, Brown Dep. 98:13-18.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes testimony from Brown's deposition. Disputed insofar as Defendants mischaracterize the testimony. Brown did not testify that "want[ing guidance] to be accurate" was his "primary goal in providing quarterly guidance." Rather, as set forth in the quotation, his testimony was the unremarkable proposition that "When we provide guidance, I want it to be accurate so we achieve that guidance . . . ." In fact, having already decided not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of the factors they could "frame [the decision] around." Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5. Indeed, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id*.

172.    The Company would announce its quarterly earnings according to SEC guidelines, which was generally about four to five weeks into the next quarter. *See* Ex. 27, Houston Dep. 32:20-33:8; Ex. 21, Brown Dep. 42:9-20; Ex. 20, Benson Dep. 66:20-67:13.

**Plaintiff's Response**: Partially disputed as the description of quarterly earnings being announced "generally four to five weeks into the next quarter" is inconsistent with the record and other testimony. Using the second quarter as an example, as Brown conceded he considers May 15 to be "about the midpoint" of the quarter. As such, when asked "So would you agree then that

the company typically provided guidance approximately halfway through the ongoing quarter?" he answered "Or approximately five weeks into the quarter, five, maybe add two days.  If we want to add two days, we can add two days. That's fine."  Ex. 21, Brown Dep. 43:21-44:13.  Moreover, his testimony regarding "five weeks" is incorrect. The month of April contains 30 days.  Therefore, May 12, 2022 was 42 days into the second quarter of 2022.  42 days is six weeks, not "four to five weeks".  For example, in 2021, Co-Diagnostics also announced quarterly earnings on May 13, 2021 (43 days) and November 11, 2021 (42 days).

173.    Preparing for the quarterly earnings release was a collaborative effort involving Mr. Dwight Egan, Mr. Brown, and Mr. Benson, with help from the Company's outside investor relations firm, Lambert. *See* Ex. 23, D. Egan Dep. 38:9-40:23, 100:17-103:6; Ex. 21, Brown Dep. 37:11-23; Ex. 20, Benson Dep. 70:17-71:2; Ex. 27, Houston Dep. 26:21-27:11.

**Plaintiff's Response**: Undisputed.

174.    The Lambert team was led by Mr. Michael Houston, and also included William Stack and Zachary Mizener. *See* Ex. 20, Benson Dep. 65:22-66:3; Ex. 27, Houston Dep. 19:11-23.

**Plaintiff's Response**: Undisputed.

175.    Leading up to an earnings release, Mr. Brown and Mr. Benson would work with the Lambert team to develop messaging for the quarterly press release and earnings call:

> **Q.** In the weeks leading up to an earnings release, what would you typically discuss with Mr. Brown or Mr. Benson or Dwight Egan?
>
> **A.** Specifically Mr. Brown and Mr. Benson, but really trying to get an understanding from them as to how the quarter played out, so meaning, you know, what did the financial statements look like between the income statement, the balance sheet and the statement of cash flows, and developing key messages from there.
>
> And so typically those key messages would be, one, how did the quarter go and then how does that tie to the longer term strategy, and helping them parse through what those messages looked like, with the end goal of being as open and transparent as possible, without giving away any of the secret sauce, because our main job was to try to reduce the uncertainty and volatility around Co-Diagnostics's valuation

and our philosophy is, as you provide open and transparent communication with the street, then that reduces some of that volatility and some of that risk that they might perceive in a particular micro or small cap stock.

Ex. 27, Houston Dep. 33:12-34:17; *see also* Ex. 20, Benson Dep. 68:8-22.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes testimony from Houston's deposition. Partially disputed insofar as Defendants suggest that only Brown and Benson would work with the Lambert team, as Dwight Egan was also involved in developing the messaging for the quarterly press release and earnings call. *See, e.g.,* Ex. 27 Houston Dep. at 34:25-35:12; 27:7-19.

**176.** Mr. Brown testified that prior to the release of quarterly earnings, he would typically discuss his thoughts on quarterly guidance with the Lambert team. *See* Ex. 21, Brown Dep. 89:11-20; *see also* Ex. 20, Benson Dep. 82:21-83:6 (explaining Lambert would use input from Mr. Brown and Mr. Benson in generating the initial drafts of earnings release materials, but not "in every instance for every phrase" used).

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases testimony from the referenced depositions. For additional context, as part of those discussions, as Brown testified, "we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . .". Brown Dep. 100:4-15; *see also id*. at 101:9-16 ("we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide."); *see also id*. at 104:11-20 ("we had a call and we discussed where we were . . . We would have a discussion around that.").

**177.** In drafting a press release or earnings call transcript, Lambert did not consider or have any visibility into the intra-quarter sales or revenue for the current quarter. *See* Ex. 27, Houston Dep. 44:13-17 ("So if there was a Q2 earnings call, we were only talking about Q2, we

didn't have any visibility into Q3; even though technically we were into that current quarter, we never talked about it."), *id.* 45:13-46:9 (same).

**Plaintiff's Response**: Disputed.  As Brown testified, "[w]e may have discussed [taking a more prudent approach to guidance] prior to this draft. That would be my expectation, that we had some discussion about guidance prior to the first draft which is normal. We would normally have a discussion -- it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script." Brown Dep. at 89:4-20. As Brown also testified, "we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . .".  Brown Dep. 100:4-15; *see also id.* at 101:9-16 ("we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide."); *see also id.* at 104:11-20 ("we had a call and we discussed where we were . . . We would have a discussion around that.").

Moreover, when asked whether he would help "formulate the messaging [for an earnings release]", Houston testified "Correct, based on the information that they would share with us." Ex. 27, Houston Dep. at 34:18-21. Indeed, a May 5, 2022 email from Houston to Brown shows that *he did* have visibility into Q2 sales, stating, for example, that "[g]uiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two and provide some air cover during the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number". Uris Decl. (ECF No. 114) Ex. 12 (LAMBERT0000769).

178.    No witness testified that a few weeks or months of sales data were important in predicting future sales. *See*, *e.g.*, Ex. 23, D. Egan Dep. 82:13-18 ("I feel like I keep answering this question. We did not focus on the results of one or two months as being dispositive as to what the

quarter or the rest of the year might bring about."); Ex. 21, Brown Dep. 70:19-71:71:17 (explaining why mid-quarter sales are not indicative of quarterly earnings); Ex. 20, Benson Dep. 77:14-17 ("[W]here the company was at that given -- at that time wasn't necessarily predictive of where it was going to end up at the end of that quarter.").

**Plaintiff's Response**: Undisputed insofar as this accurately quotes portions of the referenced depositions. Disputed as to the parenthetical regarding Brown's testimony, in which he does not testify that "mid-quarter sales are not indicative of quarterly earnings". Further disputed as Benson testified that he did not know how guidance was actually determined. *See* Response to No. 184. Further disputed as inconsistent with the record. *See* Response to No. 179. Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on whether Defendants thought "a few weeks or months of sales were important in predicting future sales."

179.    Mr. Dwight Egan did not consider intra-quarter sales numbers in preparing for the end-of-quarter earnings release or in assessing the quarterly guidance provided therein. *See* Ex. 23, D. Egan Dep. 51:21-54:3; 82:2-6.

**Plaintiff's Response**: Disputed. Dwight Egan testified to the opposite: "**Q.** In thinking about guidance for any particular quarter, would you compare the company's results so far in that quarter to the results in that same quarter in the previous year? **A.** I believe we did . . . .". Ex. 23, Dwight Egan Dep. 79:20-25.

This was confirmed by Brown, who was the primary person rinsible for determining guidance. Ex. 21, Brown Dep. at 42:5-8. Brown used the Company's sales data to calculate the Company's guidance. *Id*. at 50:19-51:3 ("I would generally access [monday.com] close to the end of the quarter to see where we are going to end up in a quarter and then I would look at it as I

prepared guidance, I would see what is in the system at that point in time."). Brown testified that in determining quarterly guidance he would look at the quarterly "results that had happened up to that point in time." *Id*. at 45:24-46:13, *id.* at 70:2-6 ("when determining guidance that would be provided, [he] would look at the company's orders to date").

Brown testified that in order to determine guidance "[t]ypically I would look at the prior quarter's numbers, the results for the prior quarter and then just base it off of those prior year, prior quarter numbers to determine, look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." *Id*. at 44:15-45:5. He also testified that testified that in determining guidance he would also "have discussions with Seth Egan" about "how sales were going." *Id*. at 45:13-23.

180.    At deposition, Mr. Dwight Egan explained why he believed that intra-quarter sales revenue is irrelevant in determining quarterly guidance:

> What the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter because sometimes a quarter came together all in the last month of the quarter or in the last two or three weeks of the quarter. You know, again, this is not a hamburger store, having people come through a drive-up window and you have certain patterns of the day when people are buying a lot. This is a pandemic. . . . So there's just a lot going on that makes up the whole picture of why you might feel one way or another about what the prognosis is for the future. There are a lot of variables.

Ex. 23, D. Egan Dep. 54:15-57:05.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes testimony from Egan's deposition. Disputed to the extent this mischaracterizes Dwight Egan's testimony, and is inconsistent with other testimony and the record. In the referenced testimony, he did not state that sales to date in a quarter are "irrelevant", but rather "in many respects irrelevant". *Id*.

Moreover, the context of this testimony makes clear that Dwight Egan was making an even broader argument; an argument that "looking at a monthly sales number, *even over a quarter*, is

97

not something that we can build in our minds reliable – it's not a reliable model from which to make a prediction of future sales . . ." *Id.* at 55:8-13 (emphasis added). But this testimony ignores that quarterly sales to date *were* used in order to determine the Company's quarterly guidance. *See* Response to No. 179.

Rather, as the context of this testimony makes clear, Dwight Egan's argument is that since "we did not make decisions based on one or two or three or four months of activity . . . our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." *Id.* at 204:4-23. While Dwight Egan may very well have had confidence in his Company and its long-term prospects (like any CEO might), it is an admission of recklessness. Given that sales of the Logix Test, the sole material source of Co-Diagnostics' revenue, had in fact plummeted by the start of the Class Period, Defendants had an obligation to disclose that they were seeing a significant decline in orders, regardless of whether their "view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." *Id.* Defendants' disclosure obligations under the Exchange Act do not turn on what they thought "investors ought to focus more on". Rather, as the Court previously held, "it was misleading to describe the situation as 'fluctuations' or to disclose the company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." MTD Order at 5.

Indeed, Dwight Egan even conceded that any expectations he had for a potential resurgence in sales was not until the ***fall and winter*** of 2022. Ex. 23, D. Egan Dep. at 183:4-184:21 (testifying that, with respect to any sizable fluctuations in order patters at this time "[t]he company had a very strong first quarter so here we're reporting the second quarter. So again, we're looking at the having

a little bit more long-term view than you're encouraging here with respect to what the prospects are. There's enough going on in terms of our not having a clear view of the future to not want to predict it. So Brian's characterizing is sizable fluctuations in order patterns. I would have tended to look at it in the context of the entire global landscape of what's going on with COVID, but the fact still remains that we had every expectation that there would be a resurgence come fall and winter."); *id.* at 127:17-128:22 (testifying that, with respect to any sizable fluctuations in order patterns at this time "a month or a quarter did not a year make. Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up. So that's the kind of expectation we were focusing on, not a near-term situation with respect to our sales orders . . .").

181.    Mr. Dwight Egan further testified that the first few weeks of sales usually is not a good indicator of quarterly performance and is not enough information to predict overall quarterly earnings:

> One month does not a quarter make and if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how a quarter might ultimately present itself based on what we see in that short of a time period.

Ex. 23, D. Egan Dep. 57:16-23.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Dwight Egan's testimony.  Disputed as a mischaracterization of the testimony, and as inconsistent with other testimony and the record.  As explained in Response to No. 172, the Class Period starts six weeks into Q2 2022, not "five weeks".  Nor does Dwight Egan suggest in the cited testimony that

quarterly sales to date "usually is not a good indicator of quarterly performance". Moreover, this testimony ignores that Brown testified that quarterly sales to date *were* used in order to determine the Company's quarterly guidance. *See* Response to No. 179.

Additionally, Dwight Egan himself testified that in determining guidance Defendants would compare the Company's results so far in that quarter to the results in that same quarter in the previous year. *See* Response to No. 179.

**182.**    Mr. Dwight Egan also testified that he did not consider pie charts or line graphs of sales, like those shown in the Quarterly Dashboard, to be helpful in predicting future sales of the Logix test, and he did not review them when preparing guidance or in connection with earnings releases. *See* Ex. 96, Monday.com Quarterly Dashboard; Ex. 23, D. Egan Dep. 67:14-68:1 ("Looking at a graph like this wouldn't have given me a basis from which to make any kind of prediction or speculation about what was going to happen in the future. So this, while this may have been a tool that somebody is working on the tools within monday.com and exploring what different graphs and things would be done, it wasn't something that I was focusing on or that our management team was focusing on as a management tool.").

**Plaintiff's Response**: Disputed.  As Dwight Egan testified, it was not his role to "predict[] future sales of the Logix test", nor did he "prepar[e] guidance" as this statement incorrectly asserts. *See, e.g.* Ex. 23, D. Egan Dep. 99:14-24 (testifying that determining guidance was "[p]rimarily . . Brian [Brown]'s purview" and that he would provide input "[i]f I thought it was relevant, but mainly I would be accepting his recommendation.").

Moreover, this statement mischaracterizes the testimony.  In the cited testimony, Dwight Egan asserts that the Quarterly Dashboard "wouldn't have given me a basis from which to make any kind of prediction or speculation about what was going to happen in the future."  This

statement is too vague and non-specific to be taken as undisputed fact. Any in any event, nowhere in the cited testimony does he state, as asserted in the statement, that "he did not consider pie charts or line graphs of sales, like those shown in the Quarterly Dashboard, to be helpful in predicting future sales of the Logix test, and he did not review them when preparing guidance or in connection with earnings releases" which is far more specific than he generic testimony about "what was going to happen in the future."

Additionally, nowhere in the cited testimony did Dwight Egan state he did not review [the Quarterly Dashboard] . . . in connection with earnings releases." Rather, he testified that "I probably looked at this but not regularly and I don't know when during the course of the calendar year I would have looked at it." *Id.* at 66:17-20.

Additionally, the testimony that it wasn't something "that our management team was focusing on as a management tool" is inadmissible hearsay that is also inconsistent with other testimony and the record. To the contrary, Brown testified that quarterly sales to date *were* used in order to determine the Company's quarterly guidance. *See* Response to No. 179; *see also* Ex. 21, Brown Dep. at 62:3-4 (referring to the Quarterly Dashboard as "the dashboard that I would view in monday.com"). Additionally, Dwight Egan himself testified that in determining guidance Defendants would compare the Company's results so far in that quarter to the results in that same quarter in the previous year. *See* Response to No. 179.

**183.** Like Mr. Dwight Egan, Mr. Benson testified that he also did not review the Quarterly Dashboard in preparing quarterly earnings press releases or quarterly earnings call scripts. *See* Ex. 20, Benson Dep. 35:8-36:24.

101

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of Benson's deposition testimony.  Disputed insofar as Defendants suggest that Dwight Egan testified to the same.  *See* Response to No. 182.

**184.**    Mr. Benson did not consider comparisons of year-over-year sales to be helpful in predicting future sales given the limited historical data available in a "once-in-a-generation pandemic," explaining:

> [W]e simply weren't the kind of company where comparing prior year quarter was necessarily -- at least to my mind, and I can't speak to what would be important to anybody else. To me, that wasn't always necessarily a valuable metric because -- just because it happened to be occurring at the same time as the previous year, the entire landscape was changing regularly -- regularly during the pandemic.
>
> . . .
>
> [T]he world was essentially entirely different the year before, as it was the year before that, as it was the year before that.

Ex. 20, Benson Dep. 78:18-79:12.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes portions of Benson's testimony.  Disputed as a mischaracterization of Benson's testimony.  Benson testified that such comparisons were "not really for me to speculate."  *Id*. at 78:7-8; *see also id*. at 72:13-19 ("I don't recall any specific method by which guidance was regularly determined on a monthly basis, whether there is a specific protocol or rubric that he followed along with -- with Dwight Egan in order to determine those numbers. ***That was not my department to -- to be involved in specifically how those numbers were derived***.") (emphasis added); *id.* at 74:20-75:5 ("**Q.** In discussing guidance that would be discussed on the earnings call, is -- is sales to date in the ongoing quarter the type of thing that would be discussed?  **A.** Again, I -- I can't recall exactly what it was that went in to determining what those -- what the guidance would be that would be given. It wasn't my job to determine the guidance, and so I can't really speak to what metrics were looked at in

102

order to arrive at those numbers."); *id*. at 76:9-22 ("**Q.** Do you think [what the company quarterly sales were as of May 12, 2022] would be something important to ask [Brown], being involved in discussions regarding guidance that would be given on that earnings -- in that earnings release? **A.** It wasn't up to me to determine what that guidance would be, and so there wouldn't be -- for me to ask Brian what the sales numbers were, to -- to what effect if I'm not the one that's giving the guidance? So I -- I don't understand why I would be asking him what the sales numbers were in order to come up with numbers for guidance that I wasn't deriving myself anyways.").

Moreover, Defendants exclude important context within the above cited testimony where Benson testifies that in his view "we weren't a company [where] one quarter might be fairly predictive of the next quarter" or "could you say, Okay, well, let's compare to a previous quarter . . . ." *Id*. at 78:11-15, 79:5-9. This testimony is inconsistent with Brown's testimony stating that the Company *did* make such comparisons in determining guidance. *See* Response to No. 179.

**185.** For Mr. Brown, the "key driver" in determining quarterly guidance was historical data rather than quarter-to-date sales: "Typically I would . . . look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." Ex. 21, Brown Dep. 44:15-45:17; *see also id.* 47:23-48:2 (explaining practice of pulling historical results from prior public filings into a spreadsheet to determine guidance for the present quarter), 45:13-46:13 (he would also review current sales data and confer with Mr. Seth Egan regarding same), 50:19-51:3 (same).

**Plaintiff's Response**: Disputed as Defendants' selectively quote and mischaracterize Brown's testimony. While Brown testified that "look[ing] at the company's historical results" was "the key driver" in determining guidance, he did not testify that he looked at historical results

"rather than quarter-to-date sales".  Not only did Brown not testify to that, but it makes no sense, as "quarter-to-date sales" are by definition "historical data".  *Id*.

Indeed, Brown testified that he used the Company's up-to-date sales data to calculate the Company's guidance. *Id*. at 50:19-51:3 ("I would generally access [monday.com] close to the end of the quarter to see where we are going to end up in a quarter and then I would look at it as I prepared guidance, I would see what is in the system at that point in time."). Brown testified that in determining quarterly guidance he would look at the quarterly "results that had happened up to that point in time." *Id*. at 45:24-46:13, *id.* at 70:2-6 ("when determining guidance that would be provided, [he] would look at the company's orders to date").

Moreover, Defendants omit important context by selectively quoting Brown.  Brown more fully testified that in order to determine guidance "[t]ypically I would look at the prior quarter's numbers, the results for the prior quarter and then just base it off of those prior year, prior quarter numbers to determine, look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." *Id*. at 44:15-45:5.  He also testified that testified that in determining guidance he would also "have discussions with Seth Egan" about "how sales were going." *Id*. at 45:13-23.

Testifying that "historical results" are "the key driver" is unremarkable, because in order to put quarterly sales to date in context (and to give them meaning), they must be compared to historical results.

**186.**    In determining guidance, and whether to provide quarterly guidance, Mr. Brown did not consider the expiration of federal funding for certain COVID-related programs. *See* Ex. 21, Brown Dep. 176:8-17.

**Plaintiff's Response**: Undisputed insofar as this accurately reflects Brown's testimony. Plaintiff otherwise has no independent basis to confirm or dispute this statement.

### B.    Co-Diagnostics Lacked Sufficient Visibility To Provide Accurate Guidance And Thus Did Not Provide Guidance on May 12, 2022

187.    In preparing for the May 12, 2022 earnings release, Mr. Dwight Egan and Mr. Brown determined they did not have the visibility necessary to provide quarterly revenue guidance at that time. *See* Ex. 23, D. Egan Dep. 185:24-186:3 ("We decided not to give quarterly guidance because we didn't have the ability to predict it. We didn't have those optics. It wasn't clear to us."), 105:18-107:3, 114:12-19, 118:9-19; Ex. 21, Brown Dep. 87:23-88:5 ("[T]here was a lot of volatility at that point and there was a lot of, you know, things going on externally in terms of society and dealing with COVID that we -- that we would withhold guidance because we couldn't provide accurate guidance that we felt comfortable with to the Street.").

**Plaintiff's Response**: Disputed.  The evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that "they did not have the visibility necessary to provide quarterly revenue guidance at that time."  Plaintiff's 56.1 Statement ¶38-42; Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5.

As Dwight Egan testified, "[s]ales were what they were." Plaintiff's 56.1 Statement ¶22; *see also, e.g.,* ¶39 (Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter"); *see also id*. ¶ 11 (as of May 12, 2022, the Company received 2Q 2022 orders of just $2,514,682.30).  As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. When asked about Houston's email stating that Co-Diagnostics was "likely to have a soft quarter, or two", as Brown

admitted, "at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a)

Furthermore, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id*. Indeed, as Brown described it, a few days later on May 9, "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release." ¶43. On May 10, Defendants continued working up to the last minute to edit and make changes to their post-hoc reasoning for deciding not to provide quarterly guidance. *See* ¶¶44, 44(a), 44(b) (Houston testifying that as of May 10, after the decision had been made that guidance would not be provided, they were still working though what reasons would be given for not providing guidance), 45.

Indeed, it wasn't until *after* deciding not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance

106

completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of the factors they could "frame [the decision] around." Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5. Indeed, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id*.; *see also* Response to No. 180.

**188.**     Mr. Dwight Egan and Mr. Brown both testified that they made this decision because conditions were too volatile and unpredictable to provide accurate guidance, and *not* because they were concerned about low quarter-to-date sales or expected full-quarter Q2 2022 revenue to end up low:

> Again, I think I've answered this before but we would not have viewed that our monthly results were indicative of what the future held. A month did not a quarter make. Two months did not necessarily prognosticate what a quarter would be. We were watching very carefully and we did develop a viewpoint that it was volatile and that we, as a prudent measure in the context of our investing public, that we did not feel comfortable prognosticating future quarters at this point.

Ex. 23, D. Egan Dep. 75:3-23; *see also* Ex. 21, Brown Dep. 96:21-97:18 (explaining he decided not to provide Q2 2022 guidance because he did not feel he could provide an accurate prediction due to the increased volatility in the COVID testing market).

**Plaintiff's Response**: Disputed as this mischaracterizes the referenced testimony, and is inconsistent with other testimony and the record. *See* Responses to Nos. 187, 136, 180.

**189.**     Mr. Brown did not discuss with Mr. Dwight Egan, the board, or anybody else what the revenue for Q2 2022 might be because there was not enough information for him to feel comfortable with the accuracy of such a projection:

> **Q.** Do you recall discussing any numbers of what revenue for the second quarter of 2022 might be at this time?

**A.** No. Again, we were five weeks into the quarter and still had seven weeks to go and we could see in recent history, Q1 of '22, Q4 of '21, that we had two weeks we did 14 million dollars and if you've got seven weeks left in a quarter and you're sitting at week five, there's a chance that it could be another one of those if another variant popped up. We just didn't know at that time. There wasn't enough information to feel comfortable with the accuracy of providing guidance.

Ex. 21, Brown Dep. 117:23-118:14.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Brown's testimony. Disputed insofar as this mischaracterizes the referenced testimony, and is inconsistent with other testimony and the record. In the cited testimony, Brown testified that he did not *recall* discussing what revenue for the second quarter of 2022 might be. *Id*.

Moreover, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that "there was not enough information for him to feel comfortable with the accuracy of such a projection." *See* Response to No. 187.

**190.** Mr. Brown testified he did not feel confident that he could provide accurate guidance due to the lack of visibility and increased volatility in the COVID testing market:

I think anytime as I think about the time during COVID, there was always volatility and so providing guidance was always a concern. One thing that I want to make sure I do is provide accurate guidance to the Street. I want to provide -- that's my job is to provide accurate information to the Street. And so I would say at every juncture, you know, when we were providing guidance, that was something you had to consider. At this point in time there was even more volatility and more noise in society, et cetera, in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate to the Street and therefore, that's why this discussion would happen.

Ex. 21, Brown Dep. 96:24-97:18.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Brown's testimony. Disputed insofar as this mischaracterizes the testimony and is inconsistent with other testimony and the record. In the referenced testimony, Brown referred to "more volatility and

108

more noise in society." He did not refer to "lack of visibility" as referenced in the statement. Moreover, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that "he did not feel confident that he could provide accurate guidance due to the lack of visibility and increased volatility in the COVID testing market." *See* Response to No. 187.

**191.** Mr. Dwight Egan similarly testified that the decision not to provide Q2 2022 guidance was the "prudent thing to do" given that the Company did not have clarity as to what the guidance should be:

> We came to the conclusion that things were -- things were volatile enough that we didn't have a clear sense of what we would be doing as guidance so we were -- our view was that it was the prudent thing to do to say that we didn't have the kind of optics and clarity that we would like to have in order to provide guidance. To us that was a prudent decision, that was in the investors' best interest to let them know about that we did not have that kind of clarity such that we were willing to give that.
>
> And we weren't the only company in the country looking at that environment. . . . So I think we did the prudent thing saying we don't have the kind of clarity and certainty that we would like to have in order to give that kind of guidance.

Ex. 23, D. Egan Dep. 105:22-107:3.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Dwight Egan's testimony. Disputed insofar as this is inconsistent with other testimony and the record. The evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that "it was the 'prudent thing to do' given that the Company did not have clarity as to what the guidance should be." *See* Response to No. 187.

**192.** Mr. Dwight Egan further testified that despite the inability to predict short-term revenue, he expected a new variant to emerge and sales to follow:

109

Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up. So that's the kind of expectation we were focusing on, not a near-term situation with respect to our sales orders, which was coming off one of the most vicious COVID onslaughts in the entire pandemic that occurred in the fourth quarter and first quarters of '21 and '22.

Ex. 23, D. Egan Dep. 128:3-22.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Dwight Egan's testimony. Disputed as to whether there was in fact any "inability to predict short-term revenue" as the cited testimony does not state that. Making the "deci[sion] not to guide" based on those purported reasons does not mean there was in fact the "inability" to do so. *Id*. Moreover, the cited testimony does not make any reference to "short-term revenue." Indeed, as the cited testimony makes clear, to the extent Dwight Egan may have been expecting increased sales in the future (whether due to a new variant or otherwise), he did not expect those "circumstances [until] *the fall and winter*." *Id*. at 128:5-9 (emphasis added); *see also* Response to No. 180.

193.    In the spring of 2022, Mr. Dwight Egan was aware of and considered statements from U.S. and world health officials and organizations, as well as news reports, indicating that COVID infections were expected to increase in the coming months. *See* Ex. 23, D. Egan Dep. 107:4-109:23; Greene Decl. ¶ 100, Ex. 99, Email to D. Egan (and others) re Fortune Magazine: A new COVID wave is probably coming, and American just doesn't seem to care, dated Apr. 10, 2022; *id.* ¶ 104, Ex. 103, Email to Gundry and S. Egan re FW: New, fitter descendants of Omicron variant begin to drive their own coronavirus waves, dated May 4, 2022 ("It looks like a new wave may be upon us."); Ex. 109, Email to S. Egan and D. Egan re NY Times: Coronavirus: Expecting a fall surge, dated May 9, 2022.

110

**Plaintiff's Response**: Disputed as a mischaracterization of the referenced testimony. Dwight Egan did not refer to any specific statements or "news reports" in the cited testimony. Disputed as the statement that Dwight Egan was "aware of and considered from U.S. and world health officials and organizations, as well as news reports, indicating that COVID infections were expected to increase in the coming months" as too vague and non-specific to be taken as undisputed fact.

Disputed with respect to the portion of that statement that any such statements or "news reports" "indicat[ed] that COVID infections were expected to increase in the coming months" as Dwight Egan did not testify to that in the cited testimony. *See* Ex. 23, Dwight Egan Dep. at 107:18-21 (testifying generically that "we're looking for a significant potential uptick, median range at a hundred million cases."). Disputed to the extent that Defendants suggest that Dwight Egan was "aware of and considered" any of the other documents cited in this statement as Dwight Egan did not testify in the referenced testimony that he was "aware of and considered" any of those documents. Moreover, Dwight Egan conceded that any expectations he had for a potential resurgence in sales was not until the ***fall and winter*** of 2022. *See* Response to No. 180.

194.    Mr. Benson testified that increased volatility and unpredictability caused a lack of visibility:

> My recollection at the time was, again, kind of like I've said earlier, things were just much more volatile and unpredictable at this point than we had experienced before. The pandemic was continually evolving, and we sort of took -- we'd only started offering guidance about a year or so before this, and so it was something that we were continually evaluating on a -- you know, on a per-quarter basis.
>
> So I can't recall specifically any of the details here, other than just that general sense of coming off of omicron and seeing these peaks and troughs and these -- these spikes. There were a lot of factors at play, and I remember that it was -- it was more difficult to -- to -- to feel like we had visibility in what things were going to be looking like.

111

Ex. 20, Benson Dep. 91:4-23; *see also id.* 105:19-22 ("Again, my -- my recollection at the time was specifically revolved around just, like, the volatility and unpredictability of it all. Not that there was any specific number in mind.").

     **Plaintiff's Response**: Undisputed insofar as this accurately quotes portions of Benson's testimony. Disputed as to the assertion that "increased volatility and unpredictability caused a lack of visibility". In the cited testimony, Benson testified that he felt "it was more difficult to . . . *feel like* we had visibility in what things were going to be looking like." *Id*. at 91:21-23. But as Benson conceded, he "c[ouldn't] recall specifically any of the details here". *Id*. at 91:16-17; *see also* 92:3-93:10 (similarly could not recall details).

     More importantly, Benson testified that he did not know how guidance was actually determined (and therefore has no basis to speak to visibility with respect to guidance). *Id*. at 72:13-19 ("I don't recall any specific method by which guidance was regularly determined on a monthly basis, whether there is a specific protocol or rubric that he followed along with -- with Dwight Egan in order to determine those numbers. *That was not my department to -- to be involved in specifically how those numbers were derived*.") (emphasis added); *id.* at 74:20-75:5 ("**Q.** In discussing guidance that would be discussed on the earnings call, is -- is sales to date in the ongoing quarter the type of thing that would be discussed? **A.** Again, I -- I can't recall exactly what it was that went in to determining what those -- what the guidance would be that would be given. It wasn't my job to determine the guidance, and so I can't really speak to what metrics were looked at in order to arrive at those numbers."); *id*. at 76:9-22 ("**Q.** Do you think [what the company quarterly sales were as of May 12, 2022] would be something important to ask [Brown], being involved in discussions regarding guidance that would be given on that earnings -- in that earnings release? **A.** It wasn't up to me to determine what that guidance would be, and so there wouldn't be -- for me

to ask Brian what the sales numbers were, to -- to what effect if I'm not the one that's giving the guidance? So I -- I don't understand why I would be asking him what the sales numbers were in order to come up with numbers for guidance that I wasn't deriving myself anyways.").

Moreover, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* "increased volatility and unpredictability [that] caused a lack of visibility." *See* Response to No. 187.

**195.** Mr. Benson explained that there were many factors that caused the Company to have increased uncertainty about short-term sales, testifying:

> But we'd also just been through omicron, and that was not the first variant, but it seemed to be the worst. And we didn't know if these waves were going to keep getting bigger. It was -- you know, omicron caught everybody by surprise. And we didn't know when there was going to be another omicron, but we assumed there would be. All we had seen from this virus was more variants and variability.

> Our mix was, you know -- I -- I don't exactly recall what the percentage was between domestic and international, but those markets were also just different. I mean, the -- the international markets reacted differently, as I recall, to -- you know, in -- in some respects than the domestic markets.

> And so there was just a lot happening at that time, and we didn't -- you know, we didn't -- we didn't feel comfortable or we didn't feel like it would be the responsible thing to do to take a guess if we didn't have an idea what it was going to -- what it was going to convey. Like, we had a responsibility to our shareholders to communicate accurately and honestly, and if we don't feel as though we have the ability to do so and for it to be accurate, then we're not going to say something that we feel is -- is -- is not accurate.

Ex. 20, Benson Dep. 94:1-95:1; *see also id.* 95:10-96:19 (explaining further how new variants and vaccines were leading to more uncertainty as the pandemic progressed).

**Plaintiff's Response**: Undisputed insofar as this accurately quotes portions of Benson's testimony. Disputed as a mischaracterization of the testimony and as inconsistent with other testimony and the record. Benson does not state in the referenced testimony that any purported

"increased uncertainty" was specific to "short-term sales".  Moreover, when asked "**Q.** You had mentioned that there was always the possibility that a new variant would pop up.  Isn't that the case in all quarters?" he responded " . . . It's easy to look back in hindsight now and -- and – you know, and feel like we've learned a lot.  But when we were in the moment, experiencing it all together, it was totally unpredictable and nobody knew what was going to happen next."  *Id*. at 95:3-15.  His testimony ignores that Co-Diagnostics had previously provided guidance despite the same possibility existing in all quarters that a new variant could "pop up".

Additionally, Dwight Egan even conceded that any expectations he had for a potential resurgence in sales was not until the ***fall and winter*** of 2022.  Ex. 23, D. Egan Dep. at 183:4-184:21 (testifying that, with respect to any sizable fluctuations in order patters at this time "[t]he company had a very strong first quarter so here we're reporting the second quarter. So again, we're looking at the having a little bit more long-term view than you're encouraging here with respect to what the prospects are. There's enough going on in terms of our not having a clear view of the future to not want to predict it. So Brian's characterizing is sizable fluctuations in order patterns. I would have tended to look at it in the context of the entire global landscape of what's going on with COVID, but the fact still remains that we had every expectation that there would be a resurgence come fall and winter.").  What's more, Dwight Egan testified that they ***were not*** focusing on the question of near-term sales. *id*. at 127:17-128:22 (testifying that, with respect to any sizable fluctuations in order patterns at this time "a month or a quarter did not a year make. Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was

114

being importuned by the White House to give them another 22 and a half billion dollars to gear up. ***So that's the kind of expectation we were focusing on, not a near-term situation with respect to our sales orders*** . . .").

Moreover, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* "increased uncertainty about short-term sales." *See* Response to No. 187.

**196.**    Mr. Benson further testified:

[W]e were just kind of focused more on it being unpredictable and all -- all these different factors at play.

People going back to -- to -- to normal life, but then interacting more in person, how much effect was that going to have? We didn't know. What was the relative vaccination rates in different -- you know, in different areas? How was that going to impact -- affect our sales mix? We didn't know.

I mean, that -- what -- my recollection of this was certainly more so around just the volatility and . . . unpredictability more so than exactly what number we were going to hit at. And if -- if the latter was the case, then we would have maybe had some concerns about missing it or not or having a -- a high quarter or low quarter. It was more just like, Where is this going?

Ex. 20, Benson Dep. 113:4-20.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes portions of Benson's testimony. Disputed as inconsistent with other testimony and the record. *See* Responses to Nos. 194-95.

### C.    Co-Diagnostics Sought Input From Its Outside Investor Relations Firm

**197.**    In preparing for the May 12, 2022 earnings release, the Lambert team learned from Co-Diagnostics that it was experiencing "less visibility" into the COVID testing market, as Mr. Houston testified:

I don't remember the exact timeline of events as to how we knew that there was less visibility that Co-Diagnostics was facing and so I know we did give them a few potential ways to handle that.

115

I would have to go back and look, but our counsel is typically be open, be transparent and share as much as you can around any uncertainty.

And I think what further -- I have to go back and look -- I think what further compounded that too is just a lot of macro issues that all of our clients were facing, I mean, not just a pandemic, but Russia invading Ukraine, the Fed increasing interest rates, Donald Trump saying he's going to run for office again.

So if I remember correctly, I think that spring and that summer were quite a tumultuous time for a lot of our micro and small cap clients.

Ex. 27, Houston Dep. 49:6-50:3.

**Plaintiff's Response**: Disputed. As Houston concedes in the cited testimony "[he did not] remember the exact timeline of events . . . ." In preparing for the May 12, 2022 earnings release, the Lambert team learned from Co-Diagnostics that sales had plummeted. "Less visibility" was part of the messaging that Defendants (with assistance from Lambert) decided on as the reasoning they could provide for pulling guidance completely.

As Dwight Egan testified, "[s]ales were what they were." Plaintiff's 56.1 Statement ¶22; *see also, e.g.,* ¶39 (Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter"); *see also id.* ¶ 11 (as of May 12, 2022, the Company received 2Q 2022 orders of just $2,514,682.30). As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. Indeed, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two. *Id.* ¶¶37-42. When asked about Houston's email stating that Co-Diagnostics was "likely to have a soft quarter, or two", as Brown admitted, "at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a).

116

Furthermore, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id*. Indeed, as Brown described it, a few days later on May 9, "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release." ¶43. On May 10, Defendants continued working up to the last minute to edit and make changes to their post-hoc reasoning for deciding not to provide quarterly guidance. *See* ¶¶44, 44(a), 44(b) (Houston testifying that as of May 10, after the decision had been made that guidance would not be provided, they were still working though what reasons would be given for not providing guidance), 45.

Indeed, it wasn't until *after* deciding not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of

117

the factors they could "frame [the decision] around."  Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5.  Indeed, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id.*; *see also* Response to No. 180.

198.    Mr. Houston explained that while Co-Diagnostics "knew there was reduced visibility," the Company was still "trying to get [its] arms around it." Ex. 27, Houston Dep. 50:10-12.

**Plaintiff's Response**: Disputed as this mischaracterizes the testimony and the record, and is inadmissible hearsay as to what Defendants "knew".  Moreover, with respect to "trying to get their arms around it . . . [and going] back and forth to really try and nail down what exactly is at play here" (*Id.* at 50:11-16), as reflected in the evidence, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two.  *Id.*, ¶¶37-42.  Indeed, following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id.*

The "back and forth to really try and nail down what exactly is at play here" that Houston referred to is their post-hoc workshopping of the reasons that could be provided for their decision to completely pull guidance.  Ex. 27, Houston Dep. 50:11-16; s*ee* Response to No. 197.

**199.**    Accordingly, the Lambert and Co-Diagnostics teams "went back and forth to really try and nail down what exactly [was] at play[.]" Ex. 27, Houston Dep. 50:14-17.

**Plaintiff's Response**: Disputed as this mischaracterizes the testimony and the record.  As set forth in Plaintiff's Response to No. 198, the "back and forth to really try and nail down what exactly is at play here" that Houston referred to is their post-hoc workshopping of the reasons that could be provided for their decision to completely pull guidance.  Ex. 27, Houston Dep. 50:11-16; s*ee* Response to Nos. 198, 197.

**200.**    The guidance set forth in the initial draft of the May 12, 2022 press release and Mr. Brown's CFO call script were placeholders pulled from the earnings materials from the previous quarter. *See* Ex. 27, Houston Dep. 50:23-51:25 (explaining it was Lambert's practice to pull forward the information provided in the materials from the prior earnings release and therefore, the presence of quarterly guidance in the initial drafts of the Q2 2022 materials was a placeholder and did not indicate that Co-Diagnostics was planning to provide guidance at that time); *id.* 54:15-55 (explaining same with regards to initial draft of earnings press release); Greene Decl. ¶ 105, Ex. 104, Email re Q1 CFO Script, dated May 4, 2022, attaching CFO Script; *id.* ¶ 106, Ex. 105, Email re Q1 CFO Script, dated May 4, 2022, attaching Draft Press Release.

**Plaintiff's Response**: Undisputed with the clarification that Houston testified that while the presence of the placeholder for guidance did not necessarily indicate one way or the other whether Defendants would provide guidance, "we would just assume that they're going to continue

to provide quarterly guidance and so we would just pull that forward into the next first version of the draft." Ex. 27, Houston Dep. 54:24-55:4.

201.    On May 4, 2022, Mr. Houston emailed Mr. Brown regarding potential alternatives to providing quarterly guidance for 2Q22 and offering some thoughts on those alternatives. *See* Greene Decl. ¶ 107, Ex. 106, Email from Houston to Brown re Guidance Considerations, dated May 4, 2022 ("May 4 Lambert Email").

**Plaintiff's Response**: Undisputed.

202.    Mr. Houston testified that the options he identified in the May 4 Lambert Email were "very similar" to those Lambert shared with other clients around the same time "given the uncertainty." Ex. 27, Houston Dep. 57:18-58:15.

**Plaintiff's Response**: Partially disputed to the extent it mischaracterizes the testimony. Houston testified that "Looking at this, it's a very similar e-mail that we would give to some of our other small microcap clients at the time that were contemplating either pulling guidance altogether, only providing annual, but it looks like there's a few items specific to Co-Diagnostics." *Id*. at 58:5-12. Indeed, the "few items specific to Co-Diagnostics" included, among others, that "[g]uiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two, and provide some air cover during the soft quarters", and "will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number". *See* Ex. 106.

203.    Mr. Houston further testified that the options he provided to Co-Diagnostics were not driven by a concern, on his part or at Co-Diagnostics, that the quarterly guidance would come up short or that 2Q 2022 was off to a slow start:

> [I]t was more of a concern that they didn't really have the proper visibility that they
> felt they needed to be able to produce a range that could be relied on by the street.

120

. . .

I just recall it would have been a month into the quarter that they didn't have the visibility that they might typically have, that they had at the same time last year, as to their ability to derive a forecast.

. . .

[I]f I remember correctly, this felt more like a fishing expedition for us in really trying to get at the heart of what's going on here and let us help you.

Ex. 27, Houston Dep. 59:5-61:5.

**Plaintiff's Response**: Disputed as inconsistent with the record and inadmissible hearsay as to Co-Diagnostics' concerns. The May 4 Lambert Email makes clear that the impetus for exploring alternatives to providing Q2 guidance was the fact that Q2 2022 was off to an unusually slow start for Co-Diagnostics.  *See generally* Ex. 106; *see also* Response to No. 187.  The "concern" was that Defendants wanted to avoid disclosing that sales of the Logix Test had rapidly declined.

Indeed, the May 4 Lambert Email makes explicit the concern of "tip[ping their] hand to investors that [Co-Diagnostics will] likely have a soft quarter, or two".  Ex. 106; *see also* Ex. 27, Houston Dep. 103:23-104:4 ("**Q.** The phrase tipping your hand, generally is your understand that that phrase means to disclose the cards that you're holding? **A.** To share something new that they're not aware of, yes.").

In fact, with respect to the option of "Guid[ing] to $17-19 million in topline with the hope that you come close because you've done so before" the May 4 Lambert Email raises the concern: "Need to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter". Ex. 106.

121

**204.** Mr. Benson agreed that the concern was not "guiding to a figure and coming up short," but that the Company did not have enough information to comfortably make a prediction regarding quarterly revenue:

> **Q.** Do you recall whether there was a concern at the time of guiding to a figure and coming up very short?
>
> **A.** I don't recall that specific concern, beyond the context of not being able to reliably produce a number that we felt we could stand by full stop, whether we would come in with something that would end up being way lower than -- than we had anticipated because of a variant or because of a -- a larger push in the Southern Hemisphere or in different -- in different areas. Or if we would give a number that would be higher, and then it would be lower than we had anticipated for other -- you know, for -- for other factors that we couldn't -- that we couldn't predict.

Ex. 20, Benson Dep. 101:22-102:11; *see id.* 99:25-100:9 ("[I]t was an evolving situation with a pandemic, an evolving situation with our company. And to the extent that we had a degree of comfort that we could rely upon -- give responsible predictions that we felt would be, you know, ingenuous and . . . would communicate honestly and fully to the market, we did so. When it got to the point where we felt like it would be irresponsible to do so, we didn't.").

**Plaintiff's Response**: Disputed as a mischaracterization of the testimony and as inconsistent with the evidence and other testimony. The May 4 Lambert Email makes clear that the impetus for exploring alternatives to providing Q2 guidance was the fact that Q2 2022 was off to an unusually slow start for Co-Diagnostics. *See generally* Ex. 106; *see also* Response to No. 187. The "concern" was that Defendants wanted to avoid disclosing that sales of the Logix Test had rapidly declined.

Indeed, the May 4 Lambert Email makes explicit the concern of "tip[ping their] hand to investors that [Co-Diagnostics will] likely have a soft quarter, or two". Ex. 106; *see also* Ex. 27, Houston Dep. 103:23-104:4 ("**Q.** The phrase tipping your hand, generally is your understand that

122

that phrase means to disclose the cards that you're holding? **A.** To share something new that they're not aware of, yes.").

In fact, with respect to the option of "Guid[ing] to $17-19 million in topline with the hope that you come close because you've done so before" the May 4 Lambert Email raises the concern: "Need to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter". Ex. 106.

Moreover, in Benson's cited testimony that he did not "recall that specific concern" Ex. 20, Benson Dep. 101:25, and again reiterated, in a portion omitted by Defendants "So I don't remember anything specifically beyond kind of whatever I said there." *Id.* 102:12-13. It's not surprising that he would not recall any such concerns because he testified that he did not know how guidance was actually determined (and therefore has no basis to speak to visibility with respect to guidance). *Id.* at 72:13-19 ("I don't recall any specific method by which guidance was regularly determined on a monthly basis, whether there is a specific protocol or rubric that he followed along with -- with Dwight Egan in order to determine those numbers. ***That was not my department to -- to be involved in specifically how those numbers were derived***.") (emphasis added); *id.* at 74:20-75:5 ("**Q.** In discussing guidance that would be discussed on the earnings call, is -- is sales to date in the ongoing quarter the type of thing that would be discussed? **A.** Again, I -- I can't recall exactly what it was that went in to determining what those -- what the guidance would be that would be given. It wasn't my job to determine the guidance, and so I can't really speak to what metrics were looked at in order to arrive at those numbers."); *id.* at 76:9-22 ("**Q.** Do you think [what the company quarterly sales were as of May 12, 2022] would be something important to ask [Brown], being involved in discussions regarding guidance that would be given

on that earnings -- in that earnings release? **A.** It wasn't up to me to determine what that guidance would be, and so there wouldn't be -- for me to ask Brian what the sales numbers were, to -- to what effect if I'm not the one that's giving the guidance? So I -- I don't understand why I would be asking him what the sales numbers were in order to come up with numbers for guidance that I wasn't deriving myself anyways.").

205.    Mr. Houston testified that in preparing for the May 12, 2022 earnings release, nobody from Co-Diagnostics told him that sales for the Logix test had fallen or that revenues were down. *See* Ex. 27, Houston Dep. 40:17-41:11; *see also* Ex. 20, Benson Dep. 102:23-103:16 (testifying he does not recall having a conversation with the Lambert team in which it was suggested the Company "was likely to have a soft quarter or two" or that "Q2 was off to a slow start").

**Plaintiff's Response**: Disputed.  As Brown testified, "[w]e may have discussed [taking a more prudent approach to guidance] prior to this draft. That would be my expectation, that we had some discussion about guidance prior to the first draft which is normal. We would normally have a discussion -- it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script." Ex. 21, Brown Dep. at 89:4-20. As Brown also testified, "we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . .".  *Id.* at 100:4-15; *see also id.* at 101:9-16 (when asked whether he recalled "telling Mr. Houston that Q2 was off to a slow start", Mr. Brown testified "I don't recall. . . . we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide."); *see also id.* at 104:11-20 ("we had a call and we discussed where we were . . . We would have a discussion around that."); *see also* Response to No. 177.  Houston testified that based on his

124

conversation with Brown "my inference [at this time]" was that "Co-Diagnostics was likely to have a soft quarter or two." ¶39(c). Based on Houston's inference, the only logical conclusion is that Brown told him sales were down, as Houston would have no reason to make such an inference if Brown had told him sales were good.

Moreover, when asked whether he would help "formulate the messaging [for an earnings release]", Houston testified "Correct, based on the information that they would share with us." Houston Tr. at 34:18-21. Indeed, a May 5, 2022 email from Houston to Brown shows that *he did* have visibility into Q2 sales, stating, for example, that "[g]uiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two and provide some air cover during the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number". Uris Decl. (ECF No. 114) Ex. 12 (LAMBERT0000769). Indeed, the email starts off noting that it was a "follow[] up on our call yesterday." *Id*.

Moreover, the May 4 Lambert Email makes clear that the impetus for exploring alternatives to providing Q2 guidance was the fact that Q2 2022 was off to an unusually slow start for Co-Diagnostics. *See* Response to No. 203.

Houston also testified that he "didn't recall" whether Brown told him that Q2 was off to a slow start. Ex. 27 Houston Dep. 62:14-17; *see also id*. 62:18-21 ("**Q.** Do you think you would have written that if he didn't tell you that? **A.** I don't know.").

206.    Nor is there any evidence that, leading up to the May 12, 2022 earnings release, anybody at Co-Diagnostics told the Lambert team that sales for the Logix test were down. *See*, *e.g.*, Ex. 20, Benson Dep. 73:9-15; Ex. 21, Brown Dep. 89:22-90:2; Ex. 23, D. Egan Dep. 107:4-8, 138:6-141:18.

**Plaintiff's Response**: Disputed. As Dwight Egan testified, "[s]ales were what they were." Plaintiff's 56.1 Statement ¶22; *see also, e.g.,* ¶39 (***Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter"***); *see also id.* ¶ 11 (as of May 12, 2022, the Company received 2Q 2022 orders of just $2,514,682.30). As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. Indeed, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two. *Id.* ¶¶37-42. When asked about Houston's email stating that Co-Diagnostics was "likely to have a soft quarter, or two", as Brown admitted, "at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a); *see also* Response to Nos. 205; 177.

Furthermore, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying."

126

*Id*. Indeed, as Brown described it, a few days later on May 9, "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release." ¶43. On May 10, Defendants continued working up to the last minute to edit and make changes to their post-hoc reasoning for deciding not to provide quarterly guidance. *See* ¶¶44, 44(a), 44(b) (Houston testifying that as of May 10, after the decision had been made that guidance would not be provided, they were still working though what reasons would be given for not providing guidance), 45.

Indeed, it wasn't until *after* deciding not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of the factors they could "frame [the decision] around."  Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5.  Indeed, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id*.; *see also* Response to No. 180.

Moreover, the cited self-serving testimony is telling in that it states no more than Defendants (and Benson) did not *recall* such conversations.  Indeed, when asked directly "if anyone from Co-Diagnostics told anyone from Lambert that orders for the Logix tests were down?" Brown testified: "I can't recall."  Ex. 21, Brown Dep. 89:22-90:1.

207.    Nor did the Lambert team have any knowledge of Co-Diagnostics' quarter-to-date sales leading up to the May 12, 2022 earnings release. *See* Ex. 27, Houston Dep. 62:22-63:7 ("[W]e didn't have any visibility into anything quantitative in a current quarter time frame."), 108:2-4 ("We didn't have any visibility into what the sales were actually doing or the order flow was

127

actually doing."), 114:23-25 ("I don't have any visibility into [Co-Diagnostics'] monthly sales numbers.").

      **Plaintiff's Response**: Disputed.  As Brown testified, "[w]e may have discussed [taking a more prudent approach to guidance] prior to this draft. That would be my expectation, that we had some discussion about guidance prior to the first draft which is normal. We would normally have a discussion -- it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script." Brown Dep. at 89:4-20. As Brown also testified, "we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . .".  Brown Dep. 100:4-15; *see also id*. at 101:9-16 (when asked whether he recalled "telling Mr. Houston that Q2 was off to a slow start", Mr. Brown testified "I don't recall. . . . we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide."); *see also id*. at 104:11-20 ("we had a call and we discussed where we were . . . We would have a discussion around that."); *see also* Response to Nos. 205, 206, 177.  Houston testified that based on his conversation with Brown "my inference [at this time]" was that "Co-Diagnostics was likely to have a soft quarter or two." ¶39(c).  Based on Houston's inference, the only logical conclusion is that Brown told him sales were down, as Houston would have no reason to make such an inference if Brown had told him sales were good.

      Moreover, when asked whether he would help "formulate the messaging [for an earnings release]", Houston testified "Correct, based on the information that they would share with us." Houston Tr. at 34:18-21. Indeed, a May 5, 2022 email from Houston to Brown shows that *he did* have visibility into Q2 sales, stating, for example, that "[g]uiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two and provide some air cover

128

during the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number". Uris Decl. (ECF No. 114) Ex. 12 (LAMBERT0000769). Indeed, the email starts off noting that it was a "follow[] up on our call yesterday." *Id*.

Moreover, the May 4 Lambert Email makes clear that the impetus for exploring alternatives to providing Q2 guidance was the fact that Q2 2022 was off to an unusually slow start for Co-Diagnostics. *See* Response to No. 203.

**208.**    Mr. Houston testified that any statements in the May 4 Lambert Email suggesting Co-Diagnostics was having "a weak start to the quarter" were inferences on his part based on experiences with different clients:

> [I]t's me putting words into their mouth and me just assuming . . . . Again, the language that I chose to use were the inferences based on what I've seen with other clients that are considering pulling quarterly guidance or annual guidance, for that matter, and so it's really just trying for me to give them all of the different opportunities that they have, but me inferring that there's probably less visibility or Q2 isn't off to the start they thought it would be, so let me know my options now and it's not to say this is exactly what happened and now we've got to figure out a recipe to resolve the situation.

Ex. 27, Houston Dep. 69:7-70:2; *see also id.* 62:7-13 (explaining any reference to "a soft quarter or two" in his email was inference he made); *id.* 67:9-16 ("So I really don't think Mr. Brown had shared anything other than he would give us some scenarios on if we were to stop quarterly guidance, if we're going to continue, what are all the puts and takes with that, and so I immediately go into, well, okay, that probably means Q2 is going to be soft."); Ex. 23, D. Egan Dep. 143:11-144:2 (testifying while he was not involved in the discussions regarding guidance at this point in time, he believes Mr. Houston was merely providing "a bunch of hypothetical scenarios").

**Plaintiff's Response**:    Disputed insofar as this mischaracterizes the testimony and is inconsistent with the record and other testimony. Most importantly, Brown himself testified that

they did discuss sales.   Plaintiff's 56.1 Statement ¶39 (Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter"); *see also id*. ¶ 11 (as of May 12, 2022, the Company received 2Q 2022 orders of just $2,514,682.30); *id*. ¶22 (Dwight Egan testified, "[s]ales were what they were.").   As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. Indeed, it was from conversations with Brown that Houston, Co-Diagnostics' IR consultant, understood that Q2 2022 was off to a slow start and Co-Diagnostics likely to have a soft quarter or two.  *Id*. ¶¶37-42.   When asked about Houston's email stating that Co-Diagnostics was "likely to have a soft quarter, or two", as Brown admitted, "at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a).

Houston testified that based on his conversation with Brown "my inference [at this time]" was that "Co-Diagnostics was likely to have a soft quarter or two." ¶39(c). Based on Houston's inference, the only logical conclusion is that Brown told him sales were down, as Houston would have no reason to make such an inference if Brown had told him sales were good. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). Indeed, Houston's May 4 email starts off noting that he was "following up on our call yesterday". Ex. 106.  When asked whether Brown "ever t[old him] that he disagreed with the notion that Q2 [was] off to a slow start?" Houston testified "Not that I recall, no." Plaintiff's 56.1 Statement ¶39(d).

Moreover, although he testified that the fact Co-Diagnostics was likely to have a soft quarter or two based on his conversations with Brown, he also testified that he "didn't recall" whether Brown told him that Q2 was off to a slow start.  Ex. 27 Houston Dep. 62:14-17; *see also id*. 62:18-21 ("**Q.** Do you think you would have written that if he didn't tell you that? **A.** I don't know.").

Moreover, Defendants mischaracterize Houston's testimony in stating that his inferences are "based on experiences with different clients."  Indeed, Defendants gloss over the context of this testimony, which is his May 4, 2022 email to Brown "following up on [their] call yesterday" in which Brown conceded he discussed quarterly sales to date with Houston.  Importantly, Defendants have omitted the following testimony from the selectively quoted testimony cited here: "it's me putting words into their mouth and me just assuming ***what is probably happening [based on our conversation]*** rather than Brian reaching out and saying, hey, we're having a soft quarter, can you pull together something that helps me communicate that."  Ex. 27 Houston Dep. at 69:7-12.

With respect to Dwight Egan's cited testimony, disputed insofar as Defendants omit that he testified that he did not know what Houston was referring to.  Ex. 23, D. Egan Dep. 143:11-14.  Further disputed to the extent Defendants suggest testified that "he was not involved in the discussions regarding guidance at this point in time".  Rather, he was testifying about an email that he was copied on.  *See* Supp. Uris Decl. Ex. 8 at (CoDx_00506183, 89-90); *see also* Ex. 23, Dwight Egan Dep. 143:19-22 ("After Brian had given due consideration to it and decided on language, that's when I would have stepped in . . . .").

131

209.    Mr. Houston testified that the alternatives provided were to help Co-Diagnostics determine the best option for providing transparency to investors. *See* Ex. 27, Houston Dep. 33:12-34:17 (testifying "the end goal" was to be "as open and transparent as possible").

**Plaintiff's Response**: Disputed as a mischaracterization of the testimony.  The cited testimony relates generically to Lambert's assistance leading up to an earnings release.  *Id*. Nowhere in the cited testimony is Houston referring to Q2 2022 specifically, let alone "the alternatives provided."  *Id*.; *e.g., see id.* at 33:25-34:7 ("And so typically those key messages would be, one, how did the quarter go and then how does that tie to the longer term strategy, and helping them parse through what those messages looked like, with the end goal of being as open and transparent as possible . . .).  Indeed, specifically with respect to "the alternatives provided" for Q2 2022, Houston testified that what he meant by "Guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter or two" was "That we wanted them to, that we want them to be open and transparent, that even though they maybe didn't feel confident with the quantitative range for quarterly guidance, that by switching to annual guidance, those professional investors are smart enough to really determine, you know, okay, maybe there's going to be a down quarter here or there, but the annual number is still the same.")  *Id*. 61:6-22.

210.    When Mr. Houston wrote that guiding to an annual figure would "tip your hand" to investors, he meant that switching from quarterly to annual guidance would provide insight to investors:

> [W]e want them to be open and transparent, that even though they maybe didn't feel confident with the quantitative range for quarterly guidance, that by switching to annual guidance, those professional investors are smart enough to really determine, you know, okay, maybe there's going to be a down quarter here or there, but the annual number is still the same.
>
> Again, trying to remove some of that uncertainty and volatility to where, maybe it doesn't read that way, but the intent of that bullet to them was that we would want

to tip our hand to investors and give them as much information as possible, that we still had a high level of confidence around achieving.

Ex. 27, Houston Dep. 61:6-62:6; *see also* Ex. 106, May 4, 2022 Lambert Email.

**Plaintiff's Response**: Partially disputed as this statement is vague.  In any event, the "insight [that would be provided] to investors" was that Co-Diagnostics was likely to have a soft quarter, or two.  *See* Ex. 106 ("Guiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two, and provide some air cover during the soft quarters").

211.    When Mr. Houston wrote, with respect to one of the options he outlined, that Co-Diagnostics should ask itself "if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rational and logic for guiding to such a high number despite the weak start to the quarter," he was ensuring that Co-Diagnostics "cover [its] bases" and would be "able to talk through exactly how did we arrive at this forecast." Ex. 27, Houston Dep. 66:4-25; *see also* Ex. 106, May 4, 2022 Lambert Email.

**Plaintiff's Response**: Undisputed insofar as the above accurately represents excerpted testimony from Houston's deposition.  However, Plaintiff refers the Court to the full content of his response: "Again, just inferring that the quarter is not going to be good, because we probably wouldn't have this conversation if it was great, just making sure that they cover their bases and that they're able to talk through exactly how did we arrive at this forecast, here are the inputs and variables that went into it, here's why we chose the range. Again, just really covering all their bases and helping remind them that they needed to do that."). Ex. 27, Houston Dep. 66:14-25.

212.    On May 6, 2022, Mr. Brown responded to Mr. Houston, stating he was leaning toward pulling Q2 2022 guidance completely and asking for assistance regarding how best to present this decision to investors. *See* Greene Decl. ¶ 108, Ex. 107, Email Correspondence between Brown and Houston, dated May 6, 2022 ("May 6 Lambert Email"); Ex. 21, Brown Dep. 106:12-

17 ("Lambert is our investor relations expert and that's why we hired them is to help us with communication to the Street and so my question would be asking him what would be the best way to present this.").

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases the referenced sources.

213.    In response, Mr. Houston looked into how other companies that had recently decided to discontinue quarterly guidance had messaged their decisions and provided Co-Diagnostics with some rationales for not providing guidance that might apply to Co-Diagnostics. *See* Ex. 27, Houston Dep. 71:7-73:2; *see also* Ex. 107, May 6 Lambert Email.

**Plaintiff's Response**: Undisputed, however Plaintiff respectfully refers the Court to Ex. 108 at Page 4 of 5 for the email in which Houston actually provides a list of reasons that "could be rationale for pulling guidance completely."

214.    Mr. Brown responded, indicating that he felt the following reasons for not providing guidance were most applicable to Co-Diagnostics:

a.    Uncertainty as to how Co-Diagnostics' revenue will be impacted once the Company starts selling the at-home and point-of-care PCR test;

b.    Timing of orders in a particular quarter and how they are fluctuating greatly due to significant fluctuations in testing requirements in various geographic location;

c.    Inability to confidently project testing requirements through the remainder of the year; and

d.    Not wanting to put out guidance that he did not feel confident would be accurate.

*See* Greene Decl. ¶ 109, Ex. 108, Email Correspondence between Brown and Houston, dated May 9, 2022 ("May 8-9 Lambert Email").

**Plaintiff's Response**: Disputed insofar as this mischaracterizes the testimony and the record. Brown did not respond "that he felt the following reasons for not providing guidance were

134

most applicable to Co-Diagnostics." In Houston's prior email, in which he listed many of these reasons, he wrote "We'll defer to you on which of the below reasons could be rationale for pulling guidance completely. Some are likely a stretch, but we included them anyways to at least spur discussion." Ex. 108 at Page 4 of 15. Brown responded "I would suggest we frame this around the following" and listed three bullet points:

- "Uncertainty surrounding the revenue impact of the CODX YourTest PCR device following FDA approval (a little differently said - what you wrote makes me feel like there is much uncertainty around being able to get the device to market) - To me the uncertainty is truly how our revenue will be impacted once we have the opportunity to start selling the device.
- Timing of orders in a particular quarter and how they are fluctuating greatly due to significant fluctuations in testing requirements in various geographic locations.
- Inability to confidently project testing requirements through the remainder of the year - I don't want to put out guidance that I don't feel is accurate.

Nowhere in the email did Brown state these "were most applicable to Co-Diagnostics", rather he was searching for any reasons they could point to. *See id.* ("Andrew – what thoughts do you have on what we can point to as we pull back on guidance.")

215. Mr. Brown testified that the timing of orders for the Logix test was fluctuating more in the period leading up to May 12, 2022 than it had in prior quarters:

> There had been fluctuations on a weekly basis and it was becoming more apparent that the fluctuations were becoming more defined, there were more defined fluctuations, it was just happening more often. . . . If you look back at the history of the sales during COVID, they fluctuated, and even at this time it fluctuated even more based on the outside influences, how society was responding to COVID, how different countries were responding to the COVID pandemic at that point in time because we recently had had an Omicron spike that caused a significant amount of volatility when it came to how revenue came in and was recognized.

Ex. 21, Brown Dep. 114:8-115:6; *see also* Ex. 20, Benson Dep. 122:15-17 ("I think it's fair to say that it was a volatile time with lots of fluctuations in a quarter.").

**Plaintiff's Response**: Undisputed insofar as the above statement accurately quotes portions of Brown's testimony. Disputed as the reference to "timing of orders for the Logix test

135

was fluctuating more in the period leading up to May 12, 2022 than it had in prior quarters" is unsupported. As Brown testified, the only "fluctuations [in the timing of orders]" was the fact that sales had increased in December 2021 and January 2022, before quickly falling back down to record low levels. Ex. 21, Brown Dep. 114:8-115:18. Indeed, Brown conceded that sales were low in February, March, April and the beginning of May 2022. *Id*. As Seth Egan conceded, sales had never been that low for that long. Ex. 24, S. Egan Dep. 65:6-66:3. Such an extended period of low sales is not volatility or "fluctuations [in the timing of orders]".

Moreover, Defendants' suggestion that it was "more difficult for Mr. Brown to predict sales for the Logix test in Q2 2022" is inconsistent with the record. Indeed, by the beginning of the Class Period, sales had been down for three and a half months. The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. Following his May 4, 2022 call with Brown, Houston had an understanding that sales were down, and as a result proposed "[a]lternatives to providing Q2 guidance in the earnings call and release." Plaintiff's 56.1 Statement, ¶¶38, 41(a) (Houston testifying that "we probably wouldn't have this conversation if [sales were] great"). The evidence is clear that poor sales were the impetus to exploring "alternatives to providing Q2 guidance." *Id.* ¶¶39-41. While Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" *Id.* ¶42. Indeed, many of the factors that the Company ultimately disclosed as reasons for their reduced ability to accurately forecast demand were based on Houston's "research on what others have been saying." *Id*.

**216.** In addition to the reasons set forth by Mr. Brown on May 9, 2022, Mr. Benson added that "mask mandates being dropped while variants continue to surface and spread . . . especially [outside of the United States]" was another factor leading to significant uncertainty in the COVID testing market. *See* Ex. 108, May 8-9 Lambert Email; Ex. 20, Benson Dep. 124:21-22; *see also* Ex. 29, Tsai Dep. 52:13–54:14.

**Plaintiff's Response**: Partially disputed insofar as Defendants' imply that these reasons were not derived from the reasons Houston set forth in his May 8, 2022 email. *See* Ex. 108 at Pages 3-4 of 15. What Benson wrote was that "I also thought the bullet [in Houston's email] about the mask mandates being dropped while variants continue to surface and spread is insightful and accurate, especially X-US." *Id.* at Page 3 of 15. Disputed insofar as Brown's email Defendants appear to be referring to ("the reasons set forth by Mr. Brown on May 9, 2022") was written on May 8, 2022 not May 9, 2022.

**217.** Mr. Dwight Egan or Mr. Brown never told Mr. Houston that Co-Diagnostics was trying to hide lower sales of the Logix test from the investing public. *See* Ex. 27, Houston Dep. 123:15-21, 124:16-20.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of Houston's testimony. Plaintiff otherwise has no independent basis to confirm or dispute this statement. However, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *See* Response to Nos. 187, 180.

**218.** Mr. Brown never told Mr. Houston that the decision not to provide guidance on May 12, 2022 was motivated by trying to hide lower sales of the Logix test. *See* Ex. 27, Houston Dep. 123:22-124:3.

**Plaintiff's Response**:  Undisputed insofar as this is an accurate paraphrase of Houston's testimony.   Plaintiff otherwise has no independent basis to confirm or dispute this statement. However, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *See* Response to Nos. 187, 180.

**219.**    Mr. Dwight Egan or Mr. Brown never told Mr. Houston that the statements made in the May 12, 2022 press release or earnings call were intended to hide low sales from the investing public. *See* Ex. 27, Houston Dep. 124:4-15, 124:21-24.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of Houston's testimony.   Plaintiff otherwise has no independent basis to confirm or dispute this statement. However, the evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *See* Response to Nos. 187, 180.

Moreover, with respect to Brown's statements on the May 12, 2022 earnings call (in which Dwight Egan participated) a direct question about whether sales had declined was asked: **[Analyst]:** "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?"  Brown responded ***"It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in."*** Plaintiff's 56.1 Statement, ¶58.  As the Court put it, "[h]e dodged slightly, but he also clearly picked a side, emphasizing the "timing" issue and downplaying the "demand" issue. A reasonable investor would take that statement as a description of or at least informed by facts on the ground." ECF No. 42 at

5-6. Now that the evidence has revealed that sales had in fact plummeted by May 12, 2022, it is evident that Brown's answer was "intended to hide low sales from the investing public."

220. As Mr. Benson testified, the Company decided not to provide guidance because it felt like it was the most responsible option:

> We didn't choose any of these options, except for the first one, because that was the one that we felt was most responsible. It wasn't because we were worried it was going to be low or we thought it might be higher. It was simply because all of those together tell the story of an unpredictable, volatile situation.

> And we had to go with what we thought was the most responsible action to communicate to our shareholders. And that wasn't to take a guess on a number that was too low or a number that was too high or to stretch it out over the year.

> Any -- any one of those options would have been more irresponsible than -- to our mind than to just be honest and say, We can't -- we can't read where this is going.

Ex. 20, Benson Dep. 110:24-111:14; *see also id.* 112:8-13 ("A company has a responsibility to do what's, best to give the best number that it can. And if that -- if your best guess is, We can't give a number that we can accurate -- that we feel like we can responsibly stand behind, then it's the company's responsibility to not give a number.").

**Plaintiff's Response**: Disputed as inconsistent with the evidence and other testimony. The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *See* Response to Nos. 187, 180.

Moreover, Benson testified that he did not know how guidance was actually determined (and therefore has no basis to speak to visibility with respect to guidance). *Id*. at 72:13-19 ("I don't recall any specific method by which guidance was regularly determined on a monthly basis, whether there is a specific protocol or rubric that he followed along with -- with Dwight Egan in order to determine those numbers. *That was not my department to -- to be involved in specifically how those numbers were derived*.") (emphasis added); *id.* at 74:20-75:5 ("**Q.** In discussing

139

guidance that would be discussed on the earnings call, is -- is sales to date in the ongoing quarter the type of thing that would be discussed?  **A.** Again, I -- I can't recall exactly what it was that went in to determining what those -- what the guidance would be that would be given. It wasn't my job to determine the guidance, and so I can't really speak to what metrics were looked at in order to arrive at those numbers."); *id*. at 76:9-22 ("**Q.** Do you think [what the company quarterly sales were as of May 12, 2022] would be something important to ask [Brown], being involved in discussions regarding guidance that would be given on that earnings -- in that earnings release? **A.** It wasn't up to me to determine what that guidance would be, and so there wouldn't be -- for me to ask Brian what the sales numbers were, to -- to what effect if I'm not the one that's giving the guidance? So I -- I don't understand why I would be asking him what the sales numbers were in order to come up with numbers for guidance that I wasn't deriving myself anyways.").

221.    Ultimately, as Mr. Brown repeatedly explained: "I don't want to put out guidance that I don't feel is accurate." Ex. 108, May 8-9 Lambert Email; *see also* Brown Dep. 113:4-19 ("There's more than one concern you may have when providing guidance. You can't make a determination based on one item. . . . [T]hese are the things that were happening that we -- helped me to feel like it was appropriate to not provide guidance because again, I didn't want to provide guidance that was not accurate."), 133:24-134:9 (testifying, during an earnings call, he could not "provide every single reason for the volatility in the market in terms of COVID testing" but he tried to "point to the things that we think most accurately impact the market and the environment at that time"), 155:15-22 ("I just want to emphasize my thought process here is that the last thing I want to do is provide guidance that we're not confident in, so that's one thing you'll know going forward, is if we're not confident in providing guidance, then we won't provide guidance. I just want to make sure that's clear.").

**Plaintiff's Response**: Undisputed insofar as the above accurately quotes portions of the referenced documents.  Disputed as the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that Brown was concerned about an inability to determine guidance that he felt would be accurate.  *See* Response to No. 187, 180.

Having already decided not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of the factors they could "frame [the decision] around."  Uris Decl. (ECF No. 114) Ex. 14 at Pages 3-5.  Indeed, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id*.

**222.**    Co-Diagnostics' board approved the decision to not provide quarterly guidance for Q2 2022. *See* Ex. 21, Brown Dep. 116:21-117:5 (explaining the board supported the decision because there was "good reason for it"); *see also* Ex. 23, D. Egan Dep. 114:5-19 ("I'm sure that the board, if they were consulted on it and weighed in, that they would have agreed or we wouldn't have gone forward with the recommendation of Mr. Brown. They would not have given us a stipulation of as long as there are good reasons. I mean obviously, we wanted to have good reasons why we were making that decision which I think I've discussed in terms of our -- the kind of optics and uncertainty that we thought potentially lie ahead. I think we did the prudent thing."), 118:9-19 ("We wouldn't go to the board nakedly and say what do you think about this? We would have already had good reasons to present to the board in terms of things that I mentioned previously in

141

terms of our -- the optics we had and the uncertainty that we were looking at and not feeling that we should commit to numbers that didn't have a clear sense of being able to achieve them.").

**Plaintiff's Response**: Undisputed insofar as the statement itself is accurate. Disputed insofar as the descriptions of the supporting materials are mischaracterizations. Following a May 9, 2022 meeting with the Board, Brown wrote an email to Houston and others: "The board is up with not giving guidance *but providing some good reason in the script and on the earnings release. Can you guys take the first stab at writing this?*" Supp. Uris Decl. Ex. 8 at (CoDx_00506183 at 86) (emphasis added). As reflected in Brown's email, contrary to Dwight Egan's cited testimony, the Board *did* "give[] the stipulation of as long as there are good reasons." Indeed, Brown even explicitly testified to that: "They were -- they were okay with us not providing guidance as long as there was a good reason for it . . . ." Ex. 21, Brown Dep. at 117:3-5. And, as Houston testified, when asked whether as of May 10, 2022 he was "still working with Co-Diagnostics on determining what reason would be provided for not giving guidance, correct?", Houston answered "That's my understanding, yes, that's what it looks like." Houston Tr. at 75:10-24; *id*. at 80:4-83:18 (with respect to May 10 draft of Brown's earnings call script, agreeing that "the decision appears to have been made that guidance would not be provided, but [they were] still working though what reasons would be given for not providing guidance" testifying "It appears that way, but I don't remember for certain."); *see also* Ex. 21, Brown Dep. 117:6-11 (testifying that at this point "we're still discussing what would be the best presentation for [the reasons we're going to give]").

## IX.    THE CHALLENGED STATEMENTS

223.    On May 12, 2022, after the market closed, Co-Diagnostics issued a press release disclosing the Company's financial results for the quarter ended March 31, 2022 (the "May 12, 2022 Press Release"), and filed a Form 8-K with the U.S. Securities and Exchange

Commission ("SEC") attaching a copy of that press release as an exhibit. *See* Greene Decl. ¶ 14, Ex. 13, Co-Diagnostics Form 8-K, filed May 12, 2022 ("May 12, 2022 8-K"); AC ¶ 43.

**Plaintiff's Response**: Undisputed.

224.    Also on May 12, 2022, after the market closed, Co-Diagnostics held a conference call with investors and analysts to discuss the 1Q 2022 earnings release, share prepared remarks, and answer questions. AC ¶¶ 43, 45-47; Ex. 76, May 12, 2022 Earnings Call Transcript, at 6 ("For Q1, revenue increased 13.5% to $22.7 million as compared to $20.0 million during the prior year period. This increase in revenue on a year-over-year basis was primarily driven by increased global sales of our Logix Smart COVID-19 tests.").

**Plaintiff's Response**: Undisputed.

225.    Each of the challenged statements still at issue in this case was made after hours on May 12, 2022, which means that any artificial inflation caused by any of these statements could not have entered Co-Diagnostics' stock price until the trading day on May 13, 2022, and could not have impacted the stock price on May 12, 2022. *See* Ex. 94, Initial Coffman Rpt. ¶ 81 n.76 (acknowledging that while the certified Class Period begins on May 12, 2022, the first challenged statement was made after hours that day, "[t]herefore, artificial inflation would first be present in the market price of Co-Diagnostics Common Stock on the following trading day, May 13, 2022."); Greene Decl. ¶ 23, Ex. 22, Deposition of Chad Coffman ("Coffman Dep.") 38:2-19; AC ¶¶ 43, 45.

**Plaintiff's Response**: Partially disputed.  Plaintiff does not dispute that any alleged artificial inflation would not have entered the stock price during market hours on May 12, 2022. Ex. 22 Coffman Dep. at 38:7-14 ("I'm not taking a view on what the class period should be or shouldn't be. All I'm saying is that my understanding of when the inflation would have entered the stock would have been after the first alleged misstatement, which occurred after the market

143

closed on May 12. So in my view at least during the market trading hours of May 12 there was not artificial inflation.")..

**226.**    Co-Diagnostics' May 12, 2022 Press Release identified certain statements as forward-looking and referred investors to cautionary language in the 2021 Form 10-K. Ex. 13, May 12, 2022 8-K, at 6.

**Plaintiff's Response**: Undisputed, however Plaintiff respectfully refers the Court to the full contents of the generic section titled "Forward-Looking Statements" in the press release.

**227.**    Among other things, the May 12, 2022 Press Release stated:

*This press release contains forward-looking statements. . . . Such forward-looking statements are based on facts and conditions as they exist at the time such statements are made and predictions as to future facts and conditions. Forward-looking statements in this release include statements regarding (i) completion of development and FDA submission for approval of the new Co-Dx at-home/point-of-care PCR testing device, (ii) forecast of strong demand for our broad product portfolio across all end markets . . . Forward-looking statements are subject to inherent uncertainties, risks and changes in circumstances. Actual results may differ materially from those contemplated or anticipated by such forward-looking statements. Readers of this press release are cautioned not to place undue reliance on any forward-looking statements. There can be no assurance that any of the anticipated results will occur on a timely basis or at all due to certain risks and uncertainties, a discussion of which can be found in our Risk Factors disclosure in our Annual Report on Form 10-K, filed with the Securities and Exchange Commission (SEC) on March 24, 2022, and in our other filings with the SEC.*

*Id.* (emphasis in original).

**Plaintiff's Response**: Undisputed insofar as the above accurately quotes excerpted language from the May 12, 2022 Press Release.

**228.**    The May 12, 2022 Press Release reported revenue of $22.7 million, primarily due to sales of the Logix test, representing a revenue increase of approximately 13.5% as compared to approximately $20.0 million during the prior year period. *See* Ex. 13, May 12, 2022 8-K, at 4; AC ¶ 43.

**Plaintiff's Response**: Undisputed.

**229.** The May 12, 2022 Press Release announced Co-Diagnostics' decision to stop providing quarterly guidance at that time based on various factors making it difficult for the Company to accurately forecast sales for the Logix test. *See* Ex. 13, May 12, 2022 8-K, at 4; AC ¶ 44.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of what was stated in the May 12, 2022 Press Release. However, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* "various factors making it difficult for the Company to accurately forecast sales for the Logix test." *See* Response to Nos. 187, 180. The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *Id*.

**230.** In the May 12, 2022 Press Release, Mr. Dwight Egan is quoted as stating:

> While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]

*See* Ex. 13, May 12, 2022 8-K, at 4; AC ¶ 44.

**Plaintiff's Response**: Undisputed insofar as this is an accurate quotation of an excerpt from the May 12, 2022 Press Release. However, the evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two", *not* that "ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished." *See*

Response to Nos. 187, 180.  The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined.  *Id*.

231.    The analysts covering May 12, 2022 Earnings Call included: Yi Chen from H.C. Wainwright; James Sidoti from Sidoti; Theodore O'Neill from Litchfield; and Jason McCarty from Maxim. *See* Ex. 20, Benson Dep. 29:16-30:13 (testifying to same); Ex. 76, May 12, 2022 Earnings Call Transcript, at 3.

**Plaintiff's Response**: Undisputed, with the clarification that Jason McCarthy does not appear to have been present on the May 12, 2022 Earnings Call.  Ex. 76 at 3.

232.    At the beginning of the May 12, 2022 Earnings Call, Mr. Benson (Co-Diagnostics' head of corporate communications), identified certain statements as forward-looking and referred investors to additional cautionary language in the 2021 Form 10-K:

> Before we begin, we would like to inform the listeners that certain statements made by Co-Diagnostics during the course of this call may constitute forward-looking statements. Any statement about company expectations, beliefs, plans, objectives, assumptions of future events or performance are forward-looking statements. For example, statements concerning 2022 financial and operational guidance, the development, regulatory clearance, commercialization and features of new products, plans and objectives of management and market trends are forward-looking statements. . . .

> The company believes these statements are based on reasonable assumptions. However, these statements are not guarantees of performance and involve known and unknown risks and uncertainties that may cause the actual results to be materially different from any future results expressed or implied by such statements.

> Important factors, which could cause actual results to differ materially from those in these forward-looking statements are detailed in Co-Diagnostics filings with the SEC. . . .

Ex. 76, May 12, 2022 Earnings Call Transcript, at 4.

146

**Plaintiff's Response**: Undisputed, however Plaintiff respectfully refers the Court to the full contents of Benson's generic statement regarding forward-looking statements. *Id*.

233.    S&P Global issued a transcript of the May 12, 2022 Earnings Call, in which Mr. Brown is quoted as stating:

> Turning now to our visibility around the outlook for the balance of the year. While we experienced strong demand for our products during the first quarter of 2022, changes in our operating environment and markets have restricted our near-term visibility. We will continue to navigate the near-term environment with caution, but as a result, we'll not be providing quarterly guidance at this time.
>
> To be clear, we remain very confident about the long-term potential of our business and the demand for our products. Our ability to accurately forecast Logix Smart COVID-19 test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants and persistently low vaccination rates in many parts of the world.
>
> Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results.

Ex. 76, May 12, 2022 Earnings Call Transcript, at 7; AC ¶ 45.

**Plaintiff's Response**: Undisputed.

234.    The May 12, 2022 Earnings Call Transcript also included the following exchange between Yi Chen, an analyst for H.C. Wainwright, and Mr. Dwight Egan and Mr. Brown:

**Yi Chen**
*H.C. Wainwright & Co, LLC, Research Division*

Excellent. Thanks a lot. And a quick follow-up on the Logix Smart detection test. I know you spoke about the fact that you couldn't -- I mean it's not -- now is not the right time, like give guidance, but are you already seeing a decline in the number of orders for the test? Or is it mainly a fluctuation in the total number of orders and the timing of customers or customer orders? And in the same context, I was also -- I know you spoke about it during your prepared remarks, but maybe if you could summarize how you could leverage the existing CoPrimer technology for other indications that will also be very helpful for our understanding.

**Dwight H. Egan**

147

*Chairman, CEO & President*

Okay. We have a little bit of a problem hearing all of the questions that you just answered or that you just asked. So if you wouldn't mind, would you please repeat most important part of the question so that we can hear it.

**Yi Chen**
*H.C. Wainwright & Co, LLC, Research Division*

Sure. Sorry about that. So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward? And in the same context, I was wondering if you could, I know you spoke about it during your prepared remarks, but I was wondering if you could essentially summarize how you could leverage your CoPrimer technology for other indications, assuming COVID-19 testing decreases throughout the rest of this year?

**Brian L. Brown**
*CFO & Company Secretary*

Yes. This is Brian. I can respond to the first question that you asked. It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in. And the last thing we want to do is provide guidance that we're not confident in. And so that's one thing you'll know going forward is if we're not confident in providing guidance, then we won't provide guidance.

Ex. 76, May 12, 2022 Earnings Call Transcript, at 9-10; AC ¶ 46.

**Plaintiff's Response**:  Undisputed.  However, Plaintiff refers the Court to additional context with respect to this exchange.  The audio recording of the May 12, 2022 Earnings Call Transcript reveals that there were in fact no audio problems with respect to Yi Chen's initial question (or at any other point in the earnings call).  Interestingly, once Yi Chen finished asking the initial question, Dwight Egan waited almost 10 seconds before stating "Okay. We have a little bit of a problem hearing all of the questions that you just answered or that you just asked . . ." and asked him to repeat his question.  *Id.*; *see also* Supp. Uris Decl. Ex. 9 at timestamp 21:35-23:02.  As is evidenced from Dwight Egan and Brown's long silence, followed by Egan's mixing up of

words and request to repeat the question, they appeared to be flustered by Yi Chen's direct question about whether they were already seeing a decline in orders. *Id.*

**X.     FACTORS IDENTIFIED BY THE DEFENDANTS ON MAY 12, 2022 AS CREATING UNCERTAINTY DID NOT NECESSARILY INDICATE AN INCREASE IN LOGIX TEST SALES**

**235.**     Mr. Dwight Egan and Mr. Brown did not believe that the factors set forth in the May 12, 2022 earnings release and on the May 12, 2022 Earnings Call as leading to diminished ability to accurately forecast sales of the Logix test suggested increased COVID infection in the near term, testifying:

> It could go either way. What we were saying is we didn't know what it was going to do and if it was going to be more or less, we couldn't put our finger on it. Hence, we didn't have the level of precision and optical clarity that we wanted to try and predict or forecast it.

Ex. 23, D. Egan Dep. 146:8-15; *see also* Ex. 21, Brown Dep. 142:10-23 (same); *see also* Ex. 27, Houston Dep. 86:13-87:9 (testifying that whether the factors presented suggested more COVID infection going forward "depends on the reader").

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  Both Dwight Egan and Brown were asked specifically about each individual factor and largely gave evasive and non-responsive answers to the questions of whether they would associate each factor with higher levels of COVID infection.  *See* Ex. 23, D. Egan Dep. 145:12-153:25; Ex. 21, Brown Dep. 141:22-146:21.  Dwight Egan testified that he would "potentially" associate "decreased mask mandates" with higher levels of COVID infection. Ex. 23, D. Egan Dep. 146:16-19; Brown Dep. at 144:5-11 ("you would have to ask [Dwight] exactly whether he meant that was a positive or a negative").  He testified that whether he would associate "the continued emergence and spread of new variants" with increased COVID infection "would depend on how virulent the new variant was.  . . . if it ended up being less infectious, in

other words that it doesn't cause serious disease, it would diminish the need for COVID testing . . . ." (ignoring that the factor itself refers to the ***continued*** emergence and ***spread*** of new variants, i.e., variants that ***are*** virulent.). D. Egan Dep. 150:21-151:6; Brown Dep. at 146:10-14 ("**Q.** Are you aware of any variants that emerged and spread that were then followed by reduced levels of COVID testing? **A.** I don't know."); Ex. 20, Benson Dep. 148:7-16 ("I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- ***that goes hand in hand with infection. You can't spread a variant without there being infections***.") (emphasis added). He testified that he would "not necessarily" associate "low vaccinates rates" with higher levels of COVID infection and that it could "go either way". D. Egan Dep. at 153:3-25; Brown Dep. at 146:15-21 ("You would have to ask Dwight who made that statement. You'd have to ask him."). Despite Dwight Egan's attempts to avoid answering the questions directly, he acknowledged (as the evidence shows), that one of Defendants' key messages was, and continued to be, that COVID was not going away and would persist. *Id.* at 155:17-25 (Co-Diagnostics was "emphasizing that th[e] theme [that COVID was not going away] because we're spending a lot of money putting up a new platform for at home and point of care use . . . ." ; 156:13-157:6 ("So when we're making an argument that the COVID is going to be here as a permanent part of our landscape going forward, we're making the argument that the new project that we're investing a lot of shareholder money on is going to be able to . . . diagnose or to screen for COVID specifically. . . it was going to be a long-term viable and important product"). Indeed the persistence of COVID in a post-COVID world is a talking point that the Company, and Dwight Egan, had been pushing since as early as January 2021. *See* Plaintiff's 56.1 Statement ¶52. In fact, the Company cited "vaccine refusal, logistic issues with vaccinating the planet, [and] regular mutations" as factors supporting their message that "COVID

150

will persist in a post-COVID' world". *Id*. Finally, Dwight Egan also testified that such factors *were* associated with increased COVID infection:

> "[w]e're not sitting there thinking [the pandemic is] going to stop. Everything we're hearing and every indication we can see says we've got trouble. *We have vaccinations that are waning*. Vaccinations we start to learn are not lasting maybe as long as they had hoped, and so people have waning immunity from vaccines and we have *new variants at the same time that have escaped immunity*. In other words, the virus is not responding to the vaccine in the way they hoped. And there's lots of different variables going on and the public, there begins as time goes on to be a disconnect between the way the government is talking about what's going on and what the experts are saying and what the American public is willing to do about it, *what changes they are willing to make in their behavior about masks* or going to congregate settings and all of those sorts of things. And some of *these things would exacerbate the number of cases of COVID* that we could experience and some of them might even push it down but it's -- *the general expectation out there is robust and an expectation that it's going to potentially get worse before it gets better*."

Dwight Egan Tr. at 108:14-109:23 (emphasis added).

What's more, this statement is belied by Brown's own public statement. On the May 12, 2022 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, and analyst asked "I just want to be clear on the guidance. I mean *based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022*. . . ." Brown responded "*Yes, you're absolutely right*." Plaintiff's 56.1 Statement ¶53.

Moreover, this statement is inconsistent with the testimony of other witnesses. When asked "Leaving aside any people that at the time may have viewed COVID as a hoax, was it your understanding that the public at large understood wearing masks to be something that was done in order to reduce the transmission of COVID?" Houston testified "I think that's fair, that would be a fair statement." Ex. 27, Houston Tr. at 88:17-25; *see also* Ex. 24, Seth Egan Tr. at 67:20-24 ("where mask mandates were changing, and those would cause, depending on what you want to

151

look at, that when people are no longer taking precautions, that case counts would go up resulting in needing more testing."); Ex. 20, Benson Tr. at 147:2-11 ("**Q.** Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID? **A.** . . . I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the – the risk of infection . . . .").

Houston testified that the continued emergence and spread of new variants is something he would associate with increased levels of COVID infection. Ex. 27, Houston Tr. at 89:2-6.  He also testified that low vaccination rates is something he would associate with increased levels of COVID infection. *Id.* at 89:7-10.

**236.** Mr. Dwight Egan testified that he did not associate reduced mask mandates, the emergence of new variants, or lower vaccination rates with increased levels of COVID infection:

> Whether or not a decrease in mask mandates created more demand for COVID testing or not I think was up in the air. And the same with the emergence of new variants. Variants may have ended up being less transmissible and less infectious because a lot of times as a virus goes through its iterations it gets weaker. . . .
>
> [D]epending on what's going on with low vaccination rates, by this time you've got some degree of herd immunity in the country where people have already had COVID and people have already been vaccinated, so that would have potentially a dampening effect. So bottom line here is these are elements -- these are variables and they are variables of uncertainty and that's what we were trying to communicate in our communication with the shareholders that because of that, and that lack of, you know, of optics and clarity, we're not going to try and guess and give a forecast or speculation as to what it's going to do. We just didn't know.

Ex. 23, D. Egan Dep. 147:2-148:11; *see also id.* 148:23-149:8 ("And our public have certainly shown that they are willing to abandon masks without resulting in massive new explosions of COVID infection. So I would go back to what I said earlier, it could have gone either way. The mask mandate was a national controversy, but not one that would give us a clear signal as to which way this thing was going to go."), 150:25-151:22 ("It would depend on how virulent the new variant was."), 153:6-7 (explaining again low vaccination rates is "not necessarily" associated with

152

higher levels of COVID infection); Greene Decl. ¶ 101, Ex. 100, Email to D. Egan re Rapid Antigen Solutions For Next COVID Variant Surge, dated Apr. 28, 2022 ("With many mask mandates being lifted, Covid-19 cases are up 55% across the U.S.").

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes portions of Dwight Egan's testimony.  For context, Plaintiff notes that Defendants omitted the following relevant language from the above quote: "Variants may have ended up being less transmissible and less infectious because a lot of times as a virus goes through its iterations it gets weaker. Delta and Omicron suggested a little bit of a surprise that this virus wasn't necessarily acting that way."  D. Egan Dep. at 147:6-12.

Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  *See* Response to No. 235.

Moreover, Defendants' citation to Ex. 100 undercuts their position.  The cited language suggests that as a result of "mask mandates being lifted" (i.e., reduced mask mandates), COVID infection *increased*.

237.    Similarly, Mr. Brown testified:

> [T]he decreased mask mandates in the United States doesn't necessarily mean that COVID would spread more, it could be that the spread has decreased and so there was less risk. It could be one side or the other.

Ex. 21, Brown Dep. 142:18-23.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Brown's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  *See* Brown Dep. at 144:5-11 ("you would have to ask [Dwight] exactly whether he meant that was a positive or a negative"); *see also* Response to No. 235.

In particular, this statement is belied by Brown's own public statement. On the May 12, 2022 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-

153

Diagnostics' Head of Corporate Communications) participated, and analyst asked "I just want to be clear on the guidance. I mean *based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022*. . . ." Brown responded "*Yes, you're absolutely right*." Plaintiff's 56.1 Statement ¶53.

238.    Mr. Brown believed that the emergence and spread of COVID variants did not mean there would be increased COVID infection in the short term:

> **Q.** Do you understand the emergence and spread of variants to be a factor that indicates more COVID infection?
>
> . . .
>
> **THE WITNESS:** Again, not necessarily. I mean you don't know so there have been various variants that hit during COVID. Some were more impactful than others. So a variant could spread and you could see a variant that maybe didn't have the same impact that Omicron did. Again, we just didn't know. We didn't know when the next variant would hit and the impact it would have to revenue.

Ex. 21, Brown Dep. 145:5-19.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Brown's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  *See* Brown Dep. at 146:10-14 ("**Q.** Are you aware of any variants that emerged and spread that were then followed by reduced levels of COVID testing? **A.** I don't know."); *see also* Response to No. 235.

In particular, this statement is belied by Brown's own public statement. On the May 12, 2022 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, and analyst asked "I just want to be clear on the guidance. I mean *based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022*. . . ." Brown responded "*Yes, you're absolutely right*." Plaintiff's 56.1 Statement ¶53.

154

**239.**    Mr. Benson, who helped draft the May 12, 2022 earnings release, testified similarly and explained that the factors indicated unpredictability, making it difficult to predict revenue for the ongoing quarter:

> I see these [factors] as just pointing to just the -- more of the -- the unpredictability and the variability about the existence of -- of -- or the persistence of COVID. It was just hard to predict responsibly exactly and accurately, like you said, to accurately forecast what -- what it would be.
>
> And I would say that that's -- again, I would probably just take it -- I would -- I would just take it at face value. It's our ability to accurately forecast through the remainder of the year because of these factors. We're not saying -- taking the position on what these factors specifically -- what effect they're going to have, just that they make it unpredictable. They make it hard to predict.

Ex. 20, Benson Dep. 145:9-23.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Benson's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record. Benson testified that he agreed that the "continued emergence and spread of new variants" is a factor he would associate with more COVID infection going forward. *Id*. at 144:9-18; 147:15-19 (same); 148:7-16 ("I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- *that goes hand in hand with infection. You can't spread a variant without there being infections*.") (emphasis added).  He also testified that "one of the main driving factors behind mask mandates was lowering the [] risk of infection." *Id*. at 147:2-11 ("**Q.** Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID? **A.** . . . I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the – the risk of infection . . . .").  When asked "are low vaccination rates something you that you would associate with high levels of COVID infection?" he answered: "It could."  *Id*. at 148:18-22; *see also* Response to No. 235.

155

**240.** Mr. Benson testified that decreased mask mandates did not necessarily mean an increase in COVID infection:

> I could see [decreased mask mandates leading to more COVID infection] as being possible, but it could also have the inverse effect; right? The -- the decreased mask mandates could be a result of lower infection rates; right? Like, it's -- I can't -- I can't say that one would lead to the other. . . just that is a factor that makes it difficult to predict.

Ex. 20, Benson Dep. 146:17-147:1.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Benson's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record. Benson testified that "one of the main driving factors behind mask mandates was lowering the [] risk of infection." *Id*. at 147:2-11 ("**Q.** Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID? **A.** . . . I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the – the risk of infection . . . ."); *see also* Response to No. 235.

**241.** Mr. Benson also agreed the same is true with regards to lower vaccination rates:

> People getting -- people refusing the vaccine could also be associated with people refusing to test just because of overall COVID fatigue. And so as people are not getting the vaccine, it could be because they're just resisting the whole change through to their lifestyle and then not doing the testing at all anymore.
>
> It's -- it's something that could have an effect either way. We felt like it was significant, but it was significant in an unpredictable way. It was a different world than it was a year before or a quarter before or three quarters before.

Ex. 20, Benson Dep. 150:1-12.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a portion of Benson's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record. When asked "are low vaccination rates something you that you would associate

156

with high levels of COVID infection?" he answered: "It could." *Id*. at 148:18-22; *see also* Response to No. 235.

242.    And while new variants may lead to more infections, Mr. Benson explained that there was unpredictability regarding both when the next variant would emerge and how much it would drive testing:

> Believing that a variant will come isn't necessarily saying we believe that there's going to be a lot of infection or a lot of testing in the future. What it means is -- to me -- and I think this is what Dwight is saying here -- is that we just don't know when. We feel that COVID is still around, but we can't pin the tail on -- you know, on -- on -- on -- on the timing there, on that donkey. Who knows exactly when it's going to happen? We just feel that it's in our future, but who can say when?

Ex. 20, Benson Dep. 147:22-148:6.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Benson's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  Benson testified that he agreed that the "continued emergence and spread of new variants" is a factor he would associate with more COVID infection going forward.  *Id*. at 144:9-18; 147:15-19 (same); 148:7-16 ("I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- ***that goes hand in hand with infection. You can't spread a variant without there being infections***.") (emphasis added).  He also testified that "one of the main driving factors behind mask mandates was lowering the [] risk of infection." *Id*. at 147:2-11 ("**Q.** Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID? **A.** . . . . I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the – the risk of infection . . . ."); *see also* Response to No. 235.

**243.**    Dr. Tsai—a Senior Policy Advisor for the COVID-19 Response Team during the Biden Administration—opined that the May 12, 2022 challenged statements were "consistent with [his] understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022." Ex. 91, Tsai Rpt. ¶ 13; *see also id.* ¶ 45.

**Plaintiff's Response**:  Partially disputed.  Undisputed insofar as this is an accurate quote of a portion of a sentence in Dr. Tsai's report.  Disputed insofar as this statement mischaracterizes Dr. Tsai's opinion.  In ¶ 13 of his report, Dr. Tsai stated that his opinion was limited to "Co-Diagnostics' statements on May 12, 2022 about its decision not to provide guidance for its Q2 2022 results and the reasons why . . . ." *Id*.  In ¶ 45, Dr. Tsai stated that his opinion was limited to Co-Diagnostics' statements "regarding the uncertainty in forecasting demand for COVID tests". *Id*.  Further disputed to the extent Defendants suggest he was a Senior Policy Advisor for the COVID-19 Response Team for the entirety of the Biden Administration, as opposed to from June 2022 through 2023.  *Id*. ¶ 2.

**244.**    Dr. Tsai testified that a decrease in mask mandates, on its own, cannot be associated with either an increase or decrease in COVID infections. Ex. 29, Tsai Dep. 52:13–54:14 (explaining the impact of decreased mask mandates "depend[s] on the context" because if there low prevalence of disease in communities "then masking may not make a difference" but "if there were COVID cases and active transmission, then it could have an impact"); Ex. 91, Tsai Rpt. ¶¶ 1-5 (setting forth Dr. Tsai's qualifications).

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  When asked "are decreased mask mandates something you would associate with increased COVID infection?" Dr. Tsai testified that "if there were COVID

cases and active transmission, then [decreased mask mandates] could have an impact . . . ."  Ex. 29, Tsai Dep. 52:13-53:7.  Additionally, when asked "[i]n May of 2022, did public health experts generally associate wearing masks as a measure to be used to decrease COVID infection going forward?" he conceded that "[m]ask wearing was part of a suite of behavioral guidance as part of the broader what public health has called a mitigation strategy to the spread of COVID-19.  *Id*. at 54:16-25; *see also id*. at 55:17-20 ("It was part of a suite of public health guidance that was used throughout the pandemic as part of the mitigation strategy."); *see also* Response to No. 235.

**245.**    Dr. Tsai further testified that the ability of mask mandates to reduce COVID infections depends on factors such as the transmissibility of a given variant, the underlying prevalence of COVID cases at a given time, whether individuals follow masking guidance, a community's vaccination rates, and individuals' previous COVID exposure. Ex. 29, Tsai Dep. 53:11–54:10.

**Plaintiff's Response**:  Undisputed insofar as this accurately paraphrases portions of Dr. Tsai's testimony.  For context, Plaintiff notes that this statement says nothing of whether a reasonable investor would associate decreased mask mandates with increased COVID infection.

**246.**    Dr. Tsai also testified that the emergence of new COVID variants, on its own, cannot be associated with either an increase or decrease in COVID infections. *Id.* 56:8–57:11 (explaining that the impact of new variants on COVID infection rates "depend[s] on the specific nature of the variants" because there can be "variants that fizzle away or variants that become variants of concern").

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  When asked "[i]s the continued emergence and spread of new variants something you would associate with increased COVID infection going forward?" Dr.

Tsai testified "[d]epends on the particulars of those variants. You can have variants that fizzle away or variants that then become variants of concern." *Id*. at 56:8-17 (ignoring that the factor itself, and the question, referred to the ***continued*** emergence and ***spread*** of new variants, i.e., variants that ***are*** virulent.); *see also* Ex. 20, Benson Dep. 148:7-16 ("I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- *that goes hand in hand with infection. You can't spread a variant without there being infections*.") (emphasis added); *see also* Response to No. 235.

247.    Dr. Tsai testified that the ability of new variants to increase COVID infections depends on factors such as the binding of the virus to specific receptors, background vaccination rates, whether there is a vaccine targeted to a variant, the amount of diagnoses of a variant, specific treatment for a variant, and state and local public health guidance. *Id.* 56:19-59:5.

**Plaintiff's Response**:  Undisputed insofar as this accurately paraphrases portions of Dr. Tsai's testimony.  For context, Plaintiff notes that this statement says nothing of whether a reasonable investor would associate the emergence and spread of new variants with increased COVID infection.

248.    Dr. Tsai additionally testified that low vaccination rates, on their own, cannot be associated with either an increase or decrease in COVID infections. *Id.* 59:7-60:5 (explaining impact of vaccination rates on COVID infections was "unknowable" in the spring of 2022 because it depended on characteristics of future variants and "[t]here was an imprecise ability to forecast that"); *see also* Ex. 91, Tsai Rpt. ¶ 40 ("Lower vaccine rates do not necessarily result in more COVID infections or more COVID testing.").

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  *See* Response to No. 235.  Plaintiff respectfully refers the

160

Court to Dr. Tsai's complete testimony with respect to this question. Dr. Tsai repeatedly refused to provide a direct answer on this point and attempted to evade the question by raising other variables outside the scope of the questions:

> **Q.** In May of 2022, is persistently low vaccination rates in many parts of the world something you would have associated with increased COVID infection going forward?
> **A.** Unknowable in May 14 of 2022 because it depends on what the future variant in the future would be. There was an imprecise ability to forecast that.
>
> **Q.** I'm not asking about forecasting, I'm just asking generally all other things being equal, are persistently low vaccination rates in many parts of the world something you would have associated with increased COVID infection going forward?
> **A.** But all things can't be held equal because it depends what the future variants might be.
>
> **Q.** Let's suppose in May of 2022 there were high vaccination rates in many parts of the world. In that scenario would you expect more COVID infection going forward as compared to a scenario where there's low vaccination rates in many parts of the world?
> **A.** Depends on what the future variant would be and again, I think as evidence of that, vaccinations aside there was constant monitoring of new variants, public health decisions about what not to approve, a new vaccine targeted to the emergence of new variants, so that truly does depend on what the future variants would be in addition to all the other things I mentioned, including the availability of testing to be able to accurately diagnose whether or not there are more cases, the availability of therapeutics that may be able to treat COVID cases and shorten the duration of symptoms, and then the transmission, behavior of people staying home, are they going to work sick, again, all of these factors come into play. We're thinking about the transmission which is a combination of the biology of the virus, the epidemiology of how it spreads, the policies, regulations, guidance that may be shaping that and then also the available therapeutics that are available to medically -- what we call medical countermeasures.

Moreover, Defendants omit that the citation to ¶ 40 of the Tsai report that "lower vaccine rates do not necessarily result in more COVID infections or more COVID testing" was a specific reference to Figure 5 of the report, which is a handpicked comparison of COVID data related to Connecticut and Georgia. Nowhere in ¶ 40 does Dr. Tsai assert that as a general matter, lower vaccine rates do not result in more COVID infections.

161

**249.** For instance, Dr. Tsai found that Connecticut and Georgia registered a similar number of COVID cases per capita for the week ending May 12, 2022, but providers in Connecticut administered more than twice as many molecular tests per capita, over twice as many molecular tests per COVID case, and about 1.5 times as many vaccine doses per capita, as illustrated below:



**COVID Testing and Vaccination Differed Regionally Connecticut and Georgia**

Ex. 91, Tsai Rpt. ¶ 40, Fig. 5.

**Plaintiff's Response**: Undisputed insofar as the above is an accurate representation of Figure 5 in Dr. Tsai's report. Disputed insofar as Defendants suggest this handpicked example means supports a conclusion that as a general matter, lower vaccine rates do not result in more COVID infections. Indeed, as Defendants and Dr. Tsai conveniently ignore, the data in this chart have a logical explanation in that, as they concede, for the week ending May 12, 2022 "***providers in Connecticut administered more than twice as many molecular tests per capita***". Yet, despite administering only "about 1.5 times as many vaccine doses per capita", Connecticut registered "a similar number of COVID cases per capita" despite administering more than ***2.3 times more*** tests

per capita. The fact that Connecticut registered a similar number of COVID cases per capita (despite administering more than 2.3 times more tests per capita, compared to only 1.5 times more vaccines per capita) suggests that lower vaccine rates **do result** in more COVID infections.

250.    The ability of vaccination rates to decrease COVID infections depends on factors such as characteristics of future variants, vaccines targeted to those variants, public health decisions like people deciding to stay home, availability of therapeutics to treat COVID cases and shorten the duration of symptoms, and the epidemiology of how the virus spreads. Ex. 29, Tsai Dep. 60:7-61:20.

**Plaintiff's Response**:  Undisputed insofar as this accurately paraphrases portions of Dr. Tsai's testimony.   For context, Plaintiff notes that this statement says nothing of whether a reasonable investor would associate low vaccination rates with increased COVID infection.

## XI.    DEFENDANTS BELIEVED FUTURE DEMAND WOULD REMAIN STRONG AS OF MAY 12, 2022

251.    In the spring of 2022, the Company believed there would continue to be strong demand for the Logix test in future, as Mr. Benson testified: "We thought COVID was still going to be driving a large portion of our business for an indeterminate amount of time." Ex. 20, Benson Dep. 164:8-10.

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony.   Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on whether "the Company believed there would continue to be strong demand for the Logix test in future".  Further disputed as "continue to be strong demand for the Logix test" is vague and unsupported by the record given that demand for the Logix test had plummeted even prior to the Class Period.  *See, e.g.,* Plaintiff's 56.1 Statement ¶ 16 (The Company had sales of $3.32 million in February 2022, $2.80 million in March 2022, $1.94 million in April 2022, and

163

May sales, as of May 12, of $574,915); *id.* ¶ 17 (Since the Company began selling its Logix Test, prior to February, March, and April 2022, it had never before experienced back-to-back months with sales below $4 million, let alone back-to-back-to-back months); ¶ 18 (Other than March 2020 (the month in which the Company began selling the Logix Test in earnest), March 2022 and April 2022 represented the second-worst and worst months in terms of sales volume, respectively, for the Company since the Company began selling the Logix Test.).

In the referenced testimony, Benson testified "We believed at this point that -- like I had already testified, at -- at this point here, sales were cyclical. We thought COVID was still going to be driving a large portion of our business for an indeterminate amount of time." *Id.* at 164:6-10. Given that COVID was driving nearly 100% of the Company's sales, stating that they "thought COVID was still going to be driving a large portion of our business" is unremarkable, and not the equivalent of stating he thought there would be "strong demand."

**252.**    On May 12, 2022, Mr. Brown did not believe there was a demand issue with respect to the Logix test:

> Because at the time we didn't [think there was a demand issue], that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time. It was just recently if you think about Q1 which is not that far in the past here, Q1, we had the biggest month in Q1 that we've ever had so the volatility there didn't necessarily lean to a reduction in demand. It felt like more of a change potentially in fluctuation order patterns.

Ex. 21, Brown Dep. 152:18-153:7.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Brown's testimony.  Disputed as this is inconsistent with the record and other testimony.  The evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two".  *See* Response to Nos. 187, 180.  The evidence shows that the statements concerning the company's decision not

164

to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *Id*.

Demand for the Logix test had plummeted by the start of the Class Period. *See, e.g.,* Plaintiff's 56.1 Statement ¶ 16 (The Company had sales of $3.32 million in February 2022, $2.80 million in March 2022, $1.94 million in April 2022, and May sales, as of May 12, of $574,915); *id*. ¶ 17 (Since the Company began selling its Logix Test, prior to February, March, and April 2022, it had never before experienced back-to-back months with sales below $4 million, let alone back-to-back-to-back months); ¶ 18 (Other than March 2020 (the month in which the Company began selling the Logix Test in earnest), March 2022 and April 2022 represented the second-worst and worst months in terms of sales volume, respectively, for the Company since the Company began selling the Logix Test.).

As of May 12, 2022, the Company received 2Q 2022 orders of $2,514,682.30. *Id*., ¶ 11. Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter. *Id*. ¶ 14.

As Brown testified, the only "fluctuations [in the timing of orders]" was the fact that sales had increased in December 2021 and January 2022, before quickly falling back down to record low levels. Ex. 21, Brown Dep. 114:8-115:18. Indeed, Brown conceded that sales were low in February, March, April and the beginning of May 2022. *Id*. As Seth Egan conceded, sales had never been that low for that long. Ex. 24, S. Egan Dep. 65:6-66:3. *See* Responses to Nos. 140, 215. Such an extended period of low sales is not volatility or "fluctuations [in the timing of orders]".

253.    Nor did Mr. Brown see lower sales in February, March, and April of 2022 as inconsistent with that view: "The orders were lower. I don't know that there would be necessarily

you could point to a decline as in a trend per se. There was volatility in when orders were coming in, plain and simple." Ex. 21, Brown Dep. 153:22-154:3.

**Plaintiff's Response**: Disputed as this mischaracterizes the testimony. Brown did not identify any volatility other than the fact that sales had increased in December 2021 and January 2022, before quickly falling back down to record low levels. Ex. 21, Brown Dep. 114:8-115:18. Brown testified that the "timing of orders for the Logix test [were] fluctuating greatly [on or around May 12, 2022]" and when asked "[i]s it fair to describe those fluctuations as a high volume of orders in December of 2021 and January of 2022 and then a lower volume of orders in February, March, April and the beginning of May of 2022?" Brown testified "If you look at the numbers the revenue was lower in those periods that it was in December and January. That's what the numbers tell you." Ex. 21, Brown Dep. 114:8-115:18; *see also* Responses to Nos. 138, 215. As Seth Egan conceded, sales had never been that low for that long. Ex. 24, S. Egan Dep. 65:6-66:3. Such an extended period of low sales is not "volatility."

In fact, prior to brief reprieve provided by the Omicron wave, in a November 10, 2021 email to Dwight Egan, Benson, and Houston, after October 2021 sales of $4,627,158.90 and November sales through November 10, 2021 of $315,824, Brown stated that "[t]hus far in Q4, we have seen slowing sales." Plaintiff's 56.1 Statement ¶20.

The evidence shows that the impetus for the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-Diagnostics was "likely to have a soft quarter, or two". *See* Response to Nos. 187, 180. The evidence shows that the statements concerning the company's decision not to provide guidance on May 12, 2022 were a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *Id*.; *see also* Response to No. 252.

166

**254.**    Mr. Dwight Egan also did not believe that the February, March, and April sales revenues indicated a demand problem for the Logix test:

> We became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be. We were in the middle of a pandemic. We were also coming off of a very rough season in the world and in the country with respect to the Omicron virus and its mutations which were extremely pervasive. So at this point, we're looking at a whole bunch of other data besides just looking at monthly sales results as to what could happen in the future.

Ex. 23, D. Egan Dep. 71:8-23.

**Plaintiff's Response**:  Disputed as this mischaracterizes the testimony.  The context of Dwight Egan's testimony makes clear that he was making an argument that "looking at a monthly sales number, ***even over a quarter***, is not something that we can build in our minds reliable – it's not a reliable model from which to make a prediction of future sales . . ." *Id.* at 55:8-13 (emphasis added).  But this testimony ignores that the Company's historical sales *were* used in order to determine the Company's quarterly guidance.  *See* Response to No. 179.

Rather, as the context of this testimony makes clear, Dwight Egan's argument is that since "we did not make decisions based on one or two or three or four months of activity . . . our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." *Id.* at 204:4-23. While Dwight Egan may very well have had confidence in his Company and its long-term prospects (like any CEO might), it is an admission of recklessness. Given that sales of the Logix Test, the sole material source of Co-Diagnostics' revenue, had in fact plummeted by the start of the Class Period, Defendants had an obligation to disclose that they were seeing a significant decline in orders, regardless of whether their "view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of myopic view on a couple of quarters." *Id*.  Defendants' disclosure obligations

under the Exchange Act do not turn on what they thought "investors ought to focus more on". Rather, as the Court previously held, "it was misleading to describe the situation as 'fluctuations' or to disclose the company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." MTD Order at 5.

Indeed, Dwight Egan even conceded that any expectations he had for a potential resurgence in sales was not until the *fall and winter* of 2022. *id.* at 183:4-184:21 (testifying that, with respect to any sizable fluctuations in order patters at this time "[t]he company had a very strong first quarter so here we're reporting the second quarter. So again, we're looking at the having a little bit more long-term view than you're encouraging here with respect to what the prospects are. There's enough going on in terms of our not having a clear view of the future to not want to predict it. So Brian's characterizing is sizable fluctuations in order patterns. I would have tended to look at it in the context of the entire global landscape of what's going on with COVID, but the fact still remains that we had every expectation that there would be a resurgence come fall and winter."); *id.* at 127:17-128:22 (testifying that, with respect to any sizable fluctuations in order patterns at this time "a month or a quarter did not a year make. Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up. So that's the kind of expectation we were focusing on, not a near-term situation with respect to our sales orders . . .").

Further disputed to the extent Defendants suggest that whether the fact that sales had plummeted was required to be disclosed turns on "what could happen in the future".  D. Egan Dep. 71:22-23.

## XII.    MARKET REACTION TO THE MAY 12, 2022 EARNINGS RELEASE

**255.**    On May 13, 2022, the price of Co-Diagnostics' common stock increased $0.59, from a closing price of $3.96 per share on May 12, 2022 to close at $4.55 per share on May 13, 2022. *See* Greene Decl. ¶ 91, Ex. 90, Co-Diagnostics Stock Price History for May 12, 2022 through August 12, 2022, Yahoo!Finance; *see also* AC ¶¶ 8, 58.

**Plaintiff's Response**:  Undisputed.

**256.**    Analyst commentary and news coverage shows that the market perceived the challenged statements and the cessation of guidance by Co-Diagnostics as negative news and as an indication of a likely decline in future revenue and earnings related to COVID-19 products. *See* Greene Decl. ¶ 93, Ex. 92, Expert Report of Vinita Juneja, Ph.D., dated Nov. 20, 2024 ("Juneja Rpt.") ¶ 17; *id.* ¶ 29, Ex. 28, Deposition of Vinita Juneja, Ph.D. ("Juneja Dep.") 48:6-16.

**Plaintiff's Response**:  Partially disputed.  With respect to commentary and news coverage regarding the market's perception of "the challenged statements", this statement is vague and non-specific.  Without citation to specific challenged statements or reactions to specific statements, Plaintiff has no basis to agree or disagree.

Disputed to the extent Defendants suggest that the challenged statements constituted a full disclosure of the truth that Plaintiff alleges Defendants failed to disclose.  "Dr. Juneja does not present any economic evidence inconsistent with Plaintiff's claim that Defendants were aware of, and failed to disclose, a precipitous decline in demand for the Logix Smart Test at the time of the alleged misstatements."  Ex. 95, Coffman Reply Rep. ¶7.  "Furthermore, Dr. Juneja does not dispute that Co-Diagnostics disclosed information that revealed the relevant truth when they issued

their Q2 2022 earnings after market close on August 11, 2022." *Id*. "Nor does she analyze whether the market price fell by a statistically significant amount on August 12, 2022 or whether it is causally connected to the alleged misrepresentations and/or omissions." *Id*.

Additionally, as explained by Mr. Coffman:

At most, Dr. Juneja asserts that Defendants dampened market expectations to some degree by no longer providing revenue guidance as a result of uncertainty in demand for the Company's COVID-19 test, and that this was perceived negatively by the market and analysts at the time. Dr. Juneja states that "ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance." That is true, and such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period. But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth.

*Id*. ¶8.

Disputed as to Defendants' characterization of Dr. Juneja's cited testimony, which is also inconsistent with the record. In the cited testimony, Dr. Juneja testified that "[w]hat we see is that the analysts are hearing a suspension of guidance and then commenting as they do as is shown in paragraph 20 of my report and change their earnings estimates for the year in Table 1 of my report and then discussed in paragraph 22, and that indicates that there is a general decline in expectations by informed market participants for Co-Diagnostics' sales and profitability for 2022." Ex. 28 at 47:23-48:16. In paragraph 20 of her report, Dr. Juneja wrote: "Though the Defendants did not state that they anticipated lower COVID-19 related revenues in 2Q 2022, the commentary by analysts shows that they understood that to be the likely outcome. Below is a list of quotes by the Co-Diagnostics analysts commenting on the ending of guidance and their outlook regarding the demand for COVID-19 testing products and its impact on CODX sales in 2022 and beyond[.]" Ex. 92 ¶20. The cited quotes do not support her statement. She cites an H.C. Wainwright quote that "Of note, management did not provide quarterly sales guidance at this time due to uncertainties

170

related to COVID-19 testing demand. We continue to project a gradually decreasing demand for COVID-19 testing in the coming quarters." *Id.* But she ignores that H.C. Wainwright is simply "***continuing*** to project gradually decreasing demand for COVID-19 testing in the coming quarters"—reiterating what they were *already* doing. So too with Sidoti: "The company did not provide guidance for 2Q:22 due to uncertainties around order timing. ***We continue to expect some demand*** for Covid-19 test will continue throughout 2022 due to continued outbreaks of new variants." *Id.* (emphasis added).

Moreover, as shown in Table 1 of her report (¶ 21), analysts generally *did not* understand Defendants' statements as an indication of a likely decline in future revenue. Juneja Rep. ¶ 20 (arguing that "the commentary by analysts shows that they understood [lower COVID-19 related revenues in 2Q 2022] to be the likely outcome.") Indeed, her own Table 1 shows that ***H.C. Wainwright's and Sidoti's Q2 2022 revenue estimates remained unchanged following the May 12, 2022 earnings call***. *Id.* Sidoti's Q3 and Q4 2022 estimates also remained unchanged, while H.C. Wainwright's Q3+Q4 2022 estimates were revised downward by a mere 8.1%. *Id.*

Following the August 11, 2022 disclosure, analysts stated that while they had expected testing to eventually slow, the drop in revenue was far faster and more substantial than they had anticipated. Ex. 94, Coffman Rep. ¶70.

**257.** Analyst reports from H.C. Wainwright, Sidoti, and Litchfield covering the May 12, 2022 earnings release commented as follows:

**H.C. Wainwright**

**Top and bottom-line beat in 1Q22.** . . . We note that revenue primarily comprised sales of the Logix] test. Of note, management did not provide quarterly sales guidance at this time due to uncertainties related to COVID-19 testing demand. We continue to project a gradually decreasing demand for COVID- 19 testing in the coming quarters.

Ex. 79, H.C. Wainwright May 2022 Report, at 1 (emphasis in original); *see also* Ex. 92, Juneja

Rpt. ¶ 20.

**Litchfield**

**CODX beats 1Q22 Consensus but drops forward guidance** . . . The current Western strategy of 'living with COVID' and no national strategy of testing and monitoring means that, sales of tests are likely to rise and fall and become a lagging indicator of the virus. This inserts enough variability to hamper precise forecasts. We believe the company made the right decision to cease its usual quarterly guidance. Our only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside. . . . The company ceased providing quarterly guidance due to Western changes that make testing, a matter of choice.

Ex. 80, Litchfield May 2022 Report, at 1,4 (emphasis in original); *see also* Ex. 92, Juneja Rpt. ¶

20.

**Sidoti**

**1Q:22 Results Exceed Expectations; Expect Earnings To Decline In 2022, As Covid Cases Level Off, Before Rebounding In 2023 With Release Of Point-Of-Care System** . . . . The company did not provide guidance for 2Q:22 due to uncertainties around order timing. We continue to expect some demand for Covid-19 test will continue throughout 2022 due to continued outbreaks of new variants. . . . March-quarter revenue grew 13% year over year on increased demand for Covid-19 testing, due to the emergence of the Omicron variant. . . . We think the need for some screening will continue in the next several quarters as new COVID-19 variants emerge. Though net income should slow the remainder of 2022, as Covid-19 testing levels off and R&D spending increases, we expect sales and earnings to rebound in 2023 with the launch of the new point-of-care system.

Ex. 78, Sidoti May 2022 Report, at 1-2 (emphasis in original); *see also* Ex. 92, Juneja Rpt. ¶ 20.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes portions of the referenced analyst reports.  Disputed to the extent Defendants suggest these quotes support Statement No. 256.  As explained in Response No. 256, the analyst reports largely reflect that, following the May 12, 2022 earnings call, analysts continued to project gradually decreasing demand.  *See* Response to No. 256.  Moreover, nothing in the analyst commentary suggests that

was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth. *Id*.

258.    Following the May 12, 2022 earnings announcement and the decision to suspend guidance, none of the analysts revised his forecasts upwards for the next fiscal quarter or for the two remaining quarters of 2022 even though Co-Diagnostics reported 1Q 2022 revenues and earnings above analyst estimates. Ex. 92, Juneja Rpt. ¶¶ 21-23; *see also* Ex. 28, Juneja Dep. 42:16-44:14; 46:6-14.

**Plaintiff's Response**: Undisputed that following the May 12, 2022 earnings announcement and earnings call none of the referenced analysts revised his forecasts upwards for the next fiscal quarter or for the two remaining quarters of 2022.  Plaintiff notes for context that in every quarter of 2021, and the first quarter of 2022, Co-Diagnostics had earnings above analyst estimates. *See* Ex. 93, Juneja Reply Report ¶39.

259.    H.C. Wainwright decreased its earnings per share ("EPS") estimate for 2Q 2022 by $0.01 and decreased its estimates for 3Q and 4Q 2022 ESP by $0.06. *See* Ex. 79, H.C. Wainwright May 2022 Report; Ex. 92, Juneja Rpt. ¶¶ 21-22.

**Plaintiff's Response**:  Undisputed.

260.    Similarly, Litchfield decreased its estimates for 2Q 2022 EPS by $0.07 and for 3Q 2022 and 4Q 2022 EPS by $0.20, and it decreased its estimate for 2Q22 sales by $3 million. *See* Ex. 80, Litchfield May 2022 Report; Ex. 92, Juneja Rpt. ¶ 22.

**Plaintiff's Response**:  Undisputed, with the clarification that "for 3Q 2022 and 4Q 2022 EPS by $0.20" refers to both quarters combined.

261.    Both H.C. Wainwright and Litchfield also decreased their estimates for 3Q and 4Q 2022 sales, with H.C. Wainwright reducing its estimate for 3Q and 4Q sales by $3 million, and

Litchfield reducing its estimate for 3Q and 4Q by $10 million. *See* Ex. 79, H.C. Wainwright May Report; Ex. 80, Litchfield May Report; Ex. 92, Juneja Rpt. ¶¶ 21-22.

**Plaintiff's Response**:  Undisputed, with the clarification that "for 3Q and 4Q" refers to both 3Q and 4Q combined. For additional context, H.C. Wainwright did not reduce its Q2 2022 sales estimate. More specifically, H.C. Wainwright lowered its Q3 2022 sales estimate from $19m to $18m, and Q4 2022 from $18m to $16m. Additionally, Sidoti did not reduce its 2Q 2022 sales estimate, or its 3Q or 4Q 2022 sales estimates.

262.   Sidoti left its EPS and sales estimates for the remainder of 2022 unchanged. *See* Ex. 78, Sidoti May 2022 Report; *see also* Juneja Rpt. ¶¶ 21-22.

**Plaintiff's Response**:  Undisputed.

263.   Dr. Juneja opined that this economic evidence shows that the market understood the challenged statements as negative news:

> While Plaintiff alleges that the above statements misled investors and caused the price of Co-Diagnostics stock to be inflated, a review of analyst commentary and news stories shows that the market perceived the Alleged Misrepresentations, in conjunction with the cessation of guidance by the Defendants, to be negative news and interpreted it as indicating a likely decline in future revenues and earnings related to COVID-19 products.
>
> . . . .
>
> [C]easing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance. A review of analyst commentary and revisions in analyst estimates demonstrate that analysts took the Company's statement removing guidance to heart and revised their outlook down accordingly. This is inconsistent with Plaintiff's claim that the Alleged Misrepresentations artificially inflated Co-Diagnostics' stock price.

Ex. 92, Juneja Rpt. ¶¶ 17, 29; *see also* ¶¶ 18-23.

> I think that there are a number of factors that go into this and what we see is that on average and individually for some of the analysts, they adjust down not just their second quarter but their third and fourth quarter 2022 numbers. So while the timing may have been uncertain, they are responding to this announcement as negative news in terms of 2022 earnings.

174

Ex. 28, Juneja Dep. 43:9-19.

**Plaintiff's Response**:  Partially disputed.  Undisputed insofar as the above accurately quotes portions of Dr. Juneja's Report and testimony.  With respect to commentary and news coverage regarding the market's perception of "the challenged statements", this statement is vague and non-specific.  Without citation to specific challenged statements or reactions to specific statements, Plaintiff has no basis to agree or disagree.

Additionally, as explained by Mr. Coffman:

At most, Dr. Juneja asserts that Defendants dampened market expectations to some degree by no longer providing revenue guidance as a result of uncertainty in demand for the Company's COVID-19 test, and that this was perceived negatively by the market and analysts at the time.  Dr. Juneja states that "ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance."   That is true, and such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period. But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth.

*Id.* ¶8.

Moreover, as explained in Response No. 256, the analyst reports largely reflect that, following the May 12, 2022 earnings call, analysts continued to project gradually decreasing demand.  *See* Response to No. 257.  Moreover, nothing in the analyst commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth.  *Id.*

Additional, Juneja's cited testimony about analysts "adjust[ing] not just their second quarter but their third and fourth quarter 2022 numbers" is vague, and inconsistent with the evidence. As context, this testimony was in response to the following question: "so in paragraph 20 of your report you state, "Though the defendants did not state that they anticipated lower

COVID-19 related revenues in the second quarter of 2022, the commentary by analysts shows that they understood that to be the likely outcome." Don't you think that if analysts understood that to be the likely outcome, they would have adjusted their second quarter 2022 revenue estimates downward?" Ex. 28, Juneja Dep. 42:21-43:7.  Indeed, as shown in her own Table 1 (Ex. 92, ¶21), neither Sidoti nor H.C. Wainwright adjusted their Q2 2022 sales estimates downward.

264.    Plaintiff's economic expert, Mr. Coffman, did not dispute that the challenged statements were understood by the market as bad news. *See* Greene Decl. ¶ 96, Ex. 95, Reply Report of Chad Coffman, dated January 10, 2025 ("Coffman Reply") ¶ 8 ("Dr. Juneja states that 'ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance.' That is true, and such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period.").

**Plaintiff's Response**:  Partially disputed.  Mr. Coffman specifically did not dispute that "***ceasing to provide quarterly guidance*** was interpreted by the market as a ***generic disclosure of bad news indicating a likely decrease in future earnings performance***." (emphasis added). *Id*. Moreover, "such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period." *Id*.  "But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth." *Id*.

265.    Neither Mr. Coffman's merits reports (filed November 20, 2024 and January 10, 2025), nor his class certification report (filed July 25, 2024) opines at any point on the challenged statements' alleged price impact on May 13, 2022. *See generally* Ex. 94, Initial Coffman Rpt.; Ex. 95, Coffman Reply; Dkt. #58-1.

**Plaintiff's Response**:  Disputed. Mr. Coffman does opine that the impact of the challenged statements is $2.08 of artificial inflation per share, which is the amount the share price would have dropped had Defendants had spoken truthfully on May 12, 2022.  *See, e.g.,* Ex. 94 ¶19.

### XIII.  ON AUGUST 11, 2022, CO-DIAGNOSTICS ANNOUNCES DISAPPOINTING 2Q 2022 FINANCIAL RESULTS AND SEVERAL OTHER PIECES OF BAD NEWS

266.    On August 11, 2022, after the market closed, Co-Diagnostics issued a press release that disclosed its Q2 2022 financial results (the "August 11, 2022 Press Release"), and filed a Form 8-K with the SEC attaching that press release. *See* Ex. 17, August 11, 2022 8-K; AC ¶ 56.

**Plaintiff's Response**:  Undisputed.

267.    Also on August 11, 2022, after the market closed, Co-Diagnostics held a conference call with investors and analysts to discuss the 2Q 2022 earnings release, share prepared remarks, and answer questions. AC ¶¶ 56-57; Ex. 77, August 11 Earnings Call Transcript.

**Plaintiff's Response**:  Undisputed.

268.    The August 11 Press Release announced Co-Diagnostics' full-quarter financial results for the second quarter of 2022. *See* Ex. 17, August 11, 2022 8-K.

**Plaintiff's Response**:  Undisputed.

269.    The full-quarter financial results for Q2 2022 that were announced on August 11, 2022, incorporated far more sales than existed as of May 12, 2022—specifically, all of the additional sales, revenue, and other financial information from May 13, 2022 through June 30, 2022. *See* Ex. 93, Juneja Reply ¶¶ 15-19, 21-22.

**Plaintiff's Response**:  Partially disputed.  Plaintiff does not dispute that by definition, full-quarter financial results for Q2 2022 includes sales that did not exist as of May 12, 2022.  Disputed to the extent Defendants inaccurately imply that Plaintiff alleged the misstatements were misleading for failing to disclose intra-quarter sales numbers as of May 12, 2022. What Plaintiff

alleged, the Court upheld, and Plaintiff's expert analyzed, is the claim that Defendants misrepresented and concealed the fact that demand for its COVID-19 test had already plummeted as of May 12, 2022. *See* AC ¶48; ECF No. 42 at 4-5 (upholding allegations that statements were misleading for failing to disclose "that demand was already declining rapidly"); Ex. 94 Coffman Rep. at ¶12 ("The Complaint alleges that Defendants misled investors by reassuring them that demand for the Logix Smart Test remained strong; and by withdrawing their quarterly guidance, citing an inability to accurately forecast sales and demand for the Company's primary revenue-generating product, when in reality, Defendants publicly admitted to tracking demand daily and were already aware sales had substantially declined compared to recent quarters."). As the Court acknowledged, the alleged misrepresentations implicated "both current demand and risks to future demand." ECF No. 42 at 4.

Indeed, the Complaint ¶48 explicitly states that the alleged misrepresentations were false or misleading because they failed to disclose that "demand for [Co-Diagnostics'] Logix Smart COVID-19 Test had already plummeted, and . . . Defendants' positive statements about the demand for its Logix Smart COVID-19 Test lacked a reasonable basis." And Plaintiff's expert, Mr. Coffman, repeatedly, emphatically testified that in his analyses, "I'm not suggesting that [Defendants] had to disclose a particular sales figure. I'm assuming they had to reveal that there was substantially reduced demand, and that [the test's] sales were far less than what [the Company] had seen in prior quarters." Ex. 22 Coffman Dep. at 69:25-70:4.

Contrary to Defendants' implication in this statement, the nature of the allegedly concealed information (that test demand was significantly down by the start of the Class Period) did not change throughout the period. As Mr. Coffman explained, "plaintiffs are directly alleging that there had been a substantial decline in demand, and the obvious foreseeable consequence of that

if you are not going to disclose it before the next earnings announcement is for that earnings announcement to reflect that lower demand that the company had been facing, and so when they announced far worse than expected revenue and profitability for Q2 2022 and directly attributed that worse than expected performance to lower demand for this specific product, to me, that provides a clear causal link between -- that that is the relevant truth that had been concealed by the alleged misstatements. So the lower demand was reflected in the quarterly performance, and I think that's borne out by the analyst commentary following that disclosure as well, that the negative value relevant news was that there was lower demand for their flagship product and the results reflected that." *Id*. at 52:25-53:19

270.    The August 11, 2022 Press Release reported revenue of $5.0 million for Q2 2022, down from $27.4 million during the prior year period. *See id.*, at 4; AC ¶ 56.

**Plaintiff's Response**:  Undisputed.

271.    In the August 11, 2022 Press Release, Mr. Dwight Egan is quoted as stating:

Our second quarter results reflect lower volumes for our Logix Smart COVID-19 Test, which we believe is primarily the result of a reduction in mandated testing in travel and public venues and in government funding for testing programs. The Company has initiatives underway intended to actively address these pressures, such as growing our international distributor network, expanding our infectious disease testing menu including monkeypox, and most importantly, our upcoming at-home/point-of-care testing platform. We anticipate these initiatives will potentially be bolstered by recurring COVID surges as we have previously experienced.

Ex. 13, May 12, 2022 8-K, at 4; AC ¶ 56.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes the August 11, 2022 Press Release.  Defendants appear to have mistakenly cited to the May 12, 2022 press release.

272.    Mr. Dwight Egan testified, with respect to the August 11, 2022 Press Release, that:

We would have been looking at the entire landscape, what was being promulgated by the experts in the country in terms of mandates and what the status was of

government funding, and it would have been a cumulative sense of what we thought the results were primarily affected by.

Ex. 23, D. Egan Dep. 173:2-9.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes Dwight Egan's testimony.   For additional context, Plaintiff notes that this was Dwight Egan's response to the following question: ". . . I'm just trying to get an understanding of how did you or anyone at the company come to the conclusion that the second quarter results reflected a reduction in mandated testing in travel and public venues and in government funding for testing programs?" *Id*. at 172:16-173:9.

273.    S&P Global issued a transcript of the August 11, 2022 Earnings Call, in which Mr. Dwight Egan is quoted as stating:

> We believe that several factors contributed to the second quarter's results, including a reduction in mandated testing for travel and public venues, a reduction in public funding assistance for testing programs and an increase in overall weariness for the disruption to daily life after a multiyear pandemic, specifically the Omicron variant earlier this year. This dramatic shift in testing behavior was widely felt across the diagnostics industry. Experts believe other waves of COVID variants are all but inevitable. However, the timing and severity are impossible to predict with every new variant, including the possibility of immune escape as variants and sub-variants by predominance.
>
> In the US alone, we are still seeing around 100,000 new COVID cases reported per day, over 6,000 COVID-related hospital admissions and nearly 400 deaths. All evidence to-date points to a resilient, mutable virus with no indication it will go away, and then that we will be living with it for years to come. Trends observed since the original outbreak of the virus suggests a buildup in the number of positive cases increasing as we move further into the fall and winter seasons. While there is significant public resistance against future lockdowns and other mitigation measures, we are confident that reliable, accurate testing will remain a critical line of defense to identify and counter future waves of the virus.
>
> While we were presented with a number of challenges during the quarter, with those challenges came opportunities for growth and for growing our unique portfolio of innovative testing products and devices, prominent among those is the progress we have made in the Co-Dx PCR Home testing platform. The company has assembled a world-class team of developers, scientists and engineers working tirelessly to

bring this platform to market with significant breakthroughs and optimizations that have been made since formally initiating its development.

Ex. 77, August 11, 2022 Earnings Call Transcript, at 4-5.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Dwight

Egan's statements on the August 11, 2022 Earnings Call.

274.    Mr. Dwight Egan testified, with respect to the August 11 Earnings Call, that:

Those factors cited at the first quarter are still at play and additional factors can be at play as well. So taken all together, cumulatively, Brian is simply pointing out that there's a lot of variability. That doesn't necessarily exclude variability that was cited in the first quarter and it continued to restrict our near-term visibility.

Ex. 23, D. Egan Dep. 180:8-17.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of

Dwight Egan's testimony.  For context, this was part of Dwight Egan's answer to a series

of questions noting that while Defendants made similar statements on August 11, 2022

regarding "variability in [their] operating environment [that] has restricted [their] near-term

visibility", they did not cite to "decreased mask mandated in the United States, continued

emergence and spread of new variants and persistently low vaccination rates as factors that

were impacting visibility".  *Id*. at 178:12-181:9.

275.    The August 11 Earnings Call included the following exchange between James

Sidoti and Mr. Dwight Egan:

**James Philip Sidoti**
*Sidoti & Company, LLC*

Do you have any sense on what the inventory levels are at your distributors? Do you think the second quarter was a quarter where distributors let inventory levels come down as demand declined? And do you think that they're at historically low levels at this point and likely to restock? Or do you think that they have enough inventory on hand from the current level of demand?

**Dwight H. Egan**

*Chairman, CEO & President*

[Great question and], of course, one that we keep a close eye on every day. And we certainly saw the -- as the second quarter progressed, the falloff and we've cited the reasons we think that falloff occurred in terms of public funding of testing initiatives and just the swaging of the pressure put on by Omicron. But because it's not going to go away, we're just going to have to see where it normalizes. And we have a very broad distribution base in over 50 countries and with a lot of distributors and some very powerful labs and distributors. So to the extent COVID reasserts itself as we believe it probably will and presents itself with additional surges. I think we could expect that our company would be the beneficiary of that phenomenon. But we're not -- we don't have optics on it. And so we're not giving guidance as to what level or timing of the surges may obtain.

Ex. 77, August 11, 2022 Earnings Call Transcript at 8-9; *see also* AC ¶ 57.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes the S&P Global transcript of the August 11, 2022 Earnings Call. However the phrase "Great question and" does not appear in the transcript, and Defendants have not cited any other source for that language.

276.    Mr. Dwight Egan testified that in his answer to Sidoti's question *supra* ¶ 275, he was referring to "the inventory levels that the company has"—which makes sense since Co-Diagnostics did not have any visibility into the inventory levels of its customers. Ex. 23, D. Egan Dep. 59:11-62:16; *see also* Ex. 24, S. Egan Dep. 72:9-12, 76:4-7.

**Plaintiff's Response**: Undisputed to the extent his answer refers to inventory levels. However, that given there are not actually any references to the Company's inventory in the quoted language, the only logical conclusion, particularly given the context of the question (which asks about distributor inventory levels and demand) and full answer, is that when Dwight Egan stated "we keep a close eye on [it] every day" he was referring to demand for the Logix test.

With respect to Dwight Egan and Seth Egan's testimony that they did not have visibility into their customers' inventory levels, Plaintiff does not dispute that this was their testimony and does not have any other basis to agree or disagree with this portion of the statement.

182

**277.** The August 11, 2022 Earnings Call also included the following exchange between James Sidoti, an analyst for Sidoti, and Mr. Dwight Egan regarding, in part, federal funding:

**James Sidoti**
*Sidoti & Co., LLC*

And then last one for me. Are you aware of any budget proposals that will restore government funding in 2022 for COVID testing?

**Dwight H. Egan**
*Chief Executive Officer & Director, Co-Diagnostics, Inc.*

I'm not really aware of that, and I'm not really counting on the government driving it. The government has not been, in many respects, it's not been the big driver of what we've done for the last 2.5 years. And we haven't been a company that's come out and said, yes, the government just bought a whole boatload of our tests. We have serviced more private oriented market and an international market. And I believe that that as you see this thing progress the people-- you'll see people take it upon themselves to protect their own families and their own [selves], both in an at-home environment, and businesses and in their business situation, restaurants. There's a whole lot of things that companies are going to need to do in terms of operationalizing testing so that they don't end up being on the negligent side of liability when either customers or employees become sick and potentially die.

So we think that there's some refinement that's going to go on in society and in our culture. Right now, we sort of are in an environment where there's just reckless abandon. There's very little testing and in the main compared to what we saw earlier, and we have virtually no mitigation measures when it comes to masks or social distancing or other things. So you're going to see, I think, a whole new world emerge of how this actually normalizes over time to give us maximum protection as individuals. And the burden is going to shift largely from governmental mandates and policies to individuals and individual families and individual businesses that have to manage their own environment as it relates to COVID and other infectious diseases.

Ex. 77, August 11, 2022 Earnings Call Transcript, at 9-10.

**Plaintiff's Response**: Undisputed insofar as this accurately quotes a potion of an exchange between Sidoti and Dwight Egan on the August 11, 2022 Earnings Call. Disputed as Dwight Egan's quoted response is inconsistent with other testimony and the record. Dwight Egan's statement that "[t]he government has not been, in many respects, it's not been the big driver of what we've done for the last 2.5 years" is inconsistent with other of his own statements. Indeed,

183

in the August 11, 2022 Press Release, Dwight Egan was quoted as stating that "[o]ur second quarter results reflect lower volumes for our Logix Smart™ COVID-19 Test, which we believe is *primarily* the result of a reduction in mandated testing in travel and public venues *and in government funding for testing programs*." Ex. 17 at Page 5 of 10 (emphasis added). As one of two primary factors that caused revenues to decline nearly *82%*, it strains credulity to assert that "[t]he government has not been, in many respects, it's not been the big driver of what we've done . . . ."

Moreover, with respect to Dwight Egan's statement that "we haven't been a company that's come out and said, yes, the government just bought a whole big boatload of our tests" did not state that government funding was not a "big driver" for Co-Diagnostics; indeed, even if most of Co-Diagnostics' sales serviced a "more private oriented market", that in no way means that government funding didn't contribute to such sales. Indeed, on the March 24, 2022 Earnings Call, Dwight Egan admitted that government funding "certainly . . . enhance[s] sales" and its expiration "would have an impact on us". Ex. 75 at Page 14 of 16.

278.    In response to a question about expectations for COVID-19 testing, Mr. Dwight Egan expressed his continued belief that surges of COVID-19 infections would persist:

> And so as we head into the fall and into the winter, I think our expectations are confident with what we're hearing from others that the -- including government officials that we could be heading for some additional stress on the whole system as we head into the winter months. COVID is going to be with us for many, many years to come. It certainly appears to be reversing from a pandemic to an endemic environment, but endemic is not good.

> And we think as the country learns how to operationalize testing where people are, to some degree, taking it upon themselves to take care of their own COVID-safe environments that we'll see testing continue to persist and be one of the primary parts of sort of a trimodal defense against the COVID, which includes testing, vaccinations and therapeutics. So testing is not going to go away. We're going to have to see where it lands in sort of an endemic environment.

*Id.* at 8.

184

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes a portion of Dwight Egan's statements on the August 11, 2022 Earnings call, with the clarification that the quoted language does not refer to "surges of COVID-19 infections" as referenced in the statement.

279.    During the August 11 Earnings Call, Co-Diagnostics' executives indicated that they had not yet commenced clinical trials for the Company's at-home PCR platform but that they "look[ed] forward to announcing [that] soon." *Id.* at 5. This represented a departure from the May 12, 2022 Earnings Call in which executives stated that the Company was on track to begin clinical trials by August 2022. Ex. 76, May 12, 2022 Earnings Call Transcript, at 5.

**Plaintiff's Response**:  Undisputed that Dwight Egan stated on the August 11 Earnings call: "It is important to remember the high standard to which we hold ourselves and our goal of delivering products that are high quality, reliable and durable, and we look forward to announcing soon that we have commenced clinical trials. This device and platform is transformative and it will fundamentally alter the way the world thinks about at-home and point-of-care testing. However, time lines for such innovations are always fluid."  Ex. 77 at Page 6 of 13.

Disputed to the extent Defendants imply that this represented material, confounding information, or a significant "departure" from the first quarter statements that the trial would begin "by our second quarter earnings call this August".  *See* Ex. 76 at 5; Ex. 94, Coffman Rep. ¶¶ 17, 76 (Mr. Coffman noting that as part of his analysis he specifically evaluated whether there was information released contemporaneous with the corrective information that is arguably unrelated to the corrective information (*i.e.*, confounding information) potentially impacted the stock price and did not identify any confounding information); Ex. 22 Coffman Dep. at 72:20-73:1 ("I certainly considered whether there was any confounding news and came to the conclusion there was not any value relevant confounding news so there was no need to disaggregate."); *Id*. at 73:21-

74:4 ("when I reviewed the details of those disclosures or of those company statements, I did not find there to be any negative value relevant information that would have substantially contributed to the stock price decline observed on that day, and that was backed up by what the analyst reports disclosed or that were -- that were published in the wake of that earnings announcement supported that conclusion.").

Additionally, Defendants omit other relevant context. Also on the August 11, 2022 Earnings Call, Dwight Egan answered a question from an analyst regarding the timing of clinical trials as follows:

> **James Philip Sidoti**, *Sidoti & Company, LLC - Research Analyst*:
>
> And you said you expect to commence clinical trials soon from the new point-of-care device. Can you give us a little more color on what that means? Is that something you expect in weeks or months or longer than that?
>
> **Dwight H. Egan,** *Co-Diagnostics, Inc. - Chairman, CEO & President*:
>
> We expect that they will commence when we're highly confident that we have the very best product that we can present to the FDA. ***And we're -- basically in the last mile of delivery here in terms of being ready for our clinical trials***. And we're not trying to put out a product that would just be good enough to get through EUA. We're trying to put out a product that we have total confidence in as we put it out into the market. And so we're really doing some terrific optimizations of the product. . . .
>
> . . . We'll have it into clinical trials, as we said, ***in the near term***, but we're not going to put it in before we are totally confident in how it's performing and how much we've been able to optimize it. ***But it's not far away***.

Supp. Uris Decl., Ex. 1 at 7 (emphasis added).

In fact, while Dr. Juneja asserted in her reply report that "th[e] delay in the clinical trials was important to the market", with respect to Dwight Egan's statement that they were "basically in the last mile of delivery here in terms of being ready for our clinical trials" she "[did not] remember that was part of the conference call". Ex. 28 Juneja Dep. at 82:17-84:1. Moreover, she could not recall whether any analyst other than Sidoti even mentioned the delay following the August 12, 2022 earnings call. *Id*. at 84:3-7.

186

Moreover, in her reply report, Dr. Juneja cited just two analyst reports in support of her assertion that "th[e] delay was important to the market." Ex. 93, ¶29. The first is the August 15, 2022 Litchfield report in which Litchfield *did not even mention the delay*. Rather, Litchfield just noted that "[t]he company is advancing the development [of the device] . . . [and w]e expect it to enter clinical trials soon . . . ." Ex. 84.  The second is the August 12, 2022 Sidoti report, notably titled "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target to $5 (From $14)" Ex. 82; *see also* Ex. 28, Juneja Dep. at 84:16-24.  Sidoti stated that it was lowering 2022 revenue and EPS estimates solely "[b]ased on the 2Q:22 results and factoring in the lack of visibility regarding near-term demand for COVID-19 testing," (Greene Decl. Ex. 82), indicating that the clinical trial news was not value-relevant.

**280.**    When asked about it by an analyst on the August 11 Earnings Call, Mr. Dwight Egan did not provide an updated timeline for the clinical trials for the at-home PCR platform:

> We expect that they will commence when we're highly confident that we have the very best product that we can present to the FDA. . . . We'll have it into clinical trials, as we said, in the near term, but we're not going to put it in before we are totally confident in how it's performing and how much we've been able to optimize it. But it's not far away.

Ex. 77, August 11, 2022 Earnings Call Transcript, at 9.

**Plaintiff's Response**:  Undisputed insofar as this accurately quotes excerpts of Dwight Egan's statements on the August 11 Earnings call.  Notably, Defendants specifically omit relevant context: "We expect that they will commence when we're highly confident that we have the very best product that we can present to the FDA. ***And we're -- basically in the last mile of delivery here in terms of being ready for our clinical trials***. And we're not trying to put out a product that would just be good enough to get through EUA. We're trying to put out a product that we have

187

total confidence in as we put it out into the market. And so we're really doing some terrific optimizations of the product. . . ." *Id*. (emphasis added); *see also* Response to No. 279.

## XIV.    MARKET REACTION TO THE AUGUST 11, 2022 EARNINGS RELEASE

**281.**    On August 12, 2022, the price of Co-Diagnostics' common stock declined $1.98, from a closing price of $6.46 per share on August 11, 2022 to close at $4.48 per share on August 12, 2022. *See* Ex. 90, Co-Diagnostics Stock Price History for May 12, 2022 through August 12, 2022, Yahoo!Finance; *see also* AC ¶¶ 8, 58.

**Plaintiff's Response**:  Undisputed.

**282.**    The analyst report published by Sidoti & Company on August 12, 2022, titled "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target To $5 (From $14); Downgrade Rating To NEUTRAL (From BUY)," stated:

> June-quarter sales declined to $5 million . . . as demand for COVID-19 tests declined much faster than expected due to the easing of mandates for travel and lower government funding. . . . Management reported that a trial for PCR point-of-care systems is due to start once the system performance is optimized; we expect approval in 2H:23. The company did not provide 3Q:22 guidance, citing uncertain order timing. Based on 2Q:22 results and the lack of visibility regarding demand for COVID-19 testing, we lower 2022 estimates to $44 million (from $77 million) of revenue and $0.17 (from $0.45) EPS. . . .
>
> . . .
>
> Based on the 2Q:22 results and factoring in the lack of visibility regarding near-term demand for COVID-19 testing, we lower our 2022 revenue and EPS estimate to $44 million (from $77 million) and $0.17 (from $0.45).
>
> . . .
>
> The company is now optimizing the [at-home PCR platform] so that it can be used to diagnose a wider variety of infectious diseases. These changes have delayed the start of the clinical trial a few months, and we now expect 2H:23 approval.
>
> . . .

> We lower our price target to $5 (from $14) and downgrade CODX to NEUTRAL (from BUY). We now expect net income will slow for the remainder of 2022 and in 2023 as COVID-19 testing levels off . . . .

Ex. 82, Sidoti August 2022 Report, at 1-2. The report also noted "delays in new product approvals" as a "key risk" for the Company. *Id.* at 2.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes excerpts from the referenced report.  For additional context, Plaintiff notes that Defendants omitted the following bolded language "June-quarter sales declined to $5 million from $27 million in 2Q:21, **$11 million below our estimate,** as demand for COVID-19 tests declined much faster than expected . . ." *Id.*

Disputed insofar as Defendants suggest that this report contains any material confounding information or is evidence of material confounding information in Defendants' August 11, 2022 earnings announcement.  *See* Response to No. 279; *see also* ¶¶69-74 (analysis of significant contents of the August 11, 2022 earnings release including analyst and media commentary supporting his opinion that the value-relevant content of the earnings release was the corrective information).  Further disputed to the extent Defendants suggest that Sidoti's lowered 2022 estimates is confounding information.  *See* Ex. 22, Coffman Dep. at 73:5-11 ("I viewed the earnings results themselves . . . as reflecting the lower demand that the company was facing, that plaintiffs are alleging that substantial lower demand should have been disclosed earlier, and so I clearly viewed those elements as corrective and not confounding.").  If Defendants had disclosed what Plaintiff alleges was concealed on May 12, 2022—that sales had "already cratered" (ECF No. 42 at 5) or that current sales were down so substantially as to signal future demand concerns—then investors would have anticipated the dramatically lower sales reported at the end of the quarter and the reduced demand going forward.  As Mr. Coffman explained at his deposition, "[T]he market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods as

189

well regardless about whether [Defendants] explicitly said anything about future periods or not."
Ex. 22 Coffman Dep. 76:17-23; *id.* at 82:13-18 ("an earlier disclosure of lower demand would have caused the market to update its expectations not only for the current quarter but for further quarters. The market is not naive. It's going to evaluate what that information means for future periods as well.).

283.    The analyst report published by Maxim Group on August 12, 2022, titled "Easing of Testing Mandates and Lack of Government Funding for Testing Programs Result in Revenue Decline," stated:

> The decline in COVID-19 testing was largely expected, though more rapid than projected, likely owing to the reduction in mandated travel testing and government funding for PCR testing programs. In our view, these factors not only contract the overall COVID-19 testing market, but also favor cheaper and more convenient, though less effective, rapid tests. . . . [W]e are reducing 2022 revenue estimate to $48.8M, from $60.3M and our 2023 revenue estimate to $33.6M, from $63.4M, and we are reducing our expense estimates for 2022 to $42.0M, from $56.3M and for 2023 to $41.7M, from $60.2M. We have also removed COVID-19 mass testing revenues from our model post-2022.

Ex. 81, Maxim August 2022 Report, at 1.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes excerpts of the referenced report.  Disputed to the extent Defendants suggest that Maxim Group's lowered revenue estimates is confounding information.  *See* Ex. 22, Coffman Dep. at 73:5-11 ("I viewed the earnings results themselves . . . as reflecting the lower demand that the company was facing, that plaintiffs are alleging that substantial lower demand should have been disclosed earlier, and so I clearly viewed those elements as corrective and not confounding.").  If Defendants had disclosed what Plaintiff alleges was concealed on May 12, 2022—that sales had "already cratered" (ECF No. 42 at 5) or that current sales were down so substantially as to signal future demand concerns— then investors would have anticipated the dramatically lower sales reported at the end of the quarter

190

and the reduced demand going forward. As Mr. Coffman explained at his deposition, "[T]he market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods as well regardless about whether [Defendants] explicitly said anything about future periods or not." Ex. 22 Coffman Dep. 76:17-23; *id.* at 82:13-18 ("an earlier disclosure of lower demand would have caused the market to update its expectations not only for the current quarter but for further quarters. The market is not naive. It's going to evaluate what that information means for future periods as well.).

284.    The analyst report published by Litchfield on August 15, 2022 stated that it was "[l]owering estimates and price target post 2Q22 results - Reiterate Buy rating and $25 PT, down from $29" and noted that "the company provided no guidance." Greene Decl. ¶ 85, Ex. 84, Litchfield Hills Research, "Lowering estimates and price target post 2Q22 results - Reiterate Buy rating and $25 PT, down from $29," August 15, 2022, at 1.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes excerpts of the referenced report. For context, Plaintiff notes that the cited language that "the company provided no guidance" is not in the opening summary of the report, but rather on page 4 of the report under the standard Section Header "Guidance and Financial Forecasts".

Disputed to the extent Defendants suggest that Litchfield's lowered estimates is confounding information. *See* Ex. 22, Coffman Dep. at 73:5-11 ("I viewed the earnings results themselves . . . as reflecting the lower demand that the company was facing, that plaintiffs are alleging that substantial lower demand should have been disclosed earlier, and so I clearly viewed those elements as corrective and not confounding."). If Defendants had disclosed what Plaintiff alleges was concealed on May 12, 2022—that sales had "already cratered" (ECF No. 42 at 5) or

that current sales were down so substantially as to signal future demand concerns—then investors would have anticipated the dramatically lower sales reported at the end of the quarter and the reduced demand going forward.  As Mr. Coffman explained at his deposition, "[T]he market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods as well regardless about whether [Defendants] explicitly said anything about future periods or not." Ex. 22 Coffman Dep. 76:17-23; *id.* at 82:13-18 ("an earlier disclosure of lower demand would have caused the market to update its expectations not only for the current quarter but for further quarters. The market is not naive. It's going to evaluate what that information means for future periods as well.).

Moreover, while the Company did not provide formal guidance, on the August 11, 2022 earnings call the Company indicated that they did not anticipate demand to dramatically rise in upcoming quarters, stating that the Company believed its "orders will continue to come in at a measured pace." Ex. 77 at Page 11 of 13.

**285.**   The analyst report published by H.C. Wainwright on August 15, 2022 stated: "Management noted that the decline in revenue was due to reduction in mandated testing and in government funding for testing programs. . . . We continue to project a gradually decreasing demand for COVID-19 testing, and we believe the company's top-line revenue may fluctuate in the coming quarters"; and "Co-Diagnostics continues to develop the at-home/point-of-care PCR diagnostic platform Co-Dx based on its proprietary CoPrimer technology." Greene Decl. ¶ 84, Ex. 83, H.C. Wainwright, "2Q22 Financial Results Reported; Reiterate Buy; Lowering PT to $9," August 15, 2022, ("H.C. Wainwright August 2022 Report"), at 1-2.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes excerpts from the referenced report. Disputed insofar as Defendants suggest that this report contains any material confounding information. *See generally* Responses to Nos. 282-285.

286.    The H.C. Wainwright report also noted the updates to CDC testing guidance, published just hours before the August 11 earnings call

> **CDC updates COVID-19 guidance.** On August 11, 2022, Centers for Disease Control and Prevention (CDC) updated its COVID-19 guidance. Specifically, it no longer recommends screening testing of asymptomatic people without known exposure, and it no longer recommends routine testing in K-12 schools unless COVID-19 community transmission levels are high in the area. Unvaccinated students are no longer required to get tested frequently in order to attend school. Testing is now recommended after exposure to COVID-19 regardless of vaccination status. We note that more students are going back to school this fall for physical attendance vs. online course, which may drive testing volume. With this updated CDC guidance, the net effect on the testing volume for the coming months is not clear at this juncture, in our view. Potentially lower testing demand may result in lower number of orders for COVID-19 test kits in the coming quarters.

Ex. 83, H.C. Wainwright August 2022 Report, at 1.

**Plaintiff's Response**:    Undisputed insofar as this accurately quotes a portion of the referenced report.  Disputed insofar as Defendants suggest that this report contains any material confounding information or is evidence of material confounding information in Defendants' August 11, 2022 earnings announcement.  As Defendants concede, the updated guidance from the CDC was published "hours" prior to the August 11 earnings call. For additional context, Plaintiff also notes that the quoted language itself states that "the net effect on the testing volume for the coming months is not clear at this juncture." *Id*.

287.    Plaintiff's economic expert, Mr. Coffman, did not identify any "confounding information" (i.e., "information arguably unrelated to the corrective information" that might have impacted the stock price on August 12, 2022) and did not make any attempt to disaggregate the

193

impact of any confounding information on Co-Diagnostics' stock price on August 12, 2022. Ex. 94, Initial Coffman Rpt. ¶ 76.

**Plaintiff's Response**:  Undisputed as to the portion of this statement that Mr. Coffman did not identify any confounding information.  Disputed as to the remainder, which mischaracterizes the record and Mr. Coffman's definition of "confounding information," and implies that Mr. Coffman did not assess whether there was any confounding information.  To the contrary, Mr. Coffman specifically evaluated whether there was any value-relevant information released contemporaneous with the corrective information that is arguably unrelated to the corrective information (*i.e.*, confounding information) that potentially impacted the stock price and did not identify any confounding information. Ex. 94, Coffman Rep. ¶¶ 17, 76; s*ee also* Ex. 22 Coffman Dep. at 72:20-73:1 ("I certainly considered whether there was any confounding news and came to the conclusion there was not any value relevant confounding news so there was no need to disaggregate."); *Id*. at 73:21-74:4 ("when I reviewed the details of those disclosures or of those company statements, I did not find there to be any negative value relevant information that would have substantially contributed to the stock price decline observed on that day, and that was backed up by what the analyst reports disclosed or that were -- that were published in the wake of that earnings announcement supported that conclusion."); *id*. at 32:2-11 (indicating that information is truly confounding and contemporaneous when "there's no way to separate it even on an [intra]day basis of some kind and it's an economically meaningful piece of information such that it is reasonable to conclude that it was value relevant and there's some evidence it was value relevant to the market, and to the extent it's moving – it would move the market in the same direction as the corrective information.").

**288.** Mr. Coffman's reports do not include any analysis or explanation as to why he concluded that there was no confounding information on August 11, 2022. *See id.* (stating only his conclusion that that he "considered and analyzed the degree to which information arguably unrelated to the corrective information . . . potentially impacted the stock price over the two day trading period [and] did not identify any confounding information"); *see generally* Ex. 95, Coffman Reply.

**Plaintiff's Response**: Disputed. Mr. Coffman specifically evaluated whether there was information released contemporaneous with the corrective information that is arguably unrelated to the corrective information (*i.e.*, confounding information) that potentially impacted the stock price and did not identify any confounding information. Ex. 94, Coffman Rep. ¶¶ 17, 76; *id*. at ¶¶69-74 (analysis of significant contents of the August 11, 2022 earnings release including analyst and media commentary supporting his opinion that the value-relevant content of the earnings release was the corrective information); *id*. at ¶¶49-53 (explanation of economic and valuation principles supporting his opinions that the value-relevant content of the earnings release was the corrective information); *id*. at ¶¶42-48 (discussing pre-disclosure analyst reports supporting opinion that sales and demand of Logix test was key to share price valuation); s*ee also* Ex. 22 Coffman Dep. at 72:20-73:1 ("I certainly considered whether there was any confounding news and came to the conclusion there was not any value relevant confounding news so there was no need to disaggregate."); *Id*. at 73:21-74:4 ("when I reviewed the details of those disclosures or of those company statements, I did not find there to be any negative value relevant information that would have substantially contributed to the stock price decline observed on that day, and that was backed up by what the analyst reports disclosed or that were -- that were published in the wake of that earnings announcement supported that conclusion.").

Moreover, Defendants had the opportunity to question Mr. Coffman regarding his conclusion that there was not any value relevant confounding news. At his deposition Mr. Coffman thoroughly explained why none of the information raised by Defendants' counsel was value relevant confounding news. *See* Ex. 22 Coffman Dep. 72:20-87:4.

**289.** Dr. Juneja's Reply Report identified and discussed several potentially confounding news items on August 11, 2022, including, announcement of Co-Diagnostics' financial results for the *full quarter*, which included the second half of Q2 2022 and were based on subsequent market developments; forward-looking uncertainty in light of the changed market conditions in August; and the delayed timeline for clinical trials of the at-home testing platform. *See* Ex. 93, Juneja Reply ¶¶ 8, 12-31.

**Plaintiff's Response**: Undisputed that Dr. Juneja identified in her Reply Report what *she* asserted to be confounding information. Disputed as the items identified by Dr. Juneja are not negative value relevant confounding information. For additional context, the scheduling order in this case did not provide for "rebuttal" or additional reply from Mr. Coffman in response to her Reply Report. *See* ECF No. 49 at 5(c); *see also* Ex. 22 Coffman Dep. 35:16-19 ("I have also been asked for my views on the rebuttal reports issued or the rebuttal report issued by Dr. Juneja. So I have views on that and am prepared to testify about that."); *see also* Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Exclude the Testimony of Chad Coffman, filed concurrently herewith.

In any event, with respect to the "announcement of Co-Diagnostics' financial results for the full quarter", many of Dr. Juneja's assertions flow from her unduly narrow and inaccurate view that Plaintiff alleged the misstatements were misleading for "*failing to disclose intra-quarter sales numbers as of May 12, 2022*." Ex. 93 Reply Report at ¶7 (emphasis added); *see also*, Ex. 92 at

196

¶28 (similar). What Plaintiff alleged, the Court upheld, and Plaintiff's expert analyzed, is the claim that Defendants misrepresented and concealed the fact that demand for its COVID-19 test had already plummeted as of May 12, 2022. *See* Compl. ¶48; ECF No. 42 at 4-5 (upholding allegations that statements were misleading for failing to disclose "that demand was already declining rapidly"); Ex. 94 Coffman Rep. at ¶12 ("The Complaint alleges that Defendants misled investors by reassuring them that demand for the Logix Smart Test remained strong; and by withdrawing their quarterly guidance, citing an inability to accurately forecast sales and demand for the Company's primary revenue-generating product, when in reality, Defendants publicly admitted to tracking demand daily and were already aware sales had substantially declined compared to recent quarters."). As the Court acknowledged, the alleged misrepresentations implicated "both current demand and risks to future demand." ECF No. 42 at 4.

Moreover, with respect to the "announcement of Co-Diagnostics' financial results for the full quarter . . . based on subsequent market developments", as Mr. Coffman explained at his deposition, "my understanding is the company didn't regularly provide intra-quarter sales numbers. So I don't understand plaintiff's claim to be that they didn't disclose a particular sales number at a particular point in time intra-quarter. It's that they characterized demand in the way they did or -- and failed to disclose the substantial decline in demand that they were observing. So it's the claim -- I don't understand the claim to be that they should have disclosed a particular sales number at a particular point in time. My understanding of the claim is that they misled the market by essentially describing there as being not a substantial demand decline already occurring.". Ex. 22, Coffman Dep. 51:18-52:8; *see also* 51:8-11; 70:2-12 (similar). As Coffman further explained, "plaintiffs are directly alleging that there had been a substantial decline in demand, and the obvious foreseeable consequence of that if you are not going to disclose it before the next earnings

197

announcement is for that earnings announcement to reflect that lower demand that the company had been facing, and so when they announced far worse than expected revenue and profitability for Q2 2022 and directly attributed that worse than expected performance to lower demand for this specific product, to me, that provides a clear causal link between -- that that is the relevant truth that had been concealed by the alleged misstatements. So the lower demand was reflected in the quarterly performance, and I think that's borne out by the analyst commentary following that disclosure as well, that the negative value relevant news was that there was lower demand for their flagship product and the results reflected that." *Id*. at 52:25-53:19; *see also* 65:4-12 ("if sales are down substantially in the current quarter, that includes information about what's already occurred through some portion of the quarter, which is highly relevant and predictive of what is likely to continue happening, and then statements about -- and so even statements about current demand have relevance for the market's assessment of financial performance for future periods.")

With respect to "forward-looking uncertainty in light of the changed market conditions in August" the statement is vague and non-specific. Dr. Juneja contends that the purportedly confounding information on August 11, 2022 is that Defendants expected lower demand for the foreseeable future. Ex. 93 at ¶¶24-28. But that news *is part of the alleged fraud*. If Defendants had disclosed what Plaintiff alleges was concealed on May 12, 2022—that sales had "already cratered" (ECF No. 42 at 5) or that current sales were down so substantially as to signal future demand concerns—then investors would have anticipated the dramatically lower sales reported at the end of the quarter and the reduced demand going forward. As Mr. Coffman aptly explained, "[T]he market upon hearing the demand for the product was substantially lower than expected and had been in prior periods would use that information to update its expectations about future periods

as well regardless about whether [Defendants] explicitly said anything about future periods or not." Ex. 22, Coffman Dep. at 76:17-23.

Moreover, the statements' vague and non-specific reference to unnamed "changed market conditions in August" is inconsistent with the record. Dwight Egan testified that compared to May 12, 2022, as of the August 11, 2022 earnings call, "I suppose [the factors impacting visibility] could have changed *but generally speaking, we're looking at the same overall environment*." Ex. 23 at 180:2-5 (emphasis added).

Additionally, to the extent Defendants are also referring to updated CDC guidelines announced "hours before the August 11 earnings call" (see Statement No. 286), as H.C. Wainwright noted, "With this updated CDC guidance, the net effect on the testing volume for the coming months is not clear at this juncture". *Id*. As such, it was not negative value relevant confounding information. Nor did Defendants even ask Mr. Coffman about this at his deposition.

With respect to "the delayed timeline for clinical trials of the at-home testing platform" as explained in Response to No. 279, on the August 11, 2022 Earnings Call, Dwight Egan stated "*And we're -- basically in the last mile of delivery here in terms of being ready for our clinical trials*". *See generally* Response to No. 279. While Dr. Juneja asserted in her reply report that "th[e] delay in the clinical trials was important to the market", with respect to Dwight Egan's statement that they were "basically in the last mile of delivery here in terms of being ready for our clinical trials" she "[did not] remember that was part of the conference call". Ex. 28 Juneja Dep. at 82:17-84:1. Moreover, she could not recall whether any analyst other than Sidoti even mentioned the delay following the August 12, 2022 earnings call. *Id*. at 84:3-7.

Moreover, in her reply report, Dr. Juneja cited just two analyst reports in support of her assertion that "th[e] delay was important to the market." Ex. 93, ¶29. The first is the August

199

15, 2022 Litchfield report in which Litchfield *did not even mention the delay*.  Rather, Litchfield just noted that "[t]he company is advancing the development [of the device] . . . [and w]e expect it to enter clinical trials soon . . . ."  Ex. 84.  The second is the August 12, 2022 Sidoti report, notably titled "2Q:22 Results Well Below Expectations As Demand For COVID-19 Testing Falls Faster-Than-Expected; Lower Price Target to $5 (From $14)" Ex. 82; *see also* Ex. 28 Juneja Dep. at 84:16-24; *see also* Response to No. 279.  Nor did Defendants even ask Mr. Coffman about this at his deposition.

290.    In Dr. Juneja's Reply Report, she also explained why certain news items constituted confounding information and why Mr. Coffman's analysis needed to account for them, and she opined that Mr. Coffman's failure to do so rendered his opinions on loss causation (and his measures of inflation and damages, which flow from that) fatally flawed and unreliable. *Id.* ¶¶ 8, 12-42, 53, 67-69.

**Plaintiff's Response**:  Undisputed insofar as this provides are generic description of assertions made in Dr. Juneja's Reply Report.  Otherwise disputed. As explained above the items identified by Dr. Juneja are not negative value relevant confounding information.  *See generally* Response to No. 289.  Moreover, this statement is vague and non-specific, citing to over 30 paragraphs without making any providing any specifics in the Statement itself.  *See* Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Exclude the Testimony of Chad Coffman, filed concurrently herewith; *see also* Plaintiff's *Daubert* Motion, ECF No. 105.

As Mr. Coffman explained, "the nature of the concealed information in this matter did not change over the Class Period. . . . at all times during the Class Period, the concealed information was that decreased demand for the Company's flagship product was adversely impacting Co-Diagnostics' revenue and expected revenue." Ex. 94, Coffman Rep. ¶79.  Because the alleged

200

fraud is not premised on the failure to disclose a particular dollar figure of sales on May 12, 2022, the "failure" to adjust the fraudulent inflation based on that sales value is of no import to loss causation or damages. Rather, because the nature of the allegedly concealed information (that test demand was significantly down by the start of the Class Period) did not change throughout the period, there was no reason to adjust the amount of fraudulent inflation in share prices during that time.

As Mr. Coffman testified, "the most economically reliable proxy we have for measuring how much this information mattered to the market is to observe how the stock price reacted when the lower demand was revealed to the market. And my understanding is that the essence of the concealed information didn't change during the class period. It was that there was far lower demand for the product than implied by the company's statements, and that was ultimately revealed at the end of the class period, and the most reliable economic proxy available for what that information was worth is the stock price decline that occurred at that time. So in my view that's the most reasonable economic conclusion to be drawn." Ex. 22 Coffman Dep. 71:7-21.

## XV.    EGAN'S AND BROWN'S STOCK HOLDING INCREASED DURING THE CLASS PERIOD

**291.**    During the Class Period, Mr. Dwight Egan's and Mr. Brown's Co-Diagnostics stock holdings increased, and their only sales were to cover tax withholding obligations in connection with the vesting of certain restricted stock units. *See* Greene Decl. ¶ 17, Ex. 16, Compilation of SEC Forms 4 for D. Egan, dated November 11, 2021 through November 11, 2022; *id.* ¶ 16, Ex. 15, Compilation of SEC Forms 4 for Brown, dated November 11, 2021 through November 11, 2022.

**Plaintiff's Response**:  Undisputed with the clarification that Dwight Egan's and Brown's transactions both represented the vesting of restricted stock units ("RSUs") which vest every 6

months (at a price of $0.00 to the awardee).  *See* Exs. 15, 16.  For additional context, the RSUs that vested during the Class Period for Egan and Brown, represented approximately 83% and 86% respectively of their total holdings. The fact that the RSUs that vested during the Class Period for Egan and Brown represented approximately 83% and 86%, respectively, of their total holdings suggests that they pursued a strategy of cashing out their Co-Dx stock as quickly as possible and minimizing their exposure to Co-Dx stock

Disputed insofar as Defendants' suggest that they used any of their own money to increase their stock holdings.  In fact, these transactions show that Egan and Brown benefitted from the inflated stock price at the time of vesting, as they each simultaneously sold shares (at an inflated price of $4.99) to cover tax withholding obligations in connection with the vesting of RSUs.  *Id.*

In fact, as Dwight Egan testified, in 2022, stock-based compensation was a significant portion of the Company's spend.  Ex. 23 at 221:6-10.

 Dated: May 2, 2025

**KAPLAN FOX & KILSHEIMER LLP**

*/s/  Jason A. Uris*
Frederic S. Fox
Donald R. Hall
Jason A. Uris
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Jason A. Uris, hereby certify that, on May 2, 2025, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM/ECF system which will send electronic notices of the filing to all counsel of record.

/s/ *Jason A. Uris*
Jason A. Uris
