**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br><br>               Defendants. | Case No.: 1:22-cv-06978-AS<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1
STATEMENT OF UNDISPUTED FACTS AND DEFENDANTS' STATEMENT OF
ADDITIONAL UNDISPUTED MATERIAL FACTS THAT PRECLUDE PARTIAL
SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1 of the United States

District Court for the Southern District of New York, and the Court's Individual Practices in Civil

Cases, Defendants Co-Diagnostics, Inc. ("Co-Diagnostics" or the "Company), Dwight H. Egan,

and Brian L. Brown (together, "Defendants") respectfully submit this response to Lead Plaintiff's

Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment

("Plaintiff's Statement of Undisputed Facts") (ECF No. 115).

Defendants provide these responses for purposes of opposing Plaintiff's Motion for Partial

Summary Judgment ("Plaintiff's Motion") (ECF Nos. 112-113) only and not for all purposes in

this action. To the extent Defendants do not deny or dispute a particular fact herein, Defendants do

not thereby concede for any other purposes that any such fact constitutes a material fact, that the

cited evidence is relevant, or that the cited evidence would be admissible at trial.

Further, Defendants object to Plaintiff's Statement of Undisputed Facts on several grounds that apply broadly to many paragraphs in that statement. As an initial matter, Plaintiff's brief in support of partial summary judgment regularly cites to paragraphs in Plaintiff's Statement of Undisputed Facts that do not support its arguments. Defendants accordingly respond or otherwise object to these improper assertions below. Additionally, Plaintiff's summary judgment brief does not cite to paragraphs 5, 32, 33, and 54 in Plaintiff's Statement of Undisputed Facts, reflecting that those statements are not material to Plaintiff's Motion.

Defendants reserve all rights and objections, including but not limited to, relevance, authenticity, privilege, materiality, and admissibility of any materials identified by Plaintiff.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

### I.    The Logix Test Was Co-Diagnostics' Sole Material Source of Revenue

**CLASS REPRESENTATIVE'S PARAGRAPH 1:**

1.    Upon commencing sales of its Logix Smart COVID-19 Test (the "Logix Test") in late February and March of 2020, the test immediately became Co-Dx's sole material source of revenue. Uris Decl. Ex. 1, Dwight Egan Tr. at 47:5-16 (testifying that once Co-Dx started selling the Logix Smart COVID-19 "it amounted to . . . an overwhelming percentage of what we were selling."; "I believe it would be [over 90 percent]."); Uris Decl. Ex. 2, Brown Tr. at 41:7-21 (testifying that in 2021 and 2022 the Logix test "probably accounted for while I was here, probably 95 plus percent of our sales.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 1:**

1.    Defendants admit the statements in paragraph 1.

**CLASS REPRESENTATIVE'S PARAGRAPH 2:**

2.    From the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter. Uris Decl. Ex. 3 (CoDx_00501488).

**DEFENDANTS' RESPONSE TO PARAGRAPH 2:**

2

**2.**      Defendants admit that the Monday.com Quarterly Dashboard[1] cited by Plaintiff reflects at least $20 million in orders for Co-Diagnostics' products each quarter from the first quarter of 2021 through the first quarter of 2022. Defendants, however, note that while Monday.com is used by the sales team at Co-Diagnostics to track orders, along with other information, it was not used by the finance group to determine sales revenue. ECF No. 102-21 (DX 21), Brown Dep. 49:11-25[2] (testifying the sales team uses Monday.com "to keep an eye on the orders," but the finance department uses NetSuite to track and account for sales).

Defendants further note that the undisputed facts show that Co-Diagnostics did not have an expectation of at least $20 million in quarterly revenue. *See* ECF No. 102-20 (DX 20), Benson Dep. 169:13-170:2 (testifying the Company did not have an expected "standard" for quarterly revenue), 172:1-6 ("There isn't, like, a particular standard as far as revenue that we've said, This is what you can expect from Co-Diagnostics as a company on a quarterly basis. It was not a quarterly standard of revenue that we were pointing to as our standard."); *see also* ECF No. 102-23 (DX 23), D. Egan Dep. 69:3-12; ECF No. 102-21 (DX 21), S. Egan Dep. 58:1-4.

**CLASS REPRESENTATIVE'S PARAGRAPH 3:**

**3.**      As early as May 13, 2021, concurrent with announcing its financial results for the quarter ended March 31, 2021, Co-Dx began a practice of offering revenue guidance for the upcoming quarter. Uris Decl. Ex. 4, Benson Tr. at 66:16-19.

---

[1] The Quarterly Dashboard cited by Plaintiff is a compilation of data reflecting sales orders entered into a data management tool called Monday.com. ECF No. 102-24 (DX 24), S. Egan Dep. 41:2-42:1.

[2] Citations to ECF Nos. 102-1 through 103-53 refer to the exhibits ("DX _") attached to the Declaration of Douglas W. Greene filed in support of Defendants' Motion for Summary Judgment. Citations to ECF Nos. 114-1 through 114-25 refer to exhibits ("PX _") attached to the Declaration of Jason A. Uris filed in support of Plaintiff's Motion for Partial Summary Judgment. Citations to "Greene Resp. Decl., Ex. __" refer to exhibits attached to the Declaration of Douglas W. Greene filed concurrently herewith in support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment.

**DEFENDANTS' RESPONSE TO PARAGRAPH 3:**

3.      Defendants admit that Co-Diagnostics provided quarterly revenue guidance for the first time on May 13, 2021 (for 2Q21) and subsequently provided quarterly revenue guidance for the next three quarters (3Q21, 4Q21, and 1Q22). ECF No. 102-6 (DX 6), Form 8-K and attached press release, filed on May 13, 2021; Greene Resp. Decl. Ex. 1, Form 8-K and attached press release, filed on August 12, 2021; Greene Resp. Decl. Ex. 2, Form 8-K and attached press release, filed on November 12, 2021; ECF 114-24 (DX 24), Form 8-K and attached press release filed on March 24, 2022.

Defendants note, however, that the undisputed facts show that Co-Diagnostics did not have a longstanding or typical practice of providing quarterly guidance. In fact, Co-Diagnostics provided quarterly revenue guidance on only the four occasions indicated in the previous paragraph. *See id.; see also* ECF No. 102-23 (DX 23), D. Egan Dep. 80:1-6 ("[O]ur financial reporting in terms of making predictions about the future was a rather recent practice of the company. This wasn't something that went back years.").

**CLASS REPRESENTATIVE'S PARAGRAPH 4:**

4.      These revenue guidance announcements typically occurred approximately halfway through the current quarter. Uris Decl. Ex. 2, Brown Tr. at 43:21-44:13; *see also* Uris Decl. Ex. 5, Houston Tr. at 32:20-33:8 (testifying that earnings releases were released according to the SEC guidelines of when following a quarter close, when they should be released).

**DEFENDANTS' RESPONSE TO PARAGRAPH 4:**

4.      Defendants admit that on three of the four occasions when Co-Diagnostics provided quarterly guidance (2Q21, 3Q21, and 4Q21), it did so near, but prior to, the midpoint of the current quarter. *See* ECF No. 102-6 (DX 6), Form 8-K and attached press release, filed on May 13, 2021; Greene Resp. Decl. Ex. 1, Form 8-K and attached press release, filed on August 12, 2021; Greene

Resp. Decl. Ex. 2, Form 8-K and attached press release, filed on November 12, 2021; *see also* ECF No. 102-27 (DX 27), Houston Dep. 32:20-33:8 (explaining the Company would announce its quarterly earnings according to SEC guidelines, which was generally about four to five weeks into the next quarter). Defendants note, however, that the fourth occasion on which Co-Diagnostics provided quarterly guidance occurred seven days before the end of that quarter (1Q22). ECF 114-24 (DX 24), Form 8-K and attached press release filed on March 24, 2022.

Further, as detailed in response to paragraph 3 above, Defendants note that the undisputed facts show Co-Diagnostics did not have a longstanding or typical practice of providing quarterly guidance.

**CLASS REPRESENTATIVE'S PARAGRAPH 5:**

5.    In a March 8, 2022 email from Andrew Benson (Co-Dx's Head of Corporate Communications) to Dwight Egan, copying Brown, Benson wrote: "I think it's important in our messaging for people to understand we're still very bullish about our future despite the decline in COVID testing." Uris Decl. Ex. 6 (CoDx_00464876); *see also* Uris Decl. Ex. 5, Benson Tr. at 194:1-17 ("it seems here I'm saying it's important that people understand that despite what other companies are saying, despite what other market sentiments are, we're still bullish about our specific future at Co-Diagnostics).

**DEFENDANTS' RESPONSE TO PARAGRAPH 5:**

5.    Defendants admit Plaintiff accurately quotes an email from Mr. Benson and that the Company was optimistic about its future, including on or about March 8, 2022. However, Defendants deny that this statement from March 2022 is material to any claims or defenses in this litigation, as illustrated by the fact that Plaintiff's Motion does not cite to this paragraph. *See* ECF No. 113, Pl.'s Mem. Supp. Partial Summ. J.

**CLASS REPRESENTATIVE'S PARAGRAPH 6:**

6.    The Company's March 24, 2022 release reporting the Company's full year 2021 financial results quoted Defendant Egan as stating: "Looking ahead, we believe that the demand for our COVID-19 tests and other diagnostic products will persist as our reputation has now been established and continues to grow among the diagnostic testing community and organizations

continue to implement COVID-19 testing as part of normal protocol" and provided revenue guidance in the range of $21.0 to $22.0 million for the first quarter of 2022. Uris Decl. Ex. 24 (Co-Diagnostics Form 8-K dated March 24, 2022) at 4.

**DEFENDANTS' RESPONSE TO PARAGRAPH 6:**

**6.** Defendants admit that Plaintiff accurately quotes language contained in Co-Diagnostics'

Form 8-K, dated March 24, 2022. Defendants note that the Company provided this 1Q22 guidance

just seven (7) days before the quarter end. *See supra* ¶ 4.

**II.    The Company Tracked Daily Sales Information[3]**

**CLASS REPRESENTATIVE'S PARAGRAPH 7:**

**7.** On a May 13, 2021 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, Egan stated that they tracked daily demand for their Logix Smart™ COVID-19 Test: "While we observe the daily infection and death counts around the world, we are also, of course, able to monitor the daily influx of demand for our tests . . . ." Uris Decl. Ex. 25 (May 13, 2021 Earnings Call Transcript) at 4.

**DEFENDANTS' RESPONSE TO PARAGRAPH 7:**

**7.** Defendants admits that during the May 13, 2021 earnings call, Mr. Dwight Egan stated that

the Company was "able to monitor the daily influx of demand for our tests." But Defendants object

to Plaintiff's suggestion that these facts (or any others in the case) show that Mr. Dwight Egan or

any other Defendant reviewed or tracked sales of and/or demand for the Logix test (or other Co-

Diagnostics products) on a daily basis in general or at any time in 2022. ECF No. 102-23 (DX 23),

---

[3] Defendants deny this section header's characterization of the facts because the statement is not supported by the evidence. While certain individuals in the Company had access to Monday.com (a software program used to track sales orders), there is no evidence that anyone at the Company tracked orders or completed sales of the Logix test on a daily basis. Mr. Dwight Egan testified that he reviewed sales data within Monday.com "[i]ntermittently." ECF No. 102-23 (DX 23), D. Egan Dep. 49:17-51:19 (testifying he "would look at [Monday.com] from time to time"). Similarly, when asked how often he would review the information in Monday.com, Mr. Brown testified: "I don't know that I could say a frequency per se." ECF No. 102-21 (DX 21), Brown Dep. 50:19-51:3 (testifying he would review the sales data in Monday.com a couple of times throughout the quarter).

D. Egan Dep. 49:17-51:19 (testifying he "would look at [Monday.com] from time to time"); ECF No. 102-21 (DX 21), Brown Dep. 50:19-51:3 (testifying he would review the sales data in Monday.com a couple of times throughout the quarter).

Defendants also object to any suggestion that the facts cited in this paragraph show that, in the spring of 2022, Defendants knew or believed that there was a demand issue with respect to the Logix test or that full-quarter 2Q22 revenue would be low, and Defendants note that the undisputed, material facts establish the opposite. ECF No. 102-21 (DX 21), Brown Dep. 152:21-24 ("Because at the time we didn't [think there was a demand issue], that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time."), 153:22-154:3 (testifying even though "orders were lower," he did not believe "you could point to a decline as in a trend per se"); ECF No. 102-23 (DX 23), D. Egan Dep. 71:8-13 ("We became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be."); ECF No. 102-24 (DX 24), S. Egan Dep. 60:7-19 (testifying February through April 2022 sales numbers did not cause concern); ECF No. 102-20 (DX 20), Benson Dep. 209:2-9 (same). *See also infra* ¶¶ 11, 16, 17.

Further, Defendants also deny that a statement made by Mr. Dwight Egan almost a year before the start of the Class Period is material to the claims in this case or substantiates any Defendant's practices in 2022.

## CLASS REPRESENTATIVE'S PARAGRAPH 8:

**8.** Monday.com is a project management platform that the Company used to keep track of placed orders. Uris Decl. Ex. 8, Seth Egan Tr. at 41:15-24; *see also id.* at 42:10-11 ("my primary way of monitoring the sales orders was through monday.com").

## DEFENDANTS' RESPONSE TO PARAGRAPH 8:

**8.**    Defendants admit that Co-Diagnostics' sales team used Monday.com to keep track of orders. Defendants note, however, that the undisputed facts, as set forth in response to paragraph 7 above, show that neither Mr. Dwight Egan nor Mr. Brown frequently used Monday.com to track sales of the Logix test, or any other of Co-Diagnostics' products. Defendants also note, as set forth in response to paragraph 7 above, that the undisputed facts show that the data in Monday.com as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and does not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶¶ 11, 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 9:**

**9.**    Specifically, the Company had a workspace (or "board") on monday.com titled "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024", that was used to keep track of the company's purchase orders. Uris Decl. Ex. 7 (CoDx_00501485); Uris Decl. Ex. 8, Seth Egan Tr. at 44:21-45:5 ("it's something like Co-Diagnostics' orders, and then it would go into 2021 – 2020, it kind of put the time frame that it was there"); *id*. at 49:5-50:50:11.

**DEFENDANTS' RESPONSE TO PARAGRAPH 9:**

**9.**    Defendants admits that there was a workspace or board accessible on Monday.com titled "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024." Defendants note, however, that the undisputed facts establish that not everyone at the Company had unlimited access to and/or frequently used Monday.com to track purchase orders, and that Mr. Dwight Egan and Mr. Brown in particular did not frequently use Monday.com to track orders. ECF No. 102-24 (DX 24), S. Egan Dep. 43:5-45:25 (S. Egan testifying access to Monday.com depended on permissions granted and was different for different employees), 54:8-17 (S. Egan testifying he did "not always" review Monday.com daily); ECF No. 102-23 (DX 23), D. Egan Dep. 49:17-51:19 (D. Egan testifying he reviewed Monday.com "[i]ntermittently"); ECF No. 102-21 (DX 21), Brown Dep. 50:19-51:3

(Brown testifying he reviewed Monday.com a couple of times throughout the quarter). In fact, Mr. Brown testified that he was unfamiliar with the spreadsheet titled "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024." ECF No. 102-21 (DX 21), Brown Dep. 53:8-55:11 (testifying to same).

Defendants also note that, as set forth in response to paragraph 7, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶¶ 11, 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 10:**

**10.** The Company had a board on monday.com titled "Quarterly Dashboard" which displayed "monthly and quarterly results." Uris Decl. Ex. 3; Uris Decl. Ex. 8, Seth Egan Tr. at 46:25-47:11; *id.* at 56:5-12. Seth Egan testified that the numbers in the quarterly dashboard "come from . . . the sales orders dashboard . . . ." *id.* at 57:5-10.

**DEFENDANTS' RESPONSE TO PARAGRAPH 10:**

**10.** Defendants admit that there was a board on Monday.com titled "Quarterly Dashboard" that displayed monthly and quarterly orders, based on orders entered into the data management program, and that Mr. Seth Egan testified as indicated. But Defendants note, as detailed by the evidence set forth in response to paragraph 9 above, that the undisputed facts show that not everyone at the Company had unlimited access to and/or frequently used Monday.com to track purchase orders, and that Mr. Dwight Egan and Mr. Brown in particular did not frequently use Monday.com to track orders. Defendants also note that, as set forth in response to paragraph 7, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue

for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra*

¶¶ 11, 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 11:**

11.     As of May 12, 2022, the Company received 2Q 2022 orders of $2,514,682.30. Uris Decl. Exs. 7, 3.

**DEFENDANTS' RESPONSE TO PARAGRAPH 11:**

11.     Defendants admit that, for the second quarter of 2022 as of May 12, 2022, data from

Monday.com reflects orders of about $2.5 million. Defendants, however, deny that sales as of

May 12, 2022 are material, or otherwise relevant to Plaintiff's claims, in part because the

undisputed facts show that the Company never formally tracked or reported intra-quarter sales

numbers and intra-quarter sales were not good indicators of full-quarter performance or broader

demand trends. *See* ECF No. 102-20 (DX 20), Benson Dep. 210:22-23 ("[I]t was never company

policy to provide monthly cadence as we were reporting earnings."); ECF No. 102-21 (DX 21),

Brown Dep. 69:22-24 ("I don't recall exactly what that [midpoint] number was because it wasn't

a reported number."); ECF No. 102-23 (DX 23), D. Egan Dep. 54:15-22 ("What the company's

sales were to date in a quarter was in many respects irrelevant to our view of what might happen

in the quarter because sometimes a quarter came together all in the last month of the quarter or in

the last two or three weeks of the quarter."), 80:17-20 ("You keep asking me about a few months

and up to a mid quarter. That's not how we view things, not how we view things today."), 220:15-

221:4 ("[Brown] didn't want to all of a sudden turn a quarterly revenue guidance environment to

a monthly guidance environment because that's not the way our business worked in terms of how

we brought in sales. It was oftentimes at the very end of the quarter when the quarter became a

solid quarter. He didn't want to all of a sudden have to go off with month-by-month cadencing. He

wanted to keep it as it was which he thought was a more appropriate way to address it and I agree with that."); *see also* ECF No. 108, Defs' 56.1 ¶¶ 135-136, 178-181.

Defendants also note that, as set forth in response to paragraph 7, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶¶ 16.

## CLASS REPRESENTATIVE'S PARAGRAPH 12:

12.    The Company had second quarter 2022 sales of $5,034,092.36. Uris Decl. Ex. 3. By comparison, the Company reported second quarter revenue of $5,023,226. Uris Decl. Ex. 9 (ECF No. 34, Ex. 11) at Page 7 of 8.

## DEFENDANTS' RESPONSE TO PARAGRAPH 12:

12.    Defendants admit that data from Monday.com reflects about $5 million in orders for the second quarter of 2022, but note that Monday.com data shows purchase orders rather than revenue. ECF No. 102-21 (DX 21), Brown Dep. 49:11-25 (testifying the finance department used NetSuite to track sales and revenue).

Defendants also note that, as set forth in response to paragraphs 7 and 11 above, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶ 16.

## CLASS REPRESENTATIVE'S PARAGRAPH 13:

13.    The Company's reported quarterly revenues closely tracked the Company's quarterly sales. *See* Uris Decl. Ex. 2, Brown Tr. at 62:5-17 (testifying the Monday.com sales information "would

not be recognized revenue information so the numbers here may be different than what we reported in our Qs, so I'm more familiar with the Q numbers than I am with these numbers but the numbers are relatively close, I believe."); *compare* Uris Decl. Ex. 3 *with* Consolidated Amended Complaint, ECF No. 31 ¶36; Answer to Consolidated Amended Complaint, ECF No. 44 ¶36.

**DEFENDANTS' RESPONSE TO PARAGRAPH 13:**

13.    Defendants admit the statement in paragraph 13. Defendants again note, however, that, as set forth in response to paragraphs 7 and 11 above, the undisputed facts show that Co-Diagnostics' sales and revenue numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶ 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 14:**

14.    Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter. Uris Decl. Exs. 7, 3.

**DEFENDANTS' RESPONSE TO PARAGRAPH 14:**

14.    Defendants admit that data from Monday.com shows that from 2Q20 through 1Q22, Co-Diagnostics had more than about $5 million in sales by the midpoint of each quarter. Defendants, however, deny that mid-quarter sales are material, or otherwise relevant to Plaintiff's claims, in part because the undisputed facts show that the Company never formally tracked or reported intra-quarter sales numbers and intra-quarter sales were not good indicators of full-quarter performance or broader demand trends, as shown by the evidence set forth in response to paragraph 11 above. Defendants further note that, as set forth in response to paragraphs 7 and 11 above, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be

low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶ 16.

## CLASS REPRESENTATIVE'S PARAGRAPH 15:

15.     In 2Q 2021, as of May 12, 2021, the Company had quarterly sales of approximately $14,333,009.84. Uris Decl. Exs. 7, 3. In 2Q 2020, as of May 12, 2020, the Company had quarterly sales in excess of $14,169,061.95. Uris Decl. Ex. 3.

## DEFENDANTS' RESPONSE TO PARAGRAPH 15:

15.     Defendants admit that data from Monday.com reflects orders in excess of $14 million, as of May 12, 2020, for 2Q20, and about $14 million, as of May 12, 2021, for 2Q21. Defendants, however, again deny that mid-quarter sales are material, or otherwise relevant to Plaintiff's claims, in part because the undisputed facts show that the Company never formally tracked or reported intra-quarter sales numbers and intra-quarter sales were not good indicators of full-quarter performance or broader demand trends, as shown by the evidence set forth in response to paragraph 11 above. Defendants further note that, as set forth in response to paragraphs 7 and 11 above, the undisputed facts show that Co-Diagnostics' sales numbers as of May 12, 2022 did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low. *See also infra* ¶ 16.

## CLASS REPRESENTATIVE'S PARAGRAPH 16:

16.     The Company had sales of $3.32 million in February 2022, $2.80 million in March 2022, $1.94 million in April 2022, and May sales, as of May 12, of $574,915. Uris Decl. Exs. 7, 3.

## DEFENDANTS' RESPONSE TO PARAGRAPH 16:

16.     Defendants admit that data from Monday.com reflects orders of about $3.32 million in February 2022, about $2.8 million in March 2022, and about $1.94 million in April 2022.

Defendants also admit that data from Monday.com reflects orders of about $574,915, as of May 12, 2022, for the second quarter of 2022.

Defendants note, however, that, as set forth in response to paragraphs 7 and 11 above, the undisputed facts show that Co-Diagnostics' sales in February, March, and April 2022, and the quarter-to-date sales as of May 12, 2022, did not signal that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low, and do not show that any Defendant knew or believed that there was a demand issue for the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low.

Defendants further note that the undisputed facts show that increased volatility and uncertainty and lack of visibility (not concern about recent or quarter-to-date sales) were the impetus to the Company's decision not to provide quarterly guidance on May 12, 2022. ECF No. 102-27 (DX 27), Houston Dep. 49:24-50:3 ("I think that spring and that summer were quite a tumultuous time for a lot of our micro and small cap clients."), 33:12-34:17 (testifying the alternatives set forth in the May 4 Lambert email were provided to help Co-Diagnostics determine the best option for providing transparency to investors); ECF No. 102-23 (DX 23), D. Egan Dep. 75:17-23 ("We were watching very carefully and we did develop a viewpoint that it was volatile and that we, as a prudent measure in the context of our investing public, that we did not feel comfortable prognosticating future quarters at this point."), 105:24-106: ("[T]hings were volatile enough that we didn't have a clear sense . . . our view was that it was the prudent thing to do to say that we didn't have the kind of optics and clarity that we would like to have in order to provide guidance."), 185:24-186:3 ("We decided not to give quarterly guidance because we didn't have the ability to predict it. We didn't have those optics. It wasn't clear to us."); ECF No. 102-21 (DX 21), Brown Dep. 96:24-97:18 ("I think anytime as I think about the time during COVID, there was

always volatility and so providing guidance was always a concern. One thing that I want to make sure I do is provide accurate guidance to the Street. I want to provide -- that's my job is to provide accurate information to the Street. And so I would say at every juncture, you know, when we were providing guidance, that was something you had to consider. At this point in time there was even more volatility and more noise in society, et cetera, in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate to the Street and therefore, that's why this discussion would happen."), 117:23-118:14 ("[W]e were five weeks into the quarter and still had seven weeks to go and we could see in recent history, Q1 of '22, Q4 of '21, that we had two weeks we did 14 million dollars . . . . We just didn't know at that time. There wasn't enough information to feel comfortable with the accuracy of providing guidance."); *see also* ECF No. 102-20 (DX 20), Benson Dep. 101:22-102:11 (testifying the concern was not "guiding to a figure and coming up short," but that the Company did not have enough information to comfortably make a prediction regarding quarterly revenue), 99:25-100:9 ("[I]t was an evolving situation with a pandemic, an evolving situation with our company. And to the extent that we had a degree of comfort that we could rely upon -- give responsible predictions that we felt would be, you know, ingenuous and . . . would communicate honestly and fully to the market, we did so. When it got to the point where we felt like it would be irresponsible to do so, we didn't."), 210:22-211:13.

**CLASS REPRESENTATIVE'S PARAGRAPH 17:**

**17.**     Since the Company began selling its Logix Test, prior to February, March, and April 2022, it had never before experienced back-to-back months with sales below $4 million, let alone back-to-back-to-back months. Uris Decl. Ex. 3. Similarly, since the Company began selling its Logix Test, prior to March and April 2022, it had never before experienced back-to-back months with revenue below $3 million. *Id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 17:**

**17.**    Defendants admit that data from Monday.com and compiled on the Quarterly Dashboard reflects that from March 2020 through February 2022, there were no two consecutive months with orders of less than $4 million each month, and no instances of three consecutive months with orders of less than $3 million each month.

Defendants also admit that in late-2021 and 2022, the Company was experiencing increased volatility in sales of the Logix test. ECF No. 102-21 (DX 21), Brown Dep. 71:3-17 ("If I look back, for example, Q4 of 2021, you'll see I think [sales for the Logix test] was [$4 million]. -- I'm not sure what that number is, 4.5, something like that and then it went down to, I think that's 2 or 3.8 and then it spiked up in December. In that period of time in December was approximately most of that revenue happened in about a two-week period of time. So there was volatility, especially Q4-21, Q1-22, Q2-22, there was continued volatility that was maybe more present than it had been in the past, especially on a weekly basis."); ECF No. 102-26 (DX 26), Gundry Dep. 88:8-10 (describing Omicron wave as "an unprecedented surge in demand, which I never expected"); ECF No. 102-20 (DX 20), Benson Dep. 191:23-192:7 ("It was -- it was all over the map. We just didn't know what it -- what it was going to look like. We'd have these wild peaks. I mean, it was . . . frankly, impossible to predict what was going to happen next. Would there be another variant? Would there be another omicron? Would there not? What would that do? I mean, I don't recall anybody specifically stating what percentage of sales they thought would come in after the first week of May in that quarter."); ECF No. 102-12 (DX 112), Weekly Sales Data Compilation (showing that in 1Q21, 2Q21, and 1Q22, about 50% of sales came in just two or three weeks of the quarter, and more than 70% of 4Q21 sales—roughly $14.9 million—came in the final three weeks of that quarter); *see also* ECF No. 108, Defs' 56.1 ¶¶ 125, 129-133.

Defendants note, however, that the undisputed facts show that monthly sales of $3 or $4 million, or two or three consecutive months of sales of $3 or $4 million, was not a benchmark against which Co-Diagnostics evaluated its revenue, or a meaningful threshold below which sales indicated a demand issue for the Logix test. ECF No. 102-21 (DX 21), Brown Dep. 68:16-21 ("[F]our million dollars was not a measuring tool or a measuring guide for us. We had experienced volatility throughout COVID and we continued to experience volatility in Q1 and Q2 of 2022."); *see also id.* 65:19-66:12 (testifying sales in February, March, and April of 2022 were lower than they were in January 2022, but does not recall any concerns at that time); Benson Dep. 44:19-25 ("One month wouldn't necessarily be predictive of [the next] so to see one month with more sales and another month with fewer sales wasn't ever an indication to us that sales [] were dropping or diminishing, just that it was part of the sales cycle."), 209:2-9 (similar); ECF No. 102-24 (DX 24), S. Egan Dep. 60:7-61:1 (similar); ECF No. 102-20 (DX 20), ECF No. 102-26 (DX 26), Gundry Dep. 105:24–106:12 (similar); 102-25 (DX 25), Featherstone Dep. 70:14-23 (similar); ECF No. 108, Defs' 56.1 ¶ 138.

Defendants also note that undisputed testimony from several Co-Diagnostics employees shows that it was common to see a big drop in Logix test sales after a large surge in orders and that this did not concern them or signal a demand problem. *See id.*; *see also* ECF No. 102-21 (DX 21), Brown Dep. 71:19-72:7; ECF No. 102-26, Gundry Dep. 86:20-88:10; *see also* ECF No. 108, Defs' 56.1 ¶ 137.

Defendants further note that the undisputed facts establish that the sales numbers leading up to the Class Period did not signal to Defendants that there was a demand issue for the Logix test or that full-quarter revenue for 2Q22 would be low. Mr. Brown testified that he did not believe there was a demand issue with respect to the Logix test:

17

Because at the time we didn't [think there was a demand issue], that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time. It was just recently if you think about Q1 which is not that far in the past here, Q1, we had the biggest month in Q1 that we've ever had so the volatility there didn't necessarily lean to a reduction in demand. It felt like more of a change potentially in fluctuation order patterns.

ECF No. 102-21 (DX 21), Brown Dep. 152:21-24; *see also id.* 153:22-154:3 (testifying even though "orders were lower," he did not believe "you could point to a decline as in a trend per se"); ECF No. 102-23 (DX 23), D. Egan Dep. 71:8-13 ("We became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be."); ECF No. 102-24 (DX 24), S. Egan Dep. 58:6-17 ("There was never really a defined set of what we'd expect on a monthly basis, and things changed a lot really fast[.]"), 58:22-59:5 (testifying that sales leading up to May 12, 2022 did not concern him: "it really wasn't apparent maybe until later in the year that numbers were lower"), 65:6-24 (testifying he does not recall being concerned about sales in the spring of 2022 because "you could never place any – any real assurances on anything until you got through an entire quarter because things change fast"); ECF No. 108, Defs' 56.1 ¶¶ 137-138. *See also supra* ¶ 11 (setting forth facts showing Co-Diagnostics did not formally track or report intra-quarter sales numbers and intra-quarter sales were not good indicators of full-quarter performance or broader demand trends). *See also supra* ¶ 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 18:**

**18.**    Other than March 2020 (the month in which the Company began selling the Logix Test in earnest), March 2022 and April 2022 represented the second-worst and worst months in terms of sales volume, respectively, for the Company since the Company began selling the Logix Test. Uris Decl. Ex. 3; *see also* Uris Decl. Ex. 8, Seth Egan Tr. at 39:21-22 ("The Logix Smart COVID-19 test really began sales in the April 2020 time period, March and April.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 18:**

18

18.     Defendants admit that the Company began receiving substantial orders for the Logix test in March 2020, and that the Monday.com data shows that since March 2020 and prior to May 2022, monthly orders for the Company's products were lowest in March and April 2022. Also, as detailed in response to paragraph 17 above, Defendants admit that the Company was experiencing increased volatility in sales of the Logix test in late-2021 and early-2022.

Defendants note, however, that, as set forth in response to paragraph 17 above, the undisputed facts show that March 2022 and April 2022 sales numbers did not signal a demand issue for the Logix test or that full-quarter 2Q22 revenue would be low, or show that any Defendant knew or believed that there was a demand issue for the Logix test in the spring of 2022 or that full-quarter 2Q22 revenue would be low. *See also supra* ¶¶ 7, 11, 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 19:**

19.     Other than March 2020 (the month in which the Company began selling the Logix Test in earnest), in only two of the 22 months prior to February 2022 (June 2020 and November 2021) did the Company have monthly revenues below $4 million. Uris Decl. Ex. 3. Similarly, November 2021 was the only such month in which the Company had sales below $3 million. *Id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 19:**

19.     Defendants admit that Monday.com data shows that, since March 2020 and prior to February 2022, monthly orders for the Company's products were less than $4 million only in June 2020 and November 2021. Defendants also admit that during this same time period, Monday.com shows that November 2021 is the only month in which sales were less than $3 million. And Defendants further admit, as detailed in response to paragraph 17 above, that the Company was experiencing increased volatility in sales of the Logix test in late-2021 and early-2022.

Defendants again note, however, that, as set forth in response to paragraph 17 above, the undisputed facts show that February, March, and/or April 2022 sales numbers did not signal a

demand issue for the Logix test or that full-quarter 2Q22 revenue would be low, or show that any

Defendant knew or believed that there was a demand issue for the Logix test in the spring of 2022

or that full-quarter 2Q22 revenue would be low. Indeed, in each of 1Q21, 2Q21, 4Q21, and 1Q22,

just three weeks of the quarter accounted for $12-19 million in sales. ECF No. 103-36 (DX 96),

Quarterly Dashboard; ECF No. 102-112 (DX 112), Weekly Sales Compilation; *see also* Defs' 56.1

¶¶ 123-133, 138; *see also supra* ¶¶ 7, 11, 16.

## CLASS REPRESENTATIVE'S PARAGRAPH 20:

20.    In a November 10, 2021 email to Dwight Egan, Benson, and Houston, after October 2021
sales of $4,627,158.90 and November sales through November 10, 2021 of $315,824, Brown
stated that "[t]hus far in Q4, we have seen slowing sales." Uris Decl. Exs. 7, 3, 10
(LAMBERT0006702).

## DEFENDANTS' RESPONSE TO PARAGRAPH 20:

20.    Defendants admit that Monday.com data reflects $4,627,158.90 in orders for Co-

Diagnostics' products in October 2021, and orders of about $315,824, as of November 10, 2021,

for November 2021. Defendants also admit that Plaintiff selectively quotes a portion of an email

chain, in which Mr. Brown stated on November 10, 2021: "Thus far in Q4, we have seen slowing

sales." Defendants also admit that the cited evidence shows that monthly and intra-quarter sales

numbers were not indicative of full-quarter results, especially in late-2021 and early-2022, as set

forth and shown by the evidence cited in response to paragraphs 7, 11, and 17 above. *See also* ECF

No. 108, Defs' 56.1 ¶¶ 136, 178-181. Indeed, despite relatively lower orders in the first two months

of 4Q21, orders substantially increased in December, with approximately $14.9 million in orders

coming in just the final three weeks, and resulted in full-quarter 4Q21 revenue of $20,401,341.

ECF No. 102-12 (DX 12), 2021 Form 10-K at 20; ECF No. 103-36 (DX 96), Quarterly Dashboard;

ECF No. 102-112 (DX 112), Weekly Sales Compilation; ECF No. 102-23 (DX 23), D. Egan Dep.

199:17-25 ("As it ended up, it was a -- Q4 was a very good quarter for us. This also shows we

wouldn't necessarily have known that, given the first two months of the quarter which we've addressed that phenomenon several times today, that there are lots of spikes and valleys depending on what's going on at any given time."); ECF No. 102-20 (DX 20), Benson Dep. 191:19-22 ("I do know that Q1 was different than Q4. Q4 had a big final month in the -- in the quarter. Q1 had a big initial month in the quarter. It was unpredictable."); *see also* ECF No. 108, Defs' 56.1 ¶ 129.

### III.    Defendants Had Access to, and Monitored, Daily Sales Information[4]

### CLASS REPRESENTATIVE'S PARAGRAPH 21:

21.    Dwight Egan testified that he had access to the "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024" board. Uris Decl. Ex. 1, Dwight Egan Tr. at 49:17-23 ("Q. Did you have access to the page or board on monday.com that reflected the sales orders that were coming into the company? A. I had the ability to go in and look at that page."); *id.* at 50:18-23 (Q. Do you recall if that page was titled Co-Diagnostics Orders 2020, 2021 and so forth? A. I believe – I believe that's correct."); 51:16-19 ("There wasn't any set pattern or schedule that I would check it. I had access to it. I would look at it from time to time."); *see also id.* at 66:16-20 (with respect to the Quarterly Dashboard, testifying "I would have to say I probably looked at this but not regularly and I don't know when during the course of the calendar year I would have looked at it.").

### DEFENDANTS' RESPONSE TO PARAGRAPH 21:

21.    Defendants admit that Plaintiff accurately cites certain testimony from Mr. Dwight Egan's deposition, including that Mr. Dwight Egan testified that he did not regularly review sales data on Monday.com. Again, however, Defendants note that the undisputed facts show that, in the spring of 2022, Mr. Dwight Egan did not know or believe that there was a demand issue for the Logix test or that full-quarter revenue for 2Q22 would be low. ECF No. 102-23 (DX 23), D. Egan Dep. 71:8-13 ("We became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be."), 84:18-85:4 ("We didn't know how the rest of the quarter was going to play out, but we knew it was quite early

---

[4] Defendants deny this section header's characterization of the facts for the reasons set forth and evidence cited in n.3, above.

in the quarter and we were also aware that quarters sometimes don't come together until the very end of the quarter. That is what we had seen on more than once, that just one month of the quarter has a significant amount of contribution to the results for the quarter."); *see also supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 22:**

22.    When asked whether he made any effort to determine whether sales had slowed on or around May 9, 2022, Dwight Egan testified that "[s]ales were what they were." Uris Decl. Ex. 1, Dwight Egan Tr. at 111:11-16; 112:7-15.

**DEFENDANTS' RESPONSE TO PARAGRAPH 22:**

22.    Defendants admit that Plaintiff selectively quotes from Mr. Dwight Egan's deposition transcript. Defendants, however, respectfully refer the Court to the entirety of the transcript, at ECF No. 102-23 (DX 23), for a complete statement of its contents, including Mr. Dwight Egan's repeated testimony that he did not view intra-quarter sales as useful or important in forecasting full-quarter results or understanding broader demand trends for the Logix test. *See, e.g.*, ECF No. 102-23 (DX 23), D. Egan Dep. 54:15-57:05 ("What the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter because sometimes a quarter came together all in the last month of the quarter or in the last two or three weeks of the quarter. . . . There are a lot of variables."), 57:16-23 ("One month does not a quarter make and if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how a quarter might ultimately present itself based on what we see in that short of a time period."), 75:11-23 ("[W]e would not have viewed that our monthly results were indicative of what the future held. A month did not a quarter make. Two months did not necessarily prognosticate what a quarter would be. We were watching very carefully and we did develop a viewpoint that it was volatile and that we, as a prudent measure in the context of our

22

investing public, that we did not feel comfortable prognosticating future quarters at this point."),

84:18-85:4 ("We didn't know how the rest of the quarter was going to play out, but we knew it

was quite early in the quarter and we were also aware that quarters sometimes don't come together

until the very end of the quarter. That is what we had seen on more than once, that just one month

of the quarter has a significant amount of contribution to the results for the quarter."); *see also* ECF

No. 102-20 (DX 20), Benson Dep. 44:19-25 ("One month wouldn't necessarily be predictive of

[the next] so to see one month with more sales and another month with fewer sales wasn't ever an

indication to us that sales [] were dropping or diminishing, just that it was part of the sales cycle.");

*supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 23:**

23.     When asked "[b]y May 12th of 2022 or any time before that, did you notice that orders had been low in February, March, April or the beginning of May of 2022?" Dwight Egan testified "[w]e became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be." Uris Decl. Ex. 1, Dwight Egan Tr. 71:3-13; *see also id.* at 204:4-23 ("Q. Do you know whether there was an overall decline in COVID testing at this time? A. Well, the numbers speak for themselves. I think I've expressed many, many times, we did not make decisions based on one or two or three or four months of activity. If we did that, we would be, you know, have a big time problem with everything we're trying to do in our vision for what we're doing as a company. We're in the middle of a heavy development project that is also centered on COVID but other disease states as well, and our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of a myopic view on a couple of quarters. It's not how we view the world."); *id.* at 208:16-23 ("Q. After the first quarter of 2022, has Co-Diagnostics ever had more than six million dollars in revenue in any quarter? A. I don't know quarter to quarter. Those numbers are what they are. I don't think they are indicative of our potential prognosis for the future of the company. We're developing a major new platform.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 23:**

23.     Defendants admit that Plaintiff selectively quotes from Mr. Dwight Egan's deposition

transcript. Defendants note, however, that the undisputed facts establish that Mr. Egan did not view

sales leading up to or as of May 12, 2022, as indicating that there was a demand issue with respect

to the Logix test in spring 2022 or that full-quarter 2Q22 revenue would be low, as shown by the evidence detailed in response to paragraph 22 above. *See also supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 24:**

24.     Brown testified that he had access to Monday.com. Uris Decl. Ex. 2, Brown Tr. at 50:5-7.

**DEFENDANTS' RESPONSE TO PARAGRAPH 24:**

24.     Defendants admit that Mr. Brown had access to certain information on Monday.com. Defendants note, however, that Mr. Brown also testified that he and the finance department more often used the NetSuite revenue data, and while he was familiar with the Quarterly Dashboard, he was unfamiliar with the Monday.com spreadsheet titled "Co-Diagnostics Orders 2020, 2021, 2022, 2023 & 2024." *Compare* ECF No. 102-21 (DX 21), Brown Dep. 61:17-25 (testifying he was familiar with the Quarterly Dashboard), *with id.* 54:16-55:11 (**Q.** Can you see at the top it says Co-Diagnostics Orders, 2020, 2021, 2022, 2023 & 2024, do you see that? . . . Do you recognize this document? **A.** I do not. **Q.** Does this appear to be the sales order information that was stored on monday.com? **A.** I don't know because it's not familiar to me."); *see also supra* ¶¶ 2, 12.

**CLASS REPRESENTATIVE'S PARAGRAPH 25:**

25.     Brown was the primary person responsible for determining quarterly guidance. *Id.* at 42:5-8.

**DEFENDANTS' RESPONSE TO PARAGRAPH 25:**

25.     Defendants admit the statement in paragraph 25.

**CLASS REPRESENTATIVE'S PARAGRAPH 26:**

26.     Brown used the Company's sales data to calculate the Company's guidance. *Id.* at 50:19-51:3 ("I would generally access [monday.com] close to the end of the quarter to see where we are going to end up in a quarter and then I would look at it as I prepared guidance, I would see what is in the system at that point in time."). Brown testified that in determining quarterly guidance he would look at the quarterly "results that had happened up to that point in time." *Id.* at 45:24-46:13, *id.* at 70:2-6 ("when determining guidance that would be provided, [he] would look at the company's orders to date"); *see also* 57:6-12 (testifying that monday.com had "a bar chart or a

graph, a pie chart, whatever you want to call it. It had a chart on there that showed you what the orders were during a certain period. It was by month."); 61:17-62:4 (testifying that Uris Decl. Ex. 3 (CoDx_00501488 (the Quarterly Dashboard)) is "familiar" and "looks like the dashboard that I would view in monday.com.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 26:**

26.    Defendants admit that Mr. Brown would review current sales data and confer with Mr. Seth Egan regarding the same in preparing quarterly guidance. Defendants note, however, that the undisputed facts establish that intra-quarter sales were not the "key driver" for determining quarterly guidance. Mr. Brown testified that the "key driver" for calculating guidance was historical data and not quarter-to-date sales: "Typically I would . . . look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." ECF No. 102-21 (DX 21), Brown Dep. 44:15-46:13, 47:23-48:2, 50:19-51:3. Further, when asked:

> If the company's midpoint revenue in the second quarter of 2022 was less than half of what it had been in any prior quarter since the beginning of the pandemic, would that have indicated anything to you?

Mr. Brown responded:

> No, not necessarily. If I look back, for example, Q4 of 2021, you'll see I think it was 4. -- I'm not sure what that number is, 4.5, something like that and then it went down to, I think that's 2 or 3.8 and then it spiked up in December. In that period of time in December was approximately most of that revenue happened in about a two-week period of time. So there was volatility, especially Q4-21, Q1-22, Q2-22, there was continued volatility that was maybe more present than it had been in the past, especially on a weekly basis.

ECF No. 102-21 (DX 21), Brown Dep. 70:19-71:17. *See also supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 27:**

27.    Brown testified that in order to determine guidance "[t]ypically I would look at the prior quarter's numbers, the results for the prior quarter and then just base it off of those prior year, prior quarter numbers to determine, look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." Uris Decl. Ex. 2, Brown Tr. at 44:15-45:5.

**DEFENDANTS' RESPONSE TO PARAGRAPH 27:**

27.    Defendants admit that Plaintiff accurately quotes Mr. Brown's deposition testimony, but note that the undisputed facts establish that Mr. Brown did not know or believe as of May 12, 2022 that there was a demand issue for the Logix test or that full-quarter revenue for 2Q22 would be low. ECF No. 102-21 (DX 21), Brown Dep. 152:21-24 ("Because at the time we didn't [think there was a demand issue], that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time."), 153:22-154:3 (similar). *See also supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 28:**

28.    Brown testified that in determining guidance he would also "have discussions with Seth Egan" about "how sales were going." *Id.* at 45:13-23.

**DEFENDANTS' RESPONSE TO PARAGRAPH 28:**

28.    Defendants admit that Mr. Brown typically would confer with Mr. Seth Egan about current-quarter sales when preparing for an earnings release, but also note that, as shown by the evidence cited in response to paragraph 26 above, quarter-to-date sales were not Mr. Brown's "key driver" in preparing quarterly guidance. Defendants also note that the undisputed facts show that Mr. Seth Egan was not concerned about sales or demand for the Logix test in spring 2022 and that Mr. Brown did not know or believe as of May 12, 2022 that there was a demand issue for the Logix test or that full-quarter revenue for 2Q22 would be low. *See* ECF No. 102-24 (DX 24), S. Egan Dep. 60:7-61:1 (testifying he was not concerned about sales or demand for the Logix test in February, March, or April of 2022); *id.* 135:13-24 (testifying he does not recall raising any concerns regarding sales of the Logix test to Mr. Brown, or any executives or board members in April or early-May of 2022); ECF No. 108, Defs' 56.1 ¶¶ 142-145; *see also supra* ¶¶ 7, 11, 16-17.

**CLASS REPRESENTATIVE'S PARAGRAPH 29:**

**29.** Seth Egan testified that he would review the Co-Diagnostics orders board on Monday.com "very often." He further testified that he would review it "sometimes every day, sometimes every other day, sometimes once a week." Uris Decl. Ex. 8, Seth Egan Tr. at 54:8-17.

**DEFENDANTS' RESPONSE TO PARAGRAPH 29:**

**29.** Defendants admit that Plaintiff accurately quotes Mr. Seth Egan's deposition testimony, but note that Mr. Seth Egan's undisputed testimony also establishes that he did not evaluate sales on a daily, weekly, or even monthly basis—rather, he evaluated sales on a quarterly basis. ECF No. 102-24 (DX 24), S. Egan Dep. 61:21-24 ("I would typically watch quarter by quarter, not month -- not mid month, you know, sales numbers. It was a quarter by quarter watch for me."), 66:8-10 ("I didn't do like mid quarter, mid month, mid day updates like that. I -- I would really monitor it quarter by quarter."). Mr. Seth Egan further testified that in the spring of 2022, he was not concerned about sales or demand for the Logix test or Co-Diagnostics' other products:

> **Q.** So beginning in February 2022, followed by March of 2022, and April of 2022, the company had less than $4 million in orders each month, correct?
>
> **A.** That's what this would say.
>
> **Q.** Was that unusual to you?
>
> **A.** Followed by the December month, which was very high, and then the January month, which was very high, having a February and March that were lower, given the amounts that were -- the amount of product that was sold the previous quarter and the different strains going on with COVID-19, it was -- you know, for that January, February and March, I don't have any concerns about that.
>
> **Q.** What about in April?
>
> **A.** April starts a new quarter and quarters would sometimes start big or they would start slow. It depended on how the quarter would go. But depending on how different strains of the virus or different variants were going on, these numbers would change quickly."

ECF No. 102-24 (DX 24), S. Egan. Dep. 60:7-61:1. *See also supra* ¶ 11.

Accordingly, Mr. Seth Egan does not recall raising any concerns regarding sales of the Logix test to the Company's executives or board members in April or early-May of 2022. ECF No.

102-24 (DX 24), S. Egan Dep. 135:13-24; *see also id.* 67:5-6 ("[T]here was no reason [as of May 12, 2022] to think that a big order wasn't going to be coming.").

Defendants also note that the undisputed facts show that Mr. Seth Egan, who was the head of Co-Diagnostics' sales department at all relevant times, was not involved at any time (including in spring 2022) in preparing or presenting the Company's quarterly earnings releases, including the process of preparing quarterly guidance, draft press releases, or draft earnings call scripts. ECF No. 102-24 (DX 24), S. Egan Dep. 133:22-134:24 ("I'm not part of [quarterly guidance] discussions nor would I have -- know anything more about them."), 142:1-7 ("**Q.** Have you ever participated in quarterly earnings calls? **A.** I don't write those earnings calls, I don't participate in organizing the earnings calls, so it's not something I've been in. **Q.** Have you ever helped Co-Diagnostics' executives prepare for earnings calls? **A.** Not that I recall."); ECF No. 113, Pl.'s Mem. Supp. Partial Summ. J., at 7 (referring to Mr. Seth Egan as Co-Diagnostics' "Head of Sales"); *see also* Defs' 56.1 ¶ 112.

**CLASS REPRESENTATIVE'S PARAGRAPH 30:**

**30.**    "Seth [Egan] had responsibility for customers. He had overall supervision of all of the sales personnel and what they were doing with their customers but he also dealt directly with some customers." Uris Decl. Ex. 1, Dwight Egan Tr. at 28:14-20; *see also* Uris Decl. Ex. 8, Seth Egan Tr. at 25:14-15 (testifying that he reported to Dwight Egan).

**DEFENDANTS' RESPONSE TO PARAGRAPH 30:**

**30.**    Defendants admit that Plaintiff accurately quotes Mr. Dwight Egan's deposition testimony and cites Mr. Seth Egan's deposition testimony, but respectfully refer the Court to the entirety of those transcripts, at ECF No. 102-23 (DX 23) and ECF No. 102-24 (DX 24), for a more complete understanding of their contents. Defendants also note that, as set forth in response to paragraph 29 above, the undisputed facts establish that, in the spring of 2022, Mr. Seth Egan did not have concerns about sales of or demand for the Logix test. *See* ECF No. 102-24 (DX 24), S. Egan Dep.

58:22-59:5 (testifying that sales leading up to May 12, 2022 did not concern him: "it really wasn't apparent maybe until later in the year that numbers were lower . . . because we would often have big months followed by lower months"), 60:7-61:1 (testifying it was not concerning to have lower sales for a few months following the spike in sales the Company experienced in December 2021 and January 2022), 65:6-24 (testifying he does not recall being concerned about sales in the spring of 2022 because "you could never place any – any real assurances on anything until you got through an entire quarter because things change fast"), 83:18-86:3, 91:8-92:18, 97:16-98:9; *see also* ECF No. 102-20 (DX 20), Benson Dep. 209:2-9 (testifying he does not recall having any concerns regarding the Company's sales in the spring of 2022), 44:18-25; ECF No. 102-26 (DX 26), Gundry Dep. 104:20-105:10, 105:24-106:12 (similar); ECF No. 102-25 (DX 25), Featherstone Dep. 70:14-23 (similar). *See also supra* ¶¶ 7, 16-17.

## IV.    Lead Up to the Issuance of the May 12, 2022 Statements

### CLASS REPRESENTATIVE'S PARAGRAPH 31:

31.    Mr. Brown testified that to prepare for earnings calls, "[t]hat's generally a process where we would typically meet with our investor relations firm and start to discuss results of the quarter. I'd probably say close to the end of the quarter. We discuss kind of things, operations that are going on at that time, developments that we're working on and discuss kind of a tone of call and what it would be like and then we would move forward in preparing a script, preparing an 8-K with an earnings release, preparing guidance, preparing a Q or a K. That would just move forward until we actually had our earnings call so all that stuff fit into a few week period of time." Uris Decl. Ex. 2, Brown Tr. at 36:17-37:10.

### DEFENDANTS' RESPONSE TO PARAGRAPH 31:

31.    Defendants admit that Plaintiff accurately quotes Mr. Brown's deposition testimony.

### CLASS REPRESENTATIVE'S PARAGRAPH 32:

32.    Brown testified that he would have earnings call prep meetings with Dwight Egan, Andrew Benson (Co-Dx's Head of Corporate Communications), and their IR firm. *Id.* at 37:11-16.

### DEFENDANTS' RESPONSE TO PARAGRAPH 32:

**32.**    Defendants admit the statement in paragraph 32. Defendants also note that Plaintiff's

Motion does not cite to paragraph 32, indicating that this statement is not material to its motion.

**CLASS REPRESENTATIVE'S PARAGRAPH 33:**

**33.**    Brown testified that scripts were used for earnings calls. *Id.* at 38:19-24.

**DEFENDANTS' RESPONSE TO PARAGRAPH 33:**

**33.**    Defendants admit the statement in paragraph 33. Defendants also note that Plaintiff's

Motion does not cite to paragraph 33, indicating that this statement further is not material to its motion.

**CLASS REPRESENTATIVE'S PARAGRAPH 34:**

**34.**    Brown testified that "we had calls with Lambert [Global] on a weekly basis". Uris Decl. Ex. 2, Brown Tr. at 86:24-87:3; *id.* at 92:24-93:3 ("at this point in time when you're preparing for an earnings call, we had weekly calls with our advisors."); Uris Decl. Ex. 5, Houston Tr. at 28:6-15 (testifying that around three weeks after the end of a quarter, they would have weekly meetings leading up to the quarterly earnings call); *see also* Uris Decl. Ex. 2, Brown Tr. at 84:2-16 (testifying that he "work[ed] with Mike Houston. He was our main contact was [sic] Mike Houston and I think William [Stack], and there was another individual, I can't remember his name, that also helped Mike with preparing documents and setting up calls and things like that").

**DEFENDANTS' RESPONSE TO PARAGRAPH 34:**

**34.**    Defendants admit that Plaintiff accurately quotes Mr. Brown's and Mr. Houston's

deposition testimony.

**CLASS REPRESENTATIVE'S PARAGRAPH 35:**

**35.**    When asked whether he would help "formulate the messaging [for an earnings release]", Mr. Houston (Managing Director at Lambert) testified "Correct, based on the information that they would share with us." Uris Decl. Ex. 5, Houston Tr. at 34:18-21.

**DEFENDANTS' RESPONSE TO PARAGRAPH 35:**

**35.**    Defendants admit that Plaintiff selectively quotes a portion of Mr. Houston's deposition

transcript, and respectfully refer the Court to the entirety of the transcript, at ECF No. 102-27

(DX 27), for a complete statement of its contents. Defendants further admit that Mr. Houston, the

lead for the Lambert team, testified that the Lambert team would advise on and help formulate the

Company's statements in connection with the earnings release based on information the Company shared with Lambert. Defendants note, however, that Mr. Houston further testified that Lambert's advice and proposed language, including with respect to the May 12, 2022 earnings release, were also based on information learned from its other clients. *See, e.g.*, ECF No. 102-27 (DX 27), Houston Dep. 49:17-50:3 (testifying "a lot of our micro and small cap clients" were facing uncertainty in the spring of 2022; "I mean, not just a pandemic, but Russia invading Ukraine, the Fed increasing interest rates, Donald Trump saying he's going to run for office again."), 57:24-58:15 (testifying options provided to Co-Diagnostics regarding quarterly guidance were similar to those "shared with other clients give the uncertainty"); *see also* ECF No. 102-20 (DX 20), Benson Dep. 82:21-83:6 (explaining Lambert would use input from Mr. Brown and Mr. Benson in generating the initial drafts of earnings release materials, but not "in every instance for every phrase" used).

## CLASS REPRESENTATIVE'S PARAGRAPH 36:

36.     In a May 3, 2022 email from William Stack (a Manager at Lambert) to Andrew Benson, which Benson forwarded to Brown, Stack attached a draft of the CFO portion of the May 12, 2022 earnings call script that contained the following language: "While we experienced strong demand for our products during the first quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result will be taking a more prudent approach to guidance for the second quarter of fiscal 2022" and included a placeholder for quarterly guidance. Uris Decl. Ex. 11 (CoDx_00004432 at 38). This language had a comment on it to "Discuss". *Id.*

## DEFENDANTS' RESPONSE TO PARAGRAPH 36:

36.     Defendants admit that Plaintiff selectively quotes from an initial draft of the May 12, 2022 earnings call transcript, drafted by the Lambert team. Defendants note, however, that the undisputed facts establish that the Company was not planning to provide quarterly guidance at this time; rather, the guidance-related language was merely a placeholder from the script used the prior quarter. ECF No. 102-27 (DX 27), Houston Dep. 50:23-51:25 ("**Q.** This draft seems to contemplate

31

that guidance would be provided, correct? . . . **A.** Typically what we do is we'll put in a placeholder of what was done in the prior quarter and use that as a starting point around discussions. So I don't know that it can contemplate that they were considering providing guidance even though we had it in there in the script because we would just pull forward whatever we did from last quarter. . . . It would be an easier way to really pull forward exactly what was discussed in the prior quarter and use that as a reminder tool, hey, we said this last quarter, how do we want to say it this quarter. All that said, I don't think it necessarily contemplates that they were considering providing guidance other than we pulled the language forward to the next quarter.").

## CLASS REPRESENTATIVE'S PARAGRAPH 37:

37.     Brown testified that "taking a more prudent approach to guidance" "could have been discussed before [May 3, 2022]. I just don't know specifically by date." Uris Decl. Ex. 2, Brown Tr. at 86:19-87:3. When asked whether he "th[ought] Mr. Stack would have sent a draft stating that the company will be taking a more prudent approach to guidance unless he had been given some indication that the company wanted to do that", Mr. Brown testified "[w]e may have discussed it prior to this draft. That would be my expectation, that we had some discussion about guidance prior to the first draft which is normal. We would normally have a discussion -- it's normal practice to discuss guidance and what we felt like we could do with guidance before the first draft of the script." *Id.* at 89:4-20.

## DEFENDANTS' RESPONSE TO PARAGRAPH 37:

37.     Defendants admit that Mr. Brown typically would discuss his thoughts on quarterly guidance with the Lambert team leading up to the earnings release and thus may have done the same ahead of the May 12, 2022 earnings call. ECF No. 102-21 (DX 21), Brown Dep. 89:11-20 (testifying it was "normal" to discuss with Lambert "what we felt like we could do with guidance before the first draft of the script"). Defendants note, however, that the undisputed facts establish that no one at Co-Diagnostics discussed sales numbers or expected revenue with Lambert leading up to the May 12, 2022 earnings call, and, as Houston testified, Lambert had no visibility into Co-Diagnostics' intra-quarter sales or revenue when helping to prepare for the May 12, 2022 earnings

release. ECF No. 102-21 (DX 21), Brown Dep. 89:22-90:2 (testifying he does not recall discussing sales numbers with Lambert leading up to the May 12, 2022 earnings release); ECF No. 102-27 (DX 27), Houston Dep. 40:17-41:11 (testifying that in preparing for the May 12, 2022 earnings release, no one from Co-Diagnostics told him sales for the Logix test had fallen or that revenues were down), 44:5-17 (**Q.** Would you also try to incorporate any information you had been given by the company regarding the ongoing quarter or how the ongoing quarter was going? **A.** No, we didn't have any visibility to that and we only talked about what had been done. So if there was a Q2 earnings call, we were only talking about Q2, we didn't have any visibility into Q3; even though technically we were into that current quarter, we never talked about it."), 45:13-46:5 (testifying Lambert did not talk with the Company about quarterly guidance "on a quantitative basis"), 114:18-25 ("**Q.** Do you know how many months of low sales the company had experienced leading up to the May 12, 2022, earnings call? . . . **A.** No, I do not, I don't have any visibility into their monthly sales numbers."); *see also* ECF No. 102-20 (DX 20), Benson Dep. 102:23-103:16 (testifying he does not recall having a conversation with the Lambert team in which it was suggested the Company "was likely to have a soft quarter or two" or that "Q2 was off to a slow start"); ECF No. 108, Defs' 56.1 ¶¶ 142-145; *see also supra* ¶¶ 11, 16.

**CLASS REPRESENTATIVE'S PARAGRAPH 38:**

**38.**    In a May 5, 2022 email to Brown, Houston wrote "[f]ollowing up on our call yesterday, I wanted to outline a few considerations as you prepare to discuss guidance with the Board." Uris Decl. Ex. 12 (LAMBERT0000769). In the email, Mr. Houston outlined "[a]lternatives to providing Q2 guidance in the earnings call and release:" (1) "Pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results"; (2) "Convert quarterly guidance to annual guidance, citing similar uncertainty to the above scenario", (3) "Keep quarterly guidance but lower your estimates to a range that you believe is 95% achievable", and (4) "Guide to $17-$19 million in topline with the hope that you come close because you've done so before[.]" *Id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 38:**

33

**38.**    Defendants admit that Plaintiff selectively quotes a portion of an email addressed to

Mr. Brown sent on May 4, 2022. ECF No. 114-12 (PX 12), Lambert email, dated May 4, 2022;

*see also* ECF No. 103-46 (DX 106) (same).

**CLASS REPRESENTATIVE'S PARAGRAPH 39:**

**39.**    With respect to alternative 2, Houston noted that "[g]uiding to an annual figure would tip your hand to investors that you'll likely have a soft quarter, or two, and provide some air cover during the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that Q2 is off to a slow start without having to provide a specific number". *Id.*

> **a.**    When asked whether he recalled telling "Mr. Houston on a call [the day prior] that the company was likely to have a soft quarter or two", Mr. Brown testified "I don't recall that but we're talking about the 4th of May which is four and a half weeks into the quarter, so at that point in time we would have been able to see what the numbers were through monday.com and been able to discuss where we stood at that point in time, again four and a half weeks into a 12-week quarter." Uris Decl. Ex. 2, Brown Tr. at 100:4-15.

> **b.**    Similarly, when asked whether he recalled "telling Mr. Houston that Q2 was off to a slow start", Mr. Brown testified "I don't recall. Again, we were four and a half weeks into the quarter so we would have potentially talked about what we'd seen up to this point in time in the quarter when we had our call to discuss what kind of guidance we provide." Id. at 101:9-16; *see also id.* at 104:11-20 ("we had a call and we discussed where we were four and a half weeks into a quarter with another, you know, seven and a half weeks to go. We would have a discussion around that.")

> **c.**    When asked if it was "[his] understanding at this time that Co-Diagnostics was likely to have a soft quarter or two, is that correct?" Houston testified "[t]hat was my inference, but that's completely on me." Uris Decl. Ex. 5, Houston Tr. at 62:7-13.

> **d.**    When asked whether Brown "ever t[old him] that he disagreed with the notion that Q2 [was] off to a slow start?" Houston testified "Not that I recall, no." Id. at 70:3-6.

**DEFENDANTS' RESPONSE TO PARAGRAPH 39:**

**39.**    Defendants admit that Plaintiff selectively quotes a portion of an email addressed to

Mr. Brown, dated May 4, 2022, but note that the undisputed facts show that the four "alternatives"

Mr. Houston presented in the May 4 Lambert email were based on similar advice he was giving to

other clients that were considering not providing guidance around the same time "given the uncertainty." ECF No. 102-27 (DX 27), Houston Dep. 57:18-58:15; *see also* ECF No. 108, Defs' 56.1 ¶ 202.

Defendants also note that the undisputed facts show that "alternative 2" was not proposed by Mr. Houston to conceal intra-quarter sales numbers or full-quarter revenue expectations from Co-Diagnostics investors, and that he never got the impression that Defendants were trying to conceal intra-quarter sales numbers or hide expected low full-quarter revenue. ECF No. 102-27 (DX 27), Houston Dep. 61:6-62:6; 123:15-124:24. Mr. Houston testified that when he wrote that guiding to an annual figure would "tip your hand" to investors, he meant that switching from quarterly to annual guidance would provide insight to investors:

> [W]e want them to be open and transparent, that even though they maybe didn't feel confident with the quantitative range for quarterly guidance, that by switching to annual guidance, those professional investors are smart enough to really determine, you know, okay, maybe there's going to be a down quarter here or there, but the annual number is still the same.
>
> Again, trying to remove some of that uncertainty and volatility to where, maybe it doesn't read that way, but the intent of that bullet to them was that we would want to tip our hand to investors and give them as much information as possible, that we still had a high level of confidence around achieving.

*Id.*; *see also id.* 40:17-41:11 (testifying no one from Co-Diagnostics suggest to him that sales for the Logix test had fallen or that revenues were down); *supra* ¶ 11; ECF 108, Defs' 56.1 ¶ 203.

Defendants further note that none of the language quoted in in paragraph 39 or any of its subparts shows that Co-Diagnostics' February, March, April, and/or May sales numbers (as opposed to increased volatility and uncertainty in the marketplace) were the impetus for Defendants' decision not to provide guidance on May 12, 2022 for 2Q22, and other undisputed facts establish that sales were not the impetus. *See supra* ¶ 16.

35

a.    Defendants admit that Plaintiff selectively quotes from Mr. Brown's deposition transcript, but respectfully refer the Court to the entirety of the transcript, at ECF No. 102-21 (DX 21), for a complete understanding of his testimony. Again, Defendants admit that Mr. Brown would generally discuss his thoughts on quarterly guidance with the Lambert team leading up to the earnings release, but note that the undisputed facts establish that neither Mr. Brown nor anyone else at Co-Diagnostics discussed sales numbers or expected revenue with Lambert leading up to the May 12, 2022 earnings call, and also establish that recent sales were not the impetus for Defendants' decision not to provide quarterly guidance on May 12, 2022. *See* ¶¶ 16, 37, and 39 above.

b.    Defendants admit that Plaintiff selectively quotes from Mr. Brown's deposition transcript, but respectfully refer the Court to the entirety of the transcript, at ECF No. 102-21 (DX 21), for a complete understanding of his testimony. Again, Defendants admit that Mr. Brown would generally discuss his thoughts on quarterly guidance with the Lambert team leading up to the earnings release, but note that the undisputed evidence establishes that neither Mr. Brown nor anyone else at Co-Diagnostics discussed sales numbers or expected revenue with Lambert leading up to the May 12, 2022 earnings call, and establishes that recent sales were not the impetus for Defendants' decision not to provide quarterly guidance on May 12, 2022, as shown by the evidence cited in response to paragraphs 16, 37, and 39 above.

c.    Defendants admit that Mr. Houston testified that his statements in the May 4 Lambert email were inferences on his part based on past experience with other

36

clients. ECF No. 102-27 (DX 27), Houston Dep. 69:7-70:2 (testifying statements contained in the May 4 Lambert email are "me just assuming" based on experiences with other clients who were considering not providing guidance); *see also id.* 62:7-13 (testifying any reference to "a soft quarter or two" in his email was inference he made). Defendants note, however, that the undisputed facts show that the inferences made by Mr. Houston were not based on information shared by Mr. Brown (or anybody else at the Company) regarding Co-Diagnostics' past or current sales numbers or expected future revenue. ECF No. 102-27 (DX 27), Houston Dep. 67:9-16 ("So I really don't think Mr. Brown had shared anything other than he would give us some scenarios on if we were to stop quarterly guidance, if we're going to continue, what are all the puts and takes with that, and so I immediately go into, well, okay, that probably means Q2 is going to be soft."); *see also* ECF No. 102-23 (DX 23), D. Egan Dep. 143:11-144:2 (testifying while he was not involved in the discussions regarding guidance at this point in time, he believes Mr. Houston was merely providing "a bunch of hypothetical scenarios").

In fact, Mr. Houston testified that his statements in the May 4 Lambert email were inferences based on experiences with clients other than Co-Diagnostics:

> [I]t's me putting words into their mouth and me just assuming . . . . Again, the language that I chose to use were the inferences based on what I've seen with other clients that are considering pulling quarterly guidance or annual guidance, for that matter, and so it's really just trying for me to give them all of the different opportunities that they have, but me inferring that there's probably less visibility or Q2 isn't off to the start they thought it would be, so let me know my options now and it's not to say this is exactly what happened and now we've got to figure out a recipe to resolve the situation.

ECF No. 102-27 (DX 27), Houston Dep. 69:7-70:2.

    **d.**    Defendants admit that Plaintiff selectively quotes a portion of Mr. Houston's deposition transcript, but note that the undisputed facts show that Mr. Brown did not tell Mr. Houston that the second quarter of 2022 was "off to a slow start"; rather that was an inference on Mr. Houston's part based on experiences with other clients. ECF No. 102-27 (DX 27), Houston Dep. 40:17-41:11 (testifying in preparing for the May 12, 2022 earnings release, nobody from Co-Diagnostics told him that sales for the Logix test had fallen or that revenues were down); *see also supra* ¶¶ 37, 39(a).

## CLASS REPRESENTATIVE'S PARAGRAPH 40:

40.    With respect to alternative 3, Houston stated: "[w]hile it will have a negative impact on the share price, it's better to take your lumps up front and maintain your credibility" and "[i]f the forecast calls for CODX to make up for the soft quarter throughout the balance of the year, it might be beneficial to offer an annual topline guidance range as well". Uris Decl. Ex. 12.

## DEFENDANTS' RESPONSE TO PARAGRAPH 40:

40.    Defendants admit that Plaintiff selectively quotes a portion of the May 4 Lambert email, but note that this was Mr. Houston's language, based on inferences from experiences with other clients, and the undisputed facts establish that the Defendants did not know or believe as of May 12, 2022 that there was a demand issue for the Logix test or that full-quarter 2Q22 revenue would be low, and sales numbers were not the impetus for Defendants' decision not to provide quarterly guidance on May 12, 2022, as shown by the evidence cited in paragraphs 16 and 39 above. ECF No. 102-23 (DX 23), D. Egan Dep. 70:20-78:8 (testifying there were many indicators that sales would rebound and, further, that the Company did not "make judgments about the future based on what happens in a few-month period"); ECF No. 102-21 (DX 21), Brown Dep. 65:19-66:12 (testifying not concerned about demand in the Spring of 2022), 68:9-21 (similar; *see also*

ECF No. 102-24 (DX 24), S. Egan Dep. 58:22-59:5, 60:7-61:1, 65:6-24 (similar); ECF No. 102-20 (DX 20), Benson Dep. 209:2-9 (similar); *see also supra* ¶¶ 7, 11, 17.

Defendants further note that the undisputed facts show that the Defendants' decision not to provide guidance was not motivated by any concern that following other alternatives outlined in the May 4 Lambert email might negatively impact the Company's share price. ECF No. 102-23 (DX 23), D. Egan Dep. 142:16-22 ("[W]e would not have had a discussion as to whether it would impact our share price. As a matter of our practice, we did not make decisions about what would be released based on its proclivity to influence share price one way or the other."); ECF No. 102-21 (DX 21), Brown Dep. 103:16-17 ("I think that would be speculation more than anything."); ECF No. 102-27 (DX 27), Houston Dep. 65:6-9 (explaining, with respect to his statement in the May 4 Lambert email that alternative #3 might negatively impact stock price: "I think there's a lot of factors that go into whether or not it will have a negative impact, but that was really just an inference on my end more than anything.").

**CLASS REPRESENTATIVE'S PARAGRAPH 41:**

41.    With respect to alternative 4, Houston stated: "[n]eed to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number despite the weak start to the quarter[.]" *Id.*

a.    When asked what he meant by this, Houston testified that "Again, just inferring that the quarter is not going to be good, because we probably wouldn't have this conversation if it was great, just making sure that they cover their bases and that they're able to talk through exactly how did we arrive at this forecast, here are the inputs and variables that went into it, here's why we chose the range. Again, just really covering all their bases and helping remind them that they needed to do that." Uris Decl. Ex. 5, Houston Tr. at 66:4-25.

b.    With respect to alternative 4, Houston suggested: "Should the Q2 softness persist after Memorial Day, we would recommend considering a pre-announcement to earnings in early June so that investors are not surprised the day of earnings." Uris Decl. Ex. 12. Dwight Egan testified that "our decision was to not provide guidance at all, which would obviate the need to do a preannouncement since we were not going to give guidance." Uris Decl. Ex. 1, Dwight Egan Tr. at 143:22-144:2.

39

**DEFENDANTS' RESPONSE TO PARAGRAPH 41:**

41.    Defendants admit that Plaintiff selectively quotes a portion of the May 4 Lambert email. But again, as detailed in response to paragraphs 37 and 39 above, Defendants note that the undisputed facts show that neither Mr. Brown nor anyone else at Co-Diagnostics told Mr. Houston that sales were down or that they expected full-quarter 2Q22 revenue to be low, and the undisputed facts also show that Co-Diagnostic's sales numbers in the spring of 2022 were not the impetus for Defendants' decision not to provide quarterly guidance on May 12, 2022. *See supra* ¶¶ 16, 17.

    a.    Defendants admit that Plaintiff selectively quotes from Mr. Houston's deposition transcript, but again note that the undisputed facts establish that Mr. Houston's statements in the May 4 Lambert email were inferences on his part, based on past experiences with other clients, and not based on information shared by Mr. Brown (or anyone else at the Company) regarding Co-Diagnostics' past or current sales numbers or expected future revenue, as shown by the evidence cited in response to paragraph 39 above.

    b.    Defendants admit that Plaintiff selectively quotes from the May 4 Lambert email and Mr. Dwight Egan's deposition transcript. But Defendants again note that the undisputed facts show that the Defendants did not know or believe as of May 12, 2022 that there was a demand issue for the Logix test or that full-quarter 2Q22 revenue would be low, and that Defendants were not, as Plaintiff suggests, trying to hide low sales until sales rebounded. D. Egan Dep. 70:20-78:8 (testifying there were many indicators that sales would rebound and further, the Company did not "make judgments about the future based on what happens in a few-month period"); ECF No. 102-21 (DX 21), Brown Dep. 65:19-66:12 (testifying sales in February,

March, and April of 2022 were lower than they were in January 2022, but does not recall any concerns at that time), 68:9-21 (testifying he was not concerned that sales in February, March and April were below $4 million because that number "was not a measuring tool or a measuring guide" for the Company); *see also* ECF No. 102-24 (DX 24), S. Egan Dep. 58:22-59:5 (testifying that sales leading up to May 12, 2022 did not concern him: "it really wasn't apparent maybe until later in the year that numbers were lower . . . because we would often have big months followed by lower months"), 60:7-61:1 (testifying it was not concerning to have lower sales for a few months following the spike in sales the Company experienced in December 2021 and January 2022), 65:6-24 (testifying he does not recall being concerned about sales in the spring of 2022 because "you could never place any – any real assurances on anything until you got through an entire quarter because things change fast"); ECF No. 102-20 (DX 20), Benson Dep. 209:2-9 (testifying he does not recall having any concerns regarding the Company's sales in February and March 2022); ECF No. 102-27 (DX 27), Houston Dep. 123:15-124:24 (testifying neither Mr. Dwight Egan nor Mr. Brown ever suggested to Mr. Houston that they were trying to hide low sales of the Logix test from the investing public or that their statements on May 12, 2022 were intended to hide low sales); *see also supra* ¶¶ 7, 11, 16, 17, 37, 39; *infra* ¶ 42.

### CLASS REPRESENTATIVE'S PARAGRAPH 42:

42.     With respect to alternative 1, Houston noted that "[t]his path will raise the most questions, but could be viewed as more positive than guiding to a figure and coming up very short" and further noted that the approach would help Defendants "[m]aintain[] some level of credibility if delivered well". Uris Decl. Ex. 12. In response, Brown noted that "[he] would lean into [that option]" and asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" Uris Decl. Ex. 13 (LAMBERT0002146). Houston responded that he would "get

back to [Brown] over the weekend [after] do[ing] some research on what others have been saying." *Id.* On May 8, 2022, Houston responded with a list of "reasons [that] could be rationale for pulling guidance completely. Some are likely a stretch, but we included them anyways to at least spur discussion." Uris Decl. Ex. 14 (CoDx_00506169 at 71). Two of those reasons that Houston came up with were "Mask mandates being dropped while variants remain, and OUS vaccination rates continue to be low" and "Timing of orders in a particular quarter and how they are beginning to fluctuate greatly." *Id.* Defendant Brown responded and also suggested "Inability to confidently project testing requirements through the remainder of the year" as an additional reason Defendants could "point to as we pull back on guidance." *Id.* at CoDx_00506170.

**DEFENDANTS' RESPONSE TO PARAGRAPH 42:**

42.     Defendants admit that Plaintiff selectively quotes portions of various email chains, dated May 4, 2022 through May 9, 2022. Defendants respectfully refer the Court to the entirety of the cited emails, at ECF Nos. 114-12, 114-13, and 114-14, for a complete statement of their contents. *See also* ECF Nos. 103-46, 103-47, 103-48.

However, Defendants object to Plaintiff's characterization of these undisputed facts as Defendants "strategiz[ing]" with Lambert to "come up with" "an excuse to stop providing guidance" ECF No. 113, Pl.'s Mem. Supp. Partial Summ. J., at 16. Defendants note that the undisputed evidence shows that Co-Diagnostics worked with Lambert (its outside investor relations firm) to further explore the reasons why the Company was experiencing increased volatility and uncertainty at the time, and to find the best way to explain to investors this volatility and uncertainty and why the Company felt it could not provide accurate quarterly guidance. *See* ECF No. 102-21 (DX 21), Brown Dep. 106:12-17 ("Lambert is our investor relations expert and that's why we hired them is to help us with communication to the Street and so my question would be asking him what would be the best way to present this."); *id.* 89:4-20 (explaining they would typically have a conversation with Mr. Houston about "what we felt like we could do with guidance" before the first draft); ECF No. 102-27 (DX 27), Houston Dep. 49:6-50:3 ("I don't remember the exact timeline of events as to how we knew that there was less visibility that Co-

Diagnostics was facing and so I know we did give them a few potential ways to handle that. . . . [O]ur counsel is typically be open, be transparent and share as much as you can around any uncertainty. . . . I think what further compounded that too is just a lot of macro issues that all of our clients were facing, I mean, not just a pandemic, but Russia invading Ukraine, the Fed increasing interest rates, Donald Trump saying he's going to run for office again. So if I remember correctly, I think that spring and that summer were quite a tumultuous time for a lot of our micro and small cap clients."), 50:10-17 (testifying that while Co-Diagnostics "knew there was reduced visibility," the Company was still "trying to get [its] arms around it" and thus the Lambert and Co-Diagnostics teams work together and "went back and forth to really try and nail down what exactly [was] at play"), 60:12-15 ("[Co-Diagnostics] didn't have the visibility that they might typically have, that they had at the same time last year, as to their ability to derive a forecast."); 33:12-34:17 (testifying "the end goal" was to be "as open and transparent as possible"); *see also see also supra* ¶¶ 16, 17, 37, 39; ECF No. 108, Defs' 56.1 ¶¶ 169-186, 197-219.

Defendants admit that in achieving this goal, Lambert considered how other companies that had recently decided not to provide guidance had explained the volatility and uncertainty in the market, and Mr. Houston provided Defendants with some of those factors that were potentially applicable to Co-Diagnostics. ECF No. 102-27 (DX 27), Houston Dep. 71:12-73:2 (testifying to same); *see also* ECF No. 102-20 (DX 20), Benson Dep. 117:1-2 ("[It] wasn't uncommon for us to look and see what -- what other companies were -- were doing.").

**CLASS REPRESENTATIVE'S PARAGRAPH 43:**

**43.**    Following a May 9, 2022 meeting with Co-Diagnostics' Board of Directors, Brown emailed Houston and his Lambert team members to note that "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release. Can you guys take the first stab at writing this?" Uris Decl. Ex. 14 at CoDx_00506170. Houston circulated updated drafts of the earnings release and earnings call script later that day. Uris Decl. Ex. 14 at CoDx_00506169; *see also* Uris Decl. Ex. 5, Houston Tr. at 78:12-80:3 (testifying that he made the

edits based on their emails and conversations). In the updated draft, the placeholder for guidance was deleted, and the following paragraph inserted:

> While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix Smart$^{TM}$ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States as well as persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future," concluded Egan.

Uris Decl. Ex. 14 at CoDx_00506174-75. Houston included a comment on that paragraph stating "Purposefully left this high level. Let's discuss if you also want to cite timing of orders in this paragraph or leave it to the script how we have it now." *Id* at 174.

**DEFENDANTS' RESPONSE TO PARAGRAPH 43:**

**43.** Defendants admit that Plaintiff selectively quotes from the May 8-9 Lambert email, working drafts of the May 12, 2022 press release and earnings call transcript attached to the same, and Mr. Houston's deposition transcript.

Defendants object, however, to any suggestion that these undisputed facts indicate that the reasons presented to Co-Diagnostics' investors for not providing quarterly guidance on May 12, 2022 were pretextual. Defendants note that the undisputed evidence shows that Defendants believed that the factors identified on the call as causing increased uncertainty as of May 12, 2022 were in fact contributing to the uncertainty that led Defendants not to provide guidance. *See, e.g.*, ECF No. 102-21 (DX 21), Brown Dep. 113:14-19 ("[T]hese are the things that were happening that we -- helped me to feel like it was appropriate to not provide guidance because again, I didn't want to provide guidance that was not accurate."); *id.* 114:8-115:6 (**Q.** Were the timing of orders for the Logix test fluctuating greatly at this time? **A.** Yes, they had been over the past two quarters prior to this. There had been fluctuations on a weekly basis and it was becoming more apparent that the fluctuations were becoming more defined, there were more defined

44

fluctuations, it was just happening more often. **Q.** What do you mean by fluctuations? **A.** Just the timing of orders. If you look back at the history of the sales during COVID, they fluctuated, and even at this time it fluctuated even more based on the outside influences, how society was responding to COVID, how different countries were responding to the COVID pandemic at that point in time because we recently had had an Omicron spike that caused a significant amount of volatility when it came to how revenue came in and was recognized."); *id.* 96:21-97:18; ECF No. 102-23 (DX 23), D. Egan Dep. 185:12-20 ("It's in the context of a very short corporate history and in trying to be prudent with investors in terms of what we're predicting in an uncertain environment that is characterized by an international and including a national pandemic, so we're making the best judgments we can given the data that we're presented with."); *id.* 75:3-23, 105:22-107:3; ECF No. 102-20 (DX 20), Benson Dep. 111:1-13 ("It wasn't because we were worried [full-quarter revenue] was going to be low . . . . It was simply because all of those together tell the story of an unpredictable, volatile situation. [W]e had to go with what we thought was the most responsible action to communicate to our shareholders[, a]nd that wasn't to take a guess on a number that was too low or a number that was too high or to stretch it out over the year. Any [] of those options would have been more irresponsible [] to our mind than to just be honest and say, [] we can't read where this is going."), 112:8-13 ("A company has a responsibility to . . . give the best number that it can . . . . [I]f your best guess is, We can't give a number that we . . . feel like we can responsibly stand behind, then it's the company's responsibility to not give a number."); *see also supra* ¶ 7, 16, 17, 37, 39; ECF No. 108, Defs' 56.1 ¶¶ 187-188, 190-191, 195-196.

Defendants also note that the undisputed facts show that Mr. Brown reviewed with the board the reasons why he did not believe the Company could provide accurate 2Q22 guidance on May 12, 2022. ECF No. 102-23 (DX 23), D. Egan Dep. 118:9-19 ("We wouldn't go to the board

nakedly and say what do you think about this? We would have already had good reasons to present to the board in terms of things that I mentioned previously in terms of our -- the optics we had and the uncertainty that we were looking at and not feeling that we should commit to numbers that didn't have a clear sense of being able to achieve them."); ECF No. 102-21 (DX 21), Brown Dep. 116:21-117:5 ("**Q.** So by this, did you mean that the -- are you saying that the board is okay with not giving guidance as long as you can come up with a good reason? **A.** I don't know that I would say come up with a good reason. They were -- they were okay with us not providing guidance as long as there was a good reason for it, not come up.").

Defendants further note that the undisputed facts show that the reasons for not providing guidance set forth in the May 12, 2022 press release and on the earnings call were not "post hoc" rationalizations, as Plaintiff claims (ECF No. 113, Pl's Mem. Supp. Partial Summ. J., at 20), but in fact were the same reasons Co-Diagnostics and Lambert discussed prior to the May 9, 2022 board meeting and that Mr. Brown and Mr. Benson had identified as particularly pertinent to Co-Diagnostics' circumstances and the uncertainty it was facing. *Compare* ECF No. 114-14 (PX 14), the May 8-9 Lambert email (referring to decreased masks mandates, low vaccination rates, and fluctuations in order patterns as reasons why they could not provide accurate 2Q22 guidance), *with* ECF No. 103-16 (DX 76), May 12, 2022 Earnings Call Transcript (referring to same).

**CLASS REPRESENTATIVE'S PARAGRAPH 44:**

**44.** Brown circulated edits to the script on May 10, 2022. Uris Decl. Ex. 15 (CoDx_00506830). Those edits included the following edit, which was incorporated into the final version of the script that Brown used on the May 12, 2022 earnings call (Brown's redline edits bolded):

> The dedication from our team to deliver solid performance remains on full display. Our record performance during the first quarter would not have been possible without their many contributions. As we look to the balance of fiscal 2022, we remain encouraged by the **demand for our products and the** operational and scientific teams we have established to support our future growth.

Turning now to our visibility around Turning now to our visibility around the outlook for the balance of the year. While we experienced strong demand for our products during the first quarter of 2022, challenges in our operating environment have restricted our near-term visibility. We will continue to navigate the near-term environment with caution but as a result, will not be providing quarterly guidance at this time. To be clear, we remain very confident about the long-term potential of our business and the demand for our products . Our ability to accurately predict Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States as well as persistently low vaccination rates in many parts of the world. Furthermore, we are experiencing sizable fluctuations in order patterns from our customers that are not cleanly captured in a particular quarter as testing requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact on our future financial results. Despite these dynamics, we continue to believe we are at a critical point in our growth trajectory that will enable us to expand into new verticals, new markets, and innovative molecular diagnostic solutions

Uris Decl. Ex. 15 at CoDx_00506839-40; Uris Decl. Ex. 19 (ECF No. 34, Ex. 1 at Page 8 of 16).

a.     With respect to the paragraph in the script discussing the decision to not provide quarterly guidance, in response to a comment from Houston that "[a]s I was drafting this, it seems premature to cite uncertainty of YourTest revenues as a reason to drop guidance quite yet since it's not approved. Let's discuss if you have time on Tuesday." Brown responded "If we were expecting to start selling the device in Q2, I would disagree. But as we are not, I would agree with your comment. I will run this by Andrew and [Dwight] today and get their thoughts on why we are not providing guidance." Uris Decl. Ex. 15 at CoDx_00506839-40.

b.     When asked "at the time of [Brown's] e-mail you were still working with Co-Diagnostics on determining what reason would be provided for not giving guidance, correct?", Houston answered "That's my understanding, yes, that's what it looks like." Uris Decl. Ex. 5, Houston Tr. at 75:10-24; *id.* at 80:4-83:18 (with respect to May 10 draft of Brown's earnings call script, agreeing that "the decision appears to have been made that guidance would not be provided, but [they were] still working though what reasons would be given for not providing guidance" testifying "It appears that way, but I don't remember for certain.")

**DEFENDANTS' RESPONSE TO PARAGRAPH 44:**

**44.**     Defendants admit that Plaintiff selectively quotes from a working draft of the May 12, 2022

earnings call transcript, attached to an email chain, dated May 5, 2022 through May 10, 2022.

Defendants further note that the bolded text (and other evidence) shows that Defendants were confident about long-term demand for Co-Diagnostics' products, including its COVID tests. ECF No. 102-20 (DX 20), Benson Dep. 164:8-10 ("We thought COVID was still going to be driving a large portion of our business for an indeterminate amount of time."); ECF No. 102-21 (DX 21), Brown Dep. 152:18-24 ("**Q.** Why did you think it was not necessarily a demand issue that you were seeing? **A.** Because at the time we didn't, that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time."); ECF No. 102-23 (DX 23), D. Egan Dep. 71:9-13 ("[W]e knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be."); *see also* ECF No. 102-23 (DX 23), D. Egan Dep. 206:23-207:17 (testifying in the spring of 2022, he did not believe it was a "post-pandemic world"; "My goodness, we're March 10 of '22. It's not until another year that the World Health Organization and the United States government, you know, ends their public health emergency. The public health emergency of international concern is the highest level of emergency that these organizations have, and you cited earlier the enormous amount of money that the United States government had spent in order to mitigate the effects of COVID."); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 14, 24-25, 30-31, 33, 41 (opining on factors indicating continued demand for COVID tests); ECF No. 108, Defs' 56.1 ¶¶ 53-55, 87-88, 93, 109, 164-165, 192-193.

However, Defendants object to any suggestion that these undisputed facts indicate that the reasons presented for not providing quarterly guidance on May 12, 2022 were pretextual or post-hoc rationalizations.

    **a.**    Defendants admit that Plaintiff selectively quotes from a working draft of the May 12, 2022 earnings call transcript, attached to an email chain, dated May 5, 2022 through May 10, 2022. But again, as detailed by the evidence cited in

response to paragraph 43 above, Defendants note that the undisputed facts demonstrate that the reasons they presented on May 12, 2022 for not providing 2Q22 guidance were not pretextual or post-hoc rationalizations. *See also* ECF No. 102-21 (DX 21), Brown Dep. 132:2-134:9. (Brown testifying that when he sent the email and comments to the script cited by Plaintiff, the decision not to provide 2Q22 guidance had already been made; preparing for an earnings call is on-going process and he just wanted to ensure that Mr. Dwight Egan and Mr. Benson were "comfortable with [Mr. Brown's] section of the script" and that there were not any additional factors "affecting the environment at that time" that they wanted to reference).

b.     Defendants admit that Plaintiff selectively quotes from Mr. Houston's deposition transcript. But again note that, as detailed in response to paragraphs 43 and 44(a) above, the undisputed facts establish that the reasons presented for not providing 2Q22 guidance on May 12, 2022 were not pretextual or post-hoc rationalizations.

## CLASS REPRESENTATIVE'S PARAGRAPH 45:

45.     On May 10, 2022, in advance of a call scheduled for 10 a.m. with Benson, Brown, and Dwight Egan, Benson circulated a draft of the May 12, 2022 earnings release to Brown and Dwight Egan. Uris Decl. Ex. 16 (CoDx_00506183). Those edits included the following (Benson's redline edits bolded):

> While we remain very confident about the long-term potential of our business, our ability to accurately predict Logix SmartTM COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, **continued emergence and spread of new variants, and** ~~as well as~~ persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact on our future financial results. For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future," concluded Egan.

*Id.* at CoDx_00506192.

49

**DEFENDANTS' RESPONSE TO PARAGRAPH 45:**

45.     Defendants admit that Plaintiff selectively quotes from a working draft of the May 12, 2022

press release, attached to an email chain, dated May 5, 2022 through May 10, 2022. However,

Defendants object to any suggestion that the edits to the May 12, 2022 press release indicate pretext

or a post-hoc rationalization, and Defendants note that, as set forth in response to paragraphs 43

and 44(a) above, the undisputed facts establish that the reasons presented for not providing 2Q22

guidance on May 12, 2022 were not pretextual or post-hoc rationalizations.

**CLASS REPRESENTATIVE'S PARAGRAPH 46:**

46.     When asked if he recalled "any discussions around [May 12, 2022] about whether Co-
Diagnostics was likely to have a soft second and third quarter?", Dwight Egan testified "We
weren't particularly focused on that because in our view, we had performed an important duty
letting our investing public know that we don't have the kind of optics that we would like to have
and that there was uncertainty in terms of what was going on. And so we're just putting one foot
in the front of the other, developing our new platform as rapidly as we can and selling as much as
we can, working on grants that are going to potentially move our aspirations along more quickly
and give us the credibility of these types of grantors who see everything going on in the country."
Uris Decl. Ex. 1, Dwight Egan Tr. 109:25-110:22; *see also id.* at 183:4-184:21 (testifying that,
with respect to any sizable fluctuations in order patters at this time "[t]he company had a very
strong first quarter so here we're reporting the second quarter. So again, we're looking at the having
a little bit more long-term view than you're encouraging here with respect to what the prospects
are. There's enough going on in terms of our not having a clear view of the future to not want to
predict it. So Brian's characterizing is sizable fluctuations in order patterns. I would have tended
to look at it in the context of the entire global landscape of what's going on with COVID, but the
fact still remains that we had every expectation that there would be a resurgence come fall and
winter."); *id.* at 127:17-128:22 (testifying that, with respect to any sizable fluctuations in order
patterns at this time "a month or a quarter did not a year make. Things were uncertain enough and
the optics were unclear enough so we decided not to guide on it, but we were gearing up for what
the nation as a whole was projecting was going to be a very probable or at least possible set of
circumstances in the fall and winter. Nobody knew when the new variant or an old variant or
whatever would have asserted itself. That's why the Congress was being importuned by the White
House to give them another 22 and a half billion dollars to gear up. So that's the kind of expectation
we were focusing on, not a near-term situation with respect to our sales orders, which was coming
off one of the most vicious COVID onslaughts in the entire pandemic that occurred in the fourth
quarter and first quarters of '21 and '22.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 46:**

**46.**    Defendants admit that Plaintiff selectively quotes from Mr. Dwight Egan's deposition transcript and respectfully refer the Court to the entirety of the transcript, at ECF No. 102-23 (DX 23), for a complete statement of its contents.

Defendants note, however, that the undisputed facts establish that Defendants did not know or believe as of May 12, 2022 that there was a demand issue for the Logix test or that full-quarter 2Q22 revenue would be low. ECF No. 102-23 (DX 23), D. Egan Dep. 70:20-78:8 (testifying there were many indicators that sales would rebound and, further, the Company did not "make judgments about the future based on what happens in a few-month period"); ECF No. 102-21 (DX 21), Brown Dep. 65:19-66:12 (testifying sales in February, March, and April of 2022 were lower than they were in January 2022, but does not recall any concerns at that time); ECF No. 102-27 (DX 27), Houston Dep. 123:15-124:24; *see also supra* ¶¶ 37, 39 (testifying that neither Mr. Dwight Egan nor Mr. Brown ever suggested to Mr. Houston that they were trying to hide low sales of the Logix test from the investing public or that their statements on May 12, 2022 were intended to hide low sales); *see also supra* ¶¶ 7, 11, 16, 17.

Defendants also note that there is no evidence of any internal discussions at Co-Diagnostics leading up to May 12, 2022 "about whether Co-Diagnostics was likely to have a soft second and third quarter." Mr. Brown testified that he would usually confer with Mr. Seth Egan regarding current sales data when preparing for an earnings release (ECF No. 102-21 (DX 21), Brown Dep. 45:13-23), but Mr. Seth Egan also testified that in the spring of 2022, he was not concerned about sales of or demand for the Logix test or Co-Diagnostics' other products and does not recall raising any concerns regarding sales of the Logix test to the Company's executives or board members. ECF No. 102-24 (DX 24), S. Egan. Dep. 60:7-61:1 (testifying he was not concerned about February, March, or April 2022 sales of the Logix test), 135:13-24 (testifying he does not recall

bringing any concerns regarding Logix test sales to the attention of company executives or the board).

**CLASS REPRESENTATIVE'S PARAGRAPH 47:**

47.     When asked "Leaving aside any people that at the time may have viewed COVID as a hoax, was it your understanding that the public at large understood wearing masks to be something that was done in order to reduce the transmission of COVID?" Houston testified "I think that's fair, that would be a fair statement." Uris Decl. Ex. 5, Houston Tr. at 88:17-25; *see also* Uris Decl. Ex. 8, Seth Egan Tr. at 67:20-24 ("where mask mandates were changing, and those would cause, depending on what you want to look at, that when people are no longer taking precautions, that case counts would go up resulting in needing more testing."); Uris Decl. Ex. 4, Benson Tr. at 147:2-11 ("Q. Do you recall that at this time mask mandates were something that were imposed because it was believed that they would help reduce the transmission of COVID? A. . . . I do recall that being one of the main driving factors behind mask mandates was lowering the -- the -- the – the risk of infection . . . .").

**DEFENDANTS' RESPONSE TO PARAGRAPH 47:**

47.     Defendants admit that Plaintiff selectively quotes from Mr. Houston's, Mr. Seth Egan's, and Mr. Benson's deposition transcripts. Again, Defendants respectfully refer the Court to the entirety of those transcripts, at ECF Nos. 102-27, 102-24, and 102-20, for a complete statement of their contents.

Defendants note, however, that  Mr. Houston also testified that the factors Co-Diagnostics identified on May 12, 2022 as causing uncertainty, including decreased mask mandates in the United States, could have indicated an increase or decrease in infection going forward: "It depends on the reader. … one could infer that … but someone could infer something different." ECF No. 102-27 (DX 27), Houston Dep. 86:23-87:4. And when asked about mask mandates specifically, Mr. Houston also testified:

> **Q.** Are decreased mask mandates something you would associate with a higher transmission of COVID?
>     . . .
> **A.** No, it wouldn't be.
> **Q.** Why not?

**A.** Well, I guess -- so I would not link the two just on a personal level, but I'm not a scientist or any expert in that realm.

**Q.** Is less mask-wearing something you would associate with higher COVID transmission?

. . .

**A.** I personally would associate it with people being tired of wearing masks and politicians listening to that.

ECF No. 102-27 (DX 27), Houston Dep. 87:10-90:2. Similarly, Mr. Benson testified:

I see these [factors] as just pointing to just the -- more of the -- the unpredictability and the variability about the existence of -- of -- or the persistence of COVID. . . . It's our ability to accurately forecast through the remainder of the year because of these factors. We're not saying -- taking the position on what these factors specifically -- what effect they're going to have, just that they make it unpredictable. They make it hard to predict.

ECF No. 102-20 (DX 20), Benson Dep. 145:9-23. Mr. Benson also testified that decreased mask

mandates did not necessarily mean an increase in COVID infection:

I could see [decreased mask mandates leading to more COVID infection] as being possible, but it could also have the inverse effect; right? The -- the decreased mask mandates could be a result of lower infection rates; right? Like, it's -- I can't -- I can't say that one would lead to the other. . . just that is a factor that makes it difficult to predict.

ECF No. 102-20 (DX 20), Benson Dep. 146:17-147:1.

And, while Mr. Seth Egan testified that decreased mask mandates could cause COVID cases to increase depending on the circumstances, he explained that this was one of many factors leading to increased uncertainty with respect to Logix test sales. ECF No. 102-24 (DX 24), S. Egan Dep. 68:10-13 ("[Y]ou had a lot of different things going on in many different countries. Many countries keeping masked, not keeping masked and, you know, the possible new variants, so there were a lot of factors.").

More importantly, however, both Mr. Dwight Egan and Mr. Brown believed that the factors identified in the May 12, 2022 press release and earnings call indicated *uncertainty*, not a likely increase in COVID infection or testing demand in the near term. ECF No. 102-23 (DX 23), D.

Egan Dep. 146:8-15 ("It could go either way. What we were saying is we didn't know what it was going to do and if it was going to be more or less, we couldn't put our finger on it. Hence, we didn't have the level of precision and optical clarity that we wanted to try and predict or forecast it."); 147:2-148:10 ("Whether or not a decrease in mask mandates created more demand for COVID testing or not I think was up in the air. . . . So bottom line here is these are elements -- these are variables and they are variables of uncertainty and that's what we were trying to communicate in our communication with the shareholders that because of that, and that lack of, you know, of optics and clarity, we're not going to try and guess and give a forecast or speculation as to what it's going to do."), 148:23-149:8 ("And our public have certainly shown that they are willing to abandon masks without resulting in massive new explosions of COVID infection. So I would go back to what I said earlier, it could have gone either way. The mask mandate was a national controversy, but not one that would give us a clear signal as to which way this thing was going to go."); ECF No. 102-21 (DX 21), Brown Dep. 142:10-23 (**Q.** The factors listed here are factors that suggest more COVID infection going forward; correct? **A.** I don't know that I would say that, I don't know that I would agree with that. **Q.** Why not? **A.** You know, if I even look at the first one, the decreased mask mandates in the United States doesn't necessarily mean that COVID would spread more, it could be that the spread has decreased and so there was less risk. It could be one side or the other."); *see also infra* ¶¶ 48, 49.

Dr. Tsai likewise testified that in his undisputed, expert opinion the factors cited in the May 12, 2022 earnings release, individually and cumulatively created uncertainty regarding future test sales and did not necessarily indicate increased infection or testing demand. ECF No. 102-29 (DX 29), Tsai Dep. 50:4-61:20; ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 23-44.

**CLASS REPRESENTATIVE'S PARAGRAPH 48:**

**48.**    Houston testified that the continued emergence and spread of new variants is something he would associate with increased levels of COVID infection. Uris Decl. Ex. 5, Houston Tr. at 89:2-6.

**DEFENDANTS' RESPONSE TO PARAGRAPH 48:**

**48.**    Defendants admit that Plaintiff selectively quotes from Mr. Houston's deposition transcript, but note again that Mr. Houston also testified that the factors Defendants cited on May 12, 2022 as creating uncertainty could indicate either increased or decreased infection: "It depends on the reader." ECF No. 102-27 (DX 27), Houston Dep. 86:23-87:4. *See also supra* ¶ 47 (detailing how factors identified on May 12, 2022 could either increase or decrease COVID infection or test demand).

Importantly, Mr. Dwight Egan testified that the continued emergence and spread of new variants created uncertainty, particularly as to when a new one would emerge and how transmissible it would be, and did not necessarily mean there would be an increase in COVID testing. ECF No. 102-23 (DX 23), D. Egan Dep. 147:4-9 ("[T]he same with the emergence of new variants. Variants may have ended up being less transmissible and less infectious because a lot of times as a virus goes through its iterations it gets weaker. . . ."), 150:25-151:22 ("It would depend on how virulent the new variant was. If the variant ended up being less transmissible, if it ended up being less infectious, in other words that it doesn't cause serious disease, it would diminish the need for COVID testing because it's not transmitting at the same rate, it's not making people as sick as they were. . . . So you can't just say that because we have variants that we're going to have a whole bunch of new COVID testing. It may be that way but isn't necessarily that way."), 151:23-152:22 ("**Q.** If new variants continued to emerge and spread, that would lead to higher levels of COVID infection than if new variants had not continued to emerge and spread; correct? . . . **THE WITNESS:** It's not as simple as that equation, Jason. If you said to the public, there's a lot of

COVID out there right now but it doesn't matter because it's not going to make you sick, it's not going to put you in the hospital, it's not going to kill you, you don't need to worry about it, then that would have had a deleterious effect on testing. If on the other hand it was highly, a highly transmissible and highly infectious and deadly strain, then it could have the opposite effect. So it could go either way depending on, you know, which way you go and that's not something we felt adequately prepared to predict.").

Mr. Brown likewise testified that he did not believe that the continued emergence and spread of new COVID variants meant there would be increased COVID infection in the short term, rather it created uncertainty:

> **Q.** Do you understand the emergence and spread of variants to be a factor that indicates more COVID infection?
>    . . .
> **THE WITNESS:** Again, not necessarily. I mean you don't know so there have been various variants that hit during COVID. Some were more impactful than others. So a variant could spread and you could see a variant that maybe didn't have the same impact that Omicron did. Again, we just didn't know. We didn't know when the next variant would hit and the impact it would have to revenue.

ECF No. 102-21 (DX 21), Brown Dep. 145:5-19.

Dr. Tsai likewise testified that in his undisputed, expert opinion the factors cited in the May 12, 2022 earnings release, individually and cumulatively created uncertainty regarding future test sales and did not necessarily indicate increased infection or testing demand. ECF No. 102-29 (DX 29), Tsai Dep. 50:4-61:20; ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 23-44.

**CLASS REPRESENTATIVE'S PARAGRAPH 49:**

**49.**    Houston testified that low vaccination rates is something he would associate with increased levels of COVID infection. *Id.* at 89:7-10.

**DEFENDANTS' RESPONSE TO PARAGRAPH 49:**

**49.**     Defendants admit that Plaintiff selectively quotes from Mr. Houston's deposition transcript, but again note that Mr. Houston also testified that the factors Defendants cited on May 12, 2022 as creating uncertainty could indicate either increased or decreased infection: "It depends on the reader." ECF No. 102-27 (DX 27), Houston Dep. 86:23-87:4. *See also supra* ¶¶ 47-48 (detailing how factors identified on May 12, 2022 could either increase or decrease COVID infection or test demand).

Importantly, Mr. Dwight Egan testified that lower vaccination rates do not necessarily suggest increased COVID infection or more COVID testing:

> **Q.** Are low vaccination rates something you generally associate with higher levels of COVID infection?
>
> **A.** Again, the answer is not necessarily. By this time, you've had a lot of vaccinations have taken place. You have a lot of people that have already had COVID so you have herd immunity to some extent. If you've already had the disease, your ability to be contracting it again are somewhat diminished by the fact that you've already had it. So you have some innate immunity that comes with having already had the disease. And you have vaccinations that depending on how effective vaccinations are and whether they are working or whether they are actually working on the right strain, that also was a variable that could make it go either way, and we were not in a position to try and predict which way it was going to go with all of that uncertainty and all those variables.

ECF No. 102-23 (DX 23), D. Egan Dep. 153:3-25.

Mr. Benson further explained: "People getting -- people refusing the vaccine could also be associated with people refusing to test just because of overall COVID fatigue. And so as people are not getting the vaccine, it could be because they're just resisting the whole change through to their lifestyle and then not doing the testing at all anymore." ECF No. 102-20 (DX 20), Benson Dep. 150:1-7.

Moreover, Dr. Tsai's undisputed expert testimony establishes that lower vaccination rates did not in fact mean increased infection or increased testing demand. ECF No. 103-31 (DX 91),

Tsai Rpt. ¶ 40, Fig. 5 (comparing Connecticut's and Georgia's per capita COVID vaccination, confirmed case, and testing rates, and showing Georgia had both lower vaccination and testing rates than Connecticut, despite similar per capita case counts).

**CLASS REPRESENTATIVE'S PARAGRAPH 50:**

50.    Dwight Egan testified that around May 12, 2022 "[w]e're not sitting there thinking [the pandemic is] going to stop. Everything we're hearing and every indication we can see says we've got trouble. We have vaccinations that are waning. Vaccinations we start to learn are not lasting maybe as long as they had hoped, and so people have waning immunity from vaccines and we have new variants at the same time that have escaped immunity. In other words, the virus is not responding to the vaccine in the way they hoped. And there's lots of different variables going on and the public, there begins as time goes on to be a disconnect between the way the government is talking about what's going on and what the experts are saying and what the American public is willing to do about it, what changes they are willing to make in their behavior about masks or going to congregate settings and all of those sorts of things. And some of these things would exacerbate the number of cases of COVID that we could experience and some of them might even push it down but it's -- the general expectation out there is robust and an expectation that it's going to potentially get worse before it gets better." Uris Decl. Ex. 1, Dwight Egan Tr. at 108:14-109:23.

**DEFENDANTS' RESPONSE TO PARAGRAPH 50:**

50.    Defendants admit that Plaintiff quotes from Mr. Dwight Egan's deposition transcript, and further note that the quoted testimony exemplifies Mr. Dwight Egan's good-faith belief that while the Company had confidence in the long-term demand for COVID tests, it did not have the visibility necessary to provide quarterly revenue guidance for 2Q22 on May 12, 2022. *See also* ECF No. 102-23 (DX 23), D. Egan 128:3-11 ("Things were uncertain enough and the optics were unclear enough so we decided not to guide on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself."). Defendants further note that, from March through May 2022, numerous public sources discussed the potential for new surges of COVID infections in the coming months. *See, e.g.,* ECF Nos. 102-45, 102-49, 102-52, 102-55, 103-4, 103-5, 103-6, 103-7, 103-10 (compilation

of publicly-available sources); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 37, 42. And Defendants note

that, as detailed in response to paragraphs 47, 48, and 49 above, the undisputed facts show that the

factors Defendants cited on May 12, 2022 indicated uncertainty, and not necessarily an increase or

decrease in COVID infection or testing demand going forward.

**CLASS REPRESENTATIVE'S PARAGRAPH 51:**

51.    When asked about the Company's effort to emphasize as part of its messaging that COVID was not going away, Dwight Egan testified "We're emphasizing that that theme, because we're spending a lot of money putting up a new platform for at home and point of care use, a lot of money and a lot of resource and effort and we've got some of the best scientists in the country doing it." *Id.* at 155:17-156:4. He testified "So when we're making an argument that the COVID is going to be here as a permanent part of our landscape going forward, we're making the argument that the new project that we're investing a lot of shareholder money on is going to be able to treat -- not treat, but to diagnose or to screen for COVID specifically and for other pathogens down the road." *Id.* 156:13-22.

**DEFENDANTS' RESPONSE TO PARAGRAPH 51:**

51.    Defendants admit that Plaintiff quotes from Mr. Dwight Egan's deposition transcript and

again note that the quoted testimony exemplifies Mr. Dwight Egan's good-faith belief in the long-

term demand for COVID tests. However, Defendants also note that, as detailed in response to

paragraphs 7, 11, 16, 17, 21, 22, and 44, the undisputed facts show that Mr. Dwight Egan did not

know or believe on May 12, 2022 that there was a demand issue with the Logix test or that full-

quarter 2Q22 revenue would be low. And Defendants further note that the undisputed facts show

that the factors they cited on May 12, 2022 as creating uncertainty did not necessarily indicate an

increase or decrease in COVID infection or testing demand going forward, as detailed in response

to paragraphs 47-49.

**CLASS REPRESENTATIVE'S PARAGRAPH 52:**

52.    In a January 4, 2021 e-mail from Benson to Dwight Egan and others, with the subject line "PR draft and initial talking points", with an attachment "CODX – Talking Points for Fireside Chat.docx", Benson wrote in the email "[t]he talking points are the 5 core concepts that have been rattling around in my head. Feel free to add more that I've missed." Uris Decl. Ex. 17

(CoDx_00522583). The fourth talking point in the attachment was "COVID will persist in a 'post-COVID' world (vaccine refusal, logistic issues with vaccinating the planet, regular mutations)." Uris Decl. Ex. 17 (CoDx_00522583 at 86); *see also* Uris Decl. Ex. 1, Dwight Egan Tr. at 159:24-160:5 ("Q. . . . So here these talking points are citing vaccine refusal and regular mutations as factors that support the idea that COVID will persist in a post-COVID world; correct? A. They could point to that. . . ."); Uris Decl. Ex. 18 (CoDx_00032186 at 86-87) (Dwight Egan putting forth "4. Persistence of COVID-19" and "9. . . . "The appearance of new variants may require an internationally coordinated public health initiative for many years to come to fight against COVID-19 and its potential new variants" as potential talking points for a Yahoo Finance interview); Uris Decl. Ex. 5, Houston at 92:14-94:14 (testifying "COVID-19 with its variants will be a permanent, endemic disease" was a message that Dwight Egan had wanted to include in the company's public statements, and testifying that he "felt that [Dwight Egan] cited too many scientists, I personally felt, in a way to lend some credibility to what they were trying to accomplish as a company, and so my counsel there was move away from the citations and more to the execution and show the street what you're doing and what your vision is for the company rather than focusing on these quotes.")

**DEFENDANTS' RESPONSE TO PARAGRAPH 52:**

52.    Defendants admit that Plaintiff selectively quotes a portion of an email chain, dated January 4, 2021, and attachments to the same, along with certain testimony from Mr. Dwight Egan's and Mr. Houston's deposition transcripts. Again, Defendants note Mr. Dwight Egan's cited testimony exemplifies his good-faith belief in the long-term demand for COVID tests. Defendants, however, deny that the cited "talking points" are material and note that they are irrelevant given that they were drafted by Mr. Benson (not Mr. Egan) almost a year and a half before the Defendants made the challenged statements on May 12, 2022. *See* ECF No. 114-17 (PX 17), January 4, 2021 Email; *see also* ECF No. 102-23 (DX 23), D. Egan Dep. 161:20-25 ("[T]his is a sheet put out by Andrew [Benson] and sent to me as things that could be considered for the talking points. That doesn't necessarily mean I agree with them. He sent it to me and these are his ideas.").

**CLASS REPRESENTATIVE'S PARAGRAPH 53:**

53.    On the May 12, 2022 conference call with investors and analysts, in which Egan, Brown, and Andrew Benson (Co-Diagnostics' Head of Corporate Communications) participated, an analyst asked "I just want to be clear on the guidance. I mean based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022. . . ." Brown responded "Yes, you're absolutely right." Uris Decl. Ex. 19 (ECF No. 34, Ex. 1 at Page 12 of 16).

**DEFENDANTS' RESPONSE TO PARAGRAPH 53:**

53.    Defendants admit that Plaintiff selectively quotes from a transcript of Co-Diagnostics'

earnings call, held on May 12, 2022, published by S&P Global Market Intelligence. Defendants

respectfully refer the Court to the entirety of the transcript, at ECF No. 103-16 (DX 76), for a

complete statement of its contents. Defendants note that the Court has held that this statement is

not actionable. ECF No. 42, Mem. Opinion & Order. Defendants also note that Mr. Brown's cited

statement exemplifies his good-faith belief in long-term demand for Co-Diagnostics' COVID tests,

as detailed in response to paragraphs 7, 11, 16, 17, 27-28, and 44.

**CLASS REPRESENTATIVE'S PARAGRAPH 54:**

54.    On the March 24, 2024 conference call with investors and analysts, in which Dwight Egan,
Brown, and Benson participated, Dwight Egan acknowledged that "it would have an impact on
us" if the "U.S. government does not reauthorize any additional money for COVID testing." Uris
Decl. Ex. 20 (ECF No. 34, Ex. 5) at Page 14 of 16; *see also* Uris Decl. Ex. 1, Dwight Egan Tr. at
188:6-20 ("I am aware that the government had various programs and there were a lot of them that
dealt with lots of different constituencies, so I don't have a strong knowledge of all the programs
the government promulgated but I am aware that they provided supportive funding to try and
mitigate the effects of COVID, of the COVID pandemic."); *id.* at 128:9-15 ("Nobody knew when
the new variant or an old variant or whatever would have asserted itself. That's why the Congress
was being importuned by the White House to give them another 22 and a half billion dollars to
gear up.").

**DEFENDANTS' RESPONSE TO PARAGRAPH 54:**

54.    Defendants admit that Plaintiff selectively quotes from a Co-Diagnostics' earnings call

transcript, published by S&P Global Market Intelligence, but note that the transcript is dated

March 24, 2022, not March 24, 2024. Defendants also note that Plaintiff's Motion does not cite to

paragraph 54, confirming that this statement is not material to its motion.

Defendants further admit that Plaintiff quotes from Mr. Dwight Egan's deposition

transcript and again note that the quoted testimony exemplifies Mr. Dwight Egan's good-faith

belief in the long-term demand for COVID tests. *See* ECF No. 102-23 (DX 23), D. Egan Dep.

128:9-15 ("Nobody knew when the new variant or an old variant or whatever would have asserted itself. That's why the Congress was being importuned by the White House to give them another 22 and a half billion dollars to gear up."); *supra* ¶¶ 7, 11, 16, 17, 44.

Defendants also admit that Mr. Egan was generally aware of COVID-related government funding and believed that it could have an impact on Co-Diagnostics' business, but Defendants note that the undisputed facts establish that neither Mr. Dwight Egan nor any other witness was aware of any specifics regarding the expiration of government funding in or around March of 2022. ECF No. 102-23 (DX 23), D. Egan Dep. 188:22-189:11 ("**Q.** Are you aware that in early 2020 the Health Resources and Services Administration COVID-19 uninsured program was established to reimburse health care providers directly for the costs of delivering COVID-19 testing to those who are uninsured? . . . **THE WITNESS:** My awareness is that would have been on a very tangential level. We did not generally view our customers as being heavily reliant on government sponsored programs."),189:13-191:20 (testifying he was "not particularly aware" of the end of HRSA funding for uninsured: "[W]e didn't view ourselves as being in sort of a total landscape aggregate effect of it. We didn't really view it necessarily impacting our customers in the same way that it may affect others."); *see also* ECF No. 102-21 (DX 21), Brown Dep. 174:16-175:5 ("**Q.** Are you aware that since the beginning of the pandemic, the Health Resources and Services Administration provided approximately 24.5 billion in reimbursement for COVID-19 related claims, including reimbursement for COVID-19 testing? . . . **THE WITNESS:** No. **Q.** Do you know when that funding expired? **A.** I have no idea."), 176:3-17 (testifying because he was not aware of federal funding expiring in March 2022, it was not something he considered in deciding whether to provide quarterly guidance); ECF No. 102-24 (DX 24), S. Egan Dep. 137:20-24 ("Q. (BY MR. URIS) Do you know when that funding expired? **THE WITNESS:** I don't know exactly which bills or things

expired when throughout the course."); ECF No. 102-20 (DX 20), Benson Dep. 183:17-22 ("**Q.** Do you recall whether any government funding was set to expire by the end of March of 2022? **A.** I remember there were expirations for government funding, but I can't remember exactly when they were, how much they were. I recall it vaguely being a thing, but no details about it.").

Defendants further note, that neither Mr. Dwight Egan nor any other witness was aware of how government funding impacted Co-Diagnostics' customers or sales of the Logix test in the spring of 2022. ECF No. 102-23 (DX 23), D. Egan Dep. 189:8-11 ("We did not generally view our customers as being heavily reliant on government sponsored programs."), 190:17-191:6 (**Q.** Are you aware that in March of 2022, the Health Resources and Services Administration announced that the COVID-19 uninsured program would end on March 22, 2022 due to lack of funding? . . . **THE WITNESS:** I'm not particularly aware of that maneuver. As I mentioned, we didn't view ourselves as being in sort of a total landscape aggregate effect of it. We didn't really view it necessarily impacting our customers in the same way that it may affect others."); ECF No. 102-24 (DX 24), S. Egan Dep. 138:12-141:2 ("**Q.** Do you know whether any of Co-Diagnostics' customers relied on any government funding for COVID-19 testing? **A.** No, I don't know exactly where they got their reimbursements from or who or -- or who was reimbursing them. That wasn't out -- that wasn't our business. . . . **Q.** Do you think the expiration of government funding for COVID testing would have a negative impact on sales of COVID tests? . . . **THE WITNESS:** At the time we didn't have any -- I don't think we had any reason to believe that that was going to be a problem at all. I don't think we knew how that would affect us, and we didn't think it would. And there were lots of ways the customers would likely -- what the laboratories would get reimbursed. Sometimes they were self-pay, sometimes they were private organizations paying for tests. Many times I would think, I don't know for sure, but it would be insurance carriers reimbursing them.

And so how does the government versus insurance payers, there's a lot of dynamics there. And, you know, government funding does not really relate to insurance carriers reimbursement. So there's a lot of dynamics there that need to be taken in account. But if that funding was expired, as it was set to expire of the different programs -- again, I'm not even telling you exactly which one I'm referring to because I don't know which one -- they were -- they would be set to expire and then they would be extended over and over and over again. So we couldn't have had any indication that that would have been a negative to us when that expired because there were lots of different dynamics at play."); ECF No. 102-20 (DX 20), Benson Dep. 184:7-185:7 ("**Q.** Do you know whether any of the company's customers relied on funding from those programs to fund their purchases of the Logix Smart COVID-19 test? . . . **THE WITNESS:** So I'm not on the sales side . . . I myself did not have a lot of visibility or if any at all into exactly who was paying for what from our -- through our end -- our end user customers. I mean, I would put stuff in boxes and ship it, but I didn't know how something was paid for."); ECF No. 102-25 (DX 25), Featherstone Dep. 73:24-74:7 ("**Q.** Are you aware, in early 2020, so shortly after the pandemic started, that various government programs were put in place in order to increase access to COVID-19 tests? **A.** I personally was not aware of that because it -- I don't -- I don't know that it would have affected the specific customers that I was working with at that time. So I was not aware of how the government funding was affecting those things."); ECF No. 102-27 (DX 27), Houston Dep. 125:8-13 ("**Q.** Fair to say in May of 2022 you did not have an expectation that changes in Federal funding for COVID testing would impact Co-Diagnostics's sales of its Logix Smart COVID-19 test? **A.** No, that's correct.").

Further, during the August 11, 2022 Co-Diagnostics' earnings call, Mr. Dwight Egan stated:

The government has not been, in many respects, it's not been the big driver of what we've done for the last 2.5 years. And we haven't been a company that's come out

64

and said, yes, the government just bought a whole boatload of our tests. We have serviced more private oriented market and an international market.

ECF No. 103-17 (DX 77), August 11, 2022 Earnings Call Transcript, at 9-10.

Moreover, Dr. Tsai's undisputed expert testimony establishes that the end of HRSA COVID funding for the uninsured in March 2022 was not expected to have a significant impact on demand for lab-based PCR testing (like the Logix test), in light of the many other statutes and governmental and institutes programs and policies that still supported lab-based COVID testing after March 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 38.

## V.    The May 12, 2022 Press Release and Earnings Call

### CLASS REPRESENTATIVE'S PARAGRAPH 55:

55.    On May 12, 2022, after the market closed, the Company issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the quarter ended March 31, 2022 (the "May 12, 2022 Press Release"). Uris Decl. Ex. 21 (ECF No. 34, Ex. 7 at Page 4 of 8). The May 12, 2022 Press Release reported "Revenue of $22.7 million, primarily due to sales of the Logix Smart™ COVID-19 Test", representing a revenue increase of 13.5% as compared to $20.0 million during the prior year period. *Id.*; Uris Decl. Ex. 19 (ECF No. 34, Ex. 1 at Page 7 of 16).

### DEFENDANTS' RESPONSE TO PARAGRAPH 55:

55.    Defendants admit the statements in paragraph 55.

### CLASS REPRESENTATIVE'S PARAGRAPH 56:

56.    The May 12, 2022 Press Release, issued approximately halfway through Q2 2022, announced Defendants' decision to stop providing quarterly guidance at that time based on various factors that purportedly affected their ability to accurately forecast demand for their Logix Smart™ COVID-19 test, and quoted Defendant Egan as stating:

> "*While we remain very confident about the long-term potential of our business, our ability to accurately forecast Logix Smart™ COVID-19 Test sales through the balance of the year has diminished due to decreased mask mandates in the United States, continued emergence and spread of new variants, and persistently low vaccination rates in many parts of the world. As a result, it has become difficult to predict with any level of precision the cumulative impact of these and other factors on our future financial results.* For these reasons, we are not providing quarterly guidance at this time and will reassess this position in the future[.]"

Uris Decl. Ex. 21 (ECF No. 34, Ex. 7 at Page 4 of 8).

**DEFENDANTS' RESPONSE TO PARAGRAPH 56:**

56.     Defendants admit that Plaintiff quotes from a press release issued by Co-Diagnostics on

May 12, 2022. Defendants also note, as detailed in paragraphs 3 and 4 above, that Co-Diagnostics

provided quarterly guidance on only four occasions prior to May 12, 2022, and admit that when

Co-Diagnostics provided quarterly guidance it usually did so near the middle of the current quarter.

However, Defendants note that, as detailed in paragraph 3, the undisputed facts show that Co-

Diagnostics did not have a longstanding or typical practice of providing quarterly guidance. And

Defendants further note that the undisputed facts show that the factors identified on May 12, 2022

as creating uncertainty accurately described Defendants' reasons for not providing 2Q22 guidance

and were not pretextual. *See also supra* ¶¶ 7, 17.

**CLASS REPRESENTATIVE'S PARAGRAPH 57:**

57.     On that same day, during a conference call with investors and analysts after the disclosure
of Co-Dx's financial results, Defendant Brown similarly stated:

> The dedication from our team to deliver solid performance remains on full display.
> Our record performance during the first quarter would not have been possible
> without their many contributions. As we look to the balance of fiscal 2022, we
> remain encouraged by the demand for our products and the operational and
> scientific teams we have established to support our future growth.

> Turning now to our visibility around the outlook for the balance of the year. While
> we experienced strong demand for our products during the first quarter of 2022,
> changes in our operating environment and markets have restricted our near term
> visibility. We will continue to navigate the near term environment with caution, but
> as a result, we'll not be providing quarterly guidance at this time.

> *To be clear, we remain very confident about the long-term potential of our business
> and the demand for our products. Our ability to accurately forecast Logix Smart
> COVID-19 test sales through the balance of the year has diminished due to
> decreased mask mandates in the United States, continued emergence and spread of
> new variants and persistently low vaccination rates in many parts of the world.
> Furthermore, we are experiencing sizable fluctuations in order patterns from our
> customers that are not cleanly captured in a particular quarter as testing*

66

*requirements continue to vary across the many geographic regions we serve. As a result, it has become difficult to predict with an expected level of precision the cumulative impact of these and other factors on our future financial results.*

Uris Decl. Ex. 19 (ECF No. 34, Ex. 1 at Page 8 of 16).

**DEFENDANTS' RESPONSE TO PARAGRAPH 57:**

57.    Defendants admit Plaintiff quotes from a transcript of Co-Diagnostics' earnings call, held on May 12, 2022, published by S&P Global Market Intelligence.

**CLASS REPRESENTATIVE'S PARAGRAPH 58:**

58.    However, during the same conference call, in response to a question from an analyst regarding whether Defendants were already seeing a decline in customer orders, Defendant Brown reassured investors regarding current demand for Logix Smart™ COVID-19 detection test:

> [Analyst]: "So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward?"

> Defendant Brown: *"It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in."*

*Id.* at Pages 10, 11 of 16.

**DEFENDANTS' RESPONSE TO PARAGRAPH 58:**

58.    Defendants admit that Plaintiff selectively quotes from a transcript of Co-Diagnostics' earnings call, held on May 12, 2022 earnings call transcript, published by S&P Global Market Intelligence, but object to Plaintiff's characterization of Mr. Brown's response to the analyst's question. Defendants respectfully refer the Court to the entirety of the transcript, at ECF No. 103-16 (DX 76), for a complete statement of its contents, including the full, following exchange between Yi Chen, an analyst for H.C. Wainwright, and Mr. Dwight Egan and Mr. Brown:

> **Yi Chen**
> *H.C. Wainwright & Co, LLC, Research Division*

Excellent. Thanks a lot. And a quick follow-up on the Logix Smart detection test. I know you spoke about the fact that you couldn't -- I mean it's not -- now is not the right time, like give guidance, but are you already seeing a decline in the number of orders for the test? Or is it mainly a fluctuation in the total number of orders and the timing of customers or customer orders? And in the same context, I was also -- I know you spoke about it during your prepared remarks, but maybe if you could summarize how you could leverage the existing CoPrimer technology for other indications that will also be very helpful for our understanding.

**Dwight H. Egan**
*Chairman, CEO & President*

Okay. We have a little bit of a problem hearing all of the questions that you just answered or that you just asked. So if you wouldn't mind, would you please repeat most important part of the question so that we can hear it.

**Yi Chen**
*H.C. Wainwright & Co, LLC, Research Division*

Sure. Sorry about that. So with the Logix Smart detection test, are you already seeing a decline in customer orders? Or are you refraining from providing a guidance mainly because it's tough to like predict the environment moving forward? And in the same context, I was wondering if you could, I know you spoke about it during your prepared remarks, but I was wondering if you could essentially summarize how you could leverage your CoPrimer technology for other indications, assuming COVID-19 testing decreases throughout the rest of this year?

**Brian L. Brown**
*CFO & Company Secretary*

Yes. This is Brian. I can respond to the first question that you asked. It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in. And the last thing we want to do is provide guidance that we're not confident in. And so that's one thing you'll know going forward is if we're not confident in providing guidance, then we won't provide guidance.

ECF No. 103-16 (DX 76), May 12, 2022 Earnings Call Transcript, at 9-10.

## VI.    August 11, 2022 Press Release and Earnings Call

## CLASS REPRESENTATIVE'S PARAGRAPH 59:

**59.**    On August 11, 2022, after the market closed, Co-Dx issued a press release and filed a report with the SEC on Form 8-K that disclosed its Q2 2022 financial results, and conducted a conference

call with investors and analysts. Uris Decl. Ex. 9 (ECF No. 34, Ex. 11 at Page 4 of 8). The press release disclosed revenue of just $5.0 million for Q2 2022, down from $27.4 million during the prior year period (a decline of almost 82%). *Id.* The Company primarily attributed the decrease to lower demand of the Logix Smart™ COVID-19 Test. Specifically, Defendant Egan was quoted as stating that "[o]ur second quarter results reflect lower volumes for our Logix Smart™ COVID-19 Test, which [we] believe is primarily the result of a reduction in mandated testing in travel and public venues and in government funding for testing programs." *Id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 59:**

59.    Defendants admit that on August 11, 2022, Co-Diagnostics issued a press release and filed

a report with the SEC on Form 8-K that disclosed its Q2 2022 financial results, and conducted a

conference call with investors and analysts. Defendants also admit that the August 11, 2022 press

release disclosed revenue of $5.0 million for Q2 2022, down from $27.4 million during the prior

year period.

Defendants note, however, that the undisputed call transcript reflects that Mr. Dwight Egan

also attributed the lower sales to a "dramatic" shift in testing behavior and other factors:

> We believe that several factors contributed to the second quarter's results, including a reduction in mandated testing for travel and public venues, a reduction in public funding assistance for testing programs and an increase in overall weariness for the disruption to daily life after a multiyear pandemic, specifically the Omicron variant earlier this year. This dramatic shift in testing behavior was widely felt across the diagnostics industry. Experts believe other waves of COVID variants are all but inevitable. However, the timing and severity are impossible to predict with every new variant, including the possibility of immune escape as variants and sub-variants by predominance.

ECF No. 103-17 (DX 77), August 11, 2022 Earnings Call Transcript, at 4-5.

**CLASS REPRESENTATIVE'S PARAGRAPH 60:**

60.    On an August 11, 2022 conference call with investors and analysts, in which Dwight Egan, Brown, and Benson participated, Defendant Egan stated "we certainly saw the -- as the second quarter progressed, the falloff and we've cited the reasons we think that falloff occurred":

> [Analyst]: Do you have any sense on what inventory levels are at your distributors? Do you think the second quarter was a quarter where distributors let inventory levels come down as demand declined? And do you think that they're at historically

low levels at this point and likely to restock? Or do you think that they have enough inventory on hand from the current level of demand?

Defendant Egan: And of course, one that we keep a close eye on every day. And we certainly saw the -- as the second quarter progressed, the falloff and we've cited the reasons we think that falloff occurred in terms of public funding of testing initiatives and just the swaging of the pressure put on by Omicron. . . .

Uris Decl. Ex. 22 (ECF No. 34, Ex. 6 at Page 9 of 13).

**DEFENDANTS' RESPONSE TO PARAGRAPH 60:**

**60.** Defendants admit that Plaintiff selectively quotes from a transcript of Co-Diagnostics' earnings call, held on August 11, 2022, published by S&P Global Market Intelligence. Defendants respectfully refer the Court to the entirety of the transcript, at ECF No. 103-17 (DX 77), for a complete statement of its contents.

Defendants note, however, that the undisputed facts establish that Co-Diagnostics did not monitor, and did not have the ability to monitor, its customers' inventory levels. Mr. Dwight Egan testified that in the quoted section of the August 11 call transcript he was referring to "the inventory levels that the company has"—which makes sense since Co-Diagnostics did not have any visibility into the inventory levels of its customers. ECF No. 102-23 (DX 23), D. Egan Dep. 62:6-16 ("**Q.** I believe the question was about inventory levels at your distributors. So were you not talking about inventory levels at your distributors? **A.** No, I would have had no way to have a read on what inventory levels our distributors had. I mean we had customers in 50 different countries and scores of customers in labs throughout the United States so we wouldn't be tracking what's going on with our individual distributors."); ECF No. 102-24 (DX 24), S. Egan Dep. 72:9-12 (testifying he had no insight into customers' inventory levels), 76:4-7 (same). The undisputed facts also establish that Co-Diagnostics did not receive monthly sales projections from its distributor or laboratory customers during the COVID pandemic. ECF No. 102-24 (DX 24), S. Egan Dep. 75:22-76:3.

Defendants also note that the undisputed facts establish that the Defendants did not know or believe that there was a "falloff" in demand for the Logix test prior to May 12, 2022 or that lower sales in the spring of 2022 signaled a demand issue or that full-quarter revenue for 2Q22 would be low. ECF No. 102-21 (DX 21), Brown Dep. 152:21-24 ("Because at the time we didn't [think there was a demand issue], that's not what we saw. That's just basically we felt like it was a timing of orders at that given point in time."), 153:22-154:3 (similar); ECF No. 102-23 (DX 23), D. Egan Dep. 71:8-23 ("We became aware of -- we knew what the sales and revenue activity was but we did not view that as being dispositive in terms of what the prospective sales levels would be. We were in the middle of a pandemic. We were also coming off of a very rough season in the world and in the country with respect to the Omicron virus and its mutations which were extremely pervasive. So at this point, we're looking at a whole bunch of other data besides just looking at monthly sales results as to what could happen in the future.").

**CLASS REPRESENTATIVE'S PARAGRAPH 61:**

61.     On August 12, 2022, the price of Co-Dx's common stock declined $1.98, or 30.65%, from a closing price of $6.46 per share on August 11, 2022 to close at $4.48 per share on August 12, 2022. The abnormal return on this date was -32.21%, and the abnormal dollar change was -$2.08. Uris Decl. Ex. 23, Expert Report of Chad Coffman, CFA, dated November 20, 2024, ¶75 & Ex. 1.

**DEFENDANTS' RESPONSE TO PARAGRAPH 61:**

61.     Defendants admit that on August 12, 2022, the price of Co-Diagnostics' common stock declined $1.98, or 30.65%, from a closing price of $6.46 per share on August 11, 2022 to close at $4.48 per share on August 12, 2022. Defendants also admit that Plaintiff's economic expert Mr. Coffman opines that the "abnormal return on this date was -32.21%, and the abnormal dollar change was -$2.08," but Defendants object to Mr. Coffman's testimony as unreliable and irrelevant for the reasons set forth in Defendants' Motion to Exclude Mr. Chad Coffman's Purported Expert Report (ECF No. 110).

Further, Defendants note that no facts establish that the stock drop observed on August 12, 2022 was due in whole or in part to the revelation of any truth allegedly fraudulently hidden by the challenged statements. The undisputed evidence shows that there were several non-corrective, negative news items ("confounding" information) announced on August 11, 2022: Co-Diagnostics' *full-quarter* 2Q22 financial results, which included sales information that did not exist on May 12, 2022 and which resulted from subsequent market developments and changed conditions; statements about Co-Diagnostics' forward-looking uncertainty in light of those changed conditions; delay of the clinical trials for Co-Diagnostics' new at-home PCR platform; and new CDC testing guidance announced just hours before Co-Diagnostics' earnings release, which relaxed testing recommendations for schools. *See* ECF No. 103-17 (DX 77), August 11 Earnings Call Transcript, at 4-5, 8-11; ECF No. 102-17 (DX 17), August 11, 2022 8-K; ECF No. 103-23 (DX 83), H.C. Wainwright August 2022 Report, at 1 (detailing new CDC guidance that no longer recommended routine COVID screening in K-12 schools); *see also* ECF No. 103-33 (DX 93), Juneja Reply ¶¶ 8, 13-42, 53, 67-69; Defs' 56.1 ¶¶ 266-274, 277-280. Plaintiff's economic expert Mr. Coffman fails to analyze, account for, or disaggregate the impact of any of these confounding news items on Co-Diagnostics' stock price. *See* Juneja Reply ¶¶ 8, 13-42, 53, 67-69; Defs' 56.1 ¶¶ 287-290. Accordingly, no facts establish that Co-Diagnostics' stock price drop on August 12, 2022 was attributable in whole or in part to the "correction" of any challenged statement.

**CLASS REPRESENTATIVE'S PARAGRAPH 62:**

**62.**     The decline in the price of Co-Dx common stock on August 12, 2022 was statistically significant beyond the 99% level. *Id.*

**DEFENDANTS' RESPONSE TO PARAGRAPH 62:**

**62.** Defendants admit that Mr. Coffman opines that the decline in the price of Co-Diagnostics' common stock on August 12, 2022 "was statistically significant beyond the 99% level." Defendants, however, object to Mr. Coffman's expert opinion as unreliable and irrelevant for the reasons set forth in Defendants' Motion to Exclude Mr. Chad Coffman's Purported Expert Report. And Defendants again note that no facts establish that the stock drop observed on August 12, 2022 was due in whole or in part to the revelation of any truth allegedly hidden by the challenged statements, as detailed in response to paragraph 61.

<u>**DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS THAT PRECLUDE PARTIAL SUMMARY JUDGMENT**</u>

In addition to Defendants' responses above, Defendants offer the following undisputed, materials facts that support the denial of Plaintiff's Motion:

**I.    COVID-TEST SALES WERE ALWAYS CYCLICAL AND UNPREDICTABLE, AND EVEN MORE SO IN SPRING 2022**

**63.** From 2Q20 through 1Q22, demand for COVID tests generally, including the Logix test, largely tracked the unpredictable rise and fall of infections due to the emergence and subsidence of new COVID variants. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 23-27, Fig. 4; ECF No. 103-36 (DX 96), Quarterly Dashboard; ECF No. 102-112 (DX 112), Weekly Sales Compilation.

**64.** During this time, the emergence and subsidence of new COVID variants was highly unpredictable and did not follow regular seasonal patterns, and the severity, transmissibility, and vaccine-efficacy of each variant was different. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 15-18, 24-27; *see also* ECF No. 108, Defs' 56.1 ¶¶ 43-102.

**65.** Masking, vaccination, and testing mandates, funding initiatives, and other COVID-related government and institutional policies had different and often conflicting impacts on test sales depending on a variety of factors. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 14, 23-35, 37-41, Fig. 5;

ECF No. 103-33 (DX 93), Juneja Reply ¶ 17; *see also* ECF No. 108, Defs' 56.1 ¶¶ 57-85, 88-108, 146-154, 111, 244-250.

66. For example, Dr. Tsai testified that the impact of decreased mask mandates on COVID infection rates "depend[s] on the context" because if there is low prevalence of disease in communities "then masking may not make a difference" but "if there were COVID cases and active transmission, then it could have an impact" ECF No. 102-29 (DX 29), Tsai Dep. 52:13-54:14, 51:10-52:12; 56:19-58:4 (testifying uncertainty as to whether emergence of new variants results in increased COVID infections); ECF No. 103-31 (DX 91), Tsai Rpt. ¶ 23 ("Often, but not always, demand for tests increases as COVID cases increase."); *id.* ¶ 40 (showing that although Connecticut and Georgia registered a similar number of COVID cases per capita for the week ending May 12, 2022, providers in Connecticut administered more than twice as many molecular tests per capita); *id* ¶ 38 (similar regarding changes to certain sources of federal funding); *see also supra* ¶¶ 47-49.

67. As a result of the factors identified in paragraphs 63 through 65, among others, COVID-test sales were highly volatile, cycling unpredictably between peaks and troughs throughout the pandemic. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 23, 26-34, 36-41; *see also* ECF No. 108, Defs' 56.1 ¶¶ 43-102, 146-154, 244-250.

68. COVID-test sales in general surged with the rise of the Omicron variant in late 2021 and the beginning of 2022, and then dropped in early 2022 as Omicron receded. ECF Nos. 102-33, 102-34, 102-38, 102-42 (DXs 33-34, 38, 41) (public coverage of the fluctuations in COVID-test sales during and after Omicron); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 24, 26, 36 Fig. 4; *see also* ECF No. 108, Defs' 56.1 ¶¶ 59-66; 110(a)-(d).

**69.** Despite the drop in test sales following the Omicron surge, public statements by industry and public health and government officials in the spring of 2022 show that those officials expected long-term demand for COVID tests to remain strong due to the emergence of future variants and surges in COVID infections. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 14, 37; *see also* ECF No. 108, Defs' 56.1 ¶¶ 87-88.

**70.** It was widely reported in March through May 2022 that experts and government officials expected a new COVID wave to emerge in the coming months and drive continued test sales. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 25, 37, 42, 44; *see also*, *e.g.*, ECF Nos. 102-45, 102-49, 102-52, 102-55, 103-5, 103-6, 103-7 (DXs 45, 49, 52, 55, 65, 66, 67) (public coverage of health officials and experts warning of coming COVID waves); ECF No. 108, Defs' 56.1 ¶¶ 55, 86-87, 89-92, 102-104, 109.

**71.** Two new Omicron sub-variants (BA.2 and BA.5) had begun to circulate in the United States in early 2022 and were expected to increase test sales by the summer of 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 15-17, 25; ECF No. 103-4 (DX 64); *see also* ECF No. 108, Defs' 56.1 ¶¶ 46-47, 51, 53, 93, 109(f).

**72.** At the same time, however, policies, practices, and personal behaviors with respect to COVID testing were shifting rapidly post-Omicron, making it increasingly difficult to predict test sales in March, April, and May 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 14, 28-40; *see also* ECF No. 108, Defs' 56.1 ¶¶ 68-70, 74-86, 89-104, 108, 111.

**73.** Changes in perceived risk, personal behaviors, and increased pandemic fatigue, along with the other factors described above, further complicated attempts to predict testing demand in the spring of 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 34-44 (testing requirements and utilization and vaccination rates, masking requirements, and other factors varied even more widely and

changed more frequently in spring 2022); ¶ 42, Tbl. 2 (showing public discussion of same); *see also* ECF No. 108, Defs' 56.1 ¶¶ 101-102, 111, 241.

74.    Congress's decision in March 2022 not to renew certain COVID funding for the uninsured was extensively covered in the press, but other federal programs continued to require private plans, Medicare, and Medicaid to reimburse for lab-based COVID tests, bolstering PCR-test sales. ECF Nos. 102-44, 102-50 (DXs 44, 50) (public coverage of certain federal funding cuts for COVID testing); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 21, 29, 38, 41; *see also* ECF No. 108, Defs' 56.1 ¶¶ 88, 110, 148-154.

75.    Dr. Tsai opined that the May 12, 2022 challenged statements were "consistent with [his] understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022." ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶ 13, 45.

## II.    THE MARKET RECEIVED THE CHALLENGED STATEMENTS AS BAD NEWS INDICATING LIKELY REDUCED 2Q22 EARNINGS

76.    Analysts covering Co-Diagnostics understood the Company's decision not to provide guidance, and the uncertainty Defendants described on the May 12, 2022 earnings call, as bad news for 2Q22 revenue. *See* ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶ 17-18, 20-23, 29; ECF No. 102-28 (DX 28), Juneja Dep. 42:14-44:14, 43:9-19, 46:6-14, 48:6-16; ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report; ECF No. 103-20 (DX 80), Litchfield May 2022 Report; ECF No. 103-18 (DX 78), Sidoti May 2022 Report; *see also* ECF No. 108, Defs' 56.1 ¶¶ 255-265.

77.    Each analyst report commented on the suspension of guidance, with comments being overwhelmingly negative—no analyst considered it to indicate anything positive. *See* ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report, at 1 ("Of note, management did not provide quarterly sales guidance . . . . We continue to project a gradually decreasing demand for

COVID-19 testing in the coming quarters."); ECF No. 103-20 (DX 80), Litchfield May 2022 Report, at 1,4; ECF No. 103-18 (DX 78), Sidoti May 2022 Report, at 1-2; *see also* ECF No. 103-32 ((DX 92), Juneja Rpt. ¶ 20; ECF No. 108, Defs' 56.1 ¶¶ 256-257.

78.    Despite Co-Diagnostics' positive 1Q22 earnings also announced on May 12, 2022, no analyst revised their forecasts upward, and two analysts decreased certain estimates for 2Q, 3Q, and 4Q22. *See* ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶ 20-23; ECF No. 103-20 (DX 80), Litchfield May 2022 Report (lowering revenue and EPS estimates; "Our only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside."); ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report (lowering EPS estimate); ECF No. 103-18 (DX 78), Sidoti May 2022 Report ("[N]et income should slow the remainder of 2022, as Covid-19 testing levels off."); *see also* ECF No. 102-28 (DX 28), Juneja Dep. 42:16-44:14; 46:6-14; ECF No. 108, Defs' 56.1 ¶¶ 257-262.

79.    Defendants' economic expert, Dr. Juneja, opined—and Plaintiff's economic expert, Mr. Coffman, did not dispute—that these analyst reports and other market evidence demonstrate that the market perceived the challenged statements as "negative news and interpreted [them] as indicating a likely decline in future revenues and earnings." ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶ 17, 29; *see also id.* ¶¶ 18-23; ECF No. 103-35 (DX 95), Coffman Reply ¶ 8; ECF No. 102-28 (DX 28), Juneja Dep. 43:9-19; ECF No. 108, Defs' 56.1 ¶¶ 263-264.

### III.    MR. DWIGHT EGAN'S AND MR. BROWN'S STOCK HOLDINGS INCREASED DURING THE CLASS PERIOD

80.    During the class period, Mr. Dwight Egan's and Mr. Brown's Co-Diagnostics stock holdings increased, and their only sales were to cover tax withholding obligations in connection with the vesting of certain restricted stock units. *See* ECF No. 102-16 (DX 16), Compilation of SEC Forms 4 for D. Egan, dated November 11, 2021 through November 11, 2022; ECF No. 102-

15 (DX 15), Compilation of SEC Forms 4 for Brown, dated November 11, 2021 through November 11, 2022.

Dated: May 2, 2025
       New York, New York

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:    */s/ Douglas W. Greene*
        Douglas W. Greene (*pro hac vice*)
        dgreene@bakerlaw.com
        Genevieve G. York-Erwin
        gyorkerwin@bakerlaw.com
        Marissa Peirsol (*pro hac vice*)
        mpeirsol@bakerlaw.com
        45 Rockefeller Plaza
        New York, NY 10111
        Telephone: 212.589.4200

*Attorneys for Defendants*