**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated, | Case No.: 22-cv-6978-AS |
| Plaintiff, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN, | |
| Defendants. | |

## <u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................................ ii

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................... 3

        A.      Defendants Tracked Daily Sales Information; Information That Showed
                that Sales Had Significantly Declined by The Start of the Class Period ................ 3

        B.      Defendants' May 12, 2022 Statements Concerning the Company's
                Decision Not to Provide Guidance Were a Pretext to Avoid Disclosing
                that Sales of the Logix Test Had Rapidly Declined .................................................. 4

        C.      Defendants Provided Comfort To Investors Regarding Demand for the
                Logix Test on the May 12, 2022 Press Release and Earnings Call ........................ 6

        D.      The August 11, 2022 Press Release and Earnings Call ......................................... 8

III.    LEGAL STANDARD ....................................................................................................... 8

IV.     ARGUMENT .................................................................................................................... 8

        A.      Defendants Cannot Obtain Summary Judgment On Falsity ................................... 8

        B.      Defendants Cannot Obtain Summary Judgment On Materiality .......................... 13

        C.      Defendants Cannot Obtain Summary Judgment as to Scienter ........................... 14

                1.      Discovery Has Confirmed The Court's Prior Scienter Holding .............. 14

                2.      Defendants' "Good Faith" Argument is a Red Herring .......................... 15

        D.      Defendants Are Not Entitled to Summary Judgment on Reliance ....................... 18

        E.      Genuine Issues of Material Fact Preclude Summary Judgment for
                Defendants on Loss Causation ............................................................................. 23

V.      CONCLUSION .............................................................................................................. 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) ........................................................................................... 21, 22

*AUSA Life Ins.*,
  206 F.3d 202 (2d Cir. 2000).............................................................................................. 24

*F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
  205 F.3d 66 (2d Cir. 2000)................................................................................................ 13

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ............................................................................................ 19

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021)................................................................................................... 3, 18

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012)......................................................................................... 3, 8, 24

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  2010 WL 6397500 (S.D. Fla. Aug. 18, 2010)................................................................... 9

*In re Ferroglobe PLC Sec. Litig.*,
  2020 WL 6585715 (S.D.N.Y. Nov. 10, 2020)................................................................... 9

*In re JWP Inc. Sec. Litig.*,
  928 F. Supp. 1239 (S.D.N.Y. 1996)................................................................................. 14

*In re Pfizer Inc. Sec. Litig.*,
  819 F.3d 642 (2d Cir. 2016).............................................................................................. 26

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).......................................................................................... 19, 24

*In re WorldCom, Inc. Sec. Litig.*,
  352 F. Supp. 2d 472 (S.D.N.Y. 2005).............................................................................. 14

*Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*,
  2018 WL 6329396 (S.D.N.Y. Dec. 4, 2018) .................................................................... 27

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).............................................................................................. 23

*Menorah Mivtachim Ins. Ltd. v. Sheehan*,
   2024 WL 1613907 (2d Cir. Apr. 15, 2024) ................................................................. 27

*Omnicare, Inc. v. Laborers Dist. Council Const. Indust. Pension Fund*,
   575 U.S. 175 (2015) ...................................................................................................... 9

*S.E.C. v. Cole*,
   2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ........................................................... 14

*Scott v. Harris*,
   550 U.S. 372 (2007) ...................................................................................................... 8

*Siegel v. Bos. Beer Co., Inc.*,
   2022 WL 17417111 (S.D.N.Y. Dec. 5, 2022) ............................................................. 9

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ................................................................ 21

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ..................................................................................... 18, 19

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 8

Lead Plaintiff Stadium Capital LLC ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion for summary judgment. ECF Nos. 101, 107.

## I.    INTRODUCTION

Defendants seek summary judgment on the elements of falsity, materiality, scienter, reliance, and loss causation. While Plaintiff agrees that there are many undisputed facts warranting summary judgment on some of these elements, those facts are entirely in favor of summary judgment for **Plaintiff**, not Defendants. At a minimum, there are genuine issues of material fact that preclude summary judgment for Defendants on any element.

The primary underlying facts of this action remain undisputed. On May 12, 2022, Defendants informed investors that they would cease providing quarterly revenue guidance due to changes in "near term visibility" and "sizable fluctuations in order patterns," but refuted analyst concerns about demand for the Logix Smart COVID-19 Test™ (the "Logix Test"), assuring them in response to the direct question "[s]o with the Logix Smart detection test, *are you already seeing a decline in customer orders*? . . ." that "[i]t's not necessarily a demand issue that we're seeing." ¶¶56-58.[1] At the time they made this and the other alleged misstatements, Defendants knew that Co-Diagnostics had *never before* had less than *$5.1 million* in sales by the midpoint of any quarter. ¶14. But as of May 12, 2022, the Company had sales of approximately *$2.5 million*. ¶¶11, 14. And this was a continuation of the record low sales that started before 2Q 2022. ¶¶16-19. The Company shocked the market with the ultimate reported 2Q 2022 revenues of $5.02 million, which the Company primarily attributed to "lower volumes for our Logix Smart™ COVID-19 Test". ¶11-13, 59. This disclosure of the dramatic decline in demand for the Logix Test caused Co-

---

[1] All emphasis herein is added unless stated otherwise. All references to "¶_" are to paragraphs in Lead Plaintiff's Rule 56.1 Statement of Undisputed Facts (ECF No. 115), and all references to "Pl. Resp. ¶_" are to paragraphs in Plaintiffs' Response to Defendants' Statement of Undisputed Facts.

Diagnostics' stock price to plummet more than 30%. ¶ 61. Accordingly, the evidence strongly supports Plaintiff's motion for summary judgment on falsity, materiality, and scienter, but at a minimum, there is ample evidence to create a genuine issue precluding summary judgment for Defendants.

*First*, the evidence precludes summary judgment for Defendants on falsity because it is undisputed that Defendants knew sales had fallen dramatically by May 12, 2022. As this Court previously held, "it was misleading to describe the situation as 'fluctuations' or to disclose the Company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." ECF No. 42 at 5; *see also* AC ¶48. Moreover, *even if* Defendants believed that "present conditions did not indicate a 'demand issue'" (they did), the fact that sales had plummeted to record low levels was a "risk[] to future demand" that Defendants were required to disclose to make their statements not misleading. *See* ECF No. 42 at 4.

*Second*, Defendants' materiality argument that the market was already aware of the "volatile, cyclical nature of COVID-test sales" and "the fact that [generally, Covid test] sales had decreased following the Omicron spike" ignores that, *even if true*, the market was **not** already aware that sales of the **Logix Test** had plummeted.

*Third*, overwhelming evidence precludes summary judgment for Defendants on scienter. Defendants monitored the "daily influx of demand" for the Logix Test and their internal documents show that the decision to cease providing quarterly guidance was a pretext to avoid disclosing that Q2 2022 was "***off to a slow start***" and Co-Diagnostics was "***likely to have a soft quarter, or two***". ¶39.

*Fourth*, Defendants have not rebutted the presumption of reliance, which requires proof by a preponderance of the evidence that the alleged misstatements did not impact Co-Dx's stock

2

price. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) (defendants bear the burden of persuasion to rebut price impact by a preponderance of the evidence). Plaintiff's event study, which Defendants do not challenge, demonstrates that the alleged misrepresentations impacted share prices because when the truth was revealed, share prices fell precipitously. Their quibbles over supposedly confounding news on the corrective disclosure date are meritless and insufficient to prove no price impact.

**Finally**, abundant evidence shows that the alleged misrepresentations caused Plaintiff's losses when the true information about drastically reduced demand was revealed by the Q2 2022 earnings announcement. Defendants are not entitled to summary judgment on this issue because they have presented no evidence that "foreclose[s] the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161-162 (2d Cir. 2012).

Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Defendants Tracked Daily Sales Information; Information That Showed that Sales Had Significantly Declined by The Start of the Class Period

Defendants concede that they used Monday.com, a project management platform, to keep track of placed orders and from which they were "able to monitor the daily influx of demand for [their] tests . . . .".  ¶¶7-10, 21-29.

While COVID sales patterns naturally evinced some variability given the seasonal nature of COVID (Pl. Resp. ¶51), sales of the Logix Test were consistent – from the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter. ¶2.  Moreover, while each new "wave" of COVID had the potential to boost sales of the Logix

3

Test, Co-Diagnostics historically had a consistent level of baseline sales, even between "waves." ¶¶14-15; *see infra* at 1.

The Company's poor sales in Q2 2022 through May 12, 2022 was not a new development. Rather, it was the continuation of the abnormally low sales that occurred in the preceding months – Co-Diagnostics had sales of $3.32 million in February 2022, $2.80 million in March 2022, $1.94 million in April 2022, and $574,915 in May through May 12. ¶16. Since the Company began selling its Logix Test, prior to March 2022, it had **never before experienced back-to-back months with sales below $4 million, let alone three consecutive such months**. ¶17. In fact, other than March 2020 (when the Company began selling the Logix Test in earnest), **March 2022 and April 2022 represented the second-worst and worst months in terms of sales volume, respectively, since the Company began selling the Logix Test**. ¶18.

> **B.     Defendants' May 12, 2022 Statements Concerning the Company's Decision Not to Provide Guidance Were a Pretext to Avoid Disclosing that Sales of the Logix Test Had Rapidly Declined**

Mike Houston (Managing Director of Co-Diagnostics' investor relations consulting firm) testified that he would help "formulate the messaging [for an earnings release]" "based on the information that they would share with us." ¶35. In a May 5, 2022 email to Brown from Houston, wrote "[f]ollowing up on our call yesterday, I wanted to outline a few considerations as you prepare to discuss guidance with the Board." ¶38. In the email, Mr. Houston outlined four "[a]lternatives to providing Q2 guidance in the earnings call and release". *Id*. Regarding his call with Houston, Brown testified that "at that point in time we would have been able to see what the numbers were through Monday.com and been able to discuss where we stood at that point in time . . . ." ¶39(a); ¶39(b) ("we had a call and we discussed where we were . . . .").

Regarding alternative 2, Houston noted that **"[g]uiding to an annual figure would tip your hand to investors** that you'll likely have a soft quarter, or two, and provide some air cover during

4

the soft quarters" and "will also allow you to directionally provide guidance on Q2, stating that *Q2 is off to a slow start* without having to provide a specific number". ¶39 (emphasis added).

Regarding alternative 3, lowering quarterly guidance to a "95% achievable" number, Houston stated: "[w]hile it *will have a negative impact on the share price*, it's better to take your lumps up front and maintain your credibility" and "[i]f the forecast calls for CODX to make up for the soft quarter throughout the balance of the year, it might be beneficial to offer an annual topline guidance range as well". ¶40 (emphasis added).

Regarding alternative 4, "[g]uid[ing] to $17-$19 million in topline with the hope that you come close because you've done so before" (¶38), Houston stated: "[n]eed to ask yourself if a reasonable person (SEC official or class action lawyer scenario) could reasonably understand your rationale and logic for guiding to such a high number *despite the weak start to the quarter*[.]" ¶41.

Regarding alternative 1, pulling guidance completely, Houston noted that "[t]his path will raise the most questions, but could be viewed as more positive than guiding to a figure and coming up very short," and would help Defendants "[m]aintain[] some level of credibility if delivered well". ¶42. In response, Brown noted that he "would lean into [that option]" and asked Houston: "What are [your] thoughts for *the reasoning that would be presented best*?" *Id.* (emphasis added). On May 8, 2022, Houston responded with a list of "*reasons [that] could be [the] rationale for pulling guidance completely*. Some are likely a stretch, but we included them anyways to at least spur discussion." *Id*. Two of those reasons that Houston came up with were "[m]ask mandates being dropped while variants remain, and OUS vaccination rates continue to be low" and "[t]iming of orders in a particular quarter and how they are beginning to fluctuate greatly." *Id*. Defendant Brown responded, suggesting "[i]nability to confidently project testing requirements through the

remainder of the year" as an additional reason Defendants could "point to as we pull back on guidance." *Id*.

On May 9, 2022 Brown emailed Houston to note that "[t]he board is up with not giving guidance but providing some good reason in the script and on the earnings release." ¶43.  On May 10, 2022, Brown stated that he would get Benson's and Dwight Egan's "thoughts on why we are not providing guidance." ¶44(a).  Houston acknowledged that he was still working with the Company on determining the rationale that would be provided for not giving guidance. ¶44(b).

On May 10, 2022, Benson circulated a draft of the May 12, 2022 earnings release to Brown and Dwight Egan.  ¶45.  Those edits included the addition of "continued emergence and spread of new variants" as a factor impacting their ability to accurately forecast Logix Smart COVID-19 test sales. *Id*.  As Dwight Egan testified, the Company made an effort to "emphasize [the] theme" that COVID was not going away. ¶51.

### C.    Defendants Provided Comfort To Investors Regarding Demand for the Logix Test on the May 12, 2022 Press Release and Earnings Call

On May 12, 2022, after the market closed, the Company issued a press release disclosing financial results for Q1 2022 (the "Q1 Press Release"). ¶55. The Q1 Press Release reported "Revenue of $22.7 million, primarily due to sales of the Logix Smart™ COVID-19 Test", representing a revenue increase of 13.5% as compared to $20.0 million during the prior year period. *Id*.  Brown reiterated on the earnings call that same day that "[a]s we look to the balance of fiscal 2022, we remain encouraged by the demand for our products . . . ." ¶57.

The Q1 Press Release announced Defendants' decision to stop providing quarterly guidance based on various factors that purportedly affected their ability to accurately forecast demand for their Logix Smart™ COVID-19 test.  ¶56.  None of the cited factors suggested to the market that test sales may be ***reduced*** going forward.  In fact, each factor ("decreased mask

mandates," "continued emergence and spread of new variants," and "persistently low vaccination rates") suggested *more COVID-19 infection*, and therefore, more testing, going forward. *Id*.; *see also* ECF No. 42 at 5 (factors suggest "greater demand for tests."); *see also* ¶¶47-52; Pl. Resp. ¶235. As illustrated by an analyst's question on the May 12, 2022 earnings call, that is what the market understood Defendants to be suggesting: "I just want to be clear on the guidance. I mean *based on all the factors you laid out, it sounds like you don't expect demand for COVID-19 testing [to] go away in 2022* . . . ." ¶53. Defendant Brown answered emphatically: "*Yes, you're absolutely right*." *Id*.

On the earnings call that same day, Defendant Brown further stated "*we are experiencing sizable fluctuations in order patterns from our customers . . . .*" ¶57. However, as Brown testified, the only "fluctuations [in the timing of orders]" was the fact that sales had increased in December 2021 and January 2022, before quickly falling back down to record low levels. Pl. Resp. ¶215. Indeed, Brown conceded that sales were low in February, March, April and the beginning of May 2022. *Id*. As Seth Egan agreed, "*sales had never been that low for that long*." *Id*.

In response to another analyst question regarding whether Defendants were already seeing a decline in customer orders, Defendant Brown reassured investors that "*It's more about the timing and being able to forecast the timing of orders is the bigger issue. It's not necessarily a demand issue that we're seeing. It's more of just timing of being able to accurately forecast what's coming in.*" ¶58. As a result, the market was only left with the impression that market conditions were impacting their ability to forecast demand, not that demand was already declining rapidly.

D.      **The August 11, 2022 Press Release and Earnings Call**

On August 11, 2022, after the market closed, Co-Dx issued a press release that disclosed its Q2 2022 financial results. ¶59.  The press release disclosed revenue of just $5.0 million, down from $27.4 million during the prior year period (almost 82%).  *Id*.  The Company primarily attributed the decrease to lower demand of the Logix Smart™ COVID-19 Test, with Defendant Egan explaining that "[o]ur second quarter results reflect lower volumes for our Logix Smart™ COVID-19 Test . . . ."  *Id*.; *see also* Uris Decl., ECF No. 114, Ex. 22 at 6 (Brown stating that the "decrease in revenue . . . was primarily driven by lower demand for our Logix Smart COVID-19 tests.").

III.    **LEGAL STANDARD**

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Gould*, 692 F.3d at 158 (quotation omitted). "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

IV.     **ARGUMENT**

A.      **Defendants Cannot Obtain Summary Judgment On Falsity**

As the Court previously found "[e]ven if [the Company] had earned every dime by May 12, it still would have been at half its usual pace."  ECF No. 42 at 5.  Not only has discovery shown that the Company had not earned every dime by May 12, but it has proven that by May 12, 2022 the Company had earned only ***$2.5 million***, which was ***less than half its <u>slowest ever pace</u> in any quarter since it began selling the Logix Test***.  ¶14.

*First*, Defendants argue that their statements "accurately described the extreme unpredictability of near-term test sales in spring 2022, and several of the factors contributing to it". Def. MSJ at 9-10. As the Court previously held, "[r]eferences to 'near term visibility' and 'fluctuations' imply current or potential volatility, not that sales have already cratered. And if anything, [Defendants] refer[red] to trends that a reasonable investor would expect to prop up sales." ECF No. 42 at 5; ¶¶47-53. Further, "[b]y listing some potentially positive trends [that the difficulty was "due to"] but omitting the negative elephant in the room, the statement was plausibly misleading." ECF No. 42 at 6.

Moreover, *even if* aspects of Defendants' statements were true, "literal accuracy is not enough: an issuer must as well desist from misleading investors by saying one thing and holding back another". *Omnicare, Inc. v. Laborers Dist. Council Const. Indust. Pension Fund*, 575 U.S. 175, 192 (2015). Accordingly, it is crystal clear that Defendants failed to tell "the whole truth" in their statements regarding demand for the Logix Test by omitting that sales had plummeted. And contrary to Defendants' suggestion, the misleading nature of the statements does not turn on their supposed belief "that present conditions did not indicate a 'demand issue'; and their genuine optimism about long-term demand for the Logix test and CoDx's other products." Def. MSJ at 10; 12 (similar). "While that may be true, it does not tend to negate the falsity of [Defendants'] statements [which failed to disclose that sales had plummeted]." *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *30 (S.D. Fla. Aug. 18, 2010).

Defendants' cases are nothing like the facts here. *See Siegel v. Bos. Beer Co., Inc.*, 2022 WL 17417111, at *7 (S.D.N.Y. Dec. 5, 2022) (complaint offered "no facts or figures" to support characterizations that "industry trends . . . did not demonstrate 'a lot of growth'"); *In re Ferroglobe PLC Sec. Litig.*, 2020 WL 6585715, at *9 (S.D.N.Y. Nov. 10, 2020) (finding that "[a] discussion

9

of third-party estimates of global demand . . . for [aluminum only] over a four-year time horizon would not mislead any reasonable investor about [Defendant's] quarterly sales figures [for silicon metals].").  Here, discovery proves sales for the quarter were a meagre $2.5 million on May 12, representing a tremendous drop from the norm for the last eight consecutive quarters.  ¶11, 14. Moreover, the Court has already rejected Defendants' attempts to frame the challenged statements as opinions, puffery, or forward-looking statements.  Def. MSJ at 12-13; ECF No. 42 at 5-6.

Defendants assert that Dr. Tsai's testimony "establishes that the factors identified in the challenged statements . . . create[d] tremendous uncertainty" regarding COVID testing demand. Def. MSJ at 10.  But Plaintiff does not allege that the statements were misleading because the identified factors were false, but rather, because Defendants knew sales information indicating demand for the Logix test had already plummeted and therefore Defendants' positive statements about the demand for its Logix Smart™ COVID-19 Test lacked a reasonable basis. Def. MSJ at 10; AC ¶48; *see also* ECF No. 42 at 5.  Nor is Dr. Tsai's testimony "undisputed," as Plaintiff has moved to partially exclude his testimony on the grounds that he relies almost exclusively on COVID developments in the U.S. or the Americas despite the fact that Co-Diagnostics operated globally, and that he offers no basis for his repeated claim that it was "***increasingly*** difficult" in the Spring of 2022 to accurately predict demand for COVID-19 tests.  *See* ECF No. 105 at 6-9.

*Second*, Defendants argue that "CoDx saw greater volatility and increased fluctuations in its test orders from the end of 2021 through spring 2022, making it even harder to forecast sales" and provides "critical context" for the challenged statements. Def. MSJ at 10-11, 15.  However, as Brown testified, the only "volatility" or "fluctuations" in the timing of orders was the fact that sales had increased in December 2021 and January 2022 as a result of Omicron, before quickly falling back down to record low levels.  Pl. Resp. ¶215. Indeed, Brown conceded that sales were

10

low in February, March, April and the beginning of May 2022.  *Id*.  As Seth Egan agreed, "***sales***

***had never been that low for that long***."  *Id*.  Rather, the context of Defendants' statements were

that, despite the decline is COVID testing, Defendants misleadingly continued to tout strong

demand for the Logix Test. ¶57 (Brown on May 12, 2022 earnings call: "[a]s we look to the balance

of fiscal 2022, ***we remain encouraged by the demand for our products*** . . . .").  Indeed, given the

context of a general decline in COVID testing, analysts were naturally curious whether Co-Dx had

seen that same decline in its sales of the Logix Test.  As such, the decision to "emphasiz[e] the

'timing' issue and downplay[] the 'demand' issue" (ECF No. 42 at 5) made each of the challenged

statements all the more misleading in context.

Similarly, Defendants argue that "complicated market conditions made it impossible to

accurately predict sales at the time and that this drove their decision not to provide 2Q22

guidance."  Def. MSJ at 11.  But the evidence in internal documents shows that the impetus for

the decision not to provide quarterly guidance was that Q2 2022 was "off to a slow start" and Co-

Diagnostics was "likely to have a soft quarter, or two", *not* that "complicated market conditions

made it impossible to accurately predict sales at the time," creating at least a genuine issue of

material fact precluding summary judgment.  Pl. Resp. ¶187.

*Third*, Defendants argue that their alleged failure to disclose that sales of the Logix Test

had plummeted "is a trend-omission claim forbidden by *Macquarie*," Def. MSJ at 13, but Plaintiff

does not allege, nor did the Court uphold, a violation of Item 303 with respect to the remaining

statements.  As such, this argument is irrelevant.

*Fourth*, Defendants argue that Plaintiff's claim fails because "it was not CoDx's practice

to provide intra-quarter sales numbers on quarterly earnings calls".  Def. MSJ at 13.  Again, this

is not Plaintiff's claim.  *See* AC ¶48; ECF No. 42 at 4-5; *see also* ECF No. 105 at 2, 11-12 (citing,

*inter alia*, Coffman Dep. at 69:25-70:4 ("I'm not suggesting that [Defendants] had to disclose a particular sales figure. I'm assuming they had to reveal that there was substantially reduced demand, and that [the test's] sales were far less than what [the Company] had seen in prior quarters.").

Defendants further argue that they "did not view intra-quarter sales numbers . . . as predictive of full-quarter results or as good indicators of broader demand trends". Def. MSJ at 13-15. But even if these self-serving assertions were true, Defendants cannot avoid that Q2 2022 sales as of May 12 were ***less than half its <u>slowest ever pace</u>*** in any quarter since it began selling the Logix Test, ***and*** that sales of the Logix Test had begun to decline even prior to the start of 2Q 2022 to record low levels. ¶¶11, 14, 16-19. And, in any event, the "undisputed, material facts" on which this argument relies are both heavily disputed and inconsistent with the record. *See* Pl. Resp. ¶¶124, 125-133, 134-39, 144-45, 177, 180-81, 179-185, 189, 251-54.

For example, Defendant Egan's testimony that Defendants would not make a judgment about full quarter results five weeks in  (Def. MSJ at 14) is belied by the fact that the Company had previously provided revenue guidance at the quarter midpoint. Pl. Resp. ¶136. Moreover, his testimony that the company's sales to-date were "irrelevant" is belied by other testimony. Brown, the primary person responsible for determining guidance, testified that he would look at the company's historical results, and "[c]learly I would have discussions with Seth Egan . . . [about] how sales were going." *Id*. (testifying that he "would look at the results that had happened up to that point in time [in the quarter]" in order to determine guidance). In fact, when Defendant Egan was asked whether he compared "the company's results so far in that quarter to the results in that same quarter in the previous year" to determine guidance, he conceded "I believe we did . . . .". Pl. Resp. ¶136.

Similarly, while Brown testified that the company's historical results were the "key driver" in determining guidance (Def. MSJ at 14), he also testified that he also "would look at the company's orders to date" when determining guidance. *Id*. at ¶185; *id*. at ¶179.

*Finally*, Defendants argument that "no one at CoDx saw [the drop in sales following Omicron] as concerning" (Def. MSJ at 14-15) is inconsistent with the record. *See* Pl. Resp. ¶¶ 187, 180. Moreover, the fact that Defendants could not "recall" any concerns at the time about the drop in sales does not support their assertion that they did not see it as concerning. *See* Pl. Resp. ¶138 (citing testimony that Defendants did not "recall" any concerns at the time); s*ee F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 71 (2d Cir. 2000) ("[U]nsubstantiated, self-serving testimony that he does not 'recall' whether or not he was ever informed of . . . wrongdoing does not place this issue in genuine dispute.").

## B.    Defendants Cannot Obtain Summary Judgment On Materiality

Defendants argue that Plaintiff cannot prove that disclosing Logix test sales had plummeted would have "significantly altered the total mix of information" because "[t]he market was already aware of the volatile, cyclical nature of COVID-test sales, the fact that [generally, Covid test] sales had decreased following the Omicron spike, and that testing requirements, policies, and individual practices were in flux." Def. MSJ at 15-16. Crucially, *even if that were true*, the market was *not* already aware that sales of the *Logix Test* had plummeted. It is for that very reason that an analyst of the May 12, 2022 directly asked Defendants "with the Logix Smart detection test, are you already seeing a decline in customer orders?" ¶58.

Defendants also argue that "[t]he analyst reports following May 12 show that the market understood from these statements, in context, . . . [that] CoDx's revenue would likely end up lower than previous estimates." Def. MSJ at 16. This argument ignores the evidence. Contrary to Defendants' assertion, the Q2 2022 revenue estimates of two of three analysts covering Co-

Diagnostics (H.C. Wainwright and Sidoti) *remained unchanged following the May 12, 2022 earnings call*.  Pl. Resp. ¶256.  And while the third analyst revised its Q2 2022 estimates down slightly (from $24m to $21m), the revision was not due to any understanding that sales had already plummeted, but rather the same reasons given by Defendants.  *See* Pl. Resp. ¶¶256, 257 (Litchfield noting the "variability [] hamper[ing] precise forecasts" and stating "[o]ur only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside").

### C.    Defendants Cannot Obtain Summary Judgment as to Scienter

"[T]he Second Circuit has left no doubt that scienter issues are seldom appropriate for resolution at the summary judgment stage." *S.E.C. v. Cole*, 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19, 2015) (collecting cases). Rather, "[w]hether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 500 (S.D.N.Y. 2005). As such, whenever there is "evidence that could support an inference of fraudulent intent," scienter becomes "a question of fact that should be resolved by a jury." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1258 (S.D.N.Y. 1996).

### 1.    Discovery Has Confirmed The Court's Prior Scienter Holding

Plaintiff has adduced substantial evidence of Defendants' recklessness, precluding summary judgment on scienter. As at the pleading stage, the evidence now confirms that "the most cogent and compelling inference to draw from all the statements, taken together, is that Brown and Egan knew sales were down by mid-May 2022 and tried to obscure that fact by simply declining to offer quarterly guidance and offering vague assurances regarding 'fluctuations,' 'timing,' and 'near term visibility.'" ECF. 42 at 10.  Here, it is undisputed that Egan and Brown knew of, and had access to sales data on Monday.com showing, that Logix Test sales had in fact plummeted by May 12, 2022.  ¶¶7-10, 21-22, 24-26, 28-29.  Indeed, Defendants admit their knowledge of facts contradicting their public statements.  As Dwight Egan testified, "[s]ales were what they were."

14

¶22; *see also, e.g.,* ¶39 (Brown testifying that he discussed with Houston "what we'd seen up to this point in time in the quarter").

As Dwight Egan admitted, with respect to the overall decline in COVID testing at this time, "[w]ell, the numbers speak for themselves." ¶23. As Brown testified, in order to determine guidance he would "look at the prior quarters, look at the last year, the comparable quarter of the prior year and then determine what felt like the most accurate number to provide." ¶27. Had Brown looked at "the comparable quarter of the prior year" he would have seen that in 2Q 2021, as of May 12, 2021, the Company had quarterly sales of approximately *$14.33 million*. ¶15.[2]

This evidence is sufficient to support summary judgment for Plaintiff on scienter, but at a minimum, it creates a genuine issue of material fact.

### 2.  Defendants' "Good Faith" Argument is a Red Herring

Defendants' primary argument with respect to scienter is that "Mr. Egan and Mr. Brown acted in good faith . . . [because they] testified that they believed their May 12 statements accurately described the volatile and uncertain market conditions CoDx was facing [and] the enormous unpredictability those conditions created with respect to sales . . . ." Def. MSJ at 17. This argument is a red herring as it fails to address Plaintiff's actual claim alleging that the statements regarding demand for the Logix Test were misleading because they failed to disclose that demand for the Logix Test had plummeted. AC ¶48.

Moreover, the "undisputed material facts" Defendants' rely on in support of this argument are heavily disputed. *See* Pl. Resp. ¶¶139-40, 165, 187-93, 214-15, 221, 251-54, 278. For example, Defendants assert that Egan and Brown "simply could not get comfortable with providing *any* guidance because it seemed certain to be inaccurate" Def. MSJ at 17 (emphasis in

---

[2] Similarly, as of May 12, 2020, the Company had quarterly sales *in excess of $14.16 million*. *Id*.

original), but the evidence shows that the Company's decision not to provide guidance on May 12, 2022 was a pretext to avoid disclosing that sales of the Logix Test had rapidly declined. *Id.* ¶¶190-91, 187. In fact, after Houston proposed "[a]lternatives to providing Q2 guidance in the earnings call and release", while Brown noted that "[he] would lean into [pulling guidance completely, citing uncertainty in the market causing the company to not accurately predict results]", the pretext is revealed when he asked Houston: "What are you [sic] thoughts for the reasoning that would be presented best?" *Id.* Indeed, it wasn't until *after* deciding not to provide guidance given "that Q2 [was] off to a slow start" and Co-Diagnostics was "likely [to] have a soft quarter, or two", in brainstorming with Mike Houston about "the reasoning that would be presented best [for pulling guidance completely]", Brown suggested "Inability to confidently project testing requirements through the remainder of the year – I don't want to put out guidance that I don't feel is accurate" as just one of the factors they could "frame [the decision] around." *Id.* ¶187. In fact, Brown chose *not* to pursue the alternative option of "keep[ing] quarterly guidance but lower[ing] your estimates to a range that you believe is 95% achievable." *Id.*

Nor did Houston "corroborate" Defendants' story. Def. MSJ at 18. *First*, Defendants assert that Houston "testified that he never got the impression any Defendant was trying to "hide" low sales, but the 56.1 statements they cite in support of that assertion state only that he testified that neither Egan nor Brown *told him* that they were "motivated by trying to hide lower sales of the Logix Test." Pl. Resp. ¶¶217-219. *Second*, Houston's wrote an email to Brown making explicit the concern of "tip[ping their] hand to investors that [Co-Diagnostics will] likely have a soft quarter, or two". Pl. Resp. ¶203.

Nor is this argument "further buttressed by Dr. Tsai's expert opinion" (Def. MSJ at 18) for the same reasons mentioned *supra* at 10.

16

Additionally, Defendants' rehash their motion to dismiss argument that they did not "s[ell] stock for profit during the class period" and therefore "this lack of motive cuts strongly against scienter", despite the fact Plaintiff has pursued a recklessness theory, not a motive and opportunity theory.  Def. MSJ at 18-19; *see* ECF No. 42 at 9 ("Even if a defendant could refute a recklessness claim by showing that he hurt himself too, that is not this case.").  While Egan and Brown note "their holdings increased" during the Class Period, that was due to the vesting of restricted stock units ("RSUs"), from which Egan and Brown ***benefitted*** as they simultaneously sold shares at inflated prices to cover tax obligations. *See* Pl. Resp. ¶291.

Finally, Defendants argue that "weeks or months of low sales were simply an expected part of the sales cycle . . . and did not signal a 'demand' problem."  Def. MSJ at 19.  As explained *supra* at 1, even accounting for the historical "ebbs and flows" of COVID, Co-Diagnostics historically had a consistent level of baseline sales ***and*** the Company's poor sales in Q2 2022 through May 12, 2022 was a continuation of the abnormally low sales that occurred in the preceding months.  These are clear and objective indications of a demand problem.  Moreover, *even if* these measures somehow "did not signal a 'demand' problem" (they did), Def. MSJ at 19, the fact that sales had plummeted to record low levels was a "risk[] to future demand" that Defendants were required to disclose.  *See* ECF No. 42 at 4.

Even if one were to take Defendants at their word that they genuinely believed they were in "a lull before the next, inevitable COVID wave" (the lowest and longest lull the Company had experienced since it began selling the Logix Test) ***the argument is itself an admission of recklessness*** because as Dwight Egan testified, they were hoping for a resurgence ***in the fall and winter***.  ¶46; Pl. Resp. ¶¶180, 254.  As the Court previously held, "[o]ne cogent and compelling inference to draw . . . is that they knew demand was down, but hoped they could mask that fact

17

until it rebounded.  That scenario would support a claim of recklessness." ECF No. 42 at 8.  Dwight Egan admitted that "our real view as a company is that investors ought to focus more on what we're doing in preparing for the long-term vitality of the company than having a sort of a myopic view on a couple of quarters."[3] ¶23 Defendants' disclosure obligations do not turn on what Defendants thought "investors ought to focus more on".

### D.    Defendants Are Not Entitled to Summary Judgment on Reliance

Defendants argue that they have rebutted the fraud-on-the-market presumption of reliance because "the alleged misstatements did not artificially inflate Co-Dx's stock price."  Def. MSJ at 20.  Specifically, they argue that the price impact of the alleged misstatements is rebutted because the evidence shows the misstatements did not cause Co-Diagnostics' share prices to increase, and that the price impact demonstrated on the drop caused by the corrective disclosure cannot be imputed to the alleged misrepresentations. They are wrong on both counts. Moreover, to rebut the presumption of reliance, Defendants "must demonstrate that the misrepresentations did not affect the stock's price by a preponderance of the evidence." *Waggoner v. Barclays PLC*, 875 F.3d 79, 101 (2d Cir. 2017); *see also, Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021) (holding defendants bear the burden of persuasion to rebut price impact by a preponderance of the evidence). "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner*, 875 F.3d at 104-05. Defendants' purported evidence against price impact does not even include an event study, the standard method of studying the issue. In sum, their arguments fall far short of what is required to rebut the presumption of reliance.

---

[3] Because Defendants are not entitled to summary judgment on Plaintiffs' Section 10(b) claims, they are not entitled to summary judgment on Plaintiffs' Section 20(a) claim.

First, Defendants argue that there is no front-end price impact because the share price increase on May 13 was due to positive 1Q22 results and the market responded *negatively* to the alleged misrepresentation regarding the cessation of guidance. But Plaintiff does not have to show that the misrepresentations caused a significant share price increase; price impact can be proven when a misstatement "*prevents* [the] preexisting inflation in a stock price from dissipating", which is precisely what happened here. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 257-58 (2d Cir. 2016) (emphasis in original) (quotation omitted);[4] *accord*, *Waggoner*, 875 F.3d at 104 (under the price maintenance theory, "which we have previously accepted, . . . statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price.") (quotation omitted). The applicability of the price maintenance theory here is a matter of common sense: a misrepresentation that doesn't promise a big, new, profitable development, but rather, postpones the market's discovery of a negative (demand) development would not be expected to cause a significant price increase, but only to prevent an earlier price fall. And the Coffman Report amply demonstrates price impact based on the price drop that occurred when the truth was revealed, as discussed below.

Nevertheless, Defendants argue, based on a review of analyst responses to the May 12, 2022 cessation of guidance by their expert, Dr. Juneja that "the challenged statements were seen by the market as *bad*, not good, news" so there is no "front-end price impact" (*i.e.*, the challenged statements did not have an inflationary impact on the stock price).  Def. MSJ at 20-21.  But the

---

[4] The *Vivendi* Court noted that "[a]rtificial inflation is not necessarily fraud-induced," referencing the thorough exposition of the point in *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 417–18 (7th Cir. 2015). There, the Seventh Circuit explained that "[b]efore the first false statement is made, there is 'actual inflation' in the stock price,"—which is "just the difference between the stock price and what the price would have been if the truth had been known"—"but no 'fraud-induced inflation' because although the stock is overpriced, misrepresentations are not the cause." *Id*. at 418.

only thing that argument suggests is that the alleged misrepresentations were *less bad* news than the truthful bad news that they concealed. As Mr. Coffman explained, "at most, Dr. Juneja asserts that Defendants dampened market expectations to some degree by no longer providing revenue guidance as a result of uncertainty in demand for the Company's COVID-19 test, and that this was perceived negatively by the market and analysts at the time." Pl. Resp. ¶256. "But nothing in Dr. Juneja's commentary suggests that was the *full truth* that the Plaintiff alleges Defendants failed to disclose, or that the market price already reflected the full truth that sales had already plummeted." *Id*. (emphasis added). Indeed, analyst commentary on the corrective disclosure confirms Mr. Coffman's understanding.  ¶¶256-57; *supra* at 13-14. Analysts noted that they had expected testing to eventually slow, but the drop in demand was far faster and more substantial than they had anticipated, showing that the alleged misrepresentations nonetheless concealed reduced demand that had an extremely significant price impact.  *Id*.; Uris Decl. (ECF No. 114), Ex. 23, Coffman Rep., ¶¶70-74.[5] Thus, even if the alleged misstatements were perceived negatively, it does not negate the rock-solid evidence of Mr. Coffman's event study proving that Defendants' concealment of the true reduced demand maintained substantial price inflation in Co-Diagnostics' share prices until the truth was revealed.

Second, Defendants argue Plaintiff cannot prove price impact by the "back-end" price drop because the alleged misrepresentations are generic in nature and there is a supposed "mismatch"

---

[5] As such, Defendants' assertions that "the analysts covering CoDx understood the challenged statements precisely as one would expect them to have understood [a] hypothetical truthful substitute" is belied by the record. Def. MSJ at 22.  By no means did Defendants disclose on May 12, 2022, explicitly or otherwise, that the Company was aware of the reduced demand and that its sales to date for Q2 2022 were far less than what it had seen in prior quarters. *See* Coffman Rep. ¶ 34.

between the specificity of the alleged misstatements and the August 11, 2022 disclosure.  Def. MSJ. at 21-22. They are wrong on both points.

On the first point, *Goldman* concerned extremely generic, boilerplate-type risk disclosures that are nothing like the statements here, making it questionable whether a "mismatch" assessment is even necessary. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 102 (2d Cir. 2023) (analysis necessary where plaintiff claims "that a company's generic risk-disclosure was misleading by omission"). Although Defendants argue that the misrepresentations are generic, claiming they "generally announced that CoDx was not providing guidance due to uncertain market conditions", that simply glosses over the important details of the alleged misrepresentations. In the May 12, 2022 announcement ceasing guidance based on the ***pretext*** of uncertain market conditions, Defendants described "trends that a reasonable investor would expect to prop up sales" and that "would have provided 'comfort to investors.'" *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024). Additionally, Defendants denied that they were "already seeing a decline in customer orders," saying "[i]t's not necessarily a demand issue that we're seeing." *Id*. at *3. And, importantly, Defendants concealed their knowledge of dramatically reduced sales that was so troubling it prompted internal discussions about how to message guidance to investors without revealing that demand had already plummeted at that time. Pl. Resp. ¶187; ¶38-42, *supra* at 4-5.  Thus, the allegedly misrepresented and concealed information here is not generic at all, but rather, it clearly portrayed a much rosier picture of demand than what Defendants were aware of and discussing internally.

But even if a genericness match analysis is conducted, there is a more than a sufficiently close connection between the specificity of the alleged misrepresentations and the disclosure. As the Second Circuit instructed in *Goldman*, "[w]e do not suggest that the inflation-maintenance

21

theory requires a precise match." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 98 (2d Cir. 2023). Rather, "[i]t may frequently be the case that what is *corrective* about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure." *Id.* (emphasis in original). Illustrating the point, the *Goldman* Court cited approvingly the analysis in *Vivendi*, where the Second Circuit described, "as a truthful substitute for the company's [allegedly misleading] 'rosy picture of its liquidity state,' the 'misgivings its executives were sharing behind the scenes,' which included statements—less specific than the corrective disclosure news—that the company was in 'danger' of a downgrade, or that its liquidity situation was 'tense.'" *Id.* There is an equally tight connection here as the one in *Vivendi*: Defendants conveyed to investors a rosier picture of product demand than the data and discussions they "shar[ed] behind the scenes" indicating demand was down significantly.

Moreover, Defendants' construction of a supposedly truthful substitute for the alleged misrepresentations misses the mark by a wide margin. Contrary to Defendants' arguments, the allegedly hidden truth is not that "quarter-to-date sales were low," (Defs.' Br. at 22), but that quarter-to-date sales had plummeted to such a degree that it indicated significantly lower demand for the Company's most important product going forward. This is precisely what was revealed, and what caused the share price drop, when Co-Dx's full 2Q 2022 financial results were announced.

Because Defendants have not rebutted the presumption of reliance, their argument that "each class member must prove reliance individually" is moot. Def. MSJ at 23. In any event, Defendants' assertion that Lead Plaintiff's "corporate representative testified that it relied *only* on statements at a conference in June 2022, and *not* the challenged statements" is wrong. *Id.* (emphasis in original); *see* Pl. Resp. ¶42 (testifying, *inter alia*, that he would not have purchased the stock if

22

he had known that defendants made misleading statements on May 12, 2022 which artificially inflated the stock price).

### E.  Genuine Issues of Material Fact Preclude Summary Judgment for Defendants on Loss Causation

Defendants argue that loss causation cannot be established as a matter of law because (1) "the August 11 earnings release did not 'correct' any challenged statement", and (2) Co-Diagnostics' share price could have declined due to other "confounding" information. Def. MSJ at 23-25. They are wrong on both counts.

*First*, Plaintiff alleged, and the Court upheld, that the challenged statements concealed material information that "***demand was already declining rapidly***" at that time. ECF No. 42 at 5 (emphasis added); AC ¶48. That truth was disclosed on August 11, 2022, when Defendants revealed dramatically lower sales of the Logix test than the market expected. As Mr. Coffman explained, ". . . the lower demand was reflected in the quarterly performance, and I think that's borne out by the analyst commentary following that disclosure as well, that the negative value relevant news was that there was lower demand for their flagship product and the results reflected that." Pl. Resp. ¶269.).

Defendants argue the Q2 2022 results were not corrective because they did not reveal the falsity of Defendants' stated reasons for stopping giving guidance or the uncertainty they claimed to see in the market at the time, but this misconstrues the test for proving loss causation. "[T]o establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (internal quotation omitted). "Whether the truth comes out by way of a corrective disclosure describing the precise

fraud inherent in the alleged misstatements, or through ***events constructively disclosing the fraud***, does not alter the basic loss-causation calculus." *Vivendi*, 838 F.3d at 262 (emphasis added). Here, although the disclosure of Q2 2022 results did not explicitly state that Defendants had previously misrepresented demand for the Logix test, the results constructively revealed that they had based on the abysmal test sales. That is enough to satisfy loss causation.

*Second*, Defendants argue that loss causation is not satisfied because Plaintiff's expert, Mr. Coffman, did not disaggregate the price effects of "other, non-corrective and negative news the same day." Def. MSJ at 24. But these arguments are wrong because, as explained more fully in Plaintiff's opposition to Defendants' motion to exclude Mr. Coffman's testimony and below, there was ***no material confounding news*** on August 11, 2022, and Defendants overstate what Plaintiff must prove under the law.

To satisfy loss causation, Plaintiff need not show that the ***entire*** price drop was caused by the alleged fraud; loss causation is satisfied so long as the loss is "attributable in part to the alleged fraud." *Gould*, 692 F.3d at 161-162 (denying summary judgment on loss causation because defendants' competing facts, "if established, hardly foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself."); *see also*, *AUSA Life Ins.,* 206 F.3d 202, 215 (2d Cir. 2000) (alleged misconduct must be a "substantial factor in the sequence of responsible causation") (quotation omitted). Mr. Coffman's analysis provides ample evidence of the portion of the share price drop caused by the alleged fraud (after removing the price effects of market and industry movements), and it is "up to the jury to determine how much, if any, of the artificial inflation identified by [plaintiff's expert] was caused by [Defendants'] alleged fraud[.]" *Vivendi*, 838 F.3d at 255–56.

Defendants argue that the August 11 earnings announcement included the following purportedly "confounding" news: (1) the financial results for the second half of Q2 2022 (post-May 12, 2022); (2) statements about the uncertainty of future sales and demand; and (3) the announcement that the initial clinical trial of a point-of-care PCR test would start "soon". None of this news is confounding, so there is nothing to "disaggregate" from the fraud-related losses.

The first category, disappointing sales and demand for the second half of Q2 2022 is not confounding because it is part of the corrective information. The alleged misrepresentations both explicitly and implicitly related to demand (and sales) beyond May 12, 2022. By their explicit terms, the alleged misrepresentations claimed to cease guidance due to an inability "to accurately forecast Logix Smart COVID-19 Test sales through the balance of the year" and the reduced "visibility around the outlook for the balance of the year." AC ¶¶44-45. These statements indicated that demand would be uncertain through the end of the year despite Defendants' knowledge that demand had already plummeted. Likewise, the misrepresentations implicitly concerned demand and sales beyond May 12 because they described trends that a reasonable investor would expect to prop up sales going forward, and "the market would have anticipated as a matter of economics what the [concealed information regarding lower sales and demand] would mean, not just for the current quarter, but for future quarters." Coffman Dep. at 83:23-84:1. As Coffman further explained, the precipitous drop in sales as of May 12, 2022 was "highly relevant and predictive of what [was] likely to continue happening, and . . . statements about current demand have relevance for the market's assessment of financial performance for future periods." Coffman Dep. 65:3-12.

The second category, statements about demand uncertainty, are not confounding because they so closely mirror the alleged misrepresentations that they could not possibly cause a stock price reaction; the market had "already digested that information and incorporated it into the

25

price." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016). Specifically, on August 11, Defendants said that "[v]ariability in our operating environment has restricted our near-term visibility," which is virtually indistinguishable from their May 12 statement that, "changes in our operating environments and markets have restricted our near term visibility" (AC ¶45). And Defendant Egan has admitted that "the same overall environment" existed throughout the Class Period.  Pl. Resp. ¶289. Likewise, the August 11 comment that the Company would not provide guidance was merely a continuation of a policy that was first announced on May 12. These supposedly confounding statements would not have elicited any stock price drop whatsoever, much less one that must be disaggregated from the effects of the alleged fraud.

And finally, the third category, a continued delay of the clinical trial for their at-home PCR test, which Defendants assured investors would commence "soon," was not confounding as demonstrated by the analyst response, which shows this was not viewed as negative material news. Defendants framed the news in positive terms on the August 11 earnings call, touting the progress the Company made in developing a potential at home and point-of-care PCR test and said that "we look forward to announcing soon that we have commenced clinical trials," which would happen "in the near term" and was "not far away." Pl. Resp. ¶279. Neither Litchfield Hills or H.C. Wainwright & Co mentioned any delay, commenting only that they expected the test "to enter clinical trials soon" (ECF No. 111-9 at 2) or "later this year" (ECF No. 111-7 at 3), respectively. Even Sidoti & Company's August 12, 2022 report, which noted the delay, did not lower 2022 revenue and EPS estimates on that basis. Rather, Sidoti lowered 2022 revenue estimates "[b]ased on the 2Q:22 results and factoring in the lack of visibility regarding near-term demand for COVID-19 testing," (ECF No. 111-6 at 2), supporting Coffman's conclusion that reduced Logix test demand was the cause of the share price drop that day.

26

Because there was no negative value relevant confounding information, Defendants cited cases are irrelevant.  Def. MSJ at 25. In *Menorah*, for example, appellants *conceded* that they "were unable to sufficiently disaggregate . . . confounding factors[.]"  *Menorah*, 2024 WL 1613907, at *2.

In sum, Plaintiff has adduced more than enough evidence to create a genuine issue of material fact as to loss causation, and "[p]roximate cause is almost invariably a factual issue ... for the trier of fact to determine." *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 2018 WL 6329396, at *5 (S.D.N.Y. Dec. 4, 2018).

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

Dated: May 2, 2025                                   **KAPLAN FOX & KILSHEIMER LLP**

                                                     */s/  Jason A. Uris*
                                                     Frederic S. Fox
                                                     Donald R. Hall
                                                     Jason A. Uris
                                                     800 Third Avenue, 38th Floor
                                                     New York, NY 10022
                                                     Telephone: (212) 687-1980
                                                     Facsimile: (212) 687-7714
                                                     *ffox@kaplanfox.com*
                                                     *dhall@kaplanfox.com*
                                                     *juris@kaplanfox.com*

                                                     *Lead Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 8,747 words and complies with the type-volume limitation of Local Civil Rule 7.1(c) of the Local Rules of United States District Courts for the Southern and Eastern District of New York. I also certify that this brief complies with the typeface and type style requirements of Local Civil Rule 7.1(b)(1)(2)(3).

/s/ *Jason A. Uris*
Jason A. Uris