**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>                     Plaintiff,<br><br>     v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>                    Defendants. | Case No.: 1:22-cv-06978-AS<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Tel. 212-589-4200
Fax. 212-589-4201

*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   PLAINTIFF OMITS CRITICAL, ADDITIONAL UNDISPUTED FACTS. .....................3

     A.    COVID-Test Demand Was Volatile and Cyclical, and Became Even More
          Unpredictable in Spring 2022 ...................................................................................3

     B.    Defendants Felt They Could Not Provide Accurate 2Q22 Guidance in Light
          of the Significant Volatility and Uncertainty, So They Discussed Alternatives
          With Lambert. ...........................................................................................................6

     C.    Every Fact Witness Testified That the Challenged Statements Truthfully
          Described Defendants' Understanding of the Market and Their Reasons for
          Not Providing Guidance. ...........................................................................................7

     D.    The Market Received the Challenged Statements As Bad News Indicating
          Likely Reduced 2Q22 Earnings. ...............................................................................8

     E.    No Defendant Personally Benefited From the Alleged Fraud. ...............................9

III.  ARGUMENT...........................................................................................................9

     A.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON
          FALSITY. ..................................................................................................................9

     B.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON
          MATERIALITY. .....................................................................................................16

     C.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON
          SCIENTER. ............................................................................................................19

IV.   CONCLUSION.......................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ..................................................................................................21

*In re Allergan, Inc. Sec. Litig.*,
  2018 WL 3912934 (C.D. Cal. Aug. 14, 2018)..................................................................17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................................................9

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  477 F.Supp.3d 88 (S.D.N.Y. 2020)...................................................................................16

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  2010 WL 6397500 (S.D. Fla. Aug. 18, 2010)...................................................................16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).....................................................................................................16, 18

*Bazzelle v. Novocure Ltd.*,
  2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ....................................................................21

*Belya v. Kapral*,
  2025 WL 963111 (S.D.N.Y. Mar. 31, 2025) ....................................................................18

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014)..............................................................................................17

*DeKalb Cnty. Pension Fund v. Allergan PLC*,
  2024 WL 677081 (2d Cir. Feb. 20, 2024).....................................................................9, 16

*Donoghue v. Oaktree Specialty Lending Corp.*,
  2024 WL 3455292 (S.D.N.Y. June 20, 2024) ....................................................................9

*Donoghue v. Tannenbaum*,
  2023 WL 4631963 (2d Cir. July 20, 2023)..........................................................................9

*In re Eaton Corp. Sec. Litig.*,
  318 F.Supp.3d 659 (S.D.N.Y. 2018)..................................................................................19

*Fresno County Employees' Ret. Assoc. v. comScore, Inc.*,
  268 F.Supp.3d 526 (S.D.N.Y. 2017)..................................................................................18

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ..................................................................16

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)...........................................................................19

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2024 WL 5107289 (S.D.N.Y. Dec. 13, 2024) .....................................20, 26

*In re Mylan N.V. Sec. Litig.*,
    666 F.Supp.3d 266 (S.D.N.Y. 2023)............................................................19

*In re Northern Telecom Ltd. Sec. Litig.*,
    116 F.Supp.2d 446 (S.D.N.Y. 2000)............................................................26

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................................10

*In re Perrigo Co. PLC Sec. Litig.*,
    2021 WL 3005657 (S.D.N.Y. July 15, 2021) .......................................16, 17

*In re Petrobras Sec. Litig.*,
    116 F.Supp.3d 368 (S.D.N.Y. 2015)............................................................18

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)...........................................................................19

*Scott v. Harris*,
    550 U.S. 372 (2007).....................................................................................15

*SEC v. Constantin*,
    939 F.Supp.2d 288 (S.D.N.Y. 2013)............................................................26

*SEC v. Frohling*,
    851 F.3d 132 (2d Cir. 2016).........................................................................23

*SEC v. Gallison*,
    588 F.Supp.3d 509 (S.D.N.Y. 2022)............................................................23

*SEC v. Honig*,
    2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023).............................................23

*SEC v. Milan Capital Grp., Inc.*,
    2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000)................................................26

*SEC v. Monterosso*,
   756 F.3d 1326 (11th Cir. 2014) .........................................................................26

*SEC v. Research Automation Corp.*,
   585 F.2d 31 (2d Cir. 1978)..................................................................................26

*SEC v. StratoComm Corp.*,
   652 F. App'x 35 (2d Cir. 2016) ..........................................................................26

*In re Skechers USA, Inc. Sec. Litig.*,
   444 F.Supp.3d 498 (S.D.N.Y. 2020)................................................................. 9-10

*Stepak v. Aetna Life & Cas. Co.*,
   1994 WL 858045 (D. Conn. Aug. 29, 1994) .......................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................19

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)................................................................................10

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)............................................................................................17

*In re WorldCom, Inc. Sec. Litig.*,
   346 F.Supp.2d 628 (S.D.N.Y. 2004)...................................................................17

## Other Authorities

10A Charles Wright et al., *Federal Practice and Procedure* §2727.1 (4th ed.
   2016) .....................................................................................................................9

## I.    PRELIMINARY STATEMENT

After numerous depositions and half a million pages of document discovery, Plaintiff's case is much as it started. It is still built on the incorrect supposition that if Logix test[1] sales were low leading up to May 12, 2022, then Defendants' challenged statements—citing volatility and uncertainty as the reasons for not providing guidance, stating they were not seeing a "demand issue," and expressing confidence about long-term demand for Co-Diagnostics' products—must have been materially false and misleading, and Defendants must have known it. And that foundational supposition is still speculation, unsupported by any evidence. Speculation and supposition, of course, do not suffice for summary judgment, and Plaintiff's lack of proof confirms the strength of Defendants' MSJ.

The undisputed, material facts show several dispositive and indisputable truths:

1. Logix test sales, like COVID-test sales generally, were cyclical and swung widely between peaks and troughs based on the rise and fall of new COVID waves and other factors.

2. This volatility became even more pronounced and unpredictable in the months leading up to the challenged statements.

3. This increased volatility and changing COVID-testing mandates, policies, and individual behaviors post-Omicron created enormous uncertainty about short-term COVID-test sales and made it impossible for Defendants to provide accurate guidance on May 12.

---

[1] Defined terms are as in Defendants' Memorandum of Law in Support of their MSJ (Dkt. #107; "MSJ"). "Defs' 56.1" refers to Defendants' Rule 56.1 Statement (Dkt. #108), incorporated herein.

4. The Defendants genuinely did not believe that lower sales leading up to May 12 indicated a broader change in demand or predicted low full-quarter revenue when they made the challenged statements.

Every witness—including third-party IR consultant Mike Houston—testified that they believed the Defendants truthfully described their reasons for not providing guidance on May 12 and that, while increased volatility and uncertainty made it impossible to provide accurate guidance, they genuinely did not see a demand issue and were not trying to hide low quarter-to-date sales when they made the challenged statements. This is further supported by the undisputed testimony of leading COVID-testing expert Dr. Tsai, who identified the same and additional factors as creating increased volatility and uncertainty at the time, and by contemporaneous documents reflecting the Defendants' good faith.

Faced with this mountain of undisputed evidence, Plaintiff claims it is nonetheless entitled to summary judgment on falsity, materiality, and scienter for essentially one reason: sales were lower in the weeks and months preceding May 12, 2022 than in previous quarters, and Mr. Brown and Mr. Egan knew or had access to this sales information. According to Plaintiff, those low sales, on their face, mean that "demand for the Logix Test had plummeted," and Defendants' failure to disclose this rendered the challenged statements materially misleading and was either intentional or reckless. Plaintiff's Motion for Partial Summary Judgment (Dkt. #113; "MPSJ"), 1-4.

Defendants understand how Plaintiff can look back at May 2022, in light of what came after, and assume it must have been obvious that demand had fundamentally shifted. But that inflection point is clear only in retrospect—at the time, the changes Defendants identified as creating uncertainty had not yet settled into new patterns, and the Defendants, like everyone else, were viewing then-current conditions through the lens of the previous two years of COVID. The

2

testimonial, documentary, and expert evidence uniformly contradict Plaintiff's theory, showing that: in the context of Logix test's historical sales patterns and the COVID-testing market's volatility, weeks (or months) of low sales did not indicate a "demand" problem; Defendants did not believe recent low sales on May 12 indicated a demand problem or predicted poor full-quarter results; and therefore the undisclosed sales numbers did not contradict or render misleading any challenged statement, and Defendants' awareness of, or access to, sales data cannot show scienter.

Plaintiff's supposition sufficed at the motion to dismiss stage, but summary judgment is about evidence. After extensive discovery, the undisputed, material facts demonstrate that Plaintiff cannot offer *any* evidence of falsity, materiality, or scienter, much less the overwhelming evidence required for summary judgment in its favor. Plaintiff's MPSJ should be denied in its entirety.

## II.    PLAINTIFF OMITS CRITICAL, ADDITIONAL UNDISPUTED FACTS.

Defendants agree that there are no genuine issues of material fact in this case, and respectfully refer the Court to their MSJ, Defs' 56.1, and Defendants' Response to Plaintiff's Rule 56.1 Statement of Undisputed Facts and Statement of Additional Undisputed Material Facts ("Resp-56.1"), which are incorporated herein by reference, for a complete accounting of the undisputed, material facts. Plaintiff's Rule 56.1 Statement of Undisputed Facts (Dkt. #115) frequently mischaracterizes evidence, but those statements are simply characterizations or unsupported inferences—not facts themselves. More problematic is Plaintiff's omission of many additional undisputed, material facts, as detailed below.

### A.    COVID-Test Demand Was Volatile and Cyclical, and Became Even More Unpredictable in Spring 2022.

From 2Q20 through 1Q22, demand for COVID tests generally, including the Logix test, largely tracked the unpredictable rise and fall of new COVID variants. Resp-56.1 ¶63. Dr. Tsai's undisputed expert report describes how the emergence and subsidence of new COVID variants

was highly unpredictable and did not follow regular seasonal patterns; how severity, transmissibility, and vaccine-efficacy for each variant was different; how masking, vaccination, and testing mandates, funding initiatives, and other COVID-related policies had different and often conflicting impacts on test sales; and how the cumulative impact of these many, complex factors made test sales highly unpredictable throughout the pandemic. *Id.* ¶¶47-49, 64-67, 72-74; DX91. It was impossible to predict when the next COVID wave would emerge, but experts were certain at all relevant times that it *would* emerge and drive test sales; the only question was when. Resp-56.1 ¶¶17, 48, 50, 69-71.

Logix test sales mirrored this volatile cycle of peaks and troughs: historical sales data show that sales varied enormously month-to-month and week-to-week from 2Q20 through 1Q22. Resp-56.1 ¶¶16-17, 63. Contrary to Plaintiff's supposition (MPSJ 3), there was no "track" for sales to be on or off of; some quarters started extremely high and ended with very low sales, others did the opposite, and some had high sales in the middle. *See* Resp-56.1 ¶¶2, 17, 20; DX96; DX112. Moreover, it was common for these swings to be extreme. *Id.* In 1Q21, 2Q21, and 1Q22, just three weeks of each quarter accounted for $12-19 million in sales (more than 50% of quarterly sales). Resp-56.1 ¶17; DX112. And in 4Q21, shortly before the class period, ~$14.9 million (more than 70% of 4Q21 sales) came in just the *last three weeks* of that quarter, as Omicron surged. *Id.* Moreover, several Co-Diagnostics employees testified (and none disputed) that it was common to see a big drop in sales after a large surge in orders, and this did not concern them or signal a demand problem—it was simply the expected, cyclical nature of Logix test sales. Resp-56.1 ¶¶11, 17, 43, 60, 68-69.

Thus, when COVID-test sales surged to all-time highs with Omicron and then dropped in early 2022 as Omicron receded—a fact widely reported in the press (*id.* ¶69)—this did not appear

4

to portend a fundamental change in demand: Dr. Tsai and the Co-Diagnostics witnesses uniformly testified that they viewed this at the time as a temporary lull and expected new waves to emerge and drive sales in coming months. *Id.*; *see also* ¶¶7, 44, 70. Indeed, two new Omicron sub-variants had just recently begun to circulate in the U.S. and were expected to increase test sales by summer 2022. *Id.* ¶71.

At the same time, however, policies, practices, and personal behaviors related to COVID testing were shifting rapidly post-Omicron, making it increasingly difficult to predict sales in March, April, and May 2022. *Id.* ¶¶47-49, 72-73 (testing requirements and utilization and vaccination rates, masking requirements, and other factors varied even more widely and changed more frequently in spring 2022). Congress's decision in March 2022 not to renew certain uninsured COVID funding was extensively reported, but other federal programs continued to require private insurers, Medicare, and Medicaid to reimburse for lab-based COVID tests, bolstering PCR-test sales. *Id.*; *see also* ¶¶54, 74.

Individual testing and preventative behaviors also appeared to be changing—again, widely publicly discussed—but it was still unclear in May 2022 how these behavioral changes would play out and impact sales *Id.* ¶¶47-49, 66, 72-73. Moreover, the uncertainty regarding near-term sales was amplified by the fact that many of these factors could cause an increase or decrease in sales, depending on the circumstances. *Id.*; ¶47 (D. Egan: "It could go either way…. [W]e didn't know … if it was going to be more or less…. Hence, we didn't have the level of precision and optical clarity that we wanted to try and predict or forecast it."), (Brown: decreased mask mandates "doesn't necessarily mean that COVID would spread more, it could be that the spread has decreased and so there was less risk"), (Benson: "I see these [factors] as just pointing [the] unpredictability and the variability"); *id.* ¶¶47-49; ¶66 (Tsai: factors could indicate more or less

testing).

**B.     Defendants Felt They Could Not Provide Accurate 2Q22 Guidance in Light of the Significant Volatility and Uncertainty, So They Discussed Alternatives With Lambert.**

In light of this increased volatility and market uncertainty in spring 2022, when it came time to work with Co-Diagnostics' IR consultant Lambert to prepare the 1Q22 earnings release, Brown felt he had too little visibility to provide accurate 2Q22 guidance, so he asked Houston for his thoughts on possible alternatives to providing guidance. Resp-56.1 ¶¶17, 35, 37; ¶16 (Brown asked about alternatives because "[a]t this point in time there was even more volatility and more noise in society … in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate"); ¶42 (Houston: "I don't remember the exact timeline of … how we knew that there was less visibility that Co-Diagnostics was facing [but] I know we did give them a few potential ways to handle that."); *see also* ¶37 (Brown and/or Benson usually spoke with Houston about "what we felt like we could do with guidance" before Houston prepared first draft).

In response, Houston emailed Brown and Benson on May 4, 2022, offering his thoughts on several potential alternatives to providing guidance, including the option Defendants ultimately chose—"pull guidance completely, citing uncertainty in the market causing the company to not accurately predict results." PX12. Houston testified that he did not have any visibility into Co-Diagnostics' intra-quarter sales or revenue at the time, and that the options he outlined were similar to those Lambert "shared with other clients given the uncertainty." Resp-56.1 ¶¶16, 35, 39; ¶37 ("[I]f there was a Q2 earnings call, we were only talking about Q2, we didn't have any visibility into Q3; even though technically we were into that current quarter, we never talked about it."). Moreover, while Houston's May 4 email included references to the possibility of Co-Diagnostics having "a soft quarter, or two," and Q2 being "off to a slow start," Houston testified that no one at

Co-Diagnostics ever told him this was the case—he was simply assuming it based on past experiences with other clients that considered pulling guidance. *Id*. He also testified that neither Brown nor Egan ever suggested to him that their decision not to provide guidance was motivated by a desire to hide low sales of the Logix test. *Id.*; ¶¶40-42.

Brown responded to the May 4 email, indicating that he was inclined to pull guidance because of the lack of visibility and would like Houston's thoughts on how best to explain this to investors. PX14. Houston then suggested several factors creating uncertainty in the market that the Company might want to reference, and Brown and Benson developed those they felt best explained the lack of visibility driving Co-Diagnostics' decision, with input from Egan and Lambert. *Id.*; Resp-56.1 ¶¶39-43; ¶42 (Houston: Co-Diagnostics "knew there was reduced visibility," but was still "trying to get [its] arms around it").

Brown, Egan, Benson, and Houston each testified that they were trying to be transparent about challenging market conditions and did not want to provide inaccurate guidance. Resp-56.1 ¶¶16, 39-43. Brown, Egan, and Benson also testified that this was not an attempt to hide low sales: they did not view sales-to-date as good indicators of full-quarter performance, and to the extent they were aware of quarter-to-date sales prior to May 12, they did not view them as concerning. *See id.* ¶¶11, 16-17, 20-23, 26, 39-43, 46; ¶22 (D. Egan: "A month did not a quarter make…. We were watching very carefully and … [we] did not feel comfortable prognosticating future quarters at this point.").

**C.    Every Fact Witness Testified That the Challenged Statements Truthfully Described Defendants' Understanding of the Market and Their Reasons for Not Providing Guidance.**

This process yielded thoughtful and truthful disclosures. On May 12, 2022, Defendants announced strong 1Q22 results but also explained that sales had become so volatile and market conditions so uncertain that they could not provide accurate guidance for 2Q22, even though they

remained confident about demand for Co-Diagnostics' products. AC ¶¶44-45. Brown further explained, in response to an analyst question, that it was not a "demand issue" they were seeing but lack of clarity with respect to timing that had caused Co-Diagnostics not to provide guidance. AC ¶46; Resp-56.1 ¶58.

That was undisputedly true. Brown and Egan each testified—and no facts dispute—that they genuinely believed (and still believe) that these challenged statements truthfully described the significant uncertainty in the market on May 12, their reasons for not providing guidance, and the reasons why they nonetheless remained optimistic about demand for Co-Diagnostics' products. Resp-56.1 ¶¶7, 16-17, 27-28 39-44, 47-49, 50-51. Every other deponent to address the issue—including third-party witness Mike Houston—testified similarly. *Id*.; ¶30. Dr. Tsai's expert testimony further corroborates these views, opining that the challenged statements "were consistent with my own understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022." *Id.* ¶75; ¶¶ 47-49.

### D. The Market Received the Challenged Statements As Bad News Indicating Likely Reduced 2Q22 Earnings.

Analysts covering Co-Diagnostics understood its decision not to provide guidance, and the uncertainty Defendants described on May 12, as bad news for 2Q22 revenue. Resp-56.1 ¶¶76-79. Despite positive 1Q22 results, no analyst revised their forecasts upward, and two analysts decreased certain estimates for 2Q, 3Q, and 4Q22. *Id.* ¶78. Defendants' economic expert, Dr. Juneja, opined—and Plaintiff's expert, Mr. Coffman, did not dispute—that these analyst reports and other evidence demonstrate that the market perceived the challenged statements as "negative news and interpreted [them] as indicating a likely decline in future revenues[.]" *Id.* ¶79.

8

**E.**     **No Defendant Personally Benefited From the Alleged Fraud.**

Finally, neither of the individual defendants (Brown and Egan) sold Co-Diagnostics stock for profit during the class period or personally benefitted from the purported fraud; rather, their respective holdings actually increased over the class period. Resp-56.1 ¶80.

## III.   ARGUMENT

At summary judgment, the movant bears the initial burden of showing there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In addition, where the movant bears the ultimate burden of persuasion—as Plaintiff does here—the burden is even higher: it must offer substantial, admissible evidence that would entitle it to a directed verdict if not contradicted at trial. *See Donoghue v. Oaktree Specialty Lending Corp.*, 2024 WL 3455292, at *8 (S.D.N.Y. June 20, 2024).  The evidence in the movant's favor must be so "conclusive[]" and "indisputabl[e]" that no reasonable jury would be free to disbelieve it; anything less requires denial of summary judgment. *Donoghue v. Tannenbaum*, 2023 WL 4631963, at *4 (2d Cir. July 20, 2023); 10A Charles Wright et al., *Federal Practice and Procedure* §2727.1, at 492 (4th ed. 2016) (record must be "so one-sided" nonmovant could not prevail). Plaintiff's MPSJ cannot clear this high bar as to any element.

### A.     PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON FALSITY.

Summary judgment as to falsity must be denied if any reasonable jury could conclude from the record that the challenged statements were true and not misleading. *DeKalb Cnty. Pension Fund v. Allergan PLC*, 2024 WL 677081, at *1-2 (2d Cir. Feb. 20, 2024). "The key question in considering the misleading nature of a statement is whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor, not whether it is susceptible to any interpretation that could generate misleading impressions when read in isolation." *In re*

9

*Skechers, Inc. Sec. Litig.,* 444 F.Supp.3d 498, 516 (S.D.N.Y. 2020); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-89, 190, 194 (2015) (statement is only misleading if it would have misled a "reasonable investor" reading it "fairly and in context," including the "customs and practices of the relevant industry" and other public information). Moreover, this "reasonable investor" is assumed:

- to be aware of that full context;

- to have a basic understanding of the relevant industry; and

- rationally to incorporate all public information into their decisionmaking.

*See Omnicare*, 575 U.S. at 186-87; *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016).

Here, Plaintiff's theory of falsity is the same for each of the three remaining challenged statements (AC ¶¶44-46): because quarter-to-date sales as of May 12, 2022 were lower than in past quarters, Defendants must have decided not to provide guidance in order to hide that "demand for the Logix test had plummeted," and it was therefore misleading for Defendants to state that (i) the decision was due to uncertainty and diminished visibility caused by several factors, (ii) they nonetheless remained confident about demand for their products; and (iii) they were not seeing a "demand issue." MPSJ 1, 15-17.

In support of its theory, Plaintiff relies *solely* on the Company's sales numbers themselves, arguing that, on their face, they contradicted the challenged statements because quarter-to-date sales on May 12 were only $2.5 million, compared to at least $5 million at the midpoint in each prior quarter since COVID began. *Id.* No facts support Plaintiff's theory—no expert opinions, no testimony, and no evidence of any kind showing Defendants were concerned about or motivated by low sales (they were not), or that the comparison Plaintiff points to was meaningful or in fact mattered to Co-Diagnostics. Indeed, the only evidence on this comparison demonstrates the

10

opposite: low quarter-to-date sales were not meaningful and did not contradict the challenged statements. Resp-56.1 ¶¶11, 16-17, 22, 26, 29, 47-49, 75. Dr. Tsai's undisputed expert testimony establishes that COVID-test sales were highly volatile, cycling between peaks and troughs throughout the pandemic in response to unpredictable new COVID waves and other factors. *Id.* ¶¶ 63-68. Logix test sales likewise followed this unpredictable, cyclical pattern: some quarters started high and ended low, others the opposite, and it was common for just two or three weeks in a quarter to account for $10-15 million in sales. *See* DX96, DX112; Resp-56.1 ¶¶2, 17, 20.

Not surprisingly, then, Co-Diagnostics employees uniformly testified that they did not view intra-quarter sales—even those nearly halfway through a quarter—as predictive of full-quarter results or as good indicators of broader demand trends. Resp-56.1 ¶11; *id.* ¶22 (D. Egan: "What the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter because sometimes a quarter came together all in the last month of the quarter or in the last two or three weeks"), (Benson: "One month wouldn't necessarily be predictive of [the next] so to see one month with more sales and another month with fewer sales wasn't ever an indication to us that sales [] were dropping or diminishing, just that it was part of the sales cycle."); ¶17, 26, 28 (similar from S. Egan and Brown).

As a result, no one at Co-Diagnostics was concerned when sales dropped following the Omicron surge and stayed low for the first several weeks of 2Q22, even though quarter-to-date sales were lower than at similar points in past quarters:

> Brown: "[W]e were five weeks into the quarter and still had seven weeks to go and we could see in recent history, Q1 of '22, Q4 of '21, that we had two weeks we did 14 million dollars … We just didn't know at that time. There wasn't enough information to feel comfortable with the accuracy of providing guidance." (Resp-56.1 ¶16)

> D. Egan: "A month did not a quarter make. Two months did not necessarily prognosticate what a quarter would be. We were watching very carefully and we did develop a viewpoint that it was volatile and that we, as a prudent measure in the context of our investing public

11

did not feel comfortable prognosticating future quarters at this point." (*id.* ¶22)

Indeed, Brown specifically denied the significance Plaintiff ascribes to the quarter-to-date sales on

May 12 compared to prior quarters. When asked if it "would have indicated anything to [him]" if

midpoint revenue in 2Q22 was "less than half of what it had been in any prior quarter," Brown

responded:

> No, not necessarily. If I look back, for example, Q4 of 2021, you'll see I think it
> was 4 [million dollars]—I'm not sure what that number is, 4.5, something like that
> and then it went down to, I think that's 2 or 3.8 and then it spiked up in December.
> In that period of time in December [2021] most of that revenue happened in about
> a two-week period of time. So there was … continued volatility that was maybe
> more present than it had been in the past, especially on a weekly basis.

Resp-56.1 ¶26.

Every Co-Diagnostics witness said the same thing: significant volatility and market

uncertainty made it impossible to offer accurate guidance for 2Q22 on May 12, but low quarter-

to-date sales, particularly on the heels of extraordinarily high sales during Omicron, did not

concern them, indicate a "demand issue," or predict low full-quarter revenue. Resp-56.1 ¶¶7, 11,

16-17, 22, 26-27, 43. In spring 2022, in the context of Logix test's volatile, cyclical sales history,

low sales leading up to May 12 simply looked like an expected trough following Omicron's high

peak, not like a fundamental change in demand. *Id.* ¶¶16-17. Defendants fully expected sales to

swing up again with the next new variant, they just did not know when. *Id.* ¶¶44-47. Thus, when

an analyst questioned Brown on May 12 about why Co-Diagnostics decided not to provide

guidance, and whether it was because of declining orders or general uncertainty, Brown truthfully

said the bigger issue was uncertainty regarding timing and that he was not seeing a "demand issue."

AC ¶46; Resp-56.1 ¶58; ¶17 (Brown: "[A demand issue's] not what we saw…. [W]e felt like it

was a timing of orders at that given point in time…. [We] had the biggest month in Q1 that we've

ever had so the volatility there didn't necessarily lean to a reduction in demand. It felt like more of a change potentially in fluctuation order patterns.").

Faced with this overwhelming evidence showing the truth of the challenged statements, Plaintiff tries to turn certain routine emails with Houston into evidence that Defendants' stated reasons for not providing guidance on May 12 were "pretextual excuse[s]." MPSJ 15. They were not, and Plaintiff's speculation is once again disproved by the undisputed facts. No evidence (expert or otherwise) disputes Dr. Tsai's testimony that shifting market conditions, including the factors identified by Defendants on May 12, did in fact create significant volatility and uncertainty in spring 2022 and made it increasingly difficult to predict COVID-test sales at that time. Nor do any facts dispute Brown's, Egan's, Benson's, and Houston's testimony (i) describing how Co-Diagnostics' decision not to provide guidance on May 12 was, in fact, motivated by that uncertainty and unpredictability and *not* by low quarter-to-date sales, and (ii) explaining the good-faith reasons for the soundbites Plaintiff claims reflect pretext. Resp-56.1 ¶¶16-17, 26, 35-44.

Plaintiff thus is left solely with its own unsupported characterizations of a single email chain that, on its face, does not show what Plaintiff claims. Plaintiff selectively quotes from May 4-10, 2022 emails between Houston, Brown, and Benson to suggest that the real impetus for not providing guidance on May 12 was a desire to hide low quarter-to-date sales, but no facts support this reading. That chain simply shows Defendants seeking advice from their outside IR consultant, as part of their usual preparations for an earnings release, about how to explain an important issue to the market. All witnesses involved in that process testified that the Defendants were uncomfortable with providing guidance in light of market conditions at the time, and that this led them to ask Houston for his thoughts on alternatives to providing guidance. Resp-56.1 ¶¶16-17, 35-44. Based on that email discussion, Brown concluded that not providing guidance was the best

13

option—and the only accurate one—and he and Benson worked with Houston to identify and articulate the factors that best described the uncertainty driving that decision. *Id.*; ¶42, (Houston: Co-Diagnostics "knew there was reduced visibility" but was still "trying to get [its] arms around it" so they "went back and forth [with Lambert] to really try and nail down what exactly [was] at play").

It makes perfect sense that a client would ask its IR firm for advice about the potential consequences of an important decision and how best to explain it; to research how others have explained similar decisions; and to work on this messaging up to the last minute to ensure its accuracy. Nothing about these communications with Houston, or the process they reflect, suggests the reasons Defendants gave on May 12 for not providing guidance were untrue or pretextual. To the contrary, the undisputed facts show these *were* factors the Defendants understood to be contributing to the volatility and uncertainty that caused them to ask Lambert about alternatives and to decide not to provide guidance. *Id.*; *see also* ¶¶47-49; ¶43 ("[T]hese are the things that were happening that [] helped me to feel like it was appropriate to not provide guidance because again, I didn't want to provide guidance that was not accurate."), (Benson: "It wasn't because we were worried [2Q22] was going to be low …. It was simply because all of those together tell the story of an unpredictable, volatile situation. [W]e had to go with what we thought was the most responsible action … [and] that wasn't to take a guess on a number that was too low or [] too high or to stretch it out over the year. Any [] of those options would have been more irresponsible [] to our mind than to just be honest and say, [] we can't read where this is going."); PX14, at 2 (Brown and Benson identifying and framing factors they believed were contributing to Logix test's volatility; Brown noting "I don't want to put out guidance that I don't feel is accurate").

Finally, Plaintiff argues the challenged statements were misleading because the factors

14

Defendants pointed to as creating uncertainty were "trends that a reasonable investor would expect to prop up sales," citing this Court's reasoning denying the MTD. MPSJ 16. Again, regardless of any inferences the Court may have drawn in Plaintiff's favor on the MTD, the undisputed facts disprove Plaintiff's assertion. As detailed above, Egan, Brown, Benson, Houston, and Dr. Tsai all testified that these factors could have led to *higher or lower* test sales depending on the circumstances, and therefore contributed to the market uncertainty Defendants identified. *Supra* 5-6; Resp-56.1 ¶¶47-49; ¶47 (D. Egan: "It could go either way…we didn't know … if it was going to be more or less"). No facts dispute this, and Plaintiff's selective quotation from Houston's deposition ignores the fact that Houston specifically disagreed with the idea that these factors together indicated more COVID infection going forward: "it depends on the reader … one could infer that … but someone could infer something different." *Id.* ¶47 (Houston also testifying he did not associate fewer mask mandates with more COVID transmission: "I personally would associate it with people being tired of wearing masks and politicians listening to that."). Moreover, the analyst reports following the May 12 earnings release show that the market understood the challenged statements as indicating a likely *decrease*, not increase, in 2Q22 revenue, further refuting Plaintiff's theory that these factors misled investors into believing that quarterly sales would be strong. Resp-56.1 ¶¶76-79.

Because the undisputed, material facts demonstrate that the challenged statements were true, and that omission of low quarter-to-date sales as of May 12 did not render any challenged statement misleading, Plaintiff cannot prove falsity. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment.").[2] This entitles *Defendants* to summary judgment, as detailed in their MSJ; at a minimum, it precludes summary judgment for Plaintiff. *See Allergan*, 2024 WL 677081, at *2 (affirming summary judgment for defendant on falsity and denial of plaintiff's cross motion); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F.Supp.3d 88, 106 (S.D.N.Y. 2020) (similar).

### B.    PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON MATERIALITY.

For essentially the same reasons, Plaintiff also cannot prove that disclosing the allegedly hidden truth—that Co-Diagnostics' quarter-to-date sales were lower than in previous quarters— would have "significantly altered the total mix of information made available" to a reasonable investor on May 12. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (total mix includes "information already in the public domain and facts known or reasonably available to the shareholders").

It is undisputed that the challenged statements were made against the backdrop of extensive public discussion of the fact that COVID testing and sales had dropped significantly following Omicron and that COVID-testing policies, practices, and individual behaviors were changing rapidly, creating significant uncertainty in the testing market. Resp-56.1 ¶¶47-49, 63-74; ¶75 (Tsai: challenged statements "were consistent with my own understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022"). The challenged statements themselves explicitly discussed some of those market conditions and explained that they created so much

---

[2] By contrast, in *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *30 (S.D. Fla. Aug. 18, 2010) and *In re Perrigo Co. PLC Sec. Litig.*, 2021 WL 3005657, at *6-7 (S.D.N.Y. July 15, 2021), strong documentary evidence proved the challenged statements were false.

uncertainty that Defendants could not accurately forecast full-quarter results. *Id.* ¶¶55-58. Not surprisingly, the undisputed facts also show that the market took these statements as bad news: the analyst reports after May 12 show that the market understood the challenged statements, in context, as indicating that 2Q22 revenue would likely end up lower than previous quarters and estimates, but that this remained highly uncertain. *Id.* ¶¶76-79 (Litchfield: "Our only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside."), (Wainwright: lowering EPS estimate), (Sidoti: "net income should slow the remainder of 2022, as Covid-19 testing levels off").

Thus, the undisputed facts demonstrate that the market took from the challenged statements essentially the same information that disclosing quarter-to-date sales on May 12 would also have conveyed—that full-quarter results could end up lower than past quarters, depending on how the rest of the quarter played out, but that this remained highly uncertain. In these circumstances, no rational trier of fact could find that disclosing sales-to-date would have added anything to the "total mix of information" available to investors on May 12; at a minimum, a rational jury could find for Defendants on this issue. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-88 (2d Cir. 2014) (affirming summary judgment for defendants where challenged statements were not material in context of contradictory public information); *Stepak v. Aetna Life & Cas. Co.*, 1994 WL 858045, at *12-13 (D. Conn. Aug. 29, 1994) (similar).[3]

Nonetheless, Plaintiff claims it is entitled to summary judgment on materiality "given the

---

[3] Plaintiff's authorities are not to the contrary. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976) (reversing summary judgment granted to *plaintiff* on materiality); *Perrigo*, 2021 WL 3005657, at *8 (€1.6 billion tax liability so obviously important reasonable minds could not differ); *In re Allergan, Inc. Sec. Litig.*, 2018 WL 3912934, at *34 (C.D. Cal. Aug. 14, 2018) (nonpublic information material where defendant traded $4 billion on it); *In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d 628, 657-58 (S.D.N.Y. 2004) (materiality is "fact-specific inquiry" and courts have "consistently rejected a formulaic approach").

extent to which sales of the Logix test had declined" and because "the magnitude of the decrease in revenue that Co-Diagnostics was on track for … demonstrates that it would be material[.]" MPSJ 17. Once again, Plaintiff's argument[4] boils down to its unfounded supposition that low quarter-to-date sales on May 12 must have signaled a broader decline in demand and predicted poor full-quarter results. This is not how Logix test sales worked: the undisputed facts show there was no consistent pattern within or between quarters, no "track" to be on or off of, and no basis for Plaintiff's speculation that low quarter-to-date sales meant a long-term demand problem or that full-quarter results would be low. Resp-56.1 ¶¶2, 7, 11, 16-17, 20-22, 44, 50, 63. Because low quarter-to-date sales on May 12 did not provide meaningful or predictive information about larger demand trends or likely full-quarter performance, their disclosure would not have significantly altered the total mix of information available to investors at that time.

Nor does the stock-price drop following the 2Q22 earnings release on August 11, 2022 suggest materiality, for essentially the same reasons. That drop was in response to disappointing *full-quarter* results—which could not have been known or disclosed on May 12—and other negative news; no facts establish that it was caused by revelation of the truth allegedly hidden on May 12 (i.e., low sales-to-date).[5] *Id.* ¶61; MSJ 23-25. Accordingly, the stock drop on August 12

---

[4] The fact that Defendants "did not even dispute materiality in their [MTD]" (MPSJ 17) is irrelevant to the cross-motions for summary judgment. Materiality is rarely a successful motion-to-dismiss issue. *See Basic*, 485 U.S. at 231 ("[Materiality is] an inherently fact-specific finding."). Moreover, litigants routinely challenge some elements and not others on the pleadings for a variety of reasons; this does not waive or limit their right to challenge all elements at summary judgment and/or trial. *See Belya v. Kapral*, 2025 WL 963111 (S.D.N.Y. Mar. 31, 2025) (granting defendants summary judgment on element not challenged in motion-to-dismiss briefing).

[5] This is very different than the motion-to-dismiss decisions Plaintiff cites, where courts drew every reasonable inference in plaintiffs' favor and found stock drops supported an inference of materiality. *See In re Petrobras Sec. Litig.*, 116 F.Supp.3d 368, 380 (S.D.N.Y. 2015); *Fresno County Employees' Ret. Assoc. v. comScore, Inc.*, 268 F.Supp.3d 526, 550 (S.D.N.Y. 2017).

cannot show the materiality of the information allegedly fraudulently concealed, and no reasonable jury could find for Plaintiff on materiality. *See In re Eaton Corp. Sec. Litig.*, 318 F.Supp.3d 659, 670 (S.D.N.Y. 2018) (stock drop "not determinative and cannot serve as the sole basis for finding materiality," especially "when other negative news … [i]s published").

C.    **PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON SCIENTER.**

To establish scienter, Plaintiff must prove that Defendants Brown, Egan, and/or Co-Diagnostics[6] made one or more of the challenged statements intending to defraud investors, or with recklessness so severe that it "approximat[ed] actual intent … not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Plaintiff must offer (1) "specific facts demonstrating … both a motive and opportunity to commit fraud," or (2) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Mylan N.V. Sec. Litig.*, 666 F.Supp.3d 266, 294 (S.D.N.Y. 2023). This is a high bar rarely satisfied even at trial, much less on summary judgment. Plaintiff would have to show that there is no evidence from which a jury might reasonably conclude that Brown and Egan acted in good faith. Plaintiff cannot meet this burden; to the contrary, as detailed in Defendants' MSJ, no rational trier of fact could find for *Plaintiff* on this evidentiary record. MSJ 16-20.

As an initial matter, Brown and Egan each credibly testified that they believed their

---

[6] Plaintiff suggests in passing that non-defendant Seth Egan's scienter "may also be attributed to Co-Diagnostics" (MPSJ 23n.4) but no law or facts support this. The scienter of "other officers or directors who were involved in dissemination of the fraud" may be imputed to a corporate defendant. *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). But Seth Egan was not an officer or director and was not involved in preparing or disseminating the challenged statements. Resp-56.1 ¶29. Moreover, Plaintiff offers no facts or argument regarding Seth Egan except that he was the head of sales and regularly reviewed sales numbers. This is insufficient for scienter even if his mental state could be imputed to Co-Diagnostics.

statements on May 12, 2022 were true and not misleading and that they never intended to mislead investors. They explained that increased volatility and market uncertainty at the time made it impossible to accurately forecast sales for 2Q22 or the remainder of the year, and that this was why they decided not to provide guidance on May 12. Resp-56.1 ¶¶16-17, 22, 43. As Brown put it, "my job is to provide accurate information to the Street.… At this point in time there was even more volatility and more noise in society … in terms of testing and things like that, that it was not possible for me to feel comfortable in giving a number that was accurate[.]" *Id.* ¶58 (Brown: "[T]he last thing we want to do is provide guidance that we're not confident in …. [I]f we're not confident … then we won't provide guidance."). Egan testified similarly: "We decided not to give quarterly guidance because we didn't have the ability to predict it. We didn't have those optics. It wasn't clear to us." *Id.* ¶16; (D. Egan: "[T]hings were volatile enough that we didn't have a clear sense…our view was that it was the prudent thing to do to say that we didn't have the kind of optics and clarity that we would like to have in order to provide guidance."). At the same time, both Defendants testified that they remained confident, even in the midst of that uncertainty, about the Company's prospects and long-term demand for its products. *Id.* ¶¶44, 50.

This testimony, in and of itself, is strong evidence from which a rational jury could (and should) find that the Defendants acted in good faith. *See In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 5107289, at *5n.4, 10 (S.D.N.Y. Dec. 13, 2024) (granting defendants summary judgment where testimony was strong evidence against scienter). But additional evidence strongly supports this conclusion as well: Benson and Houston—the only other witnesses who helped prepare the challenged statements—testified similarly, and every other witness testified that they were not concerned about low sales at the time. *See* Resp-56.1 ¶¶17, 29-30, 39-43; ¶¶17, 43 (Benson: "We just didn't know what it … was going to look like. We'd have these wild peaks. I mean, it was ...

20

frankly, impossible to predict what was going to happen next."; "A company has a responsibility to … give the best number that it can…. [I]f your best guess is, We can't give a number that we … feel like we can responsibly stand behind, then it's the company's responsibility to not give a number."); ¶¶37, 39, 42 (Houston: testifying he believed Defendants were trying to be transparent with investors about unpredictable market conditions, and never got the impression they were trying to "hide" low sales); ¶30 (S. Egan: "it really wasn't apparent maybe until later in the year that numbers were lower … because we would often have big months followed by lower months"; "you could never place … any real assurances on anything until you got through an entire quarter because things change fast"); ¶¶17, 30  (similar from Gundry and Featherstone).

Dr. Tsai's undisputed testimony likewise corroborates Defendants' account, describing how the factors identified in the challenged statements, among others, created enormous uncertainty about near-term COVID-test sales in spring 2022, and how the challenged statements were consistent with his understanding of the COVID-testing market at the time. Resp-56.1 ¶¶47-66, 75; DX91. Moreover, the fact that Egan and Brown did not sell any Co-Diagnostics stock for profit during the class period or personally benefit from the alleged fraud—and instead increased their holdings—demonstrates their lack of motive and cuts strongly against scienter. Resp-56.1 ¶80; *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (increased holdings undermine scienter); *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *22 (S.D.N.Y. Mar. 18, 2025) (sales for tax reasons not indicative of scienter).

Ignoring all of this, Plaintiff claims it is nonetheless entitled to summary judgment for two reasons:

First, Plaintiff argues that the undisputed fact that Egan and Brown "knew or had access to sales data on Monday.com" showing lower sales leading up to May 12 proves recklessness. MPSJ

21

18-19. It does not: Defendants' knowledge of or access to that sales data cannot show recklessness because, as detailed *supra* and in Defendants' MSJ, the undisputed, material facts demonstrate that the sales data did not "contradict[] their public statements." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Every witness said the same thing: Logix test sales varied so much week-to-week and month-to-month that there was no reason to believe low quarter-to-date sales five to seven weeks into the quarter predicted low full-quarter results or indicated a demand issue. Resp-56.1 ¶¶7, 11, 16-17, 26, 30. The Company's historical sales data show that quarters routinely began with very high sales and ended with very low sales, or vice versa, with a majority of sales coming in just 2 or 3 weeks. *Id.* ¶¶2, 17, 19-20; *supra* 4, 11. Moreover, it was expected that sales would be significantly lower after a period of very high sales like those seen during Omicron. *Id.* ¶¶17, 68-69. Consequently, "[w]hat the company's sales were to date in a quarter was in many respects irrelevant to our view of what might happen in the quarter." *Id.* ¶¶11, 22. Co-Diagnostics, like the vast majority of public companies, did not generally share intra-quarter sales for precisely this reason: quarter-to-date sales—even very high or very low ones—simply were not good indicators of how a quarter would turn out and were not useful predictors of full-quarter results. *Id.* ¶11 (D. Egan: "[Brown] didn't want to all of a sudden turn a quarterly revenue guidance environment to a monthly guidance environment because that's not the way our business worked in terms of how we brought in sales. It was oftentimes at the very end of the quarter when the quarter became a solid quarter."); ¶22 ("One month does not a quarter make and if we're in the quarter five weeks and we've got most of the quarter still ahead of us, we would not make a judgment as to how a quarter might ultimately present itself based on what we see in that short of a time period."); ¶¶26, 28 (Brown looked at quarter-to-date sales but they were not the "key driver" for setting guidance). *No facts dispute any of this*, and it is fatal to Plaintiff's claims. Because the undisputed, material

22

facts establish that low quarter-to-date sales on May 12 did not predict low full-quarter revenue or signify a "demand issue," they did not contradict the challenged statements, and Brown's and Egan's knowledge of or access to those sales data cannot show scienter.[7]

Second, Plaintiff argues that the challenged statements explaining why Defendants were not providing guidance on May 12 were a "pretext" to avoid disclosing low quarter-to-date sales. MPSJ 19-20. Again, no facts support this. As discussed *supra*, no one at Co-Diagnostics viewed the low quarter-to-date sales leading up to May 12 as concerning, out of the ordinary, or predicting a bad quarter; it makes no sense, then, that Defendants would seek to "hide" data that was not predictive or meaningful. *See supra* 7, 11-12; Resp-56.1 ¶¶16-17, 29-30, 37, 39-43. Plaintiff selectively quotes Houston's testimony to suggest that he understood from communications with Defendants that they were trying to hide low sales, but Houston explicitly *denied* this inference. Resp-56.1 ¶37; ¶41 (testifying Egan and Brown never suggested they were trying to hide low sales); ¶¶39-43. Indeed, Houston testified that he had no idea what Co-Diagnostics' recent sales were when he offered Defendants several alternatives to providing guidance and helped them prepare the challenged statements; he merely assumed based on his past experience *with other clients* that if Co-Diagnostics was considering not providing guidance it was probably looking at "a soft quarter or two." Resp-56.1 ¶¶16, 35; ¶37 ("[W]e didn't have any visibility into [the current quarter]; even though technically we were into [it], we never talked about it."); ¶39(c) ("[T]he language that I chose to use were the inferences based on what I've seen with other clients that are considering pulling quarterly guidance or annual guidance….").

---

[7] This renders inapposite all of Plaintiff's authorities, which involved strong evidence of knowledge of or access to facts that objectively contradicted statements, and/or strong evidence of motive or intent. *E.g.*, *SEC v. Honig*, 2023 WL 6386918, at *30 (S.D.N.Y. Sept. 29, 2023); *SEC v. Gallison*, 588 F.Supp.3d 509, 525 (S.D.N.Y. 2022) (same); *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016).

Plaintiff claims that the May 4-10 email chain with Lambert shows low sales were the real reason for pulling guidance, but no facts support this reading and a wealth of undisputed evidence—including the testimony of every witness—contradicts it. Brown testified that the decision not to provide guidance was driven by increased volatility in orders and increased market uncertainty, both of which had many contributing factors that were hard to tease out: "over the past two quarters … [t]here had been fluctuations [in the timing of sales orders] on a weekly basis and it was becoming more apparent that the fluctuations were becoming more defined …. [A]t this time it fluctuated even more based on the outside influences, how society was responding to COVID, how different were countries responding to the COVID pandemic …." Resp-56.1 ¶43; *see also* ¶42 (Houston: "macro" issues created uncertainty for all his clients at the time, and Co-Diagnostics "didn't have the visibility that they might typically have, that they had at the same time last year, as to their ability to derive a forecast"); ¶¶16-17, 39-43. Because Brown was uncomfortable with the idea of providing guidance in this environment, he asked Lambert for its thoughts on alternatives to providing guidance, and to research how other companies were explaining their decisions not to provide guidance amidst this uncertainty and how they were characterizing the factors contributing to that volatility and uncertainty. *Id*. ¶¶35, 37, 39-43; ¶42 (Houston: Co-Diagnostics "knew there was reduced visibility" but was still "trying to get [its] arms around it"). Plaintiff reads into these innocuous communications fraudulent intent, but nothing on their face (or in the testimony explaining the statements) supports this, and the undisputed facts demonstrate that the factors Defendants identified on May 12 did in fact contribute to the market uncertainty that caused Defendants not to provide guidance. *Id.*; ¶¶47-49, 63-75.

As for snippets of language Plaintiff claims suggest pretext, these are too weak even to

24

create a genuine issue of material fact, much less to compel summary judgment for Plaintiff. The May 4 email's references to "a soft quarter" and a "weak start" were penned by *Houston,* not anyone at Co-Diagnostics, and he testified that he had no knowledge of Co-Diagnostics' recent sales at the time and was merely making assumptions about what *might* be going on based on experiences with other clients. Resp-56.1 ¶¶37-42.  And Brown's email after speaking to the board simply reflects that the board understandably felt it was important to give investors a good explanation as to why Co-Diagnostics was not providing guidance; it does not suggest they still needed to "come up" with a good reason, or that no good reasons had yet been communicated to the board. *See id.* ¶43 (Brown: "I don't know that I would say 'come up with' a good reason. They were [] okay with us not providing guidance as long as there was a good reason for it, not 'come up.'"); *id.* (D. Egan testifying they would have already presented good reasons to the board regarding "the uncertainty that we were looking at and not feeling that we should commit to numbers that didn't have a clear sense of being able to achieve them").

Nor do Egan's statements about taking a longer view with respect to demand constitute "admissions" of recklessness. Plaintiff selectively quotes Egan's testimony to suggest he knew full-quarter results would likely be low but did not disclose it because he believed investors should be focused on Co-Diagnostics' longer-term prospects. MPSJ 20-21. This is not what Egan said or suggested at any point. What he repeatedly explained is that he viewed conditions in spring 2022 as too uncertain to provide accurate quarterly guidance, but that he was confident new COVID waves would eventually emerge and drive sales—it was simply a matter of when and how high. *E.g.*, Resp-56.1 ¶¶17, 46-47, 49; ¶16 ("We decided not to give quarterly guidance because we didn't have the ability to predict it. We didn't have those optics. It wasn't clear to us."); ¶50 ("Things were uncertain enough and the optics were unclear enough so we decided not to guide

25

on it, but we were gearing up for what the nation as a whole was projecting was going to be a very probable or at least possible set of circumstances in the fall and winter. Nobody knew when the new variant or an old variant or whatever would have asserted itself."). Egan never "admitted" or suggested he "knew demand was down, but hoped they could mask [it]" (MPSJ 21); he simply truthfully explained why he and the other Defendants were *uncertain* about the short-term but highly confident about long-term demand for Co-Diagnostics' products. Resp-56.1 ¶¶39, 44, 47-49.

All this is strong evidence from which a jury—and the Court on Defendants' MSJ—could (and should) reasonably conclude that Defendants did not act with scienter when they made the challenged statements on May 12. These facts also fully distinguish Plaintiff's authorities, each of which—unlike here—involved strong evidence of personal financial motive, actual knowledge of falsity, and/or egregious recklessness, and lacked countervailing evidence of good faith.[8] Because the undisputed, material facts compel summary judgment for Defendants on scienter, Plaintiff's MPSJ must be denied. *See Kirkland*, 2024 WL 5107289, at *6 (granting defendants summary judgment where evidence did not show "highly unreasonable behavior" that would allow a rational jury to find scienter); *In re Northern Telecom Ltd. Sec. Litig.*, 116 F.Supp.2d 446, 465 (S.D.N.Y. 2000) (similar).

---

[8] *E.g.*, *SEC v. StratoComm Corp.*, 652 F. App'x 35, 38 (2d Cir. 2016) (finding "reckless disregard for the truth" where company marketed non-existent system); *SEC v. Constantin*, 939 F.Supp.2d 288, 309 & n.14 (S.D.N.Y. 2013) ("apparent," "ample" evidence defendants "routinely lied" to misappropriate funds); *SEC v. Milan Capital Grp., Inc.*, 2000 WL 1682761, at *6-8 (S.D.N.Y. Nov. 9, 2000) (similar); *SEC v. Monterosso*, 756 F.3d 1326, 1336 (11th Cir. 2014) ("overwhelming" evidence defendants were "conscious of the obvious risk" they were misrepresenting revenue); *SEC v. Research Automation Corp.*, 585 F.2d 31, 34-35 (2d Cir. 1978) (defendant "totally failed to contradict" allegations and "denied none of the[] facts").

## IV.     CONCLUSION

For all of these reasons, and those in Defendants' MSJ papers, the Court should deny

Plaintiff's MPSJ.


Dated:  May 2, 2025                                    Respectfully submitted,
             New York, New York

                                                            **BAKER & HOSTETLER LLP**


                                            By:     /s/ Douglas W. Greene
                                                    Douglas W. Greene (*pro hac vice*)
                                                    dgreene@bakerlaw.com
                                                    Genevieve G. York-Erwin
                                                    gyorkerwin@bakerlaw.com
                                                    Marissa Peirsol (*pro hac vice*)
                                                    mpeirsol@bakerlaw.com
                                                    45 Rockefeller Plaza
                                                    New York, NY 10111
                                                    Telephone: 212.589.4200

                                            *Attorneys for Defendants*

27

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C)**

Pursuant to Hon. Subramanian's Individual Practices Rule 8(C) and Local Civil Rule 7.1(c), I hereby certify that on May 2, 2025, I electronically filed the foregoing Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment. As measured by the word processing system used to prepare it, the memorandum has a word count of 8,748 and complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

BAKER & HOSTETLER LLP

By:    */s/ Douglas W. Greene*
       Douglas W. Greene