**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br>       Defendants. | Case No.: 1:22-cv-06978-AS<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**LEAD PLAINTIFF'S MOTION FOR EXCLUSION OF EXPERT TESTIMONY**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT ...................................................................................................................... 2

    A.    Dr. Tsai and Dr. Juneja Satisfy the Standard for Admitting Expert
        Testimony. ................................................................................................................ 2

    B.    The Court Should Not Exclude Dr. Tsai's Opinions. ............................................. 2

        1.    Dr. Tsai's Opinion That It Was Increasingly Difficult to Accurately
            Predict COVID-Testing Demand in Spring 2022 Is Relevant and
            Based on Sufficient Data and Methodology. ............................................. 3

            a.    Plaintiff's Arguments Misrepresent the Scope of Dr. Tsai's
                Data. ............................................................................................. 3

            b.    Dr. Tsai's Opinion That It Was Increasingly Difficult to
                Accurately Predict COVID-Testing Demand in Spring 2022
                Is Well-Supported by Facts and Expert Experience ....................... 7

        2.    Dr. Tsai's Opinion Regarding Co-Diagnostics' Reasons for
            Discontinuing Quarterly Guidance Is Not An Impermissible Legal
            Conclusion, Is Helpful to the Jury, and Should Not Be Excluded. ............. 9

    C.    The Court Should Not Exclude Dr. Juneja's Opinions. ....................................... 12

        1.    Dr. Juneja's Opinions Are Based on an Accurate Understanding of
            Plaintiff's Allegations and Are Helpful in Evaluating Its Claims. ............. 13

         2.    Dr. Juneja's Reference to *Goldman* Is Appropriate and Does Not
            Transform Her Economic Analysis Into a Legal Conclusion or
            Invade the Jury's Province. ...................................................................... 16

        3.    Dr. Juneja's Discussion of Publicly Available Information in
            Spring 2022 Is Within Her Expertise, Reliable, and Relevant. ................. 18

III.  CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Bus. Grp. Int'l, LLC v. Refresco Beverages US Inc.*,
  2023 WL 8280139 (S.D.N.Y. Nov. 30, 2023) ..............................................................................6

*Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*,
  2015 WL 1472015 (N.D.N.Y. Mar. 31, 2015) ..............................................................................6

*Arista Recs. LLC v. Lime Grp. LLC*,
  2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................................................................19

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  77 F.4th 74 (2d Cir. 2023) .........................................................................................................16

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*,
  2022 WL 2662678 (D. Mass. July 8, 2022) .................................................................................6

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................................................19

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ..........................................................................................................2, 5, 20

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  2024 WL 1115944 (S.D.N.Y. Mar. 14, 2024) ............................................................................18

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ......................................................................................................................5

*In re Golden*,
  2022 WL 362913 (Bankr. E.D.N.Y. Feb. 4, 2022) .....................................................................17

*Hnot v. Willis Grp. Holdings Ltd.*,
  2007 WL 1599154 (S.D.N.Y. June 1, 2007) ..............................................................................19

*Hygh v. Jacobs*,
  961 F.2d 359 (2d Cir. 1992) ........................................................................................................10

*King v. Brandtjen & Kluge, Inc.*,
  2001 WL 1804345 (W.D.N.Y. June 20, 2001) .............................................................................9

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
  589 F. Supp. 3d 302 (S.D.N.Y. 2022) ..........................................................................................7

*Lidle ex rel. Lidle v. Cirrus Design Corp.*,
  2010 WL 2674584 (S.D.N.Y. July 6, 2010) ...................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ....................................................................................................17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................................................18

*In re Platinum-Beechwood Litig.*,
  469 F. Supp. 3d 105 (S.D.N.Y. 2020) .............................................................................18

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) ..............................................................................................2

*Solid 21, Inc. v. Richemont N. Am., Inc.*,
  2023 WL 6058614 (S.D.N.Y. Sept. 18, 2023) ...........................................................5, 6, 10

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) .....................................................................................17, 18

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994) ........................................................................................10, 11, 12

*United States v. Jakobetz*,
  955 F.2d 786 (2d Cir. 1992) .............................................................................................20

*United States v. Morgan*,
  675 F. App'x 53 (2d Cir. 2017) .........................................................................................6

*United States v. Napout*,
  963 F.3d 163 (2d Cir. 2020) ...........................................................................................2, 6

*United States v. Scop*,
  846 F.2d 135 (2d Cir.), *rev'd in part on reh'g on other grounds*, 856 F.2d 5
  (2d Cir. 1988) ....................................................................................................................10

*Valelly v. Lynch*,
  2024 WL 4476088 (S.D.N.Y. Oct. 11, 2024) ...................................................................6

*Weiss v. Macy's Retail Holdings Inc.*,
  2019 WL 6174350 (S.D.N.Y. Nov. 19, 2019) ...................................................................6

*In re Xerox Corp. Sec. Litig.*,
  2009 WL 8556135 (D. Conn. Apr. 22, 2009) ..................................................................19

**Rules**

Fed. R. Evid. 702 ...................................................................................................................2

Fed. R. Evid. 704(a) ................................................................................................................11

**Other Authorities**

29 Charles Alan Wright et al., *Federal Practice and Procedure* § 6268 (2d ed. 2017) ...........................................................................................................................7

## I.    INTRODUCTION

Plaintiff does not challenge Dr. Thomas Tsai's or Dr. Vinita Juneja's obvious qualifications as experts in their respective fields, nor could it. It also does not seek to exclude their reports or testimony in their entirety. Instead, Plaintiff targets a few discrete opinions from each expert, arguing that they are unreliable, irrelevant, and/or outside their areas of expertise.

None of this is factually or legally supported, and, tellingly, the central arguments Plaintiff advances with respect to each expert are fundamentally at odds with the way Plaintiff itself conceptualized the important issues and facts in its Motion for Partial Summary Judgment. ECF No. 113 (Pl's Mot. for Partial Summary Judgment; "MPSJ"). Plaintiff argues here that Dr. Tsai's opinions are irrelevant and unreliable because his expert experience and the data on which he relies are based primarily in North and South America while "close to half" of Co-Diagnostics' sales at the relevant times were to non-U.S. companies. Yet, nowhere in the MPSJ does Plaintiff even suggest, let alone proffer facts showing, that the geographic distinction Plaintiff raises here actually matters in any way to any element of its claim.

Likewise, Plaintiff asserts here that Dr. Juneja's criticisms of Plaintiff's expert, Mr. Chad Coffman's, opinions are irrelevant because (according to Plaintiff) her analysis is premised on a fundamentally wrong conception of Plaintiff's claims—namely, she assumes that the "truth" allegedly fraudulently hidden by the challenged statements was that intra-quarter sales were low as of May 12, 2022, rather than that "demand had plummeted." Once again, however, Plaintiff's MPSJ belies the significance of this distinction: as detailed below, the MPSJ itself repeatedly characterizes "Defendant's failure to disclose that *sales* of the Logix Test had plummeted" as the omission that rendered the challenged statements misleading and, on Plaintiff's theory, establishes Defendants' scienter. MPSJ at 4 (emphasis added); *see also id.* at 1, 15-16, 18-20. Moreover,

1

Plaintiff fails to offer any fact other than sales numbers as evidence that "demand had plummeted" or as undercutting the challenged statements.

In short, the arguments in Plaintiff's Motion for Exclusion of Expert Testimony (ECF No. 105; the "Motion") appear to have been conjured for strategic purposes with little regard for the real issues in this case. For that reason, and the many others articulated below, this Court should reject Plaintiff's Motion in its entirety.

## II.    ARGUMENT

### A.    Dr. Tsai and Dr. Juneja Satisfy the Standard for Admitting Expert Testimony.

It is a "well-accepted principle" that Federal Rule of Evidence 702 "embodies a liberal standard of admissibility for expert opinions." *United States v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020). To be admissible, the expert must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Once the Court finds an expert qualified, it must still "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 580 (1993). If an expert and his or her report satisfy the basic requirements of qualifications, relevance, and reliability, then any shortcomings in their opinions "go to weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted). Dr. Tsai and Dr. Juneja are widely recognized and highly qualified experts whose opinions satisfy the admissibility standard and should not be excluded.

### B.    The Court Should Not Exclude Dr. Tsai's Opinions.

Plaintiff does not (and cannot in good faith) challenge Dr. Tsai's qualifications. Dr. Tsai is a highly regarded professor at the Harvard T.H. Chan School of Public Health and Harvard Medical School; an advisor to the U.S. Department of Health and Human Services; a consultant to the U.S. Centers for Disease Control and Prevention and U.S. Food and Drug Administration on increasing

access to testing programs and digital healthcare, respectively; and an accomplished researcher in the field of COVID forecasting and public health strategy. ECF No. 106-01,[1] Expert Report of Thomas C. Tsai, MD, MPH, dated November 20, 2024 ("Tsai Rpt."), ¶¶ 1-5 (setting forth credentials), App. A (curriculum vitae). Notably, Dr. Tsai also served as a Senior Policy Advisor and the Testing and Treatment Coordinator for the COVID-19 Response Team during the Biden Administration beginning in 2022. *Id.* And while Dr. Tsai has particularly notable familiarity and expertise with COVID-related public health trends in the United States, it is undisputed that he has broad experience relevant to global COVID patterns as well. *See* ECF No. 106-05, Transcript of Deposition of Thomas C. Tsai, MD, MPH, dated February 6, 2025 ("Tsai Dep."), at 76:18-25 (testifying to same); Tsai Rpt. ¶ 5, App. A (setting forth experience related to COVID policies abroad).

Nevertheless, Plaintiff attacks two of Dr. Tsai's opinions on reliability and relevancy grounds. No facts or law support these arguments, and Plaintiff's Motion to exclude portions of Dr. Tsai's testimony should be rejected.

> **1.**   **Dr. Tsai's Opinion That It Was Increasingly Difficult to Accurately Predict COVID-Testing Demand in Spring 2022 Is Relevant and Based on Sufficient Data and Methodology.**

> **a.**   ***Plaintiff's Arguments Misrepresent the Scope of Dr. Tsai's Data.***

First, Plaintiff argues that Dr. Tsai's opinion that it was increasingly difficult to accurately predict COVID-testing demand in spring 2022 is irrelevant and unreliable because, according to Plaintiff, Dr. Tsai relies "almost exclusively" on COVID-related data from North and South America, even though Co-Diagnostics sells COVID tests around the world.

---

[1] Defendants cite to the exhibits attached to the Declaration of Jason A. Uris filed in support of Plaintiff's motion, ECF Nos. 106-01 through 106-06.

3

This argument is fundamentally flawed for one simple reason: the deficiency Plaintiff purports to identify—that Dr. Tsai effectively relied only on data from North and South America—does not exist. Indeed, Dr. Tsai's opinion is grounded in data that extend beyond North and South America, as is evident throughout his report. For example:

- Dr. Tsai relies on data from around the world to support his opinions regarding COVID mutations and other drivers of testing demand. *See*, *e.g.*, Tsai Rpt. ¶ 16 (discussing variants that emerged in the United Kingdom, South Africa, and India), ¶ 22 (referencing articles covering public health responses in multiple countries to support opinion regarding supply chain pressure caused by COVID surveillance), ¶ 23 (citing data from England regarding drivers that influence demand).

- Dr. Tsai similarly relies on data from around the world to support his opinions regarding public perceptions related to COVID testing, vaccine hesitancy and efficacy, and testing fatigue. *See*, *e.g.*, Tsai Rpt. ¶ 35 (considering survey results from 23 countries to support opinion that "[v]ariation in public perception of risk and adherence to public health guidelines exacerbated the difficulty in predicting demand for COVID tests").

*See also* Tsai Dep. 78:5-16 (testifying he "was aware of the global patterns for COVID-19 throughout the pandemic"); 76:18-25 (testifying to experience relevant to global COVID patterns); Tsai Rpt. ¶ 5, App. A (setting forth experience related to COVID policies abroad).

Regardless, there is no "misfit" between Dr. Tsai's use of North and South American data and his opinion that it was increasingly difficult to accurately predict COVID-testing demand in 2022, particularly given that most of Co-Diagnostics' sales were in North and South America. *See* ECF No. 103-50, November 2022 Investor Presentation, at 16 ("In 2021, 53% of revenues were derived from the U.S. while 47% were from the rest of the world."); ECF No. 102-26, Gundry Dep. 42:20-43:2 (testifying that, except for the United States, Co-Diagnostics sold more tests in Latin America than any other region in the world). Further, as shown by undisputed evidence relied upon by Dr. Tsai, patterns of COVID and related behaviors found in North and South America, and especially the United States, are representative of global trends. *See*, *e.g.*, Tsai Rpt. ¶19 n.31

4

(citing to reference relying on a dataset from Our World in Data, showing positive COVID tests across multiple countries was comparable to the United States), ¶27 n.52 (relying on a dataset from Our World in Data, showing hospitalizations and thus demand for COVID testing across multiple countries mirrors the United States). Accordingly, even if Dr. Tsai had limited the data he considered to the United States, or North and South America, Plaintiff offers no factual basis for its conclusory assertion that this would have rendered his opinion too "far-removed" from the facts of this case to be relevant. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997) (excluding expert opinion because there was no explanation as to "why the experts could have extrapolated their opinions from . . . seemingly far-removed animal studies").

Nor does Dr. Tsai's reliance on North and South American data render his opinion unreliable, for essentially the same reasons. As detailed above, and contrary to Plaintiff's assertions, Dr. Tsai's opinions rely on a variety of data and sources from around the world. *Supra* 4. Moreover, the fact that Co-Diagnostics is a U.S.-based company that mostly sells to companies in North and South America makes Dr. Tsai's focus on data from that geographic area particularly appropriate, and Plaintiff offers no basis for its speculation that the COVID-testing trends in North and South America as described by Dr. Tsai were significantly different from the rest of the world. *Supra* 4-5. All of this confirms the reliability of his opinion.

But even if Dr. Tsai had considered *only* North and South American data, and if there were some meaningful differences between that data and data from other geographies, this would not have rendered his opinion unreliable or constitute grounds for exclusion under *Daubert*. *See Daubert*, 509 U.S. at 596 (explaining "gaps" in facts and data considered by the expert, as alleged here, are better addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than exclusion); *Solid 21, Inc. v.*

5

*Richemont N. Am., Inc.*, 2023 WL 6058614, *4-5 (S.D.N.Y. Sept. 18, 2023) (refusing to exclude an expert's opinion even though it was based on "an improper consumer universe" because such "potential flaws" do not warrant exclusion, but rather merely impact "the weight a factfinder decides to assign to [the expert's] findings"); *Weiss v. Macy's Retail Holdings Inc.*, 2019 WL 6174350, at *2 (S.D.N.Y. Nov. 19, 2019) (holding argument that expert gave "excessive weight to certain data" and "insufficient weight to others" is not "a basis for barring [expert's] testimony" and instead, "could be explored on cross-examination"); *Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 2015 WL 1472015, at *24-25 (N.D.N.Y. Mar. 31, 2015) (holding issue of whether expert "relie[d] on incorrect facts . . . is again an issue of weight, not admissibility").

Rule 702 also does not require that experts rely on all data that could be deemed relevant. *See Napout*, 963 F.3d at 187 (holding district court did not abuse its discretion in allowing expert to testify about the economic impact of bribes on soccer organizations even though he did not review any "empirical data . . . involved in the case"); *Valelly v. Lynch*, 2024 WL 4476088, at *8 (S.D.N.Y. Oct. 11, 2024) (holding proffered expert evidence met the reliability standards of Rule 702 even though plaintiff identified "a larger cross-section" of information on which the expert could have relied). Nor does Rule 702 "require the expert to seek out the best possible source of relevant information." *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, 2022 WL 2662678, at *5 (D. Mass. July 8, 2022).

Accordingly, this Court has expressly cautioned that "[a]n expert should be excluded only if there are 'serious flaws in reasoning or methodology.'" *Access Bus. Grp. Int'l, LLC v. Refresco Beverages US Inc.*, 2023 WL 8280139, at *2 (S.D.N.Y. Nov. 30, 2023) (citation omitted); *see also United States v. Morgan*, 675 F. App'x 53, 56 (2d Cir. 2017) (affirming district court's denial of *Daubert* motion; "[the] judge should only exclude the evidence if the flaw is large enough that the

6

expert lacks 'good grounds' for his or her conclusions"); 29 Charles Alan Wright et al., *Federal Practice and Procedure* § 6268 (2d ed. 2017) ("The word 'sufficient' [in Rule 702(b)] signifies that the expert may properly base her opinion on something less than all the pertinent facts or data."). The fact that Dr. Tsai's opinions rely on North and South American data (among others) presents no such "serious flaw."

> **b.    *Dr. Tsai's Opinion That It Was Increasingly Difficult to Accurately Predict COVID-Testing Demand in Spring 2022 Is Well-Supported by Facts and Expert Experience.***

Plaintiff next argues that Dr. Tsai "offers no basis" for his opinion that it was increasingly difficult in the spring of 2022 to accurately predict demand for COVID tests because he "gave no factual support for the contention that [sic] uncertainty was greater than it had been in 2020 . . . or in 2021." Pl.'s Mot. 8-9. Again, Plaintiff is simply wrong. Even a cursory review of Dr. Tsai's report shows that he discusses in detail several factors that exacerbated the inherent uncertainty in forecasting COVID-testing demand throughout the pandemic: changing public health guidance, uncertainty around vaccine efficacy, individuals' responses to the ongoing threat of current and future waves of the virus, etc. Tsai Rpt. ¶¶ 23-35. He then discusses how and why those uncertainties were amplified in spring 2022, and details several additional factors that made it even more challenging to predict testing demand in the spring of 2022 compared to prior time periods—e.g., the difficulty in predicting the health impacts of the new and highly contagious Omicron variants and subvariants, increased uncertainty regarding the public health response, and the shifting public perception of risk. *Id.* ¶¶ 36-43.

Further, as set forth in his report and explained at deposition, Dr. Tsai's experience as the Testing and Treatment Coordinator for the White House COVID-19 Response Team provides additional support for his opinion that it was more difficult to predict demand in spring 2022 than it had been at previous times. *See Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330

(S.D.N.Y. 2022) (holding reliability inquiry satisfied given the "personal knowledge and experience of the expert"). In this role, Dr. Tsai oversaw testing policy and purchases for the strategic national stockpile and witnessed firsthand the increasing difficulty in forecasting COVID-test demand. Tsai Rpt. ¶ 36; Tsai Dep. 21:23-22:4 ("The opinions expressed in the report reflect my several years of public health experience and also my policy experience as a testing coordinator on the White House COVID Response Team."), 85:16-86:8 (same). Dr. Tsai was also the co-lead for the development of public health policy research and guidance for the Harvard Global Health Institute during the pandemic, where he helped to develop the Google-Harvard COVID-19 Public Forecasting Model.[2] Tsai Rpt. ¶¶ 4, 36; Tsai Dep. 26:21-27:13.

Nor is Dr. Tsai's opinion the product of "hindsight-bias"; to the contrary, it is well-supported by his experience as an expert in the industry at the time, his analysis of the sources and data described in his report, and contemporaneous news coverage and published papers, relied upon by Dr. Tsai, discussing the same on-going changes in individual behaviors and public health responses he identifies as having created additional uncertainty in spring 2022. *See*, *e.g.*, Tsai Rpt. ¶ 42, Tbl. 2 (citing San Francisco Chronicle article, dated March 29, 2022, discussing unpredictability of COVID transmission rates due to uncertainty regarding whether people will continue to abide by COVID-related mandates); *id.* (citing Philadelphia Inquirer article, dated April 12, 2022, discussing residents' variable willingness to get vaccinated and wear a mask due to pandemic fatigue); *id.* (citing Associated Press article, dated May 3, 2022, discussing New York mayor's unwillingness to reinstatement vaccination and mask mandates despite rising COVID infections).

---

[2] *See also* Tsai Rpt. ¶ 4 n.4; https://lookerstudio.google.com/reporting/52f6e744-66c6-47aa-83db-f74201a7c4df/page/r4voB?s=ou-b6M0HXag (showing COVID public forecasts discontinued as of February 10, 2022).

The law does not permit the exclusion of an expert's opinion merely because the plaintiff does not agree with the conclusions he reached. *See Lidle ex rel. Lidle v. Cirrus Design Corp.*, 2010 WL 2674584, at *8 (S.D.N.Y. July 6, 2010) (expert entitled to rely on facts even if opposing party does not agree with conclusions expert draws from these sources); *King v. Brandtjen & Kluge, Inc.*, 2001 WL 1804345, at *8 (W.D.N.Y. June 20, 2001) ("If Kluge does not agree with Schutt's conclusions, it is free to cross-examine him vigorously regarding the limitations of his experience in the industry and his interpretations of the sources he used."). Here, Dr. Tsai's expert opinion that it was increasingly difficult to predict COVID-testing demand in 2022 relied on relevant data and experience and easily satisfies the relevancy and reliability requirement of Rule 702 and *Daubert*. Accordingly, Plaintiff's motion to exclude this opinion must be denied.

### 2. Dr. Tsai's Opinion Regarding Co-Diagnostics' Reasons for Discontinuing Quarterly Guidance Is Not An Impermissible Legal Conclusion, Is Helpful to the Jury, and Should Not Be Excluded.

Finally, Plaintiff seeks to exclude Dr. Tsai's opinion that the May 12, 2022, statements at issue in this case were "consistent with [his] understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022," for two reasons. Tsai Rpt. ¶ 13; Pl.'s Mot. 1-2, 9-10. First, Plaintiff argues that Dr. Tsai proffers an impermissible legal conclusion by telling "the jury what result to reach" on the ultimate question of whether the Defendants' alleged misstatements were false and misleading. *Id.* at 9. Second, Plaintiff asserts that Dr. Tsai's opinion does nothing to assist the jury in resolving "whether Defendants' statements accurately reflected what Defendants knew at the time they made the statements." *Id.* at 10. Neither argument has merit.

As to Plaintiff's initial argument, Dr. Tsai does not actually express an opinion as to whether any of Defendants' May 12, 2022, statements were false or misleading: he does not use

the words "false or misleading" in stating his opinion, nor does he attempt to define what constitutes a "false or misleading" statement for purposes of the securities laws or purport to apply that standard to the statements here. *Cf. Solid 21, Inc.*, 2023 WL 6058614, at *7 (precluding proposed expert, in a trademark infringement action, from testifying as to which "advertisements are potentially infringing" based on expert's reading of a court order); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir.), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988) (excluding testimony of SEC investigator because his opinion included legally specialized terms, like "scheme to defraud"); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (holding expert improperly opined on an "ultimate legal conclusion" when he stated that the police officer used "deadly" force that was not "justified," both of which were elements of plaintiff's claim). Rather, Dr. Tsai simply offered his opinion on a question squarely within his expertise—whether the way Defendants spoke on May 12, 2022, about conditions and uncertainty in the COVID-testing market was consistent with his expert understanding of what was happening in that industry at the time and how others in the COVID-testing industry were talking about it. This opinion provides important context for evaluating whether the statements were true and not misleading in the full context in which they were made, but it is not in itself a legal conclusion and does not invade the province of the jury.

The Second Circuit's opinion in *United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994), a case cited by Plaintiff, is instructive. In *Duncan*, the defendant (who was alleged to have made corrupt payments to public officials) contended that the trial court erred in admitting the expert testimony of an IRS agent because his opinion included impermissible legal conclusions—specifically, that "money-laundering" occurred and "false" tax returns were filed, based on the expert's personal knowledge and the undisputed evidence. *Id.* at 102 n.4. The court held that this expert testimony

10

did not constitute a legal conclusion because the expert did not expressly state that the defendant "was guilty of . . . the crimes with which [he] was charged." *Id.* at 102-103. In reaching this conclusion, the court explained that "the distinction between factual conclusions and legal conclusions [is] an important one in the context of expert opinion" and an expert's opinion "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* (quoting Fed. R. Evid. 704(a)). Similarly, Dr. Tsai's challenged opinion does not "tell the jury what result to reach," but instead states a factual conclusion based on undisputed facts and his personal experience, providing "groundwork . . . to enable the jury to make its own informed decision." *Duncan*, 42 F.3d at 101. This is not an impermissible legal conclusion and should not be excluded on that basis.

Plaintiff's second argument—that Dr. Tsai's opinion should be excluded because it is "unhelpful" in resolving "whether Defendants' statements accurately reflected what Defendants knew at the time they made the statements"—is equally unavailing. Pl.'s Mot. at 10. As an initial matter, this second argument is in significant tension with the first: how can Dr. Tsai's opinion be both an ultimate legal conclusion and also so unrelated to any important issue in the case as to be "unhelpful"? In any event, Dr. Tsai's opinion as to what was happening in the COVID-testing market in spring 2022, how those conditions and uncertainties were being discussed in public discourse, and whether the Defendants' statements were consistent with those conditions and discourse, is squarely relevant to and helpful in evaluating whether Defendants' statements on May 12, 2022, were false or misleading in context, and whether Defendants acted with scienter. Accordingly, while Dr. Tsai does not opine as to what Defendants knew or intended when they spoke on May 12, 2022, his opinion synthesizing contemporaneous public information and his own experience in the field of COVID-19 forecasting and related public health responses

11

(knowledge that is not within the purview of a fact witness) is helpful in understanding the state of the COVID-testing market in spring 2022 and the public information available to Defendants at the time, as well as in contextualizing the reasons cited by Defendants on May 12 for not providing quarterly guidance and their characterizations of the market. *See Duncan*, 42 F.3d at 101 ("Generally, expert testimony may be admissible if it is helpful to the trier of fact.").

Because Dr. Tsai's challenged opinions are relevant, reliable, and helpful to a jury, Plaintiff's motion to exclude them should be denied.

### C.    The Court Should Not Exclude Dr. Juneja's Opinions.

As with Dr. Tsai, Plaintiff does not (and cannot) challenge Dr. Juneja's qualifications as an economic expert. She is indisputably an authority in her field: she received her M.A. and Ph.D. in Economics from Harvard University; has taught undergraduate and graduate classes on economics and business regulation at Western University and Harvard University; has published numerous papers and book chapters regarding financial litigation, event studies, shareholder claims, and other pertinent economic subjects; and has served as a testifying economic expert in numerous state and federal court actions in the United States and in foreign litigations, as seen in her initial and reply reports. ECF No. 106-02, Expert Report of Vinita Juneja, Ph.D., dated November 20, 2024 ("Juneja Rpt."), at ECF pp.18-20 (short-form CV including past four years of testifying experience); ECF No. 106-03, Reply Report of Vinita Juneja, Ph.D., dated January 10, 2023 ("Juneja Reply Rpt."), at ECF pp.31-33 (same); *see also https://www.nera.com/experts/j/vinita-juneja*.

Instead, Plaintiff argues that Dr. Juneja's opinions should be partially excluded in three respects: (1) her "criticisms" of Plaintiff's economic expert's analyses are derived from an "inaccurate" description of Plaintiff's claims and are therefore irrelevant (Pl's Mot. at 11-14); (2) two paragraphs in her initial report offer a "pure legal argument which should be entirely stricken"

12

(*id.* at 14); and (3) her testimony regarding public information related to COVID testing in the period leading up to the challenged statements is outside her expertise, unreliable, and irrelevant (*id.* at 15-16). None of this has merit, and Plaintiff's Motion should be denied.

**1.    Dr. Juneja's Opinions Are Based on an Accurate Understanding of Plaintiff's Allegations and Are Helpful in Evaluating Its Claims.**

First, Plaintiff argues that Dr. Juneja's "criticisms" of the report prepared by Plaintiff's economic expert, Mr. Coffman, are irrelevant because she "posits the unduly narrow and inaccurate view that Plaintiff alleged the misstatements were misleading for 'failing to disclose intra-quarter sales numbers as of May 12, 2022,'" when she should have characterized it as for failure to disclose that "demand for [Logix test] had already plummeted." Pl.'s Mot. 2, 11.

This assertion is both faulty and dramatically at odds with the way Plaintiff itself has argued its case from the beginning. Plaintiff has consistently and repeatedly argued—including in the Motion for Partial Summary Judgment that Plaintiff filed contemporaneously with this *Daubert* Motion—that "[e]ach of the alleged misstatements were made misleading by Defendants' failure to disclose that Logix test sales had plummeted." ECF No. 37 ("Pl's Opp. To MTD"), at 11; *see also id.* at 1, 9 (similar); MPSJ at 4 (arguing Plaintiff is entitled to summary judgment for three reasons, all of which concern "Defendant's failure to disclose that sales of the Logix Test had plummeted"); *id.* at 18-19 (claiming Plaintiff is entitled to summary judgment on scienter because Defendants "either knew, or had access to sales data . . . showing, that Logix Test sales had in fact plummeted by May 12, 2022"); *id.* at 19-20 (arguing challenged statements "were a pretext to avoid disclosing that sales of the Logix test had rapidly declined"); *id.* at 1, 15-16 (arguing about undisclosed intra-quarter sales as of May 12). Indeed, *Plaintiff's* Daubert *Motion itself* characterizes low intra-quarter sales as the allegedly hidden truth that rendered the challenged statements misleading. *See* Pl's Mot. at 13 ("what Plaintiff alleges was concealed on May 12,

2022" is "that sales had 'already cratered' (ECF No. 42, at 5) or that current sales were down so substantially as to signal future demand concerns").

Even where Plaintiff phrases its allegations or arguments in terms of "demand," it is clear that it is referring to sales. *See* ECF No. 31 (Amended Complaint; "AC") ¶ 48 (alleging that remaining challenged statements were false and misleading because Defendants failed to disclose that "demand for [Logix test] had already plummeted . . . . *Specifically*, Co-Dx's Q2 2022 revenue for the entire quarter was just $5 million . . . . Even if Co-Dx had generated 100% of its Q2 2022 revenue by May 12 . . . it still would have represented a significant falloff in demand for its Logix Smart™ COVID-19 Test"); *compare* MPSJ at 1 (identifying three summary judgment arguments relating to "demand" having plummeted) *with* MPSJ at 4 (explaining those same three arguments in more detail, but referring to "sales" having plummeted). With the benefit of a full factual record after extensive discovery, Plaintiff still has not identified any other non-public *fact*—except for internal sales numbers—the non-disclosure of which it claims rendered the challenged statements misleading. *See generally* MPSJ (repeatedly arguing non-disclosure of fact that "sales" had plummeted). It is little surprise then, that Plaintiff's expert, Mr. Coffman, too centers his theory of what was allegedly fraudulently concealed around intra-quarter sales:

> In this matter, based on Plaintiff's allegations, I understand that any corrective disclosure would have had to disclose the relevant truth that Co-Diagnostics was aware of declining demand for and sales of its Logix Smart Test. **Such a disclosure would explicitly state that** the Company was aware of the reduced demand and **that its sales to date for Q2 2022 were far less than what it had seen in prior quarters.**

ECF No. 106-04, Expert Report of Chad Coffman, CFA, dated November 20, 2024 ("Coffman Rpt."), ¶ 34 (emphasis added).

In short, Plaintiff's claims (and Mr. Coffman's analyses) are very much premised on the non-disclosure that Dr. Juneja posits, and her analyses and criticisms are directly relevant to

14

evaluating Mr. Coffman's and Plaintiff's claims. Dr. Juneja's reports and deposition testimony show that she both accurately described and understands the allegations in this case—and indeed, incorporates the concept of declining demand (as shown, on Plaintiff's theory, by declining sales) into the bases for her opinions. For example, in Dr. Juneja's initial report, she sets forth the allegations upon which her opinion is based, which expressly include the Court's holding that, at the motion-to-dismiss stage, Plaintiff sufficiently alleged that "it was misleading . . . to disclose the company's difficulty in forecasting near-term demand without disclosing that demand was already declining rapidly." Juneja Rpt. ¶ 16 (quoting Mem. Opinion & Order). Indeed, this is the very language that Plaintiff contends Dr. Juneja failed to consider.[3] Similarly, in her reply report, Dr. Juneja acknowledges that Mr. Coffman's analyses assume Plaintiff will be successful in proving that Defendants were aware of the quarterly sales numbers, as of May 12, 2022, *and* that "sales were on track to be substantially lower than preceding quarters and market expectations"—again, illustrating that Dr. Juneja's description and understanding of Plaintiff's claims matches Plaintiff's allegations and arguments. Reply Rpt. ¶ 14. But nothing about those assumptions compels the conclusion (as Plaintiff suggests) that the confounding news items Dr. Juneja identifies as relevant to Mr. Coffman's analysis were somehow "part of the alleged fraud," or that disclosing what was allegedly hidden on May 12 (that sales and/or "demand" had plummeted) could have given investors exactly the same information on May 12 as the full-quarter results and other confounding news announced on August 11. *See* Juneja Reply Rpt. ¶¶ 24-30. Dr. Juneja's criticisms of Mr. Coffman's analyses are rooted in an accurate understanding of Plaintiff's claims and application of her expert knowledge and standard economic principles and methodologies to

---

[3] Dr. Juneja's initial report also expressly relies on the allegations set forth in paragraphs 56-60 of Plaintiff's Amended Complaint, which includes the assertion that "Defendants were aware of the reduced demand for their Logix Smart COVID-19 Test throughout the quarter." Juneja Rpt. ¶2 n.4.

15

the facts of this case; the fact that Plaintiff disagrees with the conclusions she draws from shared assumptions does not make her opinions irrelevant or inadmissible.

Moreover, it is worth noting that many of Dr. Juneja's critiques of Mr. Coffman's analyses do not depend on any particular characterization of specifically what would have to have been disclosed on May 12, 2022, in order to reveal the allegedly hidden truth. For example, Mr. Coffman opined that the "most widely accepted and reliable proxy" for evaluating front-end inflation is "to rely upon the abnormal market price decline observed" on the back end by the alleged corrective disclosures. Coffman Rpt. ¶ 80. One of Dr. Juneja's main criticisms of this approach is that in prior opinions, Mr. Coffman used an entirely different approach that, in this case, could have reduced his estimates of alleged inflation and damages, and he offers no reason for failing to do so here. Juneja Reply Rpt. ¶¶ 33, 35. This criticism is completely independent of how one characterizes an alternative truthful disclosure on May 12, 2022. Similarly, the analysis in Dr. Juneja's initial report showing that the challenged statements were received by the market as bad news is likewise independent of how one characterizes an alternative truthful disclosure.

> **2.  Dr. Juneja's Reference to *Goldman* Is Appropriate and Does Not Transform Her Economic Analysis Into a Legal Conclusion or Invade the Jury's Province.**

Plaintiff next argues that Dr. Juneja asserts impermissible legal conclusions in paragraphs 27 and 28 of her initial report, including when she states:

> Whether the Company's statements on May 12, 2022 effectively disclosed what Plaintiff claims was hidden can be viewed in light of what the Second Circuit has held: '[T]he district court should [ask] 'what would have happened if [the company] had spoken truthfully' . . . at an equally generic level.'

Juneja Rpt. ¶ 27 (quoting *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 (2d Cir. 2023)).

This is neither a legal argument nor a legal opinion: Dr. Juneja is merely referencing the current legal standard as a guidepost for her economic analysis comparing the alleged misrepresentations to the alleged corrective disclosures. This is a practice commonly used by experts to position their analyses within the relevant legal framework, and it does not, in and of itself, turn expert analysis into an impermissible legal opinion. *See In re Golden*, 2022 WL 362913, at \*14 (Bankr. E.D.N.Y. Feb. 4, 2022) ("[T]o the extent that an expert's testimony . . . simply states or quotes from legal sources, such as statutes or regulations, or other references . . . or the parties' submissions including memoranda of law and letter briefs, that is not a statement of legal opinion, or for that matter expert opinion, at all."); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding district court did not abuse its discretion in admitting testimony of expert who provided general background information on federal securities regulations). In fact, Mr. Coffman does the same thing in his initial report, setting forth legal standards to serve as a guidepost for his opinions:

> While I am not a lawyer and I do not offer a legal opinion, in this analysis I consider the definition of 'material' as articulated by the United States Supreme Court: an omitted fact is 'material' for purposes of Section 10(b) if there is a 'substantial likelihood' that its disclosure 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'

Coffman Rpt. ¶ 32 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011)).

> Nor does Dr. Juneja's opinion in paragraph 28 usurp the role of the jury:

> Plaintiff implies that Co-Diagnostics should have announced its 2Q 2022 results to date to the market as early as May 12, 2022 and that the May 12, 2022 statements were insufficient in terms of content. But, in this instance, a disclosure by Co-Diagnostics of its actual sales figures through approximately May 12, 2022 would have been a disclosure with far greater detail than the alleged misrepresentations.

Juneja Rpt. ¶ 28 (quotation omitted). It is well-accepted that "an expert may opine on an issue of fact within the jury province" so long as she does not state "ultimate legal conclusions" based on those facts. *Bilzerian*, 926 F.2d at 1294. Here, Dr. Juneja does not tell the jury what result to reach

17

in deciding whether Defendants violated the securities laws—but rather, states a factual conclusion based on her expert review of the evidence. *See In re Platinum-Beechwood Litig.*, 469 F. Supp. 3d 105, 116 n.9 (S.D.N.Y. 2020) (holding expert could not testify that defendant "failed to meet its fiduciary duty," but would be permitted to testify to conduct indicating "the so-called badges of fraud").

Because Dr. Juneja's opinions in paragraphs 27 and 28 of her report are not legal conclusions, the Court should not exclude them.

### 3. Dr. Juneja's Discussion of Publicly Available Information in Spring 2022 Is Within Her Expertise, Reliable, and Relevant.

Lastly, Plaintiff attacks Dr. Juneja's discussion of publicly available testing data and media reports regarding COVID-testing issues in Section III.B of her initial report and paragraph 17 of her reply report as outside her expertise, unreliable, and irrelevant. Pl.'s Mot. 15; Juneja Rpt. ¶¶ 24-25; Juneja Reply Rpt. ¶ 17. Plaintiff is wrong on all accounts.

First, analyzing economically relevant, publicly available data that inform the markets and, as a result, the price of Co-Diagnostics' securities, is squarely within Dr. Juneja's expertise. *See* Juneja Rpt. ¶¶ 6-9 (setting forth credentials), App. 1 (curriculum vitae). News and other public materials provide economically relevant information regarding the "total mix" of information available to investors as well as what was already known and what could have been disclosed to the market at the time of the challenged statements. *See, e.g., In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 505 (2d Cir. 2010) (noting company's stock "never experienced any statistically significant drop in value at or near the time of these news reports"). Thus, analyzing publicly available information during the relevant time period is a standard practice in providing expert economic analysis of the type Dr. Juneja offers here. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 2024 WL 1115944, at *10-12 (S.D.N.Y. Mar. 14, 2024) (illustrating economist's examination

18

of historical news and publication in evaluating confounding factors affecting a stock price); *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *11 (S.D.N.Y. May 2, 2011) (holding expert opinion admissible when expert "bases his conclusions on his own expertise and analysis" and "sources are of a type reasonably relied upon by experts in his field") (internal marks and citation omitted).

Second, Dr. Juneja's discussion of these publicly available materials is reliable and relevant. Reviewing publicly available information that informed how investors received the challenged statements, how the market reacted, and what else could have been disclosed at the time is a well-accepted practice when performing economic analysis in securities litigation. *See id.*; *see also*, *e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 87-88 (S.D.N.Y. 2015) (holding economist's methodology reliable where he "reviewed the mix of information released into the market . . . to assess news items and evaluate the overall direction of sentiment based on the collective body of news . . . ."); *In re Xerox Corp. Sec. Litig.*, 2009 WL 8556135, at *3 (D. Conn. Apr. 22, 2009) (holding expert was "not giving an improper lay opinion" when "he waded through a 'complicated morass' of information . . . [and] after doing so he arrived at a conclusion"). Moreover, Dr. Juneja's opinion is not controversial or contradicted by other evidence, and it provides helpful context for the jury's evaluation of the economic evidence in this case. *See Hnot v. Willis Grp. Holdings Ltd.*, 2007 WL 1599154, at *2 (S.D.N.Y. June 1, 2007) (refusing to exclude expert opinion regarding "underlying generalizations [that] are hardly controversial" and holding even though "few jurors will be surprised at the basic outlines of the testimony," expert's opinion was still "valuable in giving a jury context within which to evaluate the particular evidence"). Indeed, Mr. Coffman's initial report likewise reviewed news events in forming his economic opinions:

> To identify any Corrective Disclosure Events, I gathered and reviewed Co-Diagnostics' news events during the Class Period. Among other items, my news search included a multitude of articles obtained from Factiva [a research tool that aggregated content from various sources], numerous analyst reports issued by equity research firms covering Co-Diagnostics . . . .

Coffman Rpt. ¶ 64.

As for Plaintiff's contention that Dr. Juneja's analysis of publicly available materials is "unhelpful" because Co-Diagnostics had significant foreign sales and Dr. Juneja's analysis only addresses "anecdotal U.S. information," this fails for the same reasons articulated with respect to Dr. Tsai's analysis. *See supra* 4-7. U.S. sales accounted for at least half of Co-Diagnostics' sales during the relevant time period, making the U.S. data Dr. Juneja considered very much on point. Moreover, as explained with regards to Dr. Tsai's opinions, the data upon which Dr. Juneja relies is illustrative of worldwide trends. *See supra* 4-5; Juneja Reply Rpt. ¶ 17 n.7 (referring to data indicating a significant decline in testing around the globe and pandemic fatigue was making it difficult for scientists to track new COVID cases). To the extent Plaintiff wants to challenge the reliability of such data, it is free to do so on cross-examination or by presenting contradictory evidence (which it has not done). *See Daubert*, 509 U.S. at 596 (exclusion is not the proper remedy for alleged "gaps" in data); *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) (rejecting assumption that a jury "will be so dazzled or swayed" by expert testimony "as to ignore [contradictory] evidence").

## III.    CONCLUSION

For all of these reasons, the Court should deny Plaintiff's Motion for Exclusion of Expert Testimony in its entirety.

Dated: May 2, 2025                           Respectfully submitted,
      New York, New York

**BAKER & HOSTETLER LLP**


By:    */s/ Douglas W. Greene*

      Douglas W. Greene (*pro hac vice*)
      dgreene@bakerlaw.com
      Genevieve G. York-Erwin
      gyorkerwin@bakerlaw.com
      Marissa Peirsol (*pro hac vice*)
      mpeirsol@bakerlaw.com
      45 Rockefeller Plaza
      New York, NY 10111
      Telephone: 212.589.4200

      *Attorneys for Defendants*

21

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(C)</u>

Pursuant to Hon. Subramanian's Individual Practices Rule 8(C) and Local Civil Rule 7.1(c), I hereby certify that on May 2, 2025, I electronically filed the foregoing Memorandum of Law in Opposition to Lead Plaintiff's Motion for Exclusion of Expert Testimony. As measured by the word processing system used to prepare it, the memorandum has a word count of 6,692 and complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

**BAKER & HOSTETLER LLP**

By:  */s/ Douglas W. Greene*
      Douglas W. Greene