**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STADIUM CAPITAL LLC, on behalf of itself and all others similarly situated,<br><br>                     Plaintiff,<br><br>    v.<br><br>CO-DIAGNOSTICS, INC., DWIGHT H. EGAN, and BRIAN L. BROWN,<br><br><br>                Defendants. | Case No.: 1:22-cv-06978-AS |

**LEAD PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS AND DEFENDANTS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Court-appointed Lead Plaintiff Stadium Capital LLC respectfully submits this Reply to Defendants' Response to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts and Defendants' Statement of Additional Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 121). Defendants' response to Plaintiff's Rule 56.1 Statement of Undisputed Facts included a Statement of Additional Undisputed Material Facts. Plaintiff responds to those additional facts below.

**GENERAL OBJECTIONS**

1. Plaintiff objects to Defendants' submission of unsubstantiated facts that are not supported by a citation to admissible evidence, as required by Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(d).

2. Evidence cited by Plaintiff in support or in contradiction of any particular fact or proposition should not be construed as the only evidence supporting or contradicting the fact or

proposition in question, and Plaintiff specifically reserves the right to provide additional evidence as is necessary and appropriate.

3.      The phrases "undisputed", "does not dispute" and "not disputed", shall not be construed as a concession by Plaintiff that a statement is material, complete, supports the proposition which is cited, would be admissible at trial, or is otherwise relevant.

4.      Plaintiff reserves its right to challenge the admissibility of any statement and any cited materials at trial.

5.      Plaintiff's assertion that it "does not dispute" any particular fact or proposition is solely for purposes of Plaintiff's motion for partial summary judgment, and Plaintiff reserves all other objections including, but not limited to, its right to object to or contest each of Defendants' assertions of fact at the appropriate time, including the right to challenge such assertions of fact at trial.

6.      Because Defendants' section headings are not statements of material undisputed facts, no response is needed or provided as to any such headings.

7.      Defendants' rely largely on expert opinion testimony to support their alleged statements of undisputed material fact. See, *e.g.*, ¶¶63-67, 69-77, 79. However, opinions are not "facts" that properly may be presented under Local Rule 56.1. *See, Ofudu v. Barr Labs., Inc.*, 98 F. Supp. 2d 510, 513 (S.D.N.Y. 2000) (disregarding 56.1 statement and "hesitat[ing] to use the word 'facts' because so many of the entries in the Rule 56.1 Statement are obviously opinions or arguments"); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (refusing to consider "opinions" undisputed). Indeed, Dr. Tsai's and Dr. Juneja's expert testimony is the subject of Plaintiff's Daubert Motion. ECF No.

105; *see, e.g.*, *id.* at 6-9 (noting, for example, that Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions despite acknowledging that Co-Diagnostics operated globally with close to half of the Company's revenues derived from foreign sales).

**PLAINTIFF'S REPLY TO ADDITIONAL FACTS PRESENTED BY DEFENDANTS**

**I.    COVID-TEST SALES WERE ALWAYS CYCLICAL AND UNPREDICTABLE, AND EVEN MORE SO IN SPRING 2022**

**63.**    From 2Q20 through 1Q22, demand for COVID tests generally, including the Logix test, largely tracked the unpredictable rise and fall of infections due to the emergence and subsidence of new COVID variants. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶23-27, Fig. 4; ECF No. 103-36 (DX 96), Quarterly Dashboard; ECF No. 102-112 (DX 112), Weekly Sales Compilation.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases portions of Dr. Tsai's report and a figure in Dr. Tsai's report.  Disputed as to the portion of the statement stating "including the Logix test" as a mischaracterization of Dr. Tsai's report.  To the contrary, the cited paragraphs of Dr. Tsai's report do not concern demand for the Logix test specifically, rather they concern demand for "U.S. COVID Lab Testing" (*see* ¶26, Figure 4).  *Id*. ¶26; *see also* ¶¶23-25, 27. Further disputed to the extent this statement implies that Dr. Tsai opined in the referenced paragraphs that demand for COVID tests generally tracked the "fall of infections" when COVID cases declined.  *See* Pl. Resp. ¶60[1]. Rather, Dr. Tsai only stated: "Demand for tests generally tracked the patterns of these COVID waves, rising when cases of COVID rose, as shown in Figure 4."  DX 91, Tsai Rpt. ¶26.

---

[1] All references to "Pl. Resp. ¶_" are to paragraphs in Plaintiffs' Response to Defendants' Statement of Undisputed Facts.  ECF No. 120.

Further disputed as to the portion of the statement regarding "the unpredictable rise and fall of infections" as a mischaracterization of Dr. Tsai's report, vague, undefined, and unsupported by the record.  The NCIRD July 3, 2024 Article cited by Dr. Tsai states "COVID-19 activity tends to fluctuate with the seasons, meaning it has some seasonal patterns." Pl. Resp. ¶51; *see also, e.g.*, *id.* ¶53 (with respect to Omicron surges in the Spring of 2022, Dr. Tsai noted that "[a] similar surge was observed in the Spring of 2021").

While COVID sales patterns naturally evinced some variability given the seasonal nature of COVID, sales of the Logix Test were consistent – from the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter.  Plaintiff's 56.1 Statement, ¶2.  Moreover, while each new "wave" of COVID had the potential to boost sales of the Logix Test, Co-Diagnostics historically had a consistent level of baseline sales, even between "waves."  *Id.*, ¶¶16-19.  For example, Logix test sales rarely dropped below $4 million in a single month, and ***not once*** Logix test sales fall below $4 million in consecutive months, let alone back-to-back-to-back months.  *Id.*  Only once had monthly sales been below $3 million, and never before had sales been less than $2 million. *Id.*, ¶¶17-18.  Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter. *Id.*, ¶14.

64.     During this time, the emergence and subsidence of new COVID variants was highly unpredictable and did not follow regular seasonal patterns, and the severity, transmissibility, and vaccine-efficacy of each variant was different. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶15-18, 24-27; *see also* ECF No. 108, Defs' 56.1 ¶¶43-102.

**Plaintiff's Response**: Disputed.  Disputed as the characterization of the emergence and subsidence of new COVID variants as "highly unpredictable" is vague, undefined, and

unsupported by the record.  The NCIRD July 3, 2024 Article cited by Dr. Tsai, states "There is no distinct COVID-19 season like there is for influenza (flu) and respiratory syncytial virus (RSV). While flu and RSV have a generally defined fall/winter seasonality and circulate at low levels in most parts of the United States in the summer, meaningful COVID-19 activity occurs at other times of the year."  Pl. Resp. ¶51.  Additionally, in the same paragraph, the NCIRD July 3, 2024 Article also states "COVID-19 activity tends to fluctuate with the seasons, meaning it has some seasonal patterns." *Id*.  That COVID-19 may not follow the same seasonal patterns as the flu or RSV, does not mean it does not follow "regular seasonal patterns".  Indeed, with respect to the wave of Omicron lineages BA.2 and BA.2.12.1 Dr. Tsai noted that "[a] similar surge was observed in the Spring of 2021." ECF No. 103-31 (DX 91), ¶24 fn. 45.

While COVID sales patterns naturally evinced some variability given the seasonal nature of COVID, sales of the Logix Test were consistent – from the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter.  Plaintiff's 56.1 Statement, ¶2.  Moreover, while each new "wave" of COVID had the potential to boost sales of the Logix Test, Co-Diagnostics historically had a consistent level of baseline sales, even between "waves." *Id.*, ¶¶16-19.  For example, Logix test sales rarely dropped below $4 million in a single month, and ***not once*** Logix test sales fall below $4 million in consecutive months, let alone back-to-back-to-back months.  *Id*.  Only once had monthly sales been below $3 million, and never before had sales been less than $2 million. *Id.*, ¶¶17-18.  Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter. *Id.*, ¶14.

Further disputed as to the portion of the statement that "the severity, transmissibility, and vaccine-efficacy of each variant was different" as vague and lacking foundation, as Dr. Tsai does

not make any such statement or provide any specific support for such a statement.  *See, e.g.*, Pl. Resp. ¶¶47, 50, 66.  Without citation to specific support for this statement, Plaintiff has no basis to agree or disagree.  Further disputed as "each variant" is vague and undefined.  *See, e.g.*, Pl. Resp. ¶45.

65.    Masking, vaccination, and testing mandates, funding initiatives, and other COVID-related government and institutional policies had different and often conflicting impacts on test sales depending on a variety of factors. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶14, 23-35, 37-41, Fig. 5; ECF No. 103-33 (DX 93), Juneja Reply ¶17; *see also* ECF No. 108, Defs' 56.1 ¶¶57-85, 88-108, 146-154, 111, 244-250.

**Plaintiff's Response**: Disputed as compound, vague, non-specific, and incomprehensible. This statement lists various factors that have the potential to impact COVID test sales, but makes no specific statements of fact.  Not only is the statement not specific to any time period, it does not state anything specific with respect to any factor.  For example, with respect to "masking", the statement does not refer specifically to increased or decreased masking.  With respect to "vaccination", it does not refer specifically to high or low rates of vaccination.  And so forth. Plaintiff does not dispute, as a general matter, that the listed factors could have "impacts on test sales".  Without a statement of specific time period or specific assertion of fact with respect to any particular factor, the statement provides no specific or concise statement of fact in response to which Plaintiff can agree or disagree. To the extent Defendants' have made any specific assertions of fact with respect to any of the above referenced factors, Plaintiff has already responded to them. *See generally* Pl. Resps. ¶¶1-291; *see also id.* ¶235-241, 244-248; Pl. Resp. ¶235 (highlighting extensive evidence and testimony establishing that a reasonable investor would associate

6

decreased mask mandates, continued emergence and spread of new variants, and persistently low vaccination rates with increased levels of COVID infection).

Further disputed to the extent Defendants suggest that whether the fact that demand had plummeted was required to be disclosed turns on whether "[m]asking, vaccination, and testing mandates, funding initiatives, and other COVID-related government and institutional policies had different and often conflicting impacts on test sales depending on a variety of factors."

66.    For example, Dr. Tsai testified that the impact of decreased mask mandates on COVID infection rates "depend[s] on the context" because if there is low prevalence of disease in communities "then masking may not make a difference" but "if there were COVID cases and active transmission, then it could have an impact" ECF No. 102-29 (DX 29), Tsai Dep. 52:13-54:14, 51:10-52:12; 56:19-58:4 (testifying uncertainty as to whether emergence of new variants results in increased COVID infections); ECF No. 103-31 (DX 91), Tsai Rpt. ¶23 ("Often, but not always, demand for tests increases as COVID cases increase."); *id.* ¶40 (showing that although Connecticut and Georgia registered a similar number of COVID cases per capita for the week ending May 12, 2022, providers in Connecticut administered more than twice as many molecular tests per capita); *id* ¶38 (similar regarding changes to certain sources of federal funding); *see also supra* ¶¶47-49.

**Plaintiff's Response**: Undisputed to the extent this accurately quotes portions of Dr. Tsai's testimony. Disputed as this mischaracterizes the testimony and is inconsistent with other testimony and the record.  When asked "are decreased mask mandates something you would associate with increased COVID infection?" Dr. Tsai testified that "if there were COVID cases and active transmission, then [decreased mask mandates] could have an impact . . . ."  DX 29, Tsai Dep. 52:13-53:7.  Additionally, when asked "[i]n May of 2022, did public health experts generally

associate wearing masks as a measure to be used to decrease COVID infection going forward?" he conceded that "[m]ask wearing was part of a suite of behavioral guidance as part of the broader what public health has called a mitigation strategy to the spread of COVID-19. *Id*. at 54:16-25; *see also id*. at 55:17-20 ("It was part of a suite of public health guidance that was used throughout the pandemic as part of the mitigation strategy."); *see also* Pl. Resp. ¶235; *id.* ¶¶244-45.

Further disputed as when asked "[i]s the continued emergence and spread of new variants something you would associate with increased COVID infection going forward?" Dr. Tsai testified "[d]epends on the particulars of those variants. You can have variants that fizzle away or variants that then become variants of concern." *Id*. ¶246; DX 29, Tsai Dep. 56:8-17 (ignoring that the factor itself, and the question, referred to the ***continued*** emergence and ***spread*** of new variants, *i.e.*, variants that ***are*** virulent.); *see also* DX 20, Benson Dep. 148:7-16 ("I would say the spread of infection is something that I would associate with the spread of infection, yes. I mean the spread of variants. I mean, it's -- ***that goes hand in hand with infection. You can't spread a variant without there being infections***.") (emphasis added); *see also* Pl. Resp. ¶235 (highlighting extensive evidence and testimony establishing that a reasonable investor would associate decreased mask mandates with increased levels of COVID infection).

Further disputed as the citation to ¶40 of the Tsai report has nothing to do with "the impact of decreased mask mandates on COVID infection rates." *See* Pl. Resp. ¶249.

Further disputed as the citation ¶38 has nothing to do with "the impact of decreased mask mandates on COVID infection rates." *See* Pl. Resp. ¶¶150-54.

Further disputed as the citation to their responses to ¶¶47-49 refers to testimony that inconsistent with other testimony and the record. *See* Pl. Resp. ¶¶235-242. Further disputed as Defendants mischaracterize Houston's testimony that "It depends on the reader" to suggest that he

8

testified that any of the factors, such as decreased mask mandates, could indicate either increased *or decreased* infection going forward.  ECF No. 102-27 (DX 27), Houston Dep. at 86:23-89:10.  Rather, he testified that a reader could "infer something *different*[]" such as "people being tired of wearing masks . . . ."  *Id*.  He did not testify that any of the factors could indicate *a decrease* of infection going forward.  *Id*.

67.    As a result of the factors identified in paragraphs 63 through 65, among others, COVID-test sales were highly volatile, cycling unpredictably between peaks and troughs throughout the pandemic. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶23, 26-34, 36-41; *see also* ECF No. 108, Defs' 56.1 ¶¶43-102, 146-154, 244-250.

**Plaintiff's Response**: Disputed as a mischaracterization of Dr. Tsai's report, vague, and non-specific.  Further disputed as to the characterization of COVID test sales as "highly volatile" and as "cycling unpredictably" as vague, undefined, and unsupported by the record.  The NCIRD July 3, 2024 Article cited by Dr. Tsai states "COVID-19 activity tends to fluctuate with the seasons, meaning it has some seasonal patterns." Pl. Resp. ¶51; *see also, e.g.*, *id.* ¶53 (with respect to Omicron surges in the Spring of 2022, Dr. Tsai noted that "[a] similar surge was observed in the Spring of 2021").

While COVID sales patterns naturally evinced some variability given the seasonal nature of COVID, sales of the Logix Test were consistent – from the second quarter of 2020 through the first quarter of 2022, Co-Diagnostics had sales of at least $20 million per quarter.  Plaintiff's 56.1 Statement, ¶2.  Moreover, while each new "wave" of COVID had the potential to boost sales of the Logix Test, Co-Diagnostics historically had a consistent level of baseline sales, even between "waves."  *Id*., ¶¶16-19.  For example, Logix test sales rarely dropped below $4 million in a single month, and **not once** Logix test sales fall below $4 million in consecutive months, let alone back-

to-back-to-back months. *Id.* Only once had monthly sales been below $3 million, and never before had sales been less than $2 million. *Id.*, ¶¶17-18. Since the Company began selling the Logix Test, prior to 2Q 2022, the Company never had less than $5.1 million in sales by the midpoint of any quarter. *Id.*, ¶14.

Further disputed as "paragraphs 63 through 65" are disputed, and therefore do not support the conclusory assertion that any such factors properly support that "COVID-test sales were highly volatile, cycling unpredictably between peaks and troughs throughout the pandemic", which is also disputed. *See* Response to Nos. 63-65.

Disputed as to the reference to "among other[ factors]" as vague and undefined. Without citation to specific factors, Plaintiff has no basis to agree or disagree.

68.    COVID-test sales in general surged with the rise of the Omicron variant in late 2021 and the beginning of 2022, and then dropped in early 2022 as Omicron receded. ECF Nos. 102-33, 102-34, 102-38, 102-42 (DXs 33-34, 38, 41) (public coverage of the fluctuations in COVID-test sales during and after Omicron); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶24, 26, 36 Fig. 4; *see also* ECF No. 108, Defs' 56.1 ¶¶59-66; 110(a)-(d).

**Plaintiff's Response**: Undisputed with the clarification that with respect to the Logix Test, prior to the brief reprieve provided by the Omicron wave, in a November 10, 2021 email to Dwight Egan, Benson, and Houston, after October 2021 sales of $4,627,158.90 and November sales through November 10, 2021 of $315,824, Brown stated that "[t]hus far in Q4, we have seen slowing sales." Plaintiff's 56.1 Statement ¶20. With respect to the portion of the statement that "COVID-test sales in general . . . then dropped in early 2022 as Omicron receded", clarification is necessary. While there was an increase in sales in December 2021 and January 2022, sales of the Logix Test quickly fell to record low levels. Since the Company began selling the Logix test, prior

to 2022, never before had the Company had back-to-back months in which the Company had received less than $4 million in orders (let alone *three* months in a row).  Plaintiff's 56.1 Statement ¶¶16-19.  Faced with the Company's sales numbers in February, March, April, and the first half of May 2022, when asked "sales had never been that low for that long, correct?" Seth Egan conceded "Yeah, looking at – hindsight, looking at the chart, you're correct."  ECF No. 102-24 (DX 24), S. Egan Dep. at 65:6-66:3; *see also* Response to No. 63.

69.     Despite the drop in test sales following the Omicron surge, public statements by industry and public health and government officials in the spring of 2022 show that those officials expected long-term demand for COVID tests to remain strong due to the emergence of future variants and surges in COVID infections. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶14, 37; *see also* ECF No. 108, Defs' 56.1 ¶¶87-88.

**Plaintiff's Response**: Undisputed insofar as this is an accurate paraphrase of portions of Dr. Tsai's report.  ¶14 of Dr. Tsai's report contains no citations or references. Without citation to specific support for Dr. Tsai's assertion, Plaintiff has no basis to agree or disagree.

Disputed to the extent "public health and government officials" is vague and undefined. Without citation to specific "public health and government officials", Plaintiff has no basis to agree or disagree.

Disputed to the extent Defendants imply that the excerpts of articles in Table 1 of Dr. Tsai's report, one of which is dated nearly two months before the Class Period begins and quotes "a COVID forecaster" regarding "growth in COVID over the next few months", one of which is dated April 10, 2022 and states a belief that "we are [already] in the middle of a surge . . .", one of which is dated May 6, 2022 and states "the U.S. is [already] turning another corner in this pandemic", and another which refers to "potential[] . . . infections this fall and winter . . . [and] the need for

11

more funding from Congress . . ." (emphasis added), establish that "long-term demand for COVID tests [was expected] to remain strong" (or even that "those officials" expected such). *Id*.

Further disputed as none of the excerpted language in Table 1 of Dr. Tsai's report concern "long-term demand for COVID tests". *Id*.

Disputed as "remain strong" is vague, non-specific, and unsupported by the record. *See, e.g.*, Pl. Resp. ¶88.

70.    It was widely reported in March through May 2022 that experts and government officials expected a new COVID wave to emerge in the coming months and drive continued test sales. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶25, 37, 42, 44; *see also*, *e.g.*, ECF Nos. 102-45, 102-49, 102-52, 102-55, 103-5, 103-6, 103-7 (DXs 45, 49, 52, 55, 65, 66, 67) (public coverage of health officials and experts warning of coming COVID waves); ECF No. 108, Defs' 56.1 ¶¶55, 86-87, 89-92, 102-104, 109.

**Plaintiff's Response**:  Disputed.  This statement is vague and non-specific to the extent it cites a three-month period (March through May 2022) over which "a new COVID wave [was expected] to emerge in the coming months".  For example, the "coming months" as of March 1, 2022 are the not the same as the "coming months" as of May 31, 2022.

Further disputed as the cited sources to not establish the vague and overbroad statement that "experts and government officials expected a new COVID wave to emerge in the coming months".  For example, in ¶25 of his report, the only article Dr. Tsai cites from this time period states up front that "[t]he comparatively milder infections with the Omicron variant and higher levels of population immunity have raised hopes for a weakening of the pandemic." Markov, Peter V., *et al*., "Antigenic Evolution Will Lead to New SARS-CoV-2 Variants with Unpredictable Severity," *Nature Reviews Microbiology*, Vol. 20, March 14, 2022.

As explained in Response to No. 69, the articles cited in Table 1 of Dr. Tsai's report do not establish that "continued sales" were expected "in the coming months". Nor does a Biden Administration release in March 2022 listing a goal of "Prepar[ing] for new variants" establish this. Tsai Rpt. ¶37. Indeed, additional federal funding for COVID-19 testing sought by the Biden Administration was never passed by Congress, and ran out by the end of March 2022. AC ¶73; Pl. Resp. ¶155.

Further disputed as ¶42 of the Tsai Report does not concern whether "a new COVID wave to [was expected to] emerge in the coming months [or] drive continued test sales." Rather, it concerns "Public Discussion of Changes in Individual Behaviors Later in the Pandemic". As Dr. Tsai conceded, pandemic fatigue "might lead to fewer preventive measures taken, including tests taken." *Id*. ¶43.

Further disputed as ¶44 of the Tsai Report does not concern whether "a new COVID wave to [was expected to] emerge in the coming months [or] drive continued test sales." Rather, it concerns purported "public discussion of the significant difficulty in accurately predicting COVID cases during new waves." *Id*.

Nor does Defendants' citation to DXs 45, 49, 52, 55, 65, 66, 67 (which Defendants previously described as "discuss[ing] the potential for new surges in COVID-19 infections in the coming months") support this statement. As previously noted, the same thing could be said for nearly all of the pandemic prior to "March through May 2022" as well – that "public sources . . . discussed the potential for new surges in COVID-19 infections in the coming months." Pl. Resp. ¶109.

Nor do the cited sources to not support the statement that "experts and government officials expect . . . continued test sales [in the coming months]". *Id*. Indeed, Dwight Egan even conceded

that any expectations he had for a potential resurgence in sales was not until the ***fall and winter*** of 2022. *See, e.g.*, Pl. Resp. ¶180; *see also* DX 20, Benson Dep. 98:16-23 ("**Q.** Do you recall whether there was any specific variant that the company was concerned about that was concerned might arise in the near future that was impacting visibility? **A.** I don't recall any concerns about any specific variants at that time specifically.").

71.    Two new Omicron sub-variants (BA.2 and BA.5) had begun to circulate in the United States in early 2022 and were expected to increase test sales by the summer of 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶15-17, 25; ECF No. 103-4 (DX 64); *see also* ECF No. 108, Defs' 56.1 ¶¶46-47, 51, 53, 93, 109(f).

**Plaintiff's Response**: Disputed as a mischaracterization of Dr. Tsai's report.  This appears to be a reference to ¶37 of Dr. Tsai's report.  *See* Pl. Resp. ¶93.  For context, this paraphrased sentence from Dr. Tsai's report contains no citations.  Additionally, the sentence in the report states "at the time of the Alleged Misstatements, public health experts and policymakers were expressing concerns that the Omicron lineages BA.2 and BA.5, which had recently emerged, were expected to increase cases and thus demand for testing by Summer 2022."  Tsai Rpt. ¶37.  Disputed to the extent Defendants imply that the excerpts of articles in Table 1 of Dr. Tsai's report, one of which is dated nearly two months before the Class Period begins and quotes "a COVID forecaster" regarding "growth in COVID over the next few months", one of which is dated April 10, 2022 and states a belief that "we are [already] in the middle of a surge . . .", one of which is dated May 6, 2022 and states "the U.S. is [already] turning another corner in this pandemic", and another which refers to "potential[] . . . infections this ***fall and winter*** . . . [and] the need for more funding from Congress . . ." (emphasis added), establish that " [BA.2 and BA.5] were expected to increase test sales by the summer of 2022."

Moreover, with respect to DX 64, the same NPR article cited in Table 1 of Dr. Tsai's Report which noted that "cases are rising" (while also noting that "the U.S. is [already] turning another corner in this pandemic"), which is the only specific article cited in support of the statement's assertion of "increase[d] test sales by the summer of 2022", is not even attributed to an author. Indeed, the cited "article" appears to be a summary of a *podcast*. The summary is not attributed to any person or provide any source for the specific statement. *Id*. Indeed, Dwight Egan even conceded that any expectations he had for a potential resurgence in sales was not until the ***fall and winter*** of 2022. *See, e.g.*, Pl. Resp. ¶180; *see also* DX 20, Benson Dep. 98:16-23 ("**Q.** Do you recall whether there was any specific variant that the company was concerned about that was concerned might arise in the near future that was impacting visibility? **A.** I don't recall any concerns about any specific variants at that time specifically.").

72.     At the same time, however, policies, practices, and personal behaviors with respect to COVID testing were shifting rapidly post-Omicron, making it increasingly difficult to predict test sales in March, April, and May 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶14, 28-40; *see also* ECF No. 108, Defs' 56.1 ¶¶68-70, 74-86, 89-104, 108, 111.

**Plaintiff's Response**: Disputed as a mischaracterization of Dr. Tsai's report. For the avoidance of doubt, the actual language found in Dr. Tsai's report is: "It was widely understood by myself and stated by others in the COVID testing industry in April and May 2022 that the historical volatility in COVID testing demand, exacerbated by the factors discussed herein, made it increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year." ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶14.

Further disputed because while Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions, he

acknowledges the fact that Co-Diagnostics operated globally, with close to half of the Company's revenue derived from foreign sales. *See* Plaintiff's *Daubert* Motion at 6-9; Plaintiff's *Daubert* Reply at 1-5. Similarly, Dr. Tsai offers no basis for his repeated claim that it was "***increasingly*** difficult" in the Spring of 2022 to accurately predict demand for COVID-19 PCR tests. Plaintiff's *Daubert* Motion at 8; Plaintiff's *Daubert* Reply at 5-6. Although he posited explanations of why there was uncertainty in the U.S. market in 2022, he gave no factual support for the contention that that uncertainty was any ***greater than*** it had been in 2020, when the world was first confronted with the unknown scourge of COVID-19, or in 2021, when new COVID-19 variants were proliferating and there were divergent and shifting public policies at local, state, and federal levels. *Id.*

Further disputed to the extent Defendants suggest that whether the fact that demand had plummeted was required to be disclosed turns on whether it was "increasingly difficult to accurately predict demand for COVID PCR tests over the summer and for the rest of the year."

**73.**    Changes in perceived risk, personal behaviors, and increased pandemic fatigue, along with the other factors described above, further complicated attempts to predict testing demand in the spring of 2022. ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶34-44 (testing requirements and utilization and vaccination rates, masking requirements, and other factors varied even more widely and changed more frequently in spring 2022); ¶42, Tbl. 2 (showing public discussion of same); *see also* ECF No. 108, Defs' 56.1 ¶¶101-102, 111, 241.

**Plaintiff's Response**: Undisputed insofar as this accurately paraphrases portions of Dr. Tsai's report. Disputed to the extent "further complicated" is vague and undefined insofar as it does not state what the comparison point is or from what baseline a comparison is being made such that "attempts to predict testing demand" were "further complicated". Disputed to the extent

this statement assumes that "perceived risk, personal behaviors, [and] pandemic fatigue" were not changing throughout the pandemic.

Disputed as to Defendants' parenthetical description of Tsai Rpt. ¶¶34-44. The cited paragraphs do not establish the description "that testing requirements and utilization and vaccination rates, masking requirements, and other factors varied even more widely and changed more frequently in spring 2022". *Id.* Nor does ¶42, Tbl. 2 contain any "public discussion of same". *Id.*

Further disputed because while Dr. Tsai relies almost exclusively on information about COVID developments in the U.S. or North and South America as support for his opinions, he acknowledges the fact that Co-Diagnostics operated globally, with close to half of the Company's revenue derived from foreign sales. *See* Plaintiff's *Daubert* Motion at 6-9; Plaintiff's *Daubert* Reply at 1-5. Similarly, Dr. Tsai offers no basis for his repeated claim that it was "***increasingly*** difficult" in the Spring of 2022 to accurately predict demand for COVID-19 PCR tests. Plaintiff's *Daubert* Motion at 8; Plaintiff's *Daubert* Reply at 5-6. Although he posited explanations of why there was uncertainty in the U.S. market in 2022, he gave no factual support for the contention that that uncertainty was any ***greater than*** it had been in 2020, when the world was first confronted with the unknown scourge of COVID-19, or in 2021, when new COVID-19 variants were proliferating and there were divergent and shifting public policies at local, state, and federal levels. *Id.*

**74.** Congress's decision in March 2022 not to renew certain COVID funding for the uninsured was extensively covered in the press, but other federal programs continued to require private plans, Medicare, and Medicaid to reimburse for lab-based COVID tests, bolstering PCR-test sales. ECF Nos. 102-44, 102-50 (DXs 44, 50) (public coverage of certain federal funding cuts

for COVID testing); ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶21, 29, 38, 41; *see also* ECF No. 108, Defs' 56.1 ¶¶88, 110, 148-154.

**Plaintiff's Response**: Disputed. In support of this statement, which concerns the time period following March 2022, Dr. Tsai cited articles from 2020 and 2021. DX. 91, Tsai Rpt. ¶38, fn. 81. DX. 29, Tsai Dep. at 92:2-24. Dr. Tsai also conceded that he did not know whether private health plans, Medicare, or Medicaid were actually consistently covering the costs of PCR tests by May of 2022. *Id*. at 93:22-94:10; 95:1-24. He also conceded that the interpretation by federal agencies of the law requiring coverage and/or reimbursement "did change and evolve over time." *Id*. at 94:7-10. He further conceded that he did not recall the specifics of how those interpretations changed over time. *Id*. at 94:12-25. Additionally, while he did not recall the specifics as to whether tests needed to be ordered and administered by a health care professional in order to fall under the purview of the Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act, he conceded that "for a lot of the reimbursement for a diagnostic reimbursement, in order to fall under coverage, as I recall there were regulatory guidance around the testing ordered by a medical provider and in a medical setting in order to qualify for reimbursement which is a medical encounter." *Id*. at 95:25-97:18.  *See also* Pl. Resp. ¶¶148-154.

Further disputed as Defendants' citation to two articles does not establish that Congress's decision in March 2022 not to renew certain COVID funding "extensively covered in the press".

**75.**     Dr. Tsai opined that the May 12, 2022 challenged statements were "consistent with [his] understanding of the COVID testing market and demand at that time, as well as how public health officials and industry participants publicly spoke about COVID testing and demand in Spring 2022." ECF No. 103-31 (DX 91), Tsai Rpt. ¶¶13, 45.

18

**Plaintiff's Response**: Partially disputed. Undisputed insofar as this is an accurate quote of a portion of a sentence in Dr. Tsai's report. Disputed insofar as this statement mischaracterizes Dr. Tsai's opinion. In ¶13 of his report, Dr. Tsai stated that his opinion was limited to "Co-Diagnostics' statements on May 12, 2022 about its decision not to provide guidance for its Q2 2022 results and the reasons why . . . ." *Id*. In ¶45, Dr. Tsai stated that his opinion was limited to Co-Diagnostics' statements "regarding the uncertainty in forecasting demand for COVID tests". *Id*.

## II. THE MARKET RECEIVED THE CHALLENGED STATEMENTS AS BAD NEWS INDICATING LIKELY REDUCED 2Q22 EARNINGS

76. Analysts covering Co-Diagnostics understood the Company's decision not to provide guidance, and the uncertainty Defendants described on the May 12, 2022 earnings call, as bad news for 2Q22 revenue. *See* ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶17-18, 20-23, 29; ECF No. 102-28 (DX 28), Juneja Dep. 42:14-44:14, 43:9-19, 46:6-14, 48:6-16; ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report; ECF No. 103-20 (DX 80), Litchfield May 2022 Report; ECF No. 103-18 (DX 78), Sidoti May 2022 Report; *see also* ECF No. 108, Defs' 56.1 ¶¶255-265.

**Plaintiff's Response**: Disputed. *See* Pl. Resp. ¶255-265. Disputed to the extent Defendants suggest that the challenged statements constituted a full disclosure of the truth that Plaintiff alleges Defendants failed to disclose. "Dr. Juneja does not present any economic evidence inconsistent with Plaintiff's claim that Defendants were aware of, and failed to disclose, a precipitous decline in demand for the Logix Smart Test at the time of the alleged misstatements." DX 95, Coffman Reply Rep. ¶7. "Furthermore, Dr. Juneja does not dispute that Co-Diagnostics disclosed information that revealed the relevant truth when they issued their Q2 2022 earnings after market close on August 11, 2022." *Id*. "Nor does she analyze whether the market price fell

19

by a statistically significant amount on August 12, 2022 or whether it is causally connected to the alleged misrepresentations and/or omissions." *Id*.

Additionally, as explained by Mr. Coffman:

> At most, Dr. Juneja asserts that Defendants dampened market expectations to some degree by no longer providing revenue guidance as a result of uncertainty in demand for the Company's COVID-19 test, and that this was perceived negatively by the market and analysts at the time. Dr. Juneja states that "ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance." That is true, and such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period. But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth.

*Id*. ¶8.

Disputed as to Defendants' characterization of Dr. Juneja's cited testimony, which is also inconsistent with the record. In the cited testimony, Dr. Juneja testified that "[w]hat we see is that the analysts are hearing a suspension of guidance and then commenting as they do as is shown in paragraph 20 of my report and change their earnings estimates for the year in Table 1 of my report and then discussed in paragraph 22, and that indicates that there is a general decline in expectations by informed market participants for Co-Diagnostics' sales and profitability for 2022." DX 28 at 47:23-48:16. In paragraph 20 of her report, Dr. Juneja wrote: "Though the Defendants did not state that they anticipated lower COVID-19 related revenues in 2Q 2022, the commentary by analysts shows that they understood that to be the likely outcome. Below is a list of quotes by the Co-Diagnostics analysts commenting on the ending of guidance and their outlook regarding the demand for COVID-19 testing products and its impact on CODX sales in 2022 and beyond[.]" DX 92 ¶20. The cited quotes do not support her statement. She cites an H.C. Wainwright quote that "Of note, management did not provide quarterly sales guidance at this time due to uncertainties related to COVID-19 testing demand. We continue to project a gradually decreasing demand for

COVID-19 testing in the coming quarters." *Id*. But she ignores that H.C. Wainwright is simply "***continuing*** to project gradually decreasing demand for COVID-19 testing in the coming quarters"—reiterating what they were *already* doing. So too with Sidoti: "The company did not provide guidance for 2Q:22 due to uncertainties around order timing. ***We continue to expect some demand*** for Covid-19 test will continue throughout 2022 due to continued outbreaks of new variants." *Id.* (emphasis added).

Moreover, as shown in Table 1 of her report (¶21), analysts generally *did not* understand Defendants' statements as "bad news for 2Q22 revenue." Juneja Rep. ¶20 (arguing that "the commentary by analysts shows that they understood [lower COVID-19 related revenues in 2Q 2022] to be the likely outcome.") Indeed, her own Table 1 shows that ***H.C. Wainwright's and Sidoti's Q2 2022 revenue estimates remained unchanged following the May 12, 2022 earnings call***. *Id*.

Following the August 11, 2022 disclosure, analysts stated that while they had expected testing to eventually slow, the drop in revenue was far faster and more substantial than they had anticipated. DX 94, Coffman Rep. ¶70.

**77.**    Each analyst report commented on the suspension of guidance, with comments being overwhelmingly negative—no analyst considered it to indicate anything positive. *See* ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report, at 1 ("Of note, management did not provide quarterly sales guidance . . . . We continue to project a gradually decreasing demand for COVID-19 testing in the coming quarters."); ECF No. 103-20 (DX 80), Litchfield May 2022 Report, at 1,4; ECF No. 103-18 (DX 78), Sidoti May 2022 Report, at 1-2; *see also* ECF No. 103-32 ((DX 92), Juneja Rpt. ¶20; ECF No. 108, Defs' 56.1 ¶¶256-257.

21

**Plaintiff's Response**: Disputed.  *See* Response to No. 76.  Further disputed insofar as "each analyst report" is vague and undefined.  Further disputed insofar as "each analyst report" refers to any reports other than the three cited reports.  Disputed as to the phrase "overwhelmingly negative" as vague and undefined.  Disputed to the extent Defendants suggest these reports support Statement No. 77.  As explained in Response No. 76, the analyst reports largely reflect that, following the May 12, 2022 earnings call, analysts continued to project gradually decreasing demand. *See* Response to No. 76. Moreover, nothing in the analyst commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth. *Id*.

78.    Despite Co-Diagnostics' positive 1Q22 earnings also announced on May 12, 2022, no analyst revised their forecasts upward, and two analysts decreased certain estimates for 2Q, 3Q, and 4Q22. *See* ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶20-23; ECF No. 103-20 (DX 80), Litchfield May 2022 Report (lowering revenue and EPS estimates; "Our only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside."); ECF No. 103-19 (DX 79), H.C. Wainwright May 2022 Report (lowering EPS estimate); ECF No. 103-18 (DX 78), Sidoti May 2022 Report ("[N]et income should slow the remainder of 2022, as Covid-19 testing levels off."); *see also* ECF No. 102-28 (DX 28), Juneja Dep. 42:16-44:14; 46:6-14; ECF No. 108, Defs' 56.1 ¶¶257-262.

**Plaintiff's Response**: Disputed. *See* Pl. Resp. ¶¶257-262.  Undisputed that following the May 12, 2022 earnings announcement and earnings call none of the referenced analysts revised his forecasts upwards for 2Q, 3Q, and 4Q22. Plaintiff notes for context that in every quarter of 2021, and the first quarter of 2022, Co-Diagnostics had earnings above analyst estimates. *See* DX 93, Juneja Reply Report ¶39.

Disputed to the extent "certain estimates" is vague and undefined.  As shown in Table 1 of Dr. Juneja's report (¶21), H.C. Wainwright's and Sidoti's Q2 2022 revenue estimates remained unchanged following the May 12, 2022 earnings call. *Id*.

With respect to Defendants' citation to the Litchfield May 2022 Report, the referenced revision was not due to any understanding that sales had already plummeted, but rather the same reasons given by Defendants. *See* Pl. Resp. ¶¶256, 257 (Litchfield noting the "variability [] hamper[ing] precise forecasts" and stating "[o]ur only option under the circumstances is to set our estimates at the lower end of expectations and hope for some upside").

Defendants' quotation from the Sidoti May 2022 Report that "net income should slow the remainder of 2022, as Covid-19 testing levels off" does not support Statement No. 78, as explained in Response to Statement No. 76, Sidoti was *already* projecting Covid-19 testing to "level off". Indeed, Sidoti's net income projections in the May 2022 Report (following the challenged statements) ***are exactly the same*** as his net income projections that preceded the challenged statements. *Compare* ECF No. 103-27 (DX 87) at 3; *with* ECF No. 103-18 (DX 78) at 4.

**79.**    Defendants' economic expert, Dr. Juneja, opined—and Plaintiff's economic expert, Mr. Coffman, did not dispute—that these analyst reports and other market evidence demonstrate that the market perceived the challenged statements as "negative news and interpreted [them] as indicating a likely decline in future revenues and earnings." ECF No. 103-32 (DX 92), Juneja Rpt. ¶¶17, 29; *see also id.* ¶¶18-23; ECF No. 103-35 (DX 95), Coffman Reply ¶8; ECF No. 102-28 (DX 28), Juneja Dep. 43:9-19; ECF No. 108, Defs' 56.1 ¶¶263-264.

**Plaintiff's Response**: Disputed as a mischaracterization of the record. *See* Pl. Resp. ¶¶263-264.  With respect to commentary and news coverage regarding the market's perception of "the

challenged statements", this statement is vague and non-specific. Without citation to specific

challenged statements or reactions to specific statements, Plaintiff has no basis to agree or disagree.

Additionally, as explained by Mr. Coffman:

> At most, Dr. Juneja asserts that Defendants dampened market expectations to some degree by no longer providing revenue guidance as a result of uncertainty in demand for the Company's COVID-19 test, and that this was perceived negatively by the market and analysts at the time. Dr. Juneja states that "ceasing to provide quarterly guidance was interpreted by the market as a generic disclosure of bad news indicating a likely decrease in future earnings performance." That is true, and such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period. But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth.

DX 95, Coffman Reply Rep. at ¶8.

Moreover, as explained in Response Nos. 76 and 77, the analyst reports largely reflect that,

following the May 12, 2022 earnings call, analysts continued to project gradually decreasing

demand. *See* Responses to Nos. 76-77. Moreover, nothing in the analyst commentary suggests that

was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price

already reflected the full truth. *Id*.

Additionally, Juneja's cited testimony about analysts "adjust[ing] down not just their

second quarter but their third and fourth quarter 2022 numbers" is vague, and inconsistent with the

evidence. As context, this testimony was in response to the following question: "so in paragraph

20 of your report you state, 'Though the defendants did not state that they anticipated lower

COVID-19 related revenues in the second quarter of 2022, the commentary by analysts shows that

they understood that to be the likely outcome.' Don't you think that if analysts understood that to

be the likely outcome, they would have adjusted their second quarter 2022 revenue estimates

downward?" DX 28, Juneja Dep. 42:21-43:7. Indeed, as shown in her own Table 1 (DX 92, ¶21),

neither Sidoti nor H.C. Wainwright adjusted their Q2 2022 sales estimates downward.

Moreover, it is not accurate that "Mr. Coffman did not dispute . . . that the market perceived the challenged statements as 'negative news and interpreted [them] as indicating a likely decline in future revenues and earnings.'"  Mr. Coffman specifically did not dispute that "***ceasing to provide quarterly guidance*** was interpreted by the market as a ***generic disclosure of bad news indicating a likely decrease in future earnings performance***." (emphasis added). DX 95, Reply Report of Chad Coffman, dated January 10, 2025 ("Coffman Reply") ¶8. Moreover, "such information was fully embedded in the market price of Co-Diagnostics from the beginning of the Class Period." *Id*. "But nothing in Dr. Juneja's commentary suggests that was the full truth that the Plaintiff allege Defendants failed to disclose, or that the market price already reflected the full truth." *Id*.

### III.    MR. DWIGHT EGAN'S AND MR. BROWN'S STOCK HOLDINGS INCREASED DURING THE CLASS PERIOD

**80.**    During the class period, Mr. Dwight Egan's and Mr. Brown's Co-Diagnostics stock holdings increased, and their only sales were to cover tax withholding obligations in connection with the vesting of certain restricted stock units. *See* ECF No. 102-16 (DX 16), Compilation of SEC Forms 4 for D. Egan, dated November 11, 2021 through November 11, 2022; ECF No. 102-15 (DX 15), Compilation of SEC Forms 4 for Brown, dated November 11, 2021 through November 11, 2022.

**Plaintiff's Response**: Undisputed with the clarification that Dwight Egan's and Brown's transactions both represented the vesting of restricted stock units ("RSUs") which vest every 6 months (at a price of $0.00 to the awardee). *See* DXs 15, 16. For additional context, the RSUs that vested during the Class Period for Egan and Brown, represented approximately 83% and 86% respectively of their total holdings. The fact that the RSUs that vested during the Class Period for Egan and Brown represented approximately 83% and 86%, respectively, of their total holdings

suggests that they pursued a strategy of cashing out their Co-Dx stock as quickly as possible and minimizing their exposure to Co-Dx stock.

Disputed insofar as Defendants' suggest that they used any of their own money to increase their stock holdings. In fact, these transactions show that Egan and Brown benefitted from the inflated stock price at the time of vesting, as they each simultaneously sold shares (at an inflated price of $4.99) to cover tax withholding obligations in connection with the vesting of RSUs. *Id*.

In fact, as Dwight Egan testified, in 2022, stock-based compensation was a significant portion of the Company's spend. DX 23 at 221:6-10.

Dated: May 30, 2025                          **KAPLAN FOX & KILSHEIMER LLP**

                                             */s/ Jason A. Uris*
                                             Frederic S. Fox
                                             Donald R. Hall
                                             Jason A. Uris
                                             800 Third Avenue, 38th Floor
                                             New York, NY 10022
                                             Telephone: (212) 687-1980
                                             Facsimile: (212) 687-7714
                                             *ffox@kaplanfox.com*
                                             *dhall@kaplanfox.com*
                                             *juris@kaplanfox.com*

                                             *Lead Counsel for Lead Plaintiff and the Class*